

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 17, 2024

**BY EMAIL**
The Honorable Robyn F. Tarnofsky
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *United States v. Sean Combs, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love,"* 24 Cr. 542 (ALC)

Dear Judge Tarnofsky:

      The defendant Sean Combs, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," was taken into custody this morning after a grand jury sitting in this District returned a three-count indictment charging him with crimes related to his decades-long pattern of physical and sexual violence against multiple victims, and his use of force, threats, and coercion to enact his will, protect his reputation, and fulfill his sexual desires.

      The Government respectfully submits this letter in anticipation of the defendant's appearance before this Court later today and in support of the Government's request for the defendant's detention pending trial. As set forth below, there is no condition, or combination of conditions, that will reasonably assure the appearance of the defendant as required and the safety of others and the community, not to mention the integrity of the proceedings. As reflected by the gravity of the charges in the Indictment, the defendant is dangerous and poses an ongoing threat to the safety of the community. If released, he remains a serious risk of flight, despite the conditions offered by his counsel. Most glaringly, the defendant also poses a significant risk of obstructing justice. Indeed, and as set forth below, during the course of the charged conduct, the defendant has attempted to bribe security staff and threatened and interfered with witnesses to his criminal conduct. He has already tried to obstruct the Government's investigation of this case, repeatedly contacting victims and witnesses and feeding them false narratives of events, as described in detail below. There are simply no conditions that would ensure that the defendant's efforts to obstruct and tamper with witnesses will stop. The defendant therefore cannot overcome the statutory presumption in favor of detention, and the Court should order him detained. *See* 18 U.S.C. § 3142(e)(1).

## Background

      On September 17, 2024, an indictment returned by a federal grand jury sitting in the Southern District of New York (the "Indictment") was unsealed, charging the defendant with racketeering conspiracy from in or about 2008 through on or about the date of the Indictment, in

violation of 18 U.S.C. § 1962(d) (Count One); sex trafficking from in or about 2009 through in or about 2018, in violation of 18 U.S.C. §§ 1591 and 2 (Count Two); and interstate transportation to engage in prostitution from in or about 2009 through in or about 2024, in violation of 18 U.S.C. §§ 2421(a) and 2 (Count Three).

### A. Combs' Use of Violence, Threats, and Coercion

Since at least 2008, the defendant and other members and associates of the racketeering enterprise alleged in the Indictment (the "Enterprise"), which includes the defendant's multi-faceted business empire (the "Combs Business"), wielded the power and prestige of the defendant's reputation as a musician, entrepreneur, and figure in the entertainment industry to commit federal crimes, including racketeering, sex trafficking, and other offenses. As charged in the Indictment, many of those crimes involved the sexual abuse and exploitation of women, and other crimes of violence.

1. <u>Sex Trafficking and Abuse</u>

Using the power and prestige of the Enterprise, the defendant lured female victims into the defendant's orbit, often under the pretense of a romantic relationship. The defendant then used force, threats of force, and coercion to cause those female victims to engage in sexual activity, which included frequent sex acts with male commercial sex workers that the defendant referred to as "Freak Offs." Freak Offs were elaborate sex performances that the defendant arranged, directed, masturbated during, and often electronically recorded. Freak Offs occurred regularly from at least in or around 2009 through this year, sometimes lasted multiple days, and frequently involved multiple sex workers. The defendant arranged Freak Offs with the assistance of members and associates of the Enterprise, including employees of his business, and the hotel rooms where they were staged often sustained significant damages.[1]

The defendant ensured the victims would participate in Freak Offs through coercion and violence. For instance, the defendant provided controlled substances, including ketamine, ecstasy, and gamma hydroxybutyrate ("GHB"), to female victims so that they could and would continue to engage in Freak Offs, despite fatigue, physical and emotional exhaustion, and pain. Additionally, both during Freak Offs and separate from Freak Offs, the defendant subjected female victims to physical, emotional, and verbal abuse, in part to cause them to engage in Freak Offs. The defendant hit, kicked, threw objects at, and dragged female victims, sometimes by their hair. At least a dozen witnesses will confirm that they personally observed the defendant's violence towards women and/or the injuries sustained by women at the defendant's hand. One incident of physical abuse occurred when a female victim was attempting to leave the hotel following a March 2016 Freak Off. This abuse was captured on video surveillance and publicly reported in May 2024.[2] The defendant's assaults often resulted in serious injuries to the victims that took days or weeks to heal.

