# AGNIFILO
# INTRATER

---

September 18, 2024

VIA ECF
The Honorable Andrew L. Carter
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

  Re: United States v. Sean Combs, 24 Cr. 542 (ALC)

Dear Judge Carter:

  Mr. Sean Combs, through his counsel, submits this letter in lieu of a formal motion for Mr. Combs' release from custody on the proposed bail package below. As set forth below, the defendant's updated bail package (updated even from yesterday's filing (ECF 8))[1] addresses both risk of flight and danger to the community, and reasonably ensures the defendant's return to Court.

  This letter will walk the Court through a series of actions taken by Mr. Combs over the past six months that we view as unprecedented and that prove that he is not a risk of flight or a danger to anyone in the community. These actions show that Mr. Combs is eminently trustworthy, that he is demonstrably committed to showing his innocence in Court in the context of this case, and that he should be released, on the conditions proposed, in order to do so.

## Mr. Combs flew to New York on September 5, 2024 to Surrender

  The first thing the Court should know is that when it became apparent to his counsel that Mr. Combs would at some point soon be formally charged, he did something extraordinary: He left his home in Miami and travelled *to* New York to surrender. We told the prosecutors he was in New York to surrender. We asked them for a time for the surrender. They never got back to us. The Government withheld this information solely so they could arrest Mr. Combs and not allow him to surrender, which he flew to New York to do. Instead, the Government effected an arrest two nights ago solely so it could argue for detention. Nonetheless, that Mr. Combs travelled to New York to self-surrender is a major factor that the Court should consider.

  However, surrendering himself to the prosecutors was not the first action Mr. Combs took to show his trustworthiness and lack of flight risk. Indeed, it is part of a pattern since even before the March 25, 2024, searches on Mr. Combs' residences. Mr. Combs and his counsel have been fully aware that the United States Attorney for the Southern District of New York has been conducting an investigation involving allegations concerning Racketeering and Sex Trafficking,

---

[1] We are mindful that we are giving the court a substantial letter on the same day as the hearing and have endeavored to do so as early in the day as possible. We thank the Court for its willingness to hear our application on short notice.

# AGNIFILO
# INTRATER

---

and other offenses. Knowing for these many months that he would be indicted, Mr. Combs has done everything (as will be set out below) to work with the prosecutors in ways that are unusual, if not unprecedented.

The law is clear that a district court reviews de novo a magistrate judge's decision to release or detain a defendant pending trial. See United States v. Esposito, 309 F. Supp. 3d 24, 30 (S.D.N.Y. 2018) (Marrero, J.) (citing United States v. Leon, 766 F.2d 77, 80 (2d Cir. 1985)).  We respectfully submit that Mr. Combs can rebut the presumption of detention here due to his extraordinary actions in this investigation. Mr. Combs should be released on the conditions proposed so that he can fight this case in Court effectively.

## The Proposed Package

The defense proposes the following bail package, not all of which were proposed as part of our package to the Magistrate Judge. These proposed conditions will assuage any fears of danger to the community and will ensure his return to court:

a. A $50,000,000 bond;

b. Co-signed by Sean Combs, his mother, his sister, the mother of his oldest daughter, the mother of his youngest daughter, and his three adult sons;[2]

c. Secured by the equity in Mr. Combs' residence located at 2 West Star Island in Miami, Florida:
   a. The appraised value of the home is about $48,000,000.[3]
   b. The home is unencumbered. In anticipation of this bail hearing, on August 20, 2024, Mr. Combs paid off the remaining mortgage of about $18,000,000 so that the home could be used to secure a bond and be free of a mortgage.[4]

d. Secured by the equity of Mr. Combs' mother's home in Miami, Florida;

e. Mr. Combs' travel will be restricted to the Southern District of Florida and the Southern District of New York (to attend Court, meet with his counsel, and attend medical appointments as well as the Eastern District of New York or the District of New Jersey (only to the extent that his travel to and from New York involves an airport in those Districts);

---

[2] The mother of four of his children is deceased. His three adult sons and his sister will be present at today's hearing.
[3] The written appraisal is attached as Exhibit 1.
[4] The satisfaction of the mortgage is attached as Exhibit 2.

    f.  Mr. Combs' passport was surrendered to his counsel on April 1, 2024; his counsel advised the prosecutors of this fact in an email dated the same day;[5] counsel will provide this passport to Pretrial Services;

    g.  The passports of the following family members, who have already surrendered their passports to counsel after the raids on Mr. Combs' homes:
- a. Janice Combs;
- b. Chance Combs;
- c. Jessie Combs;
- d. D'Lila Combs; and
- e. Love Combs.

