# EXHIBIT 9

O9HLComC

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  UNITED STATES OF AMERICA,

 4              v.                          24 Cr. 542 (RFT)

 5  SEAN COMBS,

 6     a/k/a "Puff Daddy,"
       a/k/a "P. Diddy,"
 7     a/k/a "Diddy,"
       a/k/a "PD,"
 8     a/k/a "Love,"

 9              Defendant.
                                            Presentment
10  ------------------------------x

11                                          New York, N.Y.
                                            September 17, 2024
12                                          2:30 p.m.

13  Before:

14                  HON. ROBYN F. TARNOFSKY,

15                                          U.S. Magistrate Judge

16                        APPEARANCES

17  DAMIAN WILLIAMS
         United States Attorney for the
18       Southern District of New York
    BY:  EMILY JOHNSON,
19       CHRISTINE SLAVIK,
         MADISON SMYSER,
20       MITZI STEINER
         MEREDITH FOSTER
21       Assistant United States Attorneys

22  AGNIFILO INTRATER LLP
         Attorneys for Defendant
23  BY:  MARC AGNIFILO
         TENY GERAGOS
24
    Also Present: Sean Quinn, Homeland Security Investigations
25
```

O9HLComC

```
 1              (Case called)
 2              MS. JOHNSON:  Good afternoon, your Honor.  Emily
 3    Johnson, Christine Slavik, Madison Smyser, Mitzi Steiner, and
 4    Meredith Foster for the government.  We are joined at counsel
 5    table by Special Agent Sean Quinn of Homeland Security
 6    Investigations.
 7              THE COURT:  Good afternoon, everyone.
 8              MR. AGNIFILO:  Good afternoon, your Honor.  My name is
 9    Marc Agnifilo.  I am with Teny Geragos, and we represent Sean
10    Love Combs, the defendant who is before the Court today.  Good
11    afternoon, your Honor.
12              THE COURT:  Good afternoon, everyone.  Thank you for
13    being here today.
14              My name is Magistrate Judge Tarnofsky, and Mr. Combs,
15    you are here because you have been charged with certain crimes
16    in an indictment.  The purpose of today's proceeding is to
17    advise you of certain rights that you have, to inform you of
18    the charges against you, and to decide under what conditions,
19    if any, you should be released pending trial.
20              I am going to explain certain constitutional rights
21    that you have.  You have the right to remain silent.  You are
22    not required to make any statements.  Even if you have already
23    made statements to the authorities, you don't need to make any
24    more statements.  Any statements you make can be used against
25    you.
```

1           You have the right to be released, either

2     conditionally or unconditionally, pending trial, unless I find

3     there are no conditions that would reasonably assure your

4     presence at future court appearances, and the safety of the

5     community.

6           If you are not a U.S. citizen, you have a right to

7     request that a colsular officer from your country of origin be

8     notified of your arrest.  In some cases a treaty or other

9     agreement may require the U.S. Government to give that notice,

10    whether you request it or not.  And I am required by law to

11    tell you this even if you are a U.S. citizen and it doesn't

12    apply to you.

13          You have the right to be presented by a lawyer during

14    all court proceedings, including this one, and during all

15    questioning by the authorities.  You have the right to hire

16    your own attorney, but if you can't afford one, I would appoint

17    one to represent you.

18          I have in front of me an indictment containing the

19    charges against you, and it has three counts.  You are charged

20    with racketeering conspiracy, conspiring to create a criminal

21    enterprise whose members and associates engaged in and

22    attempted to engage in, among other crimes, sex trafficking,

23    forced labor, kidnapping, arson, bribery, and obstruction of

24    justice.

25          In addition, you are charged with sex trafficking by

O9HLComC

1    force, fraud, or coercion.  And the charge is that from at

2    least in or about 2009 through in or about 2018, in this

3    district and elsewhere, of recruiting, enticing, harboring,

4    transporting, and maintaining a person, Victim 1, and

5    attempting, aiding and abetting, and willfully causing Victim 1

6    to engage in commercial sex acts, knowing and in reckless

7    disregard of the fact that Victim 1 was engaging in commercial

8    sex acts as a result of force, fraud, and coercion.

9            And Count Three:  From at least 2009 through and

10   including around 2024, in this district and elsewhere, of

11   knowingly transporting an individual in interstate and foreign

12   commerce with the intent that the individual engage in

13   prostitution, and attempting, aiding and abetting, and

14   willfully causing the same, that is, transporting, aiding and

15   abetting, willfully causing the transportation of female

16   victims and commercial sex workers in interstate and foreign

17   commerce on multiple occasions with the intent that they engage

18   in prostitution.

19           Counsel, have you received a copy of the indictment?

20           MR. AGNIFILO:  I have, your Honor.

21           THE COURT:  Okay.  And have you reviewed it with your

22   client?

23           MR. AGNIFILO:  I have, your Honor.

24           THE COURT:  Okay.  So do you waive the public reading

25   of the charges?

O9HLComC

```
 1            MR. AGNIFILO:  I do, your Honor.
 2            THE COURT:  Okay.  And Mr. Combs, are you prepared to
 3    enter into a plea to the indictment at this time?
 4            THE DEFENDANT:  Not guilty.
 5            THE COURT:  Okay.  A plea of not guilty will be
 6    entered, and the record should reflect that the defendant is
 7    now arraigned.
 8            For the government, in accordance with Federal Rule of
 9    Criminal Procedure 5(f), I remind the prosecution of your
10    obligation under Brady v. Maryland and its progeny to disclose
11    to the defense all information, whether you believe it or not,
12    whether it's admissible or not, that's favorable to the
13    defendant, material either to guilt or to punishment, and known
14    to the prosecution.  Possible consequences for noncompliance
15    may include dismissal of individual charges or of the entire
16    case, exclusion of evidence, and professional discipline or
17    court sanctions on the responsible attorneys.
18            I will be entering a written order that more fully
19    describes the obligation and the possible consequences of
20    failing to meet it, and I direct the prosecution to review and
21    comply with that order.
22            Does the prosecution confirm that it understands its
23    obligations and will fulfill them?
24            MS. JOHNSON:  Yes, your Honor.  The government
25    confirms that it understands our obligations in this vein and
```

O9HLComC

1  will abide by them.

2          THE COURT:  Okay.  Has Judge Carter set a conference

3  date?

4          MS. JOHNSON:  Yes, he has, your Honor.  It is next

5  Tuesday, September 24, at 11:00 a.m.  10:00 a.m.  I'm sorry,

6  your Honor.

7          THE COURT:  At 10:00 a.m.  Okay.

8          Is there a request to exclude time?

9          MS. JOHNSON:  Yes, your Honor.  The government would

10  move to exclude time between today and the conference date of

11  next Tuesday.  Such an exclusion of time would be in the

12  interest of justice because it would allow the parties to begin

13  discussing initial discovery steps like entering a protective

14  order, and the like, before we see the district court that day.

15          THE COURT:  Okay.  And does the defendant consent?

16          MR. AGNIFILO:  We do, your Honor.

17          THE COURT:  Okay.  So with the agreement of the

18  parties, I will exclude time through and including

19  September 24, 2024.  I find that the ends of justice served by

20  taking this action outweigh the interest of the public and the

21  defendant in a speedy trial.

22          I take it there is no agreement regarding release

23  pending trial.  Is that correct?

24          MS. JOHNSON:  That's correct, your Honor.

25          THE COURT:  Okay.  Then we will have a detention

O9HLComC

