UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

United States of America

      v.

Sean Combs,

            *Defendant.*

24 Cr. 542 (AS)

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AN EVIDENTIARY HEARING**

Dated:  October 9, 2024

                      **AGNIFILO INTRATER LLP**

                      Marc Agnifilo
                      Teny Geragos
                      445 Park Avenue, 7th Floor
                      New York, NY 10022
                      T: 646-205-4350
                      marc@agilawgroup.com
                      teny@agilawgroup.com

                      *Counsel to Defendant Sean Combs*

**Table of Contents**

A. Introduction ................................................................................................................ 1
B. Background .............................................................................................................. 3
   1. The Searches ....................................................................................................... 3
   2. Statements By DHS Agents To The Press ......................................................... 5
   3. The Leaked Hotel Videotape .............................................................................. 8
C. This Court's Authority ............................................................................................ 11
D. Requested Relief ..................................................................................................... 14

**A. Introduction**

Defendant Sean Combs moves for four forms of relief related to what the defense believes was a series of unlawful government leaks, which have led to damaging, highly prejudicial pretrial publicity that can only taint the jury pool and deprive Mr. Combs of his right to a fair trial. Mr. Combs requests: (1) an evidentiary hearing to examine government misconduct in connection with the leaks; (2) discovery of emails, documents and records in the possession of the government (including DHS) related to these leaks; (3) a gag order prohibiting government personnel from disclosing any evidence or investigative material related to this case to any member of the media; and (4) suppression of any evidence leaked by government employees in violation of Federal Rule of Criminal Procedure 6(e) or any other law, rule, or regulation.

The available evidence makes a prima facie showing that the government, primarily through DHS, has engaged in a seven-month campaign with three objects: (i) preventing Mr. Combs from getting fair consideration by the grand jury; (ii) preventing him from getting a fair trial; and (iii) strategically leaking confidential grand jury material and information, including the 2016 Intercontinental videotape, in order to prejudice the public and potential jurors against Mr. Combs.

The government's scheme to undermine Mr. Combs' rights to a fair proceeding has several methods and means. First, there has been a steady stream of false and prejudicial statements made by DHS agents to various press outlets over the last seven months. Second, the agents engaged in a particularly brutal and public search of Mr. Combs' homes, during which they handcuffed Mr. Combs' innocent sons and then marched them before a news helicopter and the press. This was an apparent effort to convey that they had overwhelming evidence against Mr. Combs, justifying

1

the public and brutal treatment of even his children, who were handcuffed and manhandled by federal agents armed with assault rifles. Third, government employees have repeatedly leaked grand jury information and materials to the press to raise public hostility against Mr. Combs in advance of trial.

The most egregious example of this is the leak to CNN of the 2016 videotape from the Intercontinental Hotel in Los Angeles. As detailed below, the CNN leak was but one of a long and documented history of leaks and false statements made with one purpose: to savage Mr. Combs' reputation prior to trial. While the government's misconduct in this case is particularly egregious, it is unfortunately part of a trend in this District—the government has learned that it can strategically leak information with impunity. This Court should exercise its authority to prohibit these underhanded tactics, which severely undermine a criminal defendant's right to a fair trial.

At the outset, the defense wants to be clear with the Court as to what our theory is and is not. We do not contend that the leaks were orchestrated by the U.S. Attorney's Office. Rather, we contend that the false media statements and the grand jury leaks complained of below were planned and executed by DHS. As the parties develop more information in this regard, the Court will see that the defense repeatedly contacted the prosecutors and stated, in substance, that their agents were leaking information to the press. Yet regardless of what, if any, action the U.S. Attorney's Office took, the leaks continued, even until after the arrest. The reason a hearing is needed is to determine exactly what the DHS did, and did not do regarding these leaks, and what the U.S. Attorney's Office did and did not do to stop them.

The evidence of government misconduct is clear enough already that this Court is justified in using its authority to craft appropriate remedies. Mr. Combs requests that this Court order discovery and an evidentiary hearing to investigate the government's misconduct. The abuse here

2

is clear, but "without a hearing," it would remain "unknown how far or where the abuse reached." *United States v. Walters*, 910 F.3d 11, 32 (2d Cir. 2018) (Jacobs, J., concurring). An evidentiary hearing is thus necessary. In addition, if the hearing demonstrates that the violation of grand jury secrecy was intentional, as we expect it will, the Court should order the suppression of the videotape and/or any other illegally disclosed evidence, as well as other potential sanctions.

