UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -v.-

SEAN COMBS,
    a/k/a "Puff Daddy,"
    a/k/a "P. Diddy,"
    a/k/a "Diddy,"
    a/k/a "PD,"
    a/k/a "Love,"

              Defendant.

**24 Cr. 542 (AS)**


**THE GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S
RENEWED MOTION FOR BAIL**


DAMIAN WILLIAMS
United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278


Meredith Foster
Emily A. Johnson
Christy Slavik
Madison Reddick Smyser
Mitzi Steiner
Assistant United States Attorneys
    *Of Counsel*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND ...................................................................................................................... 2

   A. The Indictment and the Defendant's Arrest ................................................................ 2

   B. The Defendant's Remand ........................................................................................... 3

ARGUMENT .......................................................................................................................... 4

   A. Applicable Law ........................................................................................................... 4

   B. Discussion .................................................................................................................. 6

      1. The Court Should Reject the Defendant's Attempt to Reopen the Bail Hearing Based on the Same Information He Presented to Judge Carter .......................................................... 6

         a. Defendant's Rehashing of the Same Personal Attacks He Made Against Victim-1 Before Judge Carter Is Not New Information ............................................................ 6

         b. The Court Should Reject the Defendant's Request to Reopen the Bail Hearing Because the Defendant Disagrees with the Government's Use of the Term "Victim" 8

         c. The Defendant's Contacts with Witnesses Demonstrate the Threat He Poses to the Integrity of these Proceedings ............................................................................. 9

      2. The Defendant Cannot Rely on Section 3142(i) for His Release ................................. 13

      3. The Defendant Poses a Serious Risk of Obstruction, Danger, and Flight ................... 16

         a. The Defendant Has Continued His Efforts to Obstruct Justice................................ 16

         b. The Defendant is a Danger to Others........................................................................ 22

         c. The Defendant Continues to Pose a Risk of Flight .................................................... 23

      4. The Defendant's New Proposed Bail Package Is Insufficient ...................................... 24

CONCLUSION...................................................................................................................... 26

# TABLE OF AUTHORITIES

Page(s)

## Cases

*United States v. Argraves*,
No. 09 Cr. 117 (MRK), 2010 WL 283064 (D. Conn. Jan. 22, 2010) ................................. 5, 14

*United States v. Banki*,
369 F. App'x 152 (2d Cir. 2010) ............................................................................. 25

*United States v. Boustani*,
932 F.3d 79 (2d Cir. 2019)...................................................................................... 25

*United States v. Dupree*,
833 F. Supp. 2d 241 (E.D.N.Y. 2011) .................................................................. 6, 15

*United States v. El-Hage*,
213 F.3d 74 (2d Cir. 2000)...................................................................................... 14

*United States v. English*,
629 F.3d 311 (2d Cir. 2011).................................................................................... 13

*United States v. Esposito*,
354 F. Supp. 3d 354 (S.D.N.Y. 2019)....................................................................... 5

*United States v. Green*,
No. 20 Cr. 357 (VM), 2020 WL 5814191 (S.D.N.Y. Sept. 30, 2020).................................... 23

*United States v. Hamilton*,
612 F. Supp. 3d 112 (E.D.N.Y. 2020) ....................................................................... 5

*United States v. Hare*,
873 F.2d 796 (5th Cir. 1989) .................................................................................... 5

*United States v. Hashmi*,
621 F. Supp. 2d 76 (S.D.N.Y. 2008)........................................................................ 14

*United States v. Kassir*,
No. S2 04 Cr. 356 (JFK), 2008 WL 2695307 (S.D.N.Y. July 8, 2008).................................... 14

*United States v. Lewis*,
No. 16 Cr. 212 (LAK), 2016 WL 6902198 (S.D.N.Y. Nov. 16, 2016) ..................................... 4

*United States v. Maxwell*,
527 F. Supp. 3d 659 (S.D.N.Y. 2021)....................................................................... 13

*United States v. Mercedes*,
   254 F.3d 433 (2d Cir. 2001)................................................................. 23

*United States v. Mizell*,
   No. 14 Cr. 212 (RJS), 2014 WL 12769113 (S.D.N.Y. July 25, 2014) ...................................... 5

*United States v. Mohamed*,
   103 F. Supp. 3d 281 (E.D.N.Y. 2015) ...................................................... 14

*United States v. Moscaritolo*,
   No. 10 Cr. 4 (JL), 2010 WL 309679 (D.N.H. Jan 26, 2010) ................................ 24

*United States v. Orena*,
   986 F.2d 628 (2d Cir. 1993)................................................................ 25

*United States v. Schwamborn*,
   No. 06-CR-328 (SJF), 2007 WL 9653332 (EDNY July 27, 2007) ........................... 8

*United States v. Zhang*,
   55 F.4th 141 (2d Cir. 2022) ............................................................ 4, 5

## **Statutes**

18 U.S.C. § 1591 ............................................................................. 2

18 U.S.C. § 1962(d) ......................................................................... 2

18 U.S.C. § 2421(a) ......................................................................... 2

18 U.S.C. § 3142 ...................................................................... passim

## PRELIMINARY STATEMENT

The Government respectfully submits its opposition to defendant Sean Combs' renewed motion for bail.[1] (Dkt. No. 60). The defendant's motion should be denied. As two judges have already concluded based on the evidence in the record, the defendant poses serious risks of danger and obstruction of these proceedings. In seeking a new hearing, the defendant rehashes the same arguments rejected by those two judges with claims of "new evidence." But the defendant offers nothing new and material justifying a third bail hearing. In fact, the only truly "new" relevant evidence shows that the defendant has continued to engage in a relentless course of obstructive conduct designed to subvert the integrity of these proceedings. As described in detail below, while attempting to evade law enforcement monitoring, the defendant has, among other things, orchestrated social media campaigns that are, in his own words, aimed at tainting the jury pool; made efforts to publicly leak materials he views as helpful to his case; and contacted witnesses through third parties.

