

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

November 18, 2024

**BY ECF**

The Honorable Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:    *United States v. Sean Combs*, 24 Cr. 542 (AS)

Dear Judge Subramanian:

    The Government respectfully submits this letter in connection with the defendant's letter dated November 18, 2024 (*see* Dkt. No. 70) and in response to the Court's Order issued earlier today (*see* Dkt. No. 71). For the reasons that follow, the relief requested by the defendant— including an evidentiary hearing—are unnecessary.

## Background

    On or about September 16, 2024, the defendant was arrested. The following day, the above referenced Indictment was unsealed and the defendant was presented arraigned before the Honorable Robyn F. Tarnofsky, United States Magistrate Judge. As part of that proceeding, the Government moved for detention under the Bail Reform Act. Finding that there was no condition or combination of conditions that would assure the safety of the community, Judge Tarnofsky denied the defendant bail. The following day, the Honorable Andrew L. Carter heard the defendant's bail appeal, and after a lengthy hearing, determined that the Government had proven by clear and convincing evidence that the defendant was a danger to the community and a risk of obstruction.

### *The Defendant's Communications*

    Since being ordered detained, the defendant has been held at the Metropolitan Detention Center Brooklyn ("MDC"), a Bureau of Prisons ("BOP") facility. With respect to inmate communications, all BOP inmates, including the defendant, are afforded the opportunity to confer with attorneys on unmonitored phone lines. Other communications occur over BOP-monitored phone lines and email. As part of its general practice to screen monitored communications for

content "that could jeopardize the public or the safety, security, or orderly operation of the facility" (*see* https://www.bop.gov/inmates/communications.jsp), BOP staff, including a particular BOP investigator ("Investigator-1"), has consistently monitored the defendant's communications on monitored communication channels, including monitored phone lines. This monitoring is independent of the Case Team (*i.e.*, the Assistant United States Attorneys charged with the investigation and prosecution of the defendant) and is not done at its direction.

As set out in the Government's November 15, 2024 brief and made clear on the record during the previous bail hearings, the Government's grand jury investigation of the defendant—including the defendant's obstruction related to this criminal case—is continuing. As part of that investigation, the Government has sent grand jury subpoenas and document requests to the BOP for the defendant's monitored communications—including calls and emails. From those materials, the Government has learned that the defendant has persisted in engaging in obstructive conduct since he entered BOP custody. Among other things, the defendant has engaged in unauthorized communications practices, including (1) three-way calling on the monitored phone line, (2) use of other inmates' phone access code (or "PAC") numbers to make phone calls on the monitored phone line, and (3) use of a third-party text messaging provider through the BOP's monitored email system. Each of these methods of communications is prohibited by BOP. Furthermore, as set out in the Government's November 15, 2024 brief, the defendant used these unauthorized methods of communications to continue to engage in obstruction, including by instructing third parties to reach out to witnesses and attempting to influence the jury pool in this criminal case.

The defendant has used all three of the aforementioned methods of communications to communicate with his attorneys. Accordingly, although it is clear to all parties involved that these calls and emails are monitored, in an abundance of caution, the Government sent any potentially privileged communication—*i.e.*, any communication involving an attorney—to the Filter Team for review before it was released to the Case Team. As is the Government's longstanding practice in ongoing covert investigations—such as the investigation into the defendant's obstructive conduct in the MDC—the Government did not disclose potentially privileged communications to defense counsel in the first instance.

As stated in the Government's opposition to the defendant's bail motion, the Government's intends to produce all the defendant's calls and emails in full to defense counsel today. (*See* Dkt. No. 69 at 16 n.7).

*Sweep of the MDC*

In or around October 28, 2024, the BOP and several other federal and local agencies initiated a "sweep" of the MDC. The sweep was "preplanned and coordinated to ensure the safety and security" of staff and inmates at the MDC, and was part of a "larger safety and security initiative and not in response to any particular threat or intelligence." (*See*

https://www.bop.gov/resources/news/pdfs/20241101-press-release.pdf).[1]  The MDC sweep included the jail and the warehouse where MDC food and other property are stored. It was planned well in advance of the defendant's arrest, and was not conducted to target any particular inmate, including the defendant.

