

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

November 25, 2024

**BY ECF**
The Honorable Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

  Re: *United States v. Sean Combs*, 24 Cr. 542 (AS)

Dear Judge Subramanian:

  The Government respectfully submits this letter in further opposition of the defendant's renewed application for bail and following the November 22, 2024 bail hearing in the above-captioned matter. At the hearing, the Court requested that the parties address whether the defendant's conduct constituted obstruction for purposes of the Bail Reform Act. In addition, the Court ordered the parties to address whether the defendant's conduct violated the Court's October 25, 2024 order (the "Order") and Local Criminal Rule 23.1 and what communications the defendant would properly be able to engage in on a prospective basis. (Nov. 22, 2024 Tr. at 62). For the reasons set forth below, the defendant's conduct—both past and present—constitutes obstruction and his recent efforts to influence the jury pool are in violation of Local Criminal Rule 23.1 and in contempt of the very Order incorporating that rule that this defendant demanded. The defendant's arguments that any of this conduct is protected by the First Amendment are similarly baseless.

  Moreover, as detailed in prior hearings and briefly addressed below, the defendant's history of obstructive conduct is part and parcel to his decades-long pattern of violence, which must be considered along with his obstructive conduct to fully assess his dangerousness under the Bail Reform Act. A holistic view of his obstructive and violent conduct—conduct that is still happening presently—makes clear that there is no way to rebut the applicable presumption of detention in this case. The bail package presented by the defendant does not come close to ensuring the safety of the community, including from the defendant's ongoing efforts to obstruct this case, nor does it adequately protect from risk of flight. For all of these reasons, the defendant's renewed application for bail must be denied.

I. **The Defendant's Conduct Constitutes Obstruction of Justice and Poses a Danger to the Community**

   A. *Obstruction*

The Court asked the parties to address the definition of obstruction in the bail context, under which "obstruction of justice has been a traditional ground for pretrial detention by the courts." *United States v. LaFontaine*, 210 F.3d 125, 134 (2d Cir. 2000) (concluding that pretrial defendant's attempts to influence witness testimony presented danger to the community that would support detention). While the Bail Reform Act does not define "obstruction of justice," district courts have interpreted "obstruction" in the pretrial detention context broadly to include willful actions that jeopardize the integrity of judicial proceedings. *See id.* (citing cases).[1] Many of the defendant's obstructive acts, discussed further herein, easily fall within that broad categorization and show a persistent, brazen effort to improperly interfere with this criminal case.

Importantly, obstructive behavior supporting pretrial detention need not rise to the level of criminal conduct. *See, e.g.*, *United States v. Sarivola*, No. 94 Cr. 236 (CSH), 1997 WL 158366, at *2-3 (finding that defendant's threat to a family member, which resulted in revocation of defendant's bail, constituted obstruction of justice because defendant willfully obstructed or impeded the administration of justice); *see also United States v. Kwok*, 23 Cr. 118 (AT), 2023 WL 3027440, at *4-6 (S.D.N.Y. Apr. 20, 2023) (applying preponderance of the evidence standard and finding that defendant posed a risk of future obstruction when he had violated orders of another court, used burner phones, made public accusations about his criminal prosecution, and provided obstructive messages to followers via video and social media posts). And in cases in which obstruction is part of the charged offense conduct—like the present case—courts have detained on the basis of risk of future obstruction. *See United States v. Hoey*, 2014 WL 572525, at *3 (S.D.N.Y. Feb. 13, 2014) (where defendant was charged with conspiracy to suborn perjury related to other counts in the indictment, court found that "[s]trict pretrial supervision and electronic monitoring of [the defendant] would provide little protection against future obstructive conduct").

Here, the defendant's actions fall easily within this definition of obstruction. Indeed, there is significant evidence that the defendant has engaged in multiple acts of obstruction during the time period relevant to the charged offenses and poses a serious risk of continuing obstruction. As set forth below, these acts include multiple acts he took in an effort to stave off the instant criminal charges, as well as acts he continued to undertake even after the Indictment was returned in order to dissipate the potential evidence against him:[2]

---

[1] "Obstructive conduct" is defined broadly in other contexts as well. For example, under the United States Sentencing Guidelines, "[o]bstructive conduct can vary widely in nature, degree of planning, and seriousness," and includes conduct not criminalized by statute. *See* U.S.S.G. § 3C1.1, application notes 3, 4.

