OBJAComO

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4               v.                          24 Cr. 542 (AS)

 5   SEAN COMBS,

 6      a/k/a "Puff Daddy,"
        a/k/a "P. Diddy,"
 7      a/k/a "Diddy,"
        a/k/a "PD,"
 8      a/k/a "Love,"                        Oral Argument
                    Defendant.
 9
     ------------------------------x
10
                                            New York, N.Y.
11                                          November 19, 2024
                                            3:00 p.m.
12

13   Before:

14                  HON. ARUN SUBRAMANIAN,

15                                          District Judge

16                        APPEARANCES

17   DAMIAN WILLIAMS
          United States Attorney for the
18        Southern District of New York
     BY:  CHRISTY SLAVIK
19        MEREDITH FOSTER
          MITZI STEINER
20        MADISON SMYSER
     Assistant United States Attorneys
21
     AGNIFILO INTRATER LLP
22        Attorneys for Defendant
     BY:  MARC AGNIFILO
23        TENY GERAGIS

24   LAW OFFICE OF ANTHONY L. RICCO
          Attorney for Defendant
25   BY:  TONY RICCO
```

OBJAComO

1    Appearances (Continued)

2    SHAPIRO ARATO BACH LLP
          Attorneys for Defendant
3    BY:   ALEXANDRA SHAPIRO

4    SHER TREMONTE, LLP
          Attorneys for Defendant
5    BY:   ANNA ESTEVAO

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OBJAComO

| 1 | (Case called) |

2          THE DEPUTY CLERK:  Can counsel starting with counsel

3   for the government please state their appearance for the

4   record.

5          MS. SLAVIK:  Good afternoon, your Honor.  Christy

6   Slavik, Meredith Foster, Mitzi Steiner, and Madison Smyser for

7   the United States.

8          THE COURT:  Good afternoon.  And for the defense?

9          MR. AGNIFILO:  Yes.  Good afternoon, your Honor.  You

10  have Marc Agnifilo, you have Teny Geragos, you have our client,

11  you have Tony Ricco, and you have Anna Estevao, and I expect

12  any moment we'll have Alexandra Shapiro who is coming from the

13  Second Circuit.  And Sean Love Combs is with us today as well.

14         THE COURT:  Good afternoon, Mr. Combs.  And good

15  afternoon to all of you.  And that's fine for Ms. Shapiro when

16  she arrives to join you at counsel table.

17         MR. AGNIFILO:  Thank you, your Honor.

18         THE COURT:  Mr. Agnifilo, and am I pronouncing that

19  correctly?

20         MR. AGNIFILO:  That's perfect.  Perfect.

21         THE COURT:  Okay.  Mr. Agnifilo.

22         MR. AGNIFILO:  Yes.

23         THE COURT:  I received the application and the

24  response from the government and your reply letter.  So let me

25  ask one question at the outset, and then I'll allow you to say

OBJAComO

```
1    anything additionally you would like to in support of your

2    application.

3            Ultimately, what is it that you are seeking here in

4    terms of relief?

5            MR. AGNIFILO:  It's a good question, your Honor.  And

6    we're seeking relief in stages.  I think at this point what we

7    need is we need more fact finding.  So in the first instance,

8    we are going to want to know more about how it came to be that

9    Mr. Combs's personal papers and his notes of meetings with his

10   lawyers came into the trial team's possession.  And the reason

11   that's important is because the government has a version of how

12   that happened that is very much at odds with our version of how

13   that happened.  And the reason it's significant is because it

14   impacts, in my view, on the magnitude of the Constitutional

15   violation.

16           There are a few different violations that we think are

17   in the mix, and let me break them down, at least from my view,

18   at this point.  Your Honor, might have an additional view.

19           There's what we contend is a Fourth Amendment

20   violation, because this was not a jail orchestrated search for

21   the purposes of preserving order and safety in the jail.

