UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      v.

SEAN COMBS,

              Defendant.

24-cr-542 (AS)

### Memorandum of Law in Support of Defendant Sean Combs' Motion for a Hearing, Suppression, and Other Relief

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

    A.    Investigator-1's Investigation Of Mr. Combs ........................................ 4

    B.    October 28 to November 1, 2024 BOP Sweep And Investigator-1's Search Of Mr. Combs' Legal Notes ..................................................................... 4

    C.    Investigator-1 Alerts The Government, Which Ratifies The Illegal Search ........... 6

    D.    The Government Uses The Notes ........................................................... 7

ARGUMENT ....................................................................................................................... 8

    I.    The Government Violated Mr. Combs' Attorney-Client Privilege And Sixth Amendment Rights .................................................................................. 8

    II.    The Government Violated Mr. Combs' Fourth Amendment Rights ............... 12

    III.    Discovery And A Hearing Are Required ............................................ 14

    IV.    This Court Should Order Appropriate Remedies .................................. 18

    A.    Use-And-Fruits Suppression ................................................................ 18

    B.    Appointment Of A Special Master ......................................................... 19

    C.    Dismissal Of The Indictment .............................................................. 22

    D.    Disqualification And Other Potential Remedies .................................... 24

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Coplon v. United States,*
   191 F.2d 749 (D.C. Cir. 1951) ................................................................ 16

*In re Grand Jury Subpoena Dated July 6, 2005,*
   256 F. App'x 379 (2d Cir. 2007) ............................................................ 9

*In Re Grand Jury Subpoenas,*
   454 F.3d 511 (6th Cir. 2006) ................................................................ 20

*Harbor Healthcare System LP v. United States,*
   5 F.4th 593 (5th Cir. 2021) ............................................................ 20, 21

*Kastigar v. United States,*
   406 U.S. 441 (1972) ............................................................................. 19

*Nat'l City Trading Corp. v. United States,*
   635 F.2d 1020 (2d Cir. 1980) ............................................................... 18

*In Re Search of the Scranton Hous. Auth.,*
   436 F. Supp. 2d 714 (M.D. Pa. 2006) .................................................. 21

*In re Search Warrant for Law Offices Executed on March 19, 1992,*
   153 F.R.D. 55 (S.D.N.Y. 1994) ........................................................... 21

*In re Search Warrant Issued June 13, 2019,*
   942 F.3d 159 (4th Cir. 2019) ............................................................... 20

*In re the Seizure of All Funds on Deposit in Accounts in the Names of*
   *National Electronics, Inc., at JP Morgan Chase Bank,*
   2005 WL 2174052 (S.D.N.Y. 2005) .................................................... 21

*United States v. Allen,*
   No. 14 CR. 272 (JSR), 2016 WL 315928 (S.D.N.Y. Jan. 8, 2016) .......... 9

*United States v. Arrington,*
   No. 15-CR-33-A, 2022 WL 3229843 (W.D.N.Y. Aug. 10, 2022) ............. 10, 16, 22

*United States v. Bolden,*
   353 F.3d 870 (10th Cir. 2003) ............................................................. 25

*United States v. Brown,*
   484 F.2d 418 (5th Cir. 1973) ............................................................... 11

*United States v. Cohen,*
   796 F.2d 20 (2d Cir. 1986) ............................................................ 12, 17

*United States v. Danielson*,
    325 F.3d 1054 (9th Cir. 2003) ........................................................................... 19, 24

*United States v. DeFonte*,
    441 F.3d 92 (2d Cir. 2006) ............................................................................... 8, 9, 22

*United States v. Gartner*,
    518 F.2d 633 (2d Cir. 1975) ................................................................................. 12

*United States v. Ginsberg*,
    758 F.2d 823 (2d Cir. 1985) ................................................................................... 8

*United States v. Jacobsen*,
    466 U.S. 109 (1984) ............................................................................................. 13

*United States v. Kaplan*,
    2003 WL 22880914 (S.D.N.Y. Dec. 5, 2003) ...................................................... 21

*United States v. Landji*,
    No. S118CR601PGG, 2021 WL 5402288 (S.D.N.Y. Nov. 18, 2021) ................................. 16

*United States v. Lumiere*,
    No. 16 CR. 483, 2016 WL 7188149 (S.D.N.Y. Nov. 29, 2016) ........................................ 11, 16

*United States v. Mastroianni*,
    749 F.2d 900 (1st Cir. 1984) ................................................................................. 19

*United States v. Mejia*,
    655 F.3d 126 (2d Cir. 2011) ................................................................................... 8

*United States v. Neill*,
    952 F. Supp. 834 (D.D.C. 1997) .......................................................................... 21

*United States v. Patel*,
    No. 16-CR-798 (KBF), 2017 WL 3394607 (S.D.N.Y. Aug. 8, 2017) ................... 11, 17, 18, 19

*United States v. Renzi*,
    722 F. Supp. 2d 1100 (D. Ariz. 2010) .................................................................. 21

*United States v. Ritchey*,
    605 F. Supp. 3d 891 (S.D. Miss. 2022) .......................................................... 21, 22

*United States v. Schulte*,
    No. S-2 17 CR. 548 (PAC), 2019 WL 5287994 (S.D.N.Y. Oct. 18, 2019) ............ 18

*United States v. Schwimmer*,
    892 F.2d 237 (2d Cir. 1989) ................................................................................. 17

*United States v. Schwimmer*,
   924 F.2d 443 (2d Cir. 1991) ................................................................. 8, 19, 23, 24

*United States v. Sharma*,
   No. 18 CR. 340 (LGS), 2019 WL 3802223 (S.D.N.Y. Aug. 13, 2019) ................................ 11

*United States v. Simels*,
   654 F.3d 161 (2d Cir. 2011) ................................................................................. 8

*United States v. Stein*,
   541 F.3d 130 (2d Cir. 2008) .................................................................... 2, 22, 23

*United States v. Stewart*,
   2002 WL 1300059 (S.D.N.Y. June 11, 2002) ................................................... 21

*United States v. Sullivan*,
   2020 WL 1815220 (D. Haw. April 9, 2020) .................................................... 21

*United States v. Trzaska*,
   111 F.3d 1019 (2d Cir. 1997) ...................................................................... 19

*United States v. Walters*,
   910 F.3d 11 (2d Cir. 2018) ..................................................................... 22, 23

*Weatherford v. Bursey*,
   429 U.S. 545 (1977) ............................................................................. 8, 10

