OBM4COM1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                                24 Cr. 542 (AS)

5   SEAN COMBS,

6      a/k/a "Puff Daddy,"
       a/k/a "P. Diddy,"
7      a/k/a "Diddy,"
       a/k/a "PD,"                             Conference
8      a/k/a "Love,"

9                Defendant.
    ------------------------------x

10
                                              New York, N.Y.
11                                            November 22, 2024
                                              2:10 p.m.
12  Before:

13                      HON. ARUN SUBRAMANIAN
                                              District Judge
14                          APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    BY:  CHRISTINE SLAVIK
17       MITZI STEINER
         MEREDITH FOSTER
18       Assistant United States Attorneys

19  AGNIFILO INTRATER LLP
         Attorneys for Defendant
20  BY:  MARC AGNIFILO
         TENY GERAGOS
21       ANTHONY RICCO
         ALEXANDRA SHAPIRO
22       ANNA ESTAVAO

23  Also Present: Sean Quinn, Homeland Security Investigations
                   Jonathan Lettieri, Pretrial Services Office
24                 Francesca Tessier, Pretrial Services Office

25

OBM4COM1

```
 1              (Case called)
 2              MS. SLAVIK:  Good afternoon, your Honor.  Christie
 3    Slavic, Mitzi Steiner, and Meredith Foster for the United
 4    States.  We are joined at counsel table by Special Agent John
 5    Quinn of Homeland Security Investigations.  We're also joined
 6    at counsel table by Pretrial Services Officers Francesca
 7    Tessier, and Jonathan Lettieri.
 8              THE COURT:  Good afternoon.
 9              MR. AGNIFILO:  Good afternoon, your Honor.
10              THE COURT:  Good afternoon.
11              MR. AGNIFILO:  Marc Agnifilo, Alexander Shapiro, our
12    client, Sean Love Combs.  We have Anthony Ricco, Teny Geragos,
13    and Anna Estavao.
14              THE COURT:  Good afternoon to you, and good afternoon
15    Mr. Combs.
16              MR. RICCO:  Your Honor, I would like to point out,
17    again, that the family of Mr. Combs is present.  I'm pointing
18    that out because they traveled a great distance to be here.
19    Your Honor, they are seated in the second row, from the left
20    all the way to the end.  That would be his mom, his children,
21    and other relatives.
22              THE COURT:  Thank you for joining us here today.  It's
23    very important for you to be here, and the Court appreciates
24    it.
25              First question, Mr. Agnifilo.
```

OBM4COM1

1          MR. AGNIFILO:  Yes, your Honor.

2          THE COURT:  Tell me about the legal pads.

3          MR. AGNIFILO:  Could I use the podium, Judge?

4          THE COURT:  Of course.

5          MR. AGNIFILO:  So the first time that I actually saw

6    the actual defense materials is when Mr. Combs brought them to

7    court on Tuesday, which is why I wrote the letter to your Honor

8    the way I did because that's what I knew for sure.  What I had

9    known for sure, based on my interviews -- based on my looking

10   into the matter is that, as I wrote, there were legal folders,

11   and the legal folders had "legal" on them and "legal work."

12   And then there were a number, I'll just call them pads, not to

13   be confusing, not legal-style pads, but pads.  So I didn't put

14   that in the letter to the Court because I wasn't sure when

15   "legal" was written on each of the legal pads.  So when the

16   issue came up, and when I actually looked at the legal pads, I

17   saw at the time, as of Tuesday, they all said "legal."  So that

18   is why I told your Honor they said "legal."

19          As we sit here today, I'm not sure when "legal" was

20   written on each of them.  I don't know.  I'm trying to get to

21   the bottom of it, but I'm not sure when "legal" was written on

22   all of them.  So it is an ongoing issue, and I know different

23   members of the defense team was talking to Mr. Combs about

24   writing "legal" on all of his materials, and I believe that he

25   was doing that.  He was doing it on his folders, and he was

OBM4COM1

1    doing it on his different legal pads.

2            Now, there is a photo of a legal pad that was in the

3    materials that the government gave us, whatever it was, earlier

4    this week, that does not have "legal" on it.  So it has to be

5    the case that as of the day of the search, November 1st of this

6    year, that "legal" wasn't written on every legal pad.

7            So what I'm in the process of trying to do, as best I

8    can, is to get back to the Court figure out what pads had

9    "legal," which pads did not have "legal."  What I'm confident

10   in saying, and what I said in the letter, is that the folders

11   clearly had "legal" written on it.  And the pads -- there are

12   about seven pads total, six or seven pads -- now they all see

13   "legal."  I don't know when "legal" was written on each one.  I

14   just don't know the answer, as we sit here today.  I'm going to

15   endeavor to find out.

16           There is a lot more information that I learned even in

17   the last two days.  What I hope to do is to give your Honor a

18   fuller account of all of these issues.  Just to give the Court

19   an idea, there is email traffic between defense counsel and

20   counsel at the Bureau of Prisons.  So what I'm going to do, and

21   I can do it in a fairly short order, is give the Court a full

22   account of all these related issues as I can, and I will do

23   that.  I will do that.

24           THE COURT:  Okay.  The legal pad that you locked up

25   and handed to me that had the tabbed page --

OBM4COM1

1          MR. AGNIFILO:  Right.

2          THE COURT:  -- with one of the featured excerpts.

3          MR. AGNIFILO:  Correct.

4          THE COURT:  That legal pad, did it have "legal"

5     written on it at the time of the MDC sweep?

6          MR. AGNIFILO:  I'm not sure, I believe it --

7          THE COURT:  Let me stop you right there.  You'll run

8     down the issue of when this happened.  Okay.  But on Tuesday,

9     when we were here, I am pretty sure that there was a clear

10    representation that these legal pads had "legal" written on

11    them.  The suggestion being that that was true as of the time

12    of the MDC sweep.  And so all I'll say is that, moving forward

13    in this proceeding, please make sure that when representations

14    are being made to the Court, that you are making them in good

15    faith and you have certainty the facts that you are stating are

16    true.  Because it makes it really hard for the Court where we

17    have to have this after the fact digging into the record to see

18    what's right and what's wrong.  Okay?

19         MR. AGNIFILO:  I completely understand, your Honor.

20    100 percent.  And so the Court is clear, I've already started

21    that process.  That's why I say I'm getting a lot more

22    information, and I will share it with the Court as soon as I

23    can.

24         THE COURT:  Understood.

25         Ms. Slavik, while we are taking care of housekeeping

OBM4COM1

1    issues, what's the status of Mr. Combs's laptop?

2                MS. SLAVIK:  Your Honor, there are two laptops at

3    issue.

4                THE COURT:  Right.  There is a laptop that they can

5    bring to the MDC, and I believe there is a second laptop that

6    is going to be for Mr. Combs.  So where is that?

7                MS. SLAVIK:  That's right, your Honor.

8                Just to back up a little bit, the laptop meant for

9    Mr. Combs's attorneys to review discovery with him, that has

10   been provided to defense counsel.  They have that.

11               The other laptop is meant for the defendant to review

12   discovery at the MDC.  So the purpose of that laptop, again, is

13   for discovery.  The idea is to preload the discovery that the

14   defendant is permitted to have at the MDC onto that laptop.

15               Now, the government just finished the bulk of its

16   production of the materials that the defendant would be able to

17   keep at the MDC.  As your Honor knows, there is a lot of

18   discovery in the case.  And there is a protective order that

19   governs the discovery in this case.  A lot of the discovery

20   that was prioritized, as requested by the defense, is

21   designated as attorney possession only, which means that the

22   defendant is not permitted to have that discovery at the MDC.

23   The bulk of the discovery that the defendant is permitted to

24   keep consists of subpoena returns and other sorts of documents.

25   Those materials were not requested to be prioritized by the

OBM4COM1

1    defense.  So the government just recently finished its

2    production of those materials to the defense.  As soon as that

3    production was made, I believe it was Wednesday of this week,

4    the government began preloading all of the discovery that the

5    defendant is permitted to keep at the MDC onto this laptop.  My

6    understanding is that process is finished.  And that the laptop

7    will be delivered to the MDC so that it can be vetted by Bureau

8    of Prisons officials in the normal course of business on

9    Monday.

10            THE COURT:  Okay.  Mr. Agnifilo, any other questions

11   along the lines of this was raised in the defendant's papers,

12   that's why I raised it?

13            MR. AGNIFILO:  Yes.  Nothing, Judge.

14            THE COURT:  Okay.  With that to the side, we are here

15   on Mr. Combs's renewed motion for bail.  I've got a few

16   questions, which I'll ask to both sides, and I will hear both

17   sides in terms of anything else they'd like to raise.

18            First question for the government, you're not saying

19   here that I can't consider the proposed bail conditions under

20   *Boustani*, right?  You are not taking that extreme position.

21   You're just saying that, generally speaking, they don't

22   reasonably assure the safety of the community and the

23   appearance of the defendant?

24            MS. SLAVIK:  That's right, your Honor.

25            THE COURT:  So I don't have to deal with *Boustani*

OBM4COM1

 1    whether the carveout for certain cases applies?

 2              MS. SLAVIK:  That's right, your Honor.

 3              THE COURT:  Okay.  Now, in *Fox*, which is one of the

 4    cases cited by Mr. Combs, the Second Circuit observed that the

 5    district court had noted the government had not really engaged

 6    with the proposed conditions and had not explained why they did

 7    not mitigate any risk to the community or risk of flight.  So

 8    I'll give you that opportunity, I'm sure it's part of your

 9    presentation, but I'll give you that opportunity be to explain

10    as to the conditions.  So put aside just the basic description

11    of Mr. Combs's conduct, but what they are saying is, there is

12    an extensive set of conditions here.  And so to the extent that

13    you thought there was a risk to the community or risk of

14    flight, that is eliminated when you have 24/7 private security

15    detail, home detention and all of that supervised and approved

16    by the government.  So what's your response there?

17              MS. SLAVIK:  Your Honor, I think the *Fox* case is very

18    distinguishable from the present case for a lot of reasons.

