UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

    -v.-

SEAN COMBS,
    a/k/a "Puff Daddy,"
    a/k/a "P. Diddy,"
    a/k/a "Diddy,"
    a/k/a "PD,"
    a/k/a "Love,"

           Defendant.

**24 Cr. 542 (AS)**

---

## THE GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTION FOR A HEARING AND OTHER RELIEF

EDWARD Y. KIM
Acting United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278

Maurene Comey
Meredith Foster
Emily A. Johnson
Christy Slavik
Madison Reddick Smyser
Mitzi Steiner
Assistant United States Attorneys
    *Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ................................................................................................................... 2

    A. The Defendant's Arrest and Remand............................................................................ 2

    B. The MDC Sweep ........................................................................................................ 3

    C. The Defendant's Renewed Motion for Bail ................................................................ 5

    D. The November 19, 2024 and November 22, 2024 Hearings ....................................... 5

ARGUMENT ...................................................................................................................... 7

    A. The BOP Search Did Not Violate the Defendant's Fourth Amendment Rights and Regardless the Requested Relief Is Moot .......................................................................... 8

        1. Legal Standard ...................................................................................................... 8

        2. Discussion .......................................................................................................... 10

    B. The Government's Possession of the BOP Notes Did Not Violate the Defendant's Sixth Amendment Rights Because the Government Did Not Intentionally Interfere With the Attorney-Client Relationship, Much Less Prejudice the Defendant .................................... 12

        1. Legal Standard .................................................................................................... 12

        2. Discussion .......................................................................................................... 13

            a. The Defendant Cannot Demonstrate a "Manifestly and Avowedly Corrupt" Or Even "Intentional" Intrusion Into the Attorney-Client Relationship.................................... 13

            b. The Defendant Cannot Demonstrate Prejudice.................................................... 18

    C. The Other Extraordinary Relief Requested By the Defendant Is Unwarranted.............. 20

        1. A Hearing Is Not Necessary ................................................................................. 20

        2. A Filter Team Will Sufficiently Protect Any Potentially Privileged Material ............ 22

        3. Disqualification Is Inappropriate .......................................................................... 24

        4. Dismissal Of the Indictment Is Absolutely Unwarranted ....................................... 25

CONCLUSION................................................................................................................... 26

# TABLE OF AUTHORITIES

Page(s)

Cases

*Bell v. Wolfish*, 441 U.S. 520 (1979) ........................................................................ 11

*Corley v. City of New York*, No. 14 Civ. 3202 (GHW), 2017 WL 4357662
   (S.D.N.Y. Sept. 28, 2017) ..................................................................................... 8

*Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318 (2012) ............. 9, 11

*Gist v. United States*, No. 19 Civ. 5095 (GHW), 2021 WL 3774289
   (S.D.N.Y. Aug. 24, 2021) ..................................................................................... 16

*Gobern v. United States*, No. 18 Civ. 12411 (VSB), 2021 WL 3774293,
   (S.D.N.Y. Aug. 25, 2021) ..................................................................................... 12

*Hudson v. Palmer*, 468 U.S. 517 (1984) ..................................................................... 8

*In re Search Warrants Executed on April 28, 2021*, No. 21 Misc. 425 (JPO),
   2021 WL 2188150 (S.D.N.Y. May 28, 2021) ........................................................ 23

*Jackson v. Duckworth*, 953 F.2d 646 (7th Cir. 1992) .................................................. 10

*Kastigar v. United States*, 406 U.S. 441 (1972) ..................................................... 20, 21

*Montejo v. Louisiana*, 556 U.S. 778 (2009) ............................................................... 14

*Nickel v. Hannigan*, 97 F.3d 403 (10th Cir. 1996) ..................................................... 22

*Ortiz v. City of New York*, No. 12 Civ. 3118 (HB), 2012 WL 6200397
   (S.D.N.Y. Dec. 12, 2012) ...................................................................................... 9

*Stow v. Grimaldi*, 993 F.2d 1002 (1st Cir. 1993) ................................................... 10, 11

*Stroud v. United States*, 251 U.S. 15 (1919) ......................................................... 10, 11

*United States v. Avenatti*, 559 F. Supp. 3d 274 (S.D.N.Y. 2021) ............................ 14, 22

*United States v. Blau*, 159 F.3d 68 (2d Cir. 1998) ...................................................... 21

*United States v. Ceglia*, No. 12 Cr. 876 (VSB), 2015 WL 1499194
   (S.D.N.Y. Mar. 30, 2015) .................................................................................... 23

*United States v. Chin*, 934 F.2d 393 (2d Cir. 1991) .................................................... 26

*United States v. Ciancia*, No. Cr. 13-902 (PSG), 2015 WL 13798678
(C.D. Cal. May 20, 2015) ........................................................................ 10, 11

*United States v. Cohen*, 796 F.2d 20 (2d Cir. 1986) ................................... 8, 9, 10, 11

*United States v. Cuervelo*, 949 F.2d 559 (2d Cir. 1991) ................................... 26

*United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001) ............................... 25

*United States v. DeFonte*, 441 F.3d 92 (2d Cir. 2006) ...................................... 9

*United States v. Dien*, 609 F.2d 1038 (2d Cir. 1979) ........................................ 19

*United States v. Grant*, No. 04 Cr. 207 (BSJ), 2004 WL 1171258
(S.D.N.Y. May 25, 2004) ........................................................................ 23

*United States v. Helmsley*, 726 F. Supp. 929 (S.D.N.Y. 1989) ...................... 21

*United States v. Hoey*, 15 Cr. 229 (PAE), 2016 WL 270871
(S.D.N.Y. Jan. 21, 2016), *aff'd*, 725 F. App'x 58, 61 (2d Cir. 2018) ................ 21, 22

*United States v. Horn*, 811 F. Supp. 739 (D.N.H. 1992) ............................. 24, 25

*United States v. Landji*, No. 18 Cr. 601 (PGG), 2021 WL 5402288
(S.D.N.Y. Nov. 18, 2021) ................................................................ 13, 15, 19

*United States v. Lumiere*, No. 16 Cr. 483 (JSR), 2016 WL 7188149
(S.D.N.Y. Nov. 29, 2016) ........................................................................ 22

*United States v. Marashi*, 913 F.2d 724 (9th Cir. 1990) ................................. 22

*United States v. Mariani*, 851 F.2d 595 (2d Cir. 1988) ................................... 21

*United States v. Neill*, 952 F. Supp. 834 (D.D.C. 1997) ................................ 19

*United States v. Noel*, No. 19 Cr. 830 (AT), 2020 WL 12834537
(S.D.N.Y. June 9, 2020) ........................................................................ 16

*United States v. Ozar*, 50 F.3d 1440 (8th Cir. 1995) ...................................... 22

*United States v. Patel*, No. 16 Cr. 798 (KBF), 2017 WL 3394607
(S.D.N.Y. Aug. 8, 2017) ........................................................................ 22

*United States v. Sammy*, 763 F. App'x 45 (2d Cir. 2019) .............................. 25

*United States v. Sanin*, 113 F.3d 1230 (2d Cir. 1997) ................................... 18

*United States v. Sattar*, No. 02 Cr. 0395 (JGK), 2002 WL 1836755
(S.D.N.Y. Aug. 12, 2002) ................................................................ 13, 18

