UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| UNITED STATES OF AMERICA,<br><br>    v.<br><br>SEAN COMBS,<br><br>               Defendant. |

24-cr-542 (AS)

**<u>Reply Memorandum of Law in Further Support of Defendant Sean Combs'
Motion for a Hearing, Suppression, and Other Relief</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

ARGUMENT ..................................................................................................................................... 1

    I.    The Government Fails To Explain Why Investigator-1 Searched Mr. Combs's Notes, Underscoring Its Fourth Amendment Violation And The Need For A Hearing .................. 1

    II.   The Government Violated Mr. Combs's Sixth Amendment Rights .................................... 4

    III.  A *Kastigar* Hearing Is Required, And the Issue Is Not Moot ............................................. 7

    IV.  The Court Should Appoint A Special Master ..................................................................... 9

    V.   Dismissal And Disqualification Remain Appropriate Potential Remedies ....................... 10

CONCLUSION ................................................................................................................................ 10

# TABLE OF AUTHORITIES

**Cases**                                                                                                         Page(s)

*Florence v. Board of Chosen Freeholders of County of Burlington,*
   566 U.S. 318 (2012) .................................................................................................... 4

*In re Grand Jury Subpoenas,*
   454 F.3d 511 (6th Cir. 2006) ..................................................................................... 10

*Harbor Healthcare System LP v. United States,*
   5 F.4th 593 (5th Cir. 2021) ........................................................................................ 10

*Kastigar v. United States,*
   406 U.S. 441 (1972) .................................................................................................... 8

*Ortiz v. City of New York,*
   2012 WL 6200397 (S.D.N.Y. Dec. 12, 2012) ............................................................. 4

*In re Search Warrant for Law Offices Executed on March 19, 1992,*
   153 F.R.D. 55 (S.D.N.Y. 1994) .................................................................................. 9

*In re Search Warrant Issued June 13, 2019,*
   942 F.3d 159 (4th Cir. 2019) ..................................................................................... 10

*Stroud v. United States,*
   251 U.S. 15 (1919) ...................................................................................................... 4

United States v. Abdel Sattar,
   2002 WL 1836755 (S.D.N.Y. Aug. 12, 2002) ............................................................ 6

United States v. Abuhamra,
   389 F.3d 309 (2d Cir. 2004) ........................................................................................ 6

United States v. Allen,
   864 F.3d 63 (2d Cir. 2017) ..................................................................................... 8, 9

United States v. Ciancia,
   2015 WL 13798678 (C.D. Cal. May 20, 2015) .......................................................... 4

United States v. Cohen,
   796 F.2d 20 (2d Cir. 1986) ..................................................................................... 2, 4

United States v. Danielson,
   325 F.3d 1054 (9th Cir. 2003) .................................................................................... 8

United States v. Gallego,
   2018 WL 4257967 (D. Ariz. Sept. 6, 2018) .............................................................. 10

*United States v. Landji*,
  2021 WL 5402288 (S.D.N.Y. Nov. 18, 2021) ............................................................. 8

*United States v. Marashi*,
  913 F.2d 724 (9th Cir. 1990) ..................................................................................... 8

*United States v. Mariani*,
  851 F.2d 595 (2d Cir. 1988) ...................................................................................... 8

*United States v. Rivieccio*,
  919 F.2d 812 (2d Cir. 1990) ...................................................................................... 8

*United States v. Schwimmer*,
  924 F.2d 443 (2d Cir. 1991) .............................................................................. 5, 7, 8

*United States v. Sharma*,
  2019 WL 3802223 (S.D.N.Y. Aug. 13, 2019) ........................................................... 5

*United States v. Tantolo*,
  680 F.2d 903 (2d Cir. 1982) ...................................................................................... 9

*Williams v. Ramos,*
  2013 WL 7017674 (S.D.N.Y. Dec. 23, 2013) ........................................................... 4

### Other Authorities

Cal. Penal Code § 1524 ..................................................................................................... 10

USAM § 9-13.420(F) .......................................................................................................... 9

It is indisputable that a BOP investigator based in West Virginia has been feeding Mr. Combs's jail communications to the prosecutors. It is also indisputable that he traveled to New York for a BOP sweep ostensibly aimed at "potential corruption and contraband at the MDC"—and that, despite finding none—he inspected and copied Mr. Combs's privileged notes. At the very least, this egregious invasion of Mr. Combs's constitutional rights raises numerous questions that can only be answered through discovery and an evidentiary hearing.

