UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         v.<br><br>SEAN COMBS,<br><br>                    Defendant. | 24-cr-542 (AS) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SEAN COMBS'S MOTION TO DISMISS COUNT THREE OF THE SUPERSEDING INDICTMENT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ......................................................................................................................... 1

BACKGROUND ........................................................................................................................... 2

ARGUMENT ................................................................................................................................. 3

   I.   COUNT THREE SHOULD BE DISMISSED AS AN INSTANCE OF SELECTIVE PROSECUTION ................................................................................................................ 3

       A.  The Act Has A Troubling History Of Racist Enforcement ........................................... 3

       B.  The Charging Decision In This Case Evinces Impermissible Bias .............................. 4

CONCLUSION ............................................................................................................................. 8

# TABLE OF AUTHORITIES

**Cases**          Page(s)

*Oyler v. Boles,*
   368 U.S. 448 (1962)......................................................................................................... 4

*United States v. Alameh,*
   341 F.3d 167 (2d Cir. 2003) ........................................................................................ 5, 8

*United States v. Armstrong,*
   517 U.S. 456 (1996) ..................................................................................................... 4, 8

*United States v. Batchelder,*
   442 U.S. 114 (1979) ......................................................................................................... 4

*United States v. Fares,*
   978 F.2d 52 (2d Cir. 1992) .............................................................................................. 7

*United States v. Flucas,*
   22 F.4th 1149 (9th Cir. 2022) ......................................................................................... 3

*United States v. Moon,*
   718 F.2d 1210 (2d Cir. 1983) ......................................................................................... 7

**Statutes**

18 U.S.C. § 2421 .................................................................................................................. 2, 3, 7, 8

**Other Authorities**

45 Cong. Rec. 821 (1910) ................................................................................................... 3, 4

45 Cong. Rec. 1040 (1910) ...................................................................................................... 4

[redacted] ....................................................................................................................... 6

Aram Roston,
   "Business partner of Falwells says affair with evangelical power couple spanned
   seven years," Reuters (Aug. 24, 2020) ........................................................................ 5

[redacted] ....................................................................................................................... 6

David J. Langum,
   *Crossing Over the Line: Legislating Morality and the Mann Act* (2006) ..................... 4

Jessica R. Pliley,
   *Policing Sexuality: The Mann Act and the Making of the FBI* (2014) ........................................ 4

**INTRODUCTION**

This case is unprecedented in many ways, but perhaps most notably, and most disturbingly, no white person has ever been the target of a remotely similar prosecution. Sean Combs is an extraordinarily successful artist, businessman, philanthropist and one of the most accomplished black people in this country. He started his first company—Bad Boy Entertainment—based on his vision for a new type of business headed by a young black executive, emphasizing black excellence and achievement. Over the ensuing decades, he forged a pathmarking career consistent with that vision. He went on to create many businesses—record labels, a recording studio, an apparel line, an alcoholic spirits business, a television network and media company—with strong reputations, operating in competitive industries and employing thousands of people around the globe. Yet the U.S. Attorney for the Southern District of New York accuses him of being the kingpin of a RICO enterprise, essentially defined as Mr. Combs himself, and claims the purpose of this faux enterprise is to conduct his personal sex life with his girlfriends.

There has never been a similar RICO prosecution. It is true that, like many others who have achieved fame and fortune in the world of entertainment, Mr. Combs has employees, staff, personal assistants, chefs, bodyguards, and other associates that he lawfully employs for different purposes. It is also true that, like many other celebrities, Mr. Combs has had complicated relationships with significant others as well as with alcohol and drugs throughout his time in the spotlight. But that doesn't make him a racketeer, or a sex trafficker.

And unlike in other cases involving similar charges, here there is *no* accusation that any of the girlfriends were minors, or that Mr. Combs raped anyone. Instead, the government has concocted a criminal case based primarily on allegations that Mr. Combs and two of his longtime

girlfriends sometimes brought a third party—a male escort—into their sexual relationship. Each of the three charges in the case are premised on the theory that this type of sexual activity is a federal crime. No white person has ever been charged with any of these offenses on similar allegations, but the most obvious evidence that Mr. Combs has been consciously singled out and selectively prosecuted because of his race is Count Three, which charges a violation of the White-Slave Traffic Act, 18 U.S.C. § 2421(a).

The unusual theory of Count Three—transporting escorts across state lines for purposes of prostitution—has never been brought before under this Act, which has a long and troubling history as a statute with racist origins, used to target Black men and supposedly protect white women from them. The use of escorts, male or female, is common and indeed widely accepted in American culture today, and the primary escort service at issue in this case— ▮▮▮▮▮▮▮▮▮▮—is a legitimate commercial business operating out in the open, frequently featured in the popular media, including a long-running TV series. It is not uncommon for couples using such services to bring a third person—including as alleged here, a man—across State lines and into their intimate relations. Yet no other person, and certainly no white person, has ever previously been prosecuted under the White-Slave Traffic Act for hiring male escorts from another State. Mr. Combs has been singled out because he is a powerful black man, and he is being prosecuted for conduct that regularly goes unpunished. Count Three should be dismissed because this is a clear case of selective prosecution.

