UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     v.

SEAN COMBS,

              Defendant.

24-cr-542 (AS)

**<u>DEFENDANT SEAN COMBS'S MOTION IN LIMINE TO PRECLUDE
TESTIMONY OF DR. DAWN HUGHES</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 2

ARGUMENT ................................................................................................................... 4

    I.    HUGHES'S OPINIONS WILL NOT "HELP" THE JURY UNDERSTAND THE
        EVIDENCE, AS REQUIRED BY RULE 702(A) ................................................. 6

        A.   Hughes Will Opine On Topics Well Within The Jury's Everyday Knowledge ........... 6

        B.   Hughes Will Improperly And Misleadingly Instruct The Jury On The Law ................ 8

        C.   Hughes's Broad Generalizations About "Typical" Fact Patterns Will Improperly
            Mirror The Testimony Of The Alleged Victims And Bolster Their Credibility ......... 11

        D.   Hughes Will Improperly Speculate On The Motivations Of Alleged Perpetrators
            Of Sexual Coercion ....................................................................................... 13

   II.   HUGHES'S OPINIONS ARE NOT A RELIABLE APPLICATION OF SCIENTIFIC
        PRINCIPLES TO THE FACTS OF THIS CASE ............................................... 14

        A.   Hughes's Opinions Are Not Supported By The Literature She Purports To
            Rely On ........................................................................................................ 14

        B.   Hughes Has Not Applied Her Methods To This Case ................................................. 18

  III.  HUGHES'S OPINIONS SHOULD ALSO BE EXCLUDED UNDER RULE 403 ......... 22

CONCLUSION ............................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) .................................................................................. 5, 19

*Andrews v. Metro N. Commuter R. Co.*,
    882 F.2d 705 (2d Cir. 1989) ..................................................................................... 6

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ................................................................................................. 5

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ............................................................................................... 18

*Hygh v. Jacobs*,
    961 F.2d 359 (2d Cir. 1992) ................................................................................... 10

*In re Rezulin Prods. Liability Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) .................................................................... 13

*In re Terrorist Attacks on Sept. 11, 2001*,
    2024 WL 5077293 (S.D.N.Y. Dec. 11, 2024) .......................................................... 5

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ................................................................................... 18, 19, 20

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005) ....................................................................... 6, 12, 23

*United States v. Amuso*,
    21 F.3d 1251 (2d Cir. 1994) ................................................................................... 12

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991) ................................................................................... 8

*United States v. Castillo*,
    924 F.2d 1227 (2d Cir. 1991) ................................................................................. 11

*United States v. Cruz*,
    981 F.2d 659 (2d Cir. 1992) ............................................................................. 11, 23

*United States v. Diaz*,
    2024 WL 758395 (D.N.M. Feb. 23, 2024) ............................................................... 5

*United States v. Dugue*,
    763 F. App'x 93 (2d Cir. 2019) .............................................................................. 13

*United States v. Grote*,
    961 F.3d 105 (2d Cir. 2020) ..................................................................... 8

*United States v. Lumpkin*,
    192 F.3d 280 (2d Cir. 1999) ........................................................ 6, 12, 23

*United States v. Mejia*,
    545 F.3d 179 (2d Cir. 2008) ............................................................ 6, 11

*United States v. Parasmo*,
    2023 WL 1109649 (S.D.N.Y. Jan. 30, 2023) ..................................... 11

*United States v. Scop*,
    846 F.2d 135 (2d Cir. 1988) ..................................................................... 8

*United States v. Stewart*,
    433 F.3d 273 (2d Cir. 2006) ..................................................................... 8

*United States v. Zhong*,
    26 F.4th 536 (2d Cir. 2022) ....................................... 6, 8, 13, 23

**Rules**

Fed. R. Evid. 403 ................................................................. 6, 22, 23

Fed. R. Evid. 702 ........................................................................ passim

**Statutes**

18 U.S.C. §1591 ........................................................................ 9

**Other Authorities**

2 Sand et al.,
    *Modern Federal Jury Instructions—Criminal* ¶ 47A-21 (2025) ................. 9

American Psychological Association (APA),
    *Specialty Guidelines for Forensic Psychology*,
    in American Psychologist (Oct. 1, 2012) ....................................... 17, 21

Department of Justice, Bureau of Justice Statistics, Criminal Victimization, 2023 .................. 14

Dichter et al.,
    *Coercive Control in Intimate Partner Violence: Relationship with Women's Experience
    of Violence, Use of Violence, and Danger*, 8(5) Psych. of Violence 596 (2018) ..................... 15

Doychak & Raghavan,
    *Trauma-Coerced Attachment: Developing DSM-5's Dissociative Disorder,*
    7 Eur. J. of Trauma & Disassociation 1 (2023).......................................... 15

Dutton & Goodman,
*Coercion in Intimate Partner Violence: Toward a New Conceptualization*,
52 Sex Roles 743 (2005) ......................................................................................... 15

Dworkin et al.,
*PTSD In the Year Following Sexual Assault: A Meta-Analysis of Prospective Studies*,
24(2) Trauma, Violence, and Abuse 497 (2023) ..................................................... 16

*Ethical Principles of Psychologists and Code of Conduct* §9.01(b) .......................... 21

Ullman et al.,
*Reasons for and Experiences of Sexual Assault Nondisclosure in a Diverse Community
Sample*, 35(8) J. Family Violence 839 (2020) ........................................................ 16

## INTRODUCTION

The prosecution seeks to call Dr. Dawn Hughes as an expert witness to offer opinions about typical behaviors among perpetrators and victims of abuse and sexual violence. Hughes has not reviewed or evaluated any of the evidence in this case. While purporting to offer only background information, her opinions are skewed to advance the government's themes, and her testimony will mirror that of the government's fact witnesses. Her testimony's only real purpose is to support an inference that because the accusers in this case behaved in "typical" ways, they must be telling the truth.

