

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

April 23, 2025

The Honorable Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re: *United States v. Combs*, S3 24 Cr. 542 (AS)**

Dear Judge Subramanian:

The Government respectfully submits this letter for the Court's consideration following the April 18, 2025 conference (the "Conference") regarding the expert testimony of Dr. Dawn Hughes, which the Government is seeking to introduce under Rule 702. At the Conference, the Court addressed, among other things, the scope of Dr. Hughes' testimony regarding coercive control, coping strategies, and the memory of victims of sexual abuse. For the reasons stated below, and in the Government's opposition to the defendant's motion *in limine*, the Court should admit Dr. Hughes' testimony in the limited areas discussed below.

## I. Background

As detailed in the Government's Enterprise letters and in its opposition to the defense motion to exclude testimony under Rule 413, *see* Dkt. No. 258, the Government anticipates [redacted]

- [redacted]

- [redacted]



## II. Discussion

### A. Dr. Hughes' Testimony Regarding Interpersonal Violence

The crux of the proposed testimony from Dr. Hughes concerns aspects of interpersonal violence, including what she described in her notice as "coercive control." Based on representations the defense made in Court and to the Government, the Government expects that the defense will argue that each victim was a willing participant in FOs and other sex acts, as opposed to being forced or coerced into them, citing that the victims—at times—expressed love, affection, and/or admiration for the defendant, and chose to remain in a relationship and/or employed by the defendant. The defense will then argue that these victim responses are incompatible with the victim being a victim of abuse. If admitted, Dr. Hughes' testimony regarding interpersonal violence, based on relevant scientific literature and her experience in the field, will appropriately contextualize these arguments. This testimony is highly relevant and outside the ken of the average juror.

As an initial matter, and consistent with the Court's guidance on this issue, if Dr. Hughes is permitted to testify on this topic, she would be instructed not to use the term "coercive control" in her testimony, in order to avoid any inadvertent conflation with the legal term "coercion" as relevant to the charged offenses. (*See* Tr. 20:13-32:13). And as described further below, the Government is also prepared to address the Court's concerns regarding testimony that may be interpreted as speaking to the subjective intent of the defendant. (Tr. 26:11-20).

The Court indicated, however, that it was inclined to admit testimony regarding, among other things, why victims remain in abusive relationships and engage in delayed disclosure. (Tr.

27:6-21; *see* Ex. A at 3-4). [redacted]

In addition, the Government respectfully requests that Dr. Hughes be permitted to provide additional limited testimony regarding interpersonal violence to provide context to her testimony regarding the reasons victims remain in relationships and delay disclosure. Such contextual testimony would be limited to the following: (1) the forms of abuse common in domestic relationships that involve interpersonal violence, such as physical violence, sexual abuse, emotional abuse, psychological aggression, and stalking and surveillance behaviors; and (2) that those forms of abuse may function together to cause a victim to remain loyal and committed to the perpetrator; remain in an abusive relationship for a variety of reasons, including emotional manipulation or fear of violence; and comply with demands from the perpetrator, including the victim participating in sex acts. (*Id.* at 3).

This testimony is highly relevant and necessary to provide a proper psychological framework for Dr. Hughes' testimony regarding why a victim may remain in an abusive relationship as well as engage in delayed disclosure. As reflected in Dr. Hughes' expert notice, interpersonal violence is an umbrella term that describes the dynamics associated with abuse, exploitation, victimization, and control of a victim by a perpetrator. Interpersonal violence may include physical abuse, rape, sexual assault, and intimate partner violence, as well as threats, intimidation, and isolation. (Ex. A at 1). Relationships involving interpersonal violence often also involve periods of normalcy and affection. Without this key testimony regarding the dynamics of interpersonal violence, a juror would be unable to understand the relevance of Dr. Hughes' testimony regarding why a victim may remain in an abusive relationship, as well as engage in delayed disclosure. Indeed, Dr. Hughes would testify that it is the dynamics of interpersonal violence that *result* in such behavior.

Importantly, the dynamics of interpersonal violence—and the resulting counterintuitive victim behaviors—fall far outside the ken of the average juror. Members of the jury are unlikely to be familiar with the tools of manipulation, control, abuse, and violence that scientific research has identified as typical in relationships involving interpersonal violence, or with the common responses that victims have in these relationships. Conversely, jurors may have opinions about how victims of interpersonal violence would—or should—respond, and these opinions could be based on any number of unscientific inputs, including the juror's personal experience or anecdotes the juror has learned from others. In light of this, jurors should also have the benefit of hearing what an expert in the field has learned about these complex psychological dynamics. Accordingly, Dr. Hughes should be permitted to provide limited testimony regarding the physical, psychological, and emotional tactics of interpersonal violence in order to provide necessary context to her testimony regarding the *impact* of those tactics, namely, that victims may express positive emotions towards a perpetrator, may remain in an abusive relationship, and may delay disclosure of abuse. (*See* Ex. A at 3).

