**EXHIBIT B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>-v.-<br><br>SEAN COMBS,<br><br>                  Defendant. | DECLARATION<br><br>S3 24 Cr. 542 (AS) |

STATE OF NEW YORK           )
COUNTY OF NEW YORK        ) ss.
SOUTHERN DISTRICT OF NEW YORK   )

FRANK PIAZZA hereby declares under penalty of perjury:

1.      My name is Frank Piazza.  I am a Law Enforcement and Emergency Services Video Association International ("LEVA") certified Forensic Video Technician and the president of Legal Audio Video, LLC, located in West Palm Beach, Florida and New York City, New York.  In January 2025, I was contacted by AUSA Emily Johnson on behalf of the U.S. Attorney's Office for the Southern District of New York ("USAO-SDNY") to review and provide analysis on numerous video files for the case *United States v. Sean Combs*.

2.      From 1996 through 2021, I was the owner and president of Audio Paint, Ltd., a professional audio and video production company located in Manhattan.  During this time, recording and editing techniques were constantly transitioning from analog to digital formats and finally landing in the software domain.  As part of my work at Audio Paint, I developed expertise in these new technologies for both audio and video.

3.      In 2000, I was contacted by criminal defense attorney Gerald Lefcourt to assist him in managing and converting more than 1600 hours of Federal Bureau of Investigation wiretap and body wire recordings that had been archived to cassette tapes and other proprietary formats.  After

completing the work for his case, I was approached by USAO-SDNY and asked to assist with their audio and video evidence for many upcoming cases and trials.  Soon after, I was contacted by private law firms, investigative agencies, government agencies, and other legal professionals needing assistance with their audio and video materials.  It was during this time that I formed my company Legal Audio. The company has been renamed Legal Audio Video, LLC.

4.	My formal forensic training and education began in 2012 at the National Center for Media Forensics, sponsored through Colorado University in Denver, Colorado.  Since 2012, I have continued to attend seminars, meetings, and continuing education classes, and I plan to attend new training opportunities approximately six times per year in the future.  I am also an active member of numerous forensic organizations, which review current forensic techniques and methodology and provide introductions to experts and professionals throughout the audio and video forensic community.  My current CV is available upon request.

5.	On February 3, 2025, I was awarded a contract to begin work on the video materials for this case.  On or around March 17, 2025, I downloaded the video materials from the USAfx server.  The materials were contained inside multiple folders.  One folder labeled "Cellphone Videos" contained two video files titled "[SEALED] USAO_00937645 - Cellphone Video 1.MOV" (**Defense Exhibit C**) and "[SEALED] USAO_00937645 - Cellphone Video 2.MOV." 2 (**Defense Exhibit D**).  A second folder labeled "Defense Rule 17 Production - CNN" contained four video files titled "SC_00090809.mp4," (**Defense Exhibit I-1**), "SC_00090810.mp4" (**Defense Exhibit I-3**), "SC_00090811.mp4" (**Defense Exhibit I-2**), and "SC_00090812.mp4" (**Defense Exhibit I-4**).  My analysis has taken place between March 17 and April 11, 2025.

6.  In addition to these materials, I also reviewed a video file titled "Ex. D – McCourt.mp4," (Dkt. 80, Ex. D), and an affidavit submitted by Conor McCourt to the Court on April 2, 2025.

7.  I took steps to preserve the files to a backup server and hard drive. All files were HASHED (assigned a digital signature). The analysis took place on non-destructive, digital duplicates (clones) of the original files.

8.  I used a series of software programs to perform my analysis. These programs include: AmpedFive, Avidemux, FinalCutPro, VLC, HexFiend, QuickHash, ExifTool, MediaInfo, and other standard software programs found in PC and MAC operating systems.

9.  These software programs enable me to locate and confirm any signatures or patterns within the files. The software can also assist in identifying any possible anomalies that might exist within the footage. The first part of this analysis focuses on the video streams, filetypes, audio streams, frame rates, codecs, aspect-ratios, bitrates, and other relevant metadata findings. The second part of the analysis focuses on whether the footage is playing in linear and chronological form. The third part of the analysis involves taking the forensic video steps needed to correct any errors that may have been identified.

