UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    v.<br><br>SEAN COMBS,<br><br>                    Defendant. | 24-cr-542 (AS) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANT SEAN COMBS'S MOTIONS IN LIMINE**

**TABLE OF CONTENTS**

                                                                        **Page**

TABLE OF AUTHORITIES ................................................................................................... ii

ARGUMENT ............................................................................................................................ 1

    I.    THE COURT SHOULD PRECLUDE THE TESTIMONY OF DR. DAWN
          HUGHES ................................................................................................................. 1

          A.  That Other Courts Have Admitted Similar Testimony Does Not Mean Hughes
              Should Be Permitted To Testify In This Case ............................................ 2

          B.  Hughes Will Improperly And Misleadingly Instruct The Jury On The Law .............. 3

          C.  Hughes's Opinions Will Not "Help" The Jury Understand The Evidence, As
              Required By Rule 702(a) ............................................................................ 4

          D.  Hughes's Opinions Are Not A Reliable Application Of Scientific Principles To
              The Facts Of This Case .............................................................................. 8

          E.  Hughes's Opinions Should Also Be Excluded Under Rule 403 ............................... 10

    II.   THE COURT SHOULD GRANT COMBS'S MOTION TO PRECLUDE
          ARGUMENTATIVE SUMMARY CHARTS EVIDENCE ........................................... 11

    III.  THE COURT SHOULD PRECLUDE THE CELLPHONE AND CNN VIDEOS
          OF THE MAY 2016 INTERCONTINENTAL HOTEL INCIDENT, OR RESERVE
          DECISION ON THE MOTION .................................................................................. 13

CONCLUSION .......................................................................................................................... 14

# **TABLE OF AUTHORITIES**

**Cases** **Page(s)**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ................................................................................................................ 8

*In re Terrorist Attacks on Sept. 11, 2001*,
  2024 WL 5077293 (S.D.N.Y. Dec. 11, 2024) ......................................................................... 2

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005) .................................................................................................... 3

*United States v. Cartagena-Carrasquillo*,
  70 F.3d 706 (1st Cir. 1995) ..................................................................................................... 4

*United States v. Castillo*,
  924 F.2d 1227 (2d Cir. 1991) .................................................................................................. 6

*United States v. Cruz*,
  981 F.2d 659 (2d Cir. 1992) .................................................................................................... 6

*United States v. Dukagjini*,
  326 F.3d 45 (2d Cir. 2003) ................................................................................................ 7, 11

*United States v. Grady*,
  645 F. App'x 1 (2d Cir. 2016) ................................................................................................. 7

*United States v. Mejia*,
  545 F.3d 179 (2d Cir. 2008) .................................................................................................... 7

*United States v. Phillips*,
  22-cr-138 (LJL) (S.D.N.Y.) ................................................................................................... 13

*United States v. Raniere*,
  18 Cr. 204 (NGG) (E.D.N.Y.) ............................................................................................... 10

*United States v. Ruggiero*,
  928 F.2d 1289 (2d Cir. 1991) .................................................................................................. 6

*United States v. Skyers*,
  787 F. App'x 771 (2d Cir. 2019) ............................................................................................. 6

*United States v. Zhong*,
  26 F.4th 536 (2d Cir. 2022) ............................................................................................ 1, 2, 7

**Rules**

Fed. R. Evid. 107 ............................................................................................................... 12, 13

Fed. R. Evid. 403 ................................................................................................................. 3, 11

Fed. R. Evid. 702 ............................................................................................................... passim

Fed. R. Evid. 704 ....................................................................................................................... 7

Fed. R. Evid. 1006 ......................................................................................................... 11, 12, 13

**Other Authorities**

O'Donohue et al.,
  *Examining the Scientific Validity of Rape Trauma Syndrome*, 21 Psychiatry,
  Psychology and Law 856 (2011) ........................................................................................ 9, 10

Defendant Sean Combs respectfully submits this brief reply in response to the government's opposition to Mr. Combs's motions in limine to preclude the testimony of Dr. Dawn Hughes (Dkt.205); to preclude argumentative summary charts prohibited by Federal Rule of Evidence 1006 (Dkt.203); and to preclude certain video evidence.[1]

