

Shapiro Arato Bach LLP

1140 Avenue of the Americas, 17th Floor, New York, NY 10036
phone: 212-257-4880
www.shapiroarato.com

Alexandra A.E. Shapiro
ashapiro@shapiroarato.com
Direct: 212-257-4881

May 24, 2025

**VIA ECF**
Hon. Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *United States v. Combs*, 24-cr-542 (AS)

Dear Judge Subramanian:

      We write on behalf of Sean Combs in further support of, and to renew, the motion to strike made at sidebar (Tr. 2123-25) following the direct testimony of the government's "blind" expert psychologist Dr. Dawn Hughes. Hughes and the government continually violated the Court's ruling limiting the scope of Hughes testimony. While the Court sustained numerous objections, the repeated and apparently deliberate defiance of the Court's ruling made it impossible to keep Hughes within bounds. This was especially the case as Hughes continually expanded her answers beyond the four corners of the prosecutor's questions. Moreover, portions of Hughes's testimony on "coping" strayed from the disclosure in other ways and reconfirmed why the Court had excluded this type of testimony in the first place. And Hughes's testimony on memory should independently be struck as junk science that will confuse rather than help the jury. This testimony amounted to an assertion that victims are all unique and no memory lapse can readily be attributed to credibility problems. This is not proper expert testimony that will help the jury discover the truth but a Rorschach inkblot calculated to support any argument the prosecution may need to make in summation, depending on how its factual witnesses testify. Hughes's testimony should be struck in its entirety.

### A. The Court's Ruling And The Government's Representations Regarding The Scope Of Hughes's Testimony

      The Court's April 25, 2025 ruling limited Hughes's anticipated testimony to those sections of her disclosure concerning "coping strategies, delayed disclosure and memory," together with specific and limited "testimony concerning the reasons why victims stay in relationships." April 25, 2025 Tr. 5. The Court excluded testimony on all matters falling within the section on "coercive control" and ruled Hughes could not discuss the motivation and intent of abusers. April 25, 2025 Tr. 5. The Court noted that "the jury can understand what abuse and violence is, and it doesn't need Dr. Hughes to explain an umbrella term of 'interpersonal violence' or to expound at length about different types of abusive conduct as a precursor to offering opinions that the Court has permitted." *Id.* at 6.

Hon. Arun Subramanian
May 24, 2025

The night before Hughes went on the stand, the defense wrote to the Court, noting concerns raised by the government's disclosure of 3500 material as to whether the government intended to keep Hughes's testimony within the bounds of the Court's ruling. May 20, 2025 Ltr. The defense urged the Court to prevent the government from repackaging Hughes's excluded testimony on "coercive control" and "interpersonal violence" and offering it as part of Hughes's testimony on why alleged victims of abuse may remain in relationships. *Id.* The government responded in writing, stating that it understood and would abide by the Court's ruling. Dkt. 345 at 2. In particular, the government stated that it "d[id] not intend to elicit testimony regarding the term 'interpersonal violence,' by that or any other name," or concerning "coercive control," but would "elicit brief testimony regarding how specific types of abuse cause a victim to remain in a relationship." *Id.*

Prior to Hughes's testimony, the Court noted the the defense's concern that Hughes would use the Court's permission to give "concise definitions of the relevant forms of abuse" as a "backdoor way of introducing what is in the coercive control section in [her] report and that should be out." Tr. 1998. The Court also noted, the defense's concern that Hughes was "a skilled and trained witness [who] doesn't need to be asked the questions to try to do as much as she can." Tr. 2000.

The government again confirmed that Hughes's testimony about "different types of abuse" was "going to be very limited" and "concise" and did not disagree with the Court's suggestion that such testimony might be limited to "five minutes." Tr. 1998-2000. The government represented that it had "instructed" Hughes on the limits imposed by the Court and would use pointed questions to "lead the witness back to the appropriate scope" were she to "veer[]." Tr. 2000.

