

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

May 28, 2025

**BY ECF**
The Honorable Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      **Re:**    *United States v. Combs*, S3 24 Cr. 542 (AS)

Dear Judge Subramanian:

      The Government respectfully writes in opposition to the defendant's motion to strike the expert testimony of Dr. Hughes. The defendant's attempt to strike properly admitted and heavily litigated testimony three days after Dr. Hughes took the stand should be swiftly rejected. As discussed further below, the defendant's arguments are unfounded, unsupported by the law, and ignore the careful consideration underlying the Court's prior rulings regarding the parameters of Dr. Hughes' testimony.

**I.    Background**

      On April 2, 2025, the defense moved in its pretrial filings to preclude the testimony of Dr. Hughes on various bases including that her opinions were not a reliable application of scientific principles to the facts of the case and under Rule 403. (Dkt. 206). On April 25, 2025, the Court denied the defense's motion in part and granted it in part, ruling that Dr. Hughes would be permitted to testify regarding coping strategies, delayed disclosure, and memory. (Apr. 25, 2025 Tr. at 5-6). In addition, the Court admitted testimony relating to why victims remain in abusive relationships, as well as why periods of positivity or neutrality in a relationship serve to prevent victims from leaving a relationship. (*See id.*; Apr. 18, 2025 Tr. at 23:7-15:20, 48:7-49:11). The Court further noted that while Dr. Hughes would not be permitted to testify regarding the concept of "coercive control" or "interpersonal violence," if asked about "why victims either stay in relationships or have delayed disclosure or engage in coping strategies or have fragmented memories, then she can, of course, answer those questions with the reasons for that behavior, as set forth in the disclosure." (Apr. 25, 2025 Tr. at 5-6).

      Before the Government's direct examination of Dr. Hughes on May 21, 2025, the Government previewed to the Court that Dr. Hughes would briefly define certain terms, including regarding specific types of abuse, as they arose in order to make her testimony understandable to the jury. (Trial Tr. 1999:18-2000:15). The Court indicated that the Government's stated plan was acceptable and that it expected the defense to object if, in its view, Dr. Hughes' testimony exceeded

its permissible scope. (*Id.* at 2001:3-5). Later that day, Dr. Hughes testified regarding the four topics authorized by the Court. (*Id.* at 2082:2-11). Throughout her expert testimony, the Court sustained objections when raised by the defense regarding the scope of Dr. Hughes' testimony. (*Id.* at 2072:11-14; 2078:6-12; 2078:23-2079:3; 2081:13-16; 2082:15-19; 2087:11-22; 2089:6-22; 2090:17-2091:2; 2093:6-18; 2100:1-10; 2102:22-24; 2103:9-14; 2108:16-23).

Following her direct examination, the defense moved to strike Dr. Hughes' testimony in its entirety, claiming that her testimony regarding coping strategies and why victims do not leave relationships was an attempt to "backdoor" discussions of coercive control and that the testimony regarding memory was "junk science." (*Id.* at 2123 at 3-19). As to the issue of coercive control, the Court noted that based on the defense's objections and the frequent sustaining of objections "we avoided all those issues to the extent that any issue arose." (*Id.* at 2124:19-24). The defense then extensively cross-examined Dr. Hughes. (*Id.* at 2126-2204). On May 24, 2025, the defense filed a letter "in further support of, and to renew, the motion to strike made at sidebar." (Ltr. at 1). In its letter, the defense argues that the Government and Dr. Hughes "deliberately defied the Court's ruling," and, further, that Dr. Hughes' testimony regarding memory was "junk science." (Ltr. at 2-6). In the alternative, the defense argues that Dr. Hughes' testimony should be "excluded in its entirety under Rule 403." (Ltr. at 6).

