

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 3, 2025

**BY ECF**
The Honorable Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

  Re: *United States v. Combs*, S3 24 Cr. 542 (AS)

Dear Judge Subramanian:

  The Government writes to respectfully request that the Court admit limited additional testimony from Dr. Dawn Hughes as described below in response to arguments advanced forcefully and repeatedly by the defense during cross-examination of Mia. For the reasons set forth below, the defendant's cross-examination of Mia opened the door to limited additional testimony to rebut the misleading arguments made to the jury about how victims react to abuse. Specifically, the Government seeks to admit testimony from Dr. Hughes regarding the following limited concepts outlined in her expert notice:[1]

1. The definitions of emotional and sexual abuse (Dkt. 207-1 at 2);

2. These forms of abuse may "together function to control the victim" (*Id.*);

3. These forms of abuse may create an "environment of fear and obedience that impacts a victim's decision-making process and free will, as well as manipulate[] the victim's emotions." (*Id.* at 3); and

4. These forms of abuse are "often interspersed with rewards, positivity, affection, and normalcy, which can create emotional attachment and psychological dependency." (*Id.* at 3).

  This limited proposed testimony of Dr. Hughes is highly probative and directly responsive to the misleading positions advanced by the defense. In connection with this request, the Government draws the Court's attention to the Second Circuit's decision yesterday in *United*

---

[1] Although Dr. Hughes' testimony contained very limited testimony regarding forms of abuse and testimony about coping mechanisms, her testimony was constrained by both the Court's prior rulings and sustained objections during direct examination. *See, e.g.*, Tr. 2082:15-19 (sustaining objection on definition of domestic violence); Tr. 2090:23-2091:2 (sustaining objection on definition of psychological abuse); Tr. 2108:20-23 (sustaining objection on how the use of coping mechanisms in a relationship impacts a victim).

*States v. Ray*, 23 Cr. 6114 (2d Cir. 2025), affirming the admission of Dr. Hughes' testimony on coercive control and concluding that similar testimony is properly admitted at trial where the Government establishes a relevance to the charged conduct.

### I. The Second Circuit's Recent Decision in *United States v. Ray*, 23 Cr. 6114 (2d Cir. 2025) Affirmed Dr. Hughes' Expert Testimony on Coercive Control

On June 2, 2025, the Second Circuit upheld the conviction of Lawrence Ray on charges including racketeering and sex trafficking. *See United States v. Ray*, 23 Cr. 6114 (2d Cir. 2025). In the opinion, the Circuit affirmed the admission of Dr. Hughes' expert testimony regarding coercive control. The full opinion of the Circuit is attached hereto as Exhibit A. Specifically, the Second Circuit in *Ray* rejected the notion that testimony regarding coercive control was not outside the ken of the average juror and cited affirmatively the holdings of other circuits that had admitted similar expert testimony. As the Circuit noted:

> [L]ike expert testimony on the practices and operations of organized crime, narcotics dealers, and forced labor schemes, expert testimony regarding the general dynamics of sexual abuse, including coercive control tactics, is admissible under Rule 702, in the exercise of the district court's discretion, when it provides jurors with information to assist them in evaluating, and placing into perspective, conduct that may be the result of complex interpersonal relationships that could be difficult for a jury to understand on its own . . . In reaching this holding, we join our sister circuits that have held under analogous circumstances, that methods of sexual abuse are a proper subject for expert testimony. *See United States v. Halamek*, 5 F.4th 1081, 1088-89 (9th Cir. 2021); *United States v. Young*, 955 F.3d 608, 615 (7th Cir. 2020); *United States v. Johnson*, 860 F.3d 1133, 1140-41 (8th Cir. 2017); *United States v. Batton*, 602 F.3d 1191, 1200-02 (10th Cir. 2010); *United States v. Hitt*, 473 F.3d 146, 158-59 (5th Cir. 2006).

*Ray*, 23 Cr. 6114, at 25-26.

The Circuit further noted that Dr. Hughes's testimony had included definitions of specialized terms such as "coercive control," which explained how "perpetrators may utilize a range of tactics to impose coercive control over their victims" including "methods of physical, sexual, and psychological abuse." *Id.* Dr. Hughes had also testified in *Ray* regarding the "impact that coercive control and its tactics have on victims, including becoming dependent on an abuser, choosing not to report abuse to others, and becoming desensitized to abuse." *Id.* at 26. The Second Circuit concluded that the district court had properly admitted this testimony on the basis that it was outside the ken of the average juror given the "complexity of these types of interpersonal dynamics," and noted that such expert testimony "may be particularly important" where it aids the jury in "contextualiz[ing] the seemingly counterintuitive behavior of the victims." *Id.* at 27. The Circuit further noted that "such expert testimony can assist jurors in understanding why certain grooming techniques—including gaining the victim's trust by providing attention, affection, and

financial support, which may seem benign on their face—can be utilized by an abuser to gain tactical control over a victim for eventual sexual abuse." *Id.* at 28.[2]

Finally, the Circuit noted that the district court had properly weighed Dr. Hughes' expert testimony under Rule 403. The Circuit noted affirmatively the district court's determination that such testimony was highly probative and rejecting the defense's argument that such testimony "would confuse and inflame the jury." *Id.* at 28-29.

