# Exhibit B

P4BCeph1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4           v.                              24 Cr. 418 (MMG)

5  SHYMELL EPHRON,

6                                           Trial
                   Defendant.
7  ------------------------------x

8
                                           New York, N.Y.
9                                          April 11, 2025
                                           11:49 a.m.
10

11 Before:

12                   HON. MARGARET M. GARNETT,

13                                          District Judge

14                        APPEARANCES

15 MATTHEW PODOLSKY
        Acting United States Attorney for the
16      Southern District of New York
   BY:  RYAN ALLISON
17      ANDREW JONES
        LISA DANIELS
18      Assistant United States Attorneys

19 FEDERAL DEFENDERS OF NEW YORK
        Attorneys for Defendant
20 BY:  HANNAH McCREA
        AMY GALLICCHIO
21      MICHAEL ARTHUS

22

23

24

25

P4BQeph2

1          MR. JONES:  The check one and move on doesn't solve

2     any problem.  So we don't think that that's useful.

3          I will note, I just caught the Count Two, I think the

4     special verdict form just copied over from Count One, but it's

5     different.  I mean, I guess it doesn't matter, I'm asking for

6     it to come out, but if it doesn't, it's first degree rape, not

7     third degree rape.

8          THE COURT:  Oh, I see.

9          MR. JONES:  Hopefully, that doesn't matter at all.

10          THE COURT:  I will take all of that under advisement

11     and let you know Monday morning.

12          Anything else, Mr. Arthus, that you want to raise on

13     the verdict form?

14          MR. ARTHUS:  Did we cover -- this may have already

15     been captured in Count Two on the special interrogatories

16     should I guess be omitted if the government --

17          THE COURT:  Yes.  If we do a special verdict form,

18     we'll have to fix all of it for Count Two because it's the

19     wrong -- we've just duped over the underlying issues from Count

20     One, and they're slightly different, so we will fix it if we do

21     it at all.

22          And on the Counts Three through Seven, any issue?

23          MR. ARTHUS:  Not from us, no, your Honor.

24          MR. JONES:  No, your Honor.

25          THE COURT:  Okay.  Let's talk about Dr. Rocchio.

P4BQeph2

1        So I have reviewed your letters, and just so we can

2   focus our time, I don't agree with the defense argument that

3   this requires some opening of the Daubert hearings on another

4   round of briefing and all of that.  The issues related to the

5   inapplicability of where the defense's view that studies or

6   treatment or literature on prepubescent children is not

7   relevant to this case or that there's issues that differentiate

8   them, all of that was fully fleshed out in the original Daubert

9   briefing, and in part led to my ruling that I thought many of

10  the proffered topics on which Dr. Rocchio was originally

11  proposed to testify were not a good fit for this case.

12       And no reason to doubt her expertise, but rather that

13  there was, you know, as with the last part of the Daubert

14  inquiry, there was a lack of fit that I did not think the

15  testimony on many of those topics would be helpful to the jury

16  to decide the issues in this case.

17       So I think your record is made, Mr. Arthus, but I just

18  don't want to spend time on that.  I think -- I don't agree,

19  and I think we can resolve the issue one way or the other based

20  on the extensive briefing and discussion that we've had, both

21  at the time of the original Daubert motions and then the issues

22  that we've discussed throughout the case as this issue has sort

23  of re-arisen.

24       I want to give you all a chance to speak, but I guess

25  what I am envisioning, if I were to allow it, is that

P4BQeph2

1    essentially the government after eliciting Dr. Rocchio's

2    qualifications would elicit from her as to -- and let me

3    just -- I don't think that this concept of disclosure is best

4    understood as a process that occurs over time.  That seems to

5    me to fall on the wrong -- on the wrong side of the narrow

6    grounds on which I'm open to hearing argument about

7    Dr. Rocchio.

8            And what I would envision is a fairly tightly cabined

9    direct testimony that goes directly to the issue of essentially

10   how come and is it based on studies, the literature and her own

11   experience of treating patients for victims to not go to law

12   enforcement, to not go right away, to not disclose any kind of

13   sexual victimization.  Broadly, you know, that sort of the

14   patterns that she believes are documented in the literature and

15   in her own practice of treating victims of some kind of --

16   victims of some kind of sexual victimization, again, limited to

17   adolescents and adults, to not make these various kinds of

18   disclosures or not do so right away.

