

1140 Avenue of the Americas, 17th Floor, New York, NY 10036
phone: 212-257-4880
www.shapiroarato.com

Alexandra A.E. Shapiro
ashapiro@shapiroarato.com
Direct: 212-257-4881

June 7, 2025

**VIA ECF**
Hon. Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *United States v. Combs*, 24-cr-542 (AS)

Dear Judge Subramanian:

      The defense respectfully submits this letter in support of its renewed motion for a mistrial based on prosecutorial misconduct.

      When the introduction of perjured testimony results in a criminal conviction, and "the prosecution knew or should have known of the perjury, the conviction must be set aside 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (cleaned up); *accord United States v. Walters*, 910 F.3d 11, 29 (2d Cir. 2008). Moreover, "the prosecutor's knowing use of perjured testimony can violate the Due Process Clause even if it only undermines a witness's credibility." *United States v. Cromitie*, 727 F3d 194, 221-222 (2d Cir. 2013) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). As the Supreme Court has explained, "[a] lie is a lie, no matter what its subject, and, *if it is in any way relevant to the case*, the district attorney has the responsibility and duty to correct what he knows to be false and [to] elicit the truth." *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959) (emphasis added).

      As explained below, in this trial the government has presented testimony that it knew or should have known was materially false related to its allegation that Mr. Combs dangled Bryana Bongolan from the balcony of Cassie Ventura's apartment in September 2016. Accordingly, to avoid an unfair conviction in this case the Court should grant a mistrial.

      The government contends the alleged balcony incident is relevant because "it shows Mr. Combs's violence directed not only to Ms. Ventura, but to other people around Ms. Ventura. She is aware of this violence, and because of her awareness," it "goes to coercion." Tr. 4430-31. The incident, as alleged, is disturbing and powerful evidence, and the government has used it to depict Mr. Combs in an extremely negative light, as an angry and dangerous man who terrified Ms. Ventura and her friends.

Hon. Arun Subramanian
June 7, 2025

Page 2

      The prosecutors elicited evidence about this allegation from both Ms. Ventura and Ms. Bongolan that is demonstrably false in key respects. They then doubled down, using this false testimony to obtain a ruling admitting inadmissible hearsay evidence about it as well, all to present a false narrative to the jury.

      The government started by eliciting testimony from Ms. Ventura about the allegation that cannot be true. Ms. Ventura said she actually *saw* Mr. Combs holding Ms. Bongolan over the balcony railings. Tr.802 ("I *saw* him bring her back over the railing of the balcony and then throw her onto the patio furniture."). Yet the prosecutors knew she had not actually seen what she described—because they had in their possession a text conversation demonstrating that Ms. Ventura was told about the alleged incident by another (unidentified) person. *See* GXC-361-C ("Hey I just found out some crazy shit"; "I'm just finding out right now"). Nonetheless, they allowed Ms. Ventura to continue to insist on cross she had witnessed this incident. *See* Tr.1069 ("Q. And you testified that you saw him throw her onto the patio furniture, right? A. Yup. He brought her back over the balcony and he threw her down."). She persisted in this story even after she was confronted by the text messages. *See* Tr.1071 ("Q. Isn't it true that you learned about this incident on the balcony after the fact? A. I saw what I saw. So I don't know. Q. Has the government, in your preparation for your testimony in this case, gone over this message with you? A. Not this one, no.").

      Thus, the government left the jury with the false impression that Ms. Ventura saw Mr. Combs dangle her friend over the balcony and that this made her fearful of him, when in fact—if there was any incident—Ventura merely heard about it afterwards, considerably lessening any probative value as to her state of mind.

