

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

**Request To Be Filed Under Seal**

February 4, 2025

**BY EMAIL**

The Honorable Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:    *United States v. Sean Combs*, S1 24 Cr. 542 (AS)

Dear Judge Subramanian:

    The Government's Filter Team respectfully submits this letter ▇▇▇▇ ▇▇▇▇ which seeks the production of a cellphone belonging to the defendant ("Device-1"). The defendant has refused to comply ▇▇▇▇ on the ground that messages on a second device ("Device-2") that alerted the Case Team to the existence of the Device-1 are protected by attorney-client privilege.[1] The defendant is wrong. Based on the Filter Team's review of these messages, which are between the defendant and a non-lawyer member of the defendant's staff ("Staff-1"), the defendant cannot carry his burden to show the messages are privileged. The Court should reject any argument that ▇▇▇▇ the Case Team violated attorney-client privilege in relying on these messages.

    **I.**    **Background**

    On March 25, 2024, approximately five months prior to the defendant's arrest, law enforcement executed search warrants on, among other things, the defendant's Miami and Los Angeles residences, a private plane the defendant was traveling on, and the defendant's person.

---

[1] The Filter Team initially withheld from the Case Team two messages in the text chain as potentially privileged. The defense subsequently asserted privilege over additional parts of the chain, which the Case Team had relied upon ▇▇▇▇ Because the Court's privilege analysis will likely be informed not only by the messages seen by the Case Team, but also the messages withheld from the Case Team as potentially privileged, the Filter Team, in an abundance of caution, is briefing this privilege issue. In order to avoid any potential taint to the Case Team prior to the Court ruling on this privilege issue, the Filter Team respectfully requests that this letter be filed under seal, and that the defendant, his counsel, and the Filter Team be the only people who can access the under seal letter.

The search warrants authorized law enforcement to seize all electronic devices. Pursuant to the warrants, law enforcement seized dozens of devices, including all of the electronic devices found on the defendant's person and located in each residence.

On September 16, 2024, following the defendant's arrest, law enforcement executed another search warrant for the hotel room the defendant was occupying, seizing all electronic devices in the room, including an iPhone 11 (i.e., Device-2). Following Device-2's seizure, law enforcement extracted Device-2 and, consistent with the Government's practice in this case, provided a copy of the extraction report to the Filter Team. The Filter Team conducted a thorough review of Device-2—following the same protocol it has applied in its review of all of the electronically stored data in this case—segregated materials that may be subject to a claim of privilege, and provided the non-privileged portion of the extraction report to the Case Team.[2]

Device-2 contained a message chain between the defendant and Staff-1, which included a string of text, audio, and picture messages the defendant and Staff-1 exchanged on June 23, 2024 (the "June 23 Messages"), approximately three months after the searches of the defendant's residences. (*See* Ex. A). On June 23, 2024 at approximately 10:44 a.m. EDT, the defendant texted Staff-1: "Call me back. It's important. Good news I think." A few minutes later, at approximately 10:47 a.m., the defendant sent Staff-1 a voice note—an audio recording—telling Staff-1 that another member of his staff ("Staff-2") had located a cellphone in his residence (i.e., Device-1) and that the device contained information regarding a woman with whom the defendant had previously had a romantic relationship ("Female-1") during the charged conspiracy. Specifically, the defendant stated, in relevant part, the following:

> I don't know how in the world, but all of a sudden this phone [i.e., Device-1] just came up we found in the house, and it's the time from when me and [Female-1] went to the thing. So they [*sic*] got to be so much stuff on the hard drive of the phone, you know what I'm saying? And I'm gonna send you a picture of it so you can see and understand like, this could be a big breakthrough just because like, we didn't have the phone and, and this phone is just sitting there . . . And there just data wise has to be a lot of shit in that phone. I didn't, I didn't delete nothing out of the phone. I'm gonna send you a picture of it now.

(*See* Ex. A-1). The defendant, who was then residing in his Miami residence, sent Staff-1 a photograph of Device-1:

---

[2] A full forensic extraction of Device-2 was produced to the defense in the Government's second discovery production on October 16, 2024. As with all device extractions collected from the various searches, both the Case Team and the Filter Team invited the defense to identify any material over which the defendant intended to assert privilege so that the material could be segregated from the Case Team.



(Ex. A-2). Staff-1 did not respond.

