P5SsCOM1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA,
3
                   v.                        24 Cr. 542 (AS)
4
     SEAN COMBS,
5        a/k/a "Puff Daddy,"
         a/k/a "P. Diddy,"
6        a/k/a "Diddy,"
         a/k/a "PD,"
7        a/k/a "Love,"

8                   Defendant.              Trial
     ------------------------------x
9                                           New York, N.Y.
                                            May 28, 2025
10                                          8:38 a.m.
     Before:
11
                         HON. ARUN SUBRAMANIAN,
12
                                            District Judge
13                                          -and a Jury-

14                              APPEARANCES

15
     JAY CLAYTON
16        United States Attorney for the
          Southern District of New York
17   BY:  MADISON R. SMYSER
          EMILY A. JOHNSON
18        MAURENE R. COMEY
          MEREDITH FOSTER
19        MITZI STEINER
          MARY C. SLAVIK
20        Assistant United States Attorneys

21

22

23

24

25

P5SsCOM1

```
 1                          APPEARANCES
                           (Continued)
 2

 3   AGNIFILO INTRATER LLP
          Attorneys for Defendant
 4   BY:  MARC A. AGNIFILO
          TENY R. GERAGOS
 5          -and-
     SHER TREMONTE
 6   BY:  ANNA M. ESTEVAO
            -and-
 7   SHAPIRO ARATO BACH LLP
     BY:  ALEXANDRA A.E. SHAPIRO
 8          JASON A. DRISCOLL
            -and-
 9   XAVIER R. DONALDSON
     BRIAN STEEL
10   NICOLE WESTMORELAND

11   ALSO PRESENT:
     LUCY GAVIN, AUSA Paralegal Specialist
12   SHANNON BECKER, AUSA Paralegal Specialist
     RAYMOND MCLEOD, Defense Paralegal Specialist
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Trial resumed; jury not present)

2          THE COURT:  First, on the motion to strike

3    Mr. Mescudi's testimony, that motion is denied for the reasons

4    stated in the government's May 28 letter.

5          Primarily, the two arguments that the court found

6    persuasive were that, first, on cross-examination, the door was

7    opened to the type of testimony that was elicited on redirect

8    examination, and second, to the extent, as the court pointed

9    out yesterday, the question was proper.

10          So the objection was overruled.  To the extent that

11    the defense believed that the answer elicited was an improper

12    lay opinion, the time to raise that objection would have been

13    contemporaneous with the answer being given.  For the reason

14    that, at that time, if the court could have stricken the

15    testimony and permitted the government to reask the question or

16    rephrase the question to elicit testimony that was not even

17    arguably a lay opinion on the question of whether what was

18    elicited was an improper lay opinion, the court finds

19    persuasive the government's arguments concerning the context in

20    which the testimony was offered and the circumstances

21    surrounding the meeting at the Soho House and the meetings

22    between Mr. Mescudi and Mr. Combs in the immediate timeframe

23    preceding that meeting.

24          This was an instance in which the testimony, to the

25    extent it could be construed as an opinion, was plainly based

P5SsCOM1

1    on the circumstances of the meeting and the interactions

2    between Mr. Mescudi and Mr. Combs preceding the view being

3    solicited, including the handshake and the testimony concerning

4    that, that Mr. Mescudi offered without objection concerning the

5    end of that meeting.

6            So the motion to strike is denied.

7            As to the prior consistent statement issue, just

8    generally, because there is a lot of primary consistent

9    statements that are being offered here.  What is the response

10   from the government on the fact that the *Caracappa* case, which

11   is the principal authority cited, states in its discussion of

12   the parameters of 801(d)(1)(B) that it is required that the

13   opposing party be permitted an opportunity to cross-examine the

14   declarant on the statements being offered.  That's literally in

15   the statement in *Caracappa* about what the rule requires.

16           What's the response to that argument which is not

17   addressed in the government's letter?

18           MS. COMEY:  So, your Honor, with respect to Mr. Nash,

19   I think the answer is that the defense was on notice that

20   Mr. Nash had received statements from Ms. Ventura about the

21   fact that she was having sex with other men, and that she did

22   not want to do so, in 3500 that was produced well before trial.

23   And I think that includes 3500 from March of 2025, and the most

24   recent before Ms. Ventura's testimony was on May 10 of 2025.

25           I think that those, that 3500 does not purport to

P5SsCOM1

1    provide a specific transcript.  It does not purport to provide

2    every single word that the witness said, but it certainly put

3    the defense on notice that this witness was likely to testify

4    about conversations that he had with Ms. Ventura about the fact

5    that she was having sex with other men in front of the

6    defendant, that he was recording it, and that she did not want

7    to be doing that.

8             In particular, they were also on notice that Mr. Nash

9    may testify about similar conversations during Ms. Ventura's

10   29th birthday.  So they were on notice of all of that and could

11   have cross-examined her about all of those particular

12   statements --

13            THE COURT:  Let me get this straight.

14            Having not elicited testimony on direct examination

15   concerning particular statements, meaning, for instance, the

16   statement from Ms. Ventura to Mr. Nash, you're saying on

17   cross-examination the defense should elicit testimony

18   concerning those statements that the government did not get

19   into?

20            Doesn't that create a strange situation where the

21   cross-examination is forced to address issues that they don't

22   know whether the government is going to get into them or not,

23   which are outside of the scope of direct examination?

24            MS. COMEY:  So, I don't think so, your Honor.  I think

25   it would have been well within the scope of cross-examination.

P5SsCOM1

1           During the direct, taking the 29th birthday first,

2   Ms. Ventura on direct examination talked at some length about

3   her 29th birthday, talked about Mr. Combs showing up, talked

4   about how she didn't want to go, told him she did not want to

5   do that on her birthday, talked about, I believe, who was at

6   her birthday.  And I don't understand there to be any

7   requirement in *Caracappa* that we ask specifically, well, did

8   you tell Deonte, did you tell your friends that, other than

9   just asking her what she remembers from her 29th birthday and

10  what she remembers happening.

11          I don't know if she would have remembered that

12  statement.  I think that with respect to the 29th birthday, the

13  very least is sufficient, combined with the 3500 from Mr. Nash,

14  to put the defense on notice that there is a witness a prior

15  consistent statement.

16          So, for the 29th birthday, I think that that would be

17  totally appropriate.

18          THE COURT:  Did Ms. Ventura reference the statements

19  to Mr. Nash?

20          MS. COMEY:  No, your Honor.

21          In direct examination, she did not.  I do not think

22  she remembers them.  I Think if she had been asked, do you

23  remember having a conversation with Mr. Nash, I think she would

24  have said no, I don't remember that.

25          THE COURT:  All right.  So I'm just reading from

P5SsCOM1

1   *Caracappa.*  So within Rule 801(d)(1)(B), the prior consistent

2   statement need not be proffered through the testimony of the

3   declarant.  This is the line that the government relies on.

4           MS. COMEY:  Precisely, your Honor.

5           THE COURT:  Further, where the declarant has already

6   testified and the prior consistent statement is proffered

7   through the testimony of another witness, the rules subject the

8   cross-examination requirement is satisfied if the opposing

9   party is not denied the opportunity to recall the declarant to

10  the stand for cross-examination concerning the statement.

11          That's the completion of the Second Circuit's

12  articulation of the standard.  You would agree that's not

13  satisfied, right?

14          MS. COMEY:  I would agree that this witness cannot be

15  recalled to the stand.  I do believe that, again, as I thought

16  we had discussed before with respect to prior consistent

17  statements that we had offered in the past, if the defense was

18  on notice that there was a prior consistent statement that

19  might be offered from another witness, that the opportunity to

20  cross-examine them would be available if they had received that

21  3500 material before Ms. Ventura's testimony.  I thought we had

22  that discussion.

23          THE COURT:  We had a discussion with respect to a

24  prior witness that, in that circumstance, neither --

25          I mean, Ms. Ventura is not subject to recall.

P5SsCOM1

1          MS. COMEY:  No, she's not.

2          THE COURT:  In that instance, the 3500 material

3    relating to the statement in question had been produced, like,

4    that day.

5          MS. COMEY:  Yes, your Honor.

6          THE COURT:  It was very close in time.

7          MS. COMEY:  Yes, your Honor.

8          THE COURT:  With respect to Mr. Nash, the defense says

9    the statements, at least as they are articulated in the

10   government's letter, are not even in the 3500 material.  That's

11   a separate issue.  But I'm not sure, reading *Caracappa*, that

12   it's an independent basis to permit these statements coming in.

13   And you've read the case.  So they were both those issues that

14   were addressed and they were addressed together, the witness

15   was subject to recall and the statements were revealed in the

16   3500 material.

17         So it's hard to tell from *Caracappa* whether it

18   would -- the court would have found it satisfied if Kaplan was

19   not subject to recall.

20         MS. COMEY:  I understand, your Honor.  I think that

21   this could be short-circuited, though, by the fact that all of

22   statements we have proffered are also admissible to prove

23   Ms. Ventura's state of mind.  If we can focus on that, we don't

24   need to spend more time --

25         THE COURT:  You're not going to spend more time.

P5SsCOM1

1          I'm not going to allow these statements to come in

2    under the prior consistent statement rule for the reason that

3    Ms. Ventura can't be recalled.

4          Let's focus on state of mind.

5          MS. COMEY:  Thank you, your Honor.

6          THE COURT:  So, as for state of mind, let me ask the

7    defense, because I don't think this is addressed in the

8    response.  Why wouldn't, at the very least, statements

9    concerning Ms. Ventura's lack of desire to participate in

10   freak-offs not fall within 803(3)?

11         Put aside whether Mr. Combs was making her do it and

12   that coercion aspect, because I don't know if that falls within

13   state of mind.  But just the statement that Ms. Ventura, did

14   she want to do these?  No, she didn't want to do these.

15         That would seem to fall right within the rule, which

16   says, a statement of the declarant's then existing state of

17   mind, such as motive, intent, or plan, or emotional sensory or

18   physical condition, such as mental feeling, pain, or bodily

19   health.

20         So if we cut it off right there, and if the questions

21   were just about whether Ms. Ventura told Mr. Nash that she did

22   not want to participate in a freak-off that was happening right

23   then, then wouldn't that fall within the rule?

24         Again, put to the side the stuff about Mr. Combs

25   making her do it.  OK.

P5SsCOM1

```
 1          MR. DONALDSON:  Judge, I still think that it would
 2   have to be for its truth because that would be the only reason
 3   why it would be relevant for what they are trying to use it
 4   for.
 5          THE COURT:  It comes in for the truth if it falls
 6   within the exceptions.
 7          MR. DONALDSON:  I don't think it goes to --
 8          I'm sorry.  I don't think it goes directly to her
 9   state of mind as much as it goes to what someone else said.  I
10   don't know how Ms. Nash, saying what Cassie told her -- told
11   him about that specific statement, goes towards what Cassie is
12   thinking.  I don't think it goes to that.
13          THE COURT:  The government is going to ask it that
14   way.  I'm saying, on this view, if we cut it off right there,
15   the questions from the government are going to be very focused
16   on, you know, did Ms. -- I'm just giving an example -- did she
17   say anything about the place she was going, the hotel she was
18   going?  Yes, she did.  All right.  Did she say she wanted to go
19   to that hotel?  No, she said she didn't want to go to the
20   hotel.
21          Look at that, standing alone.
22          MR. DONALDSON:  OK.
23          THE COURT:  Why wouldn't that be state of mind
24   testimony?
25          MR. DONALDSON:  Did she say that she wanted to go to
```

P5SsCOM1

1    the hotel; yes or no?

2            I guess if it's looking backwards, maybe not.  If

3    she's answering a question about what she is about to do, I

4    don't think that goes towards what she is thinking as much as

5    what her actions are going to be.  I would argue it's not

6    towards her state of mind specifically, but more towards what

7    she is trying to do at that time, not actually what she's

8    thinking about doing.

9            So I don't think it goes to her state of mind.

10           THE COURT:  I don't think that that argument is well

11   taken in this context, but now let me turn back to the

12   government.

13           MS. ESTEVAO:  Can I add one point, your Honor?

14           THE COURT:  Yes.

15           MS. ESTEVAO:  I believe this also raises the same

16   issue about our inability to recall Ms. Ventura to ask her

17   questions about her state of mind at the time beyond she may

18   have made this statement to Mr. Nash, if she made it at all,

19   and about the foundational requirements for her state of mind

20   at the time.

21           And this wasn't raised in the government's direct --

22   sorry, I'm not sure if I'm making that noise --

23           THE COURT:  There's some problem with our microphones.

24   We'll get it fixed.

25           Please.

P5SsCOM1

 1          MS. ESTEVAO:  -- because this wasn't raised in the
 2   government's direct.  I didn't have an opportunity to question
 3   Ms. Ventura about her state of mind at the time and why she may
 4   have made certain statements to Mr. Nash.  And it may have to
 5   do with their relationship and what was going on at the time.
 6   There are a whole host of issues that only Ms. Ventura would be
 7   able to answer with respect to her state of mind at the time.
 8          THE COURT:  True.  That is absolutely true.
 9          However, it doesn't matter for purposes of Rule
10   803(3).  It matters for the other rule, which I keep getting
11   the number wrong, 801(d)(1)(B)
12          MS. ESTEVAO:  But at a certain point, there are due
13   process concerns that are raised as a result of this.
14          THE COURT:  Understood.
15          All right.  Now, the government heard my curtailing of
16   the question.
17          MS. COMEY:  I did, your Honor.  So I think at this
18   point throughout this trial, your Honor has allowed the defense
19   to put in a wide variety of text messages and e-mails from a
20   wide variety of declarants, including a poem at one point, all
21   for the state of mind of the declarant.  Not --
22          THE COURT:  You can put in poems as well, if you would
23   like to.
24          MS. COMEY:  My point is, your Honor, that the court
25   has had a very, very wide --

P5SsCOM1

```
1              THE COURT:  That's not convincing to me.

2              Explain to me -- this is the statement, OK.  The

3    statement, as I understand it from the letter, has two

4    components.  One is that Ms. Ventura did not want to do these

5    things.

6              MS. COMEY:  The second is that she felt that --

7              Well, she did not say she felt that.  What she said is

8    he's making me.  I think the statement "he is making me" goes

9    to her state of mind that she feels she has no choice.  It goes

10   to her state of mind that she feels she has to go, that she

11   feels coerced.  It goes directly to the core of the state of

12   mind that we have to prove for Count Two.  It goes to whether

13   or not, in her mind, she felt like she had a choice and whether

14   or not, in her mind, she felt like she could say no and whether

15   or not, in her mind, she felt like she had to go even though

16   she did not want to.  It goes directly to her mind.  Indeed,

17   that's why we would be offering it.  We would not be offering

18   it --

19             THE COURT:  What's the "it"?

20             MS. COMEY:  The statement that he's making me go.

21   He's making -- he's making me freak-off on my birthday.  He's

22   making me go to these hotels.  We are offering it to prove

23   that, in her mind, she felt coerced.  That is the purpose of

24   offering those statements, your Honor.

25             MR. DONALDSON:  Judge, can I?  Sorry.
```

P5SsCOM1

```
 1          THE COURT:  All right.  Fair enough.
 2          Mr. Donaldson.
 3          MR. DONALDSON:  Just one last point, and I understood
 4   the court's distinction between Ms. Ventura not being
 5   available.  I understand that, which is why we didn't talk
 6   about that.
 7          But I think the government is -- the government is
 8   going to say what was her state of mind, and that is not what
 9   the rule is supposed to be for.  So they are telling the court
10   that they are going to hear what she said and then decide that
11   what her state of mind was, was that she was coerced.  That's
12   not how it works.
13          As my colleague said earlier, I mean, if Ms. Ventura
14   was able to say what her state of mind was based upon this
15   statement, then fine.  But the government should be able to
16   say, well, he said, I want to make you go, so therefore that
17   must mean she is thinking coercion.
18          They can't tell the jury what her state of mind is,
19   which is what they are saying they are offering this evidence
20   to do.  They shouldn't be allowed to do that.
21          THE COURT:  Well, hold on.
22          What the government is -- all they are doing is just
23   eliciting the statements, so that is all they are doing.  They
24   are just saying that the statements only go to Ms. Ventura's
25   state of mind.  Like, no matter how you slice it, I tried to
```

P5SsCOM1

1    slice it, the government says, no matter how you slice it,

2    Ms. Ventura is just saying what she was thinking at the time.

3            She is saying that she didn't want to do these things

4    and she felt that she was made to.  OK.  So why wouldn't that

5    go to state of mind, as opposed to some other impermissible

6    purpose?

7            MR. DONALDSON:  I don't think that, unless I'm --

8            THE COURT:  I mean, I suppose -- I suppose the

9    comeback is, well, her state of mind is just that she didn't

10   want to do it and that she felt like she had to.  The non-state

11   of mind part of the statement is that it was the defendant who,

12   through various means, if that is what she is going to testify

13   about, made her, compelled her to do it.  Because that's not

14   her state of mind, that's actions by the defendant.

15           MR. DONALDSON:  Right.

16           THE COURT:  I don't know if those would come in under

17   those statements.

18           MS. COMEY:  No, your Honor.

19           All Mr. Nash will say is, He's making me freak-off on

20   my birthday.  That's the statement.  It's not, He's beating me,

21   he's blackmailing me, he's using these other methods.  It's,

22   He's making me freak-off on my birthday.  He's making me go to

23   this hotel.  And that is reflective of her state of mind that

24   she feels she has no choice.  She feels she has to go.  And

25   this is the argument that we will make in summation to the jury

P5SsCOM1

1    from that statement.

2            THE COURT:  And I guess the point is, like, other than

3    the fact that it's him, as opposed to somebody else, but, of

4    course, it is him because that's, like, that's who she is going

5    to the hotel with.

6            MS. COMEY:  Yes, your Honor.

7            THE COURT:  The only actual substance to the statement

8    is the making me.

9            MS. COMEY:  Exactly, your Honor.

10           THE COURT:  That goes to her state of mind.

11           MS. COMEY:  Exactly, your Honor.

12           THE COURT:  All right.

13           MS. SHAPIRO:  Your Honor, I'm sorry.  If I can just

14   interject.

15           I think there is an additional problem here, which is

16   that he's making me go.  That could mean any number of things.

17   A spouse may say, He's making me to go the Rangers game

18   tonight.  I don't want to go.  I'm doing it to make him happy.

19           Without Ms. Ventura and the ability to cross-examine

20   her about what she meant when she was doing it, whether she

21   said that because she didn't want to do freak-offs at all and

22   felt coerced or whether, on the other hand, as the defense has

23   tried to argue and elicit testimony about, she loved Mr. Combs,

24   she wanted to make him happy, and that was the main reason

25   that -- or one of the reasons, at least, that she sometimes

P5SsCOM1

1    went to freak-offs, even if she made statements like that.

2            I think the problem here as a point of due process,

3    among other things, is that there is no ability to cross-

4    examine her on what she meant by that.  And it could mean any

5    number of things far short of coercion.

6            THE COURT:  Well, if you're going back behind the rule

7    to these due process principles, at that point, why wouldn't

8    the government's response be you could have cross-examined

9    Ms. Ventura about all of these things.

10            I'm looking at the 3500 material that is cited in your

11    letter, and you give an example as to the 29th birthday.  This

12    statement is in there, that Ms. Ventura said that Mr. Combs was

13    trying to ruin her birthday and was mad because she didn't want

14    to freak off on my birthday, which is what I take it the

15    government is going to elicit, that statement.  And so there

16    can't be any issue about not being able to confront Ms. Ventura

17    with these statements because the defense had it and so they

18    had this beforehand.

19            Now, the different situation with the prior consistent

20    statement rule, the rule imposes certain requirements.  But

21    here, there is no rule-based requirement that the declarant be

22    subject to cross-examination about the statement, and that's

23    the distinction here.

24            MS. ESTEVAO:  Your Honor, may I?

25            THE COURT:  We have three people arguing, which is --

P5SsCOM1

1          MR. DONALDSON:  No, we don't.

2          THE COURT:  -- which is fine for the moment, but we've

3    got to, kind of, try to streamline these things.

4          MS. ESTEVAO:  I apologize.

5          In preparing for Ms. Ventura's cross-examination, the

6    amount of 3500 that was produced was so voluminous, there was

7    no way that we could have fronted every single thing that was

8    produced, that was mentioned in 3500, which was extreme.

9          So we relied on the government's direct in crafting

10   our cross-examination because that's what the government chose

11   to elicit.  And I don't believe that this statement in

12   particular was on the list of prior consistent statements that

13   the government was seeking to elicit with Ms. Ventura.

14         THE COURT:  To the extent that that was a real concern

15   that the defense had, that the material was too voluminous and

16   so they did not understand exactly which statements would be

17   raised with particular witnesses, the time to have raised those

18   types of arguments was in advance of trial.

19         Every day I'm getting these letters about broad-based

20   issues, many of which should have been raised in the motion in

21   limine phase and the court would have addressed it there.

22   Every time an issue was raised prior to trial, we had a

23   conference and we dealt with it and I imposed requirements on

24   the government that I'm sure they were not really happy with in

25   terms of disclosures and everything else.  And we did that to

P5SsCOM1

1    try to make sure that, when we got to this phase, things were

2    streamlined and there was proper notice, etc.

3            So if there was any sort of issue along those lines,

4    the proper time to raise it is not after Ms. Ventura has left

5    the stand.  Now we have the other witnesses where the 3500

6    material shows these various issues.  It would have been prior

7    to trial, if the defendant had -- if the defense had any issue

8    with going through these materials.

9            MS. ESTEVAO:  Your Honor.

10           THE COURT:  In any event, I'm going to think on the

11   arguments that have been raised relevant to 803(3), and I'll

12   let you know before Mr. Nash testifies on direct, which should

13   happen after the break, right, given where we are?

14           MS. COMEY:  I think, your Honor, he's likely to take

15   the stand around 10:30 or 11:00.

16           If I may just respond to the due process point?

17           THE COURT:  OK.

18           MS. COMEY:  The points Ms. Shapiro made, I think, are

19   all excellent points of cross-examination of Mr. Nash and for

20   closing argument to the jury.  They are not a basis to keep out

21   where a proper foundation is laid, a statement that is offered

22   for state of mind, which is what this is clearly offered for.

23           Again, it is narrowly directed at Ms. Ventura's state

24   of mind with respect to coercion, which is an essential element

25   of Count Two.

P5SsCOM1

```
 1              THE COURT:  All right.  We'll have a brief sidebar
 2   before Mr. Nash takes the stand so that the government
 3   understands what's going to happen here.
 4              For present purposes, I'm going to make a tentative
 5   ruling, but I want to just think about it just for a little bit
 6   longer, to overrule the objection to those statements.
 7              Now, Ms. Comey, they are all of this nature, right?
 8              MS. COMEY:  Exactly, your Honor.
 9              THE COURT:  There is nothing that falls outside of
10   that?
11              MS. COMEY:  They will all either be Ms. Ventura -- I
12   think there is three separate vignettes -- and they are all
13   either Ms. Ventura saying, I don't want to go to a hotel or, I
14   don't want to be having sex with other men, and some version
15   of, He's making me.  Like, very, very tight, he's making me.
16              THE COURT:  Are you putting on Mr. Nash?
17              MS. COMEY:  I am, your Honor, yes.
18              THE COURT:  All right.  You're going to have to do
19   that because one of the issues -- it hasn't been that
20   pronounced, but there are sometimes, and it's unavoidable,
21   where witnesses, because they may not appreciate the scope of
22   the question, get outside of that.
23              MS. COMEY:  I understand, your Honor.
24              THE COURT:  So I'll trust that you will be monitoring
25   and will try to constrain that.
```

P5SsCOM1

```
 1              MS. COMEY:  I will, your Honor.
 2              The way I have asked this question with him in prep
 3    has been:  What do you remember her saying?  And every time it
 4    has been no more, with respect to what Mr. Combs did, it's
 5    just, He's making me.  Nothing more than that.  And with
 6    respect to her own state of mind, it's some version of, I don't
 7    want to do this.
 8              If I hear him start going astray beyond what he has
 9    said to me in the past, I will interrupt him and cut him off,
10    your Honor.
11              THE COURT:  All right.  What else do we need to
12    address?
13              Because there's a lot in these letters, and the
14    defense says that because the government's letter came in so
15    late, they didn't address a lot of it.
16              So what are the other issues that need to be addressed
17    for Mr. Nash?
18              I think we have Ignacio, Jiminez, and then we will
19    have Mr. Nash.
20              MS. COMEY:  So, for Mr. Nash, it's Defense Exhibits
21    1818 and 1820.  There were two texts in each that the
22    government objected to as hearsay.  And there are similar
23    objections to the objections that I raised with respect to a
24    text exchange that the defense sought to put in with respect to
25    Mr. Kaplan, where much of the text exchange is fine and not
```

P5SsCOM1

 1   hearsay.  There are statements buried within that appear

 2   offered to prove the truth.

 3          And I don't know if we have those to pull up or if

 4   somebody has a paper copy.

 5          MS. SHAPIRO:  Your Honor, those were addressed in our

 6   letter this morning.

 7          THE COURT:  All right.  So this is DX 1818.

 8          MS. COMEY:  Yes, your Honor.  If I can pull up my

 9   copy.

10          Your Honor, if you're on 1818, my concern was the text

11   from Ms. Ventura at the bottom of page one:  About to go out of

12   town for a couple of days.  Getting my stuff together.  And

13   then her next text, Secret trip, LOL.

14          My reading of those is that the defense is offering

15   them to prove that she was, in fact, going out of town for a

16   couple of days and she was keeping that she was keeping that

17   trip a secret.  That, to me, seems like a statement that's

18   offered for the truth of the matter asserted.

19          So that would be my objection, your Honor, similar to

20   what I raised with Mr. Kaplan.

21          THE COURT:  All right.  Putting aside the fact that

22   the expansive view of 803(3) taken by the defense to this

23   exhibit sort of undermines their narrow construction of the

24   rule with respect to the statements being elicited by the

25   government.

P5SsCOM1

1          What is the government's response on motive, intent,

2    or plan, given that the nature of the conversation seems to

3    indicate that this was a plan of Ms. Ventura's?

4          And so the defense cites to the text in the rule, as

5    well as certain cases that indicate that statements of future

6    intent and plan may be introduced to prove that the declarant

7    thereafter acted in accordance with the stated intent.

8          MS. COMEY:  I think that probably gets over the line

9    for about to go out of town, your Honor.  I don't know that it

10   does for secret trip.

11         THE COURT:  I'm going to overrule the objection to

12   DX 1818.

13         What about 1820?

14         MS. COMEY:  1820, the two text messages from

15   Ms. Ventura at the bottom of page two appear to be stating that

16   Mr. Combs is wasted, we both did the same of everything, but

17   he's tripping.  I think that means -- I believe they are

18   offering that to prove that, in fact, Mr. Combs and Ms. Ventura

19   did the same type of drugs and that Mr. Combs had a bad trip.

20   So that appears to be offered for its truth.

21         Similarly, the two text messages from Ms. Ventura on

22   the next page, I tried to stop him from embarrassing himself,

23   but I can't, appeared to be offered to prove that she, in fact,

24   tried to stop him from embarrassing himself and couldn't.

25         That would be my objection, your Honor.

P5SsCOM1

1        THE COURT:  All right.  Why doesn't that, at least

2   with respect to the observations of Mr. Combs being wasted, why

3   doesn't that fall within 803(1) as a statement describing or

4   explaining a condition made while or immediately after the

5   declarant perceived?

6        MS. COMEY:  The fact that he's wasted might, your

7   Honor.  But the fact that they both did the same of everything,

8   I think, would be offered for its truth and would not fall

9   within that exception.

10        THE COURT:  If, for instance, we both did the same of

11   everything were redacted so it said, He's wasted, but he's

12   tripping.

13        MS. COMEY:  Yes, your Honor, I think that would be

14   fine.

15        THE COURT:  All right.  Is there any issue from the

16   defense with that redaction, or if not, what's the grounds to

17   get in, We both did the same of everything?

18        MS. SHAPIRO:  I mean, I think it's in the context of

19   the same sentence.  It's fairly incoherent without the context

20   and, in fairness, it ought to be included.  I mean, it's still,

21   you know --

22        THE COURT:  It's at 4:00 a.m., and the events in

23   question happened in the preceding hours, is that correct?

24        MS. SHAPIRO:  Well, this is during a freak-off that

25   the government has put in evidence.

P5SsCOM1

 1          THE COURT:  So it's during the freak-off.

 2          MS. SHAPIRO:  Yes, your Honor.

 3          THE COURT:  I'm going to overrule the objection to

 4   1820, even with regard to the statement that we both did the

 5   same of everything.  It would seem to fall within the 803(1)

 6   exception for a statement describing or explaining an event

 7   made immediately after the declarant perceived it.  And,

 8   obviously, Ms. Ventura, under those circumstances, had

 9   perceived the drug use immediately during the events in

10   question.  For that reason, the objection is overruled.

11          What else?

12          MS. SHAPIRO:  Your Honor, just quickly, I'm not going

13   to reargue the Mescudi ruling.  I appreciate the court has made

14   its decision.  I do want to point out, going forward, with

15   respect to the question that was asked, the reason the

16   objection was valid wasn't the form of the question.

17          I think the problem here -- and that may recur, that's

18   why I'm raising it now -- when the prosecutor asked, What was

19   your understanding?  It was clear that she knew his response

20   was going to be Mr. Combs was lying, which the answer is

21   improper for all the reasons that we explained under the case

22   law.

23          I think it's inappropriate for the government to frame

24   questions, you know, what was your understanding, in an attempt

25   to make it seem like the form of the question is fine, when

P5SsCOM1

1  they know that the answer is going to elicit an improper lay

2  opinion.

3          I would ask the court to at least direct the

4  government to be more careful about that and make sure that

5  they are not just disguising improper -- eliciting improper

6  testimony under the guise of some question that sounds

7  appropriate on its face.

8          THE COURT:  Well, in this instance, as I noted, even

9  if this were construed to be an opinion, the government's

10 response is that it was rationally based on the witness's

11 perception, given what had just been discussed concerning the

12 meeting.  Not only on direct examination, but also on

13 cross-examination.  It was all about what Mr. Mescudi had seen

14 and the way he perceived Mr. Combs and all of that.

15         So that was the precursor to the testimony being

16 offered.  That's just on that issue.

17         MS. SHAPIRO:  Well, your Honor, I mean --

18         THE COURT:  The larger -- I don't know want to get

19 sidetracked.  I just wanted to address that.

20         On your larger question, the reason you address this,

21 I agree with you that, you know, in some instances here, the

22 questions that are coming out are, in terms of form, proper.

23 But the defense is aware, because they have the 3500 material,

24 as to what the response is going to be.  And so it puts the

25 defense in a tough spot, where the question may be proper, but

P5SsCOM1

1   they know that the answer that is going to be elicited may pose

2   various issues.

3           This has come up from time to time, I agree, but I

4   think the government needs to watch out, going forward, and

5   make sure if they are running into one of these issues, they

6   cabin the questions so we can avoid these issues or head them

7   off at the pass before the answer is given, and then there is a

8   motion to strike or an objection and I have to instruct the

9   jury not to consider the witness's answer.

10          So I think it's a fair point.

11          MS. SHAPIRO:  I appreciate that, your Honor.  I do

12  want to flag for the court, because I think the court may have

13  a view of the 3500, that is what we would have hoped it would

14  be.  But, in reality, as a practical matter, it's not, which is

15  that we don't always know what the witness is going to say.

16  And, in fact, often the witnesses say things that are slightly

17  different from the 3500.  So we're not totally present just

18  because we have a lot of 3500 material, so I just want to flag

19  that.

20          THE COURT:  Make your objections, but I'm watching.

21          So, to give a good example:  Were you concerned that

22  this was happening?  Yes.  Why were you concerned?  That's,

23  like, a chief example where it is known that the why question

24  is going to open the floodgates to all sorts of potentially

25  improper testimony.

P5SsCOM1

1          To the extent that that is known, let's try to avoid

2     it.  There are other questions that can be asked that are more

3     focused and that will navigate around any issue where there is

4     an objection and we have to tell the jury to disregard

5     testimony, so...

6          MS. SHAPIRO:  Thank you, your Honor.

7          THE COURT:  Let's try to do that moving forward.

8          Anything further with respect to Mr. Nash?

9          And, Ms. Johnson, you've been trying to get

10    something...

11         MS. JOHNSON:  Sorry.  I'm doing that pop-up thing.

12         I do want to respond to Ms. Shapiro's accusations that

13    the government is purposefully asking questions to elicit

14    improper testimony.

15         That is certainly not the case.  I don't think that

16    we -- you know, as Ms. Shapiro has noted, witnesses say

17    different things in our preparations with them than they

18    sometimes say.  There is some delta between the 3500 material

19    and what they may say in a courtroom.  We are not -- I did not

20    know exactly how Mr. Mescudi would respond to that question.

21         So I just want to say that we are absolutely not

22    intentionally eliciting impropr testimony.

23         THE COURT:  Understood.  Thank you.

24         Anything further from the government?

25         MS. COMEY:  Not with respect to Mr. Nash, your Honor,

P5SsCOM1

1    no.

2            THE COURT:  All right.  Then the only outstanding

3    issues are with respect to Mia, is that right?  There's various

4    evidentiary issues.

5            MS. SMYSER:  That's right, your Honor.

6            THE COURT:  OK.  Is that something we can handle

7    before or after the elongated lunch break?

8            MS. SMYSER:  Yes.  I don't expect her to take the

9    stand until sometime after lunch.

10            THE COURT:  Is there any further meeting and

11    conferring necessary?

12            I'm trying to figure out in my mind whether it's

13    something to handle at the beginning of the lunch break or

14    whether the parties can use the additional time to narrow some

15    of the objections.

16            MS. SMYSER:  We may be able to speak some.  I don't

17    expect them to be narrowed much.

18            THE COURT:  OK.  All right.  Very good.

19            So let's get our jury, and then we'll bring in our

20    next witness.

21            MS. SLAVIK:  Your Honor, may I take a place at the

22    podium?

23            THE COURT:  You may.

24            (Continued on next page)

25

1            (Jury present)

2            THE COURT:  Please be seated.  Welcome back, members

3    of the jury.

4            The government may call its next witness.

5            MS. SLAVIK:  The government calls Los Angeles Police

6    Officer Christopher Ignacio.

7            THE DEPUTY CLERK:  Just remain standing for a moment

8    and raise your right hand.

9     CHRIS IGNACIO,

10        called as a witness by the Government,

11        having been duly sworn, testified as follows:

12            You may be seated.  Can I ask you to just please give

13    the court your first and last name and spell your first and

14    last name into that microphone.

15            THE WITNESS:  It's Chris Ignacio.  C-h-r-i-s.

16    I-g-n-a-c-i-o.

17            MS. SLAVIK:  May I inquire, your Honor?

18            THE COURT:  You may.

19    DIRECT EXAMINATION

20    BY MS. SLAVIK:

21    Q.  Good morning, Officer Ignacio.

22    A.  Good morning.

23    Q.  Are you employed?

24    A.  Yes, I am.

25    Q.  What do you do?

1    A.  I am a police officer for the Los Angeles Police

2    Department.

3    Q.  Is that also known as the LAPD?

4    A.  Yes.

5    Q.  How long have you been an LAPD police officer?

6    A.  For approximately a little over 16 years.

7    Q.  What is your current title?

8    A.  Police officer two.

9    Q.  How long have you held that title?

10   A.  For approximately 15 years.

11   Q.  What was your title before you became a police officer two?

12   A.  It's a police officer one, which is a probationary officer.

13   Q.  And how long did you hold that title?

14   A.  About a year.

15   Q.  Focusing on your role as a police officer two, what are

16   your responsibilities?

17   A.  My responsibilities are to protect lives and property,

18   respond to various radio calls, including non-emergency and

19   emergency calls, make arrests, complete reports, interview

20   witnesses and victims, and gather evidence, book evidence, and

21   also sometimes testify in court.

22   Q.  You mentioned that one of your responsibilities is

23   responding to radio calls.

24           Can you just explain to the jury what a radio call is?

25   A.  So a radio call is when someone calls 911, it goes into --

P5SsCOM1                          Ignacio - Direct

1    comes into a dispatch center, like, communications.  The

2    dispatcher takes the information and decides what type of radio

3    call, what type of call would be, like, a robbery, a burglary,

4    or a traffic collision.  And then from there, it's sent to the

5    next available or near the unit available or near.

6    Q.  In other words, dispatch receives radio calls and then

7    assigns out jobs to police officers who are on duty?

8    A.  Yes, that's correct.

9    Q.  Officer Ignacio, are you currently assigned to a particular

10   division?

11   A.  Yeah.  At the moment I'm assigned to officer operations,

12   CSOC, which stands for Community Safety Operations Center.

13   Q.  Focusing on the December 2011 time period, did you have a

14   particular assignment at that time?

15   A.  Yes.  I was working Hollywood division patrol.

16   Q.  And can you explain to the jury what the Hollywood division

17   is?

18   A.  So, Hollywood division is just a geographical area in the

19   city of Los Angeles.  It's -- I don't know exactly how many

20   square miles it is.  It's from Western Avenue all the way to

21   West Hollywood to Mulholland Drive, down to Santa Mon- --

22   Melrose Avenue.

23   Q.  You said that your assignment was patrol, is that right?

24   A.  That's correct.

25   Q.  What does patrol mean?

1   A.  Patrol is the uniformed personnel that is assigned to that

2   particular geographical area, and they are assigned to for

3   visible presence and to respond to calls for service.

4   Q.  Generally speaking, what did your day-to-day look like as a

5   patrol officer in the Hollywood division?

6   A.  So day to day would be, we would show up to work, get

7   dressed in our police uniform and gear, respond to radio --

8   respond to roll call, which is a short briefing, we would get

9   our assignments, go downstairs to the room, retrieve our keys

10  to our police vehicles, and then immediately respond and patrol

11  the areas.

12  Q.  I want to focus your attention on December 22, 2011.

13          Were you working that day?

14  A.  Yes, I was.

15  Q.  What was your shift that day?

16  A.  It was day watch, which is the hours of six a.m. to

17  six p.m.

18  Q.  Were you working with a partner that day?

19  A.  Yes, I was.

20  Q.  Were you uniformed?

21  A.  Yes.

22  Q.  And were you patrolling in a vehicle or on foot?

23  A.  In a marked police vehicle.

24  Q.  Did you receive any calls from dispatch during that shift?

25  A.  Yes, I did.

P5SsCOM1                    Ignacio - Direct

1   Q.  What do you remember about the calls from dispatch that
2   day?
3   A.  That day, I did receive a call at approximately 820 hours
4   of a possible burglary, suspects there now, at 8925 Hollywood
5   Hills Road.
6   Q.  You received this call at approximately 8:20 in the
7   morning, is that right?
8   A.  That's correct.
9   Q.  What, if any, details were provided by dispatch when you
10  received this call?
11  A.  At the time, what I remember is it just came out as a
12  possible suspect is there now.
13  Q.  What was the location of the scene?
14  A.  8925 Hollywood Hills Road.
15  Q.  Did you respond to this call?
16  A.  Yes, I did.
17  Q.  Why?
18  A.  It was assigned to us and it was a private...
19  Q.  By us, you mean you and your partner, is that right?
20  A.  That's correct.
21  Q.  How did you and your partner respond?
22  A.  We responded code three, which is immediately with lights
23  and sirens.
24  Q.  Where did you go with the lights and sirens?
25  A.  To 8925 Hollywood Hills Road.

P5SsCOM1                          Ignacio - Direct

1    Q.  Is that address business or residential?

2    A.  It's a residential.

3         MS. SLAVIK:  Ms. Foster, could you please pull up

4    what's -- excuse me.

5         Ms. Foster, could you pull up for the witness and the

6    parties what's been marked for identification as Government

7    Exhibit 8C-101.

8    Q.  Officer Ignacio, do you recognize what's depicted in this

9    photo?

10   A.  Yes, I do.

11   Q.  What is it?

12   A.  It's the front gate and wall of the residence at 8925

13   Hollywood Hills Road.

14   Q.  Is there a fair and accurate depiction of the residence at

15   809025 Hollywood Hills Road?

16   A.  Yes, it is.

17        MS. SLAVIK:  The government moves to enter Government

18   Exhibit 8C-101 into evidence.

19        MR. DONALDSON:  No opposition, your Honor.

20        THE COURT:  8C-101 is admitted.

21        (Government's Exhibit 8C-101 received in evidence)

22        MS. SLAVIK:  Ms. Foster, could you please publish

23   8C-101 side by side with 8C-102 that is already in evidence.

24   Could you publish this for the jury.

25   BY MS. SLAVIK:

P5SsCOM1                    Ignacio - Direct

1  Q.  Officer Ignacio, can you explain to the jury what they are

2  looking at here?

3  A.  So, this is the front wall to the 8925 Hollywood Hills

4  Road, the residence.  So it's the front wall and gate, and

5  behind it is a courtyard, and then there is a house.

6  Q.  More generally, can you describe the neighborhood where

7  this residence is located?

8  A.  So this neighborhood is actually situated above the

9  Hollywood Hills -- Hollywood Boulevard and Sunset Boulevard.

10 Typically, to get to this location, you would have to drive

11 through narrow and windy roads.  And it's known for, sometimes,

12 its panoramic views overlooking the metropolitan area.

13           MS. SLAVIK:  Thank you, Ms. Foster.  You can take this

14 down.

15 Q.  Officer Ignacio, what, if anything, did you notice as you

16 arrived to the residence?

17 A.  As we were driving to the residence, I did notice a dark

18 black Cadillac Escalade.

19 Q.  Where was the Cadillac Escalade going?

20 A.  It was directly in front of the house and it drove

21 northwest into the hills.

22 Q.  As you approached the residence?

23 A.  That's correct.

24 Q.  Did you observe any passengers in the black Escalade?

25 A.  No, I did not, but I did observe a license plate.

P5SsCOM1                         Ignacio - Direct

1    Q.  What prevented you from observing passengers in the black

2    Escalade?

3    A.  It was had -- it was heavily tinted, like, limo tinted.

4    Q.  The windows were?

5    A.  The window, yes.

6    Q.  And where were you when you observed this black Escalade?

7    A.  I was in our police vehicle.

8    Q.  And this was a marked police vehicle you said?

9    A.  That's correct.

10   Q.  What did you do after you noticed this black Escalade?

11   A.  I memorized the plate, the license plate.

12   Q.  Why did you memorize the plate number?

13   A.  Um, just in case it may be involved in a crime.

14   Q.  What made you think it could have been involved in the

15   crime?

16   A.  It was parked directly in front of the residence and as

17   soon as we arrived, it took off up the hill.

18   Q.  Did you pull the black Escalade over?

19   A.  No, I did not.

20   Q.  Why not?

21   A.  We didn't have a crime at the time.

22   Q.  Do you remember the license plate that you noted in your

23   mind?

24   A.  Yes, I do.

25   Q.  Can you tell the jury what that license plate was?

1   A.  It's 6LKN013.

2   Q.  And that was a California plate?

3   A.  That's correct.

4   Q.  After you noticed the black Escalade and took note of the

5   license plate number, what did you do next?

6   A.  We went to the front gate and my partner jumped over the

7   fence and let me in.

8   Q.  At this point, was anyone else at the residence with you?

9   A.  Just my partner and I.

10  Q.  What did you do next after you got into the courtyard?

11  A.  So we went to the front door and knocked on the door, and

12  then that's when we noticed the door was unlocked.

13  Q.  How did you discover that the door was unlocked?

14  A.  We checked the door handle.

15  Q.  What did you do next?

16  A.  So we went inside and searched the residence for any

17  suspects or any victims.

18  Q.  Did you find any individuals, any people in the residence

19  at that time?

20  A.  No, I did not.

21  Q.  What, if anything, do you remember seeing inside the

22  residence?

23  A.  I remember seeing on the table, like, high-end, high-value

24  watches and purses.

25  Q.  Were these items wrapped?

1  A.  Some of them were and some of them were not.

2  Q.  Did anything look disturbed from your observations?

3  A.  No.

4  Q.  Was the owner of the property present at this time?

5  A.  Not at the time.

6  Q.  Did any other law enforcement officers arrive at the

7  residence?

8  A.  Yes, two detective units showed up.

9  Q.  Two detective -- excuse me.

10      Two detectives you said?

11 A.  Yes.

12 Q.  What did you do when those detectives arrived?

13 A.  We searched the property again to make sure nothing was

14 taken.

15 Q.  And what happened when you went through the residence again

16 with the detectives?

17 A.  We just searched the area and just -- just to make sure

18 that there was nobody inside and then make sure nothing was

19 disturbed as well.

20 Q.  What happened next?

21 A.  We exited the residence.

22 Q.  And what, if anything, did you see when you exited the

23 residence?

24 A.  I saw the same black Cadillac Escalade coming down the

25 hill.

P5SsCOM1                         Ignacio - Direct

1   Q.  How quickly was the black Escalade driving as it came down
2   the hill?
3   A.  Down the hill?  I can't be too sure.  Maybe 10, 15 miles.
4   Q.  Miles per hour?
5   A.  Per hour.  Sorry.
6   Q.  How does that compare to when you saw it driving the
7   opposite direction when you first arrived at the residence?
8   A.  It was probably about the same, but it took off
9   immediately.
10  Q.  As you arrived at the residence?
11  A.  That's correct.
12  Q.  Now, you said that this was the same black Escalade that
13  you saw when you arrived at the residence?
14  A.  Yes.
15  Q.  How do you know that it was the same?
16  A.  I looked at the rear plate, license plate.  It was the same
17  license plate.
18  Q.  Approximately how much time passed between the first time
19  you saw the black Escalade and the second time that you saw the
20  black Escalade?
21  A.  I would say about 15 to 20 minutes.
22  Q.  Did you observe passengers in the black Escalade the second
23  time that you saw it?
24  A.  I tried to, but it was heavily tinted and I wasn't able to
25  see anybody inside of it.

P5SsCOM1                      Ignacio - Direct

1   Q.  Did you pull the black Escalade over the second time you

2   saw it?

3   A.  No, I did not.

4   Q.  Why not?

5   A.  We didn't have a crime at that time.

6   Q.  Did anyone else arrive at the residence?

7   A.  Yes, the tenant, Scott Mescudi.

8   Q.  And how did Mr. Mescudi arrive at the residence?

9   A.  He arrived in a -- I believe it was a black Porsche.

10  Q.  A black Porsche you said?

11  A.  Yes.

12  Q.  Did you speak with Mr. Mescudi?

13  A.  I did.

14  Q.  Did you go through the residence with Mr. Mescudi?

15  A.  Yes, I do.

16  Q.  What, if anything, did you conclude with respect to whether

17  a burglary had taken place?

18       MR. STEEL:  Objection, your Honor.

19       THE COURT:  Hold on.  That's sustained.

20  BY MS. SLAVIK:

21  Q.  Officer Ignacio, what, if any, reports did you complete

22  with respect to the incident that you responded to?

23  A.  We completed a trespass report.

24  Q.  What is a trespass report?

25  A.  It's basically someone entering someone's land or property

1  without the owner's consent.

2  Q.  And you took that report immediately after the incident?

3  A.  That's correct.

4  Q.  I want to turn back to the black Escalade.

5       You testified that you saw this Escalade pass the

6  residence twice, is that right?

7  A.  That's correct.

8  Q.  What, if anything, did you do after the second time you saw

9  the black Escalade pass the residence?

10  A.  As soon as it passed, I went into our police vehicle and

11  entered the license plate into our mobile digital computer.

12  Q.  What information did the mobile computer provide after you

13  ran the plates?

14  A.  It provided the registered owner.

15       MS. SLAVIK:  Your Honor, at this time, the government

16  moves to admit Government Exhibit 8B-101.

17       MR. STEEL:  No objection, sir.

18       THE COURT:  8B-101 will be admitted.

19       (Government's Exhibit 8B-101 received in evidence)

20       MS. SLAVIK:  Ms. Foster, could you please publish

21  8B-101 for the parties and the jury.

22       Ms. Foster, can you zoom in on the very stop of this

23  document.

24  BY MS. SLAVIK:

25  Q.  Officer Ignacio, can you read the title of this document?

1  A.  DMV vehicle registrations information.

2  Q.  Thank you.

3      MS. SLAVIK:  Ms. Foster, can you zoom in on the line

4  that says LIC.

5  Q.  Officer Ignacio, do you see the license plate number that

6  you saw on the black Escalade here?

7  A.  I do.

8  Q.  What is that license plate number?

9  A.  It's 6LKN013.

10 Q.  And that's the same license plate that you saw in the black

11 Escalade that passed the residence twice?

12 A.  Yes.

13     MS. SLAVIK:  Thank you, Ms. Foster.  Could you go down

14 to the line that says prior R/O.

15 Q.  Officer Ignacio, do you have an understanding as to what

16 R/O means?

17 A.  It means registered owner.

18 Q.  And can you read the name of the registered owner?

19 A.  Bad Boy Productions, Incorporation.

20 Q.  Can you read the address?

21 A.  The address is 9374 Beverly Crest Drive in the city of

22 Beverly Hills.

23     MS. SLAVIK:  Nothing further, your Honor.

24     THE COURT:  All right.  Cross-examination.

25

1    CROSS-EXAMINATION

2    BY MR. STEEL:

3    Q.  Good morning.

4    A.  Good morning, sir.

5    Q.  This is 13 and a half years ago, approximately, is that

6    fair to say?

7    A.  Yes.

8    Q.  And in order to come to the great City of New York, you

9    prepared yourself for this testimony, is that true?

10   A.  Yes.

11   Q.  And the way you prepared yourself was you needed your

12   memory refreshed, is that fair to say?

13   A.  Yes.

14   Q.  And the reason why is because you've been a police officer

15   now for a decade and a half or more, right?

16   A.  Correct.

17   Q.  And you have done a lot of cases, trying to help people,

18   right?

19   A.  Yes.

20   Q.  And some cases stick in your mind, for whatever reason,

21   some cases don't stick in your mind, for whatever reason, is

22   that true?

23   A.  Yes.

24   Q.  And this case had no particular value to you until, of

25   course, you were notified you're having to appear in court, is

P5SsCOM1                          Ignacio - Cross

 1   that fair to say?

 2   A.  Yes.

 3   Q.  And, in fact, in this particular case, the way you worked,

 4   you worked with a teammate or a co-officer that morning, is

 5   that true?

 6   A.  Yes.

 7   Q.  And that morning, that officer is Officer Snyder.

 8           Do you remember him?

 9   A.  I do.

10   Q.  And Officer Snyder, just like you're taught and he's

11   taught, actually wrote a report about this incident, is that

12   true?

13   A.  That's correct.

14   Q.  And you used that report to, my word would be, refresh your

15   memory, but whatever.

16           Just to kind of bring this up, whether you remembered

17   it or not, you rely on that report, is that true?

18   A.  That's correct.

19   Q.  And that report is something that not only do you do

20   regularly in your course of business, or, in this case,

21   Officer Snyder, but you go to training for that report, right?

22   A.  Yes.

23   Q.  And you have to put in that report everything that is to

24   your knowledge at that time important in the case, true?

25   A.  Yes.

1  Q.  And it's important because, 13 and a half years later, you

2  may be testifying about it, right?

3  A.  That's correct.

4  Q.  And you try to make it clear, true?

5  A.  Yes.

6  Q.  And you try to make it understandable, if somebody else has

7  to read it as well, true?

8  A.  Yes.

9  Q.  And police reports are an important part of what you do.

10        I know you listed a lot of things you do to the ladies

11  and gentlemen of the jury.  But the police report is something

12  also important, true?

13  A.  Yes, it is.

14  Q.  And people rely on it, even when you're not there, you

15  understand what I'm talking about?

16  A.  Yes.

17  Q.  Like defense lawyers, judges, prosecutors, citizens, true?

18  A.  Yes.

19  Q.  All right.  Now, this is -- you respond, and it's right

20  before Christmas.

21        It's December 22, 2011, is that fair to say?

22  A.  Yes.

23  Q.  And you arrive at an address, which you announced three

24  times for the jury, but it's 8925 Hollywood Hills Road, true?

25  A.  That's correct.

P5SsCOM1                    Ignacio - Cross

1   Q.  And that was your area of where you would travel and report

2   to and assist in that time, is that true?

3   A.  Yes.

4   Q.  How long did you patrol, is my word, that area?

5   A.  For approximately 12 years.

6   Q.  So I'm assuming that you're pretty familiar with that area?

7   A.  I am, yes.

8   Q.  And are you familiar with the roads that lead to and from

9   the 8925 Hollywood Hills Road?

10  A.  Yes.

11          MR. STEEL:  If I showed you --

12          Your Honor, I believe this is already in evidence.

13  It's Defendant's Exhibit No. 957.  Could you take a look at --

14          I believe it's in evidence, your Honor.  It could be

15  shown to everybody.

16  BY MR. STEEL:

17  Q.  If you could look at this and try to tell me and the ladies

18  and gentlemen of the jury whether this accurately depicts the

19  roadway around, you see the 8925 Hollywood Hill Road?

20  A.  Yes.

21  Q.  Just take a minute to orient yourself and just tell me

22  whether you feel comfortable that, yes, this depicts the roads

23  in that area of those subdivisions?

24  A.  Yes, it does.

25  Q.  All right.  Can you explain to the jury -- they have it on

1  their screens if you don't see where they sit, so they can see

2  what is marked and admitted as 957, Mr. Combs exhibit.

3           Is it fair to say from that house, the 8925 Hollywood

4  Hills house, a lot or all of the roads to the bottom or to the

5  south of that area, they are dead-ends, is that true?

6           MS. SLAVIK:  Your Honor, I would just ask Mr. Steel to

7  refrain from the compound questions.

8           THE COURT:  Is that an objection?

9           MS. SLAVIK:  Yes, your Honor.

10           THE COURT:  All right.  Mr. Steel, could you rephrase

11  the question.

12           MR. STEEL:  Sure.

13  BY MR. STEEL:

14  Q.  Using Exhibit No. 957, is it fair to say that from 8925

15  Hollywood Hills Road, the home, if you go south or downward on

16  the exhibit, you hit to the left, you hit dead-ends, is that

17  your memory?

18  A.  According to the photo, it does look like some of them are

19  dead-ends.

20  Q.  Let's talk about you, because you've driven this area or

21  parts of that area for 12 years, right?

22  A.  Correct.

23  Q.  And it's a true statement, it's a beautiful neighborhood,

24  right?

25  A.  Yes, it is.

P5SsCOM1                    Ignacio - Cross

1    Q.   A lot of cul-de-sacs, dead-ends, true?

2    A.   Yes.

3    Q.   Now I want to go back and just talk about --

4         MR. STEEL:  You can take that down if you don't mind,

5    when you get a chance.

6    Q.   I want to go back, sir.

7         Did you need to see that longer?

8    A.   No, sir.

9    Q.   If you do, tell us or the court.

10   A.   Thank you.

11   Q.   No problem.

12        It's 8:20 in the morning.  You get a call for a

13   potential person in someone's house, that's what you told the

14   jury, fair to say?

15   A.   Yes.

16   Q.   And that's true, right?

17   A.   Yes.

18   Q.   It's recorded in your report or Officer Snyder's report,

19   right?

20   A.   That's correct.

21   Q.   So, you really don't know, god forbid, what you're coming

22   into, right?

23   A.   Yes.

24   Q.   It could be a home innovation, right, true?

25   A.   Yes.

P5SsCOM1                         Ignacio - Cross

1   Q.  It could be a simple trespass, right?

2   A.  That's correct.

3   Q.  It could be nothing, it could be, you know, a report that's

4   just not vindictive, but just wrong, right?

5   A.  Yes.

6   Q.  So you and your partner are on alert to report, and you put

7   on -- I'm not saying you, you or your partner -- put on what I

8   would call blue lights, true?

9   A.  Yes.

10  Q.  And the sirens, right?

11  A.  That's correct.

12  Q.  And even though it's 8:20 in the morning, it doesn't matter

13  because this could be a dangerous situation, it may not be a

14  dangerous situation, but you're taking no --

15         You're going to play it safe, true?

16  A.  Yes.

17  Q.  You also want to get there as fast as possible, so you are

18  warning people, we are coming through, the police, right?

19  A.  Yes.

20  Q.  And you're in the black-and-white patrol vehicle, so it's

21  clearly marked to a casual observer, true?

22  A.  Yes, it is, true.

23  Q.  And when you arrive, you actually see if the government --

24  or excuse me.

25         MR. STEEL:  If we could put up, and they are both in

1  evidence now, it's Government Exhibit 8C, as in Colette, 101

2  and 8C-102.  You can put them next to each other, if that's OK.

3  Q.  Do you see this on your screen, sir?

4  A.  Yes, I do.

5  Q.  Let's wait for the other exhibit.

6          Now, this is the same exact photograph, but just from

7  a different angle, is that true?

8  A.  This appears to be.

9  Q.  I'll just use both.  But if you're focusing on one, just

10 announce it.

11         When you arrive with your partner, Officer Snyder,

12 there's actually a large car there, right, a black Cadillac

13 Escalade, true?

14 A.  Yes.

15 Q.  And you're so observant, and that's what you're trained to

16 do, right?

17 A.  Yes.

18 Q.  And you didn't remember the license plate for 13 and a half

19 years, but you refreshed your memory and you were able to tell

20 it off the top of your head today, true?

21 A.  Yes.

22 Q.  And when you arrive, you know that you're going to a

23 possible crime at that home, and the car was there.

24         So you're observant and you focus in and get the

25 license plate, right?

```
 1   A.  Yes.

 2   Q.  But you don't follow the car as it pulls off because you

 3   really get a call from a house, and there's only one of you and

 4   Officer Snyder, true?

 5   A.  Yes.

 6   Q.  But you record that license plate that the jurors just

 7   heard, right?

 8   A.  Yes.

 9   Q.  And the car pulls off.  If doesn't peel wheels or anything,

10   it just drives away as you're pulling up, true?

11   A.  It drives up the hill, yes.

12   Q.  OK.  Now, I want you to tell the ladies and gentlemen of

13   the jury, at the time, that you're observant, you're following

14   all this, you're focused, did you see a black Porsche next to

15   or around that black Cadillac Escalade?

16   A.  I don't remember.

17   Q.  Well, you would have put it in your report, right?

18   A.  Possibly.

19   Q.  OK.  And, I mean, if you saw the black Cadillac and the

20   Porsche interacting in any way, you would have included both

21   vehicles, true?

22   A.  Yes.

23   Q.  And you didn't see a car chase at all, did you?

24   A.  No.

25   Q.  Because a car chase would have been important to you, as
```

1  well, right?

2  A.  Yes.

3  Q.  If two cars were driving side by side or one car in front

4  of the other or fast, that's something that law enforcement

5  officers like you, an observant gentleman, would have noted,

6  right?

7  A.  Yes.

8  Q.  That didn't happen here, right?

9  A.  No.

10  Q.  When you get the call to respond to the scene, it's

11  important that you have all the information that you can have,

12  right?

13  A.  Yes.

14  Q.  You had no information that there was a gun involved, am

15  I correct?

16  A.  I don't believe so, no.

17  Q.  You would have put that in the report, right?

18      It would have been on the radio, right?

19  A.  Yes.

20  Q.  Because you have to know whether you are going into a

21  potential -- anything could be dangerous.  I'm not belittling

22  that.

23      You have to know as much information so you can

24  properly have your mind set on how you're going to respond,

25  true?

P5SsCOM1                        Ignacio - Cross

 1  A.  Yes.

 2  Q.  And a firearm is always serious to everybody, true?

 3  A.  Yes.

 4  Q.  OK.  And that's not in your report, right?

 5  A.  No.

 6  Q.  In fact, no one, to your knowledge, told you or

 7  Officer Snyder anything about a firearm, true?

 8  A.  True.

 9  Q.  OK.  And you also spoke with, as well as the detectives and

10  Officer Snyder, spoke with the tenant or the homeowner, is that

11  true, later that day?

12  A.  Yes.

13  Q.  And the homeowner never mentioned anything about a gun,

14  right?

15  A.  I don't remember.

16  Q.  Well, is it in your report; how about that?

17  A.  It's not.

18  Q.  OK.  And that's something that is so important that you

19  would have put in the report, true?

20  A.  Possibly.

21  Q.  Well, why possibly?

22  A.  Well, if he would have told us, we probably, most likely,

23  would have put it in the report.

24  Q.  Of course.  I mean, if a perpetrator is in someone's home

25  with a firearm, you're writing it down in the report, right?

1   A.  Yes.

2   Q.  Now, did you hear anything about a kidnapping?

3   A.  No.

4   Q.  Because a kidnapping is something violent, as well, true?

5   A.  Yes.

6   Q.  You know the definition of a kidnapping?

7           MS. SLAVIK:  Objection.

8           THE COURT:  That's sustained.

9   Q.  You didn't hear anything about a kidnapping in this matter,

10  did you?

11  A.  No.

12  Q.  OK.  Because that would have been important to put in the

13  report, right?

14  A.  Yes.

15  Q.  OK.  And I want to ask you, if you don't mind, whether you

16  were ever told that the homeowner was in the house shortly

17  before you and your partner got there?

18          MS. SLAVIK:  Objection.

19          THE COURT:  It's overruled.

20  A.  Can you repeat the question?

21  Q.  Of course.

22          Did you have any information from the homeowner --

23          You spoke with the homeowner eventually, right?

24  A.  Yes.

25  Q.  And let's just put it in sequence.

P5SsCOM1                         Ignacio - Cross

1               You and your partner get there, the black Cadillac

2    drives off, fair?

3    A.  Yes.

4    Q.  OK.  You're observant, you see the black Cadillac's license

5    plate.

6               You already told that, right?

7    A.  That's correct.

8    Q.  You don't see anything about a Porsche, correct?

9    A.  No.

10   Q.  You don't see anything about any other car, true?

11   A.  No.

12   Q.  And am I right?

13   A.  Yes.

14   Q.  And you don't see a car chase at all, right?

15   A.  No.

16   Q.  Even when the black Cadillac, later, 10, 15 minutes later

17   drives by, you don't see a car chase or another car, true?

18               Am I correct?

19   A.  Yes.

20               (Continued on next page)

21

22

23

24

25

P5SACom2                        Ignacio - Cross

1   BY MR. STEEL:

2   Q.  Am I correct?

3   A.  Yes.

4   Q.  Now, you and your partner get to the house, your blue

5   lights are on, your siren is on, and you need to enter the home

6   to clear it, true?

7   A.  Yes.

8   Q.  And by clearing it, that means you just have to see -- not

9   only you but the partner and the other officers who arrive --

10  you have to make sure that it's safe, true?

11  A.  Yes.

12  Q.  Okay.  And at that point in time you don't see anybody

13  leaving the house, right?

14  A.  No.

15  Q.  And your partner actually climbs over what we have on the

16  Court's screen.  It's either HC, as in Collette, 101 or 102,

17  either one.  Your partner climbs that small wall, or it may not

18  be that small, but the wall, true?

19  A.  Yes.

20  Q.  And your partner goes around and that gate that's in there

21  that the jurors can see on the screen, opens the gate, so other

22  officers, including yourself at first, can enter, right?

23  A.  Yes.

24  Q.  And do you remember the courtyard when you walk in through

25  that gate?

P5SACom2                              Ignacio - Cross

1   A.  Yeah.  It was a short courtyard.

2   Q.  It had trees; fair to say?

3   A.  Yes.

4   Q.  And it had -- it was nicely manicured if you remember at

5   that time?

6   A.  Yes.

7   Q.  And it's something where it blocks the house, the trees

8   block the house, true?  I mean, from the yard -- I mean from

9   the street.  Sorry.

10  A.  I believe so, yes.

11  Q.  And this way if you're sitting at that gate, that your

12  partner, Officer Snyder opened up, you can't see the house, but

13  you can see into the courtyard, true?

14  A.  Yes.

15  Q.  And behind the courtyard, though, is the house, right?

16  A.  Yes.

17  Q.  And you eventually make your way, but you're searching the

18  grounds.  That's how you remember the courtyard.  You're making

19  sure nobody is in the courtyard, because people can hide behind

20  trees or in trees, bushes, things like that, right?

21  A.  Yes.

22  Q.  And you're clearing that; clearing that means you're making

23  it safe, true?

24  A.  Yes.

25  Q.  And you and your partner have your guns on ready.  I'm not

P5SACom2                          Ignacio - Cross

1   saying you're pointing at anybody, but you're ready for

2   anything that may happen, true?

3   A.   Yes.

4   Q.   You're again observing, right?

5   A.   Yes.

6   Q.   After you clear that courtyard and finally see the house,

7   then you make entry to the home, true?

8   A.   Yes.

9   Q.   Now, the home door is actually not ajar.  I'm not saying

10  it's like, you know, a cat could run in, but it's -- you don't

11  need a key, you can just turn the knob and get in; is that

12  true?

13  A.   Yes.

14  Q.   When I say turn a knob, I shouldn't have said that.  You

15  actually push down on the door, right?

16  A.   Yes.

17  Q.   And then in the interior of the house, right?

18  A.   That's correct.

19  Q.   And at that point, again, you and your partner have to go

20  together, you have to be aware, you have to clear the different

21  areas, including cabinets, etc., make sure no one is hiding,

22  true?

23  A.   Some cabinets.

24  Q.   I mean cabinets large enough to fit a human being, right?

25  A.   Yes.

P5SACom2                          Ignacio - Cross

1   Q.  And you do that for the entirety of the house, right?

2   A.  Yes.

3   Q.  You do it for the backyard as well, right?

4   A.  I believe, yes.

5   Q.  And you made sure, based upon your best senses, as well as

6   relying on your partner and the other officers to come, there

7   was no danger there; there was no one there, true?

8   A.  Yes.

9   Q.  Am I correct?

10  A.  Yes, sir.

11  Q.  Okay.  Now, officer, there was no property disturbed in the

12  house from what you could tell, true?

13  A.  From what it seemed like, yes.

14  Q.  And there was no furniture upended, right?

15  A.  No.

16  Q.  No closets thrown about, right?

17  A.  No.

18  Q.  It looked organized, true?

19  A.  Yes.

20  Q.  And you didn't see any bullet holes in the wall or notes of

21  threats or anything like that, did you?

22  A.  No.

23  Q.  Because you would have made note of all that, right?

24  A.  Yes.

25  Q.  Now, you called it, I believe, not a burglary, but a

P5SAComs2                         Ignacio - Cross

1  trespass; do you remember telling the ladies and gentlemen of

2  the jury that?

3  A.  Yes.

4  Q.  And that's because if a person is in another person's

5  property or residence --

6          MS. SLAVIK:  Objection.

7          THE COURT:  I think sustained, but I didn't hear the

8  rest of the question so maybe re -- try to rephrase it.

9          MR. STEEL:  If the Court says you think sustained, I

10  will rephrase it.

11  Q.  You didn't see evidence of anything stolen, right?

12  A.  No.

13  Q.  Okay.  And the homeowner didn't report anything stolen,

14  true?

15  A.  He did not.

16  Q.  Now, with regards to that Escalade, if you had any evidence

17  that Escalade was carrying somebody with a gun, you could have

18  done -- put out what's called a BOLO.  Do you know what I mean

19  by a BOLO?

20          MS. SLAVIK:  Objection.

21          THE COURT:  That's overruled.

22  A.  We could have.  Yes.

23  Q.  Can you tell -- some people may not know what that acronym

24  means.  Can you just explain that to the ladies and gentlemen

25  of the jury what a BOLO is?

1   A.   I believe it means be on the look out.

2   Q.   And that's where you can use your radio on your shoulder,

3   right?  True?

4   A.   Yes.

5   Q.   And you can say, hey, just saw this Cadillac Escalade, been

6   told that somehow it's involved in a major crime, right?

7   A.   Yes.

8   Q.   You did not do that, did you?

9   A.   We did not.

10  Q.   There was no mention of any threat to kill because you

11  would have thought that was important, right?

12  A.   Yes.

13  Q.   So and was there any mention that there was security

14  cameras; do you remember that?

15  A.   No mention, but I did see some cameras on the exterior of

16  the residence.

17  Q.   And the homeowner or tenant was charged, if you know, with

18  getting those images if they exist, if they were working, to

19  law enforcement; is that true?

20  A.   Yes.  We asked Mr. Scott Mescudi if he can provide us

21  with --

22  Q.   And he was -- sorry.  Go ahead.

23  A.   Surveillance footage.

24  Q.   And he was cooperative with law enforcement, right?

25  A.   Yes.

P5SACom2                        Ignacio - Cross

1   Q.  And he wasn't hyperventilating or saying, oh, my God, this

2   is -- this is a threat to me, right?  He was professional?

3   A.  Came off I guess kind of I would say like -- how can I

4   explain it?

5          Like he was flustered, a little flustered.

6   Q.  Okay.  And did you ever search his Porsche?

7   A.  I did not.

8   Q.  Was he driving a Porsche?

9   A.  Yes, he was.

10  Q.  Do you remember what color?

11  A.  I believe it was a black Porsche.

12         MR. STEEL:  Your Honor, may I just have a minute if

13  you don't mind.

14         THE COURT:  You may.

15         MR. STEEL:  Thank you, sir.  I'll be right back.

16         Officer, just give me one second, okay?

17         THE WITNESS:  Yes.

18  BY MR. STEEL:

19  Q.  Can I just ask you one other question, sir?

20  A.  Yes.

21         MR. STEEL:  Your Honor, is that okay?

22         THE COURT:  It's okay.

23  Q.  You arrive, I believe you told the jury, approximately --

24  or you got the call to arrive approximately 8:20 that morning,

25  true?

1   A.  Yes.

2   Q.  It wasn't 6:30 in the morning; the first call was 8:20,

3   true?

4   A.  Approximately 8:20, yeah.

5   Q.  Approximately, okay, all right.  And obviously I believe

6   it's daylight, true?

7   A.  Yes, it is.

8           MR. STEEL:  Okay.  Thank you, sir.

9           THE COURT:  All right.  Any further examination?

10          MS. SLAVIK:  No redirect, your Honor.

11          THE COURT:  All right.  Thank you very much, Officer

12  Ignacio.

13          THE WITNESS:  Thank you very much.

14          (Witness excused)

15          THE COURT:  The government may call its next witness.

16          MS. SLAVIK:  Your Honor, the government's next witness

17  is arson investigator Lance Jimenez.

18          And with the Court's permission, I will place a binder

19  at the witness stand.

20          THE COURT:  Very well.

21  LANCE JIMENEZ,

22      called as a witness by the Government,

23      having been duly sworn, testified as follows:

24          THE WITNESS:  Good morning, your Honor.

25          THE COURT:  Good morning.

1              THE DEPUTY CLERK:  Can you provide the Court your

2     first and last name and spell your first and last name.

3              THE WITNESS:  Lance Jimenez, L-A-N-C-E, J-I-M-E-N-E-Z.

4              THE COURT:  Ms. Slavik, you may proceed.

5     DIRECT EXAMINATION

6     BY MS. SLAVIK:

7     Q.  Good morning, Investigator Jimenez.

8     A.  Good morning.

9     Q.  Are you employed?

10    A.  Yes.

11    Q.  Who is your employer?

12    A.  The City of Los Angeles Fire Department.

13    Q.  Is that sometimes referred to as LAFD?

14    A.  Yes.  Correct.

15    Q.  What is your current title?

16    A.  Arson investigator, firefighter.

17    Q.  What year did you start working at the LAFD?

18    A.  I was hired in February of '03, so a little over 22 years

19    now.

20    Q.  When did you become an arson investigator?

21    A.  In 2011, so a little over 14 years now.

22    Q.  What was your role prior to becoming an arson investigator?

23    A.  Firefighter.  I was -- also went and did a time as a peer

24    instructor at the academy, and then I later on became a

25    paramedic.

P5SACom2                          Jimenez - Direct

1   Q.  Have you held any other titles?

2   A.  With the fire department?

3   Q.  With the fire department or otherwise?

4   A.  Yes.  I actually joined LAPD a while back, and I was a

5   reserve officer, went through three levels of reserve training,

6   three, two, one.  And I did that for a few years.

7   Q.  How long were you a reserves officer?

8   A.  For 17 years.  16, 17 years.

9   Q.  Can you describe your educational background?

10  A.  I have a Bachelor's Degree and a Master's Degree in

11  kinesiology.

12  Q.  And can you explain to the jury what kin -- I'm going to

13  say it wrong.

14  A.  It's study of human movement, biomechanics, or exercise,

15  things like that, health and fitness.

16  Q.  Going back to your role as an arson investigator, what are

17  your duties and responsibilities?

18  A.  We're basically detectives for the fire department.  We

19  work hand in hand with LAPD to work on the crime of arson,

20  which is intentionally set felony crimes.  And I do everything

21  from crime scene investigation, origin and cause determination,

22  evidence collection.  We look into going into law enforcement

23  as far as the follow-up cases, the detectives, so filing a

24  case, report writing, testifying in court, things of that

25  nature.  Like a detective role for the fire department.

1  Q.  Now, you mentioned that one of your duties is origin and

2  cause investigations.  Can you explain to the jury what that

3  is?

4  A.  Yeah.  So whenever a fire occurs, the duty for me is to go

5  in and try to determine where that fire originated and how the

6  fire started.  And there's a systematic approach that we use to

7  determine that.

8  Q.  So I want to talk about that systematic approach.  But

9  first, is it fair to say that the origin is where the fire

10  started?

11  A.  Yes.

12  Q.  And the cause is how the fire started?

13  A.  Yes.

14  Q.  So how do you go about conducting such an investigation?

15  A.  So I use a systematic approach that I've been trained over

16  the years to go in.  And I usually go from starting from the

17  dispatch of the call.  And I get a call out, what we may have,

18  what type of fire it possibly could be.

19          So I might do a little research on the way, maybe

20  follow up with the 9-1-1 caller to see what it is.  We might

21  pull up the address, look to see what we're looking at, a

22  building, a trash can, a street corner, apartment, commercial,

23  whatever it may be.  We try get an idea.

24          When we get there, then I will make sure the scene is

25  secure, hopefully we still have resources on scene, maybe a

1    LAPD officer holding the scene or a fire company or battalion

2    chief or somebody of that nature that called us out.

3          And I'll start with identifying pertinent people that

4    might be involved or witnesses or -- kind of set that aside so

5    we maintain those people or victims that might still be there.

6    We'll look at do they get transported to the hospital, anybody

7    gone that route.  Was there maybe a suspect on scene.

8          So we kind of identify some things first, safety wise,

9    to kind of get organized.  And then I'll do my actual scene

10   investigation.  And starting from the outside in, let's say

11   it's like a single-family dwelling, I'll go through and I'll go

12   around the perimeter of the building, look at the exterior of

13   the building, what kind of burn patterns do I see, did the

14   windows break, were doors opened or broken open or kicked open

15   or burned through, was the roof burned through.  I'll kind of

16   do a lap around.  Work my way in from the unburned area to the

17   most burned to try to pinpoint where the burn patterns lead me

18   to where the most severe area of the fire may be.

19         From that, we will dig through the area and kind of

20   get an idea of what possible causes may be there.  We'll go

21   into an extensive collection of possible data, which was, like

22   I said, witnesses.  I might go back and talk to witnesses.

23   I'll look at maybe surveillance footage.  We'll look at any

24   items in the area that may have been potential causes.  I'll

25   kind of create like a general hypothesis of what possibly could

1    have been the cause.

2          I'll work with another partner usually who will also

3    do the same thing on their own.  I'll collaborate with that

4    partner.  We'll take photos.  We'll look for any evidence we

5    might want to collect.  Then we kind of break it down.  Is

6    there an actual cause that might be crime related?  Is this an

7    accidental fire?  Is this an intentional fire?  Is this a fire

8    that's caused by the natural effects?  Or is this something we

9    just don't -- we don't know and we can't figure it out.  We may

10   label that undetermined and kind of go from there.

11   Q.  Pausing you there, Investigator Jimenez.

12   A.  Sure.

13   Q.  You mentioned that you typically work with a partner; is

14   that right?

15   A.  Correct.

16   Q.  How is work divided between partners?

17   A.  Usually we work in pairs.  They'll be a lead investigator

18   and then like a partnered up to be a colleague as assistant, so

19   to speak.  They'll usually do the photos, the scene collection

20   for evidence.  And then maybe do some witness interviews.  But

21   we always meet up with whoever called us out, like instant

22   commander in the beginning, and then we'll split up and do our

23   duties.  And then we meet back up and kind of collaborate and

24   corroborate our findings and what we both think, and come up

25   with like a cause and origin together usually if we can.

P5SACom2                              Jimenez - Direct

1   Q.  As an arson investigator, what determines whether you and

2   your partner respond to the scene of a fire?

3   A.  We have different ways of being called out.  Usually three

4   different ways.  We might get a dispatch from our central

5   command center, which is basically like our -- we call it our

6   metro dispatch, like if someone calls 9-1-1 and says, hey,

7   there's a fire.  So usually the fire company on scene will call

8   our dispatch to respond to call us out.  So that's one way.

9         And the other way may be just maybe a fire company

10  didn't respond, and we'll go out and follow up with maybe LAPD

11  who is out there already.  LAPD being Los Angeles Police

12  Department.  Sorry.  LAPD will be out there saying we have a

13  fire, no fire companies, can you come take a look at it.  Fire

14  might be out.

15        And the last way, we might be doing follow-up from the

16  day before, something might have happened maybe an owner of a

17  vehicle or owner of a home or somebody that they notice a fire

18  after the fact, and they called and we're going to go out and

19  do a follow-up on it without anybody there.

20  Q.  Investigator Jimenez, approximately how many fires have you

21  investigated in your career as an arson investigator?

22  A.  I've been with -- before I was on as an arson -- I partook

23  in a lot of different investigations while I was prepping to

24  get into the arson section.  And then we average about 100 a

25  year as an investigator.  That's assisting in investigations or

1    being the lead investigator.  So over the last 14 years, I

2    would say well over 1,000 plus.  1,200 possibly.  Maybe more.

3    Q.  And what sort of fires have you investigated?

4    A.  Los Angeles is pretty crazy.  I'm not going to lie.  So

5    I've seen everything from trash on the ground to commercial

6    buildings with fatalities and everything in between.  Auto

7    fires, dumpsters, single-family dwellings, apartments.  You

8    name it, I think I've seen it over the last decade and a half.

9    Q.  Did you receive training to become an arson investigator?

10   A.  Absolutely.

11   Q.  What sort of training?

12   A.  I went through basic training through private fire academy

13   where I went through and put myself through a fire academy

14   before I got on with LA City.  I went through extensive fire

15   academy while on the job with LA City, learning about fire

16   behavior, building construction, basic fire fighting tactics,

17   little bit of origin and cause determination.

18           As a firefighter, I experienced fire firsthand,

19   fighting fires on the end of a nozzle, inside a building, fire

20   burning around me, feeling and seeing fire travel and behavior.

21           To get certified, I went through state training, few

22   hundred hours of -- a couple hundred hours of state training to

23   be certified through the California State fire marshal as a

24   fire investigator one and two.  Also did a lot of other

25   training throughout the state and throughout the fire

1    department.

2    Q.   Have you received training specific to auto fires?

3    A.   Yes.

4    Q.   What sort of training is that?

5    A.   Went through advanced forensic fire training for auto fires

6    in the --

7              (Court reporter clarification)

8              Advanced forensic fire investigation for auto fires in

9    the City of San Obispo, a course for that.

10   Q.   What if any certifications do you hold?

11   A.   I was training as a terrorism liaison officer.  I've had

12   advanced training in weapons of mass destruction, hazmat

13   training.  Also certified as a state fire marshal, like I said,

14   through the California state fire marshals fire investigator

15   or -- yeah, fire investigator.  I have the forensic auto fire

16   class.  I've had certifications as an EMT.  I'm also a

17   paramedic, like I said.  And through LAPD as a reserve officer,

18   those certifications as well.

19   Q.   As an arson investigator, have you testified as an expert

20   witness on prior occasions?

21   A.   Yes.  Several times over the years.

22   Q.   Can you ballpark how many?

23   A.   It's tough to say.  Throughout the LA County court system

24   we have, I think, five different courts.  I've testified at all

25   of them throughout the years.  It would be tough.  I'd say

1   within the last four or five years, probably at least a dozen

2   or so.

3   Q.  Have you ever not been qualified as an expert?

4   A.  Never.

5        MS. SLAVIK:  Your Honor, at this time, the government

6   moves to qualify Investigator Jiminez as an expert in fire

7   cause and origin determinations.

8        MR. AGNIFILO:  No objection.

9        THE COURT:  He'll be accepted on that basis.

10  BY MS. SLAVIK:

11  Q.  Before we move on, Investigator Jimenez, I just want to

12  make sure that we understand the limits of your expertise.

13        As part of your duties as an arson investigator, do

14  you perform DNA testing or analysis?

15  A.  No.

16  Q.  Have you had any training with respect to DNA and analysis?

17  A.  Not in testing or analysis, no.

18  Q.  Do you have any expertise related to DNA testing and

19  analysis?

20  A.  No.

21  Q.  Same questions regarding fingerprint analysis.

22        As part of your duties as an arson investigator, do

23  you collect fingerprints?

24  A.  I've been trained on latent prints, but I don't personally

25  do that, no.

P5SACom2                          Jimenez - Direct

1   Q.  Do you perform fingerprint analysis?

2   A.  No.

3   Q.  And do you have any expertise with respect to fingerprint

4   analysis?

5   A.  No.

6   Q.  I want to know focus your attention on January 9th, 2012.

7          Were you working that day?

8   A.  Yes.

9   Q.  What was your shift?

10  A.  I was on a 24-hour platoon shift with another partner,

11  working a 24-hour car.

12  Q.  What is a 24-hour platoon shift mean?

13  A.  We're just working a 24-hour shift, available for the whole

14  city to be dispatched throughout the City of Los Angeles.

15  Q.  Were you working with a partner that day?

16  A.  Yes. I was.

17  Q.  Who was that?

18  A.  Mike Camillo.

19  Q.  Did you respond to an auto fire in the Hollywood Hills that

20  day?

21  A.  Yes.

22  Q.  I want to direct your attention to an auto fire at 8925

23  Hollywood Hills Road on January 9th, 2012.

24          Do you remember responding to that fire?

25  A.  Yes.

P5SACom2                         Jimenez - Direct

1   Q.  How were you alerted to that auto fire?

2   A.  I believe that was through a dispatch, if I'm not mistaken.

3   Q.  And can you just explain what dispatch is?

4   A.  Like I said before, our metro communications will let us

5   know that we've been requested at a fire scene.

6   Q.  Approximately what time of day were you alerted?

7   A.  I want to say around 11:00, and we were located at our

8   station.  It wasn't too far away, so we were probably there

9   within 30 minutes.

10  Q.  What information were you provided by dispatch?

11  A.  The auto fire and parked in a driveway.

12  Q.  And this auto fire was reported at 8925 Hollywood Hills

13  Road; is that right?

14  A.  Yes.

15  Q.  What did you do after you were alerted to this auto fire by

16  dispatch?

17  A.  We went to proceed to investigate, like any other normal

18  investigation we would conduct.  We arrive.  We talk to the

19  company that's there.  This particular engine company was there

20  with a fire captain and an engineer and two other firefighters.

21  Q.  I want to walk through that step by step.  But, first, can

22  you describe the residence?

23  A.  Very -- Hollywood Hills is a very affluent area in Los

24  Angeles, kind of up in the hills by Mulholland.  It's nicer

25  homes up on the hillsides, more up and away from the city, so

1    to speak.  So we consider that kind of more of an affluent

2    area, very nice home, offset from the street.

3    Q.  And what about the home itself, can you describe that?

4    A.  This was a home kind of offset from the long driveway, kind

5    of a large fence in front of the yard, so you couldn't really

6    see into the home.

7    Q.  Now, you started to get into this, but who was on the scene

8    when you and your partner arrived?

9    A.  There was a fire company there.

10   Q.  What's the first thing you do -- you did when you arrived

11   at the scene?

12   A.  We catch up with the captain to find out what they saw,

13   what they did, and why they called us out.

14   Q.  What did you do next?

15   A.  We were identified that there was a witness there so we

16   made sure that person stayed by.  We were told that the victim

17   was there, so asked that that person standby.  And then we were

18   shown the vehicle that was -- had the fire involved, and then

19   we started our investigation.

20   Q.  And just generally speaking, what did you observe with

21   respect to the scene?

22   A.  So for this vehicle was parked fairly close to the garage.

23   It was a long driveway.  There were two other cars parked

24   behind it going out to the street.  The street was kind of

25   offset so it's hard to see from the -- I'm sorry.  The driveway

P5SACom2                          Jimenez - Direct

1  and where the car was is a little offset from the street, hard

2  to see.

3          So when you walk into the driveway, it's more visible.

4  I observed a black Porsche that had had a fire.  It was

5  involved in a fire.

6  Q.  Did you inspect the black Porsche?

7  A.  I did.

8  Q.  What was the condition of it?

9  A.  Well, first, I inspected the surrounding area if I could

10 backtrack.

11         So there was a lot of vegetation and foliage around

12 the vehicle, kind of blocking the view.  So I checked to make

13 sure none of that is burned.  I didn't see any of that burned.

14 I look around the car to see if there was any fire damage to

15 the exterior of the car.  I'm looking for things that may have

16 got into the car from the outside.  I didn't observe any of

17 that.

18         I observed -- it was a black Porsche 911 with a canvas

19 top.  There was a cut on the top of the vehicle or the top of

20 the roof, about a foot long.  And inside I observed that a fire

21 occurred inside the passenger space compartment.

22 Q.  What if anything did you observe inside the Porsche?

23 A.  Inside the Porsche, when we opened it up, there was burn

24 patterns throughout the seats, the center console, little bit

25 of carpet.  Some burn patterns on the interior roofing.

P5SACom2                          Jimenez - Direct

1  Q.  Did you observe any items within the Porsche?

2  A.  Yes.  There was a bottle on the front seat.  And there was

3  a -- like a cloth handkerchief on the center console that was

4  burned.

5  Q.  What if anything did you observe around the Porsche,

6  outside of it?

7  A.  Outside the Porsche there was a couple extinguishers that

8  the fire company brought up.  There was also a disposable

9  lighter within close proximity, couple of feet from the Porsche

10  on the ground by the drivers side.

11  Q.  And what if any initial hypothesis did you draw after

12  making these observations?

13  A.  Well, I look at -- I look at different things that may

14  potentially cause the fire.  I look -- first, we always look at

15  the engine, see if there's any electrical issues.  The engine

16  in the back of the Porsche was not damaged.  The backseats

17  weren't damaged, really nothing burnt through the rear.  Look

18  at the battery area, the battery in the front.  There's nothing

19  indicating in the front console any kind of fire occurred.

20        So I try to rule out any kind of accidental type

21  thing.  Nothing natural.  Weather is good.

22        Inside, I did observe the bottle.  I smelled what I

23  know to be gasoline inside the vehicle when we opened it up.

24  And inside the bottle we observed a liquid.  That odor gave to

25  me what I know to be gasoline.  And the handkerchief there.  So

1   I made a general observation this may have been a Molotov

2   cocktail.

3   Q.  Can you explain to the jury what a Molotov cocktail is?

4   A.  A Molotov cocktail is a makeshift fire bomb.  The idea it's

5   a breakable container with an ignitable liquid poured inside,

6   some kind of a cloth wick or something stuck inside the nozzle

7   of the bottle.  They light that on fire.  The object is -- it

8   breaks open.  The gas and the vapors disperse with the flames

9   and it creates a fire bomb.  And a very -- cause a lot of

10  damage for a fire.

11  Q.  Now, focusing on the damage to the Porsche.  You said that

12  you saw smoke and fire damage to the Porsche; is that right?

13  A.  There was a lot of heat damage to the center console, the

14  door, and the windows.  I didn't observe any broken windows.

15  So the windows were still intact.  And there was a lot of burn

16  patterns on the seat and the floor carpeting.

17  Q.  And what in your view caused this damage?

18  A.  The bottle itself, I formed the opinion that it was a

19  Molotov.  And that the handkerchief had burned but fell out of

20  the bottle.  The bottle had dropped in, in my opinion, and it

21  didn't break.  So the gas kind of splashed around causing the

22  burn patterns I observed.

23  Q.  Have you seen other auto fires called by Molotov cocktails?

24  A.  Many, yes.

25  Q.  And how did the damage to the Porsche in this case compare

P5SACom2                          Jimenez - Direct

1  to the other auto fires that you've seen caused by Molotov

2  cocktails?

3  A.  Although there was fire damage to the vehicle, it wasn't as

4  extensive as what I usually see when the Molotovs do break and

5  extensive fire damage.  I've seen cars burn all the way down to

6  the frame from these type of fire bombs.

7  Q.  And why was the damage to the Porsche in this case less

8  significant?

9  A.  I formed the opinion that the cloth was more of a silky

10  type material.  I think it just fell out of the bottle.  The

11  bottle didn't break so the liquid wasn't able to disperse with

12  I think the objective intent of it.  And it just did -- and the

13  fire just smoldered out inside.  It stayed small and relatively

14  didn't have enough oxygen to cause the damage I think it was

15  intended for.

16  Q.  How close to the residence was the Porsche parked when this

17  incident occurred?

18  A.  A few feet away, maybe ten.  I would be approximating.

19  Q.  If the Molotov cocktail had broken, if the glass bottle had

20  broken, what if any damage could it have caused to the

21  residence?

22  A.  In that particular incident, I think the foliage around

23  directly would have been more exposed by the heat, and that

24  would have definitely caught fire, spreading through the

25  vegetation of the hillside.  And then if the radiant heat gets

P5SACom2                        Jimenez - Direct

1   big enough and the fire gets big enough, it definitely would

2   have affected the home and the roofing material on the garage,

3   causing the home to burn and the vehicle behind it as well.

4   Q.  Now, you said that you observed the Porsche; is that right?

5   A.  Yes.

6   Q.  Did you form an opinion as to how the Molotov cocktail got

7   into the interior of the car?

8   A.  Yeah.  At the end of my investigation, I formed the opinion

9   that somebody had lit it and dropped it -- cut the roof and

10  dropped it inside of the front seat.

11  Q.  So after making these observations as to the scene, what

12  did you do next?

13  A.  We proceeded to look for any surveillance cameras.  There

14  were cameras there.  I was informed that they weren't

15  recording.  We also looked for witnesses, canvassed the area.

16  We only had one witness that was there, but they just came

17  after the fire had already been set.  So they weren't -- they

18  didn't see the actual fire occur.  And then we -- I was able to

19  speak with the victim of the -- of the Porsche in the home.

20  Q.  What did your partner do?

21  A.  He took photos and proceeded to collect the evidence.  We

22  did collect evidence on scene.

23  Q.  Did you look at the photos that your partner took at or

24  around the time that they were taken?

25  A.  Yes.

P5SACom2                    Jimenez - Direct

1   Q.  Have you looked at them since?

2   A.  Yes.

3   Q.  When?

4   A.  As recently as yesterday I believe, or the day before

5   yesterday.

6   Q.  Investigator Jimenez, you should have a binder next to you

7   that contains two photos in evidence which are Government

8   Exhibits 8C-101 and 102, as well as what's been marked for

9   identification as Government Exhibits 8C-103 through 141.

10           Have you reviewed the contents of that binder,

11  Investigator Jimenez?

12  A.  Yes.

13  Q.  How do you know?

14  A.  I was given this binder to look at and I initialed the

15  front of the binder.

16  Q.  And do you recognize the photos that are contained in that

17  binder?

18  A.  Yes.  These are what I know to be the photos that my

19  partner took on scene.

20  Q.  Do these photos fairly and accurately depict what you

21  observed on January 9th, 2012?

22  A.  Yes.  They were taken the day of while we were there.

23           MS. SLAVIK:  The government offers Government Exhibits

24  8C-103 through 141 into evidence.

25           MR. AGNIFILO:  No objection.

P5SACom2                         Jimenez - Direct

1          THE COURT:  All right.  8C-103 through 141 will be

2    admitted.

3          (Government's Exhibits 8C-103 through 141 received in

4    evidence)

5    Q.  I want to walk through some of these photos with you,

6    Investigator Jiminez.

7          MS. SLAVIK:  Ms. Foster, can you please publish

8    Government Exhibits 8C-101 and 103 side by side.

9    Q.  Investigator Jimenez, can you explain to the jury what

10   we're looking at in these photos?

11   A.  Yes.  The photo 101 is the front of the residence, the

12   fence I had spoke about with the vegetation.  And then the one

13   adjacent to that, is that 103?

14   Q.  The one on the right is 103, yes.

15   A.  It's the vehicle in front is the Porsche, and then the

16   other two cars that were parked.  You see myself there with

17   some of the fire companies that were there.

18   Q.  And how would you describe this driveway that's depicted in

19   8C-103?

20   A.  Like I said, it was a long driveway that kind of fed to the

21   street, and the front part of that driveway was kind of hidden

22   by the vegetation.

23   Q.  And where is the black Porsche in this photo?

24   A.  Up in front towards the garage.

25          MS. SLAVIK:  Thank you, Ms. Foster.  You can take this

P5SACom2                          Jimenez - Direct

1   down.

2           And could you please publish Government Exhibits

3   8C-104 and 107 side by side.

4   Q.  What are these photos, Investigator Jimenez?

5   A.  That is myself there off to the left of the vehicle and

6   then that's the vehicle that we were referring to that was

7   burned.

8   Q.  This is the black Porsche that was burned?

9   A.  Correct.

10          MS. SLAVIK:  Thank you.  You can take these down,

11  Ms. Foster.

12  Q.  Now, Investigator Jimenez, you said that the canvas roof of

13  the Porsche had been cut; is that right?

14  A.  It was my opinion, yes.

15          MS. SLAVIK:  Ms. Foster, could you please publish

16  Government Exhibits 8C-108 and 111 side by side.

17  Q.  Investigator Jimenez, can you explain to the jury what

18  they're looking at here?

19  A.  Yeah.  That's the canvas roof that I was referring to, and

20  you'll see that a line straight to the right of that cut, looks

21  like it was intentionally cut.

22  Q.  I want to focus now on the damage to the Porsche.

23          MS. SLAVIK:  Ms. Foster, could you please publish

24  Government Exhibits 8C-113 and 116 side by side.

25  Q.  Investigator Jimenez, what are we looking at here?

1    A.  So 113 would be looking from the passenger space, passenger

2    door looking towards the driver's seat.  And you'll see the

3    cloth I was referring to on the center console there with the

4    bottle in the drivers seat.

5           116 would be the opposite side looking from the

6    driver's end, you'll see a closer view of that bottle that we

7    had observed and the burn patterns there.  You can see the burn

8    patterns there right along where the nozzle of that bottle

9    where the liquid was kind of leaking out causing that burn

10   pattern.

11   Q.  And do you see any items that you later collected as

12   evidence in these photos?

13   A.  Yes.  We go back to 113, you see the bottle there and then

14   you'd see the cloth material there.

15   Q.  And is that approximately where the cloth was when you

16   arrived at the scene?

17   A.  Yes.

18           MS. SLAVIK:  Ms. Foster, could you take these down and

19   publish Government Exhibit 8C-114.

20   Q.  What is on the -- what is depicted in the photo here,

21   Investigator Jimenez?

22   A.  So you'll see the driver's door, which shows you kind of

23   the smoke and soot damage to the window that I referred to

24   earlier where the window did not break.  You'll see more of a

25   burn pattern towards that lower bottom corner of the door,

P5SACom2                        Jimenez - Direct

1   which coincides with where that bottle was at.

2   Q.  And, again, how does the damage to this Porsche compare to

3   other auto fires set by Molotov cocktails that you've observed?

4   A.  Yeah.  There's severe damage, but not nearly what I would

5   normally see with a Molotov where the distribution of gasoline

6   would have been more effective and causing more of a

7   catastrophic damage of the vehicle.  I've seen some vehicles

8   that really just burn as if you wouldn't even recognize the

9   vehicle.

10        MS. SLAVIK:  Ms. Foster, can you take this down.

11   Could you please publish Government Exhibits 8C-119 and 120

12   side by side.

13   Q.  What are we looking at here in these photos, Investigator

14   Jimenez?

15   A.  You're looking more up towards the rear-view mirror and the

16   roof again and the canvas roof, and you'll see some of the heat

17   damage to the top of that roof.

18   Q.  Did you reach any conclusions as to what caused this

19   damage?

20   A.  Well, like I said, I believe it was originally cut, but

21   then once the fire burned, you get a little more heat damage

22   towards the top as the heat rises.  Radiant.  Radiant heat

23   damage.

24   Q.  Caused by the Molotov?

25   A.  Correct.

P5SACom2                          Jimenez - Direct

1              MS. SLAVIK:  Ms. Foster, could you please publish

2      8C-122 and 124 side by side.

3      Q.  And what are we looking at here, Investigator Jimenez?

4      A.  You'll see some minor burn patterns here.  And you'll see

5      some of the roofing material that kind of melted down and

6      dropped down, and you'll see some what looks to be like a

7      splash pattern from when the bottle hit inside the car.

8      Q.  And looking at --

9      A.  I'm sorry.  And you'll see the cloth in 122.

10     Q.  Thank you.

11             MS. SLAVIK:  You can take these down, Ms. Foster.

12     Q.  Now, Investigator Jimenez, you testified that you collected

13     several items as evidence; is that right?

14     A.  Correct.

15     Q.  I want to just run through some of the photos of those

16     items.

17             MS. SLAVIK:  Ms. Foster, could you please publish

18     Government Exhibit 8C-128.

19     Q.  What is this item?

20     A.  That's the bottle that we collected.

21     Q.  And what kind of bottle was it?

22     A.  I believe we have a better photo if you want a close up.

23     But it's a 40-ounce malt liquor bottle, Old English it looks

24     like.

25     Q.  Made of glass?

1    A.   It's a glass bottle, yes, correct.

2    Q.   What if anything was contained inside the bottle?

3    A.   Gasoline.

4         MS. SLAVIK:  Ms. Foster, could you please publish

5    8C-129.

6    Q.   Is this the photo you were referring to, Investigator

7    Jimenez?

8    A.   Yes.  We always do like a close up once we collect it.

9    Q.   And what brand of malt liquor is this?

10   A.   Old English 800.

11   Q.   Does this photo more clearly show the liquid inside the

12   glass bottle?

13   A.   Yes.

14   Q.   Did you smell the liquid?

15   A.   Yes.

16   Q.   What did it smell like?

17   A.   What I knew to be gasoline.

18   Q.   And what conclusion did you reach about the purpose of this

19   glass bottle?

20   A.   That it was a -- used for a Molotov cocktail.

21        MS. SLAVIK:  You can take this down, Ms. Foster.  And

22   could you please publish Government Exhibit 8C-131.

23   Q.   What is this?

24   A.   That's where we take some of the fluid out of the bottle

25   and we have it tested for analysis and collected as evidence.

P5SACom2                    Jimenez - Direct

1  Q.  Was this particular container recovered at the scene?

2  A.  We provide that container, but we put the fluid inside it.

3  Q.  And what is the purpose of that, of putting the fluid in

4  that container?

5  A.  To preserve it and we tag it.  We seal it, and we mark it

6  for evidence.

7          MS. SLAVIK:  Ms. Foster, could you please publish

8  Government Exhibit 8C-132 and 135 side by side.

9  Q.  What is depicted here, Investigator Jiminez?

10 A.  You'll see the fire extinguishers I was referring to and

11 then the disposable item that we observed on the -- adjacent to

12 the Porsche.

13 Q.  And does the photo on the left, Government Exhibit 8C-132,

14 does that depict the location of the lighter where it was

15 actually found on the scene?

16 A.  Yes.

17         MS. SLAVIK:  You can take this down, Ms. Foster.

18 Could you please publish Government Exhibit 8C-138.

19 Q.  What is this photo, Investigator Jimenez?

20 A.  That's the cloth material that I believe was attempted to

21 be stuffed inside the bottle.

22 Q.  Can you describe the cloth material for the jury?

23 A.  Yes.  It's what appeared to be some kind of designer-type

24 handkerchief.

25 Q.  What led you to believe it was designer?

1  A.  If you'll see in the corner of that material that didn't

2  burn, it had some kind of like fancy lines, like a -- and it

3  just had like a silky type material to it.

4       MS. SLAVIK:  You can take this down, Ms. Foster.

5  Thank you.

6  Q.  Investigator Jimenez, after reviewing the evidence that

7  we've just looked at, what if any conclusion did you reach as

8  to the cause and origin of this auto fire?

9  A.  I made the determination that somebody had taken that

10 bottle, put gasoline inside it, stuffed that cloth inside it,

11 lit the cloth, cut the roof of the vehicle, dropped it down

12 inside.  I believe that the cloth had fell out, burned,

13 smoldered, and then the liquid splashed.  And the bottle never

14 broke obviously, and then the fire just kind of self-contained

15 inside the vehicle causing damage, burn damage.  And the origin

16 was there on the seat, the driver's seat that caused the most

17 damage where the bottle had eventually landed.

18 Q.  What if anything did you conclude about whether this was a

19 random act?

20 A.  In my opinion, it was targeted for where the car was

21 located.  This car was not easily visible from the street.  The

22 car was not -- there was several car -- another car in the

23 driveway that didn't get targeted.  So I believe the Porsche

24 was targeted closer to the home.

25       It's also an area that you don't see too much activity

P5SACom2                           Jimenez - Direct

1    or crime and activity or homeless activity.  And my experience

2    is something in that neighborhood, something like that where

3    the vehicle was located, I personally felt it was targeted.

4    Q.  So you just described the investigation that you conducted

5    at the scene.  I want to talk about the additional

6    investigative steps that you took starting with testing the

7    evidence that we just talked about.

8              So, first, did you request that any of the items that

9    we just saw were tested for DNA?

10   A.  Yes.

11   Q.  Which items?

12   A.  That would be one, three, and four, which would be the

13   bottle, the cloth material, and the lighter.

14   Q.  Did you personally collect or swab these items for DNA?

15   A.  I did not.

16   Q.  Did you personally perform the DNA testing or analysis?

17   A.  I did not.

18   Q.  Did you receive any results with respect to the DNA testing

19   or analysis?

20   A.  Nothing came back on item three and four, and I believe

21   there was DNA hit on the bottle.

22   Q.  Which --

23   A.  Item number one.

24   Q.  Items three and four, that was the cloth?

25   A.  Lighter and the cloth.

1  Q.  And just to be clear, have you received any training with

2  respect to interpretation of DNA testing?

3  A.  I have not.

4  Q.  You said that DNA was recovered from the glass bottle; is

5  that right?

6  A.  Yes.  I was informed that there was a partial DNA.

7  Q.  Do you know where on the glass bottle the DNA was found?

8  A.  I do not.

9  Q.  Do you know what areas of the bottle were swabbed for DNA?

10  A.  I do not.

11  Q.  And you said that you are aware that there was a partial

12  DNA profile recovered from the bottle?

13  A.  That's what the report informed me, yes.

14  Q.  And are you aware that the partial DNA profile was

15  consistent with a female contributor?

16  A.  That's what it was -- I was told, yes.

17  Q.  So, first of all, do you know what that means that a

18  partial profile was consistent with a female contributor?

19  A.  Unfortunately, I do not know what that means.

20  Q.  Do you know if any additional DNA was found on the bottle?

21  A.  I don't believe so.

22  Q.  Do you know whether the presence of one DNA profile means

23  that only one person touched the bottle?

24  A.  No.  I don't know that.

25  Q.  Do you know whether it's possible to touch an object but

P5SACom2                          Jimenez - Direct

1    not leave detectable DNA?

2              MR. AGNIFILO:  Objection.

3              THE COURT:  Sustained.

4    Q.  Investigator Jimenez, in your experience, is DNA found

5    commonly at arson scenes?

6    A.  Unfortunately, throughout my career, I've requested DNA a

7    lot, and I have had very few hits with DNA.

8    Q.  Focusing now on the fluid in the glass bottle.  Can you

9    remind the jury what that fluid smelled like?

10   A.  It smelled like gasoline.

11   Q.  Did you submit the fluid in the bottle for testing?

12   A.  We did, and that was the item number two that you saw with

13   the can.

14   Q.  What sort of testing did you request?

15   A.  Trace analysis to identify what the liquid was.

16   Q.  Did you personally perform this trace analysis?

17   A.  No.

18   Q.  Do you have any training in trace testing or analysis?

19   A.  No.

20   Q.  What was -- what were the results of that trace testing?

21   A.  The report came back that it was in fact gasoline.

22   Q.  Turning now to fingerprints, did you request that

23   fingerprints be taken in this case?

24   A.  I requested -- yes.  I believe one and four, maybe three, I

25   don't recall if three was requested.  But we did request

1    fingerprints on the bottle and the lighter.

2    Q.  The bottle and the lighter you said.

3         Did you request fingerprinting of any other items at

4    the crime scene?

5    A.  I did make a call to LAPD latent prints lab to have them

6    come and fingerprint the vehicle itself.

7    Q.  That was the Porsche?

8    A.  The Porsche, yes.

9    Q.  Did you personally take the fingerprints?

10   A.  I did not.

11   Q.  Who did?

12   A.  I don't know.  I wasn't present for that collection.

13   Q.  Was it someone from your unit?

14   A.  No.

15   Q.  Arson investigator?

16   A.  No.  It was somebody from LAPD.

17   Q.  Is that standard protocol?

18   A.  Yes.

19   Q.  Have you received any training with respect to fingerprint

20   analysis?

21   A.  Not analysis, no.

22   Q.  Were fingerprints recovered from the glass bottle or the

23   BIC lighter?

24   A.  I was -- I have no idea to be honest.  I never received any

25   report.

1  Q.  Were fingerprints recovered from the Porsche?

2  A.  I believe there was two prints recovered.  I don't know the

3  results of that.

4  Q.  You don't know the results?

5  A.  No.

6  Q.  Did you collect any other fingerprints in this case?

7  A.  There was -- the victim had informed me that they had -- he

8  had somebody come and print his house from a previous trespass,

9  and that person recovered two fingerprints on his glass front

10 door, and that person put those on print cards and turned them

11 over to me.

12 Q.  What did you do after obtaining these print cards?

13 A.  The print cards were sealed in an envelope with the

14 person's signature, and then I put them in another envelope I

15 sealed for evidence and turned them into LAPD for a print

16 analysis.

17 Q.  What do you mean by putting them into evidence?

18 A.  We take all of our evidence we collect and we turn it

19 over -- we book everything with LAPD's evidence unit and

20 they -- they store and collect all the evidence, and it's

21 properly maintained through LAPD.

22 Q.  Did you receive results related to these fingerprint cards?

23 A.  I did not.

24 Q.  Now, you said that you entered these fingerprint cards into

25 evidence.  Did there come a time when you learned what happened

P5SACom2                          Jimenez - Direct

1    to the print cards?

2    A.  Yes.  Recently.

3    Q.  What happened to the print cards?

4    A.  The two print cards I had turned in were destroyed.

5    Q.  When were they destroyed?

6    A.  They were destroyed in August of 2012.

7    Q.  Were you aware that they had been destroyed in August of

8    2012?

9    A.  I was not.

10   Q.  Did you authorize the print cards being destroyed?

11   A.  I did not.

12   Q.  Who ordered their destruction?

13   A.  Somebody within LAPD.

14   Q.  Is that typically the way that logged evidence is

15   destroyed?

16   A.  Not for evidence that I turn in.  I'm the lead

17   investigator.  So everything goes through me before it's

18   destroyed.  Unless it goes through our arson section, it will

19   come through in a request if they want it destroyed or not or

20   returned back to the owner.

21   Q.  And the LAPD employee who authorized the destruction wasn't

22   you, you said, right?

23   A.  No.

24   Q.  Was that person a member of your team?

25   A.  No.

1   Q.  Did this strike you as unusual?

2         MR. AGNIFILO:  I'm going to object to all of this,

3   Judge.

4         THE COURT:  There was a question pending.  I take it

5   there's an objection to that question?

6         MR. AGNIFILO:  Yes.

7         THE COURT:  That's sustained.

8         MS. SLAVIK:  I'll ask a different question, your

9   Honor.

10  Q.  Investigator Jiminez, in your 15 years, approximately, as

11  an arson investigator, has evidence been ordered destroyed by

12  someone who was not a member of your team?

13        MR. AGNIFILO:  Your Honor, I object.  And can we have

14  a side bar on this?

15        THE COURT:  You may.

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

P5SACom2                          Jimenez - Direct

 1          (At sidebar)

 2          THE COURT:  Do you have any more questions along these

 3  lines?

 4          MS. SLAVIK:  No, that's my last question.

 5          THE COURT:  Well, the objection to that question,

 6  which I take it there is an objection, is sustained.

 7          MR. AGNIFILO:  Well --

 8          MS. SLAVIK:  Your Honor, this is an item of evidence

 9  that he collected with respect to his investigation.  I think

10  he's entitled to explain to the jury what happened with respect

11  to those evidentiary items.

12          THE COURT:  Well, if it were going to be asked, it

13  would need to be rephrased.  The way the question was posed was

14  whether in his 15 years of experience there's been evidence

15  that has been destroyed by someone who is not within his chain

16  of authority, something along those lines.

17          MS. SLAVIK:  That's right.

18          THE COURT:  Well, in what instances are you talking

19  about?  How would he know if evidence was destroyed, if there

20  was never any follow up to determine whether any evidence was

21  destroyed.  And you're talking about the destruction of

22  evidence when it's not within his chain of authority, so how

23  would he know about that one way or another?

24          MS. SLAVIK:  I can ask in a way that frames it within

25  his knowledge.  Understood.

1          THE COURT:  But let me hear.

2          MR. AGNIFILO:  There's a larger issue.  There's an

3     inference of wrongdoing here, which we are hearing for the

4     first time.  And which is utterly unfounded.  They're clearly

5     saying that something happened to cause these fingerprint cards

6     to be destroyed suspiciously under circumstances that this

7     witness has never seen before.

8          And I am asking that that this entire line be struck

9     as being prejudicial.  They're clearly suggesting that

10    Mr. Combs, with his authority, did something to cause the

11    destruction of these print cards.  There's no other reason for

12    these questions other than that.

13         THE COURT:  I, for one, hearing the testimony, did not

14    think that's where the government was going.

15         MR. AGNIFILO:  I don't know where else --

16         THE COURT:  Let me hear from Ms. Slavik.

17         MS. SLAVIK:  This is with respect to his

18    investigation.  And this material was in the 3500.

19    Investigator Jimenez only recently learned of the destruction

20    of these fingerprint cards in this matter.  He learned of the

21    destruction as of Friday.

22         THE COURT:  But what's the inference?  What are you

23    drying to address?

24         MS. SLAVIK:  It goes to the completion of the

25    investigation.  I think the defense is going to get up on

1    cross-examination and suggest that the -- there was -- it was a

2    dead end investigation.  There were no charges and there are

3    reasons why.  And this destruction of the print cards is one

4    such reason.

5          MR. AGNIFILO:  They could have left it at that.

6    That's clearly not what they're doing.  What they're clearly

7    doing is saying in addition.  They could have just said where

8    are the print cards, they're destroyed.  They didn't have to go

9    further and say have you ever heard of this before, did you

10   authorize it.  That is clearly improper.  And that's what

11   they're doing.

12         They are putting in front of this jury that there was

13   wrongdoing in the LAPD.  And the only reason that would be

14   relevant, since this is not an LAPD internal investigation, is

15   that someone in this courtroom had something to do with it, and

16   that someone is Mr. Combs.

17         MS. SLAVIK:  Your Honor.

18         THE COURT:  Hold on.  Again, that's not how I would

19   have taken it.  I understood the questions as they were coming

20   in as drawing the sting from potential cross-examination that

21   would show that the destruction of the fingerprint cards is

22   reason to question the entirety of the investigation to the

23   arson incident, and I assume that that's what Ms. Slavik was

24   doing, was trying to -- anticipating that you are going to get

25   up and say what are you talking about, you lost evidence that

1   would show -- possibly point to someone else as having done

2   this and just mysteriously vanished before trial.

3          MR. AGNIFILO:  Then she should have waited for me to

4   do that.  And the last question is improper along those same

5   lines.

6          THE COURT:  The last question is going to be

7   rephrased.

8          MS. SHAPIRO:  That was the only reason they asked the

9   last question.  There's no other legitimate reason consistent

10  with their explanation.

11         MR. AGNIFILO:  It shows the motive all along.  The

12  motive -- first of all, I wasn't going to bring up the print

13  cards.

14         THE COURT:  You can.  I don't think you're going to

15  hear anything in response because there's nothing to elicit.

16         MR. AGNIFILO:  But then they should have done this on

17  redirect.  They did this not for that reason.  They did this to

18  suggest something improper happened.

19         And it's not just an LAPD matter because they wouldn't

20  have asked all the other questions.  In 15 years have you ever

21  heard of -- it's suspicious.  They're making it suspicious.

22         MS. SLAVIK:  Your Honor, we discussed this yesterday.

23  With the defense raising the DNA testing issue with the testing

24  results coming into play and defense going to call into

25  question the investigation and the lack of charges in this

P5SAСom2                           Jimenez - Direct

1    crime.  I think, as I flagged for the Court we plan to --

2               THE COURT:  It was not flagged for the Court, so.

3               MS. SLAVIK:  I remember flagging for the Court that

4    the government will ask questions relating to the DNA testing,

5    the gas testing, and the fingerprint testing.

6               THE COURT:  Yes.  Those questions were asked and there

7    were no objections that were raised.  This is a separate issue

8    as I'm understanding.

9               MR. AGNIFILO:  This is a separate issue.

10              MS. SLAVIK:  I think we're entitled to draw this --

11              THE COURT:  Well, do you have any further questions

12   other than this line?

13              MS. SLAVIK:  No -- well, yes, I have further

14   questions, but not related to this line of inquiry.

15              MR. AGNIFILO:  My request is that all of the questions

16   and answers in regard to this witness being asked, in 15 years

17   you've never heard such a thing, you didn't authorize this to

18   be done --

19              THE COURT:  Fifteen years thing hasn't been answered.

20              MR. AGNIFILO:  Okay.  That you didn't authorize this

21   to be done.

22              MS. SLAVIK:  I think he's absolutely entitled --

23              MR. AGNIFILO:  My request is that it be stricken.

24              THE COURT:  I need a second to look at the transcript.

25              (Continued on next page)

1          (In open court; jury present)

2          THE COURT:  For the jury, give us one second to sync

3   up our technology here.

4          Since we've been going for a while, why don't we take

5   a restroom recess.  I'm sure everyone will appreciate it so

6   people aren't just pulling their heels here.  We will be back

7   in ten minutes.  Thank you.  All rise.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P5SACom2                        Jimenez - Direct

1              (In open court; jury not present)

2              THE COURT:  Investigator Jiminez, we will be back in

3      ten minutes.  I think you have a room.

4              THE WITNESS:  Thank you, Judge.

5              THE COURT:  Please be seated.

6              (Pause)

7              Now that we are not in side bar.

8              MR. AGNIFILO:  Can we --

9              THE COURT:  Oh, okay.

10             MR. AGNIFILO:  Bring him back out, Judge.

11             THE COURT:  If you would like this issue to be

12     addressed --

13             MR. AGNIFILO:  Yes.  Yes.

14             THE COURT:  Or I suppose if it's appropriate to

15     proceed in his absence, we can do it that way too.

16             MR. AGNIFILO:  Let me get him, Judge.

17             He's present, Judge.  Thank you.

18             THE COURT:  All right.  Ms. Slavik, what was the

19     purpose of eliciting testimony concerning these fingerprint

20     cards?

21             MS. SLAVIK:  Your Honor, the defense clearly intends

22     to attack the credibility of this investigation.  They've

23     already elicited certain details in the testimony of

24     Mr. Mescudi that, you know, certain aspects of the

25     investigation, the fact that no charges were brought, the fact

P5SACom2                          Jimenez - Direct

1    that this investigation kind of went nowhere.

2            So I think we're entitled to establish what steps were

3    taken and what steps were not taken and why those steps were or

4    were not taken through Investigator Jiminez.  So I think that

5    this testimony regarding the fingerprint analysis falls

6    squarely within that testimony of the investigative steps that

7    were and were not taken and why.

8            THE COURT:  What does the destruction of the

9    fingerprint cards have to do with what you just said?

10           MS. SLAVIK:  Because the outcome of the destruction of

11   the fingerprint cards is that no fingerprints were obtained.

12   There was nothing connecting anyone to the scene of this crime.

13   And I think there's an important reason as to why, which is

14   that these fingerprint cards were destroyed.

15           THE COURT:  And what is the defense's proposal as to

16   the instruction to be given to the jury?

17           MR. AGNIFILO:  I would like the Court to -- we're not

18   having live feed.

19           THE COURT:  Let me take a step back.

20           MR. AGNIFILO:  Yes.

21           THE COURT:  When I heard the questions, I assume that

22   there was a different reason why that line of inquiry was

23   coming up.  My assumption -- and there was no objection for I

24   think some of the initial questioning -- was that there was

25   going to be a line of cross-examination directed to the

P5SACom2                          Jimenez - Direct

1    fingerprint cards, much in the same way that we anticipate

2    there was a line of cross-examination going to the DNA

3    evidence.  That does not appear to be the case from the

4    defense's perspective.  That also is not the case from the

5    government's perspective, because I've raised that issue and

6    that isn't the reason why that testimony was brought up.

7           It appears to have been brought up precisely for the

8    reason that the defense suggests.  However, at the present

9    time, there's no inference one way or the other based on this

10   particular testimony.  That being said, I'm not -- the

11   defense's point about at the very least at this juncture a lack

12   of any relevance to the issues that are in this case is -- I

13   think we'll take it.  I don't think that there's any prejudice

14   from the line of questioning that we've had so far.

15          So my proposal would be to tell the jury to disregard

16   the testimony concerning the fingerprint cards that they just

17   heard and move on from there.

18          MR. AGNIFILO:  So, if I may, I think there's actually

19   quite -- there is prejudice.  And I think -- and I have to just

20   say it the way I think I see it.  I think what the government

21   has done is outrageous.  And I haven't used that had word all

22   trial, but I'm using it now.  And they know what they were

23   doing.  They knew exactly what they were doing.  They were

24   suggesting to this jury that someone in this courtroom had

25   something to do with the improper and suspicious destruction of

1    these fingerprint cards and that's outrageous.  And, quite

2    frankly, we are having discussions and I need a few more

3    minutes before we hit ground on what, if any, other remedies we

4    are going to ask for in light of that line of questioning.

5            So before I do that, let me speak with my colleagues

6    for a second.  And I will, if it's okay with the Court, I know

7    we're trying to get back to the jury back in the box, if I

8    could have a few minutes, two minutes, three minutes just to

9    discuss with my colleagues.

10           THE COURT:  Well, let me hear from the government

11   before we take a break, and then we'll come back at 11:00.

12           MS. SLAVIK:  Your Honor, I think that inference is

13   absolutely unwarranted here.  I think it is very clear that the

14   defense intended to attack the integrity of this investigation.

15   And, specifically, to attack the credibility of Investigator

16   Jimenez.

17           I think that the reason for eliciting the fact that

18   this was unusual, an unusual way to destroy evidence is related

19   to the fact that Investigator Jimenez did not personally

20   authorize the destruction of this evidence.  He did not have

21   anything to do with it.  Which otherwise could be, could be the

22   inference that the jury draws, that Investigator Jimenez did

23   not do an adequate investigation, which I think is exactly what

24   the defense intended to elicit.

25           The relevance of the fingerprint cards being destroyed

P5SACom2                          Jimenez - Direct

1    shortly after the incident itself is absolutely relevant

2    because it relates to the reason that there was no -- there was

3    no ability to conduct a fingerprint comparison.  If the

4    fingerprint cards from the trespass were destroyed, there's no

5    way to compare those fingerprints against any other

6    fingerprints that were obtained from the arson, such as those

7    retrieved from the Porsche.

8            This is I think an important fact for the jury to

9    consider as it assesses whether the trespass and the arson are

10   connected, which I expect the defense to argue strongly

11   against.

12           I think this is relevant, I don't think there's

13   prejudice.  I'm happy to move on from this line of questioning,

14   but I do think that it's absolutely relevant that the

15   fingerprint cards that Investigator Jimenez obtained were

16   destroyed shortly after the investigation.

17           THE COURT:  All right.  Thank you.  We'll take a

18   recess.  We'll come back at 11:00, and then that will give you

19   time, Mr. Agnifilo to discuss.

20           MR. AGNIFILO:  Thank you.

21           (Recess)

22           (Continued on next page)

23

24

25

P5SsCOM3

1          THE COURT:  All right.  So my having reviewed the

2     transcript, my intent is to strike from the record any

3     testimony regarding the fingerprint cards and the destruction

4     of them, and to instruct the jury not to consider that

5     testimony in this case.

6          I will note that after the only questions that were

7     asked as to which answers were given concerned the actual facts

8     of what the witness knew about the destruction.

9          Mr. Agnifilo, you objected solely to the question:

10    Did this strike you as unusual?  And I sustained that

11    objection.  No answer was given.  Then there was a followup

12    question about the 15 years of experience, at which point you

13    objected, and we had the sidebar and there was no further

14    testimony.

15         As I'm reviewing the record, the appropriate remedy

16    for the testimony that was given would be to strike the

17    testimony concerning the fingerprint evidence, since there was

18    no suggestion from the witness of any kind as to whether it was

19    usual or unusual or what happened in his 15 years of experience

20    since the objections were raised and either were sustained or

21    not ruled upon because of a sidebar.  There was no further

22    questioning after that.

23         So with that, Mr. Agnifilo.

24         MR. AGNIFILO:  I'll turn it over.

25         MS. SHAPIRO:  Your Honor, respectfully we are going to

P5SsCOM3

1  move for a mistrial at this time based on the prosecutorial

2  misconduct that went into this.

3       I think it's clear that, first of all, just to take a

4  step back, as the court will recall during jury selection,

5  there were issues raised by some prospective jurors about, you

6  know, the idea that Mr. Combs could buy his way out of this,

7  this type of conspiracy theory is out there, and the type of

8  implication that we believe these questions were designed to

9  create plays right into that.

10      I think the first few set of questions seem perfectly

11  fine, but --

12      I apologize, I need to use the technology here.  Can

13  you go -- yes, so go back up a little bit.

14      So we start with a few questions about what happened

15  to the fingerprints, when were they destroyed.  They were

16  destroyed in August.  You know, that all seems fine, right.

17  And it should have ended there, if the only purpose of it was

18  the one described by the government in the sidebar.

19      But instead, you know, they start going on and they

20  start asking more questions.  Did he authorize the prints being

21  destroyed?  And then he goes on, they go on to ask, in

22  particular --

23      This is going the wrong way.  I'm sorry.  I apologize.

24  The technology is not working.

25      THE COURT:  I have the questions in front of me.

P5SsCOM3

```
1          MS. SHAPIRO:  So then they get to the question, you

2    know, was this unusual.

3          THE COURT:  Right.

4          MS. SHAPIRO:  And then the last question was --

5          THE COURT:  Wait.  You got to that question and then

6    that's the first time there was an objection --

7          MS. SHAPIRO:  Well --

8          THE COURT:  -- which I sustained.

9          MS. SHAPIRO:  -- your Honor, I understand that.

10         But my point is that it was becoming clearer and

11   clearer that this inference is what the government was doing

12   this for, and the jury is going to be left with the impression,

13   even if your Honor strikes the testimony, including not only

14   those two questions, where the objections have been sustained,

15   but strikes the previous questions and answers and gives an

16   instruction, there is no way to unring this bell, particularly

17   those last two questions.

18         You know, first of all, it's clear from the last two

19   questions that, respectfully, what the government was doing

20   here, there's just no reasonable way to interpret their

21   motivation, other than they were trying to plant an idea in

22   these jurors that Mr. Combs was responsible for the destruction

23   of these fingerprints.  And there is no other reason.

24         Otherwise, they would have just stopped at the point

25   to elicit the testimony that the fingerprints are gone, you
```

P5SsCOM3

1    know, that they don't exist anymore, and that that would have

2    been the end of it.  So we, respectfully, submit that the only

3    proper remedy to cure the outrageous prejudice caused by this

4    is a mistrial.

5           THE COURT:  All right.  Let's hear from the

6    government.

7           MS. SLAVIK:  Your Honor, respectfully, a mistrial is

8    absolutely unwarranted here.  There was a good-faith basis for

9    the questions asked by the government.  I've been over those

10   good faith reasons, and I simply think that there is no

11   prejudice here, much less incurable prejudice that would

12   require a mistrial.

13          I think, going back to our discussion yesterday about

14   the DNA evidence, Mr. Agnifilo made very clear that the reason

15   that the DNA results were relevant here was because

16   Investigator Jimenez was the lead investigator and, therefore,

17   it was appropriate to explore why certain steps were taken in

18   the investigation and why certain steps weren't taken in the

19   investigation.

20          As I flagged for the court yesterday, given the

21   court's ruling that Mr. Agnifilo could pursue such questions on

22   cross-examination, that the government would elicit certain

23   information about the testing in this case from Investigator

24   Jimenez.  That includes the DNA testing, the gas testing, and

25   the fingerprint testing.

P5SsCOM3

1          I think here, with respect to the fingerprints, I

2    think that a curative instruction that the jury should not draw

3    any inference from the destruction of the fingerprints, I think

4    that sufficiently cures any possible prejudice in this case.

5          And that is the government's view of how this should

6    be resolved.

7          THE COURT:  The application for a mistrial is denied

8    for the reasons stated by the government.

9          In addition, I'll just offer the following, which is,

10   as I said, there were no objections to the questions that were

11   asked up to the last two.  As to those questions, the

12   objections were sustained, so there was no testimony from the

13   witness pertaining to those questions.

14         The jury has been instructed and will be instructed

15   that they are not to consider questions from attorneys or

16   statements from attorneys as evidence, and they are presumed to

17   follow those instructions, which we will give again.  So there

18   is no absolutely no testimony from the witness that was

19   prejudicial in any way, shape, or form, as the court sustained

20   the objections that were raised.

21         As to the inference to be drawn here, as I noted at

22   sidebar, the inference that is the most available and plausible

23   inference is that the government raised the issue concerning

24   destruction of the fingerprint cards because the defense on

25   cross-examination was intending to address that and to

P5SsCOM3

1    undermine the credibility of the investigation concerning the

2    arson incident by showing that critical evidence was destroyed

3    and could not be used by the defense to defend against the

4    suggestion from the government that Mr. Combs was responsible

5    for the arson that occurred.

6            That is the inference that the court drew -- excuse

7    me -- from the questions that were asked by the government, and

8    it was not until we had the colloquy at sidebar that it became

9    apparent that there may have been a different reason for the

10   line of questioning.

11           So I don't think that there is a problem of the jury

12   being left with an improper inference or a bell that's been

13   rung and can't be unrung.  And as the government points out, to

14   the extent there was any prejudice -- I don't believe that

15   there is any -- that could be cured by striking the testimony

16   and giving an appropriate instruction to the jury.

17           So, for those reasons, the motion for a mistrial is

18   denied.

19           As to now, given that, Ms. Shapiro, what do you want

20   me to tell the jury?

21           MS. SHAPIRO:  Yes, your Honor.

22           We would request that the court instruct the jury that

23   the questions regarding the destruction of the fingerprint

24   cards were improper and the answers given were irrelevant to

25   this case and this defendant and are not to be considered by

1    you.

2          MS. SLAVIK:  Your Honor, the government would consider

3    that prejudicial to the government and an overcorrection of any

4    possible --

5          THE COURT:  What's the difference between what you

6    said, Ms. Slavik, and what Ms. Shapiro just offered?

7          I think, phrased differently, I think it's the same

8    thing.

9          MS. SLAVIK:  Your Honor, I've been calling the

10   government's question improper is absolutely unwarranted.

11         MS. SHAPIRO:  Your Honor, they were improper, and the

12   court has so found.

13         MS. SLAVIK:  Your Honor, Ms. Shapiro just said that

14   those questions were not improper and her objection was to

15   questions that, in her mind, suggested the inference that

16   Mr. Combs had anything to do with the inference.

17         I don't think questions simply related to the

18   destruction of the fingerprint cards were improper.  Frankly, I

19   don't believe that these should be struck from the record.  I

20   think that the best way to correct, to the extent there is a

21   correction required, is to inform the jury that they are not to

22   infer anything from the fact that the fingerprint cards were

23   destroyed.

24         THE COURT:  I think the issue from the defense's

25   perspective is, just saying the last part, that the answers are

P5SsCOM3

 1    not to be considered, might leave an impression, although I

 2    don't think it would, that the questions were appropriate and

 3    were getting to something, but that there was some other legal

 4    reason why the answers should not be -- the testimony should

 5    not be considered.

 6         And so there needs to be that extra step, but I hear

 7    the government's argument.  In any event, the motion for a

 8    mistrial is denied.

 9         Let's have the witness back.

10    MS. COMEY:  Your Honor, if I may, it would be deeply

11    prejudicial and unfair to tell the jury that the government did

12    something improper.  Perhaps your Honor could instead instruct

13    the jury that they are to disregard both the questions and the

14    answers and that they are irrelevant to this case, instead of

15    impugning the government counsel by calling our questions

16    improper in front of the jury, your Honor.

17    THE COURT:  That's fair.

18    MS. SHAPIRO:  Your Honor, I think the problem that I

19    have with not doing that is that --

20         Look, we don't want a curative instruction that says,

21    You are not to draw any inference, you know, that Mr. Combs had

22    anything to do with the destruction of the fingerprints,

23    obviously, because that would just make things worse, right.

24         But we need to find a way to subtly get that issue, if

25    the court is really intending, that the instruction is going to

P5SsCOM3

1    cure the unfair prejudice from this line of questions and the

2    implication that they were clearly directed at.  I think --

3            THE COURT:  I don't think there was that implication

4    from the questions, as I explained at length, but I'm still

5    giving a curative instruction.

6            I think the government's point is, if you're

7    suggesting that there was an improper -- that there was

8    improper conduct, that is too far in the other direction.  Your

9    point is, you have to at least point out that the questions

10   should not be considered because that's really what you're --

11   what the objection is directed to, since I sustained the

12   objection to the questions that were asked.

13           MS. SHAPIRO:  So what --

14           THE COURT:  That's the reason why I think the

15   government is making the point, that there is a different way

16   to do it, that would address your concern, which, again, I

17   think it's highly questionable that there is any inference that

18   the jury would draw along those lines.

19           So I do agree that you wouldn't want to address it

20   specifically.  I don't think that's the inference the jury

21   would draw.  For present purposes, the point is, the jury

22   shouldn't consider the questions, although we have already

23   instructed them about that.  And we will instruct them about it

24   again and they shouldn't consider the answers.

25           So that's what we'll do.

P5SsCOM3

```
 1            MS. SHAPIRO:  Will the court also include that the
 2   answers are irrelevant to this case and this defendant and not
 3   to be considered by you?
 4            THE COURT:  Yes, I will.
 5            The instruction I'll give is that the jury should
 6   disregard --
 7            Sorry.  So, I'll instruct the jury that the questions
 8   regarding the destruction of the fingerprint cards and the
 9   answers given are irrelevant to this case and this defendant
10   and are not to be considered by them.
11            MS. SHAPIRO:  Thank you, your Honor.
12            THE COURT:  All right.  Let's have our witness back.
13   Then we will continue with the examination.
14            Welcome back.
15            THE WITNESS:  Yes.
16            (Continued on next page)
17
18
19
20
21
22
23
24
25
```

P5SsCOM3

```
 1              (Jury present)

 2              THE COURT:  All right.  Please be seated.

 3              Members of the jury, before the break, you heard some

 4    testimony about fingerprint cards.  And I am now instructing

 5    you that the questions regarding the destruction of the

 6    fingerprint cards and the answers given are irrelevant to this

 7    case and the defendant and are not to be considered by you.

 8              All right?  With that, Ms. Slavik, you may continue.

 9              MS. SLAVIK:  Thank you, your Honor.

10    BY MS. SLAVIK:

11    Q.  Investigator Jimenez, before the break we were talking

12    about testing various evidentiary items that you recovered

13    during your investigation.

14              Do you remember that?

15    A.  Yes.

16    Q.  Before we wrap up this morning, I want to talk to you

17    briefly about the interviews that you conducted in connection

18    with your investigation.

19              Did you interview the owner of the Porsche?

20    A.  I did.

21    Q.  Who was that the owner of the Porsche?

22    A.  He identified himself as Scott Mescudi.

23    Q.  Based on your interview of Mr. Mescudi, did you reach out

24    to other potential witnesses?

25    A.  I did.
```

P5SsCOM3

1  Q.  Who did you reach out to?

2  A.  I reached out to one of his drivers named -- first name of

3  Egor.  I don't recall the last name.  And then his personal

4  assistant who was there on scene.  And then the person who

5  provided some -- those print cards, and then there was a --

6  Q.  Did you reach out to any individuals that did not work for

7  Mr. Mescudi?

8  A.  OK.  I made attempts to reach out to people unsuccessfully.

9  Q.  Who specifically did you attempt to reach out to?

10  A.  There was a suspect named by Mr. Mescudi and there was an

11  assistant that that suspect had.  I reached out to that person

12  unsuccessfully.  And there was a common female involved between

13  the two.  I reached out, made an attempt to reach out to that

14  person.

15  Q.  Focusing on the person that you identify as the assistant,

16  what was that assistant's name?

17  A.  It's in my report.  I think it might have been Mary.  I

18  don't recall.  I have to look at my report again.

19  Q.  You referred to an assistant of a suspect.

20      Do you remember that?

21  A.  Oh, her name was Capricorn.

22      MR. AGNIFILO:  Your Honor, I'll object to the use of

23  suspect.

24      THE COURT:  All right.  Let's rephrase the question.

25  Q.  Investigator Jimenez, you mentioned that you reached out to

P5SsCOM3

1  individuals who were not employed by Mr. Mescudi, is that

2  right?

3  A.  Correct.

4  Q.  Who, by name, did you reach out to who was not employed by

5  Mr. Mescudi?

6  A.  It was a female named Capricorn, there was an individual

7  named Egor, I spoke about before, there was the assistant who

8  did work for Mescudi, who I spoke about, and then there was

9  a -- a common female between somebody who was identified.

10 Q.  Do you remember the common female's name?

11 A.  Yeah.  Her name was Cassie Ventura.

12 Q.  So, starting with Capricorn, were you able to make contact

13 with Capricorn?

14 A.  I was not.

15 Q.  Did you attempt to contact Capricorn?

16 A.  Several times, yes.

17 Q.  How many times, if you recall?

18 A.  Multiple phone calls, door knocked the place of residence.

19 Half a dozen maybe, times, attempts.

20 Q.  And when, if you remember, did you attempt to contact

21 Capricorn?

22 A.  Within -- within the immediate timeframe of that

23 investigation.  Within a couple of months.

24 Q.  You mentioned that you attempted to reach out to a woman

25 named Cassie, is that right?

P5SsCOM3

1   A.  Correct.

2   Q.  Were you able to make contact with Cassie?

3   A.  I was not.

4   Q.  How many times did you try?

5   A.  Maybe a couple.  I don't recall.

6   Q.  Do you remember how you tried to reach out to Cassie?

7   A.  I tried to identify maybe where she lived, was unable to,

8   telephone, didn't -- wasn't able to get through, through via

9   telephone, and then I made an attempt through a family member

10  of hers.

11  Q.  Were you able to reach her?

12  A.  Never.

13  Q.  Now, just stepping back, Investigator Jimenez, you said

14  that you concluded that the auto fire was deliberately set and

15  that the Porsche was targeted, is that right?

16  A.  That was my opinion, yes.

17  Q.  Were any charges brought related to this auto fire?

18  A.  Not on my case, no.

19  Q.  Why not?

20      MR. AGNIFILO:  I'll object to the form of the

21  question.

22      THE COURT:  Can you rephrase?

23  Q.  You said that you did not -- no charges were brought with

24  respect to your case?

25  A.  Correct.

P5SsCOM3                    Jimenez - Cross

1    Q.  What, if anything --

2            What, if anything, did you need that you did not have

3    in order to bring charges?

4            THE COURT:  Sustained.

5    Q.  Investigator Jimenez, you said that no charges were brought

6    related to this auto fire, right?

7    A.  Not at that time, no.

8    Q.  Did you ever close the case?

9    A.  I did not close the case.

10   Q.  What is the status of the case presently?

11   A.  It's listed as inactive pending anything further that may

12   arise.

13           MS. SLAVIK:  Nothing further at this time, your Honor.

14           THE COURT:  All right.  Cross-examination.

15           MR. AGNIFILO:  Thank you.

16   CROSS-EXAMINATION

17   BY MR. AGNIFILO:

18   Q.  Good morning --

19   A.  Good morning.

20   Q.  -- investigator Jimenez.  My name is Marc Agnifilo.  I'm

21   going to ask you some questions.  If I ask you a question that

22   you don't understand, just ask me to rephrase it and I'll be

23   happy to do that.

24   A.  Sure.

25   Q.  You put a number of photographs into evidence this morning.

P5SsCOM3                         Jimenez - Cross

1    I'm going to direct your attention to one particular one, which
2    is 8C-116.
3            MR. AGNIFILO:  So, that's in evidence.  If we can put
4    it on the screen and give it to Investigator Jimenez and the
5    jury.
6    Q.  This is the inside of the Porsche, right?
7    A.  Correct.
8    Q.  You see a glass bottle?
9    A.  Yes.
10   Q.  You submitted that glass bottle for DNA testing?
11   A.  I did.
12   Q.  And it came back with a hit, as you said, correct?
13   A.  A partial hit, yes.
14   Q.  Partial hit.  That this bottle contained female DNA,
15   correct?
16   A.  That's what the report said, yes.
17   Q.  When you send out DNA, you send it to an external
18   laboratory, am I right?
19   A.  Right, within LAPD.
20   Q.  Bode Laboratories, does that name sound familiar?
21   A.  I don't know the name of the laboratory.  I'm sorry.
22           MR. AGNIFILO:  Let me show you something, if it's
23   going to help.  It's Defense Exhibit 850.  We can put it up
24   just for the witness and the parties.
25   Q.  All right.  You see that in front of you?

P5SsCOM3                     Jimenez - Cross

1    A.  I do.

2    Q.  Yeah, I know.

3            MR. AGNIFILO:  Do me a favor.  If we could enlarge the

4    top of this for the fire investigator.  All right.

5    Q.  OK.  So my question is if, in this case, you sent this

6    glass bottle out for DNA testing to Bode Technology?

7    A.  I did not.

8    Q.  OK.  Did you --

9            THE COURT:  Hold on.  Hold on.  Are you trying to

10   refresh the witness's recollection?

11           MR. AGNIFILO:  Yes.

12           THE COURT:  All right.  Then allow him to refresh his

13   recollection.

14           MR. AGNIFILO:  I'm sorry.  That's fine.

15           THE COURT:  Then ask some questions.

16   Q.  All right.  So do you remember if -- not you personally,

17   but you and the other people who were working --

18           THE COURT:  Let's take the document down.

19           MR. AGNIFILO:  We can take it down.

20           THE COURT:  Ask your questions.

21   Q.  -- were working on the fire investigation, sent the glass

22   bottle to Bode Technologies for DNA testing?

23   A.  Incorrect.

24   Q.  OK.  How did that happen?

25   A.  I have no idea.

P5SsCOM3                    Jimenez - Cross

1   Q.  Did you receive a report from Bode Technology?

2   A.  I don't recall who the report came back from.

3   Q.  Do you remember seeing a report?

4   A.  I did a report.

5   Q.  OK.  Do you remember seeing a report indicating that the

6   glass bottle tested positive for a female's DNA?

7   A.  I think we've testified to that, yes, there was a partial

8   female.

9   Q.  OK.  And after that, you reached out for Capricorn Clark,

10  isn't that right?

11  A.  Not after that.  I think it was all during the same

12  timeframe.

13  Q.  When was the first time you reached out for Capricorn

14  Clark?

15  A.  I would imagine -- I recall maybe within a few weeks of the

16  incident.

17  Q.  Do you remember?

18  A.  I don't recall.

19  Q.  Do you have a specific recollection one way or the other?

20  A.  It was within that immediate timeframe before I turned in

21  my report.

22  Q.  Are you sure about that?

23  A.  Yes.

24  Q.  Did you reach out for her several times you said?

25  A.  Made couple of phone calls and did a door knock at her

P5SsCOM3                    Jimenez - Cross

 1   location.

 2   Q.  Do you remember reaching out for her in August of 2012?

 3   A.  It's possible.

 4   Q.  OK.  That would have been after you got this report, right?

 5   A.  I don't recall.

 6           MR. AGNIFILO:  OK.  So can we look at the report and

 7   see when you would have gotten this report.  Pull it back up

 8   for the fire investigator.

 9   Q.  Do you recall that the report came back on or about

10   March 22, 2012?

11   A.  I don't recall that, to be honest, when it came back.

12   Q.  Do you know about when it came back?

13   A.  Within that first year of the investigation.

14   Q.  OK.  And aside from a year, can you tell us anything more

15   specific about when the DNA report came back for the bottle

16   that's in the car?

17   A.  I mean, it's -- the timeframe would be probably within,

18   maybe, six months to a year.  I don't recall.

19   Q.  You don't recall?

20   A.  I don't recall when the report came back, no.

21   Q.  All right.

22   A.  I would have to go through, like, my previous e-mails when

23   it was given to me.

24   Q.  All right.  So let's talk about Government Exhibit 8C-116.

25           Do you have that in front of you?

P5SsCOM3                    Jimenez - Cross

1   A.  Not yet, no.

2        MR. AGNIFILO:  Put it in front of the fire

3   investigator.

4   Q.  OK.  So, here, we have the glass bottle that you say was

5   dropped in through the top of the car, right?

6   A.  Correct.

7   Q.  OK.  And this glass bottle, when you recovered it,

8   contained a certain amount of gasoline, correct?

9   A.  Yes.

10  Q.  All right.  And so, your theory, as you just told us, is

11  that this glass bottle was the source of the fire in the car,

12  right?

13  A.  It's an opinion, yes.

14  Q.  OK.  And that was your opinion as a trained fire

15  investigator?

16  A.  Correct.

17  Q.  OK.  And so, who made the decision to send this glass

18  bottle off to be DNA tested?

19  A.  I did.

20  Q.  OK.  So, you realized it's possible that there is going to

21  be important evidence on this bottle, correct?

22  A.  Yes.

23  Q.  And you sent it off to be tested for DNA, right?

24  A.  Yes.

25  Q.  And you would be expecting results on that, you would want

P5SsCOM3                     Jimenez - Cross

1   to see what those results were, correct?

2   A.  Yes.

3            MS. SLAVIK:  Objection.

4            THE COURT:  It's overruled.

5   Q.  Right?

6   A.  Yes.

7   Q.  It's important to your investigation to know if this glass

8   bottle comes back with DNA on it, right?

9   A.  Correct.

10  Q.  OK.  So this is something that you would be looking forward

11  to seeing, correct?

12  A.  Yes.

13  Q.  And you got results back that, in fact, there was female

14  DNA on this glass bottle, am I right?

15  A.  Partial female, yes.

16  Q.  OK.  Partial female.  So what does that mean to you?

17  A.  I have no idea.

18  Q.  So did you do any followup?  Did you figure this out?

19  A.  I asked what that meant, and I was told that if I could

20  come up with a -- maybe a sample of somebody or suspect, maybe

21  they might be able to match.  Other than that, I have no idea

22  what that was referring to.

23  Q.  But it was female DNA, you knew that?

24  A.  That's what the report said, yes.

25  Q.  That's the only DNA that came back in this case, am I

P5SsCOM3                    Jimenez - Cross

1   right?

2   A.  On that, yes.

3           MS. SLAVIK:  Objection.

4           THE COURT:  That's sustained.

5           The jury should disregard the witness's last answer.

6           Mr. Agnifilo.

7   Q.  To your knowledge, to your knowledge, did any other --

8           MS. SLAVIK:  Objection.

9   Q.  -- DNA comeback?

10          THE COURT:  That's sustained.

11  Q.  So this glass bottle comes back with female DNA.

12          Is there any other DNA that's on this glass bottle?

13          MS. SLAVIK:  Objection.

14          THE COURT:  You've got to rephrase the question.

15          MR. AGNIFILO:  All right.

16  Q.  You sent a number of objects off for DNA testing, right?

17  A.  Yes.

18  Q.  You sent the cloth, right?

19  A.  Correct.

20  Q.  You sent the bottle, as we discussed, right?

21  A.  Yes.

22  Q.  You have to say yes or no.

23  A.  Yes.  I'm sorry.

24  Q.  You sent the lighter?

25  A.  Yes.

P5SsCOM3                    Jimenez - Cross

1   Q.  Now I want to show you Government Exhibit 8C-122.  Is that

2   up in front of you?  Do you see that there?

3   A.  Yes.

4   Q.  All right.  Do you see in the lower left-hand corner of

5   that photograph what seems to be a black object?

6           Do you see that?

7   A.  I don't.

8   Q.  Do you see a black object on -- yeah, on the passenger seat

9   in the rear, on the rear?

10  A.  Yes.

11  Q.  Do you know what that was?

12  A.  I think it's a glove.

13  Q.  It's a glove.

14          MR. AGNIFILO:  OK.  I'm going to ask that the witness

15  be shown what has been introduced, but not admitted yet, as

16  Defense Exhibit 853.  This is just for the witness and the

17  parties.

18  Q.  This is another one of the photographs that were taken that

19  day, correct?

20  A.  Correct.

21  Q.  OK.  You didn't discuss this one on your direct

22  examination, am I right?

23  A.  Correct.

24  Q.  OK.

25          MR. AGNIFILO:  And we offer it as 853.

P5SsCOM3                      Jimenez - Cross

1          THE COURT:  Any objection?

2          MS. SLAVIK:  No objection.

3          THE COURT:  853 will be admitted.

4          (Defendant's Exhibit 853 received in evidence)

5          MR. AGNIFILO:  OK.  Can we show the jury 853.

6    BY MR. AGNIFILO:

7    Q.  That's a glove, right?

8    A.  Yes, sir.

9    Q.  Did you find a second glove?

10   A.  I don't recall.

11   Q.  So, in the car there is the bottle, right?

12          You have to answer yes or no so she can write it down.

13   A.  Yes.

14   Q.  There is the fabric, right, that was burned?

15          The piece of cloth, you said it was a fancy napkin or

16   handkerchief?

17   A.  Yes.

18   Q.  And there was the liquid gasoline, correct?

19   A.  Yes.

20   Q.  And there was this glove, this one single glove in the back

21   seat, am I right?

22   A.  Yes.

23   Q.  Without a second glove, am I right?  No second glove you

24   found?

25   A.  I don't recall the second glove.

P5SsCOM3                        Jimenez - Cross

1   Q.  OK.  Did you test the glove for DNA?

2   A.  No, we did not.

3   Q.  OK.  Did you look at the glove?  Did you examine the glove?

4   A.  I believe it belonged to the owner.

5   Q.  Belonged to the owner?

6   A.  Of the car.

7   Q.  Did you ask the owner if it was his glove?

8   A.  I believe so, yes.

9   Q.  Did you ask him why there was one in the car?

10  A.  I did not ask him.  It was a driving glove, according to

11  him.

12  Q.  Driving glove?

13  A.  Yes.

14  Q.  So let's talk about this.  So the one driving glove

15  belonging to the owner was in the back seat of this car, is

16  that what you're telling us?

17  A.  That's where I observed it, yes.

18  Q.  Yeah.  You observed it, and this photograph was taken of

19  the one driving glove belonging to the owner in the back seat

20  of the car, right?

21          MS. SLAVIK:  Objection, your Honor, form.

22          THE COURT:  It's overruled, but let's ...

23          Let's keep in mind that there may be objections to

24  repeated questioning along these lines.

25          MR. AGNIFILO:  I understand.

P5SsCOM3                    Jimenez - Cross

1    BY MR. AGNIFILO:

2    Q.  Let me ask you a different question.

3         Did you think it was significant that a single glove

4    was in the back seat of this car?

5    A.  I did not.

6    Q.  OK.  You thought it was significant enough that you talked

7    to the owner about it, though, right?

8    A.  Yes.

9    Q.  And you asked him if he knew about it and he said it was

10   his glove, correct?

11   A.  That's my recollection, yes.

12   Q.  Now, so you did not send this glove for any sort of testing

13   of any sort, correct?

14   A.  I did not collect the glove as evidence.

15   Q.  You didn't even take the glove as a piece of evidence?

16   A.  No.

17   Q.  Now, do you know how the one glove would have gotten into

18   the car?

19   A.  I have no idea.

20   Q.  And you agree with me that, how far --

21        See, let's look at 853.  You see these markings, these

22   black kind of blotches on the console in the back of the rear

23   seat?  Do you see that?

24   A.  Which photo are you referring to?

25   Q.  Looking at 853.  I think it's up on the screen.

P5SsCOM3                        Jimenez - Cross

1        MR. AGNIFILO:  It's not marked.

2        MS. SLAVIK:  Your Honor, this is not marked.

3   A.  OK.  Now, I see it.

4   Q.  Do you now see it?

5   A.  I do now.  Thank you.

6   Q.  All right.  And you see the black sort of splotch in

7   between the two seats in the rear of the car?

8   A.  Yes.

9   Q.  What is that?

10  A.  It's my opinion it's the drop-down material from the canvas

11  roof.

12  Q.  OK.  So the roof, right above where these black marks are,

13  that's where the roof was cut, right?

14  A.  And it also had burned through.

15  Q.  But it was cut there and it was burned there, right?

16  A.  Yes.

17  Q.  OK.  And your premise was that the Molotov cocktail was

18  dropped in that part of the roof, right?

19  A.  That was my opinion, yes.

20  Q.  OK.  Did you think it was a possibility that the person who

21  was holding the Molotov cocktail would have been wearing a

22  glove?

23  A.  It's possible.

24  Q.  OK.  Because the Molotov cocktail would get hot, right?

25  A.  No.

P5SsCOM3                        Jimenez - Cross

1   Q.  After you set it on fire?

2   A.  No, it doesn't get hot.

3   Q.  At one point it's on fire, right?

4   A.  The wick is on fire.

5   Q.  So part of is on fire, right?

6   A.  The cloth material would be on fire.

7   Q.  So if I were holding a Molotov cocktail and I lit it --

8             MS. SLAVIK:  Objection.

9             THE COURT:  It's overruled.

10  Q.  -- my hand would be close to the fire, correct?

11  A.  It would be close to the bottle.  It would be on the

12  bottle.  That's how Molotovs operate.  They throw --

13  Q.  That's not my question.

14  A.  OK.

15  Q.  My question is, if I was holding a Molotov cocktail --

16  A.  Yes.

17  Q.  -- and I lit it, my hand would be close to the flame that I

18  lit, correct?

19  A.  Sure.

20  Q.  OK.  So, let's look.  Let's take a few steps back.

21            We're going to go through some of these photographs

22  that you and your partner were good enough to take that

23  morning.  We're going to start with 8C-101 that's already in

24  evidence.

25            OK.  All right.  When you entered the property the day

P5SsCOM3                          Jimenez - Cross

1   of your investigation, did you go through that door?

2   A.  I did not.

3   Q.  You never went through that door?

4   A.  No.

5   Q.  Let's go to 8C-103.  Now, I think you said that there

6   were -- it was a long driveway and we see the driveway in this

7   photograph, correct?

8   A.  Correct.

9   Q.  And I think we see the black Porsche up front.

10          Do you see that?

11  A.  Yes.

12  Q.  All right.  Then there is a red Mercedes, and then I think

13  you said there was a black-colored Jeep?

14  A.  Correct.

15  Q.  This vehicle we see on the left, a Chevy of some sort, do

16  you know what that is?

17          Was that a law enforcement vehicle, or was that

18  vehicle there --

19  A.  That's the vehicle we arrived in.

20  Q.  That's my question.  That's your car.

21          All right.  OK.  Let's go to 8C-105.

22          There is one of the entry doors to the house, am I

23  right?

24  A.  I believe so.  I think it's adjacent to the garage door.

25  Q.  OK.  So let's do this.  Let's look at 8C-106 to orient us.

 1    That's what you're talking about, right?

 2    A.  That's the one you're referring to, yes.

 3    Q.  That's the garage.  The larger door is the garage door?

 4    A.  Correct.

 5    Q.  All right.  And the other door is entry into the house?

 6    A.  I don't recall if it was actually into the house or into

 7    the garage.  I don't know.

 8    Q.  All right.  Let's go to 8C-107.  This is the black Porsche,

 9    right?

10    A.  Yes, sir.

11    Q.  OK.  And there is no damage on the outside of the car, am I

12    right?

13    A.  Yeah.  I didn't observe any damage to the outside of the

14    vehicle.

15    Q.  And here, you can see, we're going to have closer-up views,

16    you can see the damage to the roof of the car, right?

17    A.  It's a tough picture.  You can barely see some damage.

18    Q.  All right.  We're going to see it better.

19         Let's look at 8C-108.  All right.  8C-108, that's a --

20    that's the damage to the top of the car, right?

21    A.  Correct.

22    Q.  OK.  And does it look to you that it's two cuts?

23         You said there were intentional cuts that looked, to

24    you, to be intentional into the roof?

25    A.  I formed the opinion they made a cut.  I don't know if they

P5SsCOM3                        Jimenez - Cross

1   made two, but that is some burn damage that occurred from the

2   fire, as well.

3   Q.  OK.  Just so the jury understands what you're saying, so

4   the material that is sort of on the inside of the opening

5   has -- that's burn damage.

6           The way that looks, that's from heat, correct?

7   A.  Can you rephrase your question?

8   Q.  Yes.

9           What's the top of the car made out of?

10  A.  I don't know, to be honest.  I'm -- I don't know Porsche

11  material.

12  Q.  All right.

13  A.  Sorry.

14  Q.  So the burn damage you're talking about, though, is this

15  material that is sort of, like, slightly discolored, correct?

16  A.  The burn damage that we're referring to in the other photo?

17  Q.  The one we're looking at right now.

18  A.  Right now.

19          What is your question?  I'm sorry.

20  Q.  Where is the burn damage?

21  A.  It looks like heat damage to the left side of that cut.

22  Q.  OK.  So heat damage is different than fire damage, am I

23  right?

24  A.  I consider it the same.  I mean, it's part of fire damage.

25  Q.  All right.  So, from what you can tell, was this part ever

P5SsCOM3                    Jimenez - Cross

1    on fire?

2    A.  I think it got affected by the radiant heat, yes.

3    Q.  That is really my question.  So this damage comes from the

4    heat from the fire inside the car.  It's not your conclusion

5    that this was on fire, right?

6    A.  I don't know how extensive the fire was.  But, in my

7    opinion, heat rose from the seat of the vehicle and it caused

8    the damage to the interior of the roof, which we showed

9    previously pictures of.

10   Q.  Let's look at 8C-112.  Wait for that to come up.

11        OK.  So in 8C-112, we see -- what did you say this

12   material was between the center console and the driver's seat?

13   A.  Are we talking about the handkerchief?

14   Q.  Yes, the handkerchief.

15   A.  It looked like a cloth material handkerchief.

16   Q.  So this is, that white thing that is partially burned, is

17   the handkerchief, correct?

18   A.  Correct.

19   Q.  It's not all the way burned.  Do you agree with me?

20   A.  Yes.

21   Q.  It has some burn damage and some parts of it were not

22   burned at all, am I right?

23   A.  Yes.

24   Q.  Now, does that mean to you that --

25        Well, let's look at a few more photographs, and then

P5SsCOM3                    Jimenez - Cross

1    I'll ask you the next question.

2          Let's go to 8C-115.  All right.  Here, we see the

3    bottle, and the bottle has fallen over to the left side,

4    correct?

5    A.  Correct.

6    Q.  All right.  Now, gasoline is a liquid?

7    A.  It's ignitable liquid, yes.

8    Q.  It pulls -- it tends to go downward and pulling at the

9    lowest point, correct?

10   A.  I don't understand the question.

11   Q.  It's not a gas, right?

12   A.  You mean fumes?

13   Q.  I'm asking you, the gasoline that you recovered was a

14   liquid, right?

15   A.  Inside the bottle.

16   Q.  OK.  And looking at the damage that you see here in 115, is

17   it consistent with liquid gasoline pouring out of this bottle

18   to the left and then dropping down into the seat of the car?

19   A.  I think it's visual inside that whole seat, where you would

20   drop the bottle, the wick would fall, get stuck in the side.

21   The bottle would tip over and spill more gasoline.  So you

22   would see more damage there, where the fire was burning.

23   Q.  So the majority the damage is right near the opening of the

24   glass bottle, am I right?

25   A.  Where you see that one, yes.

P5SsCOM3                          Jimenez - Cross

1    Q.  OK.  Let's look at 116.  It's a little closer-up.

2            So, from here, you can see some of the damage is to

3    the left of the photo, but the majority is sort of down, you

4    know, where the seat bottom meets the back, correct?

5    A.  You'll have to rephrase that.

6            What do you mean by left of the photo?

7    Q.  So some, some of the liquid seems to go towards the

8    steering wheel on that front seat.

9            Do you see that?

10   A.  No, I don't see what you're talking about.

11   Q.  Do you see burn damage in the direction of the front seat

12   from the bottle?

13   A.  I don't see what you're referring to.  You would have to

14   point it out to me.

15   Q.  All right.  Let's focus on the bottle.

16           You see the bottle, right?

17   A.  Yes.

18   Q.  There is burn damage on both sides of the opening, correct?

19   A.  Both sides of the opening of the bottle?

20   Q.  Correct.

21   A.  Meaning, like, to either side, like, if the bottle is here,

22   to either side?

23   Q.  Yes, that's right.

24   A.  I see what you're saying, yes.

25   Q.  Good.  That was my question.

P5SsCOM3                          Jimenez - Cross

 1  A.  OK.

 2  Q.  All right.  So the majority of the damage, though, is to

 3  the part of the seat where the rear seat meets the back of the

 4  seat, am I right, as opposed to it moving in the direction of

 5  the steering wheel?

 6  A.  Yes.  I see what you're saying.

 7  Q.  OK.  And my question is, that's because the gasoline is a

 8  liquid, and so it tends to go down to the -- it drops, it's

 9  affected by gravity, it goes down and pools at a low point,

10  correct?

11  A.  I don't understand what you're saying, but if you're -- if

12  you can let me elaborate what you're trying to say?

13  Q.  Sure.  Go ahead.

14  A.  From my opinion, from what happened, the bottle was

15  dropped.  Where the base is, the wick got caught, which is

16  where you see the unburned part of the wick, which was inside

17  the bottle.  The wick smoldered and the bottle flipped, and

18  then did distribute a little bit of gasoline there.  A lot of

19  gas stayed in the bottle.  You have fumes and still burning

20  when the gas platters.

21  Q.  Here is my question.

22          You can see what you call the wick between the

23  driver's seat and the console; you see that white part right

24  there?

25  A.  Correct.

P5SsCOM3                          Jimenez - Cross

1   Q.  So if the --
2   A.  Not in this photo, no.  But yes, I know what you're talking
3   about.
4   Q.  You don't see the white there?
5   A.  Not in this photo.
6   Q.  OK.  So, if the wick falls out of the bottle, my question
7   is, how does the fire move to this part of the seat, if the
8   wick is already out of the bottle?
9   A.  Well, you have flame disbursement from the fumes, and then
10  you have the gas emitting the fumes, and you have the gas that
11  spills over on this side, which were -- fumes would follow.
12  And then there's not enough oxygen, which is why the fire, in
13  my opinion, smoldered out.  You'll still going to have some
14  generating heat that travels up to the roof, where we saw
15  damage to the interior.
16  Q.  So your belief is that this bottle was dropped into that
17  opening in the roof, correct?
18  A.  That is my opinion, yes.
19  Q.  And it struck some part of the seat, the front seat or the
20  console, correct?
21  A.  That's my opinion, yes.
22  Q.  When that happened, the wick came out of the bottle, am I
23  right?
24  A.  That's my opinion, yes.
25  Q.  And then this bottle ends up falling to the left and

P5SsCOM3                      Jimenez - Cross

1   depositing some of the gasoline into this area where you see a
2   burn pattern, am I right?
3   A.  That would -- that's a good -- yes.  That's what my opinion
4   is, yes.
5   Q.  All right.  And my question is this.  Since you are seeing
6   that the bottle fell from the roof onto that center console
7   area, wouldn't you consider the glove significant in the back
8   seat?
9   A.  Not if the glove belonged to the owner.  I'm not -- if the
10  glove -- if the owner took off the glove and tossed it in the
11  back seat, he said it belonged to him, so it was irrelevant to
12  my investigation.
13  Q.  Now, did Mr. Cudi have one Porsche or more than one
14  Porsche?
15  A.  If I'm not mistaken, I think he had one in the garage.
16  Q.  OK.  So he had a second Porsche, right?
17  A.  In the garage, from what I understand, yes.
18  Q.  Is there any mention of the second  Porsche in your report?
19  A.  No.  It was unrelated to this fire.
20  Q.  So was the red Mercedes, right, and that was in your
21  report?
22  A.  Because it's in the photo.
23  Q.  So, let's look at --
24  A.  It would be like describing furniture in his house.  It
25  would be irrelevant.

P5SsCOM3                          Jimenez - Cross

1   Q.  I've got a question for you.

2          Let's look at another photo that you took that day

3   that you didn't talk about on direct examination.  Defense

4   Exhibit 852 for the witness.  Defense 852 for identification.

5          Do you see that photo?

6   A.  Yes.

7   Q.  That's the second Porsche?

8   A.  Yes, I believe so.

9          MR. AGNIFILO:  We offer it, your Honor.

10          MS. SLAVIK:  No objection.

11          THE COURT:  852 will be admitted.

12          (Defendant's Exhibit 852 received in evidence)

13   BY MR. AGNIFILO:

14   Q.  So, Mr. Cudi had a second -- Kid Cudi, Mr. Mescudi, had a

15   second Porsche, correct?

16   A.  That's what I was informed, correct.

17   Q.  You and your partner took a photo of it?

18   A.  Yes.

19   Q.  And that's the photo we're looking at?

20   A.  Yes.

21   Q.  OK.  So, what you said was that you put in the vehicles in

22   your report that were in the photo, but you didn't put the blue

23   Porsche in the report, did you?

24   A.  The garage door was closed at the time of our arrival.  It

25   was irrelevant to my investigation.

P5SsCOM3                          Jimenez - Cross

1   Q.  So why did you take a picture?

2   A.  I did not take the picture.  My partner did.

3   Q.  Why, to your knowledge, why did your partner take a picture

4   of it?

5   A.  I have no idea why he took that picture.

6   Q.  So, there's a second Porsche, though, right?

7           That was Mr. Mescudi's Porsche, correct?

8   A.  That's my understanding.

9   Q.  Let's look at Government Exhibit 8C-106.  It's already in

10  evidence.

11          Here, we can see how much liquid is in the Old English

12  bottle.  You see that, right?

13  A.  Correct.

14  Q.  So that, obviously, did not burn up in the fire because

15  it's still in the bottle, correct?

16  A.  Yes.

17  Q.  All right.  And is that significant with your premise that

18  the wick that was on fire fell out of the bottle when the

19  bottle tipped over to the left?

20  A.  That's my opinion, yes.

21  Q.  OK.  Because, tell me if this is right, if there was fire

22  inside the bottle, all of the gasoline would have burned up?

23  A.  Not necessarily.

24  Q.  OK.

25  A.  You need a proper oxygen, mix of fuel and oxygen.

P5SsCOM3                    Jimenez - Cross

1   Q.  All right.  And you don't know how much gas -- you don't

2   know how full this bottle was when it was dropped, you have no

3   idea how much gas leaked out of the bottle?

4   A.  Correct.

5   Q.  Do you know how much gas was left in the bottle?

6   A.  Yes.

7   Q.  Now, you said that you tried several times to contact

8   Capricorn Clark and you were not able to, right?

9   A.  Correct.

10  Q.  And you said you tried several times to contact Cassie

11  Ventura, am I right?

12  A.  Yes.

13  Q.  And you never made contact with her either?

14  A.  No.

15  Q.  OK.  And were these contacts after you got the results from

16  Bode Labs that there was female DNA on the bottle?

17  A.  I don't recall.  It might have been before that.

18  Q.  Do you have anything in your report indicating exactly when

19  you reached out for Ms. Ventura?

20  A.  No.

21  Q.  You have no indication in your report as to when you did

22  that, correct?

23  A.  Correct.

24          MS. SLAVIK:  Objection, asked and answered.

25          THE COURT:  Overruled.

P5SsCOM3                    Jimenez - Cross

1   Q.  Can you tell us a month?

2   A.  It would have been within that -- probably that first few

3   weeks maybe

4   Q.  Are you sure?

5   A.  Yes.

6   Q.  You're sure?

7   A.  That's my recollection.

8   Q.  So tell me about how you recall.

9        Where were you when you called?  Tell us everything

10  you recall about making these phone calls.

11  A.  Sure.

12        MS. SLAVIK:  Objection, argumentative.

13        THE COURT:  It's overruled.

14  Q.  Go ahead.

15  A.  Sure.

16        I reached out, left messages, got no response, got no

17  return call.  I believe Capricorn's brother answered the phone.

18  I got in an argument with him for me to leave her alone, she

19  wanted nothing to do with me, she wanted nothing to do with the

20  investigation.  She wanted -- and he and I got in an argument

21  about it.  He was impeding my investigation.  I had questions

22  for her, strictly just as an investigative side.  She wasn't in

23  any trouble.  And I got in a verbal confrontation with him over

24  the phone, on her phone, and that was the last of my attempts.

25  Q.  All right.  And with Ms. Ventura, did you ever make contact

 1  with her in any sort?

 2  A.  I did not.

 3  Q.  How many times did you try?

 4  A.  Maybe a couple.  I did reach out to her -- I was able to

 5  contact her father, I believe, if I am not mistaken.

 6  Q.  Who is a fireman, right?

 7  A.  Yes, sir.

 8  Q.  But Ms. Ventura never called you back?

 9  A.  She never returned -- I asked and pleaded with him to reach

10  out to her to see if she would answer some questions.  He said

11  he would let her know I just wanted to talk to her on the

12  investigative side.  And she never reached out to me.

13  Q.  And nobody called you back?

14  A.  She did not call me back.

15  Q.  And in regard to Mr. Mescudi, as soon as he told you that

16  the one glove in the car was his, you didn't do any more

17  investigation as to that glove, right?

18  A.  Correct.

19        MR. AGNIFILO:  I don't think I have any more

20  questions, but let me check.

21  Q.  Do you remember if you put anything in this report about

22  this single glove you found in the back seat of the car?

23  A.  I don't think I did.

24        MR. AGNIFILO:  One more second, judge.

25        Thank you, sir.  Thank you, Judge.

P5SsCOM3                    Jimenez - Redirect

```
 1              THE COURT:  All right.  Redirect.

 2              MS. SLAVIK:  Just very briefly, your Honor.

 3    REDIRECT EXAMINATION

 4    BY MS. SLAVIK:

 5    Q.  Investigator Jimenez, you were just asked a series of

 6    questions about the glove that was found in the back of the

 7    car.

 8              Do you remember that?

 9    A.  Yes, of course.

10    Q.  And you didn't collect that glove as evidence?

11    A.  Yes.

12    Q.  Why not?

13    A.  I did not.

14    Q.  Can you remind the jury why not?

15    A.  It was irrelevant to my investigation.  The owner said it

16    belonged to him.

17    Q.  At any point when you spoke to the owner, that's

18    Mr. Mescudi, did you have the impression that he did not want

19    you to investigate this issue?

20              MR. AGNIFILO:  Objection.

21              THE COURT:  That's sustained.

22    Q.  You spoke with Mr. Mescudi, is that right?

23    A.  Yes.

24    Q.  Can you remind the jury when you first spoke with

25    Mr. Mescudi?
```

P5SsCOM3                    Jimenez - Redirect

1   A.   The day of the incident.

2   Q.   And how soon after you spoke with Mr. Mescudi did you reach

3   out to Capricorn?

4   A.   I made attempts, I think, within a weeks after that.

5   Q.   To be clear, was the reason that you reached out to

6   Capricorn because you received a DNA report?

7   A.   No.

8            MS. SLAVIK:  Nothing further, your Honor.

9            THE COURT:  All right.  Thank you very much.

10           Thank you, Investigator Jimenez.

11           (Witness excused)

12           THE WITNESS:  Thank you, your Honor.

13           THE COURT:  The government may call its next witness.

14   Ms.  Comey, we're at 12:00.  We can go on for a little bit or

15   we can take a break.  It's your election.

16           Would you want to take the lunch break now, or would

17   you rather get your direct started, and then maybe there's a

18   good stopping place about 20 minutes.

19           MS. COMEY:  I think we can get started, your Honor.

20           THE COURT:  The government may call its next witness.

21           MS. COMEY:  The government calls Deonte Nash.

22           Your Honor, may I retrieve the binder?

23           THE COURT:  You may.

24           MS. COMEY:  Thank you.

25   DEONTE NASH,

P5SsCOM3                          Nash - Direct

1        called as a witness by the Government,

2        having been duly sworn, testified as follows:

3             THE DEPUTY CLERK:  Could I please ask you to give the

4    court your first and last name and spell your first and last

5    name into that microphone.

6             THE WITNESS:  Deonte Nash.  D-e-o-n-t-e N-a-s-h.

7             MS. COMEY:  May I inquire, your Honor?

8             THE COURT:  You may.

9             MS. COMEY:  Thank you.

10   DIRECT EXAMINATION

11   BY MS. COMEY:

12   Q.  Good afternoon, Mr. Nash.

13             Are you testifying here today because you received a

14   subpoena?

15   A.  Yes.

16   Q.  Did that subpoena require you to appear here today?

17   A.  Yes.

18   Q.  Do you want to testify at this trial?

19   A.  Absolutely not.

20   Q.  What do you do for work?

21   A.  I am a celebrity stylist.

22   Q.  Can you explain to the jury what a celebrity stylist,

23   please?

24   A.  Um, I shop, do a little designing for music videos, all the

25   fun stuff.

P5SsCOM3                    Nash - Direct

1    Q.  I would like to direct your attention to 2008.

2            What were you doing for work then?

3    A.  Working with Sean Combs and Cassie.

4    Q.  What were you doing with Sean Combs and Cassie?

5    A.  Styling.

6    Q.  Who did you style?

7    A.  Puff and Cassie.

8            MS. COMEY:  Could we please pull up what is in

9    evidence as Government Exhibit 2A-101.

10   Q.  Do you recognize the person in that photograph, Mr. Nash?

11   A.  Yeah.  That's Puff.

12   Q.  Is that the person that you styled starting in around 2008?

13   A.  Yes.

14   Q.  Do you know him by any other names?

15   A.  Um, yeah.  Sean Combs.

16           MS. COMEY:  We can take that down.  Thank you.  Can we

17   please pull up Government Exhibit 2A-401.

18   Q.  Do you recognize the person in that photograph?

19   A.  Yes.  That's Cass.

20   Q.  Is that the same person you said you styled starting in

21   2008?

22   A.  Yes.

23   Q.  Do you know her by any other name?

24   A.  Cassie, Casandra Elizabeth Ventura.

25           MS. COMEY:  We can take that down.  Thank you.

P5SsCOM3                         Nash - Direct

1   Q.  How did you get hired to work styling Mr. Combs and

2   Ms. Ventura?

3   A.  I moved to New York.  Maybe, like, two weeks later, I

4   responded to a Craigslist ad and it kind of went on from there.

5   Q.  So what was your first position?

6   A.  Intern.

7   Q.  Where?

8   A.  Um, the fashion department with Derek Roche.

9   Q.  The fashion department of what?

10  A.  Bad Boy Entertainment.

11  Q.  Who ran Bad Boy Entertainment?

12  A.  Sean Combs.

13  Q.  What was your next position after you were an intern?

14  A.  Just a stylist.

15  Q.  And you said that you were an intern with Derek Roche.

16         Who is Derek Roche?

17  A.  That was Puff's main stylist.

18  Q.  About when did you stop working for Mr. Combs?

19  A.  2018.

20         MS. COMEY:  Can we pull up, please, what's in evidence

21  as Government Exhibit 2A-504.

22  Q.  Who is that?

23  A.  That's me.

24  Q.  Is that a fair and accurate depiction of what you looked

25  like during part of the time you worked for Mr. Combs for a

1   stylist?

2   A.   No.

3   Q.   Is it a Glamour Shot of you?

4   A.   Yes.  I look amazing.

5        MS. COMEY:  We can take that down.  Thank you.

6   Q.   During your time working as a stylist for Mr. Combs and

7   Ms. Ventura, how were you paid?

8   A.   Um, through Sean Combs' companies.

9   Q.   What was your relationship with Ms. Ventura like during the

10  years you worked as her stylist?

11  A.   We were very close.

12  Q.   Based on your interactions with Ms. Ventura between 2009

13  and 2018, who did you understand she was in a relationship

14  with?

15  A.   Puff.

16  Q.   How did you learn that Ms. Ventura and Mr. Combs were in a

17  relationship?

18  A.   I mean, I was around every day.

19  Q.   And about when did you learn that they had started being in

20  a relationship?

21  A.   Very early.

22  Q.   Do you remember what year approximately?

23  A.   Very early.  Maybe 2009, 2010.

24  Q.   I would like to focus on the period between 2009 and 2018.

25       During that time, how much time did you spend with

1   Ms. Ventura?

2   A.  Almost every day.

3   Q.  How close were you and Ms. Ventura during that same period?

4   A.  Very close.

5   Q.  And about how often did you see Ms. Ventura interact in

6   person with Mr. Combs during that same period?

7   A.  Pretty often.

8   Q.  So could you give us a sense of about how often you would

9   see the two of them interact?

10  A.  At minimum, once a week.

11  Q.  I would like to focus on those in-person interactions.

12          What, if any, names did you hear Mr. Combs call

13  Ms. Ventura in front of you?

14  A.  Um, Baby Girl, CC, Cass, bitch, slut, ho.

15  Q.  About how many times do you remember hearing Mr. Combs call

16  her a bitch?

17  A.  Um, quite a bit.  That was his fave.

18          MR. DONALDSON:  I'm sorry, Judge.  I couldn't hear the

19  last answer.

20  A.  I said quite a bit.  That was his fave.

21  Q.  In what context did you hear Mr. Combs call Cassie a bitch?

22  A.  Bitch, stop playing with me.  Bitch, you better bring your

23  ass to this house.  I mean, I was there for quite some time.

24  Q.  What was Mr. Combs' tone when you heard him say those

25  things to Cassie?

 1   A.  Sometimes he would be calm, sometimes irate, but he was

 2   always.

 3   Q.  And about how often did you hear Mr. Combs refer to Cassie

 4   as a ho or a slut?

 5   A.  Quite a few.

 6   Q.  In what context?

 7   A.  Um, he told her that she was just an outright ho.  Um, he

 8   told her she was nothing but a slut anyway.

 9   Q.  What was Mr. Combs' tone when he said those things?

10   A.  Um, he was pretty irate.

11   Q.  How did Ms. Ventura react when Mr. Combs said those things

12   to her in front of you?

13   A.  She --

14         MR. DONALDSON:  Objection.  Time period, Judge.

15         MS. COMEY:  Talking about the statements he just

16   testified to, your Honor.

17         THE COURT:  That's overruled.

18   Q.  So when you heard Mr. Combs say the things you just

19   testified to, Mr. Nash, how did you observe Ms. Ventura react?

20   A.  She would be sad.

21   Q.  What would she do?

22   A.  Sometimes cry.  Sometimes go into a depression.

23         MR. DONALDSON:  Objection, your Honor.  Move to strike

24   the last part of the answer.

25         THE COURT:  Overruled.

1   A.  Pardon me.

2   Q.  During the period between 2009 and 2018, what, if any,

3   threats did you personally hear Mr. Combs make to Ms. Ventura

4   in front of you?

5   A.  That he would beat her ass.  Um, that he wouldn't put her

6   music out.  Um, that he would get her parents fired from their

7   jobs and he would send her sex tapes to their jobs.  He would

8   start there.

9   Q.  Let me break each of those down, please.

10          About how many times do you remember hearing Mr. Combs

11  say, in front of you to Ms. Ventura, that he would beat her

12  ass?

13  A.  Quite a few.

14  Q.  What was Mr. Combs' tone when you heard him say that?

15  A.  Um, he was pretty angry.

16  Q.  How did Ms. Ventura react each time you heard him say that

17  to her?

18  A.  It drove her crazy.

19  Q.  What do you mean?

20  A.  She would be super emotional.

21  Q.  Can you explain what you mean?

22  A.  She would cry.  Sometimes she would just stay in the house

23  for days and go in a cocoon.

24  Q.  Next you said that you heard Mr. Combs say that he would

25  not put Cassie's music out.

1          About how many times did you hear Mr. Combs say that

2    to Cassie in front of you?

3    A.   Quite a few.

4    Q.   In what context?

5    A.   When we were working on the mix tape, anytime she did

6    something that he didn't like, he always said that, you know,

7    Y'all little mix tape ain't coming out.

8          MR. DONALDSON:  Objection, your Honor.  Form of the

9    question.  Strike the answer.

10          THE COURT:  Hold on.

11          Mr. Nash, when there is an objection, just hold on for

12    a second, and then I'll let you know if you can answer.

13          MS. COMEY:  I think I asked for context.

14          THE COURT:  Hold on.

15          It's overruled.

16          MS. COMEY:  Sorry.

17          THE COURT:  Why don't we get a fresh question.

18          When there is an objection, all you need to say is

19    objection, we'll pause, and I'll take a look.

20          MS. COMEY:  Thank you, your Honor.

21    BY MS. COMEY:

22    Q.   Mr. Nash, we'll come back to the mix tape in a bit.  I just

23    want to ask about another threat you said you heard Mr. Combs

24    make.

25          About how many times did you hear Mr. Combs threaten

1   to do something to Ms. Ventura's parents?

2   A.  One, off the top of my head.

3   Q.  And that one time, where were you?

4   A.  Sitting right next to her in the car.

5   Q.  And about what year was that?

6   A.  2012, '13.

7   Q.  We'll come back to that as well.

8   A.  OK.

9   Q.  During that same period, between 2009 and 2018, about how

10  many times do you remember hearing Mr. Combs say that you and

11  Ms. Ventura could not go out without his permission?

12  A.  Twice.

13  Q.  When is the first time that you remember?

14  A.  The first time was when we went to a gay club with Rita Ora

15  and Adrienne Bailon.

16  Q.  Let me ask you about that.

17          About what year was this?

18  A.  2013.

19  Q.  Are you estimating?

20  A.  Yes.

21  Q.  And you said you went to a gay club.

22          Who went to the gay club?

23  A.  Me, Cassie, Kyle, Rita, and Adrienne.

24  Q.  And after going to the gay club, where did that group of

25  people go?

P5SsCOM3                         Nash - Direct

1   A.   To Cassie's apartment.

2   Q.   Where was Cassie's apartment at the time?

3   A.   818 Doheny.

4   Q.   Was that in Los Angeles?

5   A.   Yes.

6   Q.   And when that group was back at Cassie's apartment, what,

7   if any, phone calls did you observe Cassie receive?

8   A.   A call from Puff.

9   Q.   What happened when she got a call from Mr. Combs?

10  A.   He told her that --

11  Q.   Hold on.  Did she answer it?

12  A.   Yes.

13  Q.   And were you able to hear the other side of the call?

14  A.   Yes.

15  Q.   How?

16  A.   Because it was on speaker.

17  Q.   So, over speakerphone, what did you hear Mr. Combs say?

18  A.   That she better bring her ass to his house.

19  Q.   What happened next?

20  A.   She started to panic.  And then Puff called back and he,

21  um, talked to me at that moment and told me, um, that we were

22  wilding and that he thought he told us not to be going out.

23  And since every time I go out, that bitch want to go out, then

24  I need to stay my ass home, too.

25  Q.   So what did you understand Mr. Combs was telling you?

P5SsCOM3                          Nash - Direct

1           MR. DONALDSON:  Objection, Judge.

2           THE COURT:  Overruled.

3    Q.  What did you understand Mr. Combs was telling you?

4    A.  To stay home.

5    Q.  And when he referred to that bitch in this conversation,

6    who did you understand Mr. Combs was referencing?

7    A.  Cassie.

8    Q.  What did Cassie do after Mr. Combs made these phone calls

9    to you and to her?

10   A.  She just packed her stuff and went to his house.

11   Q.  During your time as Ms. Ventura's stylist, in your

12   experience, how much control, if any, did Mr. Combs demand over

13   Ms. Ventura's appearance?

14          MR. DONALDSON:  Objection.

15          THE COURT:  That's sustained.

16   Q.  In your experience as Ms. Ventura's stylist, what did you

17   have to do to get approval of looks that you prepared for

18   Ms. Ventura?

19          MR. DONALDSON:  Objection.

20          THE COURT:  That's overruled.

21   Q.  You can answer.

22   A.  We had to sent all the photos of him to approval.

23   Q.  Photos of what?

24   A.  Cassie's options from the fittings.

25   Q.  So outfits that she might wear?

1   A.  Outfits that she would wear, yes.

2   Q.  And who would you send pictures of those outfits to?

3   A.  Puff.

4   Q.  What, if any, conversations would you then have with

5   Mr. Combs about those outfits?

6   A.  We would pick which one he liked, and that's usually the

7   one we went with.

8   Q.  I want to direct your attention to the year 2014.

9        Did you attend a Vanity Fair party that year?

10  A.  Yes.

11  Q.  Could you explain what a Vanity Fair party is, please?

12  A.  A Vanity Fair party is the Oscars after-party.

13  Q.  Who did you attend the Vanity Fair party with in 2014?

14  A.  Puff, Cass, Derek, and a couple other people from the team.

15  Q.  Who did you arrive at the party with?

16  A.  Cassie.

17  Q.  When you and Cassie arrived at the party, who else was

18  already there?

19  A.  Puff.

20  Q.  What interactions did you have with Mr. Combs at that

21  Vanity Fair party?

22  A.  He said, I thought I fucking told y'all that she needed to

23  wear her hair up.

24  Q.  Let me back up.

25        How was Ms. Ventura's hair styled when you arrived at

1    the party?

2    A.  Oh, she looked bomb.  Her hair was down --

3              MR. DONALDSON:  Objection.

4    A.  -- all the way to her shoulders.

5              THE COURT:  It's overruled.

6    A.  She -- her hair was, like, down, cut straight.

7    Q.  And when Mr. Combs came and had this conversation with you,

8    what did he say?

9    A.  I thought I told you she need to wear her hair up.

10   Q.  What did Mr. Combs do physically when he said that to you?

11   A.  Grabbed me by my jacket and lifted me up.

12   Q.  What was Mr. Combs' tone as he was grabbing you by your

13   jacket and lifting you up?

14   A.  Angry.

15   Q.  How did you respond?

16   A.  I just started asking people in the party for hair pins.

17   And I told Derek he needed to go deal with her and take them to

18   the bathroom, and they went to go fix her hair in the bathroom.

19   Q.  Who went to the bathroom?

20   A.  Derek Roche, Puff, and Cassie.

21   Q.  What happened after?

22   A.  Oh, when he came out, he said, Y'all was right.  It does

23   look better down.

24   Q.  Who said that?

25   A.  Puff.

1    Q.  During her relationship with Mr. Combs, did you observe

2    Ms. Ventura record music?

3    A.  Yes.

4    Q.  How often did you accompany Ms. Ventura to the studio while

5    she recorded music?

6    A.  Quite often.

7    Q.  And what, if any, role did you play in helping her record

8    music during her relationship with Mr. Combs?

9    A.  I helped her pick songs.  I probably should have been

10    called an executive --

11            MR. DONALDSON:  Objection.  Objection.

12            MS. COMEY:  I can ask another question.

13            THE COURT:  All right.

14    Q.  What, if any, role did you play in helping Ms. Ventura

15    prepare for a mix tape that you mentioned earlier?

16    A.  Helped come up with the creative and helped pick songs.

17    Q.  Now, you talked about this mix tape earlier.

18            Could you explain what Ms. Ventura's mix tape was?

19    A.  It's a body of work, like, a promotional body of work she

20    put out.  Almost like an album, but it's not.

21    Q.  How is a mix tape put out?

22            MR. DONALDSON:  Objection.

23            THE COURT:  It's overruled.

24    A.  Um, you can put it out online for free or you can put it on

25    streaming platforms.

1    Q.  What was Ms. Ventura's mix tape called?

2    A.  RockaByeBaby.

3    Q.  About when was it put out?

4    A.  April 2013.

5    Q.  And was it put out for free, or was it put out to sell

6    online?

7    A.  For free.

8    Q.  To your knowledge, was it ever sold online?

9    A.  No.

10   Q.  Based on your participation in the preparation of the

11   release of the mix tape, what was your understanding of who

12   decided whether the mix tape would be sold or free?

13            MR. DONALDSON:  Objection.

14            THE COURT:  Overruled.

15   A.  Puff.

16   Q.  What, if any, conversations were you present for with

17   Mr. Combs about whether the mix tape should be sold?

18   A.  He said that, if it did well, then it can go on streaming

19   platforms.

20   Q.  Do you have an understanding of how well the mix tape

21   did --

22            MR. DONALDSON:  Objection.

23   Q.  -- with free downloads?

24            MR. DONALDSON:  Objection.

25            THE COURT:  We've got to wait until the end of the

1    questions.

2              MR. DONALDSON:  Apologies.

3              THE COURT:  I can't understand what the question is.

4    It's overruled.

5              So, Ms. Comey, why don't you ask the question again.

6    BY MS. COMEY:

7    Q.  Do you have an understanding how well the mix tape did with

8    free downloads?

9    A.  It did really well.  It was the top mix tape of that year.

10   Q.  Was it ever sold online?

11   A.  No.

12   Q.  Who made that decision?

13   A.  Puff.

14             MR. DONALDSON:  Objection.

15             THE COURT:  It's overruled.

16   Q.  During your time -- withdrawn.

17             During Ms. Ventura's relationship with Mr. Combs,

18   about how often did you personally observe her recording music

19   in the studio?

20   A.  Pretty often.

21   Q.  Would you give us a little more context?

22   A.  I mean, during -- an example is, I guess, towards the end

23   of, you know, their relationship, she was recording an album.

24   We stayed there so much, she decorated the studio room with

25   photos.  And in the next room, she had a teepee and we

P5SsCOM3                    Nash - Direct

1  literally slept in there.

2  Q.  You said she was recording an album towards the end of her

3  relationship with Mr. Combs.

4         To your knowledge, was that album ever released?

5  A.  No.

6  Q.  What percentage of music that Ms. Ventura recorded during

7  her relationship with Mr. Combs was actually released?

8         MR. DONALDSON:  Objection.

9         THE COURT:  Maybe we can ask some initial questions to

10  lay a foundation.

11         MS. COMEY:  Sure.

12  Q.  Mr. Nash, you said that you were present with Ms. Ventura

13  recording music at multiple points throughout her relationship

14  with Mr. Combs, is that right?

15  A.  Yes.

16  Q.  Do you have a sense, based on your relationship with

17  Ms. Ventura and your professional role, of how much music she

18  recorded during her relationship with Mr. Combs?

19  A.  A lot.  Hundreds of songs.

20  Q.  Do you have an understanding of approximately what

21  percentage of the songs she recorded were actually released?

22         MR. DONALDSON:  Objection.

23  Q.  Just yes or no.

24         THE COURT:  That's overruled.

25         You can answer.

1   Q.  Yes or no, do you have an understanding?

2   A.  Yes.

3   Q.  And what is that understanding?

4   A.  I would say, I'm being generous by saying 10 percent.

5           MS. COMEY:  Your Honor, this is a good place to break

6   for lunch.

7           THE COURT:  Good.  Thank you very much.

8           Members of the jury, we'll have our lunch break now.

9   We'll come back at 1:15.  Have a great lunch.  Don't talk to

10  each other about the case.  Don't talk to anyone else about the

11  case, and we'll see you back at 1:15.

12          All rise.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Mr. Nash, we'll see you back here at 1:15.

3    You can leave the stand now.

4          (Witness temporarily excused)

5          Please be seated everyone.

6          Ms. Comey, as to the 2013 conversation between

7    Ms. Ventura and Mr. Nash, to the extent that Mr. Nash addresses

8    Ms. Ventura's state of mind, concerning the sex acts, that

9    would be her present state of mind meaning on -- at that time,

10   in 2013, she did not want to engage in those sex acts.  The

11   reason I ask the question, that conversation has to do with the

12   sex tapes.  I want to make sure he's not going to say that

13   those sex acts that are depicted in the tapes were without

14   consent, because that would not be the then existing state of

15   mind of Ms. Ventura.

16         MS. COMEY:  Yes, your Honor.

17         That is not how I believe the testimony will come out.

18   If I can refer to my notes, I want to be precise in my proffer.

19         THE COURT:  Sure.

20         MS. COMEY:  What I expect he will say is that she said

21   the videos were of her having sex with other men and then that

22   Mr. Combs, the way he would say it, I expect, is I think he

23   will say, "Puff had her doing these things she didn't want to

24   do," which is in the present sense.

25         So yes, I think the testimony will be of the present.

P5SsCOM3                              Nash - Direct

1          THE COURT:  All right.  As to the exhibits to be used
2    with Mia, what I'll do is, I'll address the exhibits that were
3    raised in the letters, and then I think it makes sense for us
4    to take our lunch break.  And then there may be just a couple
5    issues that the parties want to revisit, and you can do that at
6    the end of the lunch break.  It may turn out no one has any
7    issues.  We can proceed on that basis.
8          As for 3T-107, I've reviewed the materials.  That is
9    admissible under 801(d)(2)(D).  It's also not being introduced
10   based on the submission for the truth of the matter, but rather
11   just a fact of the communication.
12         As to 3T-110, that would be admissible under 803(1),
13   and I don't believe it would be testimonial under the standard
14   in *Ohio v. Clark*.
15         As to 3T-112, that's also admissible under
16   801(d)(2)(D) and also 803(3).  That's the government's
17   exhibits.
18         Again, Ms. Shapiro, to the extent that you want to
19   revisit any of those, you can at the end of the lunch break.
20   But for present purposes, that's how the court sees it based on
21   the submissions.
22         MS. SHAPIRO:  That's fine, your Honor.  I just wanted
23   to address the defense exhibits, because we have not had a
24   chance to respond, and I don't believe Mia will be on cross
25   until tomorrow.

1        So we can get a letter in to the court not very late
2   tonight, but we would like the opportunity to respond in
3   writing.  And just to reiterate, we didn't get the government's
4   letter until 1:00 in the morning.  We were focused on today's
5   testimony and did not get a chance to write that up yet.  We
6   would like to address it in writing.
7        THE COURT:  I was about to say that because I think
8   the gravamen of the government's objection is that there is no
9   relevance or probative value to any of these exhibits, and so I
10  was just going to ask you that question.
11       Now you'll submit your letter and I'll get the answer.
12       MS. SHAPIRO:  Thank you, your Honor.
13       THE COURT:  All right.  Anything further from the
14  government?
15       MS. COMEY:  No.  Thank you, your Honor.
16       THE COURT:  Anything from the defense?
17       MR. DONALDSON:  No, Judge.
18       I think you said we can take it right before we
19  finish.  I'll come back and take a look then.
20       THE COURT:  On the three exhibits?
21       MR. DONALDSON:  Just on what Ms. Comey just said
22  related to when the court asked about 2013 sex acts and whether
23  we're talking about at that time.
24       My concern is the government's response to the court.
25  I believe they still left that rather vague.  The answer

P5SsCOM3                    Nash - Direct

1  doesn't seem to apply to just at that time, it seems to -- it

2  may be interpreted to be something else.

3           Just didn't seem like --

4           THE COURT:  I think, at that point, we have to see

5  what the answer is to the question.

6           MS. COMEY:  Your Honor, if the answer ends up being

7  unclear, if I have permission to lead, I'm happy to lead to

8  make sure that it is narrowly tailored.

9           THE COURT:  Yes.  You have that permission so that we

10 can avoid any issue that would --

11          MR. DONALDSON:  Right.

12          THE COURT:  -- raise a state of mind from a prior time

13 period, which is out of bounds.

14          MR. DONALDSON:  Very good.  Thank you.

15          THE COURT:  We'll take our break.

16          I'll come back at 1:10 just to see if there is any

17 issues before we proceed at 1:15.

18          (Luncheon recess)

19

20

21

22

23

24

25

P5SACom4

|  |  |
|---|---|
| 1 | AFTERNOON SESSION |
| 2 | 1:13 P.M. |

3   THE COURT:  Anything to address before we bring the

4 jury back in?

5   MS. COMEY:  Very briefly, your Honor.  I'm about to

6 pull up a photograph of the witness testifying under pseudonym

7 Mia for the witness, and I would like the jurors to be able to

8 see it too.

9   May I ask that the overflow screens be cut and the

10 public screen be turned off just until I show that exhibit and

11 then we can turn them back on for the rest of Mr. Nash's

12 testimony?

13   THE COURT:  I think that can be done.

14   MS. COMEY:  That would be wonderful.  Before I pull it

15 up, I will check and make sure I have a thumbs up from

16 Mr. Deputy.

17   THE COURT:  Yes.

18   MS. COMEY:  And we won't display on counsel table.  It

19 will just be for the witness and the jury and the Court.

20   And then the other thing I wanted to flag is because

21 I'm about to start eliciting testimony about Mia, I wanted to

22 ask if the Court would order prospectively that if any witness

23 accidentally says the true name of a witness who is testifying

24 under pseudonym, that you authorize the parties to confer,

25 without further consulting from your Honor, with the court

P5SACom4

1    reporters, to have the true name replaced with the pseudonym.

2              THE COURT:  That's fine.

3              MS. COMEY:  Thank you, your Honor.  And that way we

4    don't have to interrupt and ask for striking and revising the

5    transcript.

6              THE COURT:  Let me ask you a question.  As to the

7    picture.

8              MS. COMEY:  Yes, your Honor.

9              THE COURT:  Since Mia is going to be testifying in

10   open court, I just want to make sure I'm understanding the

11   reason.

12             MS. COMEY:  Yes, your Honor.  So the reasoning is that

13   the exhibit itself would be under seal and not released to the

14   public.  Obviously, as we've discussed, she'll be here in

15   person and anyone who comes to the courthouse and wants to see

16   her in person will be able to see her in person, but we will

17   not be releasing a photograph of her to the press, as that

18   would undermine the Court's pseudonym order.

19             THE COURT:  All right.  So that's going to happen

20   right when the jury comes back?

21             MS. COMEY:  I have one more topic on the music topic

22   to cover, and then pretty soon after we'll get into Mia.  But

23   the very next exhibit that I'm going to pull up will be a

24   photograph of Mia.

25             And then once I ask it to be taken down, the rest of

P5SACom4

1    my exhibits will be public and the screens can go back on.

2    Thank you.  I see Mr. Deputy nodding.

3            THE COURT:  So given the nods from the court

4    personnel, I'm assuming this can be done.

5            MS. COMEY:  Thank you, your Honor.

6            THE COURT:  Anything further from the government?

7            MS. COMEY:  No, your Honor.

8            THE COURT:  Mr. Steel, I see you standing up.  You

9    might be stretching your legs, but if not...

10           MR. STEEL:  I'm definitely stretching my legs, but can

11   I ask the Court, I heard your ruling.  I understand your ruling

12   about Government Exhibit number 3T-107, 110, and 112.

13           THE COURT:  Okay.

14           MR. STEEL:  But when it's appropriate, can we make

15   more of a record if you don't mind for us?

16           THE COURT:  Now is the time to make your record.

17   Because as I said, if there's an issue to raise, let's hear it.

18           MR. STEEL:  So, your Honor, on 107.

19           THE COURT:  Yes.

20           MR. STEEL:  3T-107.  Obviously, I'm going to adopt

21   what the Court already read in writing that we asserted.  But

22   there's hearsay within hearsay in that e-mail.  And I'm

23   quoting:  I have been informed that I cannot perform on Monday

24   due to overage in cost.  We ask that that be looked at by the

25   Court for redaction.  Or another reason to cut that out.  I

P5SACom4

 1    don't think that that is appropriate to let in on the -- that

 2    exhibit.  So I just wanted the Court to be aware of that.

 3            Number two, if I'm going too fast I'm not trying to.

 4    110.

 5            THE COURT:  Let me stop you there.  How is the

 6    statement that Ms. Ventura has been informed, how is that a

 7    statement of anything?  Because you can be informed of

 8    something by virtue of things that are not statements.  Right?

 9    I could be informed of an event by seeing the event.  Right?

10    So just the statement, I have been informed, how is that a

11    hearsay within the larger hearsay of Ms. Ventura's statement?

12            MR. STEEL:  I think I am tracking the Court.  I can be

13    educated besides someone telling me is what I hear the Court

14    saying.  But in context, what I'm reading is:  I have been

15    informed that I cannot perform Monday due to overage in cost.

16    So I don't think that's something that she is just educating

17    herself on or learning herself.  I think somebody tells her

18    that.  And I assume it's been offered for the truth of the

19    matter, because the government's position is Mr. Combs -- this

20    is my belief -- stopped the show because said it's just costing

21    too much.

22            So I'm asking that to be redacted.  And I hope I've

23    answered your question, your Honor.  I believe it's hearsay

24    within hearsay.

25            THE COURT:  Is there a response on that point?

1          MS. SMYSER:  Your Honor, I think as expressed in our

2    letter, I do think this whole statement can come in for its

3    truth, but that's not what we're seeking to do here.  It's

4    alternatively not admissible for its truth, but to show these

5    things were communicated to the defendant.

6          THE COURT:  Meaning you're not going to do what

7    Mr. Steel suggests, to suggest that Ms. Ventura had been

8    informed by Mr. Combs that she cannot perform on Monday, etc.,

9    right?  Because then the statement is just coming in for the

10   fact of the communication, which I understand it's not coming

11   in for the truth, then none of these issues are really of any

12   moment.

13         MS. SMYSER:  We're not making that specific argument,

14   your Honor.

15         THE COURT:  Okay.

16         Mr. Steel, so you heard that.  That's not coming in

17   for the purpose that you thought.  So I think that avoids the

18   hearsay issue.

19         What else?

20         MR. STEEL:  Can I go to 110, your Honor.

21         THE COURT:  Yes.

22         MR. STEEL:  I don't believe that it's 801(d)(2)(D)

23   because it's -- the statement is prefaced with, and I believe

24   I'm quoting:  I still don't know what's going on.  I just snuck

25   into D-Roc's room to watch the cameras.  Really -- can't really

1   talk about on e-mail --

2           THE COURT:  Right.  So in this one.  It's 803(1).  So

3   it's present sense in -- present sense impression.  Excuse me.

4           MR. STEEL:  Well...

5           THE COURT:  A statement describing or explaining an

6   event or condition made while or immediately after the

7   declarant perceived it.

8           So the argument is that this is just relating what

9   these things were -- what was happening as Ms. Lee perceived

10  it.

11          MR. STEEL:  Well, they're watching -- this is how I

12  read it, your Honor.  They're watching cameras.  I'm not

13  conceding that those cameras are instantaneous or realtime

14  cameras.  It could have been previous, a fight or argument.

15  And without a proper foundation, from the person who's not

16  testifying, I would ask the Court to reconsider the lacks

17  personal knowledge.

18          There's also 403 objection, your Honor, if you would

19  consider that as well.  Because when I said earlier about I

20  understand it's not testimonial under *Crawford*, but I have

21  nobody to cross-examine to say what did you say, what was it

22  like.  And I understand the hearsay rule that the Court is

23  attaching to it.  But without more to it, that this is

24  instantaneous, I would hold my objection.

25          THE COURT:  Well, on the 403 issue, what's the unfair

1  prejudice given the nature of what's in the message?  Because

2  there's not anything in the message about the actual incident

3  of any kind of kicking or anything of that nature.  There's

4  just a commotion.  And that's it.

5        And so what's the substantial unfair prejudice as a

6  result of the introduction of the fact that there was like a

7  commotion and that people were on edge?  Which is the most that

8  this particular e-mail would go to.

9        MR. STEEL:  Your Honor, they're building this entire

10  volcano from what happened earlier that day allegedly to now

11  moving to Mr. Combs' home.  And the jurors already heard

12  Mr. Combs, supposedly, we're denying it, but supposedly beat

13  Ms. Ventura from inside the house to the street.  And this just

14  adds another layer.  So I think it should not come in.  And its

15  probative value is very slight.  And I think it's very

16  prejudicial because we're getting another person, who cannot be

17  discussed, what they actually --

18        THE COURT:  Okay.  Ms. Smyser, can I ask you what is

19  Mia going to testify about concerning the events of

20  December 22nd?  And the reason I'm asking this is, is this all

21  she's going to be testifying about, the fact of this e-mail

22  exchange?  Or is there more?  Meaning there's other parts to

23  her testimony that don't run into this issue that go to what

24  was happening on that day.

25        MS. SMYSER:  That don't run into what issue?  I'm

P5SACom4

1    sorry, your Honor.

2        THE COURT:  That run into the issue raised with

3    respect to 3T-110.

4        MS. SMYSER:  So with regard to, like, the events of

5    that day, Mia is going to testify that she was at Mr. Combs'

6    house that morning and everyone was very on edge and the mood

7    was very ominous.  And before she left for the airport that

8    day, she had a conversation with Mr. Combs in which Mr. Combs

9    said, in sum and substance, I found out Cassie has been

10   cheating on me with Kid Cudi.  He looked very upset.  Mia is

11   very worried about what was going on.

12       She will also say before she leaves, she saw Cassie

13   and Capricorn Clark in an SUV out on the street outside of the

14   home.

15       And so then she goes to the airport.  And it is during

16   that flight when she's trying to figure out what is happening.

17   So that's the context of what she'll provide.  She'll also say

18   that Sienna Lee was in the home that day.  So that's one of the

19   reasons she is communicating with her.

20       THE COURT:  All right.  Understood.  Let me think

21   about that for just a second.

22       Mr. Steel, what else do you have?

23       MR. STEEL:  On that, your Honor, just, you know, I

24   think you said something earlier in the trial, if I'm

25   misquoting you, I'm not trying to do that intentionally.  But

P5SACom4

1    something like this is a trial by rumor I think you said.

2    Gossip.  Sorry.  And that's how I feel about this.  It's a

3    person on an airplane, bad energy, what am I learning, tell me

4    what I missed.

5           I think that it's very, very, very prejudicial to us.

6    And it just shows this -- people talking and people giving

7    their own, their own -- in this context at the trial, making

8    Mr. Combs things that he doesn't have to be in front of the

9    jury.  The jurors already heard a substantial amount of

10   testimony of what was allegedly going on that morning, and

11   including at his home.

12          So I don't know if I'm answering your question, but

13   I'm trying to, when you said anything else, that's why I'm

14   trying to exclude it.

15          THE COURT:  All right.  And that's on 110.  And do you

16   have anything on 112 or?

17          MR. STEEL:  I do, if you don't mind.

18          THE COURT:  Okay.

19          MR. STEEL:  112, your Honor.  I don't believe, we

20   don't believe, that it is 801(d)(2)(D) because the statement is

21   prefaced with:  I have no clue what's going on.  I don't

22   usually care to know the details, and therefore I don't believe

23   that it satisfies any scope requirement of the ruling, does not

24   relate to the employment.

25          I understand that the government constantly said,

P5SACom4

1   well, they have to know, everyone has to know because it's part

2   of their employment.  The rule can't be that much.

3              THE COURT:  That's true.  But, Ms. Smyser, before us

4   trying to introduce 112 into evidence, I take it that you'll

5   ask some foundational questions to establish the parameters of

6   the rule.

7              MS. SMYSER:  Absolutely, your Honor.

8              THE COURT:  So you can raise, Mr. Steel, you can raise

9   the objection on 112 at that point if you don't believe that

10  proper foundation has been laid for introduction of this

11  exhibit under the agency rule.

12             MR. STEEL:  And then for everything, your Honor, I

13  think I made it clear, but 403, I don't want to waive anything.

14             THE COURT:  Yeah.

15             MR. STEEL:  So also 403 objection.

16             THE COURT:  So as to 107 and 112, the objections are

17  overruled.  As to 112, it's subject, as I just said, to there

18  being an adequate foundation for introduction of the exhibit

19  under 801(d)(2)(D).

20             As for 110, I'm going to see how the questioning is

21  coming in, but I am convinced by Mr. Steel that as to 803(1),

22  which I think is the only basis for introduction of this

23  particular e-mail, the problem is that Ms. Lee is not actually

24  viewing the events in question, but rather she's in Roc's room

25  watching the cameras.

P5SACom4

1        We'll see if the foundation can be laid that can put

2   some more color to this.  But there is that issue on 803(1).

3   And even if there wasn't an 803(1) issue, I take Mr. Steel's

4   point that given that limitation on what Ms. Lee was

5   perceiving, that introduces a 403 issue that she is then

6   relaying to Mia what she is seeing on the video and then her

7   impressions of people around her.  And I think that there is a

8   prejudicial component to that, that outweighs any probative

9   value, especially when we've had witnesses testifying from

10  firsthand knowledge as to what occurred on December 22nd, and

11  obviously their testimony was firsthand and was offered here in

12  court.

13       So when we have issues like this of this e-mail where

14  it's going through a camera and then going to one witness and

15  then being relayed to the person testifying in court, I think

16  there is a high level of potential prejudice.

17       So 110 is provisionally out.  However, Ms. Smyser, you

18  can obviously try to establish a foundation for it.  Now you're

19  going to tell me why I'm wrong about this, so I'm happy to

20  hear.

21       MS. SMYSER:  Just briefly, your Honor.  So I just want

22  to point out the question is whether -- the first question is

23  whether it comes in as a present sense impression.  And

24  multiple times in the e-mail Ms. Lee, who is an employee who is

25  there that day, is saying I just saw this, this just happened.

P5SACom4

1    She's describing what she saw in realtime.  Whether that's on
2    the camera or outside.  I don't think that matters for purposes
3    of 803(1).  And Mia is going to explain that there are cameras
4    in D-Roc's room that show what is happening outside of the
5    home.  So we'll have that context in addition to the context of
6    Ms. Lee being there at the time.  I don't think there's unfair
7    prejudice here, your Honor.  Just because other witnesses have
8    testified to this.  In fact, I think the probative value of
9    this is even higher in that case because it helps corroborate
10   the witness's accounts of what was happening that day.
11            THE COURT:  But you mention the fact that it doesn't
12   matter whether it's on the camera or in person.  And as a
13   technical matter in the operation of the rule, I think that's
14   right.  But as you can tell from the statements, here it
15   actually makes a difference, because, because she's watching
16   this through camera, she has a limited vantage point in terms
17   of what she can perceive.  So she's not perceiving the actual
18   event.  She's only perceiving what comes in through the camera.
19            The further issue is that -- and, look, I don't have
20   the actual exhibits.  I have what's in -- I can pull them up.
21   But I have the statements that are related in the letter.  And
22   there's a lot of -- there's "IDK."  There's "I can't really
23   talk about it on e-mail."  And then "I still don't know what's
24   going on."
25            And those statements seem to suggest that there's a

 1    limitation in terms of what Ms. Lee is able to see and perceive

 2    concerning the event.  Which, at the same time, reduces the,

 3    you know, makes it harder to meet the limitations in 803(1),

 4    and then increases the potential for prejudice.

 5              Okay.  Now I see the e-mail.  That's helpful.  So let

 6    me see this.

 7              All right.  Thank you.

 8              So, again, 110 is out subject to laying a foundation

 9    through questioning that there's something that I'm missing.

10    But I'm not sure what you can do in that regard.  So 110 is

11    out.  And 107 and 112 are in.

12              Anything further, Mr. Steel?

13              MR. STEEL:  No.  Thank you, your Honor.  No, sir.

14              THE COURT:  All right.  Let's have Mr. Nash back and

15    then we'll get our jury.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

1             THE COURT:  Welcome back.

2             (In open court; jury present)

3             THE COURT:  Please be seated.

4             Mr. Nash, you understand you're still under oath?

5             THE WITNESS:  Yes, sir.

6             THE COURT:  Ms. Comey, you may proceed.

7             MS. COMEY:  Thank you, your Honor.

8    BY MS. COMEY:

9    Q.  Good afternoon, Mr. Nash.  I would like to follow up on a

10   topic we were touching on before the break.

11            So before the break you testified about Ms. Ventura's

12   recording of music; do you remember that?

13   A.  Yes, ma'am.

14   Q.  And I think earlier in your testimony you testified that

15   you had personally heard Mr. Combs threaten not to put out some

16   of Ms. Ventura's music; did I hear that right?

17   A.  Yes.

18   Q.  Could you please tell the jury in what context you heard

19   Mr. Combs threaten not to put out Ms. Ventura's music?

20   A.  He told her that one time if she keep -- if she keeps

21   having a smart ass mouth, her little mix tape won't be coming

22   out.

23   Q.  Do you remember about when that was?

24   A.  It had to be 2012, '13.

25   Q.  And do you remember what Ms. Ventura was doing before

P5SACom4                          Nash - Direct

1   Mr. Combs made that comment?

2   A.  I think she just responded to him in a normal fashion.

3   Q.  In a normal fashion.

4           Do you remember what Mr. Combs' tone was when he made

5   that threat to her?

6   A.  Pretty regular.

7   Q.  Calm?

8   A.  Calm.

9   Q.  I want to switch topics now.  Approximately how many times

10  in person have you witnessed Mr. Combs be violent with

11  Ms. Ventura?

12  A.  Quite a few, but three that really stand out.

13  Q.  So do some of those stand out more in your mind than

14  others?

15  A.  Yes.

16  Q.  I want to talk about some of those.

17          MS. COMEY:  First, I would like to pull up what's in

18  evidence as a sealed exhibit, please.  And that is sealed

19  Exhibit 2A-404, just for the jury, the witness and the Court,

20  please.

21          Is that on your screen?

22          THE COURT:  It's not on the screen yet.

23  Q.  Let me know when it's on your screen, please, Mr. Nash.

24  A.  It's there.

25  Q.  Okay.  Without saying her name, would you please tell us

1   just yes or no if you recognize the person in that photograph?

2   A.  Yes.

3   Q.  Okay.  I'm going to call that person Mia, and I would ask

4   that you do the same, please.  Okay?

5   A.  Yes.

6   Q.  Okay.

7        MS. COMEY:  We can take that down.  Thank you so much.

8   And we can turn on the public screens, Mr. Deputy.  Thank you.

9   Q.  How many times, if any, was Mia present with you when you

10  witnessed Mr. Combs be violent with Cassie?

11  A.  One.

12  Q.  About what year was this?

13  A.  Maybe 2013, '14.

14  Q.  And where were you before the violence started?

15  A.  At Cassie's house.

16  Q.  Which home of Cassie's was this?

17  A.  818 Doheny.

18  Q.  And is that in Los Angeles?

19  A.  Yes.

20  Q.  Is that an apartment or a house?

21  A.  Apartment.

22  Q.  What were you and Mia helping Cassie get ready for before

23  the violence started?

24  A.  We were packing Cassie for the OVO Fest in Canada.

25  Q.  What is the OVO fest in Canada?

1   A.   Drake's music festival.

2   Q.   Right before the violence started, where was Cassie in the

3   apartment?

4   A.   On the couch sleep.

5   Q.   She was asleep?

6   A.   Yes.

7   Q.   Where were you?

8   A.   Between the living room where she was sleeping and her

9   second bedroom, which was where her closet was, packing.

10  Q.   And do you remember where Mia was?

11  A.   No.

12  Q.   Who came to the door?

13  A.   I did.

14  Q.   Did you hear a knock at the door?

15  A.   Yes.

16  Q.   What did you do in response?

17  A.   I opened it.

18  Q.   Who did you see outside the apartment door?

19  A.   Puff.

20  Q.   What did Mr. Combs say when you opened the apartment door

21  for him?

22  A.   Bitch, didn't I tell you to answer the phone.

23  Q.   Who did you understand he was speaking to when he said

24  bitch, didn't I tell you to answer the phone?

25  A.   Cassie.

P5SACom4                          Nash - Direct

1    Q.  What did you see Mr. Combs do after he said that?

2    A.  Grab her by the hair and pull her off of the couch and

3    start hitting her.

4    Q.  When you say grab her by the hair, who did Mr. Combs grab

5    by the hair?

6    A.  Cassie.

7    Q.  And after Mr. Combs grabbed Cassie by the hair, what did he

8    do next?

9    A.  He began to hit her.

10   Q.  Could you tell whether it was with an open or closed fist?

11   A.  Not really, no.

12   Q.  Could you tell how hard he was hitting her?

13          MR. DONALDSON:  Objection.

14          THE COURT:  Overruled.

15   Q.  Could you tell how hard he was hitting her?

16   A.  Pretty hard.

17   Q.  What was Mr. Combs saying as he pulled Cassie by the hair

18   off the couch and hit her?

19   A.  I just remember y'all going to stop fucking with me.

20   Q.  What was Mr. Combs' tone and demeanor?

21   A.  He was in a rage.

22   Q.  Where did you, Mia, and Cassie go after Mr. Combs --

23   immediately after Mr. Combs started hitting Cassie?

24   A.  We ran to her bedroom.

25   Q.  To Cassie's bedroom?

1   A.   Cassie's bedroom, yes.

2   Q.   What did you, Mia, and Cassie attempt to do in her bedroom?

3   A.   Try to close the door.

4   Q.   What happened when you, Mia, and Cassie tried to close the

5   bedroom door?

6   A.   Puff pushed it open.

7   Q.   After Mr. Combs pushed the bedroom door open, what did you

8   see him do next?

9   A.   He continued to attack Cassie.

10   Q.   And how was he attacking Cassie?

11   A.   With his fists and kicking her.

12   Q.   And what parts of Cassie's body did you see him kick and

13   hit?

14   A.   I mean, it was so fast.

15   Q.   But did you see him --

16   A.   Yes.

17   Q.   -- make contact with her body?

18   A.   Yes, he made contact, yes.

19   Q.   What did you do to try to help Cassie?

20   A.   I jumped on Puff's back.

21   Q.   How did Mr. Combs react when you jumped on his back?

22   A.   He threw me off.

23   Q.   Where did you land?

24   A.   On the floor.

25   Q.   Were you injured?

1  A.  I was a little sore.

2  Q.  What did Mia do to try to help Cassie?

3  A.  Jump on his back as well.

4  Q.  When you say his back, whose back?

5  A.  Puff.

6  Q.  How did Mr. Combs react when Mia jumped on Mr. Combs' back?

7  A.  She was thrown off as well.

8  Q.  What did Mr. Combs do after throwing you and Mia off of his

9  back?

10  A.  Continued to hit Cassie until her head hit the edge of the

11  bed frame.

12  Q.  What did you see happen after Cassie's head hit the edge of

13  the bed frame?

14  A.  He still continued to hit her for, you know, a short time,

15  and when he noticed the blood, he just panicked.

16  Q.  So what blood did you see after Cassie's head hit the bed

17  frame?

18  A.  Blood coming from her head.

19  Q.  How much blood did you see coming from Cassie's head?

20  A.  A lot.

21  Q.  And did Mr. Combs stop hitting Cassie immediately after her

22  head hit the bed?

23  A.  No.

24  Q.  For about how much longer did he continue to hit her as she

25  was bleeding from the head?

1   A.   A couple of seconds.

2   Q.   After that, at that point, were you still in the room?

3   A.   Yes.

4   Q.   And where was Mia?

5   A.   Getting towels.

6   Q.   And where -- what were the towels for?

7   A.   Cassie's head.

8   Q.   And where was Cassie?

9   A.   She went into the second bathroom.

10  Q.   As you all were leaving the bedroom, what if anything did

11  Mr. Combs say to you, Mia, and Cassie?

12  A.   Look what y'all made me do.

13  Q.   What if any phone calls did you try to make after seeing

14  all the blood from Cassie's head?

15  A.   I tried to call 9-1-1.

16  Q.   What happened when you tried to call 9-1-1?

17  A.   I was immediately told to hang up.

18  Q.   Do you remember who told you to hang up?

19  A.   No.

20  Q.   As you sit here today, can you remember?

21  A.   No.

22  Q.   Did you hang up?

23  A.   Yes.

24  Q.   So did the call connect?

25  A.   No.

P5SACom4                      Nash - Direct

1   Q.  What if anything did Mr. Combs say about where Cassie was

2   going to go next?

3   A.  The plastic surgeon.

4   Q.  Who did Mr. Combs say was going to go to the plastic

5   surgeon with Cassie?

6   A.  D-Roc.

7   Q.  Who is D-Roc?

8   A.  A friend of his, his security.

9   Q.  Whose security?

10  A.  Puff.

11         MS. COMEY:  Can we please pull up what's in evidence

12  as Government Exhibit 2A-202.

13  Q.  Do you recognize the person in this photograph?

14  A.  Yes.

15  Q.  Who is that?

16  A.  D-Roc.

17  Q.  Do you know him by any other names?

18  A.  D-Roc is fine.

19  Q.  And do you know what his role was for Mr. Combs at the time

20  that Cassie had this head injury?

21  A.  Security.

22         MS. COMEY:  We can take that down.  Thank you.

23  Q.  After that incident, when was the next time that you saw

24  Cassie, either over FaceTime or in person?

25  A.  The next day.

P5SACom4                        Nash - Direct

1  Q.  And how did you see her the next day?

2  A.  FaceTime or something like that.

3  Q.  And when you saw her, what if any injuries did you see?

4  A.  She had a -- stitches on her forehead.  She had a gash on

5  her forehead.

6  Q.  And you made a gesture, was it above her eyebrow?

7  A.  It was like in the eyebrow.

8  Q.  I want to talk about another time you witnessed violence.

9       Was there a time when you and Cassie were cooking in

10  her apartment before Mr. Combs became violent?

11       MR. DONALDSON:  Objection, Judge.  Form of question.

12  I'm sorry.  Objection.  Sorry.

13       THE COURT:  Rephrase the question.

14       MR. DONALDSON:  Sorry, Judge.  Sorry.

15  BY MS. COMEY:

16  Q.  I want to direct your attention to a night when you were

17  cooking with Cassie in her apartment.

18       Does that ring a bell?

19  A.  Yes.

20  Q.  About what year are we talking about?

21  A.  '13, '14.

22  Q.  2013 or 2014?

23  A.  Yes.

24  Q.  What apartment were you and Cassie in?

25  A.  818 Doheny.

1  Q.  The same apartment that you just talked about?

2  A.  Yes.

3  Q.  And this incident that we're about to talk about, was it

4  before or after Cassie cut her head open on the bed frame?

5  A.  After.

6  Q.  So who was at the apartment this evening?

7  A.  Just me and Cassie.

8  Q.  And who came over?

9  A.  Puff.

10 Q.  About what time of day do you remember Mr. Combs coming

11 over to the apartment?

12 A.  Nighttime.

13 Q.  And what do you remember Mr. Combs saying when he first

14 came over to the apartment?

15 A.  He just said, hey, and that he wanted to talk to Cassie for

16 a minute.

17 Q.  And where did he and Cassie go?

18 A.  To her bedroom.

19 Q.  And what happened after they went into the bedroom?

20 A.  He grabbed her as they were walking out, he grabbed her

21 like by her hair and the back of her shirt and starting pushing

22 her out, and he was like, I don't give a fuck, you going to get

23 the fuck up out of my house, y'all going to get the fuck up out

24 of my house.

25 Q.  So a few follow-up questions.

1           First, when Mr. Combs referred to "my house," what did

2    you understand he was referring to?

3           MR. DONALDSON:  Objection.

4           THE COURT:  Overruled.

5    A.  Cassie's --

6           MS. COMEY:  You got to wait for the judge.

7           THE COURT:  I said overruled.

8           MS. COMEY:  So sorry, your Honor.

9           THE COURT:  That's okay.  Far away from the mic.

10   Q.  What did you understand he meant when he was referring to

11   "my house?"

12   A.  Cassie's house.

13   Q.  And had you heard how this argument had started in the

14   bedroom?

15   A.  No.

16   Q.  And what did you see Mr. Combs doing to Cassie as he was

17   saying get out of my house?

18   A.  Grabbing her by the hair and the back of her shirt or

19   jacket and was pushing her out the house.

20   Q.  And where did Mr. Combs ultimately push Ms. Ventura?

21   A.  Halfway out of the door.

22   Q.  And after he pushed her there, what did he do to you?

23   A.  He began to do the same to me.  And then he told me to go

24   downstairs and she'll be right down.

25   Q.  You said he did the same to you.  What did Mr. Combs do to

1   you?

2   A.  Well, he was more so popping me in the back of the head,

3   because I don't have hair.  And grabbing me by my shirt and

4   pushing --

5   Q.  When you said he was popping you in the back of your head,

6   what was he doing to your head?

7   A.  Like a, you know, slap.  You pop somebody in the head.

8   Q.  Slapping you with his hand?

9   A.  Yes.  Yes.

10  Q.  Where did you go after Mr. Combs pushed you and Cassie out

11  of the apartment?

12  A.  To get my car from valet.

13  Q.  So did you go downstairs?

14  A.  Downstairs, yes.

15  Q.  And who did you see when you went downstairs?

16  A.  Security.

17  Q.  Whose security?

18  A.  Puff.

19  Q.  Do you remember who from security?

20  A.  No.

21  Q.  What did security say to you when you got downstairs?

22          MR. DONALDSON:  Objection.

23          MS. COMEY:  I can rephrase, your Honor.

24          THE COURT:  Okay.

25  Q.  What if any instructions did security give you when you got

P5SACom4                         Nash - Direct

1   downstairs?

2          MR. DONALDSON:  Same objection.

3          THE COURT:  That's overruled.

4   A.  That I needed to wait for her to -- Puff to come down.

5   Q.  So what did you do?

6   A.  I was blocked in, so I waited.

7   Q.  What was blocking you in?

8   A.  Security.

9   Q.  Security's cars?

10  A.  No.  Security.

11  Q.  Oh, just security --

12  A.  Yes.

13  Q.  And then what happened next?

14  A.  They came down.

15  Q.  When you say "they," what do you mean?

16  A.  When Puff and Cassie came down, when they came down, Cassie

17  got in my car.  Puff began to berate us both.  And he finally

18  let us go --

19  Q.  Let me pause you there.  You said Mr. Combs began to berate

20  you both.  Who was he berating?

21  A.  Cassie and I.

22  Q.  And what was Mr. Combs saying as far as you can remember?

23  A.  We not going to be playing with him.  We can just take our

24  broke ass and ride into the sunset.

25  Q.  Where did you and Cassie go next?

P5SACom4                          Nash - Direct

1    A.  We drove off.  And as we drove off, we got a phone call to

2    pull over --

3              MR. DONALDSON:  Objection.

4              MS. COMEY:  I can ask another question, your Honor.

5              THE COURT:  Let's have a new question.

6              MS. COMEY:  Yep.

7    Q.  After you drove, what -- drove away from the building, what

8    if any phone calls did you and Cassie receive?

9    A.  Phone call from Puff.

10   Q.  What did Puff say?

11   A.  For us to pull over.

12   Q.  And what did you do?

13   A.  Pulled over.

14   Q.  What happened after you pulled over?

15   A.  He came to the window and began to talk to Cassie.

16   Q.  Who came to the window?

17   A.  Puff.

18   Q.  What did you hear Mr. Combs say when he came up to the car

19   window?

20   A.  That she fucked up.  And that he was going to put her sex

21   tapes on the internet.  He was going to release them on

22   schedule.  And that he was going to first start by sending them

23   to her parents' jobs, and he was going to get them fired, and

24   that her brother was a bitch, and that Puff was the only one

25   that -- that protected her.

P5SACom4                          Nash - Direct

1   Q.  How did Cassie react to Mr. Combs saying all of these

2   things to her?

3   A.  She was in tears.

4   Q.  What was Mr. Combs' tone when he said these things to

5   Cassie?

6   A.  He was pretty in between.

7   Q.  In between what?

8   A.  Angry, but he wasn't shouting.

9   Q.  After Mr. Combs finished saying all of those things, what

10  did you and Ms. Ventura do next?

11  A.  We drove off.

12  Q.  And where did you ultimately drive to?

13  A.  To my house.

14  Q.  As you were driving away, what was Cassie's demeanor?

15  A.  She was in tears.

16  Q.  What did you say to try to comfort her?

17          MR. DONALDSON:  Objection.  Objection.

18          THE COURT:  Overruled.

19  A.  I told her, I said, well, girl if he wants to release

20  the -- release the sex tapes, then let him because he's on them

21  too.

22  Q.  What did you mean when you said he's on them too?

23  A.  That Puff was on them too.

24  Q.  On the videos?

25  A.  Yes.

P5SACom4                          Nash - Direct

1    Q.  How did Cassie respond when you said that Puff was on the

2    videos too?

3    A.  She said that she -- that he wasn't on the videos, that it

4    was him taping her with other guys.

5    Q.  And did she say what she was doing with those other guys?

6    A.  Yeah, having sex with the other guys.

7    Q.  What did she say about whether, in that moment, in 2013,

8    2014, she wanted to have sex with other guys?

9              MR. DONALDSON:  Objection.

10             THE COURT:  That's overruled.

11   A.  That she didn't want to.

12   Q.  And what did she say about why she was in that moment?

13   A.  Because Puff wanted her to.

14   Q.  After you got back to your house, who if anyone called you

15   and Cassie?

16   A.  Puff and Derek Roche.

17   Q.  What do you remember about those phone calls?

18   A.  Derek Roche called me and told me that he had given Puff my

19   address and that Puff was on the way.

20             MR. DONALDSON:  Objection.

21             MS. COMEY:  It's not offered for the truth, your

22   Honor, just impact on the listener.

23             THE COURT:  That's overruled.

24   Q.  How did you and Cassie react when Derek told you that Puff

25   was on the way?

1  A.  We panicked.

2  Q.  And then what did you do?

3  A.  I drove her to Sunset Boulevard so she can catch a yellow

4  taxi.

5  Q.  Why did you drive Ms. Ventura to Sunset Boulevard to get a

6  taxi?

7  A.  Uber wasn't really a thing then.

8  Q.  What did Cassie tell you she was going to do when she got

9  into the taxi?

10  A.  She would call me when she got to where she was.

11  Q.  Did she tell you where she was going at that point or no?

12  A.  No.  No.

13  Q.  What did you do after dropping Cassie off to get a taxi?

14  A.  I went back home.

15  Q.  What happened when you went back home?

16  A.  Puff came to my house with Derek Roche and D-Roc.

17  Q.  What happened when Mr. Combs, D-Roc, and Derek Roche came

18  to your house?

19  A.  Puff came in and he was like where the fuck is she.  He

20  started looking all around my house.  In the closets, he went

21  in the oven, I don't know why he looked in the oven.  And he

22  asked me where she was.

23  Q.  Who did you understand he was referring to when Mr. Combs

24  said where is she?

25  A.  Cassie.

P5SACom4                          Nash - Direct

1   Q.  After Mr. Combs looked around your house, what happened

2   next?

3   A.  He then took my phone and my car keys.

4   Q.  And as Mr. Combs took your phone, what if any phone calls

5   came into your phone?

6   A.  Cassie called.

7   Q.  And what happened when Cassie called your phone?

8   A.  When he saw the number, he --

9              MR. DONALDSON:  Objection.

10             THE COURT:  Can you rephrase the question.

11             MS. COMEY:  Yes, your Honor.

12  Q.  Could you tell what phone number or what ID came up on your

13  phone?

14  A.  The Le Montrose.

15  Q.  And what's the Le Montrose?

16  A.  A hotel in the West Hollywood.

17  Q.  And were you able to see the Le Montrose come up on the

18  screen of your phone?

19  A.  Yes.

20  Q.  As Mr. Combs was holding it?

21  A.  Yes.

22  Q.  And after that came up on the screen of your phone, what

23  did Mr. Combs say?

24  A.  He said, oh, she at the Le Montrose, let's go.

25  Q.  So then what did Mr. Combs tell you to do?

P5SACom4                          Nash - Direct

1   A.  He told me to get in the car and they will follow me to the

2   Le Montrose so I can get her to come down.

3   Q.  And who did you understand would be following you?

4   A.  Puff and security.

5            MR. DONALDSON:  Objection.

6            THE COURT:  That's overruled.

7   Q.  Who from security?

8   A.  D-Roc.

9   Q.  So what did you do?

10  A.  I hopped in a car and drove to the Le Montrose.

11  Q.  And as you drove, where was your phone?

12  A.  With Mr. Combs.

13  Q.  Where did you drive to?

14  A.  Le Montrose.

15  Q.  What happened after you got to the Le Montrose?

16  A.  When I walked up, he kind of like stopped before he went in

17  and he told me that since -- because we got shipments there a

18  lot, I knew the people so --

19            MR. DONALDSON:  Objection.  Objection.

20            MS. COMEY:  Let me break it down if that's okay, your

21  Honor.

22            THE COURT:  It's okay.

23            MS. COMEY:  Thank you, your Honor.

24  Q.  So, first, who was talking to you?

25  A.  Puff.

P5SACom4                          Nash - Direct

1  Q.  And backing up, before this day, what if any connection did
2  you personally have to the Le Montrose?
3  A.  We always got packages there, and most of the staff stayed
4  there.
5  Q.  Most of the staff meaning whose staff?
6  A.  Bad Boy staff.
7  Q.  So what did Mr. Combs say to you outside of the Le
8  Montrose?
9  A.  Since I want to be all chummy chummy with those bitches, go
10 upstairs and get Cassie.
11 Q.  How did you respond?
12 A.  I told him that if he gave me my phone back -- I told him
13 that he needed to give me my phone back because she would think
14 it was weird that I didn't have my phone.
15 Q.  And what did Mr. Combs do in response?
16 A.  He gave it back.
17 Q.  And then where did you go?
18 A.  Upstairs to her room.
19 Q.  When you went inside the Le Montrose, who came with you?
20 A.  D-Roc, and Toni Bias Fletcher showed up some kind of way.
21 Q.  Who is Toni Bias Fletcher?
22 A.  Puff's old chief of staff.
23      MS. COMEY:  Can we please pull up what's in evidence
24 as Government Exhibit 2A-305.
25 Q.  Do you recognize the person in that photograph?

1    A.   Yes.

2    Q.   Who is that?

3    A.   Toni Bias Fletcher.

4         ms.com:  We can take that down.  Thank you.

5    Q.   How did you and Toni and D-Roc know which room to go to?

6    A.   The people at the front desk told me.

7    Q.   And then where did you go?

8    A.   To Cassie's room.

9    Q.   And what happened when you got to Cassie's room?

10   A.   I opened the door and turned on the light.

11   Q.   And what happened when you turned on the light to Cassie's

12   room?

13   A.   She jumped up.

14   Q.   Who jumped up?

15   A.   Cassie.

16   Q.   And how was her demeanor based on her appearance --

17   withdrawn.

18        Based on your observations of her appearance, what did

19   her demeanor appear to be when she jumped up?

20   A.   She was frightened.

21   Q.   What did you and D-Roc and Toni say to Cassie?

22   A.   That Puff was downstairs looking for her.

23   Q.   How did Cassie react when she heard that?

24   A.   She said, oh, no.  And then she went towards the balcony.

25   She said she was going to go over the balcony.

P5SACom4                          Nash - Direct

1          MR. DONALDSON:  Objection.  Objection, your Honor.

2          THE COURT:  That's sustained.  The jury should

3     disregard the witness's last answer.

4          Ms. Comey, you can ask a different question or

5     rephrase.

6     Q.  Did Cassie make any statements about what her intent was to

7     do in the immediate future?

8          MR. DONALDSON:  Objection.

9          THE COURT:  That's overruled.

10    Q.  Did he make any statements about what her intent was to do

11    in the immediate future?

12    A.  Yes.  She said that she was going to climb over the

13    balcony.

14    Q.  How high up was the balcony?

15    A.  It wasn't the first floor.

16    Q.  Do you remember what floor it was on?

17    A.  No.

18    Q.  How did you and D-Roc and Toni react when Cassie said she

19    was going to go over the balcony?

20    A.  We told her no and that we would sneak her out the side.

21    Q.  So then where did Cassie go?

22    A.  I assume out the side.

23    Q.  Where did you go?

24    A.  Back through the front.

25    Q.  Now, when you say out the side, what do you mean by the

P5SACom4                        Nash - Direct

1   side of the Le Montrose?

2   A.  The side of the hotel I guess.

3   Q.  And then where did you go?

4   A.  I went back to the front of the hotel.

5   Q.  And who did you see when you went back to the front of the

6   hotel?

7   A.  Puff and some other security guards.

8   Q.  Whose security guards did you see?

9   A.  Puff's.

10  Q.  About how many of Mr. Combs' security guards did you see

11  outside of the Le Montrose?

12  A.  Maybe four or five.

13  Q.  And what if any vehicles did you see with Mr. Combs and his

14  security staff?

15  A.  An SUV and I don't remember the other one.

16  Q.  Do you remember what color SUV?

17  A.  No.  I mean, I'm sure -- no.

18  Q.  What if any conversation did you and Mr. Combs have when

19  you went outside?

20  A.  I told him that she -- she had left the room and he told me

21  that I played him.

22  Q.  What happened next?

23  A.  As he was talking, I just hopped in the car and drove off.

24  Q.  Where were you driving to?

25  A.  I was going to drive home.

P5SACom4                    Nash - Direct

1   Q.  And what happened?

2   A.  I noticed that a car was following me.

3   Q.  Did you recognize the car?

4   A.  Yes.

5   Q.  From where?

6   A.  One of the same cars that was outside of the Le Montrose.

7   Q.  And who had been in or next to those car -- one of those

8   cars outside of the Le Montrose?

9               MR. DONALDSON:  Objection.

10              THE COURT:  Overruled.

11  A.  Puff and security.

12  Q.  What did you do when you saw this car that you recognized

13  driving behind you?

14  A.  I turned off my lights and drove really fast until I --

15  until I lost them.

16  Q.  And then where did you go?

17  A.  To the Universal Sheraton.

18  Q.  Why did you go to a hotel?

19  A.  Because I didn't think my home was safe to go to that

20  night.

21  Q.  When did you go back to your home?

22  A.  The next morning.

23  Q.  And what did you find when you went back to your home?

24  A.  My backpack was stolen.

25  Q.  What had been in that backpack?

1    A.  My identification, thousand dollars cash, and my iPad.

2    Q.  Why did you have a thousand dollars cash in your backpack?

3            MR. DONALDSON:  Objection.

4            THE COURT:  It's overruled.

5    A.  Generally when Puff would --

6            MR. DONALDSON:  Object --

7    A.  -- go be irate, I kept $500 for a deposit for the hotel and

8    $500 for the room so that I didn't have to put my name on a

9    hotel room.

10           MR. DONALDSON:  Objection.

11   Q.  Why didn't you want to put your name --

12           THE COURT:  Hold on.  When the question is being

13   asked, if you object, then I have no idea what the objection is

14   or what the question is.

15           So let's get the question, and then, Mr. Donaldson,

16   I'll give you a chance for the objection.

17           MR. DONALDSON:  Judge, just for the record I was

18   actually objecting to the prior answer that he started with

19   generally.  I didn't want to interrupt his answer.

20           THE COURT:  That's overruled.

21           Ms. Comey, can we get a new question.

22           MS. COMEY:  Yes, your Honor.  Thank you.

23   Q.  Why, Mr. Nash, did you not want to put your name on a hotel

24   where you were staying?

25   A.  Because I didn't want Puff to find me.

1   Q.   Switching topics a bit.

2         How many times, if any, do you remember seeing

3   Mr. Combs slap Cassie across the face?

4   A.   Once.

5   Q.   Where was this?

6   A.   Outside in the parking lot at a studio.

7   Q.   At which studio?

8   A.   I just remember it was in like North Hollywood.

9   Q.   And who do you remember being in the studio parking lot?

10  A.   It was quite a few people.

11  Q.   About what year was this?

12  A.   2015.

13  Q.   And what did you see happen?

14  A.   I just heard commotion, and I looked over, and by the time

15  I looked over, he slapped her.

16  Q.   Who slapped who?

17  A.   Puff slapped Cassie.

18  Q.   Where?

19  A.   In her face.

20  Q.   What did Mr. Combs say as he slapped Cassie in the face?

21  A.   Get this bitch out of here.

22  Q.   What did you do in response?

23  A.   Got her out of there.

24  Q.   And how did Cassie react to being slapped in the face?

25  A.   She was in tears.

1  Q.  During Cassie's relationship with Mr. Combs, what if any

2  movies are you aware of that she appeared in?

3  A.  Step Up 3, The Perfect Match, and Honey 3.

4  Q.  I want to talk about The Perfect Match.  Do you remember

5  about when the premiere of that movie was?

6  A.  2015, '16.

7  Q.  Are you estimating?

8  A.  Yes.

9  Q.  Who helped her get ready for that premiere?

10  A.  Derek Roche and I think Rokael, the makeup artist.

11  Q.  And who if anyone did you FaceTime with while Cassie was

12  getting ready for that premiere?

13  A.  Derek.

14  Q.  And when Derek FaceTimed with you, did you talk with

15  Cassie?

16  A.  Yes.

17  Q.  And when you saw Cassie's face over FaceTime, what did you

18  see?

19  A.  That she had a black eye.

20  Q.  When was the next time you saw Cassie in person after

21  seeing that black eye over FaceTime?

22  A.  At the premiere.

23  Q.  When you saw Cassie at the premiere, what if any injuries

24  could you see on her face?

25  A.  I could see the black eye under the makeup.

1   Q.  But was there makeup covering it?

2   A.  Yes.

3          MR. DONALDSON:  Objection.

4          THE COURT:  Overruled.

5   Q.  How much makeup?

6   A.  A lot.

7   Q.  While you were at the premiere, what if any interactions

8   did you observe between Mr. Combs and Cassie?

9   A.  He just kept pulling her next to him any time she would try

10  to, you know, have a conversation with someone.  And then I

11  notice him grabbing at her side and she would, like, jump.

12         MR. DONALDSON:  Objection, your Honor.  Objection.

13  Move to strike.

14         THE COURT:  Overruled.

15  BY MS. COMEY:

16  Q.  Now, Mr. Nash, other than what we've already talked about,

17  how often do you remember seeing bruises on Cassie during her

18  relationship with Mr. Combs?

19  A.  Quite often.

20  Q.  Where do you remember seeing bruises on Cassie's body?

21  A.  Legs, arms, and neck.

22  Q.  And other than the premiere and the incident where Cassie

23  hit her head on the bed frame, how many other times do you

24  remember seeing bruising on Cassie's face either in person or

25  over FaceTime?

1    A.  Twice.

2    Q.  When are those times?

3    A.  One time was just a random time, I think he slapped her.

4    And the other time was after a Las Vegas trip.

5    Q.  All right, I want to talk about just your interactions with

6    Cassie and your observations with her, not anything anyone told

7    you about that.  Okay?

8    A.  Mm-hmm.

9    Q.  So about what year was this?

10   A.  2015 maybe.

11   Q.  And are you estimating?

12   A.  Yeah.

13   Q.  And how did you come to first see injuries on Cassie's

14   face?

15   A.  She FaceTimed me.

16   Q.  From where?

17   A.  From --

18   Q.  From what city?

19   A.  From Vegas -- no, I don't think they were in Vegas.  But

20   she FaceTimed me.

21   Q.  Well, did this have any connection to a Vegas trip or no?

22   A.  Yes.  This was a Vegas trip.

23   Q.  And what injuries did you see on Cassie's face when she

24   FaceTimed you?

25   A.  I saw bruising on her face.

P5SACom4                          Nash - Direct

1   Q.  Could you describe it, please?

2   A.  She had two black eyes that time.

3   Q.  How did those injuries compare to the other injuries you'd

4   seen her with?

5   A.  It was pretty bad.

6   Q.  Now, how many times, Mr. Nash, has Mr. Combs been

7   physically violent with you?

8   A.  A few.

9   Q.  Do some stand out more in your mind than others?

10  A.  Yes.

11  Q.  Was one of those times that stands out at a music video

12  shoot?

13          MR. DONALDSON:  Objection, Judge.

14          THE COURT:  It's overruled.

15  A.  Yes.

16  Q.  About what year was this?

17  A.  2013.

18  Q.  Are you estimating?

19  A.  About.

20  Q.  Whose music video was being shot that day?

21  A.  Cassie's.

22  Q.  Where were you right before the violence started?

23  A.  Outside smoking a cigarette.

24  Q.  Was anyone with you?

25  A.  No.

P5SACom4                    Nash - Direct

1  Q.  What were you standing by?

2  A.  A car.

3  Q.  Was it parked?

4  A.  Yes.

5  Q.  What happened as you were outside smoking a cigarette by a

6  car?

7  A.  Puff came around and threw me on the car and started

8  choking me out.

9  Q.  What did Mr. Combs say as he choked you on the car?

10 A.  I thought I told y'all about going out, y'all wilin.

11 Q.  Who did you understand Mr. Combs was referring to when he

12 said y'all?

13 A.  Cassie and I.

14 Q.  And at that point what had Mr. Combs said to you in the

15 past about whether you and Cassie could go out without his

16 permission?

17 A.  After the Rita thing, that's basically -- he said that we

18 couldn't.

19 Q.  That you couldn't what?

20 A.  That we couldn't go out.  Because every time I wanted to go

21 out, she wanted to go out.

22 Q.  Now, Mr. Nash, stepping back, did you report any of the

23 violence you've described today to the police?

24     Did you file a report?

25 A.  No.

1    Q.  To the police?

2    A.  No.

3    Q.  Why not?

4    A.  Out of fear.

5    Q.  What were you afraid of?

6    A.  Of retaliation from Puff.

7    Q.  What kind of retaliation were you afraid of?

8         MR. DONALDSON:  Objection.

9         THE COURT:  Sustained.

10   Q.  Who on Mr. Combs' staff did you talk to about the violence

11   you observed Mr. Combs inflict on Cassie?

12   A.  Derek and Kristina.

13   Q.  Who is Kristina?

14   A.  Puff's assistant.

15        MS. COMEY:  Can we please pull up what's in evidence

16   as Government Exhibit 2A-301.

17   Q.  Do you recognize this person?

18   A.  Yes.

19   Q.  Who is that?

20   A.  Kristina.

21   Q.  Do you know her last name?

22   A.  Khorram.

23   Q.  Do you know her by any nicknames?

24   A.  K.K.

25        MS. COMEY:  We can take that down.  Thank you.

P5SACom4                    Nash - Direct

1   Q.  How did Kristina respond when you told her about violence

2   you observed between Mr. Combs and Cassie?

3   A.  That she would talk to him.

4          MR. DONALDSON:  Objection.

5          THE COURT:  That's overruled.

6   Q.  And did the violence stop after she said that?

7   A.  No.

8   Q.  During your friendship with Cassie, approximately how many

9   times did you help Cassie hide from Mr. Combs?

10  A.  Too many to count.

11  Q.  About how often?

12  A.  Pretty often.

13  Q.  Do those instances run together in your mind?

14         MR. DONALDSON:  Objection.

15         THE COURT:  That's overruled.

16  A.  Yes.

17  Q.  Where are some of the places you remember going with Cassie

18  to hide?

19  A.  Hotels.  Shutters, The London, and a couple of other

20  places.

21  Q.  What sorts of things do you remember seeing and hearing

22  Mr. Combs say and do before you and Cassie ran away to hide?

23         MR. DONALDSON:  Objection, your Honor.

24         THE COURT:  That needs to be rephrased.

25  Q.  What caused you and Cassie to hide from Mr. Combs?

P5SACom4                        Nash - Direct

1          MR. DONALDSON:  Objection, your Honor.

2          THE COURT:  Can we get some specificity on what you're

3     talking about.

4          MS. COMEY:  Sure.

5     Q.  So you talked about hiding in hotels; is that right,

6     Mr. Nash?

7     A.  Yes.

8     Q.  Can you explain to us why you and Cassie went to hotels to

9     hide?

10         MR. DONALDSON:  Objection, your Honor.

11         THE COURT:  Grounds?

12         MR. DONALDSON:  Form of the question, your Honor.

13         THE COURT:  Overruled.

14    A.  Repeat the question, please.

15    Q.  Can you explain to us why you and Cassie would go to hotels

16    to hide from Mr. Combs?

17    A.  Because we didn't want him to come back to the house and

18    attack us.

19    Q.  And before you went to these hotels, what if any

20    conversations do you remember having with Mr. Combs or hearing

21    Cassie have with Mr. Combs?

22    A.  I can't even remember.

23    Q.  On the occasions when you helped Cassie hide from

24    Mr. Combs, what ended up happening each time?

25    A.  He would blow everyone's phone up and threaten everybody

P5SACom4                          Nash - Direct

1   until --

2   Q.  Let me pause you there.  You said he would blow everyone's

3   phone up.  Who's the "he?"

4   A.  Puff.

5   Q.  And when you say "blow everyone's phone up," what do you

6   mean?

7   A.  He would call incessantly.

8   Q.  Who did you see him call incessantly?

9   A.  Me and Cassie.

10  Q.  And who else during those same periods called you and

11  Cassie?

12  A.  Kristina.

13  Q.  Kristina Khorram?

14  A.  Yes.

15  Q.  Did you answer any of those calls?

16  A.  Yes.

17  Q.  When you answered Mr. Combs' calls, what did he say?

18  A.  He would just say we needed to get back to the house.  She

19  needs to get back to the house and --

20  Q.  And what do you remember his tone being?

21  A.  Sometimes angry.  Sometimes he would soften up.

22  Q.  And what do you remember Kristina saying when you answered

23  her calls?

24  A.  That she was going to help with the situation, that he's

25  calmed down, that we should come back to the house.

P5SACom4                        Nash - Direct

1   Q.  And after you heard that Mr. Combs had calmed down, what

2   did you and Cassie do each time after going to a hotel?

3   A.  I would -- she would just go back -- she would go back to

4   her house.

5   Q.  During Ms. Ventura's relationship with Mr. Combs, about how

6   often did she tell you that she was going to a hotel with

7   Mr. Combs?

8   A.  Quite often.

9   Q.  Can you give us an estimate, weekly, monthly, yearly?

10  A.  Weekly.

11  Q.  And each time that she told you she was going to a hotel

12  with Mr. Combs, what if anything did you see her packing?

13  A.  A black duffle bag.

14  Q.  Did you see what she put in the duffle bag?

15  A.  Sex toys.

16  Q.  And what, on each of those occasions, what if anything did

17  Cassie say to you about whether she wanted in those moments to

18  go to those hotels with Mr. Combs?

19          MR. DONALDSON:  Objection.

20          THE COURT:  Overruled.

21  A.  She said she didn't want to.

22  Q.  And in those moments, what did she tell you about why she

23  was going?

24          MR. DONALDSON:  Objection.

25          THE COURT:  Overruled.

1   A.  Because he wanted her to.

2   Q.  How long would Cassie usually be gone when she went to

3   these hotels with Mr. Combs?

4   A.  Maybe, maybe a day or more.

5   Q.  And did you ever see her when she came back from these

6   hotel stays?

7   A.  Most times, yes.

8   Q.  And what did you observe about her demeanor when she came

9   back?

10  A.  That she would be tired.

11  Q.  During Cassie's relationship with Mr. Combs, what if any

12  drugs did you see her take?

13  A.  Prescription pills and cocaine, Molly.

14  Q.  What if any of those drugs did you understand she became

15  addicted to?

16  A.  The prescription drugs.

17  Q.  I want to talk now about Cassie's 29th birthday.  Okay?

18  A.  Mm-hmm.

19  Q.  What conversations, if any, do you remember having with

20  Mr. Combs ahead of Cassie's 29th birthday?

21  A.  Should he surprise her for her birthday.

22  Q.  Is that what he asked you?

23  A.  Yes.

24  Q.  How did you respond?

25  A.  I told him if you want to.

1   Q.  Now, why did you tell Mr. Combs to come if he wanted to if

2   you'd seen him do all of this violence to Cassie?

3   A.  Girl, I was not about to tell him he couldn't come, give

4   that girl a party.

5   Q.  Where was Cassie's 29th birthday?

6   A.  At the Cavatina.

7   Q.  What's the Cavatina?

8   A.  A restaurant in Los Angeles.

9   Q.  What do you remember happening at the birthday party there?

10  A.  As they were leaving, Puff was telling Cassie, fuck you, I

11  do all this -- I'll do everything for you and you just can't do

12  this one thing for me.

13  Q.  Did you end up speaking with Cassie at the Cavatina about

14  Mr. Combs?

15  A.  Yes.

16  Q.  Were you two alone?

17  A.  It was -- it was a couple people around.

18  Q.  What do you remember Cassie saying to you at the Cavatina?

19  A.  I asked her about Puff.  I was like girl, what is she over

20  there doing, what is she talking about.  And Cassie said, girl,

21  she's just mad because I don't want to go to the hotel and

22  freak-off with him.

23  Q.  Now, before that moment, had you heard the words freak-off

24  come out of Cassie's mouth before to the best of your memory?

25  A.  Yeah.  But it's not like freak-off.  It was just like

1  freak-off.  You know what I mean?

2  Q.  Like the verb?

3  A.  Yeah.

4  Q.  And at the Cavatina, what did Cassie say about whether she

5  wanted to go to the hotel?

6          MR. DONALDSON:  Objection.

7  A.  That she didn't want --

8          MS. COMEY:  No you got to wait.

9          THE COURT:  Overruled.

10 Q.  What did say about in that moment whether she wanted to go

11 to the hotel?

12 A.  That she didn't want to.  She wanted to enjoy her birthday.

13 Q.  After the Cavatina, where did you go next?

14 A.  To the Blind Dragon.

15 Q.  What's the Blind Dragon?

16 A.  A karaoke club.

17 Q.  Who else do you remember going to the Blind Dragon?

18 A.  Some friends.

19 Q.  Did you see Cassie or Mr. Combs there?

20 A.  Yes, they came -- they followed behind.

21 Q.  What if any interactions did you see between Cassie and

22 Mr. Combs at the Blind Dragon?

23 A.  He just had her in the corner.  He was like pointing in her

24 face.

25 Q.  What was his demeanor when Mr. Combs was pointing in

P5SACom4                        Nash - Direct

1    Cassie's face?

2    A.  Stern.

3    Q.  Sorry?

4    A.  Stern.

5    Q.  Could you hear what he was saying?

6    A.  No.

7    Q.  Did you have any conversations with Cassie at the Blind

8    Dragon or no?

9    A.  No.

10   Q.  Where did you go after the Blind Dragon?

11   A.  To Cassie's house.

12   Q.  Who else do you remember going to Cassie's house after the

13   Blind Dragon?

14   A.  Bana and another girl.

15   Q.  Who is Bana?

16   A.  A friend of ours.

17   Q.  When you say friend of ours, who is ours?

18   A.  Cassie and I.

19           MS. COMEY:  Can we Please pull up what is in evidence

20   as Government Exhibit 2A-407.

21   Q.  Do you recognize the person in this photograph?

22   A.  Yes.

23   Q.  Who's that?

24   A.  Bana.

25   Q.  Do you know her by any other names?

1   A.   Bryana.

2            MS. COMEY:  We can take that down.  Thank you.

3   Q.   Now, which, which of Cassie's homes -- which home did you

4   go to?

5   A.   875 Comstock.

6   Q.   Comstock?

7   A.   Yes.

8   Q.   And is that in Los Angeles?

9   A.   Yes.

10  Q.   What floor was that on?

11  A.   I want to say -- that might have been 17A.

12  Q.   The 17th floor you think?

13  A.   Yeah.

14  Q.   Okay.  What do you remember happening when that small group

15  of people went to Cassie's home after the Blind Dragon?

16  A.   I -- Puff and Cassie came in.

17  Q.   And what do you remember Mr. Combs saying?

18  A.   Y'all girl going to get some dick tonight.

19  Q.   Who did Mr. Combs say that to?

20  A.   Me, Bana, and the other girl that was there.

21  Q.   And what did you see Cassie do next?

22  A.   She went to her room to pack her black bag.

23  Q.   And did you see what she was packing?

24  A.   Yes.

25  Q.   What was she packing?

P5SACom4                        Nash - Direct

1   A.  Like sex toys and stuff and money.

2   Q.  And what did Cassie say to you as she was packing up that

3   bag?

4          MR. DONALDSON:  Objection.

5          THE COURT:  Overruled.

6   A.  That she didn't want to go there and should she take all

7   this money because she had a wad of cash.

8   Q.  So, first, when she said she didn't want to go there, what

9   did you understand the "there" was?

10  A.  With Puff.

11  Q.  To where with Puff?

12  A.  She didn't want to go -- she didn't want to go with him.

13  Q.  And what did you say about the money?

14  A.  I told her to put -- leave some behind because he always

15  makes her spend all her money.

16  Q.  And what if anything did Cassie say to you about where she

17  and Puff were about to go?

18  A.  To the hotel.

19  Q.  And what if anything did Cassie say to you about, in that

20  moment, why she was going if she did not want to?

21         MR. DONALDSON:  Objection.

22         THE COURT:  That needs to be rephrased.

23  Q.  What if anything did Cassie say to you in that moment in

24  her bedroom on her 29th birthday about why she was going to a

25  hotel with Mr. Combs?

P5SACom4                        Nash - Direct

 1  A.  Because --

 2          MR. DONALDSON:  Objection.

 3          THE COURT:  That's overruled.

 4  A.  Because he was making her do that shit.

 5  Q.  What did you see happen next?

 6  A.  They ended up leaving the house.

 7  Q.  When you say "they" who do you mean?

 8  A.  Puff and Cassie.

 9  Q.  When did you next see them after they left the apartment?

10  A.  I looked over the balcony and they were driving off in a

11  golf cart.

12  Q.  Now, stepping back a bit, could you tell whether Cassie was

13  under the influence of any substances this night?

14  A.  Oh, yeah.

15  Q.  Could you tell us about that?

16  A.  She was super high.

17  Q.  How could you tell?

18  A.  I mean, I know her demeanor.

19  Q.  And could you tell anything about whether Mr. Combs was

20  under the influence of anything that night?

21  A.  Yes.

22  Q.  Tell us about that?

23  A.  He was high.

24  Q.  Based on his demeanor and his appearance and based on

25  Cassie's appearance and demeanor, could you tell who was more

P5SACom4                          Nash - Direct

1   intoxicated than the other?

2           MR. DONALDSON:  Objection.

3           THE COURT:  You can answer that yes or no if you can.

4   A.  Yes.

5   Q.  Who was more intoxicated based on your observations?

6   A.  Cassie.

7   Q.  Who did you see driving the golf cart?

8   A.  Puff.

9   Q.  And who was in the golf cart with Mr. Combs?

10  A.  Cassie.

11  Q.  And where were you when you saw the golf cart driving away?

12  A.  Looking off of the balcony.

13  Q.  Who else was with you on the balcony?

14  A.  I don't know.

15  Q.  I just want to ask you about one other event, Mr. Nash.

16  A.  Mm-hmm.

17  Q.  I want to direct your attention to New Years Eve in

18  approximately 2017.  Okay?

19  A.  Yes.

20  Q.  Do you remember where you were then?

21  A.  Vegas.

22  Q.  Who else do you remember being in Vegas for that New Years?

23  A.  Puff, Cassie, and the rest of the staff.

24  Q.  Whose staff?

25  A.  Puff.

1   Q.  Where were Mr. Combs, Cassie, you, and the rest of the

2   staff staying?

3   A.  I forget the hotel.

4   Q.  But at a hotel?

5   A.  Yes.

6   Q.  And were you all on different floors or the same floor?

7   A.  Same.

8   Q.  Could you describe where Mr. Combs' room was in relation to

9   the rest of the staff's rooms?

10  A.  The end of the hallway.

11  Q.  So his was at the end of the hallway.

12          When you arrived in Vegas for this trip, where did you

13  go?

14  A.  To their -- Puff and Cassie's room to unload Cassie's

15  clothes.

16  Q.  And what happened when you went to Mr. Combs' and Cassie's

17  room?

18  A.  He told me that she had been asleep for 24 hours and we

19  needed -- I needed to wake her up.

20          MR. DONALDSON:  Objection.

21  Q.  Who told you that?

22  A.  Puff.

23          THE COURT:  It's overruled.  You can continue.

24  Q.  I'm sorry.  Who told you that?

25  A.  Puff.

1   Q.  After Mr. Combs told you that, what did you do?

2   A.  I went to wake her up.

3   Q.  And did you wake her up?

4   A.  Yeah.  She woke up right away for me.

5   Q.  And what did she tell you she wanted to do?

6   A.  Stay in.

7   Q.  And then what if any conversation did you have with

8   Mr. Combs about what he wanted to happen that night?

9   A.  He pulled me in the hallway and told me that he spent all

10  that money, she needed to get ready.

11  Q.  So then what did you and Cassie do?

12  A.  Got her ready.

13  Q.  And then where did you, Cassie, and Mr. Combs go?

14  A.  To a couple of clubs.

15  Q.  After going out, where did you end up at the end of the

16  night?

17  A.  In Puff and Cassie's room.

18  Q.  Who do you remember being there?

19  A.  Me, Cassie, Rob Holladay, and Puff.

20  Q.  Who is Rob Holladay?

21  A.  A low budget producer.

22  Q.  What do you remember happening in Mr. Combs' suite?

23  A.  Well, I usually go to sleep before everybody, so I went to

24  sleep in the room, and Cassie woke me up and said that Puff

25  wanted to invite a guy over.

P5SACom4                            Nash - Direct

1          MR. DONALDSON:  Objection, Judge.

2          THE COURT:  It's overruled.

3   Q.  How did you respond when Cassie told you that Puff wanted

4   to invite a guy over?

5   A.  I just went ugh, and I got up and went to my hotel room.

6   Q.  And what did you do when you went to your hotel room?

7   A.  I started packing.

8   Q.  And as you were packing, where were you?

9   A.  Going between two rooms.

10  Q.  Why were you going between two rooms?

11  A.  Because I had clothes in both rooms.

12  Q.  So were you out in the hallway?

13  A.  Yes.

14  Q.  What did you see when you were going in and out of rooms

15  into the hotel hallway?

16  A.  A guy knocking on the door.

17  Q.  A guy knocking on which door?

18  A.  Puff and Cassie's.

19  Q.  Do you know what that guy looked like?

20  A.  I can only see him from the back.

21  Q.  What did you see happen after this guy knocked on

22  Mr. Combs' and Cassie's door?

23  A.  Somebody opened the door and he went in.

24  Q.  Did you see that man again?

25  A.  No.

1   Q.  What year did you ultimately stop working as a stylist for

2   Mr. Combs?

3   A.  2018.

4   Q.  And what year did Cassie break up with Mr. Combs once and

5   for all?

6   A.  2018.

7   Q.  What is your relationship like with Cassie now?

8   A.  Very close.

9   Q.  How often do you talk?

10  A.  Pretty often.

11  Q.  Have you discussed the substance of your testimony here

12  today with Cassie at all?

13  A.  No.

14  Q.  Has she discussed the substance of her testimony, if any,

15  with you at all?

16  A.  No.

17  Q.  About how many times have you met with prosecutors in

18  connection with this case?

19  A.  Too many.

20  Q.  Can you estimate the number?

21  A.  What, five.

22  Q.  Approximately?

23  A.  Maybe.

24  Q.  How many of those meetings did you cut off and end early

25  because you did not want to continue participating in them?

1    MR. DONALDSON:  Objection.  Excuse me.  Objection.

2    THE COURT:  That's overruled.

3  Q.  How many of your meetings with prosecutors did you cut off

4  and --

5    THE COURT:  Let's rephrase the question just to avoid

6  the form objection.

7  Q.  How many, if any, meetings with prosecutors did you end

8  early?

9  A.  Probably all of them.

10  Q.  And did you do that because you did not want to continue

11  speaking with prosecutors?

12  A.  Yeah.

13  Q.  During your meetings with prosecutors, did you volunteer

14  information or did you only answer the specific questions you

15  were asked?

16  A.  Only specific questions.

17  Q.  Now, after you stopped working for Mr. Combs, did you still

18  communicate with him?

19  A.  Absolutely.

20  Q.  By text and by phone?

21  A.  Absolutely.

22  Q.  Did you also occasionally see him in person?

23  A.  No.

24  Q.  What was the tone of your text messages to Mr. Combs after

25  you stopped working for him?

P5SACom4                          Nash - Direct

 1   A.   Loving.

 2   Q.   Why was your tone to him loving if you had seen him do all

 3   of these things to one of your closest friends and if he had

 4   been violent with you?

 5   A.   I mean, my -- my whole 20s, this man's sanity was my

 6   safety.  So it was just very -- it was what I was used to.

 7   Q.   Have you personally filed any lawsuits against Mr. Combs?

 8   A.   No.

 9   Q.   Have you personally sent any demands for money to

10   Mr. Combs?

11   A.   No.

12   Q.   How do you feel about Mr. Combs here today?

13   A.   I don't hate him.

14   Q.   Why is that?

15   A.   I mean, I don't.  It's just not in me.

16            MS. COMEY:  May I have a moment, your Honor.

17            THE COURT:  You may.

18            MS. COMEY:  No further questions.

19            THE COURT:  All right.  Cross-examination.

20            MR. DONALDSON:  Yes.  But can I take a two-minute

21   break, please?  Go to the bathroom.

22            THE COURT:  Yes.  Let's take five minutes.  We'll come

23   back at 2:30.  All rise.

24            (Continued on next page)

25

1                    (In open court; jury not present)

2                    THE COURT:  Mr. Nash, we'll be back in a few minutes.

3    You can head back to that room and we'll bring you out.

4                    THE WITNESS:  Okay.

5                    THE COURT:  All right.  We'll be back in five.

6                    (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (Jury not present)

 2                THE COURT:  All right.  Please be seated.

 3                Let's have Mr. Nash back.

 4                MS. COMEY:  Your Honor, I've raised this with defense

 5      counsel.  I know this may not be possible.  If there's any way

 6      we can go a little late today.  The witness has a flight back

 7      home to Los Angeles tonight.  If we have to rebook it, we will.

 8      If there's any way we can stay a little late and get this

 9      witness done, I think the witness will appreciate it.

10                THE COURT:  That's fine.  I think the jury will

11      understand.

12                Mr. Donaldson, any issues with that?

13                MR. DONALDSON:  Not from me personally.

14                THE COURT:  OK.

15                MR. DONALDSON:  Just tell me what we think.

16                THE COURT:  I could be mistaken.  I think I told the

17      jury at some point in the beginning of this case that it may be

18      a little bit longer, we will get them out.  I think we said at

19      some point, the latest, 4:00.  I think we have some breathing

20      room there.

21                MR. DONALDSON:  OK.

22                (Witness returned)

23                THE COURT:  Welcome back.

24                THE WITNESS:  Thank you.

25                (Continued on next page)
```

1        (Jury present)

2        THE COURT:  Please be seated.

3        Welcome back, members of the jury.

4        Just to give you a heads-up, we're going to be stay

5   ago little bit later today, just for some scheduling reasons.

6   The bad news is we're going to be going later than 3:00.  I

7   assure you we're not going to get out of here any later than

8   4:00.

9        The good news is, we're doing all of this is make sure

10  that we stay on schedule, on a more general level, for the

11  trial so we can make sure that we're keeping on track.

12       So, with that, thank you for your patience.

13       And, Mr. Donaldson, when you're ready.

14       MR. DONALDSON:  Thank you, Judge.

15  BY MR. DONALDSON:

16  Q.  Good afternoon, sir.  Good afternoon.

17  A.  How are you?

18  Q.  I'm pretty good.  Thank you.

19       How are you?

20  A.  Blessed.

21  Q.  Blessed.

22       I'm going to ask you to try to speak up as loud as you

23  can so that the last person in this jury box can hear you.

24       All right?

25  A.  Sure.

1  Q.  Cool.

2       Now, you just mentioned on direct with Ms. Comey here

3  that you met with the government several times, is that right?

4  A.  Yes.

5  Q.  And during those times you met with the government, you had

6  an attorney present, is that right?

7  A.  Um, yes.

8  Q.  And you also said that you, a few times, you wanted to

9  leave early, is that right?

10 A.  Yeah.

11 Q.  By leave early, you were saying that you wanted to stop

12 whatever questions they were asking you, you wanted to just get

13 out of there?

14 A.  Yes.

15 Q.  Because either you were tired of the questions or you just

16 didn't want to be there, correct?

17 A.  Correct.

18 Q.  And I think you said, when you first sat down this

19 afternoon, that you did not want to be here, right?

20 A.  Absolutely.

21 Q.  You did not want to testify in this case?

22 A.  Yep.

23 Q.  And you were told you had to be here because of a subpoena,

24 is that right?

25 A.  Correct.

1  Q.  And that subpoena told you, you had to come to court,

2  correct?

3  A.  Yes.

4  Q.  Now, as far as you going to the government's offices to

5  talk to them, you didn't have to go there, correct?

6  A.  Nope.

7  Q.  So when you went there, you went because --

8           Well, you went voluntarily, right?

9  A.  Yeah.

10  Q.  And so, you went there to answer their questions, like they

11  said, correct?

12  A.  Yes.

13  Q.  And give them truthful answers?

14  A.  Nothing but the truth.

15  Q.  And that is what you did every time you was there?

16  A.  Every single time.

17  Q.  When you said you went there with the lawyer, Mr. Dunn, is

18  that it?

19  A.  Yes.

20  Q.  And Mr. Dunn -- well, you also said that, I think one of

21  your last questions -- answers was you're not -- you haven't

22  filed a lawsuit, right?

23  A.  No.

24  Q.  And you haven't sent out a demand letter?

25  A.  No.

1   Q.  You know what a demand letter is?

2   A.  Yes, I do.

3   Q.  So you haven't sent out anything to Mr. Combs demanding

4   money?

5   A.  No.

6   Q.  But you did hire Mr. Dunn to pursue possible civil

7   litigation against Mr. Combs, right?

8            THE COURT:  Sustained.

9            MS. COMEY:  Objection.

10  Q.  Do you have a civil --

11           Are you considering a lawsuit against Mr. Combs?

12  A.  No.  I'm focused on getting out of here.

13           MR. DONALDSON:  Could you put up 3514-5, just for the

14  parties and the witness, please.  Would you just highlight the

15  first hyphen, please.

16  Q.  Mr. Nash, could you read that first part to yourself, and

17  let me know when you're finished reading it?

18  A.  Um, let me see.  Dunn representing --

19  Q.  No, no, no, no.  Read it to yourself.  I'm sorry about

20  that.  Read it to yourself.

21           THE COURT:  Mr. Nash, are you done reading that?

22           THE WITNESS:  Yes.

23           THE COURT:  Can we take it down.

24           Mr. Donaldson, a question.

25           MR. DONALDSON:  Thank you.

P5SsCOM5                    Nash - Cross

1    BY MR. DONALDSON:

2    Q.  Now, after reading that document, does that refresh your

3    recollection, or does that change your testimony, whether or

4    not you are considering civil litigation against Mr. Combs?

5    A.  No, it doesn't.  It seems like an assumption.

6    Q.  We don't want to do assumptions in the courtroom, so does

7    that document refresh your recollection that you are

8    considering civil --

9    A.  No, it doesn't.

10   Q.  Hold on.

11   A.  It doesn't.

12   Q.  It does not?

13   A.  No.

14   Q.  So it's fair to say then that you do not have, or not as

15   much March -- one second -- as of March 10, 2025, you are not

16   considering or retaining counsel to consider suing Mr. Combs in

17   civil actions?

18   A.  I have counsel to protect me.  I don't -- I don't do

19   federal court.

20   Q.  All right.  So you have counsel to protect you related to?

21   A.  This case.

22   Q.  Protect you related to your interests regarding civil

23   claims against Mr. Combs, correct?

24   A.  No.  This case.

25   Q.  Did you not tell the government on March 10, 2025, that you

P5SsCOM5                          Nash - Cross

1   have civil counsel to consider civil claims against Mr. Combs?

2           MS. COMEY:  Objection, asked and answered, your Honor.

3           MR. DONALDSON:  Different question, Judge.

4           THE COURT:  I don't know about that.  I'll let you ask

5   it one more time.

6           Overruled.

7           MR. DONALDSON:  Excuse me.

8           Mr. Donaldson, do you want to ask your question?

9           MR. DONALDSON:  Yes.  I want to make sure I get the

10  date right.

11          THE COURT:  All right.

12  BY MR. DONALDSON:

13  Q.  On Mr. March 10, 2025, did you not tell the government,

14  Ms. Comey, that you have civil counsel to consider pursuing a

15  civil complaint against Mr. Combs?

16  A.  No.

17          MR. DONALDSON:  All right.  Could you put up 1800,

18  please.  I want to show the witness and the parties, witness

19  only, what's been premarked as a Defense Exhibit 1800.

20  A.  Yes.

21  Q.  Mr. Nash, do you recognize that?

22  A.  Yes.

23  Q.  What do you recognize that to be?

24  A.  Cassie in the *Numb* video.

25  Q.  I'm sorry?

P5SsCOM5                          Nash - Cross

1   A.  Cassie in the *Numb* video.

2   Q.  The *Numb* video?

3   A.  Yes.

4   Q.  What's the *Numb* video?

5   A.  It's a music video from a mix tape.

6   Q.  From the mix tape?

7   A.  Yes.

8            MR. DONALDSON:  We would like to have that moved in as

9   Defense Exhibit 1800?

10           MS. COMEY:  No objection.

11           THE COURT:  1800 will be admitted.

12           (Defendant's Exhibit 1800 received in evidence)

13           MR. DONALDSON:  Could you put up 1801, please.

14  Q.  Mr. Nash, do you see what's been marked as Defense Exhibit

15  1801?

16  A.  Yes.

17  Q.  What do you recognize that to be?

18  A.  Cassie and it looks like Usher.

19           MR. DONALDSON:  Your Honor, I would like to move

20  Defense Exhibit 1801 in.

21           MS. COMEY:  I would object, your Honor.  I don't think

22  the witness has established the relevance.

23           THE COURT:  All right.  Mr. Donaldson.

24  BY MR. DONALDSON:

25  Q.  Mr. Nash, do you know where this particular picture comes

P5SsCOM5                         Nash - Cross

1   from?

2   A.   The Bad Boy Reunion tour.

3   Q.   Was that 2016?

4   A.   Maybe.

5   Q.   Were you a part of that tour?

6   A.   Yes.

7   Q.   You participated as a stylist in that tour?

8   A.   Yes.

9   Q.   And is this -- was Cassie your -- were you styling for

10  Cassie at that time?

11  A.   Yes.

12          MR. DONALDSON:   I would like to move this in as

13  Defense Exhibit 1801.

14          MS. COMEY:   No objection, your Honor.

15          THE COURT:   1801 will be admitted.

16          (Defendant's Exhibit 1801 received in evidence)

17          MR. DONALDSON:   Publish that to the jury, please, if

18  you don't mind.

19          Take that down, please.

20          Could you please put up 1802, please.

21  BY MR. DONALDSON:

22  Q.   Mr. Nash, do you recognize what's been previously marked as

23  Defense Exhibit 1802?

24  A.   Yes.

25  Q.   What do you recognize that to be?

1  A.  This is Cassie doing her two-minute performance at the Bad

2  Boy Reunion tour.

3  Q.  This is the same 2016 Bad Boy Reunion tour?

4  A.  This is actually the show.  This is not the tour.  She

5  didn't do the tour.  She did the show.

6  Q.  OK.  This is the show from that?

7  A.  Yes, yes.

8  Q.  Were you her stylist at that time?

9  A.  Yes.

10          MR. DONALDSON:  Your Honor, I move to in as Defense

11  Exhibit 1802.

12          MS. COMEY:  No objection.

13          THE COURT:  1802 will be admitted.

14          (Defendant's Exhibit 1802 received in evidence)

15          MR. DONALDSON:  Please publish for the jury, please.

16  BY MR. DONALDSON:

17  Q.  Did you pick out that dress?

18  A.  I don't remember.

19          MR. DONALDSON:  Could we go back to 1801, please.  Put

20  back up 1801.

21  Q.  Did you pick out that one?

22  A.  I don't remember.

23          MR. DONALDSON:  Could we put up 1803 just for the

24  witness and the parties.

25          Now, your Honor, can I have a word with the

1    prosecution, please?

2            THE COURT:  Yes, you may.

3            (Counsel confer)

4        MR. DONALDSON:  Your Honor, with the consent of the

5    government, we have approximately ten more exhibits we would

6    like to put in.  The government has indicated it has no

7    objection.  We can do a batch, if that's OK, to make it

8    quicker, or we can go through it one by one.

9            THE COURT:  Do you need to use those during your Honor

10   examination or get them into evidence?

11           MR. DONALDSON:  I want to get them into evidence now

12   and use them later on.

13           THE COURT:  In the examination?

14           MR. DONALDSON:  Yes.

15           THE COURT:  What are the exhibits?

16           MR. DONALDSON:  1810, 1811, 1814, 1818, 1820 -- those

17   are over the government's objection, but the court allowed

18   those in -- 1819, 1821 through 1826, 1828, 1829, 1833, 1835,

19   1837, 1839 through 1841.

20           MS. COMEY:  No objection, so long as 1841 has the

21   redactions that I requested.

22           MR. DONALDSON:  I believe it does.  Yes, it does.

23           THE COURT:  All right.  Those exhibits identified by

24   counsel will be admitted.

25           MR. DONALDSON:  Thank you.

1              (Defendant's Exhibits 1810, 1811, 1814, 1818, 1820

2      1819, 1821 through 1826, 1828, 1829, 1833, 1835, 1837, 1839

3      through 1841 received in evidence)

4      BY MR. DONALDSON:

5      Q.  All right.  Mr. Nash, you testified this afternoon about

6      your relationship with Ms. Ventura, right, Cassie, right?

7      A.  Mrs. Fine.

8      Q.  I'm sorry?

9      A.  Mrs. Fine.

10     Q.  Mrs. Fine?

11     A.  Yes.

12     Q.  Because she's married to Alex?

13     A.  Yes.

14     Q.  And that was -- we'll get to that.

15             So, well, you testified about your relationship to

16     Mrs. Fine?

17     A.  Yes.

18     Q.  It started in 2001 what?

19     A.  2009, '8.

20     Q.  And you mentioned back in 2008, when you started this

21     relationship, you were a -- you still are a stylist, right?

22     A.  Yes.

23     Q.  I think when you came into there, you said that you are a

24     celebrity stylist?

25     A.  Yes, correct.

1   Q.  And a celebrity stylist means someone that styles for

2   celebrities, right?

3   A.  Yes.

4   Q.  That's contrary to someone who doesn't style for

5   celebrities, right?

6   A.  Yes.

7   Q.  So someone that's not a celebrity stylist can call

8   themselves just a stylist?

9   A.  Yes.

10  Q.  So you have earned the distinction of being a celebrity

11  stylist because you style primarily for celebrities?

12          MS. COMEY:  Objection, your Honor.

13  A.  Yes.

14          THE COURT:  It's overruled.

15  Q.  Now, when you -- that's not how you started your career,

16  though, correct?

17          You don't just become a celebrity stylist, you have to

18  move up to become that?

19  A.  No.  That's how I started it.

20  Q.  So, in 2007, when you were an intern at Bad Boy, you were a

21  celebrity stylist?

22  A.  I started as an intern.

23  Q.  But were you a celebrity stylist is my question?

24  A.  Oh, no.

25  Q.  So, in 2008, you became a celebrity stylist?

P5SsCOM5                        Nash - Cross

1    A.   Yeah.

2    Q.   What do you mean yeah?

3    A.   Yes.

4    Q.   So, by working at Bad Boy between 2007 and 2008, you just

5    became a celebrity stylist?

6    A.   Yes.

7    Q.   And that was because Mr. Combs introduced you to Cassie?

8    A.   I introduced myself to Cassie.

9    Q.   You introduced yourself to Cassie while working for

10   Mr. Combs?

11   A.   Yes.

12   Q.   And you were still styling Mr. Combs, as well?

13   A.   Yes.

14   Q.   So that's how you became a celebrity stylist, by that kind

15   of movement, correct?

16   A.   Yes.

17   Q.   And that was -- but that only happened, though, because you

18   started your internship with Bad Boy, right?

19   A.   Yes.

20   Q.   So it would be fair to say that Mr. Combs or Bad Boy helped

21   start your career you have now as a stylist, as a celebrity

22   stylist, would that be fair to say?

23   A.   Yeah.  Go ahead.

24   Q.   I'm going.  Don't worry about it.

25            So now, when you say stylist, what do you mean by

 1   stylist?  What is a stylist?  Tell everybody what a stylist is.

 2   A.  Someone that goes shopping for clothes, you style them for

 3   music, dress them for music videos, personal appearances, some

 4   people do personal styling, which I do, as well, where I do

 5   everyday looks for clients.

 6   Q.  What about music?

 7   A.  No.

 8   Q.  You don't do any music?

 9   A.  What do you mean?

10   Q.  So when you talked this morning, this afternoon, about your

11   knowledge of studios and your knowledge of time period, your

12   knowledge of when records get released and your knowledge of

13   who releases records and your knowledge of all this, you were

14   giving us that information based upon your extensive experience

15   as a celebrity stylist, right?

16        MS. COMEY:  Objection, misstates the testimony, your

17   Honor.

18        THE COURT:  You've got to rephrase the question,

19   Mr. Donaldson.

20        Mr. Donaldson, if you can just do me a favor and stay

21   at the lectern, just because the court reporters are having

22   difficulty if you're not at the microphone.

23        MR. DONALDSON:  OK, Judge.  Got you.  Let me start

24   over.

25   BY MR. DONALDSON:

P5SsCOM5                          Nash - Cross

1   Q.  As a celebrity stylist, you indicated that you purchased

2   clothes, correct?

3   A.  Um-hmm.

4   Q.  Is that a yes?

5   A.  Yes.

6   Q.  You also helped people pick out clothing for their videos,

7   correct?

8   A.  Um-hmm.

9   Q.  Is that a yes?

10  A.  Yes.

11  Q.  You also helped people pick out clothing for their photo

12  shoots, correct?

13  A.  Yes.

14  Q.  You also helped them pick out clothing for their weddings,

15  correct?

16  A.  Yes.

17  Q.  And, in fact, as you indicated, for Mrs. Fine, you helped

18  pick out her wedding dress, correct?

19  A.  Yes.

20  Q.  You and who else?  A father-daughter group?

21  A.  Who?

22  Q.  Who was it?

23          Who helped you pick out that dress?

24  A.  What do you mean father-daughter group?

25  Q.  Who helped you pick out Mrs. Fine's wedding dress?

1  A.  Marni Senofonte.

2  Q.  Did his daughter help, too?

3  A.  Whose daughter?

4  Q.  Don't worry about it.  We'll get to it.

5           So now, once you finished picking out the clothing for

6  the celebrities and their photo shoots and their video shoots,

7  is your job done?

8  A.  Depends.

9  Q.  OK.  You also helped people pick out their clothing for

10  tours, correct?

11  A.  Correct.

12  Q.  For when they perform on these tours, correct?

13  A.  Yes.

14  Q.  So, in 2016, doing this Reunion tour, you were present to

15  help pick out persons' clothing for their performances,

16  correct?

17  A.  Yes.

18  Q.  And that's a very important job, right?

19  A.  Yes.

20  Q.  Because people have to look -- celebrities have to look a

21  certain way when they walk outside, correct?

22  A.  Yes.

23  Q.  Because their look is part of their celebrity status,

24  correct?

25  A.  Yes.

1  Q.  And it has to be -- I mean, it takes a lot to pick out the

2  right outfit for the right event, correct?

3  A.  Yes.

4  Q.  And you have to have the right hair, correct?

5  A.  Yes.

6  Q.  And that's all a part of being an artist, correct?

7  A.  Yes.

8  Q.  All right.  And you help people do that, correct?

9  A.  Yes.

10 Q.  You helped Mr. Combs do that, correct?

11 A.  Yes.

12 Q.  You did that for a while with Mr. Combs, correct?

13 A.  Yes.

14 Q.  And he would send you -- you would send him pictures of

15 what to wear, he would pick which ones he wanted, correct?

16 A.  Cassie would usually send them, but yes.

17 Q.  Cassie would send him pictures?

18 A.  Yes.

19 Q.  And he would pick out which ones he wanted from those?

20 A.  Yes.

21 Q.  You know someone named Scott Langston or Scott Langston?

22 A.  No.

23 Q.  OK.  What about -- do you know the Public School brand, the

24 Public School clothing brand?

25 A.  No.

P5SsCOM5                           Nash - Cross

1   Q.  Do you know Murio Solomon?

2   A.  No.

3   Q.  Do you know Groovey Lew?

4   A.  Yes.

5   Q.  Who is Groovey Lew?

6   A.  Puff's longtime friend and one of his stylists.

7   Q.  Do you know Mike B?

8   A.  From around, yes.

9   Q.  Who was Mike B?

10  A.  One of Puff's old stylists.

11  Q.  Now, it would be fair to say that when you worked at Bad

12  Boy as an intern and as a stylist for Mr. Combs and as stylist

13  for Mrs. -- what's her name, Mrs --

14  A.  Fine.

15  Q.  -- Fine, Mrs. Fine, there were other artists that were also

16  signed to the Bad Boy roster, would that be fair to say?

17  A.  Yes.

18  Q.  Who were they?

19  A.  Um, French Montana.

20  Q.  Wait.  French Montana, the hip-hop person, rap star?

21  A.  Yes.  I mean, and Puff.  That's all I can really remember

22  right now.

23  Q.  Just two of them?

24  A.  I just -- I don't know.

25          While I was there?

1    Q.  You were --

2    A.  Danity Kane, Day 26.

3    Q.  Danity Kane, Day 26.  Who else?

4    A.  I don't remember.

5    Q.  Did you ever see Gun Kelly there?

6    A.  Oh, yeah.

7    Q.  You seen Gun Kelly?

8    A.  Yes.

9    Q.  OK.  Who else?

10   A.  I don't remember.

11   Q.  All those people that were there, they also had stylists,

12   correct?

13   A.  Oh, I don't know.

14   Q.  Well, when at a label such as Bad Boy Records or Bad Boy,

15   period, as you said, artists have to be, well, pay attention to

16   their clothing, correct?

17   A.  Yes.

18   Q.  You would agree that it is in the best interest, based upon

19   your experience as indicated on direct, you would agree it's in

20   the label's best interest to make sure that the artists signed

21   to a label are dressed appropriately, correct?

22   A.  Yes.

23   Q.  You would agree that it's in a label's best interest that

24   its stars or its artists that are signed to them, hair is

25   appropriate, correct?

P5SsCOM5                         Nash - Cross

1    A.   Yes.

2    Q.   You would agree that it's in the label's best interest that

3    the artists signed to the label represent themselves properly

4    in public, correct?

5    A.   Yes.

6    Q.   And that's all because the label, I guess, makes more money

7    if the artists make money, does that make sense?

8    A.   Yes.

9    Q.   OK.  And so you would agree then that if Cassie -- well,

10   strike.

11          Was Cassie signed to the Bad Boy label?

12   A.   Yes.

13   Q.   So you would agree then that the label had an interest in

14   how Cassie looked when she went outside, correct?

15   A.   Yes.

16   Q.   You would agree that the label had an interest in how

17   Cassie's clothing looked like, correct?

18   A.   Yes.

19   Q.   You would even agree that that --

20          Do you recall a haircut that Cassie had, the side

21   haircut?

22   A.   Yes.

23   Q.   That haircut became almost iconic status, correct?

24   A.   Yes.

25   Q.   It became the Cassie cut, correct?

P5SsCOM5                     Nash - Cross

1    A.  Yes.

2    Q.  People all around the world was getting their hair cut,

3    correct?

4           MS. COMEY:  Objection, your Honor.

5           THE COURT:  Sustained.

6           Let's move on.

7    Q.  Who decided that haircut?  Who suggested the haircut?

8    A.  Puff.

9    Q.  Who?

10   A.  Puff.

11   Q.  Mr. Combs?

12   A.  Um-hmm.

13   Q.  Is that a yes?

14   A.  Yes.

15   Q.  So Mr. Combs suggested the haircut on Cassie that became

16   iconic status?

17   A.  Yes.

18   Q.  And so when Cassie was wearing certain clothing outside, it

19   would be important for the person who ran the label, that her

20   clothing looked good, would that be fair to say?

21   A.  Sometimes, yeah.

22   Q.  You also mentioned during direct that you were -- Cassie

23   was at studio sessions quite often.

24          Do you recall saying that?

25   A.  Yes.

P5SsCOM5                    Nash - Cross

1   Q.  I believe you said she was recording almost every day.

2       Do you recall saying that?

3   A.  Towards the end, yes.

4   Q.  And this was in a studio, correct?

5   A.  Correct.

6   Q.  I believe you also said that the something about -- we'll

7   get to the mix tape.

8       When you say recording every day, this is in an actual

9   studio, correct?

10  A.  Yes.

11  Q.  So the jury understands, we're talking about a studio that

12  can record songs that could be released commercially, correct?

13  A.  Correct.

14  Q.  And you know the difference, you know what commercial

15  releases mean, correct?

16  A.  Yes.

17  Q.  That means releases that are to the public so that can have

18  some commercial profit, I guess, right?

19  A.  Yes.

20  Q.  And making those songs in those studios take time, correct?

21  A.  Yes.

22  Q.  Sometimes days and weeks, correct?

23  A.  Yes.

24  Q.  For one song, correct?

25  A.  Um-hmm.

1    Q.   Is that a yes?

2    A.   That's a little excessive, but yes.

3    Q.   OK.  Studios are expensive, correct?

4    A.   Yes.

5    Q.   Studio time is expensive, correct?

6    A.   Yes.

7    Q.   So when you say that you and Cassie were in the studio

8    quite often, almost every day, recording songs, somebody had to

9    pay for that studio, correct?

10   A.   Yes.

11   Q.   And it is in the label's best interest to ensure that the

12   artist is putting out a commercially satisfactory song,

13   correct, if you know?

14   A.   Yes.

15   Q.   OK.  And so the label pays for the studio time, correct?

16   A.   Yes.

17   Q.   And so the label in this situation was Bad Boy, correct?

18   A.   Correct.

19   Q.   And that would be Mr. Combs, correct?

20   A.   Correct.

21   Q.   So when you say that you and Cassie were in the studio

22   almost every day or quite often, that means that Mr. Combs was

23   paying for that studio time, correct?

24   A.   Correct.

25   Q.   She wouldn't be able to go to the studio unless he pays for

1   it, correct?

2   A.  Correct.

3   Q.  And so the label wants -- well, I shouldn't say wants.

4           It would be fair to say that -- well, when you say a

5   lot, you mean over the course of between 2009 and 2018, you and

6   Cassie went to a studio quite often, paid for by Mr. Combs,

7   correct?

8   A.  Um-hmm.

9   Q.  Yes?

10  A.  Yes.

11  Q.  Well, that would mean then that you would agree that

12  Mr. Combs and Bad Boy had an interest in Cassie's future,

13  correct?

14  A.  Yeah.

15  Q.  Do you know what Young & Reckless is?

16  A.  Yes.

17  Q.  And that's something that was -- well, I don't want --

18          You tell the jury what that is.

19  A.  A streetwear brand, clothing brand.

20  Q.  Streetwear clubbing brand?

21  A.  Clothing brand.

22  Q.  Say that again?

23  A.  A streetwear clothing brand.

24  Q.  Clothing brand.

25          And it was founded or owned or made by whom?

P5SsCOM5                    Nash - Cross

1   A.  I don't know.  I don't remember.

2   Q.  Well, Cassie had an interest in this, right?

3   A.  Yes.

4   Q.  And Cassie was part of that, correct?

5   A.  Yes.

6   Q.  That was in 2015, '16?

7   A.  Maybe around there.

8   Q.  And as part of this clothing streetwear brand, Cassie was

9   taking photos, correct?

10  A.  Yes.

11  Q.  She was doing photo shoots, correct?

12  A.  Yes.

13  Q.  Were you styling that as well?

14  A.  Yes.

15  Q.  And that wasn't under the auspices of Bad Boy, correct?

16  A.  What do you mean?

17  Q.  Bad Boy had nothing to do with Young & Reckless, correct?

18  A.  No.  Puff had to approve the photos.

19  Q.  Puff had to approve the photos?

20  A.  Yes.

21  Q.  But Puff didn't have to approve Cassie going to do work

22  with Young & Reckless, correct?

23  A.  Yes, he did.

24  Q.  Did he approve that?

25  A.  Yes.

P5SsCOM5                    Nash - Cross

1   Q.  When did he approve that?

2   A.  You say what?

3   Q.  When did he approve that?

4   A.  I don't -- it was years ago, but he approved it.

5   Q.  Just so I'm clear, that was also to make money, correct?

6   A.  Yes.

7   Q.  So Mr. Combs approved Cassie to go out and make money with

8   the clothing and streetwear brand, correct?

9   A.  Yes.

10  Q.  And Mr. Combs had nothing to do with the release of Young &

11  Reckless, correct?

12  A.  I mean, he was hands on.

13  Q.  But it wasn't his company, correct?

14  A.  No.

15  Q.  So someone else was making money off of Young & Reckless

16  with Cassie, correct?

17  A.  Yes.

18  Q.  How long did that last?

19  A.  I don't remember.

20  Q.  Do you know someone named Bana?

21  A.  Yes.

22  Q.  Did Bana have something to do with Young & Reckless?

23  A.  Yes.

24  Q.  What did Bana have to do with Young & Reckless?

25  A.  She was a designer.

P5SsCOM5                          Nash - Cross

1    Q.  So Bana was the designer for Young & Reckless, is that

2    right?

3              Is that a yes?

4    A.  Um, yes.

5    Q.  And Bana -- would it be fair to say that Bana is a friend

6    of Cassie's?

7    A.  Yes.

8    Q.  And so Bana asked Cassie to help her with Young & Reckless,

9    correct?

10   A.  Yes.

11   Q.  And then Cassie decides to step away from her singing and

12   go into making money with Bana in Young & Reckless, correct?

13   A.  It wasn't a step-away from syncing.

14   Q.  OK.  In addition to her singing, she decided to do

15   something else to help her make money, correct?

16   A.  Correct.

17   Q.  And Mr. Combs said that's fine, go ahead and do that,

18   correct?

19   A.  Yes.

20   Q.  Did not hold her back at all, correct?

21   A.  No, not with that.

22   Q.  Now, you said you mentioned a Bad Boy tour that was in

23   2016.

24              Do you recall that?

25   A.  Yes.  Yes.

1   Q.  And you were part of that tour, correct?

2   A.  Yes.

3   Q.  And when I say part of it, you were a stylist for the tour,

4   correct?

5   A.  Yes.

6   Q.  That means you traveled with the tour, correct?

7   A.  Oh, no, no, no.  I stayed home.

8   Q.  You stayed home?

9   A.  Yeah.

10  Q.  I don't blame you.

11          Where is home, California?

12  A.  Yes.

13  Q.  I'm not mad at you.

14          So you stayed home and you styled from home?

15  A.  No.  We did a fitting beforehand.

16  Q.  What does that mean?

17  A.  Um, you do a fitting, you prep the clothes, and Derek took

18  the clothes with him.

19  Q.  When you say prep the clothes, what does prep --

20          We don't know what that means.  What do you mean by

21  prep the clothes?

22  A.  You go shopping, you make outfits, you pack everything and,

23  you know, we put it on garment racks, you have a fitting, and

24  you take the edits with you.

25  Q.  Well, for how many people, for how many artists did you do

P5SsCOM5                         Nash - Cross

1    that for?

2    A.  I think maybe, like, four.

3    Q.  Which artists?

4    A.  It was Lil' Kim, Cassie, Puff, and Mase, I want to say.

5    Q.  So, fair to say then, that back in 2016, during this

6    particular tour, you did the styling or helped do the styling

7    for what would be considered major musicians at that time,

8    correct?

9    A.  Yes.

10   Q.  Mase would be a major platinum-selling musician, correct?

11   A.  Not at the time.

12   Q.  Well, overall?

13   A.  Yes.

14   Q.  And who else was there?

15   A.  Lil' Kim.

16   Q.  Major platinum-selling artist, correct?

17   A.  Yes.

18   Q.  Mr. Combs, as well?

19   A.  Yes.

20   Q.  Major platinum-selling artist, correct?

21   A.  Yes.

22   Q.  And your personal client was Cassie?

23   A.  Yes.

24   Q.  Anyone else on that tour?

25   A.  No.

P5SsCOM5                    Nash - Cross

1  Q.  And this was after --

2      Just quickly, you mentioned something about seeing a

3  black eye on FaceTime.  Do you remember saying that?

4  A.  Yes.

5  Q.  And that was after this InterContinental incident, correct,

6  during the InterContinental incident, correct?

7  A.  No.  The black eye -- yes, I did see that one, yes.  I

8  thought you meant the Vegas.  Yes.

9  Q.  And this tour that you styled for was after that, correct?

10     The tour was in May, June 2016, and the incident at

11 InterContinental happened in March 2016, correct?

12 A.  Hmm.  Yes, but there was a show, maybe, like a year before,

13 before the tour, at Barclays.  It was maybe, like, a two-night

14 show and then, maybe, I want to say the next year, six months

15 later, then they went out on tour.

16 Q.  Who was in the show?

17 A.  Bad Boy artists.

18 Q.  Who?

19 A.  Carl Thomas.  I don't remember.

20 Q.  Did you style for them as well?

21 A.  I actually did, yeah.

22 Q.  You styled for Carl Thomas, as well?

23 A.  Yes.

24 Q.  Let's get this right then.

25     You started as an intern 2007, 2008.  You catapulted

1   to celebrity stylist, right?

2   A.  Yes.

3   Q.  And then after that, by the time 2016 came around, you

4   styled Carl Thomas, Sean Combs, Mase, Lil' Kim?

5   A.  Yes.

6   Q.  Who else?

7   A.  Cassie.

8   Q.  Cassie?

9   A.  Um-hmm.

10  Q.  Anybody else?

11  A.  Puff.  Who else?

12  Q.  So based upon your internship with Bad Boy, you became a

13  serious celebrity stylist, correct?

14  A.  Yes.

15  Q.  Is that a yes?

16  A.  Yes.

17  Q.  Now, I'm going to get back to your studio stuff.

18          You said Cassie was inside the studio all the time.

19  These studio sessions weren't just by herself, though, correct?

20  A.  What do you mean?

21  Q.  Well, we talked about this mix tape.

22          Do you recall talking about that?

23  A.  Yes.

24  Q.  All right.  And the mix tape, for some of the jurors that

25  might not know what it is, a mix tape is a tape of a lot of

P5SsCOM5                          Nash - Cross

1  different songs, correct?

2  A.  Yes.

3  Q.  With various artists, correct?

4  A.  Yes.

5  Q.  And in this particular situation, the mix tape they were

6  talking about was Cassie and a lot of different people,

7  correct?

8  A.  Yes.

9  Q.  And all these artists had to be in studios, had to do work

10 with Cassie to make their particular song, correct?

11 A.  They weren't necessarily in the studio all the time.

12 Q.  Not all the time?

13 A.  Yes.  Some of them, yes.

14 Q.  Some of them, right?  OK.

15         So the mix tape that Cassie made while being with Bad

16 Boy had --

17         well, you recall the mix tape, correct?

18 A.  Yes.

19 Q.  You said you helped -- what did you say you helped do?  You

20 helped make it?  You helped --

21 A.  Yeah.

22 Q.  No.  Tell us what you did.

23 A.  I helped Cassie pick songs, I helped her set up sessions, I

24 helped with the creative ideas.

25 Q.  So you went from celebrity stylist to executive producer

1    status?

2    A.   I mean, yeah.

3    Q.   Say that again louder.

4    A.   Actually, my original interview with Bad Boy was to work in

5    AR.

6    Q.   All right.  But at this point 2016, you are basically

7    executive producing this mix tape, correct?

8    A.   With the team.  We have a team.

9    Q.   You got no credit for that, right?

10   A.   No.

11   Q.   You got paid no money for that?

12   A.   No one got paid for the mix tape.

13   Q.   You even get no acknowledgment for being the executive

14   producer of the mix tape, correct?

15   A.   No.

16   Q.   So no one besides you and Cassie knew what you did on this

17   mix tape, is that fair to say?

18   A.   No.  Rob Holiday.

19   Q.   Rob Holiday --

20   A.   Dominique.

21   Q.   -- rob Holiday is the low-budget producer you said earlier?

22   A.   Yes.

23   Q.   Is that what you said?

24   A.   Yes.

25   Q.   When you said low-budget producer, you were just saying

 1   that because he's a low-paying producer, or he's not a good

 2   producer, he's a whack producer?

 3           Why is he a low-budget producer?

 4   A.   Hmm, a little bit of all of the above.

 5   Q.   And he was, this low-budget producer, was also on the mix

 6   tape, correct?

 7   A.   Yes.

 8   Q.   Meek Mills on the mix tape, correct?

 9   A.   Yes.

10   Q.   And Meek Mills at that time was a really popular

11   internationally known rap artist, correct?

12   A.   Correct.

13   Q.   You also said French Montana, correct?

14   A.   Yes.

15   Q.   He also was a pretty well-known popular rap artist,

16   correct?

17   A.   Correct.

18   Q.   Jeremih, right?

19   A.   Yes.

20   Q.   Platinum-selling artist?

21   A.   Oh, I don't know his stats.

22   Q.   Very popular at the time, correct?

23   A.   Yes.

24   Q.   Fabolous?

25   A.   Yes.

P5SsCOM5                      Nash - Cross

1   Q.   Very popular rap artist?

2   A.   Yes.

3   Q.   Pusha T?

4   A.   Yes.

5   Q.   Pusha T was on the mix tape?

6   A.   Yes.

7   Q.   Whiz Khalifa?

8   A.   Yes.

9   Q.   And, just so we're clear, Pusha T and Whiz Khalifa are both

10  really well-known popular major rap artists, correct?

11  A.   Correct.

12  Q.   Rick Ross?

13  A.   Yes.

14  Q.   At that time, Rick Ross was super major well-known rap

15  artist, correct?

16  A.   Correct.

17  Q.   Too Short?

18  A.   Yes.

19  Q.   The Too Short from the West Coast?

20  A.   Yes.

21  Q.   Who decided that, you?

22  A.   Um...

23  Q.   You're from California?

24  A.   I'm from California, yes.

25  Q.   Did you pick Too Short?

P5SsCOM5                     Nash - Cross

1    A.  Um, no, not -- no.

2    Q.  But Too Short was on there, too?

3    A.  Yes.

4    Q.  And he is really well-known, correct?

5    A.  Moderately.

6    Q.  Moderately.

7            So this -- these rap artists, these platinum-selling

8    popular rap artists at the time, all were on Cassie's mix tape,

9    correct?

10   A.  Correct.

11   Q.  And that's only possible because the label got them to do

12   that, correct?

13   A.  The label and Cassie, yes.

14           THE WITNESS:  Do you guys mind if I take a break?

15           THE COURT:  You need a break?

16           THE WITNESS:  Um-hmm, I do.

17           THE COURT:  OK.  Let's take a break.

18           THE WITNESS:  All right.

19           THE COURT:  Members of the jury, we'll take a short

20   break and come back.

21           Let's come back at 3:30.  Thank you very much.

22           All rise.

23           (Continued on next page)

24

25

1            (Jury not present)

2            THE COURT:  Mr. Nash, you're not to have any

3    discussions with the government lawyers here, but you can take

4    your break.

5            We'll be back here at 3:30.

6            THE WITNESS:  Thank you.

7            (Witness temporarily excused)

8            THE COURT:  Please be seated.

9            Mr. Donaldson, about how much time do you have left?

10           I'm just mindful of the issues that were raised

11   before.

12           MR. DONALDSON:  I have absolutely no reason to believe

13   I'll be finished by 4:00.

14           THE COURT:  All right.  Then should we let the jury go

15   home, since they are supposed to go home at 3:00?

16           MR. DONALDSON:  Yes.  I won't be finished by 4:00, I

17   can tell you that clearly.

18           THE COURT:  Wait.  But did you know that you were not

19   going to be finished by 4:00 when we had the discussion and I

20   told the jury that I was going to get them out by 4:00?

21   Because if you knew that --

22           MR. DONALDSON:  No.

23           THE COURT:  -- you should have told me that.  We would

24   have let the jury go, and Ms. Comey or other folks from the

25   government side could have made appropriate arrangements, given

1    that there's a flight later today.

2              MR. DONALDSON:  Respectfully, Judge --

3              THE COURT:  Is this a late-breaking development that

4    you now think you won't be done by 4:00?

5              MR. DONALDSON:  Judge, respectfully, I tried to do

6    what the court and Ms. Comey was considering, which is try to

7    get finished by 4:00.

8              After going through what I'm going through, I'm

9    telling the court that I do not think I'll be done by 4:00.

10             THE COURT:  I understand.

11             Look, you should ask the questions you need to ask.

12   My only request is, moving forward, just let me know, because I

13   don't want to tell the jury something and then have them leave.

14   I don't know.  When they think they are going to be here, we

15   can finish something up, I let them go.  I want to be able to

16   give the right instructions to the jury in the future.

17             MR. DONALDSON:  I totally appreciate that.

18             THE COURT:  All right.  So, given that, I've told them

19   we'll keep them here through 4:00.

20             Let's go ahead and see what we can do here.  Let's go

21   to 4:00, and then at that point, we'll adjourn for the day.

22             Anyone from the government's side, any response or

23   anything regarding scheduling that we need to know?

24             MS. COMEY:  I'll work on rebooking the witness's

25   flight, your Honor.

1            I'll note that this witness does not seem to be

2       fighting Mr. Donaldson.  He seems to be answering the

3       questions.  I think many of the questions are repetitive and

4       covering the same territory over and over again.  I'm hoping we

5       can be more efficient.

6            THE COURT:  You mean, how would you define stylist?

7            MS. COMEY:  Exactly, your Honor.

8            THE COURT:  All right.  So let's go to 4:00 and then

9       we'll take a break.  And then on the break, you know, the only

10      thing is, we do need to move this along.  Maybe we can use the

11      break to make sure that we're being as streamlined as possible.

12           Again, Mr. Donaldson, I understand what you said.  I

13      hear you, the questions you need to ask, and you're fully

14      permitted to ask those questions.

15           MR. DONALDSON:  I appreciate that, Judge.  Thank you.

16           THE COURT:  We'll take a break and come back at 3:30.

17           MR. STEEL:  Thank you, sir.

18           (Recess)

19           THE COURT:  Please be seated.

20           Let's have Mr. Nash back.

21           (Witness returned)

22           Welcome back.

23           THE WITNESS:  Thank you.

24           THE COURT:  It's not just you.  It's freezing in here.

25           THE WITNESS:  It is freezing in here.  I'm, like, how

P5SsCOM5                         Nash - Cross

1    y'all do this all day.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P5SsCOM5                        Nash - Cross

1          (Jury present)

2          THE COURT:  All rise.

3          Please be seated.

4          Mr. Donaldson, you may proceed when ready.

5   BY MR. DONALDSON:

6   Q.  Mr. Nash, welcome back.

7   A.  Thank you.

8   Q.  You're welcome.  Nice coat.

9   A.  Ah, thank you.

10  Q.  You're very welcome.  What size is it?

11  A.  Not yo size.

12  Q.  That's the right answer.  You got the right answer.

13         I just want to ask you a few more questions about the

14  stylist part.  I'm just going to go real quickly.

15         When we talk about styling for labels, for Bad Boy in

16  particular, Mr. Combs would be the person that makes the final

17  decision in those people -- in those artists' performance

18  clothing, is that correct?

19  A.  Not all, no.

20  Q.  Who would be the final decision-maker?

21  A.  Um, most of the artists kind of did their own thing.

22  Q.  But they would send it to Mr. Combs or someone to get some

23  type of consultation in the decision-making, would that be fair

24  to say?

25  A.  Not that I know of.  Some of them look terrible.

1    Q.  The ones that you did, that didn't look terrible?

2    A.  Um, yeah.

3    Q.  OK.  All right.  And as far as the mix tape is concerned,

4    several platinum-selling artists that appeared on that mix

5    tape, those had to be approved by Mr. Combs or the label,

6    correct?

7    A.  Correct.

8    Q.  And when you mentioned that it did well streaming but

9    didn't get released commercially or for profit, that's a

10   decision to be made by the label, correct?

11   A.  Correct.

12   Q.  Now, I just want to move a little bit to a different

13   section.

14          You said you and Mrs. Fine are good friends, is that

15   fair to say?

16   A.  Yes.

17   Q.  And sometimes you would even consider yourself her best

18   friend, correct?

19   A.  Yes.

20   Q.  And when you say best friend, would it be fair to say you

21   spoke to her a lot between 2008 and -- well, today, would that

22   be fair to say?

23   A.  Yes.

24   Q.  And do you also speak to someone named Bana?

25   A.  Yes.

P5SsCOM5                         Nash - Cross

1   Q.  And Bana, I believe you said, is a designer, is that

2   correct?

3   A.  Yes.

4   Q.  And how often do you speak to her?

5          Let me ask a different question.  When is the last

6   time you spoke to her?

7   A.  Yesterday.

8   Q.  And I'm sure you were told not to speak to her about her --

9   about your testimony or her testimony, correct?

10  A.  Absolutely.

11  Q.  And you didn't do that?

12  A.  No.

13  Q.  You spoke to her about coming to New York and having to

14  testify?

15  A.  Yes.

16  Q.  And the last time you spoke to --

17  A.  I didn't speak with her with it.  She saw it on the news.

18  But yes.

19  Q.  OK.  And the last time you spoke to her was yesterday.  And

20  before that was when?

21  A.  Oh, I don't know.  Probably a couple days.

22  Q.  So it would be fair to say that Bana, at least, you have

23  spoken to her often over the last three weeks?

24  A.  Yeah.

25  Q.  Now, as far as Cassie is concerned, she's your good friend

1    or best friend.

2            What is the last time you spoke to her?

3    A.  After she had the baby yesterday.  Tell her

4    congratulations.

5    Q.  Oh, you're saying congratulations or you're telling me to

6    tell her congratulations?

7    A.  No, no.  No thanks.

8            THE COURT:  All right.  Let's keep going.

9    Q.  The last time you spoke to her was yesterday?

10   A.  Yes.

11   Q.  And before that was when?

12   A.  Probably the day before that.

13   Q.  So it's fair to say that you spoke to her --

14           You know she testified in this trial, correct?

15   A.  Yes.

16   Q.  You spoke to her before she testified, correct?

17   A.  Yes.

18   Q.  You spoke to her after she testified, correct?

19   A.  Yes.

20   Q.  Did you speak to her in the middle of her testimony?

21   A.  Um, not really, no.

22   Q.  You say not really.  What does that mean?

23           Did she call you?  Did you ask her how she's doing?

24   A.  How she was doing.  But more, like, her clothes stuff.  And

25   Marni handled most of that because she was here in New York and

P5SsCOM5                        Nash - Cross

1    I was in Los Angeles.

2    Q.  So you spoke to her about what clothes she should wear

3    while she was testifying, is that fair to say?

4    A.  Yes.

5    Q.  You also mentioned -- I want to talk to you a little bit

6    about drug use or Cassie's drug use.

7            Do you recall testifying about that?

8    A.  Yes.

9    Q.  I believe you said she takes cocaine, is that right?

10   A.  Yes, yes.

11   Q.  Or was?

12   A.  Yes.

13   Q.  She also took prescription pills?

14   A.  Yes.

15   Q.  She also took what else?

16   A.  Molly and ectasy.

17   Q.  She also used mushrooms and acid, as well, correct?

18   A.  Mushrooms.  The acid, I'm not, like, privy on that.

19   Q.  And when she took these drugs, you actually saw her taking

20   these drugs, correct?

21   A.  Sometimes.

22   Q.  Which drugs did you see her take?

23   A.  Cocaine, ectasy, and molly.

24   Q.  And when you saw her taking these drugs, it would be inside

25   her house, correct?

P5SsCOM5                         Nash - Cross

1    A.  Yes.

2    Q.  And sometimes inside your house, correct?

3    A.  No.

4    Q.  So you would be inside her house, and at that point you

5    would observe her taking cocaine, ectasy, or what was the other

6    one?

7    A.  Molly.

8    Q.  Molly.  And she would have the drugs already in her house?

9    A.  That was so long ago.

10   Q.  How long ago was it?

11   A.  I don't recall.  Like, 2017, '18.

12   Q.  OK.  So in 2017 or '18, we're saying, you're saying that

13   you were in her house and you observed Cassie taking either

14   cocaine, molly, or some prescription pill?

15   A.  Yes.

16   Q.  But you don't know whether she got it from inside her

17   house?

18   A.  Correct.

19   Q.  You don't know whether it was already there when she took

20   it?

21   A.  No.

22   Q.  And it's true that nobody delivered it to her, though,

23   correct?

24   A.  I have no clue.  I'm not the friend that, you know, that

25   they indulge that stuff to.

P5SsCOM5                          Nash - Cross

1    Q.   OK.  Not to get too much into your business.

2         You have used cocaine before?

3    A.   Yes.

4    Q.   You have used ectasy and molly before?

5    A.   Um, I tried ectasy and I tried molly, yes.

6    Q.   It's fair to say that you don't do that anymore now,

7    correct?

8    A.   Absolutely not.

9    Q.   And you still smoke marijuana --

10        Do you smoke marijuana?

11   A.   Yes.

12   Q.   On the few of your meetings with the government, were

13   you -- did you arrive at the meeting before smoking marijuana?

14   A.   One of them Maurene cut it short.

15   Q.   Because of what?

16   A.   She said she wanted me to have a clear mind.

17   Q.   So you went to the meeting and you told her that you were

18   high at that time?

19   A.   Yeah.  I didn't say high.  I said I'm smoking right now.  I

20   didn't say I was high.

21   Q.   I'm sorry.

22        So you told her that you were smoking -- well, not in

23   the meeting, before you got to the meeting?

24   A.   Yes.

25   Q.   And then Ms. Comey told you, you need to stop the meeting

1   because she wanted you to have a clear mind?

2   A.  Yes.

3   Q.  Do you know which meeting that was?

4   A.  I don't know.  I told her very early in the meeting.

5   Q.  OK.  So we know you had a meeting April 2025 and three

6   meetings in May of 2025.

7           Do you know whether it was in April or May of 2025?

8   A.  I don't know.  It was, like, all running together at this

9   moment.

10  Q.  Now, in your -- between 2008 and 2018, that's when you left

11  Bad Boy, correct?

12  A.  Yes.

13  Q.  And you -- I believe you testified earlier that you were,

14  you had some interactions with security guards at work for Bad

15  Boy that worked with Mr. Combs, correct?

16  A.  Yes.

17  Q.  And in those several years, you never saw any of those

18  security guards with guns, correct?

19  A.  I don't recall.

20  Q.  Besides -- well, strike that.

21          You never saw those security guards committing any

22  acts of violence, correct?

23  A.  No.

24          (Continued on next page)

25

 1   BY MR. DONALDSON:

 2   Q.  And you never saw those security guards delivering any

 3   narcotics to Cassie, correct?

 4   A.  No.

 5   Q.  And you never saw those security guards delivering any

 6   narcotics to you, correct?

 7   A.  No.

 8   Q.  And you never saw any of those security guards delivering

 9   narcotics to Mr. Combs, correct?

10   A.  No.

11   Q.  In fact, it's fair to say that in your nine or ten years of

12   working at Bad Boy and -- well, strike that.

13           Were you getting paid from Mr. Combs from 2009 to

14   2018?

15   A.  Yes.

16   Q.  So for all those years you were actually receiving a check

17   from the Combs --

18   A.  Combs Enterprise and some of the other entities, yes.

19   Q.  So it would be fair to say you were an employee all that

20   time?

21   A.  Yes.

22   Q.  And as an employee of Combs Enterprises, of Mr. Combs, you

23   didn't participate in any criminal conduct for Mr. Combs,

24   correct?

25   A.  I know that he --

P5SACom6                        Nash - Cross

1   Q.  You -- did you participate in any criminal conduct for

2   Mr. Combs?

3   A.  Yes.

4   Q.  Okay.  You also said you were at a music video shoot where

5   you got thrown against a car?

6   A.  Yes.

7   Q.  Which video shoot was that?

8   A.  I Love It.

9   Q.  When was that?

10  A.  2013.

11  Q.  And whose video shoot was that?

12  A.  Cassie.

13  Q.  Who else was in the video besides Cassie?

14  A.  Fabolous.

15  Q.  I'm sorry?

16  A.  Fabolous.

17  Q.  And was that part of the mix tape?

18  A.  Yes.

19  Q.  And the video for that particular song was -- it cost to

20  make that video, correct?

21  A.  Yes.

22  Q.  And that cost for the video was paid for by Bad Boy,

23  correct?

24  A.  Yes.  It was never released.

25  Q.  I understand that.  But was the video made?

 1   A.   Yes.

 2   Q.   Was Fabolous in the video?

 3   A.   Yes.

 4   Q.   Was Ms. Fine in the video?

 5   A.   Yes.

 6   Q.   Was there a cost associated with that video?

 7   A.   Yes.

 8   Q.   And Mr. Combs and Bad Boy paid for that video?

 9   A.   Yes.

10   Q.   Were there other videos made for the mix tape -- well,

11   there was.

12             Did Rick Ross make a video?

13   A.   Yes.

14   Q.   Was that video with Cassie?

15   A.   Yes.

16   Q.   And was that video paid for by Bad Boy?

17   A.   Yes.

18   Q.   So then it's fair to say then that at least in 2013 or up

19   to there Bad Boy Records or Mr. Combs invested significant

20   money into videos and studio time for Cassie; is that correct?

21   A.   Yes.

22   Q.   Was that a yes?

23   A.   Yes.

24   Q.   And we say invested significant money, based upon your

25   experience, videos, to make a video, costs hundreds of

1    thousands of dollars, correct?

2    A.  Not the videos we were shooting, no.

3    Q.  Okay.  How many videos did you all make for that particular

4    mix tape, if you know?

5    A.  The first three I know Puff paid for and then there were

6    two other ones that we did that Cassie paid for.

7    Q.  Now, you also mentioned earlier today about an incident

8    where there was -- Ms. Fine sustained a cut to her head; do you

9    recall that?

10   A.  Yes.

11   Q.  What year was that?

12   A.  2013. '12, '13.

13   Q.  I think Ms. Comey asked you a few times if you were

14   estimating.  Do you know whether it was 2013, 2014?

15   A.  I'm not sure.

16   Q.  Estimating 2013?

17   A.  Yes.  Let's just say that.

18   Q.  Okay.  Now, at that time you had only been working for with

19   Cassie and Mr. Combs for approximately five, approximately

20   four, five years, correct?

21   A.  Correct.

22   Q.  And I believe you said during that incident Mr. Combs came

23   over to Cassie's house; is that right?

24   A.  Yes.

25   Q.  And she was on the couch; is that correct?

1   A.  Yes.

2   Q.  And this was the day that you all were about to go to

3   Toronto for a Drake concert or Drake performance, whatever it

4   was, right?

5   A.  Yes.

6   Q.  And Mr. Combs I believe you said knocked on the door and

7   you let him in, correct?

8   A.  Yes.

9   Q.  And when you let him in, he then grabbed Cassie's hair and

10  started beating on her, correct?

11  A.  Correct.

12  Q.  Now, I believe you said that there was somebody else

13  present in the house at that time.  Who was that?

14  A.  Mia.

15  Q.  And Mia at that time worked for Mr. Combs, correct?

16  A.  Yes.

17  Q.  Do you know what her position was?

18  A.  She was his assistant.

19  Q.  His assistant?

20  A.  Mm-hmm.

21  Q.  Is that a yes?

22  A.  Yes.

23  Q.  Okay.  And then you said at that time that you and Mia and

24  Cassie ran to the bedroom, correct?

25  A.  Yes.

P5SACom6                          Nash - Cross

1    Q.    And Mr. Combs ran behind you, correct?

2    A.    Yes.

3    Q.    And then at some point he grabbed Cassie again; is that

4    right?

5    A.    Yes.

6    Q.    And then you jumped on his back to protect Cassie, correct?

7    A.    Correct.

8    Q.    So as an employee of Mr. Combs, you jump on his back to

9    protect Cassie from him, correct?

10   A.    Yes.

11   Q.    And as an employee -- Mia you said was an employee as well,

12   correct?

13   A.    Yes.

14   Q.    And she jumped on his back to protect Cassie from

15   Mr. Combs, correct?

16   A.    Yes.  And protect him from doing something more serious.

17   Q.    Okay.  So you -- both employees of Mr. Combs at that time,

18   was trying to protect Cassie from Mr. Combs, correct?

19   A.    Correct.

20   Q.    And I believe you said on direct -- well, maybe you didn't,

21   but this was the first time that you had saw a gash on Cassie's

22   head as related to Mr. Combs' conduct, correct?

23   A.    Yes.

24   Q.    And that -- be fair to say that startled you, correct?

25   A.    Absolutely.

1  Q.  And it concerned you because you're -- at this time, she

2  was still a good friend of yours, correct?

3  A.  Yes.

4  Q.  And you had been talking to her every day between -- almost

5  every day between 2008 and 2013; is that fair to say?

6  A.  Yes.

7  Q.  So when this violent incident happened where Mr. Combs

8  caused Cassie to hit her head on a bed frame and bleeding, that

9  shocked you, correct?

10  A.  Yeah.  Completely.

11  Q.  Because your friend, your good friend, Cassie, was now

12  bleeding with a gash on her head?

13  A.  It wasn't about her -- it wasn't about it being my friend.

14  It was about the act in general.

15  Q.  So the act in general of Mr. Combs causing a gash on

16  Cassie's head, that shocked you, correct?

17  A.  Yes.

18  Q.  But you, after that, you did still have interactions with

19  Mr. Combs, correct?

20  A.  Yes.

21  Q.  You did still have interactions with Cassie, correct?

22  A.  Yes.

23  Q.  You did still have interactions where you invited Mr. Combs

24  to some place where Cassie was, correct?

25  A.  Yes.

1  Q.  In fact, I believe it was, if you remember, Halloween of

2  that year, I believe you invited both of them to the Boulevard

3  to go to a Halloween show, correct?

4  A.  Yeah.

5  Q.  And that was after the cut, correct?

6  A.  Absolutely.

7  Q.  So after the violence by Mr. Combs, you invited him and

8  Cassie to come with you to a Halloween function, correct?

9  A.  Correct.

10  Q.  You also mentioned an incident involving D-Roc.  Do you

11  know who D-Roc is?

12  A.  Yes.

13  Q.  Who is D-Roc?

14  A.  Puff's long time friend and security.

15  Q.  Be fair to say he was head of security, correct?

16  A.  Yes.

17  Q.  Now, there was an incident where I believe you said you

18  were cooking in -- was it your apartment or Cassie's apartment?

19  A.  Cassie's.

20  Q.  And I believe you said at that time Mr. Combs came over to

21  Cassie's house, correct?

22  A.  Yes.

23  Q.  Knocked on the door and you let him in; is that right?

24  A.  Yes.

25  Q.  Mr. Combs, when he arrived inside the house, he was -- was

1   he angry?

2   A.  He was calm.

3   Q.  And this was after the cut as well, after the cut on the

4   bed frame?

5   A.  Mm-hmm.  Yes.

6   Q.  All right.  So he called you before he came over, correct,

7   or he called Cassie before he came over?

8   A.  Called Cassie.

9   Q.  And, if you know, Cassie let him know that you all were

10  over there cooking, correct?

11  A.  I don't know.

12  Q.  And when he arrived at the home, you and -- well, him and

13  Cassie get into an argument; is that fair to say?

14  A.  No, they went to the room, but I didn't hear like -- I

15  didn't hear an argument.

16  Q.  So when he got there, he and Cassie went to the room and

17  you stayed in the kitchen?

18  A.  Yes.

19  Q.  And at some point they came back outside; is that right?

20  A.  Yes.

21  Q.  And I believe you said on direct that at that moment

22  Cassie -- he started pushing Cassie out the door; is that

23  correct?

24  A.  Yes.

25  Q.  And then he started I think you said slapped you in the

1   back of the head and moving you out the door; is that right?

2   A.  Yes.

3   Q.  And when you got outside, D-Roc was outside, correct?

4   A.  Yes.

5   Q.  And D-Roc is head of security?

6   A.  Yes.

7   Q.  Or one of the heads of security?

8   A.  Yes.

9   Q.  Now, when you got outside, isn't it fair to say that

10  security was trying to convince Mr. Combs to stop bothering you

11  and Cassie?

12  A.  Yes.

13  Q.  And when we say that, we're saying that Mr. Combs'

14  security, at that point, his employees, was telling him to

15  basically leave you guys alone, correct?

16  A.  Yes.

17  Q.  They were not trying to participate in doing anything to

18  you, correct?

19  A.  Correct.

20  Q.  They were trying to stop him from doing something to you,

21  correct?

22  A.  Correct.

23  Q.  And they were telling him that he should leave you alone,

24  correct?

25  A.  Yes.

1   Q.  And that was D-Roc and other members of his security team,

2   correct?

3   A.  Yes.

4   Q.  Those are other employees of Mr. Combs, correct?

5   A.  Correct.

6   Q.  At some point I believe you said you all went to the hotel;

7   is that right?  Is this the same instance when you went to the

8   hotel?

9   A.  Mm-hmm.

10  Q.  Is that a yes?

11  A.  Yes.

12  Q.  Do you know who Uncle Paulie is?

13  A.  Yes.

14  Q.  In fact, on that day -- do you know who Ruben is?

15  A.  Yes.

16  Q.  On that day, Rube, Uncle Paulie, and D-Roc was there,

17  correct?

18  A.  I don't recall.

19          MR. DONALDSON:  Can we have one second, please, Judge.

20          THE COURT:  Yes.

21          MR. DONALDSON:  Can we please put up 35-1412 for the

22  parties and witness only.

23          Can we highlight the four boxes under the fifth open

24  circle.

25  Q.  Mr. Nash, can you do me a favor and read that to yourself.

1  When you're finished reading it, lift up your head, let me know

2  you're finished reading it, and then I'll follow up with some

3  questions.

4  A.  Okay.

5           MR. DONALDSON:  Take that down, please.

6  Q.  Now, I just want to ask you some questions.

7           Now, after reading that does that refresh your

8  recollection as to whether or not Rube and Uncle Paulie were

9  there at that particular time?

10  A.  I don't remember.

11  Q.  Okay.

12  A.  I don't recall.

13  Q.  Okay.  You do recall -- well, not you do recall.

14           Do you recall whether or not Uncle Paulie and Rube

15  also in the past told Mr. Combs to leave you alone?

16  A.  Yes.

17  Q.  And when Uncle Paulie and Rube told Mr. Combs to leave you

18  all alone, they were acting in their capacity as his employees,

19  correct?

20  A.  Yes.

21  Q.  So those moments, his employees were actually trying to

22  protect -- stop him from doing something against you all,

23  correct?

24  A.  Correct.

25  Q.  Now, you mentioned someone named I believe it was Toni; do

1   you remember saying that?

2   A.  Yes.

3   Q.  Her name was Toni Fletcher, correct?

4   A.  Correct.

5   Q.  I believe they showed you a picture of Ms. Fletcher on the

6   screen, correct?

7   A.  Yes.

8   Q.  And I believe you said that Ms. Fletcher was Bad Boy's

9   chief of staff; is that correct?

10  A.  Correct.

11  Q.  And I believe you mentioned on one of the occasions, on

12  this occasion, you went to the hotel and Cassie was upstairs in

13  one of the hotel rooms, correct?

14  A.  Yes.

15  Q.  And then you went upstairs, and who went upstairs with you?

16  A.  D-Roc and Toni Bias.

17  Q.  Toni Bias Fletcher?

18  A.  Correct.

19  Q.  I'm sorry.  I didn't know it was Bias.

20          So you, Toni Bias Fletcher, and D-Roc went upstairs to

21  Cassie's room, correct?

22  A.  Correct.

23  Q.  To see if she was there, correct?

24  A.  Yes.

25  Q.  And then when you saw her -- strike that.

P5SACom6                          Nash - Cross

1                    You went inside and she was actually there, correct?

2    A.  Yes.

3    Q.  And D-Roc and Toni Fletcher were again working as employees

4    of Mr. Combs, correct?

5    A.  Yes.

6    Q.  Now, and Cassie at that point, according to your testimony,

7    was running from or hiding from Mr. Combs, correct?

8    A.  Yes.

9    Q.  And, at that time, when they were at this hotel, you,

10   D-Roc, and Toni Fletcher, Cassie eventually came downstairs,

11   correct?

12   A.  Yes.

13   Q.  She came down stairs with Toni Fletcher and D-Roc, correct?

14   A.  I don't recall.

15   Q.  Well, they showed -- they're the ones that showed her out

16   the back door, correct?

17   A.  No.  That's not what I said.

18   Q.  I'm not asking what you said.

19                   Isn't it true that Toni Fletcher and D-Roc showed

20   Cassie out the back door, or out the side door?

21   A.  Probably so.  But I remember walking down the front with

22   D-Roc.

23   Q.  Okay.  That would mean then that Toni Fletcher, as chief of

24   staff of Bad Boy, an employee of Mr. Combs, was actually

25   helping you all as opposed to helping Mr. Combs, correct?

P5SACom6                        Nash - Cross

1    A.  Correct.

2    Q.  And that would mean that D-Roc, as the head of security,

3    again, was helping you all as opposed to helping Mr. Combs,

4    correct?

5    A.  Correct.

6    Q.  And as employees of Bad Boy, they were doing something

7    counter to what the head of Bad Boy wanted, correct?

8    A.  Correct.

9    Q.  And that means they were -- when I say counter to, they

10   were doing something to help you as opposed to help Mr. Combs,

11   correct?

12   A.  Correct.

13            THE COURT:  Mr. Donaldson.

14            MR. DONALDSON:  Yes.

15            THE COURT:  We're about 4:00 p.m.

16            MR. DONALDSON:  I'm sorry, Judge.

17            THE COURT:  This is a good place?

18            MR. DONALDSON:  Yes, it is, Judge.  I was trying to be

19   efficient.  I'm trying.

20            THE COURT:  Very good.  We'll be back tomorrow.

21            Thank you, members of the jury.  Again, don't speak to

22   each other about the case.  Don't talk to anyone else about the

23   case.  Don't look up anything about the case or reach out to

24   anyone about the case.  We'll see you back here to start at

25   9:00.  Try to get here at 8:45.  (Continued on next page)

1              (In open court; jury not present)

2              THE COURT:  Mr. Nash, we will see you here tomorrow.

3     Again, no discussions with anyone from the government.

4              Please be seated.

5              MS. COMEY:  Your Honor, for the record, we'll need to

6     rebook Mr. Nash's flight, so can I coordinate with him and his

7     counsel just for those logistics, please.

8              THE COURT:  Of course.

9              MS. COMEY:  Thank you.

10             THE COURT:  Anything to address what -- I guess so

11    after our next witness, Mia, who do we have next after Mia?

12             MS. COMEY:  So I think the next witness would be

13    Enrique Santos, but I think that we are unlikely to get to him.

14    I suspect Mia will -- given how long today went, I suspect Mia

15    will take us close to the end of the day Friday, and then if we

16    get to Enrique Santos, I think he'll certainly take us into the

17    weekend.

18             THE COURT:  Very good.

19             Mr. Agnifilo?

20             MR. AGNIFILO:  Yes.  Thank you, your Honor.

21             THE COURT:  In terms of -- I'll get to your issues.

22             MR. AGNIFILO:  Yes.

23             THE COURT:  Just a question.  Since we're, except for

24    today, ending earlier, I'm going to ask you to make your

25    exhibit disclosure earlier.  And I think this is for your

1  benefit because one of the issues that happened, one of the

2  things that happened today, is that the government's letter

3  came in after midnight.  And I think there's a way to avoid

4  that if we're stopping close to 3:00.

5          So I'm going to make the deadline, instead of

6  7:00 p.m., 5:00 p.m.  So there will be two extra hours.  We're

7  only talking about the exhibits that are not being used for

8  impeachment purposes.  There shouldn't be that many of those.

9  But what that is going to do is it's going to make it easier

10  for the government to respond, to meet and confer, to let you

11  know what their objections are, which is going to help you make

12  sure that there's no issue getting those exhibits in if they

13  are properly admissible.

14          Now, we're not going to do that today because it's

15  4:00 and I'm just telling you this now.  But I think looking

16  after today, I think it's important for us to have an earlier

17  deadline so we can avoid some of these after midnight filings.

18          MR. AGNIFILO:  I understand the Court's concern.  My

19  concern is by the time we get back to our offices, it's

20  practically 5:00.  And it's just -- and it just doesn't give us

21  a lot of time.  So let me mix two issues together at the risk

22  of doing that.

23          I think I might have a possible solution for the

24  access to Mr. Combs.  And the solution would be this.  There's

25  a SCIF in the marshal's lockup area.  It's typically used for

1    confidential information.  And we don't -- this is not the

2    typical use of the SCIF, but it is a facility.  And I believe

3    the Court could order things to happen that would make access

4    to Mr. Combs there possible.

5          And one of the ways I think the Court can do -- the

6    Court can do it because the Court can do lots of things.  But I

7    also note that under the Bail Reform Act, and I think we

8    actually cited I think it's subdivision I, there's that one

9    sort of subdivision that no one knows --

10          THE COURT:  I got it.

11          MR. AGNIFILO:  But I think what it probably means is

12    that when there's somewhat of an urgent situation of a

13    defendant being able to defend one's self, that the Court can

14    take measures, including -- and I'm not asking for this

15    obviously -- including even letting him leave, you know, a

16    facility.  And obviously that would somehow be paid for and

17    ordered.

18          So it seems to me if that's in the Bail Reform Act and

19    that goes as far as to do that, a more modest accommodation

20    would be there's a room in the building, in the marshal's

21    lockup, and we would need meaningful access.  Meaning, you

22    know, as late as we can get.  I mean, 9:00 at night, 10:00 at

23    night.  And it seems that if the Court has a statutory basis to

24    order things like, well, under these circumstances, you know,

25    the defendant who's incarcerated can temporarily be released

1   we're not asking for anything remotely that extreme, that this

2   must be something that not only can the Court order of its own

3   Article III power and authority, but it's actually rooted in a

4   statute.  So that's the ask.  That's the target that I'm trying

5   to shoot at.

6          And I don't know how that's going to play in practice.

7   But I think the Court certainly has the power to order that,

8   and then the logistics of that will have to be taken care of.

9   Just as though if we asked your Honor to do something else, you

10  know, to allow us access so that Mr. Combs could better defend.

11  And let me just add one thing to the record and this is I think

12  the important part.

13         Every trial is different.  And I don't know that this

14  is necessary in every trial.  One thing that I've seen is your

15  Honor has given a great deal of thought to making things run as

16  orderly as possible with deadlines that, you know, one of the

17  deadlines is 10:00 p.m. because we want to raise issues for the

18  next day.  The problem with this particular trial and having an

19  incarcerated client in this particular trial, is we lose all

20  access to him at about 7:00.  7:30 maybe.  So we, from

21  7:30 until 10:00, we are necessarily having to make decisions

22  without him.  And that really isn't right.  And is certainly

23  not preferred.  And I'm not looking to raise Constitutional

24  issues because I know your Honor is trying to come up with a

25  solution.  So we don't need to go there and I'm not going

1   there.  Except to say there seems to be, in the statute,

2   something that contemplates this, that in this particular case,

3   we need this degree of access.  Maybe not in every case.  I've

4   never had a 10:00 p.m. deadline in a case so far.  We have one

5   here.  Not because your Honor is driving a hard case, but

6   because that's what the case requires.  That's what this

7   particular case requires.  And it's different than other cases

8   I've tried over the last 35 years.  And that's what this case

9   requires.  And what this case requires is we just need more

10  access to Mr. Combs.

11        The best kind of access is in-person access.  You

12  know, we were trying with the VTC, that could have worked but

13  it's just not easy to do because the MDC has its own, you know,

14  situation.  My hope is that because it's in the building, that

15  if your Honor orders something, the logistics will somehow work

16  themselves out the way sort of the statute contemplates that

17  these logistics would have to work themselves out.  So that's

18  my request.

19        I guess the request, if I could just say it all in one

20  sort of paragraph, is that your Honor direct that the SCIF be

21  made available to Mr. Combs and his defense counsel every night

22  until 10:00.  That's the ask.

23        THE COURT:  All right.  I hear you, and let me talk to

24  the appropriate people about that request.

25        MR. AGNIFILO:  Yes, Judge.

1          THE COURT:  Now, what I don't understand is what that

2     has to do with the deadlines that concern evidentiary issues.

3     Meaning, you've had months to prepare for trial and the Court

4     purposely had deadlines that the government didn't like, let me

5     put it that way, for the disclosure of witnesses, exhibits, and

6     so forth.  And the reason for that is so that you would be

7     aware of what was coming down the pike and could prepare your

8     case.

9          Now, despite all of that, when the government

10    requested that exhibits that would go to the defendant's case

11    in chief be produced at the beginning of this trial, the Court

12    rejected that request and then said that you would just need to

13    turn them over the day before.  And these are only the ones

14    that go to your affirmative case and not to impeachment.

15         And so, in that regard, the problem that we're having

16    is that because the exhibits are being turned over late, and

17    this is just like telling here's the things we might use so

18    that the government can lodge their evidentiary objections, is

19    just coming in late.  Which is causing issues like getting a

20    letter at 12:36 a.m. that the defense can't respond to until

21    the morning.

22         So I don't see what that issue has to do with the

23    issue concerning the SCIF.  So is there any issue moving the

24    deadline up -- not today because it's 4:00 -- but for days

25    coming up since we're ending close to 3:00.  You'll have enough

1   time to just get those exhibits over.  If you have, like if

2   there's one you missed, okay, you get it over late, and that's

3   fine because there's a good cause.  I said in my order that if

4   there's some cause, some reason that there's an extra exhibit,

5   that's okay.  But just to get it turned over a little bit

6   earlier so people don't have to be up until 2:00 in the

7   morning.

8              MR. AGNIFILO:  One second, Judge.

9              MS. GERAGOS:  Your Honor, I apologize for jumping in

10  on this.  I heard your Honor this morning about not

11  appreciating multiple lawyers addressing one issue.  If you

12  would allow me to address this point.

13             THE COURT:  That's fine.

14             MS. GERAGOS:  Thank you.

15             Our affirmative exhibits, your Honor, change on a

16  daily basis with each witness based on the testimony that comes

17  out with each witness.  So while it would be great and

18  preferred I think for us to know everything we're going to use

19  for the witnesses in the upcoming week, it's not practical on

20  the defense side because we are responding -- we really are

21  responding to testimony that comes in on a daily basis.

22             So just practically I want to explain to your Honor

23  why this is difficult for us and why 7:00 p.m. works.  I

24  understand what -- none of us want to be up as late as we are

25  every single night.  It's just what's happening.

1        The government preps their witnesses every night and

2   then gets to our exhibits and we're dealing with -- we're

3   meeting and conferring all the time.  But just so I can explain

4   to your Honor practically what happens is we're getting the

5   government's witnesses for the next week when they're ordered

6   to give it over.  We spend weekends with Mr. Combs with

7   visitation cuts off at 2:15.  We all have child care issues

8   that's not always practical.  We have to go over with him the

9   affirmative exhibits that we want to go over for the witnesses

10  who are available in the upcoming week or who are going to be

11  called by the government.  Then we are with him afterwards

12  after court until about 5:00 p.m. going over the witnesses for

13  the next day.

14       So when Mr. Agnifilo says we're just practically not

15  at our office until, you know, 5:00, 5:30, it's because we're

16  meeting with our client to try to figure out what do we need to

17  get out affirmatively for the next day.  We have made great

18  efforts to work with your Honor's deadline to get these over to

19  the government by 7:00 p.m.  And we do over mark our exhibits

20  because we don't really know what we'll use based on the

21  testimony.  And that's what leads to a lot of the letters

22  because we are over marking in an abundance of caution so that

23  the government can see anything that we may use for each

24  witness.

25       But I think it's because our affirmative exhibits

1    change daily based on testimony that we get in court.  It's why

2    kind of a 5:00 p.m. makes it very difficult because we're

3    meeting with our client after court, then going to our office,

4    which is uptown, and then based on our conversations changing

5    those exhibits.

6          I will note that for Mia, we have given the

7    government, as your Honor knows, I think all the exhibits so

8    far that we've marked.  There may be some that may change.  And

9    I -- we've been meeting and conferring with Ms. Johnson about

10   Mr. Santos.  So perhaps we could do this earlier for next week

11   if we were to get the witnesses they're going to call like

12   today or tomorrow, and that could speed things along.

13         But, practically, with respect to the -- I think

14   that's why Mr. Agnifilo was addressing an incarcerated client,

15   it makes it very, very difficult for us because we have to

16   confer with him while we're addressing what affirmative

17   exhibits to use.

18         THE COURT:  All right.  Look, for present purposes, do

19   me a favor, 7:00 p.m. is the deadline.  But you're over marking

20   as you noted.  So there's probably a set of exhibits that you

21   can get out earlier.  Understanding that you're going through

22   them, some of them might not work, you might have additional

23   exhibits to add.  But it's just for your benefit to get them

24   out earlier.  Because once you get them out by 5:00 or earlier,

25   right, and if there's someone there who can just send those

1   over and say, hey, here are the exhibits we're considering,

2   you're going to have more time to address any government

3   objections and get these in.  So that's a request.

4           MS. GERAGOS:  Agree.  And we've done that for Mia.  We

5   are doing that to the extent we can.

6           THE COURT:  All right.

7           MS. GERAGOS:  We did that.  We really did with Mia.

8   We sent them over I think a couple nights ago.

9           THE COURT:  Fair enough.

10          So as to the issue concerning the SCIF, I've heard

11  you, Mr. Agnifilo.  Are you planning to put in something in

12  writing?  And the reason why I ask that is sometimes it's

13  easier for me if I need to speak to the marshals to understand

14  the full nature of the question.

15          MR. AGNIFILO:  Yes.

16          THE COURT:  That you put something in writing.

17          MR. AGNIFILO:  Absolutely.  I wanted to raise it with

18  your Honor now.  I'll have something to the Court in a few

19  hours.

20          THE COURT:  That's helpful.  I will talk to them in

21  the meantime, but it's helpful to have something in writing.

22          And the only other update, I did raise what you said

23  yesterday about the minutes and the reason why the minutes

24  might be helpful as well with the MDC, so I'll let you know

25  when I hear from them.

1          MR. AGNIFILO:  Thank you so much, Judge.

2          THE COURT:  Of course.  Anything else from your side?

3          MR. AGNIFILO:  Nothing.

4          THE COURT:  Anything else from the government before

5    we adjourn?

6          MS. COMEY:  One thing to flag, your Honor.  We're

7    going to assess among ourselves, but we think we may be moving

8    even ahead of schedule at this point.  I know today was a long

9    today, but we're hopeful we are going to be able to cut some

10   witnesses from the witness list, and we wanted to flag for your

11   Honor that we'll plan to let your Honor and the defense know

12   from this week any witnesses we've identified we can cut.  I do

13   think we'll end up resting in less than six weeks.  I don't

14   know how much less, but I think it will be less than six weeks.

15         THE COURT:  Just I'm so bad with the calendar.  But

16   six weeks means?

17         MS. COMEY:  I think our hope is to be able to rest by

18   the end of the second week of June.  We may bleed over into the

19   third week.

20         THE COURT:  All right.  Very good.

21         Good.  So that's helpful.  And given that, I will

22   start looking at the request to charge and then I'll have some

23   parameters of what I'd like to do in that regard.  I think it

24   makes a lot of sense a lot of times to have an initial charge

25   conference where we go over to get -- address any larger

P5SACom6                        Nash - Cross

1    objections.  And so I can take all those into account and come

2    up with a response from the Court based on the parties'

3    submissions.  And then we'll have the actual charge conference

4    closer to when we're at the end of the case.

5              So that's just a heads up, but I'm happy to hear any

6    thoughts on what the parties think might be most productive.

7              MS. COMEY:  I think that makes sense, your Honor, if

8    there's going to be a very short defense case.  If there's

9    going to be a longer defense case, they've given quite a long

10   witness list, so if there's going to be a long defense case, we

11   might want to wait.  I defer to defense counsel on the timing

12   there.

13             THE COURT:  Yeah.  Let me take a look at the requests

14   and see how different they really are.

15             Anything further from the government?

16             MS. COMEY:  Nothing.

17             THE COURT:  Anything from the defense?

18             MR. AGNIFILO:  Nothing.  Thank you.

19             THE COURT:  We'll see everyone here tomorrow at 8:30.

20             (Adjourned to May 29, 2025, at 8:30 a.m.)

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination  of:                          Page

 3    CHRIS IGNACIO

 4   Direct By Ms. Slavik . . . . . . . . . . .2820

 5   Cross By Mr. Steel . . . . . . . . . . . .2834

 6   LANCE JIMENEZ

 7   Direct By Ms. Slavik . . . . . . . . . . .2855

 8   Cross By Mr. Agnifilo . . . . . . . . . .2913

 9   Redirect By Ms. Slavik . . . . . . . . . .2941

10    DEONTE NASH

11   Direct By Ms. Comey  . . . . . . . . . . .2943

12                     GOVERNMENT EXHIBITS

13   Exhibit No.                           Received

14    8C-101   . . . . . . . . . . . . . . . .2825

15    8B-101   . . . . . . . . . . . . . . . .2832

16    8C-103 through 141 . . . . . . . . . . .2873

17                     DEFENDANT EXHIBITS

18   Exhibit No.                           Received

19    853  . . . . . . . . . . . . . . . . . .2922

20    852  . . . . . . . . . . . . . . . . . .2936

21    1800  . . . . . . . . . . . . . . . . . .3037

22    1801  . . . . . . . . . . . . . . . . . .3038

23    1802  . . . . . . . . . . . . . . . . . .3039

24    1810, 1811, 1814, 1818, 1820 1819, 1821 . . .3041

25          through 1826, 1828, 1829,
```

1            1833, 1835, 1837, 1839 through

2            1841

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25