UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

SEAN COMBS,
    a/k/a "Puff Daddy,"
    a/k/a "P. Diddy,"
    a/k/a "Diddy,"
    a/k/a "PD,"
    a/k/a "Love,"

                Defendant.

**S3 24 Cr. 542 (AS)**


# THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, A NEW TRIAL


JAY CLAYTON
United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278

Meredith Foster
Emily A. Johnson
Christy Slavik
Madison Reddick Smyser
Mitzi Steiner
Assistant United States Attorneys
    *Of Counsel*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................. 2

ARGUMENT ..................................................................................................................... 8

   I. The Court Should Deny the Defendant's Motion for a Judgment of Acquittal ................... 8

    A. Applicable Law ...................................................................................................... 8

    B. Discussion .......................................................................................................... 10

      1. The Defendant's Statutory Arguments Are Not Properly Asserted Under Rule 29 ..... 10

      2. The Mann Act Covers the Conduct of Conviction ...................................... 15

        a. Relevant Background ........................................................................ 15

        b. The Court's Definition of "Prostitution" Was Appropriate ..................... 17

        c. The Court Should Decline to Employ the Doctrine of Constitutional Avoidance .... 18

          (1) The Mann Act Is Unambiguous ...................................................... 19

          (2) The Mann Act Does Not Present Constitutional Concerns ...................... 22

            (a) There Are No Due Process Vagueness Concerns to Avoid ................ 22

            (b) There Are No Substantive Due Process Concerns to Avoid ............. 27

            (c) There Are No Federalism Concerns to Avoid ................................ 28

            (d) There Are No First Amendment Concerns to Avoid ...................... 28

      3. The Defendant's Purported First Amendment Concerns Are Meritless ...................... 28

      4. There Was Sufficient Evidence for a Rational Jury to Find the Defendant Guilty of the Counts of Conviction ................................................................................. 34

   II. The Court Should Deny the Defendant's Motion for a New Trial ...................................... 43

    A. Applicable Law .................................................................................................... 43

      1. Rule 33 .......................................................................................... 43

      2. Retroactive Misjoinder ..................................................................... 44

    B. Discussion .......................................................................................................... 45

CONCLUSION .................................................................................................................. 50

# TABLE OF AUTHORITIES

**Cases**

*Amadio v. United States*,
 348 U.S. 892 (1954) ............................................................................... 21

*Arriaga v. Mukasey*,
 521 F.3d 219 (2d Cir. 2008) .................................................................. 24

*Barnes v. Glen Theatre, Inc.*,
 501 U.S. 560 (1991) ............................................................................... 31

*Calderon v. United States*,
 2017 WL 11473376 (S.D.N.Y. Mar. 13, 2017) ..................................... 46

*California v. Freeman*,
 488 U.S. 1311 (1989) ....................................................................... 30, 31

*Caminetti v. United States*,
 242 U.S. 470 (1917) .................................................................. 19, 21, 27

*Clark v. Community for Creative Non-Violence*,
 468 U.S. 288 (1984) ............................................................................... 31

*Cleveland v. United States*,
 329 U.S. 14 (1946) ..................................................................... 17, 18, 20

*Duncan v. Walker*,
 533 U.S. 167 (2001) ............................................................................... 26

*Farrell v. Burke*,
 449 F.3d 470 (2d Cir. 2006) .................................................................. 22

*Forrest v. United States*,
 363 F.2d 348 (5th Cir. 1966) ...................................................... 20, 22, 26

*Hays v. United States*,
 231 F. 106 (8th Cir. 1916) ..................................................................... 21

*Henry v. Dinelle*,
 557 F. App'x 20 (2d Cir. 2014) ............................................................. 14

*Jennings v. Rodriguez*,
 583 U.S. 281 (2018) ............................................................................... 19

*Jones v. Schneiderman*,
 974 F. Supp. 2d 322 (S.D.N.Y. 2013) .............................................. 30, 31

*Lawrence v. Texas*,
 539 U.S. 558 (2003) ............................................................................... 27

*Musacchio v. United States,*
    577 U.S. 237 (2016) ........................................................ 14

*Robinson v. Shell Oil Co.,*
    519 U.S. 337 (1997) ........................................................ 18

*Rubin v. Garvin,*
    544 F.3d 461 (2d Cir. 2008) ........................................... 22

*Schindler Elevator Corp. v. U.S. ex rel. Kirk,*
    563 U.S. 401 (2011) ........................................................ 17

*Scott v. United States,*
    2015 WL 4950033 (M.D. Pa. Aug. 19, 2015) ................... 25

*Slifer v. CG Tech., L.P.,*
    2017 WL 3106438 (S.D.N.Y. June 13, 2017) ................... 13

*State v. Theriault,*
    158 N.H. 123 (N.H. 2008) ........................................ 33, 34

*Taniguchi v. Kan Pac. Saipan, Ltd.,*
    566 U.S. 560 (2012) ........................................................ 17

*United States v. al Ghazi,*
    2009 WL 1605741 (S.D.N.Y. June 9, 2009) ..................... 10

*United States v. Amadio,*
    215 F.2d 605 (7th Cir. 1954) .......................................... 21

*United States v. Archer,*
    977 F.3d 181 (2d Cir. 2020) ........................................... 44

*United States v. Atilla,*
    966 F.3d 118 (2d Cir. 2020) ............................................. 9

*United States v. Watson,*
    2025 WL 510814 (E.D.N.Y. Feb. 16, 2025) ......... 10, 11-12, 14

*United States v. Avenatti,*
    81 F.4th 171 (2d Cir. 2023) ............................................. 9

*United States v. Barret,*
    2012 WL 3229291 (E.D.N.Y. Aug. 6, 2012) ................... 11

*United States v. Blaszczak,*
    947 F.3d 19 (2d Cir. 2019) ............................................. 14

*United States v. Capers,*
    20 F.4th 105 (2d Cir. 2021) ............................................. 9

*United States v. Chen,*
 WL 3597904 (D. Minn. May 23, 2023) ................................................. 27

*United States v. Clark,*
 582 F.3d 607 (5th Cir. 2009) .............................................................. 27

*United States v. Concepcion,*
 139 F.4th 242 (2d Cir. 2025) ......................................................... 23, 24

*United States v. Dawkins,*
 999 F.3d 767 (2d Cir. 2021) .............................................................. 10

*United States v. DiNome,*
 954 F.2d 839 (2d Cir. 1992) ....................................................... 47, 48-49

*United States v. Facen,*
 812 F.3d 280 (2d Cir. 2016) .............................................................. 10

*United States v. Ferguson,*
 246 F.3d 129, 134 (2d Cir. 2001) ........................................................ 47

*United States v. Freeman,*
 46 Cal.3d 419 (Cal. 1988) ......................................................... 32, 33, 34

*United States v. Gambino,*
 59 F.3d 353 (2d Cir. 1995) .............................................................. 43

*United States v. Gilmore,*
 2018 WL 2905766 (W.D.N.C. June 11, 2018) ........................................ 11, 13

*United States v. Goklu,*
 2023 WL 184254 (E.D.N.Y. Jan. 13, 2023) ...................................... 10, 12, 14

*United States v. Griffith,*
 284 F.3d 338 (2d Cir. 2002) .............................................................. 45

*United States v. Guiliano,*
 644 F.2d 85 (2d Cir. 1981) .............................................................. 47

*United States v. Hamilton,*
 334 F.3d 170 (2d Cir. 2003) ....................................................... *passim*

*United States v. Jackson,*
 335 F.3d 170 (2d Cir. 2003) .............................................................. 9

*United States v. Jones,*
 482 F.3d 60 (2d Cir. 2006) ......................................................... 45, 46

*United States v. Kelly,*
 128 F.4th 387 (2d Cir. 2025) ....................................................... 13, 41-42

*United States v. Kelly,*
609 F. Supp. 3d 85 (E.D.N.Y. 2022) ........................................................................ 11, 13

*United States v. Lebowitz,*
676 F.3d 1000 (11th Cir. 2012) .............................................................................. 35

*United States v. Levy,*
2013 WL 3832718 (S.D.N.Y. July 15, 2013) ....................................................... 10

*United States v. Louper-Morris,*
672 F.3d 539 (8th Cir. 2012) .............................................................................. 10-11

*United States v. Mi Sun Cho,*
713 F.3d 716 (2d Cir. 2013) ................................................................... 9, 20, 22, 26

*United States v. Miller,*
148 F.3d 207 (2d Cir. 1998) .............................................................................. 34-35

*United States v. Mitchell,*
811 F. App'x 50 (2d Cir. 2020) ......................................................................... 13-14

*United States v. Nadi,*
996 F.2d 548 (2d Cir. 1993) .............................................................................. 23, 24

*United States v. Neely,*
124 F.4th 937 (D.C. Cir. 2024) ............................................................................ 27

*United States v. O'Brien*
391 U.S. 367 (1968) ........................................................................................... 31

*United States v. Palomar-Santiago,*
593 U.S. 321 (2021) ........................................................................................... 19

*United States v. Persico,*
645 F.3d 85 (2d Cir. 2011) ..................................................................... 9, 10, 41

*United States v. Ramirez,*
324 F.3d 1225 (11th Cir. 2003) ......................................................................... 10

*United States v. Raniere,*
55 F.4th 354 (2d Cir. 2022) .......................................................................... 18, 9

*United States v. Rivers,*
108 F.4th 973 (7th Cir. 2024) ......................................................................... 12, 13

*United States v. Robinson,*
702 F.3d 22 (2d Cir. 2012) ............................................................................... 26

*United States v. Roeder,*
526 F.2d 736 (10th Cir. 1975) ........................................................................... 32

*United States v. Rutigliano*,
    790 F.3d 389 (2d Cir. 2015) ......................................................... 10, 41

*United States v. Sam Goody, Inc.*,
    518 F. Supp. 1223 (E.D.N.Y. 1981) .............................................. 47

*United States v. Sam Goody, Inc.*,
    675 F.2d 17 (2d Cir. 1982) ........................................................... 47, 48

*United States v. Sanchez*,
    969 F.2d 1409 (2d Cir. 1992) ....................................................... 43, 44

*United States v. Schlesinger*,
    390 F. Supp. 2d 274 (E.D.N.Y. 2005) ........................................... 44

*United States v. Tellier*,
    83 F.3d 578 (2d Cir. 1996) ........................................................... 46, 48

*United States v. Teman*,
    465 F. Supp. 3d 277 (S.D.N.Y. 2020) ........................................... 9, 44

*United States v. Thompson*,
    458 F. Supp. 2d 730 (N.D. Ind. 2006) ........................................... 31

*United States v. Thompson*,
    671 F. Supp. 3d 1290 (D. Utah 2023) ........................................... 11

*United States v. Tyson*,
    947 F.3d 139 (3d Cir. 2020) ......................................................... 26

*United States v. Vebeliunas*,
    76 F.3d 1283 (2d Cir. 1996) ......................................................... 45, 46

*United States v. Wagoner*,
    2022 WL 17418000 (W.D. Va. Dec. 5, 2022) ................................. 11

*United States v. Wapnick*,
    60 F.3d 948 (2d Cir. 1995) ........................................................... 46-47

*United States v. Wedd*,
    993 F.3d 104 (2d Cir. 2021) ......................................................... 24

*United States v. Wheeler*,
    444 F.2d 385 (10th Cir. 1971) ...................................................... 20

*United States v. Wrightwood Dairy Co.*,
    315 U.S. 110 (1942) ..................................................................... 28, 30

**Statutes & Rules**

18 U.S.C. § 1591 ............................................................................... 18

18 U.S.C. § 2421 ........................................................... 15, 24, 28, 30

Cal. P. Code § 647 ............................................................................ 25

Fed. R. Civ. P. 12 ..................................................................... *passim*

Fed. R. Civ. P. 33 ................................................................. 8, 43, 44

Fed. R. Crim. P. 29 ................................................................. *passim*

Fed. R. Crim. P. 33 ........................................................................ 43

Florida Stat. § 796.07 ...................................................................... 25

N.Y.P.L. § 230 ................................................................................ 25

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the defendant's renewed motion for judgment of acquittal or, in the alternative, a new trial. The defendant—following a conviction at trial on two felony Mann Act counts—advocates for the Court to narrow the scope of the Mann Act to exclude his own criminal conduct on the grounds that, among other things, the statute is unduly vague, violates his substantive due process rights, and violates his First Amendment rights. The defendant further contends that the record at trial fails to support his counts of conviction. The defendant is mistaken as a matter of fact and law.

As an initial matter, because several of the defendant's Rule 29 arguments address alleged constitutional issues, and are untethered to the sufficiency of the evidence, they are not properly raised in the present motion and can be rejected on that basis alone.

Even if that were not the case, however, the defendant's arguments fail. While the defendant may wish to limit the provisions of the Mann Act to suit his own purposes, the terms of the Mann Act are unambiguous. Contrary to the defendant's arguments, where, as here, the text of a statute is clear, the doctrine of constitutional avoidance is inapplicable. And even if the Court were to consider applying the constitutional avoidance canon after conducting a textual analysis of the Mann Act, there are simply no constitutional concerns to avoid. The Mann Act is not unduly vague, nor do its provisions run afoul of substantive due process or pose federalism concerns. Equally, the defendant fails to raise any legitimate First Amendment concern, since his conduct is clearly not entitled to First Amendment protection.

