# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

## 24 Cr. 542 (AS)

---

### UNITED STATES OF AMERICA

### v.

### SEAN COMBS,

### Defendant.

---

## SENTENCING MEMORANDUM ON
## BEHALF OF SEAN COMBS

**AGNIFILO INTRATER LLP**
445 Park Ave., 7th Fl.
New York, NY 10022
(646) 205-4350

    By:    Marc Agnifilo
             Teny R. Geragos

**THE STEEL LAW FIRM P.C.**
1800 Peachtree Street, Ste. 300
Atlanta, GA 30309
(404) 605-0023

    By:    Brian Steel

Xavier R. Donaldson
136 Madison Ave, 6th Fl.
New York, NY 10016
(646) 772-3334

**SHAPIRO ARATO BACH LLP**
1140 Avenue of the Americas, 17th Fl.
New York, NY 10036
(212) 257-4880

    By:    Alexandra A.E. Shapiro
             Jason A. Driscoll

**WESTMORELAND LAW LLC**
132 Cone Street, Ste. A
Atlanta, GA 30303
(404) 446-2620

    By:    Nicole Westmoreland

**HARRIS TRZASKOMA LLP**
156 West 56th Street, Ste. 2004
New York, NY 10019
(212) 970-6465

    By:    Anna Estevao

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................... v

INTRODUCTION ...................................................................................... 1

ARGUMENT ............................................................................................. 5

I.    MR. COMBS'S HISTORY AND CHARACTERISTICS ................................. 6

    A.  Mr. Combs's Upbringing And The Effect Of The Death Of His Father
        On His Life ................................................................................. 6

    B.  Mr. Combs's Dedication To His Family .................................... 10

    C.  Mr. Combs's Career And Work History .................................... 21

    D.  Mr. Combs Created A Family For His Business Colleagues and Friends ................ 28

    E.  Mr. Combs Is Dedicated To Inspiring Those Around Him And Helping
        People Believe in Their Own Potential ...................................... 30

    F.  Mr. Combs's Contributions To The Community .......................... 34

    G.  Mr. Combs Continues His Positive Community Impact By Inspiring and
        Helping Other MDC Inmates ..................................................... 40

    H.  Mr. Combs's Drug Use History, Medical History, And Medical
        Diagnoses Both Before And During Incarceration Are Important To
        Understanding Mr. Combs's Life And Past Anger Management Issues ................. 41

    I.  Mr. Combs's Behavior Has Markedly Improved While In Treatment And
        Under Evaluation At The MDC ................................................. 44

    J.  The Effect Of Mr. Combs's Trauma And Why Mr. Combs Is Now
        Considered a Low Risk Of Sexual Violence Or Domestic Violence ................. 49

II.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE DO NOT
    WARRANT MORE INCARCERATION ..................................................... 52

    A.  Mr. Combs And His Adult Girlfriends Had Serious Relationships That
        Involved Consensual Sexual Experiences With Adult Third Parties .................. 54

        1.  Mr. Combs's And Ms. Ventura's Relationship And Participation
            In Consensual Adult Sexual Experiences ........................... 54

        2.  Mr. Combs's And Jane's Relationship And Participation In
            Consensual Adult Sexual Experiences .............................. 55

B. The Male Escorts And Entertainers Were Fully Consenting, Empowered Adults Who Traveled And Participated Of Their Own Accord ............................... 57

C. Mr. Combs Did Not Profit In Any Way—This Was Merely The Way He And His Girlfriends Enjoyed Their Sexual Experiences ............................... 58

D. Drugs And A High-Profile Celebrity Lifestyle Obviously Played A Role ................ 59

    1. Mr. Combs And Ms. Ventura Each Had Serious Drug Problems For Years ................................................................................................. 59

    2. Jane Explored Drug Use With Mr. Combs And Saw Mr. Combs Struggle With Drugs ................................................................................ 60

    3. Mr. Combs's Employees Did Not Participate In The Offense Conduct ........................................................................................... 61

E. Mr. Combs Had A Domestic Violence Problem Unrelated To The Offense Conduct .......................................................................................... 61

F. The Jury Rejected Any Notion Of Force, Fraud, Coercion ........................................ 62

III. THE GUIDELINES RANGE SHOULD BE 6-12 MONTHS, AND ACQUITTED CONDUCT MUST NOT BE USED *IN ANY WAY* TO ENHANCE THE SENTENCE ...................................................................................... 63

A. The Court Cannot Rely On Acquitted Conduct When Determining Mr. Combs's Guidelines Range ...................................................................................... 65

B. Enhancing Mr. Combs's Sentence *In Any Way* Based On Acquitted Conduct Would Raise Serious Constitutional And Fairness Concerns ..................... 70

    1. Sixth Amendment Problems ....................................................................... 73

    2. Fifth Amendment Due Process Problems ................................................... 79

    3. Fifth Amendment Double Jeopardy Problems............................................. 83

    4. Unfairness ..................................................................................................... 87

C. Applying The Fraud/Coercion Enhancement Would Illegally End-Run The Acquitted Conduct Amendment And Defy The Factual Record........................ 89

    1. The Acquitted Conduct Amendment Precludes Application of the Fraud/Coercion Enhancement......................................................... 89

    2. The Fraud/Coercion Enhancement Is Unsupported By the Factual Record ................................................................................................ 92

D. No Grouping Is Appropriate Because There Are No "Victims" .............................. 100

E. No Role Enhancement Is Warranted................................................................ 111

    1. Mr. Combs Was Not A Leader Or Organizer ................................................. 112

    2. There Were No "Participants" Within The Meaning Of The Guideline................................................................................................ 114

    3. The Alleged Criminality Was Not "Otherwise Extensive" .......................... 119

F. Mr. Combs Is A Qualifying Zero-Point Offender ..................................................... 122

G. Mr. Combs Has Demonstrated Acceptance Of Responsibility................................. 126

H. Stacking The PSR's Recommended Enhancements Produces An Excessively Punitive Guidelines Range........................................................ 129

IV. ANY SENTENCE GREATER THAN 14 MONTHS WOULD CREATE "UNWARRANTED SENTENCE DISPARITIES" THAT SHOULD BE AVOIDED UNDER 18 U.S.C. §3553(A)(6)................................................................ 131

A. The Median Mann Act Sentence In Criminal History Category I Is A Year And A Day, Time Mr. Combs Has Already Served ......................................... 132

B. Mr. Combs Deserves A Lower Sentence Than Even The Average Case................. 133

C. DOJ Enforcement Policy Treats—And Has Always Treated—Mr. Combs's Offense Conduct As The Least Culpable Type Of Mann Act Offense ............................................................................................................ 137

D. "Buyer" Or "John" Cases Are Incredibly Rare And Do Not Support A Sentence Beyond Time Served ............................................................................... 140

    1. Trowbridge, Tills, and Stebick.................................................................... 141

    2. Nabit.......................................................................................................... 142

E. The Data Underlying Guideline §2G1.1 Further Demonstrate That Mr. Combs's Mann Act Conviction Is Of The Least Culpable Variety ......................... 144

F. This Is The Only Case We Have Identified Where The Government Claims Professional, Consenting Adult Males Were Mann Act "Victims" ............. 147

V. MR. COMBS HAS ALREADY EXPERIENCED "JUST PUNISHMENT FOR THE OFFENSE"................................................................................................ 148

A. Mr. Combs's Time At The MDC Has Been Extremely Punitive And Demands A Lesser Sentence Relative To Other Cases ............................................ 149

    B.  Mr. Combs Has Suffered Innumerable Additional Collateral
        Consequences To His Professional And Personal Life............................... 151

VI.    A SENTENCE OF NO MORE THAN 14 MONTHS "AFFORD[S]
       ADEQUATE DETERRENCE TO CRIMINAL CONDUCT"...................................... 152

    A.  Specific Deterrence Is Best Achieved By A Sentence No Greater
        Than 14 Months ................................................................................... 152

    B.  A Sentence No Greater Than 14 Months Affords Adequate General
        Deterrence ........................................................................................... 155

VII.   A 14-MONTH SENTENCE WOULD BEST "PROVIDE [MR. COMBS]
       WITH NEEDED" REHABILITATION .......................................................... 157

CONCLUSION.................................................................................................... 158

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Alleyne v. United States*,
    570 U.S. 99 (2013)......................................................................... 76, 78, 82

*Apprendi v. New Jersey*,
    530 U.S. 466 (2000)............................................................... 73, 76, 82, 127

*Arthur Andersen LLP v. United States*,
    544 U.S. 696 (2005)............................................................................. 116

*Ashe v. Swenson*,
    397 U.S. 436 (1970)...................................................................... 83, 84, 85

*Batson v. Kentucky*,
    476 U.S. 79 (1986)................................................................................. 73

*Benton v. Maryland*,
    395 U.S. 784 (1969)............................................................................... 83

*Blakely v. Washington*,
    542 U.S. 296 (2004)...................................................................... 73, 74, 76, 77

*Blueford v. Arkansas*,
    566 U.S. 599 (2012)............................................................................... 84

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020).......................................................................... 66, 91

*Bravo-Fernandez v. United States*,
    580 U.S. 5 (2016)............................................................................. 83, 84

*Braxton v. United States*,
    500 U.S. 344 (1991)............................................................................... 68

*Burks v. United States*,
    437 U.S. 1 (1978)................................................................................. 81

*California Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc.*,
    519 U.S. 316 (1997)............................................................................... 68

*City of Minneapolis v. Altimus*,
    238 N.W.2d 851 (Minn. 1976).................................................................. 98

*Coffin v. United States*,
    156 U.S. 432 (1895)............................................................................... 80

*Cunningham v. California,*
   549 U.S. 270 (2007)..................................................................................... 76

*Duncan v. Louisiana,*
   391 U.S. 145 (1968)..................................................................................... 73

*Evans v. Michigan,*
   568 U.S. 313 (2013)..................................................................................... 83

*Fischer v. United States,*
   603 U.S. 480 (2024)................................................................................... 120

*Gall v. United States,*
   552 U.S. 38 (2007)................................................................................ 77, 78

*Gebardi v. United States,*
   287 U.S. 112 (1932)................................................................................. 115

*Green v. United States,*
   355 U.S. 184 (1957)............................................................................. 83, 85

*In re Winship,*
   397 U.S. 358 (1970)............................................................. 79, 80, 82, 128

*Irizarry v. United States,*
   553 U.S. 708 (2008)................................................................................... 82

*Jefferson v. State,*
   353 S.E.2d 468 (Ga. 1987)....................................................................... 71

*Jones v. United States,*
   574 U.S. 948 (2014)....................................................................... 71, 78, 79

*Kawakita v. United States,*
   343 U.S. 717 (1952)................................................................................... 67

*Kisor v. Wilkie,*
   588 U.S. 558 (2019)................................................................................. 102

*Lawrence v. Texas,*
   539 U.S. 558 (2003)................................................................................... 62

*Liparota v. United States,*
   471 U.S. 419 (1985)................................................................................. 116

*Maracich v. Spears,*
   570 U.S. 48 (2013)................................................................................... 123

*McClinton v. United States,*
   143 S. Ct. 2400 (2023) ........................................................................ passim

*McElrath v. Georgia,*
   601 U.S. 87 (2024) .................................................................................... 83

*McNew v. State,*
   391 N.E.2d 607 (Ind. 1979) ..................................................................... 80

*Morales v. Trans World Airlines, Inc.,*
   504 U.S. 374 (1992) .................................................................................. 68

*Mortensen v. United States,*
   322 U.S. 369 (1944) ................................................................... 58, 69, 101

*Nat'l Shooting Sports Found., Inc. v. James,*
   144 F.4th 98 (2d Cir. 2025) ...................................................................... 90

*North Carolina v. Pearce,*
   395 U.S. 711 (1969) .................................................................................. 83

*Ostojich v. Specialized Loan Serv., LLC,*
   618 F. Supp. 3d 778 (N.D. Ill. 2022) ..................................................... 123

*People v. Beck,*
   939 N.W.2d 213 (Mich. 2019) .................................................................. 71

*Pepper v. United States,*
   562 U.S. 476 (2011) ..................................................................... 5, 154, 158

*Perrin v. United States,*
   444 U.S. 37(1979) ..................................................................................... 66

*Peugh v. United States,*
   569 U.S. 530 (2013) ....................................................................... 5, 77, 125

*Pulsifer v. United States,*
   601 U.S. 124 (2024) ................................................................................ 123

*Ramos v. Louisiana,*
   590 U.S. 83 (2020) ........................................................................... 109, 127

*Ring v. Arizona,*
   536 U.S. 584 (2002) ........................................................................... 76, 77

*Rita v. United States,*
   551 U.S. 338 (2007) ........................................................................... 79, 147

*S. Union Co. v. United States*,
  567 U.S. 343 (2012) ................................................................ 76

*Siddiqi v. United States*,
  98 F.3d 1427 (2d Cir. 1996) .................................................... 118

*State v. Cote*,
  530 A.2d 775 (N.H. 1987) ................................................... 71, 80

*State v. Koch*,
  112 P.3d 69 (Haw. 2005) ......................................................... 71

*State v. Marley*,
  364 S.E.2d 133 (N.C. 1988) ............................................... 71, 80

*State v. Melvin*,
  258 A.3d 1075 (N.J. 2021) ....................................................... 71

*Stinson v. United States*,
  508 U.S. 36 (1993) ................................................................. 102

*Sw. Airlines Co. v. Saxon*,
  596 U.S. 450 (2022) ............................................................... 102

*Thompson v. Clark*,
  596 U.S. 36 (2022) ............................................................... 1, 80

*Townsend v. Burke*,
  334 U.S. 736 (1948) ......................................................... 71, 82

*United States ex rel. McCann v. Adams*,
  126 F.2d 774 (2d Cir. 1942) .................................................... 74

*United States v. Algahaim*,
  842 F.3d 796 (2d Cir. 2016) .................................................. 131

*United States v. Almestica et al*,
  2:11-cr-14029-JEM (S.D. Fla.) (Defendant Almestica) ........ 134

*United States v. Aloba*,
  2025 WL 1248827 (9th Cir. Apr. 30, 2025) ......................... 103

*United States v. Antico*,
  275 F.3d 245 (3d Cir. 2001) ........................................... 121, 122

*United States v. Aranda*,
  3:11-cr-00190-BJD-MCR (M.D. Fla.) .................................. 135

*United States v. Avery*,
    123 F.4th 430 (5th Cir. 2024) ................................................................ 91

*United States v. Avila*,
    95 F.3d 887 (9th Cir. 1996) .................................................................. 114

*United States v. Bah*,
    439 F.3d 423 (8th Cir. 2006) ............................................................ 67, 68

*United States v. Bastos*,
    1:06-cr-00395 (N.D. Ill.) ..................................................................... 134

*United States v. Baylor*,
    97 F.3d 542 (D.C. Cir. 1996) ........................................................... 71, 88

*United States v. Bell*,
    808 F.3d 926 (D.C. Cir. 2015) ......................................................... 71, 88

*United States v. Berte*,
    2:12-cr-00096-JRG (E.D. Tenn.) ......................................................... 134

*United States v. Birkin*,
    366 F.3d 95 (2d Cir. 2004) .................................................................. 113

*United States v. Booker*,
    543 U.S. 220 (2005) ................................................................. 75, 76, 86

*United States v. Bovadilla-Canales*,
    2:12-cr-00114-LSC-TMP (N.D. Ala.) ................................................. 135

*United States v. Britton*,
    567 F. App'x 158 (3d Cir. 2014) ......................................................... 117

*United States v. Brown*,
    892 F.3d 385 (D.C. Cir. 2018) ......................................................... 71, 88

*United States v. Burgos*,
    324 F.3d 88 (2d Cir. 2003) .................................................................. 113

*United States v. Cameron*,
    573 F.3d 179 (4th Cir. 2009) .............................................................. 113

*United States v. Campos Murillo*,
    1:11-cr-00578-LMB (E.D. Va.) ........................................................... 134

*United States v. Canania*,
    532 F.3d 764 (8th Cir. 2008) ........................................................... 71, 88

*United States v. Carcamo*,
   3:11-cr-00192-RBD-JBT (M.D. Fla.) ................................................................. 135

*United States v. Cardoza*,
   3:11-cr-00188-RBD-MCR (M.D. Fla.) ............................................................. 135

*United States v. Carrozzella*,
   105 F.3d 796 (2d Cir. 1997) .................................................................... passim

*United States v. Carty*,
   264 F.3d 191 (2d Cir. 2001) ........................................................................ 149

*United States v. Castilblanco-Hernandez*,
   7:10-cr-00123-AKK-HGD (N.D. Ala.) ............................................................ 135

*United States v. Castillo Paucar*,
   2:17-cr-00130-CCC (D.N.J.) ........................................................................ 134

*United States v. Castillo*,
   69 F.4th 648 (9th Cir. 2023) ........................................................................ 102

*United States v. Cavera*,
   550 F.3d 180 (2d Cir. 2008) .................................................................. 78, 155

*United States v. Chang et al*,
   1:10-CR-00878-KMW (S.D.N.Y.) (Defendant Seok Cho) .................................. 134

*United States v. Chavez*,
   710 F. Supp. 3d 227 (S.D.N.Y. 2024) ............................................................ 149

*United States v. Chong*,
   08-cr-106 (W.D.N.Y.) ................................................................................. 142

*United States v. Collins et al*,
   3:17-cr-00110-MPM-RP (N.D. Miss.) (Defendant: Mario D. Collins) .................. 135

*United States v. Collins et al*,
   3:17-cr-00110-MPM-RP (N.D. Miss.) (Defendant: Paulette M. Clayton) ............. 136

*United States v. Colucci*,
   743 F. Supp. 3d 452 (E.D.N.Y. 2024) ............................................................ 149

*United States v. Concepcion*,
   983 F.2d 369 (2d Cir. 1992) .................................................................... 71, 88

*United States v. Cross et al*,
   1:10-cr-00939-GBD (S.D.N.Y.) (Defendant Cross) .......................................... 134

*United States v. Davis,*
   2017 WL 3328240 (S.D.N.Y. Aug. 3, 2017) ........................................... 118

*United States v. Day,*
   943 F.2d 1306 (11th Cir. 1991) ............................................................ 68

*United States v. Dorsey,*
   1:17-cr-00299 (N.D. Ill.) ...................................................................... 147

*United States v. Dotterweich,*
   320 U.S. 277 (1943) ............................................................................ 84

*United States v. Duckworth,*
   4:14-cr-40076-KES (D.S.D.) ............................................................... 134

*United States v. Dupree,*
   57 F.4th 1269 (11th Cir. 2023) ........................................................... 102

*United States v. Easy Rent Systems, Inc. et al.,*
   1:16-cr-45 (E.D.N.Y.) ......................................................................... 148

*United States v. Eisenberg,*
   784 F. Supp. 3d 579 (S.D.N.Y. 2025) .................................................. 67

*United States v. Faust,*
   456 F.3d 1342 (11th Cir. 2006) ...................................................... 71, 88

*United States v. Flucas,*
   22 F.4th 1149 (9th Cir. 2022) ............................................................. 101

*United States v. Footman,*
   215 F.3d 145 (1st Cir. 2000) ............................................................... 117

*United States v. Frias,*
   39 F.3d 391 (2d Cir. 1994) ............................................................. 71, 88

*United States v. Genao,*
   343 F.3d 578 (2d Cir. 2003) ................................................................ 67

*United States v. Gigante,*
   94 F.3d 53 (2d Cir. 1996) .................................................................... 131

*United States v. Gonzalez,*
   1:18-cr-00669-JPO (S.D.N.Y. Apr. 2, 2021) ........................................ 149

*United States v. Greenfield,*
   44 F.3d 1141 (2d Cir. 1995) ............................................................... 113

*United States v. He et al*,
    1:15-cr-00730-JPO (S.D.N.Y.) (Defendant Chin) .................................................. 134

*United States v. He et al*,
    1:15-cr-00730-JPO (S.D.N.Y.) (Defendant He) ..................................................... 134

*United States v. Henry*,
    472 F.3d 910 (D.C. Cir. 2007) ................................................................................. 71

*United States v. Hunsaker*,
    65 F.4th 1223 (10th Cir. 2023) .............................................................................. 113

*United States v. Jackson*,
    865 F.3d 946 (7th Cir. 2017) ................................................................................. 115

*United States v. James*,
    --- F.4th ---, 2025 WL 2486539 (2d Cir. Aug. 29, 2025) .............................. 113, 118

*United States v. Jarrett*,
    956 F.2d 864 (8th Cir. 1992) ................................................................................. 115

*United States v. Johnson*,
    671 F. Supp. 3d 265 (E.D.N.Y. 2023) .................................................................. 157

*United States v. Juwa*,
    508 F.3d 694 (2d Cir. 2007) .................................................................................... 81

*United States v. Kandic*,
    134 F.4th 92 (2d Cir. 2025) .................................................................................. 108

*United States v. Kaye*,
    23 F.3d 50 (2d Cir. 1994) ...................................................................................... 103

*United States v. Kent*,
    821 F.3d 362 (2d Cir. 2016) .................................................................. 119, 121, 122

*United States v. Kidgell et al*,
    6:13-cr-10129-EFM-2 (D. Kan.) (Defendant: Yan Zhang) .................................. 135

*United States v. Kramer*,
    289 F.2d 909 (2d Cir. 1961) .................................................................................... 83

*United States v. Lasley*,
    832 F.3d 910 (8th Cir. 2016) ................................................................................... 71

*United States v. Lauersen*,
    348 F.3d 329 (2d Cir. 2003) .......................................................................... 130, 131

*United States v. Lawrence,*
    254 F. Supp. 3d 441 (E.D.N.Y. 2017) ........................................................ 155

*United States v. Levine,*
    983 F.2d 165 (10th Cir. 1992) .................................................................. 117

*United States v. Lewis,*
    68 F.3d 987 (6th Cir. 1995) ...................................................................... 116

*United States v. Lewis,*
    963 F.3d 16 (1st Cir. 2020)....................................................................... 102

*United States v. Liebman,*
    40 F.3d 544 (2d Cir. 1994)....................................................................... 114

*United States v. Maloid,*
    71 F.4th 795 (10th Cir. 2023) .................................................................. 102

*United States v. Maloof,*
    205 F.3d 819 (5th Cir. 2000) .................................................................... 116

*United States v. Martin Linen Supply Co.,*
    430 U.S. 564 (1977).................................................................................. 83

*United States v. Martinez,*
    769 F. App'x 12 (2d Cir. 2019) ........................................................... 71, 88

*United States v. McCoy,*
    242 F.3d 399 (D.C. Cir. 2001) ................................................................. 116

*United States v. McGregor,*
    11 F.3d 1133 (2d Cir. 1993)..................................................................... 113

*United States v. McMillian,*
    777 F.3d 444 (7th Cir. 2015) ................................................................... 125

*United States v. Mendoza,*
    2022 WL 894700 (2d Cir. Mar. 28, 2022)............................................... 71

*United States v. Mendoza-Mendez,*
    1:15-cr-00640-ENV (E.D.N.Y.) ..................................................... 134, 135

*United States v. Mercado,*
    474 F.3d 654 (9th Cir. 2007) ............................................................. 71, 88

*United States v. Modica et al,*
    1:09-cr-01243-LAK (S.D.N.Y.) (Defendant Porcelli)............................ 133

*United States v. Moneke,*
   2021 WL 3190382 (E.D.N.Y. July 26, 2021) ........................................................... 111

*United States v. Moses,*
   23 F.4th 347 (4th Cir. 2022) ................................................................................. 102

*United States v. Nabit,*
   1:21-cr-00038-GLR (D. Md.) ................................................... 136, 142, 143, 144

*United States v. Nasir,*
   17 F.4th 459 (3d Cir. 2021) ................................................................................. 102

*United States v. Nucera,*
   67 F.4th 146 (3d Cir. 2023) ................................................................................... 67

*United States v. Nunez,*
   2024 WL 4504493 (S.D.N.Y. Oct. 16, 2024) ...................................................... 149

*United States v. Oliveras,*
   905 F.2d 623 (2d Cir. 1990) ......................................................................... 126, 127

*United States v. Omotayo,*
   132 F.4th 181 (2d Cir. 2025) .................................................................................. 67

*United States v. Oppenheimer,*
   242 U.S. 85 (1916) ................................................................................................. 84

*United States v. Ospina,*
   3:11-cr-00189-RBD-PDB (M.D. Fla.) ................................................................. 135

*United States v. Park,*
   3:13-cr-00037-KRG (W.D. Pa.) ........................................................................... 134

*United States v. Pellegrini,*
   929 F.2d 55 (2d Cir. 1991) ..................................................................................... 89

*United States v. Ramos-Navarro,*
   3:11-cr-00072-MMH (M.D. Fla.) ........................................................................ 135

*United States v. Reneslacis,*
   349 F.3d 412 (7th Cir. 2003) ............................................................................... 114

*United States v. Riccardi,*
   989 F.3d 476 (6th Cir. 2021) ............................................................................... 102

*United States v. Robert (R.) Kelly,*
   128 F.4th 387 (2d Cir. 2025) ....................................................................... 101, 102

*United States v. Roberts*,
　442 F.3d 128 (2d Cir. 2006) ................................................................. 66

*United States v. Sabatino*,
　943 F.2d 94 (1st Cir. 1991) ........................................................... 90, 97

*United States v. Sabillon-Umana*,
　772 F.3d 1328 (10th Cir. 2014) ..................................................... 71, 88

*United States v. Sanchez Cerdas*, 19-cr-65,
　Dkt. 53, (E.D. Va. 2019) ...................................................................... 91

*United States v. Scott*,
　529 F.3d 1290 (10th Cir. 2008) .......................................................... 117

*United States v. Settles*,
　530 F.3d 920 (D.C. Cir. 2008) ............................................................. 71

*United States v. Skys*,
　637 F.3d 146 (2d Cir. 2011) ............................................ 115, 116, 122

*United States v. Smith*,
　719 F.3d 1120 (9th Cir. 2013) ........................................................... 117

*United States v. Sofsky*,
　287 F.3d 122 (2d Cir. 2002) ............................................................... 130

*United States v. Somerstein*,
　20 F. Supp. 2d 454 (E.D.N.Y. 1998) ................................................ 116

*United States v. Spates*,
　1:09-cr-00004-CMH (E.D. Va.) ......................................................... 134

*United States v. Stebick*,
　08-cr-206 (W.D.N.Y.) ............................................................... 136, 141

*United States v. Stephenson*,
　921 F.2d 438 (2d Cir. 1990) ............................................................... 125

*United States v. Stuart*,
　22 F.3d 76 (3d Cir. 1994) ................................................................... 110

*United States v. Sturdivant*,
　244 F.3d 71 (2d Cir. 2001) ............................................... 108, 109, 110

*United States v. Tai*,
　41 F.3d 1170 (7th Cir. 1994) ............................................................. 122

*United States v. Tai,*
   750 F.3d 309 (3d Cir. 2014)................................................................................ 116

*United States v. Tapia,*
   2023 WL 2942922 (2d Cir. Apr. 14, 2023) ...................................................... 71, 82

*United States v. Tavberidze,*
   769 F. Supp. 3d 264 (S.D.N.Y. 2025)............................................................... 127

*United States v. Tills,*
   1:08-cr-00242-WMS (W.D.N.Y.)................................................................. 141, 142

*United States v. Trowbridge,*
   1:08-cr-00074-WMS (W.D.N.Y) .................................................................. 141, 142

*United States v. Vallecillo,*
   3:11-cr-00191-RBD (M.D. Fla.)....................................................................... 135

*United States v. Vang,*
   128 F.3d 1065 (7th Cir. 1997) ........................................................................ 101

*United States v. Vargas,*
   74 F.4th 673 (5th Cir. 2023) ........................................................................... 102

*United States v. Vaughn,*
   430 F.3d 518 (2d Cir. 2005).............................................................................. 74

*United States v. Wallace,*
   1:13-cr-00117-HSM-SKL (E.D. Tenn.)............................................................ 134

*United States v. Wang,*
   944 F.3d 1081 (9th Cir. 2019) .......................................................................... 67

*United States v. Ware,*
   577 F.3d 442 (2d Cir. 2009)............................................................................ 122

*United States v. Watts,*
   519 U.S. 148 (1997).................................................................................. passim

*United States v. Whaley,*
   1:18-cr-10091-RWZ (D. Mass.) ...................................................................... 136

*United States v. White,*
   324 F.2d 814 (2d Cir. 1963)............................................................................. 67

*United States v. White,*
   551 F.3d 381 (6th Cir. 2008) ...................................................................... 71, 88

*United States v. White*,
　97 F.4th 532 (7th Cir. 2024) ......................................................... 102

*United States v. Whitten*,
　610 F.3d 168 (2d Cir. 2010) .......................................................... 126

*United States v. Wilson*,
　503 U.S. 329 (1992) ....................................................................... 104

*United States v. Zimmerman*,
　2012 WL 3779387 (E.D.N.Y. June 19, 2012) ................................ 157

*Whitman v. Am. Trucking Ass'ns*,
　531 U.S. 457 (2001) ......................................................................... 70

*Yeager v. United States*,
　557 U.S. 110 (2009) .................................................................. 83, 84

**Statutes**

18 U.S.C. §1589 ................................................................................... 89

18 U.S.C. §1591 ............................................................... 69, 85, 90, 91

18 U.S.C. §1952 ................................................................................. 147

18 U.S.C. §2421 ............................................................ 101, 132, 136, 139

18 U.S.C. §2422 ........................................................................... 70, 89

18 U.S.C. §2429 ................................................................................. 103

18 U.S.C. §3663 ................................................................................. 103

18 U.S.C. §3663A ............................................................................... 103

18 U.S.C. §3771 ................................................................................. 103

18 U.S.C. §3553 ........................................................................... passim

18 U.S.C. §3661 ................................................................................... 78

**Other Authorities**

Child Sexual Abuse and Pornography Act of 1986
　Pub. L. No. 99-628 (H.R. 5560) ................................................... 148

White Slave Traffic Act
　Pub. L. No. 61-277 (1910) ............................................................ 148

"The Link Between Mental Health, Crime and Violence,"
New Ideas In Psychology, Vol. 58, August 2020. ................................................................... 50

1953 U.S. Attorneys' Manual,
https://www.justice.gov/archive/usao/usam/1953/title2criminaldivision.pdf ................. 138, 140

1961 U.S. Attorneys' Manual,
https://www.justice.gov/archive/usao/usam/1961/title2criminaldivision.pdf ....................... 138

1970 U.S. Attorneys' Manual,
https://www.justice.gov/archive/usao/usam/1970/title2criminaldivision.pdf ....................... 138

1984 U.S. Attorneys' Manual,
https://www.justice.gov/archive/usao/usam/1984/title9_part2.pdf .......................................... 138

1987 Guidelines Manual §2G1.1,
https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-
pdf/Chapter_2_E-K.pdf ........................................................................................... 91, 144, 145

1988 U.S.  Manual,
https://www.justice.gov/archive/usao/usam/1988/title9criminaldivisionchapters
71-100.pdf ................................................................................................................. 139, 140

1995 Guidelines Manual §2G1.1,
https://www.ussc.gov/guidelines/2015-guidelines-manual/archive/1995-ch2ptg ................... 145

2024 Guidelines Manual,
https://www.ussc.gov/guidelines/2024-guidelines-manual/annotated-2024-chapter-1#1a1 ... 145

2 LaFave,
Subst. Crim. L. §9.5(g) (3d ed. 2024) ................................................................................... 98

"A Look At Mental Health Courts,"
American Bar Association, Sept. 10. 2024 .............................................................................. 50

Black's (Abridged 6th ed. 1991) ......................................................................................... 102

Black's Law Dictionary (11th ed. 2019) ................................................................................ 66

Black's Law Dictionary (6th ed. 1990) .................................................................................. 91

Black's Law Dictionary (7th ed. 1999) ................................................................................ 102

Building Trust and Managing Risk: A Look At a Felony Mental Health Court,
Carol Fisler, J.D., Director, Mental Health Court Programs, appearing in
Psychology, Public Policy and Law (2005) ............................................................................ 51

Claire McCusker Murray,
*Hard Cases Make Good Law: The Intellectual History of Prior Acquittal*

*Sentencing*,
84 St. John's L. Rev. 1415 (2010) .................................................................. 75, 80, 81

Council on Criminal Justice, Recidivism Rates: What You Need to Know,
https://counciloncj.org/recidivism_report/ ............................................................ 153

David J. Langum,
*Crossing Over The Line: Legislating Morality and the Mann Act* (2006) .............................. 137

Diagnostic and Statistical Manual of Mental Disorders,
5th Edition ............................................................................................ 8, 50

Eang Ngov,
*Judicial Nullification of Juries: Use of Acquitted Conduct at Sentencing*,
76 Tenn. L. Rev. 235 (2009) ........................................................................... 75

Erica K. Beutler,
*A Look at the Use of Acquitted Conduct in Sentencing*,
88 J. Crim. L. & Criminology 809 (1998) .............................................................. 75

Feb. 2, 2018 remarks by U.S. Attorney for the District of Minnesota Greg Brooker at the DOJ
Human Trafficking Summit,
https://www.justice.gov/archives/opa/speech/us-attorney-district-minnesota-
greg-brooker-delivers-remarks-department-justice-s-human ...................................... 140, 156

Jan. 14, 2020 remarks by Assistant Attorney General Eric Dreiband at the DOJ
Summit on Combating Human Trafficking,
https://www.justice.gov/archives/opa/speech/assistant-attorney-general-eric-
dreiband-delivers-remarks-department-justice-s-summit .......................................... 140, 156

Jon O. Newman,
*The Federal Sentencing Guidelines: A Good Idea Badly Implemented*,
46 Hofstra L. Rev. 805 (2018) ........................................................................ 131

Journal of Affective Disorders,
Vol 283, March 15, 2021,
"Childhood Trauma in Adult Depressive and Anxiety Disorders: An Integrated
review on Psychological and Biological Mechanisms in the NESDA Cohort" ........................ 50

Judge Nancy Gertner,
*Circumventing Juries, Undermining Justice: Lessons from Criminal Trials and*
*Sentencing*,
32 Suffolk U. L. Rev. 419 (1999) ..................................................................... 75

Justice Manual,
8-3.400 - Prosecution of Customers Involved in Federal Sex Trafficking Offenses ....... 139, 144

Mental Health Courts In An Era of Criminal Justice Reform,
  Stephen Eide, October 2024. .................................................................... 51

National Institute of Justice, Five Things About Deterrence (June 5, 2016),
  https://nij.ojp.gov/topics/articles/five-things-about-deterrence#a-person's-age-is-
  a-powerful-factor-in-deterring-crime ........................................................ 155

*New photo shows maggot-infested food in MDC Brooklyn jail, where Diddy and
  Luigi Mangione are held*, New York Daily News, Feb. 21, 2025,
  https://www.nydailynews.com/2025/02/21/new-photo-shows-maggot-infested-
  food-in-mdc-brooklyn-where-diddy-and-luigi-mangione-are-held/ ......................... 150

Oct. 17, 2019 statements by Beth A. Williams, Assistant Attorney General for the
  Office of Legal Policy at the 2019 JuST Conference,
  https://www.justice.gov/archives/opa/speech/assistant-attorney-general-office-
  legal-policy-beth-williams-delivers-remarks-department ................................ 140, 142

Stephanos Bibas,
  *Harmonizing Substantive-Criminal-Law Values and Criminal Procedure:
  The Case of Alford and Nolo Contendere Pleas*,
  88 Cornell L. Rev. 1361 (2003) ................................................................ 128

The American Heritage College Dictionary (4th ed. 2010) ..................................... 66

The Case For Experimental Problem-Solving Courts: Rehabilitation Through
  Behavioral Modification Programs,
  55 Ariz. L. Rev. 35 (2013) .................................................................... 51

The New Merriam-Webster Dictionary (1989) .................................................... 91

The Oxford English Reference Dictionary (2d. ed. 1996) ...................................... 103

United States Parole Commission Rules and Procedures Manual (Oct. 1, 1984),
  https://www.ojp.gov/pdffiles1/Digitization/98125NCJRS.pdf ............................... 146

United States Sentencing Commission,
  2023-2024 Amendment Cycle: Proposed Amendments/Public Comment
  88 FR 89142 (Feb. 22, 2024),
  https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-
  comment/202402/88FR89142_public-comment.pdf ............................................. 65

United States Sentencing Commission,
  Older Offenders In The Federal System (July 2022),
  https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-
  publications/2022/20220726_Older-Offenders.pdf ........................................ 153

United States Sentencing Commission,
  The Effects of Aging on Recidivism Among Federal Offenders (Dec. 7, 2017),

https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders ............................................................................................ 153

USSG §1B1.11 ................................................................................................ 125

USSG §1B1.2 ................................................................................................... 67

USSG §1B1.3 ............................................................................................ passim

USSG §1B1.4 ................................................................................................... 71

USSG §2A2.2 ................................................................................................. 103

USSG §2B1.1 .............................................................................. 67, 103, 110

USSG §2G1.1 ........................................................................................... passim

USSG §2G1.2 ................................................................................................. 145

USSG §2H1.1 ................................................................................................. 123

USSG §2H4.1 ................................................................................................. 103

USSG §3A1.1 ................................................................................................. 123

USSG §3A1.5 ................................................................................................. 123

USSG §3B1.1 ........................................................................................... passim

USSG §3D1.2 ................................................................................................. 100

USSG §3D1.4 .......................................................................... 86, 100, 111

USSG §3E1.1 ......................................................................... 126, 127, 128

USSG §4C1.1 ......................................................................... 122, 123, 124

USSG §4C1.1 (2023 Manual) ....................................................................... 124

USSG §5K1.1 ................................................................................................. 132

USSG §5K2.3 ................................................................................................. 104

USSG App. C Supp. ................................................................................ passim

USSG App. C, amend. 538 ............................................................................ 102

Webster's Encyclopedic Unabridged Dictionary of the English Language (1996) .................... 103

Webster's New World College Dictionary (5th ed. 2020) ......................................... 66

## <u>INTRODUCTION</u>

The government accused Sean Combs of heinous crimes.  It branded him an evil trafficker and racketeer who coerced and defrauded his girlfriends into having sex against their will.  But none of that was true, and Mr. Combs exercised his constitutional right to fight the allegations and put the government to its proof at a jury trial.  And at that trial, the government deployed the full force of its awesome power.  For eight weeks, it presented the best evidence it could muster to support these disturbing allegations.  But it failed to prove them, because the trial revealed the true facts.  Twelve attentive jurors heard all the evidence.  They heard the testimony of Mr. Combs's girlfriends.  They saw thousands of text messages, emails, videos, and other documents about the relationships and events in question.  Those twelve citizens diligently applied the Court's instructions on the law to that evidence and unanimously rejected the government's sordid tale of coercion and racketeering.  The jury's verdict could not have been clearer or more consistent.  The jury found that Mr. Combs is not guilty of forcing, coercing, or defrauding either Casandra Ventura or Jane and that he is not guilty of RICO conspiracy.  But the jury did find Mr. Combs guilty of prostitution offenses—obviously because (as the government emphasized in closing argument) those counts didn't require proof of threats of force, force, fraud, or coercion.

Put simply, the jury has spoken.  Its verdict represents an "affirmative indication of innocence."  *Thompson v. Clark*, 596 U.S. 36, 45 (2022).  Mr. Combs must be sentenced for what the jury convicted him of—interstate transportation of fully consenting adults with intent to engage in prostitution.  But it would be unlawful, and a perversion of justice, for the Court to sentence him as if the jury had convicted him of sex trafficking and RICO, or to increase his sentence based on the Court's own findings about force or coercion or racketeering.  What is the

point of a jury trial if the defendant can be acquitted, but then sentenced as if he had been

convicted?  Doing so nullifies the entire purpose of a jury:

> Juries are democratic institutions called upon to represent the community as a
> bulwark between the State and the accused, and their verdicts are the tools by
> which they do so.  Consistent with this, juries were historically able to use
> acquittals in various ways to limit the State's authority to punish, an ability that
> the Founders prized.  With an acquittal, the jury as representative of the
> community has been asked by the State to authorize punishment for an alleged
> crime and has refused to do so.

*McClinton v. United States*, 143 S. Ct. 2400, 2401-02 (2023) (statement of Sotomayor, J.,

respecting denial of certiorari).  That is why "acquittals have long been accorded special weight,"

and are "traditionally treat[ed] . . . as inviolate, even if a judge" disagrees with the jury's verdict.

*Id.* at 2402.  Accordingly, Supreme Court justices from across the ideological spectrum, and

many other jurists, lawyers, and commentators have opined that using acquitted conduct to

enhance a sentence violates the Fifth and Sixth Amendments as well as fundamental principles of

fairness and justice.  It also erodes the "perceived fairness of the criminal justice system"—

indeed, "the woman on the street would be quite taken aback" to learn that a person's sentence

could be increased based on acquitted conduct.  *Id.* at 2401, 2403.

Yet both the Probation Office and the government ask the Court to do just that.

Probation recommends guidelines enhancements based on acquitted conduct and the imposition

of a sentence five times longer than the average sentence for Mann Act defendants with similar

criminal histories and justifies this lengthy sentence based on the supposed fraud and coercion

that the jury rejected.  The prosecutors, for their part, have lost all perspective.  They advocate

for numerous enhancements even Probation didn't find warranted and seek to sentence Mr.

Combs under a different enhancement for a crime he was never charged with, which would result

in a guidelines range *above the statutory maximum of 20 years*.  This is wildly out of proportion

to the conduct at issue—threesomes where fully competent adult men and women voluntarily

crossed state lines and had consensual sex with each other, and the defendant made no money from the conduct.  We are unaware of any other Mann Act prosecution based on such conduct. Nevertheless, the median sentence for Mann Act defendants sentenced under the applicable guideline, §2G1.1(b)(1), in Criminal History Category I, is 12 months' incarceration, and the average sentence is under 15 months—even when one includes defendants who received the coercion enhancement.  Thus, Probation recommends a sentence five times the typical sentence, and the government apparently believes a sentence *twenty times* the typical sentence may be appropriate.  This draconian approach makes Alice in Wonderland's Queen of Hearts seem benevolent: instead of "Sentence first-verdict afterwards," the government's view is "Verdict be damned—lock him up and throw away the key."

Fairness and justice, as well as the Constitution, federal sentencing law, and common sense require a far lower sentence in this unique case.  Mr. Combs is an extraordinary person who has made monumental professional and personal contributions throughout his 55 years—to society, his family, his community, and beyond.  And just as importantly, Mr. Combs has much more to give.  It will not serve any of the purposes of sentencing to keep him incarcerated and away from his elderly mother and seven children, unable to contribute meaningfully to the community as he has throughout his adult life.

Although his father was murdered on the streets of Manhattan when he was just three years old, Mr. Combs pursued a life of hard work, love, family, and faith.  He went to Howard University, entered the world of entertainment in New York City, built extraordinary businesses, and created a new culture and image for Black Americans, which had a lasting impact on music, fashion, and other industries throughout the world.  Along the way, he empowered and inspired generations.  At the same time, he nourished a growing family and community, becoming a

father and a father figure to those that needed him. He dedicated substantial energy, resources, and passion to charitable work, and made personal sacrifices for others so they too could thrive. It was not easy, and Mr. Combs overcame substantial obstacles. He lost many loved ones, including his father, his best friend, Christopher Wallace—professionally known as Notorious B.I.G.—as well as the love of his life and mother of four of his children, Kim Porter, and most recently, his mentor, Andre Harrell. These events were devastating, and for decades Mr. Combs struggled with serious substance abuse issues, anger and anxiety, and other flaws that he did not properly or professionally address until his incarceration last year.

In that respect, Mr. Combs's near-13 months in prison has been life changing, productive, and a testament to his desire to return to his family and community and lead the best life possible. He has taken the time to achieve necessary rehabilitation from day one at the MDC—including getting clean of all substances. And while he and his doctors have worked productively with all the available therapeutic tools at the MDC—and made significant progress—his doctors all agree that the next step in Mr. Combs's treatment, to ensure the changes he has made last a lifetime, requires therapy that can only effectively be provided outside of prison walls.

Mr. Combs has seven children, four by now deceased Kim Porter, who desperately await his return to their lives—Quincy, Justin, Christian, Chance, twins D'Lila and Jessie and two-year-old daughter Love. His 84-year-old mother, Janice Combs, who has had brain surgery and was hospitalized for heart concerns right before his arrest, also needs him. As she writes to this Court, she "depend[s] on Sean for emotional support. He always looked after my health and well-being…I don't know how much longer I will be around but I would love to be able to see him and his children together again." Ex. 1, Letter of Janice Combs at 1-2.

The Court has a difficult task when fashioning any sentence, but here the right answer could not be more obvious.  In the past two years, Mr. Combs's career and reputation have been destroyed.  He has served over a year in one of the most notorious jails in America—yet has made the most of that punishment.  It is time for Mr. Combs to go home to his family, so he can continue his treatment and try to make the most of the next chapter of his extraordinary life.  A sentence no greater than 14 months is plainly "sufficient, but not greater than necessary," to accomplish the purposes of sentencing articulated in 18 U.S.C. §3553(a).  It is the only just and fair sentence that could be imposed.

## ARGUMENT

Sentencing courts must fashion a punishment that "fit[s] the offender and not merely the crime."  *Pepper v. United States*, 562 U.S. 476, 487–88 (2011).[1]  As the Court is aware, it must consider and weigh all the factors enumerated in 18 U.S.C. §3553(a) and "shall impose a sentence sufficient, but not greater than necessary," to achieve the goals of sentencing— including punishment, deterrence, protecting the public, and rehabilitation.  The guidelines are but one factor, and are not determinative, as the Court "must make an individualized assessment of the appropriate sentence based on the facts presented."  *Peugh v. United States*, 569 U.S. 530, 552 (2013).  Thus, "a district court may freely depart from the range recommended by the Guidelines based not only on an individualized determination that the Guidelines yield an excessive sentence in a particular case, but also based on policy disagreement with the Guidelines themselves."  *Id*.  Accordingly, regardless of what guidelines range the Court adopts, for the reasons set forth below, the only fair and just sentence after applying all the §3553(a) factors is a sentence of no more than 14 months' imprisonment.

---

[1] Unless otherwise noted, citations through this memorandum omit internal quotation marks, citations, footnotes, and previous alterations in the original source.

## I.     MR. COMBS'S HISTORY AND CHARACTERISTICS

### A.  Mr. Combs's Upbringing And The Effect Of The Death Of His Father On His Life

Sean Combs was born on November 4, 1969, at Women's Hospital in Harlem, New York to the union of Janice and Melvin Earl Combs. The small family lived in Harlem, New York. Melvin Combs was a U.S. Air Force veteran and a popular, larger-than-life figure. His employment was not clear. Some said he was the heroin connection to Harlem and was a drug kingpin.

When Mr. Combs was just three years old, his father was murdered on the streets of Manhattan. On January 26, 1972, 31-year-old Melvin Combs was sitting in a Lincoln Continental at 106th Street and Central Park West. Three bullets were fired into the right side of his head, killing him instantly. Homicide Detective Edward Kelly reported that the bullets were likely fired by someone sitting in the front passenger seat and that the shooting was a "hit" due to the drug dealing. The killing of Melvin Combs was well-known throughout Harlem. It was a major hit on the driver of one of the most powerful drug dealers in the history of New York. Also, Melvin was well-known and well-liked in his neighborhood and his murder, still unsolved after 53 years, was a major source of discussion by everyone who knew him and the Combs family.

The violent death of Mr. Combs's father traumatized the family forever. Due to the circumstances surrounding the killing, the family told young Mr. Combs only that his father was killed in his car in a traffic accident. As Mr. Combs grew, the older kids and some of the men in Harlem said things about his father that led him to wonder whether the story told by his family was true. People in the street would gratuitously speak to Mr. Combs about his father in a way that suggested his father's death was not an accident. Mr. Combs never confronted his mother or

grandmother, however, about the story he had been told about his father's life and death.  He grew up without a father and kept whatever burning questions about what his father did for a living and how he died to himself.  It wasn't until years later, when Mr. Combs was a student at Howard University, that he learned through research of microfiche news clips that his father was murdered.

Ms. Combs raised Mr. Combs as a single mother while she was also caring for her elderly ailing mother.  She "worked three jobs to provide" him with a good education.  Ex. 1, Letter of Janice Combs at 1.  She drove a school bus during morning and afternoon hours on the weekdays, worked at the United Cerebral Palsy home in the evenings caring for patients, and worked on weekends as a salesperson in a clothing store.  *Id.*

As strong and capable as Ms. Combs is, it was difficult if not impossible for her to keep the trauma and fear of having one's husband murdered in the same neighborhood in which the family continued to live and not allow it to impact her son.  Unfortunately, however, Ms. Combs was faced with another tragic loss.  Her brother passed away of a drug overdose, and he left behind his five-year-old daughter Keisha, who became an orphan.  *Id.*  Ms. Combs adopted Keisha to prevent her from going into foster care.  *Id.*; PSR ¶171.

Determined not to let her only son follow in her deceased husband's footsteps, Janice Combs was extra-protective of Mr. Combs.  She raised him with a strong belief in God, religion, faith and redemption.  At the age of ten, he became an altar boy at the Parish of St. Charles Borromeo at 282 West 151st Street in Harlem.  He also spent his Sundays at the Shiloh Baptist Church at 2226 Adam Clayton Powell Jr. Boulevard, also in Harlem.  When Mr. Combs was about 12, their family moved to Mount Vernon, a small city in Westchester County bordering the Bronx.  He started working at an early age, exhibiting both his responsibility and drive.  Mr.

Combs "always promised to work hard to provide" for his mother and promised that she would not have to work three jobs ever again.  Ex. 1, Letter of Janice Combs at 1.  In middle school, he "worked as a newspaper boy, gas station attendant, and in retail to help ease" the family's financial burdens.  Ex. 2, Letter of K. Combs-Dent at 1.  Despite "all these traumatic experiences, Sean somehow managed to be a good student."  Ex. 1, Letter of Janice Combs at 1.  Mr. Combs attended and graduated from Mount Saint Michael Academy, an all-boys Catholic high school where he played on the football team.

Part of Ms. Combs's lifetime of effort to ensure that her son stayed off the streets of Harlem was studiously never telling him about what his father did for a living or how he died.  She managed to get him all the way to college without Mr. Combs ever being told the truth.  On some level, however, Mr. Combs knew.  He always knew.  He picked up cues.  He knew his father didn't die in a traffic accident.  He knew it was likely a result of violence.  But he didn't know why someone would intentionally kill his father.

In September of 1987, Mr. Combs started college at Howard University.  It was the first time he was away from home.  He finally had the freedom to answer the great unresolved question that had been plaguing him for a decade.  On his second day of school, he went to the library and found the microfilm.  He looked up "Melvin Combs" and found an article in the Amsterdam News.  For the first time ever, Mr. Combs knew the actual facts surrounding his father's life and death.[2]  Until that point, he had anxiously carried around his father's death as an unresolved mystery.  But now he knew the truth.  This day with the microfilm would prove to be one of the most important days in Sean Combs's life, as he would go on to say himself.

---

[2] It bears noting that "Criterion A" under the DSM-5 for PTSD is exposure to death.  A specified and explicit "exposure to death" for diagnostic purposes is "learning that the trauma happened to a close friend or close relative."  The significance is that the DSM-5 recognizes that PTSD can be sourced to merely learning that a close relative died.  Murder is a particularly traumatic type of death.

In 2014, 27 years after sitting in the library with the microfilm, Mr. Combs was back at Howard University, delivering the school's 146th Commencement address.  He shared his most important moment at Howard, which was one of the most important moments of his life, with the graduating class of 2014, the professors and all the people in attendance.  He stated the following:

> My world was changed here at Howard.  On my second day of school, I learned something that would change the course of my life forever.  I don't talk about this often.  I was raised by a single mother.  My dad, Mr. Melvin Combs, died when I was three years old.  There was something about that that didn't feel right.  There was something in my soul that was telling me otherwise.  So, as soon as I got here, I went to the library and I did some research.  I used the microfilm I found.  I search all the newspapers.  When I typed in my father's name and the day he died.  I read in the Amsterdam News that he had been murdered in a drug deal gone bad.  Right there in that library, I realized there is nothing more important than [family]…[3]

Mr. Combs described learning the truth about his father as something that "changed the course of my life forever."  He also said, "there was something in my soul that was telling me otherwise."  During Mr. Combs's entire childhood leading to the moment with the microfilm, he was experiencing a profound form of trauma.  Profound because it existed in his "soul," as he said, but was something he did not, and felt he could not, discuss.  He always knew of course that his father died suddenly and tragically, and indeed that is a form of trauma.  But he also knew there were essential aspects about his father that were never discussed, that could not be discussed.  And he knew that the stories about his father told by his family were different from what he was picking up from people in Harlem who knew his father and what happened to him.  It is apparent that Mr. Combs was desperate to know the truth because at his very earliest opportunity, on his second day of college, he beelined to the library to research what happened to his father.  It is also apparent how important learning the truth was to him.  He said, "my world

---

[3] The only footage of the commencement speech counsel located on the internet is partially inaudible at this part.

was changed here at Howard." He was not, at that moment, talking about the wonderful education he had or of his experiences at the school. His world changed because he finally learned the truth about his father.

The trauma of losing his father, not being able to talk about what happened to him, and then finally learning years later that he was murdered never left Sean Combs. However, he did exactly what he said he would do at the Howard University commencement: he put his family first and was the best father and son and brother he knew how to be.

### B.  Mr. Combs's Dedication To His Family

Despite being raised without a father, Mr. Combs has been a dedicated and present father for his seven children. He has also been a dedicated son to Janice Combs—living just down the road from her in Miami—and a dedicated uncle, nephew and cousin. Even though he was the CEO of several businesses, his dedication to his family is paramount. Mr. Combs, at 55 years old, is the father to seven children ranging from ages 2 to 34: Quincy, Justin, Christian, Chance, D'Lila, Jessie and Love. Dallas Austin, who has known Mr. Combs since the early 1990s, has observed Mr. Combs "as a man of unwavering dedication to his loved ones, his family, especially his mom and children. He is a devoted father whose family always comes first, the balance he maintains between his personal and professional life is both inspiring and admirable." Ex. 3: Letter of D. Austin at 1. And longtime friend Tiffany Brown has known "Mr. Combs as a deeply loving father and devoted son. His children have always been a central focus in his life, and I know he has taken great pride in nurturing them and being present for the milestones that matter most." Ex. 4, Letter of T. Brown at 1. Ms. Brown notes that "[f]amily has consistently played a grounding and guiding role in his life." *Id.*

Mr. Combs's children "are the center of his world." Ex. 5, Letter of L. Lane at 2. Mr. Combs's oldest child is Justin Combs, by Misa Hylton, with whom Mr. Combs had a relationship

from approximately 1989 to 1994. PSR ¶177. Justin describes Mr. Combs as "a loving, present father who has instilled in me and my siblings the importance of respect, of honoring women, and of standing tall in the face of adversity. He is the anchor of our family, the one we look to for guidance and reassurance." Ex. 6, Letter of Justin Combs at 1.

In 1994, he met the longtime love of his life, Kim Porter. Ms. Porter had a child through another relationship, Quincy Brown, who she was raising as a single mother. Mr. Combs quickly stepped in as a father to Quincy when he was four years old. He has been "the only father figure" in Quincy's life for as long as he can remember. As Quincy notes in his letter:

> He stepped in and stepped up as a father, at an important time in my life, during my most formative years, in a way that no one else could have. He poured his love into me in a way that I couldn't quite recognize as a child, a love that I'd only received from women in my life. It was unconditional, safe, and unwavering. It still is. He put me first. He went out of his way, at any and every opportunity, without hesitation, to make me feel like he'd been there the whole time. Having never experienced the love of a father before then, it was all so foreign to me. I didn't know that I was the recipient of a man's love. That is, until I began to witness the love that he had for my mother. It was tremendous and true.

Ex. 7: Letter of Q. Brown at 1.

Mr. Combs's love for Quincy made an impression on those around him. Mr. Combs's security guard at the time noted that Mr. Combs "loved and embraced [Quincy] like he was his own" and "was an amazing and loving dad" to Justin and Quincy. Ex. 8, Letter of R. House at from 1-2. Ms. Porter's best friend, Normandie Keith, remarks that Mr. Combs "has always loved [Quincy] and raised [him] as his own." Ex. 9, Letter of N. Keith at 1. La Wanda Lane, another one of Ms. Porter's best friends, who now takes care of the twins, likewise says, that she has "never seen Mr. Combs fail to be there for Quincy." Ex. 5, Letter of L. Lane at 1. Mr. Combs "went above and beyond without [Ms. Porter] ever having to ask. Quincy attended the best private schools, had the best tutors, was very well kept, and Sean was constantly pouring into

11

him as if he was his father." Ex. 10, Letter of E. Ware at 3. Though Mr. Combs was busy building Bad Boy Records, "he always found time to spend with his two sons." Ex. 8, Letter of R. House at 1.

As he started to have more children, Mr. Combs's "commitments to his new family expanded." Ex. 11, Letter of M. Irving at 1. Ms. Porter's former assistant Karen Lindsey noted that Mr. Combs "never made distinctions between biological children and those he loved as his own. I saw a father who wanted his children to have normalcy, values, and love." Ex. 12, Letter of K. Lindsey at 1.

In 1998, Ms. Porter and Mr. Combs had their first biological child together, Christian Combs. Mr. Combs and Ms. Porter had an "on and off" relationship over the next two decades. PSR ¶177. During this time, Mr. Combs had his oldest daughter, Chance Combs, with girlfriend Sarah Chapman. PSR ¶179. Shortly thereafter, Mr. Combs and Ms. Porter had twin daughters, D'Lila and Jessie. The three girls are almost like triplets and enjoy a tremendously close relationship with one another and their father. Chance Combs writes that "[m]y dad has always been our foundation." Ex. 13, Letter of Chance Combs at 1. The twins agree that he has "been nothing but the best father to us and all of our siblings." Ex. 14, Letter of D. and J. Combs at 1.

Ms. Porter's longtime assistant notes how Mr. Combs and Ms. Porter co-parented their children "with grace and unity":

> What I witnessed during those years shaped not only my view of Mr. Combs as a father and partner, but also as a friend navigating immense pressure and responsibility. Throughout the years, I saw Mr. Combs and Ms. Porter co-parent with mutual respect and a shared commitment to their family. I watched them support one another through parenting challenges with grace and unity. He was present, whether it was flying in on short notice to help guide the children through difficult moments, joining family vacations with his mother and loved ones, or simply calling to ask how Kim was really doing, his presence was intentional and meaningful.

12

Ex. 12, Letter of K. Lindsey at 1. The trial record made this clear as well. Mr. Combs's former

assistant George Kaplan testified that "Mr. Combs always seemed to have an extra gauge of

patience with Ms. Porter. Ms. Porter seemed to make Mr. Combs really happy, even when he

was otherwise not . . . he treated her in a very special manner that just felt different than the way

he treated others." Tr.2328-29.

Tragically, in November 2018, Ms. Porter unexpectedly passed away from pneumonia at

48 years old. Mr. Combs was "gutted, devastated, and to say the least extremely heart broken.

He lost his best friend and mother to 4 of his kids. He immediately became Mr. Mom and

Dad." Ex. 5, Letter of L. Lane at 1. He had to do the unthinkable, which is tell his children that

their mom passed away. *Id.* Losing Ms. Porter caused him to spiral "into a deep grief that

impacted him profoundly." Ex. 15, Letter of N. Olivera at 1. While he was grieving, he stepped

up "and made it a priority to be present with us at a time when he didn't even know how to be

there for himself." Ex. 7, Letter of Q. Brown at 1. For Mr. Combs's children, he "became the

only person we could turn to. He became our rock. Losing her sent all of us into a dark

place." *Id.* Jessie and D'Lila Combs, who were just 11 years old at the time of their mom's

passing, remember their lives changing that day:

> On November 15, 2018 our lives changed in the biggest way. That was the day
> we lost our mother. She was everything to us and the most amazing mom we
> could've ever asked for. Since that day Sean Combs, our father, has stepped up
> and has had to play the role of both parents in our lives. It was a very hard
> adjustment but our dad has done everything he could to make it as easy as
> possible for us. He's shown up to everything to support us no matter what. He
> has taught us how to become great young women as we grow into adults.

Ex. 14, Letter of D. and J. Combs at 1. The twins' longtime babysitter, Ms. Olivera, writes that

in the time she watched the twins, she was able to see what a "devoted father" he was. Ex. 15,

Letter of N. Olivera at 1. He was a "devoted father who lights up at the sight of his children, the

man who works tirelessly to create a beautiful life for them." *Id.* He is the kind of father "who

asks for photos and videos and so many face time calls when he was away for work because he missed them so much." *Id.*

Mr. Combs would do his best to "always make sure the kids' mental health was good" during this time. Ex. 5, Letter of L. Lane at 1. Ms. Keith writes that since Ms. Porter's passing, she has "witnessed Sean become an anchor for their children and a steady rock in the storm of their grief. I have seen him carry this responsibility with grace, showing up not only as a parent but as a spiritual guide and source of strength for them." Ex. 9, Letter of N. Keith at 1.

Longtime friend of the family Derek Osorio a/k/a Chuck Bone also notes that Mr. Combs remained "involved, proud, and fully present" after Ms. Porter's death. He notes that Mr. Combs navigated "Kim's passing with strength and grace, remaining grounded in his role as a father during an incredibly difficult time." Ex. 16, Letter of D. Osorio at 1. Similarly, a longtime colleague recalls that Mr. Combs "sprang into action, surrounded the girls with all whom loved them and their mother and took on the role of mother and father. Even through his grief he prioritized the children and encouraged them to keep their mother's memory alive but insisted they move forward in life." Ex. 17, Letter of K. Etheredge at 1. Mr. Combs started employing a chef named Karla around that time in 2019:

> Mr. Combs was going through a period of deep personal pain and depression. Even though he was clearly struggling emotionally, he still treated those around him with kindness and respect. It was during that time that I saw just how strong and resilient he really is. He leaned on his faith and his love for his children, and slowly, I watched him find his strength again. It was inspiring to witness someone in his position be so vulnerable, yet still so committed to others.

Ex. 18, Letter of K. Lemos at 1.

Mr. Combs's dream was to have more children, and four years after Ms. Porter's death, on October 6, 2022, Mr. Combs welcomed his seventh child, Love Combs, who he has co-parented with Dana Tran. Ms. Tran notes that Mr. Combs "is deeply committed to being present

14

for Love and his other children." Ex. 19, Letter of D. Tran at 1. Love is the center of his universe, and has brought immense joy to the whole family.

Mr. Combs has had an "unwavering" commitment to his children despite his busy work schedule running multiple companies and pursuing his music career. Ex. 20, Letter of M. Hatcher at 1. Mr. Combs's eldest daughter Chance says that "[m]y dad has always been our foundation. He's not only a hardworking businessman, but he's also the one who makes sure we're cared for and supported." Ex. 13, Letter of Chance Combs at 1. Ms. Porter's close friend Eboni Ware said that "no matter how busy and in demand he was, he showed up for everything, big or small in his kids' lives. He celebrated them in a big way." Ex. 10, Letter of E. Ware at 4. Family friend Valerie Payton describes him as a "doting father" who is "caring, loving and fun." Ex. 21, Letter of V. Payton at 1.

He has made it a priority to be there for his children throughout their lives, especially since Ms. Porter's passing and despite his hectic work schedule and travel. His son Justin recalls falling into a deep depression when he stopped playing football, and it was his father who saved him:

> I felt like I had failed, and the weight of public expectation crushed me. I was lost, and I carried a darkness I couldn't shake. My father, despite fighting battles of his own, reached into my pain and pulled me back into the light. He gave me his time when it was the one thing he had so little of. He reminded me that I was worthy of love, forgiveness, and grace. My father saved me — and I say that with all the honesty in my heart.

Ex. 6, Letter of Justin Combs at 1. He also showed up for his other children. His son Christian notes that there "was never a time my father wasn't there for me and my father didn't make me feel special." Ex. 22, Letter of Christian Combs at 1. His longtime stylist, Jun Choi, writes that Mr. Combs "made it a priority to attend his twin daughters' cheerleading performances at their high school football games. It was a clear reflection of the love and commitment he has for his

family. . . . He has been the foundation and backbone for them all." Ex. 23, Letter of J. Choi at 1. A longtime colleague has noted Mr. Combs's unwavering dedication to his family "despite the demands of an extraordinarily busy career. This personal commitment reflects a sense of responsibility and loyalty that goes beyond his professional life." Ex. 24, Letter of R. Romain at 1. Ms. Etheredge, a longtime colleague, notes that Mr. Combs's most important role is that of a parent: "He has done a remarkable job making sure home base is filled with the necessities and a 'village' to keep not only the girls focused and loved but their 3 brothers and 2 sisters as well." Ex. 17, Letter of K. Etheredge at 2. Longtime friend of Mr. Combs Hadmira Leacock notes that "he has gone above and beyond to provide stability, guidance, and love for his children, ensuring they grow up grounded despite the demands of his public life. Even with these career demands, his family has always been his anchor. He has always been present at pivotal moments in their lives, balancing his professional obligations with a steadfast role as a father and son." Ex. 25, Letter of H. Leacock at 1. Ms. Porter's best friend and the caretaker of Mr. Combs's twins notes that she has always been "amazed at how he could be working in the studio, or be on set for a movie, at the office, and always be there for all his kids no matter what was going on." Ex. 5, Letter of L. Lane at 1.

Mr. Combs has instilled a commitment to faith and religion in his children as well. Ms. Porter's longtime friend, Marsha Irving, noted that she "attended church with Sean and his children on several occasions and witnessed the spiritual foundation he worked to instill in his home. He often hosted Sunday dinners that centered around faith and family." Ex. 11, Letter of M. Irving at 1. This observation was also echoed by Mr. Combs's former chef, who notes that you can learn a lot about someone's character by how they raise their children. For Mr. Combs that meant "with strong values and love." Ex. 18, Letter of K. Lemos at 1. She recalls that

during her employment, "[e]very Sunday morning, he would step outside and loudly thank God before heading to church with his kids.  It wasn't for show it was sincere and I felt that it showed just how important faith and family are to him."  *Id.*

Mr. Combs has served "as a constant example of Black fatherhood done right: involved, nurturing, and proud.  Whether supporting his daughters in their modeling careers or guiding his sons through business and music ventures, Sean is not just present—he's intentional."  Ex. 20, Letter of M. Hatcher at 1.  Another former Bad Boy employee who has been Mr. Combs's longtime friend of 30 years, Jameel Spencer, reflected on Mr. Combs's deep commitment to his family and his faith:  "He consistently gave all the glory to God and was working tirelessly to be an example to his children and make his mother, Mama Combs proud."  Ex. 26, Letter of J. Spencer at 2.

Mr. Combs's absence for the past year has been devastating for his children.  Sarah Chapman, Chance's mother, has noted this because she had witnessed "the way he's been able to bring all his children together for family occasions, every annual holiday, birthdays and simply be a dependable dad."  Ex. 27, Letter of S. Chapman at 1.  With Mr. Combs's incarceration, Justin writes, "my sisters are especially vulnerable — they no longer have their mother, and without my dad, they lack the steady hand and protective love they need. I try to step in as their older brother, but nothing can replace the unique comfort of a father's presence."  Ex. 6, Letter of Justin Combs at 1.  Mr. Combs's incarceration has changed all that. The home Mr. Combs had created "was not a place of entitlement or ego; it was a home of structure, respect, and intentional care . . . It was not perfect, but it was real.  It was family."  Ex. 12, Letter of K. Lindsey at 1.  Mr. Combs has a large family and prioritized large family gatherings "to keep those around him close."  Ex. 28, Letter of S. Dent at 1.  For the past nearly thirteen months,

however, the sense of closeness for his family has been "shattered" with Mr. Combs

incarcerated.  As his twin daughters note:

> On September 16, 2024 our worlds shattered.  That was the day our dad was
> arrested and sent to jail. On that day it felt like we had lost everything.  Ever since
> then we have been forced to navigate our lives during an extremely hard and
> overwhelming time without parents.  No mom or dad to go to when we are sad,
> happy, excited, nervous, stressed, lonely, anxious, overwhelmed, or depressed.
> This world can be a very evil place and when people try and tear you down
> sometimes you need a mom or dad to go to for love and support, which we don't
> have.  We have gone through such important and challenging times in our lives
> such as becoming seniors in high school, starting our new business, cheering at
> our schools football and basketball games, graduating high school, the passing of
> our great grandmother who was our moms grandmother, so many more tough
> times all without our parents.

Ex. 14, Letter of D. and J. Combs at 1.  Quincy, Christian, Jessie, and D'Lila have done their

best to navigate in the past year without a father or a mother, but this has been difficult.  As

Chance Combs writes, "[w]e've missed so much over the past year with him and can't imagine

him missing any more milestones in our lives."  Ex. 13, Letter of Chance Combs at 1.  They have

had to support each other as siblings, without parents, during the twins' senior year of high

school—a formative year for adolescent girls.  Chance, who moved into NYU at the time Mr.

Combs was arrested, describes the past year as "really hard on all of us.  It doesn't feel right at

home without him here.  We miss him every day, and I know how much he wants to be with us

and face this situation responsibly."  *Id.*

Notably, his children were top of mind when he was arrested.  He stressed to the

psychology department that "he would really like to speak with his children, particularly ensure

his children who do not have a parent in the community (due to their mother passing away), are

doing okay.  He was concerned that "███████████████████████████████

████████████████████████████████████████████████████████

███████████████████████"  Ex. 29, BOP Psychology Records at 41.

Love was at a critical stage of development when Mr. Combs was incarcerated, and his visits with her have been greatly reduced while he has been at the MDC.  Although Ms. Tran has "tried to keep her life as normal as possible," "the absence of [Love's] father has taken a noticeable toll."  Ex. 19, Letter of D. Tran at 1.  Ms. Tran notes that "Love is bright and curious and she often becomes frustrated that she cannot see her 'Daddy.'"  *Id.* at 1.  Love is a precocious toddler and asks many questions to her mother and siblings as to why she "cannot be with him or why she can only see him under his current circumstances."  *Id.*  When she hears his voice over the phone, she "lights up"—it is clear how important he is to her sense of safety, happiness, and belonging.  Mr. Combs's absence has been similarly difficult on Ms. Combs, who notes that:

> I also depend on Sean for emotional support.  He always looked after my health and well-being.  This was crucial as I have no one else to care for me.  Four of his children lost their mother not too long ago.  The kids, especially the boys are still having a very difficult time dealing with the loss of their mother.  The loss of their father has been devastating.

Ex. 1, Letter of Janice Combs at 1.

His absence has also been hard on his nephew, who is on the autism spectrum.  Mr. Combs and his nephew, S.D., have a "unique and profound" bond.  Ex. 2, Letter of K. Combs-Dent at 1.  Mr. Combs connects and understands his nephew "in a way few others can—knowing when to talk, when to simply listen, and when to just sit quietly with him."  *Id.*  To his nephew, Mr. Combs "is not just 'Uncle Sean,' but a steady, loving presence who makes him feel understood and accepted."  *Id.*  Mr. Combs has always been supportive of his nephew and has used his resources to help his nephew's medical needs—including Kawasaki disease treatment and therapy—and helped foster his nephew's interests, such as hockey and derby racing.  *Id.*  Mr. Combs's brother-in-law recalls that when S.D. was diagnosed with autism, Mr. Combs helped them "secure the best therapy and care—support that has contributed to [S.D.] maintaining his

place on the Honor roll and Honor Society for the past six years."  Ex. 28, Letter of S. Dent at 1-2.  He credits much of S.D.'s success and progress to Mr. Combs's "love and attention." *Id.*

Mr. Combs is also a dedicated nephew and cousin.  His aunt, Judy, writes that she and her daughter have "grown up knowing Sean as a constant figure in our lives.  As Aubrey's cousin and Taylor's Uncle Puffy, my family has shared a deep generational bond with him and his family as a cherished member of our extended family."  Ex. 30, Letter of J. Green at 1.  His cousin, Trevin Jones, recalls the close relationship between his father, who passed away last year, and Mr. Combs.  Mr. Jones's father did not inform Mr. Combs of his battle with lung cancer until the very end, and when Mr. Combs found out, he "reached out and spoke to him. . . when he heard Sean's voice, his face lit up with life."  Ex. 31, Letter of T. Jones at 1.

Countless longtime friends and family note Mr. Combs's devotion to his family and his children's need to be reunited with their father again.  Ms. Combs begs this Court to allow "Mr. Combs to raise his children and to instill in them the need to be respectful, get an education and just be God's children with love in their hearts…I beg your honor to let him help them through the healing processes from the loss of their mother and the pain and sleepless nights they have had" since his incarceration.  Ex. 1, Letter of Janice Combs at 2. Justin Combs begs this Court to allow Mr. Combs "the chance to come home, to be the father his children desperately need, and to continue the work of becoming the man I know he is capable of being."  Ex. 6, Letter of Justin Combs at 2.  Christian Combs laments that "[t]his has been the worst year anyone could ever go through" with his father in jail.  Ex 22, Letter of Christian Combs at 1.  This sentiment is echoed by others:

- Former employee Ms. De Niro notes that "His family needs him, his mother needs him, and his daughters, the twins, Chance, and his youngest, all need him.  They depend on his love, guidance, and presence.  He is central to their lives, and they to his.  Being with them is vital for their healing and for his, and I know he would use that time to continue

being the steady, loving influence they have always known." Ex. 32, Letter of C. De Niro at 2;

- One of Ms. Porter's best friends notes that, "In short, these young people will need their father at this formative time in their lives." Ex. 11, Letter of M. Irving at 1;

- Mr. Combs's former chef Ariel Malone notes that, "Beyond the workplace, I came to know Mr. Combs as a devoted father and partner. His deep love and commitment to his children were evident every day. His absence has been felt profoundly within his family, and it has also rippled outward." Ex. 33, Letter of A. Malone at 2;

- Another longtime friend of Mr. Combs's, E. Shay Omolabi, notes that "His children have had to share their father with the rest of the world, they need him more than ever. His boys are at the age when boys become men and they need his guidance, and his little girls need the protection, safety and positive male influence from their father." Ex. 34, Letter of E. Omolabi at 1; and

- Mr. Combs's former girlfriend, Caresha Brownlee, notes that "But more than anything, he's a father and his kids are the ones who look up to him the most. They need him. His presence, love, and guidance matter deeply in their lives." Ex. 35, Letter of C. Brownlee at 2.

Mr. Combs "deeply…misses his mother and children" who have been "his anchor and source of strength during this challenging separation." Ex. 29, BOP Psychology Records at 91.

### C.  Mr. Combs's Career And Work History

For Mr. Combs, family came first. But his work history, impact on the Black community, and entrepreneurship are celebrated and iconic. In 1987, while a student at Howard, Mr. Combs began working for free at Uptown Records, which was created in 1986 by Andre Harrell to be the first major hip hop music label in the world. PSR ¶212. Mr. Combs grouped his classes at Howard on Tuesdays through Thursdays and took the train to New York to work with, and learn from, Harrell the rest of the time. While at Howard, he became a mentor for other students. One of his peers, Christopher Hicks, described Mr. Combs as a "popular upperclassman from New York" while Mr. Hicks "was a newcomer from the Bay Area." Ex. 36, Letter of C. Hicks at 1. Yet Mr. Combs "took the time to mentor those of us just arriving. He offered encouragement, advice, and made himself accessible in a way that stuck with

me." *Id.* His peer at Howard, and later Bad Boy president, writes that since their "days at Howard, we've felt a deep responsibility to uplift Black communities." Ex. 37, Letter of J. Burroughs at 3.

Mr. Combs quickly distinguished himself at Uptown Records by his hard, tireless work. After approximately two years, Harrell gave him a paid job while filling in for someone who left that position. And Harrell rewarded Mr. Combs's hard work by promoting him from talent director to Vice President. Ex. 38, Letter of R. Celestin at 1. However, with hard work comes drive and ambition, and Harrell fired Mr. Combs in 1993, as Combs started becoming more successful on his own.

Instead of seeing this as a setback, Mr. Combs saw it as an opportunity. As one former employee put it, Mr. Combs's "unwavering dedication has remained constant throughout his career." Ex. 39, Letter of T. Haskins at 1. Being fired was not a setback, because he was still intent on claiming "success in the music and entertainment industry" with his "relentless work ethic." *Id.* Failure, for Mr. Combs, "was never an option." *Id.* "Through vision, discipline, and an unshakable belief in himself, Sean not only met but surpassed his goals." *Id.* That same year, he created Bad Boy Records in New York. PSR ¶213.

The 24-year-old Combs had a vision for a new type of business, one headed by a young Black executive that emphasized Black excellence and achievement. It would reflect a certain style, sound, and sensibility that was modern, hip and urban. Before long, Mr. Combs was producing, managing, and growing numerous famous acts in the hip-hop world. *Id.* Former head of Bad Boy Jeff Burroughs recalls Mr. Combs's dedication to his pursuit and work ethic to ensure the label succeeded:

> Sean's dedication was relentless; all-nighters were the norm, and he rarely slept
> more than four nights a week. There was a moment when I felt I couldn't

continue, overwhelmed by the pace.  Sean, however, refused to let me quit.  He challenged me to articulate what the business needed for greater success and then dared me to secure a deal with our partner Clive Davis.  The next morning, we went together, and in that crucial meeting, Sean remained silent, simply stating, 'It's Jeff's meeting.'  We closed the renegotiation, and the following year, the company exploded into global dominance, all while we were still in our twenties.

Ex. 37, Letter of J. Burroughs at 2.  Vashta Wilson, Mr. Combs's longtime Head of Human Resources, reflects on her time at Bad Boy as "one of the most fulfilling periods of my career":

The environment Mr. Combs fostered was dynamic, collaborative, and deeply rooted in purpose.  The "Bad Boy Family" wasn't just a slogan — it was a spirit of unity, creativity, and excellence.  Under his leadership, a boutique record label evolved into a cultural powerhouse spanning music, fashion, and lifestyle.  Mr. Combs was a visionary and a catalyst for change.

Ex. 40, Letter of V. Wilson at 1.  Ms. Wilson remembers Mr. Combs and his leadership as empowering "his staff to think independently and dream boldly."  *Id.*  Mr. Combs "held himself and those around him to a high standard.  This discipline was not just for show; it was an essential part of his character."  Ex. 41, Letter of S. Smith at 1.  Ms. Smith echoes the "values" that Ms. Wilson remembers, recalling that Mr. Combs "consistently showed up with discipline, vision, and an unwavering sense of purpose."  *Id.*

At Bad Boy, Mr. Combs "didn't just influence music—he transformed culture. He helped build careers, communities, and confidence."  Ex. 42, Letter of L. Owens at 1.  For longtime employee Lashaun Owens, working for Mr. Combs gave employees "permission to dream big, act boldly, and hustle with purpose.  Being around him felt like witnessing history. Every session was a masterclass. He demanded excellence because he gave excellence."  *Id.*  Mr. Combs's brother-in-law, who worked at Daddy's House Recording Studio for many years, recalls that for the artists, "everything had to be earned. Talent was everywhere; effort was the only thing that set you apart."  Ex. 28, Letter of S. Dent at 1.  He says that many Bad Boy artists "went on to achieve success not only in music but across the corporate and professional world, in large part

because Sean invested in developing talent and creating opportunities for those willing to work hard and seize them." *Id.*

Mr. Combs also created opportunities for women and interns at Bad Boy, fostering an inclusive culture with opportunities for everyone who wanted to work hard. Shannon Ridley, a former employee at Bad Boy, remembers that Mr. Combs "fostered an environment at Daddy's House Recording Studios where both men and women felt comfortable and respected." Ex. 43, Letter of S. Ridley at 1. Former A&R executive at Bad Boy Dr. Hadmira Leacock describes the role she held at the label, when many

> women in the music industry were rarely given opportunities beyond roles as artists, writer, or assistants. The idea of a woman serving as an A&R executive was almost unheard of. Yet Sean trusted me with that title and the responsibility to help bring his creative vision to life. That decision forever shaped the trajectory of my career and my life. It taught me that success is not always about being the one in the spotlight, sometimes it's about standing beside greatness, learning from it, and using that wisdom to create your own path.

Ex. 25, Letter of H. Leacock at 2. Hillary Weston, also a female, was given the opportunity to manage break-out artist, Lil' Kim, for 14 years, and recalls the early days at Bad Boy as "formative." Mr. Combs was ambitious and hands-on, fostering a creative, collaborative work environment where everyone felt they were part of something groundbreaking." Ex. 44, Letter of H. Weston at 1. Ms. Weston, too, felt that Mr. Combs treated his employees "with respect." *Id.* And knowing that he got his start as an intern at Uptown, Mr. Combs insisted on hiring interns at Bad Boy. He wanted to make sure he would "pay it forward and create opportunities for others as well." Ex. 45, Letter of M. Turner at 2.

Bad Boy, it seemed, was on top of the world. But "[t]ensions were simmering," as the former head of BET, Stephen Hill, recalls at that time between Suge Knight's Death Row Record label and any record company who established themselves on the east coast. Mr. Hill recalls a

tense evening in 1995 at the Source Awards in New York City, where "[a]ll of hip-hop is in this

one, 3000 seat room":

> On this night, Suge grabs the microphone while accepting an award and says "Any artist out there that wants to be an artist, and stay a star, and don't want to worry about the executive producer trying to be all in the videos, all on the records, dancing—come to Death Row!"  That was a direct shot at NYC's Sean Combs.  The Paramount Theater at Madison Square Garden at that moment became a tinderbox; I was there and I describe it as the only room I was in where I could feel the air change in the moment.  Lots of screaming.  Subsequently lots of booing…and you could feel fingers on triggers…literally and figuratively.  Mr. Combs was scheduled to present an award about 15 minutes later and everyone knew it.  In the braggadocious art form of hip-hop, backing down is for suckers. So how will Puff Daddy address this missile launched at him?
>
> *       *       *
>
> Fortunately, for lives and for hip-hop, that did not happen.  Mr. Combs understood what was at stake, risked being called "soft" and was the bigger man.
>
> "I'm a positive Black man and I make music to bring us together and not separate us."  "And all this East and West?  That needs to stop."  "I'm very proud of Dr. Dre of Death Row and Suge Knight for their accomplishments…and if Bad Boy can become as successful as they are, we'll be happy."
>
> Many in hip-hop talk about Suge's words.  Puff deserves more recognition for quelling all the angst in the room.  NO incidents.  NO tragedy.

Ex. 46, Letter of S. Hill at 2-3.  Mr. Hill is grateful for how Mr. Combs has changed the course

of popular culture over the years but says that nothing he did was more "important than his

humility, patience and direction that night."  *Id.* at 3.  Former colleague Christopher Hicks

reflects on this time as well, stating that when tensions rose at this time:

> to the point that threats of violence were made — Sean stepped in.  Not with ego or bravado, but with calm and wisdom.  He defused the situation with maturity far beyond his years.  He didn't escalate.  He didn't walk away.  He mediated, resolved, and protected both sides from a potentially tragic outcome.  That's the side of Sean Combs the world doesn't always get to see.

Ex. 36, Letter of C. Hicks at 1.  Despite Mr. Combs calling for peace and bringing people

together, tragedy still struck Bad Boy.  In 1997, Christopher Wallace, professionally known as

Notorious B.I.G., was murdered in Los Angeles. Behind him in the car was Damion Butler a/k/a D-ROC, his best friend since they were 14. B.I.G. died in D-ROC's arms. Mr. Combs was in the car in front of them. This tragic murder solidified a bond between D-ROC and Mr. Combs for the rest of their lives.

Three months later, Combs wrote and sang his first hit song, "I'll Be Missing You," with B.I.G.'s wife, Faith Evans, which was a tribute to his slain friend, B.I.G. In February 1998, Mr. Combs's debut album, No Way Out, won a Grammy Award for the Best Rap Album. At Bad Boy, Mr. Combs released five albums to "great commercial success" and has also helped produce countless other records for other artists. PSR ¶213.

Following the start of his commercial success, Mr. Combs began to diversify his business holdings and launch new brands and companies—innovating in new industries and continuing to create opportunities for people of color. In 1998, Mr. Combs founded Sean John, a clothing and lifestyle company, which had an exclusive distribution agreement with Macy's for years. PSR ¶214. Sean John went on to win Council of Fashion Designers of America ("CFDA") awards. Combs was the first Black man awarded the CFDA Men's Designer of the Year award in 2004. Mark Turner, the former Human Resources employee at Sean John, was impressed with Mr. Combs's "passion and vision for his brand, but [also] that he was intent and deliberate about creat[ing] opportunities for people of color." Ex. 45, Letter of M. Turner at 1. Mr. Turner, a Black executive himself, had never worked at a company that "provided such opportunities for people of color." *Id.*

Beyond providing opportunities for people of color, Mr. Combs also created job opportunities for working women and single mothers. While Mr. Turner was head of HR, Mr. Combs stressed to Mr. Turner that he "wanted to make sure the single mothers did not have to

pay for health insurance, and that all employee contributions were held to a minimum!" *Id.* at 2. Terri Haskins, a former employee at Uptown, Bad Boy, and Sean John, is grateful for the leadership opportunities that she was given at Mr. Combs's companies. As a woman, she was able to hold executive roles at both Bad Boy and Sean John, which were "pivotal" for her career. Ms. Haskins says that "[e]verything I learned working with Sean gave me the knowledge, confidence, and skill set to become the successful entrepreneur and businesswoman I am today." Ex. 39, Letter of T. Haskins at 2.

In 2002, Mr. Combs produced and starred in the MTV reality show Making the Band, which was a hit success and ran for three seasons. Five years later, Mr. Combs "founded Combs Wines & Spirits LLC in 2007, which developed the Cîroc vodka brand as well as a 50% stake in Deleon Tequila." PSR ¶214. Mr. Combs acted as a paid brand ambassador. And in 2013, Combs co-founded a television network called Revolt TV and Revolt Films, the authoritative network voice for Hip Hop, Black culture, and youth empowerment across the globe. Mr. Combs later installed his mentor and first boss, Andre Harrell, as Vice Chairman at Revolt.

Through these companies, Mr. Combs "has employed hundreds and has been creating spaces in the Black community where there once were none, redefining narratives of doubt." Ex. 27, Letter of S. Chapman at 1. Mr. Combs used his "platforms to amplify the concerns of African Americans. He is unashamed to take unpopular stances for the sake of black people everywhere, driven by a mission to shift culture and secure the equity denied to people of color by our society." Ex. 37, Letter of J. Burroughs at 3. This is the drive and responsibility that led Mr. Combs to create Bad Boy and create a new generation of musical artists, to create Revolt and offer a voice to Black people in film and TV, to create clothing brands that would feel

inclusive for Black people. Mr. Combs's "leadership and innovation continue to influence the culture to this day." Ex. 36, Letter of C. Hicks at 2.

### D. Mr. Combs Created A Family For His Business Colleagues and Friends

Despite Mr. Combs's many businesses and ventures, he has always made his colleagues at his companies feel like family. Indeed, many trial witnesses discussed how the employees at Bad Boy and related companies were all a family. David James, Mr. Combs's former assistant, testified that employees "would talk about Bad Boys being a family . . . we all looked at each other . . . as being a family." Tr.1846; *see also* Tr.4106 (Derek Ferguson testifying that he and colleagues were a very close-knit group); Tr.3384-86; Tr.3791 (Mia testifying that the employees were family).

Mr. Combs's former assistant, Neil Dominique, worked for Mr. Combs in a personal capacity for many years prior to joining Revolt when Mr. Combs launched it. Mr. Combs remains close to Mr. Dominique today and "became a father figure" to him, welcoming Mr. Dominique into his life: "His entire family are some of my best friends to this day, a testament to the genuine and enduring bonds he fosters. I have always known him to be a family-oriented man of integrity, dedication, and immense generosity." Ex. 47, Letter of N. Dominique at 1.

Those who have been around Mr. Combs the longest note that "[w]hether it's his staff or his friends, he treats everyone like family." Ex. 48, Letter of B. Hall at 1; *see also* Ex. 49, Letter of L. Johnson ("Mr. Combs has always had involvement in [our] lives in ways that has [sic] had a positive impact.). And aside from his family, Mr. Combs has acted as a father figure to others. Robert Celestin, the former Vice President at Uptown Records, was always impressed by how great a father Mr. Combs is and notes that he "ultimately parent[ed] the son of one of his recording artists." Ex. 38, Letter of R. Celestin at 1.

Mr. Combs often described the employees of Bad Boy as the Bad Boy Family. Mr. Combs "consistently looked for ways to foster a 'family-like' environment among the employees, with initiatives that went far beyond the typical corporate culture." Ex. 50, Letter of R. Philpot at 2. He would frequently have "his family present in the office or at company festivities, and he extended that same sense of family to his employees. We were never treated as just staff—we were made to feel like part of something bigger." Ex. 51, Letter of J. Ferguson at 1. Carl Thomas, one of Bad Boy's former artists, was inspired by Mr. Combs's treatment of his family, and Mr. Combs always treated Mr. Thomas's son "like his very own." Ex. 52, Letter of C. Thomas at 1. One of Mr. Combs's employees of 11 years, recalls a trip to New York that felt "more like a family gathering than a work trip." Ex. 53, Letter of L. Rodriguez at 1. On that trip, Mr. Combs "took our entire team to a museum and dinner. That day stood out not just because of the experience, but because it reflected how Mr. Combs valued us, not just as staff, but as people." *Id.*

Mr. Combs also made employees who worked out of his home, and on the road with him, feel like a member of his family. Jun Choi, who was Mr. Combs's longtime stylist, also felt like part of his family. Mr. Choi worked long hours with Mr. Combs and recalls that Mr. Combs "always made me feel included—never like just a staff member, but like part of the family. Over time, Mr. Combs and his family became the second family I never knew I needed, and I will always treasure the warmth and memories we shared." Ex. 23, Letter of J. Choi at 1. Mr. Combs's chef of five years, from 2019-2024, described Mr. Combs as making sure "the people in his home felt valued. I truly loved working there not just because of the role itself, but because it didn't feel like a job. It felt like I was coming in to cook for a family member." Ex. 18, Letter of K. Lemos at 1. Another one of Mr. Combs's former chefs echoed this as well. She

29

noted that Mr. Combs, his family, and his staff "often showed personal concern for me and my children." Ex. 33, Letter of A. Malone at 1-2. She remembers "several occasions when I needed to leave work unexpectedly to care for my children, it was never an issue. Even when I was late because of the realities of raising three children, I was always met with patience and understanding rather than criticism." *Id.*

This sentiment is shared by many of Mr. Combs's friends. Normandie Keith, Ms. Porter's best friend recalls that Mr. Combs "has always made everyone feel welcome, supported, and uplifted." She has spent "countless moments with their family—Sundays at the house, holiday meals, birthdays, and quiet afternoons. I've seen Sean lead the family in prayer, speak with humility and gratitude, and create a home that is deeply rooted in love, faith, and community. The family he built is one of beauty and care." Ex. 9, Letter of N. Keith at 1-2. Another friend Shay Omolabi remembers that "I became family and always had a seat at the table for family dinners, birthdays, holidays, everything. It was the same people that were always around when it wasn't an event." Ex. 34, Letter of E. Omolabi at 1.

### E. Mr. Combs Is Dedicated To Inspiring Those Around Him And Helping People Believe in Their Own Potential

Since the beginning of his career, Mr. Combs has sought to guide and build up the Black community, shape young artists and entrepreneurs, and show others the importance of hard work and career goals. Dallas Austin, a prominent music producer and friend of 30 years, has seen Mr. Combs's "extraordinary ability to connect people and inspire collaboration, bringing out the best in the artist he has worked with." Ex. 3, Letter of D. Austin at 1. His friend, Desmond Ryan, bears witness to Mr. Combs extending "compassion and guidance to countless other young artists and members of the community." Ex. 54, Letter of D. Ryan at 1. Mr. Combs "has consistently used his platform to uplift those who might otherwise have been overlooked doing

so quietly and without the need for credit or attention. His commitment to mentorship, fairness, and opportunity has had a ripple effect that continues to benefit entire families and communities." *Id.* As Caresha Brownlee, a fellow artist and one of Mr. Combs's girlfriends of many years, puts it, "Sean has always made it a priority to open doors for Black people, to make sure we are seen, heard, and valued in spaces where we've historically been excluded." Ex. 35, Letter of C. Brownlee at 1. Mr. Combs has the power to encourage those "to dream bigger, walk in confidence, and never shrink who we are to make others comfortable." *Id.*

Brittany Hall, who views Mr. Combs as her uncle, says that "[a]t pivotal moments in my life, he opened his doors to me and even provided life changing job opportunities always with the reminder that nothing is given without hard work and commitment." Ex. 48, Letter of B. Hall at 1. Not only does he open doors, but he teaches his employees lessons about leadership and entrepreneurship. A former colleague says Mr. Combs's style of leadership is rare:

> One thing I can say without hesitation: I am one of many successful music executives who came up under the influence of Sean Combs. We studied him, learned from him, and applied those lessons in our own careers. In doing so, we weren't just following his example — we were building upon a legacy he helped create. The ripple effects of his leadership and innovation continue to influence the culture to this day.

Ex. 36, Letter of C. Hicks at 1; *see also* Ex. 16, Letter of D. Osorio at 2 ("Sean didn't just teach me the music business, he shaped how I work, lead and give back"). Those who worked with him and for him were inspired by Mr. Combs's "strive for excellence," including his stylist, Jun Choi:

> Despite the obstacles, Mr. Combs took me under his wing, believed in my talent, and continuously pushed me to strive for excellence. He encouraged me never to settle for less, and even during the long hours and demanding schedules, the experience was always rewarding. His drive and belief in me inspired a mindset that anything is possible if you truly dedicate yourself to it.

31

Ex. 23, Letter of J. Choi at 1; *see also* Ex 28, Letter of S. Dent at 1 ("Sean consistently demonstrated an unmatched work ethic and drive.  He demanded excellence not only from himself but also from those around him, fostering an environment that pushed us to reach higher."); Ex. 2, Letter of K. Combs-Dent ("He is the cheerleader, the motivator, the one who can lift you up when you are at your lowest.  His pep talks are legendary, and those who know him often describe them as having their very own TED Talk, because he always knows how to inspire others to believe in themselves.").

Ms. Olivera similarly notes that Mr. Combs "build[s] up the people around him."  Ex. 15, Letter of N. Olivera at 1.  She writes that "[h]e uplifted me, gave me confidence, and helped me recognize my own strengths at a time in my life when I needed that kind of belief."  *Id.*  Shannon Ridley, who used to work with Mr. Combs and has gone on to great success, is grateful to Mr. Combs: "Sean pushed me to realize my potential and never make excuses.  His mentorship helped me live my dream, so I can now focus on my purpose: God, family, and my business." Ex. 43, Letter of S. Ridley at 3.

Mr. Combs is generous with his time, truly wanting those who surround him to succeed. Roget Romain, a former colleague, remembers that many years ago, "during a particularly challenging moment in my career, he took the time to offer guidance and encouragement that helped me find clarity and move forward.  His words were not grand gestures meant for show, but genuine counsel rooted in wanting to see others succeed."  Ex. 24, Letter of R. Romain at 1.

By believing in people—even when they do not believe in themselves—Mr. Combs encourages others to be better, smarter, and work harder.  Mr. Combs was an inspiration to those who knew him and worked with him over the years, starting at Bad Boy and continuing at his other ventures.  Jameel Spencer, who joined Bad Boy in 2000, recalls that while negotiating his

role as General Manager of the business, Mr. Combs "insisted" that Mr. Spencer be the

President.  Mr. Combs said to him "no one wants to make decisions with the General Manager,

they want to speak to the President."  Ex. 26, Letter of J. Spencer at 2.  Mr. Combs "always saw

the best version of people, even when they didn't see that version of themselves."  *Id.*  A former

Bad Boy artist, Marlin Hatcher, is thankful for Mr. Combs's "words and wisdom" that Mr.

Combs taught him.  Mr. Combs would insist that they should turn obstacles into opportunities

and problems into possibilities.  Ex. 20, Letter of M. Hatcher at 1.  This advice helped Mr.

Hatcher find the strength to reclaim himself.

      To his friends, Mr. Combs would provide advice and seed money for their businesses.

Angela Alcantara, who Mr. Combs used to date, recalls that Mr. Combs "supported my pursuit

of higher education, helped me establish my esthetics business, and even guided me in building a

positive mindset."  Ex. 55, Letter of A. Alcantara at 1.  His longtime friends La Wanda Lane and

Jeff Burroughs describe Mr. Combs's advice as inspirational.  Ms. Lane, who has known Mr.

Combs for three decades, says that throughout that time, he "would continuously give me advice

about my passions."  One day, she says, "he sat me down for two hours and told me everything I

was doing wrong in my business and how to change it to make it work for me.  I learned a wise

lesson that less is best, be private, and be intentional in all I do."  Ex. 5, Letter of L. Lane at

1.  Jeff Burroughs describes Mr. Combs as a "steadfast friend and confidant who offers sobering

advice or simply an ear to listen and quietly reflect."  Ex. 37, Letter of J. Burroughs at 2.

      His daughters have always admired this about their father as well—they recognize their

father as always wanting "the best for people and allows people to chase their passions and

dreams through his advice and teachings."  Ex. 14, Letter of D. and J. Combs at 1.  Mr. Grimes

describes this as Mr. Combs's "gift" because Mr. Combs "has offered me advice and

opportunities without ever asking for anything in return. Whenever I felt discouraged whether about music or personal struggles, he always knew how to lift my spirits with his words." Ex. 56, Letter of M. Grimes at 1.

In a similar vein, friend Desmond Ryan notes how Mr. Combs "helped [him] navigate critical career decisions":

> At a point when I lacked the experience to protect myself in contractual matters, Sean stepped in to assist me in negotiating fair deals ensuring I was not taken advantage of and teaching me how to advocate for myself moving forward. These lessons were invaluable and instrumental in helping me sustain and grow my career.

Ex. 54, Letter of D. Ryan at 1. Music producer Charles Alexander has known Mr. Combs since 1990 and is currently a professor of Music Production and Engineering at Berklee College of Music. He has found such value in Mr. Combs's advice that he has relayed much of Mr. Combs's "business acumen to thousands of students across [] twenty years of teaching music production and audio engineering." Ex. 57, Letter of C. Alexander at 2.

### F. Mr. Combs's Contributions To The Community

Mr. Combs is also incredibly philanthropic and cares about the community here in New York and elsewhere. As Ms. Chapman notes, "[t]hrough mentorships, charitable donations (public and private) or simply lending help when others are in need, Sean Combs has always been a reliable man." Ex. 27, Letter of S. Chapman at 1. Since founding Bad Boy, Mr. Combs has also founded and is the chairman of the Sean Combs Foundation, which is "a nonprofit organization which handles [Mr. Combs]' charitable and philanthropic endeavors." PSR ¶216. Through the Sean Combs Foundation, he has "consistently used his platform to serve." Ex. 42, Letter of L. Owens at 2. "From running the NYC Marathon to raise funds for children, to donating to inner-city schools, supporting hurricane relief, and awarding scholarships through the Sean Combs Foundation," Mr. Combs has always given back, even if it means not making

headlines. *Id.* Longtime friend Karen Anderson states that Mr. Combs's "philanthropic efforts reflect a long-standing commitment to helping others and creating opportunities for those in need." Ex. 58, Letter of K. Anderson at 1.

Mr. Combs has actively supported and donated millions to after-school programs and organizations like the Boys & Girls Clubs of America. He has also supported organizations including the National Foundation for Teaching Entrepreneurship, creating opportunities for young entrepreneurs. His sister, Keisha, is the foundation's director and president and describes its mission, which is for Mr. Combs to give back "in countless ways":

> He has donated his time, money, and resources to support schools and students—providing laptops, Wi-Fi hotspots, and books to help close the education gap. He funded scholarships for children to attend sleepaway camps, supported Saturday Schools offering technology classes, SAT prep, African studies, and manhood and womanhood classes. He sponsored Wall Street visits to teach financial literacy, HBCU/college tours, and even an educational trip for students to Africa. He has helped fund school libraries in underserved communities, supported STEM and STEAM programs, paid off school tuition balances, and provided start-up funding to young entrepreneurs. He has also contributed to numerous health organizations.

Ex. 2, Letter of K. Combs-Dent at 2.

A cornerstone of his philanthropy is education. In 2003, Mr. Combs ran the New York City Marathon to raise money for inner-city education, which inspired his friends and "brought awareness to the importance of education for young people." Ex. 11, Letter of M. Irving at 1; *see also* Ex. 59, Letter of L. Jones at 1; Ex. 60, Letter of L. White at 1; Ex. 40, Letter of V. Wilson at 1. Many years later, he fulfilled a lifelong dream of contributing to education for the youth when, with a partner, he opened Capital Preparatory Harlem Capital Charter School in 2016 to provide high-quality education to inner-city youth in New York City. The success of this initiative led to the launch of Capital Preparatory Bronx Charter School in 2020, with Combs donating $1 million to support its development. For Mr. Combs, the establishment "of Capital

Preparatory Harlem Charter School was not a publicity project—it was a deeply personal

mission.  Capital Preparatory Harlem Charter School was more than philanthropy—it was

legacy-building."  Ex. 61, Letter of C. Gentry at 1.

Mr. Combs has also been proactive in health and disaster relief efforts—having raised

over $2 million for New York City public schools and hosting a virtual dance-a-thon that raised

more than $4 million to provide personal protective equipment to healthcare workers on the front

line of the COVID-19 pandemic.  Mr. Combs's philanthropic work has earned him numerous

accolades throughout his career, including the Triumph Award from the National Action

Network in 2016, the Superhero Award from Room to Read in 2017, the Child of America

Award from the Carver Foundation in 2018 and in 2023 the Icon Award from the Apollo.

Mr. Combs's good deeds, however, extend far beyond his philanthropy.  He is a

dedicated friend and member of the community who remains a constant presence during the

good times and bad.  Stephen Hill, the former BET president, recalls how Mr. Combs was there

for him when he struggled professionally after losing his job as the head of the network:

> Once I had nothing to offer, calls went unreturned, and unavailabilities became
> plentiful. Sean Combs was the exception. Not only did he continually call and
> check on my wellbeing, but he was constantly encouraging and made sure that I
> was included in events so I could stay "warm".  As a "former", I could do nothing
> for this man…and Mr. Combs ALWAYS remains a busy person.  He showed
> himself to be a kind, compassionate friend to me during (and beyond) that
> difficult time.

Ex. 46, Letter of S. Hill at 1.  This is who Mr. Combs is—checking on friends and acquaintances

during their time in need to ensure they do not spiral into a depression.  For example, his former

employee, Claudine, describes one of the moments that showed her "the depth of his character,"

which was on September 11, 2001.  Her uncle was missing, and she told Mr. Combs that she

"couldn't bear the smell of the city because it reminded me of the fire in which my mother had

died just a few years earlier.  Without hesitation, Sean told me to go stay in his Hamptons home,

and he made sure I would not be alone, sending friends to join me within days." Ex. 32, Letter of C. De Niro at 1. That was emblematic of his character—"someone who steps in when you need it most, without asking for anything in return." *Id.*

Another longtime friend, Lashaun Owens, describes Mr. Combs's "compassion and presence" in his life, during his time in need when Mr. Owens lost both of his parents in the same week in 2008: "It was Mr. Combs, in the midst of his own demanding life, who reached out, called my house, and urged me not to give up. He reminded me that my parents would want to see me succeed. He gave me a reason to stand back up." Ex. 42, Letter of L. Owens at 1; *see also* Ex. 58, Letter of K. Anderson at 1 ("Sean's character was shown during each family member's death over the years. He was exceptionally supportive to both my mother and me—offering comfort, ensuring we felt cared for, and reminding me to take time to grieve. His sincere concern during such a difficult time demonstrated a depth of empathy that I will never forget.")

This compassion extended to employees suffering from loss and sickness as well. Sean John's former controller Raymond Philpot is still grateful to Mr. Combs showing him "extraordinary compassion" during one of the most challenging periods of his life:

> When my father became gravely ill, I approached Mr. Combs, intending to resign from my position so I could return home to care for him. I explained the situation, fully prepared to step away from my career. To my utter surprise, Mr. Combs refused to accept my resignation. Instead, he extended a gesture of profound kindness and offered me paid leave with full benefits so I could focus entirely on being with my father. I was overwhelmed with gratitude. I will never forget that evening after sharing my problem, we shook hands, embraced, and Mr. Comb[s] said a heartfelt prayer for me. His words and presence brought me a sense of peace and support that went far beyond the workplace. Even while I was on leave, his unwavering generosity and compassion had a powerful impact on me and my family. Sadly, about a month later, my father passed away after a brave battle with his illness. The outpouring of condolences, flowers, and messages from the office family, including Mr. Combs himself, meant more than words could express.

Ex. 50, Letter of R. Philpot at 1.  Vashta Wilson has a similar story after her mother became ill, when "he encouraged me to take all the time I needed to care for her, with full pay.  He checked on me regularly, extended genuine compassion, and stood by me during that difficult period."  Ex. 40, Letter of V. Wilson at 1.

A former colleague, Marlon Grimes, recalls a time that Mr. Combs covered the costs for Marlon's flight home to Ohio to be with family and friends after his childhood best friend passed away unexpectedly.  Ex. 56, Letter of M. Grimes at 1.  Mr. Combs refused to let him pay him back, but also personally called Marlon "every day that week just to check in, not to talk about music or business, but to ask, 'How are you really holding up?'"  *Id.*  He notes how Mr. Combs "shows up when it matters, no strings attached."  *Id.*  Mr. Combs did something similar with his best friend Stevie Jordan when Mr. Jordan's father passed away.  Two years ago, when Stevie's father passed, Mr. Combs, without being asked, paid all the expenses for the funeral.  Ex. 62, Letter of S. Jordan at 1.  This action "speaks volumes for the type of heart that he possesses." *Id.*  These gestures are something he does regularly.  For example, when another friend, Lenny Jones' best friend passed away in 2010, Mr. Combs immediately sent $10,000 to contribute to funeral expenses and sent his car for use at the funeral.  Ex. 59, Letter of L. Jones at 1.

When Shannon Ridley did not have a place to live and was residing in Daddy's House Studio, Mr. Combs offered him an entire floor of his townhome as soon as he found out.  Ex. 43, Letter of S. Ridley at 2.  Mr. Combs similarly did this for Desmond Ryan, who was facing personal and professional hardships in 2008 that could have "permanently derailed" his career:

> Without hesitation, Sean welcomed me into his home, offering me a safe and stable place to live for two years.  During this time, not once did he make me feel like a burden.  Instead, he lifted my spirit daily encouraging me, reminding me of my purpose, and assuring me that I could get back on my feet.  His generosity during that time changed the trajectory of my life.

Ex. 54, Letter of D. Ryan at 1; *see also* Ex. 63, Letter of C. Terrell at 1 (describing how Mr. Combs offered to shelter he and other artists, who did not have housing, at Mr. Combs's mother's home.).  When his employee, Aaron Arnold, was three months behind on his rent, "Mr. Combs wrote me a check without me asking.  When I needed dental work, Mr. Combs and HR saw that I got my insurance without me asking."  Ex. 64, Letter of A. Arnold at 2.

In the 1990s, Mr. Combs owned and operated restaurants named Justin's (after his son Justin), and he wanted to coordinate a party to honor the customers who were mothers.  His employee, Alan Barcoff, "found a nice location and he paid for everything and had gifts for each mother who attended and it was just a beautiful time for everyone and once again, NO press was alerted just something from his heart."  Ex. 65, Letter of A. Barcoff at 1.  Mr. Barcoff recalls that Mr. Combs would often donate food to the homeless who were near the restaurant, as well. *Id.*

In his hometown of Mount Vernon, there was once a heatwave that left a group of underserved seniors without electricity.  Ms. Wilson remembers that "[s]ome had to be hospitalized due to the extreme temperatures while the city delayed repairs.  When their pastor reached out, Mr. Combs didn't hesitate.  He bypassed the usual channels and, instead of waiting for accounting to cut a check, he gave his own money on the spot."  Ex. 40, Letter of V. Wilson at 2.  This is the type of giving back to his community that he has also encouraged in his children. He has taught his children to give back to their communities and be "caring and giving" people. Ex. 14, Letter of D. and J. Combs at 2.  Mr. Combs has wanted them to give back to the less fortunate:

> On certain holidays he would take us out to the less fortunate areas of where ever we were and give back.  For [instance] one Christmas we went out to the neighborhoods in Miami that were less fortunate and gave them money to take care of whatever they were in need of.  Another time on thanksgiving we volunteered at a shelter and gave out food to the less fortunate that didn't get to have a thanksgiving meal that day.

*Id.* Mr. Combs's friend from growing up in Harlem describes Mr. Combs's dedication to funding charity work in Harlem that feeds "thousands of families each year" and provides "toys to thousands of children during the holidays." Ex. 54, Letter of D. Ryan at 1. Mr. Combs has consistently and quietly "funded these events for many years—never seeking credit, only wanting to support the community that helped raise us both." *Id.* Thanks to Mr. Combs's generosity, "countless families" have experienced "joy, dignity and hope." *Id.*

### G. Mr. Combs Continues His Positive Community Impact By Inspiring and Helping Other MDC Inmates

Mr. Combs is taking this skill of his—being able to offer advice to others—and using it for good at the MDC. As noted in the PSR, Mr. Combs has begun discussions with the BOP on a program for fellow inmates. PSR ¶217. This program has evolved from a concept he created called "Love Forward" into a concept called Free Game and he has begun teaching it to many inmates in his unit. *Id.*

Inmates invariably experience a wide range of intense emotions and many struggle to cope with fear, loneliness and helplessness. The detention of individuals, all of whom face unique and significant legal and personal challenges, often creates a highly stressful environment. Many detainees deal with their situation through bouts of frustration, hostility or violent outbursts. Mr. Combs, in stark contrast, elected to use his time in pretrial detention to uplift and inspire those with whom he lived.

While in custody but prior to his trial, Mr. Combs developed a curriculum for a 6-week long course he called "Free Game with Diddy." His goal was to spread his knowledge to his fellow inmates. Mr. Combs scripted a 15-page class plan for the course, which is an educational program designed to equip participants with essential skills in business management, entrepreneurship and personal development. Free Game with Diddy was offered to all in the

dorm, and there was even a Spanish interpreter used so everyone who wanted to participate had

an opportunity to do so.  Because there are no other educational courses offered at MDC, "Free

Game with Diddy" had a substantial impact on many fellow inmates.  Despite many professional

successes in Mr. Combs's life, he counts his Free Game course as one of the most impactful and

important endeavors of his life.  He hopes to continue with and expand and improve upon this

curriculum in the future.  His goal is to implement this program on a grander scale upon his

release with programming to extend to youth in the community as well as in state operated

facilities.  Rather, he is a humbled man who understands that the most important things in life are

his devotion to and quality time with his family and his contributions for the benefit of others.

### H.  Mr. Combs's Drug Use History, Medical History, And Medical Diagnoses Both Before And During Incarceration Are Important To Understanding Mr. Combs's Life And Past Anger Management Issues

As the trial record made clear, Mr. Combs was addicted to various substances over the

years.  Tr.982.  It was not until his incarceration at the MDC that he became clean of any

substance for the first time.  Mr. Combs was addicted to opiates throughout most of his

relationship with Ms. Ventura.  Evidence produced in discovery showed that Mr. Combs suffered

from withdrawal symptoms as early as 2009.  *See* DX-1356 (not admitted) (█████████

███████████████████████████████).  There were periods of *years* in Mr.

Combs's and Ms. Ventura's relationship that were worse than others, due to his drug addiction

and behavior while on those drugs.  Tr.986.  Like every addict, his behavior while on painkillers

was erratic and unpredictable, and often the reason behind any assaults discussed at the trial:

- Ventura testimony regarding Cannes in February 2012: Mr. Combs "kicked [her] off the boat" for taking drugs from her.  Tr.699;

- Ventura to D-ROC in September 2015: "[Combs] came in the house searching for painkillers from me.  I had flushed them.  I don't know what's wrong with your man but he really fucked up today."  DX-1237 at 3;

- Gina Hunyh to D-ROC in January 2016: lamenting to D-ROC that Mr. Combs was on painkillers and not acting normal.

He sought help with this addiction through a stable of doctors in Miami and Los Angeles and even went to Mexico to do an ibogane treatment to detox from opiates. This is something Mr. Combs did, and something that Ms. Ventura did as well. *See, e.g.* GX B-302 (Ventura searches for "ibogaine Mexico," "what vitamins can you take to detox off of opiates," "home remedy for opiates."). However, it was not until his incarceration at the MDC that he became sober—free of any non-medically necessary drugs and any alcohol—for the first time in 25 years.

Mr. Combs has had a long history of being treated by doctors for a variety of mental health conditions including ███████████████████████████████████████ ███████████████████████████████████. His medical records reflect that Mr. Combs was prescribed ███████████ by doctors over a long period of time to treat his disorders. He combined these with illicit substances, which led to the ███████████" on his life. Ex. 66, Krueger Report at 14. Dr. Richard Krueger reviewed the medical records for Mr. Combs and opined that Mr. Combs was "████████████████████████████ ████████████████████ *Id.* Additionally, Dr. Krueger noted that Mr. Combs's physicians prescribed him stimulants for no valid reason:



*Id.* at 15. His medication regimen, though prescribed by doctors over his lifetime, is considered excessive and likely contributed to his angry actions and his temper.

These findings are consistent with Dr. Elie Aoun's findings prior to trial. As the Court will recall, the defense noticed Dr. Aoun as an expert regarding the effects of certain substances, including illegal drugs and prescription drugs. Dr. Aoun offered several opinions similar to Dr. Krueger's, including that:



*See generally* ECF 276, Ex. A (submitted under seal); *see also* 4/9/25 Government Letter regarding defense's expert disclosure at 2.

The PSR, Mr. Combs's medical history, as well as Dr. Krueger's forensic psychiatrist's report emphasize Combs's consistent and long-term history with mental health challenges, chronicling the different doctors he has seen through the years and their diagnoses. A persistent theme in these diagnoses is ████████████████████████████████

████████████████████████████████████. The medical literature tends to indicate that there is

substantial comorbidity among these three conditions. The literature also indicates that a

common source for this triple comorbidity is trauma, especially childhood trauma.

**I.  Mr. Combs's Behavior Has Markedly Improved While In Treatment And
    Under Evaluation At The MDC**

Though Mr. Combs stopped using opiates by the time of his arrest, he was still abusing

other illegal substances. In the Park Hyatt hotel at his arrest, HSI agents recovered a pink

powdered substance that tested positive for MDMA and ketamine. GX 1305; GX 1D-

150. When Mr. Combs was remanded to MDC, he tested positive for "███████

███████████" Ex. 29, BOP Psychology Records at 10. As disclosed to the BOP upon his

incarceration, Mr. Combs was honest that he "████████████████████████████

████████████ *Id.* at 1, 16. ████████████████████████████████

to help alleviate Mr. Combs's withdrawal symptoms related to his discontinuing ███████

████████████████████████████████████████. *Id.* at

16-18, 26, 29.[4]

████████████████████████████████████████

████████████████████████The psychology department at MDC has assisted with Mr.

Combs's addiction recovery since his first week in incarceration, providing him with a workbook

on substance use called "My Recovery Song." *Id.* at 27. Throughout his incarceration he has

expressed a desire not to take substances. *Id.* at 31. With the help of the medical unit, he has

resisted the urges to use even though contraband drugs are readily available in MDC.

---

[4] As Dr. Krueger notes, side effects of detoxification are tremulousness, anxiety, and insomnia, among other
symptoms. Ex. 66, Krueger Report at 14.

Mr. Combs has been in treatment with BOP's Psychology Department and has also been examined extensively, since March, by Dr. Richard Krueger and Dr. Meg Kaplan regarding how he responds to situations that trigger him. Starting almost immediately after his incarceration, his attending psychologist created a safety plan with Mr. Combs and helped him " ███████

█████████████████████████ " *Id.* at 20. Mr. Combs worked with his psychologist to ████████████████████ ." *Id.* As one would imagine, this was not always easy for Mr.

Combs, as he was suffering with depression and acclimating to his new surroundings at MDC. There were days when he was unable to get out of his bed or even talk to the psychology department. Ex. 29, BOP Psychology Records at 43. But he continued with his work at MDC and even sought out evaluations from Dr. Krueger and Dr. Kaplan to " ████████████ " himself. Ex. 66, Krueger Report at 2.

When Dr. Meg Kaplan began evaluating him, she " ███████████████████

████████████████████ " to help him identify " ██████████████

████████████████ " Ex. 67, Kaplan Report at 3. Mr. Combs worked through the workbooks on days he was not being evaluated by Dr. Kaplan and " █████████████████

████████████████████ *Id.* During the months of evaluation by Dr. Kaplan, Mr.

Combs worked diligently to address the issues of ████████████████████

████████████████████ " *Id.* Dr. Kaplan's evaluating work included the following identification of triggers:

• ████████████████████████████████
████████████████████

• ████████████████████████████████
████████████████

- ███████████████████████████████████████████████████

*Id.* at 3.  Mr. Combs has learned through his evaluation with Dr. Kaplan that he has ███████

███████████████████████████████████████████"  *Id.* at 3-4.  This has been a

major breakthrough for Mr. Combs, who understands that in a situation where he is the one with

faulty cognition, removing himself from the situation to address any negative consequences from

his actions is crucial.  *Id.* at 4.

His psychologist at MDC has commended Mr. Combs's work since being incarcerated,

which includes completing multiple workbooks such as "Relationships and Personal

Responsibility," "Quiet Moments," "Strategies for Change," and "Managing My Emotions."  Ex.

29, BOP Psychology Records at 72-75.  Mr. Combs has been "████████ in the past year and

inspiring, with his psychologist writing that



Ex. 29, BOP Psychology Records at 76.  MDC worked with Mr. Combs throughout his

incarceration, including during trial, regarding the stressors of the trial and his difficulty

sleeping.  They gave him techniques to ████████████████ and practiced "████

████████  *Id.* at 54. These techniques, and this support, made Mr. Combs feel "████████

████████████████████████████  *Id.*  Mr. Combs's

███████████████████████████████████████████

████  *Id.*  at 76.

This sentiment is echoed by Dr. Kaplan who opines that Mr. Combs "████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████  Ex. 67, Kaplan Report at 5.

Mr. Combs's therapeutic progress has been evident to his family as well, who have been able to visit him throughout the past 13 months. Sarah Chapman, Chance's mom, has recognized "someone who is much calmer and drug free with a clear mind. I have seen him through his adult stages in life and I believe that after this year in prison, it has been the only time that he has had a break from his past lifestyle and is now focused on what truly matters." Ex. 27, Letter of S. Chapman at 2. His sister, Keisha, has noticed the same thing:

> I can see and hear the change in Sean. The dark veil of addiction, confusion, and the chaos of his life is gone. When I think back to the start, I recall the fear, the uncertainty, in his voice, his words, and his body language. Now, his voice, his words, and his thoughts are clear.
>
> Considering where he is at, Sean sounds lighter. His new reality away from family, the glamour, the comfort and familiarity he is used to, has forced him to self-reflect and assess his choices. He is different now than when he entered MDC. I cannot tell you how many times during our conversations he has said to me, "I've been able to think clearer now." Or "This time has made me sit my a–down and be honest with myself."

Ex. 2, Letter of K. Combs-Dent at 2.

Jameel Spencer has seen Mr. Combs once since Mr. Combs's incarceration. During that meeting, Mr. Spencer told Mr. Combs, "when he was at his best, he was the brightest light our culture had ever enjoyed. Somewhere along the way he got to enamored with the power and lost his way. He responded that he thought that fame and fortune brought you notoriety, but he how realized the magnitude of the obligation and responsibility required." Ex. 26, Letter of J. Spencer at 2-3. It is clear that the last year has given Mr. Combs the outlook-shift, the break, and the sobriety, that he has so badly needed. He reflected to the Probation Officer how the legal process and incarceration has affected his outlook on life:

> There is a price you have to pay if you're blessed with success. This is something I never knew or accepted. Success has a steep price. And that price is responsibility. Responsibility is a scary word, most humans dread responsibility. I know I did I really thought success and money gave me freedom to do whatever I wanted to do with no real consequences. I had to learn the hard way. Its unfortunate that it took me being incarcerated to learn this valuable lesson. I have to admit that I have been irresponsible with the life god blessed me with. I have been irresponsible with the gifts that god blessed me with. I ran with the responsibility. Heavy is the head that wears the crown. I used to call myself a king. But I didn't act like a king. I didn't act like a man. If you don't pay the price you eventually fail. I have learned that everything I say and everything I do matters. It all matters. I have a responsibility for it all. With responsibility comes sacrifice. In the future I will sacrifice what want to do for what is best for all. Not just me. I will be selfless instead of selfish. Selfishness is a disease. Selflessness is a gift. This situation has made me become a man, a man that knows and understands his responsibilities. A man that is ready to sacrifice, and do what's right, over my selfish desires. A man that is ready to pay the price. I am accountable, I am responsible.

PSR ¶82. These are the results of someone who "as always…tried to learn" from his circumstances. Ex. 60, Letter of L. White at 2. However, before these 13 months in custody, "he never truly learned about himself and his flaws" to engage in the "serious therapy to help him understand his issues." *Id.*

Now, however, he has taken the time to do that. It is clear that Mr. Combs's treatment and examination while incarcerated *has worked*. Since tapering off Xanax, quitting alcohol, and illicit substances, his angry actions have disappeared. Mr. Combs has an "incident free record" while being confined in a violent institution, has never initiated a fight, and never participated in a fight. Ex. 29, BOP Psychology Records at 76.[5] Through his work with Dr. Krueger, Dr. Kaplan and the MDC medical department, he has been able to handle the unbelievably difficult situation of being incarcerated at the MDC with grace and without violence. As Dr. Kaplan explains, ████████████████████████████████████████ including when

---

[5] Mr. Combs has received a BOP violation for using another inmate's phone to make calls, when Mr. Combs was out of minutes.

an inmate approached Mr. Combs with a shiv and said ███████████████████

████████████████" when Mr. Combs was sitting on a chair that the inmate wanted to

sit on.  Ex. 67, Kaplan Report at 4.  Mr. Combs would have ordinarily reacted in that terrifying

situation, but instead he remained calm and the fight was diffused.  He has also been able to

withstand drug use and abide only by the medical protocol designed by the medical staff at the

facility.  *See generally, id.* at 4; Ex. 29, BOP Psychology Records.

Dr. Kaplan advises that Mr. Combs has benefited as much as he can in the MDC, and

would now benefit from group therapy for domestic violence and anger management, which is

not available at the MDC.  Group therapy for anger management is effective because it helps

███████████████████████████████████████████████████████

████████████████████████████████████ Ex. 67, Kaplan

Report at 5.  Mr. Combs has expressed a desire to BOP, Dr. Kaplan and to Probation "to

continue mental health counseling in [the] future" because "Every day in here is a commitment

to do my best."  PSR ¶200.

### J. The Effect Of Mr. Combs's Trauma And Why Mr. Combs Is Now Considered a Low Risk Of Sexual Violence Or Domestic Violence

As noted in Dr. Kaplan's report, Dr. Krueger's report and in the BOP's Psychology

records, Mr. Combs is considered a ██████████████████."  Ex. 29, BOP Psychology

Records at 15; Ex. 67, Kaplan Report at 5; Ex. 66, Krueger Report at 18-20.   After evaluating

Mr. Combs from March until August, Dr. Krueger found that Mr. Combs:



[REDACTED]

PSR ¶202; Ex. 66, Krueger Report at 14.  The tripartite comorbidity of PTSD, depression and anxiety often derive from trauma, particularly childhood trauma, and especially childhood trauma that is not sufficiently addressed at the time of occurrence.[6]  Further, the comorbidity of these disorders contributes significantly to a condition known as hyperarousal, which encompasses symptoms such as highly irritable behavior and aggressive outbursts.  In particular, Criterion E of the DSM-5 specify that among the diagnostic factors for PTSD is "irritability or aggression" as well as "difficulty sleeping."

Based on Dr. Krueger's report and the PSR addressing Combs's psychological history of [REDACTED], it is apparent that the violence in this case, to the extent it is considered by the Court (and for reasons stated elsewhere, it should not be considered), is attributed directly to Mr. Combs's well-documented psychological challenges.  Indeed, the behaviors attributed to Mr. Combs are textbook behaviors exhibited by people suffering from PTSD as a result of their own traumatic situation.  This is not being offered as an excuse, but instead as an explanation and an avenue to greater psychological and physical health for Mr. Combs and an assurance that he will not return to those behaviors.

The role of mental health in the criminal justice system has been the subject of a great degree of research and thought over the last three decades.[7]  As one example, New York State

---

[6] Journal of Affective Disorders, Vol 283, March 15, 2021, "Childhood Trauma in Adult Depressive and Anxiety Disorders: An Integrated review on Psychological and Biological Mechanisms in the NESDA Cohort (Childhood trauma "impacts the functioning of the brain, mind and body, which together may contribute to a higher vulnerability for affective disorders."

[7] "A Look At Mental Health Courts," American Bar Association, Sept. 10. 2024 (18% of the population has a mental illness.  44% of people in jail have mental illness); "The Link Between Mental Health, Crime and Violence," New Ideas In Psychology, Vol. 58, August 2020.

embraced "problem solving courts" to address issues such as addiction, domestic violence and mental illness by focusing on achieving positive outcomes for offenders rather than processing criminal cases in the traditional manner.[8]  Over the last twenty years, these "problem solving" courts have expanded dramatically nationwide.[9]  This expansion is for two related reasons.  First, they work.  They achieve the stated objective of reducing the recidivism rate of offenders in the areas of domestic violence and drug use due to addiction or mental health challenges.[10]  Second, they get at the root cause of the problem, which is the psychological challenge facing the offender.  *Id.*  Decades of experience across tens of thousands of cases and tens of thousands of defendants have led to a far greater appreciation of what is both fair and effective for people in the criminal justice system with a history of addiction and mental illness.  The answer is not more jail.  The answer is less jail and more therapeutic and rehabilitative measures to actually help the person who needs the help.

While a draconian sentence in this case may help the U.S. Attorney's Office, it will not help either Mr. Combs or the community which this Office purportedly serves.  Dr. Krueger also noted several factors demonstrating that Mr. Combs had a decreased risk of future violence.  These factors include the following:



---

[8] Building Trust and Managing Risk: A Look At a Felony Mental Health Court, Carol Fisler, J.D., Director, Mental Health Court Programs, appearing in Psychology, Public Policy and Law, 11, 587-604 (2005).
[9] Mental Health Courts In An Era of Criminal Justice Reform, Stephen Eide, October 2024.
[10] The Case For Experimental Problem-Solving Courts: Rehabilitation Through Behavioral Modification Programs, 55 Ariz. L. Rev. 35 (2013) (Problem solving courts provide treatment and services for offenders so that they are less likely to recidivate).



Ex. 66, Krueger Report at 18-19.

*Id.* at 20.  Dr. Krueger notes that Mr. Combs's risk for violence would be reduced even further by engaging in treatment for substance abuse and domestic violence or anger management.  *Id.*

## II.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE DO NOT WARRANT MORE INCARCERATION

In the mid-20th century, the government stopped using the Mann Act to prosecute supposedly "immoral" sex between consenting adults.  In fact, pursuant to DOJ policy, Mann Act prosecutions are brought only against supposed commercial purveyors of prostitution or those involved in sex trafficking or exploitation of minors.  *See infra* Part IV(C).  Mr. Combs's case is nothing like that, as the PSR even notes.  PSR at 71.

The trial evidence undeniably revealed that Mr. Combs shared serious loving relationships with both Ms. Ventura and Jane.  One aspect of these relationships was consensual sexual activity, including sexual experiences that involved third parties.  The relevant third parties were always adult men acting on their own accord who often traveled to join Mr. Combs and his girlfriends when they had these sexual experiences.  Mr. Combs did not profit in any way from this activity—it was simply part of the way he and his longtime girlfriends' enjoyed their personal sexual lives.  These romantic relationships were complicated and at times toxic, plagued by celebrity lifestyles, an inability to effectively communicate, as well as serious substance abuse and domestic violence.

While the government attempted at trial to depict these couples' sex lives as coerced and nonconsensual, the jury rejected that theory.  It heard seven weeks of testimony, including from Ms. Ventura and Jane, and reviewed thousands of text messages, photos, videos, and other documents chronicling the history of these relationships.  The jury evaluated that evidence and rejected the government's claims of force, fraud or coercion.[11]  The jury quickly acquitted Mr. Combs of sex trafficking and RICO conspiracy but convicted him under the Mann Act for transporting other individuals for the purposes of engaging in prostitution.  Mr. Combs was thus convicted only for participating in sexual activity with his girlfriends, for which his girlfriends and male entertainers sometimes traveled interstate and the male entertainers were sometimes paid.  In other words, he was convicted of Mann Act prostitution offenses and nothing more.

---

[11] As outlined in our objections to the PSR and throughout this memorandum, we object to the Court considering in any way this acquitted conduct, because it is not relevant conduct under the Guidelines, and because its use in any way to increase Mr. Combs's sentence would raise serious constitutional and fairness concerns.

### A. Mr. Combs And His Adult Girlfriends Had Serious Relationships That Involved Consensual Sexual Experiences With Adult Third Parties

#### 1. Mr. Combs's And Ms. Ventura's Relationship And Participation In Consensual Adult Sexual Experiences

Mr. Combs and Ms. Ventura had a serious eleven-year adult relationship. Mr. Combs and Ms. Ventura met when she was an artist making over a quarter of a million dollars per year. Tr.1646-1647. By that time, she was a celebrity in her own right with her first album, and she had been modeling for years. Tr.942. She was signed to Bad Boy, and their relationship "was still a platonic" one, where Mr. Combs "looked out for" Ms. Ventura and "had [her] back" during some rough performances. Tr.416. She was dating her producer, who was ten years her senior, at the time she and Mr. Combs started dating. Tr.946. After a trip to Miami, the two fell in love. Tr.428; Tr.1685; *see also* DX-1353; DX-1354; DX-1359; DX-1360; DX-1355. They dated for a decade and did not live with one another. Tr.434. In fact, they "often had long breaks from each other." Tr.913. They remained together until 2018, when Ms. Ventura ended the relationship after seeing Mr. Combs with another woman and realizing she would never play the role in his life that Kim Porter had. Tr.815; Tr.1227-28; Tr.1261. Ms. Ventura testified at trial that throughout these eleven years, she was in love with Mr. Combs, the relationship was "filled with love and passion," and she came to know a version of Mr. Combs that nobody else knew. Tr.899-901.

A mutual aspect of the relationship was sex, and an "integral part of [their sexual] relationship" was "freak-offs." Tr.940. Ms. Ventura agreed to participate in their first "freak-off" because she "loved [Mr. Combs] very much and wanted to make him happy." Tr.409; *see also* Tr. 477; Tr.915-916; Tr.1340. At trial, she did not remember what she told him afterwards, but she did testify that after that point she did not want to say "no" because she did not want to regret Mr. Combs sharing this private, vulnerable side of himself with her. As Ms. Ventura put

it, "his trust meant a lot to me." Tr.483; *see also* Tr.918-919. She testified she enjoyed "the time

spent with" Mr. Combs during "freak-offs," which allowed her to feel "very close to him."

Tr.486. It was important to Ms. Ventura to get close to Mr. Combs and the time during "freak-

offs" was a special time that she cherished. Tr.914; Tr.1064.

There was voluminous evidence at trial revealing that Ms. Ventura was not merely a

willing, but an enthusiastic participant in "freak-offs"—and that is what she conveyed to him.

After one "freak-off," for example, Ms. Ventura wrote Mr. Combs: "You are truly the most

extraordinary man. I love you so much. You make me a better woman, daughter, sister, person.

I hope you always know how much I love and appreciate you. Thank you for always showing

me love and happiness the way it's supposed to be." GX B-248. Although the government

apparently continues to maintain that Ms. Ventura engaged in "freak-offs" because of force,

fraud, coercion, or fear, there was evidence to the contrary and that was not the jury's evaluation

of their relationship and certainly not a sentiment she ever shared with Mr. Combs. To the

contrary, she testified she "really didn't want to make him think I didn't want to do it anymore."

Tr.494; Tr.917. Ms. Ventura felt that "when you really care about somebody and you're in love

with them, you don't want to disappoint them." *Id.*; *see also* Tr.1331. That was the sentiment

she communicated to Mr. Combs, and Ms. Ventura repeatedly testified she "was just in love and

wanted to make him happy." Tr.409.

### 2. Mr. Combs's And Jane's Relationship And Participation In Consensual Adult Sexual Experiences

Jane was 35 years old at the time she began dating Mr. Combs. Tr.5302. She was a

devoted mother and was previously in a relationship with, and had a child with, an individual at

the top of the entertainment industry. Tr.5950. She immediately fell in love with Mr. Combs

after a trip to the Bahamas and Turks & Caicos and they started dating in February 2021. She

lived in New Jersey for the first few months of their relationship, then moved to Los Angeles, but maintained her own residence.  Tr.5306-07.  Although the two broke up in late 2023, they rekindled in 2024 and remained in a relationship until Mr. Combs's arrest.

From the beginning, their relationship was incredibly sexual, and after several months of dating, Jane and Mr. Combs had their first "hotel night."  Jane testified that after she had sex with entertainer Don during this initial "hotel night," she and Combs "were in a really good mood and we just started making love and he was really, really happy…we were together and we were happy." Tr.4592.  She further testified she "felt exhilarated from that experience," doing something she "had never done before."  *Id*.  She said she felt excited, happy, and had a good time with her partner, Tr.4592-4593, and thought "maybe we would do it again, just something taboo," Tr.4593.

When Mr. Combs suggested to Jane that they continue "hotel nights," she "was agreeable" "because [her] partner wanted that and [she] just wanted to make him really happy." Tr.4595-96.  She "knew it turned him on and [she] just wanted to satisfy [her] partner."  *Id*.  Jane and Mr. Combs continued "hotel nights," and Jane was a willing participant because she "wanted our time to be special every single time," "[a]nd if that made him happy, I was willing to make him happy."  *Id*.  Jane would often coordinate with the men, often *without* Mr. Combs's knowledge, and without Mr. Combs's direction, to organize "hotel nights" as a surprise to Mr. Combs.  Tr.4811.  She testified she would personally reach out to many "entertainers" including Kabrale, Antoine, Paul, and Don.  Tr.4811; 5523.  Indeed, she came up with the idea of reaching out to porn stars, Kabrale and Antoine, to see if they would join her and Mr. Combs for a "hotel night."  Tr.4811; 5523; Tr.4740-41; Tr.4755; Tr.4735.  She found entertainers, contacted them, and arranged times for them to join her and Mr. Combs.  *See, e.g.*, Tr.5523; GX1411 p.11;

Tr.5525. Her participation in this lifestyle continued even without Mr. Combs during a period when they had temporarily separated, and she encountered Antoine at a party in Las Vegas where another rap star and his wife were involved in similar consensual sexual conduct. Tr.5117-18; Tr.5760-61; Tr.5763.

### B. The Male Escorts And Entertainers Were Fully Consenting, Empowered Adults Who Traveled And Participated Of Their Own Accord

The jury convicted Mr. Combs on the Mann Act counts based on evidence that he and his girlfriends paid the male escorts and entertainers who traveled to "freak-offs" and "hotel nights." While Mr. Combs preserves the arguments in his post-trial motions, the purported "prostitutes" were all adult males who voluntarily traveled and participated in the activity because they enjoyed spending time with Mr. Combs and his girlfriends. The relationships at issue, the relevant participants, and the means by which the offenses were carried out are worlds apart from typical Mann Act convictions.

The evidence shows these men enjoyed their experiences with Ms. Ventura, Jane, and Mr. Combs, and were not motivated just by money or a need to engage in sex work for some exploitive pimp. *See* Dkt.486 at 30-31. Moreover, Ms. Ventura and Jane developed their own relationships and friendships with these men, including independently loving and sensual relationships. *Id.* And these men were in no way dependent on Mr. Combs or the money they were paid. Kabrale and Antoine were both successful porn stars. And Kabrale had another job—as a chef. Paul was an escort as well as a successful personal trainer (including for Mr. Combs). These men were all making a living outside of "freak-offs" and "hotel nights" and chose to participate for their own reasons.

Nor did anyone "transport" these men in the traditional sense. Mr. Combs did not, for example, drive them across state lines in a car to motels, or across the Mexican or Canadian

border; he did not book them flights from locations like China or Korea. That would be the normal Mann Act case. Here, the transportation was open and obvious, often with flights booked in the men's own names by either Ms. Ventura, Jane or Mr. Combs. Occasionally, the men would book their own travel and be reimbursed. These facts are not akin to the "'white slave' business" originally motivating the Mann Act, or the cases DOJ typically prosecutes. *Mortensen v. United States*, 322 U.S. 369, 377 (1944).

### C. Mr. Combs Did Not Profit In Any Way—This Was Merely The Way He And His Girlfriends Enjoyed Their Sexual Experiences

Moreover, the evidence revealed that Mr. Combs did not in any way profit or benefit from the "freak-offs" or "hotel nights" as a Mann Act defendant typically would. To the contrary, these sexual encounters reflected highly personal, sensitive decisions about the couples' sex lives, as well as the couples' sexual preferences.

For example, Ms. Ventura testified that "within the first year of our relationship, um, Sean proposed to me this idea, this sexual encounter that he called voyeurism, where he would watch me … have intercourse and sexual activity with a third party, specifically another man." Tr.407; Tr.475. Ms. Ventura later explained to male entertainers that Mr. Combs was "into something called voyeurism." Tr.528. Ms. Ventura even indicated that this was a subject that caused Mr. Combs "personal shame," a weight she helped carry in the relationship. Tr.825-26. Jane explained that hotel nights were simply sexual kinks, testifying she "came upon a word that was called a 'cuck,' 'cuckholder'" which "is a man who is in a relationship with a woman and he's turned on watching his woman have sex with another man." Tr.5380. Jane testified that the sexual experiences were meaningful because they "brought [Mr. Combs] peace" and she was able to provide that peace for him. Tr.5640-41.

These intimate, consensual experiences cannot now be turned into violent, unwelcomed encounters. The motivation for "freak-offs" and "hotel nights" was not profit or control or sexual abuse. To the contrary, these experiences merely reflected the couples' sexual preferences and their desire to make love in their own way. For this reason, the trial evidence demonstrated that Mr. Combs and his girlfriends attempted to keep this activity secret, and Ms. Ventura and Jane felt particularly close to Mr. Combs given the "taboo" nature of the activity. Tr.4593.

### D. Drugs And A High-Profile Celebrity Lifestyle Obviously Played A Role

Without minimizing Mr. Combs's conduct, this is in many ways a "sex, drugs, and rock n' roll" story. Mr. Combs had severe substance abuse problems throughout the entirety of the offense conduct and participated in a high-octane celebrity lifestyle. So did Ms. Ventura—independently and not because of Mr. Combs. As for Jane, she willingly took ecstasy and other drugs with Mr. Combs, which became a part of their relationship.

### 1. *Mr. Combs And Ms. Ventura Each Had Serious Drug Problems For Years*

In a relationship between two famous celebrities, Mr. Combs and Ms. Ventura partied together and unfortunately became addicted to drugs together. Drugs were "always part of [their] relationship, but became a main event" for them. Tr.1063. Ms. Ventura was "surprisingly" able to keep up with Mr. Combs's drug use. Tr.1064. They even called one another "get high partners." Tr.1065. For Ms. Ventura and Mr. Combs—both of whom were addicted to opiates during their relationship—"freak-offs" were also a time to do drugs in a safe, confined space, in a hotel room." Tr.1062.

Though the government tried to paint Ms. Ventura's drug use throughout the trial as solely due to Mr. Combs and his influence, the evidence refuted that narrative. Ms. Ventura

consumed opiates and marijuana with her longtime best friend (with whom she lived prior to even knowing Mr. Combs); and she used cocaine, ecstasy, and molly without Mr. Combs. Tr.1588-1589; 3075-76 (testimony about Ms. Ventura doing drugs without Mr. Combs).  Mr. Combs would often not be involved when Ms. Ventura did drugs with friends.  Tr.1087-1088; Tr.4257-4268; Tr.4330-4336; DX-1281 (Ventura discussing molly with Bongolan); DX-1287 (Ventura coordinating drugs with Bongolan); DX-1853 (Ventura receiving drugs from Bongolan).  And by 2016, Mr. Combs was telling drug dealers not to provide product to Ms. Ventura.  Tr.1068; Tr.1679 (Ms. Morgan testifying that Mr. Combs was trying to get Ms. Ventura to do less drugs); *see also* DX-1856 (Mr. Combs to Bongolan lamenting that Bongolan was doing ketamine with Ms. Ventura and not watching out for Ms. Ventura).  And after years of the two abusing drugs with one another, Mr. Combs and Ms. Ventura attempted to get sober several times.

### 2.  Jane Explored Drug Use With Mr. Combs And Saw Mr. Combs Struggle With Drugs

Jane testified that from the very beginning of their relationship (even before any "hotel nights" began), she willingly took ecstasy and other drugs with Mr. Combs.  She testified that Mr. Combs would offer her ecstasy, that she *chose* to take it, and that it made her more uninhibited and sexual.  Tr.5302-03; Tr.4708-10.  Jane observed Mr. Combs struggle with drug use throughout their relationship and encouraged him to go to rehab and get sober.  Tr.5641-5642.  She "could see that [Mr. Combs] … was excessively partying on top of just so many pills that he t[ook] daily."  Tr.4710.  Drugs were clearly a part of their sexual relationship both during and outside of "hotel nights."  And by the end of their relationship, drugs played a major role in their sex life.  *See, e.g.*, Tr.5417-18; DX-3306 (Jane texting Mr. Combs in August 2024, "You're

the greatest. Detox weekend and week babe. We got to reset our gut health, hormone levels, and mental clarity").

### 3.  Mr. Combs's Employees Did Not Participate In The Offense Conduct

The government argued at trial that these sexual experiences were the product of a RICO enterprise comprised of "foot soldiers," security guards, and personal assistants, but that theory was flatly refuted and, thereafter, rejected by the jury.  These third parties may have had tangential involvement (e.g., setting up hotel rooms), but that does not mean they participated in the offense conduct.  To the contrary, their only role was working in their capacities as Mr. Combs's or Combs Enterprises' employees.  Of course, celebrities like Mr. Combs often employ chefs, travel agents, doctors, and other individuals who help them with aspects of managing their personal lives.  But no evidence suggested these individuals were criminally responsible for the Mann Act offenses or participated in the offense conduct.

### E.  Mr. Combs Had A Domestic Violence Problem Unrelated To The Offense Conduct

As the InterContinental Hotel video reveals, and Ms. Ventura testified, *see, e.g.*, Tr.1294-95, there were rare times where Mr. Combs committed acts of domestic violence during their relationship.[12]  The violence was not entirely one-sided, however.  Ms. Ventura testified there were times when she initiated physical fights with Mr. Combs.  Tr.757.  On one occasion, for example, she "punched [Mr. Combs] in the face."  Tr.764.  Mr. Combs, for his part, is the first to exclaim that these acts of domestic violence against Ms. Ventura are inexcusable.  But the notion that the violence, or coercion, had a nexus to "freak-offs" is not true, as the jury clearly found.

---

[12] To be clear, the events depicted in the InterContinental video do not relate to any Mann Act violation charged in Count Three, since no one traveled interstate to the freak-off that preceded the fight, and these events are not relevant conduct.

As for the one episode of violence between Jane and Mr. Combs in June 2024, Jane unequivocally testified that she provoked the fight.[13]  She testified she began the fight by slamming Mr. Combs's head into her marble counter while he was bending over to tie his shoe, stating she "gave it a good shot."  Tr.5181.  She then threw lit candles and wine glasses at him.  Tr.5181; Tr.5807.  And she did this while repeatedly calling him a "pedophile" and a "monster."  Tr.5807-08; Tr.5817-18.  She then gave him a "solid punch" in his head, to which Mr. Combs then retaliated.  Tr.5818.  By that point, Mr. Combs was intoxicated, as he had consumed multiple glasses of champagne and multiple shots of tequila.  Tr.5800.  Again, Mr. Combs's knows that partaking in any type of physical violence with a woman is inexcusable, but the jury rejected the argument that the violence caused Jane to participate in a "hotel night."

### F.  The Jury Rejected Any Notion Of Force, Fraud, Coercion

The jury rejected the government's theory that Ms. Ventura and Jane were victims of sex trafficking.  There was overwhelming evidence—which the jury credited—that Ms. Ventura and Jane were enthusiastic and voluntary participants in the sexual activity underlying the case.  We will not relitigate the trial or waste space explaining why the jury's Not Guilty verdicts on sex trafficking and RICO conspiracy were the only just verdicts supported by the evidence or rehash all the evidence showing why the government's force, fraud, or coercion arguments at trial were unfounded. Suffice it to say that the jury already weighed the strength of that evidence, and it is not relevant here and should play no role at sentencing.  As is clear from Mr. Combs's objections to the PSR and throughout this memorandum, we object to the use for purposes of sentencing of any evidence the government claims shows force, fraud, or coercion, because the law requires the Court to respect the jury's verdict.

---

[13] The "hotel night" that took place that evening involved no interstate travel and is not charged within Count Five. The events that evening should not be considered relevant conduct.

*      *      *

Whether the form of intimacy is a threesome, or home-made pornography, or some other type of consensual adult sexual activity, the sexual freedom of consenting adults is recognized and protected under the law.  *See generally Lawrence v. Texas*, 539 U.S. 558 (2003).  Mr. Combs and several of his long-term, adult partners chose to pursue threesomes.  Had they pursued this lifestyle by, for instance, meeting willing adult participants in swingers' clubs, the sexual activity in this case would have been constitutionally protected.  However, as Mr. Combs's notoriety increased, picking up men in clubs posed serious concerns for his, and his partners', safety.  In addition, there were concerns that these random men would publicly disclose Mr. Combs and his partners' private sex life.  The most sensible alternative, and the one they chose, was to find "professional" men, either with a well-known agency or an established actor in pornographic movies.  But there is nothing about the fact the men were professionals, or that they traveled interstate, that made the conduct harmful or injurious.  That context is an important factor the Court should consider when weighing the §3553(a) factors.

## III.    THE GUIDELINES RANGE SHOULD BE 6-12 MONTHS, AND ACQUITTED CONDUCT MUST NOT BE USED *IN ANY WAY* TO ENHANCE THE SENTENCE

Probation recommends a guidelines range of 70 to 87 months' imprisonment based on a total offense level of 27 and criminal history category of I.  PSR ¶¶153, 227.  This calculation is premised on a base offense level of 14 pursuant to USSG §2G1.1(a)(2), a 4-point enhancement for fraud and coercion under §2G1.1(b)(1)(A) & (B)(i), a 4-point enhancement for role in the offense under §3B1.1(a), and a 5-level increase based on grouping.  *See id.* ¶¶84-85, 87, 89, 95, 101, 107, 113, 117, 119, 125, 131, 137, 143, 146-49.  Probation's calculation grossly overstates the seriousness of the offense and is infected with multiple legal and factual errors.

We agree the base offense level is 14, but none of the proposed enhancements should be applied, and 2-level downward adjustments are warranted under the zero-point offender guideline and for acceptance of responsibility, for the following reasons, explained in greater detail below:

- The Court cannot use acquitted conduct *in any way* to enhance Mr. Combs's sentence. The recent acquitted conduct amendment forbids the use of acquitted conduct for guidelines purposes, and the narrow exception permitting such use doesn't apply here. Moreover, using acquitted conduct even under the §3553(a) factors or when determining Combs's ultimate sentence within the guidelines range if the Court determines a guidelines sentence is appropriate would raise serious Sixth Amendment, Fifth Amendment due process, Fifth Amendment Double Jeopardy, and fairness concerns.

- Applying the enhancement for fraud or coercion would circumvent the acquitted conduct amendment—and the constitutional concerns it was promulgated to address—because the jury rejected the government's claim that Mr. Combs defrauded or coerced Ms. Ventura or Jane when it acquitted him on Counts 2 and 4. That "coercion" is defined differently in the guideline than the sex-trafficking statute is irrelevant. Applying the fraud/coercion enhancement would also defy the trial record.

- No grouping analysis is appropriate because neither Ms. Ventura nor Jane nor any male entertainer is a "victim." Concluding otherwise would defy the plain meaning of "victim" (i.e., one who is harmed or injured in some way) and the factual record. At the very least, there is no serious argument that the entertainers are "victims," but the Court should vary downward significantly if it disagrees.

- No role enhancement should be applied because the jury rejected the government's arguments that Mr. Combs was a "leader" or "organizer" of a criminal association when it acquitted him of the RICO conspiracy charge. And the record shows that neither Ms. Ventura, Jane, Kristina Khorram nor any other of Mr. Combs's employees are "criminal participants" within the meaning of the guideline, and that the alleged criminal conduct was not "otherwise extensive."

- Mr. Combs is entitled to a two-level downward reduction for being a zero-point offender. To avoid violating Mr. Combs's constitutional rights, the Court should apply the 2023 version of the zero-point offender provision, along with the rest of the 2024 Manual. The so-called one-book rule does not prohibit this approach.

- Declining to award Mr. Combs a two-level reduction for acceptance of responsibility would unfairly penalize him for exercising his Sixth Amendment rights. Given the government's unreasonable position in pre-trial plea discussions (refusing to offer a plea solely to Mann Act counts and insisting on a stipulated guidelines range that would

effectively represent a life sentence for a 55-year-old), Mr. Combs had no choice but to take this case to trial.

- If the Court disagrees with these arguments and applies the PSR's recommended enhancements, a *significant* downward variance would be warranted because the stacking of enhancements would dramatically inflate Mr. Combs's guidelines range beyond reason.

### A. The Court Cannot Rely On Acquitted Conduct When Determining Mr. Combs's Guidelines Range

1. The guidelines were amended, effective November 1, 2024, to exclude "acquitted conduct" from the definition of "relevant conduct" in USSG §1B1.3. App. C Supp., amend. 826.[14] "Acquitted conduct," in turn, is defined as "conduct for which the defendant was criminally charged and acquitted in federal court." §1B1.3(c). The acquitted conduct here was based on evidence the government claimed supported the RICO conspiracy and sex-trafficking counts, but which did not establish the elements of the Mann Act counts. This was the vast majority of the evidence the government presented at trial. The jury rejected this evidence and acquitted Mr. Combs of this conduct, including the government's theory that force, fraud or coercion was used in connection with the freak-offs and hotel nights. Only the narrow body of evidence used to prove the elements of the Mann Act counts—i.e., transportation with intent to engage in prostitution—is left as "relevant conduct."

Although relevant conduct continues to include conduct that "also establishes, in whole or in part, the instant offense of conviction," §1B1.3(c), this is a narrow carveout from "acquitted conduct" that is limited to conduct that actually *establishes the elements of* the offense of conviction. The Probation Office and the government both employ an incorrect and overbroad interpretation of "establishes" that would render the new acquitted conduct guideline a nullity.

---

[14] https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/2024/APPENDIX_C_Supplement.pdf.

When the Commission sought public comment for its acquitted conduct amendment, the government proposed a broader exception that would have covered conduct that "relates . . . to the instant offense of conviction."[15]  The Commission rejected the government's proposal and chose, instead, to limit the carveout from acquitted conduct to conduct that "establishes" a convicted count.  §1B1.3(c).  As explained in more detail below, "establishes" has a specific meaning far narrower than "relates to."

The application note accompanying the new guideline provision explains that "[t]here may be cases in which certain conduct *underlies* both an acquitted charge and the instant offense of conviction," and in such cases the court is best positioned to determine "whether such *overlapping* conduct *establishes*, in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct."  §1B1.3 App. Note 10 (emphases added).  In other words, to constitute "relevant conduct," it is not sufficient that acquitted conduct "underlie" or "overlap" with the count of conviction.  Nor is it sufficient for conduct to "relate" to the convicted count, as the government had proposed.  Rather, the conduct at issue must "establish[]" the convicted count.

 "Establishes" is a very particular and narrow term.  In applying it, the Court should look to its plain meaning at the time it was promulgated, i.e., 2024.  *Perrin v. United States*, 444 U.S. 37, 42 (1979); *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020); *e.g.*, *United States v. Roberts*, 442 F.3d 128, 129 (2d Cir. 2006) (per curiam).  Contemporary legal and non-legal dictionaries define "establish" to mean prove or demonstrate.  *See* Black's Law Dictionary, *Establish* (12th ed. 2024) ("To prove; to convince someone of," e.g., "the House managers tried to establish the

---

[15] United States Sentencing Commission, 2023-2024 Amendment Cycle: Proposed Amendments/Public Comment 88 FR 89142 at 52 (Feb. 22, 2024), https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/202402/88FR89142_public-comment.pdf.

president's guilt"); Black's Law Dictionary, *Establish* (11th ed. 2019) (same); Webster's New

World College Dictionary at 497 (5th ed. 2020) ("to prove; demonstrate," e.g., "to establish

one's cause at law"); The American Heritage College Dictionary at 478 (4th ed. 2010) ("[t]o

prove the validity or truth of").

Courts also routinely define "establish" in similar terms: proving or demonstrating a

crime and its elements. *See, e.g.*, *United States v. Omotayo*, 132 F.4th 181, 200 (2d Cir. 2025)

("[T]he government needed to prove three elements beyond a reasonable doubt to establish

aggravated identity theft."); *United States v. Eisenberg*, 784 F. Supp. 3d 579, 591 (S.D.N.Y.

2025) (the government "need establish" venue only by a preponderance of the evidence because

it is "not an element of a crime"). Older cases are in accord. *E.g.*, *United States v. White*, 324

F.2d 814, 816 (2d Cir. 1963) ("All necessary elements of the crime under the statute had been

established."); *Kawakita v. United States*, 343 U.S. 717, 737 (1952) ("[A]ll other elements of the

crime . . . being established").

The plain meaning of "establish" is consistent with how the term is used elsewhere in the

guidelines. For example, the guideline for fraud offenses provides a cross reference directing

that if "the conduct set forth in the count of conviction *establishes* an offense specifically

covered by another guideline," that other guideline should be applied. §2B1.1(c)(3) (emphasis

added). The Second Circuit has limited this provision to situations where "the *elements of*

*another offense* are established by" the convicted conduct, *United States v. Genao*, 343 F.3d 578,

584 (2d Cir. 2003) (emphasis added), and other Circuits have adopted similar interpretations,

*e.g.*, *United States v. Nucera*, 67 F.4th 146, 173-75 (3d Cir. 2023); *United States v. Wang*, 944

F.3d 1081, 1086-87 & n.7 (9th Cir. 2019); *United States v. Bah*, 439 F.3d 423, 427-28 (8th Cir.

2006).

Similarly, the guidelines direct that where a plea agreement "containing a stipulation . . . specifically *establishes* a more serious offense than the offense of conviction," the court should apply the offense guideline applicable to the stipulated offense.  §1B1.2(a) (emphasis added); *see also id.* at (c).  Applying this provision, the Supreme Court held that the stipulated facts did not "specifically establish" a violation of a particular statute because they failed to establish the intent element.  *Braxton v. United States*, 500 U.S. 344, 349-51, 351* (1991) (applying analogous, prior version of guideline); *accord, e.g.*, *Bah*, 439 F.3d at 428-30; *United States v. Day*, 943 F.2d 1306, 1309-11 (11th Cir. 1991).

As these interpretations make clear, the exception the Commission drafted for conduct that "establishes" the count of conviction, §1B1.3(c), is far narrower than the government's proposed carveout for conduct that "relates to" the convicted count.  Whereas "establishes" is limited to conduct that proves transportation for purposes of prostitution, "relates to" is a "broad" and "expansive" phrase that would have swept in any conduct merely bearing any kind of relation, however attenuated, to these elements.  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992) (collecting cases); *see also California Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring, joined by Ginsburg, J.) ("[A]s many a curbstone philosopher has observed, everything is related to everything else.").  The Commission never intended to craft an exception to the amendment that would swallow the amendment itself.

2.  Applying the well-defined plain meaning of "establishes," it is clear that only conduct necessary to prove the elements of the Mann Act convictions can constitute relevant conduct.

To prove Counts 3 and 5, the government needed to prove only that Combs (1) knowingly transported an individual in interstate commerce (2) with the intent that the individual

engage in prostitution.  Tr.8028 (jury charge).  These were very narrow counts.  The government

didn't have to prove that sexual activity even occurred, or that the person who was transported

traveled against their will or engaged in any sexual activity that did occur.  And as the

government emphasized to the jury, the Mann Act counts were "totally separate" from the sex

trafficking counts because they "simply address[] transporting people across state lines or

internationally for the purposes of prostitution" and "do[] not require force, fraud or coercion."

Tr.7696.

By contrast, the sex-trafficking counts *did* require evidence of "force, threats of force,

fraud, coercion . . . , or any combination of such means."  18 U.S.C. §1591(a).  That was the only

element of sex trafficking that was disputed, and the jury resoundingly rejected the government's

proof on that element.  The jury also rejected evidence of the alleged "criminal enterprise" at the

heart of the RICO count.  As a result, none of this evidence is relevant conduct.

Probation nevertheless found that the relevant conduct includes a broad range of evidence

that the jury rejected when it acquitted Combs of Counts 1, 2, and 4, purportedly because this

evidence "establishes" Combs's intent under the Mann Act and therefore fits into the carveout

from acquitted conduct.  PSR ¶70.  But such an expansive interpretation of this exception defies

the ordinary meaning of the term "establishes" and the history of the amendment—indeed, it

would replace the term the Commission chose with the broader "relates to" language the

government was unable to persuade the Commission to adopt.

Mr. Combs's intent for Counts 3 and 5 turned on the narrow question whether, at the time

of the interstate travel, he intended that Ms. Ventura, Jane, or an entertainer would engage in

prostitution.  *See United States v. Broxmeyer*, 616 F.3d 120, 129-30 (2d Cir. 2010); *see also*

*Mortensen*, 322 U.S. at 374.  Virtually all the evidence of purported fraud or coercion involved

events that occurred well before or well after any transportation was arranged.  Moreover, this

evidence has nothing to do with whether the purpose of the transportation was to engage in

prostitution.  It is irrelevant because coercion is not necessary to prove the Mann Act charges,

and consent is no defense to those charges.[16]  Nor is any of the inflammatory evidence the

government introduced to try to prove a RICO enterprise or pattern or individual predicates

(other than the Mann Act predicate) relevant to Combs's intent for the Mann Act counts.

The Commission adopted the new guideline in response to years of criticism from jurists,

including multiple Supreme Court Justices, lawyers and commentators, about the host of

constitutional concerns presented by the practice of enhancing defendants' sentences based on

conduct for which a jury has found them not guilty.  It declared acquitted conduct out-of-bounds,

other than where a carefully crafted, very narrow exception, is met.  Like Congress, the

Commission does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531

U.S. 457, 468 (2001), and the Court should not conclude that it did so here by disregarding the

jury's verdict and considering evidence it clearly rejected in fashioning an appropriate sentence

for the two far less serious counts of which Combs was convicted.

### B. Enhancing Mr. Combs's Sentence *In Any Way* Based On Acquitted Conduct Would Raise Serious Constitutional And Fairness Concerns

The Commission's recent amendment expressly forbids the Court from using conduct

underlying the acquitted sex trafficking and RICO conspiracy counts to increase Mr. Combs's

guidelines range.  Even if it did not, however, enhancing Mr. Combs's sentence *in any way* based

on acquitted conduct would raise serious concerns under the Fifth and Sixth Amendments, as

---

[16] The analysis may have been different had Mr. Combs been convicted under 18 U.S.C. §2422, which criminalizes knowingly "persuad[ing], induc[ing], entic[ing], or *coerc[ing]*" an individual to travel for purposes of prostitution. But the government chose not to bring a standalone §2422 charge against Mr. Combs.  Instead, the government charged §2422 only as a RICO conspiracy predicate, S-3 Indictment ¶13(g), and the jury rejected these allegations by acquitting Mr. Combs on Count 1.

well as broader questions about the fairness and perceived fairness of his sentencing.  This includes not only calculating the guidelines range but also weighing the §3553(a) factors and selecting the ultimate sentence.  Considering acquitted conduct pursuant to the §3553(a) factors would fail to "promote respect for the law" by disrespecting the jury's verdict and would fundamentally undermine the jury system itself.  And considering acquitted conduct when determining the sentence within the guidelines range would be "prohibited by law."  USSG §1B1.4 (citing 18 U.S.C. §3661).

Numerous federal jurists have opined that sentencing based on acquitted conduct raises fundamental constitutional and fairness concerns.[17]  Indeed, several state supreme courts have outlawed this practice in certain circumstances.[18]

The U.S. Supreme Court was poised to consider these questions and whether acquitted-conduct sentencing is legal just two years ago in *McClinton v. United States*, where the

_____

[17] *See, e.g.*, *McClinton v. United States*, 600 U.S. ---, 143 S. Ct. 2400, 2400-03 (Mem) (2023) (statement of Sotomayor, J., respecting denial of certiorari) (statement of Kavanaugh, J., respecting denial of certiorari, joined by Gorsuch, J. and Barrett, J.); *Jones v. United States*, 574 U.S. 948, 948 (2014) (Scalia, J., dissenting from denial of certiorari, joined by Thomas, J., and Ginsburg, J.); *United States v. Watts*, 519 U.S. 148, 163-64, 169-70 (1997) (Stevens, J., dissenting) (Kennedy, J., dissenting); *Townsend v. Burke*, 334 U.S. 736, 740 (1948) (Jackson, J.); *United States v. Tapia*, 2023 WL 2942922, at *2 n.2 (2d Cir. Apr. 14, 2023); *United States v. Mendoza*, 2022 WL 894700, at *2 (2d Cir. Mar. 28, 2022); *United States v. Martinez*, 769 F. App'x 12, 17 (2d Cir. 2019) (Pooler, J., concurring); *United States v. Brown*, 892 F.3d 385, 408-09, 415 (D.C. Cir. 2018) (Millett, J., concurring) (Kavanaugh, J., dissenting in part); *United States v. Lasley*, 832 F.3d 910, 920-23 (8th Cir. 2016) (Bright, J., dissenting); *United States v. Bell*, 808 F.3d 926, 927-32 (D.C. Cir. 2015) (Kavanaugh, J., concurring in denial of rehearing en banc) (Millett, J., concurring in denial of rehearing en banc); *United States v. Sabillon-Umana*, 772 F.3d 1328, 1331 (10th Cir. 2014) (Gorsuch, J.); *United States v. White*, 551 F.3d 381, 391-97 (6th Cir. 2008) (Merritt, J., dissenting); *United States v. Settles*, 530 F.3d 920, 924 (D.C. Cir. 2008) (Kavanaugh, J.); *United States v. Canania*, 532 F.3d 764, 776-78 (8th Cir. 2008) (Bright, J., concurring); *United States v. Henry*, 472 F.3d 910, 920-22 (D.C. Cir. 2007) (Kavanaugh, J., concurring); *United States v. Mercado*, 474 F.3d 654, 658–65 (9th Cir. 2007) (Fletcher, J., dissenting); *United States v. Faust*, 456 F.3d 1342, 1349-53 (11th Cir. 2006) (Barkett, J., specially concurring); *United States v. Baylor*, 97 F.3d 542, 549-53 (D.C. Cir. 1996) (Wald, J., concurring specially); *United States v. Frias*, 39 F.3d 391, 392-94 (2d Cir. 1994) (Oakes, J., concurring); *United States v. Concepcion*, 983 F.2d 369, 393-96 (2d Cir. 1992) (Newman, J., concurring) (Newman, J., dissenting from denial of rehearing en banc); *see also* Brief of 17 Former Federal Judges as Amici Curiae in Support of Petitioner, *McClinton v. United States* (21-1557).

[18] *See, e.g.*, *State v. Melvin*, 258 A.3d 1075, 1092-94 (N.J. 2021); *People v. Beck*, 939 N.W.2d 213, 224-27 (Mich. 2019); *State v. Marley*, 364 S.E.2d 133, 138-39 (N.C. 1988); *State v. Cote*, 530 A.2d 775, 784-85 (N.H. 1987); *see also State v. Koch*, 112 P.3d 69, 78-79 (Haw. 2005); *Jefferson v. State*, 353 S.E.2d 468, 474 (Ga. 1987).

defendant's guidelines range had been dramatically increased based on acquitted conduct. The defendant was convicted of a robbery but acquitted of a related murder. His total offense level based on only the robbery would have been 23, resulting in a guidelines range of roughly five to six years' imprisonment. But the prosecutor argued, and the judge agreed, that the murder could be considered relevant conduct, resulting in a dramatic increase in the guidelines range—to 27 years to life. The defendant ultimately received a 19-year sentence: more than three times longer than the high end of his initial guidelines range. *See* Petition for a Writ of Certiorari 5-9, 21-1557 (June 10, 2022).

The Court denied McClinton's petition, but Justices Sotomayor, Kavanaugh, Gorsuch, and Barrett were all troubled by the idea that a person's sentence could be increased by a judge finding he committed a crime of which he had been acquitted. They strongly suggested the Court denied the petition only because the Sentencing Commission had announced that it would be addressing the use of acquitted conduct at sentencing. As Justice Sotomayor explained in her statement respecting the denial of certiorari, "[i]f the Commission d[id] not act expeditiously or cho[se] not to act," the Court "may need to take up the constitutional issues presented." 143 S. Ct. at 2403. In a separate statement, Justice Kavanaugh—joined by Justices Gorsuch and Barrett—agreed with Justice Sotomayor that the Court's denial of cert "should not be misinterpreted" as a decision that it was not worth taking up these "important" constitutional questions. *Id.*

The Commission has now spoken. It amended the relevant conduct guideline to exclude acquitted conduct, USSG §1B1.3(c), and it did so to address the exact constitutional issues the requisite four Justices deemed cert-worthy in *McClinton*.

72

In its Reason for Amendment, the Commission explained that "the use of acquitted conduct to increase a defendant's sentence has been a persistent concern for many within the criminal justice system and the subject of robust debate over the past several years."  App. C Supp., amend. 826.  With this amendment, the Commission sought to address various jurists' concerns about, among other things, "the 'perceived fairness' of the criminal justice system," "undermin[ing of] the historical role of the jury," "diminish[ment of] 'the public's perception that justice is being done,'" and "erosion of the jury-trial right."  *Id.* (quoting *McClinton*, 143 S. Ct. at 2401–03 (statement of Sotomayor, J., respecting denial of certiorari)).

If the Court were to enhance Combs's sentence based on conduct underlying the RICO conspiracy or sex-trafficking counts, it would run roughshod over all of these concerns and the others described below.

### 1. Sixth Amendment Problems

a.  The Sixth Amendment "reflect[s] a fundamental decision" to not "entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges," *Duncan v. Louisiana*, 391 U.S. 145, 156 (1968), and to instead "reserve[] . . . power" in a jury of the defendant's peers, *Blakely v. Washington*, 542 U.S. 296, 306 (2004).  The Sixth Amendment thus provides an "inestimable safeguard" against judge and prosecutor, *Duncan*, 391 U.S. at 156, and a "bulwark" of liberty, *Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000), and "occupie[s] a central position in our system of justice," *Batson v. Kentucky*, 476 U.S. 79, 86 (1986).  That is why the Sixth Amendment jury trial right was "one of the least controversial provisions of the Bill of Rights."  *Apprendi*, 530 U.S. at 498 (Scalia, J., concurring).

At the heart of the jury trial right was the understanding that the "the unanimous suffrage of twelve of the defendant's equals and neighbours" would be required before any "accusation" could serve as the basis for a punishment.  *Id.* at 477 (quoting 4 W. Blackstone, Commentaries

on the Laws of England 343 (1769)).  In this system, juries have long "use[d] acquittals . . . to limit the State's authority to punish, an ability that the Founders prized."  *McClinton*, 143 S. Ct. at 2401 (statement of Sotomayor, J., respecting denial of certiorari); *see also United States ex rel. McCann v. Adams*, 126 F.2d 774, 776 (2d Cir. 1942) (L. Hand, J.) (juries "introduce[] a slack into the enforcement of law, tempering its rigor").

Thus, as this Court instructed: "You, the members of the jury, are the sole and exclusive judges of the facts.  You pass upon the weight of the evidence; you determine the credibility of the witnesses; you resolve such conflicts as there may be in the testimony; and you draw whatever reasonable inferences you decide to draw from the fact[s] as you have determined them."  Tr.7965-66.  The jury in this case fulfilled its constitutional role as the exclusive fact-finder on the prosecution's charges by listening attentively to seven weeks of testimony and argument, reviewing hundreds of text messages, emails, photos, videos, and other documents, deliberating for more than two days, and reaching a verdict on all five counts.

The jury's verdict spoke loud and clear: the jury found Mr. Combs not guilty of the two sex-trafficking and one RICO conspiracy counts and guilty only on the two Mann Act counts.  In doing so, the jury rejected all but a small sliver of the government's proof.  To now increase Mr. Combs's sentence based on evidence the jury rejected at trial would be to trivialize the jury's work and render the Sixth Amendment a mere "procedural formality," *Blakely*, 542 U.S. at 305-06, rather than the "fundamental reservation of power in our constitutional structure" the Framers intended it to be, *McClinton*, 143 S. Ct. at 2402 (statement of Sotomayor, J., respecting denial of certiorari).

Decisions endorsing the practice of acquitted-conduct sentencing have often looked to the Supreme Court's holding in *United States v. Watts* that "a jury's verdict of acquittal does not

prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." 519 U.S. 148, 157 (1997); *e.g.*, *United States v. Vaughn*, 430 F.3d 518, 525-27 (2d Cir. 2005).

But *Watts* is not dispositive for numerous reasons. For one, it merely holds that acquittals "do not prevent the court" from considering acquitted conduct, and therefore merely purports to *permit*, but not *require*, the use of acquitted conduct at sentencing. Moreover, *Watts* concerned only whether acquitted-conduct sentencing violated the Double Jeopardy Clause—not the Sixth Amendment jury trial right or Fifth Amendment due process right. *See United States v. Booker*, 543 U.S. 220, 240, 240 n.4 (2005) (merits opinion) (narrowly interpreting *Watts*). *Watts* was also decided before the Supreme Court's *Apprendi* jurisprudence reconceptualized the constitutional analysis for judicial fact finding at sentencing. So while *Watts* remains good law unless and until overruled, it does not control here.

In any event, *Watts* was a per curiam decision that "did not even have the benefit of full briefing or oral argument," *Booker*, 543 U.S. at 240 n.4 (merits opinion), was controversial from the start, *Watts*, 519 U.S. at 159-71 (Stevens, J., dissenting) & (Kennedy, J., dissenting), and has been heavily criticized by commentators in the years since it was decided.[19] The Commission even struck citations to *Watts* when it recently amended the guidelines to exclude acquitted conduct from relevant conduct. App. C Supp., amend. 826 (citing commentary to USSG §6A1.3).

---

[19] *See, e.g.*, Claire McCusker Murray, *Hard Cases Make Good Law: The Intellectual History of Prior Acquittal Sentencing*, 84 St. John's L. Rev. 1415, 1417 n.9 (2010) (collecting scholarship) [*hereinafter* Murray, *Intellectual History of Prior Acquittal Sentencing*]; Judge Nancy Gertner, *Circumventing Juries, Undermining Justice: Lessons from Criminal Trials and Sentencing*, 32 Suffolk U. L. Rev. 419, 422, 426, 432-33 (1999); Erica K. Beutler, *A Look at the Use of Acquitted Conduct in Sentencing*, 88 J. Crim. L. & Criminology 809, 809-10, 834-43, 846 (1998); Eang Ngov, *Judicial Nullification of Juries: Use of Acquitted Conduct at Sentencing*, 76 Tenn. L. Rev. 235, 258-60 (2009).

b.  Enhancing Mr. Combs's sentence based on rejected conduct underlying the sex-trafficking or RICO conspiracy counts would risk punishing him for conduct not authorized by the jury's verdict, in violation of the Supreme Court's *Apprendi* decision and its progeny.

At their core, these decisions hold that "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow," he "exceeds his proper authority."  *Blakely*, 542 U.S. at 303-04; *see also, e.g.*, *Apprendi*, 530 U.S. at 482-83, 490; *Ring v. Arizona*, 536 U.S. 584, 588-89, 602 (2002); *Cunningham v. California*, 549 U.S. 270, 274-75, 281, 290 (2007); *Booker*, 543 U.S. at 238-39, 243-44 (merits opinion); *S. Union Co. v. United States*, 567 U.S. 343, 346, 348-49 (2012); *Alleyne v. United States*, 570 U.S. 99, 111-12 (2013).  Particularly because of the unprecedented and unique nature of this case, to justify a sentence longer than the average sentence imposed in other Mann Act cases discussed below in Point IV, the Court would have to rely on evidence the jury rejected when it acquitted Mr. Combs on Counts 1, 2, and 4.  The jury's verdict thus does not "authorize"—and, indeed, expressly forbids—any such increase to Mr. Combs's sentence.

The *Apprendi* concerns are serious here regardless of the Mann Act's statutory maximum.  *Blakely* held that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*."  542 U.S. at 303.  Like other decisions in the *Apprendi* line, therefore, *Blakely* was less concerned with the "language used in [the *Apprendi*] holding" about statutory maxima than the "the principles [the *Apprendi* Court] sought to vindicate."  *Booker*, 543 U.S. at 238-39 (merits opinion).  The *Apprendi* rule has thus been reaffirmed in a wide variety of circumstances.  *Cunningham*, 549 U.S. at 282 (collecting Supreme Court precedents).

In *Blakely*, for example, the petitioner had pleaded guilty to facts that authorized a maximum sentence of 53 months. The sentencing judge, however, made a factual finding that increased his sentence to 90 months—outside the range authorized by his plea alone, but still within the statutory maximum of 10 years. The State argued that *Apprendi* was inapplicable because the petitioner's sentence remained within the 10-year statutory maximum. But the Court disagreed and held that because the judge needed to find facts "neither admitted by petitioner nor found by a jury" to impose the 90-month sentence, the sentence exceeded the maximum the judge could have imposed "*without* any additional findings"—i.e., 53 months. 542 U.S. at 303-04. As in *Blakely*, the Court would exceed the relevant maximum for *Apprendi* purposes if it were to significantly enhance Mr. Combs's sentence based on acquitted conduct because the Court would need to rely on facts not "reflected in the jury verdict alone," *Ring*, 536 U.S. at 602, but that the jury rejected when it acquitted Combs of the RICO conspiracy and sex-trafficking counts.

These *Apprendi* principles still apply even though the guidelines are now advisory, because the guidelines are still the "starting point and the initial benchmark" for sentencing judges to consider. *Gall v. United States*, 552 U.S. 38, 49 (2007); *see Peugh*, 569 U.S. at 541-42 (guidelines provide "the framework for sentencing" and are intended to "anchor[]" sentencing decisions).

In *Peugh*, for example, the Supreme Court held that it violates the Ex Post Facto Clause for a sentencing judge to use the guidelines manual in effect at the time of sentencing if that manual would result in a higher guidelines range than the manual in effect at the time the offense was committed. In doing so, the Court rejected the government's argument that the guidelines were "too much like guideposts and not enough like fences" to give rise to a constitutional

violation and emphasized that the guidelines "impose a series of requirements on sentencing courts" that will generally "steer [them] to . . . within-Guidelines sentences."  *Id.* at 543, 547.

*Peugh* thus makes clear that the guidelines can lead to serious constitutional concerns despite their advisory nature.  That would include the imposition of a guidelines enhancement that rests on facts rejected by the jury.  As the Supreme Court reiterated in another post-*Booker* decision, the key Sixth Amendment inquiry is whether the fact found "increase[s] the prescribed range of penalties to which a criminal defendant is exposed," *Alleyne*, 570 U.S. at 111-12; *accord id.* at 118 (Sotomayor, J., concurring, joined by Ginsburg, J., and Kagan, J.)—even if, for example, there is an increase in the *minimum* punishment rather than the maximum.

So whether through a guidelines enhancement, the determination of a sentence within the guidelines range under 18 U.S.C. §3661 (and USSG §1B1.4), or consideration of the factors enumerated in §3553(a), a sentencing court should not end-run the jury's verdict by sentencing the defendant based on judicial findings that he engaged in conduct for which he was acquitted.  Doing so would be an abuse of discretion and result in an "unreasonable" sentence, because such judicial findings would rest on facts rejected by the jury.  *See United States v. Cavera*, 550 F.3d 180, 189-90 (2d Cir. 2008) (en banc); *Gall*, 552 U.S. at 51.

For example, in *Jones v. United States*, the defendants were found guilty of distributing small amounts of drugs but acquitted of conspiracy to distribute.  At sentencing, however, the judge found that they had engaged in the conspiracy, and that finding resulted in significantly higher guidelines ranges and ultimate sentences.  As a result, Justice Scalia—joined by Justices Ginsburg and Thomas—concluded that defendants had presented a "particularly appealing case" that their sentences "would have been substantively unreasonable and therefore illegal" if based only on the petitioners' convictions for drug distribution, without the judicial finding of

conspiracy. 574 U.S. 948, 948 (2014) (dissenting from denial of certiorari). As these three Justices opined, "any fact necessary to prevent a sentence from being substantively unreasonable—thereby exposing the defendant to the longer sentence—is an element that must be either admitted by the defendant or found by the jury. It *may not* be found by a judge." *Id.*; *see also Rita v. United States*, 551 U.S. 338, 371-72 (2007) (Scalia, J., joined by Thomas, J., concurring in part and concurring in judgment) (positing similar hypotheticals).

As in *Jones*, if the Court were to significantly enhance Mr. Combs's sentence by, for example, applying the fraud/coercion or leadership enhancements, or consider that alleged conduct in weighing the §3553(a) factors, it would have to make factual findings in direct conflict with the jury's verdict. Such judicial fact-finding would, at a bare minimum, be in significant tension with *Apprendi* and its progeny, and would result in an unreasonable sentence.

### 2. *Fifth Amendment Due Process Problems*

a. At the heart of the *Apprendi* caselaw is an emphasis on the need for juries to find facts beyond a reasonable doubt, rather than judges finding facts by a preponderance of the evidence. The beyond-a-reasonable-doubt standard is rooted in the Fifth Amendment's due process clause and, like the Sixth Amendment jury trial right, "dates at least from our early years as a Nation" and "plays a vital role in the American scheme of criminal procedure." *In re Winship*, 397 U.S. 358, 361, 363 (1970).

At trial, the government failed to meet its burden on the RICO conspiracy and sex-trafficking counts. If the Court were to rely on the evidence on these counts that the jury rejected for sentencing, that would eviscerate Combs's Fifth Amendment right to have facts found beyond a reasonable doubt. "The notion that a charge that cannot be sustained by proof beyond a reasonable doubt may give rise to the same punishment as if it had been so proved is repugnant" to the Constitution. *Watts*, 519 U.S. at 169-70 (Stevens, J., dissenting).

Although this Fifth Amendment concern is related to the Sixth Amendment *Apprendi* problems described above, it is an independent reason (based on a different constitutional provision) to avoid sentencing Combs based on facts the jury rejected when it acquitted him of Counts 1, 2, and 4.

An acquittal does not just represent a finding that the charged counts were not proven beyond a reasonable doubt. It is an "affirmative indication of innocence," *Thompson*, 596 U.S. at 45, and an "official statement in a court of law that a criminal defendant is not guilty," *Acquittal*, Black's Law Dictionary (12th ed. 2024). That is why the Court cannot use a preponderance of the evidence standard to find acquitted facts. "So far as the criminal justice is concerned," an acquittal means "the defendant has been set free or judicially discharged from an accusation; released from a charge or *suspicion* of guilt." *McClinton*, 143 S. Ct. at 2402 (statement of Sotomayor, J., respecting denial of certiorari).

Indeed, now that Mr. Combs has been acquitted on the sex-trafficking and RICO conspiracy counts, there is nothing else he can do to clear his name: "no verdict whereby [he] may definitively prove his innocence." Murray, *Intellectual History of Prior Acquittal Sentencing* at 1563-64. To treat the jury's acquittals as anything less than a finding of innocence, therefore, would be to directly undermine the presumption of innocence—"that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law." *Winship*, 397 U.S. at 363; *see Coffin v. United States*, 156 U.S. 432, 453 (1895) ("The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary.")[20]

---

[20] *See also Marley*, 364 S.E.2d at 138 ("The law requires proof beyond a reasonable doubt in criminal cases as the standard of proof commensurate with the presumption of innocence; a presumption not to be forgotten after the acquitting jury has left and sentencing has begun."); *Cote*, 530 A.2d at 784 ("The presumption in favor of innocence is not to be reargued by mere suspicion . . . It is a maxim which out to be inscribed in indelible characters in the

To be sure, acquittals can happen for all kinds of reasons, such as a "prosecutorial misstep, a sympathetic jury, or the restrictions imposed by the rules of evidence."  Murray, *Intellectual History of Prior Acquittal Sentencing* at 1425.  In other cases, however, the jury will conclude the defendant was innocent because "the State's witnesses were lying," *McClinton*, 143 S. Ct. at 2402 (statement of Sotomayor, J., respecting denial of certiorari), or because important pieces of circumstantial evidence were unpersuasive.  Here, the verdict makes clear that the jury rejected the vast majority of the government's evidence.  Yet even if that were not true, "[t]he fact is that . . . the jury has formally and finally determined that [Combs] will not be held criminally culpable for the conduct at issue."  *Id.*

For these reasons, as the Commission recognized when it amended the guidelines, "acquittals have long been accorded special weight, distinguishing them from conduct that was never charged and passed upon by a jury, and viewed as inviolate."  App. C Supp., amend. 826 (citing *McClinton*, 143 S. Ct. at 2402 (statement of Sotomayor, J., respecting denial of certiorari) and *McElrath v. Georgia*, 601 U.S. 87, 94 (2024)).  Acquittals are "afford[ed] absolute finality," *Burks v. United States*, 437 U.S. 1, 16 (1978), "even if a judge is convinced that the jury was mistaken," *McClinton*, 143 S. Ct. at 2402 (statement of Sotomayor, J., respecting denial of certiorari).  The jury's acquittals on Counts 1, 2, and 4 should be treated no differently.

b.  Enhancing Mr. Combs's sentence based on conduct for which he was acquitted would raise other Fifth Amendment due process concerns as well.

*First*, there would be a serious risk of inaccurate fact-finding.  In *United States v. Juwa*, for example, the defendant faced a guidelines range of 24 to 30 months' imprisonment based on

---

heart of every judge and juryman."); *McNew v. State*, 391 N.E.2d 607, 612 (Ind. 1979) ("A not guilty judgment is more than a presumption of innocence; it is a finding of innocence. And the courts of this state . . . must give exonerative effect to a not guilty verdict if anyone is to respect and honor the judgments coming out of our criminal justice system.").

his guilty plea to a sole count.  The sentencing judge, however, imposed a 90-month sentence by relying on unproven conduct underlying state charges pending against the defendant.  The Second Circuit vacated and remanded because the sentence violated the defendant's "due process right to be sentenced based on accurate information," 508 F.3d 694, 700-02 (2d Cir. 2007); *see also Townsend*, 334 U.S. at 740-41—a right rooted in the Fifth Amendment's recognition that the beyond-a-reasonable-doubt standard is designed to "reduc[e] the risk of convictions resting on factual error," *Winship*, 397 U.S. at 363.  The Fifth Amendment problem is more serious here than in *Juwa* because the Court would be relying on evidence the jury *rejected* when it acquitted Combs on Counts 1, 2, and 4—rather than unsubstantiated allegations that had not been tried before a jury.  And acquittals have long been accorded "special" and greater weight than "conduct that was never charged and passed upon by a jury."  *McClinton*, 143 S. Ct. at 2402 (statement of Sotomayor, J., respecting denial of certiorari).

*Second*, Mr. Combs's right to notice of his potential punishment could be undermined. When Mr. Combs decided to defend himself against the government's charges at trial, he understood that any counts for which he was acquitted could not thereafter be used to dramatically increase his sentence.  That is because, just as convictions have historically been linked with punishment, *see Apprendi*, 530 U.S. at 478-79; *Alleyne*, 570 U.S. at 108-09 (plurality opinion), so too have acquittals been linked with the absence of punishment.  Mr. Combs also knew that the Commission had recently amended the guidelines to specifically exclude acquitted conduct from the definition of relevant conduct.

If Mr. Combs's sentence is now significantly increased based on evidence underlying the acquitted counts, he will have been deprived of "fair notice to know the precise effect [the] jury's verdict w[ould] have on his punishment."  *Tapia*, 2023 WL 2942922, at *2 n.2 (2d Cir. 2023);

*see also Irizarry v. United States*, 553 U.S. 708, 719 (2008) (Breyer, J., dissenting, joined by Kennedy, J., Souter, J., and Ginsburg, J.) (raising notice concern in sentencing context).  Not even three acquittals *plus* the recent guidelines amendment will have sufficed to prevent the Court from relying on acquitted conduct, and going forward "[e]ven defendants [like Combs] with strong cases may understandably choose not to exercise their right to a jury trial." *McClinton*, 143 S. Ct. at 2402 (statement of Sotomayor, J., respecting denial of certiorari).

### 3.  Fifth Amendment Double Jeopardy Problems

Using conduct for which Mr. Combs was acquitted to enhance his sentence would also raise serious concerns under the Fifth Amendment's Double Jeopardy Clause.

That Clause prevents defendants from being "twice put in jeopardy of life or limb" for the same offense and thereby protects against, among other things, "a second prosecution for the same offense after acquittal."  *North Carolina v. Pearce*, 395 U.S. 711, 717-18 (1969); *accord, e.g.*, *Benton v. Maryland*, 395 U.S. 784, 795-96 (1969); *Green v. United States*, 355 U.S. 184, 187-88 (1957); *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 569, 571 (1977); *Evans v. Michigan*, 568 U.S. 313, 318 (2013); *McElrath*, 601 U.S. at 93-94.[21]  That is because "a verdict of acquittal is final, ending a defendant's jeopardy," *McElrath*, 601 U.S. at 93-94, and that finality is "unassailable," *Yeager v. United States*, 557 U.S. 110, 123 (2009).

The Supreme Court has also recognized that the Double Jeopardy Clause incorporates an "issue-preclusion component" providing that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties."  *Bravo-Fernandez v. United States*, 580 U.S. 5, 7 (2016).  While perhaps more familiar in the civil context, issue preclusion is "fully applicable" to criminal judgments, *United States v.*

---

[21] The Double Jeopardy Clause also protects against "multiple punishments for the same offense."  *Pearce*, 395 U.S. at 717.

*Kramer*, 289 F.2d 909, 913 (2d Cir. 1961) (Friendly, J.), and an "extremely important principle in our adversary system of justice," *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). Critically, this doctrine prevents the government from relitigating "any issue that was necessarily decided by a jury's acquittal in a prior trial," *Yeager*, 557 U.S. at 119, because, again, such issues are "final" and cannot be "reopened," *United States v. Oppenheimer*, 242 U.S. 85, 87-88 (1916) (Holmes, J.).

Through its mixed verdict, which was fully consistent and reflects a logical application of the jury instructions to the evidence, the jury fully and finally resolved several critical issues in Combs's favor. By acquitting Combs of the sex-trafficking counts, which required evidence of fraud or coercion, and convicting him of the Mann Act counts, which did not require any such evidence, the jury found that Combs did not defraud or coerce Ms. Ventura or Jane in any way. And by acquitting Combs of the RICO conspiracy count, which charged Mann Act violations as a predicate offense, but convicting Combs of only the Mann Act counts, the found that Combs was not the leader of any type of criminal enterprise or other conspiracy to violate the Mann Act—or commit any other of the various charged predicates. "Straightforward application" of Double Jeopardy Principles, therefore, "can lead to but one conclusion": these issues cannot be relitigated by the government. *Ashe*, 397 U.S. at 445.

This is not a case of inconsistent verdicts where it may be unclear what the jury actually found. *See, e.g.*, *Bravo-Fernandez*, 580 U.S. at 356-57, 359-60 (citing, *inter alia*, *United States v. Powell*, 469 U.S. 57, 68 (1984)). Nor is it a case where even if the verdict is not inconsistent, it is difficult to reconcile because, for example, only one of two equally culpable defendants is convicted. *See, e.g.*, *United States v. Dotterweich*, 320 U.S. 277, 279 (1943).

Rather, the jury's verdict is perfectly logical.  The jury was instructed on the elements of the sex-trafficking and RICO charges, Tr.7981-90, 8022-27, and is of course presumed to have followed those instructions, *see, e.g.*, *Blueford v. Arkansas*, 566 U.S. 599, 606 (2012).  "[F]orce, threats of force, fraud, coercion . . . or any combination of such means," 18 U.S.C. §1591(a), was the only element in dispute for the sex-trafficking counts, and the jury acquitted Combs on those counts.  By the same token, Combs's leadership of a purported criminal enterprise or association was the key issue for the RICO charge, and the jury acquitted.  For these reasons, there is no serious dispute about what the jury did or did not find—and those findings are now final and cannot be revisited at sentencing under the Double Jeopardy Clause's issue preclusion doctrine.

But the government has made clear throughout the post-trial proceedings that it seeks to do exactly that.  It is asking the Court to reconsider all the evidence the jury rejected when it acquitted on Counts 1, 2, and 4.  It is seeking a series of sentencing enhancements predicated on factual findings in direct conflict with what the jury found at trial.[22]  It is asking the Court to pretend that the jury never acquitted Combs on three of the five counts.  It is, in effect, seeking to try him on these three counts a second time.

If the Double Jeopardy Clause stands for anything, it is the "underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, . . . that the State with all its resources and power should not be allowed to make repeated attempts" to impose criminal liability or punishment on a defendant for the same offense.  *Green*, 355 U.S. at 187-88, 187 n.5 (citing 4 Blackstone's Commentaries 335, *Ex Parte Lange*, 18 Wall. 163, 169 (1873), and *Ball v. United States*, 163 U.S. 662, 669 (1896)).  To dramatically enhance Mr. Combs's sentence based

---

[22] Some of these enhancements are draconian and bear no relation to the offense conduct.  Most notably, the government is seeking to more than double Mr. Combs's base offense level through application of the cross-reference for the criminal sexual abuse guideline.  *See* USSG §2G1.1(c)(1) (referencing §2A3.1).  As even Probation recognized, the government's arguments are—at the very least—a "stretch."  PSR at 59 (discussing ¶86).

on the evidence underlying Counts 1, 2, and 4 would violate this core precept and force "a man who has been acquitted . . . to 'run the gantlet' a second time." *Ashe*, 397 U.S. at 445-46. As Justice Sotomayor put it in *McClinton*, the government should not get this kind of "second bite at the apple." 143 S. Ct. at 2402.

None of these arguments are foreclosed by the Supreme Court's holding in *Watts* that the Double Jeopardy Clause "does not prevent the sentencing court from considering conduct underlying [an] acquitted charge" if that conduct is proved by a preponderance of the evidence. 519 U.S. at 157. As the Court later recognized, *Watts* "presented a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause," *Booker*, 543 U.S. at 240 n.4 (merits opinion), and is thus of limited precedential value as to the use of acquitted conduct at sentencing for other purposes. More importantly, the *Watts* per curiam's rationale that "sentencing enhancements do not punish a defendant for crimes of which he was not convicted, but rather increase his sentence because of the manner in which he committed the crime of conviction" is not dispositive in this case. 519 U.S. at 154.

The government is not seeking to punish Mr. Combs for the manner in which the jury found he violated the Mann Act—it is seeking to punish him for the sex-trafficking and RICO conspiracy counts of which he was acquitted. The "manner" in which the jury found the statute violated was by arranging interstate flights to places where individuals got together to have sex and where, according to the verdict, a male escort or entertainer received money for the sexual activity. Here, however, the government seeks to enhance Mr. Combs's sentence not for that, but for fraud or coercion (under §2G1.1(b)(1)), the key element of the sex-trafficking counts; for being a leader or organizer of the alleged criminal activity (under §3B1.11(a)), which was the core of its RICO theory; and for "victimizing" ten different individuals (under §§2G1.1(d)(1) and

3D1.4).  The government's purported basis for seeking these enhancements has nothing to do with the small sliver of evidence underlying the Mann Act counts.  The government even told the jury that the Mann Act counts were "totally separate" from the sex trafficking counts, Tr.7696 (closing); and the only connection between the Mann Act counts and the RICO count was one of the eight predicate acts, S-3 Indictment ¶13(g).

Accordingly, *Watts* is not dispositive, and any increase in Mr. Combs's sentence based on conduct for which he was acquitted would raise serious Double Jeopardy concerns.

### 4.   Unfairness

Enhancing Mr. Combs's sentence using conduct underlying Counts 1, 2, and 4 would also be fundamentally unfair.  The jury found him not guilty on those counts after carefully listening to all the evidence and arguments and the Court's instructions.  And, as the Court observed after the verdict, this jury was attentive, dedicated, and worked very hard, and their public service "is inspiring to all of us" and "should give all of us hope."  Tr.8129.

It would make a mockery of the jury's role, and the jury system, if the Court made its own findings contradicting the verdict at sentencing.  What is the point of exercising one's right to a jury trial if the jury vindicates one's defense as to the most serious charges, but the government obtains a lengthy sentence anyway based on a "fallback" charge that is easy to prove but involves far less serious criminal conduct?  How would such a perversion of justice respect the jurors' public service and place in the criminal justice system?  What kind of signal does that send the public about due process and the rule of law?  The jury spoke, and its verdict should be respected.  Having swung for the fences but come up short, the government should not get a "second bite at the apple" at sentencing based on evidence that "did not convince the jury coupled with a *lower* standard of proof."  *McClinton*, 143 S. Ct. at 2402 (statement of Sotomayor, J., respecting denial of certiorari).

The fairness concerns are magnified in this case because, by acquitting Mr. Combs on the sex-trafficking and RICO conspiracy counts, the jury rejected the vast majority of the government's evidence. "[T]he woman on the street would be quite taken aback" to learn that Mr. Combs is now being sentenced based on this same evidence. *Id.* at 2403.

What the government is trying to do in this case is just like what it did in *McClinton*, where the defendant was acquitted of murder but sentenced as if he had committed the murder. Just like in *McClinton*, it would not be fair, just, or sensible to sentence Mr. Combs in any way "in essence as if he had been convicted" of charges for which he was acquitted, *Brown*, 892 F.3d at 415 (Kavanaugh, J., dissenting in part), "based on facts the judge finds without the aid of a jury," *Sabillon-Umana*, 772 F.3d at 1331 (Gorsuch, J.).[23]

Finally, even if the Court rejects these arguments as to the guidelines, these constitutional concerns warrant a substantial downward variance under the §3553(a) factors. Indeed, as the Commission recognized when it amended the guidelines, the sentencing judge "promote[s] respect for the law" by refusing to enhance a sentence based on acquitted conduct. §3553(a)(2); *see* USSG App. C. Supp., amend. 826 (Reason for Amendment), and has full discretion to do so, as even *Watts* acknowledged (at 157). So even though the Commission was only tasked with

---

[23] *See, e.g.*, *Martinez*, 769 F. App'x at 17 (Pooler, J., concurring) ("[T]he district court's practice of using acquitted conduct to enhance a defendant's sentence . . . is fundamentally unfair."); *Frias*, 39 F.3d at 393 (Oakes, J., concurring) ("This is jurisprudence reminiscent of *Alice in Wonderland*. As the Queen of Hearts might say, 'Acquittal first, sentence afterwards.'"); *Concepcion*, 983 F.2d at 396 (Newman, J., dissenting from denial of rehearing en banc) ("A just system of criminal sentencing cannot fail to distinguish between an allegation of conduct resulting in a conviction and an allegation of conduct resulting in an acquittal"); *Baylor*, 97 F.3d at 549 (Wald, J., concurring specially) ("There is something fundamentally wrong" with enhancing a defendant's guidelines range based on acquitted conduct.); *Bell*, 808 F.3d at 932 (Millett, J., concurring in denial of rehearing en banc) (sentencing based on acquitted conduct is a "troubling contradiction in sentencing law"); *Canania*, 532 F.3d at 777 (Bright, J., concurring) ("[T]he unfairness perpetuated by the use of 'acquitted conduct' at sentencing in federal district courts is uniquely malevolent."); *Mercado*, 474 F.3d at 663 (Fletcher, J., dissenting) ("It makes absolutely no sense to conclude that . . . the fruits of the jury's efforts can be ignored with impunity by the judge in sentencing"); *White*, 551 F.3d at 391-92 (Merritt, J., dissenting) ("[T]he use of acquitted conduct at sentencing defies . . . common sense"); *Faust*, 456 F.3d at 1350 (Barkett, J., specially concurring) (It "perverts our system of justice to allow a defendant to suffer punishment for a criminal charge for which he or she was acquitted.").

addressing the use of acquitted conduct for guidelines calculations, it expressly recognized the problems with using acquitted conduct under the §3553(a) factors.

### C. Applying The Fraud/Coercion Enhancement Would Illegally End-Run The Acquitted Conduct Amendment And Defy The Factual Record

#### 1. *The Acquitted Conduct Amendment Precludes Application of the Fraud/Coercion Enhancement*

The PSR recommends (at ¶¶87, 117) increasing Mr. Combs's offense level by four because the government claims "the offense involved fraud or coercion." USSG §2G1.1(b)(1)(A) & (B)(i). Like other enhancements that are part of "specific offense characteristics," the fraud/coercion enhancement is "determined on the basis of" relevant conduct. §1B1.3(a); *see United States v. Pellegrini*, 929 F.2d 55, 56 (2d Cir. 1991) (per curiam). As explained, however, the definition of relevant conduct no longer includes "acquitted conduct," §1B1.3(c)—foreclosing any application of the §2G1.1(b)(1) enhancement.

The jury's verdict could not have been clearer in rejecting the government's theory that Mr. Combs defrauded or coerced Ms. Ventura or Jane into engaging in sexual conduct. The primary difference between the sex-trafficking counts and the Mann Act counts was that the former required evidence of "force, threats of force, fraud, coercion … , or any combination of such means," while the latter did not. The jury carefully distinguished between these counts and acquitted Mr. Combs only of sex-trafficking.[24] Accordingly, the alleged fraud and coercion underlying those counts is not relevant conduct, and it does not in any way "establish[]" the Mann Act counts. §1B1.3(c).

---

[24] The jury also acquitted Mr. Combs of two RICO predicates that similarly required evidence of fraud or coercion: inducement/enticement to engage in prostitution (18 U.S.C. §2422(a)) and forced labor (18 U.S.C. §1589). S-3 Indictment ¶13(e), (g).

If the Court were to impose the fraud/coercion enhancement despite the jury's acquittals on Counts 2 and 4, it would nullify the recent guidelines amendment precisely when it is most needed to protect defendants: when prosecutors seek to enhance a sentence based on evidence the jury rejected at trial. The Commission's intent "when it closes a door is not for [the government] to thus jimmy a window," *Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 118 (2d Cir. 2025) (Jacobs, J., concurring), and the Court should not allow the government to do so here by circumventing the Commission's careful, considered work, *see* App. C Supp., amend. 826 (Reason for Amendment).

It is irrelevant that the definitions of "coercion" in the sex-trafficking statute and the fraud/coercion guideline use slightly different verbiage. Indeed, the statute is not in any way narrower than the guideline. It does not just prohibit coercion—it prohibits the use of "force, threats of force, fraud, coercion . . . or any combination of such means." 18 U.S.C. §1591(a).

The statute defines coercion as "threats of serious harm" or a "scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm," §1591(e)(2), whereas the guideline defines coercion as "any form of conduct that negates the voluntariness of the victim," USSG §2G1.1 App. Note 2. These two definitions prohibit the same conduct. Like the sex-trafficking statute, the guideline application note requires "an impending threat of some negative consequence that will affirmatively befall a person if he or she does not succumb to the pressure that is being exerted." *United States v. Sabatino*, 943 F.2d 94, 104 (1st Cir. 1991).

Judge Wood applied this definition in declining to impose the fraud/coercion enhancement because the defendant "ma[de] no threat," and even if there was an "implied threat," that did not "suffice[] to meet the standard of coercion." Sentencing Transcript from

*United States v. Mi Sun Cho*, 10-cr-878 (KMW) (Mar. 14, 2012) at 23; *see also id.* at 16-17

(discussing *Sabatino*).[25]  In another case, the Fifth Circuit upheld the district court's application

of the enhancement when the defendant "sent a death threat text."  *United States v. Avery*, 123

F.4th 430, 433 (5th Cir. 2024).

By contrast, when the alleged victim is not threatened and acts voluntarily, neither the

sex-trafficking statute nor the application note applies.  In *United States v. Sanchez Cerdas*, for

example, the court declined to apply the fraud/coercion enhancement because the relevant

"communications . . . demonstrate[d] voluntariness," and although "there may have been

coercion at some stage," it was insufficient to warrant a four-level increase to the defendant's

offense level.  Sentencing Transcript for 19-cr-65 (E.D. Va.), Dkt.53 at 8.

Moreover, in the real world there is no daylight between "negating the voluntariness" of a

purported victim and the coercion required to prove sex trafficking.  Negate means "[t]o deny,

negative, nullify, or render ineffective."  *Negate*, Black's Law Dictionary (6th ed. 1990); *see also*

The New Merriam-Webster Dictionary at 490 (1989) ("to cause to be ineffective or invalid,"

"nullify").[26]  As one court applying the enhancement explained, "'[n]egates' means erases for the

most part or gets rid of," and so even if the allegedly coercive conduct need not "completely zero

. . . out" the victim's voluntariness, "it has to have a powerful impact" on it.  Sentencing

Transcript for *United States v. Willis*, 14-cr-33 (D. Or.), Dkt.67 at 55-57 (declining to impose

enhancement).

---

[25] The transcript can be found as part of the joint appendix for the subsequent appeal.  *United States v. Chang (Cho)*, 12-1084 (2d Cir.), Dkt.16 at A-102-30.

[26] The phrase "[n]egates the voluntariness of" was included in the original, 1987 Guidelines Manual.  *See* 1987 Manual Part G, §2G1.1 App. Note 3, https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/Chapter_2_E-K.pdf.  The phrase accordingly must be interpreted in accordance with its plain meaning around 1987.  *E.g.*, *Bostock*, 590 U.S. at 654.

Accordingly, when the jury acquitted Mr. Combs of sex-trafficking, it rejected any notion that Mr. Combs used "threats of serious harm" against Ms. Ventura or Jane, 18 U.S.C. §1591(e)(2)(A), just as much as it rejected any notion that Mr. Combs "negate[d] the voluntariness" of either individual, §2G1.1 App. Note 2. So whichever definition of "coercion" is used, it is undeniable that the jury found Mr. Combs *did not* coerce Ms. Ventura or Jane.

For example, the government has claimed—and Probation appeared to find—that both Ms. Ventura's and Jane's "voluntariness was negated" by drug use during freak-offs and hotel nights. PSR ¶72. But the government tried to prove exactly this point at trial—and failed to persuade the jury of its position. The government contended "drugs" was "just another way that the defendant made sure that he got Jane [and Ms. Ventura] to say yes," one of the "illegal actions that made Cassie and Jane believe that they had no choice but to do the freak-offs and the hotel nights even when they didn't want to," and thus an "important part of the pattern of the defendant's coercion." Tr.7609-10, 7651-52. The jury rejected these arguments and didn't find that the drugs caused Ms. Ventura and Jane to act involuntarily when it acquitted on Counts 2 and 4.

2.  *The Fraud/Coercion Enhancement Is Unsupported By the Factual Record*

To support its recommendation that the Court apply the fraud/coercion enhancement, Probation relied entirely on evidence the jury rejected, *see* PSR ¶72, and that therefore cannot be considered under USSG §1B1.3(c). Even if this evidence could be considered, however, none of it establishes that Mr. Combs defrauded or coerced Ms. Ventura or Jane. Rather, the evidence shows that Ms. Ventura and Jane were adults who acted freely, voluntarily, and often enthusiastically.

a.  Probation concluded that Mr. Combs coerced Ms. Ventura by forcing her to participate in freak-offs against her will by, among other things, threatening to publicize freak-

off videos.  PSR ¶72(a).  For example, Probation found that, on a flight back to New York after the 2012 Cannes Film Festival, Mr. Combs "threatened Ventura with Freak Off videos" and "demanded that Ventura engage in a Freak Off" when they landed.  *Id.*  But the government made the exact same argument at trial, referring to this episode as an "example of clear-cut coercion," Tr.7683-85, and the jury disagreed and acquitted Mr. Combs on Count 2.

Indeed, numerous pieces of evidence show that Mr. Combs did not coerce, pressure, or force Ms. Ventura to participate in freak-offs, and that she instead would enthusiastically suggest them herself and otherwise participated in them willingly.[27]  Ms. Ventura would even coordinate with Cowboys 4 Angels about choosing particular entertainers she wanted, *see, e.g.*, GX B-227; GX B-357, p.4, even if she would later show Combs to "see if that person was of interest," Tr.523.  And to the extent Ms. Ventura did not want to engage in freak-offs, there is limited evidence that she shared this sentiment with Mr. Combs.  Ms. Ventura testified that she brought up not wanting to do freak-offs only "gently" and "treaded lightly," in part because she didn't want Mr. Combs to "find somebody else to do [freak-offs] with," and emphasized that "when you really care about somebody and you're in love with them, you don't want to disappoint them."  Tr.487.  Ms. Ventura had ample opportunities to tell Mr. Combs that she would no longer participate in freak-offs, but she chose not to do so.  All this evidence, and more, demonstrates why the jury acquitted Mr. Combs of Count 2.

---

[27] *See, e.g.*, GX B-349, p.5 (Ventura: "we can lol" when Mr. Combs asks if she is "tryin to fo tonight"); GX B-352, p.2 (Ventura: "Let's go out and have a sexy night," and Mr. Combs responds, "Whatever you want I'm down."); GX B-622, p.2 (Mr. Combs: "a successful Fo is when we remember and don't be f[]iending to do it the right way. I won't bring up again until you are in that mood."); DX 1016, p.1 (Ventura: "I don't want to freak off for a last time. I want it to be the first time for the rest of our lives."); DX 1035, p.2 (Ventura: "Wish we could have fo'd before you left."); DX-1159, p.2 (Ventura: "I'm always ready to freak off. LOLOL."); GX B-625, p.3 (Ventura: "Baby. I want to FO sooooo bad but I don't want to fuck myself up."); GX B-346, p.4 (Mr. Combs: "So what you wanna do woman. And no I'm not askin you to Fo. I wanna know what you wanna do"), p.9 (Ventura: "Yea I liked" when they had a freak-off); GX B-238, pp.3, 6 (Mr. Combs: "Baby we can just chill," "Whatever you want. I just wanna mk you happy," "We don't need to freak off."); GX B-623, p.9 (Mr. Combs: "We can just GO to your crib and chill").

The evidence also showed that Mr. Combs did everything possible to keep the videos, and the facts about the sexual activities, secret. Ms. Ventura testified that Mr. Combs "express[ed] concern about these videos being released" and always supported Ms. Ventura "in not wanting these videos to come out and prevented these videos from coming out." Tr.1188. Ms. Ventura also testified that she and Mr. Combs wanted to keep freak-offs private. Tr.1193.

The evidence also showed that *Ms. Ventura* kept the freak-off videos on electronic devices. *See, e.g.*, GX 1307 ¶1; Tr.412; Tr.570; Tr.1333-1334. Accordingly, Mr. Combs wrote to Ms. Ventura that "YOU WILL NOT BE THREATENING ME. you have too many iPads full of skeletons." GX A-441-G, p.2. And to the extent the evidence shows that Mr. Combs did "blackmail" Ms. Ventura with freak-off videos, there is insufficient evidence that such threats were connected to freak-offs.

Probation's finding that Mr. Combs coerced Ms. Ventura by controlling her "career and livelihood" is similarly unfounded. PSR ¶72(a). The government repeatedly argued this theory to the jury, *e.g.,* Tr.7596 (Mr. Combs took "extreme measures . . . to control Cassie and to keep anyone who might interfere with that control away."), but the jury rejected it, and it was unsupported by the evidence. And once again, it has nothing to do with the elements of the Mann Act—whether anyone was transported interstate to engage in prostitution.

For example, even when Ms. Ventura testified that Mr. Combs could be controlling, she stated that "there was still love there." Tr.431. And contrary to the government's claim that Mr. Combs did not allow Ms. Ventura to release albums, she in fact released a mixtape during her record deal. Tr.1339. Ms. Ventura also testified that as Mr. Combs's girlfriend and a Bad Boy artist, she was given opportunities that many others coming up in the entertainment industry never had—including studio time, access to sound engineers, and access to famous musical

artists like Kid Cudi, Nicki Minaj, and Lil Wayne.  Tr.1338-39.  Ms. Ventura also released

singles with Rick Ross, Pusha T, and others.  Tr.1340.

b.  Directly contradicting the verdict and the jury's rejections of the government's

arguments, Probation also found that Mr. Combs defrauded Jane into participating in hotel nights

by, for example, falsely promising trips and "alone time."  PSR ¶72(b).  The PSR says that, in

September 2023, Mr. Combs misled Jane into flying to New York from Los Angeles by claiming

they would have "romantic one-on-one time together" when he actually wanted to have a hotel

night.  *Id.*  But the government expressly argued to the jury that this episode was a "completed

act of sex trafficking," Tr.7635-36, and the jury rejected this argument and acquitted Mr. Combs

on Count 4.  In fact, the evidence showed that Mr. Combs texted Jane on the flight and said "I

have a surprise if that's OK. Just one."  DX-3183, p.20.  Combs sent Jane the link to the

Cowboys 4 Angels entertainer and—contrary to her testimony that she felt "really

disappointed"—Jane "liked" the link.  *Id.* at pp.21-22; Tr.4799, 5626-27.

After Jane landed, an entertainer came to their hotel, and Jane agreed to meet him, but

decided to "release[] him" because she didn't like their chemistry.  Tr.5630.  Jane testified that

she then felt like she needed to make up for rejecting the prior entertainer and decided to call in

Kabrale.  Tr.5632-33.  According to Jane, she "felt freer," "tried to give it [her] all," and "tried to

make it a show" with Kabrale.  Tr.5633.  Jane and Mr. Combs later texted about her New York

trip, and she noted that "it was perfect how it all played out."  DX-3191, pp.7-8.  Jane then, on

her own, texted Kabrale (without Mr. Combs' knowledge and not at his insistence) asking for his

availability to come to Miami later that week.  DX 3328, p.258.

Other trial evidence demonstrated that Jane willingly and enthusiastically participated in

hotel nights.  For example, Jane testified that one night in Miami with Paul was a "really great

sexual experience" during which she "felt in control" and from which she had "really good memories." Tr.5876. Jane would often coordinate with escorts without Mr. Combs's knowledge or direction, including by "personally reach[ing] out to Kabrale, Antoine, Paul, sometimes Don," Tr.4811, and contacting entertainers to surprise Mr. Combs. That included Valentine's Day in 2022, when Jane decorated a hotel room with heart balloons and rose petals, GX E-123; GX E-124, and even suggested that there be two male entertainers present, Tr.5525.

Probation also erred in concluding that Mr. Combs coerced Jane into participating in hotel nights by threatening to stop paying her rent. PSR ¶72(b). This is yet another theory the jury rejected with its acquittal on Count 4. *See* Tr.7620 (government arguing that Mr. Combs "started using his payment of Jane's rent as leverage"). Jane testified that she and Mr. Combs obtained the residence in question in part so they could have hotel nights more conveniently—i.e., by "shift[ing] [them] from hotels to the home." Tr.5324. Jane wanted to "start mixing it up." *Id.* And after the lease commenced, Mr. Combs saw Jane on multiple occasions without a hotel night occurring. *See, e.g.*, Tr.5066, 5617-5618, 5644-46. Moreover, any notion of coercion regarding the rent is questionable—as the jury no doubt concluded—given Jane's testimony that she makes over $10,000 a month on OnlyFans, once made as much as $50,000, and that being on OnlyFans allowed her to "reclaim my [financial] independence," and "stand on my own two feet." Tr.5118-19, 5950-51.

c. Probation also concluded that Mr. Combs's coercion of Ms. Ventura and Jane included "force and threats of force." PSR ¶72(a), (b). This was the core of the government's sex-trafficking theory, and a point it repeatedly emphasized to the jury. *See, e.g.*, Tr.7563 ("The defendant used power, violence and fear to get what he wanted."); 7609-10 ("The sex trafficking charges in this case are based on the defendant's . . . [t]hreats . . . and violence."); 7611 ("The

sex trafficking charge is about the multiple occasions when the defendant made Cassie and Jane have sex when they didn't want to by threatening them . . . and being violent with them"). The government even told the jury that it didn't have enough time during its day-long summation "to talk about all of those violent incidents now." Tr.7663.

The jury clearly rejected this theory, and it is contrary to the trial record. While there may be some evidence of domestic violence in the record, there is no evidence of Mr. Combs committing any violent acts over the past seven years—with the lone exception of a single instance in June 2024 where Mr. Combs was provoked after Jane attacked him by, among other things, slamming his head into a kitchen countertop. In a similar vein, Ms. Ventura testified that she would sometimes initiate physical fights with Mr. Combs. Tr.757, 763-64. Critically, most of the evidence of violence is either completely unconnected to or attenuated from freak-offs and hotel nights.

The evidence thus resembles *Sabatino*, where the alleged violent acts were "not used as coercive elements to force the girls to participate" in the alleged criminality. 943 F.2d at 104. The First Circuit thus reversed the district court's "reliance for a coercion adjustment on the alleged theme of physical violence which permeated the record." 943 F.2d at 104. The Court should not make the same mistake here.[28]

Finally, as explained, Probation's finding that both Ms. Ventura and Jane were coerced through drug use, PSR ¶72(a), (b), is yet another theory the jury rejected. It is also—like the other evidence the PSR identifies—contrary to the trial record.

---

[28] Application Note 2 to §2G1.1 provides that the fraud/coercion enhancement "anticipates no bodily injury," but that "[i]f bodily injury results, and upward departure may be warranted." The Court should not grant an upward departure for the same reasons it should not apply the fraud/coercion enhancement based on any alleged force or threats of force.

The record shows Ms. Ventura would voluntarily procure her own drugs, separate and apart from Mr. Combs—and would even suggest obtaining drugs for freak-offs.  Similarly, Jane testified that she would willingly take ecstasy and other drugs with Mr. Combs even apart from hotel nights.  *E.g.*, Tr.4577, 5302, 5399.

Although Ms. Ventura and Jane testified that they "couldn't imagine myself doing" freak-offs without drugs, Tr.542 (Ventura), and that drugs "made [hotel nights] easier," Tr.4708 (Jane), that does not come close to establishing that Mr. Combs coerced Ms. Ventura or Jane into participate in these nights through drug use.  For starters, Ms. Ventura and Jane never told Mr. Combs they felt this way about needing to take drugs to get through these nights.  Even if they had, the testimony does not show coercion or fraud.  It does not suggest Mr. Combs threatened to harm Ms. Ventura or Jane if they did not take drugs, or that he forcibly or through trickery plied them with drugs so they would be unable to resist unwanted sexual advances.  Rather, the testimony reflects that Ms. Ventura and Jane personally preferred to and did take drugs before these nights.

None of this is grounds to impose the fraud/coercion enhancement.  The pertinent application note explains that the enhancement "generally will not apply if [a] drug" is "voluntarily taken."  §2G1.1 App. Note 2.  In other words, the enhancement is limited to instances of *involuntary* intoxication—which typically involves the consumption of drugs or alcohol through trickery, fraud, or deceit, rather than compulsion, such as through the use of spiked drinks or the like.  To the extent one can be compelled or coerced to take drugs, "courts have been quite restrictive in determining what pressures are required to overcome the will of the actor."  2 LaFave, Subst. Crim. L. §9.5(g) (3d ed. 2024) (citing cases); *e.g.*, *City of Minneapolis v. Altimus*, 238 N.W.2d 851, 856 (Minn. 1976) ("Courts have strictly construed the requirement

of coercion . . . so that acquittal by reason of coerced intoxication is an exceedingly rare result."). At the very least, there must be evidence that Ventura's or Jane's voluntariness to take the drugs was "negated"—i.e., nullified or rendered ineffective.

For example, in *United States v. Jackson*, the court declined to impose the §2G1.1(b)(1) enhancement because there was no evidence that "other than offering [drugs] to these victims, . . . there was any other sort of force imposed or utilized to get them" to consume the drugs. Sentencing Transcript for 17-cr-117 (D. Mont.), Dkt.60 at 21. Rather, the defendant had merely "encouraged the use of" the drugs and used them as a "motivator for these women to continue to participate in commercial sex," but it was "their choice" whether or not to ultimately use them given the defendant did not "employ any kind of threats or anything of that nature." *Id.* at 21-22. Similarly, here there is no evidence that Mr. Combs threatened or compelled Ms. Ventura or Jane to take drugs, even if he may have occasionally told or encouraged them to take drugs. These were adult women who chose to take drugs as part of a partying lifestyle with their celebrity lover.

The PSR cites Jane's testimony about the events of June 18 and 19, 2024 at her home in California. *See* PSR ¶72(b) (quoting Tr.5211). This particular incident is clearly not relevant conduct even under the overbroad interpretation of the acquitted conduct guideline advocated by the government, as no interstate travel was involved. Moreover, although Jane testified that Mr. Combs told her to take a particular "pill," she ultimately did so on her own accord. Tr.5211-12. Indeed, before Mr. Combs told her to take the pill, Jane easily could have prevented the male entertainer from entering her gated community or driven away herself. Tr.5848-49. The PSR also states (at ¶72(b)) that Jane "blacked out or fainted from the drug use" on unknown "occasions," but there is no evidence whatsoever of this in the record.

In sum, no fraud or coercion enhancement is appropriate. But if the Court concludes, to the contrary, that Mr. Combs "negate[d] the voluntariness" of Ms. Ventura or Jane within the meaning of Application Note 2 to §2G1.1, these same arguments militate in favor of a significant downward variance under the §3553(a) factors. That is particularly true given that the Court would be imposing a substantial guidelines enhancement for fraud or coercion despite the jury's clear rejection of the government's fraud/coercion evidence with its verdict.

### D. No Grouping Is Appropriate Because There Are No "Victims"

Probation identified the following individuals as "victims" for Counts 3 and 5: Ms. Ventura, Jane, and eight male entertainers— ███████████████████████ ███████████████████████████████ and an "unnamed Cowboys 4 Angels Escort." PSR ¶84. Probation then grouped these ten "victims" into ten separate groups, *id.* ¶¶84-85 (citing §2G1.1(d)(1) & App. Note 5), pp.22-26, and accordingly increased Mr. Combs's offense level by five pursuant to the table in §3D1.4, *id.* ¶¶146-49. The premise of this grouping analysis is that the ten identified individuals are "victims."

But that is untrue. As explained below, neither Ms. Ventura nor Jane nor any of the male entertainers are "victims." Where a prostitution offense involves adults willingly engaging in sexual activity, there is no harm to the participants caused by the defendant. The Court should therefore apply Application Note 2 to §3D1.2, which provides that counts involving victimless offenses should be grouped together so long as whatever "societal interests" are implicated are "closely related." That is the case here, where the two Mann Act counts involved identical alleged misconduct (albeit involving different individuals). As a result, no grouping is appropriate, and there should be no increase to Combs's offense level.

1. As a general matter, a Mann Act offense can be a victimless crime. As explained, there is no need to prove that sexual activity even occurred, or that the individual transported did

not voluntarily travel or engage in any sexual activity that did occur.  *See* Tr.8028 (Mann Act charge).  Nevertheless, at least since the 1950s, prosecutors have typically pursued only Mann Act cases involving true victims—i.e., individuals injured or harmed by the offense conduct in some way.

The Mann Act was enacted in 1910 to target the "'white slave' business . . . and to prevent panderers and procurers from compelling thousands of women and girls against their will and desire to enter and continue in a life of prostitution."  *Mortensen*, 322 U.S. at 377. Congress was concerned about "young women" who were "forced," "coerc[ed] . . . through threats, intimidation, and force," or "sold outright" into prostitution. *United States v. Vang*, 128 F.3d 1065, 1069 (7th Cir. 1997); *United States v. Flucas*, 22 F.4th 1149, 1166 (9th Cir. 2022) (Bybee, J., dissenting).

The DOJ has thus for decades focused on victims of commercial sex trafficking and others who suffer real harm and has avoided the "moral crusade" that plagued the early history of the Mann Act.  This is reflected in the longstanding DOJ policy recommending against Mann Act prosecutions unless there is a profit motive, and in the paucity of modern Mann Act cases that *do not involve* brothels, pimps, or minors.

Even outside the ordinary pimp fact pattern, the transported individual usually suffers some kind of harm or injury.  In *United States v. Robert (R.) Kelly*, the defendant transported minors and young women across state lines and then exposed them to herpes.  128 F.4th 387, 406, 413-14 (2d Cir. 2025).  Unlike here, the defendant in *Kelly* was charged with knowingly transporting an individual not for prostitution purposes, but rather "with intent that such individual engage in ... any sexual activity for which any person can be charged with a criminal offense." 18 U.S.C. §2421(a).  This clause is generally reserved for more serious sexual

conduct—conduct that may well injure or harm the individual transported—such as rape or sexual exploitation of minors, or, as in *Kelly*, laws prohibiting "exposing sexual partners to venereal diseases." *Id.* at 413, 414 n.8. That the government decided not to charge Mr. Combs under this provision and instead relied on the less serious "prostitution" prong, further undercuts any notion of victimization.

2.  Probation determined that Ms. Ventura, Jane, and the eight male entertainers were victims based on the definition provided in Application Note 1 to §2G1.1: "a person transported, persuaded, induced, enticed, or coerced to engage in, or travel for the purpose of engaging in, a commercial sex act or prohibited sexual conduct." PSR ¶71. But neither Ms. Ventura, Jane, nor any of the entertainers were "victimized" in any way. Any reading of the application note that extends to either the escorts or Ms. Ventura and Jane, therefore, would be "inconsistent with, or a plainly erroneous reading of" the guideline itself and thus not authoritative. *Stinson v. United States*, 508 U.S. 36, 38 (1993).[29]

To avoid that result, the Court should interpret "victim" in §2G1.1(d)(1) according to its plain meaning at the time of enactment, i.e., 1996. *See* USSG App. C, amend. 538; *e.g.*, *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022). In 1996, as now, legal and non-legal dictionaries alike generally defined "victim" as one harmed or injured by a particular action. *E.g.*, *Victim*, Black's Law Dictionary (7th ed. 1999) ("A person harmed by a crime, tort, or other wrong."); *Victim*, Black's (Abridged 6th ed. 1991) ("Person who has suffered damages as result

---

[29] Additionally, although the Second Circuit applies *Stinson*, we also preserve the argument that the commentary is no longer authoritative in any event under *Kisor v. Wilkie*, 588 U.S. 558 (2019). There is a circuit split on this issue. *Compare United States v. Lewis*, 963 F.3d 16 (1st Cir. 2020) (holding that commentary remains authoritative post-*Kisor* and that *Stinson* is good law); *United States v. Moses*, 23 F.4th 347 (4th Cir. 2022) (same); *United States v. Vargas*, 74 F.4th 673 (5th Cir. 2023) (en banc) (same); *United States v. White*, 97 F.4th 532 (7th Cir. 2024) (same); *United States v. Maloid*, 71 F.4th 795 (10th Cir. 2023) (same), *with United States v. Nasir*, 17 F.4th 459 (3d Cir. 2021) (en banc) (holding that *Kisor* modified *Stinson*); *United States v. Riccardi*, 989 F.3d 476 (6th Cir. 2021) (same); *United States v. Castillo*, 69 F.4th 648 (9th Cir. 2023) (same); *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) (en banc) (same).

of defendant's criminal activities"); *Victim*, Webster's Encyclopedic Unabridged Dictionary of the English Language 1591 (1996) ("[A] person who suffers from a destructive or injurious action or agency."); *Victim*, The Oxford English Reference Dictionary 1609 (2d. ed. 1996) ("[A] person injured or killed as a result of an event or circumstance."). Courts have understood "victim" the same way; for example, one who "is harmed by a defendant's crimes," *United States v. Aloba*, 2025 WL 1248827, at *2 (9th Cir. Apr. 30, 2025), or—more specifically—one who was "depriv[ed] . . . of most if not all of her liquid assets," *United States v. Kaye*, 23 F.3d 50, 51 (2d Cir. 1994).

This understanding of "victim" is also reflected in the criminal code, including a provision relating to federal sex crimes. The Crime Victims' Rights Act defines "crime victim" as "a person directly and proximately harmed as a result of the commission of" an offense. 18 U.S.C. §3771(e)(2)(A). Similarly, a restitution provision in the very statutory chapter where the Mann Act is codified defines "victim" as an "individual harmed as a result of a crime under this chapter." 18 U.S.C. §2429(d); *see also* §§3663, 3663A (victim is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered").

The guidelines themselves also generally equate "victimization" with some kind of harm or injury. For example, the guideline for fraud offenses defines a victim as "any person who sustained any part of the actual loss" or "any individual who sustained bodily injury as a result of the offense." USSG §2B1.1 App. Note 1. Other guidelines impose offense level increases when the "victim" suffers specified injuries, such as "sustained bodily injury," §2A2.2(b)(3), or "permanent or life-threatening bodily injury," §2H4.1(b)(1)(A). Likewise, a policy statement calls for the imposition of an above-guidelines sentence "[i]f a victim or victims suffered

psychological injury much more serious than that normally resulting from commission of the offense." §5K2.3.

To put all of this together: the PSR recommends a significant guidelines enhancement based on individuals who are not victims in the ordinary sense of the word, would not be considered victims elsewhere in the guidelines, were not protected by the statute Congress enacted to guarantee victims important rights in federal criminal cases, and (as the PSR explicitly recognizes (at ¶78) for the entertainers) are not entitled to statutory restitution. This is an untenable, if not absurd, reading of §2G1.1(d)(1), and "absurd results are to be avoided." *United States v. Wilson*, 503 U.S. 329, 334 (1992).

3. Neither Ms. Ventura, Jane, nor any of the male entertainers identified by Probation are "victims" in any relevant sense. Ms. Ventura and Jane were not victims because the jury rejected any such notion when it acquitted Mr. Combs on the sex-trafficking and RICO conspiracy counts, and because of the record evidence demonstrating that they were not forced, coerced, or defrauded into participating in freak-offs or hotel nights.

The record also makes clear that none of the entertainers are victims. As Probation concluded, none of them are entitled to restitution because they were not "harmed" in any way. *See* PSR ¶78. There is ample evidence to support the PSR's conclusion. ██████████████████████████████████████████████ (for Count 3), ██████████ ██████████████████████████████ (for Count 5) were fully consenting, willing, able-bodied adult males who chose to travel to meet with Mr. Combs and his girlfriends.[30] These men were engaging in the professions they chose and partaking in sexual experiences they chose. Several

---

[30] Although there is little in the record about the "unnamed Cowboys 4 Angels escort," this description appears to refer to a man named ██████ " who traveled to Ibiza for a freak-off. *See* PSR ¶¶19(d), 84; Tr.540, 650-51; GX B-326, pp.20-21; *see also* 3501-019 at 3-4. There is no reason to believe that ██████ was "victimized" any more than the other entertainers identified by Probation.

of them considered themselves friends of Mr. Combs, Ms. Ventura, and Jane.  And critically, unlike the usual Mann Act case involving pimps who take the proceeds of their prostitutes, these men were repeatedly paid large sums of money—typically several thousand dollars, sometimes more, often in cash—and directly, not through some exploitative pimp.  These men also stated that they were often paid for their time—not sex.

██████ was one of several escorts employed by Cowboys 4 Angels, an escort service featured on the Showtime show *Gigolos*.  Tr.1191-92.  He was typically paid $350 an hour for his get togethers with Mr. Combs and his girlfriends, 3519-008 at 6, and he told the government he has "never accepted money in exchange for sex," 3519-006 at 3.  ████ another Cowboys 4 Angels escort, was similarly paid for his time and received a combined $4,000 for his first two meetings with Mr. Combs and Jane.  3525-003 at 2-4.  He did not consider himself a prostitute and was paid "not [for] the sex."  3525-002.  ██████ yet another Cowboys 4 Angels escort, was paid $700/hour for one meeting—i.e., paid for his "time."  3532-002 at 3.  Similarly, ██████ who worked as a porn star for years, 3594-008 at 1, was ordinarily paid $3,000 to $4000 per meeting with Mr. Combs, 3594-008 at 3.  ██████ too, was usually paid between $3,000 and $5,000—and one time as high as $15,000.  3545-058 at 5; 3545-066 at 5.

These entertainers were not just paid handsomely, often just for their time—they had fun with and enjoyed their experiences with Mr. Combs and his girlfriends.  Ms. Ventura testified that she and Theodore "had our own friendship."  Tr.684.  In representative texts to Ms. Ventura, Theodore said it was "[g]reat seeing you again sexy," Tr.6638, and wished her a happy birthday, Tr.6629.  In a similar vein, Jane testified that she had a "friendship" with Arthur, that he was "warm" to her, and that she "miss[ed]" him.  Tr.5771, 5874.  Jane also explained that the first time she met Kabrale in person, he was "just really sweet" and that they both had "little

butterflies." Tr.4733. Kabrale later texted Jane that he "would love to see [her]." Tr.4749. Jane described Reggie's behavior similarly, explaining that he "was really nice," in a "nice mood," and "we took a liking to each other." Tr.4769.

Although none of the seven entertainers identified by the PSR testified, their prior statements to the government are consistent with Ms. Ventura's and Jane's testimony and refute any suggestion that they were harmed or injured in any way. ▮▮▮ explained that on certain occasions, he would just "hangout" with Mr. Combs and Ms. Ventura. 3519-006 at 3, 5; 3519-008 at 6. Arthur was Mr. Combs's personal trainer. 3519-008. ▮▮▮ smoked and watched TV during his first get-together with Mr. Combs and Jane. 3594-008 at 3. ▮▮▮ also discussed how he would begin his meetings with Mr. Combs and Jane by "[c]hill[ing]," "smok[ing]," and "dr[inking]." 3525-003 at 2-4. On one occasion, there was a charcuterie board, red wine, and shot glasses. *Id.* at 2. And when ▮▮▮ first met Ms. Ventura for a freak-off, he "did not feel pressured to do anything," 3532-001 at 1; rather, he chose to "stay longer" after "his time was up," 3532-002 at 2-3.

These sentiments were corroborated by the escorts who did testify at trial and generally had similar experiences with Mr. Combs and his girlfriends.[31] Daniel Phillip, a male stripper, testified that he was "just excited that I was in this world and . . . happy . . . to be involved with people with such notoriety." Tr.274. He "didn't care if [he] got paid one way or another." *Id.* Nevertheless, Phillip said that when he first met Combs and Ms. Ventura, she gave him a "few thousand dollars" in cash up front, before any kind of sexual conduct occurred, and then "a couple of thousand dollars more" before he left the hotel room. Tr.249, 253, 303-04. Similarly to some other escorts, Phillip "had conversations in between" meetings with Ms. Ventura and

---

[31] These two escorts did not travel interstate and were not involved in the offense conduct.

had developed a "friendship" with her, Tr.279-80, 374, felt they had a "bond," Tr.368, and he

"always wanted to make sure she was OK" and even developed romantic feelings for her,

Tr.374.

 Sharay Hayes, otherwise known as the "Punisher," had been an "exotic dancer" for about

twenty-five years before meeting Mr. Combs and Ms. Ventura.  Tr.1922.  When he finally met

them in a hotel room, Hayes was handed a "stack of money" by Ms. Ventura—again, before any

kind of sexual activity took place—and then was handed "additional monies" on the way out.

Tr.1891, 1895.  In total, Hayes took home $2000 for only 25 to 45 minutes of his time—a typical

amount for their meetings.  Tr.1894, 1906.  Hayes was even paid $500 one time for "doing

nothing."  Tr.1935.  And after meeting with Ms. Ventura about a dozen times, Hayes "felt

special" that he was being chosen for their get-togethers.  Tr.1924-25.

 Unsurprisingly, at no point has the government treated the entertainers identified by

Probation (or any other escorts) as "victims" for Counts 3 and 5—or indeed, for any purpose in

this case.  The government made no attempt to cloak them in anonymity and introduced photos

of the escorts at trial and released them to the press.  It previously considered several of them to

be "subjects" of the investigation into Combs.  *E.g.*, 3525-001 (          ; 3594-005          ; 3519-

004 (          .  The government even executed a search warrant on          electronic devices

soon after Combs's arrest in September 2024.  3519-015 at 2.

 The government's theory from the start has been that Ms. Ventura and Jane were the only

alleged victims for Counts 3 and 5.  They are expressly identified in the indictment (at ¶¶18, 20)

as "Victim-1" and "Victim-2," respectively.  Consistent with that theory, and unlike for the

entertainers, the government sought and obtained a pseudonym for Jane to protect her identity.

By contrast, the government suggested in its rebuttal at closing that the entertainers "love[d] their

jobs enough that they might say they would do them for free." Tr.7915. Only now, at sentencing, has the government changed its tune and determined that the entertainers are "victims."

4. There is another, independent reason why the record does not permit the Court to deem any of the entertainers victims and impose an upward adjustment on such basis: the government charged the Mann Act violations in a manner that renders patently unclear who the alleged "victims" were. Counts 3 and 5 respectively allege that Combs transported "*multiple individuals*, including but not limited to [Victim-1 (Count 3) and -2 (Count 5)] and commercial sex workers, in interstate and foreign commerce *on multiple occasions* with the intent that they engage in prostitution." S-3 Indictment ¶¶18, 20 (emphasis added). The indictment is therefore duplicitous in that it charges numerous Mann Act violations based on numerous individuals in each Count. *See, e.g.*, *United States v. Kandic*, 134 F.4th 92, 100-01 (2d Cir. 2025) (finding charge duplicitous).

The duplicity of Counts 3 and 5 was highly prejudicial because it has now created "uncertainty [over] whether a general verdict of guilty [has] conceal[ed] a finding of guilty as to one crime and a finding of not guilty as to another" and precluded "the basis for appropriate sentencing." *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001) (Sotomayor, J.) (citing *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir.1981) and *United States v. Murray*, 618 F.2d 892, 896 (2d Cir.1980)).

The jury was not asked to make any specific finding that any particular individual was transported across state lines. The verdict sheet merely asked for a general finding of guilty or not guilty on Counts 3 and 5, Dkt.447 at 2-3—no special findings. Although the jury was instructed that, for each Count, it must be unanimous that the offense was proven "with respect

to at least one specified instance," Tr.8030-31, this unanimity instruction does not cure the prejudice because there is no way of identifying which particular instance or instances—involving which escort or escorts—the jury relied on to convict.

There accordingly remains a risk that Mr. Combs will have his "liberty taken from him" without "the unanimous verdict of a jury of twelve persons." *Ramos v. Louisiana*, 590 U.S. 83, 92 (2020). And to the extent that any of the alleged Mann Act violations could theoretically constitute relevant conduct, USSG §1B1.3, the Court would have no way of knowing whether the jury acquitted him on any or which of these offenses.

As the Second Circuit has recognized, a defendant would be "harmed by a sentence based on the assumption that the jury convicted him for participation" in multiple offenses when "the "jury's verdict is only demonstrably unanimous with respect to one of those offenses." *Sturdivant*, 244 F.3d at 78, 80.

In *Sturdivant*, for example, the Court vacated and remanded for resentencing when the district court imposed a sentence on a duplicitous count alleging two distinct drug transactions based on the erroneous "assumption that the jury convicted him for participation in both." *Id.* at 78.[32] Although, unlike here, this error resulted in the imposition of a higher mandatory minimum sentence, the Second Circuit made clear that there would have been a duplicity problem even if that weren't true, because the defendant had been "convicted on a count charging two distinct offenses," but the jury's verdict was "demonstrably unanimous" as to only one of them. *Id.* at

---

[32] Similar to here, the defendant first raised the issue at the close of the government's case, but the Court held that immaterial, and he was still entitled to appropriate relief. *Id.* at 76. Notably, the Court held that the defendant's failure to request a special verdict form did not waive this argument because "it is the government's responsibility to seek special verdicts," *id.* at 76 n.4, and the government did not do so here. Moreover, Mr. Combs could not have raised these arguments before trial because the duplicity problem was not "apparent" (*id.* at 76) until sentencing, when the government—for the first time in this prosecution—decided to label the male entertainers "victims" for the Mann Act counts.

80. The Court held that the prejudice could be cured by sentencing him as if he had been convicted of the crime involving the lesser drug amount. *Id.*

There is a similar duplicity problem here. It is unclear which escorts the jury found were part of a Mann Act offense. To assume that the jury found any of the seven escorts identified by Probation—much less the "unnamed" escort—were involved in one of the offenses for which they convicted would be pure speculation. That is not a permissible basis to increase Combs's offense level under *Sturdivant*—especially not by five levels.

5. For all these reasons, the Court cannot conclude that the eight male entertainers, or Ms. Ventura or Jane, are "victims" within the meaning of USSG §2G1.1. If the Court does decide to apply Application Note 1's "victim" definition at all, however, it should not do so for any of the eight men because that would vastly overstate the seriousness of the offense. The guidelines recognize that enhancements are unwarranted in precisely these circumstances.

For example, the guideline for fraud offenses recommends a downward departure if the offense level "substantially overstates the seriousness of the offense." §2B1.1 App. Note 21(C). While there is no similar commentary in the Mann Act guideline, this application note illustrates a general principle that when applying a guideline "bears little or no relationship to the defendant's role in the offense and greatly magnifies the sentence, the district court should have the discretion to" impose a lesser sentence. *United States v. Stuart*, 22 F.3d 76, 83 (3d Cir. 1994). Put another way, "[w]hen an atypical case falls outside the heartland in that a particular guideline linguistically applies but … the conduct significantly differs from the norm, the court may consider whether a [lower sentence] is warranted." *Id.* at 82-83 (relying on *United States v. Restrepo*, 936 F.2d 661, 667 (2d Cir. 1991)).

In *United States v. Moneke*, for example, the government and Probation agreed that a 14-level enhancement was appropriate based on a loss amount exceeding $550,000, but they both nevertheless suggested a downward departure because this amount "may [have] overstate[d] the seriousness of the offense." 2021 WL 3190382, at *3 (E.D.N.Y. July 26, 2021). The court agreed and ultimately imposed a sentence of time served. *Id.* at *4.

Unlike the government's approach in *Moneke*, here the government is reversing its long-held position that the entertainers were not victims solely so it can jack up Mr. Combs's guidelines range and ultimate sentence. The government is not merely seeking a minor enhancement: including the entertainers in the grouping calculation results in a whopping five-level increase to Mr. Combs's offense level, compared to a two-level increase if only Ms. Ventura and Jane are deemed "victims," *see* §3D1.4; PSR ¶¶146-49—and a significantly higher guidelines range. The male entertainers are obviously not "victims" in any reasonable or fair sense. It would be vastly disproportionate to dramatically increase Mr. Combs's guidelines range in this way based on the fiction that they were somehow harmed by the offense even though they made thousands of dollars and enjoyed their time with Mr. Combs and his girlfriends during freak-offs and hotel nights.

At a minimum, for the same reasons, a significant downward variance is warranted if the 5-point enhancement is applied.

### E.  No Role Enhancement Is Warranted

Probation increased Mr. Combs's offense level by four, claiming he was an (1) "organizer or leader" of alleged criminal activity that (2) "involved five or more participants" and (3) "was otherwise extensive" within the meaning of USSG §3B1.1(a). PSR ¶¶89, 95, 101, 107, 113, 119, 125, 131, 137, 143. Each of these three determinations was legally and factual erroneous. No enhancement is appropriate.

111

### 1.  Mr. Combs Was Not A Leader Or Organizer

When the jury acquitted Combs of the RICO conspiracy count, it rejected the idea that he was the organizer or leader of any criminal conduct, including the conduct underlying Counts 3 and 5, which were alleged to have been predicate acts the supposed RICO conspirators agreed to commit.

The government alleged that Combs oversaw a criminal enterprise comprising him and an "inner circle."  Combs was the alleged "leader" of this enterprise, which allegedly committed multiple Mann Act violations, and included among its means and methods the transportation of Ms. Ventura, Jane, and male entertainers "across state lines and internationally" for freak-offs and "[o]ther commercial sex acts."  S-3 Indictment ¶¶7, 9, 12(b) & (d), 13(g).

At trial, the government sought to prove these allegations and, echoing the indictment, argued to the jury that Combs was the "leader of," "at the top of," and the "head of" this alleged enterprise.  Tr.7567-68.  The government also specified that Combs's alleged "inner circle" included Kristina Khorram, his chief of staff, and his bodyguards—including D-ROC.  Tr.7568-69.  The government also reiterated that these alleged confidants "helped the defendant arrange travel for the defendant's girlfriends and male escorts for the purpose of commercial sex."  Tr.7574.

But the jury rejected these allegations, evidence, and argument, and acquitted Combs on the RICO conspiracy count.  Had the jury believed Combs was the leader or organizer of a group of individuals that together violated the Mann Act—or even that he conspired with a single other person to commit such violations—it almost certainly would have convicted him on that count.  Indeed, the jury was instructed that "two . . . racketeering acts" would have sufficed to establish the requisite pattern, even two acts "of the same type."  Tr.7988.  Thus, any two incidents constituting a Mann Act violation would have sufficed, had the jury found that other co-

conspirators were involved.  But the special verdict confirms the jury did not make such a finding.

The only logical conclusion is that the jury found that the Mann Act was violated, but by Combs alone and without the assistance of any other person in his "inner circle"—and that it therefore rejected the premise that Combs was an "organizer or leader of [the] criminal activity." §3B1.1(a).  Probation nevertheless found that Combs "enjoyed the exercise of decision-making authority over his employees," and "directed them in the planning and organization of the travel of the escorts as well Ventura and Jane."  PSR ¶73.  But the jury's verdict refutes these findings, and they therefore do not constitute relevant conduct.  USSG §1B1.3(c).[33]

There is thus no basis for imposing a four-level enhancement, and no evidence that would enable the Court to make the "specific factual findings" necessary to support the enhancement consistent with the jury's verdict.  *United States v. James*, --- F.4th ---, 2025 WL 2486539, at *9-10 (2d Cir. Aug. 29, 2025).  The Second Circuit has strictly policed this requirement and routinely declines to uphold the enhancement either because the district court's factual findings were insufficient or the record otherwise did not support applying the enhancement.  *See, e.g.*, *James*, 2025 WL 2486539, at *9; *United States v. Birkin*, 366 F.3d 95, 102 (2d Cir. 2004); *United States v. Burgos*, 324 F.3d 88, 92-93 (2d Cir. 2003); *United States v. Greenfield*, 44 F.3d 1141, 1147 (2d Cir. 1995); *United States v. McGregor*, 11 F.3d 1133, 1139 (2d Cir. 1993); *see also United States v. Hunsaker*, 65 F.4th 1223, 1229-31 (10th Cir. 2023); *United States v. Cameron*, 573 F.3d 179, 186 (4th Cir. 2009); *United States v. Reneslacis*, 349 F.3d 412, 417-18

---

[33] The PSR's factual findings implicitly refer to the factors in §3B1.1 Application Note 4 used to "distinguish[]" a "leadership and organizational role" from a role of "mere management or supervision"—for which the guideline recommends a three- rather than a four-level increase.  We object to the application of these factors insofar as it assumes that Mr. Combs may be considered a "manager or supervisor" as an alternative to a "leadership or organizer."  No aggravating role enhancement of any kind is appropriate—whether on the basis that Mr. Combs is an organizer/leader or manager/supervisor.

(7th Cir. 2003); *United States v. Avila*, 95 F.3d 887, 891-82 (9th Cir. 1996). And these cases were all (except *James*) decided before the acquitted conduct guideline was adopted. To the extent any doubt remains, that guideline precludes findings that would support the enhancement because of the jury's acquittal on RICO conspiracy, coupled with its convictions on the standalone Mann Act counts.[34]

> 2. *There Were No "Participants" Within The Meaning Of The Guideline*

a. Even assuming Combs could be considered an "organizer or leader," a four-level enhancement would be appropriate only if the alleged criminal conduct involved "five or more participants" *or* was "otherwise extensive." USSG §3B1.1(a). Neither is true.

Probation purported to identify five "participants": Ms. Ventura, Jane, Khorram, Butler, and Jessica Ruiz, his travel agent. PSR ¶73. It specified that only Ms. Ventura, Jane, and Khorram are "criminally responsible" participants, *see id.*, that is, individuals who are "criminally responsible for the commission of the offense," §3B1.1 App. Note 1. By contrast, Probation determined that Butler and Ruiz are "likely" only "unknowing participants." PSR ¶73. Probation therefore identified four criminally responsible participants (including Combs) and two unknowing participants.

But the enhancement cannot be applied unless there are *five criminally responsible* participants. This alone is dispositive and precludes a four-level enhancement. For example, in *United States v. Carrozzella*, the Second Circuit concluded: "Because the government does not dispute that the number of criminal participants in this case was under five, any application of Guidelines §3B1.1(a) must rest on [defendant's] criminal activity having been 'otherwise

---

[34] The Second Circuit has observed that the role enhancement was not intended to be restricted to "structured enterprises." *United States v. Liebman*, 40 F.3d 544, 549 (2d Cir. 1994). But regardless of how structured the alleged RICO enterprise was in this case, the important point is that the jury rejected the evidence concerning this purported "association of people" (*id.*) when it acquitted Mr. Combs on Count 1.

extensive.'"  105 F.3d 796, 802 (2d Cir. 1997) (citing definition of "participant" in Application Note 1 to §3B1.1).  The Circuit later reiterated that the requirement of "five or more participants" refers to "criminally responsible" participants.  *United States v. Skys*, 637 F.3d 146, 156 (2d Cir. 2011) (same).

b.  Not only does the PSR expressly fail to identify the requisite five criminally responsible "participants," the three such participants it purports to identify were not "criminally responsible" within the meaning of §3B1.1.  This is an independent reason for the Court to decline to impose a four-level enhancement.

From the very start of this case, Ms. Ventura and Jane have been treated as "victims"— not coconspirators or otherwise "criminally responsible" in any way.  They are not actually "victims," but this has nevertheless been the government's theory.  And for nearly a hundred years, the law has been that a person cannot be a coconspirator in and victim of the same Mann Act violation.  Rather, the statute "fail[s] . . . to condemn the woman's participations in those transportation which are effected with her mere consent," and affirmatively seeks to "leave her acquiescence unpunished."  *Gebardi v. United States*, 287 U.S. 112, 118-23 (1932).  Applicable guideline commentary and caselaw therefore recognizes that "[f]or purposes of §3B1.1 (Aggravating Role), a victim . . . is considered a participant only if that victim assisted in the" alleged criminal activity "in respect to another victim."  §2G1.1 App. Note 3; *see, e.g.*, *United States v. Jackson*, 865 F.3d 946, 954-55 (7th Cir. 2017); *United States v. Jarrett*, 956 F.2d 864, 868 (8th Cir. 1992).

Ms. Ventura and Jane, therefore, cannot be criminally responsible "participants" for the Mann Act violations in which they were allegedly "victims."  The PSR, however, appears to conclude that Ms. Ventura and Jane were criminally responsible "participants" with respect to

the alleged interstate travel of *escorts*.  It states that Ms. Ventura and Jane both "made concerted efforts to organize and assist various escorts in traveling."  *Id.* ¶73.  But this theory doesn't work either.

"Criminally responsible" means what it says: the alleged participant must have committed the elements of the crime with the required mental state.  *E.g.*, *United States v. Tai*, 750 F.3d 309, 318 (3d Cir. 2014); *United States v. McCoy*, 242 F.3d 399, 410 (D.C. Cir. 2001).  The Second Circuit has made clear, moreover, that to be a criminally responsible "participant," the individual must have "acted with knowledge that her conduct was criminal," *Skys*, 637 F.3d at 157-58, consistent with background *mens rea* principles equating knowledge with consciousness of wrongdoing, *see, e.g.*, *Liparota v. United States*, 471 U.S. 419, 433-34 (1985); *Arthur Andersen LLP v. United States*, 544 U.S. 696, 705-06 (2005).

Accordingly, one who is "unwittingly" involved in the alleged criminal activity cannot be a "criminally responsible" participant.  *E.g., Skys*, 637 F.3d at 158; *McCoy*, 242 F.3d at 410.  Nor does that definition apply to those who were merely "aware of," "involved in," or "generally suspected" the alleged criminality of the conduct at issue.  *E.g.*, *United States v. Lewis*, 68 F.3d 987, 989-90 (6th Cir. 1995); *United States v. Maloof*, 205 F.3d 819, 830 (5th Cir. 2000); *United States v. Somerstein*, 20 F. Supp. 2d 454, 458-60 (E.D.N.Y. 1998).

There is no evidence that Ms. Ventura or Jane acted with the requisite mental state to be "criminally responsible" for Counts 3 and 5.  The government has never suggested that they knew they were doing anything criminal when they allegedly assisted in facilitating the transport of escorts across state lines.  Nor could it have: again, the government has claimed all along that Ms. Ventura and Jane were victims.

116

Ms. Ventura and Jane both repeatedly testified that when they contacted the escorts for freak-offs or hotel nights, they did so at the behest of their romantic partner. Ms. Ventura said Mr. Combs would "ask [her] . . . if we were flying somebody in, who's available . . . [a]nd from there talk about how to get them there." Tr.540. As the government characterized her testimony at closing, Ms. Ventura said "it was at the direction of [Combs] that the transportation was settled." Tr.7698. And Jane, for example, would invite Kabrale to hotel nights "[b]ecause I knew my partner would want an entertainer for the night," Tr.4735, and was reimbursed by Mr. Combs for booking his flights, Tr.4737.

Ms. Ventura and Jane are nothing like other individuals who have been found to be criminally responsible "participants" within the meaning of §3B1.1. The participant in *United States v. Britton*, for example, "pled guilty to conspiracy to engage in interstate prostitution" and was therefore "criminally responsible for the commission of the offense." 567 F. App'x. 158, 161 (3d Cir. 2014). The Tenth Circuit similarly affirmed a finding that "four of defendant's salesmen [who] pled guilty to similar charges" were participants. *United States v. Levine*, 983 F.2d 165, 168 (10th Cir. 1992).

Even absent a formal adjudication of guilt, criminally responsible "participants" typically have roles far more extensive and intentional than Ms. Ventura's or Jane's involvement—such as "groom[ing] [the victim] for her prostitution responsibilities," *United States v. Smith*, 719 F.3d 1120, 1126 (9th Cir. 2013), or "encouraging [the victim] to join them in the vehicle and by reassuring her of the purportedly benign purposes of the trip," *United States v. Scott*, 529 F.3d 1290, 1303-04 (10th Cir. 2008); *cf. United States v. Footman*, 215 F.3d 145, 151-52 (1st Cir. 2000) (rejecting sufficiency challenge to §2421 conspiracy charge when coconspirator "acted on

[defendant's] behalf as transporter of the women, arranger of the details of the business, occasional money handler, and enforcer").[35]

c. Nor does the record support any "specific factual findings" that Khorram was a criminally responsible participant or coconspirator for the Mann Act counts. *James*, 2025 WL 2486539, at *9.

The jury rejected any such notion with its verdict. As explained, the acquittal on the RICO conspiracy and finding that Mann Act violations were not proven to be part of any racketeering conspiracy shows that the jury believed Combs did not conspire with anyone in his inner circle to violate the Mann Act. Moreover, the government had sought to prove at trial that Khorram was Combs's right "hand" or "brain"—in effect, a "fixer" for the alleged criminal conduct. The government identified Khorram as the foremost member of Combs's "inner circle" for the RICO conspiracy count, Tr.7568-69, and argued, among other things, that Khorram would "book travel and a hotel or get cash to a hotel room" when Combs wanted her to, Tr.7572-73. The jury disagreed and acquitted Mr. Combs on the RICO count and Mann Act predicate.

Regardless, there is insufficient evidence that Khorram knowingly arranged or coordinated travel for *escorts*—and certainly not enough evidence to support the PSR's conclusion (at ¶73) that she "played an integral role." Mr. Combs, Ms. Ventura, and Jane all wanted to keep their sex lives private, including from Khorram (and other staff members). And Khorram had limited knowledge of whether—and if so which—escorts were involved, particularly as to hotel nights with Jane. Indeed, the Court sustained our objection to an exhibit

---

[35] The government also should not be permitted to constantly change its theories after they are rejected by the fact-finder. *See, e.g.*, *Siddiqi v. United States*, 98 F.3d 1427, 1427, 1438-40 (2d Cir. 1996); *United States v. Davis*, 2017 WL 3328240, at *29-35 (S.D.N.Y. Aug. 3, 2017). Not until sentencing has the government treated Ms. Ventura or Jane as coconspirators, just as it has not previously treated the escorts as "victims."

the government tried to introduce that would purportedly "help[] to establish Ms. Khorram's notice of the defendant using escorts."  Tr.6282-85 (discussing GX C-259-D).

### 3.  The Alleged Criminality Was Not "Otherwise Extensive"

As an alternative basis for imposing the enhancement (i.e., alternative to there being at least five criminal "participants"), Probation concluded that the alleged criminal conduct was "otherwise extensive."  PSR ¶73.  This determination was legally and factually incorrect as well.

Guideline 3B1.1 is "based primarily on the number of people involved, criminally and noncriminally, rather than on other possible indices of the extensiveness of the activity." *Carrozzella*, 105 F.3d at 802.  Probation seemingly recognized this binding precedent but nonetheless concluded that "the years over which the offense conduct spanned and the scope of the employee's obligations to COMBS are considered."  PSR ¶73, n.2 (citing *United States v. Kent*, 821 F.3d 362, 370 (2d Cir. 2016)).

But even *Kent* acknowledges that the "otherwise extensive" analysis is primarily a head-counting exercise.  It cited *Carrozzella* with approval, found error in the district court's failure to analyze the number of participants pursuant to *Carrozzella*, and pointed out the commentary stating that §3B1.1 provides for enhancements "based upon the size of a criminal organization (i.e., *the number of participants* in the offense)," and that "*all persons* involved during the course of the entire offense are to be considered."  *Kent*, 821 F.3d at 368-71 (emphases added).[36]

The focus on head counting follows directly from the guideline's text, which sets forth [1] "five or more participants" and [2] "otherwise extensive" in the same subprovision as two

---

[36] Although *Kent* observed that district courts are not limited to "head counting alone," it cautioned that the district court must not "engage in impermissible double counting," given that "many characteristics that might ordinarily be considered evidence of 'extensive' activity are dealt with elsewhere in the Guidelines."  *Id.* at 369.  And here, the PSR already recommends a five-level increase to Mr. Combs's offense level based on the premise that there was "extensive" number of victims—i.e., ten.  To the extent the Court sees fit to consider factors other than the number of participants involved, the jury rejected the government's theory that Mr. Combs engaged in any kind of extensive criminal conduct when it acquitted him of everything but the government's two fallback transportation counts.

disjunctive triggers for the enhancement.  §3B1.1(a).  Under the *noscitur a sociis* canon, a word is known by the company it keeps, so the phrase "otherwise extensive" is "given more precise content by the neighboring words with which it is associated"—i.e., "five or more" criminally responsible "participants."  *Fischer v. United States*, 603 U.S. 480, 487 (2024).

The Second Circuit read §3B1.1 the same way in *Carrozzella* and held that criminal activity is "otherwise extensive" within the meaning of §3B1.1 only if it is the "functional equivalent of an activity involving five or more participants."  *Id.* at 803.  This "functional equivalence" test requires the Court to look to "(i) the number of knowing [i.e., 'criminally responsible'] participants; (ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; [and] (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme."  *Id.* at 803-04.

None of these factors militate in favor of a finding that the criminal activity involved in Counts 3 and 5 was "otherwise extensive."

As explained, neither Ms. Ventura, Jane, nor Khorram are "criminally responsible" participants.  Probation purported to identify two "unknowing participants"—Ruiz and Butler, PSR ¶73—but neither of them qualify because, as with Khorram, any finding that Ruiz and Butler were assisting in criminal activity in any way (whether knowingly or unknowingly) is belied by the jury's verdict on the RICO conspiracy count.

Any such finding would also conflict with the trial record.  For starters, the evidence shows that freak-offs and hotel nights were private affairs that Mr. Combs, Ms. Ventura, and Jane kept secret from Mr. Combs's assistants.  Ms. Ventura testified that she never told a member of Mr. Combs's staff about freak-offs, and that she didn't want "any member of his staff

to find out what was going on in the freakoffs." Tr.966. Jane similarly testified that "it was important that none of [Combs's] employees," including assistants and security, "knew about the entertainers at these nights." Tr.5323-24. Jane emphasized that she and Mr. Combs wanted their "sex life to be private." Tr.5952. Testimony from Mr. Combs's assistants reiterated that they had, at best, limited knowledge of what was transpiring during these nights.[37]

In any event, however involved Butler and other security staff or assistants may have been in, for instance, setting or cleaning up hotel rooms or providing supplies for freak-offs or hotel nights, *see* PSR ¶73, that evidence does not show they were involved in the narrow set of evidence pertaining to the *transportation* of anyone for purposes of prostitution. And that is all the Mann Act criminalizes. Tr.8028 (jury charge). While there may be some evidence that Ruiz, Mr. Combs's travel advisor, helped book a few instances of interstate travel, even this limited evidence is weak.

For example, the PSR states (at ¶35) that "[s]ome of Jane's travel for [hotel] nights was charged to an American Express card in the name of Ruiz and CE Opco LLC." But as Probation found, the evidence showed that "Combs personally reimbursed [this LLC] for . . . these expenses." *Id.* Also, "not every otherwise lawful activity directed by a defendant to further criminal activity . . . leads inexorably to counting the persons involved as unknowing participants." *Carrozzella*, 105 F.3d at 803; *accord United States v. Antico*, 275 F.3d 245, 269 (3d Cir. 2001) (similar). Ruiz's minimal role should be disregarded. And when Ruiz is considered together with Butler, neither of the two purported unknowing participants provided services that were "peculiar and necessary" to the criminal conduct. *Kent*, 821 F.3d at 369.

---

[37] *See, e.g.*, Tr.1769 (David James: "I just didn't really think [what was happening in a hotel room] was my business. I mean, I thought they were doing some personal things."); Tr.6867 (Brendan Paul testifying that he never thought "king nights" were anything criminal); Tr.6117 (Jonathan Perez testifying that king nights were "Mr. Combs going to a hotel to have private time with a female").

The Second Circuit has repeatedly declined to uphold the trial court's application of §3B1.1 based on "too broad a test for extensiveness," *Carrozzella*, 105 F.3d at 802-05, and the Court should avoid that outcome here. In *Kent*, for instance, the *Second Circuit agreed* there were four "knowing," i.e., "criminally responsible," participants, but it nonetheless vacated and remanded because the district court did not identify any unknowing participants. 821 F.3d at 368-71. Here, the PSR purports to identify four knowing participants (including Mr. Combs)— but none of them actually qualify.

The Second Circuit also remanded in *Skys* because although "the government . . . had named four individuals (other than [the defendant]) whom it viewed as criminally responsible participants," the district court *made no finding* "that there was a significant number of persons who were culpable." 637 F.3d at 158-59 (emphasis added); *see also United States v. Ware*, 577 F.3d 442, 453-54 (2d Cir. 2009). Other Circuits are in line with the Second in closely scrutinizing claims that criminal activity was "otherwise extensive" within the meaning of §3B1.1. *See, e.g.*, *Antico*, 275 F.3d at 269-70; *United States v. Tai*, 41 F.3d 1170, 1173-75 (7th Cir. 1994).

The Court should do the same and decline any enhancement under §3B1.1. At a minimum, if the Court applies the enhancement, it should vary downward under the §3553(a) factors for the reasons described above. In particular, this case would present the extraordinary "nature and circumstance[]," §3553(a)(1), of a defendant acquitted of a charge based on his alleged "leadership" of the criminal activity at issue (i.e., the RICO conspiracy charge) but who nevertheless received a large sentence enhancement for being a "leader."

### F.  Mr. Combs Is A Qualifying Zero-Point Offender

1. Mr. Combs qualifies for a two-level downward adjustment under the zero-point offender guideline. He has no criminal history points, USSG §4C1.1(a)(1), PSR ¶¶156-57; he

did not receive an adjustment for terrorism, §4C1.1(a)(2); the offense did not result in death or serious bodily injury, §4C1.1(a)(4); he did not personally cause substantial financial hardship, §4C1.1(a)(6); no firearm or dangerous weapon was involved in the offense, §4C1.1(a)(7); the offense is not covered by §2H1.1, §4C1.1(a)(8); there is no basis for an adjustment under §3A1.1 or §3A1.5, §4C1.1(a)(9); as explained above, no aggravating role adjustment is appropriate, §4C1.1(a)(10); and he was not engaged in a continuing criminal enterprise, §4C1.1(a)(11).

That leaves only the questions whether Mr. Combs "use[d] violence or credible threats of violence in connection with the offense," §4C1.1(a)(3), and whether the offense of conviction is a "sex offense," §4C1.1(a)(5).

Probation found that "it can be argued that Mr. Combs" used violence or threats of violence "in connection with" Counts 3 and 5. PSR ¶152 n.4. There was no evidence of such conduct that related in any way to the *transportation* of any individual for prostitution purposes—which is what the Mann Act prohibits. So even if there was some evidence of violence or threats of violence in the record, no such evidence was "in connection with" the Mann Act counts.

However broadly the phrase "in connection with" can be construed in isolation, it nevertheless—according to standard principles or construction—must be read "in context." *Pulsifer v. United States*, 601 U.S. 124, 133 (2024). The phrase has "limits," *Ostojich v. Specialized Loan Serv., LLC*, 618 F. Supp. 3d 778, 785 (N.D. Ill. 2022), and cannot be read without some "limiting principle," *Maracich v. Spears*, 570 U.S. 48, 60 (2013). And here, any evidence of violence or threats of violence must be "in connection with *the offense*," §4C1.1(a)(3) (emphasis added)—i.e., the Mann Act counts. "In connection with" thus cannot be read to sweep in evidence of alleged violence or threats of violence that have nothing to do with

the transportation of Mr. Combs's girlfriends or male entertainers for prostitution purposes. *See generally* Dkt.486 at 45-50; Dkt.499 at 20-22.

Regardless, the jury rejected the government's theory that Mr. Combs used force or threats of force to induce commercial sex acts when it acquitted him of the sex-trafficking counts. For the same reasons the coercion enhancement may not be applied discussed above, Mr. Combs is also not disqualified from the two-level reduction by virtue of any alleged violence or threats of violence. §4C1.1(a)(3).

Nor is he disqualified on the alleged basis that the Mann Act convictions were "sex offenses." §4C1.1(a)(5). Although the current guideline defines all Mann Act convictions as disqualifying sex offenses, *id.* (b)(2) (2024 Manual), that guideline cannot constitutionally be applied to him because the alleged offenses here were committed before November 1, 2024, when the current Guidelines Manual—containing the current version of §4C1.1—took effect. Any Mann Act violations necessarily preceded November 2024 because Mr. Combs was arrested and detained in September 2024.

Under the zero-point offender definition in effect when the last Mann Act offense could have been committed (the 2023 Manual), the term "sex offense" was limited to Mann Act offenses "perpetrated against a minor." §4C1.1(b)(2) (2023 Manual). Mr. Combs is not a "sex offender" under the 2023 definition because there are no minors involved in this case.

The 2023 definition of "sex offense," however, was subsequently expanded to include all Chapter 117 offenses, including those involving adults. App. C Supp., amend. 830. But the amended definition cannot be retroactively applied to Mr. Combs because it violates the Ex Post Facto Clause for a defendant to be sentenced under a guidelines manual promulgated after he

committed his offenses if that manual results in a higher sentencing range. *See Peugh*, 569 U.S. at 533, 550-51.

2. The typical remedy for such an Ex Post Facto violation would be for the Court to "use the Guidelines Manual in effect on the date that the offense of conviction was committed," which in Mr. Combs's case would be the 2023 Manual. *See* §1B1.11(b), App. Note 2. If the Court were to do that here, however, it would deprive Mr. Combs of the acquitted conduct amendment in the 2024 Manual and potentially lead to a much lengthier sentence that raises grave Fifth and Sixth Amendment and fairness concerns. At the same time, applying the 2024 Manual in its entirety would violate Mr. Combs's Ex Post Facto rights because it would deprive him of the zero point offender credit even though the amendment that would make him ineligible took effect after his alleged offenses.

Rather than apply the 2023 or 2024 Manual in its entirety, the Court should apply the zero-point offender guideline from the 2023 Manual, along with the rest of the 2024 Manual—including the acquitted conduct amendment. Although the so-called one-book rule ordinarily directs that courts not apply different guideline sections from different Manuals, that rule must give way here given the constitutional concerns at stake.

The one-book rule is animated by policy concerns about "upset[ting] the coherency and balance" of the guidelines and "contraven[ing] . . . the objective of seeking uniformity in sentencing," *United States v. Stephenson*, 921 F.2d 438, 441 (2d Cir. 1990), and is appropriately codified in a policy statement provided in §1B1.11(b)(2). The rule is thus "nonbinding" on the Court, "*should not* be applied indiscriminately," *United States v. McMillian*, 777 F.3d 444, 448 (7th Cir. 2015) (Posner, J.) (emphasis added); *accord* Hutchinson et al., Fed. Sent. L. & Prac.

§1B1.11 Authors' Cmt. 5(a) (2025 ed.), and *cannot* be applied when doing so would violate the defendant's constitutional rights.

Under the unconstitutional conditions doctrine, the Court cannot permit "the defendant's exercise of specific constitutional guarantees [to be used] against him," *United States v. Whitten*, 610 F.3d 168, 194 (2d Cir. 2010), including when that means forcing the defendant to "forfeit[] substantial reductions in their sentences to which they would otherwise be entitled," *United States v. Oliveras*, 905 F.2d 623, 628 (2d Cir. 1990) (per curiam). Mr. Combs is entitled to exercise his Ex Post Facto rights to avoid application of the entire 2024 Manual, as well as his Fifth and Sixth Amendment rights to avoid application of the entire 2023 Manual. The Court cannot put him to the Hobson's choice of these two alternatives. The only constitutionally sound solution is to apply the zero-point offender provision from the 2023 Manual, along with the rest of the 2024 Manual.[38]

### G.  Mr. Combs Has Demonstrated Acceptance Of Responsibility

Probation concluded that Mr. Combs was not entitled to a reduction for acceptance of responsibility under USSG §3E1.1 because he "put[] the Government to the burden of proving his guilt and ma[de] no statement regarding his criminal conduct in this case." PSR ¶¶81, 151. This finding was incorrect, and Mr. Combs should receive a two-level reduction under §3E1.1(a).

---

[38] Probation's recommendation is truly Kafkaesque—it says the Court should apply the 2024 Manual for all purposes notwithstanding the Ex Post Facto problem, because doing so would be "beneficial" to Mr. Combs overall given the recent acquitted conduct amendment. PSR ¶152 n.4. But Probation does not actually want Mr. Combs to get any benefits from the new guideline, and applying the 2024 Manual as a whole would not be beneficial to Mr. Combs under the PSR's interpretation. Instead, undoubtedly cutting and pasting from the government's purported description of the "offense conduct," the PSR cites a vast array of conduct relevant only to the sex-trafficking and RICO conspiracy counts, and recommends multiple draconian upward adjustments based on that acquitted conduct.

A defendant's decision to "exercise[] his constitutional right to trial" does not prevent him from receiving an acceptance reduction.  §3E1.1 App. Note 2.  A reduction may nevertheless be appropriate when, for example, the defendant challenges the constitutionality of the prosecution or the "applicability of a statute to his conduct."  *Id.*  Mr. Combs has raised several constitutional challenges to Counts 3 and 5, including under the First, Fifth, and Tenth Amendments, and strenuously contested the Mann Act's applicability in these circumstances. *See* Dkt.486 at 14-24, 32-42.

Moreover, while the Second Circuit has held that §3E1.1 is constitutional when "properly interpreted and applied," *Oliveras*, 905 F.2d at 628-29, denying a downward reduction here would severely risk penalizing Mr. Combs for exercising his Sixth Amendment rights.  Judge Rakoff recently reached this very conclusion, explaining that §3E1.1 "effectively penalizes" defendants who take their cases to trial.  *United States v. Tavberidze*, 769 F. Supp. 3d 264, 270-73 (S.D.N.Y. 2025) (specifically holding that §3E1.1(b) violates the Sixth Amendment).  If that is not necessarily true in all circumstances, it is at least true in this unique case.

Mr. Combs took this case to trial because he wanted to defend himself against the government's allegations and evidence before a jury of his peers.  The Sixth Amendment exists so that defendants can do exactly that.  *See, e.g.*, *Apprendi*, 530 U.S. at 477 ("[T]rial by jury has been understood to require that the truth of every accusation . . . should afterwards be confirmed by the unanimous suffrage of twelve of the defendant's equals and neighbours"); *Ramos*, 590 U.S. at 92 ("verdict of a jury of twelve persons" is required before a defendant's liberty is "taken from him").

Mr. Combs was largely vindicated for exercising his Sixth Amendment rights: the jury rejected the vast majority of the government's case, acquitted him of all the most serious

charges, and convicted him only on the two less serious charges. This is not a situation in which the defendant demanded a trial merely so he could falsely deny or frivolously contest his guilt. *Cf.* §3E1.1 App. Note 1 (discussing the unfounded denial of relevant conduct). Rather, as the jury's verdict showed, there were ample factual and legal grounds with which Mr. Combs was able to undermine the government's case and prove his innocence.

Moreover, taking this case to trial was Mr. Combs's only realistic option. The government unreasonably overcharged this case. It then failed to present a reasonable plea offer during pre-trial discussions: the government advised us it would refuse to offer any disposition limited solely to Mann Act violations. And the plea offer it did make illustrates how punitive it would be to impose a trial penalty here—the government offered a plea in which the stipulated guidelines range would have been 325 to 405 months' imprisonment. In other words, a guidelines range that would have exposed Mr. Combs, a 55-year-old, to decades (and probably the rest of his life) in prison. Obviously, no rational person would accept such a plea offer, and the jury's verdict vindicates his position that he was innocent of the sex trafficking and RICO charges.

Mr. Combs had no choice but to put the government to its proof on all charges. His only other option was to plead guilty to crimes he did not commit—and for which the jury later acquitted him. That would have been untenable not just for Mr. Combs, but for our criminal justice system as a whole—which must "command the respect and confidence of the community in applications of the criminal law." *Winship*, 397 U.S. at 364; *see also* Stephanos Bibas, *Harmonizing Substantive-Criminal-Law Values and Criminal Procedure: The Case of Alford and Nolo Contendere Pleas*, 88 Cornell L. Rev. 1361, 1386 (2003) ("Allowing innocent

defendants to plead guilty creates serious negative externalities because society has a strong interest in ensuring that criminal convictions are both just and perceived as just.").

Given the government's unreasonable position in pre-trial plea discussions, Mr. Combs had no real opportunity to "accept responsibility" for solely the counts of conviction and sensibly chose to exercise his Sixth Amendment rights.  Both Mr. Combs and our criminal justice system benefited from the trial, which allowed the truth to be revealed and permitted Mr. Combs to demonstrate that he was innocent of the most serious charges at trial.  Under DOJ policy, Mr. Combs would never have been charged solely with Mann Act violations.  In these unique circumstances, he should not suffer a trial penalty, and the 2-point reduction should not be denied.  Finally, at the very least, it would "promote respect for the law" for the Court to use these Sixth Amendment concerns as a basis to vary downward under the §3553(a) factors.

### H.  Stacking The PSR's Recommended Enhancements Produces An Excessively Punitive Guidelines Range

The PSR recommends stacking multiple large offense level adjustments and enhancements of +4 levels (§2G1.1(b)(1)), +4 levels (§3B1.1(a)), and +5 levels (§2G1.1(d) grouping).  This nearly doubles the total offense level—to 27—from the base offense level of 14.  Although the base offense level translates to a range of 15-21 months, the cumulative effect of these enhancements adds 55 months to the bottom of the range and 66 months to the top.  This stacking greatly exaggerates the guidelines range to the point that it no longer reflects any reasoned approach to sentencing—or even what the Sentencing Commission intended when crafting the guidelines.  If the Court applies the PSR's recommended enhancements, a significant downward variance would be warranted.

When the Sentencing Commission designed the Sentencing Table, it made the decision to "increase a sentence proportionately" with each increase in offense level, as opposed to

increasing the sentence linearly.  USSG Ch.1 Pt.A (1)(4)(h), The Sentencing Table.  Thus, "[a] change of six levels roughly doubles the sentence irrespective of the level at which one starts." *Id.*  The Commission justified this approach because it did not foresee protracted litigation over enhancements, stating that "[b]oth prosecution and defense will realize that the difference between one level and another will not necessarily make a difference in the sentence."  *Id.* Therefore, the design of the Sentencing Table is such that "individual adjustments call for somewhat modest increments of punishment when only one or two are added, but result in substantial increments of punishment when several are aggregated together."  *United States v. Sofsky*, 287 F.3d 122, 124 n.1 (2d Cir. 2002).  The effect is even more pronounced "at the upper ranges of the sentencing table, [where] the cumulative effect of enhancements has a significant effect upon the applicable sentencing range."  *United States v. Lauersen*, 348 F.3d 329, 344 (2d Cir. 2003).

But that approach makes little sense in a case where multiple large enhancements are applied.  This is a case in point.  Adding a 4-level enhancement on top of a base offense level of 14 adds 12 months to the bottom of the range.  But adding an additional 4-level enhancement on top of that adds another *14 months*.  Adding the PSR's recommended 5-level additional increase ratchets up the bottom of the range by *yet another 29 months*.  By the time you stack these enhancements, only roughly 21% of the range is attributable to the base offense level corresponding to a Mann Act offense.  The vast majority of the range, in other words, is driven by the enhancements alone.

This is a serious problem.  Jurists, including Judge Newman, have noted that "[r]equiring increased offense levels was reasonable for Guidelines calculations where one or perhaps two factors were both present in the same case."  Jon O. Newman, *The Federal Sentencing*

*Guidelines: A Good Idea Badly Implemented*, 46 Hofstra L. Rev. 805, 816 (2018).  "But the Commission appears not to have appreciated that … because of the structure of the sentencing table, a factor that might result in a modest increase in the sentencing range if it was the only factor, resulted in a large increase when cumulated with other factors."  *Id.*  The solution is clear: "a cumulation of adjustments … would obviously be an appropriate basis for a non-Guidelines sentence."  *Id.* at 817-18.

That is not just one jurist's opinion—the full Second Circuit has adopted that view both pre- and post-*Booker*.  Therefore, where the cumulation of enhancements "translates to a high sentencing range"—as the PSR recommends here—that "permits a sentencing judge to make a downward departure," *Lauersen*, 348 F.3d at 344; *United States v. Gigante*, 94 F.3d 53, 56 (2d Cir. 1996) (same), or "consider a non-Guidelines sentence," *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (holding the same in fraud cases "[w]here the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement").  The Court should therefore impose a sentence well below the range if it adopts the Probation Office's recommended guidelines calculation, or even some combination of the multiple recommended enhancements.

## IV.  ANY SENTENCE GREATER THAN 14 MONTHS WOULD CREATE "UNWARRANTED SENTENCE DISPARITIES" THAT SHOULD BE AVOIDED UNDER 18 U.S.C. §3553(A)(6)

A sentence of no more than 14 months—which is already being served at one of the worst federal facilities in the country—is the only sentence that would be consistent with Congress's instruction "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. §3553(a)(6).  Existing guidelines data regarding Mann Act convictions for defendants under §2G1.1(a)(2) in Criminal History Category I demonstrates that a 14-month sentence would be more than sufficient.

Moreover, decades of Mann Act enforcement policy and pre-Guidelines practices indicate that noncommercial Mann Act offenses like this one are to be treated as the least culpable. Indeed, based on our survey of Mann Act cases prosecuted and sentenced over the last 25 years and research into the history of the Act, we do not believe there has ever been a prior Mann Act prosecution on similar facts—where a defendant and his long-time girlfriends agreed to bring other consenting adult men into their consensual sexual relationship. The government is unable to, and has not attempted to, dispute this fact. Any sentence beyond 14 months would therefore be unwarranted.

### A.  The Median Mann Act Sentence In Criminal History Category I Is A Year And A Day, Time Mr. Combs Has Already Served

We have researched the sentencing outcomes in virtually every Mann Act case brought over the past 25 years. We have reviewed the dockets of all federal cases since the year 2000 searchable on PACER in which a defendant was charged with a Mann Act count (roughly 900 cases) and identified 378 cases where defendants were convicted and sentenced for conduct that violated the Mann Act. *See* Dkt.498.[39]  Exhibits 68 and 69 contain summary charts describing these cases, including offense conduct summaries and available Guidelines and Sentencing information where available.[40]  Among these cases, we specifically identified 63 cases in which (i) the defendant was convicted solely under 18 U.S.C. §2421(a), (ii) the base offense level was calculated under §2G1.1(a)(2) and a Criminal History Category of I, and (iii) the defendant did not receive a downward departure under §5K1.1.  *See* Dkt.498.  These cases are in Exhibit 68.

---

[39] The reduced list excluded cases where the defendant was not ultimately convicted under the Mann Act, where the sentence was determined by non-Mann Act offenses, and where a Mann Act defendant was not sentenced under §2G1.1(a)(2) due to a cross reference or for other reasons.

[40] Due to the limited information available on some dockets, differing PACER practices across districts, and the sealed nature of many filings, it is not always possible to determine key information regarding these cases— including the offense conduct and how the Guidelines were ultimately applied.

The outcomes in these cases confirm that a sentence of no more than 14 months is the only reasonable sentence.

The median sentence among these 63 defendants is 12.03 months' incarceration and the mean is 14.92 months' incarceration.[41]  Seven of these defendants received the 4-point fraud/coercion enhancement under §2G1.1(b)(1).  When these seven judgments are excluded—as they should be, *see supra* at Part III(C)—the median and mean sentences are 12.03 and 13.25 months' incarceration, respectively.  In other words, the time Mr. Combs has already served is the typical sentence for "defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. §3553(a)(6).  And among the five Southern District of New York cases, the average sentence is even lower—8.8 months.  A sentence exceeding 14 months is "greater than necessary" to achieve the purposes of sentencing, 18 U.S.C. §3553(a), and would only create unwarranted sentencing disparities.

### B.  Mr. Combs Deserves A Lower Sentence Than Even The Average Case

Putting the numbers aside, the offense conduct here stands at the least culpable end of the spectrum and deserves a lesser sentence than even the average case.  Every Mann Act case prosecuted over the last 25 years—except this one—involved some form of human trafficking, sex trafficking, conduct involving minors, or prostitution conducted for the defendant's own commercial gain.  These 63 cases are no exception.  Many of the cases involved large scale prostitution enterprises or brothels where defendants profited from Mann Act conduct on an ongoing basis.  *See United States v. Modica et al*, 1:09-cr-01243-LAK (S.D.N.Y.) (Defendant Porcelli) (probation); *United States v. Chang et al*, 1:10-CR-00878-KMW (S.D.N.Y.) (Defendant

---

[41] The Sentencing Commission's datafiles included three judgments matching the stated criteria for which we could not locate publicly available dockets.  The sentences in those three cases were reported to the Commission as 12.03, 16.62, and 0 months, which would further reduce the mean.

Seok Cho) (6 months); *United States v. He et al*, 1:15-cr-00730-JPO (S.D.N.Y.) (Defendant

Chin) (21 months); *United States v. He et al*, 1:15-cr-00730-JPO (S.D.N.Y.) (Defendant He) (7

months); *United States v. Almestica et al*, 2:11-cr-14029-JEM (S.D. Fla.) (Defendant Almestica)

(12 months and a day); *United States v. Park*, 3:13-cr-00037-KRG (W.D. Pa.) (probation);

*United States v. Castillo Paucar*, 2:17-cr-00130-CCC (D.N.J.) (14.72 months); *United States v.

Campos Murillo*, 1:11-cr-00578-LMB (E.D. Va.) (18 months); *United States v. Wallace*, 1:13-cr-

00117-HSM-SKL (E.D. Tenn.) (probation); *United States v. Berte*, 2:12-cr-00096-JRG (E.D.

Tenn.) (11 months).  For example, in *He*, the defendants placed ads in local Chinese-language

newspapers seeking women to do massage work, assured the women they would be able to

perform legal, non-sexual massage work, and later compelled the women to engage in

prostitution or be abandoned.  The defendants kept the prostitution proceeds as well as the

women's savings, and the government identified "approximately 10 to 12 victims in total."

Dkts.1, 40 at 1-3.

Other cases involved individual pimps who enticed women to work as prostitutes.

advertised their prostitution services on sites like Backpage, and took the proceeds of their

commercial sex acts with "johns."  *See United States v. Cross et al*, 1:10-cr-00939-GBD

(S.D.N.Y.) (Defendant Cross) (10 months); *United States v. Mendoza-Mendez*, 1:15-cr-00640-

ENV (E.D.N.Y.) (16 months); *United States v. Spates*, 1:09-cr-00004-CMH (E.D. Va.) (15

months); *United States v. Bastos*, 1:06-cr-00395 (N.D. Ill.) (12 months and a day); *United States

v. Duckworth*, 4:14-cr-40076-KES (D.S.D.) (10 months).  In *Cross*, for example, defendants

Cross and Ryder transported a young woman, gave her instructions to work as a prostitute, and

directed her to give the proceeds to Cross, who threatened her, including using a stun gun found

in a motel room.  At the time of sentencing, Cross had "repeatedly violated the terms of pretrial

release as set by the Court." Dkt.48 at 3; *see also* Dkt.51. Another example is *Mendoza-Mendez*, where the defendant received a below-guidelines 16-month sentence for enticing a victim prostitute to leave her former trafficker and move in with him, and forcing her to continue working as a prostitute even after she became pregnant, when the defendant took her to a clinic in Queens, New York, where she was drugged and forced to have an abortion. The government's investigation also revealed the defendant was involved in the coerced prostitution of additional victims. Dkt.19.

These cases also involve more culpable behavior because they routinely involve helpless victims, such as Hispanic or Asian immigrants who lacked legal status in the U.S. and began working as prostitutes to, for example, pay off debts owed for being smuggled into the United States or to secure shelter, work, or other opportunities. *See United States v. Ramos-Navarro*, 3:11-cr-00072-MMH (M.D. Fla.) (14 months); *United States v. Cardoza*, 3:11-cr-00188-RBD-MCR (M.D. Fla.) (12 months and a day); *United States v. Ospina*, 3:11-cr-00189-RBD-PDB (M.D. Fla.) (15 months); *United States v. Aranda*, 3:11-cr-00190-BJD-MCR (M.D. Fla.) (25 months); *United States v. Vallecillo*, 3:11-cr-00191-RBD (M.D. Fla.) (14 months); *United States v. Carcamo*, 3:11-cr-00192-RBD-JBT (M.D. Fla.) (12 months and a day); *United States v. Bovadilla-Canales*, 2:12-cr-00114-LSC-TMP (N.D. Ala.) (10 months); *United States v. Castilblanco-Hernandez*, 7:10-cr-00123-AKK-HGD (N.D. Ala.) (10 months); *United States v. Kidgell et al*, 6:13-cr-10129-EFM-2 (D. Kan.) (Defendant: Yan Zhang) (12 months); *United States v. Cheah et al*, 1:06-cr-00480-LTB-2 (D. Colo.) (Defendant: Wai Chong Kong) (15 months); *United States v. Cheah et al*, 1:06-cr-00480-LTB-3 (D. Colo.) (Defendant: Kit Chi Ho) (4 months). Other cases involve victims who were mentally ill, *see, e.g.*, *United States v. Collins et al*, 3:17-cr-00110-MPM-RP (N.D. Miss.) (Defendant: Mario D. Collins) (24 months); *United*

*States v. Collins et al*, 3:17-cr-00110-MPM-RP (N.D. Miss.) (Defendant: Paulette M. Clayton)

(probation), or addicted to drugs, *see, e.g.*, *United States v. Whaley*, 1:18-cr-10091-RWZ (D.

Mass.) (12 months); *United States v. Nabit*, 1:21-cr-00038-GLR (D. Md.) (18 months).

Mr. Combs's offense conduct—in which he and his long-time girlfriends agreed to bring

other consenting adult men into their consensual sexual relationship—is clearly far less serious

than the conduct in these cases. Mr. Combs did not run a brothel or force anyone to engage in

prostitution, and he certainly did not engage in the conduct for his own commercial gain. His

girlfriends and the male escorts were not homeless, from vulnerable immigrant populations, or

suffering from any other characteristics that would have rendered them helpless or dependent on

Mr. Combs or a life of prostitution. They were independent, sophisticated women and

professional, highly paid male escorts and entertainers. The appropriate sentence should not be

more than 14 months given the outcomes in the above Mann Act cases.

The government identified approximately 24 cases that were not included in the defense's

September 1, 2025 submission, which we summarize in Exhibit 70. None of these cases

involved defendants convicted solely under 18 U.S.C. §2421(a) and sentenced under

§2G1.1(a)(2) in Criminal History Category I. Nor in any of these cases did a jury acquit the

defendant of offenses involving allegations of force, fraud, or coercion, as occurred here. And

the government's cases—apart from *United States v. Stebick*, 08-cr-206 (W.D.N.Y.), which we

discuss *infra*—are irrelevant in other ways too. In 17 of these cases, the defendant was not

sentenced primarily for Mann Act conduct and/or was not sentenced under Guideline

§2G1.1(a)(2). The government appears to have included these cases to cherry-pick outliers with

very high sentences, which were plainly driven by aggravating factors not present here (or which

the government tried but failed to prove to the jury in this case). In sum, none of the

government's additional cases is comparable to this case or justifies a sentence greater than 14 months.

### C. DOJ Enforcement Policy Treats—And Has Always Treated—Mr. Combs's Offense Conduct As The Least Culpable Type Of Mann Act Offense

Based on our review of past Mann Act prosecutions, in the modern era the DOJ has never used the Mann Act against a defendant like Mr. Combs, who was engaging in consensual sexual activity and was not motivated by any commercial gain. As we have previously explained, for several decades after it was enacted, the Mann Act was often used to prosecute supposedly "immoral" conduct, and a divided Supreme Court upheld convictions for "prostitution" involving sex with unmarried women or in polygamous relationships, where the defendants had no commercial purpose. *See* Dkt.486 at 4-8. Over time, however, the "morals crusade" ended and, beginning in the 1920s, the government had a difficult time persuading juries to convict merely because, for example, people having an affair had crossed a state line. *See* David J. Langum, *Crossing Over The Line: Legislating Morality and the Mann Act* at 161 (2006). As attitudes about sex began to change, the government's enforcement focus shifted by the 1930s to "prosecuting pimps for interstate transportation of prostitutes." *Id.* at 167.

Thus, starting in 1950s, the DOJ has explicitly instructed U.S. Attorneys to avoid prosecutions like this one, where the conduct is less serious. As a result, Mann Act cases normally look nothing like the instant case. Indeed, it is not an exaggeration to say that Mr. Combs is the only defendant we are aware of being sentenced in a federal court for a Mann Act conviction premised solely on this type of offense conduct—that is, a man involved in a threesome in which his girlfriend had sex with another man.

This is because, for over 75 years, it has been the explicit policy of the DOJ to charge the Mann Act in adult prostitution cases *only where* the defendant was motivated by commercial

gain or where the offense involved a sex trafficking victim.[42]  For example, the 1953 version of

the U.S. Attorneys' Manual stated:

> The White Slave Traffic Act makes it an offense knowingly to transport any
> woman or girl in interstate or foreign commerce or in the District of Columbia or
> in any territory or possession of the United States for the purpose of prostitution,
> debauchery or for any other immoral purpose. Commercialism is not essential to a
> violation of the Act.  *Caminetti v. United States*, 242 U.S. 470.  However, as a
> general rule prosecution should not be instituted in the so-called "non-
> commercial" cases.…
>
> As a guide to the exercise of sound discretion in noncommercial cases,
> consideration may be given to prosecution in such cases as the fraudulent
> overreaching of previously chaste young women or girls, or cases where State
> laws are inadequate, involving married women with young children who are
> living with their husbands.  Cases having the appearance of blackmail should, as
> far as possible, be avoided.[43]

This policy of not prosecuting "non-commercial cases" continued through the remainder

of the 1900s until the focus of the statute turned to cases involving minors and/or sex trafficking

in the 1980s.  Thus, the 1961 U.S. Attorneys' Manual stated that prosecution of persons who are

not engaged in commercial prostitution enterprises as panderers, operators of houses of

prostitution or call girl operations, and those who act for or in association with such persons,

should not be instituted without prior approval of the Criminal Division."[44]  The 1970

and 1984 Manuals stated the same.[45]

By 1988, enforcement priority shifted to cases involving sex trafficking and minors, yet

"non-commercial cases" remained deprioritized:

> Unless minors are victims, prosecutions under 18 U.S.C. §§ 2421 and 2422
> should generally be limited to persons engaged in commercial prostitution
> activities, even though commerciality is not an element of the offense.  *See*

---

[42] Archived versions of the U.S. Attorneys' Manual are available here: United States Attorneys' Manual & Resource Manual Archives, https://www.justice.gov/archive/usao/usam/index.html.
[43] 1953 U.S. Attorneys' Manual at 111-12, https://www.justice.gov/archive/usao/usam/1953/title2criminaldivision.pdf.
[44] 1961 U.S. Attorneys' Manual at 109, https://www.justice.gov/archive/usao/usam/1961/title2criminaldivision.pdf.
[45] 1970 U.S. Attorneys' Manual at 192, https://www.justice.gov/archive/usao/usam/1970/title2criminaldivision.pdf; 1984 U.S. Attorneys' Manual at 9-79.100, https://www.justice.gov/archive/usao/usam/1984/title9_part2.pdf.

> *Cleveland v. United States*, 329 U.S. 14 (1946), and *Caminetti v. United States*, 242 U.S. 470 (1917).  Prosecution of persons other than those engaged in commercial prostitution enterprises as panderers, operators of houses of prostitution, or call-girl operations, and of those acting for or in association with such persons, should not be instituted without consultation with the General Litigation and Legal Advice Section unless minors are victims.[46]

That directive continued through the most recent iteration of the U.S. Attorneys' Manual.[47]  And today, the Justice Manual, which replaced the U.S. Attorneys' Manual in 2018, makes clear that the "prosecution of customers" involved in an 18 U.S.C. §2421 offense—like Mr. Combs here—is now limited to "prosecuting those who engage in commercial sex with victims of sex trafficking, in addition to those who otherwise perpetrate or facilitate human trafficking offenses."[48]  The purpose of this policy is clear: the federal government should not be in the business of prosecuting people for sex outside marriage, or other sex some prosecutors might deem "immoral."  Instead, its focus should be on prosecutions of commercial purveyors of prostitution, who often take advantage of and exploit prostitutes for commercial gain, and others who coerce women into sex, or sexually exploit minors.

Since the jury acquitted Mr. Combs of sex trafficking, any sentence should reflect this enforcement history.  Mr. Combs has already served far more time than the average individual engaged in non-commercial prostitution, which the DOJ has not deemed worthy of federal prosecution since the mid-20th century.  Thus, the appropriate sentence for such conduct is *at most* 14 months.

---

[46] 1988 U.S. Attorneys' Manual at 9-79.100, https://www.justice.gov/archive/usao/usam/1988/title9criminaldivisionchapters71-100.pdf.
[47] https://www.justice.gov/archives/usam/archives/usam-9-79000-other-criminal-division-statutes.
[48] Justice Manual, 8-3.400 - Prosecution of Customers Involved in Federal Sex Trafficking Offenses, https://www.justice.gov/jm/jm-8-3000-enforcement-civil-rights-criminal-statutes.

### D.  "Buyer" Or "John" Cases Are Incredibly Rare And Do Not Support A Sentence Beyond Time Served

The government previously suggested that DOJ policy today encourages prosecutions of "buyers of commercial sex."  Dkt.487 at 6.  But that suggestion was entirely misleading.  The current policy merely allows prosecutions of those "who buy sex from *trafficked victims and minors*," because defendants "who knowingly purchase[] a commercial sex act with a trafficking victim [are] just as culpable as [those] who provide[] the trafficking victim for commercial sex."[49]  That does not mean DOJ now targets—or has ever targeted—routine "buyers" of prostitution or "johns."  Indeed, current DOJ efforts concerning such individuals involve entirely non-punitive measures such as "education directed at would-be buyers, to raise awareness" of the dangers of sex trafficking and child abuse.[50]

Our survey of Mann Act cases prosecuted over the past 25 years confirms what the DOJ has stated since 1953: Mann Act prosecutions are not "instituted in the so-called 'non-commercial' cases,"[51] and are limited to those involving sex trafficking, minors, or defendants "engaged in commercial prostitution enterprises as panderers, operators of houses of prostitution, or call-girl operations."[52]  In fact, of all the cases we reviewed, only four cases involve defendants prosecuted for *purchasing* adult prostitution services.  In other words, only 1% of the Mann Act cases we identified involved so-called "buyers" or "johns."  That number alone speaks

---

[49] Oct. 17, 2019 statements by Beth A. Williams, Assistant Attorney General for the Office of Legal Policy at the 2019 JuST Conference, https://www.justice.gov/archives/opa/speech/assistant-attorney-general-office-legal-policy-beth-williams-delivers-remarks-department.

[50] Jan. 14, 2020 remarks by Assistant Attorney General Eric Dreiband at the DOJ Summit on Combating Human Trafficking, https://www.justice.gov/archives/opa/speech/assistant-attorney-general-eric-dreiband-delivers-remarks-department-justice-s-summit; *see also* Feb. 2, 2018 remarks by U.S. Attorney for the District of Minnesota Greg Brooker at the DOJ Human Trafficking Summit (describing "public awareness campaigns" to target the demand side of sex cases), https://www.justice.gov/archives/opa/speech/us-attorney-district-minnesota-greg-brooker-delivers-remarks-department-justice-s-human.

[51] 1953 U.S. Attorneys' Manual at 111, https://www.justice.gov/archive/usao/usam/1953/title2criminaldivision.pdf.

[52] 1988 U.S. Attorneys' Manual at 9-79.100, https://www.justice.gov/archive/usao/usam/1988/title9criminaldivisionchapters71-100.pdf.

volumes and corroborates the conclusion that the DOJ *does not seek to incarcerate* Mann Act defendants who merely purchase prostitution services. Moreover, these four cases do not counsel in favor of a sentence beyond 14 months. These defendants were sentenced to terms of 0, 0, 9, and 18 months. But each case involved a defendant who knew he was purchasing commercial sex from actual sex trafficking victims—vulnerable women who were exploited because of their immigration status, lack of English language, or poverty and addiction—under circumstances much more culpable than the instant offense conduct. Given these defendants' relatively more culpable conduct, a lesser sentence is warranted here.

*1.* Trowbridge*, Tills*, and Stebick

We are aware of three "john" cases within the Second Circuit, none of which was prosecuted in this district or the Eastern District. *See United States v. Trowbridge*, 1:08-cr-00074-WMS (W.D.N.Y), *United States v. Tills*, 1:08-cr-00242-WMS (W.D.N.Y.), and *United States v. Stebick*, 08-cr-206 (W.D.N.Y.). Trowbridge was a retired police officer who, along with a former New York State Judge—Tills—and Till's Principal Law Clerk—Stebick—hired undocumented women whom they paid to have sex with members of a male fraternal group called the Jesters during group gatherings.[53] *Trowbridge* Dkt.3; *Tills* Dkt.3; *Stebick* Dkt.3. These cases were brought in connection with a larger sex trafficking investigation against the brothel where these defendants sourced the women.

Although Trowbridge, Tills, and Stebick made no financial profit and were merely having sex with the prostitutes and arranging for others to have sex with them, the female prostitutes the defendants transported were clearly victims of sex trafficking—unlike anyone in this case. The victims were vulnerable and exploited by traffickers—they lacked legal

---

[53] https://archives.fbi.gov/archives/buffalo/press-releases/2009/bffo050709.htm.

immigration status, spoke little to no English, and had been tricked into working for a brothel by the owner, who had told them they would be providing "normal" massages, rather than sexual services. Indeed, the owner pleaded guilty to sex trafficking and admitted "prey[ing] upon financial and ethnic vulnerabilities, immigration status," and using her relationships with public officials—including the police officer and the judge—to coerce the women to engage in commercial sex acts for her businesses. *See United States v. Chong*, 08-cr-106 (W.D.N.Y.), Dkt. 23; *id.*, Dkt.24 at 3-6. Trowbridge, Tills, and Stebick surely knew all this, and the defendant in *Chong* even admitted to "placing pictures of herself with [public] officials on the walls of [her] business establishments" to advertise her connections. *Id.* at 5. Both Trowbridge and Tills were repeat customers of the brothel and paid women for sexual acts at the brothel. *Trowbridge* Dkt.3 at 4; *Tills* Dkt.3 at 3-4. In other words, Trowbridge and Tills were defendants "who b[ought] sex from trafficked victims," and "who knowingly purchase[d] a commercial sex act with a trafficking victim."[54]

That is not what Mr. Combs did in connection with "freak-offs" or "hotel nights." To the contrary, his girlfriends and the male escorts were willing participants who had none of the financial or ethnic vulnerabilities of the brothel workers. And the so-called "victims" here were not sex trafficking victims.

### 2. Nabit

We found only one "john" case outside the Second Circuit, *United States v. Nabit*, 1:21-cr-00038-GLR (D. Md.). There, the defendant pleaded guilty to a Mann Act violation and was sentenced to 18 months in prison but granted compassionate release to home confinement after

---

[54] Oct. 17, 2019 statements by Beth A. Williams, Assistant Attorney General for the Office of Legal Policy at the 2019 JuST Conference, https://www.justice.gov/archives/opa/speech/assistant-attorney-general-office-legal-policy-beth-williams-delivers-remarks-department.

serving 9 months.  The defendant's conduct was again significantly more culpable than the instant offense conduct, and like *Tills*, *Trowbridge*, and *Stebick*, involved a broader sex trafficking ring and victims the defendant knew were being trafficked.

The defendant (66 years old) pleaded guilty to regularly paying indigent women for commercial sex acts knowing that several of the women were severely addicted to narcotics and suffered from serious substance abuse disorders.  Worse, he previously owned a comprehensive drug treatment center, understood the victims' vulnerabilities and how to manipulate them, and supplied at least one victim with narcotics during their encounters.  *Id.*; Dkt.92 at 145.  He paid the victims approximately $90,000, knowing that the money was often used to fuel the women's drug habits and that a substantial portion of the money was being paid to a third party who the government later identified as the victims' sex trafficker.  The government identified seven victims in total, one of whom died of a drug overdose.  Dkt.13 at 14.  The government argued the defendant "specifically preyed on lower class females with drug addictions and other vulnerabilities," and used his wealth "to keep the victims doing whatever he wanted them to do, even though he knew that this meant that they would not be healthy and sober."  Dkt.34 at 5.

While the defendant argued his conduct was that of the typical "buyer," the government argued he "tantaliz[ed] [the victims] with his ability to provide them extra money which they so badly needed to support their drug addictions, to put food in their stomachs, and to maintain safe shelter."  Dkt.34 at 13-14.  Moreover, the defendant "knew about the allegations by the Government that [his victims] had been trafficked," "yet continued to regularly see women for commercial sex," Dkt.92 at 15, which "set him apart from every other buyer or commercial sex

customer," Dkt.92 at 28.  The court agreed.  Dkt.92 at 145-49.  In other words, this was again a case of a defendant "who engage[d] in commercial sex with victims of sex trafficking."[55]

After 9 months' incarceration during COVID, the defendant was granted compassionate release to serve the remainder of his sentence in home confinement.  After reconsidering the 3553(a) factors, the court concluded:  "Looking at the need to deter this Defendant and others similarly situated, there is no question that the sentence imposed, even with a reduction to home confinement, will deter this Defendant and others like the Defendant from engaging in this kind of behavior.  The stigma of a felony criminal conviction is a real punishment."  Dkt.94 at 3.

Mr. Combs has already served a longer prison sentence than Nabit, and a sentence of no more than 14 months would clearly be sufficient.

### E.  The Data Underlying Guideline §2G1.1 Further Demonstrate That Mr. Combs's Mann Act Conviction Is The Least Culpable Type

The history of the applicable Sentencing Guidelines also demonstrates that Mr. Combs's offense conduct is the least culpable type of Mann Act offense, further justifying a sentence of no more than 14 months.  The sentencing research at the time §2G1.1 was first created—as well as years of pre-Guidelines United States Parole Commission practice—teaches that the base offense level applicable in this case (level 14) overstates the gravity of the instant offense conduct.

The first iteration of the Sentencing Guidelines promulgated in 1987 provided a base offense level of 14 for Mann Act offenses.[56]  But that offense level "assume[d] that the offense was committed for profit."[57]  That is not surprising, as the DOJ specifically avoided prosecuting

---

[55] Justice Manual, 8-3.400 - Prosecution of Customers Involved in Federal Sex Trafficking Offenses, https://www.justice.gov/jm/jm-8-3000-enforcement-civil-rights-criminal-statutes.
[56] 1987 Guidelines Manual §2G1.1, Application Note 1, https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/Chapter_2_E-K.pdf.
[57] Id.

non-commercial cases. The 1987 Sentencing Guidelines further provided a qualification: "In the infrequent case where the defendant did not commit the offense for profit and the offense did not involve physical force or coercion, the Commission recommends **a downward departure of 8 levels**."[58] That application note was in force through the 1995 Sentencing Guidelines, until Amendment 538 removed the application note for non-substantive reasons and without explanation as part of a consolidation of §2G1.1 with §2G1.2.[59]

The recommended 8-level downward departure that first appeared in the Guidelines for non-commercial Mann Act offenses—like the instant offense—is significant as it was premised on available sentencing data at the time. When the Guidelines were first designed—and the base offense levels determined—the Commission adopted "an empirical approach that used as a starting point data estimating pre-guidelines sentencing practice."[60] The Commission "analyzed data drawn from 10,000 presentence investigations, … the United States Parole Commission's guidelines and statistics, and data from other relevant sources in order to determine which distinctions were important in pre-guidelines practice."[61] "After consideration, the Commission accepted, modified, or rationalized these distinctions" through base offense levels, specific offense characteristics, and special instructions.[62] In other words, the 8-level downward departure the Commission recommended for Mann Act violations committed without a profit motive was the result of "empirical data" and careful analysis of decades of prior sentencing practice in Mann Act cases.

---

[58] *Id.*
[59] 1995 Guidelines Manual §2G1.1, Application Note 1, https://www.ussc.gov/guidelines/2015-guidelines-manual/archive/1995-ch2ptg; *see* 2024 Guidelines Manual Appendix C, Amendment 538, https://www.ussc.gov/guidelines/amendment/538.
[60] 2024 Guidelines Manual, Chapter One, Part A(1)(3) The Basic Approach, https://www.ussc.gov/guidelines/2024-guidelines-manual/annotated-2024-chapter-1#1a1.
[61] *Id.*
[62] *Id.*

If that were not enough, the pre-Guidelines practices on which the Sentencing Commission relied clearly would have treated Mr. Combs's offense conduct as the least culpable type of Mann Act offense.  Prior to the creation of the Sentencing Guidelines, the United States Parole Commission rated non-commercial prostitution offenses under the Mann Act to be "Category One" offenses—the lowest severity level—warranting "customary total time to be served prior to release" of *less than 6 months to 12 months* for "Very Good," "Good," and "Fair" defendant scores, and time up to 16 months only for "Poor" defendant scores.[63]  And the Parole Commission specifically distinguished non-commercial Mann Act offenses from other types of Mann Act offenses, treating commercial offenses and cases involving coercion or minors as more serious.  The Parole Commission defined "commercial" cases as those in which the defendant "procur[ed] a sexual partner for another for profit"—conduct not at issue here—and rated these more serious Mann Act cases in Categories Four through Six:[64]

SUBCHAPTER E - PROSTITUTION AND WHITE SLAVE TRAFFIC

1141 <u>Interstate Transportation for Commercial Purposes</u>
 (a) If physical coercion, or involving person(s) of age less than 16, grade as Category Six;
 (b) If involving person(s) of ages 16-17, grade as Category Five;
 (c) Otherwise, grade as Category Four.
 [[*Notes and Procedures.*  The term 'for commercial purposes' refers to procuring a sexual partner for another for profit.]]

1142 <u>Prostitution</u>
 Category One.

Thus, both the pre-Guidelines Parole Commission procedures and the Sentencing Commission's initial empirical analysis acknowledged that the routine "buyer" or "john" participating in a non-commercial Mann Act offense is significantly less culpable than defendants committing Mann Act violations for profit or through force or coercion.  Indeed, the initial Guidelines counseled a 57% reduction in the base offense level.  This is one of the rare

---

[63] United States Parole Commission Rules and Procedures Manual at 26, 50 (Oct. 1, 1984), https://www.ojp.gov/pdffiles1/Digitization/98125NCJRS.pdf.
[64] *Id.* at 50.

instances in which the conduct clearly "falls outside the 'heartland' to which the Commission intends individual Guidelines to apply," as the Commission explicitly recognized at the outset in §2G1.1. *Rita v. United States*, 551 U.S. 338, 351 (2007). This history should not be ignored here and similarly counsels a significantly reduced sentence.

### F. This Is The Only Case We Have Identified Where The Government Claims Professional, Consenting Adult Males Were Mann Act "Victims"

Mr. Combs's offense conduct is less culpable for another reason: the government now claims that the male escorts were Mr. Combs's "victims," but this is apparently the only case in Mann Act history where the government has argued that consenting, professional adult male escorts or entertainers who made thousands of dollars were "victims." The Mann Act did not originally treat men as victims, and Congress never anticipated such an application of the statute.

Of the cases we surveyed, only one Mann Act case appears to have involved adult male prostitutes, *United States v. Dorsey*, 1:17-cr-00299 (N.D. Ill.). In that case, the defendant admitted to running a multi-state sex trafficking operation using young men that he recruited under the false pretense that they would be providing sensual/erotic massages. Dkt.58. He specifically preyed on young men (in their late teens and early twenties) with troubled family situations, mental health diagnoses, and drug abuse issues, and threatened that he would beat up or kill anyone who left his organization to prostitute on his own. Dkt.63. The court gave him a 120-month sentence after concluding he was responsible for the *murder* of one young man. Dkt.81 at 71.

We found one additional case in which the government charged a defendant for operating an online male escort service, but there the defendant pleaded guilty to promoting prostitution in violation of 18 U.S.C. §1952(a)(3)(A). *See United States v. Easy Rent Systems, Inc. et al*., 1:16-

cr-45 (E.D.N.Y.).  The defendant's escort business grossed over $10 million, the government sought a custodial sentence, and the defendant was sentenced to 6 months' imprisonment.

Cases in which predators transport young males across state lines for sexual exploitation are cases with real "victims."  This is not such a case, and Congress never anticipated that the government would seek to enforce the Act based on the theory that fully consenting adult male escorts like the ones at issue here could be deemed "victims."  When the Mann Act was originally enacted as the White Slave Traffic Act, it applied only to "wom[e]n or girl[s]."  Pub. L. No. 61-277 §2 (1910).  When it was amended in 1986 to cover "any individual," the law's drafters made clear they were seeking to protect young boys—not professional male escorts—from sexual exploitation.  The amendment was passed as part of the "Child Sexual Abuse and Pornography Act of 1986."  Pub. L. No. 99-628 (H.R. 5560).  And as the accompanying house report explained, the Mann Act then "applie[d] only to offenses involving the transportation of females," but "[t]he problem of the sexual exploitation of young males [was] equally serious." H.R. Rep. 99-910 (emphasis added).  The escorts in this case are thus not the "victims" Congress sought to protect when it made the statute gender-neutral, and there is no precedent for such a theory, further demonstrating that a 14-month sentence is sufficient.

## V.     MR. COMBS HAS ALREADY EXPERIENCED "JUST PUNISHMENT FOR THE OFFENSE"

The punishment Mr. Combs has experienced while at the MDC and beyond has already been extreme.  And the collateral consequences he has experienced far exceed what the average Mann Act defendant experiences.  He has surpassed "just punishment for the offense."  18 U.S.C. §3553(a)(2)(A).

### A. Mr. Combs's Time At The MDC Has Been Extremely Punitive And Demands A Lesser Sentence Relative To Other Cases

Mr. Combs has already been incarcerated as long as the typical Mann Act defendant in Criminal History Category I, but his time at the MDC has been more punitive than if he had served that time at a different federal facility.  This is significant because harsh "pre-sentence confinement conditions" are a factor to be considered in arriving at a just sentence under §3553(a).  *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001).

Indeed, judges in this Circuit regularly conclude that "[a] sentence served at MDC is materially different and necessarily disparate from one served elsewhere," demanding a lesser sentence.  *United States v. Colucci*, 743 F. Supp. 3d 452, 462 (E.D.N.Y. 2024).  It is thus "routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC."  *United States v. Chavez*, 710 F. Supp. 3d 227, 229 (S.D.N.Y. 2024) (collecting cases) (further noting "[p]rosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable"); *United States v. Nunez*, 23 CR. 517 (AT), 2024 WL 4504493, at *6 (S.D.N.Y. Oct. 16, 2024) (the "harsh conditions at [MDC] counsel in favor of a shorter overall sentence"); *United States v. Gonzalez*, 1:18-cr-00669-JPO (S.D.N.Y. Apr. 2, 2021), ECF No. 250 at 17-18 (concluding that "having served 24 months is equivalent to having served three years").

The Sentencing Guidelines—as well as the data from previous cases discussed above—do not adequately consider the pervasive violence and inhumane conditions of confinement that Mr. Combs has experienced at the MDC.  The government has argued that *Chavez* "no longer provides an accurate picture of conditions at the MDC."  Dkt.487 at 7.  But the government is wrong.  As defense counsel has already made this Court aware, Mr. Combs is routinely subject to violence—both directed *at him* and at others.  On September 12, for example, defense counsel

was in the middle of a legal video call with Mr. Combs, which was summarily ended at 2pm because of a stabbing that locked the facility down for the next several days. And as we have noted for the Court, living conditions at the MDC remain inhumane. Lockdowns remain common and other conditions are similarly horrible. The consequences of Mr. Combs's detention at MDC for the past year has further included:

- constant suicide watch. This means that every two hours, Mr. Combs must present his identification card to the guards to show that he is alive and well. While he is sleeping, he is awoken by an officer to ensure he is well and subjected to bright lights illuminated 24 hours per day;

- limited access to clean water—Mr. Combs often heats his water to have clean water to drink without getting sick;

- sleeping in a dorm-style room within two feet from other inmates with the bathroom in the same room, with no door;

- Mr. Combs has not breathed fresh air in nearly 13 months, or felt sunlight on his skin;

- often walking with a limp due to a painful knee injury that requires surgery that he has not received in federal custody;

- lack of access to healthy, or edible, food which is essential to pre-diabetics - the food that Mr. Combs has survived on includes expired processed pork, chicken and beef, which on any given day can contain maggots;[65]

- lack of physical exercise with weights or any proper equipment;

- no physical therapy for his several shoulder and knee injuries;

- no functioning washing machine/dryers; and

- extreme temperatures (freezing cold or burning hot).

---

[65] *New photo shows maggot-infested food in MDC Brooklyn jail, where Diddy and Luigi Mangione are held*, New York Daily News, Feb. 21, 2025, https://www.nydailynews.com/2025/02/21/new-photo-shows-maggot-infested-food-in-mdc-brooklyn-where-diddy-and-luigi-mangione-are-held/.

Considering these conditions, Mr. Combs's time served has already been substantially more punitive than the average time served by other defendants convicted under the Mann Act, and a sentence of no more than 14 months is sufficient "just punishment."

### B. Mr. Combs Has Suffered Innumerable Additional Collateral Consequences To His Professional And Personal Life

The indictment and trial of Sean Combs in the Southern District of New York was a spectacle and brought serious charges for which Mr. Combs was mostly acquitted. These events brought unspeakable shame and monumental adverse consequences to Mr. Combs which will taint him for the foreseeable future. The punishment that Mr. Combs has already endured has affected not only Mr. Combs himself, but his family and friends. As a result of Ms. Ventura's lawsuit, the quick settlement, the leaked and highly publicized Homeland Security raids on his home, and this prosecution, Mr. Combs's celebrity status in the realms of music, fashion, spirits, media, and finance has been shattered and Mr. Combs's legacy has been destroyed. Due to the adverse publicity and the allegations which the jury rejected, he faces nearly 100 lawsuits—most of which have been filed by individuals he has never met before; all of which contain made-up claims by individuals seeking to profit from Mr. Combs's downfall. Unfortunately, these lawsuits have involved his family, with his 84-year-old mother being sued in several states by individuals, and his sons also being sued alongside Mr. Combs.

This is *the* case where the Court can say with absolute certainly that the collateral consequences have been extreme, far exceeding any "just punishment." As bad as life is inside of MDC, Mr. Combs has suffered countless other losses. Since his incarceration and conviction on the Mann Act, these and other collateral consequences to his life have been personally devastating—he has been separated from his family, has mounting legal bills from the indictment and defending lawsuits that were the direct result of United States Attorney Damian Williams's

prejudicial press conference announcing this case, and has lived in the MDC for over a year despite having every intention of fighting this case from day one. His life outside of jail has been systematically dismantled:

- After Ms. Ventura's lawsuits, and the lawsuits following it, Mr. Combs's companies were unable to operate as they once were, and he had to let go over 100 employees from diverse communities and backgrounds. Even worse, many of these employees have been unable to obtain new employment due to their past association with Mr. Combs;

- This led to devastating consequences for his children, who, before and after his arrest were sued by plaintiffs also suing Mr. Combs, were "cancelled" and lost business opportunities, including those in acting, television, fashion and concerts;

- Mr. Combs and his family were set to star in a Hulu show about their lives, which was going to help his children with interests in acting and television, but that show was cancelled soon after Ms. Ventura's lawsuit;

- Mr. Combs and Diageo resolved all disputes relating to their business relationship with Cîroc vodka and DeLeón tequila;

- Mr. Combs was removed from the Boards at three Charter schools which he created in Harlem, the Bronx, and the State of Connecticut;

- Mr. Combs was stripped of an Honorary Doctorate degree from Howard University, which is intending to return his prior donations;

- Mr. Combs was forced to return the key to the city of New York that was previously presented to him by the Mayor;

- Mr. Combs's 35-year legacy as an entrepreneur, fashion pioneer, music mogul and global businessman has collapsed; and

- Mr. Combs stepped down from Revolt—his television network—one of two Black television networks in the United States.

## VI.    A SENTENCE OF NO MORE THAN 14 MONTHS "AFFORD[S] ADEQUATE DETERRENCE TO CRIMINAL CONDUCT"

### A.  Specific Deterrence Is Best Achieved By A Sentence No Greater Than 14 Months

To achieve specific deterrence in this case, a sentence of no more than 14 months is "sufficient, but not greater than necessary" to achieve the goals of sentencing.  18 U.S.C.

§3553(a).  Mr. Combs is committed to leading a completely law-abiding life.  He will never again engage in any type of conduct that comes close to crossing the line into criminal conduct and will fully comply with all conditions of release.  Many circumstances demonstrate that there is little to no risk that Mr. Combs will recidivate.

*First*, Mr. Combs is 55 years old with no prior criminal history.  Mr. Combs's age and lack of criminal history are significant, because defendants with these characteristics are least likely to recidivate.  A defendant's "[a]ge and criminal history exert[] a strong influence on recidivism"—or the lack thereof—with older offenders like Mr. Combs being "substantially less likely than younger offenders to recidivate following release."[66]  Indeed, this is "one of the most well-established facts in criminology."[67]  And older defendants in Criminal History Category I— also like Mr. Combs—have lower recidivism rates still.[68]

Sentencing Commission data teaches that a sentence beyond 14 months would achieve no incremental specific deterrence.  Among "offenders sentenced to one year or more of imprisonment, there was no clear association between the length of sentence and the rearrest rate."[69]  Any specific deterrent effect from incarceration has already been achieved through Mr. Combs's near-13 months in prison, confirming no incarceration beyond 14 months is "necessary."  18 U.S.C. §3553(a).

---

[66] United States Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders (Dec. 7, 2017), https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders; *see also* United States Sentencing Commission, Older Offenders In The Federal System (July 2022) (revealing that defendants above the age of 50—like Mr. Combs—recidivate at a rate less than half that of offenders under the age of 50), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Older-Offenders.pdf.

[67] Council on Criminal Justice, Recidivism Rates: What You Need to Know, https://counciloncj.org/recidivism_report/.

[68] United States Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders (Dec. 7, 2017), https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders.

[69] *Id.*

*Second*, despite the unraveling of Mr. Combs's personal and professional life, over the past year Mr. Combs has sought to improve his life and transform the lives of others at MDC, demonstrating he is committed to living the most productive life possible.  As MDC even recognizes, he has "demonstrated a future-oriented and goal-directed attitude."  Ex. 29, BOP Psychology Records at 85.  While incarcerated persons typically form groups or gangs and fight with others not in their affiliated group, Mr. Combs has used his experiences and leadership skills to unite persons of all nationalities, religions, races, and socio-economic backgrounds.  *See supra* Part I(G).  Mr. Combs has been successful in transforming his unit from a place where hostilities and division were normal to a place where people in very stressful life situations exist harmoniously.  This has brought serenity and peace to persons in Mr. Combs's pod, leading to Correctional Officers commenting on the transformative results brought about by Mr. Combs.  This is a testament to Mr. Combs's ability to continue to impact people in a positive way and lead a law-abiding life.  Going forward, Mr. Combs plans to visit jails and prisons once released from custody to continue to demonstrate that people can co-exist in peace even in a custodial environment.

*Third*, Mr. Combs has been adequately addressing his addictions and mental health issues, some of which, we submit, partially contributed to the commission of the domestic violence discussed during the trial.  *See Pepper*, 562 U.S. at 492 (recognizing that a defendant's "postsentencing conduct . . . sheds light on the likelihood that he will engage in future criminal conduct.")

*Fourth*, Mr. Combs will not do anything to subject himself to being in MDC again, given the conditions that he now knows he will be subject to.  In light of the minimal to no risk of Mr.

154

Combs reoffending, a prison sentence longer than 14 months is not required to achieve specific deterrence.

### B.  A Sentence No Greater Than 14 Months Affords Adequate General Deterrence

As for general deterrence, while the goal of general deterrence may call for some punishment, it does not follow that a lengthy prison sentence, or even a sentence as long as the one Mr. Combs has already served, is necessary.  "Degree of certainty—as opposed to the length and severity—of punishment provides the strongest general deterrence effect."  *United States v. Lawrence*, 254 F. Supp. 3d 441, 445 (E.D.N.Y. 2017).  Empirical research on deterrence supports that observation.  A 2016 publication by the National Institute of Justice, the research and evaluation arm of the Department of Justice, explains that short prison sentences may deter future crime, but that increasingly lengthy prison sentences produce "at best a very modest deterrent effect" and "increasing the severity of punishment does little to deter crime."[70]  As the NIJ reports, "there is no evidence that … the deterrent effect increases when the likelihood of imprisonment increases."[71]

Even more antiquated economic theories of general deterrence do not support additional punishment here.  It is sometimes said that "[w]here the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence."  *United States v. Cavera*, 550 F.3d 180, 196 (2d Cir. 2008) (citing Richard A. Posner, Economic Analysis of the Law, §7.2 (3d ed. 1986) ("A person commits a crime because the expected benefits of the crime to him exceed the expected costs.")).  As the NIJ publication

---

[70] National Institute of Justice, Five Things About Deterrence (June 5, 2016), https://nij.ojp.gov/topics/articles/five-things-about-deterrence#a-person's-age-is-a-powerful-factor-in-deterring-crime.

[71] National Institute of Justice, Five Things About Deterrence (June 5, 2016), https://nij.ojp.gov/topics/articles/five-things-about-deterrence#a-person's-age-is-a-powerful-factor-in-deterring-crime.

notes, these economic theories of deterrence are dubious. But even if they weren't, they have no

application here. While most Mann Act cases prosecuted might involve real profits to the

defendant, Mr. Combs's offense did not and was not committed with any expected commercial

benefit. The fact Mr. Combs was prosecuted, convicted, and has served significant prison time is

already sufficient to send any needed deterrent message.

Indeed, DOJ efforts against "buyers" or "johns"—who do not profit from prostitution like

traffickers or pimps—focus on education and other non-punitive measures rather than formal

prosecution or prison time. The DOJ has successfully used "education directed at would-be

buyers" and public campaigns to increase detection and reduce demand.[72] And—regardless of

the ultimate sentence—this is obviously one of the highest profile and most widely discussed

Mann Act prosecutions in history. The general public now knows it is criminal to engage in the

offense conduct, and a conviction itself is a frightening enough prospect. Mr. Combs's case has

already served as a greater deterrent than the average case, and no further incarceration is needed

to educate or deter would-be offenders.

Mr. Combs's release will facilitate general deterrence. Upon release from custody, it is

Mr. Combs's intention to avail himself of opportunities to engage with the youth and other

communities to detail his experience of being prosecuted and incarcerated. Mr. Combs will be

able to impart on the youth and others the consequences of bringing infamy and disgrace upon

him and his family. Mr. Combs will stress the fact that living a law abiding, drug free, non-

violent life is essential in the journey to happiness and peace. By sharing details of his

---

[72] Jan. 14, 2020 remarks by Assistant Attorney General Eric Dreiband at the DOJ Summit on Combating Human Trafficking, https://www.justice.gov/archives/opa/speech/assistant-attorney-general-eric-dreiband-delivers-remarks-department-justice-s-summit; *see also* Feb. 2, 2018 remarks by U.S. Attorney for the District of Minnesota Greg Brooker at the DOJ Human Trafficking Summit (describing "public awareness campaigns" to target the demand side of sex cases), https://www.justice.gov/archives/opa/speech/us-attorney-district-minnesota-greg-brooker-delivers-remarks-department-justice-s-human.

experiences, Mr. Combs hopes to divert young people away from vices and conduct that lead to disastrous ramifications.

### VII.    A 14-MONTH SENTENCE WOULD BEST "PROVIDE [MR. COMBS] WITH NEEDED" REHABILITATION

Mr. Combs has enthusiastically embraced and benefited from post-arrest rehabilitation efforts and will benefit from treatment plans outside of prison.  These plans will only be impeded by additional prison time.  Consistent with the recommendations of Dr. Krueger, Dr. Kaplan, and Probation, Mr. Combs is committed to counseling for anger management, violence, drug and alcohol addiction to be overseen and chosen by the Probation Office.  Mental health experts who have evaluated Mr. Combs have opined, to a medical certainty, that additional incarceration is not beneficial to Mr. Combs.  In fact, additional incarceration would be nothing more than warehousing without any positive value or rehabilitative benefit.

"A sentencing court can and should impose a sentence that not only takes into account past rehabilitation, but facilitates further rehabilitation." *United States v. Zimmerman*, No. 10-CR-598 JG, 2012 WL 3779387, at *8 (E.D.N.Y. June 19, 2012).  In fact, post-arrest rehabilitation and a defendant's attitude toward further rehabilitation are "highly relevant to several of the factors a sentencing court is required to consider when imposing sentence," including specific deterrence and 18 U.S.C. §3553(a)(2)(D)'s additional instruction that the specific sentence should "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Zimmerman*, 2012 WL 3779387, at *8 (citing *Pepper*, 562 U.S. at 492 (holding a sentencing court should give weight to evidence of rehabilitation)).  Additional prison time would only be a step in the wrong direction and will frustrate Mr. Combs's efforts to lead the most productive life practicable.  *Cf. United States v. Johnson*, 671 F. Supp. 3d 265, 284 (E.D.N.Y. 2023) (concluding defendant "and

society as a whole would best be served by a sentence reduction that enables and requires [defendant] to obtain [necessary] treatment").

Mr. Combs has suffered physically and mentally, and continued incarceration serves no positive goal. Courts do not simply punish, but must restore and rehabilitate with a goal to returning the convicted person to their community as soon as practicable. Upon release, Mr. Combs fully intends to abide by every order of this Court and to renew and repair relationships that have been damaged, in a healthy, positive, and lawful manner. After embarking on this journey, Mr. Combs will devote attention to his family and community and to creating new initiatives and opportunities for others.

## CONCLUSION

The Court's ultimate focus of attention should be the sort of man Mr. Combs has strived to be his entire life, as reflected in the highly laudatory letters accompanying this Sentencing Memorandum, rather than the crimes of conviction, for which he has already been sufficiently punished. As the Supreme Court reminded us in *Pepper*: "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." 562 U.S. at 487 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

As discussed at length above, the proposed sentence is the only just and fair sentence for Mr. Combs for all the reasons set forth herein:

- The guidelines range for Mr. Combs's crimes of conviction is 6-12 months, which accurately reflects the seriousness of the offenses and is in line with other Mann Act sentences;

- Mr. Combs has been adequately punished by serving 13 months in the terrible conditions at the MDC, where he became sober for the first time in 25 years, had an "incident free record," and inspired inmates with his program;

- Mr. Combs is a 55-year-old man with no prior criminal history;

- Mr. Combs has already seen how being arrested and convicted can destroy his reputation and lead to terrible collateral consequences for his businesses, and he recognizes the consequences his actions have had for himself and his family; and

- Mr. Combs has seven children and an elderly mother who rely on him for support and care.

Because of Mr. Combs's contributions to society and the community, the need to avoid sentencing disparities, and his family circumstances, counsel respectfully submits that, consistent with Section 3553(a), a 14-month sentence with supervised release mandating (1) drug treatment, (2) therapy, and (3) group therapy is the sentence "sufficient, but not greater than necessary," to accomplish the traditional goals of sentencing.

Dated:      September 22, 2025
            New York, New York

                              Respectfully submitted,

                              _____
                              Marc Agnifilo
                              Teny R. Geragos
                              AGNIFILO INTRATER LLP
                              445 Park Ave., 7th Fl.
                              New York, NY 10022
                              (646) 205-4350
                              marc@agilawgroup.com
                              teny@agilawgroup.com

                              _____
                              Alexandra A.E. Shapiro
                              Jason A. Driscoll
                              SHAPIRO ARATO BACH LLP
                              1140 Avenue of the Americas, 17th Fl.
                              New York, NY 10036
                              (212) 257-4881
                              ashapiro@shapiroarato.com
                              jdriscoll@shapiroarato.com

Brian Steel
THE STEEL LAW FIRM, P.C.
1800 Peachtree Street, Ste. 300
Atlanta, GA 30309
(404) 605-0023
thesteellawfirm@msn.com

Nicole Westmoreland
WESTMORELAND LAW, LLC
132 Cone Street, Ste. A
Atlanta, GA 30303
(404) 446-2620
nw@westmorelandlawgroup.com

Xavier R. Donaldson
136 Madison Ave, 6th Fl.
New York, NY 10016
(646) 772-3334
xdonaldson@aol.com

Anna Estevao
HARRIS TRZASKOMA LLP
156 West 56th Street, Ste. 2004
New York, NY 10019
(212) 970-6465
aestevao@harristrz.com