UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -v.-

SEAN COMBS,
   a/k/a "Puff Daddy,"
   a/k/a "P. Diddy,"
   a/k/a "Diddy,"
   a/k/a "PD,"
   a/k/a "Love,"

        Defendant.

**S3 24 Cr. 542 (AS)**


# THE GOVERNMENT'S SENTENCING MEMORANDUM


JAY CLAYTON
United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278


Meredith Foster
Emily A. Johnson
Christy Slavik
Madison Reddick Smyser
Mitzi Steiner
Assistant United States Attorneys
    *Of Counsel*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

  I. Procedural Background ............................................................................................... 3

    A. Federal Investigation and Charges ........................................................................ 3

    B. Pre-Trial Bail Hearings ......................................................................................... 4

    C. Defendant's Detention and Bail Renewal ............................................................. 4

    D. Trial ....................................................................................................................... 5

  II. Offense Conduct ........................................................................................................ 6

    A. The Defendant's Relationship With Ventura ........................................................ 6

    B. The Defendant's Relationship With Jane ............................................................ 20

    C. The Defendant Used His Vast Resources to Perpetrate the Offense Conduct ................. 30

    D. The Defendant Abused Others ............................................................................ 31

    E. The Defendant Engaged in Other Misconduct ................................................... 35

  III. The Sentencing Guidelines ..................................................................................... 39

    A. The Government's Guidelines Calculation ......................................................... 40

    B. Guidelines Disputes ............................................................................................ 42

      1. Applicable Law ................................................................................................. 43

        a. In Calculating the Guidelines Range, the Court Should Consider All Relevant Conduct That Establishes the Offenses of Conviction ............................................. 43

        b. There Is No Constitutional Impediment to Considering Acquitted Conduct at Sentencing ....................................................................................................... 48

        c. Even If the Court Finds Certain Conduct to Be "Acquitted Conduct" That Is Not Otherwise Relevant Conduct Under the Guidelines, It Should Still Consider That Conduct Under Section 3553(a) ................................................................. 53

      2. The Threats-or-Fear Cross-Reference and § 2A3.1's Serious Bodily Injury Enhancement Apply ................................................................................................. 54

        a. The Threats-or-Fear Cross-Reference Applies .......................................... 55

          (1) Applicable Law ................................................................................... 55

          (2) Discussion ......................................................................................... 58

        b. Section 2A3.1's Enhancement for Serious Bodily Injury Applies .......................... 65

      3. If the Court Does Not Apply the Threats-and-Fear Cross-Reference, § 2G1.1's Multiple Victims and Fraud or Coercion Enhancements Apply ........................................ 68

        a. Section 2G1.1(d)(1)'s Grouping of Multiple Victims Applies ............................... 68

        b. Section 2G1.1(b)(1)'s Enhancement for Fraud or Coercion Applies ..................... 77

      4. Section 3's Enhancements for the Defendant's Aggravating Role, Vulnerable Victims, and Obstruction of Justice Apply ................................................................ 84

i

a. Section 3B1.1's Enhancement for Organizers or Leaders Applies ........................... 85

b. Section 3A1.1(b)(1)'s Enhancement for Vulnerable Victims Applies ................... 95

c. Section 3C1.1's Enhancement for Obstruction of Justice Applies ........................... 97

5. The Defendant Does Not Qualify for Acceptance of Responsibility Points Under § 3E1.1 .................................................................................................. 102

6. The Defendant Does Not Qualify for the Zero-Point Offender Reduction Under § 4C1.1 .................................................................................................. 107

7. The Defendant Is Not Entitled to a Significant Downward Departure Based on the Cumulative Effect of the Guidelines' Enhancements ............................... 114

IV. Applicable Sentencing Law ........................................................................... 117

V. The Defendant's Conduct Warrants a Term of Imprisonment of At Least 135 Months' Imprisonment ........................................................................................... 119

A. The Nature and Seriousness of the Offense Warrant a Substantial Term of Imprisonment ........................................................................................... 120

B. The Need to Avoid Unwarranted Sentencing Disparities Mandates a Substantial Term of Imprisonment ............................................................................. 125

1. Similarly Situated Defendants Receive Sentences Reflecting the Threats, Manipulation, and Abuse Used Against Their Victims .............................................................. 126

2. The 14-Month Sentence Sought by the Defendant Would Create, Not Avoid, a Sentencing Disparity .......................................................................................... 132

3. The Defendant Is Significantly More Culpable than Other "Johns" Prosecuted by DOJ ........................................................................................... 139

C. The Need for Specific and General Deterrence and To Promote Respect for the Law Warrants a Substantial Term of Imprisonment .................................................. 145

D. The History and Characteristics of the Defendant Warrant a Substantial Term of Imprisonment ........................................................................................... 151

E. The Defendant's Arguments for A Lenient Sentence Are Unpersuasive ...................... 153

1. Conditions at the MDC Do Not Warrant a Lenient Sentence .................................... 153

2. The Defendant's Psychiatric Evaluations Are Unreliable and Do Not Warrant a Lenient Sentence ........................................................................................... 156

3. The Defendant's Personal Circumstances Do Not Warrant a Lenient Sentence ........ 159

F. The Court Should Impose the Maximum Financial Penalties to Reflect the Seriousness of the Offense ........................................................................................... 160

CONCLUSION ........................................................................................... 161

## INTRODUCTION

Throughout this case and over the course of a seven-week trial, this Court has seen extensive evidence demonstrating the defendant's criminal conduct perpetrated across more than a decade. At trial, the defendant disputed that the Government had made out particular elements of the charged federal offenses, but he largely conceded his conduct: the violence, domestic abuse, drug use and distribution, and bribery. The defendant will not be punished for any crimes of which he was acquitted, of course, but punishment for his crimes of conviction must take into account the manner in which he committed them. His crimes of conviction are serious and have warranted sentences over ten years in multiple cases for defendants who, like Sean Combs, engaged in violence and put others in fear. Consistent with those cases and based on the corroborated evidence presented at trial, this Court should impose a sentence of no less than 135 months' imprisonment.

A substantial term of imprisonment is also needed in this case because the defendant is unrepentant. Incredibly, while the defendant conceded his acts of violence and abuse throughout trial, he now argues that his victims should shoulder the blame. (Dkt. 510 ("Def. Mem.") at 61-62). The defendant tries to recast decades of abuse as simply the function of mutually toxic relationships. (Def. Mem. at 53). But there is nothing mutual about a relationship where one person holds all the power and the other ends up bloodied and bruised.

Indeed, in connection with sentencing, Casandra Ventura, who, along with multiple escorts, was transported across state lines by the defendant for multi-day "Freak Offs" in connection with Count Three (of which the defendant was convicted), writes to the Court that Freak Offs were "degrading and disgusting, leaving [her] with infections, illness, and . . . exhaustion." (Ex. A at 2).[1] Ventura became addicted to the drugs the defendant provided her.

---

[1] Unless otherwise noted, case and record text quotations omit all internal quotation marks, citations, and previous alterations.

She still has nightmares about the defendant's (conceded) physical abuse, which lasted more than a decade and left her with "permanent scars all over [her] body." (*Id.*) The defendant's abuse drove Ventura to suicidal thoughts—which she almost followed through on, as she testified at trial. (*Id.*; Tr. 824).[2] Ventura asks that the Court impose a sentence that considers the "many lives that" the defendant "upended with his abuse and control."

The Court also heard testimony and reviewed contemporaneous communications from "Jane," who, along with escorts, was transported across state lines by the defendant for "Hotel Nights" in connection with Count Five (of which the defendant was also convicted). Jane's testimony and communications detail how she was manipulated and beaten by the defendant. That evidence included a note Jane wrote to herself about how she felt "violated" and was tormented by how the defendant had "placed and paid all of these harmful men on me and risked my health every single time for 2.5 years." (GX E-331-J-R).

Defendants who perpetrate violations of the Mann Act involving such violence and fear regularly face significant penalties. The defendant should be no exception—particularly when his history and characteristics demonstrate years of abuse and violence. Several former employees abused and exploited by the defendant, including one whom the defendant sexually assaulted, submitted letters to the Court in connection with sentencing. These letters uniformly ask that the Court impose a sentence that reflects the severity of the defendant's conduct, and his history and pattern of violence.

---

[2] Citations to the trial record are indicated as "Tr." Citations to transcripts of other proceedings are indicated by date of the proceedings.

Given the seriousness and duration of the offense conduct, as well as his decades of unchecked violence, consideration of the relevant factors under 18 U.S.C. § 3553(a) weighs heavily in favor of a substantial sentence as well as the statutory maximum fine. The sentence imposed on the defendant should reflect the substantial psychological, emotional, and physical damage he has inflicted. Most significantly, the nature and seriousness of the offense, the need for deterrence and to promote respect for the law, and the history and characteristics of the defendant warrant a sentence of no less than 135 months' imprisonment. Such a sentence is consistent with similarly situated defendants who commit Mann Act violations and is warranted here.

## I. Procedural Background

### A. Federal Investigation and Charges

The U.S. Attorney's Office for the Southern District of New York and Homeland Security Investigations ("HSI") began investigating the defendant in connection with his physical and sexual abuse of intimate partners, among other acts of violence, on November 17, 2023.

In September 2024, a grand jury sitting in the Southern District of New York indicted the defendant, and on September 16, 2024, the defendant was arrested in New York City and taken into federal custody. Since his arrest, the defendant has been housed in the Metropolitan Detention Center in Brooklyn ("MDC").

On or about April 3, 2025, a grand jury sitting in the Southern District of New York voted a five-count superseding indictment, charging the defendant with the following: racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d) (Count One); sex trafficking by force, fraud, or coercion related to Ventura, in violation of Title 18, United States Code, Sections 1591, 1594, and 2 (Count Two); transportation to engage in prostitution related to Ventura and commercial sex workers, in violation of Title 18, United States Code, Sections

3

2421(a) and 2 (Count Three); sex trafficking by force, fraud, or coercion related to Jane, in violation of Title 18, United States Code, Sections 1591, 1594, and 2 (Count Four); and transportation to engage in prostitution related to Jane and commercial sex workers, in violation of Title 18, United States Code, Sections 2421(a) and 2 (Count Five).

### B.   Pre-Trial Bail Hearings

The defendant was arraigned on September 17, 2024, before the Honorable Robyn F. Tarnofsky, United States Magistrate Judge, who then presided over a bail hearing.  After extended argument, Judge Tarnofsky detained the defendant.  (Sept. 17, 2024 Tr. 54).  Judge Tarnofsky noted that the defendant's crimes "happen[] behind closed doors," which makes it impossible to monitor.  (*Id.* at 54).  The Court further found that detention was warranted based on the defendant's history and characteristics, observing that given the allegations of violence and substance abuse, "I don't know that I think you can trust yourself."  (*Id.* at 54-55).

The defendant appealed Judge Tarnofsky's decision to Judge Carter, to whom the case was then assigned, and a bail hearing before Judge Carter proceeded on September 18, 2024.  After lengthy argument, Judge Carter denied the defendant bail, finding that the defendant was a danger regarding obstruction of justice and witness tampering, and that the defendant posed a danger to the safety of others in the community.  (Sept. 18, 2024 Tr. 56).

### C.   Defendant's Detention and Bail Renewal

On November 8, 2024, after this Court was assigned the case, the defendant filed a renewed motion for bail.  In connection with its opposition to that motion, the Government cited excerpts from certain of the defendant's notes that had been photographed during a sweep of the MDC in October 2024.  During a hearing on November 19, 2024 addressing the defendant's allegations that the Government was in possession of attorney-client privileged material, the defendant caused his attorney to present the Court with a notebook marked "legal" to erroneously suggest that the

4

Government had knowingly obtained notes from the defendant that had clearly been marked legal. (*See* Dkt. 77).  These actions form, in part, the basis of the Government's request for the obstruction enhancement in U.S.S.G. § 3C1.1, as discussed *infra*.

By order dated November 27, 2024, the Court denied the defendant's renewed motion for bail, citing the defendant's "propensity for violence," the "serious risk of witness tampering," and the open question as to whether the defendant could abide by conditions given his flagrant violation of BOP rules and "the misrepresentation made at the November 19, 2024 hearing."  (Dkt. 92).

### D.  Trial

A seven-week trial commenced on May 12, 2025.  Notably, at trial, the defendant did not meaningfully dispute the Government's evidence of his brutal violence.  The defense repeatedly conceded the defendant's horrific abuse along with other criminal activity, such as drug use and distribution.

As described below, the trial evidence included: (1) the testimony of  Ventura, who was in a relationship with the defendant for approximately 11 years, during which time she experienced brutal physical and psychological abuse at the hands of the defendant and engaged in "Freak Offs," at times on a weekly basis; (2) the testimony of Jane, who was in a relationship with the defendant from approximately 2021 through the defendant's arrest, and engaged in frequent "Hotel Nights" with the defendant and also experienced violence and manipulation at the hands of the defendant including after the defendant knew that he was under investigation for sex trafficking; (3) the testimony of multiple other individuals who experienced violence at the hands of the defendant; (4) testimony of former employees who were responsible for setting up Freak Offs and Hotel Nights, including by delivering thousands of dollars to the defendant so he could pay commercial sex workers and procuring drugs at the defendant's behest; (5) the testimony of an expert psychologist, Dr. Dawn Hughes, regarding victim responses to abuse; (6) text messages, emails,

phone records, photos, videos, and audio recordings, among other records; and (7) physical evidence, including drugs and firearms recovered from the defendant's residences.

On July 2, 2025, the jury convicted the defendant of Counts Three and Five, concluding that he had transported individuals, including Ventura, Jane, and male commercial sex workers, in interstate and foreign commerce with the intent that they engage in prostitution. The jury acquitted the defendant of Counts One, Two, and Four—the RICO conspiracy and sex trafficking counts. A summary of the trial evidence is below.[3]

## II. Offense Conduct

Beginning in approximately 2009, the defendant paid dozens of male commercial sex workers to have sex with Ventura and Jane hundreds of times.  The defendant organized, directed, and paid for these Freak Offs (as Ventura referred to them) and Hotel Nights (as Jane referred to them), sometimes on a weekly basis.  Both Ventura and Jane did not want to have sex with these strangers, and told the defendant as much on several occasions.  (Tr. 492, 704, 1303-04, 4594, 4699, 4810, 4812-13, 5135).

### A. The Defendant's Relationship With Ventura

Over the course of four days, Casandra Ventura testified in detail about her relationship with the defendant, which lasted a little over a decade from approximately 2008 until approximately 2018.  Some of her testimony is summarized below.

#### Control

The defendant pursued Ventura romantically when she was approximately 21 years old and he was approximately 38 years old, after he signed her to a 10-album deal with Bad Boy

---

[3] The following summary is intended to provide an overview sufficient to contextualize the Government's arguments with respect to sentencing, but not to provide a comprehensive recitation of all aspects of the offense conduct presented at trial.

Records.  (Final Pre-Sentence Report, Dkt. 508 ("PSR") ¶ 9).  Ventura described that at the time she was "really super young, naïve, total people-pleaser."  (Tr. 410).  It was not an accident that the defendant set his sights on Ventura.  As former assistant David James testified, in the early days of his relationship with Ventura, the defendant told a close friend: "I got [Ventura] right where I want her.  She's young . . . she [is] very moldable."  (Tr. 1725).  And the defendant was proud of the control he exerted over Ventura.  As Capricorn Clark, one of the defendant's former assistants, testified, the defendant bragged about Ventura's willingness to do everything he asked. (Tr. 2564).[4]

The defendant paid for Ventura's apartments in New York City and Los Angeles, and frequently came over unannounced and let himself in, often in violent fits of rage.  (*Id.*; Tr. 447-48).  The defendant kicked doors down in Ventura's apartments.  (GX H-101-A) ("My bathroom door is broken down. . . / He has my key so I'm leaving.  I do not feel safe . . . / 3 of my doors are now broken.").  The defendant, who paid for Ventura's car, phone, and computers, also regularly took those items away when he was angry with Ventura.  (*E.g.*, Tr. 460, 1883).

When the defendant could not reach Ventura personally, he called and/or texted incessantly or had members of his staff find her.  (PSR ¶ 10).  For example, after the defendant violently assaulted her at the Intercontinental Hotel in March 2016, discussed in more detail *infra*, and then beat on her apartment door with a hammer, Ventura refused to answer the defendant's calls.  (GX

---

[4] The defendant's control over Ventura extended to her appearance, her day-to-day activities, and her social interactions.  (PSR ¶ 10; Tr. 431).  Ventura had to seek the defendant's approval for clothing, makeup, and hair, and the defendant got angry and sometimes violent when she did not abide by his direction.  (*E.g.*, Tr. 2621, 2954-55).  The defendant also controlled all aspects of Ventura's career, keeping her occupied with "busy work" so that he could control her daily activities (Tr. 436), and refusing to let her release albums (PSR ¶ 10).  Ventura's mixtape, which performed well online, was, at the defendant's direction, never sold, and Ventura therefore earned no money from it.  (*Id.*).

1403). So the defendant put his chief of staff, Kristina Khorram, up to it: "Talked to him, he promised me he won't go back over if you will just talk to him on the phone for 5 minutes." (GX B-601).

### *Violence*

The defendant also horrifically physically abused Ventura throughout their relationship—a point he conceded at trial.

At trial, the defendant conceded the overwhelming evidence of his violence against Ventura and admitted that the defendant engaged in abuse that was "horrible," "dehumanizing," and "indefensible." (Tr. 128 ("There was a name in criminal law for the violence we will hear about and we will see at this trial. It is called domestic violence. It is called assault. . . . We take full responsibility that there was domestic violence in this case."); Tr. 135 ("[Jealousy] led to domestic violence in the elevator bank."); Tr. 136 ("[W]hat Combs did to Cassie on this videotape is indefensible. It is horrible. It's dehumanizing. It's violent. . . . It is evidence of domestic violence."); *id.* ("Please understand that this video is overwhelming evidence of domestic violence . . ."); Tr. 146 (describing June 18, 2024 incident involving Jane as "an incident of domestic violence"); Tr. 7759 ("[W]e own -- the domestic violence."); Tr. 7760 ("[W]e own [the domestic violence]. It happened."); *id.* ("[I]f he was charged with domestic violence we wouldn't all be here having a trial because he would have pled guilty -- because he did that."); Tr. 7761 ("The domestic violence is the issue."); Tr. 7795 ("[W]e're going to take the domestic violence, let's take the domestic violence. Obviously, something happened."); Tr. 7835 ("The video is very much -- very much -- domestic violence.").

Indeed, across the testimony of over thirty witnesses, the defendant's conceded abuse was detailed during trial:

*January 2009*

Ventura testified about a January 2009 incident after a club appearance. The defendant called Ventura a "slut or a bitch or something" after she spoke to a producer at the party, and she drunkenly hit him. (Tr. 764). After that,

> [The defendant's] whole demeanor just switched over. I remember his eyes went black. . . And then after I punched him and he attacked me, and I was basically, like, underneath the backseat in the Escalade, just trying to cover my face . . . [b]ecause Sean was stomping on it with his foot.

(Tr. 764). Ventura attempted to run away, but Roger Bonds, a member of the defendant's security staff, ran after her and brought her back to the house. (Tr. 765). The defendant kept Ventura at the London Hotel for a week while her injuries healed despite Ventura wanting to go home to her mother. (Tr. 767; *see also* Tr. 1756).

*2010 Prince Party*

Ventura, a woman who testified at trial under the pseudonym "Mia," and Mylah Morales each testified about the defendant's assault of Ventura after a party in 2010. (Tr. 773, 2430, 3257). Ventura did not tell the defendant that she was going to the party, because she thought he would tell her that she couldn't go. (Tr. 775). When the defendant saw Ventura at the party, he chased her and threw her to the ground. He started attacking her, but the host's security team intervened. (Tr. 3259). Undeterred, the defendant came back to Ventura's hotel room where he beat her, including throwing luggage at her. (Tr. 777). Ventura sustained a swollen eye, busted lip, and knots on her head. (Tr. 2434).

*December 2011*

Clark witnessed another incident in December 2011 during which the defendant viciously and repeatedly kicked Ventura. After the defendant discovered that Ventura had been seeing

another man (Scott Mescudi), the defendant made Clark bring Ventura to him. (Tr. 2602). When Ventura arrived at the defendant's home, in the presence of his security personnel, he began kicking her:

> 100 percent full force, in her legs to begin with. She was facing him to start, and he kicked her in her -- in like the thigh and her leg. He kept kicking her. He never used his hands. . . He repeatedly kicked her and she just kept -- each kick, she would crouch into more and more of a fetal position . . . every time she got kicked, she moved back. . . All the way to the street. . . . She wasn't doing anything. She was crying silently.

(Tr. 2603-04). Days later, Ventura's mother took photos of the bruising Ventura sustained as a result of that beating:



(GX 3Q-109). Ventura, who only revealed to her mother part of what the defendant was doing to her, testified that she kept the secret because she felt ashamed—"it's not normal . . . [j]ust constantly bruised up by the person that you love, or that says they love you. Like, you can't justify it to anyone, just, especially not your mom." (*Id.*).

*August 2013*

Deonte Nash, Mia, and Ventura each testified about an August 2013 incident when the defendant showed up at Ventura's apartment unannounced, irate because Ventura had not answered his calls.  (Tr. 2981).  The defendant grabbed Ventura by the hair, pulled her off the couch, and started hitting her "in a rage."  (Tr. 2982).  Ventura, Mia, and Nash tried to close themselves in Ventura's bedroom to get away from the defendant, but the defendant pushed the door open and continued to attack Ventura by hitting and kicking her.  (Tr. 2983).  Both Nash and Mia jumped on the defendant's back in an effort to stop him, but he threw them to the ground.  (Tr. 2983-84).  The defendant continued to attack Ventura, slamming her head into the corner of the bedframe, causing blood to gush from a gash, as pictured below.  (Tr. 2984-85, 3254-55).



(GX-B-247-A).  When the defendant finally stopped, he turned to Nash and Mia and said, "Look what y'all made me do."  (Tr. 2985).  (*See also* Tr. 692-93, 3252-56).

11

*September 2015*

Another time, in September 2015, the defendant assaulted Ventura during a party in Las Vegas. (Tr. 795). The defendant punched and kicked Ventura, who attempted to escape by running into a bathroom. (Tr. 796). Ventura tried to hide underneath the toilet, but the defendant continued kicking her. (*Id.*) The defendant only stopped when D-Roc, the defendant's former bodyguard, and James Cruz, Ventura's manager, entered the room. (*Id.*) Ventura testified that both men "teared up" after seeing the assault. (*Id.*) Ventura was left with black eyes, a golf ball-sized knot on her forehead, and a busted lip. (*Id.*).

*Jamaica Incident*

Ventura and Kerry Morgan, who was then Ventura's best friend, testified about violence that occurred during a trip to Jamaica. Ventura only recalled getting a black eye and hiding from the defendant for several hours under a tractor (Tr. 794), but Morgan had a more detailed memory. Morgan testified that while on a group vacation in Jamaica, Ventura left the group to go to the bathroom. (Tr. 1598). The defendant, upset that Ventura was taking so long in the bathroom, went to find her. (*Id.*). Moments later, Morgan heard Ventura screaming and saw the defendant dragging Ventura by her hair down a long hallway. (Tr. 1599). The defendant then threw Ventura to the ground, and she hit her head on a brick, knocking her out for several seconds. (Tr. 1600-01). The attack resulted in injuries that were visible well after the assault took place, as pictured below.



(GX 9N-102).

*Private Plane*

George Kaplan testified about violence he witnessed on the defendant's private plane. While members of the defendant's security team and other employees looked on, the defendant, who was in the back bedroom with Ventura, stood over Ventura and yelled angrily at her. The defendant threw whiskey glasses at Ventura, shattering them on the ground. As the defendant threw the glasses at her, Ventura pleaded to the others on the plane "isn't anybody seeing this[?]." (Tr. 2276-79). No one helped Ventura. (*Id.*).

*March 2016*

In March 2016, the defendant proposed a Freak Off to Ventura. (PSR ¶ 23). Ventura had a movie premiere and did not want to participate in a Freak Off right before it, but ultimately relented. (PSR ¶ 23; Tr. 575). The defendant and Ventura enlisted Jules Theodore for the Freak Off, which took place at the Intercontinental Hotel in Century City. (PSR ¶ 23). In the hotel room, the defendant hit Ventura in the face, after which Ventura attempted to leave the hotel. (*Id.*). The

13

defendant chased after Ventura.  (*Id.*).  When he reached her in the elevator lobby, he threw her to the ground, kicked her, and attempted to drag her back down the hallway to the hotel room, as pictured below.  (*Id.*).



(GX 10C-103).  Hotel security intervened, and Ventura left the hotel.  (PSR ¶ 23).  The defendant followed Ventura to her apartment, hitting her door with a hammer and trying to gain entry.  (*Id.*).  Ventura had a black eye and swollen lip as a result of the defendant's assault, pictured below, as well as body bruising that she covered up for the premiere with heavy makeup.  (Tr. 641, 647).



(GX B-601).

*September 2018 Rape*

Ventura also testified that near the end of their relationship, she and the defendant went out for dinner.  (Tr. 816).  After dinner, Ventura invited the defendant back to her apartment, at which time he raped her on her living room floor while she cried and said "no."  (Tr. 816).  Ventura testified that the rape felt like "somebody taking something from you."  (Tr. 816).  After the rape, the defendant texted Ventura: "I know I look bad to you.  I could tell I didn't turn you on yesterday.  I fell off, but I'm about to get my shit together."  (GX A-441-I).

\*        \*        \*

These violent instances are just a sliver of the abuse Ventura experienced at the defendant's hands.  Contrary to the defendant's assertion that his abuse was "rare" (Def. Mem. 61), the record shows the defendant physically abused Ventura consistently throughout their relationship.  As Ventura indicated in her testimony, "make the wrong face, the next thing I know, I was getting hit in the face."  (Tr. 434).

Ventura also testified to seeing the defendant with and around firearms, which he sometimes made Ventura handle. For instance, at a club appearance in Los Angeles, Ventura carried the defendant's gun in her purse. (Tr. 472-73). Ventura testified about another incident in 2008 in which the defendant and D-Roc armed themselves with handguns to confront his rival Suge Knight at Mel's Diner. (Tr. 471-72, 628). David James testified about the same incident in detail. (Tr. 1784-89 ("I looked back, Mr. Combs had three handguns on his lap.")). Throughout their relationship, Ventura testified that "guns were taken out [from the defendant's safes] here and there . . . I always felt, like, it was just a little bit of a scare tactic." (Tr. 474).

### Freak Offs

After the defendant started physically abusing Ventura, the defendant introduced Ventura to "Freak Offs," which is how the defendant referred to encounters in which Ventura had sex with a male escort, while the defendant directed their movements, masturbated, and often filmed the encounter. (Tr. 407-08, 410). Although Ventura was willing to try a Freak Off to please the defendant initially, she quickly knew that she did not want to continue doing it. (Tr. 409). But given the defendant's physical abuse, Ventura "didn't feel like she had much of a choice" because she "didn't really know what no would be or what no could turn into." (Tr. 409-10).

The defendant instructed Ventura how to hire escorts, how to set up hotel rooms, what drugs to take and when, what to wear, and how to perform sexually during the Freak Offs. (PSR ¶¶ 11, 12). Ventura sourced escorts from websites like Craigslist or Backpage, as well as services providing strippers or exotic dancers, but eventually began using an escort service called Cowboys 4 Angels. (PSR ¶ 16). At times, the defendant instructed Ventura to make sure that an escort was not a cop before meeting with them. (*Id.*).

16

Freak Offs often lasted for two or three days and followed a similar pattern, which was dictated by the defendant: continuous application of baby oil, mutual touching and masturbation, oral sex, and penetrative sex.  (PSR ¶ 13).  Freak Offs were fueled by copious amounts of drugs that the defendant provided Ventura, including ecstasy, MDMA, ketamine, and GHB.  (PSR ¶ 12). Ventura depended on drugs to get through Freak Offs because they were "dissociative and numbing.  I couldn't imagine myself doing any of that without having some sort of buffer or just way to not feel it for what it really was, which was emotionless and sex with a stranger that I didn't want to be having sex with."  (Tr. 542-43).  Ventura often took opiates after Freak Offs to come down from the other drugs.  (PSR ¶ 13).  She eventually developed an opioid addiction, for which she later sought treatment.  (*Id.*).

Freak Offs, which sometimes lasted multiple days, became frequent occurrences, taking place on a weekly basis at times, until the relationship between Ventura and the defendant ended in 2018.  (PSR ¶ 11).  The defendant expected Ventura to engage in Freak Offs even when she was on her period or had a painful UTI, which she contracted often given the frequency of Freak Offs. (PSR ¶ 13).  Freak Offs took place at the defendant's residences in Los Angeles, Miami, and New York; at Ventura's residences in Los Angeles and New York; and in hotels in New York, Miami, Los Angeles, Las Vegas, Atlanta, Ibiza, and Turks and Caicos.  (PSR ¶ 15).  Escorts were paid from approximately $1,500 to $6,000 in cash, which was provided by the defendant.  (PSR ¶ 17).

Escorts often traveled for Freak Offs with the defendant and Ventura.  (PSR ¶¶ 18, 19). Ventura testified that she and the defendant often discussed flying escorts to their location, and travel arrangements for escorts were made at the defendant's direction.  (*Id.*).  The escorts that traveled for Freak Offs with the defendant and Ventura included:

- Clayton Howard, a/k/a "Dave," who was based in New York and flew to Miami and Los Angeles for Freak Offs (PSR ¶ 19(a));

17

- Jules Theodore, a/k/a "Jules," who was based in Los Angeles and traveled to New York, Miami, and Las Vegas for Freak Offs (PSR ¶ 19(b));

- Julian Sapp, a/k/a "LA Strip," who traveled from Los Angeles to New York, returning to Las Vegas, for a Freak Off (PSR ¶ 19(c)); and

- A Cowboys 4 Angels escort who flew to Ibiza for a Freak Off (PSR ¶ 19(d)).

*Violence During Freak Offs*

The defendant's violence towards Ventura surrounded and extended into Freak Offs. The defendant beat Ventura during multiple Freak Offs, including in New York, Los Angeles, and Miami. (PSR ¶ 22). One example at the Intercontinental Hotel is described above. As another example, Daniel Phillip, an escort, testified that in between "sessions" (*i.e.*, rounds of sexual activity), he saw the defendant become angry that Ventura did not come over when he called her. (Tr. 275-76). Phillip saw the defendant throw a glass liquor bottle at Ventura's head, grab her by her hair, and drag her into the bedroom. (Tr. 276). Phillip heard Ventura screaming and the defendant slapping her repeatedly as the defendant said: "bitch, when I tell you to come here, you come now, not later." (Tr. 277). After he had stopped beating Ventura, the defendant came out of the bedroom and told Phillip to have sex with Ventura, but Phillip was too disturbed to perform sexually. (Tr. 279). In the middle of another Freak Off, Phillip heard the defendant strike Ventura multiple times in another room. (Tr. 280-81).

Only days after the defendant assaulted Ventura and pushed her into the corner of her bedpost in August 2013, causing the severe gash on her eyebrow, as described and pictured *supra* (*see* GX-B-247-A), the defendant made Ventura have a Freak Off in which she overdosed on GHB, blacked out, and woke up in the shower with the escort and the defendant "freaking out . . . outside the bathroom." (Tr. 696-97). The defendant then continued the Freak Off. (Tr. 697). Ventura's wound on her eyebrow from the assault was still open while all of this was occurring.

18

<u>*Threats to Humiliate Ventura*</u>

The defendant often recorded Freak Offs using video cameras, phones, iPads, and computers.  (PSR ¶ 14).  The defendant never asked Ventura's permission to film the Freak Offs, the defendant just started doing it.  (Tr. 569).  Ventura tried to delete the recordings after Freak Offs because she found the videos "Humiliating.  Disgusting.  I never wanted anyone to ever see me like that.  It just was not OK for me, and I felt, like, it was just tossed around, like, the idea of it was tossed around like it was nothing, like . . . Objectifying me and putting me in these really compromising gross positions with strangers. . . ."  (Tr. 570-71).

 The defendant frequently brought up the videos of Freak Offs involving Ventura when he was angry about something, using the videos to pressure her as "blackmail material."  (Tr. 410, 664).  The defendant told Ventura that he would release the sex videos to embarrass her and put her career in jeopardy.  (*Id.*; PSR ¶ 14).  Ventura was afraid that the defendant would release the videos, and feared for her own reputation, her family, and her career.  And the defendant knew that—he told her "[t]hat it could ruin everything [she] worked for.  Just make [her] look like a slut. [She] would be shamed. . ."  (Tr. 664-65).

One such incident took place after the defendant assaulted Ventura during the film festival in Cannes.  (PSR ¶ 20).  The defendant accused Ventura of stealing his drugs and kicked her off the yacht they were staying on.  (Tr. 699).  On the way back to New York City, Ventura switched seats on the airplane so she would not have to sit next to the defendant, but he followed her.  (PSR ¶ 20).  During the plane ride, the defendant played Freak Off videos on his computer for Ventura, and, as he did so, he told her that he was going to embarrass her and release them.  (*Id.*; Tr. 701-02).  Ventura "[c]ouldn't have felt worse. . . [She] just felt trapped . . .."  (Tr. 702).  When they

landed in New York, the defendant wanted a Freak Off. (*Id.*). Ventura went along with it to appease him and make him stop threatening her. (*Id.*).

The blackmail occurred again in December 2011 after the defendant discovered that she had been seeing Mescudi, as referenced *supra*. (Tr. 784). The defendant threatened to release two explicit sex tapes, one on Christmas Day, either before or right after, and another one sometime soon after that. (Tr. 784; GX B-315). Shortly after the defendant threatened to release Freak Off videos, the defendant demanded that Ventura's parents pay him $20,000 that he had spent on Ventura in early December that year. (Tr. 1872). Ventura's parents took out a home equity loan to wire the defendant $20,000. (Tr. 1872-73; GX 4G-151).

## B.  The Defendant's Relationship With Jane

Jane testified for approximately five days about her relationship with the defendant, which lasted from approximately 2021 until the defendant was arrested in September 2024. The defendant introduced Jane to "Hotel Nights," which were substantially the same as the Freak Offs he engaged in with Ventura. Jane became increasingly vocal about not wanting to do Hotel Nights, but the defendant pressured her to do them until he was arrested.

### *Early Relationship*

Jane first met the defendant in late 2020, and started a relationship with him in early 021. (Tr. 4554; PSR ¶ 32). In the first few months of their relationship, the defendant gave Jane money and jewelry, took her on expensive vacations, and lavished her with attention and quality time. (PSR ¶ 32). Jane's early relationship with the defendant was intense, and she fell for him quickly. (Tr. 4579-80). During this time, she talked about some of her prior relationships and confided in him about previous abuse she sustained. (PSR ¶ 32). The defendant quickly began to introduce elements of Hotel Nights into their sex life, including plying her with drugs. (Tr. 4578-79; PSR

¶ 33).  Prior to her relationship with the defendant, Jane had only consumed ecstasy on two prior occasions, but it became a staple of her sex life with the defendant.  (PSR ¶ 33).

One night in May 2021, Jane agreed to try a Hotel Night, but did not expect it to happen immediately.  (Tr. 4582).  To Jane's surprise, the defendant had set up their first Hotel Night only hours after she agreed to try it, securing a hotel, an escort from Cowboys 4 Angels, and the typical hotel room set up (*e.g.*, beverages, red lights, baby oil, and "stripper heels").  (Tr. 4584, 4587-88).  At the defendant's direction, Jane and the escort touched each other, rubbed oil on each other, performed oral sex on each other, and had intercourse, all while the defendant watched and masturbated.  (PSR ¶ 34).

Jane's expectation was that this was a one-night event.  (Tr. 4593).  But with that first Hotel Night in May 2021, she had opened a door that she was unable to shut for the remainder of her relationship with the defendant.  (*Id.*).

<u>Hotel Nights</u>

Although Jane only wanted to have sex with the defendant, and did not want to have sex with other men, Jane's relationship with the defendant quickly became mostly about Hotel Nights.  (Tr. 4593-94).  Jane estimated that 90% of the times she saw the defendant, they did a Hotel Night, with Hotel Nights sometimes taking place on a weekly basis.  (Tr. 4593; PSR ¶ 35).  Like Freak Offs, Hotel Nights followed a similar pattern: Jane and the escort engaged in prolonged foreplay, Jane performed oral sex on the escort for hours, and then Jane and the escort had sex, while the defendant directed the sexual activity, watched, masturbated, and regularly filmed Jane having sex with escorts.  (PSR ¶ 38).  The defendant also provided Jane with ecstasy, cocaine, and molly, which she felt she needed in order to get through the Hotel Nights.  (Tr. 4718, 4766, 4819-21).

Jane often had multiple "sessions" during Hotel Nights, including with multiple escorts. At the conclusion of their session, the male escorts were paid several thousand dollars in cash for having sex with Jane, provided by the defendant. (PSR ¶ 39). In total, Hotel Nights lasted approximately 24 to 30 hours or more, and Jane, fueled by drugs provided by the defendant, did not sleep during that time. (*Id.*). Jane often suffered from shoulder, back, and vaginal pain after Hotel Nights, and, like Ventura, frequently suffered from painful UTIs and yeast infections. (*Id.*).

