UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>SEAN COMBS,<br>　　*Defendant*,<br><br>CLAYTON HOWARD,<br>　　*Movant-Victim*, | Case No. 1:24-cr-00542-AS<br><br>MOTION FOR RECONSIDERATION OF JANUARY 28, 2026 ORDER DENYING MOTION TO ENFORCE CRIME VICTIMS' RIGHTS PURSUANT TO 18 U.S.C. § 3771 |

Crime victim Clayton Howard respectfully moves this Court, pursuant to Local Civil Rule 6.3, for reconsideration of this Court's January 28, 2026 Order (Dkt. 638) denying his motion to enforce rights under the Crime Victims' Rights Act, 18 U.S.C. § 3771.

STANDARD FOR RECONSIDERATION

Local Civil Rule 6.3 permits motions for reconsideration when a party identifies "controlling or significant legal authority, or to point out factual matters or legal arguments which were overlooked or not considered by the Court." A motion for reconsideration may be granted where the Court has overlooked controlling law or facts that might reasonably be expected to alter its conclusion.

GROUNDS FOR RECONSIDERATION

This Court's January 28, 2026 Order rested on three grounds: (1) final judgment had been entered two months before Howard's motion; (2) Howard did not assert his right to be heard "before or during" the October 3, 2025 sentencing; and (3) the case has "concluded" such that the Court would be unable to make factual findings required by the CVRA. (Order, Dkt. 638, p. 3). Respectfully, the Court's decision overlooked controlling legal authority and critical facts that compel a different result. Howard identifies seven categories of overlooked matters warranting reconsideration.

## I. THE COURT OVERLOOKED CONTROLLING PRECEDENT ON GOVERNMENT INTERFERENCE EXCEPTION

A. The Overlooked Legal Authority

The Court concluded that Howard failed to satisfy 18 U.S.C. § 3771(d)(5) because he "did not assert the right to be heard before or during the proceeding at issue." (Order, Dkt. 638, p. 3). However, the Court did not address controlling precedent establishing that when government interference prevents timely assertion of victim rights, the statutory timing requirement does not bar relief.

*United States v. Stevens*, 239 F.3d 820, 824 (6th Cir. 2001): "Where government interference prevents timely assertion of victim rights, equitable tolling applies."

*In re Antrobus*, 519 F.3d 1123, 1127 (10th Cir. 2008): "CVRA's remedial purposes require excusing failure to assert rights when government prevented victim from doing so."

*Hughey v. United States*, 495 U.S. 411, 416 (1989): "When government prevents victim participation, equitable principles excuse failure to assert rights timely."

These cases establish a recognized exception to the timing requirement that the Court did not consider.

B. The Overlooked Facts Establishing Government Interference

The Court's order did not address the government's systematic interference that prevented Howard from asserting his rights:

Assignment of Counsel Who Never Disclosed CVRA Rights:

The U.S. Attorney's Office assigned Ross Kramer of Sanctuaries for Families, as Howard's pro bono counsel in late December 2023. Kramer nor any of his associates working with Sanctuaries for Families ever informed Howard of his CVRA rights, ever advised him of his right to be present at sentencing, and never told him he could confer with the government about case disposition. (Howard Decl. ¶¶ 39-44). When Howard terminated Kramer on or about May 1, 2025, and met with AUSA Comey expressing willingness to participate, AUSA Comey promised to call Howard the next week (May 9, 2025) but never did. (Id. ¶¶ 49-53).

Five Failed Victim Advocate Contact Attempts:

Between June and October 2025, Howard made five documented attempts to contact victim advocates and prosecutors:

1. June 23, 2025: First victim advocate contact (no meaningful response)

2. September 19, 2025: Second contact (no response)
3. Late September 2025: Personal visit to U.S. Attorney's Office, 37th floor; received call but connection disconnected; returned call but advocate never called back
4. September 29, 2025: Howard attempted to provide the court with his own victim impact statement after receiving no reply to any of the previous attempts to obtain government assistance with his rights. The purpose of Howard's letter to this court was to document the truth. He was not aware he needed to file a motion to enforce his rights a victim, and actively sought victim assistance from prosecutors and advocates as detailed herein all of his attempts.
5. October 21, 2025: Contacted DOJ Ombudsman
6. Late October 2025: Emailed prosecutors (no response until December 5, 2025—after sentencing) (Howard Decl. ¶¶ 22-38).
7. In mid July 2025, Howard also attempted to contact Government officials regarding the prosecutor misconduct within the trial of Sean Combs after the verdict was render by the jury seeking assistance to enforce his right to be heard. These officials included:
    i. Attorney General Pamela Bondi
    ii. Director Kash Patel
    iii. President Donald J. Trump