---

[1] For example, in approximately 2012 in Manhattan, the defendant paid over $46,000 to cover damages to a penthouse hotel room following a Freak Off.

[2] An excerpt of this video footage is attached hereto as Exhibit A.

The defendant also coerced victims into participating in Freak Offs by controlling their careers, finances, livelihood, and/or housing, among other aspects of their lives, or by threatening to disseminate recordings of Freak Offs. The defendant used his considerable wealth and influence to make victims rely on him financially, for example, by paying for their rent or their cars or by offering them career opportunities. Once he provided his support, the defendant repeatedly threatened to take it away to ensure the victims' compliance with his demands, including their participation in Freak Offs. Indeed, victims believed that they could not refuse the defendant's demands that they engage in Freak Offs without risking their financial security or career prospects or without repercussions in the form of physical or emotional abuse.

2. Other Violence

In addition to the defendant's physical, sexual, and emotional abuse of his romantic partners, the defendant repeatedly engaged in acts of violence directed towards his employees and others. As charged in the Indictment, the defendant, often assisted by members and associates of the Enterprise, engaged in kidnapping, arson, and physical violence, such as throwing objects at people, throwing people to the ground, and hitting, dragging, choking, and shoving others. Numerous witnesses, including the defendant's employees and others, observed or experienced violence from the defendant firsthand and sustained lasting trauma as a result.

For example, in the early morning hours of December 22, 2011, the defendant and a co-conspirator kidnapped an individual at gunpoint to facilitate breaking into and entering the residence of another ("Individual-1"). Multiple witnesses would testify at trial to the events surrounding the kidnapping and break-in, the latter of which is corroborated by police reports and other records.

Approximately two weeks later, the defendant's co-conspirators set fire to Individual-1's vehicle by slicing open the car's convertible top and dropping a Molotov cocktail inside the interior. Police and fire department reports extensively document the arson and conclude that the fire was intentionally set. Multiple witnesses would also testify to the defendant bragging about his role in destroying Individual-1's car.

More broadly, since at least 2008, allegations of the defendant's physical abuse of women and others have been publicly reported in the media, including in Hollywood blogs and on podcasts. Law enforcement reports corroborate that police responded to several instances of the defendant's violence, including assaults against victims and other individuals. More recently, there has been an outpouring of other public allegations against the defendant, including claims of threats and physical and sexual violence, dating as far back as the 1990s.[3] In short, the defendant's

---

[3] *See Joi Dickerson-Neal v. Combs*, No. 952341/2023 (N.Y. Sup. Ct.) (complaint filed on Nov. 23, 2023); *Liza Gardner v. Combs*, No. 24 Civ. 7729 (D.N.J.) (LMG-JRA) (complaint filed on Nov. 27, 2023, and removed to New Jersey federal court on July 12, 2024); *Doe v. Combs*, No. 23 Civ. 10628 (JGLC) (S.D.N.Y) (complaint filed on Dec. 6, 2023); *Crystal McKinney v. Combs*, No. 24 Civ. 3931 (NRB) (S.D.N.Y.) (complaint filed on May 21, 2024); and *Dawn Richard v. Combs*, No. 24 Civ. 6848 (KPF) (S.D.N.Y.) (complaint filed on Sept. 10, 2024).

violent tendencies are widely known. However, at no point during the past few decades has the threat of public exposure or law enforcement intervention deterred the defendant from continuing his abuse.

3. <u>Firearms</u>

The defendant and members of the Enterprise, including the defendant's security personnel, at times carried firearms, and the defendant himself carried and brandished firearms to intimidate and threaten others. Indeed, some victims were aware of the defendant's access to firearms: on one occasion, the defendant forced a female victim to carry a firearm on his behalf and on another occasion, he pointed a firearm at a female victim.

The defendant continues to have access to guns, including illegal firearms. In March 2024, during searches of the defendant's residences in Miami, Florida and Los Angeles, California, law enforcement seized firearms and ammunition, including three AR-15s, each with defaced serial numbers, as well as a large capacity drum magazine. As pictured below in a close-up image, the serial number of one of the AR-15s is visibly bored through and obscured:



Two of the three defaced AR-15s were found in the defendant's Miami bedroom closet, stored broken down in parts, along with magazines that were loaded with ammunition, as depicted below. One of the AR-15s had a 10-round magazine loaded with 10 rounds of large caliber .223 ammunition, while the second AR-15 had a 30-round magazine loaded with 19 rounds of .223 ammunition.