    h.  Since at least April 2024, Mr. Combs has been making efforts to sell his airplane. We informed the Government of these efforts in May 2024, as explained further below. Just last weekend, Mr. Combs entered into a Letter of Intent with a party to sell it. Mr. Combs understands he is not to travel to Los Angeles, where the plane had been located this week, and further that the plane is not to be brought to any District in which he is located until it is sold;[6]

    i.  Home detention with GPS monitoring; and

    j.  Restrict all visitors to Mr. Combs' residences at 2 West Star Island *and* 1 West Star Island (the adjoining property that Mr. Combs owns) except for family, property caretakers, and friends who are not considered to be co-conspirators;

    k.  Restrict female visitors to Mr. Combs' residence except for family, or mothers of his children;

    l.  The security company that secures Mr. Combs' person and properties will require any person who enters the property to sign a visitor log, and then the company will produce those logs to Pretrial Services nightly;[7]

    m.  No contact with known grand jury witnesses;

    n.  Weekly drug testing by Pretrial Services;

    o.  All other standard conditions of pretrial supervision.

---

[5] The letter to the prosecutors is attached as Exhibit 3.

[6] As of yesterday, the plane flew to Teterboro, NJ, for a charter flight.

[7] If the Government and the Court prefer that Mr. Combs employ a different security company than the one he has used for the past decade or so, we request a week to engage a new security company to comply with this condition.

3

# AGNIFILO
# INTRATER

---

This combination of conditions will reasonably assure Mr. Combs' appearance in Court and protect the Government's and the Magistrate Judge's stated concerns with respect to the safety of the community. Taken in combination, these conditions present a very substantial, comprehensive bail package for any defendant, much less one who flew to New York to surrender, as this defendant has.

### The History of This Investigation Shows a Great Degree of Collaboration Between the Government, Mr. Combs and His Counsel Which Should Weigh Heavily in This Court Releasing Him on the Conditions Proposed

On March 13, 2024, counsel for Mr. Combs emailed the assigned Assistant United States Attorneys. In this introductory email, counsel identified himself as counsel for Mr. Combs and stated that he wished to speak with the prosecutors and share information about Mr. Combs and the matters under investigation. See Ex. 4. After not hearing back from the AUSAs, counsel again emailed the prosecutors on March 18, 2024. Counsel did not get a response to this second email either.

On March 25, 2024, search warrants were executed at Mr. Combs' places of residence in Miami and Los Angeles. In addition, he was removed from his airplane and searched. The searches of the residences were unusually public and particularly heavy-handed. The agents had assault rifles trained on the heads and the chests of his children, who were then handcuffed and brought before news cameras and a press helicopter. On the day of the searches, counsel called the prosecutors, and they spoke for the first time. Counsel indicated that he would accept service of two grand jury subpoenas to Mr. Combs' businesses.

1. Counsel Took Possession of Mr. Combs' Passport on April 1, 2024

About a week following the searches, on April 1, 2024, counsel took possession of Mr. Combs' passport. As noted, on this same day, counsel advised the AUSAs of the fact that counsel had Mr. Combs' passport, that we would not return it to him, and that he would not leave the country during the pendency of the investigation. See Ex. 1. We have, in fact, maintained the passports, and Mr. Combs has not, in fact, left the country – despite knowing the investigation was ongoing, despite having a plane at his disposal, despite not being charged with any crime.

2. Counsel Agreed to Advise the Government of All Domestic Travel

Moreover, counsel advised the Government that if Mr. Combs intended to travel domestically, counsel would so inform the AUSAs. See Ex. 1. These two promises have also been kept. For example, on June 9, 2024, counsel advised the AUSAs that Mr. Combs was traveling from Miami to Los Angeles to go on a road trip with his children. See Ex. 5. In addition, we provided the AUSAs with information about when his flight departed and it would land. Id. On June 29, 2024, counsel emailed the prosecutors that Mr. Combs was flying to Wyoming via a chartered aircraft. See Ex. 6 at 3. On July 5, 2024, counsel emailed the prosecutors that he was traveling back to Los Angeles. Id. Two days later, on July 7, 2024, when he travelled back to

4

Miami via a chartered aircraft, we again emailed the AUSAs. Id. at 2. In addition, when Mr. Combs planned travel but not take those trips, we notified the prosecutors of that as well. See id. at 1.