```
 1    hearing.
 2              On what basis is the government seeking detention?
 3              MS. JOHNSON:  The government is seeking detention on
 4    multiple bases.  The indictment alleges a violation of 18,
 5    United States Code, Section 1591, and that's a basis under 18,
 6    United States Code 3142(f)(1)(A).  The indictment also charges
 7    a crime for which the maximum sentence is life imprisonment or
 8    death.  That is 18, United States Code 3142(f)(1)(B).  The
 9    government is also moving under 18, United States Code
10    3142(f)(2)(A), that is, the serious risk of flight; and 18,
11    United States Code 3142(f)(2)(B), which is a serious risk that
12    the person will obstruct or attempt to obstruct justice, or
13    threaten, injure, or intimidate or attempt to threaten, injure,
14    or intimidate a prospective witness or juror.
15              THE COURT:  Okay.  And is this a presumption case?
16              MS. JOHNSON:  It is, your Honor.
17              THE COURT:  Okay.  And why is that?
18              MS. JOHNSON:  Detention is presumed under the Bail
19    Reform Act because the defendant is charged with sex
20    trafficking, which is an offense under Chapter 77 of Title 18,
21    and the cite for that is 18, United States Code 3142(e)(3)(D).
22              THE COURT:  Okay.  Thank you, counsel.
23              So I am required under the law to release you, either
24    with or without conditions imposed, unless I determine that
25    there are no conditions that will reasonably assure your
```

O9HLComC

1    appearance in court as required, and the safety of the

2    community.  In this case, the government has asked that you be

3    detained without bail, and they are entitled to make that

4    request because the government contends that you present a

5    serious risk of flight and obstruction of justice, and because

6    of the nature of the charges against you, which include sex

7    trafficking, and a crime for which the maximum sentence is life

8    imprisonment or death.

9         So we are having a bail hearing, and I have to

10   determine whether there are any conditions, any combination of

11   conditions of release that will protect the safety of the

12   community and reasonably assure your appearance at trial.  In

13   making this determination, I am required to consider several

14   factors, including the nature and circumstances of the charged

15   offense, including whether there are crimes of violence

16   charged, crimes involving firearms, controlled substances, the

17   weight of the evidence, and your history and characteristics,

18   which include character, physical and mental condition, family

19   ties, employment, financial resources, length of residence in

20   the community, community ties, past conduct, history of

21   substance abuse, criminal history, and record concerning

22   appearances at prior court proceedings.  I have also have to

23   consider the nature and seriousness of any danger to any person

24   in the community that would be posed by release.

25        Because this is a presumption case, because you are

O9HLComC

1    accused of one of several specified crimes, there is a

2    presumption that no conditions of release will reasonably

3    ensure the safety of the community, but -- and because if there

4    is probable cause to believe that you have committed certain

5    enumerated offenses, including sex offenses, there is a

6    presumption that no conditions of release will reasonably

7    ensure your appearance and the safety of the community.  But

8    the presumption is rebuttable, and the government bears the

9    burden of establishing by clear and convincing evidence that

10   you are a danger to the community or establishing by a

11   preponderance of the evidence that you are a risk of flight.

12        I will now hear from counsel.  First I would like to

13   hear from the government as to why it believes that detention

14   is warranted.

15        MS. JOHNSON:  Your Honor, the defendant, Sean Combs,

16   physically and sexually abused victims for decades.  He used

17   the vast resources of his company to facilitate his abuse and

18   to cover up his crimes.  Simply put, he is a serial abuser and

19   a serial obstructer.

20        As I just mentioned to your Honor, the government is

21   seeking detention, which I note is also the conclusion that

22   pretrial services has reached in its report after interviewing

23   the defendant.  The government submits that the defendant

24   should be detained pending trial because he is an extreme

25   danger to the community.  He poses a serious risk of

O9HLComC

obstruction of justice, which also makes him a danger to the

community, and he poses a serious risk of flight because now

he's facing significant charges, some with mandatory prison

time.

As your Honor mentioned, detention is presumed here

under the Bail Reform Act.  It's the starting point, and it's

the defendant's burden to rebut that presumption, which the

government, respectfully, submits that the defendant cannot do

here.  The government is going to respectfully request that the

Court enter an order of detention.

As the Court knows, the government submitted a

detailed letter to your Honor this morning outlining the facts

and bases for detention, so I will highlight some of those

here.  The facts are set forth in detail in the letter, but in

short, the defendant used force, threats of force, and coercion

to cause female victims to engage in sexual activity with male

commercial sex workers that he termed Freak Offs.  These were

elaborate sex performances that the defendant arranged,

directed, masturbated during, and often electronically

recorded.  They began at least in and around 2009, lasted

through at least this year, 2024, and often took place over

multiple days, and involved more than one commercial sex

worker.

These Freak Offs were enabled and arranged with

members and associates of his enterprise who set up the hotel

O9HLComC

1    rooms, stocked them with supplies, arranged travel for victims

2    and sex workers, and delivered bulk cash and narcotics to the

3    hotel rooms, among other tasks.  And those narcotics that were

4    delivered or stocked in the room were used at least in part so

5    that female victims could continue to participate in Freak Offs

6    despite exhaustion and fatigue from these events happening for

7    sometimes multiple days.  The defendant was violent with women

8    both inside Freak Offs and outside Freak Offs.  At least a

9    dozen witnesses who we have spoken to will confirm that they

10   personally observed the defendant's violence towards women or

11   injuries sustained by female victims as a result of his

12   violence.

13         In addition to this violence directed toward women,

14   the defendant committed a host of other violent acts.  He

15   committed other physical assaults against other individuals,

16   and with the assistance of members and associates of his

17   enterprise, he committed kidnapping and he committed arson.

18         The defendant also surrounded himself with and used

19   firearms.  Those include the three defaced AR-15s that the

20   government seized from his residences in March of 2024.  One of

21   those was found in his residence in Los Angeles, and two were

22   found in his bedroom closet, disassembled, in Miami.  In Miami,

23   the magazines were loaded with ammunition.  And in Los Angeles,

24   we also seized a high-capacity drum magazine what was loaded

25   with 60 rounds of ammunition.  And all of those AR-15s I just

O9HLComC

1    mentioned had the serial number bored through, so they were

2    defaced.

3            And as if that were not enough, your Honor, what sets

4    this case apart from so many others and what makes this

5    defendant even more dangerous is the defendant's extensive and

6    exhaustive history of obstruction of justice.  The indictment

7    charges acts of bribery and witness tampering as predicate

8    offenses for the charged racketeering conspiracy.  And just

9    like the violence I just outlined, the defendant and his

10   coconspirators have engaged in years-long efforts to cover up

11   the defendant's crimes and to tamper with witnesses.

12           So to get a sense of what I am talking about, I want

13   to use one example to the Court, and that example is March 5,

14   2016 at the InterContinental Hotel in Los Angeles.  The

15   government attached to its submission this morning a video clip

16   that had previously been publicly disclosed by the media in or

17   about May of this year.  This incident is critical to

18   understanding both the physical danger of the defendant and the

19   obstruction efforts that he goes to.  It is a recorded example

20   of his use of force in connection with a Freak Off.  And when

21   we get to the end of this example, the defendant was eventually

22   forced to acknowledge that he, in fact, is the individual

23   featured in that video, despite multiple previous denials that

24   this incident occurred.

25           So, in short, the evidence would show this:  Following

O9HLComC

1    a Freak Off at the InterContinental Hotel, the defendant

2    violently assaulted the victim who was trying to leave the

3    hotel room and was walking down the hall to the elevators.  He

4    punched her, he threw her to the ground, he kicked her.  He

5    attempted to drag her back to the hotel room, and then later he

6    threw a vase at her.  And it's after this assault that the

7    coverup started.

8        After the victim managed to leave the hotel, or --

9    pardon me.  When hotel security was helping the victim leave

10   the hotel, the defendant attempted to bribe a hotel security

11   officer with a handful of cash in exchange for that officer's

12   silence.  That security guard, however, refused to be bought.

13       Next, the defendant directed his staff to contact the

14   hotel security staff in an apparent effort to obtain the

15   surveillance video that recorded every moment of that assault

16   that I just described, and as your Honor can see on Exhibit A

17   to our letter from this morning.  These same employees of the

18   defendant were in contact with the victim at the same time to

19   ensure that she would stay quiet and she wouldn't say anything.

20   And within days of that March 5, 2016 violent attack that was

21   caught on video, the surveillance video disappeared from the

22   hotel server.  That's just not a coincidence.  That is a result

23   of the defendant's effort to obtain it through his staff

24   members.  And the coverup of that incident continued for nearly

25   another eight years -- seven years.  I apologize, your Honor.

O9HLComC

1              A civil suit was filed in mid November 2023 that,

2     among other allegations, detailed this assault at the

3     InterContinental.  The defendant issued a public response to

4     that lawsuit, which I will quote.  Quote, "I did not do any of

5     the awful things alleged."  Through counsel, the defendant

6     released an even more strident response where he denied, quote,

7     "offensive and outrageous allegations" and described the

8     lawsuit as, quote, "riddled with baseless and outrageous lies."

9              These are unequivocal denials of the defendant's

10    participation in this incident.  This happened in November of

11    2023.  And these denials are also further attempts by him to

12    obstruct justice and prevent the truth of this event from being

13    known.

14             So we fast forward to May of 2024 when this

15    surveillance video is obtained by the media and publicized.  It

16    is only then, only when there is indisputable proof caught on

17    video and published to the world that the defendant admitted

18    that he was involved in this assault.  The sequence of events

19    makes crystal clear that you cannot take the defendant at his

20    word.  You cannot believe him when he denies his criminal

21    conduct.  He lies to cover things up.

22             And make no mistake, March 5, 2016, is just one

23    incident of violence and obstruction that we have investigated

24    and would prove.  This investigation has yielded evidence of

25    numerous assaults against female victims and other individuals.

O9HLComC

1    These assaults include choking, hitting, kicking, and dragging

2    victims, often by their hair.  The investigation has yielded,

3    which I will talk in a little bit more detail later, detailed

4    evidence of these Freak Offs in the form of travel records,

5    communications, hotel records, witnesses, and videos.

6            So this is the kind of conduct I am talking about when

7    I argue that the defendant is a danger to the community.  This

8    Freak Off activity is core to this case.  It's a way of

9    controlling female victims' lives, method of using physical

10    force against them, all to compel them to engage in sex acts

11    that the defendant wants.  And this decades-long history of

12    violent conduct makes clear that even the most stringent bail

13    conditions will not suffice to ensure the safety of this

14    community.

15            The danger inquiry is focused on danger to any real

16    person, and the evidence shows that the risk of danger in this

17    case is acute.  The risk of danger is acute towards victims,

18    towards some of the defendant's staff, towards other -- and

19    towards other witnesses.  His past assaults have caused

20    significant injuries and required periods of physical recovery

21    for individuals who have been injured.  And what's more, this

22    conduct takes place behind closed doors typically.  It

23    typically takes place in settings that are not easily monitored

24    by even stringent conditions of release.  And the investigation

25    has further showed that this defendant's violence was both

O9HLComC

1    premeditated, but often spontaneous, and the spontaneity

2    exacerbates the difficulty of crafting conditions of release.

3    It's very difficult to ensure the safety of any person when the

4    defendant has the propensity to become violent at the slightest

5    provocation.  No bail conditions can address that.

6           It's this longstanding pattern of abuse that is really

7    critical here, your Honor.  This pattern has been entirely

8    undeterred by over a decade, by threats of public exposure, and

9    by law enforcement intervention, and it's incredibly probative

10   of whether the defendant will continue to act the way he has

11   done for the past few decades.

12          And the risk of obstruction is also incredibly

13   significant.  The defendant's power gives him a unique ability

14   to influence and intimidate witnesses and victims.  Witnesses

15   we have interviewed have universally expressed their fear of

16   the defendant.  His influence makes it extremely difficult to

17   convince people that they will be safe from his actions.  And

18   evidence like the March 5, 2016 incident that I just outlined

19   makes it clear that the defendant is willing to deflect, to

20   minimize, and to lie about his conduct.

21          And March 5 is not the only incident of obstruction in

22   this case.  Following the November civil suit that I mentioned,

23   the defendant and his coconspirators continued their efforts by

24   reaching out to potential victims and witnesses.  This outreach

25   has included several different types of contact.  The defendant

1    himself has contacted witnesses, including those who received

2    grand jury subpoenas from the government in this case, and that

3    contact has occurred prior to dates of testimony or meetings

4    with the government, and in one case with an individual who

5    hadn't spoken to the defendant in years prior to this reachout.

6    The defendant also directly contacted at least one victim,

7    which I will circle back to momentarily.

8           This constant contact with witnesses is important to

9    understand, and so just one example from this past week is

10   illustrative.  On September 10, which is one week ago, Dawn

11   Richard filed a civil complaint detailing abuse she experienced

12   and observed from the defendant.  And the allegations in

13   Ms. Richard's complaint overlap in time period with the events

14   charged in this criminal case.  Several days later, on

15   September 13, another member of a band that Ms. Richard had

16   been in with the defendant, an individual named Kalenna Harper,

17   released a statement that, in sum and substance, denied that

18   she saw some of the same things that Richard's complaint

19   alleges.  And so where does the defendant's contact come in?

20          Well, in between September 10, the date of the filing

21   of the lawsuit, and September 14, the day after the public

22   statement by Ms. Harper, the defendant and Ms. Harper had 128

23   total phone contacts.  The defendant called or texted

24   Ms. Harper 58 times in four days.  There hasn't been any

25   contact since September 14.  This incident is just one way of

O9HLComC

making clear that this defendant has the ongoing ability to keep witnesses, even witnesses who might have been around for very distant-in-time abuse, in his pocket and at his disposal.

Some of the ways in which the defendant contacts victims and witnesses are also chosen deliberately to avoid detection. Occasionally intermediaries are used to reach out to individuals. And in one case, the call, the reach-out to the victim I mentioned earlier, that communication was recorded on another individual's cell phone. It's ways like this that make this obstruction incredibly difficult to detect. And from our investigation, we know what's happened on some of these calls. We know that at least one purpose is to spread false narratives and to get witnesses on his side, and by telling them -- sometimes gaslighting them into making them think that something happened that didn't happen.

So in the calls with the victim that I mentioned, there are two calls. This victim is financially supported by the defendant, and two calls are recorded. The defendant asked for the victim's support and friendship, and attempts to convince the victim that she had willingly engaged in sex acts with him. In this call, the defendant ensures the victim that if she continues to be on his side and provide support and friendship, that she doesn't have to worry about anything else, which is just a thinly-veiled reference to continuing that financial support. And that call happened, I believe, three

O9HLComC