**B. Background**

The full extent of the government's misconduct cannot yet be known. But what is known is already enough. The government's tactic in the searches, its constant stream of statements to the press, and the leak of the hotel video demonstrate its intent to violate grand jury secrecy rules and prejudice Mr. Combs prior to trial.

1. <u>The Searches</u>

The government's campaign to prejudice Mr. Combs in the press commenced with the searches on March 25, 2024. Notably, the searches could have been avoided altogether at no cost to the government—prior to the searches, counsel for Mr. Combs had contacted the government *twice* to offer cooperation. Prosecutors thus knew that they could serve a subpoena on counsel for the phones, devices and other items they sought. Indeed, after the searches had been conducted, the prosecutors did exactly this, serving two subpoenas on the undersigned seeking the identical items it sought in the search warrants. However, the prosecutors ignored defense counsel's invitation to discuss the case so that they could engage in one of the more brutal and public searches in recent memory.

At about 12:40 PM (PST) on March 25, 2024, over one-hundred armed federal agents massed in three locations. Over 50 agents were at a residence at Two Star Island in Miami, Florida; over 50 more were at Mr. Combs' property in Los Angeles, California, and over 30 more were

3

prepared to stop and search an airplane that Mr. Combs and his family were taking to a spring break vacation. These searches were specifically designed to be public spectacles of brutality and were not primarily focused merely on acquiring potential evidence.

*First*, the searches were carried out in the middle of the day to optimize media exposure. Typically, searches are conducted quietly in the early morning. In this case, however, they were conducted in the middle of the day—both in Los Angeles and Florida—so that the media could cover them before a larger audience.

*Second*, the media was present at the inception of the Los Angeles search. In fact, one media outlet, Fox 11, boasted on air that it was on site and filming even before the crime scene tape was put up. It is thus clear that the DHS alerted the media prior to the search in order to maximize exposure.

*Third*, the agents arrived in military-style armored vehicles, with scores of heavily armed agents in full combat gear. One would think they were attempting to retake Donbas rather than seize some phones and computers. The show of force had no legitimate purpose—it was merely an attempt to garner further press attention, sensationalize the case, and portray Mr. Combs as dangerous. The show of force was also particularly egregious given that authorities knew Mr. Combs' children—who are innocent, and who have never been a target of this investigation—were likely to be present.

*Fourth*, the agents used excessive force against Mr. Combs' children—who were in his home, doing nothing wrong. One agent held a semi-automatic rifle to the head of Christian Combs, even though he was visibly complying with the agents' demands. Another agent had a semi-automatic rifle with a laser site trained, and the orange dot visible, on the middle of the chest of Justin Combs. Like his brother, Justin was also complying with agents' demands. The agents then

handcuffed Christian and Justin inside their house and then marched them to the front yard of the house where news cameras and the Fox 11 helicopter—all invited by authorities—were waiting to get salacious footage.[1]  After perp-walking these two completely innocent young men and displaying them in handcuffs and under restraint to the media, the agents walked them back into the house, still in handcuffs, and released them.

These egregious tactics had no possible purpose other than to garner sensational media coverage.  It worked.  The images of armed agents in full tactical gear, of the military style vehicles and of Mr. Combs' sons handcuffed and under restraint, having been removed at the point of an assault weapon from their homes, made instant international news.

2.      Statements By DHS Agents To The Press

With the searches concluded, the public relations campaign by the agents moved into high gear.  There were scores of public statements made by the agents, only a small sampling of which will be included here.  On March 25, 2024, agents and a spokesperson from Homeland Security Investigations (HSI) confirmed that the government was conducting an ongoing sex trafficking investigation.  Agnifilo Decl. Exs. 1, 2.  That day, "a source" further disclosed to the press that "four Jane Does and one John Doe already sat for interviews with Southern District of New York investigators for a probe related to alleged sex trafficking and racketeering" and that "[m]ore interviews are scheduled."  Agnifilo Decl. Exs. 1, 2.