For these reasons, the Court should deny the defendant a new bail hearing. *See* 18 U.S.C. § 3142(f). To the extent the Court decides to reopen the bail hearing, however, the defendant's application for bail still must fail under the Bail Reform Act. His motion ignores the significant evidence presented by the Government at the prior hearings showing that the defendant is a violent, serial abuser who uses his vast wealth and position in the entertainment industry to conceal his illegal conduct and prevent victims of, and witnesses to, his abuse from coming forward. In light of the well-documented danger posed by the defendant, the updated proposed conditions of release

---

[1]    The defendant has previously sought bail on two prior occasions, as described in more detail below. In connection with those proceedings, both the Government and the defendant filed submissions. The Government incorporates its prior submissions and arguments by reference herein. (*See* Sept. 17, 2024 Ltr. (Dkt. No. 5, attached hereto as Exhibit A); Sept. 18, 2024 Ltr. (Dkt. No. 15, attached hereto as Exhibit B); Transcript of Sept. 17, 2024 Bail Hearing ("Sept. 17, 2024 Tr."), attached hereto as Exhibit C; Transcript of Sept. 18, 2024 Bail Hearing ("Sept. 18, 2024 Tr.")), attached hereto as Exhibit D.

are woefully insufficient to assure the safety of the community and integrity of these proceedings. Indeed, the defendant's continued obstructive conduct confirms the conclusion reached by two other Courts: no set of conditions can meet that task.

The defendant's request for "temporary release" pursuant to 18 U.S.C. § 3142(i) should similarly be rejected. The defendant's confinement at the Metropolitan Detention Center Brooklyn ("MDC") affords him more than adequate opportunity to prepare for trial, and his convenience does not provide a basis to reevaluate the danger to the community and the threat to the integrity of these proceedings that the defendant's release poses.

## BACKGROUND

### A.  The Indictment and the Defendant's Arrest

After a nearly year-long investigation, Indictment 24 Cr. 542 was filed on September 12, 2024, charging the defendant in three counts: (1) racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) ("Count One"); (2) sex trafficking, in violation of 18 U.S.C. §§ 1591 and 2 ("Count Two"); and (3) interstate transportation to engage in prostitution, in violation of 18 U.S.C. §§ 2421(a) and 2 ("Count Three").  As alleged in Count One, the defendant participated in a racketeering conspiracy since at least 2008.  Specifically, as charged in the Indictment, the defendant, often assisted by other members and associates of the racketeering enterprise (the "Enterprise"), engaged in sex trafficking and acts of violence, including kidnapping, arson, and physical violence, among other crimes.  (Dkt. No. 1 ¶¶ 1-14).

As the Indictment alleges, from at least 2008 through 2024, the defendant used force, threats of force, and coercion to cause women to engage in sexual activity, which included sex acts with male commercial sex workers that the defendant referred to as "Freak Offs."  (*Id.* at ¶¶ 12, 16).  Freak Offs, which sometimes lasted days, were elaborate sex performances that the defendant directed, masturbated during, and often electronically recorded.  (*Id.* at ¶ 12).  The defendant

ensured that female victims participated in Freak Offs through coercion and violence, including by supplying female victims with controlled substances; subjecting female victims to physical, emotional, and verbal abuse; controlling female victims' careers, livelihoods, and housing; and threatening to disseminate recordings of Freak Offs. (*Id.*). In connection with this conduct, Count Two charges the defendant with sex trafficking Victim-1 by force, fraud, and coercion (*id.* at ¶ 16), and Count Three charges the defendant with causing the interstate transportation of others for the purpose of engaging in prostitution (*id.* at ¶ 17).

The defendant was arrested on September 16, 2024. He was presented and arraigned the following day by the Honorable Robyn Tarnofsky, United States Magistrate Judge.

### B.  The Defendant's Remand

Following the defendant's arraignment on the Indictment on September 17, 2024, the Government moved for the defendant's detention under the Bail Reform Act. *See* 18 U.S.C. §§ 3142(f)(1)(A), (B); 3142(f)(2)(A), (B). Because the defendant was charged with sex trafficking, detention is presumed under the Bail Reform Act. *See* 18 U.S.C. § 3142(e)(3)(D). After hearing argument, Judge Tarnofsky found the defendant had not rebutted the presumption in favor of detention, and there were no conditions that would reasonably assure the defendant's appearance or the safety of the community. (Sept. 17, 2024 Tr. at 54). Judge Tarnofsky emphasized the serious nature and circumstances of the charged conduct, which largely happened behind closed doors and was therefore difficult to monitor. (*Id.* at 54-55). Judge Tarnofsky noted "indications in [Combs's] history and characteristics" that he would present a danger to the community and dismissed as inadequate the exhortations from the defendant's counsel to trust him and his client given the defendant's drug abuse and anger issues. (*Id.*). Judge Tarnofsky highlighted that the weight of the evidence was "significant," given that multiple witnesses observed firsthand the defendant's violence and coercion. (*Id.* at 55).

The defendant appealed Judge Tarnofsky's decision to Judge Carter, to whom the case was then assigned, and a bail hearing before Judge Carter proceeded on September 18, 2024. After lengthy argument, Judge Carter denied the defendant bail, finding specifically that the Government had "proven that the defendant is a danger regarding obstruction of justice and witness tampering by clear and convincing evidence [and that] the defendant is a danger to the safety of others in the community more generally by clear and convincing evidence." (Sept. 18, 2024 Tr. at 56). Although Judge Carter did not rely on risk of flight, he noted that the bail package proposed by defense counsel was insufficient to address that risk. (*Id.*). Ultimately, Judge Carter found that there was no condition or combination of conditions that would reasonably assure the safety of a person in the community or that the defendant would not obstruct justice or tamper with witnesses and accordingly denied the defendant bail. (*Id.* at 57).

The defendant was remanded to the MDC, a Bureau of Prisons ("BOP") facility, where he has remained in pretrial custody to the present.