During the MDC sweep, multiple housing units were searched, including the defendant's unit. Although members of the Case Team were aware in advance that the defendant's housing unit would be searched, (in addition to other areas of the jail), no one on the Case Team supervised, conducted, or participated the search of any housing unit, nor the search of the defendant's bunk area. In fact, the Case Team was not aware in advance of what agents and officers were conducting the search of that housing area.

Investigator-1 was assigned by BOP to participate in the weeklong sweep and was present at the MDC during the operation. During the sweep of the defendant's housing unit, Investigator-1 interviewed multiple inmates, including the defendant, about potential corruption and contraband at the MDC. Following Investigator-1's interview of the defendant, Investigator-1 approached the defendant's assigned bunk to check for contraband. On the defendant's bunk, Investigator-1 found the following items: (1) a manila folder marked "legal," (2) a notebook labeled ▮▮▮▮▮▮▮▮ (3) an address book, and (4) personal effects. Investigator-1 felt the outside of the manila folder marked "legal" for contraband, and feeling none, set it aside and did not open or photograph it. With respect to the notebook labeled ▮▮▮▮▮▮▮▮ and the address book, Investigator-1 took photos of these materials. Investigator-1 left the materials on the defendant's assigned bunk. No physical materials were seized from the defendant.

Following the MDC sweep, Investigator-1 alerted the Case Team that he had taken photos of the defendant's ▮▮▮▮▮▮▮ notebook and address book (the "Photographs"). Investigator-1 described the ▮▮▮▮▮▮▮ notebook as largely "notes to self" written by the defendant that included notes regarding ▮▮▮▮▮▮▮▮▮▮▮▮▮. In an abundance of caution, the Case Team asked Investigator-1 to provide the Photographs directly to the Filter Team, given the possibility that they touched on legal strategy. Following review, the Filter Team provided certain of the Photographs to the Case Team, including Photographs containing redactions.[2]

---

[1] The Government's November 15, 2024 brief mistakenly described the MDC sweep as "nationwide." This was an error—the sweep of the MDC included BOP officers and agents from around the nation, but the sweep was focused on the MDC and facilities used by the MDC (*e.g.*, the MDC warehouse).

[2] For reference, the Government is including as exhibits photographs of the notebook labeled "Things to Do" and the address book as Exhibit A, which contain redactions, per the Filter Team review. This is the full set of material from the BOP sweep that was provided to the Case Team. This exhibit is being filed under seal pursuant to the protective order governing discovery in this case.

*The Instant Motion*

On November 8, 2024, the defendant submitted a renewed motion for bail in front of Your Honor. (*See* Dkt. No. 60). In the Government's response, filed on November 15, 2024, the Government argued, among other things, that the Court should deny the defendant's motion to reopen the bail hearing since he had failed to present any new or material information. In addition, the Government argued that the defendant was actively continuing his efforts to obstruct justice while in custody, including by, among other things, attempting to influence witness testimony. In support, the Government cited to excerpts of portions of the Photographs that discuss the defendant paying a potential witness and ▓▓▓▓▓▓▓ on other potential victims and witnesses, which had been provided to the Government after review by the Government's filter team. (*See* Dkt. No. 69 at 21-22). Both excerpts are consistent with other evidence discussed in the Government's submission.

On November 18, 2024, defense counsel submitted a letter motion to the Court arguing that the Government was in possession of attorney-client privileged material, namely portions of the Photographs which reflected the defendant's notes, which it argued were "privileged notes to his lawyers concerning defense witnesses and defense strategies." (*See* Dkt. No. 70 at 1). The defense also argued that the Government had engaged in a "targeted" seizure of the defendant's materials, *id.* at 1, which it argued amounted to a violation of the defendant's constitutional rights. The defense therefore requested that the Court hold a hearing to assess, among other things, who authorized a search of Mr. Combs's cell, determined which materials should be seized, and provided the materials to the Government. (*See Id.* at 1-2). A discussed herein, there was no targeted seizure of the defendant and the BOP sweep resulting in the Government's obtaining the Photographs was not unconstitutional nor improper.