[2] Evidence from the charged period is consistent with the defendant's decades-long pattern of obstruction, which the Government continues to investigate. For instance, in the defendant's prior 2001 state criminal trial, in which he was acquitted in connection with a New York City nightclub shooting, the defendant's then driver testified that the defendant attempted to bribe him $50,000

- The racketeering conspiracy offense in Count One alleges acts of obstruction, as set forth in the Indictment (*see* Dkt. No. 1 at ¶ 13(c), (d), (f));

- In 2016, the defendant bribed security officers with $100,000 in cash to destroy evidence of a brutal assault on a female victim while they were at a Los Angeles hotel for a Freak Off (*see* Nov. 22, 2024 Tr. at 20 ("[I]n 2016 the defendant bribed hotel security officers $100,000 to make the original video go away.")). In doing so, the defendant relied on intermediaries to reach out to security staff and help carry out the cover-up. This act is alleged as part of the bribery racketeering conspiracy predicate;

- After a victim filed a civil lawsuit in 2023 alleging—among other things—that the victim's participation in Freak Offs was not consensual, the defendant made multiple efforts to interfere with victims and witnesses by feeding those individuals false narratives regarding the defendant's criminal conduct. For instance, the defendant caused intermediaries—former and current "security" staff—to repeatedly call a former employee ("Employee-1") who had witnessed firsthand the defendant's abuse of the victim. The intermediaries told Employee-1, in sum and substance, that what she had observed was a "normal" relationship. Around the same time, and as highlighted at a prior hearing, the defendant recorded two phone calls with a different victim ("Victim-2") in which the defendant attempted to feed Victim-2 a false narrative regarding Victim-2's involvement in Freak Offs—namely that they were consensual (*see* Sept. 18, 2024 Tr. at 21-22);

- The defendant has evidently deleted messages between himself and key witnesses—including a grand jury witness and Victim-2—in this criminal case. One of these witnesses is Witness-1, a male commercial sex worker who participated in Freak Offs, and received a grand jury subpoena during the investigation. (Nov. 15, 2024 Gov't Br. at 9-11). After defense counsel represented unequivocally at the prior bail hearing before Judge Carter that the defendant would not reach out to grand jury witnesses, it became clear that the defendant had done just that: phone records and electronic evidence shows that the defendant contacted Witness-1 repeatedly leading up to and after his appearance in the grand jury, and then the defendant apparently deleted the messages from his phone. (*See* Nov. 22, 2024 Tr. at 34 ("[T]here were further communications and there were text messages through this entire period, including to

---

to state that the weapon used in the incident was his, and did not belong to the defendant. On November 18, 2024, Jamal Barrow—the defendant's former Bad Boy Records protégé and his co-defendant in that case—made public statements about taking the fall for the defendant in the incident. Barrow further stated publicly that following public allegations against the defendant, the defendant contacted him to make sure that, in sum and substance, they were still on the "same page." The defendant has denied his involvement in the shooting and has sent a cease and desist letter regarding Barrow's statements.

August 2024, that were deleted.")).[3]  In the lead-up to his arrest, the defendant similarly appeared to have deleted messages with Victim-2, including relating to the significant monetary payments he was continuing to provide to Victim-2;

- While in pretrial detention at the MDC, the defendant has used multiple unauthorized means of communications, which make it difficult or impossible to monitor the defendant's communications.  While the Government's substantial investigative efforts have identified some accounts that the defendant is improperly using, and the Government has obtained and produced those communications, the Government has no way of knowing whether there are other PAC or ContactMeASAP accounts the defendant is using of which the Government is not aware.  Put simply, when the defendant uses other inmate's accounts, his communications are very difficult—if not impossible—for BOP and the Government to track and monitor.  Such barriers to monitoring the defendant have real, significant consequences given the defendant's extensive efforts to taint the jury pool from the MDC, even in the communications the Government has been able to identify.  (*See* Nov. 15, 2024 Gov't Br. at 17-21; Nov. 22, 2024 Tr. at 57-60);

- Even after defense counsel represented that the defendant had stopped using ContactMeASAP, he *has continued to use* the ContactMeASAP account of at least one other inmate, sending messages to a family member as recently as November 24, 2024 (*see* Nov. 22, 2024 Tr. at 37 ("With respect to ContactMeASAP, he stopped using it November 16."));