22           So we contend that under the Second Circuit decision

23   the 1986 case of *United States v. Cohen*, this is not a jail

24   search.  This is a search where the Second Circuit has held

25   that Mr. Combs has an expectation of privacy in his personal
```

OBJAComO

```
1    effects, certainly in his legal notes.  So there's a Fourth
2    Amendment issue.
3              THE COURT:  So let me stop you there.
4              MR. AGNIFILO:  Yes, Judge.
5              THE COURT:  You'll agree that this occurred during a
6    BOP general sweep of the facility, right?
7              MR. AGNIFILO:  It occurred while that was also
8    occurring, yes.
9              THE COURT:  So you're saying it was a pretext?
10             MR. AGNIFILO:  That is what I'm saying, correct.  Yes.
11             THE COURT:  All right.  Continue.
12             MR. AGNIFILO:  Yes.  So there's the Fourth Amendment
13   component to it because we believe it was a pretext.  There's
14   an attorney/client privilege issue because Mr. Combs's notes
15   were taken, were photographed I should say, were photographed
16   and returned.  Some number of those notes were given to a
17   taint, team and then appears 19 pages of those notes were given
18   from the taint team to the prosecution team and that's what we
19   have now.
20             So there's an attorney/client privilege violation
21   because the prosecution team has 19 pages of his notes.  Or I
22   should be more specific, it's 11 pages of his notes, and then I
23   think it's 8 pages of a calendar book, and I think the two
24   stand on different footing.
25             The thing that we don't know yet -- and my contention
```

OBJAComO

1    is we know enough now to find an attorney/client privilege

2    violation and a Fourth Amendment violation.  What we don't know

3    yet is what really -- what led up to this.  How is it that

4    there were so many, if we look at it through the government's

5    lens even, failures that led to the prosecution team having

6    these 19 pages of material?

7            And there's a couple of things we don't yet know.

8    One, we haven't been able to test the government's proffered

9    explanation and we need certain things to do that.  Some of

10   those things is I think we need the surveillance video.  I

11   think we need the surveillance video of the search.  The

12   surveillance video of the search will tell us exactly who

13   conducted the search, what they looked at, how long they were

14   doing it, and we can see exactly how the search took place

15   because there might be a surveillance video.

16           The other part that we don't have yet is

17   communications between the U.S. Attorney's Office and the

18   person dubbed as Investigator 1 or anybody else who might have

19   been involved in the search of Mr. Comb's legal notes.  That's

20   important under -- it's important under the Fourth Amendment

21   analysis to see what, if any, role the U.S. Attorney's Office

22   played in conveying what photographs, what they should

23   photograph, what they shouldn't photograph, why it was that

24   this institutional search that was for weapons and drugs and

25   contraband, illegal cell phones and the like, that was not

OBJAComO

1    what -- and these are Mr. Combs's legal files.

2            There's no reason to search these legal files for cell

3    phones or weapons or drugs.  And if you don't find cell phones

4    or weapons or drugs in there, one is to put them back if one is

5    really acting within the scope of my understanding of what this

6    multiagency MDC sweep was all about.

7            So it is our contention, as your Honor eluded to, that

8    the aspect of the search that impacted Mr. Combs and resulted

9    in his legal papers being given to the prosecutors was all a

10   pretext.

11           And I'll get to -- there's more I have to say about

12   this, but your Honor asked me a direct question.

13           THE COURT:  I'm trying to figure out the logistics and

14   then I'm going to come back to what relief you're ultimately

15   seeking, but let's keep it on the logistics.

16           MR. AGNIFILO:  Sounds good.

17           So in the first instance, I think we need more fact

18   finding.  We don't know enough.  We don't know the role the

19   U.S. Attorney's Office played.  We don't know exactly what

20   Investigator 1 was doing.  We're not completely sure that

21   Investigator 1 was the one who conducted the search.  The facts

22   that have been proffered by the government are at odds with

23   some of the facts that we understand in terms of who

24   interviewed Mr. Combs and then who went about going to the area

25   where his legal papers were.

OBJAComO

1          The surveillance will give us answers to some of these
2     questions, as will the communications between the government
3     and Investigator 1 or whoever was conducting the search.
4          Once we know that, then it may be that we have
5     something amounting to an outrageous government conduct
6     transgression under the Fifth Amendment.  I can't tell the
7     Court that we have that at this moment because I don't know
8     enough.  We might have a form of Sixth Amendment violation of a
9     purposeful infringement of a pretrial detainee, attorney/client
10    privilege, especially when it relates to trial strategy and
11    investigation strategy.
12         So in the first instance, we're asking for further
13    fact finding so that we know enough to come to your Honor and
14    say this is a principled remedy.  Now, it could be dismissal of
15    the indictment.  It could be recusal of the prosecution team.
16    But we don't know enough to say which is a reasonable, measured
17    remedy given the facts because we don't yet know all the facts.
18         THE COURT:  Okay.  And I understand that this was
19    brought up as an emergency application principally because two
20    excerpts from these documents were used in connection with the
21    government's response to the renewed bail application, correct?
22         MR. AGNIFILO:  That is correct, Judge.
23         THE COURT:  So the relief you are seeking along those
24    lines would be for me to not consider those, right?
25         MR. AGNIFILO:  So I think in the first instance, to

OBJAComO

1   the extent that the trial team is in possession of Mr. Combs's

2   notes, I think we have to make it so they're no longer in the

3   possession of those notes.  They could give them to us.  They

4   could give them to the Court.  I don't really care what they do

5   with them, but in order to protect the sanctity of the

6   attorney/client privilege, I think I have an obligation to ask

7   the Court to remove those materials from the trial team.

8          Now, in terms of the materials held by the taint team,

9   we don't know yet what materials are held by the taint team.

10  We've just never been told that.  We've been told these 19

11  pages went over to the trial team.  We don't know what the

12  taint team has.  So as a preliminary issue, we would like to

13  know what if any additional material is held by the taint team,

14  what if any other material is in the United States Attorney's

15  Office in the Southern District anywhere, and we want all of

16  that material back while this is pending.  And the reason I

17  make that request is because we cannot put ourselves in a

18  situation of having waived Mr. Combs's attorney/client

19  privilege.

20         So we have to be as direct, and the word that comes to

21  mind is aggressive, but I don't really mean aggressive.  We

22  have to be direct right off the bat and say no one should have

23  any of this material other than Mr. Combs.

24         So in the short term, and what the emergent aspect is,

25  is that part of it, your Honor.

OBJAComO

1          THE COURT:  Okay.  Understood.

2          Ms. Slavik, are you going to be speaking on behalf of

3    the government?

4          MS. SLAVIK:  I will, your Honor.

5          THE COURT:  All right.  So, first, maybe you can just

6    fill me in on what happened here exactly.

7          MS. SLAVIK:  Yes.

8          THE COURT:  So I understand that there was this Bureau

9    of Prisons sweep.  Now, were there any communications prior to

10   that sweep between anyone on the prosecution team and this

11   investigator who photographed the notebook?

12         MS. SLAVIK:  No, your Honor.  As you note, the notes

13   at issue, which are, excuse me, the 19 pages, which are 17

14   separate documents, the 19 pages include two duplicates, those

15   were recovered during a preplanned sweep of the MDC.

16         Now, the purpose of this sweep, and this is widely

17   reported in the press, the purpose of this sweep was to address

18   some of the issues that have persistently come up at the MDC.

19         THE COURT:  No.  I understand that.  But I think what

20   Mr. Agnifilo is saying is why were they taking photos of

21   Mr. Combs's notebook.

22         MS. SLAVIK:  Yes.  To be clear, your Honor, no members

23   of the prosecution team had any communication with the BOP

24   investigator who was part of this MDC sweep.

25         THE COURT:  Now, that being said, the investigator,

OBJAComO

the same one who photographed the notebook, was the person who
was also monitoring Mr. Combs's communications in and out of
the facility, right.

MS. SLAVIK:  That's right, your Honor.

THE COURT:  So he was focused on Mr. Combs in an
investigatory capacity, fair?

MS. SLAVIK:  In his capacity as a BOP investigator,
yes, your Honor.  His task -- he was tasked, as I understand
it, with reviewing the defendant's communications, that
includes the defendant's calls and that includes the
defendant's e-mails.

THE COURT:  Okay.  So let's say that he thought of
himself as an agent of the prosecution team, whether that's
true or not, or whether that's how you saw it or not, and when
he saw that there was this sweep and that he would have access
to the cell and the locker and all of Mr. Combs's documents, he
took it upon himself to, in his mind, aid the investigation
effort by photographing these pages.

Would that, at least arguably, be a Fourth Amendment
violation?

MS. SLAVIK:  Your Honor, I don't think we can make
that logical leap.  And I say that because the BOP investigator
works for the BOP.  He has his own reasons for monitoring the
defendant's communications.  Those reasons include the safety
of the institution.  Those reasons include making sure that the

OBJAComO

| 1 | defendant is in compliance with the BOP rules and regulations,

| 2 | which I note he was not.  So the BOP has its own reasons for

| 3 | investigating the defendant's misconduct.

| 4 |         Now, it is true that the BOP has turned over

| 5 | materials.  Those include calls, e-mails, and these photographs

| 6 | of notes to the U.S. Attorney's Office.  But that was in

| 7 | response to grand jury subpoenas and document requests.  That

| 8 | was not turned over in conjunction with some sort of shared

| 9 | investigatory purpose, if that makes sense, your Honor.

| 10 |         THE COURT:  Okay.

| 11 |         MS. SLAVIK:  And to be clear, the BOP investigator who

| 12 | was tasked with reviewing the defendant's phone calls and

| 13 | e-mails, he was at the MDC sweep.  However, none of the members

| 14 | of the prosecution team were aware of that in advance.  And

| 15 | none of the members of the prosecution team provided any sort

| 16 | of direction or instruction to the BOP investigator to do

| 17 | anything with respect to the defendant's personal belongings or

| 18 | personal space, nothing of the sort.

| 19 |         THE COURT:  So when is the first time that the

| 20 | prosecution team became aware that photographs had been taken

| 21 | of Mr. Combs's notes.

| 22 |         MS. SLAVIK:  That was after the conclusion of the MDC

| 23 | sweep.

| 24 |         THE COURT:  But before the grand jury subpoena had

| 25 | issued?

OBJAComO

1          MS. SLAVIK:  Correct.

2          THE COURT:  Okay.  So you knew that there were these

3     documents and then you issued and then you pointed --

4          MS. SLAVIK:  That's right.  And then the government

5     requested receipt of those documents.

6          THE COURT:  Okay.

7          MS. SLAVIK:  And I think, your Honor -- I'm happy to

8     talk more about the circumstances of the BOP investigator

9     recovering these notes, but I do think that it's important to

10    note how the government treated these notes once the notes were

11    in the government's possession.

12         THE COURT:  But maybe this is related to that.  Are

13    these the only notes?

14         MS. SLAVIK:  Yes, your Honor.  This is the entirety of

15    the notes.  And just to --

16         THE COURT:  So just to be very clear.

17         MS. SLAVIK:  Yes.

18         THE COURT:  Because Mr. Agnifilo raised this as an

19    issue for discovery, but maybe we can short circuit that,

20    there's nothing else from the search?

21         MS. SLAVIK:  So let me be clear, and I think I should

22    clarify something that Mr. Agnifilo said.  I think he said that

23    defense team did not know what material was held by the taint

24    team.  I just want to correct that slightly.

25         The government made a production last night to defense

OBJAComO