*Wong Sun v. United States*,
   371 U.S. 471 (1963) ................................................................................. 18

*Young v. Conway*,
   698 F.3d 69 (2d Cir. 2012) ........................................................................ 18

**Other Authorities**

ABA Standards for Criminal Justice: Pretrial Release 29 (3d. ed. 2007) ........................ 1

**Rules**

28 C.F.R. § 501.3(d) ................................................................................. 25

Fed. R. Crim. P. 16 .................................................................................. 15

## INTRODUCTION

Sean Combs faces enormous challenges in this case, not because of the evidence, but because he must defend himself and prepare for trial from jail. "[P]retrial custody status is associated with the ultimate outcomes of cases, with released defendants consistently faring better than defendants in detention." ABA Standards for Criminal Justice: Pretrial Release 29 (3d. ed. 2007). But if that weren't enough, the government exploited Mr. Combs' detention by engaging in unfair and unconstitutional tactics that have interfered with his ability to work with his attorneys and make it impossible for his attorneys to provide effective assistance of counsel.

The evidence shows the government is using Mr. Combs' detention to spy on him and invade his confidential communications with his counsel. Since his arrest, the government has been working with BOP staff, including "Investigator-1," to take advantage of his incarceration by meticulously monitoring all his communications, including with his attorneys. And during a recent BOP sweep of MDC, Investigator-1 illegally searched Mr. Combs' handwritten notes containing privileged communications and work product. Investigator-1 photographed the notes and then shared them with the prosecutors. Prosecutors claim they did not request this search, yet they concede Investigator-1 has been investigating Mr. Combs at their direction all along—gathering evidence they have used and hope to continue using against Mr. Combs.

This disturbing conduct is a blatant violation of Mr. Combs' rights. Prosecutors say the search was motivated by security concerns at MDC, but that is a false pretext. The purported purpose of the BOP sweep was to search for contraband, but since when is prison "contraband" photographed and left in place? If it were contraband, it would have been seized. That is not what Investigator-1 did here, leading to the inescapable conclusion that this was an intentional,

targeted, and illegal search to discover any information that could give the prosecutors a leg up against Mr. Combs—including his handwritten, privileged notes, a roadmap to his defense.

That an investigator working with the prosecution team specifically to investigate Mr. Combs in the MDC would use a multi-agency search of the facility as a ruse to surreptitiously spy on Mr. Combs' defense camp is outrageous.  No legitimate penological interests motivated this conduct.  If the government is seriously contending otherwise, it should call to the stand the lead official from the U.S. Bureau of Prisons, or whatever agency was in charge, to explain how the unlawful, targeted actions that violated an inmate's Fourth, Fifth, and Sixth Amendment rights were contemplated by, and within the purview of, the BOP sweep at MDC.

The government's illegal actions do not end there, however.  Immediately after the search, Investigator-1 debriefed the prosecutors.  They had a clear opportunity to remedy the misconduct, but instead they doubled down.  The prosecutors knowingly, intentionally, and secretly took possession of the notes, and then used them against Mr. Combs.  They took the notes without following the agreed-upon "Filter Team" procedure that is supposed to ensure that the case team is not tainted by access to privileged information.  They then appended clearly privileged portions of the notes to their bail opposition to support continued detention.  And it is impossible to know what else the government has done with the notes—indeed, the prosecution has refused to disclaim using the notes to further its investigation going forward.

This entire sequence of events, even based on the facts known to date, is shocking and outrageous government conduct.  The government has intentionally violated Mr. Combs' attorney-client privilege and Sixth Amendment right to counsel by invading the defense camp and "unjustifiably interfer[ing] with [his] relationship with counsel and [his] ability to defend [himself]." *United States v. Stein*, 541 F.3d 130, 157 (2d Cir. 2008).  Mr. Combs cannot possibly

receive a fair trial if he is not permitted to confer privately and confidentially with his counsel and others working at their direction, and to take and keep notes of his trial preparation. The search also violated the Fourth Amendment and Mr. Combs' Fifth Amendment due process rights. This Court's intervention is imperative to safeguard Mr. Combs' constitutional rights and ability to defend himself against these very serious charges, because the government has proven time and again that it will intentionally continue to violate those rights if given the chance.

This is the same prosecution team that provided a doctored and misleading "CNN" video tape to three judges—while withholding more accurate footage—to keep Mr. Combs in jail. This is the same prosecution team that seeks to distance itself from homeland security agents who leak false and damaging statements to the press. This is the same prosecution team that has repeatedly alleged that a second woman was a sex trafficking victim without having even spoken to her. And now they are deploying Big Brother tactics and an illegal search of the defense camp. If this represents the "Office's tradition of doing the right thing, the right way, for the right reasons," then Mr. Combs' only chance at a fair trial is immediate judicial intervention.

We request discovery and a hearing to determine the extent of the violations, to establish procedures to minimize prejudice going forward, and to ensure that Mr. Combs receives a fair trial. The Court should also order other necessary relief, including but not limited to (1) suppression of the notes and any fruits of the illegal search; (2) directing that a Special Master conduct privilege review in lieu of the Filter Team going forward; (3) disqualification of any and all prosecutors tainted by access to the privileged materials; (4) ordering the government to stop monitoring Mr. Combs' communications with the defense team; and (5) depending on the evidence adduced at the hearing, dismissal of the indictment.

## **BACKGROUND**

### A.  Investigator-1's Investigation Of Mr. Combs

While Mr. Combs has been detained at the MDC, BOP staff—including "Investigator-1"—have "consistently monitored the defendant's communications on monitored communication channels."  (*See* Dkt.72 at 2).  Throughout these monitoring efforts, Investigator-1 "was focused on Mr. Combs in an investigatory capacity," as "he was tasked … with reviewing the defendant's … calls and … e-mails."  (Nov. 19, 2024 Tr.11).

The government was particularly interested in Mr. Combs' communications as part of what it describes as a "continuing" "ongoing covert investigation[] … into the defendant's obstructive conduct in the MDC."  (Dkt.72 at 2).  It therefore requested materials from Investigator-1, who "turned over materials" including Mr. Combs' calls and emails, "in response to grand jury subpoenas and document requests."  (Nov. 19, 2024 Tr.12).[1]

### B.  October 28 to November 1, 2024 BOP Sweep And Investigator-1's Search Of Mr. Combs' Legal Notes

From October 28 to November 1, 2024, the BOP conducted a sweep of the MDC.  It was purportedly "preplanned and coordinated" as part of a "larger safety and security initiative and not in response to any particular threat or intelligence."  (Dkt.72 at 2).  The prosecutors knew in advance that Mr. Combs' unit would be searched during the sweep.  (*Id.* at 3).