19    While it is true that *Fox* involved a sex trafficking charge,

20    there was no RICO charge.  Specifically, there was no --

21              THE COURT:  I agree with you that *Fox* is different.

22    In fact, even in *Fox* the Court said it was an extremely close

23    call, and if there was any kind of different circumstance, they

24    might actually reversed district court.

25              I'm asking you, just given that observation in *Fox* on

OBM4COM1

1    the facts of this case, you've made -- there is a lot of

2    briefing here across three different applications about danger

3    to the community and risk of night.  However, there is very

4    little in the government's submission specifically addressing

5    the proposed conditions, and that's what I'm here to evaluate.

6    I'll give you the opportunity to explain why the proposed

7    conditions, which you've said I can consider, why those don't

8    address danger to the community or risk of flight.

9              MS. SLAVIK:  Understood, your Honor.  And I do think

10   that the reasons why the proposed conditions are insufficient,

11   do relate in part to the defendant's conduct, which I

12   understand, your Honor, will get into at some point.

13             THE COURT:  Absolutely.

14             MS. SLAVIK:  But I think, your Honor, at bottom, in

15   order for conditions to be sufficient, there has to be some

16   level of trust that the defendant will follow them.  And the

17   defendant here has demonstrated that either he cannot or he

18   will not follow rules.  In other words, the defendant, simply

19   put, cannot be trusted.  He's left no doubt that he cannot

20   comply with conditions.  Again, that's related to the conduct

21   that the defendant has continued to engage in while in custody,

22   which is to say nothing of the previous findings by Judge

23   Carter or Judge Tarnofsky about dangerousness and obstruction.

24             Specifically, one of the proposals is to limit the

25   defendant's communications to communications with attorneys

OBM4COM1

```
 1   only.  And I simply don't think that condition is sufficient in
 2   this case, and that is because the defendant has continued to
 3   communicate through unauthorized channels at the BOP.  And he
 4   has continued to communicate through unauthorized channels with
 5   his attorneys.  In other words, his attorneys are effectively
 6   enabling his flouting of BOP rules.  I think the example that
 7   your Honor just brought up at the outset of this proceeding
 8   with respect to the labeling of the legal pads, I think that's
 9   another example of the attorneys' inability to control their
10   client and to get their client to comply with rules and
11   conditions.  So I think that's one issue with respect to
12   communications.
13           Even family --
14           THE COURT:  What's your response when Mr. Combs says,
15   even if you think I can't be trusted, there is 24/7 security
16   personnel that's been approved by the government?  They are
17   going to be the ones who have the phones and access to
18   computers, and they are only going to allow him to use
19   computers and the internet when he is speaking with his
20   attorneys and any other conditions you want.  Essentially,
21   Mr. Agnifilo is saying, any other condition you can think of,
22   we will follow it.
23           MS. SLAVIK:  Your Honor, I think, again, this goes
24   back to trust.  I do think that the lynchpin of the defendant's
25   proposal is this 24/7 security firm.  But I don't think that
```

OBM4COM1

1    the defendant has shown that he can be trusted to comply with

2    any conditions.  He can't be trusted to comply with the rules

3    in a custodial setting at the MDC.  I don't think there is any

4    reason to suspect that he'd be able to comply with

5    non-custodial rules.

6           You know, I think one of the issues that the

7    government sees is what sort of private security firm could

8    actually engage in this level of monitoring?  So far the

9    defense, their initial suggestion -- I think this was before

10   the September 18th bail hearing in front of Judge Carter --

11   their first suggestion was a coconspirator, that the

12   coconspirator could monitor the defendant.  And this

13   coconspirator's phone was actually taken earlier, I think the

14   day prior to the defendant's suggestion that this individual

15   could act as a security monitor.

16          And then the second suggestion put forth by defense

17   counsel was that he could be monitored by a defense

18   investigator in this case.  At the time that the defendant

19   suggested this individual as the head of security, that

20   individual was out contacting witnesses on the defendant's

21   behalf.

22          So I just think what the defendant's conduct and what

23   his previous suggestions to the Court has demonstrated is that

24   there is really just no separation with the defendant.  You

25   work for him.  And there is no way to trust that any private

OBM4COM1

1   security firm could actually do what the Court requires and

2   could actually ensure compliance.  So that's one issue.

3          The other issue, I think, your Honor, is that really

4   this amounts to the defendant paying his way out of custody.

5   The Second Circuit in cases cited in the government's brief,

6   the Second Circuit has rightfully decried that practice as

7   problematic.

8          THE COURT:  Right.  But you've already conceded that

9   *Boustani's* bar, that's what you are referring to, does not

10  apply in this case.

11         MS. SLAVIK:  I'm saying that your Honor can consider

12  the proposed conditions.  I'm also noting that this amounts to

13  the defendant paying his way out of custody.

14         I think the other thing --

15         THE COURT:  I think the response there is that a

16  principal reason that the government offers for detention is

17  based on the defendant's wealth and resources.  And that's

18  precisely what *Boustani* says.  In that kind of circumstance, a

19  defendant can utilize his wealth to provide conditions that

20  would satisfy the Bail Reform Act.  That's why I asked you the

21  question at the outset.  Because I agree with you that *Boustani*

22  says under normal circumstances the kind of private jail

23  scenario is not acceptable, but it has a carveout, and that's

24  why I asked you the question.

25         MS. SLAVIK:  I think, yes, that's true, there is a

OBM4COM1

1    carveout.  But I think there are many other basis that the

2    government relies on besides the defendant's wealth.  The

3    government is not primarily arguing that the defendant should

4    remain detained because of his wealth.  In fact, the

5    defendant's argument before the Court today relies more on new

6    conduct that shows his continued obstruction and his continued

7    flouting of rules, specifically at the BOP.

8            THE COURT:  Okay.  So that's a good segue to

9    obstruction.

10           MS. SLAVIK:  Yes.

11           THE COURT:  Which is, I take it that's really the

12   principal risk that is presented here, given the conditions

13   that have been proposed, right.  Given the conditions that the

14   defense has proposed, your principal concern, in addition to

15   risk of flight and the danger of actual physical violence, is

16   really centered on obstruction; is that fair?

17           MS. SLAVIK:  Your Honor, I think the government's

18   priory focus is both risk of obstruction and also dangerousness

19   to others.  The government is certainly not giving up its

20   argument based on the defendant's history of violence.

21           THE COURT:  Is it fair to say that risk of flight

22   standing alone would not provide a basis for detention in this

23   case, given the circumstances?

24           MS. SLAVIK:  Your Honor, I think if risk of flight

25   were the only reason we were in front of you, I think maybe the

OBM4COM1

1    proposed conditions could get some traction, but, to be clear,

2    that is absolutely not the case.  The government has plenty of

3    evidence of the defendant's dangerousness, his risk of

4    obstruction.  And the government continues to rely on the risk

5    of flight as well.

6            THE COURT:  Understood.

7            So obstruction falls into the category of danger to

8    the community; is that correct?

9            MS. SLAVIK:  Effectively, yes, your Honor.

10           THE COURT:  So you have to show a serious risk of

11   obstruction by clear and convincing evidence; right?

12           MS. SLAVIK:  Correct.

13           THE COURT:  All right.  So what is obstruction?  What

14   is the definition?

15           MS. SLAVIK:  Your Honor, obstruction, I think, it's

16   broad.  I don't think it has to be just what fits into the

17   narrow categories of statutes in Title 18.  I think in this

18   case, the government's position is that the defendant's

19   continued violation of rules constitutes obstruction, and I

20   think the defendant's intent to subvert the intent of these

21   proceedings constitutes obstruction as well.

22           THE COURT:  So if Mr. Combs wants to run a PR campaign

23   through PR personnel using public information, nothing

24   nonpublic, is that obstruction, or is that legitimate?

25           MS. SLAVIK:  Your Honor, that's not what we have here,

OBM4COM1

1    is the answer.

2              THE COURT:  Well, let's first focus on --

3         MS. SLAVIK:  In theory, a PR campaign or a marketing

4    strategy, in theory, I think that's unobjectionable.  But

5    that's not what we have here.  What we have here is the

6    defendant's concerted effort to affect the integrity of these

7    proceedings.  It's not just my inference; it's the defendant's

8    words.  He is saying, I want to "reach for this jury.  I just

9    need one."  And it's with that intent that he is proceeding

10   with these PR campaigns, and that's what problematic from the

11   government's prospective.

12              THE COURT:  That's what I'm trying to figure out.  If

13   a defendant is using legitimate means, public information or a

14   PR strategy to reach the entire world, including those people

15   who might be in the jury pool, is that permissible or is that

16   impermissible obstruction?

17         MS. SLAVIK:  Your Honor, I think with the defendant's

18   intention to effect the members of this jury pool, the jury

19   that will be hearing this criminal case, I think that's

20   obstructive conduct.  I'm happy to walk through this specific

21   example I'm referring to.

22              THE COURT:  I've got all the examples here.  That's

23   why I'm trying to put them in context.  I know exactly the

24   example you are pointing to.  You say that's on the side of the

25   line that's improper illegal conduct?

OBM4COM1

1          MS. SLAVIK:  Yes, your Honor.  I'm saying that is

2    improper conduct, and that shows why the defendant should be

3    detained in this case.

4          THE COURT:  So Mr. Combs is not permitted, with the

5    intent to influence the jury pool, of engaging in any conduct.

6    Meaning it could be using public information, a PR strategy,

7    anything of that kind, he is not permitted to have that intent

8    to try to reach the public, including the jury pool.  Is that

9    the government's permission?

10          MS. SLAVIK:  Your Honor, I think the defendant's

11    stated intent that he wants to influence the jury is

12    problematic.  I think that's obstructive conduct.  I also think

13    it's a direct violation of your Honor's order.  This was the

14    October 25 order, referred to as the gag order.

15          The defendant's conduct with respect to the social

16    media post, that I'm happy to get into, that is a direct

17    violation of this Court's order.  And the defendant himself is

18    the one who asked for that order.  This was the defendant's

19    request.  And the defendant himself agreed to be bound by it.

20    So his conduct, not only is it obstructive with respect to

21    these proceedings, but it is a direct and clear violation of

22    this Court's order and another example of the defendant being

23    completely unable or unwilling to comply with rules.