*United States v. Schwimmer*, 924 F.2d 443 (2d Cir. 1991).................................................... passim

*United States v. Sharma*, 18 Cr. 340 (LGS), 2019 WL 3802223
   (S.D.N.Y. Aug. 13, 2019) ............................................................................................ passim

*United States v. Spivak*, No. 21 Cr. 491, 2024 WL 3861334
   (N.D. Ohio Aug. 17, 2024) .......................................................................................... 19

*United States v. Squillacote*, 221 F.3d 542 (4th Cir. 2000) ......................................... 22

*United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) ...................................................... 25

*United States v. Stewart*, No. 02 Cr. 395 (JGK), 2002 WL 1300059
   (S.D.N.Y. June 11, 2002)........................................................................................ 23, 24

*United States v. Tourant*, No. 22 Cr. 276 (LTS), 2023 WL 5276776
   (S.D.N.Y. Aug. 15, 2023) .............................................................................. 13, 14, 20, 21

*United States v. Walker*, 243 F. App'x 621 (2d Cir. 2007).......................................... 24

*United States v. Weissman*, No. 94-CR-760-CSH, 1996 WL 751386
   (S.D.N.Y. Dec. 26, 1996)........................................................................................... 13

*United States v. Willoughby*, 860 F.2d 15 (2d Cir. 1988)............................................. 8

*United States v. Winters*, No. 06 Cr. 64 (SWK), 2006 WL 2789864 (S.D.N.Y. Sept. 27, 2006). 23

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003).................................................... 14

*Weatherford v. Bursey*, 429 U.S. 545 (1977).............................................................. 15

*Williams v. Ramos*, No. 13 Civ. 826 (VB), 2013 WL 7017674 (S.D.N.Y. Dec. 23, 2013)............ 9

## PRELIMINARY STATEMENT

The Government respectfully submits its opposition to defendant Sean Combs' motion for a hearing and other relief based on purported Fourth and Sixth Amendment violations (the "Motion," or "Br.," *see* Dkt. No. 98). The Motion is simply the defendant's latest in a series of attempts to distract from his own misconduct by crying Government foul. (*See, e.g.*, Dkt. No. 30 (claiming the Government leaked grand jury material to the press when in reality, the defendant bribed hotel security with $100,000 to obtain video surveillance of the defendant brutally assaulting a female victim); Dkt. No. 61 (accusing the Government of misleading the Court as to the defendant's contacts with victims and grand jury witnesses, despite the defendant's repeated contacts with those witnesses and his deletion of messages evidencing those contacts); Nov. 19, 2024 Tr. at 35-39 (arguing to the Court that the Government conspired to violate his attorney-client privilege by seizing a legal notebook clearly marked "Legal," when it was the defendant who apparently misled the Court by labeling the notebook after the fact)). As in those other attempts, the instant motion substitutes outlandish speculation in place of any support from the record or the law.

Here, the defendant accuses the Government of "tak[ing] advantage" of his incarceration by "spy[ing]" on him and "invad[ing]" communications with his counsel, in violation of the Fourth Amendment. (Br. at 1). Ignoring the black letter law that prison searches initiated by prison officials—which is exactly what happened here—are not subject to constitutional challenge, the defendant claims that there was no legitimate reason to search the defendant's papers and that the Bureau of Prisons ("BOP") investigator who conducted the search was "biased." (*Id.* at 13). But to support these far-fetched arguments, the defendant twists the record far beyond recognition.

The defendant also claims that the Government intentionally violated his attorney-client privilege and Sixth Amendment right to counsel by engaging in "shocking and outrageous"

1

conduct. (*Id.* at 2). However, by misrepresenting the character of the handwritten notes at issue to this Court, it is the *defendant*—and not the Government—who has engaged in "shocking and outrageous" conduct. Ignoring this completely, the defendant baselessly accuses the Government of intentionally invading "the defense camp to obtain and use materials protected by the attorney-client privilege." (*Id.* at 8). In doing so, the defendant relies on inapposite case law, factual distortions, and speculative assumptions. The undisputed facts, however, demonstrate that the Government emphatically did *not* violate the defendant's constitutional rights. Rather, the Government obtained the notes appropriately from the BOP; the Government took appropriate steps by providing the notes to a filter team; and the release of any potentially privileged material resulted in absolutely no prejudice to the defendant.

Given that the defendant cannot demonstrate any violation of his constitutional rights, his Motion should be denied. Further, as explained below, the defendant's requested suppression remedy is moot, and, even assuming *arguendo* that the seized notes were covered by attorney-client privilege, because the Government is electing to refrain from making further use of the materials, the defendant is not entitled to any other remedy.

## BACKGROUND

### A. The Defendant's Arrest and Remand

On September 12, 2024, Indictment 24 Cr. 542 was filed charging the defendant in three counts: (1) racketeering conspiracy, in violation of 18 U.S.C. § 1962(d); (2) sex trafficking, in violation of 18 U.S.C. §§ 1591 and 2; and (3) interstate transportation to engage in prostitution, in violation of 18 U.S.C. §§ 2421(a) and 2. On September 16, 2024, the defendant was arrested. The following day, the Indictment was unsealed and the defendant was presented and arraigned before the Honorable Robyn F. Tarnofsky, United States Magistrate Judge. As part of that proceeding, the Government moved for detention under the Bail Reform Act. Finding that there was no

condition or combination of conditions that would reasonably assure the safety of the community, Judge Tarnofsky denied the defendant bail. The following day, the Honorable Andrew L. Carter heard and denied the defendant's bail appeal after a lengthy hearing, determining that the Government had proven by clear and convincing evidence that the defendant was a danger to the community and a risk of obstruction. The defendant was remanded to the Metropolitan Detention Center in Brooklyn (the "MDC"), a facility managed and maintained by the BOP.

### B. The MDC Sweep

Starting on or about October 28, 2024, the BOP and several other federal and local agencies initiated a "sweep" of the MDC. The sweep was "preplanned and coordinated to ensure the safety and security" of staff and inmates at the MDC, and was part of a "larger safety and security initiative and not in response to any particular threat or intelligence." (*See* https://www.bop.gov/resources/news/pdfs/20241101-press-release.pdf). The MDC sweep—planned well in advance of the defendant's arrest, and not conducted to target any particular inmate—included the jail and the warehouse where MDC food and other property are stored.

During the MDC sweep, multiple housing units were searched, including the defendant's unit. Although the Case Team—members of the Government responsible for investigating, charging, and trying the present case—were aware in advance that the defendant's housing unit (in addition to other areas of the jail) would be searched, no one on the Case Team supervised, conducted, or participated in the search of any housing unit, nor the search of the defendant's bunk area. The Case Team was not aware in advance of which agents and officers were taking part in the MDC sweep, nor what role any specific agent or officer would play in the MDC sweep.