The government's breezy response stoops to unjustified and irrelevant mudslinging and mischaracterizes the controlling caselaw and key facts about the "filter team" protocol. Apparently lacking any concern for the fairness of these proceedings, the government minimizes the breaches of Mr. Combs's privilege and privacy, hoping the Court will accept its unsworn say-so and not bother with a hearing. The defense has repeatedly presented sworn testimony and evidence, but the government offers no actual *evidence* supporting its slippery and inconsistent claims about the underlying facts sufficient to meet the controlling legal standard. Instead of submitting, for instance, a sworn declaration by Investigator-1 explaining what happened and why, the prosecutors expect the Court to simply accept their unsworn hearsay assertions—even though they are self-contradictory and provide few answers to the legal questions. The Court should refuse to do so. It should insist on sworn testimony from Investigator-1 and the production of his written communications with the prosecutors. A hearing is the only way to find the true facts so the Court can assess how best to remedy this grave violation of Mr. Combs's constitutional rights.

## **ARGUMENT**

### I. The Government Fails To Explain Why Investigator-1 Searched Mr. Combs's Notes, Underscoring Its Fourth Amendment Violation And The Need For A Hearing

The government misreads Second Circuit precedent when it claims the Fourth Amendment doesn't apply to prison searches. Dkt.117 at 8-9. It asks the Court to blindly defer to the BOP's

press release about the reason for the sweep, without any further inquiry whatsoever into "exactly what penological interest justified the search." *Id.* at 11. The law, however, requires far more.

*First*, the Second Circuit has squarely held that Fourth Amendment scrutiny *is* required for prison searches. *United States v. Cohen* could not be clearer: warrantless searches performed "at the instigation of non-prison officials for non-institutional security-related reasons" or "intended solely to bolster the prosecution's case against a pre-trial detainee awaiting his day in court" or "to uncover information that would aid them in laying additional indictments against a detainee," are out-of-bounds and "may be challenged." 796 F.2d 20, 23-24 (2d Cir. 1986).

*Second*, the issue is not just whether the MDC sweep in general was motivated by a "larger safety and security initiative." Dkt.117 at 3. The issue is why Investigator-1 searched and photographed Mr. Combs's personal notes and immediately offered to share them with the prosecutors. The government still has not offered any explanation whatsoever for these actions as to the notes—even though the Court specifically asked the prosecutors at the November 19, 2024 hearing whether "[Investigator-1] thought of himself as an agent of the prosecution team" and "took it upon himself to … aid the investigation effort by photographing these pages." 11/19/24 Tr.11. The government refuses to tell the Court what Investigator-1 has to say about his motivations or thinking. But that is the dispositive question under *Cohen*.

Rather than even attempting to provide any explanation from Investigator-1 (sworn or otherwise), the government instead offers up a series of red herrings about things that "may" justify prison searches but have nothing to do with the search of Mr. Combs's notes or the even the BOP sweep more generally. The government claims, for example, that "a prisoner's notes may contain details of an escape plan or be used to hide contraband images." Dkt.117 at 10. But so what? That was plainly not what motivated the search or why Investigator-1 searched Mr. Combs's notes.