## **BACKGROUND**

Count Three of the S1 Indictment—the White-Slave Traffic Act count—alleges "Transportation To Engage In Prostitution," in violation of 18 U.S.C. §§2421(a) and 2. Count Three alleges that from 2009 to 2024, Mr. Combs "knowingly transported individuals in

interstate and foreign commerce with intent that the individuals engage in prostitution," and specifically, "female victims … and commercial sex workers." S1 Indictment ¶17.

The conduct at issue allegedly involved sexual activity by Mr. Combs and his adult girlfriends. This includes what the indictment describes as "Freak Offs"—instances in which Mr. Combs and two of his girlfriends would bring a third person into their intimate relations.[1]  *Id.* ¶12(b). ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅.[2]

## ARGUMENT

I. **COUNT THREE SHOULD BE DISMISSED AS AN INSTANCE OF SELECTIVE PROSECUTION**

    A. **The Act Has A Troubling History Of Racist Enforcement**

The law now codified at 18 U.S.C. § 2421 was enacted by Congress in 1910. Congress named the law the White-Slave Traffic Act. It is now colloquially referred to as the Mann Act, after its author James Robert Mann—no doubt as part of a collective effort to obscure the statute's racist origins.

But those racist origins are plain enough. The statute was "born out of hysteria that 'white slavers' were preying upon young women—coercing them into prostitution through threats, intimidation, and force." *United States v. Flucas*, 22 F.4th 1149 (9th Cir. 2022) (Bybee,

---

[1] Unlike the false narrative spreading throughout the media—that Mr. Combs had "freak off parties" in which he had sex with numerous people, including A-list celebrities or minors, none of this is accurate and is not even the government's contention. The government has alleged that FOs happened with two females – both of whom were longtime partners of Mr. Combs – and never happened at any parties.

[2] ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

3

J., dissenting). One of the bill's backers described how he had read about "a negro" who had purchased "a white wife" when she was "offered for sale in Chicago." 45 Cong. Rec. 821 (1910). He claimed that American-born girls from good homes were being tricked into prostitution, then "sold to all men who can pay the price—young men or old, clean or unclean, healthy and diseased, black or white." *Id*.

Representative Mann urged, apparently in all seriousness, that such white-slave trafficking was worse than this country's history of chattel slavery. "[A]ll of the horrors which have ever been urged, either truthfully or fancifully, against the black-slave traffic pale into insignificance as compared to the horrors of the so-called 'white-slave traffic.'" 45 Cong. Rec. 1040 (1910). Of course, there was little actual evidence that any such traffic existed. Congress nonetheless passed Mann's White-Slave Traffic Act.

What was racist in its inception has often been racist in its operation. The statute's target was black male sexuality, and from Jack Johnson to Chuck Berry, the statute's most notorious prosecutions targeted famous black men accused of deviant sexual behavior.[3] This case continues the trend. In Count Three, the government charges a violation of the Act based on allegations that Mr. Combs transported male escorts—from a legal escort service—across state lines to have sex with his girlfriends.

B.     The Charging Decision In This Case Evinces Impermissible Bias

The discretion afforded federal prosecutors in their charging decisions, while broad, is nonetheless "subject to constitutional constraints." *United States v. Armstrong*, 517 U.S. 456,

---

[3] *See* David J. Langum, *Crossing Over the Line: Legislating Morality and the Mann Act* (2006) (examining the history of the Act and its deployment in high-profile cases); *see also* Jessica R. Pliley, *Policing Sexuality: The Mann Act and the Making of the FBI* (2014) (demonstrating how, over the last century, the government has primarily used the Act to prosecute sexual practices perceived as immoral, such as interracial relationships).

4

464 (1996) (citing *United States v. Batchelder*, 442 U.S. 114, 125 (1979)). A charging decision may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456 (1962). Where a charging decision has a "discriminatory effect" and was "motivated by a discriminatory purpose," the charge is invalid and can be rejected by the judiciary. *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003).

To show discriminatory effect, a defendant must show that similarly situated individuals of a different classification were not charged. *See id*. In this case, that is easy. High-profile white men including former New York Governor Eliot Spitzer have engaged in similar conduct but were never charged under the Act. Many couples, including wealthy high-profile couples, involve third parties in their sexual relationships, sometimes for implicit or explicit remuneration.[4] Such conduct has never previously triggered Mann Act liability.