Hughes's testimony should not be admitted. It addresses no technical matters requiring elucidation by an expert. Most of her opinions relate merely to matters of common sense and everyday knowledge—for example, that victims of domestic violence often stay with their abusers, or that abusers exploit power differentials. As such, they are well within the ken of the jury. Her testimony will intrude on the province of the jury in deciding credibility and on that of the court in instructing on the law. The heart of her testimony is a broad definition of coercion, but her definition conflicts with the legal definition of coercion that the jury will have to apply in this case. In several respects, her opinions are contradicted by the literature she cites as support, and she makes no claim to be applying a scientific methodology to the facts of this case. Hughes's testimony is advocacy masquerading as expertise.

The government wants an expert so that it can waive her testimony in summation like a magic wand to cure the glaring defects in its fact witnesses' credibility. This will be a continuing refrain—"as Dr. Hughes told you … as Dr. Hughes explained"—and it will be highly effective. But this is not a proper use of expert testimony and it will not help the jury discover the truth. Hughes's testimony should be excluded in its entirety.

## **BACKGROUND**

Hughes is a clinical psychologist and a board-certified forensic psychologist and claims to be "a leading expert on sexual abuse, interpersonal violence, victimization, and traumatic stress." Ex. 1 at 1. The government is offering Hughes as a "blind" expert, *i.e.*, she "has not evaluated any specific victim or evidence in the case" and will not opine "regarding any specific victim." *Id.* Instead, Hughes will offer opinions regarding such broad topic areas as "sexual abuse and victim responses to sexual abuse; coercive control; coping strategies during and in relation to sexual abuse; delayed disclosure; and memory of sexual abuse." *Id.*

In each of these topic areas, Hughes will opine on how victims of sexual abuse "typically" or "commonly" react to and recall the alleged abuse. For example, she will explain that "[v]ictims *often* fall back on ingrained responses to power in order to stay safe, such as attempting to please or placate the abuser," that "*[c]ommonly*, victims experience a sense of mental defeat," that "disclosure of abuse is a process that occurs over time and delayed disclosure is *common*," and that "[g]endered norms, tradition, and culture *can* also influence a victim's response to sexual abuse." *Id.* at 4, 5. She will opine that "the victim *may* engage in avoidance, compartmentalization, minimization, directed forgetting, making excuses for others, self-blame, and denial," and "*may* also seek to numb and minimize painful sexual and abusive experiences through the use of substances, such as drugs and alcohol." *Id.* at 4. She will inform the jury that "victims of domestic violence *may* stay with or return to, rather than leave, their abusers." *Id.* at 3.

Hughes will use similar generalized language to describe the actions of alleged perpetrators. She will explain that "[p]erpetrators *often* exploit preexisting power differentials … for the purpose of perpetuating sexual abuse." *Id.* at 2. She will opine that "[c]oercive control

*often* includes a variety of physical, sexual, and/or emotional tactics that together function to control the victim," including "actual or threatened violence," "sexual degradation," "financial and economic control," "exploitation of preexisting psychological, traumatic, or financial vulnerability," "gaslighting," and so on. *Id*. She will explain that "perpetrators of domestic violence" do not use randomly selected means of control but "*often* use particular coercive control tactics that are targeted to exploit the vulnerabilities of their specific victim." *Id.* at 3. She will explain that "[a] perpetrator's coercive tactics and abuse are *often* interspersed with rewards, positivity, affection, and normalcy, which can create emotional attachment and psychological dependency." *Id*. She will opine that "abusers *may* escalate coercive control tactics if they feel they are going to lose the victim or if the victim is trying to leave." *Id.*

Hughes will also delve into the motivations of alleged perpetrators. She will explain that "the perpetrator engages in self-centered behavior to satisfy his own goals and desires regardless of the needs, wants, and well-being of the victim." *Id.* at 2. She will explain that perpetrators use "coercive control" "to gain dominance across a spectrum of relationships," including with intimate partners and also in "employment relationships." *Id.*

Remarkably, Hughes will also endeavor to define legal terms for the jury. She will propose definitions that are both contrary to standard legal definitions and common English usage. She will tell the jury that "[i]nterpersonal violence … refers to dynamics related to coercion and emotional abuse that *may not necessarily involve physical violence as commonly understood.*" *Id.* at 1. She will tell the jury that "[s]exual assault refers to contact *and noncontact* sexual violations." *Id.* She will tell the jury that "voyeurism" even without any physical contact may constitute a sexual assault. *Id.* at 2. Most damaging to the defense, and most confusing to the jury, Hughes will supply her own extended definition of coercion that

focuses not on serious harm and physical restraint (i.e., the legal definitions that will be given in the jury instructions) but on "subtle" tactics such as "micro-regulation" and "isolation from preexisting support networks and external influence," that "function to suppress and individual's freedom and autonomy." *Id.*

As explained in greater detail in Point II, *infra*, Hughes's use of broad generalizations about typical behaviors, divorced from any examination of the alleged victims in this case, is contrary to guidelines regulating Hughes's profession.