As to the Court's expressed concern about improper testimony regarding intent, *see* Tr. 27:16-20, Dr. Hughes will not testify to "the subjective motivations, thought processes, and mental states of abusers in general." *See United States v. Ray*, 20 Cr. 110 (LJL), 2022 WL 101911, at *11 (S.D.N.Y. Jan. 11, 2022). Indeed, under Rule 704, "an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704. Rather, Dr. Hughes would testify to "a common set of conduct experienced by those who are victims of interpersonal violence and the effect that that conduct commonly has on those who are victims of it." *Ray*, 2022 WL 101911, at *11. Indeed, the Supreme Court has recently found that testimony regarding the mental state or characteristics of a category of offenders *is* proper. *See Diaz v. United States*, 602 U.S. 526, 534-36 (2024) (finding that testimony by the Government's expert that, in most circumstances, a drug courier knows they were hired to take drugs from point A to point B did *not* violate Rule 704 noting that expert opinion "about the knowledge of most drug couriers . . . does not necessarily describe Diaz's mental state. After all, Diaz may or may not be like most drug couriers . . . The jury was thus well aware that unknowing couriers exist and that there was evidence to suggest Diaz could be one of them. It simply concluded that the evidence as a whole pointed to a different conclusion: that Diaz knowingly transported the drugs."). As in *Diaz*, Dr. Hughes will testify only to types of conduct that persist in relationships involving interpersonal violence; she will avoid any opinion regarding the subjective intent of the defendant, or the *intent* motivating the types of controlling tactics that commonly appear within interpersonal violence. Rather, Dr. Hughes will simply testify about what those tactics are and how they impact victims, without commenting on the mindset of abusers.

Neither will Dr. Hughes testify regarding the credibility of any particular witness, which would be altogether improper. *Cf. Washington v. Schriver*, 255 F.3d 45, 59 (2d Cir. 2001) ("There is no question that under New York law, a witness can testify about factors affecting the reliability of another witness, as long as he or she avoids commenting directly on the credibility of the witness.") (citing cases); *Byrd v. Brown*, No. 09 Civ. 5755 (GBD-JCF), 2010 WL 6764702, at *11 (S.D.N.Y. Oct. 25, 2010), *report and recommendation adopted*, No. 09 Civ. 5755 (GBD-JCF), 2011 WL 2162140 (S.D.N.Y. June 1, 2011) (finding expert testimony on battered woman syndrome is "properly admitted to explain the victim's behavior after an assault where the expert did not testify, or suggest, that the victim should be believed or that defendant was guilty.") (internal quotation marks and alterations omitted). As such, Dr. Hughes' proffered testimony will not opine on the particular intent of the defendant, or the credibility of specific witnesses, and will instead serve the proper function of explaining the dynamics and consequences of victims of interpersonal violence and sexual abuse.

**B. Dr. Hughes' Testimony Regarding Coping Strategies**

At the Conference, the Court also addressed the scope of Dr. Hughes' testimony regarding coping mechanisms used by victims. (Tr. 31:13-17). The Government respectfully requests that Dr. Hughes be permitted to provide limited testimony on this topic.

[redacted]

[redacted] Dr. Hughes' testimony, however, demonstrates how research and science support that these actions may be a response to interpersonal violence. Dr. Hughes's proposed testimony discusses how victims employ various coping strategies, including placating their abuser by participating in unwanted activities and consuming substances, in order to minimize the pain and well-researched psychological consequences that result from abusive experiences. (Ex. A at 3).

In addition, such expert testimony will also be particularly helpful to the jury. While the jury may be aware generally that individuals may seek to placate an abuser, or consume substances to numb challenging life experiences, they are likely to be unaware of the role these particular coping strategies play in long-term, sexual relationships where the perpetrator of the abuse is also a romantic partner. As such, Dr. Hughes' testimony regarding the use of coping mechanisms in relationships involving interpersonal violence is outside the ken of the average juror and will assist the jury in understanding the testimony of these victims.