10. A summary of my analysis to date of Defense Exhibits C, D, I-2, I-3, and I-4 is described below. These exhibits appear to contain surveillance footage from various cameras at the Intercontinental Hotel Los Angeles Century City.[1] My analysis of the video files is somewhat

---

[1] I also reviewed Defense Exhibit I-1, a screen-captured video (using Microsoft's ClipChamp software) of a CNN broadcast news story highlighting video footage involving Sean Combs and a victim, which was originally released by CNN on May 17, 2024. The metadata offers very limited information beyond what would be expected from a screen-captured file. I can confirm the filetype, file size, aspect ratio, frame rate and the audio properties. This file required additional analysis. It does not identify any information about the videos playing in the news story (Defense

limited as we are not able to obtain the original, proprietary video files produced by the surveillance recording system. However, based on my observations of the files and my training and experience, I have concluded that there is no evidence of manual editing or tampering with these videos. Further, although my analysis of Defense Exhibits I-2 and I-4 is ongoing, I believe that Defense Exhibits C and D, as well as Defense Exhibit I-3, are reliable depictions of the original surveillance footage recorded by the Intercontinental Hotel's surveillance system.

### Defense Exhibits C and D (the "Cellphone Videos")

11. Defense Exhibit C ([SEALED] USAO_00937645 - Cellphone Video 1.MOV) shows a series of events taking place on March 5, 2016 outside an elevator landing from the Intercontinental Hotel Los Angeles Century City. This footage was recorded by an iPhone 6. The footage itself captures a monitor's screen during playback of a surveillance video, i.e., Defense Exhibit C is a video-of-a-video. The iPhone video was taken on March 5, 2016 at 20:42:13 UTC, GPS +34.0543-118.4127+090.054/.  This file required additional analysis.

12. Defense Exhibit D ([SEALED] USAO_00937645 - Cellphone Video 2.MOV) shows a series of events taking place on March 5, 2016 outside an elevator landing from the Intercontinental Hotel Los Angeles Century City. This footage was recorded by an iPhone 6. The footage itself captures a monitor's screen during playback of a surveillance video, i.e., Defense Exhibit D is a video-of-a-video. The iPhone video was taken on March 5, 2016 at 21:13:00 UTC, GPS +34.0543-118.4127+090.054/.  This file required additional analysis.

---

Exhibits I-2 and I-3). It is likely the video editor and/or the producer of the broadcast at CNN did not have the forensic skills to identify and fix the playback speed issues described in Paragraph 24. Defense Exhibits I-2 and I-3 were likely imported into the story before any corrections were made. Editing, zooming, graphic overlays, and sequence order are broadcast production decisions typically made by the network.

13. The Cellphone Videos capture the original surveillance footage as displayed on the Intercontinental Hotel's surveillance system (the "Original Footage"). For the reasons described below, I have determined that the Cellphone Videos contain reliable depictions of that Original Footage.

14. The metadata confirms the date the Cellphone Videos were made. The GPS data confirms the location where these recordings were made. Analysis confirms the files have not been edited or tampered with.

15. The Cellphone Videos show that the surveillance system's original camera layout and software (ASONI) is being used to display the footage. My research and analysis of this system is still ongoing.

16. The Cellphone Videos were recorded with a variable frame rate of 30 frames per second ("FPS"). The Original Footage, which was playing back on the surveillance system and is captured on the Cellphone Videos played back at 30 FPS. While the Original Footage has dropped frames (likely caused by motion activity settings, explained below), the reliability of the iPhone's consistent frame rate confirms that the original surveillance system software is operating reliably and the playback speed is accurate. A common cause of these dropped frames, which existed on the original surveillance footage, can be the result of using the motion activity setting. This setting instructs the system to stop or start recording when the camera's lens captures a change in motion, light, or pixel activity. No frames have been manually added to or deleted from the Cellphone Videos or the Original Footage.

17. There are visual artifacts and distortions in both the Cellphone Videos that appear to have been introduced by the iPhone's recording of the Original Footage. In Defense Exhibits C and D, the camera lens in the iPhone is capturing the screen and a few distortions are taking place.

First, the video is shaky and appears stretched, and the walls on either side are curved. Second, lines and swirls appear on the screen as a result of this kind of lens-screen recording, also known as the Moire Effect. However, because the Cellphone Videos share characteristics with the Original Footage, including recording at 30 FPS and not dropping additional frames, I can conclude that the iPhone's video capabilities can be relied upon and produced a fair and accurate representation of what was taking place on the hotel's surveillance video system. In short, the Cellphone Videos contain reliable depictions of the Original Footage.

18. Separately, I have also taken steps to reduce the shaking, improve the distortions, and correct the aspect ratio in the videos. By making these corrections, the visual quality of the Cellphone Videos is improved, and my conclusion that the Cellphone Videos accurately depict the Original Footage as captured by the hotel's surveillance system is confirmed.