## ARGUMENT

### I. THE COURT SHOULD PRECLUDE THE TESTIMONY OF DR. DAWN HUGHES

The government says Dawn Hughes's testimony "has become standard within this Circuit," Opp.3, yet completely fails to grapple with the most recent *controlling authorities* on the question before the Court—the Second Circuit's decision in *United States v. Zhong*, 26 F.4th 536 (2d Cir. 2022) and the 2023 amendment of Rule 702. Instead, the government relies on a handful of district court decisions that all pre-date *Zhong* and the amendment. None of these decisions directly addresses arguments like the ones Mr. Combs is making here. The government's view is: We've used this expert before, other judges have allowed it, and no one challenged it vigorously or appealed—therefore this Court should rubber-stamp our improper use of an expert to bolster our witnesses' credibility and our summation.

The Court should reject this invitation to error. The prosecutors in *Zhong* made similar arguments, the undersigned appealed, and the Circuit reversed. That will happen again if the testimony is admitted and Mr. Combs is convicted—especially if the Court also precludes his rebuttal expert, Dr. Alexander Bardey, a highly qualified forensic psychiatrist who has been retained by the same unit of the U.S. Attorney's Office in another recent sex case.

---

[1] In addition, Mr. Combs preserves his arguments in support of his motion to exclude evidence of Victim-3's ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. If the Court is inclined to withhold decision on this issue or admit the evidence, Mr. Combs requests the opportunity to propose additional jury questionnaire questions on this topic.

### A. That Other Courts Have Admitted Similar Testimony Does Not Mean Hughes Should Be Permitted To Testify In This Case

As typical, the government lines up prior district court cases, without any controlling Circuit authority, as if there is no need for this court's independent consideration, even when no other defense counsel has squarely presented the issues raised here, such as the confusion that will arise from the conflicting definitions of coercion offered by the expert and the Court. The government fails even to mention *Zhong*, cited throughout Combs's motion. Dkt.206 at 6, 8, 13, 23. Yet *Zhong*, the key Second Circuit precedent on the use of general background opinion in criminal cases, was decided in 2022, and post-dates the district court authorities the government trots out. Instead, the government says the Circuit "has consistently applied a broad standard in determining the admissibility of expert opinion testimony," citing a single civil case from 1996. Opp.7-8. But there is no "broad standard." To the contrary, *Zhong* instructs that "district courts must proceed with caution" when admitting expert evidence, 26 F.4th at 556, and this is especially true in criminal cases. The government's attitude, in contrast, appears to be "full speed ahead."

The government also fails to address the 2023 amendment to Rule 702. That amendment was a "response to court decisions that admitted expert testimony too liberally." *In re Terrorist Attacks on Sept. 11, 2001*, 2024 WL 5077293, at *3 (S.D.N.Y. Dec. 11, 2024). In particular, the Advisory Committee addressed cases holding that most problems with expert testimony could be dealt with through cross-examination as "questions of weight and not admissibility," branding those decisions "an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Yet the government takes so little note of the 2023 amendment that the text of the rule it quotes is the *old* text. Opp.6-7. And the government's brief is littered with suggestions that the cure for the glaring problems with Hughes's testimony

2

is cross-examination. Opp.7, 14, 16. But expert opinion carries "unique weight" in jury deliberations, and courts must scrutinize proposed expert testimony closely under both Rule 702 and Rule 403. *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).

Courts previously admitted testimony similar to the government's proposed testimony in a handful of cases pre-dating these new heightened standards, but that is not dispositive under the new standards. In none of those cases did defense counsel present precisely the same arguments, and none raised a core issue raised here: the expert's muddying of the standard for coercion that can properly be stated only by the Court alone. This Court has an independent obligation to consider the merits of the motion to exclude in *this* case.