### B. Hughes's Testimony Should Be Struck Because Both The Government And The Witness Deliberately Defied The Court's Ruling

Right off the bat, the government showed that it had no intention of abiding by the Court's ruling, and that whatever instructions it gave Hughes about the permitted scope of her testimony were woefully inadequate. There was, for example, zero ambiguity about the Court's instruction that Hughes not refer to or discuss "interpersonal violence." The government understood this—its letter the night before Hughes's testimony promised, in express terms, not to delve into that concept, under any name. Yet, right at the top of Hughes's testimony, Hughes told the jury that she "specialize[d] in interpersonal violence." Tr. 2074. Instead of "lead[ing] the witness back to the appropriate scope," the government plunged right into the forbidden area, asking "What is interpersonal violence?" *Id.* It is difficult to imagine how the witness, if properly advised on the scope of her testimony, could have entered this area, or how the prosecutor could have followed up in the way she did. This flagrantly inappropriate exchange led to the first of numerous sustained objections. *Id.*

It was, however, just a harbinger of what was to come as the government continued violating both the Court's ruling and its own representations.

Page 3

Hon. Arun Subramanian
May 24, 2025

      Almost immediately, the government elicited from Hughes that it was her "understanding of the law [she's] not permitted to" assess victims in the case. As the Court stated at sidebar, it "was pretty clear when this issue came up that she can't testify about it." Tr. 2078-80.

      Next, the government asked Hughes to define "domestic violence," which prompted the following testimony: "Domestic violence is commonly defined as a pattern of behavior that functions to instill fear and to control [using] multiple abusive behaviors…". Tr. 2082. This was almost identical to Hughes's definition of coercive control as "a strategic pattern of behavior that is designed to attain and maintain control in a relationship" including through "a variety of physical, sexual, and/or emotional tactics." Hughes Disclosure at 3. Again, an objection was sustained, and the Court instructed the government to "move on." The government then elicited the anticipated high-level testimony about "why victims … stay in abusive relationships." Tr. 2084-86. But, instead of moving on, the government asked Hughes to testify about various types of abuse—physical, psychological, sexual, emotional, and so on. Tr. 2087-95. The defense repeatedly objected, and those objections were largely sustained, but it was impossible to prevent Hughes from discoursing at length on precisely the topics the Court's ruling had forbidden, or to object to all the improper questions. For instance, during the course of her testimony, Hughes used the words "control" or "controlling" no less than a dozen times. *See* Tr. 2082, 2088, 2089, 2090, 2093, 2099, 2109, 2110, 2113. She also used the word "power" multiple times, Tr. 2087, 2110, in contexts designed to repackage the precluded "coercive control" testimony as if it fit within the topics the Court had permitted. Similarly, she expounded on "love bombing," Tr. 2097, and the "trauma bond," Tr. 2096-97, concepts straight out of the "coercive control" section of her disclosure (at 2).[1]

      In part, this was because Hughes, as the Court predicted, continually used the prosecutors' questions as merely prompts to begin speeches that quickly veered into outright advocacy. Asked what she meant by "formal coping strategies," Hughes not only explained that she meant making an official report, but then began telling the jury that "[t]he problem is it's the least likely used strategy..." Tr. 2100. Again, an objection was sustained. Similarly, asked whether a victim can "use … both passive and active self-defense" Hughes gave a direct answer, "yes," then added more detail, before capping her answer off with the obviously inappropriate— and inaccurate—comment that victims "use[] a lot of strategies, *they just don't work*." Tr. 2105. It was simply impossible for the defense to object every single time Hughes did this.

      Hughes also repeatedly personalized her testimony for the jury, seeking to enlist the jurors' empathy in her campaign. At key points, she stopped referring to victims as "they" or "victims" and starting using the pronouns "we" and "you." For example, she explained that "When we placate and appease *our abuser*, what *we're trying* to do is do is soothe the abuser, *we're trying* to make an abusive episode not happen. *We* may be apologizing unnecessarily, *we*

---

[1] Much of this testimony only confirmed why it was out of bounds under Rule 702 and *Daubert* and was excluded in the first place. To take just one example, Hughes herself described "love bombing" as "a term that's used now in the popular media," Tr. 2096, and thus plainly not beyond the ken of lay jurors.