**II.     Discussion**

   **A.     Dr. Hughes' Testimony Regarding Why Victims Remain in Relationships, Coping Mechanisms, and Delayed Disclosure Was Properly Admitted**

The Court should deny the defense's request to strike the testimony of Dr. Hughes. Dr. Hughes' testimony regarding why victims remain in relationships, coping mechanisms, and delayed disclosure was concise and tailored directly to these subjects. (*See* Trial Tr. 2082:2-11). Throughout direct examination, the Government limited the testimony it elicited to permitted subjects and repeatedly directed Dr. Hughes to *briefly* define her terms to lay an appropriate foundation for her testimony, as it had indicated to the Court. (*See, e.g.*, Trial Tr. at 2087:1-10; 2087:11-14; 2090:2-4; 2090:23-25; 2120:14-16). For the most part, the defendant did not object to these high-level definitional questions or responses.

The defendant's assertion that the Government acted in "deliberate defiance" of the Court's order is unfounded and sensational. (*See* Ltr. At 1). Consistent with the Court's prior rulings, Dr. Hughes did not provide subject matter testimony regarding coercive control or interpersonal violence. As part of establishing Dr. Hughes' expert qualifications, Dr. Hughes indicated that she specialized in interpersonal violence and traumatic stress. The Government then attempted to elicit a definition of the term interpersonal violence solely for purposes of establishing Dr. Hughes' credentials, following which the Court sustained an objection. (Trial Tr. 2074:9-14). The Government did not pursue any other questions regarding interpersonal violence once the defense indicated it had no objection to Dr. Hughes' qualifications. (*Id.* at 2075:2-6). Similarly, while the Government requested that Dr. Hughes briefly define the term "domestic violence" in relation to her testimony about why victims remain in relationships involving domestic abuse, (*id.* at 2082:2-19), following a sustained objection, the Government moved on with its questioning. None of this

was in defiance of the Court's ruling—rather, the transcript makes clear that the Government acted in good faith throughout the examination.

The defense further complains regarding the terminology used by Dr. Hughes during her testimony. Specifically, the defense argues that Dr. Hughes' use of the words "control" and "power" during her testimony was impermissible. (Ltr. at 3). Similarly, the defense argues that it was improper for Dr. Hughes to "personalize[]" her testimony by using the pronouns "we" and "you" to refer to victims, rather than "they." (Ltr. 3-4). This complaint is baseless and could have been raised at the time of direct examination. The defense cites no case law for the principle that an expert witness must use the third person, rather than the first-person plural in their subject matter testimony. Nor does the defense provide any support for the proposition that Dr. Hughes was somehow forbidden from using terms—such as power and control—that are commonly understood and directly relevant to the areas of her testimony. While the Government was careful not to elicit testimony regarding "coercive control" in accordance with the Court's directives, at no point did the defense object to the expert's use of the term "control" altogether, or other commonplace terms such as "power." Indeed, to do so would have unduly hindered Dr. Hughes from providing comprehensible testimony on the subjects permitted by the Court's ruling. Moreover, the term "power" was expressly used in portions of Dr. Hughes' notice that the Court admitted testimony about at trial. (Dkt. 362, Ex. A. at 3-4). In any event, the defense failed to timely object to Dr. Hughes' terminology at any time after receiving Dr. Hughes' notice *or* during her testimony and therefore the objection is untimely. *See* 21 Fed. Prac. & Proc. Evid. § 5037 (2d ed.) (requirement that objections be timely is to allow "proponent of the evidence [the ability to] obviate the objection if possible"); *United States v. Yu-Leung*, 51 F.3d 1116, 1120 (2d Cir. 1991) ("To be timely, an objection must be made as soon as the ground of it is known, or reasonably should have been known to the objector." (internal citations omitted)); *United States v. Rose*, 525 F.2d 1026, 1027 (2d Cir. 1975) ("The court can be advised by the government of the relevant facts necessary to an informed judgment as to the admissibility of evidence only if questions as to admissibility are raised by the defendant promptly and no later than the time when the evidence is offered.").