## II.  The Defense's Extensive Cross Examination of Mia Opened the Door to Limited Additional Expert Testimony

On Friday, May 30, 2025 and Monday, June 2, 2025, the defense cross examined Mia, a victim who testified that she was sexually abused by the defendant during her employment by the defendant. Throughout its cross-examination, the defense asserted time and again that Mia's actions—such as sending loving messages to the defendant and describing positive moments in their relationship—were inconsistent with her testimony about being sexually abused by the defendant. In long, argumentative questions resembling testimony more that cross-examination, the defense expressly and impliedly stated that someone who was a victim of sexual abuse would *not* have engaged in such behavior, thereby impugning Mia's credibility before the jury. This elective questioning opened the door to limited testimony from Dr. Hughes to "contextualize the seemingly counterintuitive behavior of the victim[]." *United States v. Ray*, 23 Cr. 6114 at 27.

Over the course of cross examination, the defense showed Mia dozens of text message communications and social media posts in which Mia made positive statements about or directed at the defendant. Then, in connection with those exhibits and otherwise, the defense repeatedly questioned Mia as to why she would have supported her abuser, and argued that she was, in fact, lying about her abuse. For example, the defense's cross examination included the following:

> Q. So the man who threatened your life the night before, you decided to repost on your personal social media account?
>
> A. Yes.
>
> Q. I'm sorry if I cut you off. Go ahead.

---

[2] The Second Circuit also rejected the argument that Dr. Hughes' testimony as a blind expert amounted to improper bolstering of fact witnesses. The Court noted that "Dr. Hughes offered general testimony on coercive control and explained various tactics that may be used by perpetrators to achieve coercive control. In doing so, Dr. Hughes made clear that her testimony was based on her twenty-five years of experience as a psychologist specializing in interpersonal violence and traumatic stress, not any knowledge of [the defendant], his victims, or materials specific to this case." *Id.* at 29. The Court therefore concluded that Dr. Hughes' testimony "about coercive control generally did not bolster or mirror fact witness testimony, but instead . . . provided the jury with contextual background that helped in evaluating the evidence presented in this case." *Id.* at 30.

> A. I was going to say, yes, of course.
>
> Q. And the man who terrorized you and threatened your life the night before, you decide to write: The nicest caption ever. Thanks, Puff. Love you. You've shown me the world.
>
> A. Yes.

Tr. 3476:2-10.

> Q. Then why would you -- if you're being sexually assaulted and your sister is being brutalized physically, why are you making a scrapbook for Mr. Combs?
>
> A. It's a lot more complicated than the way you phrase that. It's called it's abuse on all levels and --
>
> Q. I'm sorry, go ahead.
>
> A. Oh no. I was just going to say I guess you could talk to any sexual victim advocate or any abuse victim advocate, and they could explain it to you much better than I could.

Tr. 3568:20-3569:3. These questions were far from aberrational. Rather, the defense systematically and repeatedly attacked Mia's credibility on the basis that she expressed affection for her abuser, the defendant. (*See, e.g.* Tr. 3484:3-23; Tr. 3493:10-16; Tr. 3540:1-4; Tr. 3691:20-3692:22; Tr. 3810:17-25).

Similarly, the defense attempted to attack Mia's credibility by noting that she had described moments of positivity with the defendant. While Mia noted that these positive moments were interspersed with moments of extreme fear, violence, and abuse, the defense forcefully attacked her credibility on the ground that she had expressed such mixed emotions. For example, the defense's cross examination included the following:

> Q. You were in fear of Sean Combs every day, is that true?
>
> A. On the days that he was calling me his best friend and treating me like that, I wasn't in fear of him.
>
> Q. You weren't in fear of the man who took your innocence?
> . . .
> A. Oh. I wasn't in fear? Yes, I -- I was in fear anytime Puff was not happy, yes, because I wanted to make sure he was because then I knew I was safe.

Tr. 3484:15-23.