19           And then her testimony as to, again, based on academic

20   studies and her own treatment experience, to describe some of

21   the reasons why disclosure or the seeking of help or

22   intervention is either not sought or not sought right away.

23   And as to those topics, I think they have squarely been put at

24   issue in the case.  They wouldn't be impracticable strain based

25   on the Supreme Court's decision in *Diaz*, again, provided

P4BQeph2

1    they're cabined to like, okay, is this a common thing?  What is

2    the parameters of its commonality?  And what are some of the

3    reasons based on the literature and her own practice why that

4    occurs?

5          Limited in that way, I think there is ample cross.  I

6    mean, I could write the cross myself.  You don't need my help,

7    but some of the topics of cross that I would be anticipating or

8    envisioning would be essentially cross about different kinds of

9    situations, right?  That a teenager who believes she's in a

10   romantic relationship with an adult teacher at her school,

11   that's a different situation from, for example, you're out

12   jogging -- you know, the situation that our juror, Mr. Barry,

13   has described to us:  You're out for a jog and a stranger drags

14   you into the bushes and forcibly rapes you, which is also

15   different from the context of where a teenager might meet an

16   adult in a social situation and wish to pursue a romantic

17   relationship with them and believe that it's an appropriate and

18   mutual romantic relationship.  That all of these situations are

19   different and elicit from her, you know, if you wish, how they

20   are different.

21         I'm not cabining any cross if she testifies.  I'm just

22   making a record about what I think could be fertile ground and

23   that any such testimony could be well tested on cross.

24   Eliciting from her that some victims or even many victims do

25   disclose, do report, do seek help, do seek medical attention,

P4BQeph2

```
1    and laying out the contours of that and how, you know, the full
2    range of reactions and type and timing of disclosure are ones
3    that I presume she would say, oh yes, that does happen.  As
4    well as eliciting from her that, you know, she has no idea
5    without treating the person, meeting the person, evaluating
6    their circumstances, why any particular person would or would
7    not do any of the things that, you know, have already been
8    elicited from her.

9           And so, you know, my concern - and then I want to hear
10   from you all - is I'm certainly sensitive to the issue that the
11   defense raised in their original Daubert motions, that we
12   discussed at the Daubert hearing, not at a testimony hearing,
13   but, you know, our oral argument on the Daubert issue and that
14   we've discussed throughout this trial; that expert testimony
15   not be substituted for the actual testimony of available
16   witnesses.

17          However, in thinking about the case, and as I
18   mentioned yesterday, my concern is that I personally think
19   based on my own life experience that it's quite likely that our
20   jurors who are young women in their twenties, many of them,
21   that's a subset of our jurors, have had life experiences that
22   would allow them to evaluate the reasons why a young woman
23   might not leave a dangerous situation because she feels
24   responsible for her friend or the reasons why a young woman who
25   is sexually assaulted might not go to the police, might not
```

P4BQeph2

1   tell their parents, might not tell anyone.

2          Likewise, I personally think that our female jurors

3   who are of a significantly older generation, of which we have

4   several - I think three off the top of my head - female jurors

5   who are in their sixties, seventies, eighties might well be

6   thinking, let me tell you how it was in the Sixties.  A boy

7   could pin you down in his car and rape you and you did nothing.

8   You went home, you took a bath, you went to sleep, you never

9   told anyone because no one would believe you.

10          But I'm not sure that -- that's sort of my personal

11  belief that I have plenty of jurors who have sufficient life

12  experience to evaluate and weigh the testimony that they've

13  heard in this case.  My concern is (A) I'm not sure that's

14  correct, and I don't want to import my own milieu and life

15  experience and perception of the jurors to unduly influence the

16  relevance of this testimony.

17          And, second, I'm not sure anyone would want the

18  defense or the government to set up a scenario where in the

19  jury room jurors are not just doing what I'm going to tell them

20  to do, which is to bring their common sense and life experience

21  to evaluating things, but bringing events in their own lives

22  that they know about into the jury room in a way that I think

23  in the way that I've described might go beyond what is

24  appropriate in terms of jurors using their common sense and

25  judgment and general life experience to evaluate the witnesses

P4BQeph2

1    and to deliberate together about what they think.