      Next, the government doubled down by presenting perjured testimony from Bongolan intended to corroborate Ventura's false testimony.[1] Bongolan claimed Combs lifted her up and held her feet on the balcony railing, Tr.4285-86, and that this caused injuries to "the back of my leg, and back and neck pain," Tr.4253.[2] Bongolan was very definitive about these injuries, and particularly the bruise to her leg, which was one of the details that "stick out in her mind":

---

[1] As the government also knows, like other witnesses in the case, Ventura and Bongolan have been in frequent contact at key points and have had many opportunities to collaborate on their stories—and in fact, Bongolan admitted the two friends discussed this incident before and after Ventura filed her lawsuit. Tr.4349-50. Bongolan also has an enormous financial motive to lie, because she filed a $10 million lawsuit against Mr. Combs based on this same allegation and will benefit by exaggerating the scope of her injuries to obtain damages.

[2] Her account makes no sense and seems to be physically impossible. Mr. Combs is only about six feet tall, and even if he is "bigger" than her, Tr.4286, he is not tall enough to have been able to hold a shorter adult by her armpits so high that her feet would have been on the balcony railing, as Bongolan testified, Tr.4286. California law required balcony railings to have a minimum height of 42 inches. *See* 2016 California Residential Code, Chapter 3, R312.1.2.

Hon. Arun Subramanian  
June 7, 2025

Page 3

> Q. Where did you go after you left Cassie's apartment?
>
> A. I went to my apartment.
>
> Q. What did you do at your apartment?
>
> A. I was shaking a lot, and then I -- I wanted to take a shower because I felt disgusted, and then I look over behind my leg, and I see a huge bruise.
>
> Q. We'll talk about the bruise in just a moment. Ms. Bongolan, do you remember all the details of the incident that night?
>
> A. No.
>
> Q. Do the details that you've talked about stick out in your mind?
>
> A. Yes.
>
> Q. What, if any, physical injuries did you have as a result of that night?
>
> A. I had a -- that big bruise with like a -- it was like a piercing in the middle of it, and then I had back and neck pain, and--

Tr.4289.

    The government next introduced photographs of the injuries Ms. Bongolan supposedly sustained at the hands of Mr. Combs, including GX3S-102A, a photo depicting the leg injury taken on September 26, 2016, at 9:45 a.m. Ms. Bongolan testified that she took the photos of her leg injury "around the time" indicated in the exhibit, Tr.4291, that she did so "the same day" as the incident, and that she "g[o]t that injury…From being thrown on to the balcony furniture." Tr.4290. On cross, she confirmed that the "balcony incident happened early in the morning," that the photo of the leg bruise "was taken later that day," Tr.4475, and that the injuries to her back and her leg "happened on the same day." Tr. 4477. The government then introduced photographs of the injuries supposedly sustained at the hands of Mr. Combs during the incident.

    The government knew or should have known this testimony was perjured, and that Ms. Bongolan could not possibly have been injured by Mr. Combs on a Los Angeles balcony in the early morning hours of September 26, or even the day before that. The government has long known that Mr. Combs was on the East Coast in late September, and specifically at around the time of this alleged incident. The government knew that he had stayed at Trump Hotel in New York City between September 24-29, 2016. In fact, the government had marked as GX7Y111 the records of this hotel stay, which are now in evidence. And it has had other evidence in its possession for some time showing Mr. Combs's travel schedule and proving that he was on the East Coast when it told the jury he dangled Ms. Bongolan over a balcony in front of Ms. Ventura.

[redacted]

Hon. Arun Subramanian
June 7, 2025

Page 4

[3]

 What's more, when the defense began to expose the perjury on cross-examination, the government repeatedly attempted to disrupt the cross with unfounded objections and requests for sidebars, *e.g.*, Tr.4489, and unfounded claims, such as that proper leading questions meant defense counsel was "testifying." Tr.4482. Then, despite having elicited Ventura's false testimony about having directly witnessed the alleged incident, the government persuaded the Court to admit the hearsay text messages with Khorram describing what Ventura had "found out" from someone else—despite having elicited perjurious testimony from Ventura claiming she saw the alleged conduct. All of this was highly improper, and exacerbated the harm caused by suborning the perjured testimony.