Approximately six hours later, at around 5:27 p.m. EDT, the defendant sent a text message to Staff-1: "Hey are you ok. Just let me know you're safe." Two minutes later, at approximately 5:29 p.m. EDT, the defendant sent another text asking Staff-1 to have his lawyer, Teny Geragos, call him: "I have a 911 need Teny to call this phone asap IMPORTANT." An hour and a half later, at approximately 7:08 p.m. EDT, the defendant again texted Staff-1: "Send me tenys number. It's important she needs to know now. I can't play these games right now. I need to speak to my lawyer and I don't have the number just send me the number please like I can't even understand why you're not sending my lawyer number and I'm telling you I have something majorly important that I have to speak to my lawyer about." A minute later, at approximately 7:09 p.m. EDT, Staff-1 responded by sending the defendant Ms. Geragos's phone number. The defendant responded with the prayer hands emoji.[3]

During a screening review of the June 23 Messages, the Filter Team identified the 5:29 p.m. and 7:08 p.m. messages—where the defendant references Ms. Geragos—as potentially privileged. The Filter Team then redacted those messages and released the remaining messages to the Case Team (the "Redacted June 23 Messages"). After the Case Team reviewed the Redacted June 23 Messages, the Case Team ▮▮▮▮▮ demanding production of Device-1.

Based on the Filter Team's conversations with defense counsel, the Filter Team understands that the defendant is claiming that all of the June 23 Messages, i.e., from "Call me back" at 10:44 a.m. through the prayer hands emoji message, are protected by attorney-client privilege. Specifically, the defendant claims the messages are protected both by the defendant's personal attorney-client privilege, that is, the attorney-client relationship between the defendant

---

[3] Due to a technical issue, the prayer hands emoji is visible in certain renderings from the Cellebrite report for Device-2 but not in the PDF that is Ex. A.

and Ms. Geragos, as well as by the corporate attorney-client privilege held by the defendant's various business entities ("Combs Global"), by whom Staff-1 was employed and which Ms. Geragos also represents. The Government understands that Staff-1 served effectively as the defendant's personal assistant for both his personal affairs and Combs Global's business interests.

**II.     Applicable Law**

The attorney-client privilege protects communications: "(1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011). Its purpose is to "encourage[] clients to confide in their attorney fully and frankly, free from the apprehension of disclosure." *In re Six Grand Jury Witnesses*, 979 F.2d 939, 943 (2d Cir. 1992). "The privilege is intended to encourage clients to be forthcoming and candid with their attorneys so that the attorney is sufficiently well-informed to provide sound legal advice." *United States v. Adlman*, 68 F.3d 1495, 1499 (2d Cir. 1995) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991)). Accordingly, the privilege "may be invoked to hold secret *only* those communications made in confidence to a lawyer to obtain legal counsel that would not have been made without the existence of the privilege." *Mejia*, 655 F.3d at 132 (emphasis added) (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976); *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)). That is because the privilege stands as an "exception to the testimonial compulsion for every witness' evidence," and "[g]enerally, all relevant proof is essential [for a] complete trial record" and for "confidence in the fair administration of justice." *Id*. Because of this tension, courts are to "apply the privilege only where necessary to achieve its purpose and construe the privilege narrowly because it renders relevant information undiscoverable." *Mejia*, 655 F.3d at 132.

A lawyer's involvement in a communication does not automatically shield the communication from discovery. *See* Rice, *Attorney-Client Privilege in the U.S.* § 7:1 ("The fact that a person consults with an attorney does not render everything he says to the attorney privileged"). Rather, "the key inquiry is whether the predominant purpose of the communication is to solicit or provide legal advice." *Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, No. 20 Civ. 10832 (AT) (SN), 2022 WL 2705396, at *2 (S.D.N.Y. July 12, 2022), *objections overruled*, 2022 WL 4584111 (S.D.N.Y. Sept. 29, 2022) (internal quotation marks omitted).

In the ordinary course, the attorney-client privilege does not apply to communications that, like here, do not directly involve an attorney and are between non-lawyers only. *Mejia*, 655 F.3d at 132. The Second Circuit has held, however, that "[u]nder certain circumstances … the privilege for communication with attorneys can extend to shield communications to others when the purpose of the communication is to assist the attorney in rendering advice to the client." *Id.* (citing *Adlman,* 68 F.3d at 1499). The Circuit has, for example, extended the application of the privilege to a communication between a client and an accountant engaged by the attorney to assist the attorney, reasoning that "[a]ccounting concepts are a foreign language to some lawyers in almost all cases, and to almost all lawyers in some cases" and therefore that "the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." *Kovel,* 296 F.2d at 922.