Further, at trial, there was ample evidence to support the jury's convictions. The defendant masterminded every aspect of Freak Offs. He transported escorts across state lines to engage in Freak Offs for pay. He directed the sexual activity of escorts and victims throughout Freak Offs for his own sexual gratification. And he personally engaged in sexual activity during Freak Offs.

1

There was more than a sufficient basis, viewing the evidence in the light most favorable to the Government, to support the counts of conviction.

Finally, the defendant fails to present any basis for a new trial. The defendant's retroactive misjoinder argument is without any merit and should be summarily rejected. There is no precedent or legal basis for a new trial based on retroactive misjoinder following a split jury verdict. And the defendant suffered no impermissible prejudice. Accordingly, and for the reasons stated below, the defendant's motion should be denied.

## **BACKGROUND**

On May 12, 2025, trial began on the third superseding indictment, which included Mann Act charges (Counts Three and Five), sex trafficking charges (Counts Two and Four), and a racketeering conspiracy charge (Count One). At trial, the evidence showed that beginning in or around 2009 and spanning through in or around 2024, the defendant transported, aided and abetted, and willfully caused the transportation of multiple individuals—including Casandra Ventura, Jane, and multiple male commercial sex workers—domestically and internationally with the intent that they engage in acts of prostitution. These acts of prostitution occurred first at "Freak Offs" with Ventura and later at "hotel nights" with Jane. (Tr. 407, 4603).

The defendant dated Ventura from approximately 2008 through 2018 and Jane from approximately 2021 through 2024. During these relationships, he asserted substantial control over Ventura and Jane's lives. Specifically, he controlled and threatened Ventura's career, controlled her appearance, and paid for most of her living expenses, taking away physical items when she did not do what he wanted. (Tr. 431, 439-40, 415-16, 446-50, 460, 462, 2949-50, 2978; GX B-329). The defendant similarly paid Jane's $10,000 rent and threatened her that he would stop paying her rent if she did not comply with his demands. (Tr. 4603, 4612-13; GX A-442-29 ("We'll [sic] get

over it pls.  Look at the roof over your head."); GX A-442-35A ("I'm about to really disappear on you. . . . You better get on your job . . . You got me on my job.")).

During their relationships, the defendant introduced Ventura to Freak Offs and Jane to hotel nights.  (Tr. 407, 4580-88).   As part of these nights, the defendant required Ventura and Jane to have sex with male commercial sex workers while he directed, watched, and masturbated.  (Tr. 260-61, 407-08, 1904-05, 1910-11, 4580-91, 4594, 4819-20).  The Freak Offs and hotel nights typically lasted several days, during which the women did not sleep and would be kept awake using drugs provided by the defendant, such as ecstasy, MDMA, and ketamine.  (Tr. 408, 484, 542-43, 550-51, 4577-78, 4628, 4684-85, 4705).  The sex acts at Freak Offs and hotel nights followed the same typical pattern, which was dictated by the defendant: continued application of baby oil, mutual touching and masturbation, oral sex, and penetrative sex.  (Tr. 502, 557-61, 4620-28).  Although the defendant often watched and masturbated, he sometimes participated in the sex acts, by, for example, engaging in oral sex with Ventura while an escort was penetrating her.  (Tr. 270, 560, 565).  Typically, after the male escorts had sex with Ventura and Jane, the defendant would also have sex with the women, often with the escorts' semen still on Ventura and Jane's bodies, at the defendant's request. (Tr. 560-61, 568, 1905, 4625-27).  These nights often involved multiple male escorts and multiple rounds of sex with each escort.  (Tr. 450, 562-63, 4620-25, 4627-28; GX 1402, 1406).  Freak Offs and hotel nights took place often, sometimes on a weekly or monthly basis.  (Tr. 483-84, 4756; GX 1402, 1406).  As a result of the physical exertion required by these nights, Ventura and Jane suffered from physical pain, urinary tract infections, and yeast infections.  (Tr. 677-78, 4828-30).  The defendant forced them to participate in hotel nights when they were still recovering from urinary tract infections, when they were on their periods, when

they were vomiting, when they had physical injuries, and after they had blacked out on drugs.  (Tr. 512-13, 542-43, 552-53, 677-78, 696-98, 4711, 4830, 5207-08).

During the Freak Offs and hotel nights, the defendant masturbated and often filmed Ventura and Jane engaging in sex acts with the male escorts.  (Tr. 565, 569-71, 4625-26, 4818).  The defendant later used these videos as blackmail materials, threatening both Ventura and Jane that he would release the videos to embarrass or harm them.  (Tr. 410-11, 663-66, 702-03, 2992, 5107-08; GX A-301-I, B-315, B-619, C-251).  For example, after a fight in Cannes, France, the defendant and Ventura flew back to New York, where Ventura traded her seat with someone to avoid sitting next to the defendant.  (Tr. 701-03).  The defendant then traded his own seat to be next to Ventura's new seat, where he used his laptop to play Freak Off videos for Ventura that she had previously deleted.  (Tr. 701-02).  Once the plane landed in New York, the defendant demanded a Freak Off, which Ventura did because she feared that the defendant would release the videos.  (Tr. 702-03).

The defendant, Ventura, and Jane located male escorts through different sources.  When the Freak Offs began, the defendant supplied the escorts.  (Tr. 407-08; *see also* Tr. 4726).  But he eventually tasked Ventura with finding escorts, and she turned to websites like Craigslist and Backpage and services providing strippers or exotic dancers.  (Tr. 517, 524-25).  Later, Ventura and the defendant sourced escorts from a service called Cowboys 4 Angels, communicating primarily with a man named Garren.  (Tr. 517, 521-24; GX B-326).  The defendant continued using Cowboys 4 Angels to find escorts for hotel nights with Jane, though his point of contact at that time was Bridget Kreshover, a/k/a "Bridget Collins."  (Tr. 4587-88, 4760, 4770, 5000; GX 1407, A-103).  Jane, knowing that she would have to have sex with strangers, attempted to exert

some control over the situation by reaching out to two adult entertainers, whom she and the defendant invited to hotel nights. (Tr. 4727-28, 4739-41, 4810-11; *see also* Tr. 4755).

The escorts were generally paid thousands of dollars in cash for their participation in Freak Offs and hotel nights, including to have sex with the women. (Tr. 479, 531-33, 4814-18, 4737-38). Ventura, Jane, or the defendant handed cash to the escorts. (Tr. 531, 4738-39, 4744, 4814-18). If Ventura or Jane paid the escorts, they did so at the defendant's direction and the money came from the defendant or his security. (Tr. 531-32, 4738-39, 4744, 4817-18). In certain cases when there was no cash, Jane would pay the escort or escort service via a payment application such as CashApp, at the defendant's direction; after the payment was made, Jane would provide the defendant with a receipt of the payment and the defendant would reimburse her. (Tr. 4739, *see, e.g.*, GX A-159, DX 3187). Often when escorts had difficulty performing sexually, they would be paid less, if at all, or even be dismissed. (Tr. 272-74, 530, 566-67, 1913-15; *see also* GX A-103). In addition, when escorts did not perform to the defendant's specifications (e.g., ejaculating before the defendant told them to do so), they were paid less. (Tr. 561).

The Freak Offs and hotel nights occurred at hotels around the country and internationally, including in New York, Miami, Los Angeles, Atlanta, Las Vegas, Ibiza, and Turks and Caicos. (Tr. 499-500, 4616). Sometimes, they occurred at the defendant's residences in Los Angeles and Miami or at Ventura's or Jane's residences in Los Angeles. (Tr. 499-500, 4619, 4756-58, 4743-44, 4825). Escorts traveled to these Freak Offs with Ventura and hotel nights with Jane. The defendant discussed the escorts' travel with Ventura and Jane. (*See, e.g.*, Tr. 540-41). For example, the defendant told Ventura several times that he would fly out Clayton Howard, a/k/a "Dave," and Jules Theodore, two of their regular escorts, for Freak Offs. (*See, e.g.*, GX B-638 ("Wanna get Dave out. ? For the day" and "J[ules] is ready to get on a flight but we gotta book")).

The travel arrangements were generally made at the defendant's direction, including by using his travel agent, using the escort service to coordinate travel, or having Ventura or Jane book travel for the escorts and receive reimbursement from the defendant.  (Tr. 535, 540-42, 4733, 4736-37, 4751-52, 4754-55, 4761, 4806; GX 1407, A-103, A-112, C-271-A-R).

The escorts who traveled for Freak Offs with the defendant and Ventura included Howard on at least six occasions, (GX 1402); Theodore on at least three occasions, (*id.*); Julian Sapp, a/k/a "LA Strip," on at least one occasion, (*id.*); and a Cowboys 4 Angels escort who flew to Ibiza on one occasion.  (Tr. 540, GX B-326).  For hotel nights with the defendant and Jane, Kabrale Williams, a/k/a "ATL," a/k/a "Chef," a/k/a "Sly," traveled at least ten times, (Tr. 4733, 4736-37, 4968-69; GX 1406); Paul Arthur traveled at least six times, (Tr. 4759-61; GX 1406); Reggie traveled at least once, (GX 1406, 1407, A-102, A-104-40); and Rico traveled at least once, (GX 1406, 1407, A-102, A-168).

In addition to arranging escort travel for Freak Offs, the defendant also arranged for Ventura's and Jane's travel, often using his travel agency to book and/or his or his businesses' American Express cards to pay for the travel.  (Tr. 4616-17; GX 1402, 1406, 1408, 1409).  Although the defendant knew there would be hotel nights when arranging the travel, the women sometimes agreed to travel without knowing that a hotel night was in store.  For example, on or about September 16, 2023, Jane, who was in Los Angeles, told the defendant, who was in New York, that she did not want to come see him in New York because she did not want to participate in a hotel night there.  (Tr. 4798-99; *see also* GX 1407; A-104-59-P ("I'm not coming to New York. . . . I don't want to be used and locked in a room to perform and fulfill your fantasies.")).  In this conversation, Jane told the defendant that she felt hotel nights were "the only reason you have me around and why you pay for the house" and that she did not "want to feel obligated to perform

these nights w you in fear of losing the roof over my head." (GX 1407; A-442-37; A-104-59-P). The defendant told her that a hotel night was not going to happen and that it would "just be [them]" and they would have "romantic one-on-one time together in New York." (Tr. 4798-99). Jane trusted the defendant and boarded a flight to New York, which Kristina Khorram, the defendant's chief of staff, and Jessica Ruiz, his travel coordinator, had arranged. (Tr. 4798; GX 1407, C-229). When she was already mid-air, the defendant texted Jane about entertainment for a hotel night— despite his earlier promises—and she felt "really disappointed" and "felt this weight" over her "like a balloon popped." (Tr. 4799-4800; GX 1407). After Jane landed in New York City, the defendant and Jane had a hotel night with a new Cowboys 4 Angel escort and Williams, who traveled from Atlanta to New York, instead of the alone time that the defendant had promised Jane. (Tr. 4800-07; GX 1407; *see also* GX A-104-74 ("Even in nyc I said I did not want to go bc I knew you would pair me up with a random person and I was anxious and anxiety filled and you did still pair me up w some random man. And u emotional manipulate me for years if ur not happy w certain sex performances")).

Both Ventura and Jane did not want to have sex with escorts and told the defendant they did not want to have Freak Offs or hotel nights. (*See, e.g.*, Tr. 1303-04, 1330-31, 4596-98, 4810-13, 4834-36; GX 1407, A-104-66, B-513). But the nights nevertheless continued. (GX 1402, 1406, 1407). The defendant was at times physically violent with Ventura and Jane at Freak Offs and hotel nights. At Freak Offs in New York, Los Angeles, and Miami, the defendant grabbed Ventura, pushed her down, dragged her, hit her in the side of the head, and kicked her, including at the Intercontinental Hotel in Los Angeles where a portion of the defendant's violence was caught on surveillance video. (Tr. 688-90, 576-77; GX 10C-115; *see also* GX B-606, B-607 (photographs of Ventura's injuries following the Intercontinental Hotel violence)). Daniel Phillip, an escort,

was present for several instances of violence in which the defendant, among other things, threw a bottle at Ventura, dragged her by her hair, and slapped her, causing her to scream and/or run from him. (Tr. 276-77, 282, 689-90). The defendant was also violent toward Jane before forcing her to engage in oral sex with an escort at her home in June 2024. (*See* Tr. 5172-5213). Specifically, the defendant kicked Jane's legs out from under her and picked her up in a chokehold and punched her; punched her in the face twice, leaving visible injuries; punched Jane and kicked her repeatedly when she was on the ground curled up in a ball; and smacked her in the face three times while she was showering, which resulted in Jane losing her balance and falling to the ground of the shower. (Tr. 5185-5202; *see also* GX E-273, E-333 (documenting Jane's injuries)). He then told Jane multiple times that she was "not going to ruin [his] fucking night," told her to "[t]ake this fucking pill," and told her to "get out there" and "suck [the escort's] dick." (Tr. 5211). Jane protested but eventually followed his instructions. (Tr. 5212-13).