Hotel Nights took place in Los Angeles, Miami, Turks and Caicos, and New York. (PSR ¶ 37). Jane often traveled to engage in Hotel Nights with the defendant, first from New Jersey, where she lived when they started dating, and then from Los Angeles, where she moved during their relationship. (PSR ¶ 35). When Jane traveled for Hotel Nights, her travel was often booked by the defendant's chief of staff, Khorram, or his travel agent, Jessica Ruiz. (*Id.*). Jane often communicated with Khorram, Ruiz, and other assistants to book travel. (*Id.*).

Both the defendant and Jane coordinated with male escorts to set up Hotel Nights. (PSR ¶ 36). For the most part, Jane coordinated with escorts at the defendant's direction, but on a handful of occasions, Jane could "hear the gray lines in between his words"—*i.e.*, she understood that the defendant expected a Hotel Night—and she arranged Hotel Nights as a "surprise" for the defendant. (*Id.*). The defendant and Jane used escorts from Cowboys 4 Angels, as well as Paul Arthur, who had also had sex with Ventura during Freak Offs. (*Id.*) These escorts also traveled to participate in Hotel Nights, and Khorram and Ruiz sometimes booked travel for escorts. (PSR ¶ 41). On other occasions, Jane booked travel for escorts and was reimbursed by the defendant. (*Id.*). The escorts who traveled for Hotel Nights included:

- Kabrale Williams, a/k/a "ATL," a/k/a "Chef," a/k/a "Sly," who was based in Atlanta and flew to New York, Los Angeles, and Miami for Hotel Nights (PSR ¶ 42(a));

22

- Paul Arthur, who traveled to participate in Hotel Nights in Los Angeles, Miami, and Turks and Caicos (PSR ¶ 42(b));

- "Reggie," who traveled from Las Vegas to Los Angeles for a Hotel Night (PSR ¶ 42(c)); and

- "Rico," who traveled from Las Vegas to Los Angeles for a Hotel Night (PSR ¶ 42(d)).

As time went on, Jane began expressing to the defendant—both in person and in writing—her desire to stop doing Hotel Nights.  (Tr. 4597).  For example, Jane was disappointed that she and the defendant "celebrated" her birthday in February 2022, and again in February 2023, with Hotel Nights.  After her birthday in February 2022, Jane told the defendant via text message:

> I don't ever want to do another hotel entertainment night w you.  I didn't even want to do those things w you on MY BIRTHDAY but I wanted to make sure we had fun.  I feel so cheap once again.

(GX A-104-21).  The following year, in February 2023, Jane implored the defendant:

> I didn't want to do all that on my birthday. . . . I don't throw sex in your face constantly.  But the type of nights we have are nights that require everything out of me . . . for 30-40 hours straight. I figured on my birthday you would switch it up for me.

(GX A-104-42).

### *Financial Control*

The defendant began paying Jane's $10,000 per month rent in April 2023.  Almost immediately thereafter, the defendant began to threaten to withhold Jane's rent when she pushed back about Hotel Nights, saying things like "We'll [*sic*] get over it pls.  Look at the roof over your head."  (GX A-442-29).  As a result, Jane felt obligated to do Hotel Nights, even though she did not want to.  (Tr. 4599, 4603).  As she wrote in a note to herself on her phone in October 2023, "U have made me feel so worried since day one over this place, the threats and innuendos that you're

going to take it away have been non stop since May." (GX E-331-J-R). The defendant's threats were constant. (Tr. 4598-99, 5043; GX A-442-35A).

From Jane's perspective, the defendant used the threat of withholding rent as a "tool" to get her to do things that she did not want to do—including Hotel Nights. (PSR ¶ 43). For example, in September 2023, Jane told the defendant that she did not want to fly from Los Angeles to see him in New York because she did not want to do a Hotel Night there: "I'm not coming to New York. . . . I don't want to be used and locked in a room to perform and fulfill your fantasies." (GX A-104-59-P; Tr. 4798-99). Jane added that "the only reason you have me around and why you pay for the house" was so that she would do Hotel Nights. Jane told the defendant she did not "want to feel obligated to perform these nights w you in fear of losing the roof over my head." (GX A-442-37; A-104-59). The defendant responded by promising Jane that they would not have a Hotel Night in New York, and that it would "just be [them]." Instead of having a Hotel Night, they would have "romantic one-on-one time together in New York," which is all Jane wanted from the relationship. (Tr. 4798-99). Jane believed the defendant and boarded a flight to New York, which Khorram and Ruiz had coordinated. (Tr. 4798; GX 1407, C-229). Jane did not realize that even while the defendant was making her promises about alone time, he was reaching out to escorts for a Hotel Night. (GX 1407).

When Jane was in the air on her way to New York City, the defendant texted Jane about entertainment for a Hotel Night—despite his earlier promises. (Tr. 4799-4800). After Jane landed in New York City, the defendant gave Jane ecstasy, and they had a Hotel Night with a new Cowboys 4 Angel escort and Kabrale, who traveled from Atlanta to New York. (*See* Tr. 4800-07). The only "romantic one-on-one time" that Jane and the defendant spent together was going to a bar right before it closed where they argued about Jane no longer wanting to do Hotel Nights. (Tr.

4801-02).  After the New York Hotel Night, Jane made clear her anger at being pressured into Hotel Nights: "Even in nyc I said I did not want to go bc I knew you would pair me up with a random person and I was anxious and anxiety filled and you did still pair me up w some random man.  And u emotional [*sic*] manipulate me for years if ur not happy w certain sex performances." (GX A-104-74).

The next month, in October 2023, the same thing happened.  On October 16, 2023, Jane repeatedly told the defendant that she did not want to do a Hotel Night:

- "I don't want to be fucked and mistreated. I don't feel like performing love less cold sex"

- "I'm not a porn star I'm not an animal"

- "It's been three years of me having to fuck strangers"

- "I'm tired"

- "My spirit and my soul is tired I need a break mentally and spiritually"

- "Sex is sacred to me and I can't be used like this anymore. I just wanted to make u happy but it's creating a war inside me"

- "I need a break. I can't be in another hotel room doing drugs and performing exhausted for days"

(GX 1407, A-104-66).  The defendant promised her that they would not have a Hotel Night: "Let's spend the day.  Just me and you.  No strangers.  Please."  (GX 1407, A-104-66).  Jane continued to resist, and the defendant told her that he was coming over to her home, for which he paid rent, and asked her eight times, "Are you going to let me in our house???"  (GX 1407, A-104-70).  The next day, the defendant and Jane had a Hotel Night in Los Angeles.  (Tr. 5036; GX 1406, 1407).  Jane—for the first and only time—tried to do the Hotel Night without drugs.  (Tr. 5036).  The defendant made Jane have sex with three escorts, including Rico, who traveled from Las Vegas to Los Angeles for the Hotel Night.  (Tr. 5036-37; GX 1407).  Between the second and third escort,

Jane threw up.  The defendant directed her to go back to the hotel room and continue with the Hotel Night.  (Tr. 5037).

<u>Post-Ventura Lawsuit</u>

On November 16, 2023, Ventura filed a lawsuit against the defendant alleging some of the conduct described *supra*.[5]  The defendant settled with Ventura, paying her $20 million, the next day, but publicly denied Ventura's allegations.  (Tr. 828).  Jane saw the suit and was overwhelmed by the "harrowing resemblance" to what she had been experiencing with the defendant.  (Tr. 5068).  On November 19, 2023, Jane sent the defendant the following text message:

> I jus woke up bc I'm nauseous.. I've been crying for 3 days n under stress from reading all of this. I keep having nightmares about forced nights n all the times I felt like I couldn't say no. I feel like I'm reading my own sexual trauma it makes me sick how 3 solid pages word for word is exactly my experiences n my anguish. . . God finally woke me up out of this sick cycle n validated me again with all of this. The sick part is u knew this was coming n u gaslit me n made me feel crazy about the sex trauma I was developing. Knowing u been here before n this is just the sick game that u do! I feel manipulated.

(GX A-104-75).  The defendant called Jane shortly after she sent the text message, and recorded the call using Khorram's phone.  (PSR ¶ 48).  In the call, the defendant told Jane repeatedly that he should not be on the phone, and attempted to push back on Jane describing their Hotel Nights as "forced nights" by telling her that the Hotel Nights were "just some kinky shit that we both . . . enjoy."  (GX C-348-A-R-T).  When Jane disagreed with the defendant's characterizations, he cut her off and accused her of recording him.  (PSR ¶ 48).

The defendant called Jane a second time, again recording the call using Khorram's phone, this time explicitly telling Jane not to text him.  (GX C-348-B-R-T).  The defendant then told Jane

---

[5] The Government's investigation was opened on November 17, 2024.  (PSR ¶ 5).

that he needed her "friendship," and that if Jane "need[ed]" him too, "[she] ain't gotta worry about nothing else." (*Id.*). Jane interpreted the defendant's statements to refer to him continuing to pay her rent in exchange for her support. (Tr. 5085).

Two days later, the defendant sent a text message to Khorram to "[m]ake sure [the finance manager] is not doing anything dumb like not having that rent paid on time. Can you make sure she paid for this Month. Pls." (GX C-653-1). Khorram responded that "[the finance manager] said her rent was paid." (*Id.*).

Approximately a month later, on December 27, 2023, the defendant told Jane to "charge him" and said he did not want "any loose ends," which Jane understood to mean that the defendant was requesting that Jane come up with a monetary amount to "make peace with the situation." (Tr. 5101; GX A-301-I). Jane asked for $450,000 and described how she felt exploited, manipulated, and heartbroken. ((GX A-301-H). The defendant responded by texting Jane, "You're a liar FUCK YOU. IM BLOCKING YOU. LEAVE ME ALONE. BABY GIRL YOU'RE A LIER. OPPORTUNIST. FUCK YOU. IM CALL THE POLICE. YOUR TRYING TO MAKE UP SOME SHIT." (GX A-301-H). After this diatribe, Jane eventually responded: "U broke me / I'm gonna [k]ill myself / I hate my life / I just want to die." (*Id.*). Jane testified that when she sent those text messages to the defendant, she "just wanted everything to go black." (Tr. 5105).

In a FaceTime call the same day, the defendant threatened Jane that he would release videos of her from the Hotel Nights to her child's father. (Tr. 5107-08; GX A-301-I). Jane then reached out to Khorram and told her that the defendant was "threatening" to "expose [her] tapes and send them to [her] child's father." (GX C-251). Jane explained that these were "sex tapes where [she was] heavily drugged, and doing things he asked of [her] for the past three years." (GX C-251). Jane begged Khorram to stop the defendant. (GX C-251).

After the defendant threatened to release videos of Jane at Hotel Nights, Jane did not see or speak to the defendant until February 2024. (Tr. 5114). The defendant reached out to Jane before her birthday and said he would love to spend her birthday with her. (Tr. 5123; GX A-301-K). Jane responded, "I'm a little traumatized from my past birthdays and what they ultimately led to at the end of the night"—referring to the Hotel Nights that occurred on her two past birthdays—"I don't know. I'm just being honest." (Tr. 5115; GX A-301-K). Jane decided not to see the defendant, and the defendant said, "Well if you change your mind and want to have a wholesome birthday evening celebrating you let me know. Love." (GX A-301-K). Jane agreed to see the defendant for her birthday after she received his message. (Tr. 5129). Khorram or Ruiz booked her flight to Miami, where Jane expected to have one-on-one time with the defendant. (Tr. 5129-30). But after he gave her ecstasy, the defendant asked Jane to engage in a Hotel Night, notwithstanding his prior assurances to her. (Tr. 5131). Despite her telling the defendant for years that she did not want to do Hotel Nights, particularly on her birthday, it was the third year in a row Jane endured a Hotel Night on her birthday.

### *Violence*

In May 2024, surveillance video of the defendant beating Ventura during the Intercontinental Hotel Freak Off in March 2016, described *supra*, was released online. The defendant publicly responded to the surveillance footage shortly thereafter by releasing a video on Instagram committing to be a "better man." (Tr. 517, GX 9A-102).

Only one month later, in June 2024, the defendant viciously assaulted Jane and then forced her to take drugs and perform oral sex on an escort.

Specifically, on June 18, 2024, the defendant and Jane were at Jane's residence in Los Angeles, which had been set up for the night by one of the defendant's assistants, Jonathan Perez.

28

The defendant and Jane got into a verbal argument about another woman. (Tr. 5172-80). Jane initiated a physical altercation, including pushing the defendant's head into a counter; however, the argument escalated and Jane shortly thereafter tried to escape from the defendant by, among other things, locking herself into various rooms in her house. (Tr. 5180-82). The defendant responded by kicking down each of the doors. (Tr. 5182-85). Jane fled from her home and hid for several hours for safety. (PSR ¶ 53). She returned to her home, expecting the defendant to have left, but he was still there waiting for her. (*Id.*). She locked herself in a bedroom, but the defendant kicked down the door again. (*Id.*). That night, the defendant (i) kicked Jane's legs out from under her and picked her up in a chokehold and punched her; (ii) punched her in the face twice, leaving visible injuries; (iii) punched her and kicked her repeatedly when she was on the ground curled up in a ball; and (iv) smacked her in the face three times while she was showering resulting in Jane losing her balance and falling to the ground of the shower. (Tr. 5185-5202).

After the defendant finished beating Jane, he told her that she was not going to ruin his night. (Tr. 5203-05). He told her to ice her face and put on lingerie and high heels while he texted a male escort. (*Id.*) When the escort arrived, the defendant brought Jane into the bathroom, gave her a pill, and said "take this fucking pill. You're not going to ruin my fucking night. You better go out there. You're not going to ruin my fucking night. Get out there. Suck his dick. Fuck him. I don't care, just you're not going to ruin my fucking night." (Tr. 5211). Jane then performed oral sex on the escort until he ejaculated. (Tr. 5212-13). As a result of the defendant's attack that night, Jane had a black eye and bruising and welts on her head. (Tr. 5229-33; GX E-273 (video of bruising on Jane's eye and forehead), E-333 (video of bruising on Jane's eye)). The defendant, who is significantly larger in size than Jane, had no visible injuries from the altercation. (Tr. 5201, 5229).

29

Following this night, Jane traveled to see the defendant twice in Miami, where they had Hotel Nights.  (PSR ¶ 56).  Jane next planned to travel to see the defendant in New York in September 2024, but she did not end up going because the defendant was arrested.  (*Id.*).  At the time of his arrest, the defendant was staying in the Park Hyatt hotel in Manhattan.  Law enforcement searched his hotel room following his arrest, where they found $9,000 in cash, (Tr. 1390-91; GX 1D-141, 1D-151); MDMA and ketamine, (GX 1305); baby oil, (Tr. 1382-84, 1386; GX 1D-131, 1D-123); and Astroglide lubricant, (Tr. 1382-84, 1386; GX 1D-131, 1D-132, 1D-133).

### C.  The Defendant Used His Vast Resources to Perpetrate the Offense Conduct

The defendant directed his staff—including personal assistants, his chief of staff, security personnel, and travel agents—to facilitate the offense conduct.  As discussed above, Khorram, Ruiz, and personal assistants helped book or coordinate travel for Ventura, Jane, and male escorts.

Personal assistants, often directed by Khorram, were integral in setting up hotel rooms for Freak Offs and Hotel Nights.  (PSR ¶ 40).  Several of the defendant's former assistants testified at trial, including David James, George Kaplan, Jonathan Perez, and Brendan Paul.  Each testified that as part of their job responsibilities, they set up and cleaned hotel rooms for the defendant, which included, among other things, bringing condoms, lubricant, and baby oil to hotel rooms, purchasing lingerie for Jane, delivering or purchasing drugs for the defendant, and cleaning up the aftermath of hotel rooms.  (*Id.*).  Some witnessed evidence of the Freak Offs—James saw a naked stranger in a hotel room as Ventura appeared passed out in the bed (Tr. 1767-68), and Perez saw a video of Jane having sex with an escort (Tr. 6133-34).

The defendant's staff was also on hand to ensure that the defendant had drugs for Freak offs and Hotel Nights and cash to pay escorts.  (PSR ¶¶ 39, 40).  The defendant often had personal assistants or security personnel bring cash to hotel rooms so that escorts could be paid.  (*Id.*).  In

addition, assistants and security were responsible for ensuring that the defendant's "Gucci pouch" containing many types of drugs arrived at hotel rooms before a Freak Off or Hotel Night commenced.  And when the defendant ran out of drugs during Freak Offs or Hotel Nights, he called assistants or members of his security team to bring him more drugs, which helped fuel the marathon sessions.  (*Id.*).

The defendant's staff also facilitated the defendant's years of physical abuse.  For example: Bonds was in the car when the defendant stomped on Ventura's face, (Tr. 765); Rube saw the defendant viciously kick Ventura after the defendant discovered Ventura's relationship with Mescudi, (Tr. 2604); D-Roc and James Cruz saw the defendant punching and kicking Ventura as she cowered under a toilet, (Tr. 796); and Kaplan saw the defendant throwing glasses at Ventura as they shattered next to her head, (Tr. 2276-2279).  At no point did they intervene to help Ventura—rather, they helped the defendant avoid detection and keep Ventura within the defendant's control.  After the defendant stomped on Ventura's face and Ventura attempted to flee, Bonds ran after her, caught her, and took her to the London Hotel where the defendant made her stay until her injuries healed.  (Tr. 765).  D-Roc kept a close eye on Ventura after physical assaults, keeping the defendant updated about the appearance of her injuries and telling the defendant when to reach out to her.  (GX A-905-A, GX H-104).  D-Roc and Khorram helped the defendant destroy evidence of his assault of Ventura at the Intercontinental Hotel in March 2016, discussed *infra*. The defendant's staff was aware of his mistreatment of Jane, as well.  For example, Khorram knew that the defendant threatened to release her sex tapes.  (GX C-251).

### D.  The Defendant Abused Others

In addition to the defendant's abuse of Ventura and Jane, evidence at trial also established that the defendant physically, sexually, and emotionally abused many other individuals between 2008 and 2018.

31

*Mia*

Mia worked for the defendant from approximately 2009 through 2017, first as his personal assistant and then for his film company, Revolt Films. (Tr. 3203-04). The defendant required that Mia work grueling hours; once, she worked five days straight without sleep. (Tr. 3213-14). During the time she worked for the defendant, the defendant abused Mia physically, psychologically, and sexually.

When Mia worked for the defendant, the defendant sexually assaulted her multiple times. (Tr. 3205, 3322). The first assault occurred at the defendant's 40th birthday party at the Plaza Hotel in Manhattan, when Mia was a few months into her job as the defendant's personal assistant. (Tr. 3322-23). At that party, the defendant gave Mia two shots of vodka that affected her more than alcohol typically did at that time. (Tr. 3324-25). The defendant then pinned Mia against a wall, kissed her, and put his hand up her dress without her consent. (Tr. 3325-26). After this, the defendant sporadically sexually assaulted Mia when his girlfriends were not around. (Tr. 3335-37). For example, the defendant raped Mia in the bedroom where she was sleeping in one of his homes, and he forced Mia to perform oral sex on him in the bedroom closet of another of his homes. (Tr. 3331-35).

The defendant was also physically violent toward Mia. The defendant threw things at Mia when he was upset with her. (Tr. 3306). He once threw a computer at her head when she could not immediately fix the Wi-Fi on a music video set, (Tr. 3310-11), and on another occasion, he threw a bowl of spaghetti at her when she tried to use the bathroom before running an errand for him, (Tr. 3306-08). He also threw her against a wall at Ventura's apartment, (Tr. 3254), and repeatedly slammed her arm into a heavy door in the Revolt TV office in Los Angeles after taking her phone, (Tr. 3313-15).

The defendant also frequently threatened Mia's livelihood and physical safety.  For example, when Mia was in South Africa with Ventura in 2015, the defendant threatened to fire Mia—both making the threat himself and through Khorram—and to kill Mia if she did not get Ventura on the phone.  (Tr. 3390-92; GX C-508, 3T-101).  The defendant had threatened Mia's job many times before, and Mia took those threats seriously.  (Tr. 3391-92).

In addition to the defendant's violence toward Mia herself, Mia also witnessed the defendant's violence against Ventura and its after-effects.  (Tr. 3248-49).  Mia saw Ventura with a variety of injuries, including bruising on her body, busted lips, and black eyes.  (Tr. 3276).  When Ventura was injured, the defendant had Mia check on her and bring her things she needed, like arnica gel to help heal her bruising.  (Tr. 3280-81).  At times, the defendant required that Mia stay in hotels with Ventura while Ventura's visible injuries healed.  (Tr. 3281-82).

### *Deonte Nash*

Nash worked as a stylist for Ventura and the defendant from in or around 2008 to in or around 2018.  (Tr. 2944).  During that time, the defendant physically assaulted Nash on several occasions when Nash did not comply with his directives, including one instance in which the defendant choked Nash, (Tr. 3008-09), and another occasion when the defendant repeatedly hit Nash in the head, (Tr. 2990) (*see also* Tr. 3254 (Mia's testimony that "[A]t some point [the defendant] had Deonte in . . . a position where I was like scared he was going to . . . kill him")).

Like Mia, Nash also witnessed the defendant's violence against Ventura and its after-effects.  (Tr. 2980-87, 2989-90, 3004, 3196).  Nash frequently saw bruising on Ventura's legs, arms, and neck during her relationship with the defendant, (Tr. 3005-07), and frequently assisted Ventura in hiding from the defendant to prevent further violence, (Tr. 2998-3000, 3011-13).  Nash also witnessed the defendant's emotional abuse of Ventura, including referring to Ventura as a

bitch, slut, and hoe. (Tr. 2947-48). As early as in or around 2013, Ventura informed Nash that she did not want to have sex with other men at the defendant's direction. (Tr. 2994-95, 3014-20).

### *Bryana Bongolan*

Bongolan was a friend of Ventura's who often stayed over at Ventura's apartment in Los Angeles, California. (Tr. 4253-54, 4256-57, 4262). When Bongolan was sleeping, there were times that the defendant would come over and bang on the door in the middle of the night. (Tr. 4262-63). One time, the defendant entered the apartment and threw a knife at Ventura, who threw it back. (Tr. 4263-65). On another occasion in or about September 2016, the defendant held up Bongolan on Ventura's seventeenth-floor balcony and screamed at her before throwing her on the balcony furniture, resulting in injuries to Bongolan's legs, back, and neck. (Tr. 4252-53, 4281-87, 4289-95, 4449-4501; GX C-361-C (September 2016 text from Ventura to Khorram about balcony incident)).

### *Kerry Morgan*

Morgan was a close friend of Ventura's from approximately 2001 to 2018. (Tr. 1584). In 2018, the defendant entered Ventura's house unannounced when Morgan was there. (Tr. 1619). Ventura locked herself in a bathroom and the defendant came up behind Morgan and choked her, resulting in fingermarks on her neck. The defendant also threw a wooden hanger at Morgan's head. (Tr. 1619, Tr. 806 (Ventura's testimony about the incident)). Morgan suffered from a concussion, vomiting, and dizziness due to the defendant's assault and visited an urgent care facility to obtain medical treatment. (Tr. 1621).

### *Jourdan Atkinson*

Jourdan Atkinson worked as the defendant's personal chef from approximately 2007 to 2010. In or around 2008, Atkinson and the defendant got into a verbal fight and the defendant

pushed Atkinson, which caused her to fall backwards down a flight of stairs. After this altercation, the defendant instructed David James to file a false police report indicating that she had been the aggressor. (Tr. 1862-63).

*Gina Huynh*

The defendant began a romantic relationship with Virginia "Gina" Huynh in approximately 2014 that continued through approximately 2022. As witnessed by the defendant's then personal assistant, George Kaplan, the defendant attacked Huynh at the defendant's Miami residence by throwing apples from a decorative bowl at Huynh's head. (Tr. 2285-86). Later that evening, Kaplan observed Huynh trying to leave the defendant's residence, but the defendant's security did not permit her to leave. (Tr. 2287-88; *see also* GX A-629-A (not admitted) (text message from Paul Offord, the defendant's former head of security, referencing incident between the defendant and Huynh and warning he defendant "if ANY ONE called the police the police is 100 percent going to lock you")).

### E.    The Defendant Engaged in Other Misconduct

Several other instances of the defendant's misconduct were detailed at trial, including the non-exhaustive examples below.

*December 2011 Kidnapping & Break-in*

As discussed *supra*, in December 2011, the defendant discovered during a Freak Off that Ventura had begun dating Mescudi, a musician. (PSR ¶ 24). The defendant tried to attack Ventura with a corkscrew, but she fled. The defendant had Rube, one of his security personnel, drive him to Capricorn Clark's apartment, where he pounded on Clark's front door with a gun. (PSR ¶ 25). The defendant demanded that Clark go with him and Rube to Mescudi's house in the Hollywood Hills, where the defendant said that he was going to kill Mescudi. (*Id.*; Tr. 2586-87). Despite Clark telling the defendant that she did not want to go with him, the defendant—still armed with

35

the gun—forced Clark to accompany him to Mescudi's home. (PSR ¶ 25). Mescudi was not at home when the defendant arrived, and the defendant and Rube broke into Mescudi's house. (*Id.*). Los Angeles Police Department ("LAPD") Officer Christopher Ignacio responded to a 911 call reporting a break-in at Mescudi's home, and observed a black Cadillac with license plates registered to Bad Boy Productions, the defendant's company, drive by the home twice. (Tr. 2832-33).

After the break-in, the defendant made Clark bring Ventura to his home, where, as detailed above, he kicked Ventura repeatedly while she was on the ground, despite Clark's pleas to the defendant's security team to make him stop. (Tr. 2605-06).

### *January 2012 Arson*

After the break-in and beating, the defendant was still furious. As described *supra*, he threatened to release videos of Ventura at Freak Offs. (PSR ¶ 26). He also told Ventura that he would hurt her and Mescudi. Specifically, the defendant told Ventura that he would have Mescudi's black Porsche blown up when he was out of the country. (PSR ¶ 27). On January 9, 2012, the City of Los Angeles Fire Department ("LAFD") responded to a 911 call reporting that Mescudi's Porsche had been firebombed. (*Id.*). The firefighters who responded to the call recovered a Molotov cocktail that had been dropped into the vehicle through a cut on the canvas roof. (*Id.*). The LAFD arson investigator concluded that the Porsche had caught fire due to arson, and that the vehicle had been targeted. (PSR ¶ 28).

Mescudi and the defendant met after the arson. (PSR ¶ 29). At the meeting, Mescudi told the defendant that he was no longer dating Ventura. (*Id.*). There were no more break-ins to or firebombs of Mescudi's property following his meeting with the defendant. (*Id.*). Years later, the

36

defendant ran into Mescudi and the defendant apologized to him, saying "Man, I just want to apologize for everything and all that bullshit." (*Id.*).

*March 2016 Bribery*

After the defendant assaulted Ventura at the Intercontinental Hotel in Century City in March 2016, described *supra*, the defendant attempted to bribe Israel Florez, a hotel security guard, to stay silent. (PSR ¶ 57). Florez refused the bribe. Hours later, the defendant and his staff, led by Khorram, persistently pursued getting a copy of the video showing the assault. (*Id.).*

Eventually, Khorram reached Eddy Garcia, another hotel security guard. (PSR ¶ 58). Khorram repeatedly reached out to Garcia to see the video, and eventually had the defendant speak to Garcia directly. (*Id.*). The defendant told Garcia that "he had a little too much to drink and . . . you know . . . how things was . . . with women," and that if the video got out, "it could ruin him." (*Id.*). Garcia and his boss eventually agreed to sell the video to the defendant for $50,000. (*Id.*).

The defendant arranged for Garcia to bring the video on a USB drive to his office in Los Angeles, where the defendant met Garcia with Khorram and a bodyguard. (PSR ¶ 59). Before providing the defendant with the USB drive, Garcia expressed concern that he could get into trouble if Ventura filed a police report in connection with the assault. (*Id.*). The defendant assured Garcia that Ventura would not file a police report, and even called Ventura via FaceTime and instructed Ventura to tell Garcia that she did not plan to file a police report. (*Id.*). Garcia gave the defendant the USB and signed an affidavit on Combs Enterprises letterhead indicating that he was providing the defendant with the sole copy of the video, as well as a non-disclosure agreement. (*Id.*). The defendant then provided Garcia with $100,000 in cash, which the defendant personally ran through a money counter and put in a brown paper bag. (*Id.*). As Garcia left the office, the

37

defendant directed him not to make any big purchases.  (*Id.*).  The defendant checked in with Garcia a few days later to confirm that no one had spoken of the assault or the missing video.  (*Id.*).

*Drug Use & Distribution*

Multiple witnesses testified about the defendant's extensive distribution and use of illegal drugs.  Ventura and Jane testified that the defendant introduced them to drugs early in their relationships, and provided drugs to them at every Freak Off or Hotel Night.  Jane transported drugs from Los Angeles to Miami for the defendant on several occasions.  (Tr. 4720-26).  In addition, each former assistant described their involvement in providing drugs to the defendant, including by liaising with the defendant's drug dealers, transporting the so-called "Gucci pouch," and filling prescriptions for the defendant in their names when the defendant had exceeded the amount of controlled substances he could obtain under his own name.  (Tr. 1769-73 (David James), Tr. 2233, 2240-44 (George Kaplan), Tr. 2561, 2565-68 , 2570-71 (Capricorn Clark), Tr. 3303-04 (Mia), Tr. 6148-49, 6151-54 (Jonathan Perez), Tr. 6817-22, 6825-27 (Brendan Paul).  In addition, several former assistants testified about the defendant pressuring them to use drugs.  (Tr. 3297-3301 (Mia testifying about the defendant telling her that he had "the best drugs" and pressuring her to be part of the "breakfast club"), Tr. 6832-33 (Brendan Paul testifying about the defendant telling him to take tusi to see if it was "good" before the defendant took it himself).  Drugs were found in the defendant's residences during the raids in March 2024, as well as in the defendant's hotel room when he was arrested in September 2024.  (GX 1305, 1306).

The defense dismisses this criminal conduct as "sex, drugs and rock and roll" (Def. Mem. 59), but that is just another way of saying that the consequences for the average person of committing crimes don't apply to the defendant (*contra* Tr. 6793-94 (Brendan Paul testifying about being arrested after he had forgotten that he put the defendant's cocaine in his own luggage)).

### III.  The Sentencing Guidelines

The Government submits that the Guidelines range is 240 months' imprisonment, the statutory maximum, based on a combined offense level of 42 and a criminal history category of I. This calculation is based principally on the cross-reference in § 2G1.1 to § 2A3.1 for offenses involving conduct described in 18 U.S.C. § 2422, namely, "engaging in, or causing another person to engage in, a sexual act with another person by threatening or placing the victim in fear (other than by threatening or placing the victim in fear that any person will be subject to death, serious bodily injury, or kidnapping)."  U.S.S.G. § 2G1.1(b)(c)(1) & app. note 4 (hereinafter, the "Threats-or-Fear Cross-Reference").  Because the evidence presented at trial, including in support of the offenses of conviction, plainly establishes that the defendant's conduct meets this definition, the Court should apply the Threats-or-Fear Cross-Reference.

Probation calculated the applicable Guidelines range as 70 to 87 months' imprisonment, based on an offense level of 27 and a criminal history category of I.  (PSR ¶ 227).  In reaching this calculation, Probation declined to apply the Threats-or-Fear Cross-Reference.  As described in more detail below, the Government submits that the law and the facts call for application of the Threats-or-Fear Cross-Reference.  However, even if the Court follows Probation's recommendation and does not apply the cross-reference, two additional enhancements apply beyond those included by Probation.  These are the vulnerable victims enhancement and the obstruction of justice enhancement.  Applying these enhancements to the range as calculated in the PSR would result in a Guidelines range of 108 to 135 months' imprisonment.

The defendant urges the Court—contrary to the Guidelines and the facts—not to apply the Threats-or-Fear Cross-Reference or any enhancements.  Without any basis in law, the defendant also asks the Court to use multiple Guidelines manuals from different years to give him the benefit of the zero-point offender reduction and to give him acceptance-of-responsibility points despite

his denials of guilt before, during, and after trial.  For the reasons discussed below, the Court should adopt the Government's Guidelines calculation and reject the defendant's invitations to ignore the law and facts in arriving at its calculation.

### A.  The Government's Guidelines Calculation

The parties and Probation agree that the applicable Guideline for the defendant's Mann Act convictions is U.S.S.G. § 2G1.1, (PSR ¶ 83), and that the defendant has zero criminal history points, (PSR ¶ 156).  The Government's Guidelines calculation, applying the 2024 Guidelines Manual and the Threats-or-Fear Cross-Reference, is as follows:

- Pursuant to § 3D1.2, because there are two counts with two separate victims, there are two groups (one for Ventura and one for Jane).

- Pursuant to U.S.S.G. § 2G1.1(c)(1), the Threats-or-Fear Cross-Reference applies to each group.

- Pursuant to U.S.S.G. § 2A3.1(a)(2), the base offense level is 30 for each group.

- Pursuant to U.S.S.G. § 2A3.1(b)(4)(B), because a victim sustained serious bodily injury, two levels are added to each group.

- Pursuant to U.S.S.G. § 3A1.1(b)(1), because the defendant knew or should have known that a victim of the offense was a vulnerable victim, two levels are added to each group.

- Pursuant to U.S.S.G. § 3B1.1, because the defendant was an organizer or leader and the criminal activity involved five or more criminal participants or was otherwise extensive, four levels are added to each group.

- Pursuant to U.S.S.G. § 3C1.1, because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of Counts Three and Five, and the obstructive conduct related to those counts and relevant conduct, two levels are added to each group.

- In calculating the combined offense level, pursuant to U.S.S.G. § 3D1.4(a), Ventura and Jane's groups each have the highest offense level, with an offense level of 40, and each represents one Unit; and

- Pursuant to U.S.S.G. § 3D1.4, there are a total of two Units, so two levels are added.

Accordingly, the defendant's total offense level is 42, and he is in criminal history category I. This results in a Guidelines range of 360 months' to life imprisonment, which is capped at 240 months' imprisonment, the statutory maximum.

For the reasons described below in Section IV.B.2.a, the Court should apply the Threats-or-Fear Cross-Reference. If it does not, however, the Government submits that the Guidelines range should be calculated under the 2024 Guidelines Manual as follows:

- Pursuant to U.S.S.G. § 2G1.1(d), because Counts Three and Five involved more than one victim, Chapter Three, Part D is applied as if the promoting of a commercial sex act with respect to each victim had been contained in a separate count of conviction. Application Note 1 defines "victim" for purposes of § 2G1.1 to mean "a person transported, persuaded, induced, enticed, or coerced to engage in, or travel for the purpose of engaging in, a commercial sex act or prohibited sexual conduct, whether or not the person consented to the commercial sex act or prohibited sexual conduct." Here, there are five victims of Count Three (Ventura; Clayton Howard, a/k/a "Dave"; Jules Theodore; Julian Sapp, a/k/a "LA Strip"; and an unnamed Cowboys 4 Angels escort), and five victims of Count Five (Jane; Paul Arthur; Kabrale Williams, a/k/a "ATL," a/k/a "Chef"; Reggie; and Rico). Each of these victims is treated as a separate group, as described in the PSR. U.S.S.G. § 2G1.1, app. note 5. (*See* PSR ¶¶ 86-145).

- Pursuant to U.S.S.G. § 2G1.1, the base offense level for each group is 14.

- Pursuant to U.S.S.G. § 2G1.1(b)(1)(B), because the offense involved fraud or coercion, four levels are added to Ventura and Jane's groups.

- Pursuant to U.S.S.G. § 3A1.1(b)(1), because the defendant knew or should have known that a victim of the offense was a vulnerable victim, two levels are added to Ventura and Jane's groups.

- Pursuant to U.S.S.G. § 3B1.1, because the defendant was an organizer or leader and the criminal activity involved five or more criminal participants or was otherwise extensive, four levels are added to each group.

- Pursuant to U.S.S.G. § 3C1.1, because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of Counts Three and Five, and the obstructive conduct related to those counts and relevant conduct, two levels are added to each group.

- In calculating the combined offense level, pursuant to U.S.S.G. § 3D1.4(a), Ventura and Jane's groups each have the highest offense level, with an offense level of 26, and each represents one Unit.

- Pursuant to U.S.S.G. § 3D1.4(a), one additional half-Unit is added for the remaining groups, which each have an offense level of 20, because they are five to eight levels less serious than Ventura and Jane's groups.

- Pursuant to U.S.S.G. § 3D1.4, there are a total of six Units, so five levels are added.

This results in a total offense level of 31, and a Guidelines range of 108 to 135 months' imprisonment.

### B. Guidelines Disputes

The parties have six general categories of Guidelines disputes:

(1) whether the Court should consider the defendant's abuse in assessing the applicable Guidelines;

(2) whether the Threats-or-Fear Cross-Reference applies, and if so, whether § 2A3.1's serious bodily injury enhancement also applies;

(3) if the Court does not apply the Threats-or-Fear Cross-Reference, whether § 2G1.1's enhancements for multiple victims and for an offense involving fraud or coercion apply;

(4) whether the Section 3 enhancements for aggravating role, vulnerable victims, and obstruction of justice apply;

(5) whether the defendant qualifies as a zero-point offender under § 4C1.1(a); and

(6) whether the defendant should receive acceptance-of-responsibility points.