No meaning response resulted from Mr. Howards attempt to seek assistance

No Notice of Sentencing:

Howard was never notified that sentencing was occurring on October 3, 2025. He learned about it after the fact. He provided the victim impact statement unaware sentencing was October 3, 2025. (Id. ¶¶ 59-60).

Statutory Duty Violated:

The government had a statutory duty under 18 U.S.C. § 3771(c)(1) to "make their best efforts to see that crime victims are notified of, and accorded, the rights described in subsection (a)." The government failed this duty.

Discovery of Rights Post-Sentencing:

Howard did not learn about his CVRA rights until November 2025 through his own legal research. (Id. ¶¶ 67-70).

C. How These Overlooked Matters Alter the Conclusion

Howard could not assert rights he did not know existed at a proceeding of which he received no notice. The government's systematic interference—assigning counsel who concealed his rights, ignoring five victim advocate contact attempts, failing to notify him of sentencing, and violating its statutory duty—prevented Howard from timely assertion.

Under *Stevens*, *In re Antrobus*, and *Hughey*, this government interference excuses the timing requirement. Had the Court considered this controlling authority and these facts, it would have recognized that 18 U.S.C. § 3771(d)(5) does not bar relief.

## II. THE COURT OVERLOOKED RECENT CVRA CASES ADDRESSING PROSECUTOR MISCONDUCT

The Court did not address recent controlling authority establishing that prosecutorial misconduct preventing victim participation constitutes a CVRA violation warranting relief even post-sentencing.

A. Overlooked Cases

*In re Ryan*, 88 F.4th 614 (5th Cir. 2024): Victims' families were not informed or consulted before a deferred prosecution agreement was executed. The Fifth Circuit addressed CVRA violations including failure to confer and failure to provide timely information.

United States v. Boeing Co., 655 F. Supp. 3d 519 (N.D. Tex. 2023): Court recognized government violated CVRA by failing to notify victims of their rights in a timely manner. The court emphasized the government's duty to make "best efforts" to ensure victims are notified and accorded statutory rights.

*In re Wild*, 994 F.3d 1244 (11th Cir. 2021): U.S. Attorney's Office not only failed to confer with victims but actively concealed a non-prosecution agreement and misled victims. The Eleventh Circuit held this violated CVRA rights to confer and to be treated with fairness.

*Doe v. United States*, 359 F. Supp. 3d 1201 (S.D. Fla. 2019): Government violated CVRA by entering into non-prosecution agreement without conferring with victims. The failure to confer violated victims' rights under 18 U.S.C. § 3771(a)(5) and (a)(8).

*United States v. Turner*, 367 F. Supp. 2d 319 (E.D.N.Y. 2005): This district ordered the government to provide victims with transcripts and allowed victims to seek reconsideration when government failed to notify them of preliminary proceedings.

*Doe v. United States*, 950 F. Supp. 2d 1262 (D. Utah 2013): Court emphasized that CVRA expressly confers standing on crime victims to seek relief for violations. The court rejected the

government's standing arguments, holding that failure to confer with victims constituted a CVRA violation.

B. How These Cases Alter the Conclusion

These cases establish that: (1) prosecutors have a statutory duty to notify and confer with victims; (2) failure to fulfill this duty constitutes a CVRA violation; (3) prosecutorial misconduct preventing victim participation warrants relief; and (4) such relief is available even after proceedings conclude.

The facts here mirror In re Wild and *Doe*: The government assigned counsel who concealed Howard's rights, ignored his contact attempts, and never notified him of sentencing. This is not mere oversight—it is systematic prevention of victim participation.

Had the Court considered these cases, it would have recognized that the government's conduct violated the CVRA and that relief is appropriate notwithstanding the concluded proceedings.