 



A large capacity drum magazine, loaded with 59 rounds of .223 ammunition, was seized from the defendant's Los Angeles residence, as depicted below:



In addition, six legally purchased guns with serial numbers, some of which were stored in gun safes, were recovered from the defendant's residences. Although these particular guns—both the legal and illegal firearms—were seized, their presence in the defendant's homes demonstrates that the defendant has access to, and surrounds himself with, both guns and ammunition. Likewise, even if the defendant were personally restrained by the Court from obtaining new firearms himself, he could retain access to them through others.[4]

In sum, the defendant's regular use of violence and threats of violence, as well as the coercion described above, against the victims and others, fostered a culture of fear in which these individuals believed they were unable to reject the defendant's demands without subjecting themselves to physical violence or other abuse.

---

[4] Certain of the firearms seized during the March 2024 searches were licensed to a current member of Combs' security staff. In addition to that individual, during the course of the charged conspiracy, Combs has employed other security staff members with significant criminal history, including violent crimes and firearms offenses.

### B. Combs Bribed Witnesses and Obstructed Justice

Throughout the time period charged in the Indictment, when the defendant faced the possibility that his violent and criminal conduct could become public, the defendant and other members and associates of the Enterprise pressured witnesses and victims not to report what they saw or heard to law enforcement, or to otherwise conceal the criminal conduct.

For example, and as noted above, in March 2016, the defendant was captured on video surveillance striking, kicking, and dragging a woman in a public area of a hotel in an apparent attempt to prevent her from leaving a Freak Off. When a member of hotel security staff intervened, the defendant attempted to offer the hotel security officer a stack of cash to ensure his silence. After the security guard refused the defendant's bribe, and after coordination between the defendant and his employees, the defendant's staff contacted other members of hotel security. At the same time, staff members were in close communication with the victim of the assault as well— all in an effort to cover up the defendant's assault and to prevent the incident from being publicly disclosed. Within days of the incident, the surveillance video disappeared from the hotel's server.

Similarly, throughout the time period charged in the Indictment, members and associates of the Enterprise have reached out to multiple victims on behalf of the defendant to convince them not to report the defendant's abuse. Most recently, in late 2023, immediately following public allegations of certain of the defendant's crimes,[5] including his physical and sexual abuse of women, the defendant and other members of the Enterprise made repeated phone calls to victims and witnesses during which they provided victims and witnesses with false narratives of events, in an apparent effort to conceal the defendant's crimes. On at least two occasions, the defendant recorded those calls on a co-conspirator's cellphone, thereby attempting to obscure his involvement in the obstruction.

### C. The Government's Investigation Is Ongoing

While the Indictment against the defendant was unsealed today, the investigation into his and other co-conspirators' conduct is active and ongoing. As a result of that ongoing investigation, as well as the defendant's charged conduct outlined above—including obstruction of justice and witness tampering—the Government is limited in its ability to fully set forth all known details of the defendant's criminal conduct, including details of certain witness testimony. To the extent the Court has additional questions about the charged offense conduct or any other information set forth herein, the Government is prepared to proffer additional information on an *ex parte* basis.

### Argument

### I.   Applicable Law

Under the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a

---

[5] *See Ventura v. Combs*, No. 23 Civ. 10098 (DLC) (S.D.N.Y.), Dkt. 1 (complaint filed November 16, 2023).

danger to the community or a risk of flight. 18 U.S.C. § 3142(e). A finding of risk of flight must be supported by a preponderance of the evidence. *See, e.g.*, *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). A finding of dangerousness must be supported by clear and convincing evidence. *See, e.g.*, *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995); *Patriarca*, 948 F.2d at 792; *Chimurenga*, 760 F.2d at 405.

Obstruction of justice is another ground for pretrial detention by the courts. *See United States v. LaFontaine*, 210 F.3d 125, 134 (2d Cir. 2000). Courts in the Second Circuit have held that pretrial detention for obstruction of justice is appropriate as long as the Government can establish by "clear and convincing evidence" that "there exists a serious risk" the defendant would "threaten, injure, or intimidate, a prospective witness or juror." *United States v. Leon*, 766 F.2d 77, 82 (2d Cir. 1985); *see also United States v. Zherka*, 592 F. App'x 35, 35 (2d Cir. 2015) (summary order) ("A serious risk of obstruction of justice may qualify as . . . a danger to the community.").