3. Counsel Advised the Government of Mr. Combs' Efforts to Sell His Airplane

On May 21, 2024, counsel advised the AUSAs during a phone call that Mr. Combs had commenced efforts to sell his airplane. We followed up on that conversation the next day, on May 22, 2024, with a letter to the AUSAs that efforts were underway to sell the aircraft and reminding the AUSAs that counsel continued to be in possession of his passport. See Ex. 7.

Over the past several months, there have been several potential buyers for the airplane and at least two buyers have signed a Letter of Intent to purchase the aircraft. Just this weekend, a buyer for the aircraft and representatives for Mr. Combs executed a Letter of Intent. Due to the nature of this asset, and the amount of inspection and due diligence that is required for a purchase, it is not a simple asset to offload.

In advance of the plane being sold – which it eventually will be – we have agreed to keep the airplane in Los Angeles while Mr. Combs resides in his home in Florida, if it is not being chartered. Coincidentally, and not at Mr. Combs' request, yesterday the airplane was chartered on a Part 135 flight[8] from Los Angeles to Teterboro, NJ. Mr. Combs had no advance knowledge of the flight, nor did he possess any control over its movement last night. Obviously, Mr. Combs agrees to not go to any state – in this case, New Jersey – in which his airplane is located pending its sale, which is actively being pursued.

4. Mr. Combs Voluntarily Relocated to New York in Advance of His Arrest

Once it became apparent to counsel that Mr. Combs' arrest was imminent, he promptly relocated to New York City. On September 5, 2024, Mr. Combs arrived in New York, and counsel immediately informed the Government of Mr. Combs' whereabouts. Counsel offered to continually share Mr. Combs' location with the Government. Since arriving in New York on September 6, Mr. Combs has been staying at the Park Hyatt New York. Due to bookings made at the Park Hyatt prior to Mr. Combs' reservation, after September 17, 2024, he would no longer be able to stay at the Park Hyatt. Accordingly, Mr. Combs had a reservation to stay at the Carlyle Hotel starting yesterday. Mr. Combs and counsel have also been looking for a short term rental for Mr. Combs in New York City so that he could reside here until the Government made the determination as to whether they would charge him.

---

[8] Pursuant to the Code of Federal Regulations Part 135 ("Part 135"), a private jet may be available to the general public for use. Part 135 pertains to Mr. Combs' airplane, and, therefore, can be chartered by the general public.

5

5. <u>Counsel Advised the Government That It Was in Possession of the Passports of Members of Mr. Combs' Family</u>

On June 13, 2024, counsel informed the Government that we possessed Mr. Combs' mother's passport. <u>See</u> Ex. 8. We also informed the Government that we possessed the passports of his four daughters (all of whom were minors at the time we took possession of the passports). We will have all passports with us in court at today's hearing.

6. <u>Counsel's Assistance to the Government Concerning the Subpoenas</u>

As stated above, counsel accepted service of two subpoenas directed at several of Combs' businesses in March of 2024. Separate counsel for the entities filed a motion to quash those subpoenas in April of 2024. In May of 2024, upon becoming sole counsel in connection with the criminal investigation of Mr. Combs, we advised the Court that it would withdraw the motion to quash the Grand Jury subpoenas and instead that the parties would meet and confer with the Government to minimize the number of requests on which the parties disagreed. Counsel agreed to begin gathering documents responsive to the subpoena.

For the past several months, counsel for Mr. Combs and the AUSAs have had regular discussions about what documents we had, what we did not have and, in regard to the documents we did not have, where the Government may be able to find such documents. We did this for two reasons. First, there was nothing, in counsel's estimation, that would constitute evidence of Mr. Combs being involved in any federal crime. Second, we wanted to be appropriately helpful to the Government in its investigation. To that end, the Combs entities have produced over 144,000 pages of documents to the SDNY in compliance with the subpoena.

6. <u>Paying Off the Mortgage at 2 West Star Island in Miami</u>

As noted in the discussion about the bail package, on August 20, 2024, Mr. Combs caused the outstanding mortgage to be paid on his primary residence in Miami. This payment of about $18,000,000 was for one reason alone: so that he would have this $48,000,000 residence free and clear of any encumbrances so that it can be used to secure a bond. We submit this is a truly extraordinary measure that shows resoundingly that Mr. Combs is appropriately focused on defending this case on the merits in this Court.