```
1    days -- sorry, those two calls happened three days after the
2    filing of that November lawsuit.
3              So in sum, this long history of obstruction and
4    violence demonstrates that the defendant simply cannot overcome
5    the presumption that no condition or combination of conditions
6    can ensure the safety of the community.
7              And I will note that, at least with respect to
8    obstruction specifically, courts have denied or revoked bail in
9    similar situations in this circuit.  For example, *United States
10   v. Lafontaine*, 210 F. 3d 125 (2nd Cir. 2000) at page 134,
11   that's where bail was revoked when the defendant contacted a
12   potential witness and attempted to feed that witness a false
13   narrative with the hope that that witness would adopt it as her
14   own testimony.
15             And this case is truly in the heartland of detention
16   cases of this magnitude and this similar -- similar charged
17   conduct.  I will just briefly review some similar cases.  R.
18   Kelly in the Eastern District of New York was also charged with
19   racketeering and sex trafficking.  He was detained on all three
20   grounds:  Danger, obstruction, and risk of flight.  Like this
21   case, there was a pattern of obstruction that had occurred, and
22   like this case, the sexual abuse that was alleged was violent
23   and repeated.
24             Jeffrey Epstein from this district was charged with
25   sex trafficking, and detained on dangerousness, obstruction,
```

O9HLComC

1    and risk of flight grounds.  In that case, the charged conduct

2    was much less recent, and so was the obstruction, yet,

3    nevertheless, Jeffrey Epstein was detained on those grounds as

4    well.

5          Keith Raniere in the Eastern District as well, also

6    charged with racketeering and trafficking, again, detained on

7    all three grounds.  While the violence in that case was

8    serious, it was not personally committed by Raniere, but the

9    Court still found that the defendant was a danger to the

10   community.

11         And finally I will turn to risk of flight.  The

12   defendant's incentives to flee changed substantially when he

13   was arrested last night.  Those incentives are markedly

14   different today than they were yesterday, and his risk of

15   flight is much more significant and much more pronounced.  He

16   is now charged with serious offenses carrying significant, in

17   some cases mandatory terms of imprisonment.  And as I will get

18   to next, the evidence is strong and the possibility of a

19   substantial sentence is one factor to be weighed in assessing

20   risk of flight.

21         He's also charged with crimes that are highly

22   sensitive and that risk serious reputational harm to him, and

23   it's the same things that he has spent the last decade trying

24   to sweep under the rug and trying to cover up.  The defendant

25   is a wealthy man.  You can see that in the pretrial services

report.  It's also widely known.  That wealth allows him the

ability to flee quickly and without detection should he so

choose.  His counsel have taken steps during this investigation

to minimize flight risk.  They have taken his passport,

attempted to sell his jet, and reported his locations and

travel to the government.  All of those things have been to set

them up for the argument here today, to be able to say today

that he is not a risk of flight.  Those things were done when

his incentives were entirely different.

        And as I expect you will hear from defense counsel,

the defendant did fly to New York two weeks ago at his

counsel's advice, and has been living in a hotel in the city

for the past two weeks, waiting, potentially, for his arrest.

So instead of fleeing from the district, he came to the

district.  But while he is sitting in a hotel, waiting to be

arrested on federal charges, at a time when he should be on his

very, very best behavior, he had what appears to be narcotics

at his hotel room that was found after his arrest last night.

The test results have not yet -- are not yet conclusive, so I

don't want to suggest that we have conclusive test results, but

they are bags of pink powder that are visually similar to bags

of pink powder that we have seized before from the defendant

that have tested positive for ecstasy and other drugs.

        So just one quick note on the defendant's proposed

bail package.  My focus in the argument now is on detention

O9HLComC

1    because, as I mentioned, this really is a heartland detention

2    case.  I am happy if the Court has questions to address my

3    concerns in more detail, but from the government's perspective,

4    the defendant's bail package is woefully inadequate.  Its focus

5    is on risk of flight alone, and there is not a proposed

6    condition that addresses many of the concerns of danger and

7    obstruction.  And, in fact, the government submits that there

8    is no way to successfully curtail the type of obstruction that

9    the defendant has been engaging in here.

10           So finally, just a note on the strength of the

11   government's evidence, which is another factor that the Court

12   may consider in its decision.  The government has spoken to

13   over 50 witnesses, many of whom have personally witnessed the

14   defendant's abuse or seen signs of it.  The government has

15   sworn out multiple search warrants for cloud accounts, for

16   electronic devices, and for the defendant's person and

17   premises.  The government has received voluntary productions of

18   electronic evidence from coconspirators, victims, and

19   witnesses.  Some of these searches have yielded an incredible

20   amount of electronic evidence, over 90 cell phones, laptops,

21   and cloud storage accounts, as well as 30 other electronic and

22   storage devices, such as hard drives, thumb drives, cameras,

23   and a surveillance system.  We seized physical evidence from

24   the defendant's residences, the guns, the ammunition, and the

25   extended magazine I mentioned, and other evidence that

O9HLComC

1    corroborates the victim's account of the Freak Offs.  We also

2    obtained documentary evidence from over 300 grand jury

3    subpoenas that have been issued, and other voluntary

4    productions.

5            Altogether, this evidence, the electronic evidence,

6    the documentary evidence, and the witness testimony, it is

7    going to be used to prove exactly what we charged in our

8    indictment.  And for Freak Offs specifically, we have

9    communications about setting up the room, communications with

10   male escorts about getting to the rooms, about traveling to the

11   rooms.  We have the supplies that were used in the Freak Offs.

12   We have hotel records, often showing extensive damages, and

13   frequently showing reservations made in the names of his

14   employees, and we have videos sometimes of the acts themselves.

15   This is the evidence we will use to prove this case, and it

16   confirms that the defendant is a danger to the community and

17   poses a serious risk to the integrity of these proceedings

18   through his continued efforts at obstruction.

19           Your Honor, for the reasons I have stated here and in

20   our letter, the government respectfully submits that the

21   defendant should be detained pending trial.

22           THE COURT:  Thank you, counsel.

23           Mr. Agnifilo.

24           MR. AGNIFILO:  Yes.  May I use the podium, your Honor?

25           THE COURT:  Of course.

O9HLComC

1          MR. AGNIFILO:  Thank you, your Honor.  I am going to

2     address the government's letter and some of the arguments they

3     made in a second, but I want to go through first some things

4     that I think are very important.  And the first is this:

5     Something very significant in this case, and for the purposes

6     of what we are all here today to decide, happened on

7     September 5 of this year, about 12 days ago.  And as my

8     colleague with the United States alluded to, that's the day

9     that Mr. Combs flew from where he was living in Miami to

10    New York.

11          We had told the government before he left Miami that

12    we -- let me back up for a second.  It became apparent to us,

13    because this isn't our first rodeo, that we were getting close

14    to an indictment.  We met with the prosecutors and their

15    chiefs, and we left that meeting realizing that an indictment

16    was probably coming down soon.  We didn't know if it was a week

17    away, two months away, but it was going to be in the fall.

18    That's what it seemed to us.

19          I spoke to my client.  I said, My recommendation is

20    that you come New York.  I think less than 20 hours later, he

21    flew to New York.  He landed in New York.  I told my colleagues

22    with the government, Just so you know, Mr. Combs is in

23    New York, and I would like the opportunity for him to turn

24    himself in.  He has come to New York to turn himself in.

25    That's why he is here, and if he doesn't turn himself in, just

O9HLComC

let me know if you want to know where he is -- he wasn't

hiding; he was in a hotel -- and I will tell you, and the case

will start.  Twelve days later, the case has now started.

So we were here because he did the exact opposite of

what we see defendants do when they are presenting problems to

the Court by any means, whether it be risk of flight or danger.

He actually came to the district voluntarily.  At the time, I

don't know if there was an indictment returned or not.  It's

none of our business, but we didn't know whether there was.  He

came here to sit it out, to wait.  If he had to wait six

months, he would have waited six months.  He only had to wait

12 days, as it turns out.  But that is a very significant step,

and it's only the last of many, many steps.

We got involved in this case -- Ms. Geragos and I got

involved in this case in March of 2024.  And I want to go

through -- the government, I thought, did a very full job going

through parts of their investigation.  We have been doing an

investigation also.  And on March 13, I reached out to my

colleagues at the U.S. Attorney's Office.  I never met any of

them.  I don't think they met me.  I introduced myself, and I

said I wanted to talk to them about certain aspects of the case

because I had an idea even then where this was going.  And I

had an idea.  And we will take a step back even further.  And

this is all in the public record by now.

A lawsuit was unsealed in November of 2023.  It was

O9HLComC

1    unsealed for a very short period of time before it was settled,

2    but it involves one -- it involves -- I don't want to get into

3    it because no one is being named -- but someone who seems to

4    play a prominent role in the indictment.  And so what seemed to

5    me -- and I think I was absolutely right -- is that this -- the

6    unsealing of this lawsuit and the settling of that case

7    garnered a tremendous amount of public attention.  And I

8    concluded that my colleagues with the government read the same

9    newspapers I did, saw that there was talk of sex trafficking in

10   this civil complaint, which was settled, and started an

11   investigation.  And by the time we really got wind of it a few

12   months later, the investigation seemed to be in high gear.

13           So I contacted my colleagues with the U.S. Attorney's

14   Office before the searches.  The searches were on March 25 of

15   2024, and the searches consisted of searches of the residence

16   in Florida, the residence in California.  And Mr. Combs was

17   flying with certain members of his family in his plane.  They

18   searched him.  They got cell phones.  They got a lot of phones

19   from the different houses.  They got a lot of different items

20   from the different houses, and I will talk about some of that

21   in a second.  And that was the day that I first spoke to the

22   prosecutors in that case.  And it was apparent to me -- because

23   I got the search warrants on that day, and the search warrants

24   had the identical charges, most of the serious ones, that we

25   have in the indictment today.

O9HLComC

1          So when my colleague says that the world changed

2     yesterday, the world really didn't change yesterday very much

3     because we knew on March 25 where all this was headed, because

4     what was apparent to us, based on our conversations with the

5     prosecutors, on our review of the search warrant, is this was

6     an investigation into racketeering conspiracy, into sex

7     trafficking, and into violations the Mann Act, among other

8     things.  Three of those things are now in the indictment.  So

9     there's been no dramatic change in circumstances.

10          About a week after the search, Ms. Geragos and I flew

11     down to Florida.  We met with Mr. Combs for a period of time,

12     and Ms. Geragos and I took his passport.  We took physical

13     possession of his passport on April 1, 2024.  I called my

14     colleagues with the United States Attorney's Office.  I said, I

15     want you to know Ms. Geragos and I have Mr. Combs' passport.

16     We sent them an e-mail, and we said, We are going to have his

17     passport for the duration of this investigation.  He is not

18     going to fly internationally.  You won't have to worry about

19     that.  You are going to know that he is in the United States

20     because we have his passport.  And not only that; if he travels

21     domestically during the course of this investigation, we will

22     tell you.  And we did, without fail.

23          He went to a graduation of some of his children in

24     California.  We said, He is traveling from Florida to

25     California.  We sent them an e-mail.  He went on a whitewater

O9HLComC

rafting trip at one point, and we sent them an e-mail.  Anytime

he traveled domestically in the United States during the entire

course of this investigation, we told the government where he

was going.  I have been doing this 35 years.  I don't know that

I know the last time that that happened, much less us taking

his passport.

          We then took the passports of several of his family

members.  I have in my hands Mr. Combs' passport plus five, and

we have had these for months, and we told them that we have had

these for months.  And this isn't a show.  This isn't, Oh, they

are just doing this so they can do better at a detention

hearing one day.  This is because we took this investigation

absolutely seriously, as serious as one can take an

investigation, from the earliest stages.  And we made what we

think to be prudent decisions with Mr. Combs.  We don't do

these things without him.  We are a team here.  And we made

these decisions together to show the government, to try to earn

the government's trust, truthfully; to try to earn the

government's trust, to say, Hey, you know what, we know it's

coming -- back in March we knew it was coming -- we know it's

coming, and when that day comes, we are going to want you to do

two things.  They haven't done either of them, but we wanted

them to do two things:  We want you to let him surrender -- and

let me just back up for one second.

          And I am not here to find fault with anything or to

O9HLComC

1    say anything controversial.  The searches that were done on

2    March 25 were very scary for people who had no involvement in

3    this investigation whatsoever.  Semiautomatic rifles were

4    pulled on completely innocent people.  You can see videos of

5    the orange lasers on the chest of one of his children.  You

6    could see what seems to be an AR-15 at the head of another one

7    of his children.  And the kids were marched out, and other

8    people were marched out, not through the back of the house

9    where there wasn't dozens of reporters and a news helicopter,

10   but the front of the house so that these young, completely

11   innocent people could be seen on the international news with --

12   handcuffed for two hours.  Handcuffed for two hours.

13   Completely innocent, not involved in the investigation at all.

14   And we did not want that to happen again.  We took great pains

15   so that that would not happen again.

16            And that is one of the reasons he flew to New York.

17   You want me.  I know you want me.  Here I am.  Here I am.  And

18   he came to New York and we told them so that nobody else would

19   be afraid, so that, God forbid, God forbid, there be no tragedy

20   by accident.  The agents in this case are fine people.  I have

21   gotten to know many of them.  They took good care of Mr. Combs

22   last night.  I want to say that.  Things happen when people are

23   afraid, and I didn't want anyone to be afraid.  He didn't want

24   anyone to be afraid.  The case is about him, and here he is

25   because he came here to face it.

O9HLComC

1            We were worried that he had an airplane because, of

2     course, we are.  I can't remember when it started, but

3     Ms. Geragos and I said, You know what, we have to sell that

4     plane.  We have to sell that plane.  And we started efforts --

5     there is essentially a financial management company that deals

6     with a lot of these sorts of issues.  I barely own a car.  I

7     certainly don't own a plane.  But it's hard to sell a plane,

8     apparently.  And we have been trying to sell the plane for

9     about four or five months.  We currently have a letter of

10    intent, which I am told is a good thing when you are trying to

11    sell a plane, so maybe we will actually sell it this time.  But

12    we are trying to sell the plane.  Why are we trying to sell the

13    plane?  Because it's not our first rodeo, and we know it's

14    better if he doesn't have access to a plane.

15            So what's the deal with the plane at the moment?  Luck

16    would have it, it's being chartered.  So I guess what happens

17    with these planes is if you are not going to fly on the plane a

18    lot yourself, a plane needs to be active or else it falls into

19    disrepair, so folks charter it, and that's what's happening

20    here.  So some unrelated party is flying in the plane from

21    Los Angeles to Teterboro Airport, I think landing in Teterboro

22    Airport tonight.  That's really a headache I need.  The plane

23    that I am trying to keep on the West Coast is flying to

24    Teterboro, but we have nothing to do with it.

25            And the government, to their credit, hasn't made a big

O9HLComC

1    deal out of the plane because they see we are trying to sell

2    the plane.  But that's a significant act, I think, of goodwill

3    and trustworthiness that we are trying to sell the plane.  I

4    wouldn't have the -- I don't know if temerity is the right

5    word.  I wouldn't be foolish enough, I think, to come before

6    your Honor one day -- I didn't know it would be your Honor; I

7    didn't know when this day would come -- with us having this

8    airplane, with us not collecting all these passports, without

9    Mr. Combs coming to New York and saying, Hey, Judge let him go.

10   Well, why would I do that, Mr. Agnifilo?  What have you shown

11   me?  What trust, what trust have you earned in the eyes of the

12   Court?  And the answer would be, None.  But we have.  And trust

13   is earned, and we have earned it.

14        And my colleagues with the government, we couldn't win

15   them over.  We tried, and we couldn't win them over.  We

16   couldn't agree on a very substantial bail package.  We couldn't

17   get them to turn himself in, and I get it.  That's their right.

18   But, you know, we have your Honor.  So we have been trying to

19   sell the plane.

20        But coming back to the New York situation just for a

21   second.  One of the things that I notice from the indictment

22   is, there is one victim in Count Two, in the sex trafficking

23   charge.  There is one victim.  One of the things that's

24   happened -- and I will take my third step back.  When the

25   complaint of the civil case was unsealed around Thanksgiving

O9HLComC