The next day, March 26, 2024, law enforcement sources told the New York Post that the agents "wanted to seize the 54-year-old's phones and computers, and that his properties in New

---

[1] The agents could have brought the sons to a large fenced-in backyard where the media could not see them in handcuffs.  However, they purposefully marched them in handcuffs to the front of the house where the media and the news helicopter were positioned.

5

York and Chicago will be next." Agnifilo Decl. Ex. 3.  Sources further reported that the searches were "based on a search warrant issued by the Southern District of New York." *Id.*

On March 27, 2024, two days after the searches of Mr. Combs' residences, an agent specifically identified as working for DHS made public statements to, among other media, the New York Post that "[w]e believe that there is a disturbing history of sex trafficking…We are responding to concrete, detailed, explicit allegations.  This is not random.  We didn't choose his name out of a hat.  We had allegations that we're following up on." The source—identified by the Post as "[a]n officer with the Department of Homeland Security"—went on to tell the press, "[y]ou have to understand that we didn't just decide on a whim to search his homes. A federal judge had to sign off. This isn't a witch hunt."  The "DHS operative" further shared: "That's a funny thing about victims. They may be reluctant to speak at first, but once they start talking, they talk.  They talk a lot.  We are getting a lot of cooperation from a lot of people who want to see him brought to justice."  The New York Post further described the source of these quotes as a "Miami-based officer" who spoke under condition of anonymity and confirmed Mr. Combs "is under investigation."  Agnifilo Decl. Ex. 4.

Two days later, on March 29, 2024, "law enforcement sources" told ABC News that "[p]rosecutors have interviewed a number of Diddy's accusers, including those who have filed civil lawsuits…". Agnifilo Decl. Ex. 5.  The next day, on March 30, 2024, a reporter at the *New York Post* stated to *News Nation* that according to "Homeland Security sources" that the investigation into Combs was "the tip of the iceberg" and that "nothing was off the table."[2] Agnifilo Decl. Ex. 7.

---

[2] This same phrase: "nothing off the table" was also used by the United States Attorney during the press conference announcing the indictment in this case.

6

On April 2, 2024, a media outlet called The Source reported that "sources close to the case" shared that authorities had requested "telecommunications records related to Combs." It further reported that "the source, who requested anonymity due to the sensitivity of the matter, disclosed that Homeland Security investigators are also keen on obtaining flight records associated with Combs. These flight records, including passenger lists, could provide valuable insights into Combs' movements and activities." Agnifilo Decl. Ex. 6.

Within the first week of the searches, the agents, all of whom were involved in an ongoing grand jury investigation, informed the press that purported victims had been interviewed, that they had obtained and executed search warrants, that they were obtaining telecommunications and flight records (presumably with grand jury subpoenas), that their grand jury investigation was "getting a lot of cooperation from a lot of people who want to see him brought to justice," and that the grand jury investigation into Combs was "the tip of the iceberg." In addition, the agents' public statements were solely designed to prejudice the grand jury and the public, such as, "we believe that there is a disturbing history of sex trafficking…We are responding to concrete, detailed, explicit allegations. This is not random. We didn't choose his name out of a hat. We had allegations that we're following up on." Agnifilo Decl. Ex. 4.

Between the grand jury leaks and the incendiary public statements, the agents all but ensured that the grand jury would be tainted as well as the general public from which we will soon select a jury.

The inflammatory and false public statements continue up to the present. On September 18, 2024, a "Department of Homeland Security agent" told the *New York Post* that "the music mogul had rooms that were clearly 'dedicated to sex' with cameras all around." The source was identified as "one of the [DHS] agents who helped raid [Mr. Combs'] Florida abode," and further

7

described "video evidence" obtained during the investigation. This agent went on to tell the press, "[s]o if you were in those sex parties, you were being recorded from every possible angle, including angles you wouldn't have known about." The Homeland Security agent then told the *New York Post*, "in my opinion, he's as bad as Jeffrey Epstein…These women are young. Either barely legal or barely illegal." Agnifilo Decl. Ex. 8; *see also* Agnifilo Decl. Ex. 9.