## ARGUMENT

### A. Applicable Law

Under the Bail Reform Act, the district court has discretion to reopen a bail hearing "if information comes to light that is both new and material to the detention question." *United States v. Zhang*, 55 F.4th 141, 147 (2d Cir. 2022). Specifically, a bail determination "may be reopened . . . before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2)(B). However, "[a] bail hearing should not be reopened on the basis of information that was available to the defendant at the time of the hearing." *United States v. Lewis*, No. 16 Cr. 212 (LAK), 2016 WL 6902198, at *2 (S.D.N.Y.

Nov. 16, 2016) (citing *United States v. Hare*, 873 F.2d 796, 799 (5th Cir. 1989)); *see United States v. Mizell*, No. 14 Cr. 212 (RJS), 2014 WL 12769113, at *2 (S.D.N.Y. July 25, 2014). Courts in the Second Circuit have found that "[n]ew and material information for Section 3142(f)(2)(B) purposes consists of something other than a defendant's own evaluation of his character or the strength of the case against him: truly changed circumstances, something unexpected, or a significant event." *United States v. Esposito*, 354 F. Supp. 3d 354, 358-59 (S.D.N.Y. 2019) (citation omitted).

Moreover, because the Bail Reform Act states only that a hearing "may" be reopened if new and material information is presented, it "leaves the decision to reopen a hearing to the sound discretion of the district court." *Zhang*, 55 F.4th at 148. Therefore, even if the defendant's arguments for reopening the hearing met the standard—which they do not—this Court may still decide in its discretion not to reopen the hearing. *Id.*

Section 3142(i) provides that a court "may . . . permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i)(4). "This provision has been used sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injury." *United States v. Hamilton*, 612 F. Supp. 3d 112, 115 (E.D.N.Y. 2020). In considering whether release is "necessary for preparation of the person's defense," the Bail Reform Act simply requires that a defendant in custody be "afforded reasonable opportunity for private consultation with counsel." 18 U.S.C. § 3142(i)(3); *see also United States v. Argraves*, No. 09 Cr. 117 (MRK), 2010 WL 283064, at *6 (D. Conn. Jan. 22, 2010) ("Pre-trial detention will always interfere with preparation for trial to some extent, but the Bail Reform Act clearly contemplates this problem and allows for detention provided that the defendant is 'afforded reasonable opportunity for private

5

consultation with counsel.'" (quoting 18 U.S.C. § 3142(i)(3)). The defendant has the burden of showing that temporary release is "necessary for the preparation of the person's defense." *United States v. Dupree*, 833 F. Supp. 2d 241, 246 (E.D.N.Y. 2011).

### B. Discussion

#### 1. The Court Should Reject the Defendant's Attempt to Reopen the Bail Hearing Based on the Same Information He Presented to Judge Carter

The defendant's motion to reopen the bail hearing should be denied for the simple reason that he has not presented any information that was not known to him at the time of the bail hearing before Judge Carter. As set forth below, the defendant asserts that the Court should consider "new" information relating to the defendant's relationship with Victim-1 and his communications with various witnesses as a basis to reopen the bail hearing. But these allegedly "new" facts are the very same arguments made by defense counsel and rejected by the district court previously, dressed up with recently produced discovery. Because those facts were well known to the defendant before any discovery production, and because the defendant relied upon them in his prior hearing, he cannot recycle them here to revisit the sound determination made by Judge Carter that the defendant is a danger and risk to obstruction and must be detained.

##### a. Defendant's Rehashing of the Same Personal Attacks He Made Against Victim-1 Before Judge Carter Is Not New Information

The defendant claims that communications between the defendant and Victim-1, which were recently produced in discovery as part of the defendant's electronic devices and accounts, constitute "new material." The defendant claims that the recently produced text messages "reveal . . . a loving, at-times toxic, long-term relationship between two adults who decided mutually to break up." (Dkt. 61 ("Br.") at 9). This claim is nothing new. Defense counsel made these exact points previously—and even referred to text messages and communications. At the September 17,

2024 hearing, after noting that he had "looked through more text messages and e-mails than [he] cared to," defense counsel observed:

> This is a ten-year relationship. This sex trafficking is a ten-year relationship. These two people were in love. That will be made abundantly clear by the way they speak to each other, by the way other witnesses described their time together, and by the circumstances of how they broke up. They were in love, but Mr. Combs wasn't always faithful. . . . At the end of the day, there was mutual philandering, and Victim Number 1 ended up marrying the trainer that Mr. Combs got for her, and had two children. That signaled the end of the relationship.

(Sept. 17, 2024 Tr. at 35-36). There is nothing about the content of the text messages between the defendant and Victim-1 that was "not known to [the defendant] at the time of the [initial] hearing." 18 U.S.C. § 3142(f)(2)(B).

Furthermore, in presenting recently produced text messages, the defendant cherry picks to paint a misleading picture, ignoring numerous other messages in the record between the defendant and Victim-1 documenting the defendant's physical abuse of Victim-1 and his threats to expose recordings of Freak Offs. (*See, e.g.*, Sept. 18, 2024 Tr. at 6 (text message reading "You know what sick and disgusting shit I was reminded of the other day? You forcing me to [omitted] or you were going to leak some [Freak Off] shit"); *id.* at 10 ("I have a black eye and fat lip. You are sick for thinking it's OK to do what you've done" and "I still have crazy bruising"); *id.* at 16-17 ("I turn my head for a second, and you get fucked up, and you drag me down the hall by my hair," "I have bleeding cuts," "You hit me in the head two good times," "When you get fucked up the wrong way, you always want to show me that you have the power and you knock me around. I'm not a rag doll. I'm someone's child.")). Moreover, despite attaching lengthy text messages between the defendant and Victim-1 on various dates between August and November 2018, the defendant omits messages produced in this same thread about the defendant's violence. *See, e.g.*, Oct. 17, 2018 ███████████████████████████████████████

███████████████ Oct. 19, 2018 ████████████████████████████
█████████ .