**Relevant Law**

In accordance with BOP policy, "[s]taff may search an inmate's housing and work area, and personal items contained within those areas, without notice to or prior approval from the inmate and without the inmate's presence." BOP Program Statement § 552.14. This is consistent with the law, which states that "[a]n inmate's reasonable expectation of privacy is extraordinarily circumscribed, because his interest in privacy must be balanced against 'the interest of society in the security of its penal institutions.'" *United States v. Gonzalez*, 2000 WL 1721171, at *2 (S.D.N.Y. Nov. 17, 2000) (quoting *Hudson v. Palmer*, 468 U.S. 517, 527 (1984)). Although pretrial detainees, like the defendant, retain some Fourth Amendment protections, that "does not mean that these rights are not subject to restrictions and limitations." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). Indeed, even "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Accordingly, "although pretrial detainees may have some residual privacy interests that are protected by the Fourth Amendment courts must weigh those interests against the requirements of preservation of institutional security and order." *United States v. Schulte*, No. 17 Cr. 548 (PAC), 2019 WL 5287994, at *2 n1 (citing *United States v. Willoughby*, 860 F.2d 15, 21 (2d Cir. 1988)).

When potentially privileged materials are obtained by the Government, "[t]he use of a filter team is a common procedure in this District and has been deemed adequate in numerous cases to protect attorney-client communications." *In re Search Warrants Executed on Apr. 28, 2021*, No. 21 Misc. 425 (JPO), 2021 WL 2188150, at *2 (S.D.N.Y. May 28, 2021) (citing *United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347, *8 (S.D.N.Y. Oct. 9, 2020); *United States v. Ceglia*, No. 12 Cr.876 (VSB), 2015 WL 1499194, *1 (S.D.N.Y. Mar. 30, 2015)); *see also, e.g., United States v. Yousef*, 327 F.3d 56, 168 (2d Cir. 2003) ("[T]he Government established an effective firewall to prevent disclosures to the Government's trial attorneys of trial strategies or confidential communications between [the defendants] and their attorneys."), *overruled on other grounds by Montejo v. Louisiana*, 556 U.S. 778 (2009). Moreover, even if there was inadvertent disclosure of privileged material to the prosecution team, that alone does not suggest that a defendant's constitutional rights were violated or that a defendant is entitled to relief. *See United States v. Lumiere*, No. 16 Cr. 483 (JSR), 2016 WL 7188149, at *6 (S.D.N.Y. Nov. 29, 2016) ("This after-the-fact notice of potentially privileged documents did not render the Government's earlier search unreasonable."). "The Government's review need only be reasonable, not perfect." *Schulte*, 2019 WL 5287994, at *2.

## Discussion

*First*, the fact that the Photographs were taken was entirely proper. They were taken during a pre-planned sweep of the MDC, which was organized, initiated, and executed by BOP staff with the assistance of multiple federal and local partners for the purpose of the safety and security of inmates and staff, and to address persistent issues that have arisen at the MDC—including issues that the defendant himself complains of. (*See* Dkt. No. 61 at 20-21). Given that this major law enforcement operation was planned well in advance of the defendant's arrest, there can be no credible argument that the MDC sweep itself was meant to target the defendant. *Cf. United States v. Cohen*, 796 F.2d 20, at (holding that evidence recovered during a search of a pretrial inmate's cell when it was initiated by prosecutors and not by prison officials for security reasons could be challenged for violation of Fourth Amendment). Indeed, no member of the Case Team conducted or was present during the search and only learned about the Photographs once the search was complete. In sum, there is no evidence to support the defendant's weak suggestion that Investigator-1's taking photographs of the defendants notes was a "targeted seizure."