- While at the MDC, the defendant has instructed family members and third parties to contact multiple potential victims and witnesses.  The defendant has provided these instructions to others by using unauthorized means of communication—which, as described above, are difficult to monitor—and often using coded language.  The potential victims and witnesses that the defendant has instructed others to contact include former romantic partners and former employees, most of whom have experienced or witnessed the defendant perpetrate significant violence.  At the November 22, 2024 hearing, defense counsel argued that these contacts went through attorneys, however that is simply not the case.  For example, the defendant asked a family member to call Victim-2.  Separately, the defendant had a family member three-way dial a co-conspirator and the defendant and co-conspirator used coded language, discussing a certain " ███████ who has to " ███████ now and " ███████

---

[3] Defense counsel stated during the September 18 bail hearing that the defendant "did not reach out to grand jury witnesses.  I dispute that wholeheartedly.  He didn't do it and he wouldn't do it.  And he wouldn't do it because he has the sense not to do it and he wouldn't do it because we wouldn't let him do it, you know."  (Sept. 18, 2024 Tr. at 42).  Then, at the November 22, 2024 hearing, defense counsel conceded about the deleted messages: "I don't know the factual answer" in response to the Court's inquiry regarding the circumstances of these communications.  (Nov. 22, 2024 Tr. at 33-37).

There was no indication that attorneys were involved in these contacts between victims/witnesses and third parties. (*See* Nov. 15, 2024 Gov't Br. at 17-21);

- While at the MDC, the defendant orchestrated a social media campaign around his birthday for the express purpose of influencing the jury in this criminal case. In the multiple calls leading up to the birthday post—all of which occurred on unauthorized communication channels—the defendant meticulously planned out the post. The video, depicting six of the defendant's children singing him happy birthday while speaking to the defendant by phone, was initially posted to the defendant's children's pages, but the defendant was not satisfied that it would reach the correct demographic. The defendant told a family member that he had been tracking the "analytics" and directed the family member to post the video to *his* personal page because the defendant's social media followers are " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In another call the same day, the defendant talked about the reach of this social media post and said ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?" (*See* Nov. 15, 2024 Gov't Br. at 19-20).

District courts have detained pretrial defendants on obstruction grounds on less. *See Kwok*, 2023 WL 3027440, at *4-6 (finding the defendant engaged in obstructive conduct warranting pretrial detention when a message posted on one of defendant's social media accounts accused prosecutors of bias, the defendant encouraged followers to harass victims in the case, and defendant previously used burner phones to conceal communications with co-conspirators); *United States v. DeGrave*, 539 F. Supp. 3d 184, 207-08 (D.D.C. 2021) (finding the risk of future obstructive behavior "identified and articulable" when defendant deleted messages, asked others to delete messages, and began communicating via encrypted messaging application).

At the November 22, 2024 hearing, the defendant attempted to distinguish his own obstructive conduct from more violent examples of witness tampering. (*See* Nov. 22, 2024 Tr. at 28). These distinctions are unavailing. The defendant is charged with leading and founding a racketeering enterprise that on numerous occasions, committed acts of violence including trafficking, kidnapping, and arson. Some of these acts were done by the defendant and others were done by his intermediaries acting at his direction. Any obstruction or tampering by the defendant must be viewed through the lens of that underlying violent conduct, as well as the lens of the defendant's enormous influence and power. Moreover, the Second Circuit has explicitly noted that both violent and nonviolent witness tampering supports detention on the basis of potential obstruction. *LaFontaine*, 210 F.3d at 132 ("[W]itness tampering by either [violent or nonviolent] means has supported detention or revocation of bail.").