```
 1    counsel that's comprised of all the materials in the possession
 2    of the taint team, that includes calls, e-mails, and the
 3    entirety of the universe of notes.
 4          That's separate from what the government attached to
 5    its letter yesterday.  That's Exhibit A.  Those 19 pages
 6    contain redactions, as the Court probably noticed.  Those are
 7    the notes that were put over the privilege wall.  In other
 8    words, those are the notes that were reviewed by the filter
 9    team and then passed to the case team.
10          So I have not seen the production that was made
11    yesterday because those materials were in possession of the
12    filter team.  That production was made entirely through the
13    filter team.
14          THE COURT:  So why wasn't that done with respect to
15    these 19 pages?  I mean, this is getting to just a practical
16    question, which is wouldn't the best course be for documents
17    under these circumstances, if there's even a question of
18    potential privilege, because these were legal pads stacked
19    under a manila envelope -- manila folder that said legal.  To
20    just handle it in the way of:  Filter team gets it, turns it
21    over to the defense for their review so they can mark it as
22    privileged, log it, you can challenge it under the
23    circumstances.  Why wouldn't that be the best way?
24          MS. SLAVIK:  So, your Honor, I think there's an
25    important point here, which is that these materials were
```

OBJAComO

```
1    obtained by the government in connection with the government's

2    ongoing grand jury investigation.

3              The government has been very clear on the record at

4    multiple appearances that this investigation is very much

5    ongoing.  And the government's investigation into the

6    defendant's continued obstruction was ongoing.  And so, you

7    know, these materials were obtained pursuant to the

8    government's ongoing covert grand jury investigation.

9              THE COURT:  On the covert point.

10             MS. SLAVIK:  Yes.

11             THE COURT:  Just maybe you can help me out with this.

12   Is it BOP procedure when documents are taken from an

13   individual's cell to not take those documents, but rather to

14   photograph them and then retain those photographs?

15             MS. SLAVIK:  I'm sorry, your Honor?

16             THE COURT:  Is it the usual course when a search is

17   conducted in a BOP facility to photograph those documents as

18   opposed to taking them?  Because I think what the defense is

19   saying is, if you had just taken the notebook, we would have

20   known it was gone and then we would have challenged the taking

21   of the notebook, and then maybe they would have gotten it back

22   before the government used it offensively in a court pleading.

23   I think that's what they're saying, but I haven't heard your

24   response.

25             MS. SLAVIK:  I don't know the answer to that, your
```

OBJAComO

1   Honor.  What I would stress, though, is that the government

2   received these materials in the normal course.  Once we were

3   alerted to their presence, the existence of these photographs,

4   of the notes, the government requested the notes in connection

5   with its ongoing covert grand jury investigation, which, you

6   know, I don't think there's any obligation for the defense --

7   or excuse me, for the government to notify defense counsel of

8   its investigation into the defendant's ongoing criminal

9   conduct.

10          And just one thing I just I do want to clarify for the

11   record, I think I might have misspoke earlier.  The government

12   had previously spoken with the BOP investigator in connection

13   with the calls and e-mails.  I think I had, when I said the

14   government had never spoken to him, what I meant was in the

15   context of the MDC sweep.

16          THE COURT:  That's what I understood your answer to

17   be.

18          MS. SLAVIK:  Okay.  Thank you for that point.

19          Anyway, your Honor, I think the government received

20   these materials in a completely appropriate channel, and what

21   the government did then with the materials was also completely

22   appropriate by sending them to the filter team.

23          Whenever we get new information, whether that is

24   through a subpoena return, or a search warrant return,

25   something provided by a witness, anything like that, if there's

OBJAComO

```
 1    reason to believe that those documents may contain privileged
 2    information, the material first goes to the filter team.  That
 3    is the practice of the U.S. Attorney's Office.  That is the
 4    practice of this particular case team.  And here, because the
 5    defendant has used monitored jail calls and unauthorized
 6    third-party messaging systems to communicate with his
 7    attorneys, the government took measures to ensure that its
 8    review of the defendant's materials would respect his potential
 9    privilege.
10         THE COURT:  So let's say that these notes were
11    verbatim notes of meetings that Mr. Combs had with his
12    attorneys, how would you be able to figure out if the notes
13    were privileged or not without asking the defendants?  I mean,
14    just explain to me how you would do that?
15         MS. SLAVIK:  So, your Honor, I think the filter team's
16    job is to do the best they can to make privileged
17    determinations with what they have.  And I will note for the
18    Court that this filter process that I've been describing, that
19    has been sanctioned and blessed by many district courts here in
20    the Southern District.
21         THE COURT:  Who is the filter team?  I don't need
22    names, but are these other attorneys in the U.S. Attorney's
23    Office?
24         MS. SLAVIK:  Exactly, your Honor.  The filter team is
25    led by an Assistant United States Attorney in the office and
```

OBJAComO