The government's representation of what occurred during the sweep—which Mr. Combs disputes—is as follows.  Investigator-1 was assigned by BOP to participate in the sweep and was present at the MDC during the operation.  The government claims that during the sweep,

---

[1] On December 3, 2024, at 4:01 p.m., the government produced a "subset of materials obtained from BOP to which the Case Team has access."  That "subset" contains thousands of pages of emails and BOP documents that the defense team is in the process of reviewing.

Investigator-1 interviewed multiple inmates, including Mr. Combs, "about potential corruption and contraband at the MDC." (*Id.*). Investigator-1 then searched Mr. Combs' area for "contraband." (*Id.*). He found none. He then encountered a manila folder marked ███ as well as an address book and several legal pads that the government characterizes as a single ████████████████████ According to the government, Investigator-1 set aside the manila folder and then reviewed and photographed the ████████████████████ (*id.*), notwithstanding the fact that the photographs clearly reflect pages from at least two legal pads, as well as stray pages. There are 19 photographs, 10 of which depict Mr. Combs' legal pads.

Notably, the government's story diverges in significant respects from the defense's understanding of events. First, it is not clear to the defense that Investigator-1 is actually an MDC employee. For example, the assistant warden at the MDC has since represented that Investigator-1 is not anyone under his command, and the agent who interviewed Mr. Combs during the sweep was not based in New York. Second, the notes at issue were not stored on Mr. Combs' bunk but were stored in his locker—meaning the government's description of the chain of custody of the notes is incomplete or inaccurate. And finally, the defense has been told by BOP guards at MDC that they do not carry cameras or cellphones and it is not usual policy or procedure to do so or take photographs such as the ones taken by Investigator-1.

The government's description also lacks critical details. For one, the legal notes at issue are not limited to the notes Investigator-1 successfully photographed. Rather, among the stack of legal pads were other papers that Investigator-1 would have seen—papers that would have given Investigator-1 a preview into Mr. Combs' entire defense strategy, his thoughts and impressions regarding the evidence and charges, and other classic examples of work product. (Geragos Decl. ¶¶7, 41). Investigator-1, for at least one of the notepads, rifled through seven pages of material

prepared at counsel's direction to photograph pages 1 and 2 of Exhibit 1.  (Geragos Decl. ¶7).

The government has not described the full extent of Investigator-1's communications with them

and what, if any, additional privileged material was conveyed.  Even if this information was not

shared with the prosecution team, it is still known by Investigator-1—a government agent

working to advance the investigation.  The government cannot describe the full extent to which

Investigator-1 might have reviewed but not photographed these other privileged materials—and

orally shared what he saw on these pads—because it knows it could not legally have access to

this information.

### C.  Investigator-1 Alerts The Government, Which Ratifies The Illegal Search

According to the government, following the MDC sweep, Investigator-1 "alerted" the

prosecutors that he had taken photographs of the defendant's ▮▮▮▮▮▮▮ notebook.  (Dkt.72

at 3).  Investigator-1 "described" its contents, although it is not clear how or to what extent

Investigator-1 shared this information with the prosecutors, or which prosecutor specifically.

(*Id.*)  The prosecutors then "asked Investigator-1 to provide the Photographs directly to the Filter

Team."  (*Id.*).  It is not clear if the prosecutors subpoenaed the photographs from Investigator-1,

or whether Investigator-1 simply shared them upon being asked.  (*See* Nov. 19, 2024 Tr.12-13

("And then the government requested receipt of those documents.")).  At the time the prosecutors

requested the photographs, they understood there was a "possibility that they touched on legal

strategy" and could be privileged.  (Dkt.72 at 3).

The notes were then shared with the prosecutors after a review by the Filter Team.  The

Filter Team did not withhold any of the materials from the prosecutors, but merely applied de

minimis redactions to certain limited content in the notes.  (*Compare* Dkt.72, Ex. A, *with*

Geragos Decl. Ex. 1). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████    Prior to sharing the redacted notes

with the prosecutors, the Filter Team did not provide any copies of the notes to the defense team,

departing from the parties' prior practice and agreement.  (Dkt.75, Appendix A, Nov. 19, 2024

Geragos Decl. ¶4-6).

### D.  The Government Uses The Notes

On November 15, 2024, the government filed its opposition to defendant's renewed bail

motion, which stated the trial prosecutors possessed "possibly privileged materials, such as the

notes recovered from the defendant's cell."  (Dkt.69 at 12, n.4).  The opposition cited excerpts of

two such notes, Exhibits E and O.  The opposition said the government had (i) listened to Mr.

Combs' calls including with "family members and his *attorneys*," and (ii) reviewed his messages

"with dozens of individuals, including *attorneys*."  (*Id.* at 18 (emphasis added)).  Until receiving

the government's submission, the defense had never been notified of these facts and was

unaware that Investigator-1 had viewed and made copies of Mr. Combs' privileged materials.

Mr. Combs' counsel immediately notified the prosecutors the notes were privileged and

sought relief from the Court.  The Court ordered the parties to submit letters in advance of a

November 19, 2024 hearing.  (Dkts.70, 71, 72, 75).  The government produced copies of the

unredacted notes reviewed by the Filter Team as well as the redacted versions it received from

the Filter Team.  (Geragos Decl. Ex. 1; Dkt.72, Ex. A]).  Mr. Combs' counsel submitted an *ex*

*parte* declaration describing why these materials were privileged.  (Dkt.75, Appendix A, Nov.

19, 2024 Geragos Decl. ¶7-20).

At the hearing, the government argued that the materials were not on their face privileged

and stated it intended "to use those notes … in connection with its ongoing investigation."  (Nov.

19, 2024 Tr.25-26).  The Court ordered the prosecutors to destroy any copies of the notes in their

possession and set a schedule for the instant motion.  (Dkt.76).  The government acknowledged

the risk of continuing to rely on the notes in its investigation but did not agree to refrain from

doing so going forward.  (Nov. 19, 2024 Tr.45).  Communications with the prosecutors in this

case suggest that the government has already made affirmative use of the notes even apart from

its bail arguments, (*see, e.g.*, Geragos Decl. ¶23), but the full extent to which the prosecution has

been tainted by its knowledge of privileged material is entirely unknown.