24          THE COURT:  Do you have the order in front of you?

25          MS. SLAVIK:  The order directs the parties, including

OBM4COM1

1    the defendant, to comply with local Rule 23.1, which prohibits

2    parties from making extrajudicial statements that will

3    interfere with a fair trial.  I think that the defendant's

4    efforts to subvert the jury process, I think falls squarely

5    within the prohibited conduct under that order.

6         Again, I remind you that the defendant is the one who

7    asked for this.  In his reply brief, he effectively suggests --

8    he doesn't apologize for it -- he effectively suggests that

9    that sort of speech is protected.  It is not protected.  If he

10   had first amendment concerns with respect to this gag order, he

11   could have addressed them at any point in time, or he didn't

12   have to ask for this gag order.  But the fact is he did ask for

13   it, and he violated it.  The Court I think entered the order on

14   October 25.  We are talking about a social media campaign

15   intended to influence the jury that the defendant began

16   planning on October 27th.  That's two days, your Honor.  The

17   defendant couldn't even comply with the Court's order for two

18   days.

19         THE COURT:  Understood.

20         As to *Jefferies*, that's the Eastern District, but

21   there the government proposed, I believe, a $10 million bond

22   for Mr. Jefferies.  And the reasons for concern from the

23   government were not limited to risk of flight.  They also

24   include danger to the community.  1591 charged in that case,

25   same charge in this case, although the facts underlying the

OBM4COM1

1    charges are, of course, different.  Why such a different stance

2    from the government?

3              MS. SLAVIK:  Your Honor, the government submitted a

4    letter on the distinctions between this case and the *Jeffries*

5    case earlier today.

6              THE COURT:  He is 80, and his conduct ended in 2015, I

7    believe.

8              MS. SLAVIK:  That's two of the distinctions, your

9    Honor, yes.

10             The government's position, as set out in the letter,

11   is this case is very different from the *Jeffries* case, among

12   other reasons.  The defendant in that case is 80.  The conduct

13   was about a decade old.  I don't understand there to be a

14   racketeering conspiracy charge, certainly not one with

15   predicate acts of violence involved.

16             As more of a foundational point though, your Honor, I

17   think bail determination, by their very nature, are case

18   specific and fact specific.  So I think other judges'

19   determinations on other facts have limited relevance.  I think

20   the better points of reference with respect to this case are

21   the two previous determinations for remand made by other judges

22   looking at the very facts of this case.  So I think that's

23   another point to consider when you look at other cases, your

24   Honor.

25             THE COURT:  Okay.  And finally, and then I'll let you

OBM4COM1

1    present anything else that you would like to and then we will

2    move on to the defense, but what's the response to the

3    defendant's suggestion that you use the spliced up version of

4    the 2016 video?

5         MS. SLAVIK:  Your Honor, we covered this incident

6    multiple times in both previous bail hearings.  Frankly, to the

7    government it was a bit puzzling that the defendant brought

8    this up because there is really no dispute as to what actually

9    happened during that incident.  In fact, the defendant admitted

10   to it and apologized for it in a public Instagram post.  So

11   really whether the video was slowed or spliced or edited by

12   CNN, there is really no dispute about what the video shows.  It

13   shows the defendant shoving, kicking, and dragging a female

14   victim.

15        THE COURT:  Okay.  But why did you use that version,

16   the version that appeared on CNN, as opposed to the raw

17   footage, is at least one of the arguments made by defense.

18        MS. SLAVIK:  Your Honor, you have to remember the time

19   that video was relied upon, that was at the September 17th bail

20   hearing.  So the defendant had been arrested the day before

21   this CNN video, of course, was in the public record.  The

22   government did not provide the Court at that time with the cell

23   phone camera footage because that footage had come from a grand

24   jury witness.  And at that early stage in the case and at that

25   early stage in the proceeding, in particular before it was

1   clear whether the defendant would be remanded or not, the

2   government really just wasn't ready to identify the identity of

3   a grand jury witness.  So that's why the government didn't

4   provide the cell phone footage and instead provided the CNN

5   video that was already part of the public record.

6           The other thing, your Honor, is that the phone camera

7   footage shows the exact same thing as the CNN video.  So I

8   really don't think that there is any discrepancy in what both

9   videos show.

10          Now, just to be clear, the CNN video that the

11  government submitted to the Court at that point, that was the

12  video that was publicly reported with the victim's face blurred

13  out.  So the government did add blurring but that was the only

14  thing that the government did to the CNN video.  And to be

15  clear, the government did not engage any sort of video or

16  technical expert to analyze what CNN did to the original video.

17  And at that point, and still to this day, the government is not

18  in possession of the original footage.  The reason for that,

19  your Honor, is because in 2016 the defendant bribed hotel

20  security officers $100,000 to make the original video go away.

21  That's actually the bribery predicate in the racketeering

22  conspiracy.  He paid $100,000 to make that video go away.

23          So I think the point, your Honor, is that whether you

24  look at the CNN video or whether you look at the cell phone

25  video, the facts are the same.  Both videos show the defendant

OBM4COM1

1    brutally beating a female victim.  And, you know, whether or

2    not the defendant threw a vase at the victim or merely threw

3    the contents of the vase at the victim, it doesn't change the

4    fact this was a violent assault perpetrated by the defendant.

5    He throws her to the ground.  He kicks her.  He drags her.

6    That part was not edited.  That was the defendant assaulting

7    her.  And it cannot be disputed that it was the defendant

8    assaulting her because he admitted to it.  He admitted to it,

9    and he apologized for it.

10            And I think there is more to say about this incident,

11   your Honor, which is that this incident took place in the

12   middle of a freak off.  The government has multiple sources of

13   evidence.  This was discussed, in part, at previous bail

14   hearings.  The government has multiple sources of evidence

15   proving that a male commercial sex worker was in the hotel room

16   while the defendant was brutally assaulting this woman in the

17   elevator lobby, trying to drag her back into the hotel room.

18   The defendant insists that this is just a minutes' long glimpse

19   into a past relationship.  But the government respectfully

20   submits that this video is evidence that the defendant is a

21   violent abuser and a danger to the community.  And this is a

22   fact that Judge Carter observed and a fact that defense counsel

23   really couldn't walk away with at the initial bail hearing and

24   refuses to engage with, even in their recent submissions.

25            So the defendant knows this is devastating evidence

OBM4COM1

```
1   against him at trial.  And this is why, your Honor, he is

2   throwing anything at the wall to get this tape to go away.  But

3   this video is also a perfect encapsulation of why he cannot be

4   released on bail.  He is a danger, and he is committed to

5   concealing his crimes by any means necessary, even bribing

6   $100,000.  Your Honor, this is just one incident of violence.

7   I think the defendant's brief refers to this video as the

8   government's pièce de résistance.  I would not agree with that

9   characterization, there are multiple other incidents of

10  violence for which the government has evidence.  We've

11  discussed many of these incidents on the record at previous

12  bail hearings.  Those includes beatings, assaults, kidnappings,

13  arson, but that evidence continues to mount.  Even since the

14  initial bail hearings a little over a month ago, I guess two

15  months ago now, the government has learned about even more

16  violence committed by the defendant, punching, kicking,

17  shoving.  And the victims of the defendant's violence are

18  wide-ranging, they include employees, romantic partners, and

19  simply people who just got too close.  The defendant is

20  violent; he is dangerous, and he must be remanded on that

21  basis.

22           THE COURT:  All right.  Thank you.

23           Mr. Agnifilo, will you be handling the argument on

24  your side?

25           MR. AGNIFILO:  I'm going to have Ms. Shapiro lead us
```

OBM4COM1

1    off.

2              THE COURT:  Ms. Shapiro.

3              MS. SHAPIRO:  Thank you, your Honor.  If it's all

4    right, we are going to split this up a little bit.

5              I would just like to start by responding to a few

6    points the government just made.  With regard to the video,

7    what the government is not responding to and offers no defense

8    of is the fact at that at the earlier bail hearings when the

9    defense pointed out, in the context of its proffer about the

10   nature of the unfortunate conduct depicted on the video, that

11   Mr. Combs was trying to get his clothes and his telephone back.

12   And they had video footage.  They've given some reasons for why

13   they didn't provide that to the Court.  Even if those reasons

14   are the real reasons -- I submit they told the Court during the

15   prior bail hearings that Mr. Combs's explanation was simply not

16   true.  When they knew, because they had this footage since

17   August 7th, that it did show that he was getting his clothes

18   and his phone.  And the sequencing is actually very important

19   because the government told the Court in the prior bail

20   proceedings that the way this ended was that he dragged her

21   back to the room before the freak off.  And the new footage

22   shows that that's simply not true.  And that is --

23             THE COURT:  When you say "that's not true," there was

24   dragging; right?

25             MS. SHAPIRO:  Correct, your Honor.  I don't mean to

1    minimize that in any respect.

2              THE COURT:  And there was kicking.

3              MS. SHAPIRO:  Certainly.

4              THE COURT:  And there was shoving.  It's just the

5    ordering of events in the CNN video is incorrect.

6              MS. SHAPIRO:  But it's more -- my point really, and

7    just to be clear, we are not defending any of the conduct.

8    Mr. Combs has apologized for it.  We are not doing that at all.

9    The point is simply that the government suggested to the Court

10   in the prior bail proceedings that the way this incident ended

11   was that she was dragged back to the court -- I'm sorry, back

12   to the room.  I'm sorry.  And in any event --

13             THE COURT:  Well, since we are talking about Victim

14   Number One, what is your response to the government pointing

15   out -- let me take a step back.  So this application is to

16   reopen the prior detention hearing based on material new

17   evidence that bears on the detention decision.  In response to

18   your application, the government put in new evidence of its own

19   including 2018 text messages between Mr. Combs and Victim

20   Number One that refer to violence.  So I'll give you an

21   opportunity to respond to that.

22             MR. AGNIFILO:  So as plans tend to go, what's the

23   adage, "Man plans and God laughs"?  So I think Ms. Shapiro is

24   going to deal with the obstruction aspects, and I was going to

25   deal with some of the other aspects, but I want to be

OBM4COM1

1  responsive to your Honor's questions.