One of the BOP employees assigned to the weeklong MDC sweep was an analyst assigned to the BOP's Intelligence and Investigations Unit based in Martinsburg, West Virginia (the "BOP Investigator") who, per BOP policy, had been reviewing the defendant's recorded phone calls and

emails since the defendant entered BOP custody.[1]  (*See* Dkt. No. 72 at 2-3).  During the sweep of the defendant's housing unit, the BOP Investigator interviewed multiple inmates, including the defendant, about potential corruption and contraband at the MDC.  Following these interviews, the BOP Investigator approached the defendant's assigned bunk to check for contraband.  On the defendant's bunk, the BOP Investigator found the following items: (1) a manila folder marked "legal," (2) notes labeled "Things to Do," (3) an address book, and (4) personal effects.  The BOP Investigator felt the outside of the manila folder marked "legal" for contraband, and feeling none, set it aside and did not open or photograph it.  The BOP Investigator photographed the notes labeled "Things to Do" and the address book.  Nothing was seized from the defendant, as the BOP Investigator left the materials on the defendant's assigned bunk.  (*See id.* at 3).

Following the MDC sweep, the BOP Investigator alerted the Case Team that he was present for the MDC Sweep and had taken photographs of certain of the defendant's notes (the "BOP Notes").  The Case Team requested copies of the BOP Notes from the BOP, but to guard against the Case Team inadvertently accessing any privileged information, the Case Team asked the BOP Investigator to provide the BOP Notes directly to a team within the U.S. Attorney's Office that operates separately from the Case Team and is responsible for reviewing potentially privileged material (the "Filter Team").  As it has done throughout the course of this investigation, the Filter Team reviewed the BOP Notes—nineteen pages in total—for valid claims of privilege, segregated potentially privileged material from the Case Team (in this case by redacting potentially privileged information), and then provided the remaining materials to the Case Team.

---

[1] Prior to the MDC Sweep, the Case Team had communicated with the BOP Investigator regarding the defendant's monitored communications and had issued legal process to obtain such communications from BOP.  (*See* Dkt. No. 72 at 2).

### C.  The Defendant's Renewed Motion for Bail

On November 8, 2024, the defendant filed a renewed motion for bail.  (*See* Dkt. No. 60).  In the Government's opposition brief, submitted on November 15, 2024, the Government argued, *inter alia*, that the defendant was a danger to the community who was actively obstructing justice while in custody, including by attempting to influence witness testimony.  Among other evidence, the Government cited two excerpts of the BOP Notes that had been provided to the Case Team after review by the Filter Team.  (*See* Dkt. No. 69 at 21-22).  The Government, through the Filter Team, also produced the fully unredacted BOP Notes to the defendant.

On November 18, 2024, defense counsel submitted a letter motion to the Court requesting an "immediate evidentiary hearing," arguing that the Government was in possession of attorney-client privileged material, including "privileged notes to his lawyers concerning defense witnesses and defense strategies."  (Dkt. No. 70 at 1).  The defense also argued that the Government had engaged in a "targeted" seizure of the defendant's materials, (*id.* at 1), amounting to a violation of the defendant's constitutional rights.  The defense requested that the Court hold an "immediate hearing" to assess, among other things, who authorized a search of the defendant's cell, who determined the materials to be seized, and who provided the materials to the Government.  (*Id.* at 1-2).  The Government responded to the defendant's letter the same day.  (*See* Dkt. No. 72).

### D.  The November 19, 2024 and November 22, 2024 Hearings

On November 19, 2024, the Court held a hearing to address the issues of attorney-client privilege raised by the defense.  (*See* Dkt. No. 71).  The Government argued that the BOP Notes did not appear privileged on their face, and that the portions of the BOP Notes released by the Filter Team to the Case Team were not privileged.  (Nov. 19, 2024 Tr. at 22-23).  To counter the Government's argument, defense counsel pointed to a stack of actual notebooks the defendant brought to court, which included a notebook from which at least some of the BOP Notes were

purportedly taken, claiming that the defendant had handwritten "legal" on the notebooks and that the BOP Notes were taken from legal pads marked as legal. (*Id.* at 33-34 (MR. AGNIFILIO: "He's handwritten the word 'legal.' . . . On top of the legal pad he's handwritten in blue handwriting the word 'legal.' All these legal pads say 'legal.'"; COURT: "You['re] saying the photographs that were taken, those pages were in legal pads that are marked as legal?" MR. AGNIFILO: "Yes. Yes. They're marked as legal. They're marked as legal.")). In further support of this assertion, defense counsel presented to the Court—but not the Government—one of the notebooks from which the BOP Notes were allegedly taken, which was apparently labeled "legal."

At the conclusion of the hearing, and after the Government agreed that the Court need not consider the BOP Notes to decide the defendant's renewed bail motion, the Court ordered the Case Team to destroy all copies of the BOP Notes to which they had access but permitted the Filter Team to maintain copies of them. (*Id.* at 24, 43-46). The Court confirmed its ruling by written order dated November 20, 2024. (Dkt. No. 76). That same day, the Court issued another order stating that "defense counsel presented the Court with an intact legal pad with 'Legal' written on the binding, stating that the 'Legal' label on this and the other pads showed that they were clearly protected by attorney-client privilege and should not be in the Government's possession." (Dkt. No. 77). However, the markings on the notebook presented to the Court at the hearing were apparently at odds with the BOP Notes photographed during the MDC sweep, which had previously been submitted to the Court. Accordingly, the Court ordered defense counsel to address why the "Legal" label did not appear on the photographs of the BOP Notes. (*Id.*).

On November 22, 2024, the Court held a hearing on the defendant's renewed bail motion. In response to the Court's inquiry regarding the "Legal" label that seemed to have appeared *after* the photographs of the BOP Notes were taken, defense counsel stated that "[a]s we sit here today, I'm not sure when 'legal' was written on each" of them and conceded that, contrary to his

representations to the Court only days before, "it has to be the case that as of the day of the search
. . . 'legal' wasn't written on every legal pad." (Nov. 22, 2024 Tr. at 3-5). Defense counsel further
assured the Court that it would "get back to the Court" to "give your Honor a fuller account of all
of these issues," and that in "fairly short order," the defendant would "give the Court a full account
of all these related issues." (*Id*. at 4). The Court admonished the defense for making "a clear
representation that the[] legal pads had 'legal' written on them," which was inaccurate and urged
the defense to ensure its representations to the Court are "in good faith" and "true." (*Id.* at 5).
Although the defendant submitted the present Motion containing additional arguments about the
BOP Notes, the Government has not received the "full account" of the apparent misrepresentation
made by the defense about the "Legal" label affixed to the notebooks containing the BOP Notes.[2]

On November 27, 2024, without relying on the BOP Notes, the Court denied the
defendant's renewed bail motion. (*See* Dkt. No. 92). On December 4, 2024, the defendant filed
the instant Motion, which is notably devoid of any discussion of defense counsel's representations
in open court regarding any "legal" markings on the notebooks at the time of the MDC sweep.

## ARGUMENT

The defendant cannot show that the Government violated his constitutional rights by
obtaining the BOP Notes. Indeed, even assuming *arguendo* that portions of the BOP Notes are
covered by a valid claim of attorney-client privilege, the defendant would still not be entitled to
the relief he seeks. At most, despite the Government's good faith efforts to protect the defendant's
privilege—the same steps the Government routinely takes in countless other cases in this
District—a minimal amount of potentially privileged material may have been inadvertently

---

[2] To the extent the "full account" of the genesis of the "Legal" label was submitted *ex parte*, there
was no notice to the Government of such a filing and no readily apparent basis for filing *ex parte*.
To the extent there are portions of that full accounting that are privileged, the privileged materials
can be redacted from a publicly filed version.

released to the Case Team. Such inadvertent disclosure, to the extent it occurred, caused no prejudice to the defendant. Moreover, as set forth below, the Government does not intend to use BOP Notes. The defendant is thus not entitled to relief, let alone the extraordinary relief he seeks.