2

The far more likely reason for Investigator-1's conduct is the same one that motivated his prior work on this case—he sought to collect evidence for this prosecution. The government admits Investigator-1 "had been reviewing the defendant's recorded phone calls and emails since the defendant" was detained. *Id.* at 3-4. Throughout that period, "the Case Team had communicated with [him] regarding the defendant's monitored communications and had issued legal process to obtain such communications." *Id.* at 4 n.1. The government does not detail those communications, but it never denies the obvious: Investigator-1 understood himself to be investigating Mr. Combs's communications on behalf of the prosecution team. The government denies "coordination" before the search, *id.* at 11, but even if literally true, that claim ignores the context: the Case Team's prior work with Investigator-1 to procure evidence against Mr. Combs.

The government also makes contradictory assertions that cannot be resolved without a hearing. On the one hand, it claims "the search was initiated by a prison official for a legitimate penological purpose." *Id.* at 8. On the other hand, it admits it "obtained the BOP Notes in connection with its covert investigation into the defendant's ongoing obstruction and witness tampering." *Id.* at 18. It even says Investigator-1's purpose might have been "preventing crimes such as efforts to obstruct proceedings"—in other words, to further its ongoing investigation. *Id.* at 10. Which is it? If, as the government concedes, Investigator-1's aim was to uncover information to support additional charges and Mr. Combs's continued detention, that is not a legitimate institutional security purpose and would violate the Fourth Amendment. The government's bald assertion that there was a legitimate penological purpose contradicts its own admissions about Investigator-1's role in assisting the prosecutors to develop evidence against Mr. Combs for this case and, notably, is unsupported by any affirmation or declaration by the prosecutors, Investigator-1, or any other BOP official. The Court should not blindly accept this

3

self-serving assertion. The only way to ascertain the truth is with real factfinding at a hearing.

The government's cases (*see* Dkt.117 at 9-10) do not hold otherwise. *Williams v. Ramos* dismissed a §1983 claim alleging prison officials confiscated the detainee's legal papers without any involvement of prosecutors. 2013 WL 7017674, at *1 (S.D.N.Y. Dec. 23, 2013). *Ortiz v. City of New York* involved a search of a detainee's prosthesis and medical equipment, again without any alleged involvement of prosecutors. 2012 WL 6200397, at *6-7 (S.D.N.Y. Dec. 12, 2012). *Florence v. Board of Chosen Freeholders of County of Burlington* considered a challenge to a jail's general policy of strip-searching detainees upon their entry into the facility. 566 U.S. 318, 325 (2012). It did not address the standard for challenging a particular search of a pretrial detainee's papers. And in *Stroud v. United States*—which predates *Cohen* by decades—papers were seized pursuant to "established practice" at the penitentiary. 251 U.S. 15, 21 (1919). Finally, *United States v. Ciancia* considered a challenge to a search of an inmate's mail, which "federal law permits." 2015 WL 13798678, at *1 (C.D. Cal. May 20, 2015) (citing regulation).

In *Cohen*, the Second Circuit directed courts not to "merely … pay[] lip-service" to a pretrial detainee's Fourth Amendment rights." 796 F.2d at 24. Yet that is exactly what the government is asking the Court to do here—take its word and ignore facts and logic showing the opposite. The Court should resist that invitation to disregard Mr. Combs's rights and paper over the violation.

## II.   The Government Violated Mr. Combs's Sixth Amendment Rights

The government's only response to Mr. Combs's Sixth Amendment argument is to breezily assert that its conduct was reasonable and caused no prejudice. But the Court cannot simply accept the government's claim, which is unsupported by any evidence and implausible on its face, without finding the actual facts through sworn testimony and proof adduced at a hearing.

The government says the intrusion was not intentional, but offers no sworn declaration from Investigator-1 that would enable the Court to understand the underlying facts, or justify the

4

breach. If Investigator-1 inspected the notes and photographed them to assist the prosecutors (as demonstrated above) then the intrusion at issue was intentional government conduct requiring "careful scrutiny" in the form of a hearing. *United States v. Schwimmer*, 924 F.2d 443, 447 (2d Cir. 1991). The government ignores Mr. Combs's caselaw criticizing similar government conduct and ordering a hearing. *See* Dkt.98 at 11-12, 16-17. Instead, it cites non-binding, unpublished, decisions on whether, in the unrelated *Brady* context, the BOP was an arm of the prosecution. *See* Dkt.117 at 16. Those cases are inapposite. Since Investigator-1 is obviously a state actor, his actions are attributed to the government for Sixth Amendment purposes.