Nor have any similarly situated individuals been charged for using male escorts or male prostitutes. Count Three in this case is partly based on Mr. Combs's occasional use of male escorts, including a service called ▆▆▆▆▆▆▆▆. The indictment alleges that he hired escorts using that service, and that the escorts crossed state lines to come to hotels, where they had sex with women. But ▆▆▆▆▆▆▆▆ is not some secretive underground operation that was previously unknown. It has been operating in the open for over a decade. It has a website and over 10,000 followers on X (formerly Twitter). As the company's own press page states, its operations have been "featured in Playgirl, Glamour, Sheen, Hustler, Cosmopolitan, and Esquire

---

[4] *E.g.*, Aram Roston, "Business partner of Falwells says affair with evangelical power couple spanned seven years," Reuters (Aug. 24, 2020), https://www.reuters.com/investigates/special-report/usa-falwell-relationship/.

Magazine."[5]  Its CEO actively courts media attention, and has been repeatedly interviewed on national talk shows and the national news.

In fact, ▮▮▮▮▮ and its CEO have been regularly featured on the popular Showtime TV show ▮▮▮▮▮ which aired for six seasons. According to the CEO, the company's services have exploded in popularity because of all this publicity.

It is well-known that the escorts from ▮▮▮▮▮ sometimes—indeed, regularly—have sex with their clients. The company does not explicitly advertise prostitution services, but nor does it forbid or discourage sex. While it does not advertise sex, it has said that "anything that may or may not happen" between escorts and a client "is a matter of personal choice and personal preference between two or more consenting adults."[6] To call this an open secret would only be half correct, as it is not a secret. For example, the company's founder has admitted "[t]wo consulting adults, when you're spending a lot of time with each other, things happen … I'm sure it happens."[7] And two clients interviewed on ABC's Nightline admitted to having sex with their "▮▮▮▮▮" with the news crew's cameras following one couple to their hotel room door.

And the escorts regularly and openly cross state lines to provide their services. The company advertises ▮▮▮▮▮ located in cities around the country, including of course New

---

[5] ▮▮▮▮▮
[6] ▮▮▮▮▮
[7] ▮▮▮▮▮

6

York. And it offers travel packages around the country and around the world: "Our men will travel worldwide with you if requested."[8]

As far as the defense is aware, prior to this case, no one has every previously been prosecuted for using ▓▓▓▓▓. No federal prosecutor, in this district or any other, has targeted the company, its CEO, or its escorts. Nor has any prosecutor previously targeted any customer who purchased escort services from ▓▓▓▓▓. Thousands of customers have used ▓▓▓▓▓ over the last decade, including couples who have hired an escort, who later has sex with the female, but none of those similarly situated individuals has ever been charged with a crime. Mr. Combs—a successful black musician and businessman—is the first and only defendant ever to be charged under § 2421 for hiring male escorts. This is a clear case where the defendant has been "singled out for prosecution." *United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992).

To show discriminatory purpose, a defendant must show that the government's charging decision was "invidious or in bad faith, i.e., based on … impermissible considerations." *Id*. (quoting *United States v. Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983)). Here, the fact that Mr. Combs is the first and only person ever charged for hiring escorts from ▓▓▓▓▓ or other similar, publicly-operating escort services is itself strong circumstantial evidence of discriminatory purpose.

Beyond that, however, the government's handling of this case demonstrates bias and animus. It has gone out of its way to humiliate Mr. Combs and to prejudice the jury pool with pretrial publicity that plays on racist tropes. It has leaked damaging (and often times false)

---

[8] ▓▓▓▓▓

material to the press. It refused Mr. Combs's offer of self-surrender. It raided his home with utterly unnecessary military-level force and forcibly detained and handcuffed his sons. None of this was necessary, and none of it was normal. It is precisely the sort of conduct that suggests bad faith and racial animus.

This prosecution is yet another instance where § 2421 has been invidiously deployed against a prominent black man. Count Three should be dismissed.

In the alternative, and at a minimum, this Court should order discovery regarding the government's charging decisions. To obtain discovery on a selective prosecution, a defendant "need only produce 'some' evidence of discriminatory effect and intent." *Alameh*, 341 F.3d at 173. In other words, a defendant satisfies that preliminary burden by adducing "some evidence that similarly situated defendants of other races could have been prosecuted, but were not." *Id*. at 173-74 (quoting *Armstrong*, 517 U.S. at 469). That standard is easily met here.

## CONCLUSION

For the foregoing reasons, Count Three of the Superseding Indictment should be dismissed.

Date: February 18, 2025

Respectfully Submitted,

/s/Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Jason A. Driscoll
Shapiro Arato Bach LLP
1140 Ave of the Americas, 17th Fl.
New York, NY 10036
(212) 257-4881
ashapiro@shapiroarato.com
jdriscoll@shapiroarato.com

Marc Agnifilo
Teny Geragos
AGNIFILO INTRATER
445 Park Ave., 7th Fl.
New York, NY 10022

8

646-205-4350
marc@agilawgroup.com
teny@agilawgroup.com

Anna Estevao
SHER TREMONTE LLP
90 Broad St., 23rd Fl.
New York, NY 10004
(212) 202-2600
aestevao@shertremonte.com