Moreover, Dr. Alexander Sasha Bardey, if called by the defense to testify, would explain that "[g]eneralizations and vague psychological profiles are of little to no value in evaluating the facts and circumstances of any given case" because "[t]here is no typical response to trauma, and no typical response to rape and domestic abuse." Ex. 2 at 1. "Different people respond differently in different circumstances, depending on different life experiences, different psychological histories, and different educational and cultural backgrounds." *Id*. For this reason, Dr. Bardey would explain, "[t]he professions of psychiatry and psychology recognize that broad generalities tend to be of limited value in explaining the actual psychology or mental state of any particular individual." *Id.* at 2. Dr. Bardey would also opine that Hughes's "concept of coercive control is … so broad as to be meaningless" and because Hughes "is offering opinions without having evaluated the relevant empirical context or any of the persons involved … her opinions have virtually no value." *Id.* at 2-3.

## **ARGUMENT**

District courts must carefully exercise a "gatekeeping role" to guard against the significant risks posed by expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.

579, 597 (1993).[1]  District courts must exclude "junk science" by undertaking a "rigorous" examination of the expert's opinions to ensure they are both helpful, and reliable "at every step." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

Courts have not always applied these standards with sufficient care in the past, perhaps especially when it comes to social science experts whose testimony is mixed with advocacy. Rule 702 was thus amended in 2023 "in response to court decisions that admitted expert testimony too liberally," *In re Terrorist Attacks on Sept. 11, 2001*, 2024 WL 5077293 at *3 (S.D.N.Y. Dec. 11, 2024), and to mandate that courts "take seriously their roles as gatekeepers of expert evidence," *United States v. Diaz*, 2024 WL 758395, at *5 (D.N.M. Feb. 23, 2024).  The Advisory Committee explained that too many courts had held that "critical questions" going to the basis for and application of an expert's methodology were "questions of weight and not admissibility."  Fed. R. Evid. 702 advisory committee's note to 2023 amendment.  "These rulings are an incorrect application of Rules 702 and 104(a)." *Id.*

Before admitting any expert, the proponent must establish by a preponderance that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702.  In reviewing proposed expert testimony, the court must "look to see if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it."  *United States v. Lumpkin*, 192 F.3d

---

[1] Unless otherwise noted, citations omit internal quotation marks, footnotes, and previous alterations in the original source.

280, 289 (2d Cir. 1999).  Moreover, Rule 403 plays a "uniquely important role … in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations."  *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).

Hughes's broad testimony on matters already familiar to jurors will not help the jury understand the evidence.  Rather, it will usurp the court's role in giving the jury the law and the jury's role in deciding credibility.  Hughes's opinions are also not reliable, both because they lack an adequate basis and because they are stated at such a high level of generality that they can hardly be tested and will serve merely as rhetorical handlebars for the prosecution in its summation.  Hughes's testimony should be excluded.

## I.    HUGHES'S OPINIONS WILL NOT "HELP" THE JURY UNDERSTAND THE EVIDENCE, AS REQUIRED BY RULE 702(A)

### A.    Hughes Will Opine On Topics Well Within The Jury's Everyday Knowledge

Hughes's proposed testimony is full of broad generalities based on common sense and general life experience, not expertise.  Expert testimony is only admissible if it is "directed to matters within the witness' scientific, technical, or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help."  *Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989) (jury needed no expert assistance to understand that bright lights of an oncoming train may cause disorientation).   Where expert testimony merely tells the jury which inferences to draw in matters of common sense, it usurps the factfinder's role and is inadmissible.  *See Nimely*, 414 F.3d at 397.  Therefore, "a district court may commit manifest error by admitting expert testimony where … the subject matter of the expert's testimony is not beyond the ken of the average juror."  *United States v. Zhong*, 26 F.4th 536, 555 (2d Cir. 2022); *see also United States v. Mejia*, 545 F.3d 179, 191 (2d Cir. 2008).

Here, Hughes seeks to educate the jurors on concepts like "gaslighting" and "love bombing." Ex. 1 at 2-3. These are not scientific or technical concepts—they are, rather, concepts of pop-psychology and pop culture. Any juror who reads a newspaper, uses social media, or watches television knows what gaslighting is—there is no need for an expert to take the stand and explain it. The same goes for such extraordinary banalities as Hughes's assertion that "[p]erpetrators often exploit preexisting power differentials between themselves and their victims for the purpose of perpetuating sexual abuse and preventing disclosure" and that "perpetrators of domestic violence often use particular coercive control tactics that are targeted to exploit the vulnerabilities of their specific victim." *Id.* A good baseline test for whether expert testimony is on a subject beyond the ken of the average lay person is to ask whether the prosecutor could make substantially the same argument in summation without relying on the expert's opinion. The answer here is obvious: Any prosecutor worth her salt would be arguing about power differentials and the targeting of specific vulnerabilities, and she would not need an expert to provide a basis for that argument.