**C. Dr. Hughes' Testimony Regarding Memories of Sexual Abuse**

At the Conference, the Court addressed the scope of Dr. Hughes' potential testimony regarding the memory of victims of sexual abuse. (Tr. 32:14-35:20). The Court expressed particular concern that such testimony could be viewed as improperly bolstering the credibility of witnesses. (Tr. 32:19-24). For the reasons stated below, Dr. Hughes' limited testimony on the subject of memory is highly relevant [redacted] and will be helpful to the jury in understanding the mechanics of memory for victims of sexual abuse, which is outside the ken of the average juror.

Dr. Hughes' testimony regarding the memory of sexual abuse victims is highly relevant. [redacted]

Dr. Hughes' testimony regarding the memory of victims of abuse is therefore highly relevant and will assist the jury in assessing the credibility of [redacted] As an initial matter, such testimony is far outside the ken of the average juror. Indeed, the average juror may presume that victims should recall all incidents of trauma, and believe that the fragmented nature of the memories of victims are due to their lack of credibility, rather than as a result of trauma. Further, the average juror may lack awareness that interpersonal violence may result in psychiatric disorders, including PTSD, of which an inability to remember an important aspect of a traumatic event is a criteria of the diagnosis.[1] For that reason, the nature of traumatic memory may be

---

[1] [redacted]

counterintuitive for the average juror without the guidance of expert testimony. As such, Dr. Hughes' testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see also Daubert v. Merrell Dow*, 509 U.S. 579, 591-93 (1993). Nor will such testimony amount to improper bolstering [redacted] Dr. Hughes will not opine on the credibility [redacted] whatsoever. Rather, it will be left to the jury alone to determine whether victim testimony "fit[s] the pattern" described by Dr. Hughes' testimony. *Ray*, 2022 WL 101911 at *13.

Indeed, Dr. Hughes has recently provided similar expert testimony regarding the memory of victims of sexual abuse in several other cases. *See United States v. Copeland*, 21 Cr. 521 (KMK) (S.D.N.Y. July 12, 2023); Trial Tr. at 242-44 (discussing fragmented memory from traumatic events involving sexual abuse; that such memory can get encoded in "flashbulbs"; and that with "repeated incidents of sex abuse over time, it becomes difficult to isolate each specific incident.")[2]; *United States v. Kelly*, No. 19 Cr. 286 (AMD) (E.D.N.Y. Sept. 17, 2021), Dkt. No. 250, Trial Tr. 3946:8-21 (discussing that "memory for traumatic events can be different than memory for regular events . . . what we saw were people remember the larger context for having been abused, having been subjected to violence and maltreatment, but some of discrete details get blurred over time."); *United States v. Raniere*, 18 Cr. 204 (NGG) (E.D.N.Y. June 6, 2019), Dkt. No. 780, Trial Tr. at 3713-14 (discussing that "when we have chronic assault and repeated assault, sometimes the details tend to blend together . . . And the way that sometimes trauma is remembered, especially if someone is employing dissociation during the event, the way the memories get encoded sort of like flashbulbs . . . And over the course of therapy and time, those pieces tend to then eventually come in place. And sometimes they never come in place, but they know that these things have happened to them."). Such testimony has been found to serve its proper purpose of assisting jurors in understanding the psychological impact of trauma on memory.

Finally, if permitted to testify regarding memory, the Government will limit Dr. Hughes' testimony to the following matters, unless the defense opens the door to additional topics regarding memory through its argument or cross examination: (1) victims of interpersonal violence may have incomplete or fragmented memories due to traumatic stress; (2) victims may lack the capacity to recall each instance of abuse due to the frequency of abuse; and (3) victims may recall memories of abuse at a later time when exposed to an internal or external cue or reminder.

**Conclusion**

For the foregoing reasons, as well as those outlined in its opposition to the defense's motion *in limine*, the Government respectfully requests that the Court admit limited expert testimony of Dr. Hughes pursuant to Rule 702 with respect to interpersonal violence, coping strategies, delayed disclosure, and memory.

[2] Since this trial transcript from *Copeland* is not publicly docketed, the Government attaches the relevant portion hereto as Exhibit B.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: ___/s______________________
Maurene Comey / Meredith Foster /
Emily A. Johnson / Christy Slavik /
Madison Reddick Smyser / Mitzi Steiner
Assistant United States Attorneys
(212) 637-2324/-2310/-2409/-1113/-2381/-2284

cc: Counsel of record (by ECF)