### Defense Exhibits I-2, I-3, and I-4 (the "CNN Videos")

19. Defense Exhibit I-3 (SC_00090810.mp4) is an .mp4 video file (2 minutes 15 seconds) that appears to have been exported by the Intercontinental Hotel surveillance system's original software. The events captured in the surveillance footage have been recorded outside an elevator landing area in the hotel. The metadata includes the filetype, file size, aspect ratio, frame rate, audio properties and additional information as well. This file required additional analysis.

20. Defense Exhibit I-2 (SC_00090811.mp4) is an .mp4 video file (6 minutes 13 seconds) that appears to have been exported by the Intercontinental Hotel surveillance system's original software. The events captured in the surveillance footage have been recorded by a camera facing a long hallway near the entrance to the elevator landing. The metadata includes the filetype, file size, aspect ratio, frame rate, audio properties and additional information as well. This file required additional analysis.

21. Defense Exhibit I-4 (SC_00090812.mp4) is an .mp4 video file (1 minute 59 seconds) that appears to have been exported by the Intercontinental Hotel surveillance system's original software. The events captured in the surveillance footage have been recorded by a camera facing a long hallway from the opposite point of view of Defense Exhibit I-2 file near the entrance to the elevator landing. The metadata includes the filetype, file size, aspect ratio, frame rate, audio properties and additional information as well. This file required additional analysis.

22. The CNN Videos contain certain anomalies, such as timing errors, dropped frames, and data loss, which are discussed in more detail below. Based on my training and experience, these errors can take place when exporting the file or re-encoding the file. These are not manually or deliberately created. Certain of these errors can be corrected to provide a more reliable representation of the Original Footage. I have analyzed Defense Exhibit I-3 (SC_00090810) in depth, as described below, and have concluded that it is a reliable depiction of the Original Footage. I am continuing to analyze Defense Exhibit I-2 and I-4 and reserve the right to supplement my opinions as my analysis of those videos proceeds.

23. Defense Exhibit I-3 appears to be a file that has been exported from the original surveillance system in either a proprietary or universal filetype. Defense Exhibit I-3 appears to have been re-encoded, or converted, to a different video format, namely an H.264 format. That process appears, based on my training and experience, to have been completed without any evidence of tampering. Compared to its native format, the process likely created certain visual errors to be present in the files and caused timing issues by changing the FPS. The visual quality of the file has been reduced and the playback speed has been accelerated.

24. In particular, the re-encoding or reformatting process has caused Defense Exhibit I-3 to play back at 21 FPS, whereas, as discussed above, the Original Footage, as captured on the

7

Cellphone Videos, played back at 30 FPS. Accordingly, there is a speed difference of approximately 30 percent (9 frames). If you were to play these files side-by-side Defense Exhibit I-3 will play much faster than the Cellphone Videos. However, the frame speed of Defense Exhibit I-3 can be reduced by approximately 71 percent, such that Defense Exhibit I-3 and the Cellphone Videos are in sync with each other. With this adjustment, Defense Exhibit I-3 would present a more accurate depiction of the Original Footage, as depicted in the Cellphone Videos.

25. In Defense Exhibit I-3, there are noticeable artifacts that have been caused by the export and/or conversion process. It appears that some video frames are momentarily glitching when there is accelerated motion. This data corruption affects the pixels which appear as blocks in the viewer. This occurs when there is movement and activity in the footage. It is likely that the export and/or conversion process caused these errors, and because the file has been re-encoded and/or reformatted, the artifacts are embedded into the footage and cannot be corrected. However, many of these same errors also exist in the Original Footage recorded from the surveillance system in the Cellphone Videos.

26. There are some anomalies identified within the timestamps of Defense Exhibit I-3. Since we do not have the original proprietary files, we cannot extract the timecode stream. The timestamp artifacts are embedded into the footage and cannot be corrected. However, this does not undermine my conclusion that Defense Exhibit I-3 fairly and accurately represents the events as captured by the hotel's surveillance video system.

***

27. As mentioned previously, the Cellphone Videos and the CNN Videos contain certain artifacts and distortions. While the existence of these issues does not undermine my conclusion that the Cellphone Videos and Defense Exhibit I-3 reliably depict the Original

Footage,[2] I nevertheless used forensic techniques to identify and correct these issues, which are discussed above. This process further confirmed my conclusion that the videos had not been manually edited or tampered with, as typical forensic techniques would not have been able to fully identify and correct these issues had such manual editing taken place.

Dated: New York, New York
       April 12, 2025

By: _____
    Frank Piazza

---

[2] As noted above, my analysis of Defense Exhibits I-2 and I-4 remains ongoing.