**B.  Hughes Will Improperly And Misleadingly Instruct The Jury On The Law**

The government does not deny that Hughes will be offering the jury a definition of "coercive control" far broader than that which will appear in the jury instructions. *See* Dkt.206 at 9-11. The government's only response to the defense's argument that Hughes's testimony about "coercive control" will prejudicially confuse the jury about the law is as follows: Hughes will "clarify that her testimony relates only to concepts within the practice of psychology and *not* legal definitions." Opp.19. So the jury will be asked to draw conceptual distinctions between different professional disciplines and nuance its thought process accordingly? That is a recipe for disaster, as the Second Circuit well recognizes. The Second Circuit has repeatedly cautioned against experts whose opinions tread on legal terminology. *See* Dkt.206 at 8. It is hard to know how the expert's own milquetoast disclaimer can cure the problem if the Court's own instructions may not be sufficient. The other cases the government cites did not have to address this precise argument about coercive control conflicting with the jury instruction.

Moreover, although the government repeatedly contends Hughes will "not opine on legal terms" or "definitions" relating to coercion but will instead "describe a dynamic defined in the

3

psychology space," Dkt.206 at 19-20, this simply ignores that she will be using the same terms (and yet teaching her own version of) the jury instructions that should be the sole province of the Court. Experts cannot do this. When a psychologist is proffered in support or rebuttal of an insanity defense, for example, the expert must apply the legal definition of insanity, regardless of his or her opinion about the relevant definition within the discipline of psychology. An expert who fails to conform his or her opinion to the legal definition will be properly excluded. *See, e.g., United States v. Cartagena-Carrasquillo*, 70 F.3d 706, 712 (1st Cir. 1995) (testimony of defense psychiatrist properly excluded where report did not address whether "as a result of a severe mental disease or defect, [the defendant] was unable to appreciate the nature and quality or wrongfulness of his act").

Here too the government seeks cover under the proposition that Hughes's testimony, and that of similar "experts," has been admitted in several other cases. Opp.20-21. Not only were those rulings not tested on appeal, but the defendants in those cases did not make the same argument Mr. Combs is making here: that Hughes will instruct the jury on a definition of coercion that is not just at odds with, but is vastly more expansive than, the definition that will be given by the court. Those cases are neither controlling nor persuasive, and they should not be followed.

### C. Hughes's Opinions Will Not "Help" The Jury Understand The Evidence, As Required By Rule 702(a)

The government has no persuasive response to the argument that Hughes's testimony is within the ken of the average juror, will impermissibly mirror the testimony of the fact witnesses, and will speculate on the motivations of sexual assault perpetrators.

The government is unable to offer any persuasive reasons why the jury will be helped by Hughes's proposed testimony about *how* abusers typically perpetrate the abuse. The government

4

says "Hughes will testify about the use of physical isolation, emotional exploitation, or threats of violence." Opp.18. Hughes will tell jurors that "rewards, positivity, affection, and normalcy … can create emotional attachment and psychological dependency." Opp.5. Do jurors not have the common sense to understand that these may be aspects of abusive relationships without having an expert pontificate from the witness stand? It is difficult to know what any of this testimony adds to the case except a thumb on the scale. The same goes for the government's arguments about the jurors' supposed inability to "intuitively understand the dynamics present" in an abusive relationship. Opp.18. Jurors have life experience and common sense and will understand the facts of this case without any assistance.

The government spills a lot of ink here, as it did in its motion to exclude Bardey, attacking a supposed defense argument that Hughes "must evaluate the victims in this case to provide reliable testimony." Opp.11. This is not the defense's argument. The defense's objection is to the "blind" background testimony that Hughes plans to give—testimony that is divorced from any sort of scientific method and is instead jury-rigged to help prove the government's case.