Hon. Arun Subramanian
May 24, 2025

might be going along with things that *we* don't want to do … Once someone has demonstrated that they can use serious forms of violence *against you* … that link is set." Tr. 2102. She told the jury that "*if you can't say no* to little things, its hard to imagine when *you're* talking about something so sensitive" that the victim could say no in the context of a sexual relationship. Tr. 2103. Asked how "threats affect disclosure," Hughes immediately personalized it, opining that "[i]f *you've been threatened*, if you tell, something bad will happen to you, and this person has already demonstrated that they can use serious forms of physical violence or sexual assault against you, you believe them." Tr. 2112. Discussing fragmented memory, Hughes explained that "because [of] the narrowing of the attention … not all memories are getting in about *the event that happened to you*." Tr. 2116. Implicitly associating the case with the #MeToo movement—in a manner that would never have been permitted had she used express terms—Hughes explained that "sometimes there are societal reasons … things change in the public or in society where you feel like *you're not so alone* and … it's okay for me to talk about this now." None of this was accidental. Hughes is a highly experienced witness, and knew exactly what she was doing.[2]

Moreover, even in connection with topics the Court had permitted Hughes to testify about, she strayed beyond the disclosure to cover other substantive topics. For instance, her discussion of "formal coping strategies," Tr. 2099-2100, such as going to the police or other authorities, was nowhere mentioned in the "coping strategies" section of her report. Similarly, in her testimony she discussed "active" and "passive self-defense," Tr. 2103-04—concepts unmentioned in the "coping strategies" section of the disclosure—and said "actively fighting back" can "result in more severe injury," and started talking about "just the size and strength disparity between a man and a woman, a man can do more damage," before she was cut off because the Court sustained an objection. Tr. 2104.

\*   \*   \*

The government chose to put on an expert witness knowing that the testimony it elicited would violate the Court's ruling—knowing that if it and its witness pushed hard enough the defense would not be able to keep out all of the improper and unfairly prejudicial testimony. The government also deliberately contravened its own proffer about the scope of Hughes's testimony, including attempting to elicit precisely the terminology and opinions that it had promised it would not elicit. The proper remedy when a party fails to comply with the rules governing expert testimony is to strike the expert's testimony. *See, e.g.*, *United States v. Mrabet*, 703 F. Supp. 3d 442, 443-45 (S.D.N.Y. 2023) (striking government expert's testimony when it was "outside the scope of [expert's] purported expertise" and failed to comply with Fed. R. Crim. P. 16, and remarking that the court would not "tolerate the [government's] shoddy noncompliance" going forward). Given the heavy reliance the government is likely to place on Hughes in summation, the failure to strike her improper and unfairly prejudicial testimony is likely to be

---

[2] This aspect of Hughes's testimony also diverged from her disclosure in that she phrased her opinions in ways that suggested that her descriptions of behavior applied in every situation involving some form of domestic abuse, whereas her disclosure paid lip service to the possibility that not every situation is the same—instead referring to things that "commonly" or "often" "may" happen, for example in the "Coping Strategies" section of her disclosure.

reversible error. *See United States v. Zhong*, 26 F.4th 536, 548 (2d Cir. 2022) (reversing where, among other things, "government referenced [expert's improper] testimony numerous times in its closing statement, asking jurors to rely on that testimony" in deciding the case).

### C. Hughes's Testimony About Memory, Like Her Other Testimony, Should Be Struck As Junk Science

Hughes's testimony about memory (Tr. 2113-22) should be struck for the independent reason that it fails to comply with Rules 702 and 403. Hughes's testimony on this subject was so vague and slippery that it amounted to little more than "everyone is unique and processes traumatic memories in different ways so that no failure of memory can be used to cast doubt on a witness's credibility." This type of testimony does not help the jury, is not reliable, and invades the province of the jury in determining credibility.