The defense's argument that Dr. Hughes "strayed" beyond the scope of her disclosure, particularly with respect to her testimony on coping strategies, is likewise unfounded.[1] (Ltr. at 4). Dr. Hughes' testimony with respect to coping mechanisms was concise and comported with Dr. Hughes' disclosure. (*Id.* at 2099:10-2108-23). The contours of this testimony were outlined in Dr. Hughes' notice, which stated that Dr. Hughes would testify to a "broad range of defense mechanisms and coping strategies commonly used by victims in response to sexual abuse." (Dkt. 362, Ex. A at 4). Dr. Hughes then testified accordingly that coping mechanisms may include many strategies depending on the dynamic of an abusive relationship. (*Id.* at 2099:14-23). To the extent the defense disagreed with the scope of this testimony, the defense objected during the

---

[1] The defense also argues that Dr. Hughes exceeded the scope of her testimony by expounding on the concepts of "love bombing" and "trauma bond," which had initially been noticed in the "coercive control" section of Dr. Hughes' disclosure. (Ltr. at 2). However, as previously established, these topics were squarely within the Court's ruling. (*See* Apr. 25, 2025 Tr. at 5-6; Apr. 18, 2025 Tr. at 23:7-15:20, 48:7-49:11).

examination, which permitted the Court to address the disputed issues while Dr. Hughes was on the stand and the Government to redirect the examination if necessary.[2] To the extent the defense *now* objects to parts of that testimony to which they did not at trial, those objections should be deemed waived and the Government should not now be prejudiced by the defense's untimely new objections. *Yu-Leung*, 51 F.3d at 1120; *Rose*, 525 F.2d at 1027.

Further, Dr. Hughes' admissible testimony was not limited to the precise words of her notice. Rather, it is common, necessary, and appropriate for an expert to expound upon the concepts laid out in their notice to provide useful, comprehensible testimony to the jury. An expert disclosure serves the function of providing proper notice to the parties of the anticipated scope of a witnesses' testimony; it does not provide a comprehensive recitation of their testimony. *Cf Walsh v. Chez,* 583 F.3d 990, 994 (7th Cir. 2009) (noting that the purpose of an expert's report "is not to replicate every word that the expert might say on the stand" but "to convey the substance of the expert's opinion . . . so that the opponent will be ready to rebut, cross-examine, and to offer a competing expert." ); *In re Methyl Tertiary Butyl Ether Prods. Dab. Lilig.,* 643 F. Supp. 2d 471, 482 (S.D.N.Y. 2009) ("Section 26(a)(2)(B) does not limit an expert's testimony simply to reading his report . . . The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report.") (internal citations omitted.). Moreover, the defense failed to object to the aspects of Dr. Hughes' testimony that it now claims went beyond the disclosure while Dr. Hughes was on the stand. That alone is reason to reject this argument.

And even assuming *arguendo* that Dr. Hughes' testimony exceeded the scope of her disclosure, which it did not, preclusion is not the appropriate remedy where, as here, the Government endeavored to hew closely to the Court's order by substantially narrowing the scope of Dr. Hughes' testimony and directing the witness accordingly. *See Harkabi v. SanDisk Corp.*, No. 08 Civ. 8203 (WHP), 2012 WL 2574717, at *3 (S.D.N.Y. June 20, 2012) ("An expert's trial testimony may be precluded based on nondisclosure only when it expounds a wholly new and complex approach designed to fill a significant and logical gap in the first expert report." (internal citations omitted)); *Wechsler v. Hunt Health Sys. Ltd.,* 381 F. Supp. 2d 135, 155 (S.D.N.Y. 2003) ("[p]recluding testimony of an expert, even when there has not been strict compliance with Rule 26, may at times tend to frustrate the Federal Rules' overarching objective of doing substantial justice to litigants." (internal citations omitted)).[3]

---

[2] The defense's argument that it was "simply impossible" for the defense to object each time it believed Dr. Hughes had exceeded the permissible scope of her testimony (*see* Ltr. at 3), is belied by the record which reflects that the defense liberally objected throughout her testimony and repeatedly called for side-bars with the Court when it believed further discussion of its objections was warranted. (*See* Trial Tr. 2076:13-14; 2078:11-12; 2079:2-3; 2081:15-16; 2082:18-19; 2084:8-11; 2087:19-21; 2089:17-22; 2091:1-2; 2093:16-18; 2098:21-22; 2100:9-10; 22:23-24; 2103:1-14; 2108:6-7, 18-23).