> Q. How do you have a good moment with Sean Combs when you're terrified of him?
>
> A. Because – it's – it's easy because the dynamics would shift. So when things were good, you felt really safe and you forgot -- you almost forgot about those things, so...
>
> Q. How do you forget about being woken up with a man on top of you getting his way with you?
>
> A. Because it's too horrible to think about, so you don't, and you don't have time to either, and you just want it to go away.

Tr. 3493:17-25.

> Q. You were in constant fear, true?
>
> A. Constant fear. I said that when he was abusive, I was in horrific fear. I was in fear of being in trouble. I was in fear of upsetting him. I was in fear of any moments that were not the best friend good moments.
>
> Q. How were you best friends with a person who has treated you the way that you said to the jury?
>
> A. I mean, I guess we can ask my therapist. It was a very psychological -- it – that's what he would also refer to me to. I have multiple best friends. These were people I was around all the time. And he was vulnerable with me quite a bit, so I would feel responsible for helping him, and then I would feel bad for him, and I don't know how to -- I mean, I can describe it, but I'm not a psychiatrist or a therapist, I don't think I'm allowed to.

Tr. 3494:4-18.

> Q. How is it possible that you are even around Mr. Combs after the way you say he treats you and your sister and your other loved ones?
>
> A. It's called like psychological abuse. Again, it wasn't horrible all the time. If it was, it would have been easy getting punished after reacting to his violence where then I'm confused and begging for -- to make it all better so that I ignore what happened, like nobody around me -- no one around us ever reacted. Everyone acted like it was normal.

Tr. 3558:19-3559:2.

> Q. But my question I would like you to answer, if you don't mind, is: How could any high cover up the lows that you talked about, by being threatened with your life?
>
> . . .
>
> A. Oh, because you -- I felt safe and I felt, like, everything was great again.
>
> Q. And being, God forbid, seen actually abused, according to you, same question?
>
> MS. SMYSER: Objection.
>
> THE COURT: That's sustained.

Tr. 3792:14-24.

Notably, embedded in its examination, the defense repeatedly made conclusory statements regarding Mia's behavior—including her willingness to express support for the defendant and her descriptions of positive moments with him—resulting in numerous sustained objections. Indeed, following a series of such statements by the defense, the Court informed the defense that it was "repeating the same question multiple times, often with an improper form . . . and at a certain point, I'm going to think that you're doing that just to get the question out there so the jury can hear it." (*See* Tr. 3707:6-19). In so doing, the defense pushed a misleading narrative to the jury in the form of outright argument, as illustrated below:

> Q. So the person who you told the ladies and gentlemen of the jury terrorized you and caused you PTSD, you wrote to that person and explained how that person saved you from the other person named there, right?
>
> MS. SMYSER: Objection.
>
> THE COURT: Sustained. Needs to be rephrased.

Tr. 3661:23-3662:3.

> Q. -- why didn't you say, and, Mr. Combs, you bamboozled me as well?
>
> A. Because I was still brainwashed.
>
> Q. Who brainwashed you, Mia?
>
> A. Puff.

> Q. How did he brainwash you into thinking that it's okay to be woken up from your slumber with a man's private part being inserted into your person without permission?
>
> MS. SMYSER: Objection.
>
> THE COURT: Sustained.

Tr. 3680:22-3681:6.

> Q. Why would you stick up for Mr. Combs, knowing what you are saying you have knowledge of, this brutality? Why would you do that when Ms. Ventura said he's being jerky?
>
> MS. SMYSER: Objection.
>
> THE COURT: That's sustained.

Tr. 3725:18-23.

### III. Limited Additional Testimony from Dr. Hughes Is Admissible under *Ray* and Directly Responsive to the Defense's Attempts to Undermine Mia's Credibility

As the defense attacked Mia's truthfulness based on her mixed reactions to the defendant and public expressions of positivity, thereby attacking the concept of a victim of abuse having a non-linear or multifaceted reaction to the abuse, the Government should be permitted to introduce limited testimony to aid the jury in "contextualiz[ing] the seemingly counterintuitive behavior of the victim[]." *Ray,* 23 Cr. 6114, at 27. Dr. Hughes' limited additional testimony will "provide[] jurors with information to assist them in evaluating, and placing into perspective, conduct that may be the result of complex interpersonal relationships that could be difficult for a jury to understand on its own." *Id.* The Court should therefore admit additional testimony from Dr. Hughes on (i) emotional and sexual abuse, (ii) how different forms of abuse combine, (iii) the "environment of fear and obedience" that impacts a victim's decision-making and emotions, and (iv) how abuse is "interspersed with rewards, positivity, affection, and normalcy" to create attachment and dependency.[3] (*See* Dkt. 207-1 at 2-3). This limited testimony will assist the jury by providing context for victims' reactions to emotional and sexual abuse. Moreover, such testimony is entirely consistent with binding Second Circuit authority acknowledging the probative value and relevance of expert testimony regarding coercive control in cases involving sexual abuse.[4]

---

[3] This testimony would be limited to a subset of the opinions described in the third full paragraph on page 2 and the second full paragraph on page 3 of Dr. Hughes's expert disclosure. (*See* Dkt. 207-1).