2            And so all of that thinking is kind of animating my

3    invitation to hear again from you all, and my view that, at

4    least right now, not having heard from you all orally, that

5    narrowed in the way that I've described, tested by

6    cross-examination, that we are then putting something in the

7    record that has happened in open court and is testified

8    cross-examination that the jurors can, if not rely on, draw on

9    if they choose, both the direct and cross, to have some --

10   something, something meatier and something that is actually

11   evidence in this trial that they can use to evaluate something

12   that I think both sides would agree is a central issue in the

13   case, which is what to make of the victim's testimony and the

14   underlying conduct about which they testified.

15           So all of that is to sort of frame my own thinking

16   about the issue.  And with that, I don't know, Ms. Daniels

17   Mr. Jones, Mr. Allison.

18           MR. ALLISON:  It's me, your Honor.

19           THE COURT:  Okay.

20           MR. ALLISON:  I don't have much more to add beyond

21   what you said.  We're happy to limit it the way you described.

22   I do think it's important, but, I think, like a lot of people,

23   might hope that folks can think about sexual abuse victims in

24   the way that you anticipate some of the jurors may be able to,

25   but I don't think we should assume that people are thinking

P4BQeph2

1    about it that way.  And I do think that a lot of the conduct

2    that we all sort of know this -- a lot of conduct for sexual

3    abuse victims --

4            THE COURT:  You have to keep your voice up.  I can

5    hear you fine, but knowing 906 as I do, I'm confident that

6    defense counsel is struggling a little bit to hear you.

7            MR. ALLISON:  Just that some of the conduct is

8    counterintuitive for sexual abuse victims.  It's not within the

9    ken of many of the average jurors, and I don't think we can

10   sort of assume that they know that people who are sexually

11   abused don't often make reports immediately.

12           I think it is also important, as your Honor noted, not

13   to give any one juror undue influence over the rest of the

14   jurors based on their own life experience, and this will

15   essentially even it out.  And it will even it out in whatever

16   way it comes out.  You know, perhaps cross-examination shows

17   that, you know, what Evelyn did undermines her credibility.

18   Perhaps it will show that it doesn't.  But the point is that

19   everybody will be acting from the same set of information,

20   tested by cross-examination in open court.  We do think that's

21   appropriate.

22           Look, the defense is counting on the counterintuitive

23   nature of the conduct, right?  That's one of their central

24   credibility attacks on Evelyn - the counterintuitive nature of

25   how she responded when being abused.  And we're just trying to

P4BQeph2

1  put forward some evidence to rebut that.  It's directly

2  responsive.  We think it's appropriate and the cabined way that

3  you discussed it, short direct examination, and we think it's

4  appropriate for the reasons that you said.

5          THE COURT:  Mr. Arthus?

6          MR. ARTHUS:  So, first, just about the jurors

7  themselves -- and also, I just want to, you know, I forgot

8  something on the charge, so we are going to have to go back to

9  the charge at some point, but stick with this for now sorry.

10         THE COURT:  Just so everyone knows.  I have a PI

11  hearing which is supposed to start at 1:30.  I'm obviously

12  going to be a little bit late for that.  I mention that not to

13  limit your ability to make a full record.  And, Mr. Arthus,

14  tell me everything you want to tell me before I make a final

15  decision, but only so that you understand that I have a little

16  bit of a time constraint.

17         MR. ARTHUS:  I think most of our positions are in our

18  letter.

19         On the jurors' life experience, we heard from almost

20  every juror in the back in that jury pool.  And of the jurors

21  that we have, the young and old, I think a majority of them not

22  only disclosed stories in response to certain questions, but

23  stories that involved delayed disclosure.  So these jurors have

24  an understanding of this.

25         THE COURT:  I don't want to -- I don't mean to

P4BQeph2

1    interrupt you, Mr. Arthus, but I do think it's worth clarifying

2    that I don't think that's correct, because all of the jurors --

3    we heard from so many jurors, so I don't dispute that.  But of

4    the jurors who actually ended up on our jury pool, as to the

5    sexual questions, almost none of the jurors that are actually

6    on our jury had issues.  So just by -- I don't have my jury

7    board in front of me, but I remember it quite well.  So

8    obviously Mr. Barry, but Jurors 1 and 2 we did not speak to in

9    the back.