 It bears emphasis that the use of the perjured testimony regarding the balcony incident is just one example of prosecutorial misconduct during this trial. The defense previously moved for a mistrial based on the improper line of questioning related to the 2012 destruction of fingerprints provided by Scott Mescudi to the LAPD. As the Court will recall, the defense argued that the government's motive in eliciting this testimony was to create an unfounded and highly prejudicial inference that Mr. Combs somehow had corruptly arranged for the destruction of the fingerprints. The government claimed that was not the purpose of its questions, Tr.1902, and the Court denied the motion, Tr.1903-04, and instead gave a narrow limiting instruction.

 However, it became apparent shortly thereafter, during the questioning of Mia *the very next day*, that in fact the government's motive all along must have been to suggest that Mr. Combs had corrupt influence over the LA authorities when it tried to create the impression that he was responsible for the destruction of the fingerprints. Specifically, the government elicited testimony from Mia about two incidents in which the LAPD did not issue a ticket for speeding after she was pulled over, because the officers found out she worked for Mr. Combs. In one case, Mia got pulled over speeding, "name dropped" that her boss was Mr. Combs, and got him on the phone, after which the officer was "saying like, oh, my God, Puff Daddy, I love you, like just went into this whole very excited conversation, and then she let me go." Tr.3345. The second

---

[3] Moreover, a simple google search confirms Mr. Combs was on the East Coast performing. *See, e.g.*, Puff Daddy's Bad Boy reunion tour ignites Newark, despite B.I.G. hole (Sep. 26, 2016), https://www.nj.com/entertainment/music/2016/09/puff_daddy_diddy_nj_bad_boy_newark_2016_concert_re.html.

Hon. Arun Subramanian
June 7, 2025

Page 5

time Combs was in the car, and "once they saw Puff, they were like, oh, my bad, yeah, and left us alone." Tr.3346. The prosecutor took special care to emphasize that these incidents occurred in Los Angeles. Tr.3346 ("Q. What city did these interactions with the police occur in? A. LA."). These incidents, in isolation, seem like benign examples of police giving lenient treatment to popular famous people. Coupled with the sinister implications of the fingerprint destruction, however, they create a strong implication that the reason Mia (and as the government will surely argue, other alleged victims) didn't go to the police was because of Mr. Combs's corrupt influence over the police, and the LAPD in particular. In other words, the subsequent questioning of Mia, even if itself permissible, further corroborates that the government's real purpose in its questioning of the fire inspector, Lance Jiminez, was to improperly suggest that Mr. Combs corruptly caused the destruction of the fingerprints. This constitutes another instance of prosecutorial misconduct.

Accordingly, the Court should grant a mistrial based on prosecutorial misconduct.

Respectfully submitted,

/s/Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Jason A. Driscoll
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Fl.
New York, NY 10036
(212) 257-4880
ashapiro@shapiroarato.com
jdriscoll@shapiroarato.com

Marc Agnifilo
Teny Geragos
AGNIFILO INTRATER
445 Park Ave., 7th Fl.
New York, NY 10022
646-205-4350
marc@agilawgroup.com
teny@agilawgroup.com

Anna Estevao
HARRIS TRZASKOMA LLP
156 West 56th St., Ste. 2004
New York, NY 10019
(212) 970-6465
aestevao@harristrz.com

Hon. Arun Subramanian
June 7, 2025

                                      Brian Steel
                                      THE STEEL LAW FIRM, P.C.
                                      1800 Peachtree Street, Ste. 300
                                      Atlanta, GA 30309
                                      (404) 605-0023

                                      Xavier R. Donaldson
                                      136 Madison Ave, 6th Floor
                                      New York, New York 10016
                                      646-772-3334
                                      Xdonaldson@aol.com

                                      Nicole Westmoreland, Esq.
                                      WESTMORELAND LAW, LLC
                                      132 Cone Street, Suite A
                                      Atlanta, GA 30303
                                      Tel: (404) 446-2620
                                      nw@westmorelandlawgroup.com