But the Circuit has repeatedly cautioned that the *Kovel* exception "has always been a cabined one." *Mejia*, 655 F.3d at 32. In order for privilege to extend to a third party under *Kovel*, the third party must be acting as an agent of the attorney, and the third party's involvement must be *necessary*—not merely useful—"to improve the comprehension of the communications between attorney and client." *United States v. Ackert,* 169 F.3d 136, 139 (2d Cir.1999); *see also Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000) (privilege applies only where the third-party agent "enabl[es] counsel to understand aspects of the client's own communications that could not otherwise be appreciated in the rendering of legal advice"). "[A] communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves *important* to the attorney's ability to represent the client." *Ackert*, 169 F.3d at 139 (emphasis added) (noting that *Kovel* recognized privilege where the accountant, in enabling the attorney to understand financial information conveyed from the client, played a role "analogous to an interpreter," such as in a case where the client and attorney speak different languages).

Although *Kovel*'s holding applies to attorney-hired agents only, and the *Kovel* court expressly noted it was not addressing the situation where the *client* hired an agent and communicated with that agent "for the purposes of subsequent communication by the [agent] to the lawyer," *Kovel*, 296 F.2d at 922 n.4, other courts in this District have found that "it follows from *Kovel*" that an agent of a client who communicates *with* the client's attorney for the *purpose* of legal advice on behalf of the client should be treated just like the client and those communications can be protected by attorney-client privilege. *Benedict ex el. Duke & Benedict, Inc. v. Amaducci*, No. 92 Civ. 5239 (KMW), 1995 WL 23555, at *1 (S.D.N.Y. 1995). Courts in this District have applied this extension of *Kovel* both in the context of the corporate privilege, as "corporations … can act only through their agents," and in the context of individual client agents, so long as the agency relationship and communication at issue in individual client cases were both for the "purposes of seeking or receiving legal advice." *La Suisse, Societe d'Assurances Sur Law Vie v. Kraus*, 62 F. Supp. 3d 358, 364-65 (S.D.N.Y. 2014) (collecting cases).

Critical to this extension of *Kovel* to the client's agents, however, is that, like *Kovel* itself, it is limited to situations where it is *necessary* for a client to consult with his agent, or for corporate employees to consult with each other, in order to communicate with an attorney, in addition to satisfying all the other elements of attorney-client privilege. *See, e.g.*, *In re Grand Jury Proceedings Under Seal*, 947 F. 2d 1188, 1190-91 (4th Cir. 1991) (citing *Kovel*, 296 F.2d 918 at 922 n.4); *Cuno, Inc. v. Pall Corp.*, 121 F.R.D. 198, 203 (E.D.N.Y. 1988). "The available case law indicates that the 'necessity' element means more than just useful and convenient, but rather requires that the involvement of the third party be *nearly indispensable* or serve some specialized purpose in facilitating the attorney-client communications." *Nat'l Educ. Training Grp., Inc. v. Skillsoft Corp.*, No. M8-85 (WHP), 1999 WL 378337, at *4 (S.D.N.Y. June 10, 1999) (emphasis added) (collecting cases).

Accordingly, the Second Circuit has explained that "[w]hat is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer*." *United States v. Krug*, 868 F.3d 82, 87 (2d Cir. 2017) (quoting *Kovel*, 296 F.2d at 922) (emphasis in original). Under that strict standard, courts routinely hold that the privilege does not apply to communications merely because non-attorneys discussed contacting an attorney in

connection with an issue. *See, e.g., U.S. ex rel. Schutte v. Supervalu, Inc.*, No. 11 Civ. 3290, 2018 WL 2416588, at *2-3 (C.D. Ill. May 29, 2018) (applying federal privilege law); *accord The Sols. Team, Inc. v. Oak Street Health MSO, LLC*, No. 17 Civ. 1879, 2020 WL 30602, at *4 (N.D. Ill. Jan. 2, 2020). Indeed, the privilege does not necessarily apply even where "it was evident that legal advice would later be sought concerning the issues discussed" by the non-lawyers. *Duttle v. Bandler & Kass*, 127 F.R.D. 46, 52 (S.D.N.Y. 1989). "[D]iscussions that anticipate a privileged communication are not themselves privileged. To hold otherwise would expand the attorney-client privilege without limit, since countless communications … could be considered preparatory to seeking legal advice." *Id.* That rule makes good sense because, where the communication is not "a confidential communication with [an] attorney" nor a "confidential communication about legal advice," "shielding the [communication] does not protect full and frank communications with the attorney." *Schutte*, 2018 WL 2416588, at *2; *accord Krug*, 868 F.3d at 87 (holding privilege did not apply to statements made from one co-defendant to another that (i) were not made for "the purpose of obtaining legal advice from a lawyer"; (ii) did not "share … advice given by a lawyer"; (iii) nor "seek to facilitate a communication with a lawyer").