Following the Government's case, the defendant moved for a judgment of acquittal on all counts under Rule 29. (Tr. 7352-91). The Court reserved decision. (Tr. 7391). The jury then found the defendant guilty of the Mann Act charges (Counts Three and Five) and acquitted him on the remaining counts. (Dkt. 447). On July 30, 2025, the defendant filed a renewed motion for judgement of acquittal or, in the alternative, a new trial, pursuant to Rules 29 and 33. (Dkts. 485-86).

## ARGUMENT

### I. The Court Should Deny the Defendant's Motion for a Judgment of Acquittal

#### A. Applicable Law

Federal Rule of Criminal Procedure 29 provides a mechanism for the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Under Rule 29, a defendant challenging the "sufficiency of the evidence

to support his conviction 'bears a heavy burden.'"[1]  *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (quoting *United States v. Finley*, 245 F.3d 199, 202 (2d Cir. 2001)).  "The question is not whether this Court believes that the evidence at trial established guilt beyond a reasonable doubt, but rather, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) (emphasis in original).  Accordingly, a court "may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *United States v. Capers*, 20 F.4th 105, 113 (2d Cir. 2021).

In considering a Rule 29 motion, the court must view the evidence in the light most favorable to the Government, *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020), and analyze the pieces of evidence "in conjunction, not in isolation," *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011), as "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Avenatti*, 81 F.4th 171, 184 (2d Cir. 2023).  This Court must also "credit every inference that the jury might have drawn in favor of the government, because the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court."  *United States v. Raniere*, 55 F.4th 354, 364 (2d Cir. 2022); *see also United States v. Teman*, 465 F. Supp. 3d 277, 291 (S.D.N.Y. 2020) ("In a close case, where 'either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter.'") (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)).  Because the jury is entitled to choose which inferences to draw, "the government's case need not

---

[1] Unless otherwise noted, case and record text quotations omit all internal quotation marks, citations, and previous alterations.

exclude every possible hypothesis of innocence." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016).

"These standards apply whether the evidence being reviewed is direct or circumstantial." *Persico*, 645 F.3d at 105. "A jury's verdict may be based entirely on circumstantial evidence." *United States v. Rutigliano*, 790 F.3d 389, 402 (2d Cir. 2015).

### B. Discussion

### 1. The Defendant's Statutory Arguments Are Not Properly Asserted Under Rule 29

Among other reasons, the defendant's motion should be denied because the defendant's arguments—with the exception of those regarding sufficiency of the evidence in Section I.C. of the defendant's motion—are not, in fact, proper Rule 29 arguments. Rule 29 "only authorizes motions challenging the sufficiency of the evidence presented at trial." *United States v. al Ghazi*, No. 07 Cr. 354 (JSR), 2009 WL 1605741, at *2 (S.D.N.Y. June 9, 2009); *see United States v. Dawkins*, 999 F.3d 767, 780-81 & n.12 (2d Cir. 2021); *United States v. Watson*, No. 23 Cr. 82 (EK), 2025 WL 510814, at *4 (E.D.N.Y. Feb. 16, 2025). "Rule 29(c) is not an open-ended opportunity to relitigate unfavorable rulings, contest jury instructions, or advance new legal theories." *United States v. Goklu*, No. 19 Cr. 386 (PKC), 2023 WL 184254, at *4 (E.D.N.Y. Jan. 13, 2023); *see also United States v. Levy*, No. 11 Cr. 62 (PAC), 2013 WL 3832718, at *3 & n.2 (S.D.N.Y. July 15, 2013) (denying Rule 29 motion where defendant's "arguments in support of her Rule 29 motion [did] not address the sufficiency of the evidence presented, but rather rehash[ed] . . . arguments as to why her activities should not be considered illegal as a matter of law.").

A Rule 29 motion is also not an opportunity to raise a "challenge based upon the sufficiency of the indictment that should have been raised before trial" in a Rule 12 motion. *United States v. Ramirez*, 324 F.3d 1225, 1227 (11th Cir. 2003); *see United States v. Louper-Morris*, 672 F.3d 539,

562 (8th Cir. 2012) ("Typically, constitutional challenges to the charging statute can be raised during pretrial motions, specifically, in a motion to dismiss the indictment."). Accordingly, courts routinely deny Rule 29 motions where the motion primarily raises legal or constitutional arguments that could have been raised pre-trial. *See, e.g.*, *United States v. Kelly*, 609 F. Supp. 3d 85, 141 (E.D.N.Y. 2022), *aff'd*, 128 F.4th 387 (2d Cir. 2025) ("[T]he defendant's constitutional claims about CHSC § 120290" are "beyond the scope of a Rule 29 motion" and should have been made in a Rule 12 motion); *United States v. Barret*, No. 10 Cr. 809 (KAM), 2012 WL 3229291, at *20 (E.D.N.Y. Aug. 6, 2012), *aff'd*, 677 F. App'x 21 (2d Cir. 2017) (noting that the defendant's vagueness challenge to a charge in the indictment was "not properly raised on a motion for judgment of acquittal pursuant to Rule 29"); *see also United States v. Thompson*, 671 F. Supp. 3d 1290, 1295 (D. Utah 2023), *aff'd*, 133 F.4th 1094 (10th Cir. 2025) (denying Rule 29 motion because "it appears that the basis for Mr. Thompson's constitutional challenge to § 922(g)(1) was reasonably available or known to Mr. Thompson prior to trial and could have been resolved without a trial on the merits."); *United States v. Wagoner*, No. 20 Cr. 18 (EKD), 2022 WL 17418000, at *3 (W.D. Va. Dec. 5, 2022) ("[T]o the extent Wagoner's motion alleges that § 922(g)(1) is unconstitutional (either facially or as applied to him), it necessarily alleges a defect in the indictment and thus must comply with the timing requirements of Rule 12."); *United States v. Gilmore*, No. 17 Cr. 134 (FDW), 2018 WL 2905766, at *3 (W.D.N.C. June 11, 2018), *aff'd sub nom. United States v. Gutierrez*, 963 F.3d 320 (4th Cir. 2020) ("Since Defendant Gilmore first raised these [constitutional statutory] issues in her first Rule 29 motion . . . rather than in a pretrial motion, the Court deems this motion to dismiss the Indictment untimely.").

Similarly, a Rule 29 motion must be denied where it effectively seeks to assert an after-the-fact challenge to the district court's jury instructions. *See, e.g.*, *Watson*, 2025 WL 510814, at

11

*4 (holding that the "only permissible basis for a Rule 29 motion is insufficiency of the evidence . . . [s]o, Rule 29 is an inappropriate vehicle for challenging jury instructions"); *Goklu*, 2023 WL 184254, at *5; *see also United States v. Rivers*, 108 F.4th 973, 985 (7th Cir. 2024) (Kirsch, J., concurring) ("The jury instruction conference, not a general Rule 29 motion for judgment of acquittal, was Tucker's opportunity to object to the 'in relation to' definition used at trial.").

Here, although the defendant pays lip service to the phrase "insufficient evidence," the vast majority of the defendant's arguments are not Rule 29 arguments. Instead, with the exception of the defendant's arguments regarding the sufficiency of the evidence, the defendant's "Rule 29" arguments all concern the proper statutory construction of the Mann Act. Specifically, the defendant raises—for the first time—various due process, federalism, and First Amendment concerns regarding the Mann Act. (Def. Mem. 14). The defendant then asks the Court to interpret the Mann Act to apply narrowly to only a specific class of defendants, which would exclude the defendant—specifically, only those that have a commercial motive or who have "sex with the adult 'prostitute'" and only those who do not film the interaction. (*Id.* at 2, 14, 32). But these are arguments that should have been brought under Rule 12 or at the jury charge conference. They are not Rule 29 insufficiency arguments.

To the extent that the defendant believed that the Mann Act properly interpreted did not apply to the defendant's own conduct, that argument was fully available to the defendant pretrial. The operative Indictment made clear that the defendant filmed certain of the acts of prostitution for which he was charged. (Indictment ¶ 12(b)). The Indictment also nowhere alleged that the defendant had a commercial motive to engage in the offense or that he had "sex with the adult 'prostitute.'" (Indictment ¶ 12(b)). Thus, the basis for the defendant's newly asserted vagueness, substantive due process, and First Amendment arguments were all reasonably available to the

defendant based on the face of the Indictment and should have been raised pretrial, if at all, under Rule 12(b)(3)(B)(v) for failure to state an offense. *See* Fed. Crim. R. 12(b)(3) (providing that failure to state an offense argument must be raised "by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits"). Having not done so, these claims are now untimely and should be denied. *See United States v. Kelly*, 128 F.4th 387, 420 (2d Cir. 2025) ("Because Kelly did not argue, much less demonstrate, good cause for failing to raise a pretrial challenge to his indictment, his argument, in addition to being untimely, was forfeited."), *cert. denied*, No. 24-1172, 2025 WL 1727414 (U.S. June 23, 2025); *Kelly*, 609 F. Supp. 3d at 140; *Gilmore*, 2018 WL 2905766, at *3.

In addition, even assuming that these statutory interpretation arguments were not suitable for a Rule 12 motion—which they were—the defendant should have, at the very least, raised them at the time of the Court's jury charge conference. *See Rivers*, 108 F.4th at 985. Instead, the defendant not only did not raise these arguments at that time, but invited certain of the alleged "errors" about which he now complains. *See Slifer v. CG Tech., L.P.*, No. 14 Civ. 9661 (ALC), 2017 WL 3106438, at *7 (S.D.N.Y. June 13, 2017) ("[P]arty that invited or provoked the district court to commit a particular error may not complain of the error after the fact"). For example, and as discussed further below, while the defendant now argues that the defendant's conduct does not fit the proper definition of "prostitution," the defendant never raised this "proper definition" prior to the jury charge being issued and, in fact, *advocated* for the exact definition of prostitution that the Court provided to the jury. (*Compare* Def. Request to Charge, Dkt. 273, at 52, *with* Tr. 8030) (defining prostitution as "the practice or an instance of engaging in sexual activity for money or its equivalent."). Under these circumstances, the defendant should not be permitted to seek relief based on alleged errors that he himself invited or provoked. *See United States v. Mitchell*, 811 F.

13

App'x 50, 52 (2d Cir. 2020) (challenge to jury instruction waived where defendant stated that the district court's proposed instructions were "fine" and "right in terms of what our defense is"); *Henry v. Dinelle*, 557 F. App'x 20, 22 (2d Cir. 2014) (holding that defendant cannot challenge jury instructions that he requested and approved). Further, the defendant should not now—after the jury has already convicted him of the Mann Act charges—be allowed to package these claims as insufficiency arguments and "to end run the procedural requirements of challenging the Court's interpretation of [the Mann Act] and its instructions to the jury on that crime." *Goklu*, 2023 WL 184254, at *5; *see Watson*, 2025 WL 510814, at *4.

The defendant downplays his failure to object to any of the district court's jury instructions on these newly asserted bases by claiming, in a footnote, that "[t]he sufficiency of the evidence is assessed based on the correct interpretation of the statute of conviction, not the jury instructions at trial." (Def. Mem. 13 n.11). In support of this argument, the defendant cites to the Supreme Court's decision in *Musacchio v. United States*, 577 U.S. 237, 243 (2016), and the Second Circuit's vacated decision in *United States v. Blaszczak*, 947 F.3d 19, 31 (2d Cir. 2019), which relies on *Musacchio*. But *Musacchio* merely stands for the proposition that on appeal, "[a] reviewing court's limited determination on sufficiency review [] does not rest on how the jury was instructed" where the court improperly added an extra element to the jury charge. *See Musacchio*, 577 U.S. at 243. It does *not* stand for the proposition that a defendant can backdoor a waived challenge to the court's jury instructions through a Rule 29 motion for insufficient evidence. To permit otherwise would allow a defendant to waste court and jury resources by waiting only until after the jury convicted him to make a full-throated objection to the court's instructions on the relevant

violation.[2]  Thus, even without reaching the merits, the Court should deny all of the defendant's arguments—with the exception of those in Sections I.C. and III of the defendant's motion—on this basis alone.

### 2.  The Mann Act Covers the Conduct of Conviction

Even if addressed on the merits, the defendant's statutory arguments fail.  The Mann Act criminalizes transportation for the purpose of "prostitution."  The ordinary meaning of the term "prostitution" includes engaging in sex for money or its equivalent—a definition supported by the case law.  The defendant argues that the Court should stray from the plain text of the Mann Act and precedent by narrowly construing the term "prostitution" to "apply only to defendants who have a commercial motive or—at the very least—only to johns who pay a prostitute to have sex with the john" in order to avoid alleged constitutional concerns.  (Def. Mem. 14).  But constitutional avoidance is not appropriate where the meaning of a statute is clear, as is the case here.  And even if the Court were to consider this canon, there are simply no constitutional problems to avoid, as the defendant's vagueness, substantive due process, federalism, and First Amendment concerns are baseless.