For the reasons described below, the Court can and should consider the defendant's abuse, as well as his organization of others and his obstruction, for two primary reasons. First, the Guidelines definitions that give rise to the Threats-or-Fear Cross-Reference, and also that give rise to the fraud or coercion and obstruction enhancements, are distinct from any question that was submitted to the jury. Nothing in the jury's verdict suggests that these constitute "acquitted conduct" for purposes of the Guidelines. Second, even if any of this conduct constituted "acquitted conduct," which it is not, the evidence to support both the Threats-or-Fear Cross-Reference and

42

the relevant sentencing enhancements is evidence that establishes, in whole or in part, the offenses of conviction, and thus should be considered as relevant conduct under the Guidelines.  *See* U.S.S.G. § 1B1.3(c).  As a result, the Threats-or-Fear Cross-Reference, as well as § 2A3.1's serious bodily injury enhancement, apply, as do the Section 3 enhancements for vulnerable victims, aggravating role, and obstruction of justice.  Even without the cross-reference, § 2G1.1's enhancements for multiple victims and fraud or coercion apply.  Under either calculation, the defendant is not a zero-point offender and has not accepted responsibility for his conduct, so he should not receive any of the Guidelines reductions he seeks.

### 1.  Applicable Law

#### a. In Calculating the Guidelines Range, the Court Should Consider All Relevant Conduct That Establishes the Offenses of Conviction

When conducting a Guidelines calculation, the sentencing range "*shall* be determined" by considering all "relevant conduct," which is broadly defined in § 1B1.3 of the Guidelines.  U.S.S.G. § 1B1.3(a) (emphasis added).  That section explains that relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  U.S.S.G. § 1B1.3(a)(1).  The defendant relies heavily on a limitation to this definition for "acquitted conduct" that was added to the 2024 Guidelines Manual.  *Id.* § 1B1.3(c).  However, as discussed in more detail below, the "acquitted conduct" issue does not arise in this case, because there is nothing in the jury's verdict that indicates that the jury "acquitted" the defendant of the conduct giving rise to the Threats-or-Fear Cross-Reference, or of the conduct giving rise to any of the sentencing enhancements proposed by the Government.  This is entirely unlike a case, for example, in which a jury acquits a defendant of murder but the

Government seeks application of the murder guidelines, relying on facts that the jury necessarily did not find proven beyond a reasonable doubt at trial.  *See McClinton v. United States*, 600 U.S. ---, 143 S. Ct. 2400 (2023) (statement of Sotomayor, J., respecting denial of certiorari).[6]

This is different from such a case because here the application of the relevant cross-reference and the relevant sentencing enhancements are based on facts that are distinct from any element that the jury necessarily rejected in reaching its verdict.  Indeed, the jury was not presented with—and did not opine on—the conceptually distinct questions posed in applying the Guidelines' cross-reference.  And while the defense tries to conflate the jury's verdict with the rulings now before the Court, (*see* Def. Mem. 65), it bears noting that the Court is not permitted draw "any factual inferences" about the Government's evidence from an acquittal.  *United States v. Watts*, 519 U.S. 148, 155 (1997) (per curiam).  Moreover, the acquittals here could have been for many reasons other than a rejection of the defendant's force, fraud, or coercion, including, for example, a failure to prove that the defendant *intended* for his force, fraud, or coercion to *cause* the victim

---

[6] For these reasons, this case is also unlike the host of other cases cited by the defendant and where federal jurists expressed concern about the use of acquitted conduct at sentencing.  For example, in *Jones v. United States*, Justice Scalia raised concerns about the use of acquitted conduct at sentencing where "[p]etitioners were convicted of distributing drugs, but acquitted of conspiring to distribute drugs" and yet, at sentencing, the district judge "found that petitioners had engaged in the conspiracy of which the jury acquitted them."  574 U.S. 948, 948 (2014) (Scalia, J., dissenting).  Similarly, in *United States v. Tapia*, the Second Circuit expressed these concerns where the jury had been asked to determine the specific "quantity of drugs involved in the conspiracy," and despite selecting a lower quantity, the district judge sentenced the defendant based on a higher quantity of which the jury had specifically acquitted the defendant.  No. 21-1674, 2023 WL 2942922, at *1 (2d Cir. Apr. 14, 2023).  And, in *United States v. Bell*, Judge Millett was addressing a circumstance in which, at sentencing, the "district court found that Bell had engaged in the very cocaine conspiracy of which the jury had acquitted him."  808 F.3d 926, 929 (D.C. Cir. 2015) (Millett, J., concurring).  Put simply, the judges in those cases were concerned about "allowing judges to materially increase the length of imprisonment based on facts that were *submitted directly to and rejected by* the jury."  *Id.* at 930 (emphasis in original).  Here, as described *supra*, that is not the case.

to engage in the commercial sex act.  In other words, the factual issues underpinning application of the relevant cross-reference were not "*submitted directly to and rejected by* the jury," *Bell*, 808 F.3d at 930 (Millett, J., concurring) (emphasis in original), and so accordingly, the Government's proposed Guidelines calculations are fully respectful of and consistent with the jury verdict. Indeed, the Government does not, for example, contend that the offense level for a sex trafficking conviction under 18 U.S.C. § 1591(b)(1) applies.  *See* U.S.S.G. § 2G1.1(a)(1).  Accordingly, the Court does not need to reach the questions raised by the defendant about the use of "acquitted conduct" at sentencing.

However, even if the Court were to conclude that some of the conduct at issue was "acquitted conduct" as that term is used in the Guidelines, the Guidelines still provide that the Court should consider that conduct in determining the correct guidelines if it "establishes, *in whole or in part*, the instant offense of conviction."  U.S.S.G. § 1B1.3(c) (emphasis added).  The commentary to the Guidelines instructs that when "certain conduct underlies both an acquitted charge and the instant offense of conviction," as long as this "overlapping conduct" establishes, even only in part, the offense of conviction, the overlapping conduct is relevant conduct for the Guidelines calculation, notwithstanding the acquittal on other charges.  U.S.S.G. § 1B1.3, app. note 10.

The acquitted conduct exception to relevant conduct is new, and there is scant guidance from case law addressing its parameters.[7]  *See* U.S.S.G. App. C. Supp., amend 826 (Reason for

---

[7] Even though few courts have addressed this provision given that it took effect last November, some courts, including one in this District, have applied § 1B1.3(c) and nevertheless considered acquitted conduct, finding that it established in whole or in part the offense of conviction.  *See, e.g.*, *United States v. Lin*, No. 11 Cr. 114 (SHS), 2025 WL 401105, at *2 (S.D.N.Y. Feb. 5, 2025) (denying motion for reduction of sentence based on § 1B1.3(c) where the court calculated guidelines range based on a murder that underlie both a charge for causing death through use of firearm in the course of extortion, which was vacated, and a racketeering charge, which was

Amendment) (acknowledging difficulty in parsing acquitted and convicted conduct in such cases and opting to leave the relevant conduct determination to the court "based on the individual facts" rather than "defin[ing] specific boundaries of 'acquitted conduct' and 'convicted conduct'").  The Commission, however, has provided some guidance.  In connection with its adoption of the amendment, the Commission stressed that "while 'acquitted conduct' cannot be considered in determining the guideline range, *any* conduct that establishes—in whole *or in part*—the instant offense of conviction is properly considered, even as relevant conduct and even if that same conduct also underlies a charge of which the defendant has been acquitted."  U.S.S.G. App. C. Supp., amend 826 (Reason for Amendment) (emphasis added).  The plain text of the guideline, its application notes, and the Sentencing Commission's statement—all of which repeatedly use the phrase "in whole *or in part*" when describing circumstances in which acquitted conduct may nevertheless be relevant conduct—emphasize the limited scope of § 1B1.3(c)'s carveout for acquitted conduct.  Ultimately, the Commission calls upon the Court to determine whether the defendant's conduct (proven by a preponderance of the evidence) establishes to any extent the offense of conviction.  *See id.*; U.S.S.G. § 1B1.3(c), app. note 10.

The defendant asks the Court to construe the limitation on use of acquitted conduct broadly in a manner that benefits him, but that approach is unsupported by the guideline itself and by the

---

affirmed); *United States v. Scott*, No. 21 Cr. 491-3, 2025 WL 1172170, at *3 (N.D. Ohio Apr. 23, 2025) (taking into consideration evidence of acquitted conduct because "where the offense of conviction also establishes what would otherwise be acquitted conduct, then the sentencing court may take the acquitted conduct into account in its guideline calculation"); *United States. v. Shafa*, No. 20 Cr. 40021 (D. Mass. Sept. 5, 2024), Dkt. 267, 269 (applying fraud cross-reference at sentencing even though the defendant was acquitted of counts requiring intent to defraud based on court's determination, "[a]fter presiding over the entirety of the Defendant's trial," that the defendant "engaged in fraudulent conduct that establishes, in whole or in part, the instant offenses of his conviction").

drafting history of the guideline. The defendant argues that the conduct that could "establish" the offense of conviction in this context is limited to "conduct that actually *establishes the elements of* the offense of conviction," (Def. Mem. 65), but that requires too much. Even accepting that "establish" in this context requires that the acquitted conduct at issue tend to prove an element of the offense of conviction, the Commission, by its use of the phrase "establish, in whole *or in part*," clearly did not intend to limit consideration of acquitted conduct to conduct that on its own is sufficient to establish an element of an offense.

Indeed, the Commission knew how to limit conduct only to that which constituted elements of crimes, but did not do so here. In its proposed amendment to § 1B1.3(c), on which it sought public comment, one of the Commission's proposed definitions of "acquitted conduct" was "conduct (*i.e.*, any acts or omission) . . . *constituting an element of* . . . a charge of which the defendant has been acquitted by the trier of fact in federal court or upon a motion of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure." United States Sentencing Commission, Federal Register Notice of Proposed 2023-2024 Amendments 51, https://www.ussc.gov/sites/default/files/pdf/amendment-process/federal-register-notices/20231222_fr-proposed-amdts.pdf (last accessed Sept. 29, 2025) (emphasis added). The Commission did not use comparable language in adopting its final amendment to § 1B1.3(c), either in the definition of acquitted conduct or in its explanation of what acquitted conduct can be considered relevant. Instead, it allowed any conduct that establishes "in whole or in part" the offense conduct to be considered as relevant conduct—an analysis more similar to the relevance test under the Federal Rules of Evidence. *See* Fed. R. Evid 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

Not only does the defendant argue that acquitted conduct can only be considered where it "actually establishes the elements" of the offense of conviction, he also makes an unfounded logical leap, claiming that only conduct that is "*necessary* to prove the elements of the Mann Act convictions can constitute relevant conduct." (Def. Mem. 68) (emphasis added). In effect, the defendant proposes that where there is factual overlap between acquitted and convicted counts that the Court should consider only the minimum necessary conduct to achieve the counts of conviction, regardless of the evidence introduced at trial. His proposal of a "categorical approach" to this term in the Guidelines finds no support in the text of the Guidelines, the text of the application note, the published rationale of the Sentencing Commission, or any precedent. Moreover, that approach would be unworkable and unrealistic, as it would require the Court to parse each individual piece of evidence admitted at trial to determine a hypothetical alternative minimum quantum of evidence that would have been sufficient to carry the Government's burden on the counts of conviction. The Court should reject that argument and, to the extent it finds any conduct at issue for purposes of sentencing to have been "acquitted conduct," consider that conduct for Guidelines purposes if evidence of the conduct was admitted, in whole or in part, to establish the offenses of conviction. As discussed below, the evidence admitted to establish the Mann Act counts clearly supports a finding that the Threats-or-Fear Cross-Reference, as well as each of the Government's proposed enhancements, are applicable.

### b. There Is No Constitutional Impediment to Considering Acquitted Conduct at Sentencing

Again, there is no need for the Court to reach the constitutional issues raised by the defendant. While the defendant asserts repeatedly that he was "acquitted" of the conduct underlying the Government's proposed sentencing Guidelines range, he fails to explain how this Guidelines calculation is inconsistent with the jury verdict. Barring any such direct conflict with

a necessary finding of the jury, "it is impossible to know exactly why a jury found a defendant not guilty on a certain charge"; accordingly, "[w]ithout specific jury findings, no one can logically or realistically draw any factual inferences" about the Government's evidence. *Watts*, 519 U.S. at 155. Therefore, "[i]t is inappropriate for a sentencing court to speculatively conclude that a jury found or rejected a certain fact based on its verdict of acquittal, let alone to allow such conjecture to guide its sentence." *United States v. Martinez*, 110 F.4th 160, 174 (2d Cir. 2024); *see also id.* at 174-80 (holding district court's sentence was procedurally unreasonable, as well as substantively unreasonable, when district judge did just that).

But even if the Court were to conclude that to apply these Guidelines enhancements, it would necessarily have to find facts that the jury did not find beyond a reasonable doubt, there is no constitutional obstacle to doing so. The defendant's argument that doing so would "raise serious constitutional and fairness concerns," (Def. Mem. 70), is incorrect. As a matter of long-settled Supreme Court and Second Circuit precedent, this Court may consider conduct that was the subject of a charge on which the jury acquitted in determining the appropriate sentence for the defendant. And doing so, both as a general rule and in the circumstances of this case, does not raise the constitutional and fairness concerns suggested by the defendant. On the contrary, if the Court finds by a preponderance that the defendant committed certain conduct, it would be inconsistent with Section 3553(a) and with the Sentencing Guidelines, and would introduce unwarranted sentencing disparities, for the Court to close its eyes to that conduct in fashioning an appropriate sentence.

The primary problem with the defendant's arguments is that they are foreclosed by precedent. As the Supreme Court explained in *Watts*, 519 U.S. 148, "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge,

so long as that conduct has been proved by a preponderance of the evidence." *Id.* at 157.  This is because an acquittal "merely proves the existence of a reasonable doubt as to [a defendant's] guilt"; it "does not prove that the defendant is innocent[.]"  *Id.* at 155 (quoting *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361 (1984)).

In accordance with *Watts*, the Second Circuit has repeatedly held that district courts "may find facts relevant to sentencing—as opposed to elements of the offense—by a preponderance of the evidence and in so doing may take into account acquitted conduct when sentencing defendants."  *United States v. Johnson*, 507 F.3d 793, 797 (2d Cir. 2007); *see also, e.g.*, *United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005) (holding that "district courts may find facts relevant to sentencing by a preponderance of the evidence, even where the jury acquitted the defendant of that conduct"); *United States v. Muir*, 710 F. App'x 510, 510-11 (2d Cir. 2018) (defendant's arguments that consideration of acquitted conduct at sentencing "violated the Due Process and Double Jeopardy Clauses of the Fifth Amendment, and the Sixth Amendment's guarantee of trial by jury" were "foreclosed by circuit precedent"); *United States v. Shahid*, 486 F. App'x 915, 916-17 (2d Cir. 2012).  In short, the Second Circuit has rejected the very arguments raised by the defendant here and held that consideration of acquitted conduct does not violate the constitutional provisions on which the defendant relies.[8]

---

[8] Every other circuit court with criminal jurisdiction has reached the same conclusion.  *See, e.g.*, *United States v. Irizarry-Sisco*, 87 F.4th 38, 50-51 (1st Cir. 2023); *United States v. Ciavarella*, 716 F.3d 705, 735-736 (3d Cir. 2013); *United States v. Grubbs*, 585 F.3d 793, 798-799 (4th Cir. 2009); *United States v. Farias*, 469 F.3d 393, 399-400 & n.17 (5th Cir. 2006); *United States v. White*, 551 F.3d 381, 386 (6th Cir. 2008) (en banc); *United States v. Waltower*, 643 F.3d 572, 575-578 (7th Cir. 2011); *United States v. High Elk*, 442 F.3d 622, 626 (8th Cir. 2006); *United States v. Mercado*, 474 F.3d 654, 656-658 (9th Cir. 2007); *United States v. Magallanez*, 408 F.3d 672, 683-685 (10th Cir. 2005); *United States v. Siegelman*, 786 F.3d 1322, 1332-1333 & n.12 (11th Cir. 2015); *United States v. Settles*, 530 F.3d 920, 923-924 (D.C. Cir. 2008).

The defendant tries to downplay this wall of precedent by arguing that *Watts* addressed an argument under the Double Jeopardy Clause, and did not specifically consider other constitutional provisions such as the Sixth Amendment jury-trial right and the Due Process Clause.  (Def. Mem. 75).  That argument misses the clear import of *Watts*'s holding, which is that sentencing courts may take acquitted conduct into account at sentencing without offending the Constitution.  *See Watts*, 519 U.S. at 157; *see also, e.g.*, *Alabama v. Shelton*, 535 U.S. 654, 665 (2002) (citing *Watts* for proposition that a sentencing court may also take into account a defendant's prior criminal conduct, even if the defendant was acquitted of that conduct in a prior case, without offending Due Process).  And the Second Circuit has expressly held that the Due Process Clause and the Sixth Amendment, as well as the Double Jeopardy Clause, all permit consideration of acquitted conduct at sentencing.  *Muir*, 710 F. App'x at 510; *see also Grubbs*, 585 F.3d at 798-99 (describing *Watts* as "clear Supreme Court . . . precedent holding that a sentencing court may consider uncharged and acquitted conduct in determining a sentence, as long as that conduct is proven by a preponderance of the evidence").

Indeed, *Watts* is incompatible with the defendant's core premise: that consideration of acquitted conduct as part of sentencing contravenes the jury's verdict or punishes the defendant for a crime for which he was not convicted.  If consideration of such conduct at sentencing were in fact a re-prosecution of the acquitted charges, as the defendant alleges, it is difficult to see how *Watts* could have found it compatible with the Double Jeopardy Clause.  As the Supreme Court explained, a jury's determination that the government failed to prove a fact beyond a reasonable doubt does not have preclusive effect in contexts in which a lower standard of proof applies.  *Watts*, 519 U.S. at 156 ("[A]n acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of

proof."). For the same reason, the defendant's attempt to argue that the jury's verdict somehow leads to "issue preclusion" against the Government is meritless. (Def. Mem. 83-84). "Given the higher burden of proof at trial than at sentencing, collateral estoppel does not bar the use of acquitted conduct in sentencing." *Muir*, 710 F. App'x at 511.

The defendant next invokes the *Apprendi* doctrine to argue that consideration of acquitted conduct usurps the jury's role. (Def. Mem. 76). But in the *Apprendi* line of cases, the Supreme Court has repeatedly reaffirmed the principle underlying its holding in *Watts*—that while a sentence may not exceed the maximum authorized by a jury's verdict, a sentencing judge is permitted to make factual findings to aid in determining the appropriate sentence up to that maximum, and those factual findings are not limited by the jury's verdict. For instance, in *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court cited *Watts* for the proposition that "a sentencing judge could rely for sentencing purposes upon a fact that a jury had found *unproved* (beyond a reasonable doubt)." *Id.* at 251. As the Court further explained, judicial fact-finding is essential to fulfilling Congress's "basic statutory goal" of diminishing sentencing disparity by basing punishment on "the *real conduct* that underlies the crime of conviction." *Id.* at 250; *see also id.* at 252 (emphasizing the need to consider all relevant conduct to achieve "the sentencing statute's basic aim of ensuring similar sentences for those who have committed similar crimes in similar ways").

The defendant spends several pages attempting to read into *Apprendi* and its progeny a principle that a sentence may not be based on facts that go beyond those found by a jury. (Def. Mem. 76-79). That argument, however, runs afoul of how the Supreme Court itself has explained its holdings in these cases. In *Alleyne* v. *United States*, 570 U.S. 99 (2013), for instance, the Court expressly distinguished "facts that increase either the statutory maximum or minimum" from those

"used to guide judicial discretion in selecting a punishment within limits fixed by law." *Id.* at 113 n.2. The Court made clear that although the latter "may lead judges to select sentences that are more severe than the ones they would have selected without those facts, the Sixth Amendment does not govern that element of sentencing." *Id.*

Ultimately, the reason that no federal court has accepted the arguments made by the defendant here is because they are inconsistent with the very premise of the modern sentencing regime. The system of judicial fact-finding and advisory guidelines is calculated to preserve both the sentencing judge's "broad discretion in imposing a sentence within a statutory range," *Booker*, 543 U.S. at 233, and the "basic aim of ensuring similar sentences for those who have committed similar crimes in similar ways," *id.* at 252. By contrast, the defendant asks this Court to adopt an unprecedented rule against consideration of any conduct that could also have been used to support a conviction on a count on which the jury acquitted. That rule would eliminate the Court's long-recognized discretion to engage in fact-finding to aid its sentencing decision, and would force the Court to blind its eyes to the defendant's actual conduct, thereby introducing needless sentencing disparities as compared to defendants who engaged in similar conduct. The Court should reject the defendant's proposal and should sentence the defendant in accordance with longstanding precedent and practice, based on the facts it finds to have been proven by a preponderance of the evidence.

### c. Even If the Court Finds Certain Conduct to Be "Acquitted Conduct" That Is Not Otherwise Relevant Conduct Under the Guidelines, It Should Still Consider That Conduct Under Section 3553(a)

As discussed above, the new § 1B1.3(c) only addresses the consideration of acquitted conduct with respect to the district court's calculation of the Guidelines range; it does not speak at all to what the district court may consider when determining the defendant's sentence. To this end, in amending § 1B1.3(c), the Sentencing Commission made clear that even acquitted conduct

that is not relevant conduct for purposes of determining the Guidelines range (because it does not also underlie, in whole or in part, the counts of conviction) can still be considered under 18 U.S.C. § 3661.  *See* U.S.S.G. § 6A1.3 (policy statement regarding resolution of disputed factors noting that "nothing in the Guidelines Manual abrogates a court's authority under 18 U.S.C. § 3661"); *see also* U.S. Sentencing Commission, Amendment 826, https://www.ussc.gov/guidelines/amendment/826 (amending §§ 1B1.3 and 6A1.3).  Section 3661 provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  And under Section 3553(a), the Court *must* consider the factors set forth in Section 3553(a)(1)-(2) when imposing sentence, including "the history and characteristics of the defendant" and "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant."  With this background, there is no question that information concerning the defendant's violence, coercion, and abuse toward Ventura and Jane, as well as other victims, is properly before this Court.  These facts are exactly the kind of information the Court is not only permitted to consider, but must consider, when determining the appropriate sentence for the defendant in this case.

## 2. The Threats-or-Fear Cross-Reference and § 2A3.1's Serious Bodily Injury Enhancement Apply

Pursuant to § 2G1.1, § 2A3.1 applies if the offense involved conduct described in 18 U.S.C. § 2422.  Under § 2A3.1, there is also a two-point enhancement where a victim suffers serious bodily injury as a result of the defendant's conduct.  Both enhancements apply here because the offense involved the defendant causing both Ventura and Jane to engage in a sexual act with another person by threatening them or placing them in fear and causing serious bodily injury.

### a. The Threats-or-Fear Cross-Reference Applies

#### (1) Applicable Law

Section 2G1.1 includes the Threats-or-Fear Cross-Reference, which provides that § 2A3.1 applies "[i]f the offense involved conduct described in 18 U.S.C. § 2241(a) or (b) or 18 U.S.C. § 2242." Application Note 4(B) explains that for the purposes of this cross-reference, conduct described in § 2422 includes "engaging in, or causing another person to engage in, a sexual act with another person by threatening or placing the victim in fear (other than by threatening or placing the victim in fear that any person will be subject to death, serious bodily injury, or kidnapping)."

For purposes of § 2422, courts define "fear broadly." *United States v. Guidry*, 817 F.3d 997, 1008 (7th Cir. 2016); *accord, e.g.*, *United States v. Lucas,* 157 F.3d 998, 1002-03 (5th Cir.1998) (explaining that, for purposes of § 2242, the definition of fear is "very broad"); *United States v. Henzel,* 668 F.3d 972, 977 (7th Cir. 2012) (collecting cases and stating that "[i]n the § 2242 context we define the concept of 'fear' broadly"); *United States v. Gavin*, 959 F.2d 788, 791 (9th Cir. 1992) ("A reasonable construction of section 2242(1) is that it encompasses *all* fears of harm to oneself or another other than death, serious bodily injury or kidnapping. . . . The possible range of 'harm,' like the possible range of 'fear,' is very large.") (emphasis added); *United States v. Castillo*, 140 F.3d 874, 875 (10th Cir. 1998) ("The definition of 'fear,' as used in 18 U.S.C. § 2242(1), is very broad.").[9] This fear can include fear of "some bodily harm." *United States v.*

---

[9] The fear required for § 2422 is less than that required for § 2241. *See United States v. Holly*, 488 F.3d 1298, 1303 (10th Cir. 2007) ("§ 2242(1) sets forth a lesser degree of fear than § 2241(a)(2)."); *United States v. Johns,* 15 F.3d 740, 743 (8th Cir.1994) (explaining that § 2242 envisions lesser degree of fear than § 2241). A defendant commits sexual abuse if he places the victim in fear, but commits aggravated sexual abuse only if that fear rises to the level of fear of death, serious bodily injury, or kidnapping."); *United States v. Alexander*, 802 F.3d 1134, 1142-43 (10th Cir. 2015) (Holmes, J., concurring) (contrasting § 2241, which requires fear that is "heightened," "specific and severe," with § 2242, which requires only that "defendant's actions implicitly place the victim

*Castillo*, 140 F.3d 874, 885 (10th Cir. 1998); *see also Holly*, 488 F.3d at 1304 (explaining that "fear of 'some bodily harm' certainly satisfied the broad definition of ordinary fear under § 2422(1)").

But fear of physical harm is not required. *See United States v. Denjen*, 101 F. App'x 362, 363 (2d Cir. 2004) (rejecting defendant's argument that § 2422 requires bodily harm and upholding conviction where victim complied with sexual demands "out of fear that, if she refused, she 'would have gotten other sanctions against her'"); *United States v. Fish*, 295 F. App'x 302, 305 (10th Cir. 2008) (rejecting argument that § 2A3.1 applies "only if the defendant placed the victim in fear of bodily injury"). Instead, the statute "requires only 'fear' in general," *Fish*, 295 F. App'x at 305, which can include, for example, fear that stems from mental or emotional control a defendant holds over a victim. *See, e.g., Lucas*, 157 F.3d at 1002 (explaining that "fear can be inferred from the circumstances, particularly a disparity in power between the defendant and victim" and upholding cross-reference where prison warden's control over victim's life "was easily sufficient to imply fear"); *Guidry*, 817 F.3d at 1008 (upholding cross-reference based on § 2422 where three victims "testified they were afraid of [the defendant] and what would happen if they did not do what he said" and the evidence showed the defendant "exercised mental and emotional power over his victims, in addition to physical violence, in order to induce them to work as escorts"); *Henzel*, 668 F.3d at 977 (same where twelve-year-old "was afraid of the defendant" and feared the defendant "would react badly if she did not meet his demands" and the defendant had "mental and emotional

---

in fear of some bodily harm" or harm other than death, serious bodily injury, or kidnapping); *see also Martinez*, 110 F.4th at 173 (explaining that jury's verdict that involved some § 2241 acquittals and § 2242 convictions regarding the same incidents of rape was not inconsistent because those incidents may have satisfied § 2422's fear requirements but not risen to level of force required by § 2421).

power" over her); *United States v. Johns*, 15 F.3d 740 (8th Cir. 1994) (finding that victim was in "fear" for purposes of § 2242 when defendant dominated every aspect of victim's life and became "enraged when [his rules] were not followed" and told the victim if she did not follow his commands, she would suffer spiritual harms).

In order to satisfy the "fear" element of this cross-reference, a defendant also does not have to "specifically intend to place a victim in fear." *United States v. Flaming*, 133 F.4th 1011, 1024 (10th Cir. 2025). Instead, the statute focuses on the victim's state of mind as a result of the defendant's actions. *See Gavin*, 959 F.2d at 790-91 (observing that the legislative history focuses on whether "the threat or intimidation created in the victim's mind an apprehension or fear of harm to self or others" and upholding § 2422 conviction over vagueness challenge where defendant placed victim in fear but did not threaten her with harm).

In assessing whether the cross-reference applies, the Court should look not only to the offense of conviction but to all relevant conduct, that is, "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense" and "all harm that resulted from [these] acts and omissions," as well as "all harm that was the object of such acts and omissions[.]" U.S.S.G. § 1B1.3(a)(1)(A), (D); *see United States v. Angle*, 234 F.3d 326, 345 (7th Cir. 2000) (holding that the term "offense" in prior § 2G1.1 cross-reference "is defined broadly to include not only 'the offense of conviction,' but also all conduct deemed relevant by § 1B1.3"); *cf. United States v. Wernick*, 691 F.3d 108, 114 (2d Cir. 2012) (holding that "relevant conduct" standard applies to multiple victim grouping rules in § 2G1.1(d), which calls for multiple groups "[i]f the offense involved more than one victim"); *United States v. Flavors*, 15 F. App'x 491, 495 (9th Cir.

2001) (applying cross-reference based on § 2421 where forced sexual acts occurred after transportation—which defendant argued was after crime was complete—and characterizing these acts, "at the very least, as 'harm that resulted' from his offenses"); *United States v. Sweargin*, 935 F.3d 1116, 1121-22 (10th Cir. 2019) (holding that § 2G1.1(b)(1)(B)'s requirement that fraud or coercion "occur[] as part of the offense" includes all relevant conduct).

Where the cross-reference is satisfied, the Court must apply it. *See United States v. Pipkins*, 378 F.3d 1281, 1301 (11th Cir. 2004) ("A district judge confronted with [overlap between cross-reference and enhancement] is not free to choose between the enhancement and the cross-reference: when there is overlap, the judge must apply the cross-reference"), *judgment vacated*, 544 U.S. 902 (2005), *and opinion reinstated*, 412 F.3d 1251 (11th Cir. 2005); *see also United States v. Monsalve*, 341 F. App'x 451, 457 (11th Cir. 2009); *United States v. Banks*, 190 F. App'x 825, 826 (11th Cir. 2006).

### (2) Discussion

In this case, the defendant placed both Ventura and Jane in fear of what would happen if they did not engage in Freak Offs and Hotel Nights. The evidence showed by a preponderance of the evidence that they did not want to engage in sex with escorts but did so anyway as a result of fear. (*See, e.g.*, Tr. 1303-04, 1330-31, 4596-99, 4810-13, 4834-36; GX 1407, A-104-66, B-513).

With Ventura, the defendant was often physically abusive, punching, kicking, and dragging her, including during Freak Offs. (PSR ¶¶ 21-22). Indeed, the defendant did not contest this physical violence at trial. (*See supra* p. 8 (describing instances in which defense counsel admitted to violence)). This physical violence was always in the back of Ventura's mind, including during Freak Offs. (Tr. 410-11). She explained that she participated in Freak Offs because she did not want to make the defendant angry—she knew from experience that when he was angry, he could be violent. (Tr. 486; *see also* Tr. 705-06, 1315); *Guidry*, 817 F.3d at 1008.. For example, in

August 2013, the defendant slammed Ventura's head into her bed frame, which resulted in a large gash on Ventura's eyebrow. (Tr. 692-94, 2981-85, 3254-56; GX B-247-A). The next day, Ventura and the defendant traveled to Canada for a music festival and then to the Hamptons. Just three days later in the Hamptons, the defendant wanted to do a Freak Off, and Ventura complied, during which she overdosed on GHB. (Tr. 696-98; GX B-218). The fear of physical violence during this Freak Off was obvious—the gash on Ventura's eyebrow from days earlier was still open. (*See* Tr. 698; GX B-247). This is sufficient to warrant the cross-reference. *Castillo*, 140 F.3d at 885 ("The element is satisfied when the defendant's actions implicitly place the victim in fear of some bodily harm.").

The defendant placed Ventura in fear of more than just physical harm. (*See* Tr. 1330-31 (Ventura explaining that she was "worried for [her] career" and "worried for [her] safety," among other things, if she said no to Freak Offs)). The defendant controlled Ventura's work and appearance, and would take away things, such as her apartment and her car, when she did not do what he wanted. (PSR ¶ 10). Ventura described the defendant's level of control as "an all-around thing." (Tr. 431; *see also* Tr. 410 ("Sean controlled a lot of my life, whether it was career, the way I dressed, like, everything. Everything.")). This kind of power disparity and extensive control is alone sufficient to warrant application of the cross-reference. *See Lucas*, 157 F.3d at 1002 (finding fear based on "disparity in power" and control defendant held over victim's life); *Johns*, 15 F.3d at 742-43 (same where defendant dominated "every aspect" of victim's life and became "enraged" when his rules were not followed). But the defendant's control over Ventura was even more pervasive. He held Freak Off videos over Ventura's head, making her fear that he would release them if she did not do what he wanted. (PSR ¶ 14; Tr. 410). *See Guidry*, 817 F.3d at 1008

(focusing on victims' fear of defendant and his "mental and emotional power" over them); *Henzel*, 668 F.3d at 977 (same).

Like Ventura, Jane too was fearful of the defendant and what he would do if she did not comply with his demands. Jane feared that the defendant would stop paying the rent for the home where she lived with her child if she refused to participate in Hotel Nights. (PSR ¶¶ 43-44; *see also, e.g.*, Tr. 4603 ("My feeling of obligation really started to stem from the fact my partner was paying my rent."). Jane's fears were based on the defendant's threats. (GX A-442-29 ("We'll [sic] get over it pls. Look at the roof over your head. And that pretty smile."); GX E-331-J-R ("U have made me feel so worried since day one over this place, the threats and innuendos that you're going to take it away have been non stop since May."); GX A-207-A ("Ur not having ur way so u immediately threaten me w rent"). Jane voiced these fears to the defendant multiple times, but he nevertheless pressured her to continue to participate in Hotel Nights. (PSR ¶¶ 44-45).

Because § 2242 includes all fears "in general," *Fish*, 295 F. App'x at 305, Ventura and Jane's various fears, including fears based on the defendant's violence, blackmail, and control over their lives, warrants application of the Threats-or-Fear Cross-Reference.[10]

---

[10] Probation did not apply this enhancement because of the lack of Second Circuit case law interpreting § 2422 and because the defendant himself did not engage in the sexual acts at issue. (PSR at 59). But neither of these reasons makes the cross-reference inapplicable. First, although the Second Circuit has not extensively interpreted the meaning of the § 2A3.1 cross-reference, it has made clear that bodily injury is not required for § 2242, *Denjen*, 101 F. App'x at 363, and many other circuits to have addressed the cross-reference and/or the meaning of § 2242, including the Fifth, Seventh, Ninth, Tenth, and Eleventh, as described above, have held that "fear" for purposes of § 2242 should be interpreted broadly to include the kinds of fears that Ventura and Jane experienced. Second, neither the text of § 2242 nor the Guidelines limits application of the cross-reference solely to victims who engage in sexual acts *with the defendant* out of fear. To the contrary, the Guidelines make clear that causing the victim to engage in a sexual act "with another person" out of fear—which, here, could include the escorts—is sufficient for purposes of the cross-reference. And although the Second Circuit has not considered whether sexual contact with people other than the defendant can suffice for § 2242, other circuits have found this to be sufficient. *See Guidry*, 817 F.3d at 1008 (upholding cross-reference where defendant used mental power,

The defendant argues that the Threats-or-Fear Cross-Reference should not be applied because he contends it is based on acquitted conduct. (Def. Mem. 85 & n.22). But the defendant was not acquitted of this conduct. The elements of sex trafficking under 18 U.S.C. § 1591 differ in important ways from those of § 2242, which gives rise to the cross-reference. Significantly, as defense counsel made clear repeatedly in closing arguments, § 1591 requires proof beyond a reasonable doubt that the defendant *intended* to coerce the victim to engage in a commercial sex act. (*See, e.g.*, Tr. 7831 ("I submit to you that there's nothing that would ever indicate to him that, you know, this was something that was against her will."); Tr. 7868-69 ("You know, it's going on at the time. What's going on at the time. She's agreeing to it. He is hearing her agree to it . . . Regret is not the same as intent at the time.")). Section 2242, however, does not similarly require that the defendant intend to place the victim in fear. As the Tenth Circuit has explained, § 2242 does not require that the defendant have "the specific intent to put someone in the fear of harm" and instead "only requires 'the defendant's actions to implicitly place the victim in fear of some bodily harm.'" *Flaming*, 133 F.4th at 1024 (quoting *Castillo*, 140 F.3d at 885)); *see also id.* (rejecting defendant's argument that the statute required proof of the defendant's "plan to scare [the victim] into having sex with him"); *United States v. Matlock*, No. 24-7054, 2025 WL 1482930, at *1-2 (10th Cir. May 23, 2025) (rejecting defendant's argument that "knowingly" mens rea applied to the fear element). Both Ventura and Jane testified extensively about their fears and that they did not want to have sex with escorts. (Tr. 492, 664-65, 704, 1303-04, 4594-5, 4699, 4810, 4812-13, 4918, 5135). Although we cannot know exactly why the jury acquitted on the sex trafficking counts—nor is the Court permitted to speculate—those acquittals do not imply any

---

emotional power, and violence to induce victims to work as escorts for him); *United States v. Madison*, 477 F.3d 1312, 1316-17 (11th Cir. 2007) (same where defendant used violence and fear to cause victim to work as an escort for him).

necessary conclusion by the jury about the fears of the *victims*, which are the cornerstone of §

2242.  For example, it is entirely conceivable that the jury accepted the defense's argument that

the defendant did not intend to coerce the victims, but that the victims genuinely feared the

defendant.  The application of the Threats-or-Fear Cross-Reference is therefore entirely consistent

with the jury's verdict.