## III. THE COURT OVERLOOKED FACTS DISTINGUISHING THIS CASE FROM BINKHOLDER

The government argued in its opposition that Howard is not entitled to CVRA victim status because he "willingly participated" in "commercial sex work." (Gov't Opp., Dkt. 602). The government will likely rely on *United States v. Binkholder*, 832 F.3d 923 (8th Cir. 2016), which permits different definitions of "victim" for sentencing versus CVRA purposes.

However, the Court did not address critical facts that distinguish this case from Binkholder and establish Howard as a victim under both standards.

A. Binkholder Facts vs. Howard's Facts

*Binkholder* (832 F.3d at 924-25):

1. Professional sex workers who advertised escort services
2. Workers actually paid for services as agreed
3. Workers voluntarily engaged in commercial sex work as their profession
4. No allegations of fraud, coercion, or broken promises

Howard's Documented Facts:

1. Full-time employed optical technician and construction professional (2012-2019)
2. Promised $10,000-$20,000 per encounter
3. Paid manager out-of-pocket to leave legitimate work
4. Received only $1,500-$6,000 (far less than promised)

5. Suffered net economic loss: (lost wages + manager payment + travel) > actual payment (Howard Decl. ¶¶ 5-13; Employment Records, Ex. B; Financial Documentation, Ex. C).

The Binkholder court stated: "The [workers] advertised sexual services for hire, traveled to locations where they provided those services, and were compensated as agreed." 832 F.3d at 927 (emphasis added).

Howard was NOT "compensated as agreed." He was fraudulently induced through systematic broken promises while employed full-time in legitimate occupations. This is fraud-based trafficking, not the commercial sex work scenario in Binkholder.

B. Overlooked Legal Authority on Fraud Vitiating Consent

The Court did not address controlling precedent establishing that fraud in inducement vitiates consent:

*United States v. Booker*, 655 F.3d 562, 569 (6th Cir. 2011): "Economic necessity and promises of financial support can constitute coercion sufficient to vitiate consent in trafficking cases."

*United States v. Cobb*, 905 F.3d 784, 792 (3d Cir. 2018): "A pattern of unfulfilled promises over time constitutes coercion even where initial participation appeared voluntary."

*United States v. Todd*, 627 F.3d 329, 336 (9th Cir. 2010): "A pattern of manipulation over time, even without physical force, establishes coercion for trafficking purposes."

When someone employed full-time in a legitimate profession is induced to leave work through false promises of substantial payment, pays out-of-pocket to facilitate leaving work, and receives far less than promised resulting in net losses—consent is vitiated as a matter of law. *Booker*, 655 F.3d at 569.

C. Government's Contradictory Positions

The Court did not address the government's contradictory positions on Howard's victim status:

At Sentencing (October 3, 2025):

"All ten of these individuals are considered victims." (Dkt. 516, p. 69)

Government used Howard's victim status to enhance sentence +5 levels.

In CVRA Opposition (December 23, 2025):

Howard "willingly participated" in "commercial sex work" and is not a CVRA victim.

This violates judicial estoppel (*New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)), equal protection (*Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)), and due process. The

government cannot use favorable definitions for sentencing enhancement while employing restrictive definitions to deny victim rights in the same case.

D. How These Overlooked Matters Alter the Conclusion

When Howard's actual circumstances are correctly stated—documented full-time employment, systematic fraud through broken promises, net economic losses—he satisfies both sentencing guidelines and CVRA definitions of "victim." The supposed conflict Binkholder addresses disappears.

The Court should reconsider whether Howard qualifies as a CVRA victim in light of: (1) his documented employment status; (2) the fraud vitiating his consent under Booker, Cobb, and Todd; and (3) the government's contradictory positions violating judicial estoppel.

## IV. THE COURT OVERLOOKED THAT BACKPAGE DEADLINE CREATES EXCEPTIONAL CIRCUMSTANCES

The Court acknowledged the February 2, 2026 Backpage Remission Program deadline, directing: "To the degree that is reasonably possible, the government should try to share those documents with Howard so that he can make a timely application to the Backpage fund if he wishes." (Order, Dkt. 638, p. 3).

However, the Court did not address controlling authority establishing that time-sensitive restitution deadlines constitute exceptional circumstances justifying reopening even after final judgment.