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, including whether the offense is a violation of section 1591; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant, including the person's "character, . . . past conduct, . . . [and] financial resources"; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." *See* 18 U.S.C. § 3142(g). The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history). A finding of dangerousness does not require that the defendant have criminal history, particularly if a defendant has a history of domestic violence. *See United States v. Mercedes*, 254 F.3d 433, 437-38 (2d Cir. 2001) (holding that "prior acts of domestic violence are relevant to a determination of dangerousness" because a "willingness to strike loved ones offers probative evidence of tendency to violence and dangerousness towards others").

Evidentiary rules do not apply at detention hearings, and the Government is entitled to present evidence by way of proffer, among other means. *See* 18 U.S.C. § 3142(f)(2); *see also LaFontaine*, 210 F.3d at 130-31 (Government entitled to proceed by proffer in detention hearings).

Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1). Additionally, where, as here, a defendant is charged with sex trafficking in violation of 18 U.S.C. § 1951—in other words, an offense under chapter 77 of Title 18—it shall be presumed, subject to rebuttal, that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(D).

## II. Discussion

For the reasons set forth below, the defendant poses a significant danger to the community—both in terms of physical violence and obstructive conduct—as well as a risk of flight. This is especially true given the nature of the criminal conduct and the strong weight of the evidence. The defendant therefore cannot overcome the statutory presumption in favor of detention in this case.

### A. Dangerousness

The defendant is charged with serious and violent crimes. As charged in the Indictment, the defendant has physically and sexually abused women and others for the better part of two decades. The sex trafficking charge based on the defendant's abusive conduct—Count Two—carries with it a presumption of detention. *See* 18 U.S.C. § 3142(e)(3)(D). And detention is particularly supported by the facts of this case. Since at least 2008, the defendant has engaged in serious acts of violence, including forcing and coercing women to participate in sexual activity, including sex acts with commercial sex workers, by using physical force, financial pressure, emotional abuse, and narcotics. These acts, described in detail above, were referred to as Freak Offs, among other names, and involved orchestrated sexual performances facilitated through drug use that sometimes lasted days at a time.

That is not all. As set forth in the Indictment, the charges against the defendant capture significant additional violence, both spontaneous and premeditated. On numerous occasions, the defendant assaulted women, employees, and others when he became enraged—by throwing objects at them, choking them, pushing them, kicking them, and slamming them against walls and on to the ground. The defendant and other members and associates of the Enterprise were also capable of premeditated violence, resorting to kidnapping and arson when the defendant's power and control were threatened. The defendant's violence—whether spontaneous or premeditated—had the effect of exerting his continued control over these individuals. The defendant also carried firearms to intimidate and threaten others. Multiple defaced semi-automatic rifles were recovered when law enforcement searched the defendant's residences in March 2024, including two defaced rifles that had been disassembled and hidden in the defendant's bedroom closet. In short, the conduct with which the defendant is charged shows a pattern of violent and abusive conduct, underscoring his dangerousness. *See* 18 U.S.C. § 3142(g)(1).

This disposition to violence cannot be reasonably prevented through bail conditions. The violence alleged in the Indictment was not isolated or aberrational. It was systematic and pervasive: the defendant abused women with whom he was in personal relationships, employees, witnesses to his crimes, and others. As described above, the defendant has sexually, physically, and emotionally abused long-term romantic partners for decades, including by forcing them to engage in Freak Offs. The defendant has abused countless others in his orbit—and in particular, women—without regard for consequences. Indeed, the defendant's abuse of women long predates the conduct charged in the Indictment: to date, at least five women have publicly accused the defendant of violent sexual assaults dating back to the 1990s.

Moreover, the defendant's violence and abuse often occurred behind closed doors, including in his homes, hotels where he was staying, and other private settings. He has assaulted victims, employees, and others—and even brandished a firearm at a victim—in his homes. The alleged sex trafficking similarly took place in private settings not easily monitored. Indeed, in addition to engaging in Freak Offs at hotels, the defendant has, at times, organized Freak Offs at his home or at the homes of his female victims. This is precisely the kind of violence that even strict conditions such as home incarceration cannot prevent.