**Legal Standard**

Because Mr. Combs is presumed to be innocent, the Supreme Court has observed that "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." <u>United States v. Salerno</u>, 481 U.S. 739, 755 (1987). As the Supreme Court recognizes, "the function of bail is limited." <u>Stack v. Boyle</u>, 342 U.S. 1, 4 (1954). The underling goal is securing the presence of the defendant rather than "the sum of bail." <u>United States v. Nebbia</u>, 357 F.2d 303, 304 (2d Cir. 1966). When deciding an issue of pretrial release, the Second Circuit has noted that "the court should bear in mind that it is only a limited group of offenders who should be denied

bail pending trial." United States v. Shakur, 817 F.2d 189, 195 (2d Cir. 1987). Indeed, the Bail Reform Act requires that the Court impose "the least restrictive . . . condition, or combination of conditions, that will . . . reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(c)(1)(B).

While there is a presumption of detention in sex trafficking cases, **this presumption is rebuttable**. The presumption imposes on the defendant a "burden of production," while the "burden of persuasion" remains with the Government. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). Although this burden "is not heavy," the defendant must introduce some evidence contrary to the presumed fact. United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir. 1991). A defendant can satisfy this burden by coming forward "with evidence that he does not pose a danger to the community or a risk of flight." Mercedes, 254 F.3d at 436. Even if the defendant presents some evidence satisfying his or her burden, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." Id. In Jessup, the benchmark case defining this burden shift, the court explained:

> Since the presumption is but one factor among many, its continued consideration by the magistrate does not impose a burden of persuasion upon the defendant. And, since Congress seeks only consideration of the general drug offender/flight problem, the magistrate or judge may still conclude that what is true in general is not true in the particular case before him. He is free to do so, and to release the defendant, as long as the defendant has presented some evidence and the magistrate or some judge has evaluated all of the evidence with Congress's view of the general problem in mind.

United States v. Jessup, 757 F.2d 378, 384 (1st Cir. 1985).

### Section 3142(g) Factors

Acknowledging that sex trafficking has a rebuttable presumption of detention, Mr. Combs can rebut such a presumption with evidence that he does not pose a danger to the community and is not a risk of flight. (18 U.S.C. § 3142(c)(1)(B).) An analysis of the Section 3142(g) factors weigh in favor of releasing Mr. Combs on these conditions.

1. The Nature and Circumstances of the Offense

Mr. Combs is charged with a three-count indictment. The first count charges Mr. Combs with a Racketeering Conspiracy in violation of 18 U.S.C. § 1962(d) ("Count One"). Count One alleges that Mr. Combs "relied on the employees, resources, and influence of the multi-faceted business empire that he led and controlled—creating a criminal enterprise whose members and associates engaged in, and attempted to engage in, among other crimes, sex trafficking, forced labor, kidnapping, arson, bribery, and obstruction of justice," and that the conspiracy lasted "[f]rom at least in or about 2008, through on or about the filing of this Indictment." Indictment ¶¶ 1, 13. As alleged, the "pattern of racketeering" consisted of: (a) "multiple acts involving

kidnapping" in violation of California law; (b) "multiple acts of arson" in violation of California law; (c) "multiple acts involving bribery" in violation of California law; (d) "multiple acts indictable under" 18 U.S.C. § 1512, "relating to tampering with a witness, victim, or an informant"; (e) "multiple acts indictable under "18 U.S.C. §§ 1589 and 2, "relating to forced labor"; (f) "multiple acts indictable under" 18 U.S.C. §§ 1591 and 2, "relating to sex trafficking"); (g) "multiple acts indictable under" 18 U.S.C. §§ 2421, 2422, and 2, "relating to transportation and inducement to travel for purposes of prostitution and other illegal sexual activities"; and (f) "multiple offenses involving the possession with intent to distribute, or distribution of narcotics and controlled substances, including cocaine, oxycodone, alprazolam, 3,4-Methylenedioxymethamphetamine, 4-Brono-2, 5-dimethoxyphenethylamine, gamma hydroxybutyric acid, and ketamine," in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), (b)(1)(E), (b)(2), and 846, "distribution and possession with intent to distribute and conspiracy to commit the same" and 18 U.S.C. § 2, "aiding, abetting, and willfully causing." Indictment ¶ 13. Count One also includes a "Notice of Special Sentencing Factor" in connection with Mr. Combs' alleged agreement that "means of force, threats of force, fraud, and coercion . . . would be used to cause the person to engage in a commercial sex act." Id. at ¶ 15.