```
1    last year, November of last year, there was a flurry of other
2    civil cases, many, many of them.  I think 12, 15.  We don't do
3    the civil stuff, Ms. Geragos and I, but there is another lawyer
4    who does.  We were getting a new civil case every week,
5    sometimes two a week.  And what it seemed to us -- and I am not
6    disparaging anything -- is people were jumping on a bandwagon
7    of sorts.  I think someone noticed, Wow, Mr. Combs wrote a --
8    the settlement is confidential, so I am not going to say what
9    it was, but it was large.  Mr. Combs wrote a very large check
10   to someone who he was in a relationship with for ten years, who
11   is the person in Count Two.  And I will get to that in a
12   second.  Ten-year relationship.  If he is writing checks, I
13   want my check, and everyone lined up to get their checks.  And
14   we were getting an endless supply of civil lawsuits.
15        So I had no idea when this indictment came down, I had
16   no idea, are we going to have one victim or are we going to
17   have 12 victims.  I didn't know.  I was ready for 12 victims.
18   I was happy to see there was only one.  So it is not as though
19   this indictment is somehow worse than we imagined.  It's, if
20   anything, better than we imagined, and eminently manageable,
21   from our perspective.
22        I won't belabor the point.  I notice in the pretrial
23   services report, I think they say that Mr. Combs should be
24   detained because he has a criminal history.  I don't know that
25   that's right.  He went to trial in a New York state court in
```

O9HLComC