For a government employee to make statements to a New York Post reporter are false, damaging and prejudicial. The indictment alleges a single victim as part of the sex trafficking charge, an adult woman with whom Mr. Combs had a romantic relationship for ten years. For the agent to make public statements that the conduct involves "barely illegal" women and that Combs is as bad as Jeffrey Epstein is destructive to Mr. Combs' right to a fair trial, particularly in light of the fact that the only victim in the indictment was an adult throughout the charged conduct.

Taken together, the false, prejudicial statements and leaks served to feed further sensationalistic media coverage—and prejudice potential jurors in advance of trial.

3. <u>The Leaked Hotel Videotape</u>

In the midst of this seven-month campaign to impugn Mr. Combs's reputation before trial, on Friday, May 17, 2024, a 2016 videotape from the Intercontinental Hotel in Los Angeles was leaked to CNN. By far the most likely source of the leak is the government. That is true for several reasons.

*First*, as set forth above, by May 17, 2024, federal agents had already engaged in a months-long campaign of leaking information to the press. They had a demonstrated propensity of embracing contacts at numerous press outlets and leaking information in order to produce media coverage.

8

*Second*, Victim 1 is not a likely source of the leak. There is no evidence that either she or her lawyers had possession of the tape. To the contrary, had either Victim 1 or her lawyer had the tape, the allegations in the civil complaint would have been entirely different and far more specific than they were. Moreover, Victim 1 had no motive to approach law enforcement, much less leak a videotape. She had sued Mr. Combs and received a substantial eight-figure settlement. The government's investigation only began *after* her lawsuit was settled.

*Third*, an unrelated third party is not a likely source. If a person not in law enforcement were to leak the videotape to a news source, that person likely would have sold the tape rather than simply give it to CNN. Outlets such as TMZ are known to pay tens of thousands of dollars for such footage. That it was leaked instead to CNN shows a motive other than financial profit. It shows a motive to damage Mr. Combs' reputation without remuneration—a motive held by federal agents.

*Fourth*, the timing of the leak suggests government involvement. The tape was leaked on one of the few days the Trump trial was not being held as Barron Trump, Donald Trump's youngest son, graduated that day from High School in Florida with his father in attendance. One of the more contentious issues in the Trump trial was whether trial would be stayed so Trump could attend his son's graduation. Eventually, the court announced that May 17 would not be a trial day. This was a fact that would have been known to federal agents—and they also would have known that May 17 was thus a perfect time, as it was a slow news day given the break in the Trump trial.

Early in the morning of May 17, a CNN reporter informed a member of Mr. Combs' public relations team that CNN has "come across a video" from the Intercontinental Hotel. The reporter went on to say, "through our reporting, we have confirmed this video is authentic." The reporter sought comment and also stated that CNN was reaching out to Victim 1's representatives for

9

comment. At 10:22 AM that morning, defense counsel emailed the prosecution team to say that CNN was in possession of this videotape, and that counsel was concerned about the circumstances by which it was provided to CNN. The government acknowledged defense counsel's email hours after the tape was made public, but, as far as defense counsel is aware, took no further action. Regardless, a few hours after defense counsel made the prosecutors aware that CNN had the tape, CNN released it to overwhelming international attention.

The videotape was leaked to CNN for one reason alone: to mortally wound the reputation and the prospect of Sean Combs successfully defending himself against these allegations. Rather than using the videotape as trial evidence, alongside other evidence that gives it context and meaning, the agents misused it in the most prejudicial and damaging way possible. The government knew what it had: a frankly deplorable video recording of Sean Combs in a towel hitting, kicking and dragging a woman in full view of a camera in the hallway of the hotel.

The potential problem for the government is that if an agent provided this videotape to CNN, this would be a violation of grand jury secrecy. This is, among other things, what the hearing will determine. Because it is reasonable to believe that this was obtained in connection with a grand jury investigation, that it was intentionally given to CNN to be released to the world, and that there is a strong possibility that the person providing it to CNN was a federal agent involved in this grand jury investigation, the remedy for this conduct should be full suppression of the videotape that the government leaked.³

---

³ After the undersigned notified the government that we would be filing this motion, prosecutors responded that the video broadcast by CNN was not obtained through grand jury process and that DHS did not have possession of the videotape prior to CNN's publication of it. However, government attorneys have not given any indication that they have investigated any of the leaks related to this case. And, as discussed, we are not suggesting that the U.S. Attorney's Office itself leaked the videotape, but given all the evidence cited above, and the sheer number of agents