The defendant also rehashes his attacks on Victim-1's motives in bringing a civil lawsuit against the defendant, suggesting that Victim-1's allegations against the defendant "were merely attempts to obtain a financial windfall from Mr. Combs." (Br. at 10). Across multiple bail hearings and in the instant brief, the defendant has made clear that his litigation strategy is to personally attack Victim-1, stooping to any depth to attempt to undermine her credibility. Setting aside this questionable strategy, none of the information that purportedly undermines Victim-1's motives was unknown to the defendant at the initial bail hearing—again, defense counsel made all of these arguments previously. (*See, e.g.*, Sept. 17, 2024 Tr. at 40). And these arguments have no bearing on the question of bail. The purpose of a bail motion is to determine whether there are conditions that will assure the safety of the community and the defendant's appearance in court—not to entertain the personal attacks on a statutory victim. To the extent the defendant takes issue with Victim-1's credibility, a trial is the appropriate forum to address that. *See, e.g.*, *United States v. Schwamborn*, No. 06 Cr. 328 (SJF) (AKT), 2007 WL 9653331, at \*14 (E.D.N.Y. June 29, 2007) (holding that *Giglio* information was not sufficient grounds to reopen a bail hearing).

**b. The Court Should Reject the Defendant's Request to Reopen the Bail Hearing Because the Defendant Disagrees with the Government's Use of the Term "Victim"**

The defendant next accuses the Government of misleading the Court as to the nature of certain of the defendant's communications with another victim ("Victim-2"). (Br. at 11-12). The Government did no such thing. The defendant's primary point of contention appears to be the Government's characterization of this individual as a "victim." In quibbling about how to label

Victim-2—an individual to whom the defendant continues to pay a significant monthly sum[2]—the defendant does not present any new information or grapple with the actual evidence.  The messages and recordings between the defendant and Victim-2 on which the Government relied at the initial bail hearing are clear on their face and consistent with the Government's representations: the defendant was leveraging significant financial benefits to cause Victim-2 to adopt his narrative of their relationship.  (*See* Sept. 18, 2024 Tr. at 21-22).  Whether or not the defendant agrees with the characterization of Victim-2 as a "victim" for purposes of this criminal case, the communications highlighted by the Government indicate that the defendant used financial coercion to attempt to feed Victim-2 a narrative that was consistent with his defense theory—a theory at odds with contemporaneous text messages sent by Victim-2 to the defendant and others (*See* Sept. 18, 2024 Tr. at 7 ("[The defendant] just threatened me about my sex tapes . . . where I am heavily drugged and doing things he asked of me."); 21 (describing Victim-2's "sexual trauma").  In light of the defendant's continuing financial support of Victim-2, it is not the Government, but rather the defendant, that is misleading the Court.

### c. The Defendant's Contacts with Witnesses Demonstrate the Threat He Poses to the Integrity of these Proceedings

#### *Witness-1*

The defendant's attempts to spin his contacts with witnesses, including witnesses served with grand jury subpoenas, as evidence rebutting the Government's proof of obstruction fail in their entirety.  For example, the defendant claims that the Government "misled the court and concealed the actual content of the communication" between the defendant and a witness who was served with a grand jury subpoena in June 2024 ("Witness-1").  (Br. at 13).  As an initial matter, the nature and substance of the defendant's communication with Witness-1 was known to the

---

[2]        Bank records show the defendant's payments to Victim-2 as recently as mid-September 2024. The Government has requested and is awaiting updated financial documents through the present.

defendant at the time of the initial hearing.  But more importantly, these contacts—including the fact that the defendant evidently deleted the messages from his phone—confirm the Government's proffer at the initial hearing and refute statements made by defense counsel.

Specifically, phone records show that between the end of 2022 and January 2024, Witness-1 occasionally contacted the defendant by phone without any response from the defendant.  That changed in June 2024.  Witness-1 was served with a grand jury subpoena on June 19, 2024, and after contacting the Government, was appointed counsel on June 25, 2024.  Beginning on June 26, 2024—only after Witness-1 had been served with a grand jury subpoena and had counsel—the defendant initiated contact with Witness-1, which the defendant attempted to obscure by initially calling Witness-1's wife and later communicating with Witness-1 over a VOIP service, including by text and a call lasting over seven minutes.  The following day, phone records indicate that Witness-1 spoke with counsel for the defendant.  Even though Witness-1 was represented by counsel, he and the defendant continued to directly exchange text messages, and defense counsel also spoke directly with Witness-1 again on July 8, 2024.  Following Witness-1's testimony in the grand jury on July 25, 2024, the defendant called and texted Witness-1 again.

The defendant's repeated contact with Witness-1, despite his apparent knowledge that Witness-1 was represented by counsel and had received a grand jury subpoena, undermines defense counsel's previous denials of the defendant's  interference in the Government's grand jury investigation and shows that counsel cannot stop the defendant from contacting grand jury witnesses.[3]  This concern is amplified by evidence indicating that the defendant appears to have

---

[3]     *See* Sept. 18, 2024 Tr. at 42 ("He did not reach out to grand jury witnesses.  I dispute that wholeheartedly.  He didn't do it and he wouldn't do it.  And he wouldn't do it because he has the sense not to do it, and he wouldn't do it because we wouldn't let him do it, you know."); *see also* Dkt. No. 13 ("[W]e have studiously avoided interviewing grand jury witnesses . . ."); https://www.cnn.com/2024/09/17/us/video/marc-agnifilo-diddy-sean-combs-src-digvid (counsel for defendant discussing speaking to witnesses in the case and stating "we would not – we cannot – try to interview a grand jury witness").

deleted his messages with Witness-1: although the phone records confirm that the defendant, using a particular phone number, and Witness-1 exchanged multiple text messages from June 2024 through August 2024, there were no such messages recovered from the defendant's cellphone associated with that phone number.

<u>*Witness-2*</u>

The defendant also claims that the defendant's contacts in September 2024 with "an individual represented by counsel, who wanted to make a public statement" ("Witness-2"), were "not in any way obstructive" because the defendant and Witness-2 were previously in frequent contact.  (Br. at 13).  However, the contact between the defendant and Witness-2, who were bandmates, stopped in March 2024.  And from the timeline and the context of the defendant's contacts with Witness-2, it is clear that when the defendant reinitiated contact with Witness-2 in September 2024, his purpose was to ensure that Witness-2 was on his side and to pressure Witness-2 to make a public statement denying allegations of violence by the defendant.