Nor is there anything improper about Investigator-1 taking the Photographs. Investigator-1, who had reviewed the defendant's calls and emails in which the defendant overtly and persistently engaged in conduct that violated BOP rules and regulations, was entirely justified in inspecting the defendant's assigned bunk to recover additional evidence related to those violations and to ensure the security of the BOP facility. Moreover, Investigator-1—who is not even bound by any privilege doctrine that may affect the Case Team—took steps to respect the potential privilege of the defendant's personal effects. Investigator-1 specifically did *not* examine the manila folder labeled "legal." He confined his review of materials to the notebook labeled ▇▇▇▇▇. Moreover, none of the steps taken by Investigator-1 while he was searching the

defendant's bunk were done at the Case Team's direction; indeed, the Case Team was not aware at the time that Investigator-1 was participating in the BOP sweep.

*Second*, the Government's use of a Filter Team to review the Photographs in the first instance is entirely appropriate and adequately protected any potentially privileged documents. As is consistent with the practice in this District, the Filter Team's review segregated potentially privileged materials—as evidenced in the redactions contained in the Photographs. This approach is eminently "reasonable." *See Schulte*, 2019 WL 5287994, at *2 (quoting *Lumiere*, 2016 WL 7188149, at *6). Here, where the Photographs related to the Government's ongoing *covert* grand jury investigation, the Government had no obligation to seek defense counsel's view of the privilege determinations made by the Filter Team.

*Finally*, the Photographs, and what is depicted in them, are not privileged.[3] The defendant doesn't argue—nor could he—that the notes in the Photographs were prepared for the purpose of obtaining legal advice. Contrary to defense counsel's mischaracterization, the Photographs do not reflect "notes to [the defendant's] lawyers concerning defense witnesses and defense strategies." Rather, the Photographs depict the defendant's wide-ranging notes to himself, including notes related to the defendant's business interests, his release of music, and family matters, among other things. Under the law, these sorts of notes are not protected by the work-product doctrine. *See Correia*, 468 F. Supp.3d at 624.

Even if there was disclosure of privileged material to the Case Team, that alone is not a basis for the relief that the defendant seeks. Indeed, in order to be entitled to a hearing "to determine whether the prosecution was tainted by exposure to privileged information ... [d]efendants have the burden of showing a 'factual relationship' between the privileged information and the prosecution." *United States v. Dupree*, 781 F. Supp. 2d 115, 163 (E.D.N.Y. 2011). The defendant has not done so here, particularly given the Government's good faith use of a Filter Team. *United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019 WL 3802223, at *5 (S.D.N.Y.

---

[3] The defendant appears to assert that the Photographs are protected by both the attorney-client and work product privileges. "The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011). Because the attorney-client privilege "stands in derogation of the search for truth so essential to the effective operation of any system of justice . . . [it] must be narrowly construed." *Calvin Klein Trademark Tr. v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000). "The attorney work product doctrine . . . provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial." *In re Grand Jury Subpoenas Dated Mar. 19, 2002, & Aug. 2, 2002*, 318 F.3d 379, 383 (2d Cir. 2003). "[I]t is well established that the work-product privilege does not apply" to "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation." *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998). The party asserting either privilege bears the burden of establishing its applicability. *Correia*, 468 F. Supp. 3d at 621, 624.

Aug. 13, 2019) (denying a hearing where potentially privileged search warrant returns were inadvertently provided to the trial team).

## Conclusion

For the foregoing reasons, the Government respectfully submits that an evidentiary hearing is not required or appropriate under the law.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:   /s                    
Meredith Foster
Emily A. Johnson
Christy Slavik
Madison Reddick Smyser
Mitzi Steiner
Assistant United States Attorneys
(212) 637-2310/-2409/-1113/-2381/-2284

cc: all counsel by ECF