Likewise, other courts in this District have rejected arguments like those advanced by the defendant relating to public relations strategies built on discrediting witnesses and improperly influencing prospective jurors. In the context of bail revocation, Judge Kaplan found that a similar pattern of obstructive conduct warranted detention in *United States v. Samuel Bankman-Fried*, S5 22 Cr. 673 (LAK) (S.D.N.Y.). That case is instructive because unlike here, the defendant was charged with a nonviolent crime—specifically perpetrating a multibillion-dollar fraud related to

his operation of cryptocurrency companies that he founded and controlled—and was initially released on a $250 million personal recognizance bond, subject to conditions, including home detention. (Dkt. 224 (Aug. 11, 2023 Tr.) at 25-26). However, after the defendant (i) reached out to a witness on an encrypted messaging service, (ii) used a VPN, which prevented the Government or Pre-Trial Services, from obtaining evidence of the websites he accessed, and (iii) funneled diary entries of a key cooperator to the press, the Government moved to revoke bail. (*See* Dkt. No. 184). The court agreed with the Government on the basis of the defendant's obstruction, finding that that no condition or combination of conditions would assure the safety of the community and the consequences of witness tampering. (Dkt. 224 (Aug. 11, 2023 Tr.) at 38).[4] The court rejected the defendant's alternative proposal, a gag order on communications with the press, finding that it was not a "workable solution longer term, particularly with someone who has shown a willingness and desire to risk crossing the line in an effort to get right up to it, no matter where the line is." (*Id.* at 38-39).

Finally, it cannot be ignored that the defendant's proclivity for obstruction appears to have continued as recently as last week in court, when it appeared that the defendant provided *falsified documents to the Court* during a hearing convened to address his accusations of Government misconduct. At the November 19, 2024 conference, defense counsel represented the following about the condition of the defendant's legal notepads prior to the notepads being photographed during the MDC sweep:

> On top of the legal pad he's handwritten in blue handwriting the word 'legal.' All these legal pads say 'legal.'

(Nov. 19, 2024 Tr. at 34; *see also id.* at 42 ("[T]hat page was in a legal pad and at the top of the legal pad it was marked as legal.")). Days later, in response to the Court's order dated November 20, 2022 (*see* Dkt. No. 77), defense counsel admitted that the word "legal" was written on the notepads *after* the notepads were photographed during the MDC sweep:

> Now, there is a photo of a legal pad that was in the materials that the government gave us, whatever it was, earlier this week, that does not have 'legal' on it. So it has to be the case that as of the day of the search, November 1st of this year, that 'legal' wasn't written on every legal pad.

(Nov. 22, 2024 Tr. at 4). The inference is clear: after the BOP sweep, the defendant wrote "legal" on the top of at least one legal pad to support his argument that the materials in the legal pads were privileged. This continued obstruction—while he had a pending bail motion, no less—should certainly be viewed in the context of all the defendant's other acts of obstruction for purposes of this bail determination.

---

[4] In that case, the Government moved under 18 U.S.C. § 3148, arguing that there was probable cause to believe that the defendant had committed a new criminal offense—witness tampering—while on bail. The district court agreed, which decision was affirmed by the Second Circuit. (*See* No. 23-6914 (2d Cir.)).

### B. Dangerousness

While there is ample evidence based on the defendant's obstruction alone to deny the defendant's motion for bail, the defendant's conduct in this case must also be viewed in the context of his overall dangerousness. In contrast to many of the cases cited above, there is a statutory presumption in favor of detention, given that the defendant here is charged with sex trafficking, and it is thus presumed that no condition or combination of conditions will reasonably assure the appearance of the person and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(D). In addition, the defendant is also charged with participating in a racketeering conspiracy as the leader of a violent enterprise that exists to protect his reputation and carry out his will. That enterprise enabled him and assisted him in carrying out both premediated and spontaneous acts of violence against numerous victims, including kidnappings, assaults, arson, and sexual violence. The defendant and other enterprise members carried and brandished firearms, including when the defendant kidnapped a former employee at gunpoint.

Over the years, the defendant's physical and sexual abuse has taken many forms, often in the context of long-term romantic relationships. Throughout, there was a common theme: the defendant repeatedly and consistently forced and coerced women to satisfy his sexual desires. Often behind closed doors, the defendant engaged in acts of violence against women, including throwing them to the ground, dragging them by their hair, kicking, shoving, punching, and slapping them. He manipulated, coerced, and extorted women, including by plying them with drugs, threatening to withhold financial support, and threatening to disseminate sex tapes that the defendant had made of their sexual encounters. He intimated women, including by displaying firearms, threatening them, showing up at their homes unannounced, and attempting to beat down the door—on one occasion with a hammer. Beyond his romantic partners, the defendant also physically abused his personal staff. Former staff members have described the defendant threatening to kill them, throwing objects at them, and being struck, punched, and shoved by the defendant, and seeing him do the same to others.