```
1    there's a filter team that is completely separate from the case
2    team.
3         THE COURT:  And am I correct that in terms of
4    discovery in this case, to the extent that there are privilege
5    issues that come up, the practice has been for the filter team
6    to work with defense counsel to make the privilege calls so
7    that documents that are privileged can be filtered out.
8         MS. SLAVIK:  So yes and no, your Honor.  No in that
9    for a long time, this investigation was covert.  We had a lot
10   of information before charges were brought and the filter team
11   was responsible for reviewing potentially privileged
12   information and making privileged determinations with respect
13   to that information.  Those filter decisions were done without
14   the input of defense counsel of course because the
15   investigation was covert.
16        Since the defendant has been charged, yes.  The filter
17   team has provided information, potentially privileged
18   information, to defense counsel, and there's been, as I
19   understand it, I'm not part of the dialogue, but as I
20   understand it, there's a dialogue between the filter team and
21   defense counsel with respect to potentially privileged
22   material.  However --
23        THE COURT:  Okay.  I think you're going to give me the
24   however.
25        MS. SLAVIK:  I want to make that distinction between
```

OBJAComO

1    covert and overt.  And in this context, this BOP material that

2    was part of the government's covert grand jury investigation

3    into the defendant's ongoing criminal conduct.

4         Now, of course, the government made this public when

5    the defendant --

6         THE COURT:  I don't understand that dividing line

7    given that the defendant has been charged.  Maybe you can help

8    me out with it because especially under the circumstances where

9    the thing that happens after the government receives these

10   documents is the use by the government of those documents in

11   response to a bail application in this case.  And so it's --

12   maybe you can help me understand the dividing line between what

13   you're describing as a covert investigation and discovery in

14   this case.  Because the grand jury proceeding is what

15   ultimately triggered this case.  And so while I understand that

16   the two may be proceeding in parallel, there's some blurred

17   lines between the two, right?

18        MS. SLAVIK:  Well, I mean, it's certainly true that

19   the defendant has been charged, and so that part of the grand

20   jury investigation is now overt.  However, as stated multiple

21   times on the record, the government's grand jury investigation

22   continued into criminal conduct that was separate and apart

23   from what's already been charged.

24        THE COURT:  Well, let me ask it a different way:  Is

25   there any other situation, other than this one, where documents

OBJAComO

1    were taken from the defendant while he was in detention where

2    this kind of issue would come up?  Because any time you would

3    seek documents from Mr. Combs, he would obviously know about it

4    because you were subpoenaing documents from him or something

5    else and so they would know about it.  And then you could

6    engage in these filtering protocols that you described working

7    with defense counsel, etc.

8         It's only because of the particular nature of this

9    search that Mr. Combs was not aware apparently at the time that

10   his notebooks had been photographed.  Fair?

11   MS. SLAVIK:  I'm not sure that that is fair.  I think

12   that the government has multiple ways to access and obtain

13   information in connection with a grand jury investigation,

14   including many ways that are not obvious or overt to the

15   defendant.  And when the government is investigating that

16   continuing criminal conduct, I don't think there's any

17   obligation for the government to alert defense counsel that it

18   is investigating ongoing criminal activity.

19        I certainly -- defense counsel has not provided any

20   sort of authority for that sort of proposition.  And I'm not

21   aware of any either.

22   THE COURT:  Okay.  Turning to privilege, are any of

23   these documents privileged in the government's view and do you

24   have a case that you can share with me?  And if you don't have

25   it now, that's okay, I'll give you some time to find it.

OBJAComO

```
 1              MS. SLAVIK:  Yeah.

 2              THE COURT:  But given what you've heard from defense

 3    counsel, and I don't want to get too deep into the documents or

 4    the explanation because I think some of this is under seal, but

 5    is the government's position that these are just absolutely not

 6    privileged?

 7              MS. SLAVIK:  No, your Honor, not necessarily.

 8              So I think, as I mentioned, the filter team's job is

 9    to do the best they can in terms of making privileged

10    determinations with the information that they have.  And let me

11    just kind of run through what information they had with respect

12    to the notes, these 19 pages.

13              First, the notes were from a notebook that was labeled

14    "things to do."  They were not labeled legal.  They were not

15    labeled attorney/client privilege.

16              Defense has suggested that the notebooks and the loose

17    papers were meant to be in the manila folder labeled legal.

18    First of all, you know, assuming that proximity to a folder

19    labeled legal, means those papers should be considered "legal"

20    I think there's good authority in this district that suggests

21    that self-labeling something as attorney/client privilege or as

22    legal does not automatically make the documents attorney/client

23    privileged or legal.

24              So I think that's one important point.

25              THE COURT:  Well, I think the response is that if you
```

OBJAComO

```
1    have a folder like this you really can't jam a bunch of legal
2    pads in it.  And the defense tried to have the facility give
3    Mr. Combs a Redweld where he could have put all the documents
4    inside.  It's just that they didn't allow him to do that.  And
5    so he had the legal manila folder and it was sort of on top of
6    the legal pads, but I understand.
7            MS. SLAVIK:  Your Honor, we're talking about, you
8    know, 11 pages of what the defense has argued is privileged.
9    And, like I said, the label on the notebook is things to do.
10           So that's one thing.  The notes also, on their face,
11   I'm not sure if your Honor has gone through them, but the notes
12   on their face do not obviously memorialize conversations with
13   attorneys.  The defendant has characterized them as notes to
14   and with his attorneys, but I don't think that that is clear
15   from the face of the notes.
16           Rather, these notes are pretty wide ranging.  They
17   include action items from non-attorneys, like family members
18   and like financial advisors.  Those would not be privileged.
19   They include notes about family matters, family members'
20   birthdays; that's not privileged.  They include inspirational
21   quotes; those aren't privileged.
22           So much of the content of these 11 pages of notes
23   actually have nothing to do with this case at all.  And so the
24   filter team made determinations based on the information that
25   they had and the context that they had, which includes, you
```

OBJAComO