## **ARGUMENT**

I.    **The Government Violated Mr. Combs' Attorney-Client Privilege And Sixth Amendment Rights**

The government invaded the defense camp to obtain and use materials protected by the

attorney-client privilege.  Such "government interference in the relationship between attorney

and defendant may violate the latter's right to effective assistance of counsel," and thus the

defendant's Sixth Amendment rights.  *United States v. Simels*, 654 F.3d 161, 166 (2d Cir. 2011)

(quoting *United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985)).  In determining whether

the government violated Mr. Combs' rights, the Court should consider whether the government

intentionally sought to obtain privileged communications, and whether those communications

were passed to prosecutors in a pending case.  *See Weatherford v. Bursey*, 429 U.S. 545, 555-57

(1977).  That is precisely what transpired here.  Such an "intentional intrusion warrants careful

scrutiny" because it violates a defendant's constitutional rights.  *United States v. Schwimmer*,

924 F.2d 443, 447 (2d Cir. 1991) ("*Schwimmer II*").

"[I]t is well settled that individuals retain their attorney-client privilege when

incarcerated or detained."  *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011).  And even

when inmates have a reduced "expectation of privacy in … documents for Fourth Amendment

purpose," the Sixth and Fourth Amendment "inquiries are independent of each other."  *United

States v. DeFonte*, 441 F.3d 92, 94 (2d Cir. 2006).  Thus, "memorializations of private

conversations [an inmate] ha[s] with [an] attorney are protected from disclosure by the attorney-client privilege," as is "an outline of what a client wishes to discuss with counsel," prepared in advance of any such discussion. *Id.* at 95-96. Even where the contents of outlines are not subsequently discussed with an attorney, they are protected if they "are not conveyed … as a consequence of intervening events such as delay." *United States v. Allen*, No. 14 CR. 272 (JSR), 2016 WL 315928, at *2 (S.D.N.Y. Jan. 8, 2016). And notes prepared by a client "at the behest of counsel in anticipation of litigation," are also protected by the work product doctrine. *Id.* at *3.

Mr. Combs has already made the required showing that the notes cited in the government's opposition (Exhibits E and O) are indeed privileged. They contain memorializations of private conversations with counsel, as well as Mr. Combs' outlines for discussions he subsequently had with counsel. (Dkt.75, Appendix A, Nov. 19, 2024 Geragos Decl. ¶7-20; *see also* Geragos Decl. ¶¶7-11, 33-34). The vast majority of the remaining notes are also privileged or work product. (*See generally* Geragos Decl.; Nov. 19, 2024 Tr.35-38). The notes reflect (i) trial strategy; (ii) opinion material revealing counsel's and Mr. Combs' mental processes regarding his defense; (iii) the anticipated course of the defense investigation and questions concerning past investigation; and (iv) possible trial witnesses and testimony. The notes also reflect Mr. Combs' thoughts on certain avenues of investigation and trial strategy prepared at the behest of counsel. Because Mr. Combs supports his claim with more that "mere conclusory or ipse dixit assertions," *In re Grand Jury Subpoena Dated July 6, 2005*, 256 F. App'x 379, 382 (2d Cir. 2007), he has satisfied his burden of showing that the materials in question are privileged.

There is no question the prosecutors requested and subsequently possessed Mr. Combs' privileged materials, violating his Sixth Amendment rights.  The prosecutors were put on notice of the privileged nature of the material when Investigator-1 alerted them to its existence and described its contents.  Knowing it was likely privileged, the prosecutors asked Investigator-1 to share the materials through the Filter Team—never alerting the defense team that the government was in possession of privileged material.  And when the prosecutors ultimately received the barely-redacted copies of the notes, it was clear from the face of the notes that they were privileged. ███████████████████████████████████████ ███████████████████████████████████████████████████ But the prosecutors ignored these clear indications of privilege and affirmatively used the material in their bail opposition.  They did so while admitting they were currently in possession of "possibly privileged materials."  (Dkt.69 at 12, n.4).  That is a clear violation.  Indeed, the Solicitor General has twice "conceded … that the Sixth Amendment would be violated if the government places an informant in the defense camp during a criminal trial and receives from that informant privileged information pertaining to the defense of the criminal charges."  *Weatherford*, 429 U.S. at 554, n.4.  That is precisely what the government did here through Investigator-1.

The fact that legal strategy was conveyed not just to government agents, but to the prosecution team, distinguishes this case from other cases.  In *United States v. Arrington*, for example, the "FBI agents … did not review the papers" but "instead gathered the papers for [standby counsel's] later analysis," never "communicat[ing] anything from [the defendant's] papers to the prosecution team."  No. 15-CR-33-A, 2022 WL 3229843, at *12 (W.D.N.Y. Aug. 10, 2022).  And in *Weatherford*, there was "no communication of defense strategy to the

prosecution." 429 U.S. at 558. But here, the prosecutors affirmatively requested the material and then used material that was on its face clearly privileged.

The way the prosecutors diverged from the agreed-upon Filter Team protocol is further evidence of misconduct. Under the usual, agreed-upon protocol, the defense should have been notified that the government possessed possibly privileged materials and been given an opportunity to view the materials and assert privilege. Instead, however, the prosecutors bypassed this protocol and the Filter Team simply passed most of the material onto the case team. *Cf. United States v. Sharma*, No. 18 CR. 340 (LGS), 2019 WL 3802223, at *3 (S.D.N.Y. Aug. 13, 2019) (no violation where "no evidence that the Government intentionally diverged from the protocol"). Nor was this an instance in which the prosecutors received "[a]fter-the-fact notice of potentially privileged documents," or acted pursuant to a search warrant subject to judicial oversight. *United States v. Patel*, No. 16-CR-798 (KBF), 2017 WL 3394607, at *7 (S.D.N.Y. Aug. 8, 2017) (quoting *United States v. Lumiere*, No. 16 CR. 483, 2016 WL 7188149, at *6 (S.D.N.Y. Nov. 29, 2016)). Rather, the prosecutors understood the privileged nature of the documents upfront yet proceeded unilaterally and without caution, with the goal of taking advantage of their improper access to privileged material to keep Mr. Combs detained and try to obtain a conviction. There is no excuse for this blatant disregard for Mr. Combs' Sixth Amendment rights.