2          We have gotten a colossal amount of new information

3  concerning Victim One.  We couldn't possibly go through all of

4  it in one proceeding.  There is significant, significant --

5  since we even submitted our reply memo, we got move information

6  even yesterday that is directly relevant to the charge conduct.

7  And I don't want to quote it because it's under seal, and it

8  should be.  But it really is purely consistent, purely

9  consistent with our view of this being a consensual long-term,

10  loving, fraught relationship that had a breakup.  And the

11  breakup wasn't because of coerced sex or forced sex.  There is

12  just not talk of that.

13          THE COURT:  Well, I'm looking at the text messages

14  from 2018, you know which ones I'm referring to.  And I don't

15  want to inadvertently disclose anything that might be under

16  seal in these proceedings.  But I'm looking at the text

17  messages, so what is your response for purposes of this bail

18  application?  Is it just, look, there may have been some

19  episodes of violence, but given the conditions that we are

20  proposing, any risk of that is simply eliminated?  Is that the

21  defense's response?

22          MR. AGNIFILO:  That is absolutely the response.

23  Getting into the conditions -- and I think that's really the

24  heart of what we are saying -- is what the government is afraid

25  of is that Mr. Combs is going to be violent towards someone,

OBM4COM1

1    there is really a 0 percent chance of that happening.

2            And just getting to something that the government

3    said, we are proposing a security company that has no

4    connection to anything, and we will get to that at the right

5    time.  But it has no connection to anybody.  No one who works

6    there has ever met Mr. Combs.  No one who works there has ever

7    spoken to him on the phone.  It's utterly independent, and this

8    is what they do.  So the concerns that the government raised 10

9    or 15 minutes ago just aren't present.

10            But in response to your Honor's question, we have

11   never denied -- and I'll get to the conditions in a minute.  We

12   have never denied that there has been mutually, regrettably

13   physical conduct that goes in both directions.  And one of the

14   things that the government put in their letter to us, and I

15   won't get into the real hardcore substance of it, in essence is

16   that through their investigation, they have concluded that

17   there was violence that was initiated by this other person.

18   And then there was violence initiated by Mr. Combs, allegedly.

19   So we're in the realm of allegations, and we are in the realm

20   of stuff that will one day be trial evidence.  But it's our

21   defense to these charges that this was a toxic, loving, 11-year

22   relationship.  And our point is that in terms of the strength

23   of the evidence of a very important count, Count Two, sex

24   trafficking, there is really no evidence of that anywhere.

25   It's not in the videos, and we are starting to see some of

OBM4COM1

1  these videos.  It's not in the text messages.  Is there

2  evidence of physical conduct?  100 percent --

3          THE COURT:  Okay.  Ms. Shapiro, I didn't want to

4  derail you.  I know you were addressing the obstruction point.

5  I'll let you continue.

6          Just to figure out who is going to handle it, I do

7  have a couple questions about Witness Number One, and then some

8  questions on the bail conditions.  But if you are going to

9  address obstruction, I would ask Ms. Slavik some questions

10  about what is objection in this context?  Because there are a

11  number of communications that the government pointed to, and my

12  question for Ms. Slavik was, are these improper?  And I think

13  her answer was, yes.  Because if there was an intent to

14  influence the jury pool or to influence a potential witness,

15  then that is improper.  That is something that can be

16  considered under the umbrella of danger to the community and

17  obstruction under the bail statute.  So hopefully that's in

18  your ballpark, but I'm happy to hear your response to that.

19          MS. SHAPIRO:  Yes, your Honor.  And I think it's

20  telling that the government was not able to cite a single case

21  supporting the broad proposition that they are submitting to

22  your Honor.  That is not what obstruction is.  Obstruction is a

23  corrupt attempt to influence a witness of a proceeding, an

24  effort to persuade or coerce them to commit perjury, destroy

25  evidence, or otherwise interfere with the truth seeking

OBM4COM1

1    function of the proceeding.

2            Indeed, a couple of examples, the reported Second

3    Circuit cases of which we are aware in which detention for

4    obstruction, in those cases revocation of bail, was upheld

5    present a stark contrast.  For instance, in the *LaFontaine* case

6    from 2000, the facts show that the defendant had told a person

7    to lie on a call from the MCC and pretend certain medical

8    procedures were performed on his mother in an insurance scam

9    when they weren't.  And then while on release after that,

10   played the recordings to get the witness to induce the other

11   person to lie.

12           In the *Gotti* case from 1996 in the Second Circuit, the

13   evidence was that John Gotti, the head of the Gambino Crime

14   Family, threatened a witness.  And that the witness had

15   received a "kick in the ass," and I'm quoting from the case, a

16   warning not to testify by others in the Gambino Crime Family.

17   The Gotti crew tampered with the brakes of his van and sent

18   harassing telephone calls to the person in the middle of the

19   night.

20           The government has no case.  And, indeed, the way they

21   were characterizing this is clearly an infringement on the

22   defendant's constitutional rights under the First Amendment.

23           I want to say two additional points on that.  We cited

24   the *Trump* case in our papers.  And I think that provides an

25   interesting contrast.  First of all, the standard, as

OBM4COM1

```
1   articulated there, is much stricter and make clear that, if
2   anything, the defendants, for instance, have greater rights
3   than their attorneys to speak publicly about the case and what
4   the particular items that they are talking about, which
5   involved things like an Instagram post where his family is
6   wishing him a happy birthday, as well as, I don't know if I --
7            THE COURT:  Well, in your view, are all the
8   communications that the government points to from Mr. Combs's
9   time in the MDC --
10           MS. SHAPIRO:  I will address those in particular.
11           THE COURT:  Okay.
12           MS. SHAPIRO:  But regarding the particular recordings
13  or messages where he refers to the jury pool and his belief
14  that the prosecution is motivated by racism, those are in the
15  heartland of the First Amendment.
16           And with respect to the government's accusation that
17  Mr. Combs is violating the Court's order, that is simply not
18  true.  As the Court is well aware, what the order does is it
19  requires Mr. Combs, like his counsel, to comply with the local
20  rule.  And the local rule simply says in this regard that he
21  can't authorize or release nonpublic information -- none of
22  this is nonpublic -- or opinion that a reasonable person would
23  expect to be disseminated by means of public communication in
24  connection with the proceeding if there is a substantial
25  likelihood that the decimation will interfere with a fair trial
```

OBM4COM1

1    or otherwise prejudice the due administration of justice. Now,

2    none of the generalized statements that we are talking about,

3    his views about the nature of the prosecution, could possibly

4    fit under that.

5        Now, with regard to the specific messages they talked

6    about, we believe that they have not pointed to a single

7    message or telephone call in which he instructed anyone to lie

8    or to tell anyone else to lie or anything remotely like that.

9    To the extent the communications had any relevance to the

10   proceeding, and we've provided evidence and Ms. Geragos's

11   declaration demonstrates that a number of them are simply

12   irrelevant and don't have anything to do with the proceeding.

13   But with respect to the ones that do, they haven't pointed to

14   any statements like that. And most importantly --

15       THE COURT: Just to give you a hypothetical, if

16   Mr. Combs wants to reach out and put out family pictures, like

17   a family scrapbook and post it on the internet. And his intent

18   to is to make sure that those who would be in the jury pool

19   would see that, in order to, in his view, even the playing

20   field, given the media coverage of this case. In your view,

21   that's totally proper. That's his First Amendment right.

22   There's no violation of any rule; right?

23       MS. SHAPIRO: Yes. And in particular the unique

24   context of this case when we're dealing with nonstop and false

25   and extremely damaging media coverage coming from all

OBM4COM1

1  directions, numerous plaintiff's lawyers, it's just a barrage.

2  And he has a right to respond to that.

3          I was going to say, your Honor, with respect to the

4  other specific recordings --

5          THE COURT:  Just one follow up to that.  Is there any

6  reason Mr. Combs isn't doing that through counsel?  Meaning,

7  why he isn't just saying, Ms. Shapiro, can you help me with

8  this because we are getting hit on all sides by this media

9  coverage.  I want to just make sure I'm careful about this.

10  Can you do this?  Is there any reason why that wouldn't be the

11  way to handle things?

12          (Continued on next page)

OBM3COM2

1    MS. SHAPIRO:  Well, your Honor, we're happy to do that

2    going forward, if that's the Court's preference.

3    THE COURT:  No, I'm just asking you.  I mean, I'm

4    trying to understand what the line is, because it isn't very

5    clear from the submissions, and I hear you and I understand

6    what you are saying about the *Trump* case, which I've read, and

7    the important principles underlying the First Amendment that

8    should apply here.  So I'm trying to put that in context.

9    MS. SHAPIRO:  Your Honor, the other thing I would just

10   note is that we are lawyers, and sometimes, when we need to, we

11   certainly will work with a P.R. person or something like that.

12   THE COURT:  That's why I am asking.

13   MS. SHAPIRO:  It is not really the function of the

14   lawyer, quite frankly.

15   THE COURT:  I think what you are saying is, sure, the

16   lawyers might do this, but Mr. Combs himself has the right to

17   do this.

18   MS. SHAPIRO:  That is what we are saying, your Honor.

19   That's a very important principle here.

20   THE COURT:  Okay.  So, that covers all of the MDC

21   communications?

22   MS. SHAPIRO:  I think that's right.  I'm happy to

23   answer any questions if your Honor has them, but the other

24   point I was going to make about the ones, which we've made at

25   some length in the papers, is that the specific contents are

OBM3COM2

```
 1   really part of his Sixth Amendment rights to work with counsel
 2   and help develop witnesses.  And we've called the Court's
 3   attention to parts of the recordings, for instance, that the
 4   government ignored that demonstrate that he's telling people
 5   just tell the truth, talk to my lawyer, etc.
 6            THE COURT:  Right.  So that's where I was going to
 7   take you next.  We talked about the jury pool.
 8            It's also your submission that with respect, for
 9   instance, to Victim No. 3, that the communications there were
10   also totally protected, totally proper, and Mr. Combs' right.
11            MS. SHAPIRO:  Correct, your Honor.
12            THE COURT:  Would that also apply to the pre-MDC
13   communications that the government points to?
14            MS. SHAPIRO:  Absolutely.
15            THE COURT:  With respect to Witness No. 1 and Witness
16   No. 2.
17            MS. SHAPIRO:  Yes, your Honor.
18            THE COURT:  So are you the one responsible for the
19   Witness No. 1 communications?
20            MS. SHAPIRO:  I can address those, your honor.
21            THE COURT:  So, look, we have the Geragos declaration
22   that covers the course of events through July 8.  But the
23   government says that even after July 8, including I believe on
24   the day of Witness No. 1's grand jury testimony, that there
25   were further communications and there were text messages
```

OBM3COM2

1   through this entire period, including to August of 2024, that

2   were deleted.