### A. The BOP Search Did Not Violate the Defendant's Fourth Amendment Rights and Regardless the Requested Relief Is Moot

As discussed further below, the defendant's Fourth Amendment arguments are meritless and must fail because the search was initiated by a prison official for a legitimate penological purpose. Nevertheless, the Government does not intend to offer as evidence the BOP Notes or any "fruits" of the BOP Notes as part of this prosecution of the defendant.[3] In light of the May 2025 trial date, this decision is intended to save judicial and Government resources that would be spent litigating this issue further. Consequently, the defendant's motion is moot.

#### 1. Legal Standard

As a general matter, "'the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell' because '[t]he recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions.'" *Corley v. City of New Yor*k, No. 14 Civ. 3202 (GHW), 2017 WL 4357662, at *15 (S.D.N.Y. Sept. 28, 2017) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526 (1984)). Nevertheless, pretrial detainees "may have some residual privacy interests that are protected by the Fourth Amendment." *United States v. Willoughby*, 860 F.2d 15, 21 (2d Cir. 1988); *United States v. Cohen*, 796 F.2d 20, 24 (2d Cir. 1986) ("An individual's mere presence in a prison cell does not totally strip away every garment cloaking his Fourth Amendment rights, even though the covering that remains is but a small remnant."); *accord United States v. DeFonte*,

---

[3] To be clear, the Government reserves all rights to re-open litigation of this issue if the defendant puts the contents of the BOP Notes at issue at any point during this prosecution.

441 F.3d 92, 94 (2d Cir. 2006) (summary order).  In particular, a pretrial detainee may challenge warrantless searches conducted "at the instigation of non-prison officials for non-institutional reasons."  *Cohen*, 796 F.2d at 24.

While warrantless searches initiated by non-prison officials may be subject to challenge, searches initiated by prison officials are not subject to constitutional challenge.  *Id.*  That is because "prison officials are presumed to do their best to evaluate and monitor objectively the security needs of the institution and the inmates in their custody, and then to determine whether and when such concerns necessitate a search of a prison cell."  *Id.* at 23.  "Accordingly, when a prison official initiates the search of a pre-trial detainee's cell, the search is not 'subject to constitutional challenge, regardless of whether security needs could justify it.'"  *Williams v. Ramos*, No. 13 Civ. 826 (VB), 2013 WL 7017674, at *8 (S.D.N.Y. Dec. 23, 2013) (quoting *Cohen*, 796 F.2d at 24); *see Ortiz v. City of New York*, No. 12 Civ. 3118 (HB), 2012 WL 6200397, at *7 (S.D.N.Y. Dec. 12, 2012) ("The task of determining whether a policy is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials . . . [I]n the absence of substantial evidence . . . that the officials have exaggerated their response to these considerations[,] courts should ordinarily defer to their expert judgment in such matters." (quoting *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 328 (2012))).

Consistent with this rule, courts have repeatedly rejected challenges to warrantless searches of prison cells initiated by prison officials without first determining whether they were justified by a specific prison security need, *see, e.g.*, *Williams*, 2013 WL 7017674, at *8 ("[B]ecause the search of plaintiff's cell and the resulting seizure of plaintiff's legal papers, religious items, and books were initiated and carried out by prison personnel, plaintiff cannot as a matter of law challenge the search and seizure."), and where prison officials later provided the materials obtained from the search to prosecutors, *see, e.g.*, *Stroud v. United States*, 251 U.S. 15, 21 (1919) (holding that there

was no violation of constitutional rights of detainee where detainee's notes were seized by prison officials and furnished to the district attorney); *United States v. Ciancia*, No. Cr. 13-902 (PSG), 2015 WL 13798678, at *1 (C.D. Cal. May 20, 2015) (denying defendant's motion to preclude the government from accessing his written, telephonic, and electronic communications with family members at or from the MDC without prior judicial approval).

## 2. Discussion

The defendant's claim that the BOP Investigator's search of his bunk area violated the Fourth Amendment is contrary to controlling Second Circuit law making clear that a search of a "pre-trial detainee's cell" initiated by a prison official is not "subject to constitutional challenge." *Cohen*, 796 F.2d at 24. The defendant's Fourth Amendment claim thus fails as a matter of law.

In an apparent attempt to avoid this necessary conclusion, the defendant speculates that the BOP Investigator effectively acted as an arm of the Case Team, as opposed to a prison official. The defendant argues that the security reason for the MDC sweep—to find contraband and evidence of corruption—did not encompass the BOP Investigator's search of the cell and that instead, the BOP Investigator was improperly acting to collect evidence for the Case Team. (Br. at 12-13). But of course there are multiple security and/or penological interests that may justify the search of a detainees' notes by a prison official, including preventing crimes such as efforts to obstruct proceedings. As courts have recognized, "[p]rohibiting crime is certainly a legitimate penological interest." *Jackson v. Duckworth*, 953 F.2d 646, at *3 (7th Cir. 1992); *see also Stow v. Grimaldi*, 993 F.2d 1002, 1004 (1st Cir. 1993). Alternatively, a prisoner's notes may contain details of an escape plan or be used to hide contraband images, which prison officials certainly have a penological interest in monitoring. *See, e.g., Grimaldi*, 993 F.2d at 1004 (holding that prison officials may check detainee's correspondence to "determine whether escape plans or other

proscribable matter is being sent"). The defendant's claim that there was "no legitimate security reason to peruse Mr. Combs' personal notes," (Br. at 12), is therefore demonstrably false.

Further, this Court need not determine exactly what penological interest justified the search of the defendant's notes prior to finding that no constitutional violation occurred. *See Cohen*, 796 F.2d at 24. As the Supreme Court has noted, the "task of determining whether a policy is reasonably related to legitimate security interests 'peculiarly within the province and professional expertise of corrections officials' . . . [I]n the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations[,] courts should ordinarily defer to their expert judgment in such matters." *Florence*, 566 U.S. at 328 (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 n.23 (1979)). It is therefore not for the defendant to second guess the decision of a prison official to search a detainee's notepads.

The defendant also appears to argue that the BOP Investigator must have been acting at the behest of the Case Team because he provided photographs of the notes seized from the defendant's bunk area to the Case Team after the fact and had provided information about the defendant to the Case Team on prior occasions. Again, this claim is meritless. The mere fact that a prison official turns over materials seized from a detainee's cell to prosecutors after the fact, with no prior coordination regarding the seizure, does not show that he acted at their behest. In fact, courts have repeatedly held that searches initiated by prison officials—even where those prison officials later turned over evidence seized from those searches to prosecutors and such evidence was helpful to a prosecution against a defendant—do not implicate the Fourth Amendment. *See, e.g.*, *Stroud*, 251 U.S. at 21; *Ciancia*, 2015 WL 13798678, at *1 (rejecting claim there exists a "Fourth Amendment ground for barring the BOP from searching and seizing Defendant's letters and relinquishing them to the prosecution").