      The government further contends, incorrectly, that it never deviated from established Filter Team protocol, and that the defense has a "misunderstanding" about that protocol. Dkt.117 at 17 n.8. That is simply untrue. After Mr. Combs was arrested, a filter team prosecutor explained to defense counsel that the filter team would share a privilege log with the Case Team, but would afford defense counsel the opportunity to review identified materials and assert privilege *before* any potentially privileged documents were shared with the Case Team. Indeed, the government confirmed this understanding in its prior representations to this Court—which squarely conflict with the new position articulated in its opposition brief—when it said: "Our filter review process, our filter team reviews the full device, and removes, before the case team can see it, any potentially privileged information. That set of potentially privileged information will go to the defense so they are able to make privilege calls." Oct. 10, 2024 Tr.17. That is clearly "evidence that the Government intentionally diverged from the protocol," *United States v. Sharma*, 2019 WL 3802223, at *3 (S.D.N.Y. Aug. 13, 2019), and all the more reason why a Special Master is needed,

5

as discussed further below.[1]

The government's bare assertion that Case Team prosecutors accessed the privileged materials "inadvertent[ly] and certainly not intentional[ly]," Dkt.117 at 15 n.6, is implausible, particularly given the government's prior representations to the Court about the filter protocol. The Court should test that claim at a hearing. Even the redacted portions of the notes still contained facially privileged materials that any lawyer undoubtedly would have recognized as privileged. *See* Dkt.98 at 6-7, 10. That is particularly true given the Case Team's awareness of where the notes came from, and their initial concern that they might be privileged. If the prosecutors had any doubts or hesitations as to the meaning of the notes, the proper course of action would have been to communicate with the defense or seek relief from the Court—not file the notes on the public docket while seeking Mr. Combs's continued detention. At best, the Case Team was willfully blind to the fact that the notes contained privileged materials and deliberately chose to stick its head in the sand and use them without first confirming that they were not actually privileged.

As for prejudice, the defense should be permitted to review and respond to the "*ex parte* letter" detailing what the government learned and how it has used the privileged materials. Dkt.117 at 12 n.4. As explained below, the normal process, endorsed by the Second Circuit, is a *Kastigar* hearing. There is no way the Court can fairly and accurately evaluate the fruits question without input from the defense—indeed, ruling on this issue without affording the defense an opportunity to respond to this letter would violate due process, which "demands … the opportunity … to correct or contradict arguments or evidence offered by the [government]." *United States v. Abuhamra*, 389 F.3d 309, 322 (2d Cir. 2004). And regardless, the government has clearly seen

---

[1] *United States v. Abdel Sattar* concerned inapposite "court-authorized FISA [and] Title III surveillance" subject to statutory procedures and corresponding protections. 2002 WL 1836755, at *7 (S.D.N.Y. Aug. 12, 2002).

6

aspects of the defense's trial strategy that it should not be privy to. The notes, on their face, are not just vague allusions to usual defense tactics. They reference how to discredit *particular* allegations and witness testimony; obtaining *specific types of experts* for trial; and collecting cross examination material on *particular* witnesses. Moreover, the government fails to explain why Investigator-1 rifled through seven pages of additional privileged material to photograph pages 1 and 2 of Exhibit 1, Dkt.98 at 5-6, or what Investigator-1 told prosecutors about *those* notes.