Hughes's proposed testimony is also replete with assertions that may be true in some instances and untrue in others—and in all instances are well within jurors' knowledge of the world. She states that victims of abuse "may … seek to numb and minimize painful sexual and abusive experiences through the use of substances, such as drugs and alcohol." Ex. 1 at 4. That's no doubt true—and it is also entirely obvious to any human on the planet who has reached the age of adulthood. Similarly, Hughes would opine that "[a] perpetrator's coercive tactics and abuse are often interspersed with rewards, positivity, affection, and normalcy, which can create emotional attachment and psychological dependency." *Id.* at 3. Such obvious propositions about

human relationships are not "beyond the ken of the average juror," *Zhong*, 26 F.4th at 555, most

of whom, it goes without saying, will have experience of relationships, good and bad.

      Much of Hughes's proposed testimony rests on condescending and elitist assumptions

about what jurors don't understand.  She seeks to offer didactic testimony that sexual assault is

common, that most sexual assault is committed by assailants known to the victim, and that some

sexual assault victims do not report the assault.  All of this is predicated on the notion that jurors

harbor "rape myths."  But there is no empirical evidence demonstrating that such myths are

widely prevalent in society today.  The very prevalence of sexual assault suggests the jury will

itself contain several victims—and likely every juror will know someone who has been a victim

of sexual assault.  It will come as a surprise to no one that sexual violence is often perpetrated

within relationships and by persons known to the victim.  It will not surprise anyone, from any

walk of life, that "victims of domestic violence may stay with or return to, rather than leave, their

abusers."  Ex. 1 at 3.

### B. Hughes Will Improperly And Misleadingly Instruct The Jury On The Law

      The Second Circuit has "consistently held … that expert testimony that usurps … the role

of the trial judge in instructing the jury as to the applicable law … by definition does not aid the

jury in making a decision."  *United States v. Grote*, 961 F.3d 105, 121 (2d Cir. 2020).  Courts

should exclude expert opinions that "instruct the jury as to applicable principles of law," *United*

*States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988), and those that "embod[y] legal conclusions that

encroach upon the court's duty to instruct on the law," *United States v. Bilzerian*, 926 F.2d 1285,

1294 (2d Cir. 1991); *see also United States v. Stewart*, 433 F.3d 273, 311 (2d Cir. 2006)

("Clearly, an opinion that purports to explain the law to the jury trespasses on the trial judge's

exclusive territory.").

Hughes's proposed testimony *begins* with a series of legal definitions, and the court doesn't have to ask whether they may confuse the jury—they *will*.  For example, Hughes offers to define sexual assault:  "Sexual assault refers to contact and noncontact sexual violations," including "voyeurism."  Ex. 1 at 1-2.  But "sexual assault" is a term with a legal meaning.  Jurors already know as a general matter what sexual assault means in a colloquial sense, and if they need to apply a legal definition, that definition must be given through jury instructions, not expert testimony.

Far more serious, however, is the government's effort to use Hughes's testimony to define—and expand—the legal definition of "coercion."  The S2 Indictment alleges numerous acts of coercion, and the charges use that phrase several times.  More specifically, the indictment alleges as acts of racketeering numerous acts of sex trafficking under 18 U.S.C. §1591.  The sex trafficking statute defines various acts that are illegal if they are accomplished by "means of force, threats of force, fraud, coercion … or any combination of such means."

And the statute explicitly defines "coercion" as:

(A)    threats of serious harm to or physical restraint against any person;

(B)    any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

(C)    the abuse or threatened abuse of law or the legal process.

18 U.S.C. §1591(a), (e)(2).  That is the definition of coercion that the jury will have to apply in this case.  *See* 2 Sand et al., *Modern Federal Jury Instructions—Criminal* ¶ 47A-21 (2025) (defining coercion).  The state law racketeering predicates contain similar definitions, and the jury will have to be instructed on those definitions as well.

But Hughes also proposes to testify about what coercion means, in the context of her discussion of the concept of "coercive control."  And her definition is different.  She says coercion means any tactic "designed to attain and maintain control in a relationship," whereby a man seeks to "satisfy his own goals and desires."  Ex. 1 at 2.  According to Hughes, coercive tactics can include not just violence and threats, but a variety of other "subtle" tactics—including ostensibly positive behaviors such as "rewards, positivity, affection, and normalcy, which can create emotional attachment and psychological dependency."  *Id.* at 2-3.  As Dr. Bardey would explain if called to testify, Hughes' discussion of coercive control is so broad as to exclude nothing:  indeed, Hughes eschews definition by insisting there is no "one-size-fits-all."  Ex. 2 at 3.  According to her, anything counts.

The evidence in this case will show, for example, that Combs financially supported his girlfriends.  That does not count as coercion under the legal definition, but it would count under Hughes's definition.  Suppose the evidence shows that after a fight, Combs apologized, expressed love, and bought his girlfriend a gift.  That would not count as coercion under the legal definition, but it would count under Hughes's definition.

The Second Circuit has squarely held that expert opinions are inadmissible where they offer definitions of concepts that are different from the legal definitions that must be applied by the jury.  An expert cannot "compete with the judge in the function of instructing the jury" on legal definitions.  *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992).  While Hughes may have experience in the area of sexual assault, "experience is hardly a qualification" for giving a legal definition "when there is a knowledgeable gentleman in a robe whose exclusive province it is to instruct the jury on the law."  *Id.*  And the problem is particularly acute where the "difference between the [expert] and statutory formulations" is "substantial."  *Id.*

10

That is precisely the situation here.  The difference between the statutory definition of coercion and Hughes's definition is not just substantial, it is vast.  The statutory formulation is limited to threats of serious harm and physical restraint.  Hughes's formulation includes any "reward or punishment" offered in a relationship.