But make no mistake: Hughes's testimony is only going to give the illusion of being blind to the facts of the case. The government dutifully asserts that Hughes "will not purport to opine on the specific facts of this case, but instead will explain relevant concepts within her field." Opp.19; *see also* Opp.21 ("Hughes's opinions will speak only to concepts"). On the other hand, the government lets the cat out of the bag when it argues that "[v]ery few, if any, jurors will have experienced or directly witnessed a relationship involving repeated physical abuse, financial manipulation, drug use, and other forms of control resulting in a cycle of extreme sex acts in which one partner does not want to participate." Opp.18; *see also* Opp.22

5

("jurors are unlikely to intuit how a woman who is not physically restrained comes to participate in days-long orchestrated sexual performances that she does not want and that result in physical and psychological trauma"). Hughes's testimony is going to be tailored to, and tightly focused on, the facts of this case, telegraphing the result Hughes thinks the jury should reach, even as Hughes will deny any detailed knowledge of the facts of this case, impeding cross-examination. She will present the jury with a guide to assessing the facts of this case masquerading as general background information.

The government also has no real response to the defense's argument that Hughes's testimony describing how perpetrators usually commit their crimes "mirrors" the facts of the government's case and so should be excluded. Again, there is no doubt that the government's summation will be a litany of references to Hughes and an overall argument that Mr. Combs is guilty because his conduct matches the typical *modus operandi* of the perpetrator as described by Hughes. Dkt.206 at 11-12; *see* Opp.11-14. That type of testimony was unequivocally condemned in *United States v. Castillo*, 924 F.2d 1227 (2d Cir. 1991), and *United States v. Cruz*, 981 F.2d 659 (2d Cir. 1992). Both cases were cited in Mr. Combs's motion. Dkt.206 at 11. The government, of course, ignores them both.

Instead, the government cites *United States v. Ruggiero*, 928 F.2d 1289 (2d Cir. 1991), as blessing testimony about "a certain pattern of conduct … often found in narcotics cases." Opp.13. But that's not what was at issue in *Ruggiero*: the challenged testimony in *Ruggiero* concerned "the meaning of certain of the recorded conversations that had been introduced in evidence" and the issue on appeal concerned the line between "conclusions and interpretations" and translation of "narcotics jargon." *Id.* at 1304. The government's position is also not supported by *United States v. Skyers*, 787 F. App'x 771, 775 (2d Cir. 2019), in which the court

6

found no plain error in testimony that cocaine is not exported from the United States and that 1.5 kilograms of cocaine was "related to distribution, rather than personal use." Opp.13. *United States v. Grady*, 645 F. App'x 1, 4 (2d Cir. 2016), concerned a Rule 704(b) objection to expert testimony about the defendant's mental state, which is not at issue here. *Id.*

The government also argues that mirroring or *modus operandi* testimony is permissible so long as the expert is not a law enforcement officer. Opp.12-13. It is true that in *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008), as in *Castillo* and *Cruz*, the expert was a law enforcement officer, and that there is an "increased danger" that the expert will prejudicially stray from his or her proper role when the expert is also part of the prosecution team. *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003). But there is no logical reason why such testimony should be impermissible only when it comes from a government agent. Indeed, the expert in *Zhong* was an academic, not an arm of the prosecution. 26 F.4th at 556 n.12 ("DeBaca was not an investigator in this case …. Nevertheless, the district court was still required to ensure that DeBaca did not 'interpret the evidence' and 'usurp the jury's function.'").

Finally, the government denies that Hughes will testify about "the subjective motivations, thought processes, or mental states of abusers in general or the defendant specifically." Opp.18. Even the government knows such testimony would be flatly improper. *See* Dkt.206 at 13. But the government then acknowledges that Hughes will testify that a perpetrator "engage[s] in 'self-centered behavior to satisfy his own goals and desires regardless of the needs, wants, and well-being of the victim.'" Opp.18. How does the government square this circle? It argues that the latter opinion will not be "subjective" but will focus on "observable behaviors." *Id.* Presumably the government means that Hughes's opinion will be based on objective, empirical evidence. But that doesn't solve the fundamental problem with the opinion.