For example, addressing the details that a victim may remember and the details a victim may not remember, Hughes told the jury: "That is absolutely unique to each individual and their unique brains… So we can't, out here, determine what's significant for you or what's significant for the next person. That's a very unique thing for each person in each situation." Tr. 2116. Addressing the concept of "fragmented" memories, Hughes asserted that "there's no evidence to suggest that because it's not complete, what we do know isn't reliable," *id.*, or that "later retrieve[d] memory is any less accurate than if someone had it" earlier, Tr. 2122. The idea that mere fragments of long forgotten events, or memories retrieved from long ago, are just as accurate or reliable as coherent memories of more recent events is junk science. Hughes knows that. That's why she couched her testimony in terms of a lack of evidence in the literature. But her job as an expert, as set forth in the government's disclosure, was to summarize what the scientific literature teaches – not to point to gaps in that literature (i.e., absence of evidence) and suggest those gaps may serve as bases to sure up a witness's otherwise unreliable recollection. Similarly, Hughes explained to the jury that the failure to remember a particular detail may result from "repeated events" of domestic violence—similar to how you might not remember "each time you had a slice of pizza at your favorite pizza place," or "every single time you've walked in this courtroom." Tr. 2118. The sophistry here is palpable. Hughes is simply making the common sense point that repetition of an event can make it harder to recall each instance in detail. This has nothing to do with domestic violence *per se*, or with any empirical study of abuse victims, but Hughes tried to make it sound as if it did and as if it were esoteric expert knowledge.

Because credibility determinations are fundamentally within the province of the jury, subject to general instructions typically provided by the Court, the rules do not permit a party to call a witness to explain commonplaces about memory, or to encourage jurors to doubt their intuitions about a witness's credibility because "there's no evidence" to show that a fragmented memory is less credible than a full memory, or that repressed memories from long ago are any less accurate than memories from more recent events. This misleads the jury and is not reliable science. If memories from decades earlier are repressed, there is no way to go back and corroborate whether or not they are accurate. There may be "no evidence" of inaccuracy, but there is no way to test whether the memories are accurate. Memories from years gone by are

Hon. Arun Subramanian
May 24, 2025

obviously less reliable than ones from recent events, and yet Hughes attempted to suggest the opposite to the jury.

Hughes's rote recitation that she was relying—in tandem—on "the literature" and her "experience," does not solve this problem. On the contrary, throughout her testimony she always mentioned the academic literature and her experience inextricably and in the same breath, preventing the jury and the Court from discerning the basis for her opinions and weigh their value in any meaningful way. What is clear from the literature alone? What is not? It was impossible to tell from her testimony. *See* Tr. 2218 ("[There is remarkable consistency between what I see in the literature and what I see in my patients and what I see in my forensic practice. They do blend together."). Yet she admitted that there is no way anyone can corroborate the data that she claimed was based on her experience with her patients, or her interpretation of that data, and that "we have to take [her] word for that because there is no public data" on it. *Id.*

This is junk science, intended simply to mirror the testimony of the government's witnesses and gloss over the serious problems those witnesses have keeping their stories straight.

### D. Hughes's Testimony Violated Rule 403

Hughes's testimony should be excluded in its entirety under Rule 403 now that the Court has observed firsthand how unfairly prejudicial, confusing, and misleading her testimony truly is. Her testimony is precisely the type of "powerful and … misleading" expert evidence juries should not hear. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). Hughes's opinion is already less probative than it would be in the normal case—i.e., where the expert has actually complied with Rule 702(d) by rendering an opinion that "reflects a reliable application of the principles and methods to the facts of the case." But here, she didn't just give blind testimony, she repeatedly used bold, unqualified narration to present to the jury an overbroad view of how alleged victims act and why, ignoring her obligation not "to make claims that are unsupported by the expert's basis." Fed. R. Evid. 702, advisory committee notes to the 2023 Amendments. As her testimony revealed, she is a highly experienced expert witness who intentionally deployed one-sided tactics designed to unfairly bolster the government's case and the credibility of its witnesses.