[3] The defense cites to *United States v. Mrabet*, 703 F. Supp. 3d 442, 443-45 (S.D.N.Y. 2023) for the proposition that the proper remedy when a party does not comply with the rules governing expert notice is to strike the expert's testimony. (Ltr. at 4). However, this mispresents the holding in that case. The Court in *Mrabet,* with the consent of the Government, struck a portion of an expert's testimony regarding the sourcing of methamphetamine and fentanyl from Mexico when

B.  **Dr. Hughes' Testimony Regarding Memory Was Properly Admitted**

The defense also moves to strike the testimony of Dr. Hughes regarding traumatic memory claiming that her testimony amounts to "junk science." (Ltr. at 5). The defense's argument is baseless. Indeed, the defense raised its objections to Dr. Hughes' testifying about memory at length in seeking to preclude her testimony on the subject. (*See* Dkt. 206). The Court considered and subsequently rejected these arguments, and the defense has provided no basis to reconsider the Court's prior ruling. *See, e.g.*, *United States v. Yannotti*, 457 F. Supp. 2d 385, 389 (S.D.N.Y. 2006) (motions for reconsideration are "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the Court." (citation omitted)).

Further, contrary to the defense's description of Dr. Hughes' testimony as "vague and slippery" (*see* Ltr. at 5), Dr. Hughes' testimony regarding memory was tailored to the impact of trauma on memory and the process of recalling memory over time. (*See* Trial Tr. 2113:24-2122:18). This testimony is far outside the ken of the average juror: Dr. Hughes testified to the complex neurobiology of memory during incidents of trauma and how those incidents become encoded and stored as a result. Dr. Hughes also established the sources of her expertise with respect to memory, which include her clinical and forensic practice.[4] (*See id.* at 2209:130-2210:9). Finally, Dr. Hughes testified that there was no evidence that memories retrieved later in time were less accurate. (Tr. 2122:13-18). The defense does not provide any support for its proposition that Dr. Hughes' testimony should be limited to what the "scientific literature teaches – not to point to gaps in that literature." (Ltr. at 5). Indeed, Dr. Hughes' acknowledgement of the state of the academic literature allowed the defense to properly cross-examine her as to those opinions and the jury to assess them. *Cf. Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 285 (S.D.N.Y. 2011) (noting that "[t]he experts have not made conclusory assertions based on insufficient facts, but rather have made limited assertions tied directly to the limited evidence they had available to them. That they have been upfront about the limitations of their analysis is, in my view, to their credit, and will allow for a more frank assessment of the weight that should be afforded to their conclusions.").

---

that particular expert opinion had not been properly noticed. In so doing, the Court noted that had defense counsel notified the court of this issue pre-trial, the court would have "required the Government to amend the disclosure to comply with Rule 16 by providing far greater specificity and analysis." *Mrabet*, 703 F. Supp. 3d at 444. In other words, *Mrabet* concerned inadequate notice as to one opinion offered by an expert—it speaks nothing of the arguments raised by the defendant here. Further, the disclosure in *Mrabet* was much less detailed than Dr. Hughes' notice. For example, the disclosure contained only a single sentence about the reasons and bases for his opinions as an expert. *Id.* at 444.

[4] The defense does not provide any support for its proposition that an expert must differentiate between the various sources of their opinion once they have already been qualified as an expert. (Ltr. at 6).

### C.  Dr. Hughes' Testimony Should Not be Excluded Under Rule 403.

This Court should not reconsider its prior ruling admitting Dr. Hughes' testimony. (Apr. 25 Tr. at 5-6). The probative value of this evidence plainly outweighs its prejudicial effect. As other courts in this District have held, expert testimony such as Dr. Hughes is highly probative as it helps "the jury contextualize th[e] seemingly counterintuitive behavior" of victims and the prejudice of such testimony—particularly in cases such as this one—is low. *United States v. Ray*, No. 20 Cr. 110 (LJL), 2022 WL 101911, at *10 (S.D.N.Y. Jan. 11, 2022); *see also United States v. Torres*, No. 20CR608 (DLC), 2021 WL 1947503, at *7 (S.D.N.Y. May 13, 2021), *aff'd*, No. 21-2665-CR, 2023 WL 378942 (2d Cir. Jan. 25, 2023).