[4] During oral argument on April 18, 2025 on the defendant's motion to preclude Dr. Hughes' testimony, the Government pointed to numerous district court cases in which similar testimony regarding coercive control had been introduced at trial, while the defense argued, among other

After strenuously objecting to *any* expert testimony on these issues, the defense's cross-examination of Mia drove a battering ram through the door to additional testimony from Dr. Hughes to provide necessary context to its misleading and prejudicial assertions. As noted above, the defense extensively cross-examined Mia regarding her expressions of support to the defendant and/or her descriptions of positive moments in their relationship. The defense, through their questioning, expressly and impliedly argued that someone who is a victim of sexual abuse would not have engaged in such behavior, thereby impugning Mia's credibility before the jury. The defense therefore established through their own cross examination *why* these concepts are outside the ken of the average juror. Indeed, Mia herself struggled to articulate the complex dynamics of her abuse. In light of this record, it is proper for the Court to reconsider its prior ruling. Less than two months ago, in *United States v. Ephron*, 24 Cr. 418 (MMG), Judge Garnett reconsidered the Court's prior exclusion of expert testimony on delayed disclosure in a child enticement case. The transcript of that oral ruling is attached hereto as Exhibit B. In *Ephron*, the Court permitted the admission of expert testimony after the issue had "squarely been put at issue in the case" by the defense. (Exhibit B, Tr. 1157:23-24). Specifically, Judge Garnett noted that since jurors may have a different knowledge base on the subject, "we would all be better served by having jurors operate off a common set of -- a common pool of testimony . . . I think there would be ample cross for such a witness and that you would -- both sides would have arguments to be made in closing about whether [the expert's] testimony illuminated or did not illuminate something about this case." (*Id.* at 1165:18-1166:6)). The admission of limited additional testimony of Dr. Hughes is similarly admissible on that basis here.

Further, Dr. Hughes' limited additional testimony is independently admissible under Rules 401 and 403. The probative value of such testimony is extremely high after the defense's extensive cross examination of Mia, which likely left the misimpression with the jury that certain types of behavior are inconsistent with that of a victim of sexual abuse. Further, the offered testimony is not unduly prejudicial. By this point, multiple victims have testified to significant emotional and sexual abuse at the hands of the defendant, and Dr. Hughes' testimony is certainly no more prejudicial than that testimony and other corroborating evidence of abuse. *See United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (admission appropriate where the offered evidence "did not involve conduct any more sensational or disturbing than the crimes with which [the defendants were] charged."). Rather, Dr. Hughes testimony would simply permit the jury to draw the reasonable inference that a victim's reactions to the defendant were a result of trauma, rather than indicative of a lack of credibility. *See United States v. Ray*, No. 20 Cr. 110 (LJL), 2022 WL 101911, at *12-13 (S.D.N.Y. Jan. 11, 2022) (noting that "[i]f it turns out that the testimony of Dr. Hughes will support the testimony of the victims, that will be because the witnesses testify consistently with what Dr. Hughes will testify is victim experience generally and because the jury—after cross-examination—will believe both Dr. Hughes and the victims. It will not be because Dr. Hughes lends an expert sheen by testifying that a witness is credible.").

---

things, that "there's nothing from this Circuit" on that issue. (Apr. 18, 2025 Tr. at 18). The Court similarly noted its duty to evaluate Dr. Hughes' testimony "based on Rule 702 and the applicable Circuit precedent." (*Id.* at 44). It is therefore particularly noteworthy that the Circuit has since affirmed the admission of Dr. Hughes' expert testimony on these very topics.

\* \* \*

For the reasons set forth above, the Court should permit the Government to recall Dr. Hughes to provide limited expert testimony focusing solely on the topics outlined above.

        Respectfully submitted,

        JAY CLAYTON
        United States Attorney

By:   /s                    
    Maurene Comey / Meredith Foster /
    Emily A. Johnson / Christy Slavik /
    Madison Reddick Smyser / Mitzi Steiner
    Assistant United States Attorneys
    (212) 637-2324/-2310/-2409/-1113/-2381/-2284

cc:     Counsel of record (by ECF)