10            MR. ARTHUS:  I'm trying to remember.

11            THE COURT:  Mr. Lefever, the IT guy; Ms. Eagle, who

12    works in Bronx family court; and then we have Mr. Barry.

13    Everyone has Mr. Barry.

14            MR. ALLISON:  Julian Rivera is next.  We did not speak

15    to him in the back.

16            THE COURT:  Right, we didn't speak to him in the back.

17            MR. ARTHUS:  Ashley Rodriguez.

18            THE COURT:  We did speak to her, yes.

19            MR. ARTHUS:  Did discuss a disclosure.

20            THE COURT:  The last juror in the front row.

21            MR. ARTHUS:  I think that's Olivia Nash.

22            THE COURT:  Right, Olivia Nash, we did not speak to

23    her in the back.  We have a number of jurors in the second row

24    we didn't speak to.  The only juror I can remember in the

25    second row that we spoke to in the back about the sexual

P4BQeph2

1    questions --

2              MR. ARTHUS:  There were two.  So there was Kathie

3    Gordon.

4              THE COURT:  Yes, Kathie Gordon, I remember her.  And

5    Sarah Garrison.

6              MR. ARTHUS:  Both of whom involved delayed disclosure

7    as well.

8              THE COURT:  Yes.  But, if anything, I think this

9    recitation is kind of illustrating my point, which in any jury,

10   it's not that every juror will have some personal appearance to

11   draw on, but this little exercise kind of highlights what is

12   giving me pause, right, that in terms of not importing my own

13   views as to what I think is the typical knowledge of women of

14   any age, and some men too, of course - I don't mean to limit it

15   either as victims or knowledge of victims only to women - but

16   we all, I mean, it's a truth in the world that women are much

17   more likely to be victims of sexual crimes.

18             And I think in fact the jury that we actually have

19   kind of illustrates a basis for my concern; that there may

20   be -- it just illustrates a basis for my concern that I don't

21   know, and I don't want to overly weight my own sense of what is

22   in the common knowledge and experience of jurors, because I'm

23   not sure an actual jury supports that based on what they

24   disclosed, which is just all we can go on, and that we would

25   all be better served by having jurors operate off a common set

P4BQeph2

1    of -- a common pool of testimony, whether they reject -- I

2    mean, again, as I've said, I think there would be ample cross

3    for such a witness and that you would -- both sides would have

4    arguments to be made in closing about whether Dr. Rocchio's

5    testimony illuminated or did not illuminate something about

6    this case.

7         MR. ARTHUS:  I think I can get to the heart of our

8    concern probably --

9         THE COURT:  Again, I'm not trying to cut you off.  I

10   think we should all operate off the same set of facts.

11        MR. ARTHUS:  Yes.  There is a heart of our concerns,

12   which is, first the proposed testimony would involve

13   Dr. Rocchio saying things like:  Individuals often fear they

14   will get in trouble, fear that others will blame or judge them,

15   fear, shame, guilt, self-blame, confusion.

16        Evelyn testified to none of those things, and there's

17   a concern that if that is introduced into this trial, the jury

18   may go into the back and start asking themselves, well, Evelyn

19   didn't testify to those things, but maybe that's what she was

20   experiencing.  And there is no effective way for us to

21   cross-examine Dr. Rocchio about that.

22        And the reason is this:  I can't good ask those

23   questions that the Court posed because I don't know what the

24   answers are.  Dr. Rocchio falls back -- and I've read through

25   all of her prior testimony.  She falls back on the literature

P4BQeph2

1    she's reviewed, her interviews with patients. And, I mean -- I

2    don't mean this disrespectfully. I just mean this in looking

3    at her expert testimony, I think I found one instance where she

4    actually answered yes or no. Like it's sort of like the Al

5    Hernandez; everything goes in a paragraph. I can't ask her are

6    there situations where a teenager might be in a romantic

7    situation. Her answer to that may very well be extraordinarily

8    damaging to us. And it would be borderline malpractice for me

9    to ask that question on cross not knowing what the answer is

10   because I have not had exposure to the full range of literature

11   that she's read or patients that she's interviewed. I can't

12   ask her that because I don't know what the answer is.