The burden of establishing attorney-client privilege, and all of its elements, rests with the party asserting it. *See United States v. Correia*, 468 F. Supp. 3d 618, 621 (S.D.N.Y. 2020) (citing *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir. 1997)); *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987). That burden is not satisfied by mere "conclusory or ipse dixit assertions." *United States v. Ghavami*, 882 F. Supp. 2d 532, 536 (S.D.N.Y. 2012).

### III. Discussion

Based on the information available to the Filter Team, which does not have access to any *ex parte* filings the defendant may submit, the defendant cannot carry his burden to show that the June 23 Messages are protected by either his personal attorney-client privilege or any purported privilege of the defendant's business enterprises.[4]

As an initial matter, there is no dispute that the June 23 Messages are neither to nor from a lawyer. The defendant was texting with Staff-1, his employee and personal assistant, who is not an attorney. Accordingly, unless the defendant can show that this communication falls within one of the "cabined" exceptions recognized by the Second Circuit in *Mejia*, his claim of attorney-client privilege fails to clear the starting gate. He cannot.

Nothing about the nature of the June 23 Messages that revealed the existence of Device-1 suggests they were made by the defendant for the purpose of obtaining or providing legal advice

---

[4] The Filter Team is assuming *arguendo* that the corporate privilege asserted on behalf of Combs Global may have some relevance here, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. It seems unlikely that the defendant could carry his burden to prove that, on June 23, 2024, he was seeking legal advice on behalf of Combs Global, as opposed to himself personally, but, as discussed *infra*, his claim of privilege in his texts to Staff-1 fails under either a corporate or individual-agent theory.

from or through Staff-1, either for himself or for his companies, as the defendant must show to sustain his claim. *Adlman,* 68 F.3d at 1499. Read from the beginning of the day to the end, the June 23 Messages make clear what happened on June 23, 2024: the defendant was surprised to learn that Staff-2 had discovered Device-1 in his home. He reached out to his confidant and personal assistant, Staff-1, to tell Staff-1 what he had learned. But he was not soliciting Staff-1's advice on what to do, asking Staff-1 for additional information to put this discovery in context, or asking Staff-1 to tell his lawyer what had happened on his behalf. He did not ask Staff-1 in any way to communicate the substance of Device-1's discovery to his lawyer.

Instead, hours after sending the audio message and photo of Device-1 to Staff-1, the defendant asked Staff-1 to have his lawyer reach out to him, and, later, provide him with his lawyer's phone number. The defendant merely said he needed to talk to his lawyer about something "important." He did not say what that important thing was; he did not expressly link it to the discovery of Device-1. But even assuming *arguendo* that what was "important" was Device-1, all he asked Staff-1 to do was to put him in touch with his lawyer, which Staff-1 did when Staff-1 provided the defendant with Ms. Geragos's phone number.

That the June 23 Messages were not sent for the purpose of seeking legal advice can be illustrated through two counterfactuals. First, imagine that the defendant *never* told Staff-1 about Device-1 but merely asked Staff-1 to have Ms. Geragos call him or provide him with Ms. Geragos's phone number to discuss an important matter. Nothing would have changed about the purpose of the defendant's interactions with Staff-1, that is, Staff-1 still could have connected the defendant and Ms. Geragos. *See, e.g.*, *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 431 (S.D.N.Y. 2013) (holding no privilege applied to communications between client and public relations firm as client had not shown public relation's firm "involvement was necessary to facilitate communications between himself and his counsel, as in the case of a translator or an accountant clarifying communications between an attorney and client"). Indeed, the Second Circuit noted this very point in dicta in *Mejia*: nothing prevented the defendant there from telling his sister that he had "an important message to relay to his attorney … without specifying its content." *Mejia*, 655 F.3d at 134.

Second, imagine that the defendant had told Staff-1 about Device-1, but never followed up with a request to speak with Ms. Geragos, that is, the Case Team's understanding from the Redacted June 23 Messages. Again, nothing about the nature of the communications regarding Device-1 would have been necessary to solicit legal advice on behalf of the defendant or his companies. Staff-1 had nothing to offer on that score—she is simply the defendant's personal assistant, and she was not present when the device was found. The defendant's decision to inform Staff-1 of facts as they unfolded does not make those communications privileged, even if it was obvious to both the defendant and Staff-1 that the defendant needed to talk to his lawyer. *See Comtide Holdings, LLC v. Booth Creek Mgmt. Corp.*, No. 2:07 Civ. 1190, 2010 WL 5014483, at *3 (S.D. Ohio Dec. 3, 2010) (a "loose connection" between the document and the fact that the client later sought legal advice on the same issue is insufficient to show the communication was made for the purpose of obtaining legal advice); *accord Adlman*, 68 F.3d at 1500 (holding no *Kovel* privilege applied where client had not shown that accountant's report was prepared for purpose of communicating with lawyers, as opposed to ordinary business tax advice); *Krug*, 868 F.3d at 87

(holding no common-interest privilege applied where defendant shared non-legal research with co-defendant).