### a. Relevant Background

Under the Mann Act,

> [w]hoever knowingly transports any individual in interstate or foreign commerce . . . *with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense*, or attempts to do so, shall be fined under this title or imprisoned not more than 10 years, or both.

---

[2] The defendant also spends pages on what appears to be a claim of selective enforcement.  (*See* Def. Mem. 1, 10-13).  But a claim of "selective or vindictive prosecution" is properly raised under Rule 12, not Rule 29.  *See* Fed. R. Crim. P. 12(b)(3)(A).  Moreover, this claim was already raised by the defendant in a Rule 12 motion and was fully rejected by this Court.  (Dkt. 153).

18 U.S.C. § 2421(a) (emphasis added).  The text of the statute provides two alternative ways of violating the Mann Act: (1) transporting an individual with the intent that they engage in prostitution; or (2) transporting an individual with the intent that they engage in any sexual activity for which any person can be charged with a criminal offense.  With respect to the former, the statute does not define the term "prostitution."  With respect to the latter, the term "sexual activity for which any person can be charged with a criminal offense" is a catch-all clause incorporating state sex crime offenses.  *See* Leonard B. Sand et al., 3 Modern Federal Jury Instructions: Criminal, ¶ 64.04, Instr. 64-18 cmt. ("It is clear that the statutory phrase 'any sexual activity for which any person can be charged with a criminal offense' incorporates state sexual abuse offenses.").

In this case, the defendant was charged with transporting individuals for the purpose of prostitution.  (*See* Indictment ¶¶ 18, 20 (alleging that the defendant "knowingly transported individuals in interstate and foreign commerce with intent that the individuals engage in *prostitution*, and attempted, aided and abetted, and willfully caused the same") (emphasis added)).[3] The Court instructed the jury on the definition of prostitution as proposed by the defendant, explaining that prostitution is "the practice or an instance of engaging in sexual activity for money or its equivalent."  (Def. Request to Charge, Dkt. 273, at 52; Tr. 8030).  The jury thus convicted the defendant on Counts Three and Five based on the definition for prostitution provided by the defendant.

---

[3] As set forth above, the defendant was charged with violating the Mann Act both substantively and on aiding and abetting and willfully causing theories, but the defendant's arguments focus only on the defendant's direct liability.  There can be no question, however, that the defendant aided and abetted and willfully caused Ventura and Jane to transport individuals for purposes of prostitution.  *See supra* pp. 3-6.

### b. The Court's Definition of "Prostitution" Was Appropriate

At the defendant's request, the Court defined prostitution as "the practice or an instance of engaging in sexual activity for money or its equivalent." (Tr. 8030). Not only did the defendant waive any argument as to the appropriateness of this definition, this definition—which clearly encompasses the defendant's conduct—was proper and consistent with the text of the statute and federal case law interpreting the Mann Act.

Because the Mann Act does not define "prostitution," the Court must first look to the term's ordinary meaning. *See, e.g.*, *Taniguchi v. Kan Pac. Saipan, Ltd.,* 566 U.S. 560, 566 (2012) (noting that "[w]hen a term goes undefined in a statute, we give the term its ordinary meaning."); *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 407 (2011). The Supreme Court has long been clear on the meaning of the term "prostitution." In *Cleveland v. United States*, 329 U.S. 14, 17 (1946), the Court explained that prostitution "normally suggests sexual relations *for hire*." (emphasis added); *see also id.* at n.3 (defining prostitution as "'[t]he offering of the body to indiscriminate lewdness for hire (esp. as a practice or institution); whoredom, harlotry.' 8 Oxford English Dictionary 1497."). Current common dictionaries similarly define prostitution as engaging in sex for money or other payment. *See* Black's Law Dictionary (12th ed. 2024) (defining "prostitution" as "[t]he practice or an instance of engaging in sexual activity for money or its equivalent; commercialized sex"); American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=prostitution (last visited Aug. 20, 2025) (defining prostitution as "[t]he practice of engaging in sex acts in exchange for money[;] [t]he criminal offense of engaging in or offering to engage in sex in exchange for money"); Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/prostitution (last visited Aug. 20, 2025) (defining prostitution as "[t]he act or practice of engaging in sex acts and especially sexual intercourse in exchange for pay"); Oxford English Dictionary, https://www.oed.com/dictionary/prostitution

_n?tab=meaning_and_use#27929341 (last visited Aug. 20, 2025) (defining prostitution as "the practice or occupation of engaging in sexual activity with someone for payment").

Indeed, the term "prostitution" is so well understood that Sand provides that "it should not be necessary to provide any [] definition" of the term to the jury. Sand, 3 Modern Federal Jury Instructions: Criminal, ¶ 64.01, Instr. 64-4 cmt; *see also id.* ("If the court chooses to define the term, the following, based on the statutory definition of a 'commercial sex act' in 18 U.S.C. § 1591, is recommended: 'Prostitution means engaging in sexual activity on account of which anything of value is given to or received by any person.'");[4] *see also* 2B Fed. Jury Prac. & Instr. § 60:05 (6th ed.) (defining prostitution as "offering money in return for any sexual act"). That definition also comports with other jury instructions provided in the District. *See, e.g.*, *United States v. Purcell*, No. 18 Cr. 81 (DLC), Tr. at 660 (Oct. 18. 2018) ("Prostitution is the practice of engaging in sexual activity for money or its equivalent."). The Court's definition appropriately captured the ordinary, well-accepted meaning of "prostitution," and the statute provides no reason to depart from this definition. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (noting that in interpreting a statute, the court's "inquiry must cease if the statutory language is unambiguous").

### c. The Court Should Decline to Employ the Doctrine of Constitutional Avoidance

While the defendant acknowledges this commonly accepted definition of prostitution, (Def. Mem. 15 ("In modern times, the commonly understood meaning of 'prostitution' is 'sex for money.'")), he nevertheless seeks to narrow that definition to elide his own criminal conduct. To do so, the defendant argues that the Court should employ the canon of constitutional avoidance to construe the Mann Act "*not* to cover non-commercial conduct by mere johns—especially where

---

[4] Section 1591(e)(3) defines "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person." Most recently, in *United States v. Raniere*, 55 F.4th 354 (2d Cir. 2022), the Circuit held that a "anything of value," as used to define commercial sex act, "need not have a monetary or financial component." *Id*. at 362.

those johns do not even intend to have sex with the 'prostitute,'" which he claims will avoid alleged due process vagueness, substantive due process, First Amendment, and federalism concerns. (Def. Mem. 26) (emphasis in original). But constitutional avoidance is not appropriate where, as here, the text of a statute is clear, and nothing in the Constitution mandates the defendant's tortured proposed definition.

### (1) The Mann Act Is Unambiguous

The defendant argues that the Court should limit the definition of "prostitution" to avoid alleged constitutional concerns. For the reasons described below, *see infra* Section I.B.2.c, no such concerns exist. However, the Court need not even consider these theoretical constitutional issues because the definition of prostitution is unambiguous. Under the canon of constitutional avoidance, when "a serious doubt is raised about the constitutionality of an Act of Congress," courts "will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). But, as the Supreme Court has explained, "[t]he canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Id.* In other words, the "canon has no application in the absence of statutory ambiguity." *United States v. Palomar-Santiago*, 593 U.S. 321, 329 (2021).

Here, the Supreme Court has explicitly held that "[t]here is no ambiguity in the terms" of the Mann Act. *Caminetti v. United States*, 242 U.S. 470, 485 (1917). The Mann Act criminalizes transportation for the purpose of prostitution, and as described above, a textual analysis makes clear that prostitution includes "engaging in sexual activity for money or its equivalent." *See supra* Section I.B.2.b. The defendant's suggested limitations to the definition of prostitution—to those who are motivated by financial gain or those who themselves engage in sexual activity with an escort—find no support in the text of the statute or case law.

*First*, the Court should reject the defendant's invitation to limit the definition of prostitution solely to those who are seeking financial gain. Unlike the unlawful sexual activity language of the Mann Act, the prostitution provision of the Mann Act criminalizes commercial sex and is not limited to an individual who *profits* from sexual activity, but, rather, extends to individuals, like the defendant, who *pay* for that activity. *See Cleveland*, 329 U.S. at 18 ("Prostitution . . . normally suggests sexual relations for *hire*") (emphasis added). There is no requirement in the text or in the case law that defendants must have an independent profit motive in order to violate the Mann Act.

In *Caminetti*, the Supreme Court held that defendants convicted of Mann Act offenses need not "expect[] pecuniary gain." 242 U.S. at 486. In that case, the defendants argued that their conduct was "not within the purview of the statute," since, as they contended, "the act of Congress is intended to reach only 'commercialized vice,' or the traffic in women for gain." *Id.* at 484-85. The Supreme Court rejected this argument wholesale, finding that "[t]here is no ambiguity" that the act does not require that the defendant be motivated by financial gain. *Id.* at 485-86. This holding was affirmed by the Supreme Court 30 years later. *See Cleveland*, 329 U.S. at 17 (reaffirming *Caminetti* and holding, in the context of an immoral purpose case, that there is "no indication that a profit motive is a sine qua non to [the Act's] application").

In the decades since, courts have similarly concluded that the Mann Act does not require a commercial profit or motive. *See, e.g.*, *Mi Sun Cho*, 713 F.3d at 719-21 (upholding defendant's Mann Act conviction without any evidence that the defendant profited from the conduct); *United States v. Wheeler*, 444 F.2d 385, 387 (10th Cir. 1971) ("[E]ven though Wheeler may not have received any proceeds from the women's practice of prostitution, . . . such proof is not necessary for a conviction under the [Mann] Act."); *Forrest v. United States*, 363 F.2d 348, 349 (5th Cir. 1966) (upholding Mann Act conviction where the defendant had no commercial motive).

Nevertheless, in an effort to circumvent these holdings, the defendant argues that *Caminetti* and *Cleveland* were "effectively overruled" by the 1986 amendment, which replaced the "debauchery" and "immoral practice" language from the statute with "any sexual activity for which any person can be charged with a criminal offense." (Def. Mem. 15).[5] However, the "prostitution" language of the statute—under which a defendant in *Caminetti* was charged—remained unaffected by the 1986 amendment. And while the 1986 amendment to the statute substituted the terms "debauchery" and "immoral purpose" with "any sexual activity for which any person can be charged with a criminal offense," nothing in these amendments altered the Supreme Court's holding that the statute, which criminalized transportation for the purposes of prostitution, was unambiguous.[6]

---

[5] The defendant suggests that *Caminetti* only related to the "debauchery" and "immoral purposes" language in the Mann Act. (Def. Mem. 14). However, one of the *Caminetti* defendants was charged with inducing a woman to travel across state lines to "engage in *prostitution*, debauchery, and other immoral practices." 242 U.S. at 484 (emphasis added). The evidence adduced at trial indicated that that defendant paid the woman "[d]uring the period of their illicit relations." *Hays v. United* States, 231 F. 106, 108 (8th Cir. 1916). Accordingly, the Supreme Court's analysis in *Caminetti* appeared to interpret the statute as a whole, rather than just the "debauchery" and "immoral purpose" language. *Caminetti*, 242 U.S. at 485 ("There is no ambiguity in the terms of this act. It is specifically made an offense to knowingly transport or cause to be transported, etc., in interstate commerce, any woman or girl for the purpose of prostitution or debauchery, or for 'any other immoral purpose,' or with the intent and purpose to induce any such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice.").

[6] In further support of his argument, the defendant cites to the Supreme Court's per curiam opinion in *Amadio v. United States*, 348 U.S. 892 (1954). Yet, far from overruling *Caminetti* and *Cleveland*, *Amadio* did not refer to either case and provided no explanation for its reversal. Rather, it appears clear from the cases' procedural history—including a dissenting opinion in the Seventh Circuit in the case below—that the underlying indictment had failed to "comport with language contained in the statute." *See United States v. Amadio*, 215 F.2d 605, 615 (7th Cir. 1954), *rev'd*, 348 U.S. 892 (1954) (Major, C.J., dissenting) (noting that "each count in question goes far beyond the statutory provisions" of the Mann Act). The *Amadio* case therefore does not speak at all to the proper purview of the statute.

*Second*, the defendant's proposed limitation of the Mann Act to "johns who pay a prostitute to have sex with the john" similarly does not exist in the text. (Def. Mem. 14). Courts have held that the Mann Act applies to those who do not participate directly in sex acts and who do not financially benefit from the prostitution. *See, e.g.*, *Mi Sun Cho*, 713 F.3d at 719 (upholding defendant's Mann Act conviction even though defendant did not directly engage in any sex acts); *United States v. Tills*, No. 08 Cr. 242 (WMS) (W.D.N.Y.), Dkt. 21, at 8 (defendant did not profit financially from prostitution and transported women to engage in paid sex acts with others); *Forrest*, 363 F.2d at 349 (upholding Mann Act conviction where the defendant did not engage directly in the relevant sex acts).

Because the text of the Mann Act is unambiguous, the Court should decline to employ constitutional avoidance to artificially limit the definition of "prostitution."