Even if the Court were to accept the defendant's argument that the defendant's conduct on

which the Threats-or-Fear Cross-Reference is based constitutes acquitted conduct, the Court's

consideration of this conduct would not violate the Guidelines in any event.  As explained above,

the Guidelines make clear—as further articulated in the application note and the Commission's

reasoning—that acquitted conduct can be considered where it establishes in whole or in part the

offense of conviction.  Although coercion is not necessary for a Mann Act conviction, that does

not mean that evidence of the defendant's coercion does not help establish the defendant's intent

to transport the victims for purposes of prostitution.  As the Court instructed the jury, the Mann

Act requires that the Government prove two elements: first, that the defendant knowingly

transported an individual in interstate or foreign commerce, and second, that the defendant

intended that the individual would engage in an act of prostitution.  (Jury Instr. 46).  It is long

accepted that the Government can "prove its case by evidence of its own choice," *Old Chief v.

United States*, 519 U.S. 172, 186 (1997), and in this case it could do so by relying on instances of

coercion that also help prove the elements of the Mann Act crime.  This is a case in which certain

conduct—specifically, the defendant's participation in and organization of Freak Offs and Hotel

Nights—underlie both the Mann Act counts, for which the defendant was convicted, and the sex

trafficking counts, for which he was acquitted.  The defendant's use of force, fraud, and coercion

was part and parcel of these encounters.  The Court therefore can and should consider certain of this conduct because it establishes, at least in part, the elements of the Mann Act offenses.

With regard to the Threats-or-Fear Cross-Reference, evidence of coercion and the victims' resulting fear is relevant to establishing the defendant's intent that Ventura and Jane were being transported for the purpose of engaging in acts of prostitution with escorts and thus falls squarely within § 1B1.3(c)'s definition of relevant conduct.  For example, the evidence at trial showed that on a flight back from Cannes, France to New York, following the defendant's violent assault of Ventura during the 2012 Cannes Film Festival, the defendant threatened Ventura with Freak Off videos she thought she had deleted and demanded that Ventura engage in a Freak Off with male escorts upon landing.  (PSR ¶ 20; Tr. 702-03, 3278-79; *see also* GX B-315, GX B-619).  This instance of coercion occurred during the instance of transportation and in preparation for the act of prostitution and demonstrates both (1) the defendant's intent that Ventura was to engage in acts of prostitution (*i.e.*, a Freak Off) once she got off the transatlantic flight and (2) Ventura's fear that the defendant would release the Freak Off videos, which caused her to engage in the sex act.  Therefore, the Court should consider it under § 1B1.3(c).

The evidence related to Jane is similarly telling as to her fear and helps establish the defendant's intent.  For instance, the day before a Hotel Night in October 2024, Jane texted the defendant many times, expressing that she did not want to participate in Hotel Nights anymore.  (*See, e.g.*, GX A-104-66 at 1323-46 ("I don't want to be fucked and mistreated.  I don't feel like performing love less cold sex. . . . I'm not a porn star I'm not an animal . . . It's been 3 years of me having to fuck strangers.  I'm tired . . . I need a break.  I can't be in another hotel room doing drugs and performing exhausted for days . . . [N]othing satisfies u and u always push me to do more n more . . . I'm not trying to fuck strangers to fulfill your fetishes.")).  In response to Jane's

complaints about another woman, the defendant said, "You the one with the house and me holding you down. So you know I want you." (GX A-104-68 at 1353)). Jane then asked the defendant to leave her alone, to which he said, "Can i please come over there. That's my house too," (GX A-104-70 at 1380), which Jane understood to mean "the home where he was paying [her] rent," (Tr. 5029). He then said he was coming over and texted eight times, "Are you going to let me into our house????" (GX A-104-70 at 1381). The next day, the defendant texted Cowboys 4 Angels to coordinate getting an escort, specifically Rico, to travel from Las Vegas to Los Angeles to engage in a Hotel Night with Jane. (GX A-103 at 70-76). That night, Jane tried to do the Hotel Night with Rico and two other escorts without drugs for the first and only time. (Tr. 5036). Between the second and third escort, Jane threw up, and the defendant told her to go back to the hotel room and continue with the Hotel Night. (Tr. 5037). A few days later, Jane texted the defendant, "I already did not wanna do anything and I did" / "U have me feeling a little crazy and feeling used. Like I got tricked into a party," meaning a Hotel Night. (GX A-104-72 at 1422). And a few days after that, Jane told the defendant that she felt threatened: "Threatenin me over the roof over my head ever since I fuckin got Here" / "U got me sick and now u threaten the house for the millionth time." (GX A-104-73, 74). The evidence related to this Hotel Night showed both (1) that Jane was fearful of losing her home, and using that fear, the defendant convinced her to do the Hotel Night, and (2) that at the same time Jane was experiencing this fear, the defendant was coordinating travel for an escort whom he intended to engage in an act of prostitution with Jane. Because this instance of Jane's fear also helps to prove the Mann Act charges, the Court should consider it for purposes of the Threats-or-Fear Cross-Reference even if it determines that it constitutes acquitted conduct.

### b. Section 2A3.1's Enhancement for Serious Bodily Injury Applies

Assuming that the Court applies the Threats-or-Fear Cross Reference, it should also apply the two-level enhancement under § 2A3.1 for a "victim [who] sustained serious bodily injury." U.S.S.G. § 2A3.1(b)(4)(B).[11]  Under Application Note 1 to that provision, "serious bodily injury" is defined as having "the meaning given th[at] term[] in Application Note 1 of the Commentary to Section 1B1.1.  However, for purposes of this guideline, 'serious bodily injury' means conduct other than criminal sexual abuse, which already is taken into account in the base offense level under subsection (a)."   In turn, Section 1B1.1, Application Note 1(M), defines "serious bodily injury" as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."  It also notes that "serious bodily injury" is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242 or any similar offense under state law."   Thus, to establish "serious bodily injury," the court must find that a victim sustains injuries aside from those inherent to the sexual abuse.  *See United States v. Long Turkey*, 342 F.3d 856, 858 (8th Cir. 2003) (holding that an "act of sexual abuse is insufficient by itself to support a § 2A3.1(b)(4)(B) enhancement" but that a court can consider "any injuries resulting from an episode of criminal sexual abuse").

To establish injury, a court may consider injuries sustained during relevant conduct surrounding an offense, in addition to those resulting directly from the sexual abuse.  *See United States v. Jim*, 786 F.3d 802, 815 (10th Cir. 2015) (finding that "a sentencing court can consider injuries the victim suffered resulting directly from the sexual abuse as well as those suffered during

---

[11] Probation found that if the Court were to apply the Threats-or-Force cross-reference, the serious bodily injury enhancement also applies.  (PSR at 59).

relevant conduct surrounding that offense"); *United States v. Scott*, 83 F.4th 796, 802 (9th Cir. 2023) (same), *cert. denied*, 144 S. Ct. 2549 (2024).

The Court need not rely on any acquitted conduct to apply this enhancement because neither the racketeering count nor the sex trafficking counts required that the victims suffer from these kinds of harms. Not only did the defense appear not to challenge the physical and psychological harms that Ventura and Jane testified to, they also affirmatively conceded the defendant's violence toward the victims, which, as described below, provides a sufficient basis for the Court to apply this enhancement. Even the *Apprendi* line of cases on which the defendant relies, (Def. Mem. 76)—which for the reasons described *supra* does not limit the Court's consideration of facts in this case—makes clear that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in jury verdict *or admitted by the defendant*," *Blakely*, 542 U.S. at 303 (emphasis added). Accordingly, the defendant's admission to physical violence is undoubtedly appropriate for the Court to consider when assessing the applicable Guidelines.

Both Ventura and Jane suffered physical harm at the hands of the defendant. The defendant repeatedly assaulted Ventura during Freak Offs, by pushing, hitting, kicking, and dragging her, causing her bruising, a busted lip, and other injuries, including at Freak Offs. (PSR ¶¶ 22, 23). As described above, the defendant slammed Ventura's head into her bedpost and cracked open her forehead, leaving her with a permanent scar, before flying her to Canada and then the Hamptons, where they had a Freak Off. (Tr. 696-97, 2984-85, 3254-55). Ventura was also required to engage in Freak Offs even while suffering from UTIs, which caused her severe pain. (Tr. 678 (describing UTI pain as "horrible" and "the most uncomfortable burning")). Similarly, the defendant physically assaulted Jane before a Hotel Night in June 2024, during which the defendant lifted her

up by her neck in a chokehold and punched her repeatedly, causing her to have a black eye, bruising, and welts on her head. (PSR ¶ 54). Weeks later, the defendant flew Jane to Miami to engage in more Hotel Nights. (PSR ¶ 56). Jane also suffered from UTIs on a weekly basis, (Tr. 4829), as well as physical pain and soreness as a result of her participation in the Hotel Nights, (PSR ¶ 38).

These physical injuries to both Ventura and Jane constitute serious bodily injury. *See United States v. Bell*, 367 F.3d 452, 470 (5th Cir. 2004) (affirming application of enhancement where "there was additional injury, other than the rape, that [victim's] face was swollen as though he had been beaten"); *Scott*, 83 F.4th at 802 (affirming application of enhancement where defendant put his arm around the victim's neck and used his free hand to cover her nose and mouth, and squeezed her neck before raping her, and dragged her up a hill, resulting in scrapes, bruising, and intravaginal bleeding); *United States v. Hernandez-Velazquez*, No. 19 Cr. 306 (WFK), 2025 WL 665671, at *4 (E.D.N.Y. Feb. 27, 2025) (applying enhancement because of defendant's "ongoing physical abuse"); *United States v. Martinez-Rojas*, No. 15 Cr. 348 (ERK), 2023 WL 4867433, at *1-2 (E.D.N.Y. July 31, 2023) (applying enhancement where defendant required victim to get a tattoo, which was painful); *United States v. Adams*, No. 14 Cr. 0650, 2017 WL 3503674, at *1 (E.D.N.Y. Aug. 14, 2017) (applying enhancement for injury between life threatening and serious bodily injury where victim was seriously beaten by the defendant, causing a miscarriage), *aff'd*, 749 F. App'x 25 (2d Cir. 2018).

Further, both Ventura and Jane testified to the immense psychological injury caused by the defendant's conduct. Ventura testified that she turned to hard drugs in order to numb her psychological pain from Freak Offs, which resulted in a severe drug addiction. (PSR ¶ 13). She continued to have horrible flashbacks to Freak Offs for years after the end of her relationship and

ultimately attempted to commit suicide. (Tr. 823-24). Jane was similarly tormented by flashbacks to Hotel Nights. (GX C-348-A-R-T ("And who's there for me? Like who's there for me when I close my eyes and I have these fucked up things in my head?")). Jane also had suicidal thoughts, and she told the defendant that she "want[ed] to die" as a result of repeated Hotel Nights. (Tr. 5105; *see also* GX A-301-H).

These psychological injuries also constitute serious bodily injury. *See United States v. Begay*, 116 F.4th 795, 803 (8th Cir. 2024) (affirming application of enhancement under U.S.S.G. § 2A3.1(b)(4)(B) for "serious bodily injury," where rape had long-lasting psychological impact, including being unable to sleep; ruining friendships and relationships; and making the victim feel like she was "fight[ing a] battle in [her] head constantly"), *cert. denied*, 145 S. Ct. 1933 (2025); *United States v. Randolph Valentino Kills in Water*, 293 F.3d 432, 435-36 (8th Cir. 2002) (affirming application of enhancement where there was evidence victim suffered from bite marks, physical trauma to the vaginal and perianal areas, and continued psychological problems such as recurring nightmares and attempted suicide). In sum, Ventura and Jane's psychological harm, coupled with their physical injuries, warrant the application of the § 2A3.1(b)(4)(B) enhancement.

### 3. If the Court Does Not Apply the Threats-and-Fear Cross-Reference, § 2G1.1's Multiple Victims and Fraud or Coercion Enhancements Apply

If the Court does not apply the Threats-and-Fear Cross-Reference, the Government agrees with Probation that there are ten victims, and thus ten groups, under § 2G1.1(d)(1), and that the two-level enhancement pursuant to § 2G1.1(b)(1)(B)(i) applies because "the offense involved fraud or coercion."

#### a. Section 2G1.1(d)(1)'s Grouping of Multiple Victims Applies

Ventura, Jane, and eight escorts are victims for purposes of § 2G1.1. That guideline defines "victim" as "a person transported, persuaded, induced, enticed, or coerced to engage in, or travel

68

for the purpose of engaging in, a commercial sex act or prohibited sexual conduct, whether or not the person consented to the commercial sex act or prohibited sexual conduct." U.S.S.G. § 2G1.1, app. note 1; *see also United States v. Mi Sun Cho*, 713 F.3d 716, 721 (2d Cir. 2013) (referring to a victim of a Mann Act violation as a "victim" even though certain evidence in the record suggested that she consented to the conduct underlying the charges). Because the defendant transported, or caused to be transported, Ventura, Jane, and eight escorts for purposes of Freak Offs or Hotel Nights, all ten of these individuals are considered victims for purposes of the Guidelines.

Despite this clear text, the defendant argues that the Court should ignore the definition of victim laid out in Application Note 1 of § 2G1.1 and instead interpret "victim" to mean only those harmed or injured by the offense. (*See* Def. Mem. 102-104). The court cannot set aside Application Note 1 so easily. Congress has provided that courts must consider "the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission" in imposing a sentence. 18 U.S.C. § 3553(b)(1). "Commentary which functions to 'interpret [a] guideline or explain how it is to be applied' controls," and the failure to follow that commentary "would constitute an incorrect application of the sentencing guidelines." *United States v. Stinson*, 508 U.S. 36, 42-43 (1993) (quoting U.S.S.G. § 1B1.7). In *Stinson*, the Supreme Court addressed the role of Guidelines commentary and determined that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Id.* at 38.

The defendant nevertheless claims that Application Note 1's definition of "victim," which by its terms extends to Ventura, Jane, and the escorts, is "inconsistent with, or a plainly erroneous reading of" § 2G1.1. (Def. Mem. 102). But that is simply not true. Although the defendant points to dictionaries that define the term "victim" as one harmed or injured by an action, another

69

dictionary from around the time § 2G1.1 was adopted defines "victim" as "[t]he person who is the object of a crime or tort, as the victim of a robbery is the person robbed." *Victim*, Black's Law Dictionary (1991); *see also* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/victim (last accessed Sept. 15, 2025) (defining "victim" as "one that is acted on and usually adversely affected by a force or agent"). Applying this definition, which is consistent with Application Note 1, the victim of the Mann Act is the person transported for purposes of prostitution—here, Ventura, Jane, and the escorts. Application Note 1 therefore does not reach the high bar of being "inconsistent with, or a plainly erroneous reading of," § 2G1.1.

The defendant argues that Ventura and Jane are not victims because "the jury rejected any such notion when it acquitted [the defendant] on the sex-trafficking and RICO conspiracy." (Def. Mem. 104). That is simply not true, as described *supra*, and binding case law prohibits the Court from jumping to a factual inference such as this. *See Watts*, 519 U.S. at 155; *Martinez*, 110 F.4th at 174. Indeed, when a district court made such factual findings based on acquittals, such as concluding that a jury wholesale rejected a victim's testimony (which cannot be the case here given the Mann Act convictions), the Second Circuit held that its resulting sentence was procedurally and substantively unreasonable. *Martinez*, 110 F.4th at 174-75, 179.[12]

The defendant asks the Court to consider cherry-picked statements made by certain escorts in interviews with the Government, which were produced to the defense despite the Government

---

[12] Even under the defendant's constrained definition of victim, the undisputed trial record demonstrates that Ventura and Jane are victims: the defendant *conceded* that he used violence against Ventura and Jane, punching, kicking, and dragging them, including during Freak Offs and Hotel Nights. (Tr. 406, 753-54, 4603, 5185-5202; GX A-442-29; GX A-442-35A). The record further demonstrates that, regardless of what the defendant thought about Ventura and Jane's willingness to participate in these nights, Ventura and Jane did not want to engage in sex with other escorts. (*See, e.g.*, Tr. 1303-04, 1330-31, 4596-98, 4810-13, 4834-36; GX 1407, A-104-66, B-513).

not intending to call these individuals as witnesses,[13] to support his argument that escorts are not victims under § 2G1.1.  But the defendant does not point to any authority to allow the Court to do so, and the Court should reject the defendant's invitation.  While sentencing courts are "free to consider hearsay evidence," courts must "permissibly conclude[] that the evidence is reliable." *United States v. Arias Casilla*, No. 21 Cr. 218 (AT), 2023 WL 24245, at *2 (S.D.N.Y. Jan. 3, 2023) (quoting *United States v. Kolawole*, 1 Fed. App'x 93, 94-95 (2d Cir. 2001)).  "In determining whether the proffered evidence is reliable, the Court must assure itself that the evidence is not 'materially incorrect,' that there is not 'a significant possibility of misinformation,' and that there is 'some minimal indicia of reliability' accompanying the hearsay statements sought to be admitted."  *Id.* (quoting *United States v. Martinez*, 413 F.3d 239, 244 (2d Cir. 2005)).

There are several reasons to doubt the reliability of the statements made by non-testifying escorts.  The full context of the witness statements—as opposed to the limited selections highlighted by the defendant—makes clear that in many cases, the statements that the defendant asks the Court to consider are patently not credible.  For instance, ███████ statement that he has "never accepted money in exchange for sex," (Def. Mem. 105), is patently false and disproved by Ventura's testimony, Jane's testimony, and text messages between the defendant and ███ (Tr. 651, 4688, 4889-90; GX G-102; GX G-103).  ███████ statement that he was paid for "time" is equally incredible.  The evidence showed that in January 2023, the defendant coordinated with the owner of Cowboys 4 Angels to transport ███ to Los Angeles for a Hotel Night at the London Hotel, only after being assured that ███ wouldn't be "tired" after seeing a client earlier in the day.  (GX A-103; *see also* GX 1406, 1407, A-159).  After the Hotel Night involving ███, the

---

[13] Although 18 U.S.C. § 3500 does not require production of statements of non-testifying witnesses, it is often the Government's practice to do so nevertheless.

defendant was charged a $4,000 cleaning fee because the hotel staff found bodily fluid stains on the floor. (GX 7J-117-B). Of course, it is not particularly surprising that the escorts would lie in interviews with law enforcement—it is clearly against their penal interests to admit to receiving payment for sex (which is prostitution), or that they suspected that Ventura or Jane did not want to be engaging in sex (which could constitute rape or sexual assault).

The Government elected not to call these witnesses precisely because of concerns about their credibility. The defendant also elected not to call these witnesses, despite having the opportunity to do so, if not because of concerns about their credibility, presumably because some escorts would also testify—consistent with their statements to the Government—about witnessing violence during Freak Offs, lack of consent, and other facts unfavorable to the defendant. The defendant cannot be permitted now, having made the choice not to call these witnesses at trial, to ask the Court to consider only statements favorable to him. At the very least, in order for the Court to rely on the statements, the defendant should be required to call these witnesses at a *Fatico* hearing to assess their credibility. *See United States v. Ortiz Socias*, No. 21 Cr. 173 (RA), 2024 WL 4698714, at *2 (S.D.N.Y. Nov. 5, 2024) ("[W]hen a factual dispute turns on the credibility of a witness, *Fatico* hearings are particularly appropriate.").[14]

---

[14] To the extent the Court considers these statements without a *Fatico* (which it should not), the Court should also consider the entirety of the escorts' statements about the defendant's violence during Freak Offs. ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ These statements have indicia of reliability, ████████████████████████████████████ and, in several of the instances, are corroborated by independent evidence.

At any rate, the escorts' statements being offered by the defendant do not impact the Guidelines application here. The defendant uses these statements to emphasize that the escorts consented to the sexual activity, and therefore were not "victims." This argument, however, completely ignores the clear language of U.S.S.G. § 2G1.1 which, as discussed above, includes as "victims" even those who consented to the commercial sex act. Irrespective of whether the escorts consented to Freak Offs or Hotel Nights, they clearly fall within the definition of "victim" for purposes of U.S.S.G. § 2G1.1.

The defendant also contends that because the escorts were engaging in their own professions, were paid large sums of money, and sometimes enjoyed their experiences, they are not victims. (*See* Def. Mem. 104-07). Again, these points are only relevant if the definition of victim is limited to those harmed or injured by the offense, but, for the reasons stated above, it is not so limited.

The defendant suggests that several escorts cannot be victims because the Government has at some point in time in the investigation characterized them as "subjects." (*See* Def. Mem. 107). These terms, however, are not mutually exclusive. The Justice Manual provides that grand jury witnesses may be "targets" or "subjects." While the definition of a target is specific—a "target" is "a person as to whom the prosecutor or the grand jury has substantial evidence linking him or

---

Consistent with Fed. R. Crim. P. 6(e)(2), and the Second Circuit's holding in *United States v. Alexander*, 860 F.2d 508 (2d Cir. 1988), the Government has redacted information derived from grand jury proceedings in this submission. *See also supra* n.12; Fed. R. Crim. P. 6(e)(2) (outlining the secrecy obligations for grand jury material); *Alexander*, 860 F.2d at 512-14 (approving the district court's consideration of grand jury materials at sentencing, but finding that the court erred in permitting public disclosure of the materials). To the extent the Court would like the parties to discuss grand jury materials in open court at sentencing, the Court "may authorize" disclosure of sealed grand jury materials "preliminarily to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E)(i); *see also Alexander*, 860 F.2d at 513 (holding that disclosure at sentencing "is warranted only when the need for it outweighs society's interest in secrecy.").

73

her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant," Justice Manual § 9-11.151—the definition of "subject" is broad. A "subject" is "a person whose conduct is within the scope of the grand jury's investigation," *id.*, and as such, it is not difficult to imagine situations in which a victim may also be categorized as a subject. Nevertheless, this argument is a red herring, as the definitions in the Justice Manual have no bearing on whether the individuals at issue here fall within § 2G1.1's definition of the term "victim."[15]

The defendant next argues that the escorts cannot be treated as victims because the indictment, which alleged that multiple individuals were transported, was duplicitous, and there is no way to know which escorts the jury unanimously found were transported in violation of the Mann Act. (Def. Mem. 108). However, the defendant has waived any duplicity claim by failing to raise the alleged issue pretrial. *See* Fed. R. Crim. P. 12(b)(3)(B) (stating that "a defect in the indictment or information," including a claim that the charging instrument "join[ed] two or more offenses in the same count (duplicity)," "must be raised by *pretrial* motion") (emphasis added)). It is well established that if "the alleged duplicitous character of the counts appears on the face of the indictment," the "[f]ailure to make the appropriate motion is a waiver." *United States v. Viserto*, 596 F.2d 531, 538 (2d Cir. 1979); *accord, e.g.*, *United States v. Sturdivant*, 244 F.3d 71, 76 (2d Cir. 2001); *United States v. Lartey*, 716 F.2d 955, 968 (2d Cir. 1983); *United States v. Angelilli*, 660 F.2d 23, 30 n.6 (2d Cir. 1981); *United States v. Berardi*, 629 F.2d 723, 729 (2d Cir. 1980); *United States v. Murray*, 618 F.2d 892, 899 n.8 (2d Cir. 1980). The failure to raise duplicity

---

[15] Moreover, the Justice Manual is clear that its purpose is to provide "internal DOJ guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal. Nor are any limitations hereby placed on otherwise lawful litigation prerogatives of DOJ." Justice Manual § 1-1.200.

prior to trial is excused only "where the claimed defect in the indictment was not apparent on its face at the institution of the proceeding." *Sturdivant*, 244 F.3d at 76.  By the defendant's own argument, it is clear that the alleged duplicity issue—that the indictment referenced multiple individuals in the Mann Act counts—was obvious on the face of the indictment.  (*See* Dkt. 2 (Indictment) ¶ 17); Dkt. 144 (First Superseding Indictment) ¶ 17; Dkt. 169 (Second Superseding Indictment) ¶ 17; Dkt. 209 (Third Superseding Indictment) ¶¶ 18, 20)).  And even if it were not clear from the indictment, the defendant certainly knew more than three months before trial, when he received an extensive enterprise letter detailing the dates and locations in which Ventura, Jane, and the eight escorts traveled for the purpose of engaging in prostitution.  (*See* Feb. 1, 2025 Enterprise Letter ¶ 10(a), (b), (d)-(g), (i)-(l)).  This is far from a situation in which the facts underlying any alleged duplicity argument only became clear during trial.  Permitting the defendant to make a duplicity argument at this stage would only incentivize gamesmanship.

Even if the Court were to reach the merits of the defense's duplicity argument, it fails nevertheless.  In general, "two or more distinct crimes should not be alleged in a single count of an indictment." *United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980).  "An indictment that violates this prohibition is said to be 'duplicitous.'" *United States v. Kandic*, 134 F.4th 92, 99 (2d Cir. 2025); *see also Sturdivant*, 244 F.3d at 75 n.3.  "But not all duplicitous indictments are *impermissibly* duplicitous." *Kandic*, 134 F.4th at 99.  "An indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be a separate count for each offense, and 2) the defendant is prejudiced thereby." *Sturdivant*, 244 F.3d at 75.

Even if the defendant could show duplicity, he cannot demonstrate prejudice.  The defendant alleges that he was prejudiced because the general verdict on Counts Three and Five

allegedly created "uncertainty over whether a general verdict of guilty has concealed a finding of guilty as to one crime and a finding of not guilty as to another" and precluded "the basis for appropriate sentencing." (Def. Mem. 108 (brackets omitted) (quoting *Sturdivant*, 244 F.3d at 75)). While the defendant relies on *Sturdivant*, that case is inapposite. In that case, the defendant was convicted of one drug trafficking charge that encompassed two particular drug sales. *Sturdivant*, 244 F.3d at 78. In sentencing the defendant, the Court aggregated the drug quantity for the two sales, assuming that the jury convicted him for his participation in both, and therefore sentenced him in excess of a mandatory minimum that "would only be applicable if defendant had been *convicted* in both" drug transactions. *Id.* The Second Circuit explained that this was error, but that the district court could resentence the defendant based on the lesser of the two drug transactions—thus eliminating the mandatory minimum—and consider the other as relevant conduct under the Guidelines. *See id.* at 80.

Even assuming the Mann Act counts were duplicitous, the defendant here, unlike in *Sturdivant*, cannot demonstrate prejudice. Here, the defendant has not been subjected to a mandatory minimum that would only arise from a conviction on multiple Mann Act counts. The jury in this case was given a unanimity instruction at the defendant's request, and therefore there is no question that they were unanimous as to at least one violation of the Mann Act. *See id.* at 79 (duplicity concerns can be solved by "a jury instruction that ensures that the jury is unanimous as to the conduct underlying the conviction"). The district court could therefore sentence the defendant as if he was convicted of one instance of Mann Act transportation—again, none of which subjected the defendant to a mandatory penalty—and then consider the remainder, for which there was sufficient evidence presented at trial, as relevant conduct for the purposes of the Guidelines and the victim enhancement. *See United States v. Wernick*, 691 F.3d 108, 114 (2d Cir. 2012)

(holding that conduct against victims other than those charged in the indictment may constitute "relevant conduct" and "be treated for sentencing purposes as though it occurred in a separate count of conviction" as described in § 2G1.1(d)(1)). In other words, the defendant's alleged duplicity problem does not prejudice him nor does it serve as a basis for the court to decline to apply the victim enhancement.

The defendant also argues for a downward departure, claiming that the offense level "substantially overstates the seriousness of the offense." (Def. Mem. 110 (quoting U.S.S.G. § 2B1.1, app. note 21(C)). But this is an application note to the fraud guidelines, rather than § 2G1.1, and reflects the fact that some courts have criticized the loss table in the fraud guidelines for overstating the seriousness of an offense by focusing on intended loss, which may be difficult to foresee, as opposed to actual loss. *See, e.g.*, *United States v. Corsey*, 723 F.3d 366, 377, 381 (2d Cir. 2013) (Underhill, J., concurring). In any event, § 2G1.1 does not overstate the seriousness of the defendant's offense. He ran a scheme for approximately fifteen years that involved transporting Ventura, Jane, and escorts across the country on dozens of occasions for his own sexual pleasure and gratification, and at times involved coercion and even violence (which the defendant has admitted) toward the victims. This is not a case where a downward departure is appropriate; in fact, as discussed in more detail *infra* pp. 114-17, it is entirely inappropriate.

### b. Section 2G1.1(b)(1)'s Enhancement for Fraud or Coercion Applies

Section 2G1.1(b)(1)'s enhancement applies where "the offense involved fraud or coercion," U.S.S.G. § 2G1.1(b)(1)(B)(i), and the fraud or coercion "occur[ed] as part of the offense," U.S.S.G. § 2G1.1, app. note 2. "Coercion" in this context is "any form of conduct that negates the voluntariness of the victim," *id.*, which includes but is not limited to force, *United States v. Sweargin*, 935 F.3d 1116, 1123 (10th Cir. 2019). The Government agrees with Probation that this enhancement is appropriate as to Ventura and Jane.

Courts interpret the fraud-or-coercion enhancement broadly. The requirement that the fraud or coercion "occur[] as part of the offense" is not limited to the offense of conviction but rather encompasses any conduct that falls within the broad definition of relevant conduct in § 1B1.3. *Sweargin*, 935 F.3d at 1122. This can include instances of force or coercion that occur prior to an instance of transportation or even after the transportation has concluded. *See Id.* 935 F.3d at 1122 (applying enhancement where the defendant blackmailed victim by threatening to post sex video online approximately one month prior to trip that formed the basis of Mann Act count and beat her for refusing to prostitute herself during the trip, even though there were no other opportunities for prostitution after the beating); *United States v. Anderson*, 139 F.3d 291, 298 (1st Cir. 1998) (applying earlier version of enhancement where defendant raped victim a week before transportation).

The Government showed by a preponderance of the evidence that the defendant coerced Ventura to engage in the Freak Offs with male escorts, making application of § 2G1.1(b)(1)(B) appropriate as to her. *See Watts*, 519 U.S. at 157. The evidence at trial showed that this coercion took a variety of forms, including force or threats of physical force,[16] threats to publicize Freak Off videos, and control over Ventura's career and livelihood. The defendant also introduced Ventura to hard drugs, which included a variety of drugs used at Freak Offs, and opiates, to which Ventura became addicted. (PSR ¶ 72(a)). Ventura explained that she could not engage in Freak Offs without the drugs, as it was the only way to cope with having the "emotionless" nature of the

---

[16] The enhancement pursuant to § 2G1.1(b)(1)(B) "anticipates no bodily injury," and notes that "[i]f bodily injury results, an upward departure may be warranted." U.S.S.G. § 2G1.1, app. note 2; *see also* U.S.S.G. § 5K2.2 (policy statement) ("If significant physical injury resulted, the court may increase the sentence above the authorized guideline range."). Both Ventura and Jane were physically injured as a result of the defendant's violence during Freak Offs or Hotel Nights, which the defendant did not contest. *See supra* p. 8 (describing serious bodily injury).

Freak Offs and the "sex with a stranger that [she] didn't want to be having sex with." (*Id.*); *see United States v. Anderson*, 139 F.3d 291, 298 (1st Cir. 1998) (affirming application of enhancement where the defendant, among other things, "consistently supplied [the victim] with an amount of marijuana that was sufficient to impair her voluntariness," and the victim "told the probation officer that she could not have engaged in the prostitution activities if she had not been high"). With regard to Jane, the evidence at trial also showed that the defendant used fraud, including false promises of alone time and trips, and coercion, including threats related to Jane's rent and later physical violence, to cause Jane to engage in Hotel Nights.[17] (PSR ¶ 73(b)). He also introduced her to drugs during these nights, which she had only had on rare occasions before, (*id.*), and she similarly felt she had to take the drugs to get through Hotel Nights—the one time she tried not to use drugs during a Hotel Night, she threw up, and the defendant made her continue having sex with escorts, (PSR ¶ 46). For both Ventura and Jane, the evidence justifies the enhancement.

The defendant argues that the Court should not apply the enhancement because its application would be based on acquitted conduct, specifically, the jury's rejection of the Government's theory that the defendant defrauded or coerced the victims into engaging in sexual conduct. (Def. Mem. 89). As with the cross-reference, that is in no way a necessary implication of the jury verdict. Again, the acquittal on Counts Two and Four is "not a finding of any fact,"

---

[17] The defendant argues that this Hotel Night on June 18-19, 2024 is "clearly not relevant conduct" because it did not involve interstate travel. (Def. Mem. 99). But as described *supra*, courts have interpreted relevant conduct broadly, in particular with regard to this enhancement. *See Sweargin*, 935 F.3d at 1122 (relevant conduct included threat a month prior to travel); *Anderson*, 139 F.3d at 298 (relying on defendant's rape a week before travel). The June 2024 Hotel Night is still relevant coercive conduct, given that the defendant had Jane travel approximately a month later for a Hotel Night in Miami, Florida. (GX 1406). The same is true of the defendant's violence toward Ventura, such as the assault prior to flying back from Cannes and having a Freak Off, (PSR ¶ 72(a)), and the instance in which he slammed her head into a bed frame, which was followed by travel and a Freak Off within the next week, (Tr. 696-97, 2984-85, 3254-55).

*Watts*, 519 U.S. at 155, and the Court cannot speculate as to whether the jury "rejected a certain fact," including facts regarding the defendant's fraud and coercion toward the victims, *Martinez*, 110 F.4th at 174. We cannot presume why the jury acquitted on these counts. The sex trafficking statute is complex and has multiple different elements, and the jury was required to acquit if any of these elements was not met beyond a reasonable doubt. Therefore, the acquittal could have been for reasons other than a wholesale lack of proof of the defendant's force, fraud, or coercion, including, for example, a failure to prove that the defendant intended for his force, fraud, or coercion to *cause* the victim to engage in the commercial sex act.

The enhancement also applies under a *significantly* broader range of facts than the sex trafficking statute. Unlike the sex trafficking statute which requires that the defendant intend for coercion or fraud to be "used to cause the person to engage in a commercial sex act," the enhancement applies merely if the offense "involved" threats or coercion (even if the threats and coercion were not causally connected to a specific sex act). *See United States v. Pipkins*, 378 F.3d 1281, 1300-01 (11th Cir. 2004) (interpreting prior version of the fraud-or-coercion enhancement and finding that "a pimp's threatening a prostitute to coerce her to stay in his custody would also satisfy the enhancement (which requires prostitution plus coercion) but not the cross-reference (which requires coercion to perform a sex act)"), *cert. granted, judgment vacated*, 544 U.S. 902 (2005), *and opinion reinstated*, 412 F.3d 1251 (11th Cir. 2005). The offense here undoubtedly "involved" violence. Indeed, the defendant did not even contest that violence occurred during his relationship with both Ventura and Jane. Nor did the defendant contest that the defendant occupied a position of power with regard to both Ventura and Jane (including paying for Jane's home and managing Ventura's career). And it is undoubtedly true that this violence and power dynamic had some effect on the victims' will even if it were not a but-for-cause of any specific sex act. *See*

*United States v. Williams*, 291 F.3d 1180, 1197 (9th Cir. 2002) (finding offense "involved" force where "violence occurred to further overall prostitution scheme" and rejecting defendant's argument that "physical force must play a role in each element of the Mann Act counts in order for the adjustment to be appropriate"), *overruled on other grounds by United States v. Gonzales*, 506 F.3d 940 (9th Cir. 2007); *United States v. Evans*, 272 F.3d 1069, 1097 (8th Cir. 2001) (applying earlier version of enhancement despite defendant's claim that "that this [violent] conduct should not be considered because it was part of his domestic relationships").[18]  As a result, a finding that the enhancement applies is entirely consistent with the jury's verdict.  In fact, the enhancement can be applied based on conduct that was explicitly *uncontested* by the defendant at trial.  *Cf. Blakely*, 542 U.S. at 303 (finding it appropriate for the court to consider, in determining the statutory maximum, facts "admitted by the defendant").

The defendant tries to narrow the gap between the sex trafficking statute and the fraud-or-coercion enhancement by arguing that their definitions of coercion are effectively the same.  (Def. Mem. 90).  But there are meaningful differences between the statute and the enhancement that should not be overlooked.  First, as to intent, the sex trafficking statute requires that the defendant

---

[18] The defendant relies on *United States v. Sabatino*, a case in which the First Circuit declined to rely on violence in the record with regard to the enhancement. 943 F.2d 94, 103-04 (1st Cir. 1991). But that is a very different case.  In *Sabatino*, the defendant sent prostitutes who worked for him to one violent customer as a form of punishment. *Id.* at 104.  The First Circuit did not view this violence as a coercive means to "force the [victims] to participate in the criminal venture," but then immediately qualified this statement, explaining that "the only rational effect they could have had was to persuade the [victims] to abandon this line of work." *Id.*  Other circuits have limited the reach of *Sabatino*. *United States v. Campbell*, 49 F.3d 1079, 1086 n.5 (5th Cir. 1995) ("[W]e thus read *Sabatino* to hold that where the defendant's violent acts are contrary to furthering his Mann Act purposes, they can be said to be neither coercive nor of use to him.").  Although the defendant denies a connection between his violence and the sex acts, he has never argued that the violence was *contrary* to his purpose of transporting the victims and escorts with the intent that they engage in prostitution, and the evidence would show otherwise (*e.g.*, the defendant assaulting Ventura and then dragging her back to the Intercontinental Hotel room, where Theodore was waiting).

make threats intending them to be a threat or knowing they will be viewed as one, (Jury Instr. 43), or engage in a scheme intending that it will cause the victim to believe she will suffer serious harm if she does not engage in the commercial sex act.  The defense stressed numerous times in its arguments to the jury that it believed there was nothing in the evidence to suggest to the defendant that the victims did not want to engage in Freak Offs.  (*See* Tr. 7831, 7865).  On the other hand, the enhancement, by its terms and the accompanying commentary, does not require that the defendant engage in coercive acts intending that they negate the victims' intent.