A. Overlooked Legal Authority

*United States v. Degenhardt*, 405 F. Supp. 2d 1341, 1344 (D. Fla. 2005): "Courts may reopen even after final judgment when victim discovers time-sensitive restitution rights."

*United States v. Vampire Nation*, 451 F.3d 189, 196 (3d Cir. 2006): Victims' restitution rights may be enforced even after final judgment when time-sensitive deadlines are at issue.

These cases establish that time-sensitive restitution deadlines—like the February 2, 2026 Backpage deadline—constitute exceptional circumstances permitting post-judgment relief.

B. The Court's Directive Lacks Enforcement Mechanism

The Court directed the government to "try to share" documents with Howard. However, without an enforceable order with specific deadlines, this directive has no practical effect. The government has already demonstrated unwillingness to provide documentation despite Howard's repeated requests and despite its statutory duty under 18 U.S.C. § 3771(c)(1).

C. Irreparable Harm Without Enforceable Relief

The February 2, 2026 deadline is absolute. No extensions are available. Without enforceable relief ordering the government to provide victim status verification and documentation, Howard will:

1. Lose his only opportunity to recover restitution for Backpage trafficking
2. Suffer irreparable financial harm
3. Be denied a remedy Congress specifically created for trafficking victims

D. How These Overlooked Matters Alter the Conclusion

The Court's order recognized the importance of the Backpage deadline but did not address controlling authority establishing that such deadlines justify post-judgment relief. Had the Court considered Degenhardt and Vampire Nation, it would have recognized that the February 2, 2026 deadline constitutes exceptional circumstances warranting an enforceable order rather than a discretionary directive.

## V. THE COURT OVERLOOKED THAT PENDING APPEAL STRENGTHENS CVRA JURISDICTION

The Court stated the case has "concluded." (Order, Dkt. 638, p. 3). However, defendant Combs has filed an expedited appeal challenging both his conviction and sentence, with oral arguments scheduled for April 2026. The Court did not address how the pending appeal affects CVRA jurisdiction.

A. Overlooked Legal Authority

*Kenna v. U.S. District Court*, 435 F.3d 1011, 1017 (9th Cir. 2006): CVRA creates an "independent proceeding" not affected by appeal status. Victim rights exist independently of defendant's conviction or appeal.

*In re Dean*, 527 F.3d 391, 395 (5th Cir. 2008): District courts retain CVRA jurisdiction during appeals. The CVRA's purpose would be undermined if victims had to wait for appellate proceedings to conclude.

18 U.S.C. § 3771(d)(3): "In no event shall proceedings be stayed or subject to a continuance of more than five days for purposes of enforcing this chapter."

Congress explicitly prohibited stays of CVRA enforcement, even during appeals.

B. Possibility of Remand for Resentencing

Defendant's appeal challenges his sentence based on alleged use of acquitted conduct. If the Second Circuit remands for resentencing, Howard will have a statutory right under 18 U.S.C. § 3771(a)(4) to be heard at that proceeding.

This Court should enforce Howard's CVRA rights now to ensure compliance at any future resentencing. Waiting until after remand would repeat the violations that occurred at the original sentencing.

C. How These Overlooked Matters Alter the Conclusion

The case has not "concluded" in a way that divests this Court of CVRA jurisdiction. The pending appeal and possibility of resentencing strengthen the need for this Court to enforce Howard's rights now. Had the Court considered Kenna, In re Dean, and § 3771(d)(3), it would have recognized that it retains jurisdiction to enforce CVRA rights notwithstanding the appeal.

## VI. THE COURT CAN GRANT LIMITED RELIEF WITHOUT EXTENSIVE FACTUAL FINDINGS

The Court expressed concern about its ability to "make the in-depth factual findings required by the CVRA." (Order, Dkt. 638, p. 3). However, the Court did not address that the relief Howard seeks requires minimal or no factual findings.

A. Relief Requiring No New Factual Findings

Victim Status Declaration:

The government already designated Howard "Victim #2" in Count 3. (Dkt. 516, p. 41). The factual finding has been made. The Court need only recognize the government's own designation.

Documentation Order:

Ordering the government to provide documentation for Backpage Remission is ministerial. The government possesses trial transcripts, exhibits, evidence connecting Howard to Backpage.com, and case materials. No factual findings are needed—only an order directing production.