In sum, the defendant's long history of violent conduct makes clear that even the most stringent bail conditions will not suffice to ensure the safety of the community. The defendant is a serial abuser who repeatedly assaults and coerces women to achieve his own sexual gratification, and uses his vast wealth and position of power in the entertainment industry to conceal his illegal conduct and prevent victims of, and witnesses to, his abuse from coming forward. *See* 18 U.S.C. § 3142(g)(3). The defendant's longstanding pattern of abuse is probative evidence of the likelihood that he will continue to abuse. Indeed, nothing—not even the threat of public exposure or law enforcement intervention—has stopped his abuse. The defendant has continued to physically assault and threaten those around him, including his romantic partners, his employees, and others who happened to be present when he succumbed to fits of rage. No bail conditions can address the defendant's tendency to become violent when angry or emotional: anyone in his presence is at risk of abuse or assault. And the defendant's physical assaults are serious, resulting at times in serious injury requiring medical intervention and long periods of recovery. Therefore, the "nature and seriousness of the danger to *any* person" is both real and specific. *See* 18 U.S.C. § 3142(g)(4) (emphasis added); *see also Mercedes*, 254 F.3d at 437 (reversing district court's release of defendant who had no criminal history but had a history of domestic violence).

### B. Obstruction

As part of the charged racketeering conspiracy, the defendant engaged in obstruction of justice, including bribery and witness tampering. *See* 18 U.S.C. § 3142(g)(1). Given the defendant's history of engaging in obstructive conduct to conceal his criminal activity, both personally and through intermediaries, there is every reason to believe that the defendant will continue to engage in such obstruction if released. *See* 18 U.S.C. § 3142(g)(3); *see also United States v. Kelly*, No. 19 Cr. 286 (AMD) (E.D.N.Y.) (Aug. 2, 2019 Hear'g Tr.) (transcript of bail hearing in which defendant was denied bail due to risk of flight and obstructive conduct).

As detailed in the Indictment, following a Freak Off in March 2016, the defendant attempted to bribe hotel security staff to prevent hotel security from publicly disclosing and/or reporting to law enforcement his vicious attack on a woman attempting to leave a Freak Off. The defendant's efforts to disclaim responsibility for that attack continued until earlier this year. A civil lawsuit was filed on or about November 16, 2023 alleging years of sexual, emotional, verbal, and physical abuse by the defendant, including allegations describing the March 2016 incident. Following the filing of the lawsuit, the defendant stated, in no uncertain terms, "Let me be

absolutely clear: I did not do any of the awful things being alleged."[6]  Through counsel, the defendant "vehemently denie[d] these offensive and outrageous allegations," describing the complaint as "riddled with baseless and outrageous lies."[7]  It was not until the video surveillance footage of the defendant's attack was leaked to the media months later that the defendant was forced to admit that he had, in fact, perpetrated the "disgusting" attack.[8]  Clearly, the defendant is willing to deflect, minimize, and lie—and induce others to do so on his behalf—to avoid taking responsibility for his own actions.

More recently, the defendant has, directly and through intermediaries, engaged in obstructive conduct related to the matters under investigation in this case.  Specifically, following the November 2023 lawsuit, the defendant and intermediaries acting on his behalf reached out to potential victims and witnesses to the alleged conduct—including individuals he did not speak to regularly and had not spoken to in years, to attempt to feed those victims and witnesses false narratives about the defendant's criminal conduct.  With respect to at least two of these individuals, the defendant's co-conspirators assisted in efforts to protect the defendant.  For example, on or about November 19, 2023—just three days after the filing of the lawsuit described above—the defendant made multiple calls to another victim of his sexual abuse and recorded certain of those calls using the cellphone of a co-conspirator.  During the calls, the defendant repeatedly asked for the victim's support and "friendship," and attempted to convince the victim that she had willingly engaged in acts constituting sexual abuse.  The defendant also assured the victim that if she "needed" the defendant too, she "ain't got worry about nothing else"—a thinly veiled attempt to coerce the victim into adopting and supporting the defendant's false version of events to protect the defendant.  Even more concerning, since learning about the criminal investigation, including following the execution of the search warrants at his residences, Combs contacted other witnesses on multiple occasions, including other witnesses who had received grand jury subpoenas.

The defendant's recent conduct is similar to that in *United States v. LaFontaine*, in which the Second Circuit affirmed the district court's revocation of pretrial release after the defendant in that case engaged in witness tampering.  210 F.3d at 125.  Specifically, the defendant, who was charged with multiple counts of fraud in connection with providing false claims to medical insurers, called a witness to "remind" the witness that a particular patient had received surgeries that the patient had not, in fact, received.  *Id.* at 128.  The Second Circuit affirmed the district court's finding that there was no condition or combination of conditions that would assure the safety of the community given the defendant's witness tampering, despite the fact that the defendant's tampering did not include actual violence or threats of violence.  *Id.* at 134.  In

---

[6] *See, e.g.*, Billboard, "Diddy Denies Sexual Assault Claims: 'I Did Not Do Any of the Awful Things Being Alleged,'" *available at* https://ca.billboard.com/music/music-news/diddy-denies-sexual-assault-claims-1235543220/.