The second count charges Mr. Combs with Sex Trafficking by Force in violation of 18 U.S.C. §§ 1591(a)(1), (b)(1), 1954(a), and 2 ("Count Two"). Count Two alleges that, "[f]rom at least in or about 2009, up to an including in or about 2018," Mr. Combs "recruited, enticed, harbored, transported, and maintained a person ('Victim-1'), and attempted, aided and abetted, and willfully caused Victim-1, to engage in commercial sex acts, knowing and in reckless disregard of the fact that Victim-1 was engaging in commercial sex acts as a result of force, fraud, and coercion." Indictment ¶ 16.

The third count charges Mr. Combs with Transportation to Engage in Prostitution in violation of 18 U.S.C. §§ 2421(a) and 2 ("Count Three"). Count Three alleges that "[f]rom in or about 2009, up to an including in or about 2024," Mr. Combs "transported, aided and abetted, and willfully caused the transportation of female victims and commercial sex workers in interstate and foreign commerce on multiple occasions with the intent that they engage in prostitution." Indictment ¶ 17.

2. Defendant's History and Characteristics

Mr. Combs' history and characteristics are best demonstrated by the way he has responded to this investigation from the very inception to his most recent decision to travel to New York when his lawyers told him that the case could soon be starting. He has never run from a challenge, and he will not run from this one. Instead, he takes these challenges head on, he moves toward them confidently and with the assurance that right is on his side. These are not merely the words of his lawyer. Rather, the actions of Mr. Combs over the last several months conclusively prove this.

Aside from his actions since the inception of the investigation, Mr. Combs' character is shown through his demonstrated contributions to society in several important areas. First, he has

# AGNIFILO
# INTRATER

---

given generously over his entire life to charitable causes. To name only a few examples, since founding Bad Boy Entertainment in 1993, Mr. Combs has actively supported and donated millions to after school programs and organizations like the Boys & Girls Clubs of America. His commitment stems from the positive influence such programs had on his own childhood, inspiring him to give back to similar initiatives. He has also supported organizations including the National Foundation for Teaching Entrepreneurship ("NFTE"), further emphasizing his dedication to creating opportunities for young entrepreneurs.

A cornerstone of his philanthropy is education, and he fulfilled a lifelong dream when he, with a partner, opened Capital Preparatory Harlem Capital Charter School in 2016, to provide high-quality education to inner-city youth in New York City. The success of this initiative led to the launch of Capital Preparatory Bronx Charter School in 2020, with Combs donating $1 million to support its development. These schools are part of his broader commitment to education, which includes significant contributions to Historically Black Colleges & Universities, such as $2 million to Howard University and $1 million to Jackson State University in 2023.

Mr. Combs has also been proactive in health and disaster relief efforts—having raised over $2 million for New York City public schools and hosting a virtual dance-a-thon that raised more than $4 million to provide personal protective equipment to healthcare workers on the front line of the COVID-19 pandemic. Particularly important in an election year is Mr. Combs' contribution to mobilizing young voters with the "Vote or Die" slogan through Citizen Change, which he founded to significantly increase political awareness and youth voter turnout.

Second, few people have done more to advance the cause of black people in the music, entertainment and fashion industries than has Sean Combs. While he has always been controversial, he has also always championed minorities and underrepresented communities. As Chairman of Combs Global, Mr. Combs has used his platform to create "The Excellence Program," an internship initiative with Endeavor in July 2021, a major initiative designed to provide development opportunities for aspiring executives in entertainment, marketing, music, and fashion from underrepresented communities. Mr. Combs' philanthropic work has earned him numerous accolades throughout his career, including the Triumph Award from the National Action Network in 2016, the Superhero Award from Room to Read in 2017, the Child of America Award from the Carver Foundation in 2018 and in 2023 the Icon Award from the Apollo.

Through his multifaceted career, Mr. Combs has not only created thousands of jobs, including valuable internships for young professionals, but has also supported minority and women-owned businesses, leveraging them as key suppliers and vendors for his enterprises.