```
 1    2001 and was acquitted, fully acquitted.  And one thing that I
 2    think is noteworthy, and I would be derelict in my duties if I
 3    didn't bring it up, is that was quite a serious case, and he
 4    went to every court appearance.  He went to every court
 5    appearance for the year or so that that case was pending, and
 6    he went to every court appearance.  And then a jury of 12
 7    New Yorkers, just like a jury of 12 New Yorkers one day will
 8    hear this case, acquitted him.  So he knows what that's like.
 9    He knows what that involves.  And it looks like he is going to
10    have to do that again.  And he is ready to do it again, and he
11    came here to do it again.  So I don't think he does have a
12    criminal history in terms of felony convictions.  I don't think
13    he has any felony convictions.  I think there might be a
14    misdemeanor that goes back some period of time, but I think
15    that's it.
16              One of the other things that's in the pretrial
17    services report that I just want to mention briefly -- and this
18    is mostly a confidential matter, so I don't want to get too
19    much into it.  One of the things that Mr. Combs is doing in
20    New York is getting treatment and therapy for things that, most
21    respectfully, he needs treatment and therapy for.  And I say
22    that as his lawyer.  And he is getting that.  And I notice that
23    in the pretrial services report they had that as a reason to
24    detain him.  I don't see the world that way at all.  I think
25    everybody has flaws.  I think that some of what the
```

1  government's presentation this afternoon relates to is that

2  Mr. Combs is not a perfect person.  There's been drug use.

3  There's been toxic relationships that I think were mutual in

4  their toxicity, as these things tend to be.  And if he has seen

5  fit at the ripe old age of 54 to really take things into his

6  own hands and try to be better for the rest of his days, I

7  think that is only a positive, only a good thing.  I don't see

8  anything negative in that.  And I think if there is one thing

9  that we have seen as a country and as a justice system, is if

10  someone wants to stand up for themselves to try to get the help

11  that they need, we stand with them.  We stand with them.  We

12  don't say, Wow, you are trying to get the help that you need;

13  we think you should be in jail now because you are trying to

14  get the help you need.  So I appreciate the efforts of pretrial

15  services and their observations and the hard work that they do

16  and always do, but I very much disagree with that aspect of the

17  report.

18      I want to talk a little bit about the government's

19  sentencing letter.  I think many of the things that my

20  colleague talked about in terms of obstructing justice is not

21  actually obstructing justice.  And let me name a few.  They

22  talk about -- my colleague talks about March of 2016.  And this

23  is an unfortunately fairly well-known event because somehow --

24  we will never know how exactly -- this hotel footage found its

25  way to CNN and found its way to the rest of the world.  I

O9HLComC

1    wonder how that happened.  We didn't have it.  The government

2    had it.  It got to CNN on a day that Donald Trump wasn't having

3    any court proceedings, on a day that was sort of a slow news

4    day.  The news picked it up because CNN got this videotape.

5    And we all saw it and I saw it.  Mr. Combs saw it.  Mr. Combs

6    issued an apology.  Is that a wise thing?  Was that not a wise

7    thing?  I don't know.  He wanted to do it.  It meant something

8    to him, and he apologized.  And that's what he did.

9            Now, one thing that's important about the video -- and

10   since the government talked about some of the evidence, we have

11   to talk about some of the evidence.  What I think the evidence

12   is going to show about the events leading up to this video

13   being made is that two people are in a hotel room, Mr. Combs

14   and Victim Number 1 from Count Number Two.  Having looked

15   through more text messages and e-mails than I care to, and I

16   think the government would agree, one of the major issues in

17   that couple's relationship at that point, and at many other

18   points, is that Mr. Combs had more than one girlfriend, okay.

19   And Victim Number 1 was looking through Mr. Combs' telephone

20   when Mr. Combs was asleep, found evidence that Mr. Combs had

21   more than one girlfriend.  She was not the only one.  She hit

22   him in the head, while he was sleeping, with his own cell phone

23   and then took his clothes.  She has two bags as she runs into

24   the hallway.  In one of those bags is Mr. Combs' clothing.  All

25   of it.  She has left him in a hotel with no clothes, having hit

O9HLComC

1    him in the head in his sleep with a cell phone, which is why he

2    comes out into the hallway in a towel.

3              Now, I am not going to comment on the video because my

4    client commented on the video, and we all know what we saw, but

5    to the extent that the government says that this is somehow

6    evidence of sex trafficking, it's evidence of Mr. Combs having

7    more than one girlfriend and getting caught.  And that will be

8    shown resoundingly not just by my words, but by the written

9    communications between those two people.  And let me talk about

10   that for a second.

11             This is a ten-year relationship.  This sex trafficking

12   is a ten-year relationship.  These two people were in love.

13   That will be made abundantly clear by the way they speak to

14   each other, by the way other witnesses described their time

15   together, and by the circumstances of how they broke up.  They

16   were in love, but Mr. Combs wasn't always faithful.  There was

17   someone else.  One person, maybe more than one person.  This

18   was a source of great hurt to Victim Number 1.  At the end of

19   the day, there was mutual philandering, and Victim Number 1

20   ended up marrying the trainer that Mr. Combs got for her, and

21   had two children.  That signaled the end of the relationship.

22   They had been cheating on each other for years, but now she had

23   two kids with the trainer, and that was the bridge too far that

24   led to their relationship coming apart.

25             Years and years and years later, when I submit Victim

O9HLComC

 1   Number 1 realizes she had a pretty good thing for ten years

 2   with Mr. Combs -- they were in love, it was exciting, she was a

 3   recording artist, he had a recording studio, things -- I don't

 4   want to comment on her present life.  I have no idea what it's

 5   like.  Maybe things with the trainer weren't quite the same as

 6   they were with Mr. Combs, and she does something that is very

 7   significant, if we are going to talk about the evidence in this

 8   case.  She has her lawyer call Mr. Combs' lawyer, and in a

 9   recorded conversation for eight minutes and 12 seconds, where

10   her lawyer says, My client has written a book.  It's about your

11   relationship.  She is not talking about sex trafficking and she

12   is not talking about sex crimes.  My client has written a book,

13   and she is going to publish it, but if you want to buy the

14   rights, then you will have the exclusive rights, and she won't

15   be able to publish it.  And you know what, you can buy the

16   rights for $30 million.  A recorded conversation.  The

17   government has it.  We have it.

18         That conversation, I guess, didn't go so well for her

19   and the lawyer.  So the next thing we know, it's now November

20   of 2023, and she has a different lawyer.  This lawyer is not so

21   interested in intellectual property for $30 million.  This

22   lawyer is saying, I am going to bring a civil sex case because

23   the statute of limitations allow me to do that, because there's

24   been a change in the statute of limitations that allows me to

25   do that, and that's what I am going to do.  So I am not really

O9HLComC

1    here to embarrass you anymore to the tune of $30 million; I am

2    going to bring this civil sex claim against you.

3         It's negotiated.  Ms. Geragos and I are not involved

4    in the case yet because there is no criminal component to it,

5    and that's significant to what I am about to get to in a

6    second.  The case settles for an undisclosed and large amount

7    of money, and then we have the torrent of other civil claims.

8         Now, one of the things the government talked about,

9    and they talked about obstruction of justice, is things that

10   seem to have happened around the time that this lawsuit settled

11   and other lawsuits were coming in.  Certainly, Mr. Combs did

12   not know about any Southern District investigation at this time

13   period.  I mean, absolutely nothing.

14        And one of the important -- my colleagues mentioned

15   this case called Lafontaine, and they cited it to you.  And I

16   read Lafontaine just before we came today, and the difference

17   in Lafontaine is Lafontaine was charged.  Lafontaine was in

18   jail.  Lafontaine was released, and he was told, Don't contact

19   any of the witnesses in this case.  So what does Lafontaine do?

20   He gets released and he starts calling witnesses.  So that is a

21   drastically different situation than we have here, where

22   Mr. Combs doesn't even know that there is a criminal case.  No

23   one knew there was a criminal case afoot.  So I called the

24   prosecutors in March.  My colleagues were saying these things

25   happened in November of 2023.  There is no criminal lawyer

O9HLComC

1    involved.  I am not involved.  Mr. Combs has no idea that there

2    is a criminal case going on.  So I don't see any of these

3    things as obstruction of justice.

4         What I do see, looking at things in the light most

5    favorable to the government, is there is a tremendously

6    embarrassing event for Mr. Combs; not something he thinks is

7    criminal, not something that's under investigation.  What

8    happened on March 5, 2016, I know of no DA investigation, no

9    police investigation, no federal investigation surrounding this

10   video that we all saw from March of 2016.  The problem isn't

11   that.  The problem is, it's embarrassing.  And this is a man

12   that's involved in very significant business deals and in very

13   significant business transactions, and he can't afford, quite