## C. This Court's Authority

This Court has authority to investigate the government's actions and to order appropriate remedies. Its authority begins with Federal Rule of Criminal Procedure 6(e), which mandates secrecy of grand jury proceedings and materials. A violation of Rule 6(e) occurs when a covered person discloses "anything that will reveal what transpired during the grand jury proceedings." *In re Grand Jury Subpoena*, 103 F.3d 234, 238 (2d Cir. 1996). Covered persons include attorneys for the government and other government personnel assisting government attorneys. Fed. R. Crim. P. 6(e)(2)(B)(vi)-(vii). "Both the direct and indirect disclosure of information are proscribed." *In re Grand Jury Matter*, 682 F.2d 61, 63 (3d Cir. 1982). Secrecy extends not just to grand jury transcripts but also to all materials "relating to or affecting the grand jury." *In re Grand Jury Subpoena*, 103 F.3d at 238 (citing Fed. R. Crim. P. 6(e)(5)-(6)); *accord Lawyers' Comm. for 9/11 Inquiry, Inc. v. Garland*, 43 F.4th 276, 286-87 (2d Cir. 2022) ("Congress intended for [Rule 6(e)'s] confidentiality provisions to cover matters beyond those actually occurring before the grand jury").

Federal courts are obligated to enforce the rule by imposing sanctions on those who violate its secrecy provisions. Rule 6 itself states that a violation of that secrecy "may be punished as a contempt of court." Fed. R. Crim. P. 6(e)(7). That is not the sole possible remedy. "Other possible remedies are suppression of grand-jury material or, in extraordinary cases, dismissal of an indictment." *See* 1 Wright & Miller, Fed. Prac. & Proc. Crim. § 107 Grand Jury Secrecy (5th ed. & 2024 update). Indeed, Rule 6 "indicates no limits on the relief available to address violations." *Barry v. United States*, 865 F.2d 1317, 1321 (D.C. Cir. 1989).

---

involved in the investigation and the history of leaks, it seems entirely reasonable that the video was leaked by one or more DHS agents.

11

More generally, this Court has inherent authority under its supervisory powers to address this sort of misconduct. Federal courts may exercise their supervisory powers "to prevent parties from reaping benefit or incurring harm from violations of substantive or procedural rules (imposed by the Constitution or laws)." *United States v. Williams*, 504 U.S. 36, 46 (1992). Government misconduct includes actions whereby the government seeks to "obtain[] an unfair advantage long before the trial even has begun." *United States v. Stein*, 435 F. Supp. 2d 330, 382 (S.D.N.Y. 2006). To deter and punish such misconduct, this Court has authority to "formulate procedural rules" that apply to officers of the Court, including all "members of the bar" and "United States attorneys." *United States v. He*, 94 F.3d 782, 792 (2d Cir. 1996).

Pretrial statements to the press that have the tendency to prejudice a criminal defendant's right to a fair trial are prohibited by Rule 3.6 of the New York Rules of Professional Conduct and SDNY Local Criminal Rule 23.1. Additionally, federal regulations bar *all* Department of Justice employees—not just attorneys—from making prejudicial information prior to trial. "[T]he release of information for the purpose of influencing a trial is, of course, always improper …." 28 C.F.R. § 50.2(a)(2); *see also id*. § 50.2(b)(2) ("At no time shall personnel of the Department of Justice furnish any statement or information for the purpose of influencing the outcome of a defendant's trial, nor shall personnel of the Department furnish any statement or information, which could reasonably be expected to be disseminated by means of public communication, if such a statement or information may reasonably be expected to influence the outcome of a pending or future trial."). These provisions specifically note that "observations about a defendant's character," "statements concerning the … credibility of prospective witnesses," and "opinion[s] as to the accused's guilt" are never permissible—especially in the period leading up to trial. *Id*. § 50.2(b)(6); *see also* 5 U.S.C. § 552a (Privacy Act); 18 U.S.C. § 1503 (obstruction of "due administration of justice"

through corrupt attempt to influence grand or petit jurors). This Court has authority to craft rules and remedies to enforce those provisions—which have been violated by federal agents in this case.