The defendant reached out to Witness-2 on September 11, 2024 and sent her a copy of the lawsuit against the defendant in which Witness-2's name was mentioned several times.  The defendant then called Witness-2 and they spoke for nearly six minutes.  After reading the lawsuit, Witness-2 called the defendant back, at his request, and they spoke for over four minutes. Evidently the defendant and Witness-2 discussed Witness-2 drafting a statement, as immediately after the call, the defendant told Witness-2 in a text message ████████████████████████████ ████████  The defendant then asked Witness-2 for her attorney's name.

From September 11, 2024 through September 15, 2024, the defendant and Witness-2 exchanged multiple texts and had multiple calls—at least 128 phone contacts in total.  Throughout these phone contacts, the defendant repeatedly asked Witness-2 when she planned to post her statement (*e.g.*, ████████████████████████████████████████████████

11

████████████████████████████████████████████████

████████████████████████████████████████████████

Witness-2 ultimately made a statement about the lawsuit via an Instagram post on September 13,

2024, ████████████████████████████████████████

████████████████████████████████████████████████

Then, after the defendant was in custody, BOP investigators recovered the following notes from

the defendant's cell[4] during a pre-planned nationwide sweep of BOP facilities:

████████████████████████████████████████████████

(Ex. E).  The strong inference to be drawn from the defendant's communications with Witness-2

and his personal notes is that the defendant paid Witness-2 after she posted her statement.

From the timeline, the content, and the context of the communications between the

defendant and Witness-2, the defendant's clear goal was for Witness-2 to draft and post a

statement.  Even after the defendant knew that Witness-2 had counsel, he continued to reach out

to her directly, a fact that clearly concerned Judge Carter, and rightfully so.  That the defendant

had multiple phone contacts with Witness-2 up to and including March 2024 changes nothing

about the damning timeline and content of the calls in September 2024—these communications

are another example of the defendant using manipulation, influence, and power to persuade

witnesses to support him.

---

[4]    With respect to materials received from the BOP that included possibly privileged materials, such as the notes recovered from the defendant's cell, the Prosecution Team only accessed those materials after they had been reviewed by the Filter Team.  *See generally United States v. Stewart*, No. 02 Cr. 395 (JGK), 2002 WL 1300059, at *4-6 (S.D.N.Y. June 11, 2002) (discussing the potential options, including Government filter team, for review of potentially privileged search warrant materials).

Based on the foregoing, the defendant has not demonstrated that he is entitled to reopen the bail hearing under 18 U.S.C. § 3142(f)(2)(B), and the law cited by the defendant provides him no support otherwise. The defendant's reliance on *United States v. English*, 629 F.3d 311 (2d Cir. 2011), is misleading. (Br. at 2-3). The citation by the defendant suggests that when cases are reassigned to new judges, the court should review the record *de novo* when considering bail motions. (*Id.*). The Second Circuit's holding was not that broad. In *English*, the Second Circuit held that "[a] district judge *before whom a bail motion is properly made* should consider the subsection (g) factors and make the determinations required by § 3142." *Id.* at 320 (emphasis added). Thus, the inquiry is two steps: (1) first, the Court must determine whether the bail motion is properly before it pursuant to 18 U.S.C. § 3142, and (2) only if the Court finds in the affirmative should the Court consider the § 3142(g) factors. Here, because the defendant has not satisfied the first prong, the Court need not even consider the § 3142(g) factors. The cases cited by the defendant to support his contention that this Court has "inherent authority" to reopen a bail hearing are equally misleading. (Br. at 2 (citing *United States v. Maxwell*, 527 F. Supp. 3d 659, 663 (S.D.N.Y. 2021) (collecting cases)). Those cases involve a district court reconsidering its own bail decisions. The Second Circuit has explicitly held that, as is the case here, when two "judges of the court hav[e] original jurisdiction over defendants' offenses, neither is authorized to review a detention order issued by the other." *English*, 629 F.3d at 320.

### 2. The Defendant Cannot Rely on Section 3142(i) for His Release

Alternatively, the defendant moves for pre-trial release under 18 U.S.C. § 3142(i), claiming that the defendant cannot adequately prepare his defense at the MDC. The law does not support the defendant's release under this provision either, as the defendant has amply been "afforded reasonable opportunity for private consultation with counsel" at the MDC. *See* 18 U.S.C. § 3142(i)(3).

*First*, the MDC has provided the defendant with more than reasonable accommodations to meet with counsel. The defendant is permitted to meet with counsel seven days a week and regularly has access to a separate conference room off the common area of his unit. In fact, records indicate that the defendant has met with defense counsel most days since he has been in custody. Records also indicate that the defendant frequently communicates with his attorneys by telephone and written communication, including, as explained below, through unauthorized means. But even if the defendant were only using authorized channels of communication, the MDC's procedures do not infringe on the defendant's constitutional right to effective counsel or to participate in his defense. *See United States v. El-Hage*, 213 F.3d 78, 81-82 (2d Cir. 2000) (holding pretrial detention conditions, which included solitary confinement, restricted phone access, and a chair to review discovery more comfortably were reasonably related to defendant's specific security concerns and did not impermissibly infringe the defendant's ability to prepare his own defense); *United States v. Mohamed*, 103 F. Supp. 3d 281, 289-96 (E.D.N.Y. May 1, 2015) (same); *United States v. Hashmi*, 621 F. Supp. 2d 76, 86-87 (S.D.N.Y. 2008) (same); *United States v. Kassir*, No. S2 04 Cr. 356 (JFK), 2008 WL 2695307, at *2-5 (S.D.N.Y. July 8, 2008) (same).

*Second*, defense counsel's proposal that the defendant must be released in order to prepare his defense is inconsistent with the Bail Reform Act, which contemplates that courts will weigh dangerousness and risk of flight against a defendant's opportunity to prepare for trial. In this case, the significant danger that the defendant poses weighed against the opportunities the MDC has provided the defendant to meet privately with his attorneys clearly counsels in favor of the defendant's continued detention. *See Argraves*, 2010 WL 283064, at *6 ("Pre-trial detention will always interfere with preparation for trial to some extent, but the Bail Reform Act clearly contemplates this problem and allows for detention provided that the defendant is 'afforded reasonable opportunity for private consultation with counsel.'" (quoting 18 U.S.C. § 3142(i)(3))).