This significant history of violence must be taken into account when viewing the defendant obstructive activity. Taken together, there can be no doubt that the Government has proven the defendant's dangerousness by clear and convincing evidence.

## II. The Defendant's Conduct Violates Local Criminal Rule 23.1 and the Court's Order

The Court also asked the parties to clarify whether the defendant's conduct, specifically his recent efforts to influence the jury pool through an orchestrated social media campaign, is in violation of Local Criminal Rule 23.1 and/or this Court's gag Order incorporating the obligations of the rule that was imposed at the defendant's own request. As set forth below, it is both a local rule violation and contempt of this Court's Order. *See* 18 U.S.C. § 401, 402.

### A. The Court's October 2024 Order and Local Criminal Rule 23.1

On October 25, 2024, at the defendant's request, the Court entered the Order requiring, among other things, for the Government, defense counsel, and *the defendant himself* to comply

with Local Criminal Rule 23.1. (*See* Dkt. No. 50 at 2). Under Local Criminal Rule 23.1(a), parties are prohibited from "release[ing] or authoriz[ing] the release of non-public information or opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation with which they are associated, if there is a substantial likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice." The Local Rule lists several examples that "presumptively involve a substantial likelihood that their public dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice." *See* Local Crim. R. 23.1(d). These include any statements regarding "the character or reputation of the accused," *see* Local Crim. R. 23.1(d)(1), and any statements regarding information that is "likely to be inadmissible at trial and would if disclosed create a substantial likelihood of prejudicing an impartial trial." *See* Local Crim. R. 23.1(d)(6).

### B. *The Defendant's Social Media Post Violates Local Rule 23.1 and the Court's Order*

Within two weeks of the Court's Order, the defendant instructed a family member to create the birthday social media post, directing them to ensure that its "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and is a "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." On November 4, the defendant's birthday, the social media post went live on the defendant's children's accounts. As described above, the post depicted six of the defendant's children singing him happy birthday while speaking to the defendant by phone. Then the defendant had it posted to his own account for the explicit reason that he wanted to better taint the jury pool. He informed the family member, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"

The defendant's intent could not be clearer: he expressly wanted to interfere with the jury pool in this case through a targeted, public, social media post and he caused his family members to make the post. The statement—even if also arguably part of a "public relations" campaign—is squarely prohibited by the Court's Order and Local Criminal Rule 23.1. The post falls comfortably within Local Rule 23.1(d)(1), which prohibits the defendant from releasing statements regarding his "character or reputation," and Local Criminal Rule 23.1(d)(6) because it relies on information inadmissible at trial—namely the defendant's family circumstances. *See, e.g., United States v. Battaglia*, No. S9 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"). And even if it did not fall into any of the presumptively prejudicial categories outlined in the rule, a public statement expressly designed to interfere with a fair trial can be presumed to violate the rule.

### C. *Limitations on Prospective Statements by the Defendant*

The Court also directed the parties to provide guidance as to the parameters of future public statements made by the defendant. Here, the Court's Order sets clear and stringent limitations on the public statements that the defendant may make about the case, prohibiting statements that relate to subject matters that "presumptively involve a substantial likelihood that their public dissemination will interfere with a fair trial or otherwise prejudice the due administration of

justice," as outlined in Local Crim. R. 23.1(d). In accordance with the Rule, public statements related to the following, among other things, would be presumptively prohibited:

- "The identity, testimony, or credibility of prospective witnesses." *See* Local Crim. R. 23.1(d)(4). This would include, for example, any public statements identifying witnesses or victims in the case or statements regarding the veracity of those witnesses or victims, including, but not limited to, Victim-1 (as defined in the Indictment), Victim-2, and Victim-3.

- Information that is "likely to be inadmissible at trial and would if disclosed create a substantial likelihood of prejudicing an impartial trial." *See* Local Crim. R. 23.1(d)(6). As discussed above, this includes any information that has no bearing on the defendant's guilt or innocence and may tend to elicit the jury's sympathy, such as statements relating to family background, children, health, age, or any other similar, irrelevant, personal factors, *see United States v. Stroming*, 838 F. App'x 624, 627 (2d Cir. 2021), or statements regarding the conditions of incarceration or potential punishment, *see, e.g.*, *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)); *United States v. Mustafa*, 753 F. App'x 22, 37 (2d Cir. 2018).