```
 1     know, what I just described.
 2              Now, those determinations don't have to be perfect.
 3     In fact, the law in this space contemplates that mistakes could
 4     be made.  And I would point the Court towards the *Lumiere*
 5     decision by Judge Rakoff.
 6              So, you know, the government is happy to engage with
 7     defense counsel if they think that, as they clearly do, that
 8     some of these materials are privileged, but --
 9              THE COURT:  For present purposes, the defense argues
10     that at the very least, that excerpts from the notes that are
11     contained in the government's opposition brief are privileged.
12              So let's say I accept everything that you're saying.
13     The filter worked as best it could.  There's no bad faith
14     involved.  But you look at the explanations and everyone sort
15     of agrees that those excerpts are privileged, what happens then
16     with respect to the usage of those excerpts?
17              MS. SLAVIK:  Well, so first of all, I disagree that
18     the two excerpts used in the government's opposition brief are
19     privileged, and I'm happy to get into why I think that.
20              THE COURT:  We'll get into that next, but let's
21     assume, I just want to understand how this works.
22              MS. SLAVIK:  Yes, so assuming, of course noting my
23     disagreement with your conclusion.
24              THE COURT:  Yes.
25              MS. SLAVIK:  That these notes would be privileged, the
```

OBJAComO

 1    remedy would simply be to suppress the government's use of

 2    those notes.  It wouldn't be to suppress the notes wholesale.

 3    It would just be to excise the privileged aspects of the notes.

 4              THE COURT:  Okay.  Understood.

 5              As a matter of just strategy or just kind of to avoid

 6    the time and resources involved in further examination of those

 7    two excerpts, would the government simply say we believe we

 8    have a strong opposition, we don't need to rely on these two

 9    excerpts, so we will just not rely on them and the Court need

10    not consider them?

11              MS. SLAVIK:  Your Honor, I think that's right.  I

12    think that the government's brief --

13              THE COURT:  I mean, are you willing to take that

14    position?  Meaning that, look, this issue has been raised.

15    Rather than get deep into it when we have these other issues

16    and a lot of other things happening, the Court simply need not

17    consider those two excerpts in considering the government's

18    opposition to the bail application?

19              MS. SLAVIK:  I think that's right, your Honor.  I

20    think for the purposes of the bail hearing that's scheduled for

21    Friday, the government's position is that the Court need not

22    consider the two excerpted notes.  The government's opposition,

23    as your Honor is well aware, sets forth multiple examples of

24    the defendant's continued obstruction and interference with the

25    integrity of these proceedings.  There's no need for the

OBJAComO

1    government to rely on these two examples.

2          THE COURT:  Okay.  So then next question:  If you're

3    not relying on them for that purpose, is there any issue in

4    terms of giving those documents back?  Or putting them in a

5    vault and saying pending further investigation, if there is

6    going to be an investigation, we don't need to rely on these.

7    Because you point out a lot of what's in the notes are things

8    like inspirational messages, things that have nothing to do

9    with this case.  There are pages of phone numbers, okay.  And

10   so it may be that you say, we'll put these into a vault or

11   we'll hand these back to defense counsel.  And we will, if we

12   need to make an application at some later point in this case,

13   we'll do that.  But for these purposes, we're giving the notes

14   back.

15         MS. SLAVIK:  Your Honor, I think that these notes and

16   specifically the two excerpts in the government's bail

17   opposition, I think that they're related to the government's

18   ongoing investigation into the defendant's obstructive conduct.

19   And I think that they're evidence of the defendant's criminal

20   conduct.  So I would shy away from the Court's suggestion that

21   we put them in a vault and lock them up.

22         You know, I think that the government's opposition

23   brief is -- there's no need to rely on those two examples.  But

24   I think that the government would want to use those notes, the

25   two examples specifically, in connection with its ongoing

OBJAComO

1    investigation.

2            And primarily, you know, just as a matter of

3    procedure, I think that the defendant would have to make a

4    motion before to ask for that relief.  That's not my

5    understanding of the relief that the defendant is asking for.

6            THE COURT:  No, but you can always, to short circuit

7    any future application and having to deal with it, you can

8    agree that the Court or that the government would not consider

9    those documents pending a further application.  I mean, that's

10   something you could do.  So I'll ask you to consider that.

11           If you don't, for present purposes, I will understand

12   that the government plans to retain the documents and to use

13   them in its investigation unless the defendant makes an

14   application and it's successful.  But if you change your mind,

15   just let everyone know because that could simplify things.

16           MS. SLAVIK:  Understood, your Honor.

17           THE COURT:  Now, in terms of whether the two excerpts

18   are privileged, which I wanted to be sure I gave you an

19   opportunity to get to, can you really say one way or the other

20   if you don't have the explanation from the defense on the

21   circumstances of those two excerpts?

22           MS. SLAVIK:  I think we can, your Honor.

23           THE COURT:  Okay.

24           MS. SLAVIK:  And let me just, let me just explain why

25   I say that.  So first, the two excerpts relate to the defendant

OBJAComO

1    paying a potential witness and the defendant "finding dirt" on

2    potential victims and witnesses.

3         So with respect to both of these notes, I think it's

4    pretty clear that these are not attorney/client privileged.

5    The attorney/client privilege obviously protects communications

6    between the defendant and his attorneys for the purpose of

7    obtaining or providing legal advice.  I don't think that on

8    their face either of these notes are indicative of

9    communications to obtain legal advice.

10        So that brings us into work product territory, which

11   is certainly broader than the attorney/client privilege, but

12   it's not limitless.

13        Work product protection protects materials prepared by

14   or at the behest of counsel in anticipation of litigation, and

15   these materials don't fall under that category either.

16        So the focus of the work product privilege is really

17   opinion material.  Attorney opinion material to protect the

18   attorney's mental processes so that the attorney can analyze

19   and provide legal advice and prepare a client's case.

20        The note about whether a witness was paid or not is

21   not opinion material and it's not mental processes.  It's

22   really an administrative question that has nothing to do with

23   legal advice or strategy.  And maybe, to put a finer point on

24   it, the information at issue is not protected.  Following up

25   with a paralegal to determine whether a witness was paid off or

OBJAComO

 1    not, that's not protected by a privilege.

 2              THE COURT:  You're saying paid off, but let me give

 3    you an example.  Let's say that a potential individual had

 4    counsel that was being paid for in some capacity.  And it was a

 5    legal arrangement that was in place and so that was what was

 6    being discussed, but those are the circumstances.

 7              MS. SLAVIK:  Sure.  That fact of payment, not

 8    privileged.  And I would argue that to the extent this is about

 9    the defendant paying off a witness, which is of course what the

10    government is arguing, that would not -- that would fall under

11    the crime fraud exception of any sort of privilege.  Either

12    attorney/client privilege or work product.

13              THE COURT:  Please proceed.

14              MS. SLAVIK:  The next note about finding dirt on

15    potential victims and witnesses using a nonlawyer third party,

16    that's similarly unprotected under the work product doctrine.

17    And I think the context is particularly important here, and

18    I'll just refer the Court to the first page of Exhibit A, which

19    is where these notes are contained.  The notes say:  Find dirt

20    on two different victims, and then refers to a nonlawyer third

21    party.  That individual is referred to in the government's

22    brief as Individual 2.

23              So these notes come from the defendant's "things to do

24    list" and many items in that notebook appear to be directed at

25    nonlawyer third parties.  I've kind of described that, like

OBJAComO

1    notes for family members to follow up on things, notes for

2    financial advisors, things like that.

3            THE COURT:  You would agree that defense counsel, when

4    defending any criminal case, may be investigating people who

5    they believe will feature heavily in the government's case.

6            MS. SLAVIK:  Of course, your Honor.

7            THE COURT:  You have to do that.  It's malpractice not

8    to do that.

9            MS. SLAVIK:  Of course, your Honor.

10           THE COURT:  So what if, again --

11           MS. SLAVIK:  The defense is entitled to that.

12           THE COURT:  So --

13           MS. SLAVIK:  I'm sorry.

14           THE COURT:  I'm sorry.  No, please.

15           MS. SLAVIK:  Like I said, here context is really

16    important.

17           THE COURT:  That's just, I understand the context

18    you're pointing to and I guess the response from the defense

19    may be if this was Mr. Combs's vernacular describing what I was

20    talking about, which is that the defense team's efforts to make

21    sure that they were well prepared to defend against the

22    government's case and people that they thought would feature

23    potentially in the government's case, then under those

24    circumstances, which you might have no reason to know about

25    because you just have the document, you would agree under those

OBJAComO

```
 1   circumstances.  Closer call whether it falls into the category

 2   of work product.

 3              MS. SLAVIK:  Sure.  But here's why these notes don't.

 4              First, the individual that is apparently, according to

 5   the notes, tasked with finding this dirt is a nonlawyer.

 6   Secondly, and this is noted in the government's brief, the

 7   defendant had a call with a family member on October 14th, in

 8   which he instructed the family member to work with this

 9   nonlawyer individual to "find everything" on victim two.  So I

10   think with those two pieces of context, I think it's clear that

11   this operation is outside the context of the defendant

12   defending this criminal case.

13              I think this is clear that the defendant is reaching

14   out to nonlawyer third parties and, by the way, Individual 2,

15   has never been identified by defense counsel as part of the

16   defense team.  We have a long list of individuals who act in

17   the, you know, defense capacity.  Individual 2 is not on that

18   list.

19              THE COURT:  Okay.

20              MS. SLAVIK:  So I think that's important context.

21              THE COURT:  Okay.  And now I think that we have

22   perhaps eliminated the emergent nature of this because the

23   excerpts aren't being relied on in the government in opposition

24   or to the bail application.