The Fifth Circuit's *United States v. Brown* decision is instructive. 484 F.2d 418 (5th Cir. 1973). Although the court rejected the argument that an "undisclosed government overhear of an attorney-client conversation require[d] a new trial," it did so only because (i) "[t]here [was] no indication that defendant's telephone conversations were monitored for the purpose of gaining information to use at his trial," and (ii) "[t]he surveillance was neither authorized nor approved

by federal authorities." *Id.* at 424-25. The court made clear, however, that in cases like this one, where those were the facts, it would amount to "a practice [it] would immediately proscribe with appropriate remedy," including retrial. *Id.* at 424.

"Of course, [the Second Circuit] share[s] the view[] [that] … a surreptitious intrusion by a Government agent into the confidential relationship between lawyer and client and other similar tactics … are beneath the high standards of professional conduct expected of government counsel." *United States v. Gartner*, 518 F.2d 633, 636 (2d Cir. 1975) (cleaned up).

## II.    The Government Violated Mr. Combs' Fourth Amendment Rights

The search and seizure of Mr. Combs' notepads also violated the Fourth Amendment. Pretrial detainees retain Fourth Amendment protections, and a pre-trial detainee's "loss of [Fourth Amendment] rights is occasioned only by the *legitimate* needs of institutional security," carried out by "*objective* administrators." *United States v. Cohen*, 796 F.2d 20, 23–24 (2d Cir. 1986). Warrantless searches performed "at the instigation of non-prison officials for non-institutional security-related reasons," are therefore prohibited by the Fourth Amendment. *Id.* at 24. Likewise, warrantless searches "intended solely to bolster the prosecution's case against a pre-trial detainee awaiting his day in court," or "to uncover information that would aid them in laying additional indictments against a detainee" are out-of-bounds. *Id.* at 23. Where such a search is performed, "the validity of the search may be challenged," and suppression required if the search was not conducted for legitimate security reasons. *Id.* at 23-24. "[F]ederal courts charged with the duty to protect" these rights do not "fulfill that obligation merely by paying lip-service to this concept." *Id*. at 24.

There was plainly no legitimate security reason to peruse Mr. Combs' personal notes or photograph them. The government admits Investigator-1's aim was to "uncover information that would aid [the prosecution]" of this case and gain a tactical advantage. The stated rationale for

12

the BOP sweep was to find contraband and evidence of MDC "corruption."  But the search

quickly progressed beyond that limited purpose and became a pretext for an unconstitutional

search.  No contraband could possibly be found in the pages of Mr. Combs' notes, yet

Investigator-1 searched them anyway.  And he did not stop merely at searching the notes; he then

photographed multiple pages of the notes so he could share them with the prosecutors.

      Nor was the search carried out by an "objective administrator[]."  Instead, it was carried

out by a biased investigator collecting additional evidence for the prosecution team.  Indeed, the

government admits the materials were ultimately received as part of a "continuing" "covert

investigation," the goal of which is to produce evidence supporting additional criminal charges

against Mr. Combs.  (Dkt.72 at 2).  At the time of the search, Investigator-1 knew the materials

would be useful to the prosecution—photographing the notes for that very purpose, and not

because of any institutional security concerns related to the BOP sweep.

      It is no response for the government to pretend Investigator-1 is not a member of the

"prosecution team."  The Fourth Amendment proscribes unlawful searches by government

actors.  *United States v. Jacobsen*, 466 U.S. 109 (1984).  Even if Investigator-1 was not working

at the prosecution's direction, he was clearly a government actor.

      Regardless, it is undisputed that Investigator-1 performed investigative duties on behalf

of the prosecutors.  Investigator-1 was specifically tasked with "consistently monitor[ing] the

defendant's communication," (Dkt.72 at 2), and he "was focused on Mr. Combs in an

investigatory capacity," as "he was tasked … with reviewing the defendant's … calls and … e-

mails" (Nov. 19, 2024 Tr.11).  He did this on behalf of the prosecutors and pursuant to their

continuing requests, to collect evidence as part of the government's ongoing investigation.  He

thus monitored communications, identified helpful evidence, and produced it to the prosecution

team.  He did that prior to the BOP sweep, and acted with that purpose during the sweep, which is why he immediately voluntarily "alerted" the prosecutors that he photographed materials "written by the defendant" including "notes regarding finding 'dirt' on witnesses."  (Dkt.72 at 3).  Moreover, upon being alerted of Investigator-1's conduct, the prosecutors immediately ratified it by debriefing him about the contents of the notes and asking him to produce them.  Even if they did not order the search *ex ante*, they endorsed Investigator-1's unlawful conduct and used it to further their investigation and detention of Mr. Combs.

## III.    Discovery And A Hearing Are Required

Mr. Combs' rights were clearly violated.  As explained below, the appropriate remedy depends on the government's intent, Investigator-1's motivations, and the extent to which the privileged material has been used to develop the government's investigation.  A hearing is necessary to determine these issues and to resolve disputed factual issues.

For example, the government claims its "review need only be reasonable, not perfect" and says it proceeded here in good faith.  (Dkt.72 at 5).  But that claim is belied by its insistence—at least prior to the Court's intervention—on continuing to use the materials to advance its investigation and prosecution.  (Nov. 19, 2024 Tr.25-26, 45).  And the government's account of what happened conflicts with basic information the defense has learned.  A hearing is required to find out what really happened and why.  The Court should not just accept the government's say-so—especially because the government's narrative does not ring true.

Moreover, while the government says it didn't specifically direct Investigator-1 to search Mr. Combs' notes in advance of the raid, its conduct after he alerted them to the material suggests this could simply be part of an effort to distance the prosecutors from conduct they knew they couldn't legally participate in.  As the Court noted, it is possible Investigator-1 "thought of himself as an agent of the prosecution team."  (Nov. 19, 2024 Tr.11).  If so, why?  Is

14

that because of the history of their prior communications about the government's "continuing investigation"?  Was there a tacit understanding that he should do what he could to help the government develop evidence against Mr. Combs at any opportunity?  Who is Investigator-1 and whose instructions was he following?  The Court should order the government to produce Investigator-1's communications with the prosecutors, take his testimony to fully understand what he was thinking during the search, and explore whether the BOP sweep served as pretext for his targeted search of Mr. Combs' materials.  The Court should also order disclosure of any video footage of the search to test whether the government's description of the events is accurate.