3         MS. SHAPIRO:  Your Honor, I apologize.  I will let

4   Mr. Agnifilo respond to that, because he was Mr. Combs' counsel

5   at the time and I wasn't yet involved.

6         MR. AGNIFILO:  Yes, can I give your Honor a bit of

7   background as to this particular -- then I am going to answer

8   your Honor's question correctly.  Because there is background,

9   there is runup that I think that's important.

10        THE COURT:  I've got the background because I've read

11  the declaration and I've read the briefing, and I am trying to

12  understand, because it was not addressed in the reply brief or

13  the declaration, the missing gap of time that the government

14  does address in its opposition paper.

15        MR. AGNIFILO:  Yes.  So, and I think this is present,

16  it might be in a footnote.

17        Witness No. 1 certainly reached out to counsel, to

18  Mr. Combs' counsel, after he had a lawyer, and asked us for a

19  lawyer.  And we didn't do anything along those lines because it

20  was an odd request, and so we didn't do anything.  Now, so I'm

21  answering your Honor's question inferentially, because I don't

22  know the factual answer.

23        But, I imagine that if he's reaching out to his,

24  Mr. Combs' lawyer, there is some --

25        THE COURT:  Wait, hold on.  How do you not know the

OBM3COM2

1    answer if the government brought it up in their opposition

2    brief?  That was what was puzzling to me.  It might be my

3    fault.

4             But the government said that through July, including

5    into August, and this is before and after the grand jury

6    testimony, there were text messages -- and correct me if I'm

7    wrong -- but the defendant's response covers the course of

8    events and explains why they were proper, but only through the

9    beginning of July, at which point counsel may have been

10   involved and said, you know, we're not going to have any

11   further communications.

12            I am trying to understand if I'm missing something

13   about the gap in time or whether there is any issue here.

14            MR. AGNIFILO:  I don't know that your Honor's missing

15   anything with the gap in time.  What my point is, is I believe

16   this Witness 1 was certainly reaching out to us.  I don't

17   know -- can I just confer with someone who knows more about the

18   facts?

19            THE COURT:  Absolutely.

20            (Counsel conferring).

21            MR. AGNIFILO:  I'm going to pass the baton to my

22   colleague.

23            MS. ESTEVAO:  We did receive in discovery two days ago

24   I believe or two nights ago the messages that the government

25   referred to with respect to Witness-1.  It was a message from

OBM3COM2

1   Mr. Combs to Witness-1.  And I just tried to bring it up on my

2   computer.  I don't have internet, regrettably.

3          I would like to be able to give it to your Honor under

4   seal because it's covered by the protective order.  This is

5   something similar to how are you, or something like that.

6   Ms. Foster, AUSA, may know more.  She is the one who turned it

7   over to us.

8          It's certainly nothing that would rise to the level of

9   obstruction, the definition that Ms. Shapiro read to the Court,

10  which is try influencing or corrupting the proceeding or trying

11  to coerce the proceeding or interfere with any truth seeking

12  function of the proceeding.

13         And as your Honor knows, as we've put in our papers,

14  at least with what we've seen, what the government has turned

15  over to us with respect to Witness-1's grand jury testimony, is

16  that Mr. Combs at all times had told him just tell the truth.

17  And we've seen that in his calls at the MDC.

18         But I do not have the actual message, but it is

19  something -- it is nothing that is corrupting in any way the

20  grand jury process.

21         THE COURT:  Well, I think that to the extent that you

22  have communications and you are just saying they were

23  innocuous, that's one thing.

24         I think there are two other issues, one being the

25  potentially deleted text messages, which the government raises.

OBM3COM2

1    The other issue is just, given the chronology, they are making

2    the submission that Mr. Combs does not follow counsel's

3    direction.  Because in reply, you point out that you had

4    oversight over Mr. Combs and his discussions, and you do all

5    the time because that's your function here, is to make sure

6    that he knows the rules and he's following the rules.

7            So when there are communications that fall outside of

8    those lines, that is evidence that Mr. Combs cannot be trusted

9    to follow the rules.

10           And so do you have a response to that?  That's what

11   I'm trying to get my head around

12           MS. ESTAVAO:  I do have a response to that.  First, to

13   the conditions that we've proposed, I think it's going to be

14   impossible for him not to follow the rules.

15           But second, I think my declaration absolutely states

16   the direction that my client receives and follows when I tell

17   him something.

18           So certainly with respect to Victim-3, he followed my

19   direction there.  With respect to the ContactMeASAP, he stopped

20   using it November 16.  With respect to using other phone lines,

21   he stopped doing that also.

22           So I think that was -- the messages with Witness-1

23   were pre-arrest, but certainly in terms of if you look at the

24   history of him following our instructions and direction as a

25   whole, he has done so.

OBM3COM2

```
 1              I mean, backing up and we haven't seen spoken about

 2      this, your Honor, but coming to New York, for example, when

 3      Mr. Agnifilo and I believed that he was absolutely going to get

 4      arrested, he got on a plane the very next day and came to New

 5      York.  Not knowing how long he would be here, not knowing --

 6      really anything, we just said come to New York and he would be

 7      here.

 8              With respect to his conduct in the BOP, when I have

 9      instructed him not to do certain things, he has then followed

10      those instructions.

11              So, while I would say that text message in August may

12      be, you know, regrettable or if that's an okay word to use, he

13      has certainly followed our other instructions, certainly since

14      being in the BOP custody.

15              THE COURT:  Understood.  And who is going to cover

16      just the bail -- Ms. Shapiro, I promise I will likely not

17      derail you again, but if there is anything further.

18              MS. SHAPIRO:  We do want to answer your questions.

19              THE COURT:  I wanted to ask some questions about the

20      bail conditions, but if you had anything.

21              MS. SHAPIRO:  I had a couple of other things, if I

22      may, that I want to emphasize and maybe Mr. Agnifilo will deal

23      with the conditions.

24              So, your Honor discussed the *Jeffries* and *Fox* case

25      with the government.  And I would like to emphasize some points
```

OBM3COM2

1    that maybe weren't emphasized enough in our papers about those

2    two cases.

3         First of all, with respect to the *Jeffries* case, we

4    respectfully submit that the allegations in that case are

5    considerably worse in their nature in terms of the conduct that

6    is charged than the indictment here.  Yet the government there

7    consented to releasing the two American defendants on

8    conditions far less restrictive than we are proposing.

9         So I want to talk a little bit about the charges in

10   that case.  And there were sex trafficking -- there is a sex

11   trafficking count that relates to multiple victims, 15 specific

12   individual victims are identified.  And the government alleges

13   that the defendants operated a, quote, international sex

14   trafficking and prostitution business involving dozens of male

15   victims.  The victims were recruited on false pretenses, many

16   of them aspired to be model for Abercrombie.  The victims were

17   raped, forced to submit to anal sex, they were tortured, and

18   forced to endure extremely painful sexual activities that were

19   described in extensive detail in the E.D.N.Y. submission at

20   docket no. 9, pages 3 to 4 that the government submitted to the

21   court in that case.  These victims were pressured to consume

22   alcohol, Viagra, and muscle relaxants during the sexual

23   assaults.  The defendants forced the victims to sign NDAs, and

24   stopped victims and witnesses not only from disclosing

25   information about the coerced sex events, but also from seeking

OBM3COM2

1    assistance for themselves where needed.

2           And as noted in our submission, there are additional

3    allegations of obstruction there, of using a security committee

4    to surveil and intimidate those individuals.

5           And I would also just note with regard to the idea

6    that the defendant there is older, that one of the defendants

7    is 80, another one is actually 71, which isn't that much older,

8    Mr. Combs is 55, and I hate to say it, but that's not that

9    young.

10          With regard to the *Fox* case, the government again

11   emphasized that there is no RICO count.  And that is true, but

12   the allegations and the particular charges are actually, again,

13   I would submit considerably worse.

14          That case involved a 38-year-old financial planner.

15   He paid female escorts and had a pattern on preying drug

16   addicted women and providing them with more drugs so he could

17   sexually assault and torture and degrade them.

18          There was testimony from multiple women that the

19   defendant raped and/or sexually assaulted them and subjected

20   them to violent and degrading sex acts.  Two of the women

21   overdosed on heroin and had to be revived by Narcan by the

22   defendant.

23          And in addition, the police recovered weapons when he

24   was arrested that may have been used during the assaults, which

25   included a shotgun, a baseball bat with nails in it, electric

OBM3COM2

1    tasers, a stun gun, fixed blade knives and brass knuckles.  The

2    defendant lied to probation about his drug use, yet he was

3    released to home detention in the custody of his own father.

4            That was affirmed in the Second Circuit and all of

5    those details that I just provided are in docket no. 5 of the

6    Second Circuit case.

7            The government has no real response to this.

8            THE COURT:  I think the response would be that it's

9    rare that you see a Second Circuit decision that calls

10   something "a close call" twice.  And that any greater argument

11   from the government, because the government had not really

12   addressed the conditions in the District Court, or any

13   circumstances that were any different, might have compelled the

14   Second Circuit to reverse, and they were ruling on a clear

15   error standard.  So that was the context in which they

16   indicated that it was an extremely close call.

17           MS. SHAPIRO:  That's fair.  But as I think your Honor

18   pointed out, the conditions here are more than ample, indeed,

19   to alleviate any concerns.  The conditions in that case, the

20   guy was going to be in the custody of his father.  I mean,

21   that's very different from the professional security package

22   that we've proposed.

23           Two other quick points and then I'll sit down.  With

24   regard to the strength of the evidence, I am not going to

25   belabor this point, but I think your Honor has the *Brady* letter

OBM3COM2

1  that was disclosed.