Nevertheless, as noted above, while the defendant's Fourth Amendment challenge to the search and seizure of the BOP Notes fails as a matter of law, to conserve judicial and Government resources, the Government will not seek to offer the BOP Notes or any "fruits" of those notes as part of its prosecution against the defendant unless they are put at issue by the defendant. Accordingly, the question of whether a Fourth Amendment violation occurred is moot. *See Gobern v. United States*, No. 18 Civ. 12411 (VSB), 2021 WL 3774293, at *3 (S.D.N.Y. Aug. 25, 2021) (collecting cases).[4]

**B. The Government's Possession of the BOP Notes Did Not Violate the Defendant's Sixth Amendment Rights Because the Government Did Not Intentionally Interfere With the Attorney-Client Relationship, Much Less Prejudice the Defendant**

Given the Case Team's use of the Filter Team to review the BOP Notes in the first instance, the defendant cannot demonstrate that the Government "intentionally interfered" with the attorney-client relationship. Furthermore, given that the Court did not rely on the BOP Notes in denying the defendant's renewed motion for bail, and the Government has agreed not to use the BOP Notes or the investigative fruits of the BOP Notes in this prosecution, the defendant cannot demonstrate prejudice. Therefore, the defendant's Sixth Amendment claim must fail.

**1. Legal Standard**

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. The Sixth Amendment is violated when the Government intentionally interferes with the attorney-client relationship. *See United States v. Schwimmer*, 924 F.2d 443, 447 (2d Cir. 1991). In cases in which the Government has intentionally intruded on the attorney-client privilege, such conduct "warrants careful scrutiny." *Id.* "Such an exacting degree of scrutiny is not required, however, in cases

---

[4] The Government will file an *ex parte* letter with the Court specifying any investigative steps it has taken in response to receiving the BOP Notes.

where 'the government's intrusion into territory protected by [the defendant's] attorney client privilege *cannot be characterized as intentional*.'" *United States v. Tourant*, No. 22 Cr. 276 (LTS), 2023 WL 5276776, at *13 (S.D.N.Y. Aug. 15, 2023) (emphasis in original) (quoting *United States v. Weissman*, No. 94 Cr. 760 (CSH), 1996 WL 751386, at 12 (S.D.N.Y. Dec. 26, 1996)). Furthermore, absent a government intrusion into the attorney-client relationship that is "manifestly and avowedly corrupt," a defendant must demonstrate prejudice stemming from the government's conduct. *United States v. Landji*, No. 18 Cr. 601 (PGG), 2021 WL 5402288, at *23 (S.D.N.Y. Nov. 18, 2021) (quotation omitted). Indeed, "[w]here the intrusion upon an attorney-client communication is unintentional or justified there can be no violation of the Sixth Amendment without a showing that the intercepted communication was somehow used against the defendant to the defendant's prejudice." *United States v. Sattar*, No. 02 Cr. 0395 (JGK), 2002 WL 1836755, at *6 (S.D.N.Y. Aug. 12, 2002).

### 2. Discussion

#### a. The Defendant Cannot Demonstrate a "Manifestly and Avowedly Corrupt" Or Even "Intentional" Intrusion Into the Attorney-Client Relationship

Even assuming *arguendo* that the defendant has met his burden of demonstrating that any portions of the BOP Notes were privileged, the Motion must fail because the defendant cannot plausibly make out a Sixth Amendment violation.[5] Simply put, the Case Team's access to any privileged material in the BOP Notes cannot credibly be described as an "intentional"—much less a "manifestly and avowedly corrupt"—intrusion on the defendant's Sixth Amendment rights. Far

---

[5] To be clear, the Government does not concede that the defendant has met his burden of showing that the BOP Notes are privileged. Nor does the Government understand the defendant's position to be that the BOP Notes in their entirety are privileged. However, for the purposes of this brief, and for the reasons set out in the Filter Team's December 10, 2024 letter (*see* Dkt. No. 106), the Government will assume *arguendo* that certain information and materials within the BOP Notes are privileged.

from *intentionally* intruding upon the defendant's privilege, the Case Team took pains to *avoid* any such intrusion by providing the BOP Notes to the Filter Team. In cases like this one, where the Government has obtained potentially privileged material, use of a filter team "constitutes an action respectful of, rather than injurious to, the protection of privilege." *United States v. Avenatti*, 559 F. Supp. 3d 274, 282 (S.D.N.Y. 2021) (quoting *In re Grand Jury Subpoenas*, 454 F.3d 511, 522-23 (6th Cir. 2006)). Indeed, the use of a filter team has been deemed adequate protection of potentially privileged material obtained by the Government—pursuant to a search warrant or otherwise—time and again in cases in this District. *See Avenatti*, 559 F. Supp. 3d at 282 (noting that the use of a filter team "is a common procedure in this District and has been deemed adequate in numerous cases to protect attorney-client communications" and citing multiple cases); *see also*, *e.g.*, *United States v. Yousef*, 327 F.3d 56, 168 (2d Cir. 2003) (finding that "the Government established an effective firewall to prevent disclosures to the Government's trial attorneys of trial strategies or confidential communications between [the defendants] and their attorneys" in case in which government received notes and information from a jailhouse informant about defendants), *overruled on other grounds by Montejo v. Louisiana*, 556 U.S. 778 (2009).

The Case Team acted entirely appropriately and in good faith when it directed that the BOP Notes be provided directly to the Filter Team before reviewing these materials. The Case Team's use of the Filter Team demonstrates its good faith efforts to *avoid* coming into contact with privileged material. And even if the Filter Team inadvertently released privileged material, the Case Team's use of the Filter Team in the first place negates a finding of intentional intrusion on the attorney-client privilege. *See Tourant*, 2023 WL 5276776, at *15 ("[I]n determining whether the government has intruded upon privilege, courts often consider whether the prosecution took reasonable precautions to avoid exposure to privileged materials."); *United States v. Sharma*, 18 Cr. 340 (LGS), 2019 WL 3802223, at *3 (S.D.N.Y. Aug. 13, 2019) (finding no intentional

14

intrusion on the attorney-client privilege when Government used filter protocol for materials that it knew may contain privileged communications and the filter protocol was effective as to all but 21 documents). Even in cases in which the case team did *not* employ a filter team to review potentially privileged material, courts in this District have declined to find constitutional violations. *See Landji*, 2021 WL 5402288, at *23-24 (finding no "reckless disregard" for the defendants' Sixth Amendment rights after case agents' "cursory review" of privileged material).[6]

The defendant distorts the facts and the law to insist that the Government intentionally intruded on the defendant's Sixth Amendment rights, first by suggesting—contrary to facts and logic—that through the BOP Investigator, the Government "place[d] an informant in the defense camp . . . and receive[d] from that informant privileged information pertaining to the defense of the criminal charges," (Br. at 10 (quoting *Weatherford v. Bursey*, 429 U.S. 545, 554, n.4 (1977)), and second by insisting erroneously that the Government "diverged" from an "agreed-upon" Filter protocol. Neither argument has merit.