Finally, the government admitted it listened to Mr. Combs's calls with "family members and his *attorneys*" and reviewed his messages "with dozens of individuals, including *attorneys*." Dkt.98 at 24 (quoting Dkt.69 at 18 (emphasis added)). Yet it neither offers any explanation for this surveillance, nor promises to refrain from such spying in the future. This further highlights that the prosecutors' invasion of the defense camp—and "violative use of [the] privileged information," *Schwimmer*, 924 F.2d at 447—is likely just the tip of the iceberg.

**III.    A *Kastigar* Hearing Is Required, And the Issue Is Not Moot**

The government seeks to avoid adjudication by offering to avoid using any fruits of the BOP Notes. Dkt.117 at 12. It claims this gesture renders most of the disputes "moot." *Id.* at 12, 20. But suppression of fruits is not merely a matter of grace in the government's discretion—it is required by law. Nor is the need for a *Kastigar* hearing moot.

There is no question that a Fourth Amendment violation, if proven, requires suppression of all fruits. That is also true for violations of the Sixth Amendment. Relying entirely on out-of-circuit cases, the government claims "the remedy for a Sixth Amendment violation is suppression of the privileged material only, not the derivative fruits." Dkt.117 at 22 n.9. But the Second Circuit has already squarely held the opposite—once a Sixth Amendment violation is found, the "government must demonstrate that the evidence it uses to prosecute an individual was derived

7

from legitimate, independent sources." *Schwimmer*, 924 F.2d at 446 (citing *Kastigar v. United States*, 406 U.S. 441, 461-62 (1972)).

The government's out-of-circuit cases do not support its argument. For example, *United States v. Marashi*, 913 F.2d 724 (9th Cir. 1990), approved admitting certain testimony over a marital privilege challenge. It dealt with a purely evidentiary privilege and not any Sixth Amendment issues. In dicta in a footnote, the Ninth Circuit said even if it had found a marital privilege violation, it would not have required exclusion of all fruits. *Id.* at 731 n.11. Subsequently, however, the Ninth Circuit squarely held that a Sixth Amendment violation requires use-and-fruits suppression—it requires "prohibition on use [including] both direct and indirect use." *United States v. Danielson*, 325 F.3d 1054, 1072 (9th Cir. 2003). The Ninth Circuit applied *Kastigar*, just as the Second Circuit did in *Schwimmer*. That is not a matter of grace—it is what the law requires.

Nor is there any legal authority permitting the government to satisfy its obligations under *Kastigar* simply by filing an "*ex parte* letter" explaining what "investigatory steps it has taken" after obtaining privileged materials illegally. Dkt.117 at 12 n.4. To the contrary, under *Kastigar*, "the government must present evidence, and must show by a preponderance of that evidence, that 'all of the evidence it proposes to use,' and all its trial strategy, were 'derived from legitimate independent sources.'" *Danielson*, 325 F.3d at 1072 (quoting *Kastigar*, 406 U.S. at 460). *Kastigar* requires an evidentiary showing, and consequently, resolving disputes under *Kastigar* ordinarily requires a *hearing*. That is the standard practice. *See, e.g.*, *United States v. Allen*, 864 F.3d 63, 93-94 (2d Cir. 2017); *United States v. Rivieccio*, 919 F.2d 812, 814 (2d Cir. 1990); *United States v. Mariani*, 851 F.2d 595, 597 (2d Cir. 1988); *United States v. Landji*, 2021 WL 5402288, at *2 (S.D.N.Y. Nov. 18, 2021) (requiring testimony from AUSAs).

Indeed, the Second Circuit has held that the prosecution cannot satisfy its burden of proof

8

under *Kastigar* by offering "bare, self-serving denials." *Allen*, 864 F.3d at 94. This has been the law of the circuit for decades. "[T]he heavy burden cast upon the Government to prove independent sources … is not satisfied by the prosecution's assertion that [tainted evidence] was not used." *United States v. Tantolo*, 680 F.2d 903, 908 (2d Cir. 1982). Rather, "the defendant is entitled to a fair hearing at which the Government must make an affirmative showing …." *Id*.