### C.    Hughes's Broad Generalizations About "Typical" Fact Patterns Will Improperly Mirror The Testimony Of The Alleged Victims And Bolster Their Credibility

A criminal trial is not a college seminar.  Opinions about things that are "commonly" seen or "often" seen or "typically" seen or that "may" occur in sexually coercive relationships may be a subject of academic interest, but such opinions have no place in a courtroom *because they do not help the jury reach the truth in the actual case before them*.  The government may not prove a narcotics offense, for example, by arguing that the defendant's actions matched an expert's description of "the typical operating methods of … drug dealers" in a particular neighborhood. *United States v. Castillo*, 924 F.2d 1227, 1231, 1234 (2d Cir. 1991); *see also United States v. Cruz*, 981 F.2d 659, 660-62 (2d Cir. 1992).  Similarly, in a pill mill case, a medical expert may certainly be permitted to testify that the defendant wrote prescriptions that were not medically necessary.  *See, e.g.*, *United States v. Parasmo*, 2023 WL 1109649, at *1-2 (S.D.N.Y. Jan. 30, 2023).  But equally certainly, an expert, no matter how well qualified, would not be permitted to testify that doctors operating pill mills frequently rely on trusted, long-term employees, often serve legitimate patients alongside fraudulent ones, and that patients seeking illegal prescriptions often have some original need for the medication.  All those things may be true in a particular case, but it is the government's burden to prove its case to the jury with evidence, not by finding an expert who will say that the testimony of the fact witnesses is generally consistent with patterns of criminal behavior observed in other cases.  *See Mejia*, 545 F.3d at 191 (explaining

11

that "it is a little too convenient that the Government has found an individual who is expert on precisely those facts that the Government must prove to secure a guilty verdict").

The government is offering Hughes purely as a "blind" expert—one who has not examined the alleged victims or considered the facts of the case. But this doesn't mean her opinions are not tailored to the facts of this case—of course they are. The whole point of Hughes's testimony is that it will mirror the testimony elicited from the alleged victims, bolstering their credibility without referring to them directly, and at a sufficiently high level of generalization that it will largely be immune from cross-examination. But courts commit "manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses." *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994). That is precisely what the government is trying to do here.

Moreover, "determining the weight and credibility of a witness's testimony … belongs to the jury" and the Second Circuit "has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702." *Nimely*, 414 F.3d at 397-98. This goes also for general sociology-style testimony not tied to a particular witness. In *United States v. Lumpkin*, for example, an expert would have testified that, in general, a witness's level of confidence in making an identification "bears little or no relationship to accuracy." 192 F.3d at 289. The Circuit held that this testimony was properly excluded because it "intrudes too much on the traditional province of the jury to assess witness credibility." *Id.* Likewise, in *United States v. Dugue*, the Second Circuit held that the district court properly excluded defense expert testimony on the motivations of cooperating witnesses because "even general testimony …

12

would represent an evaluation of witness credibility … impermissible under Rules 702 and 403."
763 F. App'x 93, 96 (2d Cir. 2019).

Most of Hughes testimony is directed squarely at bolstering the alleged victims' credibility.  She will bolster their credibility by testifying that the fact patterns they describe are commonly seen in coercive relationships.  She will bolster their credibility by explaining away memory lapses or the failure to recall details or their failure to leave the relationship or come forward to accuse Combs earlier.  Then, in summation, the prosecution will use Hughes's testimony to vouch for its witnesses:  "The defense cross-examined Victim-1 about this, about that, but as Dr. Hughes told you, all of that is normal, in fact that's how it typically goes in these situations."  This use of generalized expert testimony to build a scaffold for witness credibility is fundamentally improper.

### D.    Hughes Will Improperly Speculate On The Motivations Of Alleged Perpetrators Of Sexual Coercion

Hughes is also planning to speculate about the motives of people who engage in sexual coercion, saying "the perpetrator engages in self-centered behavior to satisfy his own goals and desires regardless of the needs, wants, and well-being of the victim."  Ex. 1 at 2.  But "[m]usings as to defendants' motivations … [are not] admissible if given by any witness—lay or expert."  *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004).  Hughes should not be permitted to speculate, even generally, on the motivations of people who commit crimes such as those charged in this case.  The Second Circuit has held the admission of similar expert testimony reversible error.  In *Zhong*, the Court vacated forced labor convictions where, among other things, the expert testified that people generally use forced labor due to a "combination of profit maximization [objectives] … and almost a pleasure that is taken in being able to have this type of control over other people."  26 F.4th at 557.

## II.    HUGHES'S OPINIONS ARE NOT A RELIABLE APPLICATION OF SCIENTIFIC PRINCIPLES TO THE FACTS OF THIS CASE

### A.    Hughes's Opinions Are Not Supported By The Literature She Purports To Rely On

Hughes's opinions are also barred by Rule 702(b) and (c), which require that an expert's opinion be "based on sufficient facts or data" and be founded upon "reliable principles and methods."  Hughes's disclosure includes several footnotes citing social science literature as support for her opinions.  But the literature she cites does not support her opinions—indeed, the literature she cites directly often *contradicts* what she says.  Several examples show Hughes's troubling tendency to overread or outright disregard the very literature she cites.  This is because the phenomena she undertakes to describe are far more complicated than the simplistic distillations she provides.