7

### D. Hughes's Opinions Are Not A Reliable Application Of Scientific Principles To The Facts Of This Case

The government also fails to grapple with one of the fundamental problems with Hughes's testimony: although she purports to "testify about a common set of abusive behaviors experienced by those who are victims of interpersonal violence and coercive control," Opp.18, neither she, nor anyone, can say how common or uncommon the phenomena she describes actually are. Dkt.206 at 14-18. The government says Hughes will, "where appropriate, acknowledge limitations to her testimony." Opp.16. But it does not say what these limitations are, and presumably they will be as wishy-washy as the government's acknowledgment, in moving to exclude Bardey's rebuttal testimony, that "*some* reports of sexual assault are false" and that "*some* memory lapses can result from 'prevarication,' rather than sexual trauma." G.MiL at 87. If no one really knows whether the phenomena Hughes describes are experienced by *most* victims of sexual abuse, *some* victims, or just *a few*, then what is the basis for her testimony? And how can she say that these phenomena are "typical" or "common"?

"[E]ach expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology" and experts are "not permit[ted] … to make claims that are unsupported by the expert's basis and methodology." Fed. R. Evid. 702(d), advisory committee's note to 2023 amendment. "Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 (1993). Hughes does not even know what her opinion is, nor does anyone else. This is an exceedingly dangerous form of expert testimony—one that only pretends to be science-based. It should not be admitted.

Hughes's testimony also lacks empirical support.  The government states: "The defendant apparently does not dispute the majority of the sources cited by Dr. Hughes in support of her expert opinions on a wide range of issues …."  Opp.15.  That is laughable.  Hughes's seven-page disclosure has only a handful of citations sprinkled throughout—so most of her opinions are not supported by sources at all.  They are apparently based primarily on her clinical experience rather than any empirical literature.  But it is "well documented that clinical judgment is inferior to actuarial judgment and that clinicians are prone to heuristic errors and confirmation biases," and expert opinions should thus be "grounded in science and based upon methodologically sound data."  O'Donohue et al., *Examining the Scientific Validity of Rape Trauma Syndrome*, 21 Psychiatry, Psychology and Law 856, 864 (2011).  Rule 702(b), which the government largely ignores, likewise requires that each opinion be "based on sufficient facts or data."  Hughes's opinions utterly fail that test.

And the relatively few sources she does cite do not support her opinions.  One simple example shows her loose relationship with the literature—and the truth.  Hughes seeks to testify that rape is "underreported."  Set aside the question of how such testimony is even relevant to a jury's determination of guilt or innocence in an individual case about sex trafficking (not rape) as opposed to browbeating jurors into thinking they must do *something*.  The government correctly notes that in years past, the NCVS showed that sexual assault was reported at a lower rate than most violent crimes.  An honest and neutral researcher might testify as follows:  "According to the NCVS, sexual assault is reported less than many other crimes.  But it is important to remember that there are inherent limitations in such surveys, and the NCVS does not even cover crimes like tax evasion and drunk driving, which likely have much lower report rates.  Moreover,

9

in the most recent year, the NCVS showed that sexual assault was reported at a higher rate than most crimes."

But that is not what Hughes says. She makes broad claims like: "Research has consistently shown that sexual abuse is considered among the most underreported crimes." Hughes Disclosure at 3. Then, once she gets on the stand, she makes even more extreme claims, such as: "sex crimes and crimes against women are the most underreported crimes that we have." *United States v. Raniere*, 18 Cr. 204 (NGG) (E.D.N.Y.), Trial Tr. at 3695. That statement is not supported by the data—but Hughes nonetheless continues to offer her unqualified and false testimony.

In short, Hughes's testimony, like that of many other sexual assault and battered women's advocates who testify as experts, is riddled with "conceptual, evidential and other general problems." O'Donahue et al., *supra*, at 870. Perhaps most importantly, there is "no evidence" that such opinions assist in the task of "validly discriminat[ing] [between] women who are truthfully versus falsely alleging that they have been raped." *Id*. at 871. Against that backdrop, it is particularly troubling that some other district courts have been so credulous when evaluating Hughes's testimony. It is almost as if Hughes has grown accustomed to the fact that no one ever checks her sources or notices her lack of empirical support. This Court should not repeat those mistakes.