For example, Hughes repeatedly described how victims might act, what they might experience, and why, in broad and expansive ways designed to support virtually any argument the government might make about the alleged victims. *See, e.g.*, Tr. 2084-86 (answering "why victims … stay" with a 243-word response covering myriad explanations). In other words, Hughes provided an overinclusive universe of pseudo-expert principles and datapoints so that the government can use them in a non-expert fashion to corroborate any inference it ultimately asks the jury to make.

At the same time, Hughes offered opinions plainly tailored to match the government's arguments in the case and its presentation regarding the alleged victims, especially Ms. Ventura. For instance, she offered opinions designed to bolster Ms. Ventura's credibility and suggest that, even if Ms. Ventura loved Mr. Combs and consented to the sexual activity at issue, she must have been coerced the whole time and remained in the relationship against her will due to his

Hon. Arun Subramanian
May 24, 2025

unfortunate domestic violence. She testified that "when we are hit, harmed, beat up … it's very hard to take that fear away …. they're always sort of walking on eggshells trying not to do something to get hit…[T]he resources are now being devoted to, how do I stay safe in this relationship and not over here, how do I do all these things I need to do to get out." Tr. 2088. Mirroring the evidence showing that the violence was intermittent, she said that the abuse "doesn't have to happen all the time" and that "once someone has shown … the willingness to use violence against us, that link has been set …. And then with the other types of behaviors, the threats, the control, and the putdowns, that can solidify and reinforce that threat even without using more physical violence." Tr. 2098. Echoing the government's argument that the sex was coerced because Mr. Combs was more powerful and controlled Ms. Ventura's career and provided financial support to her and Jane, Hughes testified that this effect is exaggerated based on "the power and control differential between the abuser and the victim" and when "you're going against someone who has wealth and access and privilege." Tr. 2110. And in what can only have been a direct response to the defense opening, Hughes asserted that victims are "unable to leave" because they do "not have the same agency as your partner." Tr. 2097.

What all of this illustrates is that this purportedly "blind" testimony is actually designed to mirror the testimony of the alleged victims and bolster their credibility without referring to them directly. In other words, this was exactly the sort of faux expert testimony that courts have repeatedly found impermissible, as discussed in Mr. Combs's motion in limine. *See* Dkt. 206 at 11-13 (collecting caselaw).

Finally, Hughes repeatedly expounded on these supposed datapoints with absolutely no qualification or guardrails. What she often couched as "may" in her disclosure was often presented as a *fait accompli* in her testimony. As a result, the jury in this case will "be unable … to evaluate meaningfully the reliability of … [Hughes's] opinion" and "determine whether [her] [opinions] … go beyond what [her] basis … may reliably support." Fed. R. Evid. 702, advisory committee notes to the 2023 Amendments. The jury will necessarily be confused when trying to make sense of Hughes's opinions and evaluate them in light of the trial evidence. This is precisely a case where exclusion under Rule 403 is appropriate.

Respectfully submitted,

/s/Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Jonathan P. Bach
Jason A. Driscoll
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Fl.
New York, NY 10036
(212) 257-4880
ashapiro@shapiroarato.com
jdriscoll@shapiroarato.com

Hon. Arun Subramanian
May 24, 2025

Marc Agnifilo
Teny Geragos
AGNIFILO INTRATER
445 Park Ave., 7th Fl.
New York, NY 10022
646-205-4350
marc@agilawgroup.com
teny@agilawgroup.com

Anna Estevao
HARRIS TRZASKOMA LLP
156 West 56th St., Ste. 2004
New York, NY 10019
(212) 970-6465
aestevao@harristrz.com

Brian Steel
THE STEEL LAW FIRM, P.C.
1800 Peachtree Street, Ste. 300
Atlanta, GA 30309
(404) 605-0023

Xavier R. Donaldson
136 Madison Ave, 6th Floor
New York, New York 10016
646-772-3334
Xdonaldson@aol.com

Nicole Westmoreland, Esq.
WESTMORELAND LAW, LLC
132 Cone Street, Suite A
Atlanta, GA 30303
Tel: (404) 446-2620
nw@westmorelandlawgroup.com