Nevertheless, despite this Court's prior ruling and the numerous other precedents permitting similar testimony, the defense attempts yet another bite at the apple by again asking this Court to exclude Dr. Hughes' testimony under Rule 403. (Ltr. 6-7). In one paragraph, the defense claims that Dr. Hughes' testimony was far too broad and was "designed to support virtually any argument the government might make about the alleged victims." (*Id.* at 6). And, then in the following paragraph, the defense claims that Dr. Hughes "offered opinions plainly tailored to match the government's arguments in the case and its presentation regarding the alleged victims." (*Id.* at 7). Even ignoring the apparent internal inconsistency in these positions, both arguments should be rejected.

As to the first argument, the only support that the defense provides for their claim that Dr. Hughes' testimony was too broad is that Dr. Hughes provided "myriad explanations" for why victims stay in abusive relationships. (*Id.* at 6). But, the mere fact that Dr. Hughes explicated that there are multiple reasons that a victim may stay in a relationship does not render Dr. Hughes' testimony unhelpful or impermissibly broad. Instead, Dr. Hughes' testimony on this point went directly toward helping the jury understanding the "counterintuitive behavior" of victims and why they might stay in an abusive relationship. *See Ray*, No. 20-CR-110 (LJL), 2022 WL 101911, at *10. As to the second point, there is no evidence in the record to support the defenses' assertion that Dr. Hughes was aware of any of the allegations in the case, let alone tailored her testimony to those allegations. To the contrary, Dr. Hughes specifically testified that she did not have any personal knowledge of the facts of the case, had not reviewed any evidence in the case, and had not interviewed any government victims or witnesses. (Trial Tr. 2078). Dr. Hughes testimony also did not improperly bolster any witness testimony merely by virtue of the fact that it was consistent with certain witness testimony in the case. *See Ray*, 2022 WL 101911, at *13 ("[p]resenting expert testimony that is consistent with lay witness testimony is the permissible building block for any case, whether it be presented by the plaintiff or by the defendant.").

This Court should also reject the defense's argument that Dr. Hughes did not properly couch her opinions in her testimony. The defense does not cite a single page in the transcript to support this position, and a review of the transcript belies this claim. (Trial Tr. 2108:11:12 ("*Often*, [victims] still have positive and loving feelings toward their abuser." (emphasis added)), 2121:23-2122:1 ("They *may* smell the smell of alcohol, they *may* see someone dressed in a certain way, someone walk in a certain way, and the brain will register that as something of danger and open up those memories." (emphasis added)).

Finally, the Court should not permit the defense to misuse Rule 403, or any other argument it raises, to effectuate a manifestly unfair result. The contours of Dr. Hughes' testimony were litigated in advance of her testimony and the Government complied—and made every effort to comply—with the Court's pretrial rulings. When the defense objected during Dr. Hughes' testimony, and when any such objections were sustained by the Court, the Government swiftly directed Dr. Hughes to the next topic. In short, despite the myriad arguments the defense presents in its letter—some old, some new—it is clear that the defense is simply seeking any avenue to strike testimony that it does not like. But none of these arguments provides a colorable basis to strike Dr. Hughes' testimony now, days after it was presented to the jury and far too late for the Government to address any newly raised concerns.

### III. Conclusion

For the foregoing reasons, the defendant's motion to strike Dr. Hughes' testimony should be denied.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:   /s
Maurene Comey / Meredith Foster /
Emily A. Johnson / Christy Slavik /
Madison Reddick Smyser / Mitzi Steiner
Assistant United States Attorneys
(212) 637-2324/-2310/-2409/-1113/-2381/-2284

cc:    Counsel of record (by ECF)