13              So the only way I can challenge it is basically

14   challenging she's getting paid a lot of money and hasn't met

15   the victims here, the alleged victims here, and that's not

16   going to be that effective with the jury, because the jury is

17   going to go back and they're going to say a psychologist

18   testified to all these phenomena that a lot of other children

19   had, and maybe Evelyn has those too, but that's not what Evelyn

20   said. Evelyn said I didn't tell because I wanted to protect my

21   friend, I don't trust the police, and I was waiting basically

22   for my mom to ask and to tell her. This is barely even a

23   delayed disclosure in the case. It's delayed disclosure in the

24   sense that she didn't make an immediate report; that she said

25   she told Violet the day they got out of Mr. Ephron's apartment.

P4BQeph2

1          THE COURT:  Right, but much of the extensive portions

2     of the cross -- which is no criticism; you're doing an

3     excellent job Ms. Gallicchio -- were about the many

4     opportunities that Evelyn would have had to get help from law

5     enforcement if she had sought to do so during the time that she

6     was at Mr. Ephron's apartment, and she did testify a couple of

7     times to like "I felt trapped.  I didn't know what else to do.

8     I thought of things to do, and I sort of tried to do them but

9     they didn't work out."  Or at one point I think she said, you

10    know, as to like the last occasion of a forcible rape

11    allegation that -- I'm sorry, sir.  Are you here for the tennis

12    hearing?  It's going to be in 110.  We are obviously going to

13    be starting a little bit late, but it's going to be in 110.

14    You're welcome to stay here, but you had a tennis hearing look

15    about you, so I thought I would help you out.  Okay.  Thank

16    you.

17          Likewise, sir.  Are you here for the tennis hearing?

18          UNIDENTIFIED PERSON:  No, I was just auditing.

19          THE COURT:  You're welcome to stay.  I have another

20    matter in a different courtroom that I expect a lot of

21    reporters you're welcome to stay.  It's only that I want to

22    make sure that people who are interested in the tennis hearing

23    are in the right place.  Okay.

24          (Off the record)

25          THE COURT:  I think on the last instance, she -- after

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    they left the precinct and went back with Mr. Ephron to his

2    apartment, she said something like, "Well, at that point I had

3    given up, and I guess I just thought this is going to happen no

4    matter what."

5            MR. ARTHUS:  Yeah.

6            THE COURT:  "And there's nothing I can do about it."

7    So I'm not sure -- I raise those things because I'm not sure I

8    agree that there isn't testimonial evidence of sort of a range

9    of influences, motivations, and all of that.  And I recognize

10   that your argument is, fine, she testified to those things.  A

11   jury can evaluate it and decide whether they agree or not.  But

12   I think it doesn't really solve for me this core issue is that

13   I think it is a truth in the world that it is extraordinarily

14   common for victims of sexual crimes to not go to the police, to

15   not tell even their closest family and friends about what

16   happened, and that that is factual information that is

17   relevant -- I mean, if the parties want to work out a

18   stipulation to that as a fact, I will entertain it.  I'm not

19   sure the government would agree, but, at bottom, I just can't

20   get past or I have an abiding concern about the fact that that

21   is a fact in the world, and I remain uncertain about the extent

22   to which it is a fact that is in the common knowledge of jurors

23   in the way that like it is common knowledge that, you know,

24   people might be willing to lie about someone to get a benefit

25   for themselves or many of the other types of situations that I

P4BQeph2

1    think courts have pretty consistently held.  Like, yes, make

2    your arguments.  Everyone can understand why someone would lie

3    to get a benefit for themselves, just as one example.