This is also not a *Kovel*-like situation. Ms. Geragos did not retain Staff-1 herself for the necessary purpose of translating or interpreting information provided by the defendant or Combs Global, as *Kovel* and its direct progeny require. *See, e.g.*, *Ackert*, 169 F.3d at 139-40 (holding no privilege where company's lawyer consulted with company's investment banker about tax and legal implications of proposed transaction). Nor, under a more flexible reading of *Kovel* and related agency cases, did the defendant treat Staff-1 as either his agent or his companies' agent for the purpose of transmitting information to his attorney on his behalf to obtain legal advice. *See, e.g.*, *Benedict*, 1995 WL 23555, at *1. The defendant never instructed Staff-1 to contact his counsel and pass along the information he shared—the only instruction he gave Staff-1 was to tell Ms. Geragos to call him and to provide him with Ms. Geragos's number to discuss an "important" matter. Staff-1 acted as a mere telephone operator; she was not herself asked to either convey or receive information from Ms. Geragos. *Contra, e.g.*, *Abbott Labs. v. Airco, Inc.*, No. 82 C 3292, 1985 WL 3596, at *3-4 (N.D. Ill. Nov. 4, 1985) (holding attorney-client privilege applied to notes taken by secretary that either "transmit[ted] legal advice" or were "requests" for legal advice). Accordingly, it was not "necessary" for the defendant to share the discovery of Device-1 with Staff-1 in order to obtain legal advice from Ms. Geragos. *See, e.g.*, *Nat'l Educ. Training Grp..*, 1999 WL 378337, at *4 (holding no privilege where corporation's board discussed legal advice in the presence of investment banker and banker's associate, who took notes of conversation, as the associate's notes may have been useful, but were not "necessary to clarify, facilitate or improve" attorney's comprehension of attorney-client communications).

For similar reasons, the defendant's texts to Staff-1 cannot be protected as preparation for his communications with his attorney, either on behalf of himself or Combs Global. The key texts disclosing Device-1 were sent to Staff-1 hours before the defendant ever mentioned his attorney. There is nothing to suggest that it was necessary for the defendant to consult with Staff-1 about Device-1 before contacting Ms. Geragos. This was not an internal corporate memo prepared for a meeting with attorneys by multiple employees of a company. *See, e.g.*, *Tower 570 Co. v. Affiliated FM Ins. Co.*, No. 20 Civ. 0799 (JMF), 2021 WL 1222438 (S.D.N.Y. Apr. 1, 2021). Nor was this an "outline" of topics that the defendant was sending Staff-1 for her necessary review to either transmit to Ms. Geragos or add commentary on. *See, e.g.*, *United States v. Landji*, No. S1 18 Cr. 601 (PGG), 2021 WL 5402288, at *16 (S.D.N.Y. Nov. 18, 2021) (quoting *United States v. DeFonte*, 441 F.3d 92, 96 (2d Cir. 2006)). All the defendant claims privilege over is an excited audio message and photo the defendant sent to Staff-1 sharing the discovery of Device-1. That is insufficient. Even assuming *arguendo* the defendant was contemplating contacting Ms. Geragos at the time he sent the voice note to Staff-1, "[a] rule that recognizes a privilege for any writing made with an eye toward legal representation would be too broad. More is required." *Id.* The defendant cannot make that showing here.

IV. **Conclusion**

The defendant's claim of attorney-client privilege should be rejected ███████
███████████████████████████████████████████

                    Respectfully submitted,

                    DANIELLE R. SASSOON
                    United States Attorney

By:   /s/
                    Matthew R. Shahabian
                    Assistant United States Attorney
                    (212) 637-1046

cc: Marc A. Agnifilo, Esq. (by email)
    Jason A. Driscoll, Esq. (by email)
    Teny R. Geragos, Esq. (by email)
    Anthony L. Ricco, Esq. (by email)
    Alexandra A.E. Shapiro, Esq. (by email)

Enclosures