### (2)   The Mann Act Does Not Present Constitutional Concerns

Even if this Court were to consider applying the constitutional avoidance canon after conducting a textual analysis of the Mann Act, it should not apply the doctrine because there are no constitutional concerns to avoid.

### (a)   There Are No Due Process Vagueness Concerns to Avoid

The defendant argues that the Court should narrowly construe the term "prostitution" to avoid concerns that the Mann Act is unconstitutionally vague as applied to his conduct. (Def. Mem. 15). That argument fails because no such concerns exist.

Under the void-for-vagueness doctrine, a criminal statute violates the Due Process Clause if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Rubin v. Garvin*, 544 F.3d 461, 467 (2d Cir. 2008). "When the challenge is vagueness 'as-applied', there is a two-part test: a court must first determine whether the statute gives the person of ordinary

22

intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." *Farrell v. Burke*, 449 F.3d 470, 486 (2d Cir. 2006). Since the "statute is judged on an as applied basis, one whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness." *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993).[7]

Here, the "common sense interpretation" of the term prostitution is unquestionably clear. *Nadi*, 996 F.2d at 550. For all the reasons described above, the term connotes sex for payment or its equivalent, just as the Court instructed the jury. There is no doubt that the defendant transported escorts with the intent that they engage in sex acts for pay. Nor is there any doubt that the defendant knew what he was doing was illegal, given his inquiries to the sex workers about whether they were law enforcement. (*See, e.g.*, GX 3A-111; GX 1308; Tr. 530-31, 628-29). The defendant transported individuals for the purpose of prostitution on hundreds of occasions over the course of decades, and paid thousands of dollars for their services on each occasion either personally or through Ventura or Jane. (Tr. 479, 531-33, 4738-39, 4744, 4814-18, 4737-38). It is also clear that the defendant hired escorts for sexual acts, and not, as he continues to protest, for their time. When escorts had difficulty performing sexually, they were paid less or even dismissed. (Tr. 272-74, 530, 566-67, 1913-15; *see also* GX A-103). When escorts did not perform sexually as directed by the defendant, such as by ejaculating before the defendant told them to do so, they were paid less. (Tr. 561). The evidence could not be clearer that the defendant engaged in commercial activity by

---

[7] While the defendant appears to argue that the Mann Act is unconstitutional as applied to his conduct, he does not argue that the statute is unconstitutionally vague on its face. Nor can he. In order to "succeed on a facial challenge, the challenger must establish that *no set of circumstances* exists under which the Act would be valid." *United States v. Concepcion*, 139 F.4th 242, 249 (2d Cir. 2025) (emphasis in original). By arguing that constitutional avoidance is appropriate, the defendant has conceded that there are at least some set of circumstances in which the Mann Act is valid.

repeatedly hiring escorts for Freak Offs and transporting them interstate for that purpose. Thus, since the defendant's "conduct is clearly proscribed by the statute," he "cannot successfully challenge it for vagueness." *Nadi*, 996 F.2d at 550.

The defendant's argument that the Mann Act is vague hinges on the fact that the statute does not contain a definition of the term "prostitution." (Def. Mem. 16). But as the Second Circuit has held, "a statutory term is not impermissibly vague simply because it lacks a statutory definition." *Concepcion*, 139 F.4th at 250; *see also United States v. Wedd*, 993 F.3d 104, 124 (2d Cir. 2021) (same); *Arriaga v. Mukasey*, 521 F.3d 219, 222-23, 227-29 (2d Cir. 2008) (same). Even in such cases, "the plain meaning of the statute's wording," along with other factors such as "the use of familiar legal concepts" and a "scienter requirement," can defeat a vagueness challenge. *Concepcion*, 139 F.4th at 250. For the reasons described above, the plain meaning of the term "prostitution" is clear. *See supra* Section I.B.2.b; *see also* Sand, 3 Modern Federal Jury Instructions: Criminal, ¶ 64.01, Instr. 64-4 cmt. ("The term 'prostitution' is of sufficiently general understanding that it should not be necessary to provide any further definition."). This is far afield from instances in which courts have invalidated language in statutes as unconstitutionally vague. For example, "the Supreme Court has 'struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.'" *Concepcion*, 139 F.4th at 249 (quoting *United States v. Williams*, 553 U.S. 285, 306 (2008)). In addition, the Mann Act contains a common scienter requirement: that the defendant must "knowingly" transport an individual in interstate or foreign commerce "with intent" that the individual engage in an act of prostitution. 18 U.S.C. § 2421(a); *see also Concepcion*, 139 F.4th at 250 (finding that scienter requirement that defendant must know or recklessly discard a certain fact "help[ed] to mitigate a

law's vagueness").  Accordingly, the Mann Act does not present the kind of serious vagueness concerns that would be warranted in order for the Court to employ constitutional avoidance and narrow Congress's clear text.  *See Scott v. United States*, No. 05 Cr. 443, 2015 WL 4950033, at *3 (M.D. Pa. Aug. 19, 2015) (rejecting argument that Mann Act was void for vagueness and finding that the statute "defines the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited[, and] does not encourage arbitrary or discriminatory enforcement."), *aff'd*, 664 F. App'x 232 (3d Cir. 2016).

Ignoring the ordinary meaning of the term "prostitution" and federal case law about that term, the defendant instead relies on state and local laws—from Minnesota to Massachusetts to Texas to Washington—to argue that the meaning of the term prostitution is "amorphous" and that the Court should interpret prostitution not to apply to "voyeuristic conduct like that at issue here." (*See* Def. Mem. 16-23).  The defendant is wrong as a matter of fact and law.  As an initial matter, the ordinary meaning of the term "prostitution" as including sex for money or other payment is clear for the reasons described above.  That definition does not require direct participation in the sex act.  In addition, the definition of prostitution under *state* law is entirely irrelevant to this case. The Mann Act offenses in the instant case were charged only under the prostitution provision of the Mann Act, without any reference to the provision of the statute that incorporates state law. (*See* Indictment ¶¶ 18, 20).  Thus, the definition of "prostitution" under the Mann Act is not circumscribed by state law, but rather, by the federal jurisprudence detailed above.[8]  And the

---

[8] And, even if the Court were to look to state law in its vagueness analysis, the defense's argument would similarly be unavailing.  The relevant state jurisdictions consistently define prostitution as sex for money or other consideration.  *See* N.Y.P.L. § 230.00 ("A person is guilty of prostitution when such person engages or agrees or offers to engage in sexual conduct with another person in return for a fee."); Cal. P. Code §  647(b)(4) ("'[P]rostitution' includes any lewd act between persons for money or other consideration."); Florida Stat. § 796.07(1)(d) ("'Prostitution' means

federal definition of prostitution has been found to encompass circumstances where the defendant neither profits from the intended prostitution *nor* directly engages in the sexual conduct, as discussed above. *See Mi Sun Cho*, 713 F.3d at 719; *Forrest*, 363 F.2d at 349. This commonsense understanding of the Mann Act—that the statute's two intent provisions serve distinct purposes—also vindicates "the cardinal rule that, if possible, effect shall be given to every clause and part of a statute." *United States v. Robinson*, 702 F.3d 22, 32 (2d Cir. 2012) (citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)); *see also Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("[A] statute ought . . . to be so construed that . . . no clause, sentence, or word shall be superfluous, void, or insignificant."); *United States v. Tyson*, 947 F.3d 139, 145 (3d Cir. 2020) (noting that the defendant was "indicted on a prostitution charge rather than under the catch-all category. Adopting Tyson's approach would deprive the term "prostitution" of meaning since § 2423(a) already prohibits sexual activity that constitutes a criminal offense.").

Further, while the defendant may wish to cabin his participation to mere voyeurism, he was, in reality, an active participant in the sexual activity. The defendant's argument is premised on the idea that he did not *himself* participate in sexual activity. However, as described above, the defendant fully participated in the sexual activity with escorts by directing the sexual conduct between escorts and victims and masturbating throughout the sexual episode. (Tr. 565, 569-71, 4625-26, 4818). The defendant at times also participated in the sex acts, by for example, engaging in oral sex with Ventura while an escort was penetrating her. (Tr. 560, 565). And at the defendant's direction, Ventura and Jane did not clean up the escorts' semen and put it on the

---

the giving or receiving of the body for sexual activity for hire but excludes sexual activity between spouses.").

defendant's body before engaging in sex with him.  (Tr. 561, 4627).  Under any proper definition

of prostitution, the defendant's conduct was well within its scope.[9]

### (b)  There Are No Substantive Due Process Concerns to Avoid

The defense next takes aim at the Mann Act generally, arguing that the statute poses

substantive due process concerns and should be construed narrowly as a result.  (Def. Mem. 23).

Specifically, the defendant complains that recent expansions of sexual rights under federal law,

including in the Supreme Court's cases in *Lawrence* and *Obergefell*, which expanded the rights

afforded to same-sex partners, are "hard to square" with criminalizing "a person's decision to pay

another *adult* for sex."    (*Id.* (emphasis in original)).    The defendant is mistaken.    The

constitutionality of the Mann Act has been long been affirmed based on Congress' power to

regulate interstate commerce.  *Caminetti*, 242 U.S. at 491.  And the Supreme Court's more recent

holdings expressly do not alter that analysis.  *See Lawrence v. Texas*, 539 U.S. 558, 560 (2003)

(noting that "[t]his case does not involve minors, persons who might be injured or coerced, those

who might not easily refuse consent, or public conduct or *prostitution*." (emphasis added)); *see

also United States v. Clark*, 582 F.3d 607, 614-15 (5th Cir. 2009) (concluding that Section 1328

(importation of alien for the purpose of prostitution) remains constitutional following *Lawrence*);

*United States v. Chen*, No. 21 Cr. 250 (JRT/TNL), 2023 WL 3597904, at *11 (D. Minn. May 23,

2023) (declining to extend *Lawrence* to commercial sex and denying motion to dismiss count

brought under Section 2421).

---

[9] The defendant also suggests that he is "the only person ever convicted of violating the [Mann Act] for conduct anything like this."  (Def. Mem. 1).  Regardless of whether this is true, it would not render the statute vague as to the defendant.  *United States v. Neely*, 124 F.4th 937, 945 (D.C. Cir. 2024) ("Supreme Court precedent teaches that the presence of enforcement discretion alone does not render a statutory scheme unconstitutionally vague.  This is because the Department of Justice's interpretation of a statute does not elucidate legislative intent at enactment. '[C]riminal laws are for courts, not for the Government, to construe.'") (quoting *Abramski v. United States*, 573 U.S. 169, 191 (2014)) (internal quotations and citations omitted)).

### (c)   There Are No Federalism Concerns to Avoid

Similarly, the defendant's argument that the Mann Act should be construed narrowly to avoid federalism concerns should be rejected out of hand. (Def. Mem. 24). Section 2421 contains an interstate commerce element, and it is well established that Congress's power over interstate commerce is "complete in itself" and cannot be diminished by the exercise or non-exercise of the states' police powers. *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119 (1942). There is therefore simply no basis to suggest that the terms of the Mann Act pose any federalism concerns.

### (d)   There Are No First Amendment Concerns to Avoid

Finally, the defendant argues that the Court should employ the canon of constitutional avoidance to avoid First Amendment concerns. (Def. Mem. 24). For the reasons described below, the Mann Act does not implicate First Amendment concerns whatsoever. *See infra* Section I.B.3.

### 3.   The Defendant's Purported First Amendment Concerns Are Meritless

The defendant twists the record beyond recognition in order to claim that his Mann Act convictions run afoul of the First Amendment. Putting aside the fact that the defendant's failure to make this argument previously is grounds to reject it entirely here, neither the facts nor the law support his argument. Indeed, as detailed above, the record shows that the defendant was anything but a producer of adult films entitled to First Amendment protection—rather, he was a voracious consumer of commercial sex, paying male commercial sex workers on hundreds of occasions to have sex with his girlfriends for his own sexual arousal. Moreover, the conduct proscribed by the Mann Act—causing the interstate transportation of an individual for the purpose of prostitution— is not entitled to First Amendment protection.

For both Ventura and Jane, Freak-Offs followed a similar pattern as described at length above: the defendant decided that he wanted a Freak-Off; then the defendant, Ventura, or Jane

would book a male commercial sex worker; the defendant or his staff arranged a hotel room and set it up with supplies including baby oil, Astroglide, and red lights or candles; the defendant provided Ventura and Jane, and sometimes the male commercial sex workers, drugs including ecstasy, cocaine, and ketamine; and the defendant directed Ventura and Jane to have sex with the male commercial sex workers for hours, and sometimes days, while the defendant directed the specific sex acts and masturbated while he watched.  The defendant at times also directly participated in the sexual activity.  (Tr. 560, 565).  Freak-Offs were solely for the defendant's sexual arousal and gratification—neither Ventura nor Jane enjoyed having sex with strangers in front of the defendant.  (*See, e.g.*, Tr. 409, 5911).