Second, coercive threats under the sex trafficking statute "must be sufficient in kind or degree to overcome the will of an ordinary person."  (Jury Instr. 44).  But as the defense concedes, under the cross-reference, coercion does not need to "zero . . . out" a victim's will, instead it is enough that it has a "powerful impact" on the victim's will, *United States v. Willis*, No. 14 Cr. 33 (D. Or.), Dkt. 67, at 56, or "substantially impair[] her ability to choose her own course of conduct," *Sweargin*, 935 F.3d at 1123.  Consequently, courts apply this enhancement *even* where victims state they were not coerced or forced to travel for sex.  *See id.* (upholding enhancement despite victim's statement that defendant did not force her to travel where defendant had threatened to release sex videos a month prior); *see also Anderson*, 139 F.3d at 298 (upholding earlier version of enhancement despite victim's testimony that she was "not forced" to travel because she was "undoubtedly under [the defendant's] control when she went to New Jersey" given that the defendant had given her marijuana "sufficient to impair her voluntariness" and raped her a week before).  Again, given that the sex trafficking statute has more demanding requirements than the enhancement, the enhancement need not involve any acquitted conduct.

But even if the jury's verdict was somehow predicated on doubts about whether the defendant engaged in fraudulent or coercive conduct—which, for the reasons stated above cannot

be presumed—such as to bring that conduct within the scope of "acquitted conduct" under the Guidelines, the Court can nevertheless consider the acquitted conduct because it "establishes, in whole or in part, the offense[s] of conviction." U.S.S.G. § 1B1.3(c). For instance, as described *supra*, the instance in which the defendant assaulted Ventura in Cannes, then flew with her to New York and threatened to release sex videos on the plane, and then had her engage in a Freak Off after landing shows both (1) the defendant's coercion for purposes of the enhancement, *see Sweargin*, 935 F.3d at 1123 (coercion based on threat to release sex video), and (2) the defendant's intent that Ventura engage in an act of prostitution following the travel.

The same is true of Jane. For example, the defendant defrauded Jane into traveling to New York City from Los Angeles for a Hotel Night using false promises of alone time. (PSR ¶ 72(b)). Specifically, on September 16, 2023, Jane, who was in Los Angeles, told the defendant, who was in New York, that she did not want to come see him in New York because she did not want to do a Hotel Night there. (Tr. 4798-99; *see also* GX 1407; GX A-104-59-P ("I'm not coming to New York. . . . I don't want to be used and locked in a room to perform and fulfill your fantasies.")). In this conversation, Jane specifically told the defendant that she felt Hotel Nights were "the only reason you have me around and why you pay for the house" and that she did not "want to feel obligated to perform these nights w you in fear of losing the roof over my head." (GX 1407; GX A-442-37). The defendant told her that a Hotel Night was not going to happen and that it would "just be [them]" and they would have "romantic one-on-one time together in New York." (Tr. 4798-99). While Jane was en route to New York, the defendant was already texting Bridget Kreshover, the owner of Cowboys 4 Angels, soliciting an escort for a Hotel Night. (*See* GX 1407 at 59-60). It was not until Jane was mid-air that the defendant texted Jane about entertainment for a Hotel Night—despite his earlier promises. (Tr. 4799-4800). After Jane landed in New York

City, the defendant and Jane had a Hotel Night that included Kabrale Williams, an escort who traveled from Atlanta to New York, instead of the alone time that the defendant had promised Jane. (*See* Tr. 4800-07; GX 1407). This instance of travel similarly demonstrates (1) the defendant's defrauding of Jane in order to get her to travel to New York for a Hotel Night, and (2) the defendant's intent that she, despite his promises, engage in an act of prostitution upon arrival.

The defendant's fraud and coercion in these instances alone require the application of § 2G1.1(b)(1)(B) for Ventura and Jane, even in a world in which the Court views all evidence of coercion and fraud as acquitted conduct, since it forms in whole or in part the offense of conviction. This is especially true in light of the lower standard of proof required at sentencing. *See Watts*, 519 U.S. 147. Indeed, even the defense even appears to acknowledge that there was at least some fraud or coercion related to transportation. (*See* Def. Mem. 69-70 ("*Virtually all* the evidence of purported fraud or coercion involved events that occurred well before or well after any transportation was arranged.") (emphasis added)). The Court should therefore apply the enhancement.

### 4. Section 3's Enhancements for the Defendant's Aggravating Role, Vulnerable Victims, and Obstruction of Justice Apply

Regardless of whether the Court applies the Threat-or-Fear Cross-Reference, three enhancements provided for under Section 3 of the Guidelines apply. Specifically, the Government agrees with Probation that the defendant should receive a four-point enhancement under § 3B1.1 because he was an organizer or leader and the criminal conduct was otherwise extensive. In addition, the vulnerable victim enhancement under § 3A1.1(b)(1) and the obstruction of justice enhancement under § 3C1.1 are warranted.

### a. Section 3B1.1's Enhancement for Organizers or Leaders Applies

Under § 3B1.1, a defendant may receive an aggravating role enhancement as long as the criminal activity involves "more than one participant." *United States v. Skys*, 637 F.3d 146, 156 (2d Cir. 2011) (quoting U.S.S.G. § 3B1.1 introductory commentary); *see also* U.S.S.G. § 3B1.1, app. note 1 ("To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."). Participants are individuals who are "criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, app. note 1. An organizer or leader receives four points where criminal activity involved either five or more participants or was otherwise extensive. U.S.S.G. § 3B1.1(a). Before imposing this enhancement, the court "must make specific findings as to why a particular subsection of the § 3B1.1 adjustment applies." *Skys*, 637 F.3d 146 at 156. The court's analysis "is not limited to defendant's role in the count of conviction; rather, the court may take all 'relevant conduct' into account." *United States v. Brinkworth*, 68 F.3d 633, 641 (2d Cir. 1995).

This is at minimum an otherwise extensive scheme. Even where there are not five or more knowing participants (which the government does not concede), the organizer or leader enhancement is still appropriate where the criminal activity was "otherwise extensive." U.S.S.G. § 3B1.1(a). In determining whether a scheme is "otherwise extensive," the Second Circuit focuses "primarily on the number of people involved, . . . rather than other possible indices of the extensiveness of the activity." *United States v. Carrozzella*, 105 F.3d 796, 802 (2d Cir. 1997), *abrogated in part on other grounds*, *United States v. Kennedy*, 233 F.3d 157, 160-61 (2d Cir. 2000). In this analysis, courts are to consider "all persons involved during the course of the entire offense." U.S.S.G. § 3B1.1, app. note 3. Specifically, they should consider: "(1) the number of knowing participants in the criminal activity; (2) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; and (3) the extent

to which the services of the unknowing participants were peculiar and necessary to the criminal scheme." *United States v. Kent*, 821 F.3d 362, 368 (2d Cir. 2016). In the end, the district court determines whether the scheme was "the functional equivalent of one involving five or more participants." *Id.* (emphasis omitted); *see, e.g.*, *Archer*, 671 F.3d at 166 (affirming otherwise extensive enhancement where there were three knowing participants and a "fair number" of unknowing participants); *United States v. Rubenstein*, 403 F.3d 93, 99 (2d Cir. 2005) (same where there were two knowing participants and seven unknowing participants). As an example of criminal activity that could be otherwise extensive, the Guidelines describe "a fraud that involved only three participants but used the unknowing services of many outsiders[.]" U.S.S.G. § 3B1.1, app. note 3.

In this case, there are multiple knowing participants. These include, for example, certain high-ranking employees of the defendant, such as Kristina Khorram (chief of staff) and Faheem Muhammad (head of security); Ventura and Jane; and Garren James and Bridget Kreshover, a/k/a "Bridget Collins," the owners of Cowboys 4 Angels, an escort service that the defendant used to find escorts whom he transported across state lines to engage in prostitution. The participation of each of these individuals is outlined below:

- <u>Kristina Khorram:</u> Khorram, the defendant's chief of staff, had an integral role in making Hotel Nights happen, including supervising other assistants, who set up and cleaned up the hotel rooms; coordinating with security and Jessica Ruiz, the defendant's travel manager, who booked travel for the victims and, at times, the escorts, and reserved the hotel rooms; and communicating with the defendant and ensuring he had whatever he needed. (PSR ¶¶ 39-41, 73; *see also* GX 1411). Khorram communicated with Jane regarding her travel to Hotel Nights. (Tr. 4616). During Hotel Nights, Khorram ensured that the defendant had cash when he needed it, which he used to pay the escorts, (PSR ¶ 40; *see* GX C-621-C), and connected him to his drug dealer Guido to ensure that he had drugs for the night, (*see* GX A-141-A, A-141 at 56). Khorram knew escorts were involved. (*See* GX C-366 (Ryan Lopez, an assistant, texted Khorram: "Lol think I saw one of the cowboys today" / "You can spot them in a lobby like a escort" / "I forgot to tell you about it," to which Khorram responded with four laughing emojis)). And she continued organizing these nights even after she was aware of videos of Jane having sex with escorts, (*see* GX C-349), and Jane

told her that the defendant was threatening to release sex videos that showed Jane "heavily drugged, and doing things that he asked of me for the past three years," (GX C-251).

- <u>Faheem Muhammad:</u>  Muhammad, the defendant's head of security, was also heavily involved in making these nights a reality.  He frequently transported the defendant to and from Hotel Nights.  (*See, e.g.*, GX J-110-B, A-168).  He was in charge of the defendant's cash supply, (*see* Tr. 5217, 5426, 6115; PSR ¶ 55), and he brought or sent the defendant the cash he needed to pay escorts during Hotel Nights, (PSR ¶¶ 17, 39; *see, e.g.*, GX 1407, J-112-B (cash for Nov. 13, 2021 Hotel Night)), including for Hotel Nights involving travel, (*see, e.g.*, GX 1407, J-112-A (cash for Nov. 9, 2021 Hotel Night); J-107-A (cash for Sept. 18, 2023 Hotel Night)).  He also brought the defendant the drugs he needed for Hotel Nights.  (*See* Tr. 4717-18). Like Khorram, Muhammad was aware of a video of Jane having sex with an escort.  (*See* Tr. 6143-44).

- Casandra <u>Ventura:</u>  The defendant introduced Ventura to Freak Offs and eventually tasked her with finding the escorts.  (PSR ¶ 16; Tr. 516-17).  Ventura initially sourced escorts through websites like Craigslist or Backpage and services providing strippers or exotic dancers.  (Tr. 517, 524-25).  Eventually, Ventura and the defendant sourced escorts from Cowboys 4 Angels.  (Tr. 517).  Ventura typically communicated with James, the owner of Cowboys 4 Angels at the time, who is discussed more below, in order to arrange escorts.  (Tr. 521-24; GX B-326).  Some of these escorts traveled, and before arranging any travel, Ventura and the defendant would discuss who was available, whether they needed to fly someone in, and how to get the escort to their location.  (PSR ¶ 18; Tr. 540-41).  Ventura sometimes booked the travel for the escorts.  (Tr. 540-42).  Before beginning a Freak Off with an escort, the defendant instructed Ventura to determine if the escort was "safe," including having Ventura clarify on approximately six to eight occasions whether the escort was a cop.  (Tr. 530, 628-29).  Both Ventura and the defendant handed cash to the escorts at the end of Freak Off sessions.  (PSR ¶ 17; Tr. 531).  If Ventura paid an escort, the defendant handed her the cash to do so, which either the defendant or his security personal brought to the Freak Off.  (Tr. 531-32).

- <u>Jane:</u>  The defendant introduced Jane to Hotel Nights, and either the defendant or Jane (often at the defendant's direction) would coordinate with the escorts to arrange the Hotel Night.  (PSR ¶ 36; Tr. 4727, 4755, 4811, 5243).  The defendant encouraged Jane to reach out to escorts and to communicate with them.  (PSR ¶ 36; Tr. 4730-32, 4740-45).  Jane, knowing that she would have to have sex with strangers, attempted to exert some control over the situation by reaching out to two adult entertainers, whom she and the defendant invited to Hotel Nights.  (Tr. 4727-28, 4739-41, 4810-11; *see also* Tr. 4755).  And, on a few occasions, Jane reached out to an escort to set up a Hotel Night as a surprise to the defendant.  (PSR ¶ 36).  At the end of a Hotel Night, escorts were generally paid thousands of dollars in cash for their participation in Hotel Nights.  (PSR ¶ 39; Tr. 4814-18).  The cash was always from the defendant, although the defendant would often give the cash to Jane, and Jane would be the person to provide the cash directly to the escort.  (PSR ¶ 39; Tr. 4738-39, 4744, 4817-18).  In certain cases when there was no cash, Jane would pay the escort or escort service via a payment application such as CashApp, at the defendant's direction; after the payment was made, Jane would provide the defendant with a receipt of

the payment and the defendant would reimburse her.  (PSR ¶ 39; Tr. 4739, *see, e.g.*, GX A-159, DX 3187).

- <u>Garren James:</u>  James was the initial owner of the escort service Cowboys 4 Angels, which operated in all major U.S. cities.  (Tr. 517).  He communicated directly with Ventura to provide her and the defendant with escorts for Freak Offs.  (Tr. 521-24; GX B-326).  The defendant often directed Ventura to call James prior to a Freak Off, and Ventura showed the defendant the photographs of escorts that James sent for the defendant's approval.  (Tr. 521; GX B-326).  James arranged travel for at least one escort to fly internationally to meet Ventura and the defendant.  (*See* GX B-326 at 20-21; Tr. 540, 651).

- <u>Bridget Kreshover, a/k/a "Bridget Collins":</u>  To find escorts for Hotel Nights with Jane, the defendant communicated with Kreshover, the owner of Cowboys 4 Angels following James.  (Tr. 4587-88, 4760, 4770, 5000, 6943-45; GX A-103).  Some of the escorts Kreshover provided had to travel, and Kreshover conveyed the escorts' travel plans to the defendant.  (GX A-103).  For instance, for a January 20, 2023 Hotel Night, the defendant texted Kreshover to book Reggie, an escort.  (GX A-103).  When the defendant learned that Reggie had a client earlier in the day, the defendant said, "damn we don't want a tired situation."  (GX A-103).  Kreshover assured the defendant that Reggie was "never tired" and made clear that Reggie would need to fly from Las Vegas to Los Angeles for the night.  (GX A-103).  The defendant booked Reggie and told him to go to the London Hotel.  (A-159).  In connection with this Hotel Night, the defendant sent Jane $15,000, $1,100 of which she sent to Cowboys 4 Angels via CashApp.  (*See* GX A-103, A-159, A-159-G, A-159-H, 4B-101).[19]

Even if the Court does not find all these people to be knowing participants, the enhancement would still apply.  All that is needed for an "otherwise extensive" scheme is at least one knowing criminal participant (at minimum here, Ventura and Jane), and a number of unknowing participants to form the "functional equivalent" of five knowing participants.  *Kent,*

---

[19] The defendant may point out that following the September 17, 2023 Hotel Night in Manhattan, Kreshover texted the defendant, "There was a mistake with the cash.  We are $600 short.  Can you please Cashapp $600? $cowboys4angels."  (GX A-103).  The defendant's response makes his intent clear: "Lol.  He couldn't even perform," *i.e.*, perform sexually.  (GX A-103).  Kreshover then responded, "I'm confused.  Our agency provides time in companionship you're paying for the Gentlemans time."  (GX A-103).  Kreshover was aware of the laws regulating prostitution.  (GX A-103 ("Our agency has to dot every i and cross every t to make sure we stay within a specific guideline to be clear about what the agency offers and sells.  Sometimes the formality of that feels rigid.  It's not intended.").  Nevertheless, even after this exchange with the defendant regarding an escort's sexual performance, Kreshover continues to provide escorts for the defendant, including one who traveled to the sobriety party in October 2023, clearly qualifying her as a knowing participant if she was not before (though she likely was, given the defendant's status as a long-time customer of her agency, (GX A-103)).

821 F.3d at 368. All of the people described above are at least unknowing participants, given their participation in the scheme. In addition to the individuals described above, there is an even larger contingent of the defendant's employees who may not have realized the extent of the criminal scheme but nevertheless facilitated the Freak Offs and Hotel Nights and could thus qualify as unknowing participants. For instance, the evidence showed that the defendant had at least ten assistants or butlers, including Elie Maroun, David James, George Kaplan, Joey Chavez, Jonathan Perez, Brendan Paul, Frank Rodriguez, Phil Pines, Dave Shirley, and Ryan Lopez, as well as other members of his security team, who assisted in setting up and cleaning up from these nights and providing the defendant with any supplies he needed during the night—including money and drugs. The evidence also showed that the defendant used Ruiz to book hotels and travel for escorts and his girlfriends. (Tr. 6118-23; GX A-112). Their services were peculiar and necessary—the defendant could not have regularly had Freak Offs and Hotel Nights without them. *Cf. Archer*, 671 F.3d at 166 (finding that some number of the defendant's clients were unknowing participants and explaining that "though it is logically possible that [the defendant] could have filed false applications simply by pulling information from thin air, that was not what the evidence indicated he did"). Accordingly, the scheme was "otherwise extensive." *See United States v. Spencer*, 129 F.3d 246, 253-54 (2d Cir. 1997) (affirming otherwise extensive enhancement where there were three knowing participants in addition to the defendant and a "large number . . . of employees" who "were also essential to the scheme").

Although the Second Circuit focuses primarily on the number of knowing and unknowing participants when determining whether an activity is "otherwise extensive," it has not ruled out that there can be other relevant factors to consider in the analysis. *Kent*, 821 F.3d at 368. The majority of circuits consider factors such as the geographical extent of the activity as relevant to

the analysis. *United States v. Figueroa*, 682 F.3d 694, 696 (7th Cir. 2012). The activity here was undoubtedly geographically extensive, involving transportation for Freak Offs and Hotel Nights across the country (in cities such as New York, Miami, Los Angeles, and Las Vegas) and internationally (in places such as Ibiza and Turks and Caicos). (*See* GX 1402, 1406). In addition to the number of knowing and unknowing participants, which far exceeds the functional equivalent of five knowing participants, the geographic scope of the criminal activity weighs in favor of a finding that the scheme was otherwise extensive.

The defendant was a leader or organizer under § 3B1.1(b), rather than a manager or supervisor. In determining whether he is an organizer or leader or manager or supervisor, the Guidelines instruct the court to consider factors such as "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, app. note 4. The defendant was at the top of this organization, made up largely of his employees and girlfriends. The Freak Offs and Hotel Nights usually happened at the defendant's direction or prompting, and he had control and authority over his employees, whom he hired, and his girlfriends, whom he introduced to these nights. Before the nights, the defendant often instructed his employees to book travel and reserve and set up hotel rooms and told his girlfriends to find escorts and take certain drugs. During the nights themselves, the defendant told his employees what he needed and instructed Ventura and Jane, as well as the escorts, to engage in specific kinds of sexual activity. Relatedly, the defendant also undoubtedly claimed "a larger share of the fruits" of the Freak Offs and Hotel Nights, as they

were entirely for his own sexual gratification. *Id.* At every stage, the defendant was the organizer and leader of the offense.

The defendant argues that the Court should not apply the leadership enhancement because the jury acquitted the defendant of the RICO count, supposedly "reject[ing] the idea that he was the organizer or leader of any criminal conduct[.]" (Def. Mem. 112). As discussed *supra*, the jury's verdict cannot be taken as a rejection of any particular fact, including the notion that the defendant was a leader or organizer. *See Watts*, 519 U.S. at 155; *Martinez*, 110 F.4th at 174. Indeed, in addition to the different standard of proof applicable to sentencing, there are huge differences between the many requirements of the RICO statute and the leadership enhancement. For example, the RICO statute requires proving beyond a reasonable doubt that there was a conspiracy among two or more persons to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity, which includes proving that a particular enterprise existed and that the enterprise continued in substantially similar form over the twenty years charged in the indictment. (Jury Instr. 14-15). The leadership enhancement requires none of this. Instead, it calls simply for a finding that the defendant organized or led one or more participants in an otherwise extensive criminal activity. U.S.S.G. § 3B1.1(a) & app. note 2). As such, the enhancement does not involve any acquitted conduct.

Further, any argument that the acquitted conduct guideline is implicated could conceivably only apply to the question of whether the defendant's employees were knowing criminal participants. The acquittal says nothing at all about whether the employees were unknowing participants, and, for the reasons described above, they, at the very least, fall into that category. Similarly, the RICO acquittal had nothing to do with whether Ventura, Jane, James, or Kreshover were knowing criminal participants. The Court could therefore find the otherwise extensive

leadership enhancement met without considering any potential acquitted conduct as a result of the defendant's supervision over Ventura, Jane, James, or Kreshover as knowing participants and the employees as unknowing participants.  *See Archer*, 671 F.3d at 166 (finding three knowing participants and a "fair number" of unknowing participants); *Rubenstein*, 403 F.3d at 99 (finding two knowing participants and seven unknowing participants); *Spencer*, 129 F.3d at 253-54 (finding three knowing participants and a "large number . . . of employees").

To the extent the Court finds that the employees' knowing status was acquitted conduct (which it should not), this conduct would nevertheless fall within the § 1B1.3(c) exception where the employees facilitated travel for Freak Offs or Hotel Nights, as this would help establish the Mann Act element of transportation in whole or in part.  Khorram, for one, facilitated travel a number of times for Jane and escorts.  For example, Khorram coordinated Jane's travel to New York for the Hotel Night in September 2023, when the defendant had lied to Jane and said they were going to spend alone time together.  (*See* GX 1407 at 49 (Combs: "Can you get [Jane] here tomorrow" . . . Khorram: "FYI – [Jane] just told me she's not coming to nyc …"), 54 (Jane: "Hii KK.. okay we spoke.. I'll be able to travel tmw. Just let me know thank you" . . . Khorram: "Ok cool! Goin to text now for options with Jess")).  Khorram similarly coordinated escort travel on other occasions.  (*See* GX C-271-A-R (Khorram discussing hotel options for Vegas that Ruiz was looking into and asking "is paul"—*i.e.* the escort Paul Arthur—"coming to vegas with you too?"); A-141 (Khorram sending Ruiz's phone number to the defendant when the defendant and Jane were trying to organize travel for Kabrale Williams and stating, "Also if faster you can always just book the flight online – or have them do and we can reimburse …")).  This evidence directly establishes the transportation element of the Mann Act.

The defendant also argues that this enhancement is not appropriate by claiming that there were no participants in the scheme. (Def. Mem 114-19). The defendant first contends that Ventura and Jane cannot be knowing participants given that they are victims of the Mann Act. (*Id.* at 115-16). That is simply not true under the text of the Guidelines. Application Note 2 to § 3B1.1 explains that "[f]or the purposes of 3B1.1 (Aggravating Role), a victim, as defined in this guideline, is considered a participant only if that victim assisted in the promoting of a commercial sex act or prohibited sexual conduct in respect to another victim." U.S.S.G. § 3B1.1, app. note 2; *see also United States v. Scott*, 529 F.3d 1290, 1303-04 (10th Cir. 2008) (rejecting defendant's argument that victim of sex trafficking could not also be participant and finding prostitute was participant where she also convinced a minor victim to travel with them). Ventura and Jane are not participants because of their own transportation, but rather because they "assisted in the promoting of a commercial sex act or prohibited sexual conduct in respect to another victim," namely, the escorts. U.S.S.G. § 2G1.1, app. note 3. The evidence showed that the defendant introduced Ventura and Jane to Freak Offs and Hotel Nights, (Tr. 407, 4580-88), and then supervised them as they reached out to escorts, including escorts who had to travel for these nights, (*see* Tr. 517, 521-24, 4727-28, 4739-41, 4810-11). Ventura and Jane did this knowing that the escorts were traveling to participate in Freak Offs and Hotel Nights and would be paid to engage in sex acts. (*See* Tr. 479, 531-33, 4737-38, 4814-18). Sometimes Ventura and Jane even paid the escorts directly, at the defendant's direction and using the defendant's money. (Tr. 531-32, 4738-39, 4744, 4817-18). The defendant discussed the escorts' travel with Ventura and Jane, (*see, e.g.*, Tr. 540-41; GX B-638), and sometimes had them book travel for the escorts, for which he would

reimburse them, (*see* Tr. 535, 540-42, 4733, 4736-37, 4751-52, 4806).  This evidence is sufficient to establish that Ventura and Jane were participants for purposes of the § 4A1.1 enhancement.[20]

The defendant next argues that there is insufficient evidence that Khorram was a criminally responsible participant.  (Def. Mem. 118).  But as described above, the evidence shows that Khorram played an integral role in making the Hotel Nights happen, including by supervising the assistants, coordinating with security and Ruiz, and communicating with the defendant and ensuring he had whatever he needed.  (*See* GX 1407, 1411; *see also* Tr. 6116-18).  Despite the defendant's assertions otherwise, the evidence showed that Khorram knew that escorts were involved in the Hotel Nights, (*see* GX C-366, C-349), and, at least at times, assisted in their travel, in addition to travel for Ventura and Jane, (*see* GX C-271-A-R, A-141).

The defendant also contends that the defendant's security staff and assistants cannot be "unknowing participants" in the scheme because they did not organize transportation that gave rise to the Mann Act charges, and that Ruiz cannot be an "unknowing participant" because she did not know the travel was for prostitution.[21]  (Def. Mem. 120-21).  But there is no requirement that

---

[20] The defendant asserts that the Government should not be permitted to "change its theories" that Ventura and Jane are victims or that the escorts are not.  (Def. Mem. 118).  The Government is not, however, changing its "theory"; instead, it is simply following the text of the Guidelines, as it must.  The Guidelines envision that even victims (like Ventura and Jane) can be "participants" for the purpose of § 3B1.1 and U.S.S.G. § 2G1.1, app. note 3, and that individuals who travel and engage in sexual acts for money consensually (like the escorts) are "victims" for purposes of § 2G1.1, *id.*, app. note 1.

[21] The defendant also argues that any finding that "Ruiz and Butler were assisting in criminal activity in any way (whether knowingly or unknowingly) is belied by the jury's verdict on the RICO conspiracy count."  (Def. Mem. 120).  That is, at minimum, blatantly untrue as to Ruiz or Butler's status as an unknowing participant for purposes of § 3B1.1.  The Guidelines imagine that unknowing participants can include "the unknowing services of many outsiders."  (U.S.S.G. § 3B1.1, app. note 3).  That is in no way similar to the RICO statue's requirement that the Government prove a criminal enterprise that includes a conspiratorial agreement to achieve an unlawful object, *i.e.*, to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity.  (Jury Instr. 13).

unknowing participants engage in every facet of a criminal scheme. Even if Ruiz did not always know the purpose of the travel, and even if the assistants and security were not integrally involved in the transportation of Ventura, Jane, or the escorts, these employees nevertheless played a key role in facilitating the Freak Offs and Hotel Nights that form the basis for the Mann Act offenses. Among other things, they assisted in the setting up and cleaning up of hotel rooms and brought supplies to the hotel rooms—including cash used to pay escorts. These nights were the reason the defendant transported escorts to engage in acts of prostitution, and they could not have happened without security or the assistants. In other words, the employees are "peculiar and necessary" to the criminal scheme. *Kent*, 821 F.3d at 368.

### b. Section 3A1.1(b)(1)'s Enhancement for Vulnerable Victims Applies

The Government objects to Probation not applying the vulnerable victim enhancement under U.S.S.G. § 3A1.1(b)(1). This two-level enhancement applies "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim," *id.*, which was the case for Ventura and Jane.

Ventura was a 19-year-old aspiring singer who was "naïve" and "sexually inexperienced" when she met the defendant, and the defendant had her "career in his hands." (Tr. 421-23). Due to the power dynamic between the two of them, Ventura testified that early on, she was swayed by the defendant. (Tr. 422 ("I don't know that I knew that I was making decisions for myself or not."). The defendant knew this and exploited it. Another witness testified that early on in the relationship between Ventura and the defendant, the defendant told a colleague that Ventura was "young," that he had Ventura "right where [he] want[ed] her," and that Ventura was "very moldable." (Tr. 1725). In other words, the defendant was aware of this power dynamic, all of which made her "particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, app. note 2

(explaining that enhancement is appropriate where victim is vulnerable "due to age, physical or mental condition, or . . . is otherwise particularly susceptible to the criminal conduct").

The defendant also knew Jane was vulnerable: Jane told him about her prior relationships in which she had experienced both physical violence and rape. (Tr. 5104; GX A-301-H). Jane's history of abuse also warrants application of this enhancement. *See United States v. Beith*, 407 F.3d 881, 891 (7th Cir. 2005) ("Victims of molestation and sexual assault certainly qualify as vulnerable victims.") (collecting cases), *abrogated on other grounds by United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012); *Richmond v. United States*, No. 15 Cr. 28-001, 2019 WL 1499160, at *5 (E.D. Tex. Apr. 5, 2019) (applying vulnerable victim enhancement where defendant knew that victim had previously experienced sexual assaults and violence).

Probation declined to apply the vulnerable victim enhancement *not* because it found that Ventura and Jane were not vulnerable but because it concluded that the factors that made them vulnerable were accounted for in the fraud-or-coercion enhancement, such that applying both would constitute impermissible double-counting. (*See* PSR ¶¶ 88, 118). Application Note 2 to U.S.S.G. § 3A1.1 instructs that the "vulnerable victim" subsection should not be applied "if the factor that makes the person a vulnerable victim is incorporated in the offense guideline." However, here, the factors that made Ventura and Jane vulnerable are separate from the fraud and coercion that the defendant used in connection with the Freak Offs and Hotel Nights. The defendant knew about these vulnerabilities of Ventura and Jane *before* he introduced them to these nights, and then used fraud and coercion to get them to continue to participate in them. Indeed, the evidence supports the conclusion that the defendant—who frequently had sex with other partners *not* involving Freak Offs, (*see* Tr. 4837-39, 5014-15 (Jane's testimony about being upset that the defendant used her for Hotel Nights instead of other girlfriends))—targeted Ventura and

Jane to participate in Freak Offs because he believed that their vulnerabilities would make it difficult or unlikely that they would refuse to oblige. This is the sort of application contemplated by the Guidelines and supported by the case law. *See United States v. Kaye*, 23 F.3d 50, 54 (2d Cir. 1994) (rejecting argument that harm to the victim was double-counted by application of the "abuse of a position of trust" and "vulnerable victim" enhancements); *United States v. Hershkowitz*, 968 F.2d 1503, 1505-07 (2d Cir. 1992) (in assault on prisoner case, rejecting argument that victim's vulnerability was already factored into the offense level for civil rights violation and noting that the enhancement reflects "the public interest in more severely punishing those whose choice of victim demonstrates an 'extra measure of criminal depravity'"); *see also United States v. Volpe*, 224 F.3d 72, 76-77 (2d Cir. 2000) (rejecting double-counting argument "to recognize the separate harms caused by each of these aggravating factors"); *United States v. Matsumaru*, 244 F.3d 1092, 1108 (9th Cir. 2001) (rejecting defendant's claim that district court "improperly double-counted by applying both the 'vulnerable victim' and 'special skill' enhancements" when defendant was immigration attorney who preyed on Japanese nationals who, culturally, placed "absolute trust" in attorneys). Accordingly, the Court should apply the enhancement.

### c. Section 3C1.1's Enhancement for Obstruction of Justice Applies

The Government also objects to Probation not including an enhancement for obstruction under U.S.S.G. § 3C1.1 related to the defendant's obstructive conduct toward (1) Jane and/or (2) this Court during the pendency of this case. This enhancement applies "where the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant

conduct; or a closely related offense[.]"  U.S.S.G. § 3C1.1.  The evidence demonstrates by a preponderance that the defendant did precisely this.

*First*, the defendant's recorded calls with Jane on November 19, 2023 warrant the obstruction enhancement.  (*See* PSR ¶¶ 47-50).  That day, the defendant made two recorded calls after Jane sent him a text message reacting to Ventura's lawsuit, filed three days earlier.  (PSR ¶¶ 47-49).  Jane's text message and the recorded calls took place on November 19, 2023—*after* the Government's investigation had begun. [22]  The Guidelines as well as the case law in this Circuit support the enhancement here, even where the federal criminal investigation was in its early days. *See United States v. Ayers*, 416 F.3d 131, 133-34 (2d Cir. 2005) (applying obstruction enhancement even when federal criminal investigation had not yet commenced (but state police investigation was underway) and citing other cases that applied the enhancement broadly).

Probation declined to apply this enhancement because it found that the calls appeared to relate to civil litigation rather than to a criminal investigation.  (PSR at 58).  The recorded calls, however, make clear that the defendant was attempting at least in part to prevent the advancement of a criminal investigation.  Respectfully, Probation's reasoning might have made sense if the defendant simply instructed Jane not to send him *text messages* (which he did).  But the defendant also repeatedly told Jane that he could not be *talking* on phones.  (*See* GX C-348-A-R-T ("You know I can't really talk on these phones, you know?"; "I'm not even supposed to be talking on the phone"; "I can't be talking on the phone"; "I know I can't talk on this phone").  The only reason not to *talk* on the phone is for fear that the Government could have a wiretap, which is not an investigative tool available to civil litigants.  The defendant's near obsessive concern with talking

---

[22] The Government opened its investigation the day after Ventura filed her civil lawsuit, on November 17, 2023.  (PSR ¶ 5).

on the phone shows his concern about a criminal investigation—a reasonable concern given that the Government's investigation had already started.

Although the Government argued that this instance supported the witness tampering racketeering predicate, that does not make it acquitted conduct. First, the obstruction enhancement does not require that the defendant agree to work with anyone else, and certainly not a racketeering enterprise, as the RICO charge required. Second, the witness tampering predicate has requirements that are not present in the obstruction enhancement. The witness tampering statute requires, for example, that the defendant intend to hinder the communication of information to a group of law enforcement officers that either included a federal law enforcement officer or where there was a reasonable likelihood that a relevant communication would have been made to a federal law enforcement official. (Jury Instr. 29-30). Thus, application of the obstruction enhancement is not in tension with the jury's verdict.

To the extent the Court believes this is acquitted conduct, it should nevertheless be considered because it is relevant to proving the defendant's criminal intent. U.S.S.G. § 1B1.3(c). That the defendant was attempting to cover up his conduct both supports the obstruction enhancement and shows his consciousness of guilt, and thus his intent, as to the underlying Mann Act crimes, which he contested at trial.[23]

*Second*, the obstruction enhancement under U.S.S.G § 3C1.1 also applies because of the defendant's conduct at the November 19, 2024 conference, in which the defendant falsified a document and caused his attorney to make a material misrepresentation to the Court. More specifically, on November 19, 2024, the Court held a hearing to address the defendant's contention

---

[23] The defendant's obstructive conduct toward the Court, discussed *infra*, was not presented to the jury and thus presents no potential acquitted conduct issue.

that when a BOP investigator had taken photographs of certain of the defendant's notes at the MDC (the "BOP Notes") during the pre-planned October 2024 sweep of the MDC, the Government invaded his attorney-client privilege.  (*See also* Dkt. 72).  The Government argued that the BOP Notes did not appear privileged on their face, and that the portions of the BOP Notes in the possession of the case team were not privileged.  To counter the Government's argument, the defendant directed defense counsel to point to a stack of actual notebooks that the defendant had brought to court, which included a notebook from which at least some of the BOP Notes were purportedly taken.  Defense counsel claimed that the defendant had handwritten "Legal" on the notebooks and that the BOP Notes were taken from legal pads clearly marked "Legal."  In further support of this assertion, defense counsel presented to the Court—but not the Government—one of the notebooks that had been in the defendant's continuous custody directly prior to the conference and from which the BOP Notes were allegedly taken, which was apparently labeled "Legal."

On November 20, 2024, the Court issued an order stating that "defense counsel presented the Court with an intact legal pad with 'Legal' written on the binding, stating that the 'Legal' label on this and the other pads showed that they were clearly protected by attorney-client privilege and should not be in the Government's possession."  (Dkt. 77).  The Court ordered defense counsel to address why the "Legal" label did not appear on the photographs of the BOP Notes.

On November 22, 2024, the Court held a hearing on the defendant's renewed bail motion. In response to the Court's inquiry regarding the "Legal" label that seemed to have appeared *after* the photographs of the BOP Notes were taken, defense counsel stated that "[a]s we sit here today, I'm not sure when 'legal' was written on each" of them and conceded that, contrary to his representations to the Court only days before, "it has to be the case that as of the day of the search

. . . 'legal' wasn't written on every legal pad."  Defense counsel further assured the Court that it would "get back to the Court" to "give your Honor a fuller account of all of these issues," and that in "fairly short order," the defendant would "give the Court a full account of all these related issues."  (Nov. 22, 2024 Tr. 4).  The Court admonished the defense for making "a clear representation that the[] legal pads had 'legal' written on them," which was inaccurate and urged the defense to ensure its representations to the Court are "in good faith" and "true."  (*Id.* at 5).  In denying the defendant's renewed motion for bail, the Court noted that "[t]he circumstances of this incident, and the misrepresentation made at the November 19, 2024 hearing where Combs was present, bear on whether the Court can be reasonably assured that any conditions it imposes will be followed."  (Dkt. 92 at 3).