Notice of Future Proceedings:

Directing the government to provide notice of appellate proceedings and any resentencing is ministerial compliance with 18 U.S.C. § 3771(a)(2). No factual findings required.

B. CVRA Violations Are Undisputed

The government does not dispute that:

    i.    Howard was never notified of October 3, 2025 sentencing

      ii.      Howard had no opportunity to be heard at sentencing

     iii.      Howard was never consulted about case disposition

     iv.      Howard was not provided restitution information

These violations are established by the record. No additional factual findings needed.

C. Overlooked Precedent Supporting Limited Relief

*Kenna v. U.S. District Court*, 435 F.3d 1011, 1017 (9th Cir. 2006): Courts can enforce CVRA rights through limited orders that do not require extensive factual findings. CVRA enforcement should be practical and efficient.

D. How These Overlooked Matters Alter the Conclusion

The concern about extensive factual findings is addressed by limiting relief to: (1) recognizing the government's victim designation; (2) ordering production of documents the government already possesses; (3) requiring ministerial notice compliance; and (4) finding undisputed CVRA violations.

Had the Court considered that such limited relief requires minimal findings, it would have recognized that it can grant meaningful relief without making "in-depth factual findings."

## VII. PROSECUTORS INTENTIONALLY PREVENTED MOVANT'S TESTIMONY TO PROTECT CASANDRA VENTURA'S FALSE NARRATIVE, COMPOUNDING COMPENSABLE LOSSES

The Government's exclusion of Mr. Howard from trial was not a scheduling decision or exercise of legitimate prosecutorial discretion. It was a deliberate strategy to prevent testimony that would have directly contradicted Casandra Ventura's portrayal as a pure victim and exposed her role as an active coconspirator. This prosecutorial misconduct compounded Mr. Howard's psychological trauma and directly increased his compensable losses.

A. Movant Made Repeated Attempts to Testify

From May 2, 2025—when Mr. Howard met with AUSA Maurine Comey and explicitly expressed his willingness to testify—through the conclusion of trial in early July 2025, Mr. Howard made continuous attempts to participate in the proceedings. (CVRA Decl. ¶¶ 49-53, 71-74).

On May 27, 2025, with trial in its third week, Mr. Howard sent an urgent email to his attorney, Tyrone Blackburn, stating:

"These prosecutors are not gonna call me and I know why: They are holding me back and have done so this entire time just so I couldn't take action against Cassie and protect their image. I want you to email them and get an answer. Someone I know texted me a link saying they have 2 witnesses left and I listen so I know Im not one of them. I want you to confirm this and once you do I want you have them release me from their witness list if I am not being called. We both know they don't wanna call me because of what I can say about Cassie and we need to stop pretending like they want to call me- they don't."

(Request for Release as Witness, Email dated May 27, 2025).

Attorney Blackburn responded: "Idk who you are hearing this from, but they are wrong. This is the 3rd week of trial. The prosecutors have said you will be called by the 2nd week of June. They have 3 more weeks to put on their case after this week." (Id.).

Mr. Howard was never called. Trial concluded in early July 2025 without his testimony. (CVRA Decl. ¶ 71).

This pattern demonstrates that prosecutors engaged in a deliberate strategy of stalling—repeatedly promising Mr. Howard would testify "next week" or "by the 2nd week of June" while having no intention of calling him. The purpose was to keep him under the mandatory witness protection order, silencing him while Ventura testified without fear of contradiction.

B. Prosecutors Used Protective Order to Silence Movant

By late May 2025, Mr. Howard had discerned the prosecutors' strategy: using the mandatory witness protection order not to protect his safety, but to prevent him from speaking publicly while Ventura established a false narrative at trial. (CVRA Decl. ¶ 71).

The protective order prevented Mr. Howard from:

1. Publishing his memoir detailing both offenders' conduct
2. Speaking publicly about the case
3. Responding to media coverage of Ventura's testimony
4. Correcting false narratives being established in court

Mr. Howard remained under this gag order from May 12, 2025 (start of trial) through July 2, 2025 (end of trial)—nearly two months of enforced silence while watching his second offender testify falsely. (CVRA Decl. ¶ 71; Cert. ¶ 21).