[7] *See, e.g.*, CNN, "A closer look at the sexual misconduct lawsuits against Sean 'Diddy' Combs" *available at* https://www.cnn.com/2024/03/31/entertainment/sean-diddy-combs-lawsuits/index.html.

[8] *See* https://www.youtube.com/watch?v=0ZC2hsZHE0M (AP link showing Instagram video from the defendant's account in which the defendant admits to the attack depicted on surveillance video, which was subsequently deleted from the defendant's Instagram account).

rejecting the defendant's arguments that the district court's finding of dangerousness was not justifiable, the Second Circuit noted that the defendant had "fed" the witness false testimony with the expectation that the witness would adopt it, and that even stringent electronic monitoring conditions could be circumvented. *Id.* at 134-35.

Here, the defendant's conduct goes beyond what the *LaFontaine* court found sufficient to revoke bail. Even before being charged with a crime, the defendant has taken numerous proactive steps to tamper with potential witnesses' testimony against him. The Government is aware, through electronic evidence, toll records, conversations with witnesses, and other evidence, that the defendant has contacted witnesses, including subpoenaed witnesses, prior to the dates on which the witnesses were required to appear before the grand jury. In addition, the defendant has recorded calls with at least one victim and provided, either directly or through intermediaries, false narratives of the events that transpired so that those witnesses would adopt that false testimony. Moreover, the defendant's obstructive conduct is made even more alarming by the manner in which he carried it out to evade detection: in some instances, by having intermediaries make calls on his behalf, and recording certain calls on another individual's device. These deliberate actions show that the defendant was aware that what he was doing was obstructive and that his aim was to evade detection. Even the most stringent conditions—including the monitoring of a court authorized electronic device—would fail to ensure that the defendant would not engage in this kind of obstruction from his home, including by acting through intermediaries and using others' devices.

Given the defendant's history of obstruction, as well as the violent nature of the charges against the defendant, the defendant cannot overcome the presumption that no condition or combination of conditions can assure the safety of the community.

### C. Risk of Flight

Nor can the defendant overcome the presumption that he is a risk of flight. The crimes that the defendant is charged with carry significant penalties, including a mandatory minimum sentence of 15 years' imprisonment and a statutory maximum sentence of life imprisonment. *See* 18 U.S.C. § 3142(g)(1). The possibility of a substantial sentence is a significant factor in assessing the risk of flight. *See United States v. Green*, No. 20 Cr. 357 (VM), 2020 WL 5814191, at *2 (S.D.N.Y. Sept. 30, 2020) (noting that substantial sentence defendant may face weighed in favor of finding that defendant was a flight risk); *see also United States v. Moscaritolo*, No. 10 Cr. 4 (JL), 2010 WL 309679, at *2 (D.N.H. Jan 26, 2010) ("[T]he steeper the potential sentence, the more probable the flight risk is, especially considering the strong case of the government . . .") (citation omitted). Here, the defendant is facing *at least* 15 years' imprisonment if he is convicted. This fact alone would provide a compelling incentive for anyone to flee from prosecution, but the incentive to flee is especially strong for this defendant, who, at age 54, faces the very real prospect of spending a substantial portion of the rest of his life in prison.

As detailed below, the evidence in this case is incredibly powerful, as the facts set forth in the Indictment and herein make plain. *See* 18 U.S.C. § 3142(g)(2). Dozens of victims and witnesses have provided detailed, credible, and corroborated information against the defendant. These individuals include many who personally experienced and witnessed violence and other

crimes at the hand of the defendant. Moreover, their accounts are well corroborated by significant extrinsic evidence, including financial and billing records, travel records, electronic data, and communications, including extensive communications by and with the defendant himself. For example, victim testimony regarding Freak Offs is at times corroborated by other witness testimony, communications with the defendant and commercial sex workers, travel records, hotel records, videos of the Freak Offs, and records reflecting or indicating payment. Similarly, a victim's physical abuse may be corroborated by, among other things, videos of the abuse, photographs of injuries, reports made to law enforcement, communications with the defendant and others, and testimony from other witnesses who saw or heard about the abuse. The vast and varied sources of evidence, described in detail below, will be compelling evidence of guilt at any trial in this case. Thus, the serious risk of conviction provides further incentive for the defendant to flee prosecution.