3. Danger to the Community

The Government has argued that Mr. Combs is a danger to the community and that "what makes this defendant even more dangerous is his extensive and exhaustive history of obstruction of justice." (See Ex. 9: 9/17/24 Tr. at 12.) They laid out several allegations that do not in fact amount to obstruction at all. The truth is that Mr. Combs has done nothing to obstruct this

investigation, and the Government does not persuasively argue otherwise. Moreover, while over the past six months the defense has been conducting a defense investigation every bit as rigorous as that being conducted by the Government, we have studiously avoided interviewing grand jury witnesses (even though we have the right to interview anyone) and have done everything in our power to be both effective and mindful of the fact that the Government has been conducting an investigation parallel to our own.

    a. March 5, 2016

The Government proffered "one example" for the Court of Mr. Combs' "exhaustive history of obstruction of justice." (See Ex. 9, 9/17/24 Tr. at 12.) This "obstruction" related to an incident caught on video *eight* years ago and attached to the Government's letter as Exhibit A. However, the circumstances surrounding this incident, even in the light most favorable to the Government, does not amount to obstruction. Obstruction of justice requires that a person act corruptly and in regard to an official proceeding. Even under the facts proffered by the Government, there was no official proceeding in fact or in the contemplation of Mr. Combs or anyone else. This event from 8 years ago simply is not obstruction of justice under Title 18, U.S.C., Sec. 1512.

Second, the Government argued that when the female depicted in the video filed a 35-page civil lawsuit in November 2023 against Mr. Combs, and Mr. Combs publicly responded by saying "I did not do any of the awful things alleged," that these denials were "further attempts by him to obstruct justice and prevent the truth of this event from being known." (Id. at 14.) To be clear, preventing the truth of an embarrassing event in which Mr. Combs is caught on videotape in an alleged assault is not obstruction of justice.

The gravamen of the civil lawsuit was not misdemeanor assault, which is, at most, what is depicted in the recording, but sex trafficking. He denied it then. He denies it now. He will deny it forever.

    b. Contacting "Potential Victims and Witnesses"

The Government argues that Mr. Combs himself has contacted witnesses, including one who received a grand jury subpoena, and at least one victim. (Id. at 16-17.) Again, this is not obstruction of justice, and the Government does not point to any obstructive conduct. Mr. Combs is entitled to gather witnesses to defend himself against the Government's allegations of sex trafficking and racketeering. As part of that defense, he, with counsel's blessing, has called potential defense witnesses to let them know that counsel would reach out to speak with them. Tellingly, the Government does not point to—nor can they—any conversation Mr. Combs has had with a potential witness since he had knowledge of the criminal investigation where he pressured any witness to change their story.

Instead, the Government points to Mr. Combs' contact with a female member of a band called *Diddy – Dirty Money* after the filing of a lawsuit against Mr. Combs by *another* female

member of that band. (Id. at 17.) As counsel stated at yesterday's bail hearing, "this is the furthest thing from witness obstruction I can think of":

> And so someone with the exact point of view of the civil plaintiff comes forward and says, in essence -- and this is -- I thought it was a soft, respectful statement. And the statement was, I am not taking away her experience. That wasn't mine. That wasn't my experience. She is entitled to her experience. I was there. That's not what I saw. That's not what I saw. That's two witnesses having divergent recollections of similar events. And I expect this trial is going to feature exactly that. So there is nothing wrong with that. That's why we have criminal trials and civil trials.

(Id. at 41.)

### c. The Proposed Package Will Address the Government's Stated Concerns for Witnesses

The Government has further argued that "detailed evidence of [] Freak Offs in the form of travel records, communications, hotel records, witnesses, and videos." (Id. at 15.) To be clear, the defendant's companies, through this very counsel, has produced many of these travel records to the Government. To punish the defendant for complying with process (specifically producing travel records) because such travel records have corroborated witnesses stories, is mind boggling.

The Government further argues that their "investigation has yielded evidence of numerous assaults against female victims and other individuals." (Id. at 14.) The proposed package will address the Government's concern here as Mr. Combs will agree to not have any female non-family visitors to his house, and his security company will keep a record of all incoming and outgoing visitors.

### d. To the Extent the Court Is Concerned With Obstruction and Danger, the Proposed Conditions Address These Concerns Completely

Before addressing the proposed conditions that relate to danger and obstruction, it is critical to note that every allegation in the Indictment and every argument in the Government's detention letter is being factually contested in detail. We are not merely making general denials of guilt. Rather, we are advancing detailed, specific facts that undermine the Government's theory at its core. We will provide examples of this.