14   frankly, to be seen in a towel hitting a girlfriend.  He is not

15   trying to stop a criminal investigation.  There is no criminal

16   investigation.  He and this person had a mutually toxic

17   relationship for quite awhile.

18        Shortly after the events that are depicted on the

19   videotape that we all saw, Mr. Combs checks himself into a

20   rehab facility because he is doing too many drugs, and he has

21   an unhealthy relationship, and he knew it, and he had the

22   wherewithal to try to go get help.  And this person -- other

23   person, I believe, got help around the same time.  So this is

24   not a one-sided thing.  Now, why would it be depicted as a

25   one-sided thing?  There's 30 million reasons.  There's

O9HLComC

1  30 million reasons for this to be depicted as a one-sided

2  thing; one for each dollar that he was being sued for.  These

3  people didn't go to the cops.  These people didn't go to law

4  enforcement.  This woman didn't say, My goodness, I am the

5  victim of sex trafficking; I am going to go tell law

6  enforcement.  The first thing she did is say, I am going to

7  write a book, but for $30 million, you can buy the rights.

8  That's the first thing she did.  And the second thing she did

9  is she brought a civil suit.

10      So when they talk about the evidence in this case

11  being strong, I respectfully descent.  The evidence in this

12  case is deeply problematic.  Now, this is not the time to

13  litigate a very complicated criminal case, but the strength of

14  the evidence is one of the factors that we are told we have to

15  think about, so that's why I am talking about it.

16      In terms of what happened recently with this Dawn

17  Richard lawsuit and someone named Kalenna Harper coming out and

18  saying what her experience was, this is the furthest thing from

19  witness obstruction I can think of.  A person brings a civil

20  lawsuit.  Another person from the same band that the person who

21  brought the civil lawsuit was in -- and the civil lawsuit is

22  all about, Combs was hard on us, he drove us, he made us work

23  all the time, you know, he did a couple of inappropriate

24  things.  And so someone with the exact point of view of the

25  civil plaintiff comes forward and says, in essence -- and this

O9HLComC

1    is -- I thought it was a soft, respectful statement.  And the

2    statement was, I am not taking away her experience.  That

3    wasn't mine.  That wasn't my experience.  She is entitled to

4    her experience.  I was there.  That's not what I saw.  That's

5    not what I saw.  That's two witnesses having divergent

6    recollections of similar events.  And I expect this trial is

7    going to feature exactly that.  So there is nothing wrong with

8    that.  That's why we have criminal trials and civil trials.

9             I take the obstruction of justice seriously,

10   obviously.  And one thing I note -- and my colleague said that

11   there is nothing your Honor can do to stop Mr. Combs from

12   obstructing justice.  One thing that I think is noteworthy --

13   and my colleagues have investigated this case exhaustively for

14   several months, and I give them credit for that -- is that the

15   only thing they can say since the time Ms. Geragos and I have

16   been involved in this case is that another witness said

17   something different than a first witness.  And I am not even

18   sure Dawn Richard is a witness in this case.  I am not asking,

19   but I don't really see how she would play a role.  So I have to

20   say, quite frankly, your Honor doesn't have to do anything to

21   make sure that he doesn't obstruct justice because he hasn't

22   done a darn thing since we have been involved in this case.

23   And even taking everything that the government says as true,

24   that's true.

25             Okay.  There is a section in the government's letter

O9HLComC

1    called Sex Trafficking and Abuse, and I want to talk about that

2    because sex trafficking is a very serious crime and I want to

3    address it head on.  One victim, ten-year relationship.  It

4    seems like what their theory is, is that as part of the way

5    that these two adults wanted to be intimate together is that on

6    occasion, a third person, a male, would come into their

7    situation and have sexual contact with the woman.  And from

8    what I heard the government say -- and Mr. Combs would not have

9    sexual contact with the male.  But, you know, this male would

10   come and have sex with the woman.  All right.

11        So Ms. Geragos and I have interviewed a half a dozen

12   of these males.  We have been as busy as the government has

13   over the last six months.  And I can represent to your Honor, I

14   have asked all the questions I could think of, of, Did anything

15   ever, ever seem remotely nonconsensual?  Was anybody too drunk?

16   Was anybody too high?  Did anyone express any hesitation?  Was

17   there the slightest inkling that possibly, possibly the woman

18   wasn't consenting?  No.  No.  No.  No.  I think my colleagues

19   spoke to some of the same people, and I expect that they heard

20   the same thing.

21        One thing that I didn't see in the government's very

22   carefully written detention letter, they never say anybody

23   didn't consent.  They don't say it.  They suggest a lot of

24   things.  They suggest that because Mr. Combs is rich, because

25   Mr. Combs took care of his girlfriend financially -- they never

O9HLComC

1    lived together, and that's important for a reason that I will

2    talk about in a second.  But because Mr. Combs provided for

3    this woman, because they were in love, he was in love with her

4    and she with him, that somehow this exerted some sort of

5    control that overwhelmed her free will.  And they certainly

6    suggest that, but they are very good writers, and if someone

7    didn't consent, they would have written that in a sentence, and

8    they didn't.  And it's because I think they are speaking to the

9    same people we are, and no one is talking about lack of

10   consent.

11          Is it, maybe, unusual -- I shouldn't say that.  That's

12   a judgment word.  Does everybody have experience with being

13   intimate this way?  No.  Is it sex trafficking?  No, not if

14   everybody wants to be there.  If everybody wants to be there --

15   the federal government -- we are not all better off if the

16   federal government comes into our bedrooms.  They don't do

17   great there, and that's what's happening there.  They are

18   coming into this man's bedroom, and they are making not just

19   judgments; they are charging him with statutes that, as they

20   said, could put him in jail for life.  I don't think these

21   things are going to pan out.  I just don't think they are going

22   to pan out.

23          They talk about other violence in their bail letter,

24   and they are talking about a kidnapping from 2011, and I know

25   exactly what they are talking about because we interviewed -- I

O9HLComC

1    know who the person was who was allegedly kidnapped.

2    Ms. Geragos and I interviewed her in Los Angeles.  We took a

3    statement from her.  She certainly didn't use the word

4    "kidnapping" with us.  I won't get into what she did say, but

5    let's suffice it to say there is another side to that story,

6    and one day that other side might be told.

7            Okay.  Firearms.  Mr. Combs employs a professional

8    security company that provides his security.  He is at a point

9    in his life where he has that ability, and he has the ability

10   to employ a security company to keep him and anybody who might

11   be in his home safe.  Now, why would he do that?  I don't think

12   you have to necessarily be Sean Combs to need personal safety

13   anymore.  I mean, what we see is that, you know, people --

14   homes especially, you know, in Los Angeles and all the areas of

15   Los Angeles, including where Mr. Combs keeps his house, and in

16   Miami, responsible personal security is important, and that's

17   what we are talking about.  That's what we are talking about.

18           These aren't his guns, you know.  He has nothing to do

19   with how guns are kept in his house.  And my suggestion to the

20   Court is, if the government really thought that these were his

21   guns, they would have charged him with them, and they didn't.

22   He is not charged with firearms.  There's a part in the Methods

23   and Means section of the racketeering count where they say

24   there were firearms in the house.  We know there are firearms

25   in the house.  We know there are firearms in the house because

O9HLComC

1    he has a professional security company that keeps firearms in

2    the house.  How they do it, whether they did it right, whether

3    they did it wrong, whether they should have an AR-15 with no

4    serial number, you know what, not for us to say.  Not his gun.

5    And if it was his gun and they can prove it was his gun, I

6    think they would have charged him with a defaced AR-15, and

7    they didn't because it is not his gun, because he has a

8    professional security company that does all of this work.

9           A couple of other observations.  My colleague

10   mentioned the R. Kelly case.  R. Kelly involved children, flat

11   out.  Different.  Night and day different.  And the reason it's

12   night and day different is because children, thank goodness,

13   cannot consent.  There is no issue.  There is no issue of

14   consent when you are talking about a kid.  A kid is a kid, and

15   kids can't consent.  End of story.  Epstein, children.  Keith

16   Raniere, children.  Very, very, very different.  Very

17   different.  Children to adult, very different.  Children to

18   ten-year adult relationship, not even in the same ball park.

19          So where are we?  Where we are is we have a

20   substantial, substantial bail package.  Some members of

21   Mr. Combs' family are here.  If you can just -- there you go.

22   They have come here on short notice.  They are here.  They love

23   him.  They support him.  I won't go through it because it's in

24   our bail letter, your Honor.  We are talking about a

25   $50 million bond secured by a $50 million -- $48 million piece

O9HLComC

1   of property.

2           One thing that I think is very significant is, knowing

3   this day would come, on August 20, just less than a month ago,

4   we saw that there was, I think, $18 million of mortgage left on