This Court also has the authority—and indeed the duty—to investigate government misconduct. "Most often, conducting a hearing is the preferred course of action in cases where disputed factual issues exist." *United States v. Cuervelo*, 949 F.2d 559, 567 (2d Cir. 1991) (remanding for hearing on outrageous government conduct); *accord United States v. Ventura*, 96 F.4th 496, 502 (2d Cir. 2024); *see also United States v. Voigt*, 89 F.3d 1050, 1067-68 (3d Cir. 1996). Once a prima facie showing of misconduct has been made, courts should conduct an evidentiary hearing. *See United States v. Rioux*, 97 F.3d 648, 662 (2d Cir. 1996); *cf. United States v. Skelos*, 988 F.3d 645, 662 (2d Cir. 2021).

Moreover, this Court has authority to impose a gag order—that is, an order prohibiting "extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters." *Sheppard v. Maxwell*, 384 U.S. 333, 361 (1966); *accord Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1072-76 (1991). Court have an "ongoing obligation to ensure that speech about a criminal case" does not prejudice the proceedings. *United States v. Trump*, 88 F.4th 990, 1004 (D.C. Cir. 2023). And while court have only limited authority to limit the speech of the press, they have much broader authority to police attorneys and other trial participants. *Id*. at 1004-05.

Finally, once the Court has ascertained the full extent of the misconduct, it has wide latitude to fashion an appropriate remedy. "Rule [6(e)] indicates no limits on the relief available to address violations." *Barry*, 865 F.2d. at 1321. For example, if "Rule 6(e) . . . has been violated," the "sanctions . . . that may be imposed," include "imprisonment for criminal contempt" and "dismissal of the case." *United States v. Flemmi*, 233 F. Supp. 2d 75, 83, 86 (D. Mass. 2000); *accord* Fed. R. Crim. P. 6(e)(7). "Other possible remedies" include "suppression of grand-jury

13

material."  1 Wright & Miller, Fed. Prac. & Proc. Crim. § 107 Grand Jury Secrecy (5th ed. & 2024 update).  Defendants reserve the right to seek one or more of these remedies, including suppression of the videotape, following the evidentiary hearing.

### D. Requested Relief

Based on the foregoing, Mr. Combs requests the following relief:

*First*, this Court should order an evidentiary hearing to investigate the misconduct detailed above, as well as other misconduct that may yet come to light.  Here, the defense has made a prima facie showing that a hearing should be held, because it is clear "agents involved in this investigation spoke to the press" about matters relating to or affecting the grand jury, and leaked evidence.  *Skelos*, 988 F.3d at 662.  The agents here were specifically identified in press accounts as HSI officers and "DHS operative[s]," and specifically as "Miami-based officer[s]" "who helped raid [Mr. Combs'] Florida abode."  These officers disclosed specific information about the investigation, including its target, the types of search warrants obtained and materials sought, what witnesses had reported to prosecutors, and actual evidence, "reveal[ing] the nature or direction of the grand jury proceedings."  *In re Grand Jury Subpoena*, 103 F.3d at 238.

*Second*, in advance of that hearing, this Court should order relevant discovery from the government.  This should include any emails and text messages by any government attorneys or law enforcement agents regarding these and any other leaks of information about the investigation or prosecution of this case.

*Third*, this Court should immediately enter an order forbidding government attorneys and agents involved in the case from leaking any further information to the media.  The order should cover all grand jury material, as well as other non-public information related to the investigation and prosecution of this case.

14

*Fourth*, after the evidentiary hearing, and the extent and nature of the misconduct has been clarified, Mr. Combs will submit requests for any additional appropriate remedies, including disqualification of witnesses, suppression of evidence including the 2016 video, or dismissal of all charges in the indictment.

Dated:  October 9, 2024    Respectfully submitted,

**AGNIFILO INTRATER LLP**

/s/ _____

Marc Agnifilo
Teny Geragos
445 Park Avenue, 7th Floor
New York, NY 10022
T: 646-205-4350
marc@agilawgroup.com
teny@agilawgroup.com
*Counsel to Defendant Sean Combs*

15