14

*Third*, voluminous discovery alone is not a basis for release under either the Bail Reform Act or the Sixth Amendment. The defendant does not point to any case law suggesting that discovery of the kind produced in this case requires the defendant's release under 18 U.S.C. § 3142(i), nor can he. *See Dupree*, 833 F. Supp. 2d at 249 ("While this [fraud] case may, in fact, be complicated and require Defendant to review hundreds if not thousands of documents and meet with his lawyers for dozens of hours, that fact, standing alone, simply does not justify Defendant's release . . . . Indeed, accepting such an argument would mean that the more complicated the crime, the more likely a defendant should be released prior to trial. This is clearly an absurd result." (citation omitted)). The Bail Reform Act does not mandate the defendant's release even if review of discovery would be more convenient outside the MDC. *See id.* at 248 (holding that even where "release would certainly make it more convenient for him and his counsel to prepare his defense," release was not "necessary" given substantial accommodations for discovery review).[5] Moreover, the aggressive trial schedule was specifically requested by the defendant—if he needs more time to review discovery, he can request an adjournment of the trial date.

*Finally*, the defendant's complaints about conditions at the MDC come as a surprise to the Government, given the contrary public statements made by defense counsel and statements made by the defendant in monitored calls.[6] Additionally, defense counsel has made no attempt to confer

---

[5]    The defendant's complaint that he still does not have a laptop is overstated. At defense counsel's request, the Government prioritized production of the defendant's electronic devices, which the defendant is not entitled to keep at the MDC due to their designation as "Attorney Possession Only." The bulk of the materials that the defendant is entitled to keep at MDC were only produced recently—and immediately following the production of those materials, the Government began preloading the defendant's laptop and expects to provide the laptop to defense counsel in short order.

[6]    *See* Quinn, Liam et al., "Sean 'Diddy' Combs' Attorney Says 'Food's Probably the Roughest Part' of Mogul's Life in Prison," People, Oct. 10, 2024 (available at https://people.com/sean-diddy-combs-food-toughest-part-life-behind-bars-8726560?utm_campaign=people&utm_content=likeshop&utm_medium=social&utm_source=instagram); *see also* Ex. F at 7:20-8:16 (Oct. 27, 2024 call in which the defendant describes the MDC: ██

with the Government about their concerns.  Nonetheless, the Government stands ready to engage with defense counsel on these issues if needed.

### 3.  The Defendant Poses a Serious Risk of Obstruction, Danger, and Flight

For the reasons discussed above, the defendant has not met his burden of demonstrating that he is entitled to a hearing under 18 U.S.C. § 3142(f) or § 3142(i).  Accordingly, the Court need not make a determination regarding the defendant's risk of flight or dangerousness.  However, even if the Court were to analyze the factors in 18 U.S.C. § 3142(g) again, the Court should continue the defendant's pretrial detention because no condition or combination of conditions can assure the defendant's appearance and the safety of the community, nor can conditions prevent the defendant's continued obstructive efforts.  The incorporated submissions and arguments presented to Judge Tarnofsky and Judge Carter amply support those findings (*see* Exhibits A and B), and as described further below, the argument for detention has only gotten stronger.

### a. The Defendant Has Continued His Efforts to Obstruct Justice[7]

As noted above, the evidence presented to Judge Tarnofsky and Judge Carter amply supported their findings that the defendant posed a risk of obstruction justifying pretrial detention, and would be sufficient for this Court to find the same.  However, to the extent there was any doubt about the defendant's risk of obstruction at the time of the prior bail hearings, such doubt is now nonexistent—since the defendant has been detained at MDC, he has continued to try to evade law

---

[7]      Since the defendant's arrest, the Government has continued investigating the defendant's obstructive conduct and began receiving recordings of the defendant's BOP calls in October 2024.  These calls in their entirety will be produced to the defendant  through a filter team prior to the bail hearing scheduled for November 22, 2024.  The Government did not previously disclose these recordings due to its ongoing investigation, but is doing so now given the recent escalation in the defendant's efforts to influence the jury pool in this criminal case, set out in detail below.

enforcement monitoring, corruptly influence witness testimony, and further attack the integrity of these proceedings.

Specifically, while in custody at the MDC, the defendant has repeatedly communicated with others in ways that violate BOP rules and are designed to evade BOP and law enforcement monitoring, including, as described below, using PAC numbers belonging to other inmates to make calls; using three-way calls to contact other individuals, including individuals who are not on his approved contact list; and using an unauthorized third-party communication system to send messages to numerous individuals, including unauthorized contacts.[8]

### *Other Inmates' PAC Numbers*

The Government has reviewed dozens of recordings of BOP jail calls in which the defendant uses telephone accounts of at least eight other inmates—which is against BOP regulations. Seemingly to avoid law enforcement monitoring, the defendant uses other inmates' PAC numbers to make phone calls to both individuals on the defendant's approved contact list as well as other individuals who are not on the approved contact list. To obtain or maintain access to other inmates' PAC numbers, the defendant directs others to pay the inmates, including through payment processing apps and BOP commissary account deposits. The defendant knows this is against BOP regulations: at the outset of each telephone call, the inmate is prompted to enter his

---

[8]     When an inmate enters federal custody, he is generally permitted to communicate with out-of-custody individuals, including friends and family members. (*See generally* https://www.bop.gov/inmates/communications.jsp). To do so, inmates provide a "contact" list, which includes the individual's name, phone number, and email address. BOP staff must approve individuals on a contact list, and inmates are not authorized to contact individuals who are not on their contact list. Additionally, telephone calls and emails to non-attorneys are monitored by BOP to ensure that the messages do not jeopardize the public or the safety, security, or orderly operation of the facility. When inmates make telephone calls, they are required to use a "PAC number" or "phone access code," that is connected to their unique BOP register number. Inmates access email using the "TRULINCS" system, which is operated by a company called "CorrLinks." TRULINCS is a fee-based system that inmates must pay for to send or receive email using the TRULINCS computer system.