- Information regarding "the character or reputation of the accused." *See* Local Crim. R. 23.1(d)(1). This would include publicizing information regarding specific good acts that would be inadmissible at trial. *See United States v. Rivera*, No. 13 Cr. 149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (precluding evidence of charitable giving).

Nevertheless, the defendant is permitted under Local Criminal Rule 23.1 and the Court's Order to make statements that "presumptively do not involve a substantial likelihood that their public dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice" as outlined in Local Crim. R. 23.1(e). *See e.g.*, Local Crim. R. 23.1(e)(4), (5), (7).

### III. The Defendant's Attempts to Interfere With His Criminal Proceeding Are Not Protected By the First Amendment

Finally, the Court also asked the parties to address the defendant's First Amendment arguments relating to the gag Order—that the defendant requested and that was entered on his consent. In short, the First Amendment does not protect his efforts to interfere with this trial or prohibit the application of the Order to his statements.

It is well established that criminal defendants do "not have [] unlimited right[s] to speak." *United States v. Trump*, 88 F.4th 990, 1007 (D.C. Cir. 2023), *reh'g denied*, 2024 WL 252746 (D.C. Cir. Jan. 23, 2024). In the context of an ongoing criminal case, a party's First Amendment interest may be outweighed by the constitutional right to a fair trial, permitting a court to proscribe prejudicial extrajudicial statements. *See, e.g.*, *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966); *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1075 (1991) (noting that "[f]ew, if any, interests under the Constitution are more fundamental than the right to a fair trial by 'impartial' jurors, and an outcome affected by extrajudicial statements would violate that fundamental right"). As the *Trump* case makes clear, a criminal defendant does not have a right under the First Amendment or

the Sixth Amendment to make statements to obtain a "trial prejudiced in his favor." *Id.* at 1003; *see United States v. Brown*, 218 F.3d 415, 424 n.9 (5th Cir. 2000) ("[D]efendant is entitled to a fair and impartial jury, not a jury whose views have been deliberately manipulated by outside influences to be biased in his or her favor." (citation omitted)).

Accordingly, courts have on numerous occasions in cases involving substantial pretrial publicity upheld or imposed restrictions on a defendant's speech aimed at influencing witness testimony, either directly or indirectly, *see Trump*, 88 F.4th at 1012-13, or where that speech was reasonably likely to interfere with a fair trial or otherwise prejudice the due administration of justice, particularly where the defendant proclaimed a "willingness to seize any opportunity to use the press to their full advantage." *Brown*, 218 F.3d at 429; *see also United States v. Simon*, 664 F. Supp. 780, 795 (S.D.N.Y. 1987), *aff'd sub nom. Application of Dow Jones & Co., Inc.*, 842 F.2d 603 (2d Cir. 1988).

The defendant's extrajudicial communications in this case are not, as he alleges, "classic protected speech." (Def. Reply (Dkt. No. 80) at 12). Instead, the defendant's explicit attempts to, for example, "███████," "███████," "███████ and establish a narrative about ███████" constitute improper efforts to interfere with the integrity of the proceedings, which courts are obligated to protect against. *See Sheppard*, 384 U.S. at 361; *Trump*, 88 F.4th at 1003 ("[C]ourts must take steps to protect the integrity of the criminal justice process."). Each of these comments evinces the defendant's "willingness to seize any opportunity to use the press to their full advantage," *Brown*, 218 F.3d at 429, and attempt to obtain a "trial prejudiced in his favor," *Trump*, 88 F.4th at 1003. These efforts are not protected by the First Amendment.

The defendant nevertheless claims that these types of communications are constitutionally protected because they merely represent the defendant's "thoughts" that his "prosecution is politically motivated or that he is innocent of the charges against him," and constitute protected speech. (Def. Reply at 13). This is untrue. They are part and parcel of the defendant's repeated attempts, in clear contempt of this Court's Order and in violation of Local Criminal Rule 23.1, to use his family and associates to make public statement to obstruct and subvert the integrity of these criminal proceedings. *See* Local Crim. R. 23.1(d)(6)-(7). There is nothing constitutionally protected about such speech and the Court does not have to wait to intervene until the defendant has been successful in impacting these proceedings. As the D.C. Circuit stated in *Trump*, it cannot be true that a "court's hands [are] tied until evidence of direct causation materializes" as "[s]uch proof would be hard to come by, and requiring a court to conduct a mini-trial on that inquiry while readying a high-profile case for trial would itself divert and delay the criminal justice process." 88 F.4th at 1014.