25              What is the government's position on turning over any
```

OBJAComO

```
 1    communications between the government and investigator and the
 2    surveillance video?  Which I think were the two things that
 3    Mr. Agnifilo mentioned.  And is there any opposition to that?
 4             MS. SLAVIK:  Yes, your Honor, there is opposition to
 5    that.
 6             THE COURT:  I figured.
 7             MS. SLAVIK:  These are pretty extraordinary measures
 8    being sought by the defense.  And at least by my perusal of the
 9    defendant's letters filed yesterday and today, there's
10    absolutely no citation of any authority that supports the
11    defendant's request for this extraordinary relief.  So the
12    government is very much opposed to those requests.
13             THE COURT:  Well, I noticed that too.  So why don't
14    we -- is there anything further from the government?
15             MS. SLAVIK:  Not unless the Court has any additional
16    questions.
17             THE COURT:  Mr. Agnifilo?
18             MR. AGNIFILO:  Thank you, your Honor.
19             THE COURT:  One question.
20             MR. AGNIFILO:  Yes.
21             THE COURT:  There was a declaration that the Court
22    received ex parte and under seal.
23             MR. AGNIFILO:  Yes, Judge.
24             THE COURT:  Given that the government is in possession
25    of the underlying documents, is there any reason why that
```

OBJAComO

```
 1   declaration cannot be shared with the government, or some

 2   version of it so that the government has the context to

 3   determine whether there is actually a privilege that attaches

 4   to some portion of these documents?

 5          Because, as I understand, Ms. Slavik, they want to

 6   work with you to try to resolve this.  Now, you may disagree

 7   with that, but at some level, usually when you get an ex parte

 8   submission on a privilege application, it's because the other

 9   side doesn't have the documents so you can't really share the

10   explanation with the other side without revealing the content

11   of the document.  They have the documents, so it seems like it

12   might move things forward for you to share that declaration or

13   some version of it with the government.

14          MR. AGNIFILO:  So my concern with doing that, your

15   Honor, is that we would be further giving the government

16   insight into defense strategies, the significance of certain

17   people who are mentioned in the notes, the significance of

18   different things in the notes.

19          So your Honor has asked me a direct question, so I

20   don't want to say no to you right off the bat.  Let me talk to

21   my colleagues about it and see if there's something we can do.

22   But at the end of the day, we have an obligation to not

23   exacerbate the attorney/client.

24          THE COURT:  I agree.

25          MR. AGNIFILO:  Yeah.
```

OBJAComO

```
 1              THE COURT:  I agree.  It's just a question of whether
 2    the arguments you would make, and I'm going to give both sides
 3    a little homework here on the privilege issue.
 4              MR. AGNIFILO:  Right.
 5              THE COURT:  So if your argument on privilege didn't go
 6    to the importance of the material, but rather the
 7    circumstances, these were notes that were taken in meetings
 8    with counsel and pertain to legal strategy.  At that level of
 9    generality, I don't think it would raise any sort of
10    exacerbation concerns.  So I think that that's just something
11    to consider.
12              MR. AGNIFILO:  Yes, and we will consider it because
13    your Honor is asking us to consider it and we will.
14              THE COURT:  Okay.
15              MR. AGNIFILO:  So let me make two points.
16              I have brought the raw material.  These are
17    Mr. Combs's legal papers.
18              As Investigator 1 said, what we see here in this first
19    folder it says "legal work."  Some of these legal pads have --
20    say "legal."
21              THE COURT:  Well, you mean some of the legal pads say
22    legal, not in connection with the fact that they are legal
23    pads; you are saying they are actually marked as "legal?"
24              MR. AGNIFILO:  It's not a Staples legal pad.  It's
25    actually handwritten the word.  He's handwritten the word
```

OBJAComO

```
 1     "legal."
 2             THE COURT:  Is that applied to the notebooks that
 3     these documents were taken from?
 4             MR. AGNIFILO:  So there are no notebooks.  There are
 5     no notebooks.
 6             THE COURT:  Sorry, the legal pads that the photographs
 7     were taken.
 8             MR. AGNIFILO:  Right.  So these legal pads, we have a
 9     folder that says "legal."  On top of the legal pad he's
10     handwritten in blue handwriting the word "legal."  All these
11     legal pads say "legal."
12             Now, part of the reason we need a hearing, and there
13     are many, many reasons we need a hearing, is what the
14     government is saying was searched is just not accurate.
15             THE COURT:  Wait, let me just stop you for a second.
16             MR. AGNIFILO:  Yes.
17             THE COURT:  You saying the photographs that were
18     taken, those pages were in legal pads that are marked as legal?
19             MR. AGNIFILO:  Yes.  Yes.  They're marked as legal.
20     They're marked as legal.
21             THE COURT:  Do you have an example I can take a look
22     at right here?
23             MR. AGNIFILO:  One second, Judge.
24             Okay.  I will give your Honor this -- I'll do it any
25     way your Honor wants.
```

OBJAComO

```
 1              THE COURT:  I just want to see what you're talking
 2    about.
 3              MR. AGNIFILO:  One second.
 4              All right.  What I'm going to do, with your Honor's
 5    permission, I can give you the legal pad.  And what I've done
 6    is I've premarked where one of the pages.  I'll give this to
 7    your Honor.
 8              And this was in a folder marked legal.
 9              THE COURT:  Okay.  Mr. Hernandez, you can hand this
10    back.
11              THE DEPUTY CLERK:  Yes.
12              MR. AGNIFILO:  Thank you.
13              So one of the very significant things about these
14    notes is whenever one of Mr. Combs's lawyers goes to the jail
15    to speak to him, he walks out sometimes with all of these notes
16    in his hand, and sometimes with some subset of maybe one or two
17    folders of notes in his hand.  And two things then happen.
18    One, he sits down with his lawyer and he says who wants to go
19    through the list first.  Sometimes I'll have things I want to
20    say Ms. Geragos will do the same.  Sometimes Mr. Combs has
21    things in his list.  So every single thing, virtually every
22    single thing in these legal pads are things that he discusses
23    with his lawyers.
24              Now, sometimes they are matters of trial strategy.
25    Sometimes they're matters of what witnesses to interview.
```

OBJAComO

Sometimes they're matters of there's a certain person who knows
this potential witness, you should speak to that person about
what that third person nonlawyer might know about that
potential witness that could possibly undermine that witness's
credibility.

All of these things are discussed.  We spend an
inordinate amount of time with Mr. Combs, speaking with him
about his legal case, every aspect of his legal case.  And the
reason that is so, is because this is a sweeping racketeering
case.  This racketeering case spans a long amount of time and a
great amount of conduct.  This is not a case that relates to
say a single bank robbery that took place one day.

So we are studying this man's life.  That's what we
do.  Day in and day out.  We do that for trial preparation.  We
do that for the bail hearing.  We are constantly talking about
things that he's done, charities that he's involved in.  We're
talking about -- the government's talking about, well,
sometimes it's about financial advisors.  Well, sometimes
that's related to bail.  Sometimes that's related to how are we
going to show the judge what his assets are, how are we going
to show the judge what the house is worth.

This is not a single day, a single event case.  This
is an indictment of this man's entire life.  So we spend, his
lawyers spend, a tremendous amount of time covering every
conceivable nook and cranny of this man's life.  And I do have

OBJAComO

```
1    a case for the Court.  And the case is called United States v.