The Court should take testimony of Investigator-1 and whomever else was involved to determine which notes, papers, and materials were reviewed.  We should learn whether Investigator-1 worked alone or if others were involved.  Did Investigator-1 use his personal cellphone to photograph the materials?  What did he do with the photographs?  Did he send them to anyone else?  Was Investigator-1 in contact with anyone from the Department of Homeland Security prior to him photographing the notes, while he was doing so, or afterward?  Did Investigator-1 ever report to the officials supervising the sweep that he was photographing Mr. Combs' notes?  Did he provide the photographs of the notes to his supervisors?  If this was really part of the established protocol, one would expect that he did.  Or did he only provide them to the U.S. Attorney's Office?  Who at the U.S. Attorney's Office knew that he was giving them photographs of Mr. Combs' notes?  Who approved this?

And before weighing the prosecutors' claims that they acted reasonably after being "alerted," the Court should hear testimony, and order discovery of any emails, texts, or other communications regarding: (i) what exactly the prosecutors knew before requesting copies of the notes; (ii) whether any context was communicated to the Filter Team before the Filter Team

conducted its review of the notes; (iii) whether the Filter Team even understood where the notes came from; (iv) why the notes were not shared with the defense team in accordance with Filter Team protocol and Fed. R. Crim. P. 16; and (v) who else the government shared the notes with (including possible witnesses or alleged victims). This is all critical to assessing the government's intent.

A hearing is particularly necessary because the government's description of the events does not align with the defense team's understanding of what transpired. As explained, it is not clear who Investigator-1 is or why he was participating in the MDC sweep. The government's representation that Investigator-1 encountered the notes on Mr. Combs' bunk and that there was no indication the notes were privileged is in dispute. And the Court should more fully understand what exactly Investigator-1 reviewed (not merely what he photographed), given that he remains enmeshed in the government's ongoing investigation but has been given a preview into defense strategy

United States v. Arrington is instructive. 2022 WL 3229843, at *1. There, the defendant argued his rights were violated during a similar search of his prison cell. The court ordered a hearing complete with testimony from agents involved in the search concerning the chain-of-custody of the papers taken from the defendant's cell and concerns regarding review of privileged attorney-client communications and defendant's work product. The government voluntarily produced video footage of the search before the hearing, which the court considered in weighing the testimony. See also United States v. Arrington, 15-cr-00033-EAW-HKS (W.D.N.Y.), Dkts. 709, 733-34. Arrington is not unique in requiring a hearing. See Lumiere, 2016 WL 7188149, at *1 (conducting hearing because "[a] full factual record was required to resolve" the motion); United States v. Landji, No. S118CR601PGG, 2021 WL 5402288, at *2

(S.D.N.Y. Nov. 18, 2021) (requiring testimony from AUSAs at *Kastigar* hearing); *Coplon v. United States*, 191 F.2d 749 (D.C. Cir. 1951) (remanding for a hearing on whether government agents deliberately intercepted telephone consultations between the defendant and her lawyer before and during trial).

The Court must also assess whether the government's investigation itself—and the prosecutors—have been tainted by the unlawful search. *See Patel*, 2017 WL 3394607, at *7 (defendant "may request a hearing to determine whether information <u>derived</u> from [privileged] sources was used by the government, in violation of the attorney-client privilege, to prepare for trial"); *United States v. Schwimmer*, 892 F.2d 237, 245 (2d Cir. 1989) ("*Schwimmer I*") ("[T]he district court should have conducted an evidentiary hearing to determine whether the government's case was in any respect derived from a violation of the attorney-client privilege."); *Cohen*, 796 F.2d at 24 (the Court should "consider what fruits, if any, were obtained from information seized").  Again, the government has likely already made affirmative use of the notes even apart from their use in the government's bail arguments.  (*See, e.g.*, Geragos Decl. ¶23).

A hearing is required to learn: (i) the extent to which the prosecution team used the privileged notes to develop leads or uncover new evidence; (ii) what other information the prosecution team learned from Investigator-1, and whether that information led the prosecution team to develop new leads or gather new evidence; (iii) what other information Investigator-1 learned and whether Investigator-1 used any privileged information to develop new leads or gather new evidence; and (iv) whether the privileged information was conveyed to anyone else, and whether any other government agent used that information to develop new leads or gather new evidence.

17

IV.    **This Court Should Order Appropriate Remedies**

A.  **Use-And-Fruits Suppression**

Even without further factfinding, it is clear that the government violated Mr. Combs'

Fourth and Sixth Amendment rights.  The government conceded that if the notes are indeed

privileged, the immediate remedy would be "to suppress the government's use of those notes."

(Nov.19, 2024 Tr.24).  That is true.  "Indisputably, when the Government obtains access to a

defendant's [documents], the Government is not entitled to rely on privileged materials

contained therein."  *Patel*, 2017 WL 3394607, at *6; *see also Nat'l City Trading Corp. v. United

States*, 635 F.2d 1020, 1026 (2d Cir. 1980) ("To the extent that the files obtained ... were

privileged, the remedy is suppression and return of the documents in question …."); *United

States v. Schulte*, No. S-2 17 CR. 548 (PAC), 2019 WL 5287994, at *2 (S.D.N.Y. Oct. 18, 2019)

(same).  It is clear the notes are privileged, were the product of an unlawful search, and must be

suppressed.

But the government also suggested that it could continue to use the contents of those

notes in its ongoing investigation—it refused to disclaim reliance on the substance of what it

learned from the illegal search.  (Nov.19, 2024 Tr.25-26, 45).  The government thus took the

position that while the *notes themselves* could not be used against Mr. Combs, it could continue

to use the *fruits* of the search against him.

That is wrong as a matter of well-settled law.  A violation of the Fourth Amendment

requires suppression not only of the immediate object of the search but also any other evidence

obtained because of the search.  *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963).  In

other words, "[t]he exclusionary rule applies not only to the 'direct products' of unconstitutional

invasions of defendants' Fourth Amendment rights, but also to the indirect or derivative 'fruits'

of those invasions."  *Young v. Conway*, 698 F.3d 69, 77 (2d Cir. 2012).