2          THE COURT:  I have seen the letter.

3          MS. SHAPIRO:  What I wanted to highlight, I am not

4  going to go over the particulars, because your Honor has them.

5  But I do want to highlight that what is in that letter bears

6  out what we said at the earlier bail proceedings.  And it's

7  really significant information that neither Judge Carter nor

8  the magistrate judge had at the time.  We didn't even have it

9  when we wrote these bail briefs before your Honor.  And the

10 last thing I did want to --

11         THE COURT:  Just so I understand the import of the

12 letter.  I mean, in your view, the letter, in addition to other

13 submissions that you've made, undermine in particular the 1591

14 count.  Is that fair?

15         MS. SHAPIRO:  Yes, your Honor.

16         THE COURT:  Okay.

17         MS. SHAPIRO:  Yeah.  And a lot of the allegations in

18 the RICO count as well.

19         THE COURT:  They're overlapping in some respects.

20         MS. SHAPIRO:  Yeah.  Which obviously goes to -- the

21 first part goes to the presumption.

22         But the last thing I just wanted to just note with

23 respect to this refrain about their claim that Mr. Combs

24 violated the BOP rules.  Obviously we've demonstrated that

25 things like the messaging system really isn't a violation of

1    the rules, and so forth.  But what I did want to highlight, as

2    your Honor may well be aware, issues relating to BOP conditions

3    come up often in criminal proceedings in this district.  I've

4    had many, for instance, sentencings where disputes have arisen

5    about things like whether the BOP is capable of providing

6    adequate medical care to inmates and so forth.

7            And in my experience, and I believe the experience of

8    my colleagues at the table, defense table, virtually any time

9    something like that comes up and there is a litigated dispute,

10   the government submits either a letter or an affidavit from BOP

11   officials.  They haven't done that here.

12           They claim he's a repeat offender.  Some of defense

13   counsel are in virtually daily contact with the MDC's general

14   counsel and other counsel.  No one has ever suggested to us

15   that there was a problem with Mr. Combs' behavior in the

16   facility, nor has he ever been written up for any violation of

17   the rules.  And I think it's important to emphasize that, your

18   Honor.

19           THE COURT:  That's fair.  And just to focus on those

20   infractions in your view.  ContactMeASAP, you are saying that's

21   not a violation?

22           MS. SHAPIRO:  That's my understanding.  And I think

23   Ms. Geragos' declaration explains the investigation she did.

24   And he's not using it anymore because they brought it up.

25           THE COURT:  You would agree that sharing PAC numbers

OBM3COM2

1    and three-way calling would be an infraction, but it's routine

2    and common and essentially accepted at the MDC.

3           MS. SHAPIRO:  Yes, your Honor, correct.

4           THE COURT:  And I think, I mean, the response is,

5    look, during this time period, Mr. Combs was well aware that

6    there was a live bail application, meaning you had your appeal

7    pending before the Second Circuit, then upon reassignment,

8    you'd notified the Court that you were going to renew your bail

9    application.

10          Given that, even a minor infraction is puzzling.

11   Given that you and Mr. Combs would have been aware that the BOP

12   and the government were going to be closely monitoring his

13   conduct, precisely for the purpose of adding additional fuel to

14   their opposition on bail.

15          So, in that context, the fact that these things still

16   happened lends some credence to the government's position that

17   if there is flexibility in conditions or if Mr. Combs is in

18   charge of those conditions to some degree, that there's serious

19   doubt that he could follow those.  That's what the government

20   is suggesting.

21          MS. SHAPIRO:  I understand, your Honor.  I think the

22   most important, the most important thing that I can say is that

23   the conditions in some ways are even more restrictive than what

24   he's being subjected to in the prison in that regard.

25          We are saying no phones, no internet, 24/7 security to

OBM3COM2

```
1    enforce that, and make sure that any -- to the extent any

2    phones are ever used, it is only to talk to counsel.  So, I

3    don't see how, how he could how he can get around that, even if

4    he wanted to.

5           THE COURT:  Understood.  Thank you.

6           Mr. Agnifilo.

7           MR. AGNIFILO:  Yes.

8           THE COURT:  All right.  Where's the home that you

9    would propose Mr. Combs be detained at?

10          MR. AGNIFILO:  So, as we wrote in the bail

11   application, he has a house in Florida.

12          THE COURT:  Where exactly is that house?

13          MR. AGNIFILO:  It's -- I don't want to give the

14   address.  It is on something called Star Island.  Star

15   Island -- and this is important and this is important for the

16   security setup that I've discussed with the company.  There is

17   only one way on and off Star Island.  There is a sort of

18   causeway because it's truly an island.  And he has a house.

19          Now, the house has a dock, and so there is a dock.

20   So, he wouldn't have access to a boat.  That would have to

21   obviously be a condition.  And so that is where he lives.

22          Now, at the risk of negotiating against myself.

23          THE COURT:  I was about to say, that's not going to

24   work.  Even if I were to entertain any of this, that is not

25   going to work.
```

OBM3COM2

1           MR. AGNIFILO:  You have made my life even easier.

2           THE COURT:  Where is the suitable location in New

3   York?

4           MR. AGNIFILO:  Yes.  So, give me one second.

5           (Counsel conferring)

6           MR. AGNIFILO:  There is a place on the Upper East Side

7   of Manhattan.  It is an apartment.  I had one of the

8   investigators go look at the building just to kind of see where

9   it was.  So it is a Manhattan apartment.  And we could provide

10  photographs and whatever detail, and obviously we would be

11  happy to make all the details available.  The government can go

12  look at it.  We want to do this as transparently obviously as

13  possible.

14          So, we have a Manhattan apartment that would be on the

15  Upper East Side that would be available for him.  And I think

16  it has three bedrooms.  Three bedrooms.

17          THE COURT:  Where is the 24/7 hired security personnel

18  going to be?

19          MR. AGNIFILO:  Let me see if he's in the courtroom.

20  Would your Honor like to speak to him or would your Honor

21  rather speak to me?

22          So it's a company called Patriot Security that merged

23  with another company called Crisis24.  They've done this in the

24  past.  And we would get the detail of how many 24-hour a day

25  personnel, these would be obviously people licensed to carry

OBM3COM2

1      firearms.

2              One second, Judge.

3              (Counsel conferring)

4          MR. AGNIFILO:  So, the setup, as I understand it, is

5      there would be two people in the actual apartment, and there

6      would be one person downstairs.  So you're talking about three

7      full-time security professionals 24/7.

8              The idea would be -- the actual conditions are in our

9      bail proposal, and I think the ones your Honor is most

10     interested in are conditions 3 through 6.  And I can say what

11     those are.

12             So it's 24/7 monitoring by qualified security

13     personnel approved by the government and pretrial services.

14     Mr. Combs will have no access to telephones or the internet,

15     except for during calls with counsel to be arranged, to be

16     arranged by the security personnel, so the onus would be on the

17     security personnel to make sure that he's only calling his

18     lawyers.

19             And so, when Ms. Shapiro said these are more

20     restrictive conditions than he has at the MDC, they are

21     actually substantially more restricted conditions.

22             The next is restrict all visitors except for counsel,

23     and a preapproved list only consisting of specific family

24     members, with the consent of pretrial services and the

25     government.  So, the government and pretrial services would

OBM3COM2

1 know exactly who is on the list of people who are allowed to go

2 to the location, and that would be monitored by the security

3 company.

4    Family visits will be scheduled only with pretrial

5 services' prior approval.  Again, another restriction that's

6 more restrictive than the current situation.  Security

7 personnel would monitor family visits and keep a log of who

8 comes in and out.

9    Mr. Combs will avoid all contact, directly and

10 indirectly, with any persons who may be a victim or witness in

11 the investigation or prosecution.

12    I was very -- I was almost worried to put that in

13 because I think he has the right to do those things.  But, I

14 want to make it as easy for the Court as possible.  When I say

15 that, we are going to be doing, just like the government is

16 going to be doing, a very thorough investigation.  Our trial is

17 not that far away.  I think we're all starting to feel the

18 pressure of the trial on May 5.  And I was mindful, am I giving

19 something up that I should not be giving up, because he has the

20 constitutional right at the end of the day to assist his

21 lawyers in getting witnesses.

22    That being said, I think it's a necessary condition,

23 given the things that the government's raised to your Honor.

24 And one that we put in here because of the specific concerns in

25 this case.

OBM3COM2

1          So at the end of the day, these four conditions

2    together are far more restrictive than the conditions that he's

3    currently living under.  So, I think that this really goes to

4    the heart of the presentation.

5          Everything the government says could be true, and we

6    obviously dispute all of it at the end of the day.  And even if

7    they aren't true, this doesn't defeat what we're trying to put

8    in place.  There is nothing he'll be able to do to tamper with

9    witnesses, to do things that he's not allowed to do ultimately.

10          THE COURT:  Not telling family members to reach out to

11    potential victims.

12          MR. AGNIFILO:  Well, so this is where, avoid all

13    contact, directly or indirectly, with any person who may be a

14    victim.  That would be indirectly.

15          THE COURT:  However, and I think this would apply to

16    even the private security detail.

17          The government says, look, those folks are paid for by

18    Mr. Combs.  And so, this is what they're saying, as he's done

19    in the past, he can utilize the people he is paying to have

20    contact with those, even if he is prohibited from doing so.

21          And so, however you slice it, it goes back to trust of

22    the defendant, and they say that has been undermined by the

23    communications and other evidence that they've put in the

24    record.

25          MR. AGNIFILO:  It's certainly a valid point.  I think

OBM3COM2

1    it's a different relationship.  These are professionals that

2    are going to be in his life for, what, eight months.  You know,

3    and then they're never going to see him again or work for him

4    again.  I don't see the type of control that the government is

5    concerned about with this kind of relationship.

6            And ultimately, this security company is going to be

7    judged for what it does here.  It is a high-profile case.  It

8    is a high-profile case.  Everything that happens in this case

9    is immediately reported.  Everybody who does well or screws up,

10   it's in the newspaper the next day.  And they're just not going

11   to do a bad job I think for that reason.