*First*, the BOP Investigator is far from an "informant," and the defendant's suggestion that the BOP Investigator was "placed" in the "defense camp" is pure conspiracy theory. (Br. at 10). As a result, the defendant's reliance on *Weatherford v. Bursey* is, described charitably, misplaced. In *Bursey*, an undercover agent, who later testified at the defendant's trial, met with the defendant's attorney to discuss the approaching trial. *Id.* at 547-48. Even then, the Supreme Court found that

---

[6] The character of the BOP Notes further underscores that even if privileged material was released to the Case Team, any such "intrusion" into the defendant's Sixth Amendment was at most inadvertent and certainly not intentional. Without analyzing the substance of the BOP Notes, of which the Case Team is no longer in possession, the declaration filed by the defense team to support their contention that the BOP Notes are privileged demonstrates that the BOP Notes are not on their face privileged. Indeed, a 10-page declaration, which is effectively illegible given the number of redactions, sets out the additional context and facts apparently required to make the determination that these BOP Notes are privileged. (*See* Dec. 4. 2024 Geragos Decl.). If this context—none of which the Filter Team had—was required to determine that the BOP Notes were privileged, any determination to the contrary was obviously inadvertent.

there was no Sixth Amendment violation because "this is not a situation where the State's purpose was to learn what it could about the defendant's defense plans and the informant was instructed to intrude on the lawyer-client relationship." *Id*. at 557. Here, of course, the BOP Investigator is no undercover agent engaged in any sort of masquerade or subterfuge. And in stark contrast to having been "instructed to intrude on the lawyer-client relationship," the BOP Investigator had no direction whatsoever from the Case Team in advance of the sweep, as the Case Team had no knowledge that the BOP Investigator was even participating until after the fact.

The fact is, the BOP Investigator is part of a law enforcement team that operates independently from the Case Team and is emphatically *not* a member of the prosecution team. (*See also supra* at 10-11). "To be sure, the BOP is a component of the Department of Justice, but that fact standing alone is not sufficient to make the BOP an arm of the prosecution." *United States v. Noel*, No. 19 Cr. 830 (AT), 2020 WL 12834537, at *4 (S.D.N.Y. June 9, 2020). With respect to his search of the defendant's bunk during the sweep, the BOP Investigator was not "working with" the Case Team. (*See* Br. 2). That he made the Case Team aware of his findings after the fact does not show otherwise. In fact, exactly the opposite conclusion must be drawn from the facts regarding the search and the Case Team's overall interactions with BOP: the Case Team obtained records from the BOP by issuing grand jury subpoenas and document requests; the Case Team's investigation and the BOP investigation have operated independently; and BOP personnel have never participated in the Case Team's interviews, were not involved in the Case Team's grand jury presentation, and are not involved in the Case Team's prosecution strategy. *See Gist v. United States*, No. 19 Civ. 5095 (GHW), 2021 WL 3774289, at *17 (S.D.N.Y. Aug. 24, 2021) (analyzing same factors and concluding that BOP was not part of the prosecution team).

*Second*, the defendant's insistence that the Government deviated from some "agreed-upon" protocol is simply incorrect. (*See* Br. at 2, 11; Nov. 19, 2024 Geragos Decl. at ¶¶ 4-6). Since the

inception of the investigation, the Government has employed the Filter Team to review material that may contain attorney-client communications or work product.  The Filter Team then either (1) sends non-privileged material "over the wall" to the Case Team, or (2) segregates potentially privileged material from the Case Team entirely.  Prior to March 2024 when aspects of the investigation became overt, all data and materials obtained by the Government were reviewed in this manner—without any input from defense counsel.  After the March 2024 searches, the Government began communicating with defense counsel on certain privilege issues, such as receiving a list from defense counsel of individuals with whom the defendant may have had privileged communications to assist the Filter Team in screening for potentially privileged communications.[7]  At no point, however, did the Case Team or the Filter Team represent to the defense that the Filter Team would deviate from the process outlined above: reviewing material that may contain attorney-client communications or work product, and providing non-privileged material to the Case Team and segregating potentially privileged information from the Case Team. In fact, contrary to defense counsel's assertions, (*see* Nov. 19, 2024 Geragos Decl. at ¶ 4), the Government followed this very process for the notes seized from the defendant after overt law enforcement operations in March and September 2024.  As confirmed to defense counsel by letter dated December 11, 2024, the Filter Team reviewed those materials for privilege, and released certain files identified as non-privileged to the Case Team.[8]

---

[7] Additionally, the Filter Team has begun to produce potentially privileged material that it segregated from the Case Team to the defendant so that he, as the holder of the privilege, can assert valid claims of legal privilege over those materials.

[8] Given the defense team's apparent misunderstanding of the function of the Filter Team, and because no members of the Case Team had yet reviewed the non-privileged material from the March 2024 searches and the defendant's September 2024 arrest that were released by the Filter Team, the Filter Team has (since learning of the defense team's misunderstanding) restricted access of the Case Team to those materials until December 20, 2024 to afford the defense team an opportunity to assert valid claims of privilege.

In the case of the BOP Notes, the Filter Team operated as it has since the initiation of the investigation by reviewing the BOP Notes for potentially privileged material and releasing what it determined to be non-privileged to the Case Team. Simply put, there was no deviation from the Filter Team's protocol. *See Sharma*, 2019 WL 3802223, at *3 (finding no "intentional intrusion" when "[t]he record contain[ed] no evidence that the Government intentionally diverged from the [filter review] protocol"). Moreover, given that the Government obtained the BOP Notes in connection with its covert investigation into the defendant's ongoing obstruction and witness tampering, there was even further justification not to reveal the existence and scope of the secret investigation by engaging with defense counsel about privilege claims. *Cf. Sattar*, 2002 WL 1836755, at *7 (rejecting defendant's argument that possibility of potentially privileged materials overcame the Government's "legitimate interest in engaging in covert investigations of ongoing criminal activity" and denying defendant's motion to compel Government's disclosure of ongoing surveillance).

### b. The Defendant Cannot Demonstrate Prejudice

Because the defendant cannot demonstrate a "manifestly and avowedly corrupt" intrusion into the defendant's attorney-client relationship, to make out a violation of the Sixth Amendment, he must show that he was prejudiced. *See Schwimmer*, 924 F.2d at 447. The defendant barely addresses prejudice in his brief, likely because he simply cannot show that he has suffered any harm as a result of the Case Team's access to the BOP Notes for approximately two weeks.

First, the Court did not rely on the BOP Notes in denying the defendant's renewed motion for bail, and therefore the defendant suffered no prejudice in connection with that proceeding. Additionally, the Government has indicated that it will not use the BOP Notes or any investigative "fruits" of those BOP Notes as part of this prosecution. Accordingly, the BOP Notes will not be "used against the defendant to the defendant's prejudice," and therefore there can be no Sixth

18

Amendment violation. *Sattar*, 2002 WL 1836755, at *6; *see also United States v. Sanin*, 113 F.3d 1230, at *5 (2d Cir. 1997) (finding no prejudice when government did not use privileged information at trial); *United States v. Spivak*, No. 21 Cr. 491, 2024 WL 3861334, at *1-2 (N.D. Ohio Aug. 17, 2024) (even where government's "use of a filter team could have been structured or handled better," finding no prejudice when potentially privileged material was discovered by prosecutors after indictment).