## IV. The Court Should Appoint A Special Master

Neither the Second Circuit nor any other circuit has ever restricted the use of special masters to exceptional circumstances, as the government argues, Dkt.117 at 23. To the contrary, special masters are used regularly in jurisdictions around the country, and for good reason.

The government criticizes the defense for failing to cite any Second Circuit law disavowing filter teams. *Id.* at 23-24 n.10. But the government itself fails to cite any Second Circuit law *approving* filter teams—much less holding that they are or should be "standard practice," or that special masters are reserved for exceptional circumstances. Nor have courts in this district uniformly or routinely approved the practice. To the contrary: "[T]he implementation of a Chinese Wall, especially in the context of a criminal prosecution, is highly questionable, and should be discouraged." *In re Search Warrant for Law Offices Executed on March 19, 1992*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994). If filter teams are "standard practice" in this district, that is only because the U.S. Attorney's Office here has made a self-interested decision to make it standard practice.

Nor are filter teams the "standard practice" nationwide. Even within the Department of Justice, no official policy prefers the use of filter teams. To the contrary, the U.S. Attorneys' Manual expresses no preference between filter teams and special masters. USAM § 9-13.420(F). And many courts around the country have *rejected* the idea that government-run filter teams should be *de riguer*. "Although use of taint teams has been approved in limited factual scenarios, federal courts have generally taken a skeptical view of the Government's use of 'taint teams' as an

9

appropriate method for determining whether seized or subpoenaed records are protected by the attorney-client privilege." *United States v. Gallego*, 2018 WL 4257967 at *2 (D. Ariz. Sept. 6, 2018) (internal quotations omitted). That is because filter teams "present inevitable, and reasonably foreseeable, risks to privilege." *In re Grand Jury Subpoenas*, 454 F.3d 511, 523 (6th Cir. 2006); *accord Harbor Healthcare System LP v. United States*, 5 F.4th 593, 599 (5th Cir. 2021); *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 176 (4th Cir. 2019). For precisely these reasons, some jurisdictions require the use of special masters in circumstances where government searches are likely to obtain potentially privileged material. *E.g.*, Cal. Penal Code § 1524(c)(1).

Much of the government's argument boils down to an unsupported policy argument that special masters *should* be disfavored because they "slow[] down proceedings considerably." Dkt.117 at 23. But there is no evidence that the regular use of special masters in the Sixth Circuit or California state courts, for example, causes delays. Nor is there any reason to believe a special master would be slower than the filter team—if the latter were actually doing its job carefully.

No statute, rule, or binding case holds that filter teams are preferred or that special masters require exceptional circumstances. If anything, special masters should be the standard procedure, for the obvious reason that government attorneys cannot be trusted to protect the defendant's privileges. Regardless, this Court clearly has discretion to order a special master, and it should do so here, because the filter team has already utterly failed to protect the defendant's privilege.

## V.   Dismissal And Disqualification Remain Appropriate Potential Remedies

Mr. Combs reserves the right to seek dismissal and disqualification, which may be warranted upon development of the full factual record at a hearing. Dkt.98 at 23.

## CONCLUSION

For the foregoing reasons, the Court should order discovery and a hearing, and other remedies, as set forth in the opening memorandum.

Date:  December 30, 2024                                                    Respectfully Submitted,

/s/Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Shapiro Arato Bach LLP
1140 Ave of the Americas, 17th Fl.
New York, NY 10036
(212) 257-4881
ashapiro@shapiroarato.com

Marc Agnifilo
Teny Geragos
AGNIFILO INTRATER
445 Park Ave., 7th Fl.
New York, NY 10022
646-205-4350
marc@agilawgroup.com
teny@agilawgroup.com

Anthony Ricco
Law Office of Anthony L. Ricco
20 Vesey Street
New York, NY 10007
(212) 791-3919
tonyricco@aol.com

Anna Estevao
SHER TREMONTE LLP
90 Broad St., 23rd Fl.
New York, NY 10004
(212) 202-2600
aestevao@shertremonte.com