Rates of underreporting.  Hughes states: "Research has consistently shown that sexual abuse is considered among the most underreported crimes."  Ex. 1 at 4.  As support for that proposition, she cites the DOJ's 2023 National Crime Victimization Survey (NCVS) report.  But the report actually demonstrates the opposite.  It states that in 2023, 46% of rapes and sexual assaults were reported to police.  That is higher than the overall reporting percentage for all violent crimes (44.7%), and higher than specific crimes like robbery (42.4%) and simple assault (40.9%).  It is dramatically higher than the reporting rate for property crimes (29.9%).  It is almost as if Hughes did not read the NCVS report and simply assumed that it would support her pre-existing conclusion.

Definition of "coercive control."  Hughes states that "coercive control" means "a strategic pattern of behavior that is designed to attain and maintain control in a relationship," and adds that it can include a variety of behaviors including threats and rewards.  Ex. 1 at 2-3.  As

support for her definition, she cites Mary Ann Dutton's work.  But in one of the very articles Hughes cites, Dutton cautioned that while battered women's advocates often resort to the concept, "surprisingly little work has been done to conceptualize and measure the key construct of coercive control."  Dutton & Goodman, *Coercion in Intimate Partner Violence: Toward a New Conceptualization*, 52 Sex Roles 743, 743 (2005).  The gist of Dutton and Goodman's article is that "coercive control" is largely undefined—and must be defined with some greater clarity to be useful in practice.

Nor do other weighty sources support Hughes's broad definition.  The *Diagnostic and Statistical Manual of Mental Disorders* itself has no definition of "coercive control."  Instead, it defines a particular type of dissociative disorder called "Identity Disturbance due to Prolonged and Intense Coercive Persuasion."  That disorder is narrowly defined, involving a prolonged exposure to intense coercive persuasion—through means such as brainwashing and torture—of the sort used by cults and terrorist organizations. *See* Doychak & Raghavan, *Trauma-Coerced Attachment: Developing DSM-5's Dissociative Disorder "Identity Disturbance due to Prolonged and Intense Coercive Persuasion,"* 7 Eur. J. of Trauma & Disassociation 1, 1-2 (2023).  Other researchers of intimate partner violence have sometimes adopted broader definitions, such as "a systematic pattern of behavior that establishes dominance over another person through intimidation, isolation, and terror-inducting violence or threats of violence."  Dichter et al., *Coercive Control in Intimate Partner Violence: Relationship with Women's Experience of Violence, Use of Violence, and Danger*, 8(5) Psych. of Violence 596, 596 (2018) (citing additional sources for this definition).  There is no support for Hughes's much broader definition that "coercive control" includes all behavior—including positive and negative feedback— designed to influence another.   Her definition describes every human relationship.

15

<u>Victim coping mechanisms</u>.  In describing typical coping methods that victims use, Hughes states that victims "often fall back on ingrained responses," that they "typically will not use words such as sexual assault … and will use minimizing … language," and that they "[c]ommonly … experience a sense of mental defeat."  Ex. 1 at 4.  As support for these opinions, she cites Dworkin et al., *PTSD In the Year Following Sexual Assault: A Meta-Analysis of Prospective Studies*, 24(2) Trauma, Violence, and Abuse 497 (2023).  Once again, that article does not support any of Hughes's opinions.  The article is a meta-analysis studying the prevalence of PTSD following sexual assault.  More specifically, it was focused on the trajectory of PTSD symptoms—it found that approximately 75% of sexual assault victims met criteria for PTSD one month after an assault, but only 41% met the criteria after twelve months.  Both prevalence and severity dropped over the course of year.  The authors concluded that "the majority of PTSD recovery occurs within the first few months following sexual assault."

The conclusions in the cited article have *nothing whatsoever* to do with Hughes's proffered opinion about what coping methods are "typical" among victims.  Indeed, if anything, the article undermines Hughes's suggestions that rape trauma symptoms generally last for an indeterminate or indefinite time period.

<u>Reasons for delayed reporting</u>.  In her section on delayed disclosure, Hughes states that sexual assault victims typically do not report immediately due to "shame and embarrassment" and "fear of retaliation."  Ex. 1 at 4.  As support, she cites Ullman et al., *Reasons for and Experiences of Sexual Assault Nondisclosure in a Diverse Community Sample*, 35(8) J. Family Violence 839 (2020).  Once again, that article does not support Hughes's conclusions.

The study by Ullman and her co-authors consisted of interviews with 42 reported victims of sexual assault who *had* reported their assaults to friends and family.  Interviewees were asked

about factors that made it difficult to report.  The authors noted that prior studies had suggested that some victims do not report their assaults because they "wanted to keep it private, did not want their friends and family to find out, feared not being believed, or felt ashamed."  The interviews conducted by authors suggested some additional reasons, including that women were afraid of reporting their assaults by others to male family members out of fear that they would seek violent revenge on the assailants.  Overall, the most common reason given by interviewees was "fear of negative social reaction."  The authors also candidly acknowledge that their study could support only limited conclusions, as it "was limited by the retrospective design, with possible memory bias influencing accounts at the time of the interview," as well as the small sample size.