### E.  Hughes's Opinions Should Also Be Excluded Under Rule 403

Hughes will overstate the conclusions available from the scientific research, invade the province of the Court in instructing the jury, and lead the trial into a seminar room discussion of such opacities as "the overarching dynamic of victimization." Hughes Disclosure 2. The government sees no danger that Hughes's presence on the stand will broadcast to the jury the unspoken conclusion that she agrees the government's case has merit. Opp.21. But the Second

10

Circuit has noted precisely this danger in the analogous context of case agent testimony. Such testimony must be handled with great care because "[s]ome jurors will find it difficult to discern whether the witness is relying properly on his general experience and reliable methodology, or improperly on what he has learned of the case." *Dukagjini*, 326 F.3d at 45. Just as a case agent's testimony may lead the jurors to assume the agent is privy to facts outside the record pointing towards guilt, so Hughes's presence on the stand will cause jurors to believe that she knows additional facts and has formed an opinion favorable to the government, despite protestations that her testimony is "blind."

Moreover, much of Hughes's testimony will amount to telling the jurors that words they thought they understood in fact have a completely different, almost Orwellian meaning. The government apparently thinks there is nothing wrong with having an "expert" tell the jury that "interpersonal violence" may "refer[] to dynamics related to coercion and emotional abuse that may not necessarily involve physical violence as commonly understood." Opp.4. But the role of an expert is not to confound the meaning of commonly understood words in an attempt to persuade jurors that emotional abuse that does not involve physical contact may qualify as "interpersonal violence." None of this is proper under either Rule 702 or Rule 403.

\* \* \* \*

Hughes's testimony should be excluded in its entirety. If Hughes is permitted to testify, then due process requires that Bardey be permitted to testify in rebuttal.

## II. THE COURT SHOULD GRANT COMBS'S MOTION TO PRECLUDE ARGUMENTATIVE SUMMARY CHARTS EVIDENCE

Despite the parties' productive conferral on the Rule 1006 issue, the Court should not defer ruling on Mr. Combs's motion to preclude the government from seeking to admit improper Rule 1006 exhibits. The government's opposition makes clear that it intends to offer into

11

evidence the exact type of argumentative summary exhibits the Rules Advisory Committee has already decided are not admissible, and the Court should rule accordingly.

Contrary to the government's argument, amended Rule 1006 did not "expand" (Opp.49 n.10) the admissibly of summary evidence. The advisory committee notes clearly state that "[t]he [2024] amendment draws a distinction between summaries of voluminous admissible information offered to prove a fact, and illustrations offered solely to assist the trier of fact in understanding the evidence. The former are subject to the strictures of Rule 1006. The latter are illustrative aids, which *are now regulated by Rule 107*." (emphasis added). Mere illustrative aids are no longer admissible as substantive evidence.

The government's own description of its exhibits puts them in the latter, inadmissible category. It concedes its goal is not to "prove a fact" using the summary exhibits. Rather, it seeks to offer the exhibits in order to "coherently and efficiently present" its interpretation of the evidence. Opp.49. Cherry-picking a series of potentially inculpatory text messages or videos for inclusion in one conveniently packaged summary exhibit does not "prove the content of voluminous writings, recordings, or photographs" as required by Rule 1006. Instead, it merely serves as a "presentation offered … to assist the trier of fact in understanding [the government's] evidence or argument." Fed. R. Evid. 107, advisory committee notes to 2024 amendments; *see also id.* (describing Rule 107 aids as "helping the trier of fact to understand what is being communicated to them by the … party presenting evidence or argument"). That type of illustrative aid is what new Rule 107 is designed to govern, and that rule mandates that such exhibits "are not to go to the jury room unless all parties consent or the court, for good cause, orders otherwise." Fed. R. Evid. 107, advisory committee notes to 2024 amendments.

12

The government's cited authority (*see* Opp.50) does not mandate a different result.  First, those cases did not have occasion to apply amended Rule 1006 or new Rule 107.  And as Judge Liman has held, "[t]he proposition that the Court has the power to permit the receipt of the summary charts does not mean that it should exercise that power." *United States v. Phillips*, 22-cr-138 (LJL) (S.D.N.Y.), Oct. 20, 2023 Tr.827-28 (excluding summary exhibits under Rules 1006 and 403).  That is especially true where "[t]he main value" of such exhibits is only "that they can be carried into the jury room as a summary of the government's theory of the case." *Id.*  That is all the government seeks to do here: equip the jurors with "coherent," "efficient" summaries of what it hopes is its best evidence.