4            But I think this fact, which I don't think the defense

5    is really disputing, I'm not sure that -- I remain unsure as to

6    whether my sense that I know that to be true is truly common

7    knowledge.  I really have serious concern about that.  And a

8    serious concern that because that knowable fact is not part of

9    this record might be something that the jurors have wildly

10    different experiences of or views about that without some

11    evidence about that and your ability to test it through

12    cross-examination, and I don't agree that you -- what could I

13    possibly ask her?  It's too risky.  I reject that.  I'll write

14    the cross-examination for you and give it to you.  I know you

15    don't want me to.  I'm just -- for the record, I'm just being a

16    little bit flip about that.  But I will -- just step aside,

17    Mr. Arthus, I'll do it myself.

18            I do think that there is fertile cross that you can do

19    without eliciting answers that are unduly prejudicial to your

20    client.  And that even a three-question cross might be

21    extraordinarily effective in getting the information that you

22    would want so that you can tell the jury:  "Whatever

23    Dr. Rocchio told you, it doesn't help you at all to decide this

24    case."

25            I'm not saying I think that's true, but I think it is

P4BQeph2

1    certainly possible to develop through cross-examination the

2    ability to make that argument.  But I don't see another way

3    that a knowable fact, which I think is highly relevant to both

4    parties, both sets of lawyers' views of this case, to have it

5    happen in open court and allow the jurors to then accept it,

6    reject it, decide, okay, that's a fact, but that doesn't

7    help -- you know, I don't -- I, nonetheless, am weighing that

8    fact and coming to my own assessment of these facts here and

9    the witness's credibility and all of that.

10            And so I -- I guess it would be helpful to me,

11   Mr. Arthus, to understand what your answer is to that.

12            MR. ARTHUS:  Yes.  And I think that really gets to the

13   heart of the matter for us, which is we're not in any way

14   asserting nor are we going to assert to the jury that delayed

15   disclosure does not exist; that people wait to delay.  We're

16   not going to make that argument.  What the heart of the matter

17   here for us is, is that our argument is that the reasons Evelyn

18   provided, they're not counterintuitive.  A juror will

19   understand when someone who -- if they've credited Evelyn's

20   testimony, someone felt that they were held captive, couldn't

21   escape, would not feel the ability to call the police.  A juror

22   will understand that someone with Evelyn's background with the

23   way that she behaved when the police showed up, may not trust

24   the police to tell them that.  They will understand that.

25            If Dr. Rocchio comes in and starts proposing -- I

P4BQeph2

1    think this is the what we're most concerns about.  If she comes

2    in and starts proposing alternative probable explanations that

3    Evelyn did not give, that's where we start to worry that that

4    is put in the jury's mind.  I don't think it's the matter of

5    Dr. Rocchio coming in and saying sometimes people don't

6    disclose.  I don't think we would contest that fact.  It's the

7    alternative explanation she would provide, which are things

8    like same, self-blame.  Maybe there were things Evelyn

9    experienced but she didn't testify to them.  They both would be

10   alternative explanations and they would be prejudicial

11   explanations because they could engender sympathy in a way that

12   is just being injected by an expert here.  That is the heart of

13   our concern is the alternative explanations that could be

14   offered; that particular portion of Dr. Rocchio's testimony.

15           If it was just she got up there and testified:  A lot

16   of teenagers don't report it, I don't think I would even

17   cross-examine her on that because that's clearly true.  It's

18   the alternatives.

19           THE COURT:  Mr. Allison.

20           MR. ALLISON:  Thank you, your Honor.

21           Dr. Rocchio just getting up there and saying a lot of

22   teenagers don't report is not enough substance for the jury to

23   understand the nature of her opinions and what she's saying.  I

24   simply don't agree with Mr. Arthus that Evelyn didn't provide

25   explanations that are consistent with what Dr. Rocchio is

P4BQeph2

1    talking about.  For example, Evelyn said that she didn't tell

2    her mother until after she stopped eating and stopped drinking,

3    and her mother noticed it and then asked her about it, which is

4    consistent with feeling shame and embarrassment about what

5    happened.

6        You know, she described concerns about being believed

7    by Violet and others if she were to say what Shy was doing to

8    her in the moment.  So she did describe those feelings.  And to

9    the extent that Mr. Arthus thinks that, you know, Evelyn's

10   descriptions of her reasons for not providing disclosure don't

11   map on to exactly or don't map on to what Dr. Rocchio is

12   saying, then go ahead in closing argument and say Evelyn didn't

13   say any of that.  That wasn't any of the reason for her failing

14   to disclose.  She's really failing to disclose because she was

15   lying or whatever.