The defendant's First Amendment argument is grounded in his occasional filming of Freak Offs, but the record does not support the arguments that he makes.  In fact, many Freak Offs were not filmed at all.  For instance, Daniel Phillip, who testified that he was paid to have sex with Ventura while the defendant watched on multiple occasions, estimated that the defendant filmed the encounters only once or twice.  (Tr. 266).  And Sharay Hayes, another commercial sex worker that the defendant paid to have sex with Ventura—and upon whose testimony the defendant relies to argue that his conduct was protected by the First Amendment (Def. Mem. 36-37)—was *never filmed* by the defendant at all.  (Tr. 1937).

Far from acting like an adult film producer or director, the defendant did not provide advance notice that he may film the sexual encounter and did not seek consent from the participants to be filmed.  In fact, multiple participants specifically did *not* want to be filmed.  For example, Ventura testified that the defendant started filming Freak Offs without asking her.  (Tr. 569).  Ventura emphatically did not want there to be video footage of her having sex with strangers and attempted to delete such footage because she found it "[h]umiliating.  Disgusting.  I never wanted

29

anyone to ever see me like that.  It just was not OK for me, and I felt, like, it was just tossed around, like the idea of it was tossed around like it was nothing . . .  Objectifying me and putting me in these really compromising gross positions with strangers."  (Tr. 570-71, 936).  In Freak Offs with Jane, too, the defendant did not advise Jane or the male commercial sex worker that he planned to film them having sex—instead, he just did it.  (Tr. 4818).[10]  In fact, during a Freak Off with Jane, one commercial sex worker told the defendant that he did not want to be filmed and the defendant turned the camera off.  (Tr. 4770).  But that was not the end of the encounter—Jane still ended up having sex with the commercial sex worker while the defendant watched and masturbated.  (*Id.*)  This underscores the purpose of Freak Offs—which was for the defendant to experience sexual arousal while male commercial sex workers had sex with his girlfriend in exchange for payment.  The filming was incidental.

So when the defendant arranged for Ventura, Jane, and commercial sex workers to travel throughout the country for Freak Offs, he intended that they "engage in prostitution."  The Mann Act prohibits this very conduct.  18 U.S.C. § 2421.  Occasionally filming Freak Offs does not cloak this unlawful transport with First Amendment protection.  *See, e.g.*, *California v. Freeman*, 488 U.S. 1311, 1313 (1989) (O'Connor, J.) ("[O]therwise illegal conduct is not made legal by being filmed.").

Nor does the defendant explain how filming Freak Offs constitutes "expressive conduct" warranting First Amendment protection.  *See, e.g.*, *Jones v. Schneiderman*, 974 F. Supp. 2d 322,

---

[10]  The defendant used Freak Off films as blackmail to make Ventura and Jane continue participating in Freak Offs.  (Tr. 701-02 (the defendant showed Ventura film of a Freak Off and told her that he was "going to embarrass [her] and release them"); GX B-315 ("The threats that have been made towards me by Sean "Puffy" Combs are that . . . he is going to release 2 explicit sex tapes of me."); GX C-251 ("[N]ow he is threatening me and saying he would . . . expose my tapes and send them to my child's father.").

333-36 (S.D.N.Y. 2013) (noting that "[t]he central question" to determine whether the First Amendment protects conduct is "whether the activity is primarily communicative and expressive," which requires an intent to convey a "particularized message" along with a great likelihood that the message will be understood by those viewing it); *see also Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies."). Similar attempts to apply the First Amendment to protect acts of prostitution have failed. *See United States v. Thompson*, 458 F. Supp. 2d 730, 732-33 (N.D. Ind. 2006) ("Defendant fails to explain how her alleged actions in [Mann Act counts] are the kinds of expression that are protected by the First Amendment. . . . This failure is not surprising, though, as the Supreme Court has taught that acts of prostitution are not forms of protected expression."). And even if the defendant's conduct could be stretched enough to qualify as "expressive conduct," the Mann Act undoubtedly satisfies the test established by the Supreme Court in *United States v. O'Brien*, 391 U.S. 367 (1968), because it furthers the substantial governmental interest in controlling prostitution. *See, e.g.*, *Freeman*, 488 U.S. at 1313 ("I recognize that the State has a strong interest in controlling prostitution within its jurisdiction."); *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 583 (1991) (Souter, J., concurring in the judgment) (analyzing First Amendment challenge of public indecency statute under *O'Brien*, and finding that preventing prostitution, sexual assault, and other criminal activity was a "substantial" governmental interest).

Even if the record supported the defendant's argument that Freak Offs "are materially indistinguishable from . . . adult pornography," (Def. Mem. 41)—which it does not—the only federal court to consider the issue concluded that when a defendant transported an individual across state lines for the purpose of participating in sexual acts with the defendant for hire and for the

31

purpose of producing a movie depicting these acts, it violated the Mann Act.  *See United States v. Roeder*, 526 F.2d 736, 737 (10th Cir. 1975) *cert. denied*, 426 U.S. 905 (1976).  In *Roeder*, the court rejected the defendant's argument that since the purpose of the transportation was to make a movie, the Mann Act was not violated, finding that "the making of the movie does not serve to purge the transaction of its Mann Act character" and that "the First Amendment does not constitute a license to violate the law."  *Id.* at 738-39.  The defendant claims that *Roeder* is no longer good law following *People v. Freeman*, a state law case analyzing a California law prohibiting "pandering."  (Def. Mem. 35).[11]  But the *Freeman* court itself distinguished its facts from those in *Roeder*, making clear that it in no way disturbed *Roeder*.  The court in *Freeman* noted that the purpose of the Mann Act—directed at the conduct of transportation across state lines for the purpose of prostitution—is "quite removed from and has no direct impact upon First Amendment activities."  46 Cal.3d 419, 430 (Cal. 1988).  Moreover, the defendant offers no support for the proposition that a state court case analyzing a state law can overrule a federal court's analysis of a federal law.

Indeed, the state cases cited by the defendant are not binding on this Court, but of equal importance, do not support his position.  Both the *Freeman* and *Theriault* decisions cited by the defendant hinge on those courts' findings that pornography-producer defendants were not engaged

---

[11] The only authority the defendant cites in support of that assertion is a 2016 law review article, which is neither relevant nor persuasive on this point.  *See* Randazza, Marc. J., "The Freedom to Film Pornography," 17 Nev. L.J. 97 (2016).  Almost as an afterthought, the author puzzlingly concludes without explanation that *Roeder* "is either no longer good law, or is limited to its facts."  *Id.* at 133.  But more broadly, the article focuses on potential prosecution of *commercial* pornographers.  *See id.* at 100 ("First, we must ask whether commercial pornography fits the definition of 'prostitution' under state law.  If it does, we must then ask whether the state's free speech clause, or the First Amendment would tolerate prosecution of a commercial pornographer under that law.").  Here, there can be no credible argument that the defendant was a commercial pornographer; in fact, the evidence shows that he sometimes took pains to ensure that any films of Freak Offs were *not* widely distributed.  (*See, e.g.*, Tr. 672-73, 5150-51).

in prostitution, as defined by relevant state law.  *See Freeman*, 46 Cal.3d at 424-25 (when there was "no evidence that defendant paid the acting fees for the purpose of sexual arousal or gratification, his own or the actors'" and "did not himself participate in any of the sexual conduct," the defendant did not have "the requisite mens rea or purpose to establish procurement for purposes of prostitution"); *State v. Theriault*, 158 N.H. 123, 130 (N.H. 2008) (state penal code prohibiting prostitution was overbroad as applied to defendant who offered to pay two individuals fifty dollars per hour "to make pornography").  As discussed above, in this case, the defendant undoubtedly transported individuals, whom he paid, across state lines for the purpose of his own sexual arousal and gratification—in other words, for prostitution.

That the defendant sometimes filmed the sexual encounters or carefully choreographed the encounters does not turn him into an adult film producer.  In both the *Freeman* and *Theriault* cases, the defendants recruited or paid individuals for the explicit and sole purpose of acting in a pornographic film.  *See Freeman*, 46 Cal.3d at 422 (defendant hired porn actors through agency and paid each actor for his or her performance in the film); *Theriault*, 158 N.H. at 124, 130 (defendant asked couple if they wanted to make "f … flicks" and offered to pay them fifty dollars per hour while he videotaped them having intercourse).  In this case, of course, the defendant did no such thing.  There is no evidence in the record that, at the time of transport, the defendant intended to film anyone at all—instead, the record shows that at the time of transport, the defendant intended that Ventura, Jane, and the commercial sex workers would engage in prostitution.  And on the occasions in which he filmed Freak Offs, the defendant did not even bother to provide advance notice to the individuals he was filming or seek consent.

Freak Offs were designed specifically for the defendant's sexual arousal and gratification, which further distinguishes this case from the cases cited by the defendant.  The courts in both

33

*Freeman* and *Theriault* found the opposite—in neither case was there evidence that the defendant acted with the purpose of sexual arousal or gratification. *Freeman*, 46 Cal. 3d at 424-25; *Theriault*, 158 N.H. at 126. Here, the record is replete with evidence that the defendant orchestrated Freak Offs specifically for his own sexual arousal and gratification. (*See, e.g.*, Tr. 252 (defendant sat in the corner masturbating while Daniel Phillip and Ventura had sex); Tr. 558 (Ventura "describe[d] in detail what [she] saw" during Freak Offs even though it felt "pretty humiliating" because "[t]hat is what turned Sean on. That was his fantasy"); Tr. 1894 (while the defendant watched Ventura and Sharay Hayes have sex, the defendant masturbated); Tr. 4589 (during Jane's first Freak Off, she recalled the defendant watching her have sex with Don while the defendant watched and touched himself); Tr. 4623 (the defendant directed Jane during Freak Offs because "he really enjoyed watching" certain sex acts); GX AX-701-79B (the defendant refusing to let Jane use a condom because "I don't like to do it with all that shit"). Freak Offs were about what aroused the *defendant* in that moment—they were not about making "creative, intricate, and highly choreographed" amateur porn, as the defendant now suggests. (Def. Mem. 40).

### 4. There Was Sufficient Evidence for a Rational Jury to Find the Defendant Guilty of the Counts of Conviction

Applying the interpretation of prostitution under federal law, as described above, the question is whether the defendant transported individuals with the intent that they engage in acts involving sex for money. In doing so, "part of the defendant's conscious purpose in transporting [the victims] across state lines" must have been "to have one or [more] of them engage in prostitution. . . . It need not have been his only purpose or motivation, but it must have been more than merely incidental; it must have been one of the dominant purposes of the trip." *United States v. Miller*, 148 F.3d 207, 211-13 (2d Cir. 1998) (affirming convictions under 18 U.S.C. §§ 2422 and 2423 and approving the dual intent jury instruction, explaining that "in the context of multiple

purposes, 'dominant' simply means that these motivations predominate over other, less powerful motivations for conduct"); *see also, e.g.*, *United States v. Lebowitz*, 676 F.3d 1000, 1014 (11th Cir. 2012) (holding, for Section 2421, that "dual purposes are sufficient for a conviction, and we 'need not concern ourselves' with whether the illegal purpose was dominant over other purposes"); Sand, 3 Modern Federal Jury Instructions ¶ 64.01, Instr. 64-4 ("[I]t is not necessary for the government to prove that engaging in prostitution was the sole purpose for crossing the state line."). Construing all inferences in the Government's favor, the evidence more than demonstrated that the defendant transported the escorts, Ventura, and Jane intending that they engage in an act of prostitution.

Ventura and Jane testified that they had to participate in Freak Offs and hotel nights often—sometimes every week. (Tr. 483-84, 4756; *see also* Tr. 4594). The defendant, sometimes with help from Ventura, Jane, or his travel agent Jessica Ruiz, arranged for escorts to travel to the Freak Offs and hotel nights. (*See, e.g.*, Tr. 535, 540-42, 4737, 4754, 4761). When escorts arrived, the defendant sometimes required Ventura to ensure that they were not cops. (Tr. 530-31, 628-29). On at least one other occasion, a contact saved as "NY Strip" asked the defendant, "Hey, are you a cop!? . . . I was a little uneasy about meeting you, seems a bit too good to be true…," to which the defendant responded, "No man. Are crazy. [*sic*] No. Are you?" (GX 3A-111; GX 1308). During these nights, the defendant directed Ventura and Jane to engage in sex acts with male escorts while he watched and masturbated and engaged in sex acts himself with the women—sometimes simultaneously with the escort, other times after the escort was finished. (Tr. 557-61, 565, 4621-27). After the sex was complete, the defendant provided money to pay the escorts. (Tr. 531, 4738-39, 4744, 4814-18). The escorts were paid for participating in the Freak Offs and having sex with the women. (Tr. 533). The escorts were at times paid less or even sent away if they could

not perform sexually or if they did not perform in the way the defendant wanted.  (Tr. 530, 561, 566-67; *see also* Tr. 274, 1914-15).

The jury saw a variety of records that corroborated Ventura and Jane's testimony.  These records included text messages, travel records, hotel records, and financial records demonstrating that dozens of Freak Offs and hotel nights occurred that involved interstate travel.  (*See* GX 1402, 1406, 1407).  A juror could easily infer that based on this pattern—over a decade in which the defendant paid escorts to come to hotels where he directed them to engage in sex acts with Ventura and Jane—that when the defendant caused an escort, Ventura, or Jane to travel for a Freak Off or hotel night, at least one of his dominant purposes for such travel was that they engage in a commercial sex act.  In fact, given that some of the escorts *only* engaged in Freak Offs or hotel nights when they saw the defendant, it would be implausible to think that the defendant had any other purpose when causing such travel.  (*See* Tr. 256, 1900-02, 4748, 4762-63, 4809-10).