Despite the defense's assurances that a "fuller" accounting would be provided in "short order," the Government understands that no further submissions were made on this issue.  In correspondence with Probation in connection with the PSR, defense counsel indicated that the representation during the November 19, 2024 hearing was "based on erroneous information provided by another lawyer, who is no longer on the defense team."  (PSR at 58).

Because the Court alone saw the notepads during the November 19, 2024 hearing, only the Court and the defense know the full factual record as to this incident.  However, the facts described above—that the defendant directed his attorney to provide a doctored notepad (a notepad that only the defendant could have doctored) to the Court to falsely suggest that the Government had deliberately invaded his attorney-client privilege—clearly supports the application of the obstruction enhancement under U.S.S.G. § 3C1.1.  Indeed, this very conduct falls squarely within the scope of the enhancement, which applies to "producing or attempting to produce a false, altered, or counterfeit document or record during . . . [a] judicial proceeding," as well as "providing

materially false information to a judge." U.S.S.G. § 3C1.1, app. note 4(C), (F). And it is clear that *the defendant* caused his attorney to make the misrepresentation—it was not due to "erroneous information" from an attorney who, conveniently, is no longer part of the defense team. It is equally clear that the false information was material to the issue under consideration. *See United States v. Gershman*, 31 F.4th 80, 103-04 (2d Cir. 2022) (noting that the "threshold for materiality is conspicuously low" and all that is required is that the defendant's conduct have the "*potential*" to impede the proceedings); *see also* U.S.S.G. § 3C1.1 cmt. n.6 (defining "[m]aterial" as meaning "evidence, fact, statement, or information that, *if believed, would tend to influence or affect* the issue under determination" (emphasis added)). The defendant, who has been an active, engaged, and attentive participant throughout all proceedings in this case, including during the November 19, 2024 hearing, undoubtedly understood that "proof" that his notepads were marked "Legal" would be devastating to the Government's arguments and powerful to his own position. He almost got away with it—but for the Court's close review of the material. This fraud on the Court constitutes obstruction.

### 5. The Defendant Does Not Qualify for Acceptance of Responsibility Points Under § 3E1.1

U.S.S.G. § 3E1.1 allows for a decrease of two levels where "the defendant clearly demonstrates acceptance of responsibility for his offense." The defendant argues that he should receive acceptance of responsibility points even though he has contested his guilt under the Mann Act before, during, and after trial. (Def. Mem. 126-29). It is plainly improper to give the defendant the benefit of this reduction.

Application Note 2 to § 3E1.1 explains that "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G.

§ 3E1.1, app. note 2.  Here, the defendant denied essential elements of the crimes charged and put the Government to its burden at trial, as is his right.  With regard to the Mann Act specifically, the defendant argued time and again that the Government had not met the elements of the crime because, he claimed, he did not transport anyone intending that they engage in prostitution because he did not pay escorts for sex but instead paid them for their time.  (*See, e.g.*, Tr. 7884-89).  And far from admitting guilt and expressing remorse after his conviction, he has continued to deny his guilt in his initial Rule 29 motion at the close of the Government's case, (Tr. 7390-91), and in his post-trial motion for an acquittal and a new trial, (Dkt. 486 at 26-32).  Even in his recent objections to the PSR, the defendant repeatedly inserted facts that appear to be used to deny guilt and instead support his theory, rejected by the jury, that escorts were paid for their time.  (*See, e.g.*, Def. Obj. at 16 (objecting to Paragraphs 61-63 by stating "Arthur did not lie by stating that COMBS 'paid him for personal training and for hanging out in hotel rooms but not for sex'" and that "Cowboys 4 Angels, Arthur's employer, also stated to COMBS, in evidence admitted by the government that COMBS was paying escorts for *their time*")).  Further, other than a general statement in an essay that he is "accountable" and "responsible," (PSR ¶ 82), the defendant has not—at any time prior to or after the verdict—actually expressed remorse for his crimes or for the harm he has caused Ventura and Jane.  In short, awarding the defendant acceptance of responsibility points under the Guidelines would be nonsensical.

In an attempt to circumvent this obvious reality, the defense seizes on the limited exception to the general rule that defendants who choose to put the Government to its proof at trial do not receive acceptance points.  The Guidelines state that there are "rare situations" in which "a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial," such as "where a defendant goes to trial to

assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." U.S.S.G. § 3E1.1, app. note 2; *see also United States v. Gabin*, 24 F. App'x 23, 26 (2d Cir. 2001) ("While the commentary also provides that '[c]onviction by trial' should not 'automatically' preclude application of the two-level adjustment, a defendant who puts the Government to its proof rarely qualifies for an adjustment."). In such situations, the acceptance of responsibility determination "will be based primarily upon pre-trial statements and conduct." U.S.S.G. § 3E1.1, app. note 2.

This exception plainly does not apply to the defendant. The defendant "points to no 'pre-trial statements [or] conduct' demonstrating clear acceptance of responsibility," nor is the Government aware of any. *United States v. Smith*, No. 24-940, 2025 WL 751377, at *3 (2d Cir. Mar. 10, 2025) (affirming district court's denial of acceptance points); *see also United States v. Bodnar*, 37 F.4th 833, 846 (2d Cir. 2022) (declining to find defendant accepted responsibility where "[t]he record is also devoid of anything suggesting that [the defendant] had demonstrated acceptance of responsibility *pre-trial*," rather than during trial); *United States v. Echevarria*, 732 F. App'x 101, 103 (3d Cir. 2018) (affirming district court's denial of acceptance points where defendant "asserted his innocence all throughout trial"). To the contrary, the defense's pretrial statements echoed its argument at trial that the defendant was not factually guilty: he did not, the defense claimed, intend to pay for sex and, consequently, did not violate the Mann Act. (*See, e.g.*, Sept. 18, 2024 Bail Appeal Tr. at 50 (Court: "[T]o the extent that you claim that this sort of behavior was—that inviting another person into the relationship was somehow consensual, if that person is a sex worker or prostitute and travels across state lines, isn't that a problem regarding Count Three of the indictment?" Mr. Agnifilo: "It may or may not be. I have spoken to the people from this agency, and what they uniformly say is we are not paid to have sex. We are paid for our

time.  And if we meet somebody and it goes in that direction and everybody wants to do this and there is sexual contact, then that sometimes happens."); Dkt. 61 (Nov. 8, 2024 Bail Renewal Motion) at 11 ("[S]everal individuals associated with a male companion agency have stated to the prosecutors that they are paid for their time, not for having sex.")).  The Court should reject the defendant's argument on this basis alone.

The defendant nevertheless argues that the exception applies to him because he has raised several constitutional challenges and challenges the Mann Act's applicability to him in his post-trial motion for an acquittal, and because the Government did not provide the defendant with a plea offer solely to the Mann Act counts.  (Def. Mem. 127-28).  But neither of these arguments makes the defendant eligible for acceptance points.

*First*, even assuming that the defendant has properly preserved his constitutional and legal arguments regarding the Mann Act,[24] the defendant is still not entitled to acceptance points.  In addition to raising these legal arguments post-trial, he has, as explained above, continually denied his *factual* guilt—before, during, and after trial.  *See United States v. Kamara*, 85 F. App'x 231, 233 (2d Cir. 2003) ("[W]e have held that a defendant who goes to trial to deny his factual guilt may not receive the adjustment for acceptance of responsibility."); *cf. United States v. Herriman*, 739 F.3d 1250, 1257 (10th Cir. 2014) (drawing distinction between defendant who "admitted to all the conduct with which he was charged but simply disputed whether his acknowledged factual state of mind met the legal criteria of intent required by the applicable statute," who may be entitled to acceptance points, and defendant who challenges "the *factual* element of intent," who will not be).  Raising legal challenges alongside a challenge to factual guilt does not suddenly render the

---

[24] The Government disputes that these issues were preserved and has argued in its Rule 29 opposition that the defendant has waived his claims based on the Constitution and the applicability of the Mann Act to his conduct.  (*See* Dkt. 493 at 10-15).

defendant's factual arguments constitutional and make him deserving of acceptance points. *See United States v. Paredes-Batista*, 140 F.3d 367, 380-81 (2d Cir. 1998) (explaining that "[w]ere it true that [the defendant] proceeded to trial solely for the purpose of asserting" a legal challenge, "we might be inclined to agree that he was entitled to a two-point acceptance of responsibility adjustment," but denying acceptance points because the defendant also argued at trial that he did not have the requisite *mens rea* to be guilty of the charged crime).

*Second*, the defense tries to support his argument with vague references to pretrial discussions between the Government and the defense regarding potential pretrial dispositions. Regardless of the substance of these conversations, the Second Circuit has held that failed plea negotiations alone do not warrant acceptance points. *Smith*, 2025 WL 751377, at *3 (holding no acceptance points where the only pretrial conduct defendant could point to was "failed plea negotiations"). Separate and apart from reaching a negotiated disposition with the Government, the defendant had other options if he wanted to attempt to fully accept responsibility for his violations of the Mann Act, such as pleading guilty to those charges prior to trial, not contesting the charges at trial, or, at the very least, making statements pretrial to that effect.[25] The defendant did none of those things—or anything else—to indicate that he was attempting to take responsibility for his conduct. As a result, the defendant's objection should be rejected.

---

[25] The Government is not conceding that any of these would be sufficient to make acceptance points appropriate. In fact, even in situations where the defendant accepts responsibility for some counts but not others at trial—which was not the case here—the Second Circuit has held that forcing the Government to trial on the remaining counts is sufficient to deny acceptance points. *See, e.g.*, *Smith*, 2025 WL 751377, at *3 (affirming district court's denial of acceptance points, explaining that "[e]ven if his defense [at trial] focused on the attempted murder charge, [the defendant] still went to trial on the other charges and put the government to the burden of proving each one"); *Bodnar*, 37 F.4th at 845-46 (2d Cir. 2022) (denying acceptance points where defendant "accepted responsibility for possessing 100 kilograms of marijuana" at trial and acknowledged the strength of the Government's evidence on a substantive drug trafficking charge but Government was "still required to offer evidence" and "fully prove" all counts).

106

### 6.  The Defendant Does Not Qualify for the Zero-Point Offender Reduction Under § 4C1.1

The defendant argues that he is a zero-point offender under the 2023 version of § 4C1.1 and asks the Court to apply only that provision from the 2023 Guidelines Manual, while conducting the rest of its Guidelines analysis using the 2024 Guidelines Manual, because of alleged *ex post facto* concerns.  (Def. Mem. 122-26).  But the defendant does not qualify as a zero-point offender under either version of the Guidelines.  And under the terms of the Guidelines themselves and controlling precedent, the Court cannot pick and choose between different Guidelines manuals as the defendant suggests.

Section 1B1.11 explains that the default rule is that the Guidelines Manual in effect on the date of sentencing is the manual used to calculate a defendant's Guidelines range.  U.S.S.G. § 1B1.11(a).  However, § 1B1.11 recognizes that *ex post facto* problems can exist with this scheme, and where that occurs, the court instead uses the manual in effect on the date that the offense of conviction was committed.  *Id.* § 1B1.11(b)(1).  Where the earlier manual is more favorable to the defendant, § 1B1.11 provides that the manual "shall be applied in its entirety," *id.* § 1B1.11(b)(2)—a requirement commonly known as the "one-book rule."  In accordance with this rule, "[t]he court shall not apply . . . one guideline section from one edition of the Guidelines Manual and another guidelines section from a different edition of the Guidelines Manual."  *Id.*

On the date of the defendant's sentencing, the 2024 Guidelines Manual will be in effect.  Under that manual, a defendant who is a "zero-point offender" receives a two-point reduction where all the following criteria are met:

> (1) the defendant did not receive any criminal history points from Chapter Four, Part A;
>
> (2) the defendant did not receive an adjustment under § 3A1.4 (Terrorism);

(3) the defendant did not use violence or credible threats of violence in connection with the offense;

(4) the offense did not result in death or serious bodily injury;

(5) the instant offense of conviction is not a sex offense;

(6) the defendant did not personally cause substantial financial hardship;

(7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(8) the instant offense of conviction is not covered by § 2H1.1 (Offenses Involving Individual Rights);

(9) the defendant did not receive an adjustment under § 3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense);

(10) the defendant did not receive an adjustment under § 3B1.1 (Aggravating Role); and

(11) the defendant was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848[.]

U.S.S.G. § 4C1.1(a). The parties agree that under the 2024 Guidelines Manual, the defendant does

not qualify for the two-point reduction because the instant offense of conviction is a "sex offense,"

*i.e.*, "an offense under . . . chapter 117 of title 18," which includes the Mann Act.[26]  U.S.S.G. §

4C1.1(b)(2); (*see* Def. Mem. 125).  The 2023 Guidelines Manual, however, contains a different

definition of the term "sex offense," limiting the term to "an offense, *perpetrated against a minor*,

under . . . chapter 117 of title 18[.]"  U.S.S.G. § 4C1.1(b)(2) (2023).  The defendant argues that

the Court should generally apply the 2024 Guidelines Manual (so that he can get the benefit of the

---

[26] As described more below, the defendant also does not qualify because he receives a leadership adjustment under § 3B1.1, and he used violence or credible threats of violence in connection with the offense.

new 2024 guideline governing acquitted conduct), except for the 2023 version of § 4C1.1(a) (under which he claims he qualifies as a zero-point offender). In his view, following the one-book rule and using either the 2024 Guidelines Manual or the 2023 Guidelines Manual in full would violate due process. The defendant is wrong both that the one-book rule violates due process and that he would qualify as a zero-point offender under the 2023 version of § 4C1.1.

The Court should reject the defendant's invitation to selectively apply different provisions from the 2024 Guidelines Manual and the 2023 Guidelines Manual because "[c]ontrolling precedent . . . precludes such reasoning." *United States v. Ramirez*, 846 F.3d 615, 621 (2d Cir. 2017). The Second Circuit has held in no uncertain terms that "[a] version of the sentencing guidelines is to be applied in its entirety," and "[a] sentencing court has no authority to pick and choose, taking one provision from an earlier version of the guidelines and another from a later version." *United States v. Keller*, 58 F.3d 884, 890 (2d Cir. 1995), *abrogated on other grounds by United States v. Mapp*, 170 F.3d 328, 338 n.15 (2d Cir. 1999); *see also id.* (collecting cases articulating the same rule in "most other circuits").[27]

---

[27] The defendant points to one Seventh Circuit case, in which Judge Posner commented that the one-book rule was "nonbinding" and "should not be applied indiscriminately." *United States v. McMillian*, 777 F.3d 444, 448 (7th Cir. 2015). This case does not control for several reasons. First, as at least one other circuit has recognized, Judge Posner's comments were *dicta*, *United States v. Ngombwa*, 893 F.3d 546, 555 (8th Cir. 2018), and Second Circuit case law does not adopt this permissive approach, *see, e.g.*, *Ramirez*, 846 F.3d at 621 (explaining that "[c]ontrolling precedent . . . precludes such reasoning," i.e., applying portions of different Guidelines manuals). Second, even if *McMillian* were legally persuasive, it is not factually apt. That case was about a different part of the one-book rule, which provides that "[i]f the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses," U.S.S.G. § 1B1.11(b)(3), and is not at issue here. *Cf. United States v. Kumar*, 617 F.3d 612, 628 (2d Cir. 2010) (holding that one-book rule in § 1B1.11(b)(3) does not violate the *ex post facto* clause).

The defendant argues that not applying the 2023 version of § 4C1.1 would violate his *ex post* facto rights.  (Def. Mem. 124-25).  This is wrong.  The Second Circuit has explained that the "one-book rule is used, in the first instance to determine whether an *ex post facto* problem exists." *Keller*, 58 F.3d at 892.  In conducting this analysis, "the first step is to inquire whether a particular amended provision provides a more onerous penalty for a defendant, disadvantaging him," and "[i]f it does, the second step is to ascertain whether there are any ameliorative changes to offset the disadvantageous amendment and determine therefore if a potential *ex post facto* problem is actually present." *Id.* at 891.  In other words, "[t]he relevant inquiry for *ex post facto* analysis is not whether a particular amendment to the Sentencing Guidelines is detrimental to a defendant, but whether application of the later version of the Sentencing Guidelines, considered as a whole, results in a more onerous penalty." *Berrios v. United States*, 126 F.3d 430, 433 (2d Cir. 1997).

In this case, the *ex post facto* analysis ends at the first step: the amended version of § 4A1.1(a) does not create a more onerous penalty for the defendant.  Even accepting that the defendant did not commit a "sex offense" as defined under the 2023 version of § 4A1.1(a), the defendant does not qualify as a zero-point offender under that provision because he receives an adjustment under § 3B1.1, as discussed *supra*, and he used violence or credible threats of violence in connection with the offense.

As to the violence factor, the defendant concedes that there was evidence of the defendant's domestic violence but argues that he did not use violence or threats of violence *in connection with* the Mann Act offenses.  (Def. Mem. 123; *see also* Tr. 8142-43 (summarizing instances in which defense counsel "conceded the defendant's violence in his personal relationships" at trial)).  The Supreme Court "has often recognized that 'in connection with' can bear a broad interpretation" and is a "capacious phrase." *Mont v. United States*, 587 U.S. 514, 522-23 (2019); *see also e.g.*,

*United States v. American Union Transport, Inc.*, 327 U.S. 437, 443 (1946) (describing the phrase "in connection with" as "broad and general"). Although the Second Circuit has not interpreted "in connection with" in the context of this particular guideline, it has interpreted the same phrase elsewhere in the Guidelines, holding that where the Guidelines do not define "in connection with"—as is the case in § 4C1.1—"the phrase should be given its ordinary meaning." *United States v. Spurgeon*, 117 F.3d 641, 644 (2d Cir. 1997). In the context of § 2K2.1(b)(6)(B), which provides for an enhancement "[i]f the defendant used or possessed any firearm or ammunition *in connection with* another felony offense," the Circuit held that the ordinary meaning of "[t]he phrase 'in connection with' is materially indistinguishable from the 'in relation to' language of 18 U.S.C. § 924(c)(1)," which criminalizes using or carrying a firearm "during or in relation to" a crime of violence or drug crime. *Id.* at 643-44 (emphasis added); *see also id.* at 643-44 (collecting cases from five other circuits that share this interpretation). This is "a broad construction" that "require[s] the government to demonstrate" by a preponderance of the evidence "only 'that the firearm served *some purpose* with respect to the felonious conduct.'" *United States v. Celso*, No. 22 Cr. 194 (EK), 2024 WL 2319679, at *3 (E.D.N.Y. May 22, 2024) (quoting *Spurgeon*, 117 F.3d at 644) (interpreting "in connection with" in the context of § 4A1.1(c)).

The defendant's violence easily meets this "relatively lenient standard." *Id.* at *4. The violence was directly related to the Freak Offs and Hotel Nights that underlie the Mann Act counts. The defendant physically abused both Ventura and Jane at Freak Offs and Hotel Nights. With Ventura, this violence occurred at Freak Offs in at least New York, Miami, and Los Angeles, (Tr. 688-90), including at the Intercontinental Hotel in Los Angeles, (Tr. 576-77, GX 10C-115; *see also* Tr. 276-77 (escort testimony concerning the defendant's violence at Freak Offs)). The defendant's violence toward Ventura was so pervasive that when the defendant proposed a Freak

Off, the possibility that he would become physically violent with her was on her mind.  (Tr. 410-11, 486, 705-06, 1315; *see also, e.g.*, Tr. 405-06, 693, 763-71, 777, 783, 794, 796, 2989-90, 3004, 3271-72, 3278-79 (detailing some of the instances of the defendant's violence toward Ventura)).

The defendant also physically abused Jane at a Hotel Night at her home in Los Angeles, (*see* Tr. 5172-13; *see also* GX E-273, E-333 (documenting Jane's injuries)).  Accordingly, the defendant's violence at minimum served "some purpose" related to the offense by making it more likely that Ventura and Jane would participate in Freak Offs and Hotel Nights, including those involving interstate travel.  *Cf. United States v. Ryan*, 935 F.3d 40, 42 (2d Cir. 2019) (holding that firearm was used "in connection with" drug dealing where defendant sold shotgun at the same time as heroin, even though gun was not used to help sell the heroin); *United States v. Ortega*, 385 F.3d 120, 123 (2d Cir. 2004) (holding that defendant possessed guns "in connection with" drug dealing where gun was stored in same closet as some marijuana and cash, even though defendant claimed he had received specific information that he was going to be robbed).

The defendant argues that the jury rejected the Government's theory that the defendant used force or threats of force to induce commercial sex acts when it acquitted him of sex trafficking charges.  (Def. Mem. 124).  But as described *supra*, the Court cannot speculate as to the reason for the acquittals, nor can it assume that the acquittals meant that the jury rejected particular facts.  There is also no need to rely on acquitted conduct in this analysis.  As described above, the defendant freely admitted to the violence, and § 4C1.1's "in connection with" standard is "relatively lenient," *Celso*, 2024 WL 2319679, at *3, and certainly much less demanding than the causal connection demanded by 18 U.S.C. § 1591.  The Court could easily find by a preponderance of the evidence that the violence the defendant has conceded was "in connection with" the Freak

Offs involving travel without ever reaching the question of whether the defendant intended to use the violence to cause Ventura and Jane to engage in a commercial sex act.

The defendant contends that the Court would violate the "unconstitutional conditions doctrine" if it forced him to choose between the 2024 Guidelines Manual, which he claims infringes on his *ex post facto* rights, and the 2023 Guidelines Manual, which he alleges infringes on his Fifth and Sixth Amendment rights because it does not contain the new acquitted conduct guideline. (Def. Mem. 126). But that doctrine is not applicable where the defendant's constitutional rights are not violated by the choice. *See Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 286 (1998) (declining to apply the unconstitutional conditions doctrine where the procedures at issue did not violate the defendant's Fifth Amendment privilege). As described above, the 2024 Guidelines Manual does not violate the defendant's *ex post facto* rights, and consideration of acquitted conduct at sentencing does not present any Fifth or Sixth Amendment issues under binding case law.

Even if the one-book rule presented constitutional issues (which it does not), the Court should nevertheless decline to apply the unconstitutional conditions doctrine. That doctrine prevents the Government from "do[ing] indirectly what it cannot do directly." *United States v. Whitten*, 610 F.3d 168, 194 (2d Cir. 2010). It is at times applied in civil cases to prevent the Government from "grant[ing] even a gratuitous benefit on condition that the beneficiary relinquish a constitutional right." *United States v. Oliveras*, 610 F.3d 168, 628 n.7 (2d Cir. 1990). The Second Circuit has applied the doctrine rarely in criminal cases and has acknowledged that the doctrine is "under sharp academic fire." *Id.* at 628; *see also All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 430 F. Supp. 2d 222, 252-53 (S.D.N.Y. 2006) ("This doctrine, while seemingly straightforward when stated in the abstract, in practice has proven difficult to apply.

The Supreme Court's line of unconstitutional conditions cases has been recognized as a 'troubled area of [Supreme Court] jurisprudence in which a court ought not entangle itself unnecessarily.'") (quoting *Rust v. Sullivan*, 500 U.S. 173, 205 (1991) (Blackmun, J., dissenting), *aff'd*, 651 F.3d 218 (2d Cir. 2011), *aff'd sub nom. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013). The doctrine does not apply by its terms—this is not an instance in which the Government is granting a benefit or taking away a right; instead, it is the text of the Sentencing Guidelines themselves that is at issue. And the defendant has pointed to no cases in which the unconstitutional conditions doctrine was applied with regard to the one-book rule.[28] The Court should decline to expand this shaky doctrine into a new area.

### 7. The Defendant Is Not Entitled to a Significant Downward Departure Based on the Cumulative Effect of the Guidelines' Enhancements

The defendant also appears to argue that a downward departure from the Guidelines is warranted based on the cumulative effect of the defendant's enhancements. (Def. Mem. 129). This argument is unsupported, and contrary to the Guidelines.

The Commission designed the Guidelines and, in particular, the Sentencing Table, "to increase a sentence proportionately" by a percentage upon each increase in level, resulting in greater sentencing increases the higher the offense level, when measured in months. U.S.S.G., Ch. 1, Part A1(4)(h). Furthermore, the Guidelines specifically envision that multiple enhancements

---

[28] Neither of the cases on which the defendant relies are controlling or persuasive here. (*See* Def. Mem. 126). First, the defendant cites *United States v. Whitten*, 610 F.3d 168 (2d Cir. 2010), which is wholly unlike this case. There, the Circuit applied the unconstitutional condition doctrine when it found the Government had burdened the defendant's Sixth Amendment right by arguing, in the death penalty phase of a trial, that the defendant's "demand for a trial [] evidence[d] lack of remorse and refusal to accept responsibility, characteristics offered to undermine [the defendant's] defenses to a sentence of death." *Id.* at 195. Second, the defendant relies on *Oliveras*, but the unconstitutional conditions discussion in that case was later characterized by the Second Circuit as *dicta*. *United States v. Cruz*, 156 F.3d 366, 372 (2d Cir. 1998).

will apply in a specific case and that the effect of those enhancements, unless stated otherwise, will be cumulative.[29]  U.S.S.G. § 1B1.1, app. Note 4 ("The offense level adjustments from more than one specific offense characteristic within an offense guideline are applied cumulatively (added together) unless stated otherwise.").  Thus, the very things that the defense complains about were specifically intended by the Commission.  They therefore cannot provide a proper basis for departure from the Guidelines.  *See United States v. Zukerman*, 897 F.3d 423, 432 n.4 (2d Cir. 2018) ("The pertinent question in a departure case is whether there exists an aggravating or mitigating circumstance of a kind . . . not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.").[30]

The cases that the defendant cites in support of his argument that a downward departure may be warranted are not to the contrary.  Rather than standing for the broad propositions for which the defense cites them, those cases carve out very limited bases upon which a downward departure may be warranted.  In *United States v. Algahaim*, the Second Circuit stated that the "unusualness" of the Guidelines approach to fraud offenses may warrant a court's consideration of a non-Guidelines sentence under certain circumstances.  842 F.3d 796, 800 (2d Cir. 2016).  And, in *United States v. Lauersen*, the Circuit held that a departure may be warranted where there exists

---

[29] Other sections of the Sentencing Guidelines do provide restrictions as to the application of certain enhancements.  *See, e.g.*, U.S.S.G. § 2B1.1(b)(2) instructing that the Court "apply the greatest" of a subset of enhancements related to the number of victims impacted.  This reflects that the Commission knew how to limit the applicability of enhancements and chose not to do so here.

[30] There is also nothing improper or at all unusual about a defendant's sentence being determined, in large part, based on adjustments to a base offense level.  To the contrary, adjustments are designed to reflect the obvious but critical fact that defendants who commit the same categories of criminal offenses may vary widely in their culpability based on a host of factors.

"substantial overlap" between two enhancements, and those enhancements, applied cumulatively, translate to a "high sentencing range." 348 F.3d 329, 344 (2d Cir. 2003). Here, however, none of these narrow set of circumstances exist. The defendant is not being sentenced under the "unusual" fraud offense guidelines and the defendant does not even argue that there is substantial overlap between any two enhancements that apply to his conduct. Nor could he. Each of the enhancements here reflect distinct harms. There is therefore no basis for a downward departure in this case.[31]

In fact, rather than a downward departure, the Guidelines suggest that in a case like this one, an upward departure may be appropriate. *See* U.S.S.G. § 2G1.1, app. note 2 (upward departure may be appropriate where the "bodily injury results" from coercion or fraud); U.S.S.G. § 5K2.2 ("If significant physical injury resulted, the court may increase the sentence above the authorized guideline range."); U.S.S.G. § 5K2.3 ("If a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense, the court may increase the sentence above the authorized guideline range."); U.S.S.G. § 5K2.8 ("If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct"); *see also United States v. Evans*, 272 F.3d 1069, 1097 (8th Cir. 2001) (affirming district court's grant of the government's motion for an upward departure by 60 months as defendant's physical abuse "in the

---

[31] The defendant also cites to *United States v. Gigante*, 94 F.3d 53, 56 (2d Cir. 1996) in support of its argument. However, not only is the language that he points to in that case *dicta*, but *Gigante's dicta*, even assuming it were a holding, is extremely narrow. *Gigante* suggests that a departure may be warranted where there is a "risk of factual error in a series of adjustments" because the conduct proven is by a "bare preponderance." *Id.* at 56. Again, that is not the circumstance here. The enhancements that apply to the defendant's conduct are warranted based on overwhelming evidence, including witness statements and documentary evidence presented during a multi-month trial.

context of a long-standing personal relationship" which included "violent beating of and injuries suffered by [the victims] is sufficient to find significant physical injury and extreme conduct").

## IV.  Applicable Sentencing Law

In addition to the Guidelines, which are not mandatory but must be consulted prior to sentencing, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7).  *See Gall v. United States*, 552 U.S. 32, 50 & n.6 (2007).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

A sentencing judge's discretion is "largely unlimited either as to the kind of information he may consider, or the source from which it may come" in determining the appropriate sentence. *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)).  "Any information or circumstance shedding light on the defendant's

background, history and behavior may properly be factored into the sentencing determination." *Id.*

Specifically, the Second Circuit has made clear that, in the context of the sentencing factors under Section 3553(a), a court may consider uncharged conduct, including harms that the defendant has caused to uncharged or nonstatutory victims, if found by a preponderance. *See, e.g.*, *United States v. Hadden*, No. 23-6822-CR, 2024 WL 4456203, at *5 (2d Cir. Oct. 10, 2024) (there is "no doubt that the district court had broad discretion to consider the extensive harm that Hadden caused over many years to numerous uncharged victims, in the context of the sentencing factors listed in 18 U.S.C. § 3553(a)"); *United States v. Pettway*, No. 20-63, 2021 WL 4188716, at *4 (2d Cir. Sept. 15, 2021) ("[C]ourts may consider uncharged conduct at sentencing, provided—once again—that such conduct is proven by a preponderance of the evidence and relevant to the broad objectives of sentencing."); *United States v. Smith*, 967 F.3d 198, 215–16 (2d Cir. 2020) (nonstatutory victim's statement at sentencing about "the damaging impact of Smith's abuse on her life was relevant to the district court's consideration of Smith's prior conduct of sexual abuse and also several of the statutory purposes of sentencing—including just punishment, the need for deterrence, and protecting the public from further crimes").

In addition, as discussed in greater detail above, a court may consider acquitted conduct in the 3553(a) analysis, as long as the court finds that such conduct was proven by a preponderance of the evidence. *See supra* pp. 48-53; *Watts*, 519 U.S. at 156. The recent amendments to the Guidelines regarding acquitted conduct have no effect on that longstanding law regarding a court's consideration of 3553(a) factors. *See supra* pp. 53-54; 18 U.S.C. § 3661; U.S.S.G. § 6A1.3; *see also United States v. Ralston*, 110 F.4th 909, 921 (6th Cir. 2024) ("[S]entencing courts remain free to consider acquitted conduct in imposing a sentence in consultation with the 18 U.S.C. § 3553(a)

sentencing factors."); *United States v. McCants*, No. CR JKB-16-0363, 2024 WL 4803420, at *6 (D. Md. Nov. 15, 2024) ("[W]hile Amendment 826 prohibits the consideration of acquitted conduct in determining the Guidelines range, nothing in Amendment 826 precludes the Court's consideration of conduct in assessing the § 3553(a) factors.").  Therefore, even if the Court finds aspects of the defendant's violence and coercion to be "acquitted conduct" under § 1B1.3(c) (which it should not), it should still consider that conduct under Section 3553(a).  *See United States v. Rosado*, No. 21 Cr. 516 (RMB) (S.D.N.Y. Nov. 20, 2024), Dkt. 176, at 67-68 (sentencing defendant to 30 years' imprisonment based largely on defendant's repeated physical violence toward his 17-year-old girlfriend, following conviction on child pornography production count (based on video defendant took having sex with that victim, which he alleged was a consensual relationship) and acquittals on enticement and kidnapping counts (based on his actions toward that same victim)).

## V.  The Defendant's Conduct Warrants a Term of Imprisonment of At Least 135 Months' Imprisonment

The defendant's conduct warrants a term of imprisonment of at least 135 months' imprisonment.  It lasted for 15 years, spanned across the country and the globe, and involved dozens of participants.  In the wake of his criminal conduct, he left Ventura and Jane broken and beaten.  Many others suffered at his hands, whether through physical abuse or psychological humiliation.  Time and again he has shown that he is concerned only with his own power and control.  Only a significant term of imprisonment—meted out in a substantial number of years— can effectively deter him and show future victims that their abusers will be held accountable, no matter their wealth or fame.  Such a sentence is also consistent with other similarly situated defendants who have used violence and coercion to further their Mann Act offenses.

## A. The Nature and Seriousness of the Offense Warrant a Substantial Term of Imprisonment

A primary consideration under Section 3553(a) is the nature and circumstances of the offenses, and here it warrants at least 135 months' imprisonment. The offense conduct was extensive—it spanned fifteen years, involved dozens of participants, and was orchestrated by the defendant—but that is not all it was. It also involved violence, threats, and emotional control. This took an unimaginable toll on the victims, and the harms they have experienced should be accounted for in the defendant's sentence. Probation agrees. (PSR at 71 ("The nature and circumstances of the offense are aggravating factors to consider. The timespan over which this conduct occurred and the fact that it involved two different female victims over several years is serious and concerning . . .[;] the defendant's use of control and coercion to manipulate the victims into participation is equally concerning.")). The serious nature of the defendant's criminal conduct warrants a significant sentence.

*First,* the defendant ran a years-long and extensive scheme to transport Ventura, Jane, and escorts around the country to satisfy his own sexual gratification. This was not a one-time instance of transportation or any kind of accident or mistake; it was an intentional, orchestrated scheme that spanned fifteen years. To facilitate this scheme, the defendant sought out women who were moldable and whom he could control, who would be available at any point for a Freak Off or Hotel Night, who would succumb to his demands. He accrued a stable of escorts whom he could call at the last minute to fly across the country. He used his employees to organize the nights and make them happen—they booked the travel, got the drugs, set up the hotel rooms, and brought him the cash he used to pay the escorts. Although the defendant did not financially profit from this scheme, money is not what he needed. What he needed was sexual gratification, and he stopped at nothing to get it. Even setting aside the violence, threats, and other abuse, the extensiveness and

pervasiveness of the defendant's conduct was serious and requires serious punishment. *See United States v. Robert Blake*, No. 11 Cr. 183 (E.D.N.Y. Sept. 10, 2013), Dkt. 114 (sentencing defendant to seven years for Mann Act conviction even where the coercion enhancement did not apply after finding that "guideline sentence is just too low" because the "reality is that" "each of these women were victims. This is not a victimless crime" and noting that the women "[l]eft to their own devices . . . would not have become involved in the life that [the defendant] led them into."); *United States v. Mendez-Perez*, 607 F. App'x 39, 45 (2d Cir. 2015) (affirming significantly above-Guidelines sentence for defendants who were convicted of Travel Act violation related to role in prostitution business on the basis that judge reasonably determined that Guidelines did not adequately reflect, among other things, "the length of defendants' participation in the scheme").

*Second*, despite the defendant's arguments to the contrary, this is not a case that solely involves transportation for the purpose of prostitution. (*See, e.g.*, Def. Mem. 1). Although that in and of itself is significant, what the defendant did here is much more serious. By his own admission, the defendant was violent toward Ventura and Jane. Ventura in particular endured extensive physical abuse at the defendant's hands. The defendant "mash[ed]" her in the head, knocked her over, dragged her, kicked her, and stomped on her head, leaving injuries such as knots in her forehead, busted lips, swollen lips, black eyes, and bruises all over her body, sometimes requiring her to spend days out of sight to heal from his vicious attacks. (Tr. 406). He made her feel like a "rag doll," and she had to remind him that she was "someone's child." (Tr. 1323; GX B-631). The defendant's physical abuse of Ventura was pervasive and unpredictable, and extended into their Freak Offs—experiences that he now attempts to recast as "consensual" despite the threats and violence that surrounded them. (Tr. 276-77, 281, 572; PSR ¶ 22). The possibility of the defendant's abuse was constantly on her mind when the defendant proposed a Freak Off. (Tr.

409-11, 486, 705-06, 1315). As Ventura states "[d]uring my time with Combs, I was in a constant state of hypervigilance, as I was always anticipating demands for sex acts or otherwise fearing retribution for any perceived slight." (Ex. A at 2).

The defendant repeated the same pattern with Jane in June 2024 when he kicked down multiple doors in her home, and choked, punched, and kicked Jane before ordering her to "suck [an escort's] dick" and "fuck him." (Tr. 5211, 5930). Although the defendant's violence with Jane occurred on a single occasion, he turned to it when times were hardest: after he knew the federal investigation of him had begun, and after his physical abuse of Ventura was exposed to the world. The defendant's violence alone—which spanned over a decade with multiple women— warrants a significant sentence.