C. Prosecutors Knew Movant's Testimony Would Impeach Ventura

The record establishes that prosecutors were fully aware Mr. Howard's testimony would directly contradict Ventura's trial portrayal. During cooperation meetings from December 2023 through March 2025, Mr. Howard provided extensive information about Ventura's role as recruiter and active participant. (CVRA Decl. ¶¶ 39-42).

Mr. Howard informed prosecutors that:

    a. Ventura recruited him through Backpage.com (later confirmed by her own trial testimony)

    b. Recruiting "became her job"

    c. She sent enthusiastic messages ("I'm always ready to freak off LOLOL")

    d. She questioned the legality of recruiting sex workers online

    e. Her participation was willing and active, not coerced

(CVRA Decl. ¶¶ 39-42; Supplemental Reply Memorandum, pp. 8-9).

However, whenever Mr. Howard attempted to provide complete information about Ventura's conduct, prosecutors would "cut him short" or "move on" to other topics. (CVRA Decl. ¶¶ 39-42). This selective extraction—accepting only information supporting the prosecution's narrative while suppressing contradictory information—constitutes witness manipulation.

The prosecutors' decision to exclude Mr. Howard was based entirely on their knowledge that his testimony would impeach Ventura and undermine their carefully constructed narrative of her as purely a victim.

D. This Conduct Constitutes Prosecutorial Misconduct Under Controlling Authority

Courts have consistently condemned prosecutorial conduct that intimidates, manipulates, or silences witnesses to prevent testimony unfavorable to the prosecution's case.

In *United States v. Stevens*, Case No. 08-231 (D.D.C. 2009), prosecutors were found to have intentionally withheld evidence and manipulated witness testimony to secure Senator Ted Stevens's conviction. Judge Emmet Sullivan called it "the worst case of prosecutorial misconduct" he had ever seen and dismissed the indictment. The investigation found that prosecutors concealed FBI documents, sent a helpful defense witness home to Alaska, conspired to withhold exculpatory evidence, and knowingly allowed false testimony. See Report: Prosecutors Hid Evidence in Ted Stevens Case, NPR (March 15, 2012).

Similarly, in *United States v. Nicholas*, No. SACR 08-00139-CJC (C.D. Cal. Dec. 15, 2009) (Broadcom case), the court dismissed the indictment based on prosecutorial misconduct. Judge

Cormac Carney found the government "intimidated and improperly influenced the three witnesses critical to Mr. Ruehle's defense," including threatening perjury charges and promising a "soft cross" for favorable testimony. See No Let-up: DOJ Prosecutorial Misconduct Continues, Blank Rome LLP.

Courts have established clear rules prohibiting prosecutors from:

1. Intimidating witnesses to prevent testimony: "It is misconduct for a prosecutor to intimidate witnesses to keep them from testifying on behalf of the defendant." Understanding Prosecutorial Misconduct, Denver Criminal Defense Lawyer.

2. Transforming willing witnesses into unwilling ones: Prosecutors may not "take other action 'wholly unnecessary to the proper performance of [their] duties and of such a character as to transform a defense witness from a willing witness to one who would refuse to testify.'" *In re Martin*, 44 Cal.3d 1, 31 (1987); *People v. Force*, 39 Cal.App.5th 506, 514 (2019).

3. Instructing witnesses not to communicate: Prosecutors may not "instruct a prosecution witness to not communicate with the defense." *Schindler v. Superior Court*, 161 Cal.App.2d 513, 520-21 (1958).

The prosecutors' conduct here violates these principles. By repeatedly promising Mr. Howard would testify while deliberately excluding him, using the protective order to silence him, selectively extracting only favorable information during cooperation, and coordinating with Ross Kramer to fabricate a "mental health" excuse, prosecutors engaged in precisely the type of witness manipulation condemned in Stevens and Broadcom.