Moreover, in this case, risk of flight is augmented by the nature of the evidence against the defendant. The evidence against the defendant, which would be made public at trial, includes substantial evidence that is highly sensitive and has the potential to significantly and negatively impact the defendant's reputation—for example, dozens of video recordings created by the defendant of Freak Offs with victims. For decades, the defendant has spent significant time and resources ensuring that his criminal conduct avoids public scrutiny. Given the potential penalties here, both incarceration and reputational harm, the defendant has every incentive to flee to avoid prosecution and a public trial. *See, e.g.*, *United States v. Madoff*, 316 F. App'x 58, 59 (2d Cir. 2009) ("[I]ncentive to flee . . . naturally bears upon and increases the risk of flight."); *United States v. Sammons*, No. 19 Cr. 107, 2020 WL 613930, at *5 (S.D. Ohio Feb. 10, 2020) ("The shame of the allegations that he is facing is also an immense incentive to flee.").

The defendant's incentive to flee, outlined above, coupled with the defendant's seemingly limitless resources create significant risk of non-appearance. The defendant's net worth is publicly estimated at being close to $1 billion.[9] Indeed, the investigation of this case has revealed that the defendant has access to vast funds and resources—including deep reserves of cash—which would facilitate his evasion of prosecution. At least as of December 2023, the defendant had access to dozens of bank accounts—some personal and many under corporate entities—which contain millions of dollars. Additionally, as of December 2023, the defendant had over $1 million in personal cash on hand. The defendant has traveled internationally several times per year since at least 2006, and since approximately 2019, has owned a personal plane on which he has traveled internationally.[10] The defendant maintains two primary residences in Los Angeles and Miami. In addition to his private plane, the defendant owns multiple vehicles in multiple locations. He has a

---

[9] *See* Fox Business, "Sean 'Diddy' Combs net worth is close to $1B here are some big ticket assets," *available at* https://www.foxbusiness.com/lifestyle/sean-diddy-combs-net-worth-close-1b-here-some-big-ticket-assets.

[10] Through conversations with defense counsel, the Government understands that defense counsel is currently in possession of the defendant's passport, as well as the passports of several of the defendant's family members, and that the defendant is in the process of attempting to sell his plane and Los Angeles residence. As explained above, however, the defendant's vast resources make him a flight risk even without a passport, private plane, or multiple residences.

personal staff, including assistants, security, chefs, trainers, and others, who perform tasks at his command, including transporting him, delivering him currency, securing narcotics for him, and other tasks. And he is extraordinarily well connected both within and outside the entertainment industry. In short, if the defendant wanted to flee, he has the money, manpower, and tools to do so quickly and without detection. The defendant's lack of access to his passport or private jet would not negate the fact that the defendant could easily buy his way out of facing justice.

As discussed below, the defendant's legal team has attempted to mitigate this substantial risk of flight by taking steps such as taking his family's passports, attempting to sell his plane, and reporting his whereabouts to the Government. These steps have been taken with the precise goal of crafting an argument for bail before the Court. While the defendant may have made the calculated decision in consultation with his attorneys not to flee before any charges were filed, that calculus inevitably changes today, when an Indictment charging the defendant with extremely serious offenses carrying enormous potential penalties was unsealed. He is now—for the first time in his life—facing a mandatory minimum term of imprisonment of 15 years and a maximum term of imprisonment of life, in which the Government is prepared to prove the charges against him by, among other things, the testimony of dozens of witnesses and victims to his serial abuse, and evidence from dozens of his own electronic devices and those of his co-conspirators. Given the serious nature of the charges, the strength of the evidence, and the defendant's access to vast amounts of resources, his risk of flight is more pronounced today than it has ever been.

### D.     Weight of the Evidence

In considering the danger and risk of flight presented by the defendant, the Court is also required to consider the weight of the evidence against the defendant. 18 U.S.C. § 3142(g)(2). The defendant faces a strong and powerful case here, only magnifying the danger he could present to others, especially victims and witnesses ready to testify against him, and the risk he flees. The evidence in this case consists of a vast amount of victim and witness testimony, electronic evidence, physical evidence, and subpoena returns and other voluntary productions, among other things.

As to witnesses, to date, the Government has conducted interviews with over 50 victims and witnesses, many of whom saw or experienced the defendant's abuse. Many of these witnesses corroborate one another, and their accounts are similarly consistent with the other types of evidence discussed below. The Government only expects that number to continue to grow, given that the investigation, which is now public, is ongoing.