First, there is one alleged sex trafficking victim in the Indictment. **One.** The Government can say what it wants, but what is actually charged is one victim. Count Two, charging sex trafficking mentions Victim 1. There is no Victim 2. That one person was in a ten-year romantic relationship with Sean Combs. That one person was an adult woman who lived alone, who never lived with Sean Combs. She had her own friends, she had her own life, as adults tend to do. Mr. Combs and this person were very much in love for a long time, as the many written

communications between them show. This one person often expressed anger and jealousy because Mr. Combs had another girlfriend, as will be testified to by many witnesses and as the written communications show. At the end of Mr. Combs and this person's relationship, she started a relationship with her trainer, which prompted Mr. Combs and the woman to break up. He did not force her stay, but instead, released her from any obligation to his record label. A month later, when the mother of four of Mr. Combs' children passed away, this person was present at multiple memorial services around the country to support him. This is not sex trafficking.

Five years later, this woman hired a lawyer to contact Mr. Combs' lawyer. Mr. Combs' lawyer recorded the conversation., which lasted 8 minutes and 12 seconds. The woman's lawyer said the woman wrote a book, it would be a "tell-all" book that would be embarrassing to Mr. Combs. Her lawyer said that she would be meeting with book publishers to publish the book. However, if Mr. Combs wanted to buy the exclusive rights to the book, then he would own the rights and could prevent the book from ever being published. Her lawyer then said that in order to stop the book from being published, Mr. Combs would have to pay $30,000,000.

When that clear extortion proved unavailing, the woman took another tack. She hired a lawyer to bring a civil complaint, taking advantage of an expanded statute of limitations for sex cases. Mr. Combs settled the case. This was not because he raped or sex trafficked anyone, but because of the disastrous consequences a lawsuit of this nature would have on him and his business interests.

We are now in a position where the only person alleged to be a victim in Count Two extorted Combs (on audio tape) and profited millions of dollars (the precise settlement of the civil suit remains confidential). We have countless written communications that tend to negate any lack of consent and any coercion. The evidence shows a long-term loving relationship that became strained by mutual infidelity and jealously. The evidence of this, and this alone, is overwhelming. There was no sex trafficking, there was no sex crime of any sort, and we will conclusively prove that at a trial. If the presumption of innocence means anything, it means that when a proffered, detailed, factual defense is readily apparent, the Court should reserve judgment, and should wait for the facts and the trial.

That all being said, we are willing to agree to significant conditions outlined as though Mr. Combs is a danger, which he is plainly not. As indicated above, we are willing to restrict visitors to his home, we are willing to ensure that he not contact known witnesses and we are willing to have him undergo weekly drug testing, in addition to the other conditions outlined on pages 2 and 3 of this letter.

### A Review of Other Sex Trafficking Cases in the Southern and Eastern Districts Are Not Similar to This Case

At yesterday's bail hearing, the Government argued that this case is in the "heartland of detention cases of this magnitude and this similar [] charged conduct." (Ex. 9 at 19.) This is not accurate:

# AGNIFILO
# INTRATER

---

First, the Government cited to United States v. Jeffrey Epstein, 19 Cr. 490 (RMB), where the defendant was detained pending trial. In Epstein, the defendant was arrested after landing on his private jet at Teterboro airport, having just travelled internationally to France. In contrast, Mr. Combs has not flown internationally since November of 2023, and made a commitment to the prosecutors after the raids on his homes, that he would not travel out of the country during the pendency of the investigation. Additionally, unlike here, where there are *no* allegations that Mr. Combs trafficked minors, Epstein was alleged "to be a serial sexual predator who preyed on dozens of minor girls over a period of years." (United States v. Epstein, 19 Cr. 490 (RMB) (S.D.N.Y. July 12, 2019) (ECF 11-1).

Second, the Government cited to United States v. Keith Raniere, 18 Cr. 204 (NGG), a sex trafficking case in the Eastern District in New York, in which the undersigned were counsel. Mr. Raniere was arrested in a town in Mexico, to which the Government alleged he fled when he learned of the Eastern District of New York's investigation into his alleged conduct. Here, unlike in Raniere, Mr. Combs travelled *to* the District that was investigating him. Moreover, at the time of the bail hearing in Raniere, the Government alleged that he had multiple relationships with minors. Here, there is no such allegation.

The Government turned to United States v. Robert Kelly a/k/a R. Kelly, 19 Cr. 286 (AMD) from the Eastern District of New York, which, like the others above, centered around abuse of minors over a prolonged period of time. We do not have those allegations here.