5   that house in Florida.  It's called Two Star.  It was a

6   terrible business decision for Mr. Combs and his people.  We

7   paid off the mortgage.  Why?  Because we knew this day was

8   coming, and I wanted him to say one day -- one day I want to be

9   able to tell the judge in the Southern District of New York

10  that we have a $50 million bond secured by a $48 million house

11  with no mortgage.  So we paid off the mortgage because that is

12  what it means to build trust.  And we have done these things to

13  build trust in a real and substantial sense.  There is nothing

14  about this as a show.  No one makes bad financial decisions

15  just for a show.  It was important.  And I told him this is an

16  important thing to do.  You want to show the Court that you are

17  taking it seriously?  If we weren't taking this investigation

18  seriously back on August 20, we wouldn't have done it, and we

19  did do it.  If we didn't take this investigation seriously on

20  April 1, we wouldn't have taken his passport, and we took his

21  passport.

22          We have been taking this investigation seriously each

23  and every day since I have been involved in this case in March,

24  and yet, and yet, he flew here, and yet, he came here.  And so

25  we can trust him and we can trust him because he earned his

O9HLComC

1    trust through actions.  This isn't just the words of his

2    lawyer; this is him undertaking action to show your Honor that

3    he is trustworthy, that he is a man of his word.  He is not

4    going to obstruct justice.  He is not going to run away.

5          One day I expect we are going to have a trial, and my

6    colleagues from Southern District of New York, I know them

7    well.  They know me well.  We will have a fair trial, and this

8    will be adjudicated in the only way it possibly can; in a

9    courtroom, with evidence.  And I expect -- we have substantial

10   defenses, substantial defenses to these charges, to every

11   single one of them, every single one of them, and that is how

12   Mr. Combs is handling this case.  He is handling it head on,

13   the way he's done everything else in his life.

14         He's become a controversial figure.  He's become sort

15   of a punching bag for these civil suits, but he has also built

16   these tremendous businesses from scratch, doing things that

17   it's difficult for anyone to do.  I mean, Mr. Combs has

18   overcome tremendous odds.  His father was killed when he was

19   two years old, grew up in Harlem, and through hard work he has

20   earned everything that he has gotten.  He earned it.  And one

21   of the things that I submit wholeheartedly to your Honor is

22   that one of the things he's earned, and maybe the most

23   important thing that he has earned in his life -- and that's a

24   lot -- is he has earned this Court's trust.  He has earned this

25   Court's trust through his actions, the way he has always earned

O9HLComC

everything.  There's no difference.  And so I am asking your
Honor to release him on the very, very stringent and very
demanding bail proposal that we have on our letter on page 2
and page 3.

          And I am here for your Honor's questions, but I have
nothing else to say at this point.

          THE COURT:  Okay.  Thank you, counsel.

          Ms. Johnson, do you have any rebuttal?

          MS. JOHNSON:  Your Honor, I will be brief.  Just four
brief points.  Defense counsel has spoken extensively just now
about his view of the evidence, his thoughts on the defendant's
relationship, and his critique of law enforcement's operations
in this investigation, but I submit to the Court what he has
not done is rebutted the presumption that the defendant should
be detained.

          In terms of the obstruction points that Mr. Agnifilo
raised, there does not need to be an existing investigation,
and the defendant does not need to know about it, but we have
evidence that he does know, or he does suspect.  Three days
after the settlement of that November civil suit, he is
recorded speaking about how he is fearful of talking on the
phone because it might be tapped.  And he is using someone
else's phone in that regard.  He -- we know, as of at least
February -- knew about the existence of this very
investigation, and has continued since February to contact

1    witnesses.  He has contacted Ms. Harper last week, as I

2    mentioned, multiple times.  There are at least two other

3    witnesses who received grand jury subpoenas this summer who

4    were reached out to multiple times by the defendant.

5        THE COURT:  I think what he was saying is those

6    witnesses wouldn't necessarily have any insight into the

7    behavior that's actually charged in the indictment.

8        MS. JOHNSON:  The witnesses who received grand jury

9    subpoenas have firsthand knowledge of the behavior that's

10   charged in the indictment.  I think that -- I obviously haven't

11   spoken to Ms. Harper, but the allegations in Ms. Richard's

12   complaint certainly are of the same time period and relate to

13   some of the same violent acts that the government intends to

14   prove at trial.

15       And just a brief note on weapons.  I don't dispute

16   that Mr. Combs has used armed security, but it is incredulous

17   that armed security in a professional security company would

18   use defaced AR-15s and store them in pieces in the defendant's

19   personal closet.  That is absurd.

20       And finally, defense counsel spent a lot of time

21   talking about the individual identified as Victim 1 in this

22   case, and spent some time alleging that the government is not

23   proceeding on a theory that there was no consent.  And I want

24   to clarify the record that to the extent it was not clear,

25   based on the fact that Count Two is charged as sex trafficking

O9HLComC

1  by force, fraud, and coercion, we are most certainly proceeding

2  on the theory of lack of consent.  We are proceeding on a

3  theory that Victim 1 was forced, and that she was coerced to

4  participate in these sex acts.

5          And the relevant question here today is not that

6  consent question.  The relevant question here today is the

7  defendant's danger, and is he dangerous to the community.

8          THE COURT:  Would he not -- he wouldn't be a danger,

9  would he, if he only engaged in these kind of behaviors with

10  consenting adult partners?

11          MS. JOHNSON:  Well, we do have the video which shows

12  him assaulting a partner on video.  That video speaks for

13  itself.  And abuse and long-term relationships are not mutually

14  exclusive.  And a single instance, even where a defendant has

15  no criminal history, a history of domestic violence has been

16  found sufficient to detain a defendant, and that's the *Mercedes*

17  case which is cited in our letter.

18          And my last point, your Honor, is that despite

19  Mr. Agnifilo laboring over Victim 1, this is not a case about

20  one victim; this is a case about multiple victims and dozens of

21  witnesses who saw Mr. Combs' violence, who saw it during and in

22  connection with Freak Offs.  Multiple victims have been abused

23  in Freak Offs.  There's been violence, drugging, and coercion

24  through the date of the indictment in 2024.

25          THE COURT:  Thank you, counsel.

O9HLComC

1          MR. AGNIFILO:  Just very briefly.  One of the things

2     that we have been very transparent about -- and we have been

3     transparent in our conversations with the prosecutors, and I

4     think I have even been transparent with your Honor.  Mr. Combs

5     and this woman -- I am not picking on anybody; it is the

6     centerpiece of the indictment -- had a mutually difficult --

7     the whole relationship was actually quite good.  There was a

8     dark period for both of them, and it was mutual, and it was not

9     something that Mr. Combs imposed on anybody.  She was a

10    successful recording artist in her own right.  She was very

11    much an adult.  She had her own house.  Mr. Combs paid for the

12    house, but they didn't live together.  So to the extent that

13    there's this sort of veneer of control, Mr. Combs is a busy,

14    busy man, and one of the things he is busy doing, frankly, is

15    having more than one girlfriend.  So if this person wasn't

16    controlled, this person was a willing participant in a loving,

17    though toxic, relationship.  And we will never say anything

18    different.  But that doesn't -- that's our defense.  That

19    doesn't make it sex trafficking.

20          And what we are doing here, we are really, sort of, on

21    a slippery slope because the government is going to say, Well,

22    you know, she didn't consent because she was coerced.  She

23    didn't say that.  She didn't say that until she stood to get

24    $30 million from saying that, because that's what she needed to

25    say to get it in under the statute of limitations.  So where we

O9HLComC

1    are is, it's a very serious case, and we don't say anything

2    different than that, which is why we have a very serious bail

3    package, but it's a case that he is going to defend, and he has

4    shown that from the very first minute that he realized this was

5    a case when I told him that in March.  This has been a case.

6    We have done things a certain way since then.  Are we going to

7    continue to interview witnesses?  Of course, we are.  We take

8    pains to stay out of the governments way.  We don't know who

9    the grand jury witnesses are, you know.  And honestly -- I

10   won't get into the details.  If I think they are talking to

11   someone, I will pull up short.  I don't want any problems.  You

12   know, do I want to speak -- we both know pretty much

13   everything, you know.

14        They want to talk to 50 people; we want to talk to the

15   same 50 people.  If I find out they are a grand jury witness, I

16   make a strategic decision to not interview that person, you

17   know.  And we have done that consistently for the last six

18   months, you know.  So this is -- we are trying.  We really are.

19   We are trying to walk the fine line of doing a responsible

20   defense investigation in a very serious case, and not running

21   afoul of my colleagues with the U.S. Attorney's Office.  And I

22   think we have done it, for the most part, and we will continue

23   to do it.

24        And the one thing that I hope your Honor can see,

25   because this is really the heart of our presentation, is

O9HLComC