PAC number, after which an automated recording announces: "Sharing of PAC numbers is against BOP policy and is subject to disciplinary action."

### Three-Way Calling

The defendant also frequently instructs individuals whom he contacts by telephone— including family members and his attorneys—to add other individuals via three-way call.  This practice is also not authorized by BOP as it helps conceal the identities of the contacted individuals. The Government has reviewed multiple calls in which the defendant has instructed others to dial in third parties, including members and associates of the Enterprise and individuals who are not on the defendant's contact list.

### Non-Authorized Messaging Services

In addition to flouting BOP rules regarding phone use, the defendant also uses a non-authorized third-party messaging service called "ContactMeASAP" to obscure his communications.[9]  The defendant appears to be using two ContactMeASAP accounts.  First, the defendant's BOP contact list includes a particular email address ("Email-1") assigned to the defendant's son, which does not appear to be an account owned by the defendant's son but instead appears to be an email address connected to ContactMeASAP.  Second, the defendant appears to be using another inmate's ContactMeASAP account.  Primarily using Email-1, the defendant has exchanged hundreds of text messages via ContactMeASAP with dozens of individuals, including attorneys and individuals who are not on the defendant's contact list.

The defendant's repeated circumvention of BOP regulations—starting almost immediately after arriving at MDC—speaks volumes about his ability to comply with *any* conditions of release.

---

[9]    According to the ContactMeASAP website, (*see* https://contactmeasap.com/), the service purports to be "an innovative text messaging service for federal inmates to communicate with loved ones via real-time messages" and claims to offer "seamless SMS conversion."  ContactMeASAP provides an "email address for [the] inmate, which is then put on the inmate's TRULINCS computer" and from there, the inmate can immediately use the service to text contacts.

Even more concerning, however, is the defendant's use of these unauthorized methods of communications to continue his efforts to obstruct and subvert this criminal proceeding. The defendant's intentions are reflected in his own words on BOP calls with a network of family members and associates whom the defendant has tasked with executing his will. On multiple calls, often using the PAC numbers of other inmates, the defendant is explicit about his intention to use public statements to alter public perception and ███████████████ The defendant leaves no doubt that the narrative he wants to ████████ is the potential jury pool's perception of *this* criminal proceeding.

      Examples of these efforts are plentiful. ██████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
(Ex. G at 4:15-5:17 (Oct. 21, 2024 call)). ██████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████ (Ex. H at 5:30-6:03 (Oct. 15, 2024 call); Ex. I at 2:45-3:30 (October 4, 2024 call)). Notably, the defendant continued these efforts after the Court's October 25, 2024 order (Dkt. No. 50)— *requested by the defense*—prohibiting exactly this sort of conduct. After the Court entered the order, the defendant enlisted family members to plan and execute a social media campaign around the defendant's birthday, with the intention of influencing the potential jury in this criminal proceeding. At the defendant's carefully curated direction, the defendant's children posted a video to their respective social media accounts showing the defendant's children gathered to celebrate the defendant's birthday. The defendant (from within the MDC) then monitored the analytics—*i.e.*, audience engagement—and explicitly discussed with his family how to ensure that the video had his desired effect on potential jury members in

this case. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ (Ex. J at 1:00-2:15 (Nov. 4, 2024 call)). ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ (Ex. K at 3:15-4:05; 7:20-8:30 (Nov. 4, 2024

call)).  Besides flagrantly violating the Court's October 25, 2024 order prohibiting this kind of

interference with a fair trial, the defendant's *own words* make clear that his intent is to improperly

influence the jury pool in this criminal proceeding.

The defendant does not stop there.  During other calls, the defendant makes clear his

intention to anonymously publish information that he thinks will help his defense in this case.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ (Ex. L at 1:28-2:04

(October 4, 2024 call)). ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ (*Id.* at 2:11-3:24).  The defendant's efforts to

anonymously leak video favorable to his defense in this case show that he is using his so-called "public relations" strategy to influence this criminal case.

The defendant's efforts to obstruct the integrity of this proceeding also includes relentless efforts to contact potential witnesses, including victims of his abuse who could provide powerful testimony against him.  For example, on October 4, 2024, in a call involving the defendant and one of his adult sons, the defendant says: ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████  (Ex. M at 3:04-3:57) (Oct. 4, 2024 call)). ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████  (Ex. N at 4:10-4:24 (Oct. 14, 2024 call)). ██████████████████████

██████████████████████████████████████

████████████████████████████████████████████

(Ex. O). ████████████████████████████████████

████████████████████████████████████████████

███████████, provides the clear inference that the defendant's goal is to blackmail victims and witnesses either into silence or providing testimony helpful to his defense.

### b. The Defendant is a Danger to Others

In addition to failing to meaningfully contend with the ongoing risk of obstruction the defendant poses, he also spends no time addressing the significant acts of physical violence that the Government highlighted at the initial hearing, which led Judge Carter to conclude that the defendant "is a danger to the safety of others in the community more generally" by clear and convincing evidence. (Sept. 18, 2024 Tr. at 56). Indeed, as the record before this Court makes clear, the defendant's long history of violence demonstrates his dangerousness. (*See* Ex. A at 2-5, 8-9; Ex. B at 2-3). Moreover, contrary to the defendant's claim that the evidence is "thin" (Br. at 1), evidence supporting the defendant's long history of abuse—including witness testimony, communications, photos and videos, police reports, and other materials—demonstrates the strength of the Government's case against the defendant, a factor considered by the Court under 18 U.S.C. § 3142(g)(2).