The defendant also appears to claim—based on his reliance on *United States v. Trump*— that he is constitutionally permitted to make public comments that the instant prosecution is politically motivated or that he is innocent of the charges against him (or comments similar in kind). But, while instructive on certain points, the D.C. Circuit's *Trump* is, in essential ways, inapposite: the Court in *Trump* faced the unique task of balancing the right of a current candidate

for the presidency to speak publicly about his charges against the public's right in a fair trial.[5] *See Trump*, 88 F.4th at 1002 (noting that based on the candidate's position, there was a "strong public interest in what he has to say" and the First Amendment "has its fullest and most urgent application' to speech uttered during a campaign for political office"). Those same First Amendment interests are not at stake here. Further, the defendant's comments go well beyond attempts to claim that he is innocent of the charges against him and make clear that he intends to use the press to deliberately manipulate "outside influences to be biased in his favor." *Brown*, 218 F.3d at 424 n.9.

Finally, to wiggle out from underneath the gag Order that he demanded from this Court and consented to be bound by, the defendant now claims that the First Amendment permits him to continue to engage in communications that may prejudice these proceedings as long as the "potential jurors" are subject to *voir dire* and he is prevented from speaking directly to witnesses. (Def. Reply. at 13). But the Supreme Court has made clear that courts must take "remedial measures that will prevent the prejudice at its inception," not wait until such prejudice may have already materialized at the time of *voir dire*. *Sheppard*, 384 U.S. at 363; *see also United States v. Cutler*, 58 F.3d 825, 836 (2d Cir. 1995) (stating that comments may still be improper attempts to prejudice proceedings even if they do not "in fact taint the jury pool."). In light of the defendant's history of obstruction, this Court has an obligation to protect the fairness of this proceeding, including protecting the right of the public to have this trial end in a "just judgment[]." *Wade v. Hunter*, 336 U.S. 684, 689 (1949). The First Amendment offers no protection for the defendant's intentional efforts to interfere.

## IV. The Conditions Proposed By the Defendant Fail to Ensure the Safety of the Community or the Defendant's Appearance in Court

For all the reasons stated herein, there are no conditions sufficient to reasonably ensure the safety of the community or the defendant's appearance in court. But to the point about which the Court inquired of the Government at the November 22, 2024 hearing (*see* Nov. 22, 2024 Tr. at 8), the Government additionally writes to make clear that the package proposed by the defendant is insufficient in numerous respects. Without any meaningful specifics, the defendant argues that through private security he can turn an apartment in the upper east side of Manhattan into a more restrictive environment than the MDC and meet the requirements of the Bail Reform Act. The proposal relies on a private security company to monitor family visits, ensure zero non-lawyer phone or internet usage, and restrict visitation to a pre-approved list. Such a proposal "in essence, . . . elaborately replicate[s] a detention facility without the confidence of security such a facility instills." *United States v. Gotti*, 776 F. Supp. 666, 672 (E.D.N.Y. 1991). But as courts have

---

[5] The defendant also appears to claim that *Trump* stands for the proposition that a criminal defendant has "a greater constitutional claim than other trial participants to criticize and speak out against the prosecution and the criminal trial process that seek to take away his liberty." (Def. Reply at 13 (quoting *Trump*, 88 F.4th at 1008)). But, this overstates the court's holding. Although the court noted in dicta that criminal defendants "may very well" have "a greater constitutional claim than other trial participants to criticize and speak out," it did not decide the issue. *Trump*, 88 F.4th at 1008.

observed, "[s]ecurity guards are not trained to act as jailer or detectives, and a home is not a secure facility." *United States v. Agnello*, 101 F. Supp. 2d 108, 114-16 (E.D.N.Y. 2000).