2    Defonte, D-E-F-O-N-T-E.  It's at 441 F.3d, 92.  It's from the

3    Second Circuit from 2006.  Very important case.  In my view,

4    dispositive of these issues.  What the Second Circuit said in

5    Defonte, is that when it comes to an inmate, and that inmate's

6    notes, there are two types of notes that are 100 percent

7    privileged.  The first type is anything that is discussed with

8    the lawyer.  Everything in these notes is discussed with the

9    lawyer.  He comes out, Mr. Combs comes out, and he reads us his

10   to-do list.  That could be related to any one of a number of

11   things.

12           If it's in this legal file, it is discussed with his

13   lawyer.  The Defonte decision makes clear as a bell that when

14   that happens, that is privileged.  The other thing that's

15   privileged, not surprisingly, is whenever a lawyer says

16   something to a client and the client writes it down, that

17   happens in here, too.

18           One of the things that your Honor will see in the 19

19   pages that the trial prosecutors have, is that they're the

20   names of Mr. Combs's defense lawyers in those materials.

21   Including different things that those defense lawyers have said

22   to him.  I'm not going to say them out loud because we have

23   them in the declaration.  But there's a point where one of the

24   lawyers here at the defense table has an idea about a potential

25   expert witness, who is a doctor, and who is retired.  And he
```

OBJAComO

1    tells that to Mr. Combs.  And Mr. Combs writes it down, and

2    it's in Mr. Combs's notes that the trial prosecution now has.

3    I cannot think of anything more in the heartland of

4    attorney/client privileged material than a lawyer telling his

5    incarcerated, waiting for trial client, here is the name of a

6    potential witness, and the client thinks that's so important

7    that he writes it down in his notes.  The government has those

8    notes.  They have them, Judge.

9        They have notes related to who we have been tasked to

10    call as potential witnesses.  He gives us names.  Sometimes

11    it's first names.  In the case of what the government has, it's

12    first names.  We know who they are because it's our job to call

13    them.  It's our job to call them and interview them.  The

14    government now knows potential defense witnesses for a May 5th

15    trial.  That's prejudicial.  They shouldn't have it.  It's

16    heartland attorney/client privileged material that is now

17    giving them an insight into the defense and they should not

18    have it.  And for them to get up here in front of your Honor

19    and say we're right to have it, we don't want to give it back,

20    we want to keep it and we even want to use it.  That is the

21    problem.  That's the problem.

22        This has been a complete -- in the best of all

23    circumstances, if we take intentionality and malice out of the

24    equation, which I'm willing to do just for the sake of

25    argument, this has been a complete institutional failure.  The

OBJAComO

```
 1    government says we want to work with defense counsel.  You know
 2    when the time to work with defense counsel was?  The time to
 3    work with us was when they got some of these notes.  They have
 4    our phone number.  They could have called us on the phone.
 5    Hey, Marc, hey, Teny, can we run these things by you, that
 6    crazy BOP search, we got all this stuff, can we tell you what
 7    it is so you can tell us what it's all about.
 8            The fact that they didn't do that is not something to
 9    be glossed over, and I'm not suggesting your Honor is.  Is not
10    something to be glossed over.  That is the problem.
11            THE COURT:  Well, would you agree that in the context
12    of the grand jury investigation, it's impossible for them to do
13    that?  I mean, you are asking, as I understand your request is,
14    for purposes of this litigation, where the prosecution team
15    comes into possession of documents that they may use in this
16    case, those documents should be shared first with counsel for
17    the defense.
18            Is that fair?
19            MR. AGNIFILO:  So that's fair.  But what I'm seeing
20    the government do is something that is -- the best word for it
21    is dangerous.  They seem to be saying that if there's a covert
22    investigation, somehow, they don't have to worry about the
23    attorney/client privilege.  That is, that is nothing that I
24    have ever seen.
25            THE COURT:  I don't think that that's what they're
```

OBJAComO

1    saying.  They're saying that they use a filter team to filter

2    out potentially privileged documents and that's a practice

3    that's been accepted in this district for some time.  And I

4    haven't seen any authority from your side indicating that

5    that's improper.

6          And, I mean, I'm going to give you a chance to provide

7    that authority because I'm looking at the *Defonte* case and it's

8    very helpful.  It would have been nice to have that as part of

9    the papers that were submitted.

10          But let me, Ms. Slavik, are you familiar with this

11    case, the *Defonte* case?

12          MS. SLAVIK:  I'm not, your Honor.

13          THE COURT:  Okay.  Let's do a few things.

14          MR. AGNIFILO:  Your Honor, can I do one thing because

15    Ms. Geragos has much more to do with the filter team than I

16    have, and I think she has some insights that could be helpful

17    for some of the insights that your Honor is asking.

18          THE COURT:  Okay.

19          MS. GERAGOS:  Your Honor, just one point, I just want

20    to address notes and the covert -- their argument in terms of

21    the covert grand jury investigation.  After a search warrant

22    was executed on Mr. Combs's hotel room, after he was arrested,

23    they gave us a property receipt which we asked for and then we

24    received, and there was a notebook that was recovered.  We

25    asked immediately for that notebook to be sent to the filter

OBJAComO

1    team, which it was.  And so that material was seized after the

2    indictment pursuant to a search warrant that was done after

3    this grand jury indictment that he's arrested for.  And we

4    received that in discovery two days ago pursuant to our filter

5    protocol.

6            And I think it's important because it's just at odds

7    with what the argument is right now, which is that if there's a

8    covert grand jury investigation, particularly related to

9    Mr. Combs's notes, then the filter team would not have to check

10   that with us.  The filter -- they had Mr. Combs's notes from

11   after an indictment that he's here sitting in jail on and that

12   was sent to filter team and is not in the hands of the trial

13   team prosecutors right now.  So I just want to -- I want your

14   Honor to have that data point with respect to his notes and

15   notes that they have seized after he was indicted.

16           THE COURT:  Understood.  And, Ms. Slavik, as I

17   understand it -- well, maybe you can tell me.  What is the

18   reason why these notes were not turned over to the defendants

19   when they were first obtained?  Meaning that the filter team

20   had looked at them, they had filtered out what was not

21   privileged in their view, provided you the balance, and then at

22   that point, why didn't you just kind of package everything and

23   provide it to the defense consistent with the Rule 16

24   obligations?

25           MS. SLAVIK:  Your Honor, like I said, these particular

OBJAComO

1    notes were obtained pursuant to the government's ongoing covert

2    investigation.  The materials, the notes that Ms. Geragos

3    referred to previously, those were obtained pursuant to a

4    search warrant in connection with the defendant's arrest.

5    There was nothing covert about the seizure of those notes.

6    This set of notes is very different.

7            And if I may, your Honor, just respond to a couple of

8    the points that Mr. Agnifilo raised.  We're talking here about

9    11 pages of notes.  We're not talking about a stack of

10   notebooks, a stack of papers.  We're talking about 11 pages

11   that the defense has argued are privileged.  None of those

12   notes were labeled legal.  The Court has those notes as Exhibit

13   A.

14           THE COURT:  Well, the notes themselves are not labeled

15   legal, but at least the example that I received, that page was

16   in a legal pad and at the top of the legal pad it was marked as

17   legal.

18           MS. SLAVIK:  Well, first of all, I'll note that the

19   defendant retained all those notebooks, so it's not clear when

20   that legal label was affixed to the notebooks.  But, secondly,

21   and more importantly, there's no authority that stands for the

22   proposition that materials can become privileged by the simple

23   expedient of labeling them as such.

24           THE COURT:  That's fair.

25           MS. SLAVIK:  That's a quote.

OBJAComO

 1          THE COURT:  That's fair.  And I think that the real

 2     issue is not really -- is not primarily the labeling.  It is

 3     the context in which those notes were taken.  And I'm going to

 4     give you time to respond to it.  But, you know, I think what

 5     I'm going to do here -- so just to be clear, what the

 6     prosecution team has are these 19 pages.

 7          MS. SLAVIK:  That's correct, your Honor.

 8          THE COURT:  Right.  So pending further order of the

 9     Court, I'm going to order the prosecution to delete any

10     versions of these notes that you may have.  So get rid of them.

11     So the government should not be in possession of them.  The

12     Court has a copy, and if there are originals that would be

13     separately useful from the versions submitted to the Court,

14     then those can be e-mailed to the Court for the Court's -- and

15     the Court will retain it in its possession.  But the government

16     should get rid of all of those.  So you won't have them.

17     However, the Court will have them.

18          And so we will figure out the privilege issue.  And

19     let me ask, Mr. Agnifilo, given that we have a bail hearing

20     coming up Friday.

21          MR. AGNIFILO:  Yes, your Honor.

22          THE COURT:  But I think we have eliminated any urgency

23     in terms of that bail hearing given the representations from

24     counsel and the steps that I'm taking today, so and because I'm

25     sure counsel will be preparing for that and other things, in

OBJAComO