What is true for Fourth Amendment violations is also true for Sixth Amendment violations. *See Patel*, 2017 WL 3394607, at *7. When the government interferes with a defendant's attorney-client privilege, it must take care to refrain from affirmatively making use of the interference. *See Schwimmer II*, 924 F.2d at 446. The government must follow the procedure set forth in *Kastigar v. United States*, 406 U.S. 441 (1972)—it "must demonstrate that the evidence it uses to prosecute an individual was derived from legitimate, independent sources." *Schwimmer II*, 924 F.2d at 446; *see also United States v. Danielson*, 325 F.3d 1054, 1059, 1071 (9th Cir. 2003) (applying *Kastigar* framework and holding that the government must prove its evidence was "not tainted" by the privilege violation and was derived from a legitimate independent source); *United States v. Mastroianni*, 749 F.2d 900, 907-08 (1st Cir. 1984).

Thus, it is not enough to suppress the notes themselves. All fruits of the illegal intrusion must also be suppressed, and the government has an ongoing obligation to demonstrate that it made no use of the information obtained by the illegal search. The government cannot, for example, use the information obtained from the notes to seek additional charges against Mr. Combs, or conduct additional searches. *See, e.g.*, *United States v. Trzaska*, 111 F.3d 1019, 1026 (2d Cir. 1997) ("Evidence seized during an illegal search should not be included in a warrant affidavit."). It is troubling that the government has already suggested it may do so.

### B. Appointment Of A Special Master

This Court should also bar further use of the inherently flawed taint team procedure. It should instead appoint a Special Master to resolve privilege issues. The government noted at the hearing that several district courts in this circuit have approved the taint team procedure. That is true. What the government failed to note is that a growing number of courts around the country have rejected the procedure for the simple reason that government lawyers have proven they cannot be trusted to protect criminal defendants' privileges.

19

As the Sixth Circuit has held, "taint teams present inevitable, and reasonably foreseeable, risks to privilege, for they have been implicated in the past in leaks of confidential information to prosecutors." *In Re Grand Jury Subpoenas*, 454 F.3d 511, 523 (6th Cir. 2006). While a taint team may have an interest in protecting privileges, "it also possesses a conflicting interest in pursuing the investigation, and, human nature being what it is, occasionally some taint-team attorneys will make mistakes or violate their ethical obligations." *Id*. The procedure has insufficient checks to correct government mistakes, whether honest or otherwise. In short, under a taint team procedure, "the government's fox is left in charge of the [defendant's] henhouse, and may err by neglect or malice, as well as by honest differences of opinion." *Id*. The Sixth Circuit thus ordered the district court to employ a neutral Special Master instead.

Other courts have similarly noted that taint teams are inherently insufficient to protect a defendant's rights. The Fourth Circuit has held, for example, that "when a dispute arises as to whether a lawyer's communications or a lawyer's documents are protected by the attorney-client privilege or work-product doctrine, the resolution of that dispute is a judicial function." *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 176 (4th Cir. 2019). That function cannot be delegated to the executive branch. Like the Sixth Circuit, the Fourth noted that it is highly problematic to allow other prosecutors to make determinations about an adversary's right to privilege, citing recent "blunders." *Id*. at 178. It concluded: "Federal agents and prosecutors rummaging through … materials that are protected by attorney-client privilege and the work-product doctrine is at odds with the appearance of justice." *Id*. at 183.

More recently, the Fifth Circuit noted that the government's use of a taint team had resulted in a "callous disregard" of a criminal defendant's rights. *Harbor Healthcare System LP v. United States*, 5 F.4th 593, 599 (5th Cir. 2021). That the privileged material was obtained

through a valid search warrant did not justify the government's conduct.  Nor did the existence

of secret, ongoing grand jury proceedings.  *Id*. at 597 n.1.  The Fifth Circuit held that all

potentially privileged material must be immediately returned—that is, not held by a filter team—

and that going forward, the district court should "engage a magistrate judge or special master to

review the potentially privileged documents."  *Id*. at 598 n.4.

Many district courts around the country have likewise questioned the taint team

procedure.  *E.g.*, *United States v. Ritchey*, 605 F. Supp. 3d 891, 901-02 (S.D. Miss. 2022); *United

States v. Sullivan*, 2020 WL 1815220, at *8 (D. Haw. April 9, 2020); *United States v. Renzi*, 722

F. Supp. 2d 1100, 1112 (D. Ariz. 2010); *In Re Search of the Scranton Hous. Auth.*, 436 F. Supp.

2d 714, 721 (M.D. Pa. 2006); *United States v. Neill*, 952 F. Supp. 834 (D.D.C. 1997).  District

courts in this circuit have previously expressed similar misgivings.  *See In re the Seizure of All

Funds on Deposit in Accounts in the Names of National Electronics, Inc., at JP Morgan Chase

Bank*, 2005 WL 2174052 (S.D.N.Y. 2005); *United States v. Kaplan*, 2003 WL 22880914, at *4

n.4 (S.D.N.Y. Dec. 5, 2003); *United States v. Stewart*, 2002 WL 1300059, at *6 (S.D.N.Y. June

11, 2002); *In re Search Warrant for Law Offices Executed on March 19, 1992*, 153 F.R.D. 55, 59

(S.D.N.Y. 1994).

The cases above recognize that in general, the use of a neutral arbiter such as a Special

Master is more likely to protect a defendant's rights than the use of a prosecutorial taint team.

And whatever the general merits of the taint team procedure, the Filter Team *in this case* utterly

failed.  Despite seeing references to defense experts, paralegals, witnesses, cross-examination

strategy, and even names of defense lawyers, it failed to mark the material as privileged.  It is

inconceivable that a taint team attorney identified obviously privileged communications on a

page, marked it as such, and yet did not recognize the remainder of the page referencing lawyers

and paralegals as also privileged. The taint team has proven itself to be completely incapable of performing the most basic privilege review.

Moreover, where courts have approved the use of taint teams, "the Government typically seeks court preapproval of its filter team protocol in an adversarial context or an informal, good faith resolution with the defendant." *Ritchey*, 605 F. Supp. 3d at 901. In this case, however, the government "neither sought court preapproval of its filter team protocol in an adversarial setting nor engaged in good faith informal negotiations with [the defendant] about the creation of a protocol." *Id*. To the contrary, the government simply created its own rules—departing from the parties' previous practice and understanding. Predictably, the result was a disaster. The Filter Team handed over obviously privileged material to the Case Team in barely redacted form.

In other words, this is not a case where the Filter Team did its work carefully and thus successfully hid privileged material from the Case Team. *Cf. DeFonte*, 441 F.3d at 94 n.2 (2d Cir. 2006) (prosecutor "successfully screen[ed]"); *Arrington*, 2022 WL 3229843, at *12 ("FBI agents … did not communicate anything from [the defendant's] papers to the prosecution team"). The Filter Team failed to do its job and violated Mr. Combs' rights. There is no reason to think it will do better going forward—or that the Case Team will call its fouls when it errs again. This Court should appoint a Special Master.