12           THE COURT:  Understood.

13           Separately, you make an application under 3142(i)

14   concerning a temporary release based on the conditions of

15   Mr. Combs' custody.

16           The government comes back and says, look, we've been

17   trying to accommodate Mr. Combs.  If this argument about the

18   size of discovery is a reason for release, not subject to

19   consideration of the normal 3142(g) factors, then there are

20   going to be a lot of inmates who will be released.  That's not

21   how it works.

22           Is it fair to say, given the government's opposition,

23   you are not really relying on 3142(i) at this point?

24           MR. AGNIFILO:  It's not our argument.  It is a backup

25   argument, but I think it's a backup argument that's still a

OBM3COM2

1    pretty good argument.  And I'll share my thoughts.

2           We just got the laptop today.  I mean, he was arrested

3    what, 65, 66 days ago.  He's been in jail 66 days without a

4    laptop.  We just got it today.  Luckily we have a bail

5    proceeding and the government didn't want us to come in here

6    and say, judge, we still don't have a laptop.  As of a few

7    hours ago, we have a laptop for the first time.

8           There is a mountain of discovery.  So I don't think

9    what's -- I think the discovery in this case is in the rare

10   territory.  I don't think it's unique.  What is unique, I

11   think, is to have waited over two months, I mean two months and

12   a week, to get a laptop is a long time.

13          And I'm not -- they have a lot to do in getting a

14   laptop into the MDC, and I'm not faulting the prosecutors.  I

15   am just putting this out as a fact.

16          THE COURT:  I think the solution there is for you to

17   come to me and we can call these hearings that seem to get

18   things done.  And I think that's really the solution to that

19   particular issue.

20          In terms of the timing, we have all discovery ending

21   at the end of this year, which leaves a full four months really

22   to get everything done in terms is of review and preparation

23   for trial.  If there are other accommodations that are needed,

24   then we can certainly talk about those.

25          But I understand your position that you're not letting

OBM3COM2

1    it go, but it is a backup argument on this application.

2                MR. AGNIFILO:  It is our second argument.

3                THE COURT:  Understood.

4                MR. AGNIFILO:  But it's an important one.  I think

5    that the crux of the argument is the changed circumstances and

6    the fact that we have proposed a package that is a very, very

7    rigorous set of conditions.

8                Now, I had -- and I don't want to necessarily go

9    through it if it isn't in the forefront of the Court's mind.  I

10   had a whole presentation on the tape and the significance of

11   the tape, the InterContinental tape.  Your Honor has all of the

12   raw data because we gave your Honor Conor's 20-minute

13   presentation.  If your Honor is clear on that, I can save 15

14   minutes of everyone's life and not go through that.

15               THE COURT:  I have both, I have Exhibits B through D.

16   And I think D is -- I may be getting the letters wrong -- is

17   the presentation, and I have reviewed it.  So I don't think we

18   need to go through that here in open court.

19               MR. AGNIFILO:  Great.  Does your Honor have any other

20   questions for me at this point?

21               THE COURT:  No, I don't.

22               MR. AGNIFILO:  Thank you, your Honor.

23               THE COURT:  If I could hear, who is here from pretrial

24   services?

25               MR. LETTIERI:  Jonathan Lettieri from pretrial

OBM3COM2

1    services.

2              THE COURT:  What's your position on the proposed

3    conditions?

4              MR. LETTIERI:  Your Honor, pretrial services, as

5    during all the bail applications, maintains that the conditions

6    are insufficient, and that there is no conditions that could

7    reasonably assure the defendant's appearance in court and the

8    safety of the community.  Therefore we maintain the position

9    that detention is appropriate here.

10             THE COURT:  Has your office ever had a situation where

11   there were conditions of release that included the kind of

12   private security detail that we are talking about here?

13             MR. LETTIERI:  Not in my eight-year career here, but I

14   believe there have been instances in the past of that.  And

15   there are some concerns with that that have already been

16   brought up by your Honor in terms of who is paying those

17   individuals, and what kind of background the company has, and

18   their ability and willingness to enforce the conditions that

19   the Court imposes.  There is our office, which is the entity

20   that is designed to do that.  So, we just have concerns with

21   that proposal from the defense.

22             THE COURT:  A lot of the proposed conditions involve

23   approval by pretrial services and also visits by pretrial,

24   unannounced visits by pretrial services.  That's something that

25   could be accommodated by your office, correct?

OBM3COM2

1          MR. LETTIERI:  Yes, your Honor.  If he's released

2    under these conditions, he would be supervised by our office.

3    And the home detention, which is a little confusing in terms of

4    what defense is proposing, exactly, what that means, would be

5    enforced through location monitoring which would be monitored

6    by our office as well, which would require visits to that

7    residence.

8          THE COURT:  Understood.  Thank you.

9          MR. LETTIERI:  Thank you.

10          THE COURT:  Ms. Slavik.

11          MS. SLAVIK:  Your Honor, I'd like to respond to a few

12    of the points that the defense brought up.

13          But just at the outset, your Honor, what I want to

14    point out is that this is a case about violence.  The defendant

15    has engaged in physical, sexual, and emotional abuse of his

16    romantic partners for years, and he's subjected individuals

17    around him, employees, romantic partners, perfect strangers, to

18    physical violence.  He's thrown objects at people, he's thrown

19    people to the ground, he's hit, he's kicked, he's dragged.

20          THE COURT:  How is he going to do that, given the

21    proposed conditions?

22          MS. SLAVIK:  Your Honor, I think that the thing that I

23    go back to is trust.  Your Honor made a point earlier in this

24    proceeding, he said that the attorneys' function is to make

25    sure that the defendant knows the rules, and that he follows

OBM3COM2

1    the rules.  And there are so many examples here of counsel

2    drawing a line, and the defendant then stepping over it.

3          Witness-1 is one example.  And Witness-1, to be clear,

4    is an escort who participated in multiple freak-offs involving

5    the defendant.  And as your Honor noted, the phone records show

6    that the defendant repeatedly contacted Witness-1, even after

7    he was represented by counsel, even after he had been served

8    with a grand jury subpoena.

9          This is problematic for the defendant, because it

10   shows that he cannot follow rules, even rules set by his own

11   attorneys.

12         Defense counsel made several representations to the

13   Court and in public that they don't speak with grand jury

14   witnesses.  And let me just quote from the September 18 hearing

15   in which defense counsel said that the defendant, "did not

16   reach out to grand jury witnesses.  I dispute that the

17   wholeheartedly.  He didn't do it, and he wouldn't do it.  And

18   he wouldn't do it because he has the sense not to do it, and he

19   wouldn't do it because we wouldn't let him do it."

20         The defendant broke these rules set by his own

21   counsel.  That shows that he will relentlessly contact

22   witnesses, even witnesses who have received grand jury

23   subpoenas, and the defendant clearly knew that this was wrong,

24   because there is no other reason to delete the text messages

25   between himself and Witness-1.  This is just one example of the

OBM3COM2

1    defendant's inability to follow rules.

2              Another example is this birthday social media

3    planning.  Like I said, the defendant planned this for at least

4    a week prior to the actual unveiling of this social media post

5    that was designed to influence the jury pool in this particular

6    case.

7              The defendant planned this through unauthorized means

8    of communications, through phone calls using other inmates' PAC

9    numbers and through ContactMeASAP messages.  And in those

10   messages, it is clear that his lawyers are expressing

11   trepidation about this idea for a birthday post.  The

12   defendant's family members says, oh, the lawyers say we

13   shouldn't do it.  The defendant's response?  "I don't care.

14   It's my birthday."  That's another example of the defendant not

15   following rules set by his own attorneys.  Flouting this

16   Court's order that he requested.

17             THE COURT:  Ms. Shapiro says a number of things.  One,

18   ContactMeASAP is authorized.  Two, PAC sharing is common and

19   routine.  And three, that the underlying communication is

20   protected conduct that he was able to engage in.

21             What's your response to that?  She says no violation

22   of the order, Rule 23.1, or any other principle of law here.

23             MS. SLAVIK:  I disagree -- starting with your Honor's

24   last point.  I disagree that the content of those

25   communications violated the Court's gag order.  They did.  The

OBM3COM2

1    gag order prohibits the parties from making extrajudicial

2    statements designed to influence the integrity of these

3    proceedings.  That's exactly what the defendant's social media

4    posts were intended to do.

5           Now, with respect to the methods of communication, I

6    do want to spend a moment talking about that.  Because as set

7    out in the government's brief, the government's view is that

8    these repeated examples of the defendant engaging in

9    unauthorized communication practices are just more evidence

10   that the defendant is not amenable to conditions.

11          Now, the types of communications are use of other

12   inmates' PAC numbers, three-way calling, and ContactMeASAP.

13   These, first of all, these methods of communications are

14   specifically prohibited by the BOP.

15          THE COURT:  You've seen PAC sharing in a number of

16   cases, right?  That's something that comes up?

17          MS. SLAVIK:  Your Honor, the point is that the

18   defendant in the very declaration that was submitted yesterday,

19   there is a citation to the BOP handbook for inmates at the MDC.

20   That handbook that the defendant cited in his declaration makes

21   clear that these methods of communications are unacceptable.

22   They're in violation of BOP policy.

23          And let's just back up and talk about why these

24   regulations and policies are important.  These rules are in

25   place because they are critical to ensure order in the

OBM3COM2

1    facility.  And even more importantly, they're important to

2    assure the safety of the inmates, of the staff, and people on

3    outside, including family members and government witnesses and

4    things of that nature.  So the use of unauthorized

5    communications can lead to witness tampering and can lead to,

6    you know, actual incidents of violence.  That's why these

7    regulations are in place.  That's why they're important.

8         So, violating these rules, they are a big deal, and

9    they do matter.

10         The defendant has used at least eight other inmates'

11    PAC numbers.  He's paid for them.  He's engaged in three-way

12    calling.  He's used ContactMeASAP.  That makes it harder to

13    monitor his communications.  When he calls people using other

14    inmates' PAC numbers, BOP doesn't immediately know that it's

15    him.  The same is true for three-way calling.  It is impossible

16    to tell who he's calling, if he's asking others or instructing

17    others to dial them in via three-way.