The crux of the defendant's prejudice argument appears to be that somehow the BOP Notes have provided the Government insight into the defendant's trial strategy. This argument falls flat. The defendant claims the BOP Notes illuminate the defendant's trial strategy to: (i) discredit allegations in the Indictment and corresponding witness testimony, (ii) obtain an expert witness for trial, and (iii) collect cross examination material on key witnesses. (Br. at 24). But this sort of generic "strategy" is employed by nearly every criminal defendant in this District. Such non-specific information gives the Government no unfair insight into the defendant's trial strategy or any sort of tactical advantage in preparing for trial. *Cf. Landji*, 2021 WL 5402288, at *27 (refusing to presume prejudice even when Government had access to "highly sensitive, attorney work product material" laying out proposed trial strategy for defendant); *see also United States v. Neill*, 952 F. Supp. 834, 841-42 (D.D.C. 1997) (no prejudice when case team reviewed potentially privileged materials identifying entities and persons but not trial strategy). Any suggestion to the contrary is "wholly conjectural and insubstantial," and cannot support a finding of prejudice. *See Schwimmer*, 924 F.2d at 445-46 (holding that although the Government had "intentionally obtained . . . information protected by the attorney-client privilege," "any influence on the government's case . . . was 'wholly conjectural and insubstantial'").

Thus, even if any portions of the BOP Notes that the Case Team received were privileged, because the defendant cannot demonstrate prejudice, his Sixth Amendment violation claim fails.

*See United States v. Dien*, 609 F.2d 1038, 1043 (2d Cir. 1979) ("[T]o establish a Sixth Amendment violation . . . defendants were required to establish that privileged information had been passed to the government or that the government had intentionally invaded the attorney client relationship, and resulting prejudice.").

### C.  The Other Extraordinary Relief Requested By the Defendant Is Unwarranted

#### 1.  A Hearing Is Not Necessary

The defendant incorrectly insists that a hearing is required "to find out what really happened and why." (Br. at 14).  Given that the Government has stipulated that it will not use the BOP Notes or fruits thereof, the requested relief is moot with respect to the defendant's Fourth Amendment claim.  The defendant also insists that the Court should hold a hearing pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972), to determine whether the Government's case was "tainted" by the allegedly privileged BOP Notes.  The Court should deny this request.

*Kastigar* held that when a witness is compelled to give incriminating testimony under a grant of immunity and is thereafter prosecuted for a matter related to the compelled testimony, the Government bears "the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources."  406 U.S. at 461-62.  Courts have interpreted *Kastigar* to establish a proceeding in which the district court can determine whether the Government's evidence was derived from legitimate sources.  While some courts in this Circuit have applied the *Kastigar* standard to defendants' claims of governmental intrusion upon the attorney-client privilege, there is no binding Second Circuit authority on the question of whether a *Kastigar* hearing is required in all such cases.  *See, e.g.*, *Tourant*, 2023 WL 5276776, at *13.  Moreover, even in cases in which courts have applied the *Kastigar* standard to such a claim, a *Kastigar* hearing "is not required merely because a defendant has *asserted* that a prosecution is tainted." *United States v. Hoey*, 15 Cr. 229 (PAE), 2016 WL 270871, at *4 (S.D.N.Y. Jan. 21,

2016) (emphasis in original), *aff'd*, 725 F. App'x 58, 61 (2d Cir. 2018).  Rather, the defendant must raise a "distinct, non-speculative possibility of taint," *United States v. Helmsley*, 726 F. Supp. 929, 933-34 (S.D.N.Y. 1989), and must demonstrate a "factual relationship" between the protected information and the present prosecution, *United States v. Blau*, 159 F.3d 68, 72 (2d Cir. 1998) (citing *United States v. Mariani*, 851 F.2d 595, 599-600 (2d Cir. 1988)); *see also Tourant*, 2023 WL 5276776, at *17-18.

Prior to ordering a *Kastigar* hearing here, the Court would first need to find that the portions of the BOP Notes received by the Case Team were, in fact, privileged.  The defendant has not met his burden on that score.  Moreover, as reflected in the Filter Team's December 10, 2024 letter, (*see* Dkt. No. 106), the Government cannot fully respond to any claim of privilege by the defendant without the defendant's unredacted materials supporting his claim of privilege being made available to the Filter Team.  Even if the Court were to determine after briefing that some portion of the BOP Notes accessed by the Case Team were privileged, a *Kastigar* hearing would not be appropriate because the defendant has not raised a "distinct, non-speculative possibility of taint." *Helmsley*, 726 F. Supp. at 933-34.  Indeed, the defendant offers no concrete examples of taint, nor does he present a "factual relationship" between the privileged information and the present prosecution.  Instead, the defendant suggests that a *Kastigar* hearing is necessary to conduct what boils down to a fishing expedition to learn more about the Government's investigation.  This is plainly not the purpose of a *Kastigar* hearing, and the defendant has not satisfied his burden to demonstrate that he is entitled to such a hearing.  *See Sharma*, 2019 WL 3802223, at *5 ("To warrant a [*Kastigar*] taint hearing," a defendant has "the burden of showing a factual relationship between the privileged information and the prosecution." (citation omitted)); *United States v. Connolly*, No. 16 Cr. 0370 (CM), 2019 WL 2120523, at *19 (S.D.N.Y. May 2, 2019) ("'An insubstantial and speculative possibility of taint' does not trigger *Kastigar*." (citation

omitted)); *Hoey*, 725 F. App'x at 61 (defendant must show a "factual connection between" the content of "the allegedly privileged information and the charges in [the] case" to warrant hearing).

Moreover, because the Government has agreed not use the BOP Notes or the investigative fruits of the BOP Notes, the defendant's arguments in favor of requiring the Government to "demonstrate that the evidence it used to prosecute an individual was derived from legitimate, independent sources," (Br. at 19 (citing *Schwimmer*, 924 F.2d at 446)), are irrelevant here.[9]

### 2. A Filter Team Will Sufficiently Protect Any Potentially Privileged Material

The defendant's request for the Court to appoint a special master to resolve privilege issues—an exceptional remedy granted rarely—should also be rejected. (Br. at 19). As noted above, the use of a government "filter team" is "respectful of, rather than injurious to, the protection of privilege." *Avenatti*, 559 F. Supp. 3d at 282. Indeed, use of a filter team is "common procedure" in this District and "has been deemed adequate in numerous cases to protect attorney-client communications." *Id.*; *see also United States v. Patel*, No. 16 Cr. 798 (KBF), 2017 WL 3394607, at *7 (S.D.N.Y. Aug. 8, 2017) (noting government use of filter review team as evidence

---

[9] The Government does not agree with the defendant's assertion that "[w]hat is true for Fourth Amendment violations is also true for Sixth Amendment violations" (Br. at 19) as it relates to "fruit of the poison tree" analysis. Instead, the remedy for a Sixth Amendment violation is suppression of the privileged material only, not the derivative fruits. *See United States v. Squillacote*, 221 F.3d 542, 560 (4th Cir. 2000) (holding no hearing was required and that the defendant was not entitled to suppress any of the derivative fruits of the privileged communication); *Nickel v. Hannigan*, 97 F.3d 403, 409-10 (10th Cir. 1996) (remedy for violation of privilege is suppression of direct evidence, not fruits); *United States v. Marashi*, 913 F.2d 724, 731 n.11 (9th Cir. 1990) ("[N]o court has ever applied [the 'fruits of the poisonous tree'] theory to any evidentiary privilege and . . . we have indicated we would not be the first to do so"); *see also United States v. Ozar*, 50 F.3d 1440, 1448 (8th Cir. 1995) ("Because there was no bad faith attempt to obtain [attorney-client] privileged conversations [through a wiretap], if privileged conversations were intercepted (and the government seems to concede that some inadvertently were), those conversations should be suppressed on an individual basis at or before trial."); *United States v. Lumiere*, No. 16 Cr. 483 (JSR), 2016 WL 7188149, at *6 (S.D.N.Y. Nov. 29, 2016) (general remedy for violation of the attorney-client privilege is suppression of the privileged information, not wholesale suppression). However, because the Government has agreed not to use the BOP Notes or fruits, this point of disagreement is moot.

of good faith); *United States v. Ceglia*, No. 12 Cr. 876 (VSB), 2015 WL 1499194, at *1 (S.D.N.Y. Mar. 30, 2015); *United States v. Winters*, No. 06 Cr. 64 (SWK), 2006 WL 2789864, at *2 (S.D.N.Y. Sept. 27, 2006) (proposed use of "'wall Assistant' adequately protects the defendant's asserted privilege"); *see also* Nov. 19, 2024 Tr. at 40.