In sum, the study by Ullman et al. suggests the reasons for delayed reporting and nonreporting are extraordinarily complicated.  Whether victims report, when they report, and whether they report to authorities or just their social network—these are all highly individualized and context-dependent questions.  There is no "typical" response or typical reason.  Yet Hughes cherry-picks a few bits of the literature, then purports to offer an expert opinion that victims typically do not report due to "fear of retaliation" (among other reasons).  That is a transparent attempt to support the prosecution's theory of the case and a narrative that all the anything the victims said or did can be blamed on Combs.

And this points to a more general problem with Hughes's approach.  Neutral researchers acknowledge limitations and contrary evidence.  The ethical guidelines for professionals engaged in forensic psychology states that they should "acknowledge relevant limitations and caveats inherent in procedures and conclusions."  American Psychological Association (APA), *Specialty Guidelines for Forensic Psychology*, in American Psychologist §2.06 (Oct. 1, 2012).  Many of

the articles Hughes cites contain numerous qualifiers—they note that studies have been based on small sample size or are limited by study design, they acknowledge limitations of conclusions that can be drawn, they call for further research on a topic, and so on.  But Hughes's opinions brook no such dissent.  In short, her free-wheeling citation practice demonstrates that she approaches her work like an advocate, not a neutral expert.

**B.    Hughes Has Not Applied Her Methods To This Case**

Rule 702(d) requires an expert's opinion to be "a reliable application of the principles and methods to the facts of the case."  And yet in this case, Hughes has apparently not interviewed the alleged victims at all, much less engaged in the sort of psychological diagnostics that her profession demands.  As a result, she offers unadorned opinions that can explain the accusers' behavior—even though she has made no effort to exclude alternate explanations.  Regardless of any other issues, Rule 702(d) thus requires exclusion of all her testimony.  Rule 702(d) does not allow "blind expert testimony" of the sort the government seeks to admit here.

1.    The Supreme Court has explained why it is important for an expert to apply her principles and methods to the facts of the case.  The reliability inquiry is not focused solely on the "reasonableness *in general*" of the expert's methodology.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999).  Rather, a court must examine the reasonableness of applying that approach in the particular case "to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*."  *Id*. at 154; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

This requirement of a reliable application was incorporated as Rule 702(d) in the 2000 amendments to Rule 702.  The rule was amended again in 2023 to emphasize again that an "opinion must stay within the bounds of what can be concluded from a reliable application of the

expert's basis and methodology."  Fed. R. Evid. 702 advisory committee's note to 2023 amendment.  As the Second Circuit has explained, "[i]n deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, *and how the expert applies the facts and methods to the case at hand*."  *Amorgianos*, 303 F.3d at 267 (emphasis added).

2.      The reliable application requirement of Rule 702(d) is not a mere formality.  It serves to impose analytical rigor on an expert's proposed testimony.  More particularly, it ensures that before an expert can offer an opinion on some issue, she must be able to exclude alternate explanations that might apply in the particular case.

*Kumho* is instructive.  *Kumho* was a products liability case—the dispute was whether a tire explosion was caused by a manufacturing or design defect as opposed to overuse and improper care.  The plaintiffs called an expert to support the former explanation.  But an expert would not have been allowed to testify simply that a manufacturing defect *can* cause a tire to blow out—that is obvious and too general to be helpful.  The question was whether a manufacturing defect *did in fact* cause the tire to blow out *in that case*.  As the Court explained, the expert must address that specific matter: "That matter concerned the likelihood that a defect *in the tire at issue* caused its tread to separate from its carcass."  526 U.S. at 154 (emphasis added).  In other words, "the question before the trial court was specific, not general."  *Id*. at 156. And it was in that specific analysis that the expert's testimony was deficient, because he could not exclude alternate explanations suggested by the evidence in that case.  *See id*. at 154-57.

The requirement of reliable application applies to all experts.  In a car accident tort case, for example, a doctor could not testify as an expert simply that car accidents *can* cause head

injuries and long-term brain injuries.  Such testimony is too general to be helpful, and without specific application to the case, it presents a risk that the jury will base its decision on a completely unfounded inference.  Thus, Rule 702(d) would require the doctor to testify that the car accident did cause the party's injuries in that case—and that would require, among other things, the doctor to examine the patient's medical records to see whether he had symptoms of brain injury prior to the accident.

The same is true here.  Hughes proposes to testify, for example, that some victims of abuse "may … seek to numb and minimize painful sexual and abusive experiences through the use of substances, such as drugs and alcohol."  Ex. 1 at 4.  That is true—indeed, it is both obvious and banal to state that some people use drugs and alcohol to cope with trauma.  It is also true that some people use drugs and alcohol because they enjoy being intoxicated.  Some people use drugs and alcohol in anticipation of sex because drugs and alcohol relax inhibitions and heighten sexual pleasure.  Some people use drugs and alcohol because they are addicted to drugs and alcohol.

There will be evidence in this case that Victim-1, among others, regularly used drugs and alcohol, both in conjunction with sexual activity and otherwise.  That may be because she was coping with trauma, or that may be because she enjoyed it.  The jury will have to determine which is true based on the evidence at issue—including her own testimony, her contemporaneous text messages seeking drugs, and so on.  The question for the jury, in other words, will be "specific, not general."  *Kumho*, 526 U.S. at 156.  But Hughes's proposed "expert" opinion does not actually shed any light on that specific question—because she has made no effort to examine the evidence in this case and thus make any reliable determination whether Victim-1's substance use was related to trauma *as opposed to some other alternate explanation*.