In sum, the Court should preclude the government from offering into evidence any purported 1006 exhibits that merely compile select pieces of evidence—such as text messages, emails, or videos—into argumentative summary exhibits.

### III. THE COURT SHOULD PRECLUDE THE CELLPHONE AND CNN VIDEOS OF THE MAY 2016 INTERCONTINENTAL HOTEL INCIDENT, OR RESERVE DECISION ON THE MOTION

The government, after consultation with its own forensic video technician, now concedes that the CNN footage of the March 5, 2016 incident at the Intercontinental Hotel—the footage it heavily relied on at three separate bail hearings to detain Mr. Combs—is an unreliable, manipulated depiction of events that it will no longer be offering at trial.  *See* Opp.30 n.5.  Instead of using CNN's manipulated footage, the government now intends to offer two Cellphone Videos, and three CNN Video Files that CNN used to create the broadcast footage.  Those videos, as the government's own forensic video technician admits, are similarly plagued by inaccuracies that the jury should not see.  The videos should be excluded.

The government has had the CNN Video Files since March 14, 2025—nearly a month before it filed its opposition on April 13, 2025.  Nevertheless, it implausibly complains that its video

13

technician "has not been able to complete his analysis of the videos." Opp.32 n.7. That claim is hard to take seriously given the amount of time that has elapsed since the government obtained the videos, which it knew the defense was going to challenge. Moreover, the technician has already concluded, based on his preliminary analysis of one of the videos, that the videos "contain certain anomalies, such as timing errors, dropped frames, and data loss," Gov. Ex. B ¶22, and that the "visual quality … has been reduced and the playback speed has been accelerated," *id.* ¶23. Although the technician concludes there is no evidence of "manual editing or tampering," he admits there is clearly evidence of some modifications, including, for example, re-encoding. *Id.* ¶10, ¶¶22-23. And that is just his preliminary finding. For the remaining two videos, he is still "in the process of evaluating" them and provides no opinion as to their accuracy. Opp.32.

As for the Cellphone Videos, the government's technician admits the videos depict footage that itself "has dropped frames," and that the videos contain certain "visual artifacts and distortions … that appear to have been introduced by the iPhone's recording." *Id.* ¶¶16-17. The result is a depiction that is "shaky and appears stretched." *Id.* ¶17.

Thus, the government's proffer establishes no basis to believe the evidence is authentic or reliable. The Court should exclude the videos as inauthentic and unreliable duplicates, as outlined in the motion. At a minimum, the Court should reserve decision on the motion until the parties have an opportunity to review the government's technician's final opinions.

In the alternative, Mr. Combs is open to conferring with the government to create a version of the videos that cure the deficiencies in the current files, as the government suggests can be done.

## **CONCLUSION**

For the foregoing reasons, and the reasons outlined in his opening memoranda, the Court should grant Mr. Combs's motions in limine to exclude Dr. Hughes's testimony, prejudicial summary charts evidence, and the videos described herein.

| | | |
|---|---|---|
| Date: | April 16, 2025<br>New York, NY | Respectfully Submitted,<br><br>/s/Alexandra A.E. Shapiro<br>Alexandra A.E. Shapiro<br>Jason A. Driscoll<br>Shapiro Arato Bach LLP<br>1140 Ave of the Americas, 17th Fl.<br>New York, NY 10036<br>(212) 257-4881<br>ashapiro@shapiroarato.com<br>jdriscoll@shapiroarato.com<br><br>Marc Agnifilo<br>Teny Geragos<br>AGNIFILO INTRATER<br>445 Park Ave., 7th Fl.<br>New York, NY 10022<br>646-205-4350<br>marc@agilawgroup.com<br>teny@agilawgroup.com<br><br>Anna Estevao<br>SHER TREMONTE LLP<br>90 Broad St., 23rd Fl.<br>New York, NY 10004<br>(212) 202-2600<br>aestevao@shertremonte.com |