16       But it's not the case that Evelyn didn't say anything

17   that's consistent with what Dr. Rocchio would say are reasons

18   for failing to provide disclosure.  The issue is teed up by the

19   defense, as you noted, and Dr. Rocchio needs to be able to

20   provide some substance to explain this phenomenon to late

21   disclosure so the jury can properly understand what she's

22   talking about.

23       THE COURT:  Okay.  I am going to allow the testimony

24   for all the reasons that I have described today and described

25   originally in reserving on this issue.  I want to be absolutely

P4BQeph2

1    clear that the testimony has to be limited in the ways that

2    I've set out today.

3            The other issue that I reserved on at the time of the

4    original Daubert ruling about memory and the ways that trauma

5    or sexual assault can affect memory, I'm not going to allow

6    that.  I don't think -- I don't have the same concerns that

7    I've described as to that issue and I don't think any expert

8    testimony on that would be helpful to the jury or to the

9    parties.  So I do think it has to be tightly cabined in the way

10   that I've described today, and I'm certainly happy to police

11   that, and, you know, I will give you some latitude on cross,

12   Mr. Arthus, or whoever is going to do the cross, to elicit all

13   the things that I think are relevant under the Supreme Court's

14   ruling in *Diaz* that, you know, the fact that some people act --

15   some people who are in certain situations act in a certain way,

16   may or may not tell you anything about the actions of a

17   particular person and a particular factual circumstance, but I

18   do think that cabined in the way I've described, that that

19   testimony can be well and adequately tested by

20   cross-examination, and to put before the jury whatever

21   consideration or weight they want to give to it an issue that

22   has happened in open court, is tested by cross and allows

23   counsel for both sides to make whatever arguments in closing

24   that they think are appropriate for the jury both about the

25   weight they should give to Dr. Rocchio's testimony, if any, as

P4BQeph2

1    well as how it does or does not bear on what the evidence and

2    testimony from the witnesses has been.  But I just think on

3    balance that the limited testimony fits within Daubert, which

4    is to ensure that all parties -- you know, that the evidence

5    that anyone is asking the jury to rely on, inferences they're

6    asking them to drawer based on what actually occurred in court

7    and not our own collective projections onto what might be

8    within a juror's common experience or life experience because,

9    as I've said, I'm troubled by not projecting my own life

10   experience and assuming that it is widely shared by the jurors.

11          So that's my ruling.  I understand you have all your

12   objections preserved, Mr. Arthus.

13          MR. ARTHUS:  So just so I know, it's basically the

14   last paragraph on page 8 and the statistical information,

15   that's what the testimony is limited to.

16          THE COURT:  Well, I mean, I put it in my own words at

17   the outset of this discussion of the issue of, you know, how

18   common based on both the academic literature and her own

19   treatment experience is it for adolescent or adult victims of

20   sexual crimes to not go to law enforcement, not seek medical

21   attention, not tell a variety of important people in their

22   lives about the crime or not to do so right away.  And then to

23   put, you know, some sort of the next concentric circle out from

24   that on what, based on academic literature and her own

25   experience, are some of the reasons or operative factors or

P4BQeph2

1    reasons that exist among this population as to why they would

2    not seek help from law enforcement, medical attention, tell

3    their closest associates or family members or only do so after

4    some amount of delay.

5         I think those topics are included within the

6    government's prior disclosure, to be clear, but I -- rather

7    than identify it in the language of the government's

8    disclosure, I think it's more helpful and clear for me to say

9    these are the topics on which I -- that are encompassed within

10   the prior notice, but on which I believe my ruling permits her

11   to testify and nothing outside of that.  Obviously you know

12   they'll have to elicit her experience and background for the

13   702 ruling, but her substantive testimony should be limited to

14   those topics.

15        Anything else we need to take up today?

16        MR. ARTHUS:  Just the request to charge we'll put that

17   in writing so we don't eat up --

18        THE COURT:  I'm sorry, as to which issue?

19        MR. ARTHUS:  There was just a couple of things that we

20   omitted to ask to be added.

21        THE COURT:  If it's quick, do you want to just tell me

22   now, Mr. Arthus, because I've kept the tennis people waiting.

23   They can wait another five to ten minutes.

24        MR. ARTHUS:  We requested a charge on defendant's

25   statements in our requests to charge since those were