With all the inferences construed in the Government's favor, the evidence need only show that a reasonable juror could conclude that the defendant transported escorts for one Freak Off with Ventura and one hotel night with Jane in order to support his convictions on Counts Three and Five, respectively.  That standard is clearly met.  For example, with regard to Ventura, the jury heard evidence that in late August 2009, the defendant transported Jules Theodore from Los Angeles to Manhattan to participate in a Freak Off with Ventura.  (*See* GX 1402).  Ventura explained that Theodore was one of their regular escorts and that escorts were paid to have sex with her.  (Tr. 533, 537-38, 540).  On this particular occasion, the defendant texted Theodore in order to coordinate his travel, including providing Theodore with flight details for a flight from Los Angeles to New York and provided Theodore with the hotel number where the Freak Off was going to take place.  (GX 3A-107).  Because the defendant booked Theodore's services at the last

36

minute, the defendant told Theodore that Theodore's "tip" would "reflect that." (GX 3A-107).

After Theodore agreed, the defendant paid for Theodore to fly to New York City and to be

transported from the airport to the London Hotel in Manhattan. (GX 4A-124). A reasonable juror

could easily infer that the defendant transported Theodore intending that he engage in the Freak

Off and that this "tip" was part of his payment for the sex. Although this is all a reasonable juror

would need to conclude that the defendant was guilty of Count Three, it is far from the only time

that the defendant transported escorts, let alone Theodore, for the purpose of engaging in sex

during Freak Offs with Ventura. (*See* GX 1402; *see also, e.g.*, Tr. 537-38 (Ventura explaining that

Theodore participated in Freak Offs in Los Angeles, New York, Miami, and Las Vegas); GX 3A-

107 (defendant sending Theodore a flight itinerary for a roundtrip flight from Los Angeles to New

York in December 2009)).

      The evidence related to hotel nights with Jane was equally clear. Approximately 90% of

the time that Jane saw the defendant, there was a hotel night. (Tr. 4594). One of the regular escorts

at these nights was Kabrale Williams, who lived in Atlanta. (Tr. 4736). Because no hotel nights

took place in Georgia, Williams *always* traveled for these nights, including to Los Angeles, Miami,

and New York. (*See* Tr. 4736-37; GX 1406). At the end of each of these hotel nights, Williams

was paid thousands of dollars. (Tr. 4737-39). Sometimes Jane booked Williams' travel and was

reimbursed by the defendant. (Tr. 4733, 4736-37). Other times, the defendant arranged the travel

with Ruiz's help. (Tr. 4737; GX A-112). For example, for a November 9, 2021 hotel night, the

defendant used Ruiz to book Williams' travel for a hotel night at the L'Ermitage in Los Angeles,

including Williams' flight, travel from the airport, and hotel room. (GX 1407, A-112, A-112-A-

F; *see also* GX 7H-184 (L'Ermitage folio for stay reflecting room damage and cleaning fee)).

When faced with these facts, a reasonable juror could conclude that on at least one occasion, the defendant caused Williams to travel intending that he engage in an act of prostitution.

Williams is far from the only escort for whom this was the case. (*See* GX 1406). For instance, in January 2023, Williams, along with Paul Arthur and an escort named Reggie, traveled to Los Angeles for a hotel night at the London Hotel. (GX 1406, 1407). Jane called this night the "sobriety party"—the only time in which she tried to do a hotel night without drugs, in which the defendant forced her to continue having sex with escorts even after she threw up. (Tr. 5034, 5036-37). In order to book Reggie for the night, the defendant texted Bridget Kreshover, the owner of Cowboys 4 Angels, an escort service of which the defendant was a longtime customer. (Tr. 6943-45; GX A-103). When the defendant learned that Reggie had a client earlier in the day, he said, "damn we don't want a tired situation." (GX A-103). Kreshover assured the defendant that Reggie was "never tired" and made clear that Reggie would need to fly from Las Vegas to Los Angeles for the night. (GX A-103). The defendant booked Reggie and told him to go to the London Hotel. (A-159). In connection with this hotel night, the defendant sent Jane $15,000, $1,100 of which she sent to Cowboys 4 Angels via CashApp. (*See* GX A-103, A-159, A-159-G, A-159-H, 4B-101). Although unnecessary for a Mann Act violation, there is no question that sex occurred that night. Not only did Jane testify to this, (Tr. 5036-37), London Hotel records demonstrated that the hotel stay resulted in a damaged furniture fee of $3,750, and the hotel staff found bodily fluid stains on the floor, (GX 7J-117, 7J-117-B). Again, a juror could reasonably conclude that the defendant paid Reggie, as well as the other escorts, to travel to engage in sex.

The evidence at trial reflected dozens more Freak Offs and hotel nights involving interstate travel. (*See* GX 1402, 1406). Despite this overwhelming evidence, the defendant raises a myriad

of arguments, none of which change the conclusion: a reasonable juror could find that the defendant transported individuals intending that they engage in an act of prostitution.

*First*, the defendant argues that he did not have the intent to transport individuals with the intent that they engage in prostitution because he used "legitimate" services to find escorts, such as Cowboys 4 Angels and Hunk-O-Mania. (Def. Mem. 27-28). Specifically, the defendant points to conversations he had with Kreshover, who told the defendant about the escorts' rates and said—after the defendant had been hiring escorts from Cowboys 4 Angels for years—that the men were paid for their time. (Def. Mem. 27-28). But it is the defendant's intent at the time of travel, not Kreshover's, that matters. And the very conversation that the defendant relies on demonstrates that he intended for the escorts he was hiring to engage in commercial sex acts. In this conversation, Kreshover texted the defendant asking him about an escort whom the defendant sent away during the September 2023 hotel night in Manhattan, discussed *supra*. (*See supra* pp. 6-7). The next day, Kreshover texted the defendant, "There was a mistake with the cash. We are $600 short. Can you please Cashapp $600? $cowboys4angels." The defendant's response makes his intent clear: "Lol. He couldn't even perform," *i.e.*, perform sexually. Kreshover then responded, "I'm confused. Our agency provides time in companionship you're paying for the Gentlemans time." The defendant said, "He's lucky he got that. But all good. You'll have it by tomorrow," and reminded Kreshover that he was a "long time customer." (GX 1407, A-103). A reasonable juror examining this conversation could infer that the only reason to tie payment to "performance" is that the defendant was paying escorts to engage in sex. That the defendant sometimes paid Cowboys 4 Angels to maintain the relationship even when men did not perform does not diminish his intent, at the time of travel, for the escorts to later engage in paid sex.

*Second*, the defendant further claims that he was simply purchasing the escorts' time, rather than paying them for sex. (Def. Mem. 28). That is implausible, especially with all reasonable inferences construed in the Government's favor. Ventura explicitly testified that the escorts were paid "to ejaculate" and to "have intercourse with [her]." (Tr. 532-33). Given that the defendant provided the money to pay the escorts for the Freak Offs and hotel nights, which happened on a weekly basis at some points, it is reasonable to infer that he, like Ventura, expected the escorts to have—and be paid for—sex at the Freak Offs and hotel nights. (*See* Tr. 483-84, 531, 4738-39, 4744, 4756, 4814-18). In addition, Ventura explained that escorts who had difficulty performing sexually (*e.g.*, escorts who could not maintain an erection), or who did not follow the defendant's instructions, including ejaculating before he said they could, were paid less or were sent away. (Tr. 530, 561, 566-67). This testimony was corroborated by both escorts who testified: Daniel Phillip explained that he was sometimes paid nothing when he could not perform sexually, as compared to "$700 to thousands of dollars" when he could, (Tr. 274), and Sharay Hayes testified that he was not invited to another Freak Off after he failed to perform, (Tr. 1915). Records support this too, including the defendant's text messages to Kreshover, documenting that he paid an escort less when the escort "couldn't even perform." (GX A-103). All of this supports an inference that the defendant intended to pay for sex rather than time—there is no logical reason for the defendant to vary escorts' payments when they failed to perform sexually if he was simply paying for time. Further, Ventura testified that the defendant wanted her to clarify when the escorts first arrived that they were "safe," *i.e.*, that they were not "cop[s]," and the defendant himself had a conversation with a contact saved as "Ny Strip" about whether each were cops. (Tr. 530-31; GX 3A-111; GX 1308; *see also* Tr. 628-29). Similarly, if the defendant were paying only for the escorts' time rather than for sex, a reasonable juror could conclude that there would be no reason

for him to be concerned about the police. Together, this evidence more than establishes the defendant's intent to pay for sex.

*Third*, the defendant takes issue with the Government for relying on circumstantial evidence and summary charts when proving the Mann Act charges. (Def. Mem. 29). As just discussed, that is not true: Ventura, Jane, and two escorts testified that they were present at Freak Offs or hotel nights and that the defendant paid escorts after they had sex. But even if the Government had relied solely on circumstantial evidence, that is no basis to overturn the defendant's conviction. As the Second Circuit has explained, "[a] jury's verdict may be based entirely on circumstantial evidence." *Rutigliano*, 790 F.3d at 402. And when considering Rule 29 arguments, all inferences must be drawn in favor of the Government and the conviction must be upheld if "*any* rational trier of fact" could have found the defendant guilty, regardless of "whether the evidence being reviewed is direct or circumstantial." *Persico*, 645 F.3d at 105 (emphasis in original). For the reasons already described, a reasonable juror could have found—based on the testimony, travel records, hotel records, financial records, text messages, and videos—that the defendant transported individuals intending that they engage in an act of prostitution.

*Fourth*, the defendant argues that Phillip and Hayes denied being involved in prostitution and participated in the sex acts for fame, notoriety, and even positive feelings toward the defendant and Ventura (Def. Mem. 30-31). First, this is wrong. Phillip explicitly testified that he was paid to have sex. (Tr. 246 (Q. "What did Cassie Ventura give you money for in around 2012?" A. "To have sex with her.")). Second, this is irrelevant. The escorts' subjective belief as to whether they were engaging in prostitution is not relevant to the defendant's guilt under the Mann Act. As the Second Circuit has explained, it is the defendant's intent, not the escorts' intent, that matters. *Kelly*, 128 F.4th at 414 ("The victims' intent . . . is not relevant to this inquiry. Indeed, we have

explicitly rejected an approach to § 2422 that moves the locus of the offense conduct from the intent and actions of the would-be persuader to the effect of his words and deeds on his would-be victim."). And even if the escorts had multiple motives for going to the Freak Offs or hotel nights, such as a friendship with the defendant, Ventura, or Jane, that does not prevent a juror from inferring that the escorts were paid for sex. Reasonable jurors could infer that both escorts—and the others that Ventura and Jane engaged with—were paid by the defendant for sex, especially in light of the escorts' testimony that their pay and/or employment relationship was tied to their ability to perform sexually. (*See* Tr. 274 (Phillip testimony that he was sometimes paid "nothing" when he "could not sexually perform with Ms. Ventura in front of Mr. Combs"); Tr. 1915 (Hayes testimony that he never saw the defendant and Ventura again after he "couldn't perform")).

*Finally*, in an attempt to dodge the damning factual record, the defendant again tries to limit the definition of prostitution, claiming that there must be evidence that he intended the escorts to engage in sex with *him*. (Def. Mem. 25-26). For the reasons described above, prostitution for a Mann Act violation does not require that a defendant engage in sex acts with the person who is paid for sex. Indeed, the Mann Act criminalizes travel, rather than the sex act itself. And there can be no reasonable doubt, for the reasons described above, that the defendant here intended the escorts to engage in commercial sex at the time he transported them. Further, the defendant's assertion that he was not a participant in Freak Offs is belied by the evidence. There is ample evidence that the defendant directed the sexual acts. (*See, e.g.*, Tr. 260-61, 557-61, 1904-05, 1910-11, 4620-28, 4819-20). And despite his contrary claims, there was evidence at trial that the defendant *did* engage in sex acts during the Freak Offs. He did, for example, have Ventura perform oral sex on him at the same time an escort was having intercourse with her. (Tr. 270, 560, 565). And as the defense admits, the defendant regularly had sex with Ventura and Jane immediately

after the escorts finished having intercourse with the women. (Tr. 560, 568, 4625-27). At the defendant's direction, Ventura and Jane did not clean up the escorts' semen and put it on the defendant's body before engaging in sex with him. (Tr. 561, 4627). Based on this factual record, the jury could infer that the defendant was more of an engaged participant than the idle observer the defendant paints himself to be.

The defendant further argues that the Mann Act should not be applied to him because he is "a paying customer—a john—rather than a pimp." (Def. Mem. 26). Setting aside that application of the statute to paying customers is appropriate for the reasons discussed *supra*, by the defendant's own argument, he is not a typical "john" who pays an escort to have sex with him. The factual record demonstrates that he is in many respects more akin to a pimp than a john in that the defendant (the pimp) provides Ventura and Jane (the victims) to other men to have sex for his own personal benefit. The defendant has provided no legal or factual reason to set aside the jury's rational verdict.