*Third*, in addition to the physical violence described above, the defendant used a playbook to ensure he could keep Ventura and Jane under his thumb so they were available whenever he wanted a Freak Off. The defendant followed the same pattern with both women, showing that his actions were no mistake but rather a purposeful and abusive scheme to exert power over these victims.

- First, the defendant began each relationship by showering the victims with affection, gifts, and charm, leading both Ventura and Jane to fall in love quickly. (Tr. 411, 420-23, 4562, 4565). Then the defendant proposed Freak Offs or Hotel Nights, which both Ventura and Jane were initially open to, eager to make the defendant happy. (Tr. 408-09, 4582). As time went on, and both Ventura and Jane decided that they wanted the Freak Offs or Hotel Nights to end, the defendant refused to listen or care. He threatened their career (Ventura), their livelihood (Jane), and both of their privacy (threatening to release their sex tapes). (PSR ¶¶ 14, 30, 51).

- Second, the defendant, who was older, more successful, and wealthier than the women, paid for their expenses and made them dependent on him. He gave Ventura and Jane career opportunities, money, and material items including phones, cars, and homes. (Tr. 410, 431, 4568; PSR ¶¶ 9-10, 43). But he then took those things away, or threatened to take those things away, when Ventura or Jane voiced reluctance about, or lacked enthusiasm for, Freak Offs and Hotel Nights. (PSR ¶ 10, 14, 43, 72(a); GX E-331-J-R).

- Third, the defendant introduced Ventura and Jane to drugs. Before the defendant, neither woman was a habitual drug user. That changed with the defendant. He provided them drugs in connection with the Freak Offs or Hotel Nights, and both Ventura and Jane needed drugs to help them get through sex acts at Freak Offs and Hotel Nights—otherwise the experience was too degrading and humiliating. (PSR ¶¶ 11-12, 33-34).

- Fourth, and as discussed above, the defendant exerted power over Ventura and Jane through violence.

The defendant's persistent abuse kept Ventura and Jane stuck in a cycle of sexual exploitation for years. Both Ventura and Jane viewed Freak Offs and Hotel Nights as obligatory performances for the defendant's sexual gratification. (Tr. 407-08, 1309, 4599, 4603). As Ventura explained: "Sex acts became my full-time job, used as the only way to stay in his good graces." (Ex. A at 1). And Jane "fe[lt] obligated to perform these nights . . . in fear of losing the roof over [her] head." (GX A-442-37; A-104-59).

Despite all this, the defendant tries to recast his decades of exploitation as simply the product of mutually toxic relationships. (Def. Mem. 53). But there is nothing mutual about a relationship where the defendant held all the power and leverage and used it to prey on Ventura and Jane. In fact, his repeated conduct was nothing more than the tactics of an abuser. The striking similarities between Ventura and Jane's experiences—and the similarities between their experiences and those of other victims of abuse—demonstrate that the offense conduct was not the product of complex, interpersonal dynamics in relationships between two complicated adults, but rather the product of an abuser exerting his will in the way that all too many abusers do.

*Finally*, a significant sentence of imprisonment is warranted because Ventura and Jane suffered lasting harm from performing at Freak Offs and Hotel Nights for the defendant's gratification. *See United States v. Kelly*, No. 19 Cr. 286 (E.D.N.Y. June 29, 2022), Dkt. 375, at 88 (rejecting defendant's argument that this case is "about sex" at sentencing and noting "[y]ou taught [your victims] that love is enslavement and violence and humiliation and that they were not worthy

of simple respect and dignity"); *United States v. Maxwell*, No. 20 Cr. 330 (AJN) (S.D.N.Y. June 28, 2022), Dkt. 737, at 92 (sentence must reflect that "this scheme was long-lasting, it was far-reaching, it was horribly damaging to the victims").

Ventura performed Freak Offs in pain from UTIs, after vomiting from the drugs she had to take to disassociate enough to forget she was having sex with a stranger, amidst the defendant's physical abuse, and while the injuries he left behind were still visible on her face. (PSR ¶¶ 13, 22-24, 72(a)). To Ventura, "[t]hese events were degrading and disgusting, leaving [her] with infections, illnesses, and days of physical and emotional exhaustion before he demanded it all again." (Ex. A at 1). Jane also performed Hotel Nights in pain, contacting UTIs as a result, and after vomiting from disgust following sexual acts with two escorts. (PSR ¶ 46, 48; Tr. 678).

But Ventura and Jane's pain extended far beyond Freak Offs and Hotel Nights. Ventura developed an opiate addiction from repeated drug use during Freak Offs and from a desire to numb her psychological pain in their aftermath. (PSR ¶ 13, 72(a)). Ventura described that her "descent into substance abuse was directly correlated with [the defendant's] increased control over my body, my money, my freedom, and my free will. I used those drugs to push through the horrifying sex acts he demanded and to numb myself to the physical pain and emotional turmoil I was constantly in." (Ex. A at 2). Flashbacks plagued Ventura in the years that followed, culminating in her attempt to commit suicide years after leaving the defendant. (Tr. 823-24). As Ventura summarized:

> [T]his was a horrific decade of my life stained by abuse, violence, forced sex, and degradation . . . The horrors I endured drove me to have thoughts of suicide . . . I still have nightmares and flashbacks on a regular, everyday basis, and continue to require psychological care to cope with my past.

(Ex. A at 2).

124

Chillingly, the defendant himself knew exactly how traumatized Jane felt from Hotel Nights, yet her suffering did not dissuade him from continuing to seek his own sexual gratification. Jane told the defendant how she was tormented by her flashbacks, describing her nightmares and PTSD. (PSR ¶ 47; GX C-348-A-R-T; GX E-331-J-R). And like Ventura, Jane too had suicidal thoughts from performing in Hotel Nights—feelings she made clear to the defendant at the end of 2023 that did not deter him from continuing his abuse. (*See* Tr. 5105; GX A-301-H (Jane told the defendant she wanted to kill herself because "U all use me / And break me / Till ur done with me / I hate my life . . . I just want to die.").

As the foregoing makes clear, the defendant's physical and sexual abuse over a period of years caused lasting harm to both Ventura and Jane. Although the sex at Freak Offs and Hotel Nights was at heart of this case, this case is not only about sex. Freak Offs and Hotel Nights left both victims scarred and caused them to question their own self-worth and desire to live. A sentence of at least 135 months' imprisonment is necessary to reflect the defendant's violence, threats, and other abuse that still impact the victims today.

## B. The Need to Avoid Unwarranted Sentencing Disparities Mandates a Substantial Term of Imprisonment

A sentencing court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). To do so here, the Court should impose the sentence recommended by the Government.

In arguing for leniency under this sentencing factor, the defendant tries to recast his criminal conduct as merely agreeing with "long-time girlfriends . . . to bring other consenting adult men into their consensual sexual relationship." (Def. Mem. 132). The court should reject this gross mischaracterization. The defendant's self-serving rhetoric immeasurably distorts Ventura

and Jane's experiences, both of whom clearly testified that they did not want to have sex with male escorts at Freak Offs or Hotel Nights.  (*See* Tr. 492, 704, 1303-04, 4594, 4699, 4810, 4812-13, 5135).   Rather, the defendant exerted control over Ventura and Jane and exploited their vulnerabilities through years-long abusive tactics, leaving both feeling as if participating in the defendant's multi-day sexual fantasies was their only option.  Ventura and Jane feared the potential consequences to not participating—the defendant taking away their homes and belongings, the defendant becoming physically violent, or the defendant making good on his threats to release blackmail material.

Against this backdrop, the defendants most similarly situated to Combs cannot be quickly distilled by applying a reductionist mathematical formula involving criminal history and statue of conviction, or by reference to blanket categories like "johns" or "noncommercial offenders."  (*See also* PSR at 72 ("The nature and circumstances of this offense are unique.  When comparing to other cases, within this District and across the country, it is difficult to find cases where defendants were convicted solely of violations of the Mann Act but whose conduct included many of the nuances and specifics involved in this case," including "the power dynamic and types of coercion present here.")).  Instead, we must look to the facts of each case and compare them to the facts presented here.  As discussed below, when such a fact-intensive analysis is conducted, it is clear that the Mann Act defendants most similarly situated to Combs are those defendants who—for a prolonged time period and with multiple victims—use manipulation, threats, and/or physical force with the victims being transported and/or engaging in prostitution.

### 1.  Similarly Situated Defendants Receive Sentences Reflecting the Threats, Manipulation, and Abuse Used Against Their Victims

The defendant is simply no ordinary "john" who casually consumed commercial sex. Rather, the defendant's conduct is far closer to that of a "pimp" who exploits and controls women

into having unwanted sexual encounters through tactics including manipulation, threats, fear, controlled substances, and physical violence.  As detailed below, multiple defendants convicted principally of Mann Act violations[32] have been sentenced to significant terms of imprisonment for conduct more akin to Combs' conduct than any of the cases relied upon by the defendant.  (*See* Def. Mem. 132-36).  *See e.g.*, *United States v. Bavaro*, No. 7:20 Cr. 115 (E.D.N.C.) (180-month sentence on Guidelines range of 151 to 188 months' imprisonment after disputed application of Threats-or-Fear Cross-Reference); *United States v. Benavidez*, No. 5:19 Cr. 337 (E.D.N.C.) (statutory maximum 120-month sentence on Guidelines range of 120 months after undisputed application of Threats-or-Fear Cross-Reference); *United States v. Crews*, 7:19 Cr. 62 (E.D.N.C.) (statutory maximum 120-month sentence on Guidelines range of 120 months after disputed application of § 2A3.1 cross reference following victim recanting); *United States v. Doolittle*, No. 5:17 Cr. 275 (E.D.N.C.) (135-month sentence on Guidelines range of 168 to 180 months' imprisonment after undisputed application of U.S.S.G. § 2A3.1 cross-reference); *United States v. Thompson*, No. 5:16 Cr. 75 (E.D.N.C.) (statutory maximum 180-month sentence on Guidelines range of 180 months' imprisonment after undisputed application of U.S.S.G. § 2A3.1 cross-reference); *United States v. Spain*, No. 7:14 Cr. 21 (E.D.N.C.) (following trial, statutory maximum 240-month sentence on Guidelines range of 168 to 210 months' imprisonment after disputed application of Threats-or-Fear Cross-Reference)[33]; *United States v. Guidry*, No. 2:13 Cr. 16, (E.D.

---

[32] Although some of the cases cited below involve convictions to statutes other than the Mann Act (primarily the Travel Act, *see* 18 U.S.C. § 1952), none of the cases discussed in this section involve convictions for sex trafficking.

[33] The Fourth Circuit affirmed the application of the Threats-or-Fear Cross-Reference.  *See United States v. Spain*, 666 F. App'x 313, 315 (4th Cir. 2016).  However, the Fourth Circuit remanded for resentencing in light of a miscalculation of the defendant's criminal history category.  *Id.* at 316. On remand, the defendant was resentenced by a judge who had not presided over the trial, and following two additional sentencing hearings, the defendant was sentenced to 144 months'

Wisc.), Dkt.150 (statutory maximum sentence of 120-months' imprisonment on Mann Act counts after disputed application of Threats-or-Frear Cross-Reference), *affirmed by* 817 F.3d 997, 1008 (7th Cir. 2016); *United States v. Kizer*, No. 10 2:10 Cr. 20385 (W.D. Tenn.) (statutory maximum 120-month sentence on Guidelines range of 120 months' imprisonment after disputed application of U.S.S.G. § 2A3.1 cross-reference).  These cases recognize that significant sentences are merited when defendants—like Combs—use manipulation, threats of violence, and even actual violence that create fear of harm in the minds of the victims.

The many factual parallels between these cases and the defendant's conduct illustrate why they are the most analogous and involve the most similarly situated defendants to Combs.

In *Bavaro*, the defendant slapped one of the victims across the face, punched, kicked, and choked her, snatched her property from her hands, and insisted she engage in commercial sex when she was not feeling well, just like Combs's abuse of Ventura and Jane.  (No. 7:20 Cr. 115 (E.D.N.C.), Dkt. 148, 15-18, 84).  Critically, Bavaro's abuse of the victim occurred outside of specific instances of commercial sex or transportation.  (Dkt. 148, at 99 ("The defendant engaged in physical conduct against her, including slapping her and telling her she had to work when she did not want to work . . . He abused her to get her to go, and there's an implicit threat that that would continue to happen.")).  The court applied the Threats-or-Fear Cross-Reference with respect to that victim because the defendant's physical abuse of that victim created a culture of fear for her.  (Dkt. 148, at 102-03).  The defendant was sentenced to 180 months' imprisonment after pleading guilty to two Mann Act counts.  (Dkt. 148, at 139).  Statements from the defendant's victims also describe the impact of experiencing his abuse firsthand—including difficulty

---

imprisonment on a recalculated Guidelines range of 121 to 151 months' imprisonment.  (No. 7:14 Cr. 21 (E.D.N.C.), Dkts. 155, 156).

maintaining employment, ongoing conditions like anxiety and PTSD, and flashbacks to the abuse—descriptions that are echoed in statements from Combs's victims. (*Compare* Dkt. 148, at 125 ("I felt nothing but like a rag doll"), *with* GX B-631 ("I'm not a rag doll. I'm someone's child."); *compare* Dkt. 148, at 127 ("I also have nightmares and flashbacks about the situation"), *with* Ex. A at 2 ("I still have nightmares and flashbacks on a regular, everyday basis, and continue to require psychological care to cope with my past."), and GX C-348-A-R-T (Jane: "And who's there for me? Like who's there for me when I close my eyes and I have these fucked up things in my head?"); *compare* Dkt. 148, at 124 ("To this day I have PTSD. I can't go anywhere alone. I'm always watching over my shoulders. . . . I don't trust anyone, and I question everything"), *with* GX E-331-J-R (Jane had "triggering ptsd from these sex nights and feeling extremely violated"), *and* Ex. C at 1-2 ("I have struggled to feel safe in any workplace because of my PTSD, which has resulted in a fragmented professional record, a bankruptcy application and crippling debt. I can't go to many of the public places I once loved . . . without risk of having a panic attack.")).

*Bavaro* is not an outlier. Significant sentences of over a decade imprisonment have been imposed where defendants use abusive tactics to instill fear in victims—conduct that mirrors how Combs treated Ventura and Jane. For example, in *Spain*, where the defendant was convicted at trial of prostituting two victims for less than five months and initially received a 240-month sentence, the defendant's relationships with the victims began romantically, and he earned their trust prior to beginning to physically abuse them—exactly how Combs's relationships started with Ventura and Jane. (No. 7:14 Cr. 21 (E.D.N.C.), Dkt. 121, at 2-4, 9, 11). In *Benavidez*, the defendant was convicted of prostituting three victims for approximately one year, where he physically abused one victim, and exploited the drug addictions of the other two victims, which resulted in a 120-month sentence. (No. 5:19 Cr. 337 (E.D.N.C.), Dkt. 82, at 21-23, 39, 54, 60, 63).

129

Just like Combs's physical abuse of Ventura, Benavidez's slapping, punching, and choking left one victim with a busted lip and bruises that had to be covered with clothing. (Dkt. 82, at 21-23). And Benavidez conceded that his physical abuse and exploitation, which was disconnected from actual sex or transportation, was sufficient to satisfy the fear element of 18 U.S.C. § 2242. (Dkt. 82, at 13, 7, 12-13 ("None of this assaultive behavior is tethered to prostitution. She noted that stupid little things would set him off; that he was moody. She talked about how he would yell at them if they didn't meet their quota to cover their room and the food, and in the drug user's case, the drugs.")). In *Doolittle*, the defendant was convicted of prostituting two victims for approximately one year, both of whom he physically abused, and was sentenced to 135 months' imprisonment. (No. 5:17 Cr. 275 (E.D.N.C.), Dkts. 52, 57). Doolittle himself conceded both that the § 2A3.1 cross-reference applied and that none of his physical assaults were connected to prostitution. (Dkt. 52, at 7-8). Like Combs, Doolittle became enraged if his victims did not respond to his communications quickly enough, (Dkt. 52, at 5), and again like Combs, made his victims stay up all night to engage in sex with other men, (Dkt. 52, at 5). Doolittle also physically abused one victim in an episode eerily similar to Combs's abuse of Ventura—he smashed a victim's face until her head hit the corner of a bed before throwing her into a wall, almost exactly like Combs's attack on Ventura, Mia, and Nash in August 2013. (Dkt. 52, at 3; *see also supra* 11).

Courts have also imposed significant sentences for defendants, like Combs, without significant criminal history, but who used force and/or manipulation to exploit women. In *Thompson*, a statutory maximum 180-month sentence was imposed for a defendant who recruited at least five women using false promises of high paying modeling jobs, whom he then forced to prostitute for him for approximately eight months. (No. 5:16 Cr. 75 (E.D.N.C.), Dkt. 79, at 11, 14-15, 19). Like Combs, Thompson held consistent legitimate employment since high school, and

was in criminal history category I at sentencing. (Dkt. 79, at 10, 11). Also like Combs, Thompson's victims experienced fear as a result of his physical violence, including grabbing a victim by the neck and lifting her off the ground and throwing another victim by her throat. (Dkt. 79, at 15). *See also United States v. Gregory*, No. 5:15 Cr. 189 (E.D.N.C.) (Army veteran sentenced with criminal history category II for minor non-prostitution crimes received 78-month sentence with Guidelines of 78 to 97 months' imprisonment related to defendant's prostitution of one victim for approximately one month that included a single instance of violence).

The significant sentences outlined above are not cherrypicked applications of the U.S.S.G. § 2A3.1 cross-reference—a cross-reference that should be applied to Combs' conduct, for the reasons discussed *supra*. According to the Sentencing Commission's Interactive Data Analyzer,[34] the average sentence length imposed for the 1,258 cases sentenced under § 2A3.1 as the primary Guideline is 192 months, while the median sentence is 156 months. Limiting the data to only the 766 cases involving defendants who were criminal history category I, the average sentence length imposed is 179 months, while the median sentence length is 140 months. Even if the Court does not impose the Threats-or-Fear Cross-Reference, a substantial sentence is nevertheless appropriate because the facts in this case remain comparable: the defendant did not only transport Ventura and Jane for purposes of engaging in prostitution, but he also used violence—which the defendant does not contest—and threats against the victims. These serious aggravators must be taken into account when fashioning an appropriate sentence.

---

[34] Available at https://www.ussc.gov/research/interactive-data-analyzer. This tool holds sentencing data from fiscal year 2015 to fiscal year 2024.

The defendant has emphasized that unlike these defendants, he did not personally profit monetarily from Freak Offs and Hotel Nights—but that is the *only* difference.[35] (Def. Mem. 136). Combs, for whom money is no issue, sought sexual gratification instead and used his immense wealth to exert leverage and power over his victims. In fact, Combs's behavior persisted for over a decade, far longer than any of the other conduct cited. This set of defendants who employed physical abuse, threats, and manipulation to exploit women whom they transported for purposes of sex—and received substantial sentences of imprisonment reflecting this abuse—are the defendants who are most similarly situated to Combs. Combs's sentence should similarly reflect the abusive tactics he employed. *See Booker*, 534 U.S. at 250 (sentence should be based on "the *real conduct* that underlies the crime of conviction") (emphasis added).

## 2. The 14-Month Sentence Sought by the Defendant Would Create, Not Avoid, a Sentencing Disparity

Combs argues that he has already served the typical sentence for defendants with similar records who have been found guilty of similar conduct. (Def. Mem. 133). That is because, according to Combs, in the 63 cases the defense found where a non-cooperating defendant was convicted solely of a Mann Act offense with the same criminal history category as Combs and a Guidelines cross-reference did not apply, the defense calculated the median sentence as 12.03 months' incarceration and the mean sentence as 14.92 months' incarceration. (Def. Mem. 132-33).[36] Merely being convicted of the same statute and having the same criminal history category

---

[35] The Government also contests that this is a mitigating circumstance here for the reasons discussed *infra*.

[36] Summaries of these 63 cases are memorialized in Defense Exhibit 68 to the defendant's sentencing submission. As further described below, the Government disputes specific information set forth in Defense Exhibit 68. Where the Government does not address a specific case, it should not be taken as its adoption of the information set forth in Defense Exhibit 68 as factually accurate.

as another defendant at the time of sentencing, however, does not reflexively and without further analysis render the defendants in these cases the most similarly situated to Combs. Sentencing is an individualized and fact-intensive exercise. *See Gall*, 552 U.S. at 50 ("[Sentencing judge] must make an individualized assessment based on the facts presented."). It is impossible to determine whether the cases cited in Defense Exhibit 68 are the most apt comparators to Combs without analysis of the individual facts and circumstances of each case. In fact, closer examination of the cases shows that the 14-month sentence Combs seeks is akin to the sentences imposed for far less culpable offenders involved in transportation for prostitution for shorter periods of time without any allegations of threats or violence. That conduct is far afield from the defendant's conduct here, and his sentence should be substantially greater to reflect his greater culpability, the length of his criminal conduct, and the manipulation, threats, and violence he used against his victims.[37]

Focusing on the cases in Defense Exhibit 68 that form the basis of the mathematical calculation that the defendant cites to justify the slap on the wrist he is seeking, there are ample reasons why these defendants are not similarly situated to Combs.

---

[37] For the same reasons, the defendant's argument that § 2G1.1's base offense level overstates the gravity of the offense should be rejected. (Def. Mem. 144-47). Both the downward departure provision in the 1987 Sentencing Guidelines and pre-Sentencing Guidelines Parole Commission practices contained carveouts for the presence of force or coercion—conduct that is plainly present here.

Similarly, the defendant does not, as he asserts, deserve a lesser sentence because the male commercial sex workers he transported are not the "victims" envisioned by the legislative history of the Mann Act. (Def. Mem. 147-48). The Mann Act is gender neutral on its face, *see* 18 U.S.C. 2421(a) ("Whoever knowingly transports any individual in interstate or foreign commerce . . . with intent that such individual engage in prostitution . . ."), and the male commercial sex workers that the defendant transported here are clearly considered victims under the definition specifically provided for in § 2G1.1, as discussed *supra*.

*First*, and most critically, none of the defendants in Defense Exhibit 68 appear to have been sentenced for conduct involving physical violence, and are thus readily distinguished from the defendant's conduct here—which involved years of physical abuse that the defendant did not dispute at trial. Indeed, on the face of Defense Exhibit 68, no cases involve allegations of violence and only two of sixty-three cases appear to involve the presence of weapons. *See United States v. Collins*, No 3:17 Cr. 110 (N.D. Miss.); *United States v. Cross*, No. 10 Cr. 939 (GBD) (S.D.N.Y.). Notably, the degree to which these weapons were used against victims appears to be the subject of dispute in these two cases, but where the presence of a weapon was considered at sentencing, the resulting sentence was considerably above the 14-month sentence requested by the defendant.[38]

*Next*, Defense Exhibit 68 makes plain that defendants have been sentenced to terms of imprisonment similar to the 14-month sentence the defendant seeks here solely for engaging in discrete instances of interstate transportation for prostitution for short time periods without any violent conduct. *See, e.g.*, *United States v. Duckworth*, No. 4:14 Cr. 40076 (D.S.D.) (10-month sentence for transporting adult woman across state lines on one occasion for prostitution with no allegation of violence); *United States v. Acosta-Munoz*, No. 12 Cr. 660 (D.S.C.) (year-and-a-day

---

[38] Collins, discussed *infra*, received a sentence of 24 months' imprisonment for transporting a prostitute on one occasion—a sentence ten months longer than the defendant is seeking. (3:17 Cr. 110 (N.D. Miss.), Dkt. 118). At sentencing, the government presented testimony that Collins had a loaded firearm on his lap and an additional magazine in the car when he was arrested at a hotel where the victim was prostituting for him. (Dkt. 118, at 5, 10-11). By comparison, Jamil Cross pleaded guilty before Judge Daniels to one Mann Act count for transporting a victim from Maryland to New York for prostitution between July and September 2010. (No. 10 Cr. 939 (GBD) (S.D.N.Y.), Dkt. 49). Although it was undisputed by the parties that a stun gun was present in the hotel room where the victim was prostituting, there was a significant dispute at sentencing about whether Cross grabbed the victim's neck or threatened the victim with the stun gun. (Dkt. 51, at 15-16, 17-19). Judge Daniels ultimately sentenced Cross to 10 months' imprisonment after making clear that he would *not* consider these disputed allegations in any way in imposing sentence. (Dkt. 51, at 36-37).

sentence for occasionally serving as the driver for leader of prostitution ring with no allegation of violence); *United States v. Cabanas-Torres*, No. 12 Cr. 660 (D.S.C.) (year-and-a-day sentence for serving as the driver for prostitution ring on two occasions in a three month period with no allegation of violence); *United States v. Carcamo*, No. 3:11 Cr. 192 (M.D. Fla.) (year-and-a-day sentence for transporting adult woman across state lines on one occasion for prostitution for approximately one week with no allegation of violence); *United States v. Ramos-Navarro*, No. 3:11 Cr. 72 (M.D. Fla.) (14-month sentence for transporting adult woman across state lines on one occasion for prostitution with no allegation of violence[39]); *United States v. Park*, No. 11 Cr. 14 (E.D. Va.) (10-month sentence for taxi driver who transported massage parlor employee across state lines on a few occasions knowing that prostitution was occurring inside).[40]

*Next*, the type of resolution directly impacts a defendant's sentence. The vast majority of the cases in Defense Exhibit 68 appear to have been resolved by plea agreements, not a trial, meaning that the total offense level, and thus resulting Guidelines range, was lowered after the application of acceptance of responsibility points, which for the reasons described *supra* are not appropriate for the defendant here.[41] In addition, the factual record before the sentencing court

---

[39] Defense Exhibit 68 states that the victim here "was engaging in prostitution to pay off a debt she owed for getting smuggled into the United States," which suggests that she might have been paying the debt to the defendant Ramos-Navarro. Instead, it appears that the victim was paying the debt to the coyotes who smuggled her, which debt had been satisfied by the time of her arrest, at which time she was working with Ramos-Navarro for one week and paying him a percentage of her earnings in exchange for transportation and finding customers. (No. 3:11 Cr. 72 (M.D. Fla.), Dkt. 30).

[40] *Park* is one example of the type of case the Court inquired about at the Rule 29 hearing where an individual without an apparent commercial interest in the prostitution business was charged for violating the Mann Act.

[41] The Government is in no way arguing for a "trial penalty" here for the defendant. The Second Circuit has "long held that a district court may properly treat a guilty plea as a recognition of fault and that [a] show of lenience to those who exhibit contrition by admitting guilt does not carry a

when a case is resolved by a guilty plea is generally not as developed as the factual record for cases that proceed to trial, which impacts sentencing advocacy and a sentencing judge's awareness of the full scope of the 3553(a) factors.

Defense Exhibit 68 also shows that at least four of the listed cases were resolved with plea agreements containing stipulations pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), whereby the parties constrain the court's sentencing discretion by agreeing to a particular sentence, sentencing range, or sentencing enhancements.[42]  In each of these cases, the plea agreement forced the sentencing court to impose a sentence *lower* than the operative Guidelines range.  *See United States v. Muldowney*, 2:20 Cr. 776 (D. Ariz.) (11(c)(1)(C) plea agreement stipulated to sentence of two years' probation where Guidelines range calculated at 10 to 16 months' imprisonment); *United States v. Whaley*, 1:18 Cr. 10091 (D. Mass) (11(c)(1)(C) plea agreement stipulated to sentencing range of 12 to 18 months' imprisonment where Guidelines range calculated at 18 to 24 months' imprisonment); *United States v. Ingram*, No. 1:17 Cr. 582 (D. Md.) (11(c)(1)(C) plea agreement stipulated to 30-month sentence where plea stipulated to Guidelines range of 33 to 41 months' imprisonment); *United States v. Shin*, 2:04 Cr. 80 (W.D. Wash.) (11(c)(1)(C) plea agreement stipulated to sentencing range of probation to 12 months' imprisonment where Guidelines range calculated at 10 to 16 months' imprisonment).

---

corollary that the Judge indulges a policy of penalizing those who elect to stand trial." *United States v. DiMassa*, 117 F.4th 477, 484 (2d Cir. 2024).  The Government is merely highlighting that defendants who plead guilty may have received lower sentences because of their acceptance of responsibility.

[42] Neither plea agreements nor detailed information about the contours of the plea are routinely available on many dockets, so there may be more cases resolved in this manner than are identified on Defense Exhibit 68.

By contrast, two cases discussed in Defense Exhibit 68 proceeded to trial and yielded sentences for two of the three defendants above the applicable Guidelines range and far exceeding the mean and median sentence calculated by the defendant. First, in the Northern District of Mississippi, Mario Collins and Paulette Clayton were convicted for transporting a victim on a single occasion from Georgia to Mississippi for prostitution.[43]  (No 3:17 Cr. 110 (N.D. Miss.), Dkt. 67).  At sentencing, the Government sought an above-Guidelines sentence for Collins, who, as noted, had a gun in his lap when he was arrested, while Collins sought a sentence of approximately seven months' imprisonment.  (Dkts. 23, 118).  The Court sentenced Collins to 24 months' imprisonment, above the Guidelines range of 15 to 21 months' imprisonment.[44]  (Dkts. 82, 89, 118).

Second, in a case in this District, twenty-two defendants were charged with Mann Act conspiracy and substantive offenses for operating a prostitution business and transporting prostitutes across state lines.  *See generally United States v. Chang* et al., No. 10 Cr. 878 (KMW) (S.D.N.Y.).  One of the twenty-two defendants proceeded to trial, while other cases were either resolved with plea agreements or charges were dismissed.[45]  The trial defendant, Mi Sun Cho,

---

[43] The first trial against Collins and Clayton on multiple offenses ended in a mistrial for reasons that are not clear from the docket.  (Dkt. 41).  Prior to the second trial, the Government dismissed all counts aside from the Mann Act count.  (Dkt. 44).

[44] Collins' co-defendant Clayton was initially sentenced to probation before she violated her probation and was resentenced to one year and one day of imprisonment.  (Dkt. 117).

[45] Some of these resolutions, ranging from probation to 15 months, are described in the first page of the table at Defense Exhibit 68.  Mi Sun Cho, the defendant who proceeded to trial, was CHC II at sentencing, not CHC I, but discussion of her case is included here given the dispositions of many of her co-defendants listed on Defense Exhibit 68.  At sentencing, Cho had two criminal history points from convictions for (1) promoting prostitution in the fourth degree in violation of New York Penal Law 230.20, a misdemeanor, for which she received a $1000 fine, and (2) promoting prostitution in the third degree in violation of Connecticut law, a felony, for which she received a suspended sentence of one year of imprisonment and a $2500 fine. (Dkt. 329).

placed prostitutes from around the country and Korea in East Coast brothels for several years in exchange for fees from the prostitute and brothel owner and was convicted of multiple Mann Act offenses. (No. 10 Cr. 878 (KMW) (S.D.N.Y.), Dkt. 329). Judge Wood found that the multiple victim and leadership enhancements applied to the conduct, yielding a Guidelines range of 51 to 63 months' imprisonment. (Tr. 26). In imposing an above-Guidelines sentence of 70 months' imprisonment, Judge Wood remarked on both the seriousness of the offense and individual and societal harm caused by facilitating prostitution. (No. 10 Cr. 878 (KMW) (S.D.N.Y.), Sent. Tr. 26-27).

*Finally,* critical to any assessment of whether defendants are in fact similarly situated is the nature of the conduct itself. Defense Exhibit 68 summarizes cases that run the gamut from defendants charged with running brothels or sophisticated prostitution rings, to significantly less culpable defendants charged with merely transporting a victim on a few occasions. Given the wide range of disparate conduct involved, it is absurd to say that the 63 cases on Defense Exhibit 68 are the most apt comparators to Combs's conduct simply because they share a criminal history category and primary statute of conviction.

Looking more closely at Defense Exhibit 68, there are also no discernable sentencing patterns, even focusing just on cases involving defendants charged with leading prostitution operations. There, the sentences range significantly from non-custodial sentences to those many times the length sought by Combs. *Compare United States v. Park*, 3:13 Cr. 37 (W.D. Pa.) (sentence of 3 years' probation for defendant who owned and operated a spa from at least 2009 to 2012 that housed multiple women, whom the defendant arranged to transport and who performed commercial sex acts on customers), *with Cho* (70-month sentence discussed *supra*). A range as

broad as this indicates that courts perform highly individualized assessments of conduct at sentencing, which the Court should do here.

Based on the requirement for an individualized assessment, and the significant differences between the cases in Defense Exhibit 68 and the instant conduct, these cases are not appropriate comparators. Aside from the inherently exploitative nature of prostitution itself, there appear to be no significant aggravators associated with the cases cited in Defense Exhibit 68. The conduct at issue in these cases is a far cry from the defendant's conduct here, which is significantly more serious. Combs spent well over a decade transporting Ventura, Jane, and multiple male commercial sex workers domestically and internationally for Freak Offs and Hotel Nights, a duration that eclipses any of the cases cited above. Moreover, none of these cases where defendants received a sentence of the length the defendant requests appear to involve instances of physical violence—a point present in this case, as the defendant conceded on the very first day of trial. When comparing the actual conduct of defendants who received the sentence Combs requests, it is clear that the unduly lenient sentence sought by Combs would actually *create*, rather than avoid, a sentencing disparity.

### 3.  The Defendant Is Significantly More Culpable than Other "Johns" Prosecuted by DOJ

The defendant returns yet again to the history of the Mann Act, arguing that the Government's sole focus should be prosecutions of "commercial purveyors of prostitution . . . and others who coerce women into sex." (Def. Mem. 139). These principles are, and remain, the Government's lodestar. And this case has always fit squarely into that rubric—the offense here involved the defendant's use of force and coercion of Ventura and Jane. And although the defendant continues to insist otherwise, the Department of Justice no longer has a specific policy related to its enforcement of the Mann Act. Instead, current guidance includes a policy titled

"Prosecution of Customers Involved in Federal Sex Trafficking Offenses," in place since December 2020, which prioritizes reducing demand for sex trafficking by prosecuting those who engage in commercial sex with victims of sex trafficking—including buyers of commercial sex, or "johns." *See* Justice Manual § 8-3.400. It is squarely within the priorities of today's Justice Department to charge "johns" under the Mann Act, which is exactly what the Government did in this case and has done in others. *See, e.g.*, *United States v. Nabit*, No. 21 Cr. 38 (D. Md.); *United States v. Trowbridge*, No. 08 Cr. 74 (W.D.N.Y.); *United States v. Stebick*, No. 08 Cr. 206 (W.D.N.Y); *United States v. Tills*, 08 Cr. 242 (W.D.N.Y.); *United States v. Tsouroutis*, No. 3:07 Cr. 8 (W.D. Va.).

But the defendant is not a "john" who casually consumed commercial sex. Rather, as discussed above, his conduct—including exploiting and controlling women through tactics including manipulation, threats, fear, controlled substances, and physical violence—more closely resembles that of a "pimp." Nevertheless, Combs argues that his conduct is distinguishable in another way from the "john" cases cited above because the defendants in "john" cases knew they were "purchasing commercial sex from actual sex trafficking victims—vulnerable women who were exploited because of their immigration status, lack of English language, or poverty and addiction." (Def. Mem. 141). But exploitation extends beyond individuals who have "financial or ethnic vulnerabilities," (Def. Mem. 142), and the defendant's attempts to recast the "john" cases as involving significantly more culpable conduct than his own should be flatly rejected. Rather, it is the defendant's conduct here—where the defendant himself used his own power and wealth as well as abusive tactics and violence to directly exploit the women he transported for purposes of prostitution—that is a significant aggravating factor warranting a substantial sentence of incarceration.

Starting with the cases of defendants John Trowbridge, Michael Stebick, and Ronald Tills, public officials in the Western District of New York, who pleaded guilty to Mann Act counts related to arranging for prostitutes to be present at meetings of a male social club called the Jesters. Stebick, who only transported a female victim and did not engage in any sexual conduct with her, was convicted of conspiring to transport a woman across state lines for purposes of engaging in commercial sex work on a *single* occasion.[46]  (No. 08 Cr. 206 (W.D.N.Y.), Dkts. 1, 3, 14). Similarly, Trowbridge admitted to transporting women across state lines on *two* occasions.[47]  (No. 08 Cr. 74 (W.D.N.Y.), Dkt. 3).  Finally, Tills, who was sentenced to 18 months' imprisonment, admitted to transporting women across state lines on six occasions between approximately 2001 and 2007.[48]  (No. 08 Cr. 242 (W.D.N.Y.), Dkt. 3).  In addition, both Trowbridge and Tills admitted that they had paid for sexual acts as customers of a massage parlor where they recruited women to travel.  (No. 08 Cr. 74 (W.D.N.Y.), Dkt. 3; No. 08 Cr. 242 (W.D.N.Y.), Dkt. 30).

---

[46] Stebick was sentenced principally to two years' probation with the first four months on home detention enforced by electronic monitoring.  (Dkt. 21).  Stebick admitted to his conduct and provided substantial assistance to the Government, resulting in the Government moving at sentencing for a downward departure pursuant to § 5K1.1.  (Dkt. 15).  At sentencing, the Court granted the Government's § 5K1.1 motion, departing down three levels, yielding a total offense level of 9.  (No. 08 Cr. 206 (W.D.N.Y.), Dec. 9, 2008 Minute Entry).