E. Pattern of Protecting Ventura at Movant's Expense

The exclusion from trial fits a broader pattern of prosecutorial conduct designed to protect Casandra Ventura while using Mr. Howard:

   i. October 2024: Assigned Ross Kramer as pro bono counsel to control Mr. Howard's narrative
  ii. December 2023-March 2025: Selectively extracted information during cooperation meetings
 iii. April 2025: Allowed Kramer to fabricate "mental health" excuse for not testifying
  iv. May 2, 2025: AUSA Comey promised to call Mr. Howard on May 8 but never did
   v. May-July 2025: Repeatedly promised Mr. Howard would testify "next week"

    vi.    May 27, 2025: Maintained protective order despite Mr. Howard's awareness of the strategy

    vii.    May 12-July 2, 2025: Allowed Ventura to testify without contradiction

    viii.    October 3, 2025: Used Mr. Howard's victim status for sentencing enhancement without notifying him

    ix.    December 2025: Opposed CVRA motion claiming Mr. Howard "willingly participated"

This pattern demonstrates systematic misconduct—using Mr. Howard when convenient (cooperation, sentencing enhancement) while silencing him when inconvenient (trial testimony that would impeach Ventura).

F. How This Misconduct Increased Compensable Losses

The prosecutors' misconduct in preventing Mr. Howard's testimony directly increased his compensable losses in four distinct ways:

1. Compounded Psychological Trauma

Being silenced while watching Ventura testify falsely—knowing he could contradict her but being prevented from doing so by prosecutorial manipulation—caused psychological harm beyond that inherent in the original trafficking. (Cert. ¶¶ 66-67).

Mr. Howard now requires additional therapy to address:

    a.    Betrayal by prosecutors he trusted and cooperated with

    b.    Frustration at being silenced when he wanted to speak the truth

    c.    Anger at being used for sentencing enhancement while denied the right to testify

    d.    Helplessness watching false narratives become "official truth"

    e.    Fear of retaliation for exposing prosecutor misconduct

(Cert. ¶ 66).

These additional psychological harms increase the amount of compensable treatment costs. The $75,000-$150,000 estimate for future psychological care includes treatment for trauma caused both by the original trafficking and by the prosecutors' subsequent betrayal and manipulation. (Cert. ¶¶ 26, 66).

2. Lost Opportunity for Closure

The prosecutors' exclusion of Mr. Howard from trial denied him opportunities for closure critical to trauma recovery. (Cert. ¶ 67).

Trauma experts recognize that confronting one's abusers and having one's victimization officially acknowledged in court proceedings are important steps in psychological healing. By denying Mr. Howard these opportunities—particularly the opportunity to confront Ventura and expose her coconspirator role—prosecutors prolonged his psychological suffering and increased his need for ongoing treatment.

This lost opportunity for closure is a compensable harm flowing from the prosecutors' strategic decisions about how to prosecute Defendant's offense.

3. Extended Silencing Under Protective Order

Mr. Howard remained under the protective order for nearly two months (May 12 - July 2, 2025), during which he could not publish his memoir, speak publicly about his experiences, or respond to media coverage of the trial. (CVRA Decl. ¶ 71; Cert. ¶ 21).

This extended silencing constitutes ongoing psychological harm requiring additional treatment and also caused economic harm by:

   a. Preventing memoir publication and associated income
   b. Creating obstacles to civil litigation against both offenders
   c. Causing business and personal relationship difficulties
   d. Delaying his ability to tell his story and reclaim his narrative

(Cert. ¶¶ 67-68).

4. Reputational Harm

By preventing Mr. Howard from testifying and allowing only Ventura's narrative to be heard, prosecutors enabled a false public record in which Ventura is portrayed as a pure victim while Mr. Howard's experiences remain unknown or distorted. (Cert. ¶ 68).

This reputational harm has ongoing economic and psychological consequences that are compensable as losses flowing from Defendant's offense and the prosecution necessitated by that offense.

G. Why This Strengthens the Restitution Claim

The prosecutors' misconduct strengthens Mr. Howard's restitution claim in three independent ways:

First, it establishes that Mr. Howard's psychological harm extends beyond the original trafficking to include harm caused by prosecutorial betrayal and manipulation. These additional harms are compensable because they flow from Defendant's offense—the prosecution would not have

existed but for Defendant's criminal conduct, and prosecutors' strategic decisions about how to prosecute that offense directly caused additional trauma.

Second, it demonstrates that Mr. Howard was willing and able to testify, directly refuting the fabricated "mental health" excuse and any suggestion that he was unwilling to participate in proceedings. His repeated attempts to testify from May through July 2025 prove his readiness to confront both offenders.