The electronic evidence is similarly vast. The Government has sought and obtained numerous search warrants for such evidence, in addition to obtaining evidence voluntarily from certain victims and witnesses. Setting aside devices seized in connection with the defendant's arrest, the Government has obtained over 90 cellphones, laptops, and cloud storage accounts, as well as over 30 other electronic and storage devices, such as hard drives, thumb drives, cameras, and a surveillance system. This electronic data comes from the defendant himself, as well as co-conspirators, victims, and witnesses, and chronicles much of the defendant's criminal activity as it occurs.

The evidence also consists of physical evidence, which was seized pursuant to search warrants executed at the defendant's residences in Los Angeles and Miami, as well as on his person and the persons of certain co-conspirators. In addition to the firearms and electronics discussed above, the physical evidence also includes other evidence of Freak Offs, including over 1,000 bottles of baby oil and personal lubricant.

Finally, the evidence includes records obtained pursuant to over 300 grand jury subpoenas and other voluntary productions. These materials come from over 100 entities and individuals, including communications providers; tech companies; social media companies; banks and other financial institutions; airlines, hotels, car services, and other travel-related companies; escort services; and even the defendant's companies and wealth management firm.

Together, this evidence, as well as other evidence gathered, powerfully demonstrates the defendant's guilt, and counsels in favor of detention.

### E. The Defendant's Proposed Bail Package Is Insufficient

For all the reasons set forth herein, there is no bail package that can reasonably assure the safety of others in this case, where the defendant has engaged in a decades-long pattern of violence against women and others, and has used his wealth and power to ensure that his criminal conduct goes unpunished through manipulative and obstructive conduct. In particular, the bail package proposed by defense counsel is insufficient because it fails to adequately protect others from the defendant's violence, impose measures to prevent and detect obstruction, or prevent the defendant from accessing his vast resources—including millions of dollars in cash—to evade prosecution, or dissipating those assets to avoid financial penalties for his crimes.

Defense counsel has proposed certain bail conditions, including home detention with electronic monitoring and a $50 million bond secured by the defendant's Miami property. These conditions are plainly insufficient to address the legitimate concerns set out above. In particular, given the defendant's history of engaging in obstructive conduct, the Court must reject the insufficient conditions proposed by defense counsel, which do nothing to prevent and detect such conduct. For example, in *United States v. Ferranti*, 66 F.3d at 543-44, a case in which the defendant was charged with witness tampering and where obstruction remained an ongoing concern, the Second Circuit reversed the district court's release of the defendant on bail conditions because the $1 million bond, which was to be secured by properties owned by the defendant and members of his family, only deterred flight, not danger. *Id.* at 543. More specifically, the Second Circuit found the district court's bail condition intended to address witness tampering—which was a general prohibition that the defendant was not to commit a crime or intimidate a witness—"does not at all impede his ability to do so, and requires no more of him than that which the law already demands from [a defendant] and every other citizen." *Id.* at 544 (quoting *United States v. Colombo*, 777 F.2d 96, 100 (2d Cir. 1985)).

Notably, the defendant's previously proposed conditions do not include provisions related to his access to electronic devices, which, as outlined above, the defendant uses to engage in obstructive conduct. Nor do the proposed conditions include information related to or restrictions on access to the defendant's vast resources—including multiple personal bank accounts, bank

accounts in the name of the defendant's business, and deep cash reserves—which could facilitate the defendant's flight.  Similarly, the proposed conditions fail to protect against dissipation of assets which may be subject to forfeiture or penalties on the charges in the Indictment.  Finally, the proposed conditions do not include conditions that would limit the defendant's potential to engage in violence or abuse, such as drug testing and treatment and surrender of all firearms.

### III.   Conclusion

As set forth above, the defendant poses an ongoing and significant danger to the community, has repeatedly engaged in obstructive conduct, and presents a serious risk of flight. The Government respectfully submits that the defendant cannot meet his burden of overcoming the statutory presumption in favor of detention.  There are no conditions of bail that would assure the appearance and compliance of the defendant, or the safety of others.  Accordingly, any application for bail should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: __/s_____
    Meredith Foster
    Emily A. Johnson
    Madison Reddick Smyser
    Christy Slavik
    Mitzi Steiner
    Assistant United States Attorneys
    (212) 637-2310/-2409/-2381/-1113/-2284

cc:   Marc Agnifilo, Esq. (by email)
      Teny Geragos, Esq. (by email)

# EXHIBIT A

**(video exhibit)**