Additionally, there are significant distinctions between Mr. Combs' compliance with the Government's investigation and defendant Ghislaine Maxwell in United States v. Maxwell, 20 Cr. 330 (AJN), a recent sex trafficking case from this district, where the defendant was not granted bail. There, Judge Nathan denied Maxwell bail where attempted to evade detection by the media and by law enforcement ("the Defendant has demonstrated an extraordinary capacity to evade detection, "[e]ven in the face of what the Defense has acknowledged to be extreme and unusual efforts to locate her." Tr. at 87:4–87:19. Indeed, regardless of whether the Defendant sought to evade the press, rather than law enforcement, in the months leading up to her arrest, her sophistication in evading detection reveals the futility of relying on any conditions, including GPS monitoring, restrictive home confinement, and private security guards, to secure her appearance." United States v. Maxwell, 510 F. Supp. 3d 165, 177 (S.D.N.Y. 2020)). Judge Nathan put significant weight on this factor to support detention. Here, Mr. Combs did the complete opposite. He flew *to* the district investigating him a week ago. He has been pubicly in New York City, captured on social media and blogs. Indeed, given his notoriety, he would be unable to evade law enforcement.

### The Proposed Bail Package Addresses Any Issues with Flight and Danger to the Community

In light of the proposed conditions, the actions Mr. Combs had already taken regarding the investigation, and Mr. Combs' lifetime commitment to live up to his obligations concerning every

13

challenge he has ever faced, he should be released to fight this case in court and prove his innocence. It is significant that Mr. Combs' adult sons, his mother, his sister, and two mothers of his children are willing to sign onto such a significant bond. Those closest to him wholeheartedly believe he will return to Court, and this moral suasion is sufficient to ensure compliance with the proposed conditions of release.

Sean Combs has never evaded, avoided, eluded or run from a challenge in his life. He will not start now. As he has handled every hardship, he will meet this case head-on, he will work hard to defend himself, and he will prevail.

Recognizing that a bail hearing is not the time to defend the merits of a criminal case, it is relevant to bail that the defendant has made a clear commitment to defend an eminently defensible case. This is such a case.

Finally, several courts in this District have recognized that the conditions at Metropolitan Detention Center in Brooklyn are not fit for pre-trial detention. Just earlier this summer, an inmate was murdered.[9] At least four inmates have died by suicide there in the past three years.[10] Numerous Courts in this district have raised concerns with the horrific conditions of detention there. See United States v. Chavez, No. 22 Cr. 303 (JMF) (S.D.N.Y. Jan. 4, 2024), Dkt. 31 (describing the conditions at MDC as "dreadful" and "longstanding" and noting that the issues with food contamination and hazardous physical conditions were an "ongoing tragedy"); United States v. Morgan, No. 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), Dkt. 90, Tr. 12-15 (describing the MDC as "dirty," "infested with drugs," and plagued by violence); see also United States v. Boyd, No. 21 Cr. 486 (SHS) (S.D.N.Y. Feb. 3, 2022), Dkt. 74 (describing overcrowding, staffing issues, and lockdowns at the MDC); United States v. Days, No. 19 Cr. 619 (CM) (S.D.N.Y. Apr. 29, 2021), Dkt. 35, Tr. 19 (describing MDC conditions as "disgusting [and] inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that").

Courts in the Eastern District of New York have shared the same concerns. See United States v. Forbes, No. 22 Cr. 97 (RK) (E.D.N.Y.) (the court noted it was worried about MDC's conditions as one of the reasons for sentencing the defendant to a non-custodial sentence); United States v. Colucci, 23 Cr. 417 (GRB) (E.D.N.Y. Aug 5, 2024) (sentencing a defendant to nine months in prison, but ordering that if BOP designated the defendant to the MDC, the Court would vacate the sentence and resentence to home incarceration.)

---

[9] See John Annese, Inmate at Brooklyn's Troubled Metropolitan Detention Center Is Stabbed To Death, NY Daily News (Jun. 20, 2024) available at https://www.nydailynews.com/2024/06/20/inmate-at-brooklyns-troubled-metropolitan-detention-center-is-stabbed-to-death-sources/

[10] See Fola Akinnibi & Marie-Rose Sheinerman, Beleaguered Brooklyn Jail Blasted by Candidates in Crowded N.Y. Congressional Race, Bloomberg (Aug. 16, 2022), available at https://www.bloomberg.com/news/articles/2022-08-16/ny-10-democratic-candidates-call-on-feds-to-fix-brooklyn-jail.

# AGNIFILO
# INTRATER

---

**Conclusion**

    For the reasons set forth above, we move this Court to release Combs under the conditions set forth above. Thank you for your consideration.

                                      Respectfully submitted,

                                           Marc Agnifilo
                                           Teny R. Geragos

cc:    Counsel for the Government (via ECF)