```
 1    Mr. Combs has done a lot of things to show that he is
 2    trustworthy.  Lots of lawyers get up and say lots of stuff.
 3    He's done things to show that he is trustworthy.  All he needs
 4    to know is what he can't do, and he won't do it.  He will not
 5    do it.  We will do it.  This will be a hard fought case, very
 6    hard fought from both sides.  Obviously means a lot to the
 7    prosecutors.  It means an awful lot to us.  It will be handled
 8    well.  It will be handled with lawyers with a lot of experience
 9    who know the difference.  And I think you should absolutely
10    trust Mr. Combs.  And I will go one step further.  I am going
11    to ask you to trust me.  I am with him.  I mean, I am with him.
12    I have my eye on him.  I know where he is.  We speak five times
13    a day, and I will make sure that everything goes the right way.
14    And so I really want to thank your Honor for all the time you
15    have given us.
16            THE COURT:  Thank you, counsel.  Is there anything
17    further?
18            MS. JOHNSON:  Nothing from the government.
19            THE COURT:  Okay.  Thank you both for your argument.
20    It was very helpful.  I am going to take a short recess, and I
21    am going to invite the representative from pretrial services to
22    join me in the robing room.
23            (Recess)
24            THE COURT:  I want to thank counsel again for their
25    helpful argument.
```

O9HLComC

1          In this case, I find that the presumption has not been

2     rebutted and there are no conditions I can impose that would

3     reasonably assure the appearance in court and the safety of the

4     community.  I make this decision based on all the information

5     presented to me, which includes the arguments and information

6     provided by counsel, which includes the letters submitted in

7     the pretrial services report.

8          You are charged with a crime of sex trafficking, so

9     there is a rebuttable presumption in favor of detention, and my

10    concern is that this is a crime that happens behind closed

11    doors, even where pretrial services is monitoring.  The alleged

12    victims are people with whom there is a power imbalance, who

13    are susceptible to coercion, not necessarily threats, but

14    concern about losing benefits that they have been provided in

15    the past.

16         There are also indications in your history and

17    characteristics that I think are a reason why the presumption

18    in favor of detention has not been rebutted; prior substance

19    abuse and the fact that the alleged violence seems to occur

20    hand in hand with times when you are not necessarily in control

21    of your actions because of that substance abuse.  Your lawyer

22    asked me to trust you and to trust him, and I don't know that I

23    think you can trust yourself, and I don't believe that counsel

24    has the ability to control you, given the very significant

25    concerns I have, particularly because of substance abuse and

1    what seem like anger issues.

2            I think the weight of the evidence is significant,

3    given that the government has proffered that there are multiple

4    witnesses who are saying that they have witnessed significant

5    serious violence, and the danger, I think, is quite serious.

6    There have been weapons around.  There has been significant

7    violence, and I also think it's significant that there has, I

8    think, been a proffer of significant evidence of coercion of

9    witnesses; maybe not brutal coercion, but gentle coercion can

10    be just as effective.

11            I have considered alternatives, such as monitoring,

12    home detention, a significant bond as your counsel proposed,

13    and I just don't think it's sufficient because so much of what

14    would happen, the types of behavior we are talking about,

15    happens behind closed doors.

16            I appreciate the willingness of your family and

17    friends to support Mr. Combs, including by a willingness to

18    cosign a bond.  I thank you for coming to court today, for

19    offering to be part of the process, but in this case, due to

20    Mr. Combs' own characteristics and own history, I find even

21    with a cosigned bond, I can't reasonably assure his return to

22    court or the safety of the community, or a lack of witness

23    tampering.

24            A preliminary hearing isn't necessary, and I know

25    there is a first conference.  I believe that that covers it.

O9HLComC

1              Is there anything else for the government?

2              MS. JOHNSON:  Your Honor, just one thing.  I don't

3    recall the Court asking for the date and time of arrest, so I

4    just wanted to put that on the record.

5              THE COURT:  Yes.  Thank you.

6              MS. JOHNSON:  Mr. Combs was arrested yesterday,

7    September 16, at 8:25 p.m.

8              THE COURT:  Okay.  Counsel?

9              MR. AGNIFILO:  No, nothing from us.  Thank you.

10             THE COURT:  Okay.  Thank you very much.  I will put

11   out the bail disposition sheet.  And we are adjourned.

12             (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25