As charged in the Indictment, the defendant has engaged in physical, sexual, and emotional abuse of his romantic partners for years. (*See* Dkt. No. 1 at ¶ 12). The defendant also engaged in acts of violence directed towards his employees and many others, including kidnapping, arson, and physical violence, such as throwing objects at people, throwing people to the ground, and hitting, kicking, dragging, choking, stomping on, and shoving others. (*Id.*). Multiple witnesses, including the defendant's employees and others, observed or experienced the defendant's violence firsthand. The defendant's acts of violence show there is no condition or combination of conditions that will adequately safeguard others and the community. *See* 18 U.S.C. § 3142(g)(3), (4). (*See also* Sept. 17, 2024 Tr. at 55 ("[T]he danger, I think, is quite serious. There have been weapons around. There has been significant violence, and I also think it's significant that there has, I think,

been a proffer of significant evidence of coercion of witnesses."); Sept. 18, 2024 Tr. at 56 ("I also find that the government has proven that the defendant is a danger to the safety of others in the community more generally by clear and convincing evidence.")).

While far from the only example, the video of the March 2016 incident at the Intercontinental Hotel, discussed at length in both previous hearings, puts the defendant's dangerousness on full display. (*See* Sept. 17, 2024 Tr. at 12-15; *see also* Sept. 17, 2024 Hear'g Ex. A-1). Although defense counsel conceded that the incident was relevant to Judge Carter's determination of dangerousness (*see* Sept. 18, 2024 Tr. at 51), the defendant fails to address it with respect to the present motion. Instead, he repeats his prior characterization of the defendant's relationship with Victim-1 as "complex" and "at-times toxic," and pivots to the defendant's philanthropic endeavors and family relationships in an effort to distract. (Br. at 1, 9). But the defendant's personal relationships and charity work does not neutralize or erase the video evidence showing the defendant punching a female victim, dragging her, throwing a vase at her, and kicking her. (*See* Sept. 18, 2024 Tr. at 49-50).

In sum, the defendant cannot walk away from the clear record in this case. His inability to explain away his long history of violence—including the March 2016 incident, captured on film—is a fatal blow to his application for release. The defendant's extensive history of violence makes him a danger to those around him and the safety of the community cannot be ensured short of his continued detention. *See United States v. Mercedes*, 254 F.3d 433, 437-38 (2d Cir. 2001) (noting that a "willingness to strike loved ones offers probative evidence of tendency to violence and dangerousness towards others").

### c. The Defendant Continues to Pose a Risk of Flight

The defendant has not rebutted the presumption that there are no conditions to assure his future appearance given the fact that the defendant faces a mandatory minimum sentence of 15

years' imprisonment and a statutory maximum sentence of life imprisonment. *See United States v. Green*, No. 20 Cr. 357 (VM), 2020 WL 5814191, at *1 (S.D.N.Y. Sept. 30, 2020) (noting that substantial sentence defendant may face weighed in favor of finding that defendant was a flight risk); *see also United States v. Moscaritolo*, No. 10 Cr. 4 (JL), 2010 WL 309679, at *2 (D.N.H. Jan 26, 2010) ("[T]he steeper the potential sentence, the more probable the flight risk is, especially considering the strong case of the government . . .") (citation omitted).  In this case, the defendant has incentive to flee, given the potential punishment and the nature of the evidence that will be presented at trial, and has nearly limitless resources to facilitate his flight.  While counsel took steps to mitigate the defendant's substantial risk of flight before the Indictment, the defendant's incentives have changed materially now that he faces the very real possibility of a substantial term of incarceration.

### 4.  The Defendant's New Proposed Bail Package Is Insufficient

In the face of the significant evidence that the defendant poses a risk of obstruction, a danger to the community, and a risk of non-appearance, the defendant's proposed updated bail package is woefully insufficient.  As discussed, *supra*, the defendant has shown repeatedly—even while in custody—that he will flagrantly and repeatedly flout rules in order to improperly impact the outcome of his case.  The defendant has shown, in other words, that he cannot be trusted to abide by rules or conditions.  *See* 18 U.S.C. § 3142(g)(3).

While the proposed conditions suggest the defendant will have no access to telephones or the Internet except for calls with counsel, this is insufficient to ensure that the defendant will cease engaging in unauthorized or inappropriate communications through third parties.  The defendant is already doing just that, against BOP regulations.  If the defendant cannot abide by rules in the highly restrictive setting at MDC, there is no reason he should be trusted to abide by the Court's conditions in a less restrictive setting.

24

Furthermore, the defendant's proposal to restrict visitors to select family members is also insufficient.  Since being in custody, the defendant has deployed family members to carry out obstructive conduct on his behalf.  As evidenced in jail calls, the defendant asks family members to reach out to potential victims and witnesses; create "narratives" to influence the jury pool; and pursue marketing strategies to sway public opinion.

The defendant's emphasis on 24/7 private security is also problematic.  The defendant has demonstrated an uncanny ability to get others to do his bidding—employees, family members, and MDC inmates alike.  There is no reason to believe that private security personnel would be immune.  *United States v. Boustani*, 932 F.3d 79, 82 (2d Cir. 2019) ("[T]he Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails."); *see also United States v. Banki*, 369 F. App'x 152, 153-54 (2d Cir. 2010) (this Court is "troubled" by the possibility of "allow[ing] wealthy defendants to buy their way out by constructing a private jail.") (citation omitted).  At any rate, the defendant's private jail proposal "at best elaborately replicate[s] a detention facility without the confidence of security such a facility instills."  *United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993) (citation omitted).  Moreover, the Second Circuit has expressly decried attempts like the defendants to pay his way out of detention.

The defendant's updated proposal simply does not alleviate the risk of danger, obstruction, and flight, particularly in light of the defendant's inability to comply with BOP regulations and his efforts to engage in obstructive conduct even while subject to monitoring at the MDC.

## **CONCLUSION**

For the reasons set forth above, the defendant's renewed motion for bail should be denied.


Dated:        New York, New York
              November 15, 2024


                        Respectfully submitted,

                        DAMIAN WILLIAMS
                        United States Attorney


              By:    _____/s/_____
                     Meredith Foster
                     Emily A. Johnson
                     Christy Slavik
                     Madison Reddick Smyser
                     Mitzi Steiner
                     Assistant United States Attorneys
                     (212) 637-2310/-2409/-1113/-2381/-2284