More to the point, in this case, private security—*employed and paid for by the defendant*—cannot be trusted. Throughout the charged racketeering conspiracy, the defendant has used private "security" to stash weapons, purchase narcotics, pay commercial sex workers, and tamper with witnesses, among other things. The defendant did so through the racketeering enterprise that he led and controlled, and through which he wields his immense power and influence to cause others to act on his behalf. Private security paid for by the defendant cannot ensure that the defendant will not access contraband communication devices or tamper with witnesses because the defendant has done just that while incarcerated. Further, under the proposed conditions, the defendant would still have access to individuals, such as family members, who could act as his intermediaries (as they do now), smuggle in contraband devices to him, or even bring him drugs. It is simply unreasonable to portend that the defendant would not use whomever he has access to—family, security, even legal staff—to accomplish his aims. No amount of private monitoring can effectively mitigate this risk. *See Agnello*, 101 F. Supp. 2d at 114-15 (finding 24/7 monitoring by private security to be insufficient where "[the defendant's] activities inside the house will not be observed, nor is it reasonable to believe that the defendant could not evade monitoring by obtaining access to communication devices and employing other methods to carry on criminal activity and to endeavor to obstruct justice").[6]

The proposed conditions also fall short of sufficiently protecting against future violence and obstruction. Defense counsel claims there is a "0 percent chance" that the defendant would be violent toward someone while out on bail under the proposed conditions. (Nov. 22, 2024 Tr. 25-26). This gross overstatement ignores the realities of the defendant's history, including acts of violence he carried out himself and through those working on his behalf. Unless private security can staunch the defendant's malignant influence over everyone around him, a pattern that has resulted in numerous individuals being physically harmed and threatened for decades, the Court cannot have any confidence that the community will be safe with the defendant out on bail, regardless of the presence of a private security company.

Likewise, private security will be ineffectual at preventing the defendant from violating his conditions. The defendant has decades of practice at covering up his crimes and shows no signs of stopping. *See supra* at 6 (discussing apparent falsification of legal pad evidence). This is in addition to all the other rules—set by the BOP, the Court, and even his own counsel—that the defendant has broken and ignored since the recent inception of his criminal case. A promise now that he will abide by the conditions of release is insufficient. *See United States v. Lynch*, No. 20 Cr. 202 (LAP), 2020 WL 2145363, at *3 (S.D.N.Y. May 5, 2020) ("[T]he defendant's consistent failure to comply with the most basic condition of supervision—ceasing criminal activity—shows

---

[6] The Government notes in this regard that following the defendant's identification of Sage Intelligence Group, through its director Herman Weisberg, as a viable private security company for bail at the hearing before Judge Carter (*see* Sept. 18, 2024 Tr. at 34), the Government learned that Weisberg was already working as a private investigator for the defendant and was contacting witnesses—a fact that was not disclosed by the defense to the Court or to the Government prior to or at the hearing.

that he cannot be trusted to abide by conditions of pretrial release no matter how strict."); *cf. United States v. Manafort*, 897 F.3d 340, 348 (D.C. Cir. 2018) (affirming district court decision to revoke bail based on its judgment "about whether [the defendant] can be trusted to comply with the Court's directives" when defendant contributed to an op-ed while under a gag order and repeatedly communicated with potential witnesses, personally and through an intermediary).

Finally, the defendant's lawyers and family members do not provide meaningful guardrails to the defendant's conduct. *See United States v. Dono*, 275 F. App'x 35, 37-38 (2d Cir. 2008) (finding that assurances by defendant's father to take personal responsibility for the defendant was "insufficient to ensure the safety of the community" and that "pretrial detention was the means chosen by Congress in the Bail Reform Act to protect the community from dangerous defendants"). Far from assuring that the defendant will abide by conditions, these parties have enabled the defendant to flout rules while at the MDC. Moreover, defense counsel's blasé attitude toward breaking these rules while simultaneously asking this Court to release their client does not give the Government any confidence that counsel will be able to police the defendant's conduct with any rigor. Indeed, contrary to representations by counsel just days ago, the defendant has *continued to engage* in unauthorized communications with family members from the MDC by using another inmate's ContactMeASAP account as recently as yesterday.

## V. Conclusion

For the reasons stated above, and in the Government's prior briefing, the defendant's renewed request for bail should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: ___/s_____
Meredith Foster / Emily A. Johnson / Christy Slavik
Madison Reddick Smyser / Mitzi Steiner
Assistant United States Attorneys
(212) 637-2310/-2409/-1113/-2381/-2284

cc: all counsel by ECF