```
 1    terms of running down the privilege and other issues, my sense
 2    would be to have briefing occur over the next few weeks.  I
 3    don't think that there's a need to have everyone running around
 4    in the next 24 to 48 hours trying to find cases either in
 5    support or in opposition to some of the applications that have
 6    been made.  I'll also note that the letters that the Court has
 7    received are a couple pages at most, and until this hearing
 8    service, not entirely clear what relief the defense was
 9    seeking.
10            Do you have any issue with that timeframe?
11            MR. AGNIFILO:  Not at all, your Honor.
12            THE COURT:  Okay.  So what the Court will do, we'll
13    put in an order indicating kind of a sequence of briefing on
14    some of the issues that have been raised.  You'll have an
15    opportunity to raise authorities in support of any Fourth
16    Amendment or privilege arguments that you would like to raise.
17    We have the Defonte case.  You probably have other cases you
18    would like to rely on.  You also have your request for certain
19    evidentiary relief in terms of the video and communications
20    between the government and the BOP investigator.  And the
21    government will have its chance to respond to that before we
22    make any determination.  But I don't think given these steps
23    that there's a real urgency of the kind that was possibly at
24    issue before the Court had this hearing.
25            Is that fair?
```

OBJAComO

```
 1          MR. AGNIFILO:  I think that's right.  Your Honor dealt

 2    with the most urgent issue, which was in advance of the bail

 3    hearing for Friday, which I very much appreciate.

 4          There's one other issue that I think is -- could also

 5    be urgent, which is we don't know whether any of this

 6    privileged material has been used in a grand jury presentation.

 7          Now, I'm obviously not in a position to ask about that

 8    because I understand it's a sealed matter.  But I do want to

 9    put the government on notice that if they're looking to seek an

10    indictment or superseding indictment, you know, based on

11    privileged material, we've put them on notice in open court on

12    that and they proceed at their peril.

13          THE COURT:  Well, Ms. Slavik, is anything -- without,

14    I know you can't get into the details, but I mean, is anything

15    happening with respect to these notes in the immediate future?

16          MS. SLAVIK:  Your Honor, I won't get into details, but

17    I hear the defense and I understand the request.

18          Just one point of clarification for the government.

19    The directive that the Court just provided about the case team

20    getting rid of these notes, my understanding is that that was

21    not a directive towards the filter team, just because, you

22    know, to the extent there's litigation about these notes, I

23    think someone will have to have them.  And my understanding is

24    that the appropriate team within the U.S. Attorney's Office

25    would be the filter team.
```

OBJAComO

1          THE COURT:  And my understanding is that the filter

2     team is not involved in either the grand jury investigation or

3     this litigation, correct?

4          MS. SLAVIK:  That's correct, your Honor.

5          THE COURT:  Okay.  So I think that that's fine.

6          Mr. Agnifilo?

7          MR. AGNIFILO:  One other thing, in so far as time is

8     passing and these law enforcement searches at the MDC were from

9     I think it was October 28th until November 1st, I would ask on

10     the record that the government ask, pending your Honor's

11     ruling, that any surveillance video be preserved.

12          THE COURT:  Ms. Slavik, I assume there's no issues

13     there.  Can you make that request to the Bureau of Prisons?

14          MS. SLAVIK:  Yes, Judge.

15          THE COURT:  Okay.  Ms. Slavik, just one further

16     question for you or maybe one of your colleagues relating to

17     Friday's bail hearing, which is that the defense points to the

18     *Jefferies* case in the Eastern District.  And what they say is,

19     look, just a month ago in the *Jefferies* case, the government

20     proposed a bail package in a case that at least, from their

21     perspective, mirrors this case in several dimensions.  And

22     their point is that in that proceeding, the government asked

23     for a $10 million bond and certain other restrictions, but they

24     agreed that there was a set of conditions that would reasonably

25     assure the appearance of the defendant.  I don't know if danger

OBJAComO

```
 1    to the community was at the forefront in that, at least the

 2    government's presentation there, but they point to

 3    circumstances of the alleged case there that are similar at

 4    least to circumstances of the case here.

 5           In the government's response to the bail application,

 6    there wasn't much discussion or perhaps any to the *Jefferies*

 7    case, so that's one of the things that I hope on Friday you

 8    could inquire into, because obviously we have a prosecution

 9    ongoing in the Eastern District of New York and a proposal that

10    was green lighted by the government there.  So I wanted to just

11    make sure that there was a reason for any distinction in the

12    government's position in this case.

13           MS. SLAVIK:  Yes, your Honor.  The government's view

14    is that that case is very different from the case here and

15    we'll be prepared to address that in full at the hearing on

16    Friday.

17           THE COURT:  Okay.  And, Ms. Slavik, any further issues

18    that the government thinks we need to take care of here?

19           MS. SLAVIK:  No, your Honor.  Thank you.

20           THE COURT:  All right.  Thank you very much.

21           Mr. Agnifilo, any further issues?

22           MR. AGNIFILO:  Yes, one last thing.  I know our reply

23    on the bail issue is due tomorrow.  Would your Honor be open to

24    maybe extending it for Thursday at noon since we've gotten a

25    little detained on this other issue?  Or is that cutting it too
```

OBJAComO

```
 1   close for your Honor?
 2              THE COURT:  No, that's fine.
 3              MR. AGNIFILO:  Okay.
 4              THE COURT:  So Thursday at noon.
 5              MR. AGNIFILO:  Thursday at noon.  Let me just check
 6   with my colleagues and make sure there's nothing else.
 7              Thank you, your Honor.  We have nothing else.
 8              THE COURT:  All right.  Well, I appreciate everyone
 9   coming in.  We will see you all here on Friday.  That will be
10   on the 26th floor on Friday.  Thank you very much.  We are
11   adjourned.
12              (Adjourned)
13
14
15
16
17
18
19
20
21
22
23
24
25
```