### C. Dismissal Of The Indictment

Based on the information already known, it is clear the government has "violate[d] the Sixth Amendment" by "intrud[ing] on the attorney-client relationship" and "interfering with" Mr. Combs' "relationship with counsel and [his] ability to mount the best defense [he] c[an] muster." *Stein*, 541 F.3d at 154-56 . This extraordinary violation of Mr. Combs' Fourth and Sixth Amendment rights also constitutes "outrageous government conduct" that violates his Fifth Amendment right to due process. *United States v. Walters*, 910 F.3d 11, 27 (2d Cir. 2018).

Dismissal of the indictment may therefore be warranted upon development of the full factual record at a hearing. Dismissal is appropriate not only where "the conduct of the government has been manifestly and avowedly corrupt," but even where the conduct merely involves "intentional intrusion into the attorney-client domain" resulting in "prejudice to [the defendant's] case." *Schwimmer II*, 924 F.2d at 446-47; *see also Walters*, 910 F.3d at 27 (dismissal warranted in cases of "outrageous government conduct"). For example, in *Stein*, the Second Circuit affirmed the dismissal of an indictment against numerous defendants charged with a major tax evasion scheme because the government had interfered with their ability to retain counsel of their choice. The Court affirmed Judge Kaplan's ruling that "no other remedy would restore them to the position they would have enjoyed but for the government's unconstitutional conduct." 541 F.3d at 144. Moreover, even as to some defendants who were not deprived of their chosen counsel, the remedy was appropriate because the government had "interfere[d] in their relationships with counsel and impairment of their ability to mount a defense," including by impeding "the scope of their pre-trial investigation and preparation." *Id.* at 157.

*Stein* supports dismissal here, even though the government's misconduct has taken a different form in this case. The unconstitutional surveillance of Mr. Combs' notes about the preparation of his defense and privileged communications with his counsel have interfered with counsel's ability to provide effective assistance, just as the unconstitutional interference with counsel's fees did in *Stein*. Here, for example, although we do not yet know the full extent to which the prosecutors have used the privileged information, they cannot un-learn the "preview of defense strategy" they have obtained, nor can any "other violative use of [the] privileged information" be undone at this point. *Schwimmer II*, 924 F.2d at 447.

Specifically, the government already admits it has (i) listened to Mr. Combs' calls including with "family members and his *attorneys*," and (ii) reviewed his messages including "with dozens of individuals, including *attorneys*." (Dkt.69 at 18 (emphasis added)). And as is clear from the government's reliance on Investigator-1 and its bail arguments, the government has not hesitated before affirmatively deploying Mr. Combs' privileged communications against him. That constitutes a "violative use of [the] privileged information." *Schwimmer II*, 924 F.2d at 447. To make matters worse, the communications at issue clearly gave the government a "preview of defense strategy." *Schwimmer II*, 924 F.2d at 447; *see also Danielson*, 325 F.3d at 1067 ("The problem in this case, however, is not that the government obtained incriminating statements or other specific evidence, but rather that it obtained information about Danielson's trial strategy."). The notes reference strategy (i) to discredit particular allegations and corresponding witness testimony, (ii) to obtain a specific type of expert witness for trial, and (iii) to collect cross examination material on particular witnesses. Thus, the prejudice to Mr. Combs' defense is clear, and dismissal could be appropriate.

It remains to be seen whether the government put Mr. Combs' privileged information before the grand jury or made other use of the information, but notably the government has never denied such use, nor has it disclaimed any intent to so use the notes in the future. To the contrary, it stated it "would shy away from [any] suggestion that we put them in a vault and lock them up." (*See* Nov.19, 2024 Tr.25).

### D. Disqualification And Other Potential Remedies

Depending in part on the nature and extent of the violation uncovered at the evidentiary hearing, the Court should also consider whether other remedies are appropriate.

For instance, if the Court determines that dismissal is not warranted because a lesser remedy can cure the violation, this Court should consider whether any members of the Case

Team have been tainted in a way that warrants disqualification.  This Court has the power to disqualify individual government attorneys where circumstances warrant.  *United States v. Bolden*, 353 F.3d 870, 879 (10th Cir. 2003).  If an individual attorney engaged in misconduct or is irredeemably tainted by access to privileged material or its fruits, that attorney should be disqualified.  The Court should also consider officewide disqualification if the evidence adduced at the hearing warrants such disqualification.

Additionally, this Court should order the government to stop monitoring Mr. Combs' communications with his attorneys immediately.  Federal law allows monitoring of attorney-client communications only in limited and extraordinary circumstances involving terrorism and the like.  *See* 28 C.F.R. § 501.3(d).  There is no legal basis for the government's monitoring of Mr. Combs' privileged communications in this case.  Moreover, the government's conduct to date makes clear it cannot be trusted to respect the privilege or Mr. Combs' constitutional rights.

## CONCLUSION

For the foregoing reasons, the Court should order discovery and hold a hearing, and should further order other necessary relief, including but not limited to (1) suppression of the notes and any fruits of the illegal search; (2) directing that a Special Master conduct privilege review in lieu of the Filter Team going forward; (3) disqualification of any and all prosecutors tainted by access to the privileged materials; (4) ordering the government to stop monitoring Mr. Combs' communications with the defense team; and (5) depending on the evidence adduced at the hearing, dismissal of the indictment.

Date:  December 4, 2024                                         Respectfully Submitted,

                                                               /s/Alexandra A.E. Shapiro
                                                               Alexandra A.E. Shapiro
                                                               Shapiro Arato Bach LLP
                                                               1140 Ave of the Americas, 17th Fl.
                                                               New York, NY 10036

(212) 257-4881
ashapiro@shapiroarato.com

Marc Agnifilo
Teny Geragos
AGNIFILO INTRATER
445 Park Ave., 7th Fl.
New York, NY 10022
646-205-4350
marc@agilawgroup.com
teny@agilawgroup.com

Anthony Ricco
Law Office of Anthony L. Ricco
20 Vesey Street
New York, NY 10007
(212) 791-3919
tonyricco@aol.com

Anna Estevao
SHER TREMONTE LLP
90 Broad St., 23rd Fl.
New York, NY 10004
(212) 202-2600
aestevao@shertremonte.com

26