18         So that's why these communications are prohibited by

19    the BOP.  And the defendant knows that they're prohibited.  In

20    addition to the rules being set out very clearly in the

21    handbook cited by the defendant, the evidence is that with

22    these recorded calls, when an inmate goes to make a call, they

23    have to enter a specific PAC number, and then they have to

24    provide voice authentication.  And after that, there is a

25    prerecorded message that says, "Use of other PAC numbers

OBM3COM2

1  violates BOP policy, and may be subject to discipline."  That's

2  before every single phone call that's made, and the defendant

3  has made dozens of phone calls, so he knows that this a

4  violation of BOP policy.

5      And the defendant's use of ContactMeASAP, which is not

6  sanctioned by the BOP, that is an error to assert that it is,

7  the defendant's use of ContactMeASAP involved him assigning one

8  of his adult son's a very clearly false e-mail address.  And

9  through that e-mail address, the defendant messaged literally

10  dozens of people who were not his son.  And some of those

11  included individuals who were not on his contact list.

12      Now, I note that counsel represented that they thought

13  that ContactMeASAP was appropriate and sanctioned by the BOP

14  because they contacted ContactMeASAP.  They didn't contact the

15  BOP if this was okay.

16      THE COURT:  I think they were saying it operates

17  through the Trulincs system, so all those communications are

18  monitored.  And in fact, the government has turned over the

19  ContactMeASAP messages as part of its discovery, and so it's

20  operating within the authorized system that the BOP uses.

21      MS. SLAVIK:  Your Honor, it is not.  It is not

22  authorized by BOP.

23      And in addition to the defendant using the

24  ContactMeASAP account through this false e-mail address I've

25  described, he's also used other inmates' ContactMeASAP

OBM3COM2

1    accounts.  And in fact, one of the defendant's family members

2    is still using another inmate's ContactMeASAP account to

3    communicate and give messages to the defendant.  So this

4    violation of rules is ongoing, and this flouting of even the

5    attorneys' rules is ongoing.  And that is a deep problem and

6    that shows that the defendant is not amenable to conditions,

7    your Honor.

8              Now, I want to turn to some of the examples that

9    counsel cited, some of the prior cases that counsel cited,

10   including the *Jeffries* case in the Eastern District.

11             Now, I think it's important to note that one of the

12   defendants in that case is in fact detained.  So there are two

13   defendants who were released on conditions, but one is

14   detained.

15             THE COURT:  The one that was detained is a foreign

16   national.

17             MS. SLAVIK:  Yes, that's right.

18             But I also want to make clear that there are certain

19   non-public health issues involving the defendants in that case

20   that we understand factored very significantly in the

21   negotiations between those defendants and the prosecutors in

22   the Eastern District.

23             THE COURT:  If you are going to talk about the other

24   cases, I can read the cases.

25             MS. SLAVIK:  No.  What I want to say, your Honor, is

OBM3COM2

1    because of the significant evidence of violence in this case,

2    and because the racketeering conspiracy charged is through the

3    present, I think that this makes this case much more similar to

4    the cases in which the courts ordered detention, and which I

5    note the defense did not address at all.  That's the *R. Kelly*

6    case, that's the *Raniere* case, that's the *Lawrence Ray* case.  I

7    think those cases were much more comparable, your Honor.

8          And then, your Honor, one other point that defense

9    counsel I think suggested is that with respect to the proposed

10   conditions, I think that their argument is because the proposed

11   conditions are supposedly even more restrictive than the

12   conditions at the MDC, that the defendant should be released.

13         Your Honor, that's absurd, frankly.  That really means

14   that the worse the defendant behaves in custody, the more

15   deserving he is of release.

16         The Bail Reform Act asks this Court to consider the

17   history and characteristics of the defendant.  And when you

18   look at the history and characteristics of this particular

19   defendant, it shows that he cannot be trusted.  He cannot

20   follow rules.  He can't follow the BOP rules, he can't follow

21   this Court's orders, and he can't follow rules set by his own

22   attorneys.  He cannot be trusted to abide by conditions, your

23   Honor, and I think that is the concern identified by pretrial

24   services.

25         Your Honor, detention is the appropriate decision in

OBM3COM2

1   this case.  And I respectfully submit that your Honor should

2   consider the opinions reached by two other judges considering

3   this very case.

4           THE COURT:  The only thing you didn't address was

5   Ms. Shapiro's point that none of this is obstruction.  I

6   understand you said it is obstruction.  But, what do you say to

7   the argument that under *Trump* and some of those other cases,

8   there are First Amendment interests that have been recognized

9   that would permit Mr. Combs to do a lot of what you've pointed

10  to, as to the witnesses, the potential witnesses that you've

11  pointed to.  She says those are also authorized because those

12  are protected by the Sixth Amendment.

13          And I guess my real question is for both sides.  This

14  isn't really addressed in these papers, but it is front and

15  center in the government's opposition, since you are saying

16  these are the communications that you're saying evidence recent

17  efforts to obstruct these proceedings.

18          My suggestion would be that both sides put in a short

19  letter by Monday at noon specifically addressing the issue that

20  Ms. Shapiro raised.  Because I think that is an important issue

21  not just for this application, but moving forward,

22  understanding the types of communications that Mr. Combs is

23  able to engage in, consistent with this Court's order and

24  Rule 23.1.

25          Now that I've raised it and thought out loud, I will

OBM3COM2

1    order the parties to in fact do that by Monday at noon.

2            But, Ms. Slavik, I didn't want to get in your way if

3    there was anything further you wanted to raise.  And I already

4    saw folks from the second row standing up.  Anything further,

5    Ms. Slavik?

6            MS. SLAVIK:  Not at this time, your Honor.

7            THE COURT:  Thank you.  Mr. Ricco.

8            MR. RICCO:  Yes, good afternoon, your Honor.

9            A long time ago I learned that when you don't have to

10   add anything, don't.  But I do have to weigh in on this point,

11   your Honor, particularly when the government is asking you to

12   detain Mr. Combs because he doesn't follow his lawyers'

13   instructions.

14           Fact.  Ms. Shapiro and I joined the case and

15   co-counsel, we joined the case, and I could tell you, your

16   Honor, that the representation of a defendant in his situation,

17   detained at the MDC, is extremely difficult because of the

18   conditions under which exist at the MDC.  And we spend a great

19   deal of time trying to help defendants, and in particular

20   Mr. Combs, negotiate their right to a fair trial, given the

21   circumstances they're under.

22           Your Honor doesn't know how many e-mails that were

23   sent by myself and my co-counsel, to get Mr. Combs basic,

24   fundamental things that he needs for trial.  A file folder.  A

25   week of e-mails.  I even cited them the BOP policy statements,

OBM3COM2

please tell me why Mr. Combs can't have a file folder to

organize his materials.  And so what your Honor sees is the

tattered up shreds of paper that he walks around in jail with.

I've never seen that before.

          So what we find ourselves is for the government to

stand here and say he should be detained because he doesn't

follow instructions, Mr. Combs struggles to follow counsel's

instructions.

          Also, your Honor, his family members have been

introduced for a reason, because some of the lawyers in this

case have had discussions with the adult children who visit him

and have explained the importance of the visits.  That yes,

he's your dad, and you love him.  But whatever you do, you have

to talk to us about it.  And that's an ongoing process with

them, because they have to honor what your Honor does in this

case also, and they are prepared to do that.  And they're

prepared to subject themselves to whatever type of scrutiny the

government wants.  It is their father.

          But the idea that he's just a lawless person that

doesn't follow instructions is just not factually accurate.  We

spend way too many hours at the jail with the defendant, way

too many hours with Mr. Combs explaining this complicated

process and how things work.  And you reaching for it.

          And one of the interesting things that came up last

week with those notes, is that there is a reference in those

OBM3COM2

1    notes to a conversation that I had with Mr. Combs at the jail

2    and he's writing it down.  Following counsel's instructions

3    about what needs to be done for the preparation of certain

4    witnesses.

5         So the idea that he is this out-of-control individual

6    that has to be detained is just not factually accurate.

7         Last point, Judge.  You know, it's really interesting

8    to me that it the Department of Justice is responsible for the

9    MDC.  Now, I don't know about the rest of the lawyers.  Those

10    third-party calls come to me all the time.  And I hang them up.

11    But every once in a while, one of those third-party calls says,

12    you know, they just took your client out of here on a

13    stretcher.  And some of those calls, you follow your gut, you

14    follow them up, and guess what?  You found out that a defendant

15    was in distress at a hospital in a coma.  And so you try to

16    struggle with your good judgment.

17         It is a difficult process and it is a difficult place

18    to ensure that the defendants get a fair trial and fair

19    consideration.  He's not -- the individual in the courtroom,

20    Mr. Jettleson, he is professional.  He has a professional

21    representation at stake here.  He has more access to cell

22    phones and other phones.  He won't have that.  It's not you

23    rewarding him for bad behavior.  The government says the public

24    needs to be protected because he has access to those phones.

25    He is not going to have them.  If he left here today, he'll

OBM3COM2

 1  have more access to phones because there's a problem with cell

 2  phones in the Bureau of Prisons.  There is reports on it.

 3          So what we're proposing here is just far more

 4  restrictive.  It is shutting him down.  And I think that these

 5  conditions, and we stay focused on these conditions, the

 6  government has no response to the conditions, other than

 7  rhetorical statements about, well, he is a danger because he

 8  fights and kicks and makes phone calls, and that all that can

 9  be addressed with these conditions that have been proposed by

10  my co-counsel.

11          And I just wanted to say that, because it is very

12  difficult to sit here and to listen to say that an individual

13  doesn't follow what you're giving them advice for.  It is just

14  not factually accurate.

15          Thank you, your Honor.

16          THE COURT:  All right.  Thank you.  Thank you to both

17  sides for the argument here.  We're going to get a decision out

18  promptly.  We'll have the letters in on Monday, and we are

19  going to try to get this an opinion out to you by next week.

20          Anything further, Ms. Slavik?

21          MS. SLAVIK:  No, your Honor.

22          THE COURT:  Anything, Mr. Agnifilo?

23          MR. AGNIFILO:  No, thank you.

24          THE COURT:  Thank you very much.  We are adjourned.

25          (Adjourned)