By contrast, the appointment of a special master is appropriate only in exceptional circumstances. *See In re Search Warrants Executed on April 28, 2021*, No. 21 Misc. 425 (JPO), 2021 WL 2188150, at *2 (S.D.N.Y. May 28, 2021) (attorney representing the President of the United States such that any search may implicate not only the attorney-client privilege but also the executive privilege); *United States v. Stewart*, No. 02 Cr. 395 (JGK), 2002 WL 1300059, at *10 (S.D.N.Y. June 11, 2002) (materials recovered from a criminal defense attorney with cases adverse to the Government). As a practical matter, the use of a Special Master slows down proceedings considerably, which also counsels against appointing one outside exceptional circumstances.

No exceptional circumstance is present here, and a filter team is well-situated to protect any protected information from disclosure to the case team while also ensuring that the defendant gets the speedy trial he requested. Indeed, a filter team helps to ensure the expeditious progression of criminal matters. *See United States v. Grant*, No. 04 Cr. 207 (BSJ), 2004 WL 1171258, at *3 (S.D.N.Y. May 25, 2004) ("Permitting the Government's privilege team to conduct an initial review of the documents will narrow the disputes to be adjudicated and eliminate the time required to review the rulings of the special master . . . thus reducing the possibility of delay."). Such a protocol is also standard practice in this District, where this Office has conducted filter reviews in approximately 150 investigations and cases in this year alone. By contrast, the use of a special master has not been used in any case during that same period.[10] Even if the Filter Team

---

[10] The defense fails to cite Second Circuit cases calling into question use of a filter team. In addition, several of the district court cases cited by the defense address concerns not present in the

inadvertently released some limited privileged material in the 19 pages of BOP Notes—which is far from clear—the defendant has offered no persuasive explanation as to why that standard practice would not be sufficient here to protect any attorney-client or work product privilege. *See Sharma*, 2019 WL 3802223, at *3 (approving use of filter team despite inadvertent release of privileged material).

### 3. Disqualification Is Inappropriate

The defendant's request for disqualification is equally meritless. Disqualification is an exceedingly rare remedy reserved for cases of egregious misconduct or prejudice to defendants. *See United States v. Walker*, 243 F. App'x 621, 623-24 (2d Cir. 2007) (summary order); *United States v. Stewart*, 294 F. Supp. 2d 490, 494 (S.D.N.Y. 2003). The defendant asserts that disqualification of individual prosecutors, or even the entire United States Attorney's Office for the Southern District of New York, may be appropriate here, (Br. at 24-25), even though he cannot find a single precedent in this Circuit where the prosecutor has been disqualified for having reviewed privileged information—purposefully or otherwise. Instead, the circumstances here are akin to *Stewart* and *Walker*, where courts in this Circuit declined to disqualify prosecutors who had inadvertently reviewed privileged material despite employing a filter team or other process to segregate privileged materials from the case team. *See Walker*, 243 F. App'x at 622-23; *Stewart*, 294 F. Supp. 2d at 492-93, 495. Conversely, the facts here are nothing like the serious misconduct of a prosecutor who repeatedly violated court orders and reviewed and copied attorney work product, resulting in his disqualification. *See United States v. Horn*, 811 F. Supp. 739, 748-50

---

instant case. *See, e.g.*, *Stewart*, 2002 WL 1300059, at *6-7 (appointing special master to review seized documents for privilege in "exceptional" case where Government executed warrant on legal office of criminal defense attorney and seized documents of clients—including the files of clients not part of the Government's investigation.").

(D.N.H. 1992).  Disqualification is patently not warranted here where the evidence shows no egregious misconduct.

### 4.  Dismissal Of the Indictment Is Absolutely Unwarranted

Finally, the defendant's suggestion that dismissal of the Indictment may be appropriate is entirely baseless and finds no support in the case law.  "'The dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights.'"  *Sharma*, 2019 WL 3802223, at *3 (quoting *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001)).  Even in cases in which there was egregious prosecutorial misconduct—unlike the present case—courts have declined to dismiss the indictment based on a violation of the attorney-client privilege.  *See Horn*, 811 F. Supp. at 748-50, 752.  The defendant does not come close to demonstrating that he is entitled to such extraordinary relief.

*United States v. Stein*, 541 F.3d 130 (2d Cir. 2008), which the defendant cites, can be readily distinguished.  At issue in *Stein* was the Government's interference with the attorney-client relationship of defendants by, among other things, pressuring their employer to depart from its practice of paying legal fees without regard for cost, which amounted to a Sixth Amendment violation.  *Id.* at 136-41.  No similar intentional Government action occurred here; at most any exposure to privileged material was inadvertent and despite good faith efforts.  This is plainly not the kind of "manifestly and avowedly corrupt" Government action, nor an "intentional invasion of the attorney-client privilege" resulting in prejudice to the defendant's case, required to dismiss an indictment.  *See United States v. Gartner*, 518 F.2d 633, 637 (2d Cir. 1975).[11]

---

[11] The defendant's argument in favor of dismissal fares no better under the Fifth Amendment. Under the due process protections of the Fifth Amendment to the Constitution of the United States, if the government "violates a protected right of the defendant, due process principles may bar the government from invoking the judicial process to obtain a conviction if the government's conduct 'reached a demonstrable level of outrageousness.'" *United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991) (citations omitted).  "[T]he existence of a due process violation must turn on

## <u>CONCLUSION</u>

For the reasons set forth above, the defendant's motion for a hearing and other relief should be denied.

Dated:     New York, New York
           December 20, 2024

                          Respectfully submitted,

                          EDWARD Y. KIM
                          Acting United States Attorney

           By:    _____/s_____
                          Maurene Comey / Meredith Foster /
                          Emily A. Johnson / Christy Slavik /
                          Madison Reddick Smyser / Mitzi Steiner
                          Assistant United States Attorneys
                          (212) 637-2324/-2310/-2409/-1113/-2381/-2284

---

whether the governmental conduct, standing alone, is so offensive that it 'shocks the conscience.'" *United States v. Chin*, 934 F.2d 393, 398 (2d Cir. 1991) (citation omitted). As discussed above, the Government's use of a Filter Team to review potentially privileged material obtained pursuant to an institution-wide sweep comes nowhere close to "shocking the conscience."