Her proposed opinions thus utterly fail to satisfy Rule 702(d).

3.     What is true as a matter of law is also true as a matter of sound professional practice in the field of psychology.  The APA has adopted ethical principles and a code of conduct that requires psychologists to consider individual differences and specific factors when forming psychological opinions.  *See Ethical Principles of Psychologists and Code of Conduct* §9.01(b).

In addition, the APA has specific guidelines that apply when psychologists engage in "forensic psychology," which refers to "professional practice by any psychologist" who offers to "apply[] the scientific, technical, or specialized knowledge of psychology to the law to assist in addressing legal, contractual, and administrative matters."  APA, *Specialty Guidelines for Forensic Psychology*, in American Psychologist (Oct. 1, 2012).  These specialty guidelines emphasize that when possible forensic examinations should be conducted to ensure that assessments and opinions are well-grounded, and based on specific individualized data rather than broad generalizations.  *See* §§2.05, 2.08, 9.01-.03, 10.01-.03, 11.01, 11.04.  In particular, the guidelines state: "Forensic practitioners recognize their obligations to only provide written or oral evidence about the psychological characteristics of particular individuals when they have sufficient information or data to form an adequate foundation for those opinions or to substantiate their findings."  §9.03.

Hughes's proposed opinions do not comport with these guidelines.  Her testimony is intended to imply that the accusers in this case have the psychological characteristics of abuse victims—and that the defendant has the characteristics of an abuser.  But these inferences are not supported by any actual forensic examination, and the lack of such an examination renders Hughes's proposed testimony fundamentally unreliable.  As Dr. Bardey explains, "[a]n

21

understanding of how a particular individual typically behaves or responds sheds far more light on how that individual may have behaved or responded in a particular situation than generalizations about ways in which other people tend to respond." Ex. 2 at 2.

## III.    HUGHES'S OPINIONS SHOULD ALSO BE EXCLUDED UNDER RULE 403

Rule 403 provides an independent basis for exclusion.  Hughes's testimony has low probative value.  This is a case where the jury will have to judge the nature of a relationship between a man and a woman based on their trial testimony and other evidence, including their communications during the relationship.  A jury doesn't need an expert's help to do that.  Most of Hughes's testimony involves broad generalizations about intimate relationships that are not beyond the ken of lay jurors.  When it comes to the behaviors that are common among sexual assault victims, the most she could reliably say is that there are no "typical" behaviors— everyone reacts differently.  That opinion, even assuming it would correct some misconception harbored by jurors, does not shed much light on any disputed issues.  And this case, moreover, is different from most cases of alleged sex crimes or abuse because in this case, the jury will have an unusual amount of contemporaneous evidence shedding light on consent and coercion— including video evidence of the sexual encounters and numerous contemporaneous text messages between Combs and his girlfriends.  Hughes's testimony does not and could not shed any further light on that evidence, and thus her opinions are a poor "fit" with this case.

The unfair prejudice and potential for confusion is also severe.  Hughes's proposed definition of "coercion" would conflict with the legal definition.  Her definition of "sexual assault" as including non-contact violations, such as "voyeurism," will also muddy the waters, especially given the central role that the videos of the sexual activities involving the male escorts will play at trial.  Beyond this, Hughes's very presence on the stand, even if she disclaims any

opinion on the charges, will telegraph to the jury that a leading expert sees enough merit in the government's case to step forward as a government witness. *See Cruz*, 981 F.2d at 663 ("condemn[ing]" the use of an expert who "logically adds nothing" but whose presence "strongly suggests to the jury that a law enforcement specialist … believes the government's witness to be credible and the defendant to be guilty"). And the admission of Hughes's testimony will force Combs to call his own rebuttal expert, which would divert the jury away from the facts into a sideshow battle of experts.

The Second Circuit has repeatedly described the "added aura of reliability that necessarily surrounds expert testimony," *Lumpkin*, 192 F.3d at 289, and thus the "unique weight" expert testimony carries with juries and the "uniquely important" role of Rule 403 when it comes to the trial court's gatekeeping function as to expert evidence, *Nimely*, 414 F.3d at 397. In *Zhong*, the Second Circuit vacated forced labor convictions where the government called an expert to opine on the general sociology of forced labor organizations, instructing that "district courts must proceed with caution" when admitting expert evidence. 26 F.4th at 556. Here, that "caution" requires that Hughes's testimony be excluded in its entirety.

## **CONCLUSION**

For the foregoing reasons, Mr. Combs requests that this Court exclude Hughes's testimony in its entirety.

Date:  April 2, 2025                                  Respectfully Submitted,
       New York, NY

                                                      /s/ Alexandra A.E. Shapiro
                                                      Alexandra A.E. Shapiro
                                                      Jason A. Driscoll
                                                      Shapiro Arato Bach LLP
                                                      1140 Ave of the Americas, 17th Fl.
                                                      New York, NY 10036
                                                      (212) 257-4881

ashapiro@shapiroarato.com
jdriscoll@shapiroarato.com

Marc Agnifilo
Teny Geragos
AGNIFILO INTRATER
445 Park Ave., 7th Fl.
New York, NY 10022
646-205-4350
marc@agilawgroup.com
teny@agilawgroup.com

Anna Estevao
SHER TREMONTE LLP
90 Broad St., 23rd Fl.
New York, NY 10004
(212) 202-2600
aestevao@shertremonte.com