The defendant's motion for an acquittal should be denied.

## II.  The Court Should Deny the Defendant's Motion for a New Trial

### A.  Applicable Law

#### 1.  Rule 33

Rule 33 authorizes district courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Because "motions for a new trial are disfavored in this Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), a district court, after examining the totality of the evidence and considering objectively all of the facts and circumstances, should grant the motion only if the court finds "a real concern that an innocent person may have been convicted," *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). "It is only when it appears that an injustice has been done that there is a need for a new trial in the

interests of justice." *Id.*  Although the court's discretion to grant such a defendant's motion is broader under Rule 33 than under Rule 29, "that discretion should be exercised sparingly." *Id.*

"[A] district court may not grant a Rule 33 motion based on the weight of evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020).  Under this standard, the Second Circuit has "emphasized" that the remedy of a new trial should be granted "sparingly and in the most extraordinary circumstances." *Id.* at 187.  A district court "must be careful not to wholly usurp the role of the jury, and should defer to the jury's assessment of witnesses and resolution of conflicting evidence unless 'exceptional circumstances can be demonstrated.'" *United States v. Teman*, 465 F. Supp. 3d 277, 292 (S.D.N.Y. 2020) (quoting *Sanchez*, 969 F.2d at 1414).  Exceptional circumstances are limited to, for example, "where testimony is patently incredible or defies physical realities, although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief." *United States v. Schlesinger*, 390 F. Supp. 2d 274, 275 (E.D.N.Y. 2005) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)).  In addition, "as it must do under Rule 29, a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." *Archer*, 977 F.3d at 189.

### 2.  Retroactive Misjoinder

Retroactive misjoinder "refers to circumstances in which the joinder of multiple counts was proper initially, but later developments—such as a district court's dismissal of some counts for lack of evidence or an appellate court's reversal of less than all convictions—render the initial joinder improper." *United States v. Hamilton*, 334 F.3d 170, 181 (2d Cir. 2003).  To be entitled to a new trial on the ground of retroactive misjoinder, a defendant must show "compelling prejudice" in the form of serious "prejudicial spillover" from evidence used to obtain a conviction that was

subsequently dismissed or reversed on appeal. *Id.* at 182; *see United States v. Vebeliunas*, 76 F.3d 1283, 1293-94 (2d Cir. 1996).

A defendant "bears an extremely heavy burden when claiming prejudicial spillover." *United States v. Griffith*, 284 F.3d 338, 351 (2d Cir. 2002). The Second Circuit uses a three-part test to determine whether there has been prejudicial spillover from evidence admitted at trial to support convictions that were later set aside: "(1) whether the evidence introduced in support of the vacated count was of such an inflammatory nature that it would have tended to incite or arouse the jury into convicting the defendant on the remaining counts, (2) whether the dismissed count and the remaining counts were similar, and (3) whether the government's evidence on the remaining counts was weak or strong." *Hamilton*, 334 F.3d at 182.

The first prong of this test is not satisfied where the evidence on the reversed counts was generally "no more inflammatory than the evidence . . . on the remaining counts." *Id.*; *see, e.g.*, *United States v. Jones*, 482 F.3d 60, 78 (2d Cir. 2006). Regarding the second prong, prejudicial spillover is unlikely to be found where the dismissed counts and the counts of conviction are either "quite similar or quite dissimilar." *Hamilton*, 334 F.3d at 182. There is no basis to conclude that a new trial is warranted based on prejudicial spillover where "the record indicates that the jury was able to distinguish between counts or between defendants, and to assess separately the evidence pertinent to each[.]" *Id.*at 183. Indeed, "[t]he absence of such spillover is most readily inferable where the jury has convicted a defendant on some counts but not on others." *Id.*

### B. Discussion

The defendant's retroactive misjoinder argument is without any merit and should be summarily rejected. There is no precedent for a new trial based on retroactive misjoinder following a split jury verdict. *See Hamilton*, 334 F.3d 183 ("Indeed, so far as we are aware, no case has held that a defendant was entitled, on the ground of retroactive misjoinder, to a new trial on the counts

of conviction simply because the jury found the government's proof on other counts unpersuasive."); *see Calderon v. United States*, No. 10 Cr. 392 (CS), 2017 WL 11473376, at \*5 (S.D.N.Y. Mar. 13, 2017) ("Petitioner has not identified, and the Court has not located, a case where retroactive misjoinder has been found based not on a vacated or dismissed count, but just on an acquittal.").  Indeed, the record here demonstrates that the jury was able to distinguish between counts and thus supports the conclusion that there was no prejudicial spillover.  *See Hamilton*, 334 F.3d at 183 ("The absence of such spillover is most readily inferable where the jury has convicted a defendant on some counts but not on others.") (collecting cases).

The defendant fails to even acknowledge that the doctrine of retroactive misjoinder has never been applied to acquitted counts.  And although the defendant's argument centers on the dangers of spillover prejudice from evidence admitted to prove a racketeering count, not a single case cited by the defendant involves granting an entirely new trial on convicted counts based solely on allegations of spillover prejudice from the jury's acquittal on a racketeering count.  *See Hamilton*, 334 F.3d at 181-86 (affirming district court's denial of motion for new trial on grounds of spillover prejudice following jury's acquittal of both defendants on racketeering count); *see also Jones*, 482 F.3d at 67-68 (denying request for new trial on grounds of spillover prejudice after district court granted motion for acquittal on VICAR murder and related firearms count); *United States v. Tellier*, 83 F.3d 578, 581-82 (2d Cir. 1996) (reversing RICO conviction because predicate relied on inadmissible evidence and Hobbs Act conviction based on spillover prejudice in multi-defendant trial in which "all but a tiny sliver of the evidence admitted on the RICO charges" was "irrelevant" to the Hobbs Act charge); *Vebeliunas*, 76 F.3d at 1288-89, 1293-94 (affirming district court's vacatur of RICO count based on predicate acts' statute of limitations and denial of vacatur for other convictions based on spillover prejudice); *United States v. Wapnick*, 60 F.3d 948, 952-

54 (2d Cir. 1995) (denying request to vacate remaining counts of conviction following district court vacatur of structuring convictions based on change of law between verdict and sentencing); *United States v. DiNome*, 954 F.2d 839, 844-45 (2d Cir. 1992) (reversing mail and wire fraud convictions for two defendants whose RICO and bribery charges the district court previously granted a judgement of acquittal for prior to verdict in 16-month, multi-defendant trial); *United States v. Guiliano*, 644 F.2d 85, 87-89 (2d Cir. 1981) (reversing bankruptcy fraud count on sufficiency grounds, which was a predicate offense and thus invalidated RICO conviction, and granting new trial on remaining bankruptcy fraud count on spillover prejudice where sufficiency of the evidence as to that count was a "close question").

The defendant's reliance on *United States v. Ferguson* and *United States v. Sam Goody* is misplaced. Judge Scheindlin's decision to grant a new trial in *Ferguson* was based primarily on her ruling that the jury's verdict was against the weight of the evidence. 49 F. Supp. 2d 321, 329 (S.D.N.Y. 1999). Judge Scheindlin then noted in dicta that the evidence on the acquitted counts could have prejudiced the defendant. *Id.* at 330. When affirming Judge Scheindlin's decision, the Second Circuit expressly declined to consider the issue of prejudicial spillover. *Ferguson*, 246 F.3d at 137; *see also Hamilton*, 334 F.3d at 184 (distinguishing *Ferguson*). Likewise, in *Sam Goody*, the grant of a new trial was based on multiple factors. 518 F. Supp. 1223, 1224-25 (E.D.N.Y. 1981). At the conclusion of the Government's case, the district court entered a judgment of acquittal as to several counts against two of the three defendants (including the RICO count as to the corporate entity), and all counts as to one defendant entirely. *Id.* at 1223-24; *see also United States v. Sam Goody, Inc.*, 675 F.2d 17, 19 (2d Cir. 1982). After deliberations, the jury acquitted the corporate entity and remaining defendant of additional counts, including RICO, following which the district court ordered a new trial, citing multiple concerns, including spillover

47

prejudice from the RICO count, the false testimony of a Government agent and the Government's failure to correct that testimony, and the possible cumulative adverse effect of the various unproven charges. *Sam Goody*, 518 F. Supp. at 1224-25. While the Government's appeal of the new trial was dismissed for lack of appellate jurisdiction, the Second Circuit expressed doubt as to the risk of prejudicial spillover, given that the jury had acquitted the defendants on some counts, including the RICO count that was submitted to the jury. *See Sam Goody*, 675 F.2d at 26 n.9; *id.* at 29 (Mansfield, J., concurring); *see also Hamilton*, 334 F.3d at 184 (distinguishing *Sam Goody*). At bottom, "neither *Ferguson* nor *Sam Goody* stands for the proposition that [the Second Circuit] has ordered a new trial on the ground of retroactive misjoinder or prejudicial spillover simply because a jury found some counts unproven." *Hamilton*, 334 F.3d at 184.

Moreover, one of the primary factors driving the concerns behind prejudicial spillover from a racketeering count—that the Government can introduce evidence of criminal activities in which the defendant did not participate to prove the enterprise, *see Tellier*, 83 F.3d at 582—is not present here. Indeed, unlike many of the defendant's cited cases, the defendant's list of alleged inflammatory evidence admitted at trial all involves the defendant's *own* actions, not actions of others. (Def. Mem. 45-46). *See Ferguson*, 49 F. Supp. 2d at 330 (three-month multi-defendant trial where "jury was exposed to weeks of testimony regarding successful murders and assaults, none of which involved Ferguson"); *Tellier*, 83 F.3d at 580, 582 (defendant at issue only charged with two predicate acts in multi-defendant case involving fifteen major robberies, four murders, one attempted murder, two sales of stolen drugs, and one bribery of a witness); *DiNome*, 954 F.2d at 841-42, 844-45 (16-month trial related to the DeMeo Crew of the Gambino family involving evidence of "vicious murders, loansharking, auto theft, pornography, and firearms trafficking" where two defendants, whose association with the Crew only related to allegations of bribery to

serve as a juror, had RICO and bribery charges acquitted prior to verdict).  The defendant asks this Court to apply the retroactive misjoinder doctrine in the absence of a ruling that any count was legally insufficient and simply because the jury judged the Government's evidence on certain counts to be unpersuasive beyond a reasonable doubt.  The defendant's request to create new precedent for a finding of retroactive misjoinder merely because the jury acquitted on certain counts should be rejected outright.

Even under the three-part test used to determine whether there has been prejudicial spillover—which need not be reached—it is clear that the defendant suffered no impermissible prejudice.  With respect to the first prong, the defendant's argument rests on his faulty assumption that some evidence of violence and coercion was relevant only to the sex trafficking counts.  To the contrary, some of the most allegedly inflammatory evidence in the case, including testimony about and images of violence like the recording of the defendant's assault of Ventura during a Freak Off at the Intercontinental, was evidence supporting the Mann Act charges.  The defendant's violent and coercive conduct cannot be divorced from the Freak Offs and hotel nights, which are all evidence of his guilt under the Mann Act.  *See, e.g.*, Order Denying Bail, August 4, 2025, Dkt. 490 at 1 (The defendant's "Mann Act arguments might have traction in a case that didn't involve evidence of violence, coercion, or subjugation in connection with the acts of prostitution at issue, but the record here contains evidence of all three.").  A similar analysis applies under the second prong, which assesses whether the counts of acquittal and conviction are similar or dissimilar.  The Mann Act counts charged essentially the same course of conduct as the acquitted sex trafficking counts, whereas the RICO count both overlapped with the Mann Act and trafficking counts as well as incorporated unrelated conduct.  The defendant suffered no impermissible prejudice where much of the same evidence would be admissible to support the Mann Act charges in any event,

and the jury's verdict made clear that the jury parsed the facts and the counts and was unpersuaded by the racketeering evidence. *See Hamilton*, 334 F.3d at 182-83 ("In cases where the vacated and remaining counts emanate from similar facts, and the evidence introduced would have been admissible as to both, it is difficult for a defendant to make a showing of prejudicial spillover."). Finally, the third prong assesses the strength of the Government's case as to the counts of conviction. As set forth above, *see supra* Section I.B.4, evidence of the defendant's guilt on the Mann Act counts was overwhelming. Far from supporting the defendant's position, the jury's verdict makes clear that the trial was not infected with prejudicial spillover. *See Hamilton*, 334 F.3d at 183.

## <u>CONCLUSION</u>

For the reasons set forth above, the defendant's motions should be denied.

Dated:      New York, New York
            August 20, 2025

                    Respectfully submitted,

                    JAY CLAYTON
                    United States Attorney

By:          /s/
                    Meredith Foster
                    Emily A. Johnson
                    Christy Slavik
                    Madison Reddick Smyser
                    Mitzi Steiner
                    Assistant United States Attorneys
                    (212) 637-2310/-2409/-1113/-2381/-2284