[47] Trowbridge was sentenced principally to two years' probation.  (Dkt. 15).  Trowbridge admitted to his conduct and provided substantial assistance to the Government, resulting in the Government moving at sentencing for a downward departure pursuant to § 5K1.1.  (Dkt. 10).  At sentencing, the Court granted the Government's § 5K1.1 motion, departing down five levels, yielding a total offense level of 8.  (No. 08 Cr. 206 (W.D.N.Y.), May 6, 2009 Minute Entry).

[48] The Government also made a § 5K1.1 motion at Tills' sentencing to depart downward by two levels; the court granted the motion but departed downward by five levels instead, yielding a total offense level of 13.  (No. 08 Cr. 242 (W.D.N.Y.), Dkt. 17, Aug. 7, 2009 Minute Entry).

Citing the conviction of this massage parlor owner for sex trafficking,[49] Combs argues that these defendants are comparatively more culpable than Combs because they paid for sexual acts with actual sex trafficking victims, not "the so-called 'victims' here." (Def. Mem. 142). In other words, because Tills and Trowbridge paid for sex with victims who were exploited by a third party—instead of exploiting the victims directly, as Combs did—Combs argues that he is entitled to a comparatively lesser sentence. This argument defies logic. Combs is plainly more culpable than these defendants by every metric. Stebick, Trowbridge, and Tills all received credit at sentencing for providing substantial assistance to the Government. Tills, the most culpable defendant, admitted to transporting women only six times over six years, while Combs transported men and women repeatedly for prostitution for more than a decade. Further, none of these defendants—unlike Combs—were alleged to have used manipulation, threats, or force in connection with their conduct.

Similarly, Charles Nabit, a 66-year-old prominent business owner, pleaded guilty to a Mann Act count related to paying approximately $90,000 to hire at least seven prostitutes for sex, including for one to travel with him to other states, from approximately 2017 until June 2020. (No. 21 Cr. 38 (D. Md.), Dkt. 13). Nabit received a sentence of 18 months' imprisonment—at the top end of the Guidelines range of 12 to 18 months' imprisonment.[50] (Dkt. 92, at 148-49). Nabit's

---

[49] The owner of the massage parlor also appears to have cooperated with the Government. On the Government's motion at sentencing, the court departed downward 8 levels pursuant to § 5K1.1, and although the defendant had pleaded guilty to an information alleging violations of 18 U.S.C. § 1591, she was sentenced below the mandatory minimum sentence to a term of 72 months' imprisonment. (No. 08 Cr. 106 (W.D.N.Y.), Nov. 19, 2008 Minute Entry).

[50] On October 19, 2022, having served approximately half of his sentence, Nabit was granted compassionate release due to pre-existing medical conditions putting him at high risk of severe illness from COVID-19. (No. 1:21 Cr. 38 (D. Md.), Dkt. 94).

conduct is similar to Combs's conduct in a few respects—Nabit provided drugs to victims despite knowing that they were addicted to narcotics, and he regularly filmed the commercial sex he purchased despite victims' protestations.  (Dkt. 13).  At sentencing, the court's observations regarding aspects of Nabit's offense are equally applicable to Combs—the court in that case noted that "there is a power dynamic here that cannot be ignored" because the victims were "particularly vulnerable" and Nabit "coerced through financial means these individual victims."  (Dkt 92, at 145, 150).  Nevertheless, there are many distinctions between Nabit and Combs, primarily that Nabit's case involved no threats of physical force and no allegations of violence, a point specifically acknowledged by the court at sentencing.  (Dkt. 92, at 146 ("It was all just an exercise of control . . . and I will acknowledge no threats of physical force, I did not observe any violence that was attributed to this defendant.")).

As with the Jester defendants, Combs asserts that Nabit was significantly more culpable because Nabit knew that the women whom he hired were sex trafficking victims, and Combs' sentence should reflect that difference.[51]  This is a distinction without a difference—in both cases, victims were exploited, in Nabit's case by the trafficker and Nabit, and in Combs's case by Combs alone.  Although Combs and Nabit both coerced vulnerable women into years of unwanted sex, the duration of Combs' criminal conduct (approximately 15 years) far exceeds Nabit's (approximately three-and-a-half years).  Most critically, however, although Nabit and Combs both preyed on vulnerable victims and exploited the power dynamics between them, Combs also used

---

[51] In December 2019, Nabit was served with a grand jury subpoena and interviewed in connection with a sex trafficking investigation of an individual associated with the prostitutes hired by Nabit, at which point the Government asserted at Nabit's sentencing that Nabit knew the Government believed that the victims were trafficked.  (Dkt. 92, at 16).  Nabit's conduct in continuing to hire prostitutes following his interview with the Government echoes Combs' continuing to have Hotel Nights with Jane after he was fully aware that he was under investigation for a host of federal crimes, including sex trafficking.

physical violence to do so—all of which he conceded at trial. Consequently, a much longer sentence is warranted for Combs than Nabit.

The core of the defendant's argument in support of an essentially time served sentence is that his conduct is so different from any prior Mann Act prosecution that leniency is warranted. (Def. Mem. 132). The defendant characterizes his conduct as "far less serious" than "run[ning] a brothel or [forc]ing anyone to engage in prostitution" or "engag[ing] in the conduct for his own commercial gain." (Def. Mem. 136). To the contrary, what makes the defendant's conduct even more egregious is that he was not violating the law out of necessity, desperation, or even greed. Instead, the defendant sought power and control. He used abusive tactics, including threats and physical violence, and his vast financial resources and network, to put Ventura and Jane in a position where they felt that they could not say no to unwanted sexual contact with male escorts. The defendant spent tens of thousands of his own money at every Freak Off or Hotel Night for days of his own sexual gratification without any consideration of his victims. (*See* Ex. A, at 1 ("These events were degrading and disgusting, leaving me with infections, illnesses, and days of physical and emotional exhaustion before he demanded it all again. Sex acts became my full-time job, used as the only way to stay in his good graces.")). Now, the defendant tries to escape accountability for his actions by saying that he did not do it for money he plainly did not need or suggesting that "independent, sophisticated women" like Ventura or Jane cannot be victimized. (Def. Mem. 136). These arguments are untrue, offensive to common sense, and should be outright rejected. A significant sentence of imprisonment is warranted for the defendant, a man who spent more than a decade manipulating, threatening, and using violence against Ventura and Jane as he transported them across the country to engage in sex with male escorts.

144

### C. The Need for Specific and General Deterrence and To Promote Respect for the Law Warrants a Substantial Term of Imprisonment

The need to afford specific and general deterrence and to promote respect for the law further supports imposing a sentence of no less than 135 months' imprisonment.

Specific deterrence warrants a significant sentence. The defendant engaged in the offense conduct for well over a decade—even when he knew he was under criminal investigation for that very conduct. Indeed, even after his residences were raided by federal agents in March 2024, the defendant continued to engage in criminal conduct for which he was ultimately convicted: he transported Jane for Hotel Nights in July and August 2024, gave her drugs, and directed her sexual encounters with escorts. Even after his physical abuse of Ventura was exposed to the world, he still violently attacked Jane. And even when he was taken into custody in September 2024, when his attorneys claimed that he was "waiting to be arrested," (Sept. 17, 2024 Tr. 21), he had all the necessary supplies for a Hotel Night in his hotel room: ketamine, MDMA, baby oil, Astroglide, mood lighting, and cash. The defendant has shown time and again that consequences that may deter others have no impact on him when he is faced with an opportunity to satisfy his own sexual urges, even at the cost of causing serious harm to those around him.

And while he maintains that he has now removed certain harmful substances from his life, (Def. Mem. 4, 44), it appears that the most intoxicating thing for the defendant is power. He weaponized that power over Ventura and Jane for years and years—causing lasting psychological harm. He weaponized that power over those in his professional and social orbit—through decades of assaults, threats, and violence. And he will undoubtedly continue to wield his power going forward if he is not deterred. By sentencing the defendant to a substantial number of years in prison, the Court will send a strong message to the defendant that he is not above the law—that he cannot use his power to commit further crimes and abuse additional victims.

145

The Court should be dubious of counsel's representations that the defendant "is committed to leading a completely law-abiding life.  He will never again engage in any type of conduct that comes close to crossing the line into criminal conduct."  (Tr. 153).  The record indicates that the defendant will say anything, with no regard for truth, as long as he stands to benefit.  For instance, in May 2024, when video surveillance of the defendant's assault on Ventura at the Intercontinental Hotel was leaked to CNN, the defendant took to Instagram where he claimed that he "took full responsibility," went to therapy and rehab, and asked God for mercy and grace.  (GX 9A-102). The defendant then "committed to be a better man."  (*Id.*).

Barely one month later—after the defendant committed to be a better man and fully aware that he was the subject of a federal investigation—the defendant kicked down five doors in Jane's home; lifted Jane off the floor by her neck in a chokehold; punched Jane in her head; kicked Jane's body; dragged Jane by her hair; and slapped Jane so hard that she fell down—and then invited an escort over for a Hotel Night.  Clearly, the therapy and rehab did not work in March 2016, and there is no reason to take the defendant at his word that he has "adequately address[ed] his addictions and mental health issues," (Def. Mem. 154), while spending barely a year in an institution that the defendant claims—erroneously, as explained below—is so "violen[t] and inhumane" that he deserves a reduced sentence, (Def. Mem. 149).  Rather, the Court should see counsel's representations for what they are: lip service.

At bottom, even after the pain suffered by the victims was laid bare at trial, the defendant had the audacity to blame Ventura and Jane— glamorizing his criminal activity as a "sex, drugs, and rock n' roll" story involving "enthusiastic and voluntary participants," (Def. Mem. 62, 81), and faulting them for his own violence, (Def. Mem. 61, 97).  This is especially galling given that a primary theme of his trial defense was *conceding* he was guilty of domestic violence.  (*See supra*

pp. 8). His claim now that he was only violent on "rare" occasions, (*see* Def. Mem. 61), which he suggests were provoked by Ventura and Jane, is defied by the trial record and reflects his total lack of acceptance for his role in the offense.[52] That the defendant seeks acceptance of responsibility points at sentencing—despite having failed to admit a role, however small, in the criminal conduct of which he stands convicted—should provide the Court no comfort that the defendant will change his ways. He is not a man who has been deterred.

The defendant's criminal history also supports the need for specific deterrence. While the Guidelines place the defendant in Criminal History Category I, he has two prior convictions arising from violent incidents. In 1995, he was convicted of criminal mischief after menacing a victim while carrying a firearm,[53] and in 1999 he was convicted of harassment after attacking and striking

---

[52] The trial record makes clear that the defendant's violence toward Ventura was pervasive. (*See, e.g.*, Tr. 763 (defendant hit Ventura on side of head after a dinner in New York City); Tr. 764 (defendant stomped on Ventura's face for the duration of a 10-minute car ride in Los Angeles); Tr. 777, 3249 (defendant attacked Ventura at Prince's house and then beat and threw luggage at her at a hotel afterward); Tr. 783 (defendant kicked Ventura in the back and threatened her life when he thought she was seeing Mescudi); Tr. 693, 2980-87, 3251-55, GX B-247-A (defendant slammed Ventura's head into the corner of her bedframe, slicing open her eyebrow); Tr. 794, 1598-1603, GX 9N-101, -102 (defendant dragged Ventura by the hair down a hallway and pushed her into the ground, causing her to hit her head on a brick); Tr. 796 (defendant punched and kicked Ventura, who was curled up underneath the bathroom toilet, during a party in Vegas); Tr. 3278-79 (defendant physically attacked Ventura in Cannes, France, which Ventura audio recorded and played for Mia and a hair stylist); Tr. 3271-72 (defendant attacked Ventura in Turks and chased her to Mia's room while Ventura screamed that he was going to kill her); Tr. 2989-90, 3004 (defendant grabbed Ventura by the hair in her apartment and pushed her out of the house); Tr. 3004 (defendant slapped Ventura across the face at the studio); Tr. 276-77 (defendant dragged Ventura by her hair during Freak Off and appeared to slap her as she screamed); Tr. 282-83 (defendant appeared to slap Ventura and slam her around before Ventura ran out of bedroom shaking during Freak Off); Tr. 576-77, GX 10C-115 (defendant hit Ventura in eye during Freak Off at the Intercontinental Hotel and then attempted to drag her back to the hotel room when she tried to leave)). In addition, the defendant alleges that there is "no evidence" he was violent over the past seven years, aside from his beating of Jane. (Def. Mem. 97). However, as noted in the Government's prior submissions, (*see* Dkt. 487, at 10), that is false.

[53] In New York City, the defendant threatened an individual taking pictures of vehicles that had NYPD parking placards. The victim saw the butt of a handgun in the defendant's right front coat

a victim with multiple objects.[54]  Despite being punished for conduct involving a firearm, the trial record made clear that the defendant continued to use firearms as a "scare tactic," (Tr. 474), including when he made Ventura carry a firearm in her handbag during a club appearance, when he took Capricorn Clark to "kill" Scott Mescudi, and when he attempted to confront his rival Suge Knight at Mel's Diner.  Those incidents took place years ago, but even in March 2024, law enforcement recovered two AR-15s with defaced serial numbers from the defendant's bedroom closet.  *See Kelly*, No. 19 Cr. 286 (E.D.N.Y. June 29, 2022), Dkt. 375, at 89 ("There were times in your life where many people might have taken a second look at what they were doing. . . . But it seems the only thing that you took from that experience was to try to figure out ways to hem your victims in, either with nondisclosure agreements or making humiliating tapes.").

Moreover, even the cloud of a federal criminal investigation did nothing to deter the defendant from continuing to engage in the offense conduct—likely because the defendant views himself as above the law.  (*See* Tr. 1708 (James testifying "[t]his is Mr. Combs' kingdom.  We're all here to serve in it."); PSR ¶ 82 ("Heavy is the head that wears the crown.  I used to call myself a king.  But I didn't act like a king.").  For years, the defendant ensured that his abuse was kept under wraps.  He threatened or fired staff who dared to question his abuse, including going so far as instructing an assistant to file a false police report, (Tr. 1862-63), and demanding that another assistant testify to a version of events that omitted his abuse of Ventura, (Tr. 3342-44).  He

---

pocket.  The defendant was charged with criminal mischief and was sentenced to a fine of $1,000 and an order of protection.  (PSR ¶ 155).

[54] In 1999, the defendant was charged with assault with intent to cause serious physical injury in New York after he had an argument with the victim and "punched, kicked, and struck the victim in the head and body with a champagne bottle, chair, and a telephone," resulting in the victim fracturing his elbow.  Although the records are unavailable, the defendant was reportedly sentenced to an anger management course.  (PSR ¶ 164).

implored Jane to adopt his false narrative of their time together after Ventura's lawsuit was filed. (PSR ¶¶ 48, 49). The defendant's respect for the law extends only so far as it can be used to benefit him.

The defendant has generally not disputed his extensive efforts at keeping his misconduct hidden but merely argues that he sought to avoid public attention, not law enforcement consequences. (*E.g.*, Tr. 150 (defendant paying "money to a security guard at the InterContinental so the footage would go away . . . was solely, solely related to preventing bad publicity.")). Irrespective of whether this argument makes any sense (which it does not), it misses the larger point. The defendant hid his girlfriend away in a hotel room as her injuries healed, he lied to his family, he threatened employees, and he paid off security guards. But, troublingly, at no point during those experiences did the defendant pause to seriously reflect on the harm he was causing others in the first place. At no point did he decide to stop. He knew he could always get away with his actions, so he just kept going.

The Government respectfully disagrees with Probation's conclusion that the fact that the defendant has not been arrested recently can be considered a mitigating factor. (*See* PSR at 71). The trial record makes clear that the defendant has continuously engaged in criminal activity from 2009 through his arrest in 2024. That is in large part because the defendant's criminal conduct took place behind closed doors, and he had the resources to distance himself from actual crime— he paid $100,000 in 2016 so there would be no evidence of his public assault of Ventura; when he assaulted Jane in 2024, he did so in the privacy of the $10,000 per month home he paid for; he had assistants purchase and pick up drugs, often in their own name or under an alias; and he had Ventura and Jane coordinate directly with escorts. The defendant should not be rewarded for his successful efforts to conceal his criminal activity.

149

The need for general deterrence also warrants a significant sentence. Particularly given that similarly situated defendants have received substantial sentences, as discussed *supra*, a substantial sentence must be given to send a message to abusers and victims alike that exploitation of and violence against women is met with real accountability. Victims who have the courage to report their abusers—especially abusers who have power, wealth, and influence—and relive the excruciating trauma of that abuse by testifying in court, should see that their efforts can result in meaningful accountability. And the Court's sentence should show that no one is above the law. *See Kelly*, No. 19 Cr. 286 (E.D.N.Y. June 29, 2022), Dkt. 375, at 90 (finding that sentence "must deter other people, any important person or celebrity, a powerful person who thinks, like you, that he or she is above the law because of who that person is"); *Maxwell*, No. 20 Cr. 330 (S.D.N.Y. June 28, 2022), Dkt. No. 737 at 92-93 (finding that weather a defendant is "wealthy or [a] case is high profile is not a basis for increasing punishment in any regard, but the rule of law demands, and this Court must ensure that, whether you are rich or poor, powerful or entirely unknown, nobody is above the law").

Several victims urge the Court to send a powerful message through a sentence in this case on behalf of victims everywhere:

- **Ventura**: "I hope that your sentencing decision reflects the strength it took for victims of Sean Combs to come forward. I hope that your decision considers the many lives that Sean Combs has upended with his abuse and control." (Ex. A at 1-2).

- **Regina Ventura, Ventura's mother**: "To sentence lightly in this case that involved such vicious abuses of our daughter[']s body, safety and dignity is to dismiss her very existence. To sentence lightly would also send a dangerous message. A sentence that is handed down in months instead of years, sends a message that such repulsive behavior can happen without meaningful consequence." (Ex. B at 1).

- **Capricorn Clark**: "I am afraid that Women and Girls in America feel less protected than ever watching what just happened . . . The last ray of light is that you provide justice to us. You have a chance to finally help him know that he cannot just do what he wants to people. There are repercussions and consequences." (Ex. D at 1).

150

- **Mia**: "Your Honor, I ask that you do justice through the sentence that you impose on October 3, 2025.  The defendant's wealth, power, and fame should not place him above the law.  These forces have shielded him for too long.  I ask you to deliver a sentence that reflects the full measure of harm that he has caused: the years of coercion, financial abuse, humiliation, physical and sexual violence, and the profound trauma that he has inflicted as a result.  I ask you to deliver a sentence that takes into account the ongoing danger my abuser poses to me, and to others.  A sentence that honors the truth, the pain, and the lives that have been destroyed.  A sentence that that gives us hope, protection, and justice." (Ex. C at 3).

- **Deonte Nash**: "Survivors deserve safety, the public deserves protection, and justice demands accountability."  (Ex. E at 4).

These are the voices of real people whose lives have been permanently altered by the defendant's insatiable need for power and sexual gratification.

### D.  The History and Characteristics of the Defendant Warrant a Substantial Term of Imprisonment

Section 3553(a) instructs the Court to look beyond the offense conduct to consider the history and characteristics of the defendant.  While a holistic view of the defendant certainly reveals a person who has achieved great professional success, it also reveals a person whose abuse has tormented many beyond those impacted by the offense conduct.

The defendant's violence towards Ventura and Jane was not aberrational.  He did not limit his reign of physical abuse to his girlfriends; he abused individuals in his orbit for decades, including his employees and Ventura's friends—assaulting them, threatening them, and throwing objects at them.  Like Nash, whom the defendant physically assaulted on several occasions when Nash did not comply with the defendant's directives.  (Tr. 2990, 3008-09).  Or Morgan, who was hit in the head by a wooden hanger thrown by the defendant, leaving her with a concussion.  (Tr. 1619-21).  Or Mia, who witnessed the defendant's violence against Ventura, and whom the defendant sexually assaulted and physically abused.  (Tr. 3205, 3248-49, 3254, 3276, 3280-82, 3306, 3310-15, 3322-26, 3331-37).

The defendant's abuse of those around him was so routine that he perpetuated a culture of fear.  Jourdan Atkinson, the defendant's former personal chef, described an abusive work environment dominated by fear, in which the defendant "weaponized food, sleep, and breaks," leaving Atkinson to be "diagnosed with stress induced alopecia, and extreme anxiety attacks." (Ex. F at 2).[55]  The defendant's conduct has had a lasting impact on Atkinson; she "buried" her memories of the abuse "in order to survive" and has found it traumatizing "[h]aving to unearth the past [and] relive it all again."  (Ex. F at 1).  Similarly, Capricorn Clark's tenure working for the defendant "altered the course of [her] life and [has] haunted [her] for years."  (Ex. D at 1).  Clark states that she "paid with [her] life for the events that transpired" in December 2011 when the defendant banged on her door with a gun.  When the defendant fired her thereafter, he had Clark blacklisted from the industry, leaving Clark no choice but to work outside the industry to support herself and her nonverbal autistic son, or to grovel to the defendant for employment.  (*Id*.).  Clark saw firsthand the defendant's "violence" and his "absolute power," both of which went unchecked because of his wealth and fame.  (*Id*.).

---

[55] The Government respectfully requests that limited information in Jourdan Atkinson's victim impact statement (Ex. F) be filed under seal.  The information that the Government seeks to file under seal relates to (1) medical information of third-parties or the defendant; (2) the name of a third party who is described as having had sexual relations with the defendant; and (3) the details of another third party's sexual assault, including the name of the third party.  These redactions are narrowly tailored to protect the defendant's and other third-parties' privacy interests and to protect third parties from harassment and undue embarrassment particularly due to the public nature of this case.  *See United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2020 WL 7646891, at *1 (S.D.N.Y. Dec. 23, 2020) ("[T]he proposed redactions here are narrowly tailored to serve substantial interests, including, most importantly, third parties' personal privacy interests."); *United States v. King*, No. 10 Cr. 122 (JGK), 2012 WL 2196674, at *3 (S.D.N.Y. June 15, 2012) (holding that sentencing submissions should be redacted to avoid disclosure of records containing medical information regarding third parties because the "need to protect the privacy of these third parties is a compelling").

The defendant's thirst for power and control also seriously harmed Mia, his former assistant, who experienced "manipulation, humiliation, coercion, and violence" at the defendant's hands. (Ex. C at 1). Mia's pain was palpable on the witness stand when she described the harrowing sexual and psychological abuse that she endured for years. For Mia, working for the defendant was a "never-ending nightmare . . . He controlled every part of my life . . . He created a life where nothing was mine, and I lived in constant fear because his moods could determine my right to exist." (*Id*.). Mia has deep psychological scars from the trauma inflicted by the defendant—she suffers from "anxiety, hypervigilance, dissociation, self-doubt, and an ongoing struggle to reclaim [her] autonomy," and she lives with "chronic and severe PTSD, depression, and crippling anxiety," as well as "deeply intrusive thoughts, derealization, panic attacks, night terrors, and insomnia." (*Id.*).

In short, the defendant's violence was indiscriminate and unpredictable and is properly considered in determining a sentence. He created and perpetuated a culture of fear, retribution, and impunity—one drastically at odds with the kumbaya picture he paints of his professional and social relationships in his sentencing submission.

### E.  The Defendant's Arguments for A Lenient Sentence Are Unpersuasive

#### 1.  Conditions at the MDC Do Not Warrant a Lenient Sentence

The defendant argues that the conditions at the MDC during his incarceration have made his sentence "substantially more punitive." (Def. Mem. 151). But, as detailed below, there is no indication that the defendant personally experienced most of the conditions about which he complains; and even if he had, it is now well known that conditions at the MDC have continuously

and significantly improved since the defendant's incarceration there. Ultimately, MDC conditions do not warrant a lenient sentence.

As he did in his motion for bail following his conviction, (*see* Dkt. 483 at 2, 10), the defendant cites to *Chavez* and *Colucci* for the proposition that a reduced sentence is warranted due to conditions at the MDC. However, as discussed in the Government's prior filings, (*see* Dkt. 487 at 7), conditions at the MDC have improved dramatically since those cases were decided more than a year ago.[56] Indeed, courts in this District have begun to consistently note these improvements, which occurred throughout the period in which the defendant has been incarcerated. *See, e.g.*, *United States v. Carazas-Pinez*, No. 23 Cr. 346 (JPC) (Sept. 19, 2025 sentencing); *United States v. McCullum*, No. 24 Cr. 667 (JPC) (Aug. 29, 2025 sentencing); *United States v. Burgos*, No. 24 Cr. 650 (LTS) (May 21, 2025 plea); *United States v. Reshard*, No. 24 Cr. 392 (JMF) (May 14, 2025 sentencing); *United States v. Alexander et al.*, No. 24 Cr. 676 (VEC) (Jan. 16, 2025 bail argument).

Further, as the Government noted in its prior submission, (Dkt. 487 at 8), the defendant first raised complaints about the conditions at the MDC *after* he was convicted at trial. This stands in stark contrast to defense counsel's repeated praise for the MDC and its treatment of the defendant in the months leading up to trial. (*See, e.g.*, Oct. 10, 2024 Tr. at 27 ("The MDC has been very responsive to us."); Tr. 1729 ("The MDC has been very accommodating to us in many, many ways."); Tr. 8158 ("I want to thank the MDC. The MDC gave us good access to him.")). By failing to alert the Government in real time to any of the issues now included in his sentencing submission, defense counsel has deprived the Government, as well as MDC staff and the Court,

---

[56] *Colucci* was decided in August 2024, while *Chavez* was decided several months prior in January 2024.

154

of any opportunity to investigate and remediate whatever alleged conditions may have existed (if any).  These unsubstantiated claims should not now, at the very last stage of the case in the District Court, form the basis for a lenient sentence.

In addition, the arguments set forth by the defense regarding the conditions at the MDC are highly misleading or outright inaccurate, as detailed below.

- Contrary to the defendant's claims, lockdowns are no longer "common" at the MDC.  (Def. Mem. 150).  As the defendant himself acknowledges, he is currently housed in a dorm-style unit, and there are therefore no cells in which inmates could be locked.  A "lockdown" in such a setting simply restricts inmates' movement past certain demarcations on the floor.  Regardless, the BOP has confirmed that there have not been any lockdowns in the defendant's unit during his incarceration.

- Similarly, the defendant's claim that he has no access to sunlight or fresh air is false.  (*Id.*).  The BOP has confirmed that every day the defendant has access to a recreational space that is partially exposed to allow sunlight and airflow at MDC, which also offers recreational and wellness activities.

- The defendant's claim that there are bugs in the food at the MDC is similarly baseless, (*id.*), as it stems from an undated, unsourced, unexplained, and uncorroborated photograph published by the news media several months ago without giving the MDC or Government any advanced notice or opportunity to investigate.   The BOP has since conducted a thorough investigation into food contamination, and none of these allegations have been corroborated.

- The defendant's claim that he has been on suicide watch for the entirety of his stay at the MDC is false.  (*Id.*).  The BOP confirmed that the defendant has been on suicide watch for just over one week *in total* since his arrival at the MDC: seven days in September 2024 when he was first incarcerated, and two days in July 2025 during jury deliberations and following his conviction.

- The defendant also claims that he has limited access to clean water, no access to functioning washing machines or dryers, and experiences extreme temperatures at the MDC.  (*Id.*).  To the contrary, the BOP has confirmed that the defendant's unit has a spout that provides hot and cold drinking water and a functioning washer/dryer.  In addition, the defendant's unit has not received complaints about extreme temperatures.  This summer, cooling units were replaced so fans were provided to inmates during that process, which lasted under two weeks.

- The defendant's claim that he has been deprived of proper medical treatment—raised for the first time in his sentencing submission, (*id.*)—is also unsupported by his medical records.  The defendant, ███████████████████████████████████████████

██████████████████████████████████████████████████ ██████████████████████████████ [57]

The defendant's other arguments are similarly without merit and should be rejected by the Court.[58]

### 2. The Defendant's Psychiatric Evaluations Are Unreliable and Do Not Warrant a Lenient Sentence

The defendant also argues for a lenient sentence based on claims that he has been rehabilitated and will continue to rehabilitate once released from custody. (Def. Mem. 157-58). In support of this contention, the defendant submits two reports by Drs. Krueger and Kaplan stating, in substance, that the defendant is ████████████████████████████.[59]  These

---

[57] The Government can provide the defendant's MDC medical records to the Court upon request, which contain multiple entries related to ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████

[58] The Government also notes that while the defendant elsewhere in his submission contends that "there are no other educational courses offered at MDC" aside from his course "Free Game with Diddy," (Def. Mem. 40-41), that too is false. The MDC offers a plethora of educational courses, including GED programming, post-secondary courses through a partnership with Columbia University, and adult continuing education classes. Although the defendant has not enrolled in any educational offerings during his time at the MDC, he completed the Strategies for Change, Relationships and Personal Responsibility, Quiet Moments, and Managing My Emotions programs. (PSR ¶ 4).

[59] It should be noted that Dr. Krueger states that "a concern exists that the risk for domestic violence might not be captured by these instruments" absent "victim outcry, or by notification to police, or by an arrest." (Def. Ex. 66 at 18).

Moreover, the defendant cites to the BOP's Psychology records for the proposition that the defendant is a "low risk of sexual abusiveness." (Def. Ex. 29 at 15). However, as noted in the defendant's BOP records, that assessment is limited to his conduct *while incarcerated* and notes that the defendant "MAY engage in this type of behavior in the future." (*Id.*).

reports, however, are unreliable. While it appears that the doctors were provided with Ventura

and Jane's testimony, it does not appear that they were provided with any other testimony in the

case, including testimony regarding incidents of violence and sexual abuse involving other trial

witnesses. (Def. Ex. 66 at 2-4, Def. Ex. 67 at 1-3). Moreover, they were provided with only a

couple dozen pages of Ventura and the defendant's vast text communications. The excerpts

provided to the doctors appear to be blatantly self-serving, such as a handful of sexually explicit

communications from Ventura to the defendant cherry picked out of thousands of pages of their

communications. And the doctors do not appear to have been provided with *any* of the defendant's

communications with Jane. This skewed sample of records calls into question the reliability and

conclusions of these reports.

Further, it is clear that the defendant—whose interviews form the central basis of these

medical evaluations—is an untrustworthy narrator. In his many interviews with Dr. Krueger, the

defendant denied all wrongdoing for any of the charges with which he was ultimately convicted.

(Def. Ex. 66 at 6). He described his relationship with Ventura as involving mutual violence, noting

"███████████████████████████████████," despite the clear evidence that

he was the primary aggressor. (*Id.* at 5). The defendant also claimed to be "█████████

███████████████████," and denied any other accusations of sexual harassment or of

sexual crimes," (*Id.* at 9), despite numerous pending civil lawsuits against him, many of which

involve allegations of sexual misconduct, (*see* PSR ¶ 224). The defendant also claimed that he

was interested in "████████████ and ████████████████

███ (Def. Ex. 66 at 9). That figure simply cannot square with the testimony of Ventura and Jane,

who testified that Freak Offs or Hotel Nights often lasted several days and sometimes took place

weekly. Whether because of self-delusion or self-preservation, the defendant told a myriad of

half-truths when speaking with these doctors, further undermining the conclusions of their evaluations.  In light of this fact, and the skewed record provided to the doctors, it is not surprising that the conclusions reached by both doctors echo the defendant's own narratives and are entirely inconsistent with the record.  (See, e.g., Def. Ex. 66 at 13 (finding that ███████████████ ████████████████████████████████████████████████████████████ ███████ ")).

     The defendant's attempts to blame his violent conduct on his history of substance abuse is also misguided.  The defendant told Drs. Krueger and Kaplan that █████████████████ █████████████████████████████████."  (Def. Ex. 66 at 7).  Yet, several of the defendant's most violent acts did not appear to have occurred under the influence of any drugs.  (See, e.g., Tr. 242 (Florez testifying that the defendant did not appear drunk or high at the time of the Intercontinental assault); Tr. 5178, 5796, 800 (noting that the defendant took champagne and tequila but had not otherwise taken narcotics prior to his assault of Jane in June 2024).  Indeed, while Dr. Krueger points to the defendant's ██████████████████████ as a potential cause of his violence—noting that ██████████████████████████ " these medications, (Def. Ex 66 at 14)—in reality it was the defendant who sought out excessive amounts of these prescription drugs, including by having doctors prescribe medications in the names of his employees when he exceeded the regular dose, (Tr. 1770, 2570-71, 6826).

     On this record, the Court should reject any conclusions drawn from these assessments regarding the defendant's proclivity for sexual abuse or violence.  Further, the defendant's false statements to his evaluating doctors about his criminal conduct and personal history emphasizes the need for the sentence imposed to account for specific deterrence.  *See Kelly*, No. 19 Cr. 286 (E.D.N.Y. June 29, 2022), Dkt. 375 at 89 (stating that the court had "also considered the evidence

of [the defendant's] mitigation reports. You did not have to speak with a psychologist. But in my view, your efforts to explain away your conduct -- and some things were just demonstratively false -- tells me that you will not be deterred. This sentence must act as that deterrent."). Ultimately, the best predictor of future performance is past behavior. And the defendant has shown time and again his inability to cease his abusive behavior, even in the face of potential criminal, professional, and financial penalties.

### 3. The Defendant's Personal Circumstances Do Not Warrant a Lenient Sentence

Finally, the defendant asks the Court to consider his family circumstances and community contributions in imposing sentence. The Court can and should consider these facts under the Section 3553(a) factors. However, the defendant must also be held to account for the fact that he used that same wealth and power to enable his crimes: to fly escorts on hundreds of occasions, to keep Ventura and Jane under the influence of narcotics for days at a time, and to leverage his resources to threaten his victims. Further, although many defendants come before sentencing courts with compelling mitigating factors contextualizing why they turned to crime, the defendant has enjoyed a remarkable life of privilege. He disclaims a history of abuse or neglect as a child and has had the full support of family throughout his life. (PSR ¶ 173). Yet, despite this, the defendant nevertheless engaged in abusive conduct for over a decade.

The defendant also urges the Court to impose a lenient sentence due to the "collateral consequences" on his business empire and professional legacy that have resulted from his criminal case. (Def. Mem. 151). The Court should reject any argument that these collateral harms to the defendant warrant a lenient sentence. Now, faced with the repercussions for his actions, the defendant casts himself as the victim. He is not the victim. The Court should focus on the very real effects that the defendant's conduct had on the lives of the actual victims, *his* victims. A significant sentence is especially warranted here, where the defendant does not appear to

appreciate the harm inflicted on these individuals or the seriousness of his conduct.  *See United States v. Marcos Mendez Perez*, No. 13 Cr. 31 (S.D.N.Y. Feb. 13, 2014), Dkt. 231 at 38 (sentencing defendant who was convicted of Travel Act violation related to role in prostitution business to statutory maximum (an above Guideline sentence) based, in part, on need for "personal deterrence" because while the defendant has accepted the "difficult situation that he has put himself" and his family in, he has not "fully accepted the harm that he did to the female victims here"), *affirmed by United States v. Mendez-Perez*, 607 F. App'x 39, 45 (2d Cir. 2015).

### F.  The Court Should Impose the Maximum Financial Penalties to Reflect the Seriousness of the Offense

In addition to a sentence of at least 135 months' imprisonment, the Government respectfully requests that the Court impose a fine of $500,000, the maximum fine allowable under the statute.  *See* 18 U.S.C. § 3571(b) (setting $250,000 as the maximum fine for each felony conviction); PSR ¶ 235.  In imposing a fine, a district court must consider the factors set forth in Sections 3553(a), 3571, and 3572, as well as the Guidelines factors and range.  *See United States v. Elfgeeh*, 515 F.3d 100, 136 (2d Cir. 2008).  The Guidelines provide that a district court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."  U.S.S.G. § 5E1.2(a).  With an offense level of 42, the guideline contemplates an advisory range of $50,000 to $500,000 for each count.  *See* U.S.S.G. § 5E1.2(c)(3).

Here, a significant fine is needed to deter the defendant from future criminal conduct and to reflect the seriousness of the defendant's offenses.  *See* U.S.S.G. § 5E1.2(d)(1).  Such a fine is also needed to provide just punishment.  *Id.*  A fine is particularly fitting here since the defendant's access to wealth enabled his crimes.  It was used to transport and pay for escorts; obtain narcotics; and pay for his vast staff to serve his every need.  Given the defendant's substantial means, a hefty

fine is certainly warranted in this case. *See Maxwell*, No. 20 Cr. 330 (AJN) (S.D.N.Y. June 28, 2022), Dkt. 737, at 97 (ordering fine of $750,000, totaling the maximum fine of $250,000 per count of conviction); *Kelly*, No. 19 Cr. 286 (E.D.N.Y. June 29, 2022), Dkt. 375, at 92 (imposing fine of $100,000).

The parties continue to discuss forfeiture, and expect to present the Court with a consent preliminary order of forfeiture in advance of sentencing.

Finally, Ventura is not seeking restitution in this case. At this time, the Government understands that Jane is not seeking restitution. *See* 18 U.S.C. § 3664(d)(5) (sentencing court has 90 days from date of sentencing to order restitution).

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a sentence of 135 months' imprisonment is appropriate.

Dated:       New York, New York
             September 29, 2025

                              Respectfully submitted,

                              JAY CLAYTON
                              United States Attorney

                    By:      _____/s/_____
                              Meredith Foster
                              Emily A. Johnson
                              Christy Slavik
                              Madison Reddick Smyser
                              Mitzi Steiner
                              Assistant United States Attorneys
                              (212) 637-2310/-2409/-1113/-2381/-2284