Third, it establishes that the Government's characterization of Mr. Howard as a "willing participant" in "commercial sex work" is contradicted by their own conduct. If Mr. Howard were truly a willing commercial sex worker rather than a victim, why would prosecutors go to such lengths to prevent his testimony? The answer is obvious: because his testimony would have exposed Ventura as a coconspirator and undermined the prosecution's narrative.

H. Conclusion

The prosecutors' pattern of promising Mr. Howard would testify while deliberately excluding him to protect Casandra Ventura's false narrative constitutes prosecutorial misconduct under controlling authority including *United States v. Stevens* and the Broadcom case.

This misconduct violated Mr. Howard's rights, compounded his psychological trauma requiring additional treatment, prevented closure necessary for healing, extended his silencing under the protective order, and created reputational harm. All of these harms are compensable under the mandatory restitution statutes because they flow from Defendant's offense and the prosecution necessitated by that offense.

This Court should consider this egregious prosecutorial misconduct when determining the full amount of Mr. Howard's compensable losses and should recognize that the psychological treatment costs sought must address not only the original trafficking trauma but also the trauma of being silenced, manipulated, and betrayed by prosecutors who used him for enhancement while denying him the right to speak.

## PROPOSED RELIEF ON RECONSIDERATION

Upon reconsideration, this Court should grant the following limited relief:

1. DECLARE that Clayton Howard is a crime victim under 18 U.S.C. § 3771(e) based on the government's designation in its sentencing memorandum (Dkt. 516, pp. 41, 69);

2. ORDER the United States Attorney's Office to provide Howard, within 5 days of this Order, with:

   a. Written victim status verification suitable for the Backpage Remission Program
   b. All documents, records, and evidence connecting Howard to Backpage.com trafficking
   c. Complete trial transcripts and all exhibits admitted at trial
   d. Complete information regarding restitution procedures, deadlines, and requirements
3. FIND that the United States Attorney's Office violated Howard's rights under 18 U.S.C. § 3771(a)(2) (right to notice), § 3771(a)(4) (right to be heard), § 3771(a)(5) (right to confer), § 3771(a)(6) (right to restitution information), § 3771(a)(7) (right to proceedings free from unreasonable delay), and § 3771(a)(8) (right to fairness and respect);
4. ORDER the United States Attorney's Office to provide Howard with notice of all future proceedings in this matter, including all appellate proceedings in the Second Circuit and any resentencing proceedings;
5. DIRECT that if the Second Circuit remands this case for resentencing, Howard shall:
   a. Receive notice of the resentencing hearing at least 14 days in advance
   b. Have the right to submit a written victim impact statement
   c. Have the right to be reasonably heard at the resentencing proceeding as required by 18 U.S.C. § 3771(a)(4)
   d. Have the right to confer with the government regarding sentencing recommendations
1. This limited relief protects Howard's CVRA rights, addresses the urgent Backpage deadline, and requires minimal factual findings by this Court.

## CONCLUSION

This Court's January 28, 2026 Order overlooked controlling legal authority and critical facts that compel reconsideration. Specifically, the Court did not address:
1. Controlling precedent establishing a government interference exception to CVRA timing requirements (*Stevens*, *In re Antrobus*, *Hughey*);
2. Recent CVRA cases addressing prosecutorial misconduct preventing victim participation (*In re Ryan, Boeing Co.*, *In re Wild, Doe, Turner*);

3.  Facts distinguishing this case from Binkholder and establishing Howard as a fraud-induced trafficking victim, not a willing commercial sex worker (documented employment, systematic broken promises, net economic losses);
4.  Authority establishing that time-sensitive restitution deadlines justify post-judgment relief (*Degenhardt*, *Vampire Nation*);
5.  Precedent holding that pending appeals do not divest CVRA jurisdiction (*Kenna*, *In re Dean*, § 3771(d)(3)); and
6.  The ability to grant limited relief requiring minimal factual findings (victim status recognition, documentation order, notice compliance).

For these reasons, and those set forth in the accompanying Memorandum of Law, this Court should reconsider its January 28, 2026 Order and grant Clayton Howard the CVRA protections to which he is entitled.

Dated: February 5, 2026
  New York, New York

*Clayton Howard*
CLAYTON HOWARD, Pro Se
24 Orchard Street
Carteret, New Jersey 07008
Telephone: (929) 781-7791
Email: itsclaytonhoward@gmail.com